**Appeal No. 17-1886**

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**ICON HEALTH & FITNESS, INC., a Delaware corporation,**

*Plaintiff-Appellant,*

**v.**

**POLAR ELECTRO OY, a Finnish company, POLAR ELECTRO, INC., a Delaware corporation,**

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF UTAH IN 1:11-CV-00167-BSJ, JUDGE BRUCE S. JENKINS

**CORRECTED JOINT APPENDIX**

LARRY R. LAYCOCK
DAVID R. WRIGHT
TYSON K. HOTTINGER
**MASCHOFF BRENNAN P.L.L.C.**
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 297-1851

*Attorneys for Plaintiff-Appellant*

June 10, 2017

# TABLE OF CONTENTS

Page(s)

Fed. R. Civ. P. 12(c) Judgment

Filed March 27, 2017 ........................................................................Appx1

Memorandum Decision and Order

Filed March 10, 2017 ........................................................................Appx2

U.S. Patent No. 6,701,271

N/A.....................................................................................................Appx21

Docket Sheet from District Court Proceedings
(Fed. Cir. R. 30 (a)(2)(A)(i))

N/A.....................................................................................................Appx40

Polar Electro Oy and Polar Electro Inc.'s Motion for Judgment
on the Pleadings

Filed June 7, 2016 ............................................................................Appx64

Ex. 1 to Motion for Judgment on the Pleadings
(U.S. Patent 6,701,271)

Filed June 7, 2016 ............................................................................Appx85

ICON Health & Fitness, Inc.'s Opposition to Polar Electro Oy and
Polar Electro Inc.'s Motion for Judgment on the Pleadings

Filed October 28, 2016 ...................................................................Appx111

Declaration of Tyson K. Hottinger in Support of ICON Health &
Fitness, Inc.'s Opposition to Polar Electro Oy and Polar Electro
Inc.'s Motion for Judgment on the Pleadings

Filed October 28, 2016 ...................................................................Appx142

Ex. A to the Declaration of Tyson K. Hottinger
(Letter dated May 2, 2016)

Filed October 28, 2016 ....................................................................Appx144

Ex. B to the Declaration of Tyson K. Hottinger
(Letter dated May 18, 2016)

Filed October 28, 2016 ....................................................................Appx148

Ex. C to the Declaration of Tyson K. Hottinger
(Letter dated July 25, 2016)

Filed October 28, 2016 ....................................................................Appx152

Declaration of Dr. David Brienza in Support of ICON Health &
Fitness, Inc.'s Opposition to Polar Electro Oy and Polar
Electro Inc.'s Motion for Judgment on the Pleadings

Filed October 28, 2016 ....................................................................Appx157

Ex. A to the Declaration of D. David Brienza (Curriculum Vitae)

Filed October 28, 2016 ....................................................................Appx164

ICON Health & Fitness, Inc.'s Request for Judicial Notice in
Support of ICON Health & Fitness, Inc.'s Opposition to
Polar Electro Oy and Polar Electro Inc.'s Motion for Judgment
on the Pleadings

Filed October 28, 2016 ....................................................................Appx198

Ex. 1 to ICON's Request for Judicial Notice
(Office Action Summary)

Filed October 28, 2016 ....................................................................Appx204

Ex. 2 to ICON's Request for Judicial Notice
(Reply to Office Action)

Filed October 28, 2016 ....................................................................Appx222

Ex. 3 to ICON's Request for Judicial Notice (Issue Notification)

 Filed October 28, 2016 ...................................................................Appx241

Ex. 4 to ICON's Request for Judicial Notice
(Response to Non-final Office Action)

 Filed October 28, 2016 ...................................................................Appx243

Ex. 5 to ICON's Request for Judicial Notice
(Office Action Summary)

 Filed October 28, 2016 ...................................................................Appx262

Ex. 6 to ICON's Request for Judicial Notice
(Response to Non-final Office Action)

 Filed October 28, 2016 ...................................................................Appx281

Ex. 7 to ICON's Request for Judicial Notice (Issue Notification)

 Filed October 28, 2016 ...................................................................Appx297

Ex. 8 to ICON's Request for Judicial Notice
(Corrected Request Ex Parte Reexam)

 Filed October 28, 2016 ...................................................................Appx299

Ex. 9 to ICON's Request for Judicial Notice
(Order Granting Request Ex Parte Re)

 Filed October 28, 2016 ...................................................................Appx317

Ex. 10 to ICON's Request for Judicial Notice
(Patent Owner's Statement)

 Filed October 28, 2016 ...................................................................Appx327

Ex. 11 to ICON's Request for Judicial Notice (Office Action)

 Filed October 28, 2016 ...................................................................Appx350

Ex. 12 to ICON's Request for Judicial Notice
(Ex Parte Reexam Interview Summary)

Filed October 28, 2016 ....................................................................Appx366

Ex. 13 to ICON's Request for Judicial Notice
(Patent Owner's Interview)

Filed October 28, 2016 ....................................................................Appx369

Ex. 14 to ICON's Request for Judicial Notice (Amendment)

Filed October 28, 2016 ....................................................................Appx373

Ex. 15 to ICON's Request for Judicial Notice (Notice of Intent)

Filed October 28, 2016 ....................................................................Appx406

Ex. 16 to ICON's Request for Judicial Notice
(Comments on Statement)

Filed October 28, 2016 ....................................................................Appx413

Ex. 17 to ICON's Request for Judicial Notice
(Ex Parte Reexam Certificate)

Filed October 28, 2016 ....................................................................Appx416

Ex. 18 to ICON's Request for Judicial Notice
(Request for Inter *Partes* Reexam)

Filed October 28, 2016 ....................................................................Appx421

Ex. 19 to ICON's Request for Judicial Notice (Office Action)

Filed October 28, 2016 ....................................................................Appx464

Ex. 20 to ICON's Request for Judicial Notice (Order)

Filed October 28, 2016 ....................................................................Appx473

Ex. 21 to ICON's Request for Judicial Notice (Amendment

Filed October 28, 2016 ....................................................................Appx484

Ex. 22 to ICON's Request for Judicial Notice (Comments)

    Filed October 28, 2016 ....................................................................Appx526

Ex. 23 to ICON's Request for Judicial Notice
    (Action Closing Prosecution)

    Filed October 28, 2016 ....................................................................Appx561

Ex. 24 to ICON's Request for Judicial Notice (Amendment B)

    Filed October 28, 2016 ....................................................................Appx639

Ex. 25 to ICON's Request for Judicial Notice (Comments)

    Filed October 28, 2016 ....................................................................Appx694

Ex. 26 to ICON's Request for Judicial Notice
    (Right of Appeal Notice)

    Filed October 28, 2016 ....................................................................Appx719

Ex. 27 to ICON's Request for Judicial Notice
    (Third Party Requesters' Notice)

    Filed October 28, 2016 ....................................................................Appx757

Ex. 28 to ICON's Request for Judicial Notice
    (Notice of Cross Appeal)

    Filed October 28, 2016 ....................................................................Appx760

Ex. 29 to ICON's Request for Judicial Notice (Brief)

    Filed October 28, 2016 ....................................................................Appx763

Ex. 30 to ICON's Request for Judicial Notice (Brief on Appeal)

    Filed October 28, 2016 ....................................................................Appx807

Ex. 31 to ICON's Request for Judicial Notice (Respondent Brief)

    Filed October 28, 2016 ....................................................................Appx843

Ex. 32 to ICON's Request for Judicial Notice (Respondent Brief)

    Filed October 28, 2016 ...................................................................Appx873

Ex. 33 to ICON's Request for Judicial Notice (Examiner's Answer)

    Filed October 28, 2016 ...................................................................Appx895

Ex. 34 to ICON's Request for Judicial Notice (Rebuttal Brief)

    Filed October 28, 2016 ...................................................................Appx899

Ex. 35 to ICON's Request for Judicial Notice (Rebuttal Brief)

    Filed October 28, 2016 ...................................................................Appx914

Ex. 36 to ICON's Request for Judicial Notice (Decision on Appeal)

    Filed October 28, 2016 ...................................................................Appx924

Ex. 37 to ICON's Request for Judicial Notice (Order)

    Filed October 28, 2016 ...................................................................Appx964

Ex. 38 to ICON's Request for Judicial Notice (Notice of Intent)

    Filed October 28, 2016 ...................................................................Appx969

Ex. 39 to ICON's Request for Judicial Notice
(Inter *Partes* Certificate)

    Filed October 28, 2016 ...................................................................Appx976

Polar Electro Oy and Polar Electro Inc.'s Reply in support of their
    Motion for Judgment on the Pleadings

    Filed December 12, 2016 .................................................................Appx979

Transcript of January 19, 2017 Hearing

    Filed January 20, 2017 ...................................................................Appx995

Polar Electro Oy and Polar Electro Inc.'s Supplemental Brief
    in Support of their Motion for Judgment on the Pleadings

    Filed January 27, 2017 .................................................................Appx1047

ICON Health & Fitness, Inc.'s Supplemental Brief in Opposition
to Polar's Motion for Judgment on the Pleadings

Filed February 3, 2017 ................................................................Appx1055

Provisional Order Granting Defendants' Motion for Judgment
on the Pleadings

Filed February 8, 2017 ................................................................Appx1066

ICON Health & Fitness, Inc.'s Objections to Defendants' Proposed
Memorandum Opinion & Order Regarding Polar Electro O
and Polar Electro Inc.'s Motion for Judgment on the
Pleadings

Filed February 28, 2017 ..............................................................Appx1067

Ex. A to ICON's Objections to Proposed Order (Proposed Order)

Filed February 28, 2017 ..............................................................Appx1078

Ex. B to ICON's Objections to Proposed Order
(Proposed Judgment)

Filed February 28, 2017 ..............................................................Appx1101

Notice of Proposed Memorandum Opinion & Order Regarding
Polar Electro Oy and Polar Electro Inc.'s Motion for Judgment
on the Pleadings

Filed March 1, 2017 ....................................................................Appx1103

Notice of Proposed Judgment by Polar Electro Oy and Polar
Electro Inc.'s Motion for Judgment on the Pleadings

Filed March 1, 2017 ....................................................................Appx1125

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Utah

| | | |
|---|---|---|
| ICON HEALTH AND FITNESS, INC. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:11-cv-00167-BSJ |
| POLAR ELECTRO OY et al. | ) | |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

☑ other:   IT IS ORDERED AND ADJUDGED that judgment be entered in favor of the defendants, and plaintiff's claim
against defendants for infringement of U.S. Patent No. 6,701,271 is dismissed with prejudice.

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision
was reached.

☑ decided by Judge   Bruce Sterling Jenkins _____ on a motion for

judgment on the pleadings, pursuant to Fed. R. Civ. P. 12 (c)

Date:   March 27, 2017 _____

CLERK OF COURT

_____

*Signature of Clerk or Deputy Clerk*

**Appx1**

FILED
2017 MAR 10 PM 12:02
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ICON HEALTH & FITNESS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>POLAR ELECTRO OY et al.,<br><br>Defendants. | MEMORANDUM OPINION & ORDER REGARDING POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS<br><br>Case No.: 1:11-cv-00167-BSJ<br><br>Honorable Bruce S. Jenkins |

Pending before the Court is Defendants', Polar Electro Oy and Polar Electro Inc. (collectively, "Polar"), Motion for Judgment on the Pleadings filed pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 147) ("Motion"). Polar contends that certain claims of U.S. Patent No. 6,701,271 ("'271 patent") are directed to patent-incligible subject matter and are, therefore, invalid under 35 U.S.C. § 101 ("Section 101"). For the reasons discussed below, the Court grants Polar's Motion.

### I.    Procedural Background

On November 18, 2011, ICON Health & Fitness, Inc. ("Icon") filed a Complaint against Polar Electro Oy ("Polar Oy") asserting infringement of U.S. Patent No. 7,789,800 ("'800 patent") and the '271 patent. (Dkt. No. 1). On June 8, 2012, Icon filed an amended complaint adding Polar Electro, Inc. ("Polar Inc.") and asserting infringement of an additional patent, U.S. Patent No. 6,921,351 ("'351 patent"). (Dkt. No. 9). The case was stayed with respect to the '800 patent and the '271 patent pending finalization of reexamination proceedings for those patents. (Dkt. No. 51). The Court entered a scheduling order for the case concerning the '271 patent after finalization of the '271 patent reexamination. (Dkt. No. 141).

After entry of the scheduling order, Polar filed its Motion, requesting that the Court find that claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 of the '271 patent are directed to patent-

1

**Appx2**

ineligible subject matter and thus invalid under 35 U.S.C. § 101. (Dkt. No. 147). Icon filed an opposition ("Opposition") (Dkt. No. 166) together with two declarations: (1) a Declaration of Tyson K. Hottinger (Dkt. No. 167), along with three letters related to alleged discovery disputes between the parties; and (2) a Declaration of Dr. David Brienza. (Dkt. No. 168). With its Opposition, Icon also filed a Request that the Court take judicial notice of two groups of documents. The first group consists of the prosecution history of two patents that are unrelated to the asserted '271 patent: (1) the prosecution history file wrapper of U.S. Patent Application No. 11/545,018, which issued as U.S. Patent No. 8,512,238; and (2) the prosecution history file wrapper of U.S. Patent Application No. 13/418,781, which issued as U.S. Patent No. 9,149,213. The second group of documents includes portions of the two separate reexaminations of the '271 patent: (1) the *ex parte* reexamination of U.S. Patent No. 6,701,271 that was assigned Control No. 90/013,409; and (2) the *inter partes* reexamination of U.S. Patent No. 6,701,271 that was assigned Control No. 95/002,337. (Dkt. No. 169). Polar filed a reply brief in support of its Motion (Dkt. No. 171) and shortly thereafter a Notice of Errata. (Dkt. No. 174).

On January 19, 2017, the Court held a hearing during which Icon presented arguments based on new cases it had not previously cited. The Court allowed Polar to file a short response to Icon's arguments related to the new cases, which Polar filed shortly after the hearing. (Dkt. No. 178). In response, Icon filed a Supplemental Opposition Brief. (Dkt. No. 180). Neither party sought construction of any claim terms in its briefing on the Motion.

## II.    The '271 Patent

### A.    Technological Background

Based on a review of the '271 patent and the parties' briefing, the Court arrives at the following conclusions concerning the '271 patent. First, the '271 patent generally discloses a method and system:

> for providing feedback [that] includes receiving data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determining an evaluation of the data [or course of action]; and providing a notification regarding the evaluation [or course of action] to a device"

2

**Appx3**

(*See e.g.*, Dkt. No. 147, Ex. A, '271 patent col. 2:11-28).

The disclosed method reflects three fundamental actions: (1) receiving information regarding physical characteristic(s) of subjects; (2) evaluating, or determining a course of action based on, the characteristic(s); and (3) providing a notification of the evaluation/course of action. (*See* Dkt. No. 147, Ex. A, Figs. 1 and 2).

Second, the '271 patent broadly defines the terms used to describe and to claim the disclosed method via examples. With respect to "physical characteristic," the '271 patent gives examples, stating that it "might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them." (*See e.g.* Dkt. No. 147, Ex. A, '271 patent Abstract; col. 1:57-64; col. 4:22-23, 53-58).

Third, the '271 patent gives examples of the "determining an evaluation" such that it "may be or include summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc. some or all of the raw physical characteristic data received." (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56-66).

Fourth, with respect to "determining a course of action," the '271 patent shows that the course of action can be either of an actor such as a teacher or entertainer, or of a subject such as a student or an audience member. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:27-30; col. 8:14-23, 26-29, 51-55, and col. 9:13-17). The '271 patent gives examples of a person reading stories or giving a lecture. In those examples, the person is provided with feedback on the stories or on the parts of the lecture that the audience liked best, or on what story ending they might prefer. *Id*. Another example provided by the '271 patent is a course of action to get subjects to do something, or to improve the chances of the subjects actually doing something. *Id*. In the Background of the Invention, the '271 patent provides examples of situations where it might be "desirable to have information regarding how a subject or a group of subjects feels about information being delivered or presented to them or how the subjects react while information is being delivered or

3

**Appx4**

presented to them." (Dkt. No. 147, Ex. A, col. 1:17-21). For example, the "Background of the

Invention, states:

> [A] teacher may wish to know if the students in her class understand the
> material the teacher is discussing. A lecturer may wish to know what
> portions of his lecture the audience members find most interesting.
> Alternatively, the lecturer may want to have a better idea of when to take a
> break. An entertainer may wish to know what ending to provide to a story
> or song medley being presented to an audience.

(Dkt. No. 147, Ex. A, col. 1:22-29).

The '271 patent gives another example in the context of a person giving a presentation:

> [A]ssume a speaker is giving a presentation to an audience of ten people
> and that the speaker may want to direct the presentation along one of
> several potential themes depending on the interest of the audience. In the
> method of the present invention, information regarding each of the
> audience member's heart rates, posture, etc. may be obtained and used to
> help determine which of the themes the audience members are the most
> interested in. Once the information is communicated to the speaker, the
> speaker can direct the presentation appropriately.

(Dkt. No. 147, Ex. A, col. 4:2-11).

The speaker receives feedback information regarding the audience, such as posture (e.g., they are

slumping in their seats) or facial response (e.g., they are yawning); the speaker can then make a

decision based upon the information. For example, it might be time for the speaker to take a

break, speak up, or move to a more rousing topic.

Fifth, the '271 patent gives examples of a "notification" such that it "may be or include

an email message, instant message communication, electronic signal or other communication

(e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible

sound, a visual display, a voice message, etc." (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16). The

notification can be any format. (*See e.g.*, Dkt. No. 147, Ex. A, col. 8:37-45).

Sixth, the '271 patent discloses that no unique or specific hardware or software is needed

to implement the disclosed method, stating, for example, that "embodiments of the present

invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt.

No. 147, Ex. A, col. 12:25-27). Indeed, the '271 patent discloses that implementation of the

disclosed method could be:

4

**Appx5**

> implemented in many different ways using a wide range of programming techniques as well as general-purpose hardware or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus, implementation of the disclosed method can be via conventional technology used conventionally.

## B.   The Asserted Claims

In accordance with LR 2.3, the asserted claims are: 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 ("Asserted Claims").[1] (Dkt. No. 167-2, p. 3). During reexamination of the '271 patent, independent claim 1 was cancelled. (Dkt. No. 147-1, Ex. 1, p. 22 of 26). All of the Asserted Claims depend directly or indirectly from claim 1, which reads:

> A method for providing feedback, comprising:
>
>> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
>>
>> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
>>
>> providing a notification regarding said evaluation to a device.

Because all of the Asserted Claims depend directly or indirectly from claim 1, they each include the subject matter of claim 1. 35 U.S.C. § 112 (fourth paragraph).[2] The following table summarizes the subject matter added to claim 1 by the Asserted Claims.

---

[1] ICON contends that it also alleges infringement of claims 46, 60, 61, 84, 85, 92, 94, and 95. *See* Dkt. No. 166, p. 1, n.3. The court finds that whether these additional claims are considered or not, the result of the court's analysis, as outlined herein, is the same.

[2] The '271 patent was filed May 17, 2001. (Dkt. No. No. 147, Ex. A, face page). This is prior to the September 16, 2012 effective date of the Leahy-Smith America Invents Act ("AIA"). Thus, reference herein is to the pre-AIA version of 35 U.S.C. § 112. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 n. 1 (Fed. Cir. 2015).

| Dependent Claim | Added Subject Matter |
|---|---|
| Claim 15 (depends from claim 14, which depends from claim 13, which depends from claim 1) | This claim adds receiving a notification regarding a plurality of options, and selecting the device to which the notification is sent based on selecting one of the plurality of options. |
| Claims 42, 80, and 90 (each depends from claim 1) | These claims add that the first device of claim 1 is a sensor that senses a physical characteristic of a subject; a remote server receives the first data from the first sensor through the internet; and the remote server determines which of multiple options to provide to the first subject based on first data and second data. |
| Claims 49 (depends from claim 42), 81 (depends from claim 80), and 91 (depends from claim 90) | These claims add that the device is a software application operating on a portable computer/cell phone that has a touchscreen input device. |
| Claims 51 (depends from claim 42) and 82 (depends from claim 80) | These claims add that the first device of claim 1 is a portable wireless sensor configured to wirelessly connect to a cell phone through a wireless connection; they also add that the remote server receives the first data from the first sensor through the internet through the wireless connection between the first sensor and cell phone through a wireless cellular connection of the cell phone to the internet. |
| Claim 54 (depends from claim 51) | This claim adds that the first portable wireless sensor of claim 51 is a heart rate sensor. |

(Dkt. No. 147, pg. 5).

It is apparent from the above summary as well as from the full text of the Asserted Claims that each Asserted Claim articulates the claimed method slightly differently, but claim 1 exemplifies the general concept claimed by the Asserted Claims. It is further apparent that the general concept claimed by the Asserted Claims is providing and using feedback based upon data gathered from subjects, which amounts to (1) observing physical characteristic(s) of subjects; (2) evaluating the characteristic(s); and (3) providing a notification of the evaluation. (*See also* Dkt. No. 147, Ex. A, Fig. 1).

6

**Appx7**

### III.     Legal Standards

#### A.     Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter pleadings are closed – but early enough not to delay trial." To decide a motion for judgment on the pleadings, the Court accepts as true the non-movant's well-pleaded factual allegations and all reasonable inferences are indulged in favor of the non-movant. *Shaw v. Valdex*, 819 F.2d 965, 968 (10th Cir. 1987). Furthermore, the movant must clearly establish that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

Whether a claim recites patent-ineligible subject matter is a question of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010) ("[w]hether a claim is drawn to patent-eligible subject matter under §101 is an issue of law[.]"). This determination is a threshold inquiry that is properly decided on the pleadings. *See Ultramercial*, 772 F.3d 709, 717 (Fed. Cir. 2014). The Federal Circuit and district courts have made clear that Section 101 patent eligibility may be, and regularly is, decided at the pleadings stage, without claim construction. *See, e.g., Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) (explaining the Federal Circuit "perceive[s] no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101"); *see also Epic Tech*, 2015 WL 8160884 at *5 (D. Utah 2015). Deciding the patent eligibility of the Asserted Claims is appropriate now.

#### B.     Patent-Eligible Subject Matter

Pursuant to 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." There are three exceptions to Section 101's broad patent-eligibility principles: laws of nature, physical phenomena, and abstract ideas. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

7

**Appx8**

The Supreme Court most recently addressed determining whether a claim recites patent-eligible subject matter in *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2355 (2014). In *Alice*, the Supreme Court reaffirmed the two-step process to determine whether a claim recites patent-eligible subject matter set out in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)). The first step is to determine whether the claims at issue are directed to patent-ineligible concepts, such as laws of nature, natural phenomena, or abstract ideas. *Id.* If the claims recite, for example, an abstract idea, the Court proceeds with second step to determine if there are additional claim elements that introduce an inventive concept to the claim that is sufficient to transform the abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2355.

## C. The presumption of Validity and the Standard of Proof

It is unsettled whether the presumption of validity provided by 35 U.S.C. § 282, along with the associated clear and convincing standard of proof, applies to a Section 101 challenge. For example, Judge Mayer's concurrence in *Ultramercial* concluded that the presumption of validity does not apply in Section 101 inquiries. 772 F.3d at 717 ("[N]o presumption of eligibility attends the section 101 inquiry."). In a nonprecedential opinion, a different panel of the Federal Circuit noted that "[w]e are not persuaded that the district court was correct that a presumption of validity does not apply." *Tranxition, Inc.* v. *Lenovo (United States) Inc.*, No. 2015-1907, 2016 WL 6775967, at *4 n.1 (Fed. Cir. Nov. 16, 2016). The U.S. Supreme Court has decided Section 101 cases, such as *Alice* and *Mayo*, but it has not discussed or applied a presumption of validity in its analysis. *See Ultramercial* 772 F.3d at 720-21 ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility.").[3]

---

[3] The Court notes that a presumption of validity as to a Section 101 inquiry would not apply to the reexamination of the '271 patent because such an inquiry may not be raised in a reexamination. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . *may not be raised* in reexamination proceedings.") (emphasis added). Thus, a presumption of validity, if any exists,

In the present case, the Court's decision does not depend upon a presumption of validity, and the Court would reach its conclusion concerning whether the '271 patent Asserted Claims are directed to patent-ineligible subject matter regardless of the applicability of the presumption. In addition, the content of the '271 patent is fixed and not disputable, regardless of whether a clear and convincing standard of proof, or a lesser standard is applied. Consequently, the Court need not choose between the varying Federal Circuit views on the applicability of the presumption of validity or its corresponding clear and convincing standard of proof to a Section 101 analysis.

### 1.    *Alice* Step One: Are the claims directed to a patent-ineligible abstract idea?

The Supreme Court has confirmed that abstract ideas, such as ordinary human activities, are ineligible under Section 101 as being directed to unpatentable subject matter.[4] In *Alice*, the Supreme Court held that computerization of the ordinary human activity of maintaining escrow accounts is not patentable subject matter. 134 S. Ct. 2347. In *Bilski v. Kappos*, the Supreme Court held that the ordinary activity of hedging losses is not patentable. 130 S. Ct. 3218, 3229-30 (2010). And in *Mayo*, the Supreme Court held that the ordinary human activity of observing correlations is not patentable. 132 S. Ct. at 1293-94.

Following the Supreme Court's guidance, the Federal Circuit has confirmed that ordinary human activity, such as collecting and utilizing data by conventional means is not patentable subject matter. For example, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they merely recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection,

---

would only apply as a result of the U.S. Patent and Trademark Office's original examination and issuance of the '271 patent, not as a result of a reexamination.

[4] As noted above, if the step one analysis results in a conclusion that the claims are directed to an abstract idea, then the claims are patent ineligible unless the step two analysis shows that the claims add an inventive concept to the abstract idea as further discussed in the next section.

recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*. The Federal Circuit recently reinforced point in *Electric Power Group, LLC v. Alstom S.A.*, stating that "we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." 830 F.3d 1350, 1353-54 (Fed. Cir. 2016) (collecting cases).

Abstract ideas are not limited to natural human activities or financial/business methods and systems. The Federal Circuit has also invalidated patent claims directed to the following abstract ideas: (1) a method and system for managing an electric power grid; (2) a method of managing a bingo game; (3) a method and system of tracking and documenting shipping containers; (4) a method of tracking financial transactions to determine whether they exceed a spending limit (i.e., budgeting); and (5) a method of price optimization.[5] These are just a handful of examples of patent-ineligible subject matter, but they have a commonality: abstract ideas such as natural human activity are not patent-eligible.

### 2.    *Alice* Step Two: Do the claims recite additional elements sufficient to transform them into patent-eligible subject matter?

If a claim involves an abstract idea, the court next "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. The court looks at the elements both individually and as an ordered combination. *Id*. at 2355. In other words, if a claim recites an abstract idea, it "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id*.

It is settled that reciting generic or conventional components used in their conventional intended way does not transform an ordinary human activity into patentable subject matter.

---

[5] *See respectively,* (1) *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016); (2) *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014); (3) *Wireless Media Innovations LLC* 100 F.Supp.3d at 415-415; (4) *Intellectual Ventures I LLC v. Capital One Bank (USA),* 792 F.3d 1363, 1367 (Fed. Cir. 2015); and (5) *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir.), cert. denied, 136 S. Ct. 701, 193 L. Ed. 2d 522 (2015).

10

*Alice*, 134 S. Ct. at 2359 (adding "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material). The Supreme Court in *Alice* held that elements, such as a computer, add nothing to a claim beyond their well-known functions, do not transform an abstract idea into patent-eligible subject matter. *Id.* at 2359-60 (using a computer to obtain data, adjust account balances based on the data, and issue automated instructions is well-known and does not transform an abstract idea into a patentable-eligible invention). The *Alice* Court explained that using a computer to complete the "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material. *Id.* at 2359; *see also Wireless Media Innovations LLC v. Maher Terminals, LLC*, 100 F.Supp.3d 405, 415-415, *aff'd* 2016 WL 463218 (Fed. Cir. 2016) (physical components such as vehicles, optical scanners, and computers do not transform an abstract idea into patentable subject matter).

## IV.    Analysis and Discussion

Polar argues that on their face, the Asserted Claims recite the abstract idea of providing and using feedback based on data gathered from subjects. Initially, the Court notes that humans have received and assessed information and thereafter provided feedback to one or more people from time immemorial. The aggregation of information and the use of information to provide advice to people is a practice that has long existed. Today, the process of aggregating information and providing advice is much quicker than in the past due to, for example, the use of computers in the process. Likewise electronic sensors enable various information to be gathered comprehensively and quickly. Sensors have existed in refrigerators, in heaters and furnaces, and temperature controls for a long time. Information gathering from particular sources through the use of sensors, absent uniqueness of a sensor, does not change the nature of the information gathering. As noted above, the '271 patent does not disclose any unique sensor or require any special hardware or programming.

11

**Appx12**

### A.    *Alice* **Step One**

Polar points to claim 1 as the starting point of its argument because all Asserted Claims depend directly or indirectly from claim 1. Polar contends that the abstract idea recited by the Asserted Claims includes three common and ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data. (Dkt. No. 147, pgs. 14-15 of 21).

Polar compares the Asserted Claims to claims found invalid by the Federal Circuit. For instance, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*.

Polar also compares the Asserted Claims to the claims that the Federal Circuit recently held patent ineligible in *Electric Power Group*. There, the Federal Circuit analyzed the patent eligibility of three patents that claimed systems and methods for "performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" to determine power grid vulnerability. *Electric Power Group*, 830 F.3d at 1351-52. The Federal Circuit observed that it has "treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." *Electric Power Group*, 830 F.3d at 1353 (internal citations omitted). The Federal Circuit concluded that the idea of collecting and analyzing information or data, even when particularly limited, to be an abstract idea. *Electric Power Group*, 830 F.3d at 1353-54 (collecting cases) (Dkt. No. 171, pgs. 9-10 of 16).

Icon takes issue with Polar's description of the Asserted Claims, arguing that the Asserted Claims are like those at issue in *Enfish, LLC v. Microsoft Corp.*, 822 F3d 1350 (Fed.

<div align="center">12</div>

<div align="center">**Appx13**</div>

Cir. 2016) and are therefore directed to patent-eligible subject matter. Icon presented arguments directed to only two of the Asserted Claims, claims 15 and 80. Those arguments were directed to distinguishing claims 15 and 80 from the asserted claims in *Content Extraction*. First, Icon argued that claim 15 does not merely recite "collecting data," but "separate devices (e.g., sensors) sense, measure, and create objective data concerning physical characteristics (e.g., brain waves) and then transmit the sensed characteristics in the form of data from each person," and that claim 15 "evaluates a combination of the collected data and provides a notification of that *evaluation* (not of the collected data), receives notification of options, selects an option and selects a device based on the option selection." (*See* Dkt. No. 166, pg. 21-22 of 31) (emphasis in original). Icon asserted that these claim limitations do not have "any counterpart in the *Content Extraction* claim." *Id.* Icon also argued that asserted claim 80 "introduces a key inventive component in the last clause: determining which option(s) 'to provide to the first subject.'" *Id.* Icon argues that in *Content Extraction* the subjects are hard copy documents, and thus, *Content Extraction* is inapplicable to the present case. (*Id.* at pg. 23 of 31). While Icon's arguments pointed out that limitations of claims 15 and 80 were not identical to the *Content Extraction* claim, Icon did not argue or explain why such limitations rendered claims 15 and 80 patent eligible. Icon did not present separate arguments regarding any of the other Asserted Claims, and accordingly, the Court need not address those claims.

The Court agrees with Polar and finds that the Asserted Claims are directed to the abstract idea of providing and using feedback based upon data gathered from subjects. Controlling precedent establishes that the idea of collecting and analyzing information or data, even when particularly limited, is an abstract idea under Section 101. *See Electric Power Group,* 830 F.3d at 1353-54 (collecting cases). The abstract idea claimed by the Asserted Claims recites three ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data.

13

**Appx14**

(*See* '271 patent, col. 6:56-60; 7:31-35). The Asserted Claims fall directly into the abstract idea category of collecting and analyzing information or data.

While it is true, as Icon notes, that the Asserted Claims recite "providing a notification" and utilizing "a sensor," the Federal Circuit has ruled that claims reciting common hardware to perform functions a human could not, such as a scanner to collect data, do not thereby negate the abstract nature of the claim. As the Federal Circuit held in *Content Extraction*, added limitations must "involve more than performance of well-understood, routine [and] conventional activities previously known in the industry." 776 F.3d at 1347-48. Icon's argument that sensors make the Asserted Claims not abstract is unpersuasive. The '271 patent does not disclose and Icon does not argue that the sensors are of a unique and new structure. Instead, they are disclosed as simply conventional sensors being used conventionally, which is insufficient to transform the abstract idea into patent-eligible subject matter.[6]

Icon's argues that the recitation of an evaluation and a notification render the Asserted Claims not abstract. The '271 patent, however, does not disclose such actions as being unique or novel. Instead, it discloses that these are common actions where an evaluation can be as simple as summarizing, tabulating, charting, or collecting information; (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56 – col. 7:3) and a notification according to the '271 patent can be as simple as an audible sound. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16).

Icon points to *Enfish* to argue that the Asserted Claims are patent eligible. Unlike the claims here, the *Enfish* claims were not abstract because they were "directed to a specific improvement to the way computers operate." *Enfish*, 822 F.3d at 1336. But, Icon did not argue that the '271 patent teaches an improvement in how a computer functions, or any new sensor

---

[6] The Court recognizes that *Alice's* first step looks at "the focus of the claims, their character as a whole." *Electric Power*, 830 F.3d at 1353. In the second step, the Court determines whether additional limitations represent a patent-eligible application of the abstract idea. *Id.* Icon, however, distinguishes *Content Extraction* in response to Polar's step one analysis on such a basis. Thus, the Court addresses certain of Icon's step two arguments in its discussion of *Alice's* step one.

14

**Appx15**

structure. Instead, Icon discussed the claims as using conventional sensors to collect objective data and a conventional computer to evaluate data, send notifications, and make determinations. (*See e.g.*, Dkt. No. 166, p. 11 of 31:1-3 and ¶¶ 2 and 3). These are the ordinary functions of sensors and a computer. Because the '271 patent claims are not directed to an improvement in how sensors sense or operate, or an improvement in how computers compute, the Asserted Claims are unlike those in *Enfish*. *See Electric Power Group*, 830 F.3d at 1354.

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea.

### B.    *Alice* Step Two

At step two of the *Alice* analysis, Polar argues that the Asserted Claims do not recite any inventive concepts to transform the claimed abstract idea into patent-eligible subject matter. (*See, e.g.,* Dkt. No. 147, pgs. 16-17 of 21). To qualify as patent-eligible subject matter, a claim must recite "significantly more" than the abstract idea, for example by "improv[ing] an existing technological process," and not merely by "implement[ing] [the idea] on a computer." *Alice*, 134 S. Ct. at 2358. Polar argues that the Asserted Claims do not improve an existing technological process or product and merely recite using conventional devices for their conventional purpose – e.g., sensors for sensing and displays for displaying. (Dkt. No. 147, pgs. 16-17 of 21).

Icon argues that the Asserted Claims recite an inventive concept and provides several different bases for its argument. First, Icon argues that "[a]s an ordered combination, the additional elements do introduce inventive concepts." (Dkt. No. 166, pgs. 27-28 of 31). Icon contends that "by putting a sensor that collects 'data indicative of a physical characteristic' in communication with a remote, internet-accessible server that also receives similar data about one or more other subjects, the claims at issue enable the combined evaluation of more than one subject's objective physical-characteristics data, resulting in the provision of one or more options." (Dkt. No. 166, pgs. 27-28 of 31). Second, Icon relies upon *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2016) and *Bascom Global Internet Services, Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) in support of its argument that

**Appx16**

the Asserted Claims, even if directed to an abstract idea, contain inventive concepts to transform the claims into patentable subject matter. Third, at the January 19, 2017 hearing, Icon argued that the Asserted Claims teach a "unique distributed architecture" of databases and, for this reason, the Asserted Claims contain an inventive concept. (*See* Hearing Tr., 27:23-31:2, Jan 19, 2017). Fourth, Icon argued that certain arguments in Polar's own patent applications, which are unrelated to the Asserted Claims, estop Polar from making its step two arguments. (Dkt. No. 166, pgs. 25-27). Fifth, Icon argued that the reexamination of the '271 patent demonstrated that it was an improvement over existing technology. (Dkt. No. 166, pgs. 28-29 of 31).

The Court does not find Icon's arguments persuasive. It finds no inventive concept in the ordered combination of the claim limitations. The Asserted Claims are quite similar to those asserted in *Electric Power Group*, where the Federal Circuit reasoned that "limiting the claims [directed to collecting data, analyzing the data, and displaying the results] to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." 830 F.3d at 1354. Furthermore, "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *Id.* at 1355. Here, the '271 patent does not disclose and the Asserted Claims do not "require[] anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" and, therefore, do not include an "inventive concept of the application." *Id.*

For the same reason, Icon's argument related to a unique architecture of databases is unavailing. As noted above, the '271 patent discloses that no unique or specific hardware or software is needed to implement the disclosed method, stating, for example, that "embodiments of the present invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt. No. 147, Ex. A, col. 12:25-27). More particularly, the '271 patent discloses that implementation of the disclosed method could be:

> implemented in many different ways using a wide range of programming
> techniques as well as general-purpose hardware or dedicated controllers.
> In addition, many, if not all, of the steps for the methods described above
> are optional or can be combined or performed in one or more alternative
> orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus the abstract idea underlying the '271 patent can be implemented via conventional technology used conventionally. Once again, there is no inventive concept in such an application of conventional technology.

Icon cited a Declaration of Dr. David Brienza in support of its argument that the Asserted Claims include an inventive concept. But, on a motion for judgment on the pleadings, the court considers only the Complaint, the Answer, and the documents attached as exhibits to either. *See Burkett v. Convergys Corp.*, 2:14-CV-376-EJF, 2015 WL 4487706 at *9 (D. Utah, July 23, 2015). The declaration meets none of these criteria. Additionally, whether the Asserted Claims are directed to patent-eligible subject matter is a question of law, and Dr. Brienza's legal conclusions invade the province of the Court. *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013); s*ee also Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33-JRG-RSP, 2016 WL 98745 at *3 (E.D. Tex. Jan. 8, 2016) (striking an expert's opinion on subject matter eligibility because it did nothing more than analyze the law and offer legal conclusions).

Furthermore, even if the Court were to consider the declaration, it does not alter the analysis. The Supreme Court has held that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 189 (1981) (emphasis added).

Icon's reliance upon *DDR Holdings* and *Bascom* is also unpersuasive. Icon argues that the '271 patent improved existing technology, specifically making "share and compare" possible. (Dkt. No. 166, pg. 28 of 31). But, sharing and comparing information has long been possible. Icon does not argue or explain why this Court should consider sharing and comparing information either new or inventive. The Federal Circuit in *DDR Holdings* found a computer-

<center>17</center>

<center>**Appx18**</center>

implemented method of manipulating computer interactions to be patent-eligible because the "claimed solution amounts to an inventive concept for resolving" the Internet-centric problem of making two web pages look the same. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d at 1258. The claims here do not provide any inventive functionality in employing generic components such as sensors and touchscreens. As in *Electric Power Group*, the Asserted Claims "specify what information . . . to gather, analyze, and display . . . by use of [nothing] but entirely conventional, generic technology." 830 F.3d at 1356 (analyzing the claims-at-issue against *DDR Holdings*). The Asserted Claims do not solve or claim to solve any internet or tech-centric problem.

*Bascom* is inapposite here for the same reason. In *Bascom*, the Federal Circuit found that the patent-at-issue claimed "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems . . . the claimed invention represents a software-based invention that improves the performance of the computer system itself." *Bascom Global Internet Services*, 827 F.3d at 1351. None of the Asserted Claims relate to or propose a technology-based solution to sensors, the Internet, or a computer.

Icon's argues that Polar should be estopped from arguing patent-ineligibility in this case because of arguments it made in patent applications that are entirely unrelated to the '271 patent. The Court sees no basis for estopping Polar.

Finally, Icon's argument based on the reexamination of the '271 patent is legally irrelevant. The question of patent-eligible subject matter cannot be raised in a reexamination. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . may not be raised in reexamination proceedings."). Since this issue cannot be raised in a reexamination proceeding, the USPTO's decision has no bearing on subject matter eligibility. *Id.*; *see also SmartGene, Inc. v. Advanced Biological Labs., SA*, 852 F.Supp.2d 42, 50 (D.D.C. 2012), *aff'd*, 555 F.App'x 950 (Fed. Cir. 2014).

18

**Appx19**

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea and do not include an inventive concept that would render them patent-eligible.

**V.      Conclusion**

Because the Asserted Claims are directed to patent-ineligible subject matter, Polar's Motion for Judgment on the Pleadings is granted.

Let judgment be entered accordingly.

DATED this _10th_ day of March, 2017.

Bruce S. Jenkins
United States Senior District Judge

19

**Appx20**



US006701271B2

(12) **United States Patent**     (10) **Patent No.:**    **US 6,701,271 B2**

Willner et al.          (45) **Date of Patent:**      **Mar. 2, 2004**

(54) **METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

(75) Inventors: **Barry E. Willner**, Briarcliff Manor, NY (US); **Edith H. Stern**, Yorktown Heights, NY (US); **David P. Greene**, Ossining, NY (US); **Philip Shi-lung Yu**, Chappaqua, NY (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 22 days.

(21) Appl. No.: **09/859,827**

(22) Filed: **May 17, 2001**

(65) **Prior Publication Data**

US 2002/0173928 A1 Nov. 21, 2002

(51) **Int. Cl.**[7] ............................ **G06F 15/00**; G01D 1/00

(52) **U.S. Cl.** ........................................ **702/127**; 702/182

(58) **Field of Search** ........................ 702/81, 127, 128, 702/130, 136, 182, 186; 600/300, 301, 310, 481; 128/903, 870; 434/257–259; 723/9–10, 14, 16; 705/1, 80

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,907,973 A * 3/1990 Hon ............................ 434/262

5,233,520 A * 8/1993 Kretsch et al. .............. 600/300
5,542,420 A * 8/1996 Goldman et al. ........... 600/301
5,762,503 A * 6/1998 Hoo et al. ................... 434/237

OTHER PUBLICATIONS

Cristiane G. Lau, "Shear Madness has right mix of character, audience", http:/the–tech.mit.edc/V113/N45/madness.45a.txt.html, vol. 113, No. 45, 2 pages.*

* cited by examiner

*Primary Examiner*—Bryan Bui
(74) *Attorney, Agent, or Firm*—Buckley, Maschoff & Talwalker LLC; Stephen C. Kaufman

(57) **ABSTRACT**

A system, method, apparatus, and computer program code for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation. A physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

**41 Claims, 8 Drawing Sheets**



100

RECEIVE DATA INDICATIVE OF A PHYSICAL CHARACTERISTIC OF AT LEAST TWO SUBJECTS

<u>102</u>

DETERMINE AN EVALUATION OF THE PHYSICAL CHARACTERISTIC DATA

<u>104</u>

PROVIDE A NOTIFICATION OF THE EVALUATION TO A DEVICE

<u>106</u>

100



FIG. 1

120



RECEIVE DATA INDICATIVE OF A PHYSICAL
CHARACTERISTIC OF AT LEAST TWO
SUBJECTS

102

DETERMINE A COURSE OF ACTION BASED
ON THE PHYSICAL CHARACTERISTIC DATA

122

PROVIDE A NOTIFICATION BASED ON THE
COURSE OF ACTION

124

FIG. 2

140



DETERMINE A DESIRED ACTION
ASSOCIATED WITH A GROUP OF
SUBJECTS

142

RECEIVE DATA INDICATIVE OF A PHYSICAL
CHARACTERISTIC OF AT LEAST ONE OF
THE SUBJECTS

144

DETERMINE A COURSE OF ACTION BASED
ON THE PHYSICAL CHARACTERISTIC

146

PROVIDE A NOTIFICATION BASED ON THE
COURSE OF ACTION

148

FIG. 3



FIG. 4



FIG. 5

—300

| SENSOR IDENTIFER 302 | SENSOR DESCRIPTION 304 | SENSOR OUTPUT 306 |
|---|---|---|
| S-123456 | HEART RATE SENSOR | HEART RATE DATA EVERY TEN SECONDS |
| S-387766 | TEMPERATURE SENSOR | TEMPERATURE READINGS ONCE A MINUTE |
| S-867454 | MOTION SENSOR | DATA SENT UPON MOTION |

FIG. 6

400

| OUTPUT IDENTIFIER 402 | OUTPUT DESCRIPTION 404 | SENSOR IDENTIFIER 406 |
|---|---|---|
| O-493 | SERVER C-14 | S-123456 S-867454 |
| O-601 | USER DEVICE U-12 | S-387766 |

FIG. 7

—500

| EVALUATION IDENTIFIER 502 | EVALUATION DESCRIPTION 504 | SENSOR IDENTIFIER 506 |
|---|---|---|
| E-0234 | INTEREST LEVEL DETERMINATION | S-123456 S-867454 |
| E-4629 | RESTLESSNESS DETERMINATION | S-387766 |

FIG. 8

1

**METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

FIELD OF THE INVENTION

The present invention relates to a method and apparatus for using information obtained from two or more subjects and, more particularly, embodiments of the present invention relate to methods, apparatus, and computer program code for determining a course of action based on information regarding one or more physical characteristics of two or more subjects.

BACKGROUND OF THE INVENTION

There are many situations in which it might be desirable to have information regarding how a subject or a group of subjects feels about information being delivered or presented to them or how the subjects react while information is being delivered or presented to them. For example, a teacher may wish to know if the students in her class understand the material the teacher is discussing. A lecturer may wish to know what portions of his lecture the audience members find most interesting. Alternatively, the lecturer may want to have a better idea of when to take a break. An entertainer may wish to know what ending to provide to a story or song medley being presented to an audience.

While devices exist that allow take information from a single subject and provide information regarding the single subject, unfortunately, there is no way for an observer of two or more subjects to take objective measurements of the subjects and use the information to direct the observer or a device under the observer's control along one of several courses of action or to evaluate how best to alter or change what the observer or device is currently doing. It would be advantageous to provide a method and apparatus that overcame the drawbacks of the prior art. In particular, it would be desirable to use physical characteristic information obtained from or about two or more subjects and to determine a course of action based on such information or an evaluation of the information.

SUMMARY OF THE INVENTION

Embodiments of the present invention provide a system, method, apparatus, and computer program code for using physical characteristic information obtained from or about two or more subjects and, more particularly, embodiments of the present invention relate to methods, apparatus, and computer program code for determining a course of action based on the information or an evaluation of the information. Information or other data regarding physical characteristics of two or more subjects may be received from one or more sensors carried, worn, or handled by the subjects or otherwise associated with the subjects. The data may be indicative of a variety of physical characteristics. For example, a physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

Based on the data received regarding one or more physical characteristics, an evaluation of the data may be determined or a course of action based on the data may be

2

determined. The results of the determination may be sent to one or more devices to provide feedback based on the physical characteristics of the subjects or to enable the device(s) to make an evaluation or determine a course of action based on the physical characteristics.

Additional objects, advantages, and novel features of the invention shall be set forth in part in the description that follows, and in part will become apparent to those skilled in the art upon examination of the following or may be learned by the practice of the invention.

According to embodiments of the present invention, a method for providing feedback includes receiving data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determining an evaluation of the data; and providing a notification regarding the evaluation to a device. In other embodiments of the present invention, a method for providing feedback includes receiving data indicative of a physical characteristic of a plurality of subjects; determining a course of action based, at least in part, on the data; and providing a notification based, at least in part, on the course of action. In still further embodiments, a method for providing feedback includes determining a desired action associated with a group of subjects; receiving data indicative of a physical characteristic of at least one of the subjects; determining a course of action based, at least in part, on the characteristic and the desired action; and providing a notification based on the course of action.

According to another embodiment of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determine an evaluation of the data; and provide a notification regarding the evaluation to device. In other embodiments of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a plurality of subjects; determine a course of action based, at least in part, on the data; and provide a notification based, at least in part, on the course of action. In other embodiments of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to determine a desired action associated with a group of subjects; receive data indicative of a physical characteristic of at least one of the subjects; determine a course of action based, at least in part, on the characteristic and the desired action; and provide a notification based on the course of action.

According to yet another further embodiment of the present invention, an apparatus for using feedback includes means for obtaining data representative of a physical characteristic of a first subject and a physical characteristic of a second subject; means for evaluating the data; and means for sending data indicative of the evaluation to a device. In other embodiments of the present invention, an apparatus for using feedback includes means for obtaining data indicative of a physical characteristic of a plurality of subjects; means for identifying a course of action based, at least in part, on the data; and means for sending a notification based, at least in part, on the course of action. In other embodiments of the present invention, an apparatus for using feedback includes means for identifying a desired action associated with a

group of subjects; means for obtaining data indicative of a physical characteristic of at least one of the subjects; means for identifying a course of action based, at least in part, on the characteristic and the desired action; and means for sending a notification based on the course of action.

According to a further embodiment of the present invention, a computer program product in a computer readable medium for using feedback includes first instructions for obtaining receiving data representative of a physical characteristic of a first subject and a physical characteristic of a second subject; second instructions for evaluating the data; and third instructions for sending data indicative of the evaluation to a device. In other embodiments of the present invention, a computer program product in a computer readable medium for using feedback includes first instructions for obtaining data indicative of a physical characteristic of a plurality of subjects; second instructions for identifying a course of action based, at least in part, on the data; and third instructions for sending a notification based, at least in part, on the course of action. In other embodiments of the present invention, a computer program product in a computer readable medium for using feedback first instructions for identifying a desired action associated with a group of subjects; second instructions for obtaining data indicative of a physical characteristic of at least one of the subjects; third instructions for identifying a course of action based, at least in part, on the characteristic and the desired action; and fourth instructions for sending a notification based on the course of action.

With these and other advantages and features of the invention that will become hereinafter apparent, the nature of the invention may be more clearly understood by reference to the following detailed description of the invention, the appended claims and to the several drawings attached herein.

## BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of the specification, illustrate the preferred embodiments of the present invention, and together with the descriptions serve to explain the principles of the invention.

FIG. 1 is a flowchart of a first embodiment of a method in accordance with the present invention;

FIG. 2 is a flowchart of a second embodiment of a method in accordance with the present invention;

FIG. 3 is a flowchart of a third embodiment of a method in accordance with the present invention;

FIG. 4 is a block diagram of system components for an embodiment of an apparatus usable with the methods of FIGS. 1–3;

FIG. 5 is a block diagram of a representative server of FIG. 4;

FIG. 6 is an illustration of one possible implementation of the sensor database of FIG. 5;

FIG. 7 is an illustration of one possible implementation of the output database of FIG. 5; and

FIG. 8 is an illustration of one possible implementation of the evaluation database of FIG. 5.

## DETAILED DESCRIPTION

Applicants have recognized that there is a need for systems and methods that allow for biometric information and other physical characteristic data to be obtained regarding two or more subjects and evaluate or determine a course

of action or evaluation based on the information and data. For example, assume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the audience member's heart rates, posture, etc. may be obtained and used to help determine which of the themes the audience members are the most interested in. Once the information is communicated to the speaker, the speaker can direct the presentation appropriately.

Applicants have also recognized that there is a need for systems and methods that enable a desired action associated with a group of subjects to be determined to be obtained by obtaining biometric information and other physical characteristic data to be obtained from or about the group and using such information and data to help determine a course of action that will lead to or produce the desired action. For example, a math instructor may desire that students in a classroom memorize multiplication tables. Sensors may obtain information from two or more of the students regarding brain wave patterns, amount of movement (e.g., an indication of restlessness), heart and respiration rates, etc. Based on this information, a determination may be made as to a course of action the instructor should take to increase the chances of getting students to memorize the multiplication tables. For example, students who are determined to be bored or sleepy (e.g., have relatively slow heart rates, have not shifted position recently) may need to engage in a physical activity to wake them up or make them more alert prior to studying the multiplication tables. Students who are very active (e.g., have relatively high heart rates, are very fidgety) may need to be calmed down before beginning to memorize multiplication tables. Once the determination of a course of action is made, it can be provided to the instructor so that the instructor can proceed accordingly with an improved chance of reaching the desired activity.

These and other features will be discussed in further detail below, by describing a system, individual devices, and processes according to embodiments of the invention.

Process Description

Reference is now made to FIG. 1, where a flow chart **100** is shown which represents the operation of an embodiment of the present invention. The particular arrangement of elements in the flow chart **100** is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method **100** can be implemented by a server or other device.

Processing begins at a step **102** during which data indicative of one or more physical characteristics of two or more subjects (e.g., human beings, animals) is obtained or otherwise received. A physical characteristic of a subject might be or include the subjects' heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern, odor, motion, etc., or a change in any one or more of them.

The physical characteristic of one subject for which data is received during the step **102** may be the same as or different from the physical characteristic for which data is received for another subject during the step **102**. For example, during the step **102**, data might be received regarding the heart rate of one subject and the respiration and/or heart rate of a second subject. Data from more than one subject might be received simultaneously from multiple subjects during the step **102** or from different subjects at

different periods of time during the step **102**. The data for different subjects can come from different sources or sensors, be in different formats and contain information regarding the same or different physical characteristics. In some embodiments, information regarding one or more sensors may be stored in, and accessed from, a sensor information database.

Data and other information regarding physical characteristics of a subject can be obtained directly or indirectly by having the subject wear, carry or hold a sensor or other data gathering device (e.g., heart rate sensor, blood pressure monitor, motion sensor), by having the subject sit in a chair having sensors or data gathering devices mounted in it or attached to it, etc. Thus, a sensor might be associated with a specific subject and provide data regarding only that subject. In some embodiments, a sensor or other data gathering device might detect or obtain data indicative of a physical characteristic for more than one subject. Data regarding or indicative of one or more physical characteristics of one or more subjects also may be received during the step **102** from observers watching the subject(s) and making, entering or recording observations.

During a step **104**, an evaluation is determined of the physical characteristic(s) for which data was received during the step **102** regarding one or more of the subjects for which data was received during the step **102**. The determination or evaluation may occur in a variety of ways and the evaluation may be directed toward a variety of behaviors. For example, based on the information received during the step **102** for a subject, the determination performed during the step **104** may include determining a risk of violence associated with one or more of the subjects, determining one or more options to provide to one or more of the subjects, determining a trading propensity associated with one or more of the subjects, predicting at least one action or course of action that might be taken or contemplated by one or more of the subjects (e.g., is the subject likely to leave the room) or is desired to be taken by one or more of the subjects, determining a probability associated with an action or course of action that might be taken, or is desired to be taken, by one or more of the subjects (e.g., how likely is a subject to leave the room, how likely is a subject to stop paying attention to a speaker, how likely is a subject to fall asleep), etc. In some embodiments, information regarding one or more evaluations may be stored in, or accessed from, an evaluation database.

In some embodiments, the step **104** may include determining one or more options to provide to a subject or a group of subjects. For example, the method **100** may include a step of receiving a notification of several possible endings to a play being presented to an audience. The step **104** may include determining which of the options to provide to the audience or determining which of the options the audience will be allowed to choose from. Suppose five possible endings are available for the play, two of which are happy endings and three or which are sad endings. If the audience appears or is determined to want a happy ending, the audience may be provided with the two options having happy endings for the play. If instead the audiences appears or is determined to want a sad ending, the audience may be provided with the three options having a sad ending for the play. A notification of the possible options may be provided to one or more of the audience members to allow them to make the selection on the desired ending.

In some embodiments, the determination made during the step **104** may include determining what type of response to provide to a subject or group of subjects. For example, two

or more subjects may be part of a group listening to a live lecture or training seminar. The data received during the step **102** may indicate that one or more of the subjects is sleepy, bored, restless, confused, etc. Thus, an evaluation of the data may indicate that the person conducting the lecture or seminar should change the responses given to questions asked by the subject(s) in order to hold the subjects' interest better and provide more effective instruction to the subject(s). In addition, the evaluation may indicate that the conductor should provide different information to the subjects (e.g., raise or lower the sophistication of the presentation to better match the subjects' interests, background, education, topic familiarity, etc.). As another example, the evaluation determined during the step **104** may indicate that a break or interruption is needed so that the subjects can stretch their legs, use the restroom, overcome boredom or fatigue, etc.

The determination made during the step **104** might include comparing the data received during the step **102** with stored records or examples of previously gathered data and associated behaviors or evaluations. The records or examples may be stored in a database. For example, the data collected during the step **102** may be from two or more subjects watching a new television show. The producers of the show may be trying to evaluate which ending to use for the show based on the subjects' reaction to earlier parts of the show. Thus, the step **104** may include determining a course of entertainment or response to provide to a subject. The data received during the step **102** may include heart rate information, respiration rate information, etc. By comparing the data received during the step **102** to data received for the subjects when they watched previous shows, the producers may be able to determine the subject's level of interest during various parts of the current show. Alternatively, by comparing the data received during the step **102** to data from other subjects who watched the same show, the producers may be able to predict what parts of the current show most interest the current subjects.

In some embodiments, determining an evaluation during the step **104** may include determining an environmental condition to alter or select. For example, the data received during the step **102** may indicate that some or all of a group of subjects are cold based on temperature and facial response information collected from the subjects. Thus, the determination made during the step **104** may be to increase the room temperature so as to improve the mood and enjoyment of the subjects.

In some embodiments, the evaluation determined during the step **104** may be or include an aggregating or averaging of data taken or received from multiple subjects or some other manipulation or transformation of the data. For example, the evaluation determined during the step **104** may be or include finding the average heart rate for a group of subjects, the average maximum and/or minimum heart rate for a group of subjects, the average respiration rate for the group of subjects, etc. Thus, determining an evaluation during the step **104** may be or include summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc. some or all of the raw physical characteristic data received during the step **102**. The evaluation may use other information in addition to the data received during the step **102**. As another example, determining an evaluation during the step **104** may be or include determining the total number of people in a room who have moved, yawned, slept, undergone a decrease/increase in heart rate or respiration rate, etc. during a given time period. Thus, determining an evaluation during the step **104** may be

or include collecting and preparing for later use the raw data received during the step 102 and/or a processed or altered version of the raw data received during the step 102.

In some embodiments, determining an evaluation during the step 104 may be or include determining a pattern in data received during the step 102 from two or more subjects regarding one or more physical characteristics.

During a step 106, a notification of the evaluation determined during the step 104 is provided to at least one device. The notification provided during the step 106 can be sent to more than one device and more than one type of device. The notification may be or include an email message, instant message communication, electronic signal or other communication (e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible sound, a visual display, a voice message, etc. The notification may be sent to a variety of devices such as, for example, ear phones, a speaker, a software program operating on a device, an electronic storage device (e.g., hard disk drive, CD-ROM drive), a server, and a user device (e.g., personal digital assistant, computer). The notification may be or include a summary, table, chart, correlation, comparison, graph, etc of some or all of the data received during the step 102. In some embodiments, information regarding the notification or devices the notification is sent to may be stored in, or accessed from, an output or notification database.

As one example of the step 106, assume a speaker is giving a lecture to a group of subjects. Data received from the subjects during the step 102 and evaluated during the step 104 may provide guidance as to what parts of the lecture the group is most interested in. Once the evaluation is determined during the step 104, a notification of the evaluation may be sent to a computer being used by the speaker and displayed on the computer's screen as raw data, as a histogram, chart, graph, etc. Alternatively, the speaker may be wearing an ear phone that can pick up a wireless signal containing the notification. The audible notification may be created by a text-to-speech converter that converts the evaluation determined during the step 104 to a signal that is sent to the speaker's ear phone.

In some embodiments of the method 100, the notification sent during the step 106 may include a suggested course of action based on the evaluation determined during the step 104 or the characteristic data received during the step 102. Thus, the method 100 may include a step during which a suggested course of action is determined. For example, the data received during the step 102 may be indicative of heart rates, blood pressures, fidgetiness or restlessness, etc. for a group of subjects listening to a training lecture. The determination made during the step 104 of the data received during the step 102 may indicate that the group of subjects may be bored or in need of a break. Based on this evaluation and/or characteristic data of the subjects, a determination may be made that a ten-minute break should be given. The notification sent during the step 106 may include the suggestion or another notification may be sent after the step 106 that includes the suggestion.

In some embodiments, the method 100 may include a step of determining a desired action to be taken by a subject or group of subjects. Such a step may be completed before or after the step 102. Thus, the evaluation determined during the step 104 may be directed to getting the subject or group of subjects to initiate, perform or complete the desired action based on the physical characteristic data received during the step 102.

Reference is now made to FIG. 2, where a flow chart 120 is shown which represents the operation of an embodiment

of the present invention. The particular arrangement of elements in the flow chart 120 is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method 120 can be implemented by a server or other device.

The method 120 includes the step 102 as previously discussed above. In addition, after the step 102 the method includes a step 122 during which a course of action is determined based on the characteristic data received during the step 102. For example, a storyteller may be telling a series of stories. The data received during the step 102 may be indicative of heart rate, respiration rate, etc. for one or more people in the audience. The data can be used to determine which type of story the audience likes the best, the preferred length of stories, etc. Thus, a course of action may be determined that suggests what type of stories the audience is most interested in and how the long the stories should be for the storyteller. A database may exist of different stories that the storyteller can provide and, as a result, the course of action determined during the step 122 may include a list of stories, and perhaps a desired sequence of stories, that the storyteller can recite to the audience.

As another example, a film may be presented to an audience of people. The film may have a variety of possible endings. Data regarding physical characteristics of the audience members received during the step 102 may be used during the step 122 to determine which specific ending to provide to this particular audience.

The determination made during the step 122 may be performed by comparing the data received during the step 102 to stored records of behaviors and associated physical characteristics.

During a step 124, a notification is provided regarding the course of action determined during the step 122. The step 124 is similar to the step 106 previously discussed above. The notification may be sent to a variety of devices in a variety of formats. The notification provided during the step 124 may be sent in any format or form, including, but not limited to, HTTP, HTML or FTP transmission, XML feed, email message, instant message communication, facsimile transmission, telephone call, electronic signal or communication, etc., and may be sent to any type of device, such as a server or user device (e.g., computer, cellular telephone). In some embodiments, the notification may be sent to different devices depending on the course of action determined during the step 122.

In some embodiments, the method 120 may include a step of determining a desired action to be taken by one or more of a group of subjects, as previously discussed above with regard to the method 100. Thus, the course of action determined during the step 122 may be directed to getting a subject or group of subjects to perform or complete the desired action based on the physical characteristic data received during the step 102 for two or more of the subjects.

Reference is now made to FIG. 3, where a flow chart 140 is shown which represents the operation of an embodiment of the present invention. The particular arrangement of elements in the flow chart 140 is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method 140 can be implemented by a server or other device.

The method 140 includes a step 142 during which a desired action associated with a group of subjects is determined. For example, a motivational speaker may want to get a group of audience members to stand up and applaud and

a specific time during a presentation. As another example, a researcher conducting a psychological examination via computer of a group of people may want to have the people communicate with each other at a specific time.

During a step **144**, data indicative of one or more physical characteristics of at least one of the subjects is received. The step **144** is similar to the step **102** previously discussed above.

During a step **146**, a course of action is determined based on the physical characteristic(s) for which data was received during the step **144**. In addition, the course of action may be based on the desired action determined during the step **142**. The course of action determined during the step **146** may be selected so as to improve the chances of a subject or group of subjects completing the action determined during the step **142** based on the physical characteristic data received during the step **144** for one or more of the subjects.

During a step **148**, a notification regarding the course of action is provided. The step **148** is similar to the step **124** previously discussed above. The notification may be provided in any form or format.

System

Now referring to FIG. 4, an apparatus or system **200** usable with the methods **100**, **120** and **140** is illustrated. The apparatus **200** includes one or more sensors **202** that may communicate directly or indirectly with one or more servers, controllers or other devices **204**, and one or more user devices **206** that may communicate with a server **204**, via a computer, data, or communications network **208**. For purposes of further explanation and elaboration of the methods **100**, **120** and **140**, the method **100**, **120** and **140** will be assumed to be operating on, or under the control of, one the servers **204**.

In some embodiments, a server **204** may implement or host a Web site. A server **204** can comprise a single device or computer, a networked set or group of devices or computers, a workstation, etc. In some embodiments, a server **204** also may function as a database server, sensor controller, and/or as a user device. The use, configuration and operation of servers will be discussed in more detail below.

The sensors **202** preferably allow data to be obtained from one or more subjects regarding one or more physical characteristics of the subject(s). The sensors **202** may send data regarding physical characteristics to one or more of the servers **204** and or one or more of the user devices **206**. In some embodiments, a sensor **202** may be worn, carried or handled by a subject or otherwise in contact with the subject. In other embodiments, a sensor **202** may form part of chair or other piece of furniture a subject is sitting in, resting or standing on, etc. In some embodiments, a sensor **202** may be not be in contact with a subject. For example, a heat sensor (e.g., an infrared signal detector) may be used to detect an amount of heat or energy being created by a subject, even though the sensor is not in contact with the subject.

There are many kinds of sensors that might be used with the apparatus **200**. Potential sensors include heart rate monitors, blood pressure monitors, respiration rate monitors, water or perspiration detectors, temperature or heat detectors, pressure sensors, load sensors, motion detectors, acceleration sensors, brain wave monitors, etc.

The user devices **206** allow users to interact with the server **204** and the remainder of the apparatus **200**. The user devices **206** also may enable a user or entity to access Web sites, software, databases, sensor data, etc. hosted or operated by, or stored on, the servers **204** and to receive communications or other notifications sent by the servers

**204**. If desired, the user devices **206** also may be connected to or otherwise in communication with other devices. Possible user devices include a personal computer, portable computer, mobile or fixed user station, workstation, network terminal or server, cellular telephone, kiosk, dumb terminal, personal digital assistant, radio, two-way pager, etc. In some embodiments, a user device **206** also may function as a server **204**.

Many different types of implementations or hardware configurations can be used in the system **200** and with the methods **100**, **120**, **140** and the methods disclosed herein are not limited to any specific hardware configuration for the system **200** or any of its components.

The communications network **208** might be or include the Internet, the World Wide Web, or some other public or private computer, cable, telephone or communications network or intranet, as will be described in further detail below. The communications network **208** illustrated in FIG. 4 is only meant to be generally representative of cable, computer, telephone or other communication networks for purposes of elaboration and explanation of the present invention and other devices, networks, etc. may be connected to the communications network **208** without departing from the scope of the present invention. The communications network **208** can also include other public and/or private wide area networks, local area networks, wireless networks, data communication networks or connections, intranets, routers, satellite links, microwave links, cellular or telephone networks, radio links, fiber optic transmission lines, ISDN lines, T1 lines, DSL, etc. In some embodiments, a user device **206** or sensor **202** may be connected directly to a server **204** or a user device **206** without departing from the scope of the present invention. Moreover, as used herein, communications include those enabled by wired or wireless technology.

In some embodiments, a suitable wireless communication network **208** may include the use of Bluetooth technology, allowing a wide range of computing and telecommunication devices to be interconnected via wireless connections. Specifications and other information regarding Bluetooth technology are available at the Bluetooth Internet site www-.bluetooth.com. In embodiments utilizing Bluetooth technology, some or all of the devices of FIG. 4 may be equipped with a microchip transceiver that transmits and receives in a previously unused frequency band of 2.45 GHz that is available globally (with some variation of bandwidth in different countries). In addition to data, up to three voice channels are available. Connections can be point-to-point or multipoint over a current maximum range of ten (10) meters. Embodiments using Bluetooth technology may require the additional use of one or more receiving stations to receive and forward data from individual sensors **202**, user devices **206** or servers **204**.

Although three sensors **202**, three user devices **206**, and two servers **204** are shown in FIG. 4, any number of such devices may be included in the system **200**. The devices shown in FIG. 4 need not be in constant communication. For example, a user device or sensor may communicate with a server only when such communication is appropriate or necessary.

Server

Now referring to FIG. 5, a representative block diagram of a server or controller **204** is illustrated. The server **204** may include a processor, microchip, central processing unit, or computer **250** that is in communication with or otherwise uses or includes one or more communication ports **252** for communicating with user devices and/or other devices.

Communication ports may include such things as local area network adapters, wireless communication devices, Bluetooth technology, etc. The server 204 also may include an internal clock element 254 to maintain an accurate time and date for the server 204, create time stamps for data, notifications and other communications received or sent by the server 204, etc.

If desired, the server 204 may include one or more output devices 256 such as a printer, infrared or other transmitter, antenna, audio speaker, display screen or monitor, text to speech converter, etc., as well as one or more input devices 258 such as a bar code reader or other optical scanner, infrared or other receiver, antenna, magnetic stripe reader, image scanner, roller ball, touch pad, joystick, touch screen, microphone, computer keyboard, computer mouse, etc.

In addition to the above, the server 204 may include a memory or data storage device 260 to store information, software, databases, notifications and communications, device drivers, sensor data, potential responses or courses of action, etc. The memory or data storage device 260 preferably comprises an appropriate combination of magnetic, optical and/or semiconductor memory, and may include, for example, Random Read-Only Memory (ROM), Random Access Memory (RAM), a tape drive, flash memory, a floppy disk drive, a Zip™ disk drive, a compact disc drive, DVD drive, and/or a hard disk drive. The server 204 might also include ROM 262 and RAM 264 for additional storage and memory.

The processor 250 and the data storage device 260 in the server 204 each may be, for example: (i) located entirely within a single computer or other computing device; or (ii) connected to each other by a remote communication medium, such as a serial port cable, telephone line or radio frequency transceiver. In one embodiment, the server 204 may comprise one or more computers that are connected to a remote server computer for maintaining databases.

A conventional personal computer or workstation with sufficient memory and processing capability may be used as the server 204. In one embodiment, the server 204 operates as or includes a Web server for an Internet environment. The server 204 preferably is capable of high volume transaction processing, performing a significant number of mathematical calculations in processing communications and database searches. A Pentium™ microprocessor such as the Pentium III™ microprocessor, manufactured by Intel Corporation may be used for the processor 250. Equivalent processors are available from Motorola, Inc., AMD, or Sun Microsystems, Inc. The processor 250 also may comprise one or more microprocessors, computers, computer systems, etc.

Software may be resident and operating or operational on the server 204. The software may be stored on the data storage device 260 and may include a control program 266 for operating the server, databases, etc. The control program 266 may control the processor 250. The processor 250 preferably performs instructions of the control program 266, and thereby operates in accordance with the present invention, and particularly in accordance with the methods described in detail herein. The control program 266 may be stored in a compressed, uncompiled and/or encrypted format. The control program 266 furthermore includes program elements that may be necessary, such as an operating system, a database management system and device drivers for allowing the processor 250 to interface with peripheral devices, databases, etc. Appropriate program elements are known to those skilled in the art, and need not be described in detail herein.

The server 204 also may include or store information regarding sensors, evaluations, outputs, etc. For example, information regarding sensors may be stored in a sensor database 268 for use by the server 204, a user device, or another device or entity. Similarly, information regarding evaluation outputs and output devices might be stored in an output database 270 for use by the server 204, a user device or another device or entity. Information regarding evaluations may be stored in an evaluation database 272 for use by the server or another device or entity. In some embodiments, a server 204, a user device, or other device also may store, use, or access a subject database to keep information about one or more subjects, the data being collected from the subjects, subject activities, subject behavior patterns, evaluations, etc.

According to an embodiment of the present invention, the instructions of the control program may be read into a main memory from another computer-readable medium, such as from the ROM 262 to RAM 264. Execution of sequences of the instructions in the control program causes the processor 250 to perform the process steps described herein. In alternative embodiments, hard-wired circuitry may be used in place of, or in combination with, software instructions for implementation of some or all of the methods of the present invention. Thus, embodiments of the present invention are not limited to any specific combination of hardware and software.

The processor 250, communication port 252, clock 254, output device 256, input device 258, data storage device 260, ROM 262, and RAM 264 may communicate or be connected directly or indirectly in a variety of ways. For example, the processor 250, communication port 252, clock 254, output device 256, input device 258, data storage device 260, ROM 262, and RAM 264 may be connected via a bus 272.

While specific implementations and hardware configurations for servers 204 devices have been illustrated, it should be noted that other implementations and hardware configurations are possible and that no specific implementation or hardware configuration is needed. Thus, not all of the components illustrated in FIG. 5 may be needed for a server implementing the method 100, method 120, or the method 140. Therefore, many different types of implementations or hardware configurations can be used in the system 200 and the methods disclosed herein are not limited to any specific hardware configuration.

User Device

As mentioned above, user device 206 may be any of a number of different types of devices, including, but not limited to a personal computer, portable computer, mobile or fixed user station, workstation, network terminal or server, telephone, beeper, kiosk, dumb terminal, personal digital assistant, facsimile machine, radio, two-way pager, cable set-top box, etc. In some embodiments, a user device might be or include speakers, earphones, a signal detector or receiver, etc. If desired, the user device 206 also may function as a server 204. In some embodiments, a user device 206 may have the same structure, components or configuration as the server 204 illustrated in FIG. 5.

Databases

As previously discussed above, in some embodiments a server, user device, or other device may include or access a sensor database for storing or keeping information about sensors. One representative sensor database 300 is illustrated in FIG. 6.

The sensor database 300 may include a sensor identifier field 302 that may includes codes or other identifying

information for one or more sensors and a sensor description field **304** that may include information describing the sensors identified in the field **302**, such as information regarding a sensor's name, description, model number, tolerances, specifications, manufacturer, etc. The sensor database **300** also may include a sensor output field **306** that may include information regarding the type, timing and format of the information or other data generated or otherwise provided by the sensors identified in the field **302**. Other or different fields also may be used in the sensor database **300**. For example, a sensor database might include a field that stores information regarding one or more subjects associated with the sensor.

As illustrated in the sensor database **300** of FIG. 6, the sensor identified as "S-123456" in the field **302** is a heart rate sensor or monitor and provides heart rate data every ten seconds. The sensor identified as "S-867454" in the field **302** is a motion detector or sensor and provides data upon the detection of motion.

As previously discussed above, in some embodiments a server, user device, or other device may include or access an output database for storing or keeping information about information sent and received from one or more servers. One representative output database **400** is illustrated in FIG. 7.

The output database **400** may include an output identifier field **402** that contains codes or other identifying information regarding recipients of sensor data. The output database **400** also may include an output description field **404** that includes a name, identifier or other descriptive information for the output identifiers identified in the field **402** and a sensor identifier field **406** that identifies one or more sensors associated with the output identifiers provided in the field **402**. Other or different fields also may be used in the output database **400**. In some embodiments a specific output identifier might be associated with a specific evaluation to be determined or a specific course of action to be determined. Thus, the output database **400** might include a field that associates the devices identified in the field **402** with a specific determination being made or to be made.

As illustrated in the output database **400** of FIG. 7, the output identified as "O-493" in the field **402** is "SERVER C-14" and is associated with the data provided by the sensors "S-123456" and "S-867454". Thus, the data provided by the sensors identified as "S-123456" and "S-867454", or a notification of an evaluation of the data provided by the sensors identified as "S-123456" and "S-867454", is provided to or received by the "SERVER C14", which is identified as "O-493" in the field **402**.

As previously discussed above, in some embodiments a server, user device, or other device may include or access an evaluation database for storing or keeping information about evaluations or courses of action to be determined. One representative evaluation database **500** is illustrated in FIG. **8**.

The evaluation database **500** may include an evaluation identifier field **502** that may include codes or other identifying information for one or more evaluations or courses of action being determined. In addition, the evaluation database **500** also may include a description field **504** that may include information regarding the evaluations or courses of action identified in the field **502**. In some embodiments the evaluation database **500** also may include a sensor identifier field **506** that may contain identifiers or other information regarding the sensor data to be used in the evaluations identified in the field **502**. Other or different fields also may be used in the evaluation database **500**.

As illustrated in the evaluation database **500** of FIG. 8, the evaluation identified as "E-0234" in the field **502** is an

"INTEREST LEVEL DETERMINATION" based on data obtained or received from the sensors "S-123456" and "S-867454". Thus, during the determination during an implementation of the step **104**, an evaluation is made using the data received during the step **102** from the sensors identified as "S-123456" and "S-867454" to determine if a subject or subject exhibits interest at one or more moments or during one or more periods of time.

In some embodiments a specific determination might be associated with a specific output device that will receive a notification of the determination. Thus, the evaluation database **500** might include a field that associates the evaluations identified in the field **502** with one or more devices that will receive information or other notifications regarding the evaluations.

The methods of the present invention may be embodied as a computer program developed using an object oriented language that allows the modeling of complex systems with modular objects to create abstractions that are representative of real world, physical objects and their interrelationships. However, it would be understood by one of ordinary skill in the art that the invention as described herein could be implemented in many different ways using a wide range of programming techniques as well as general-purpose hardware systems or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences without departing from the scope of the present invention and the claims should not be construed as being limited to any particular order or sequence, unless specifically indicated.

Each of the methods described above can be performed on a single computer, computer system, microprocessor, etc. In addition, two or more of the steps in each of the methods described above could be performed on two or more different computers, computer systems, microprocessors, etc., some or all of which may be locally or remotely configured. The methods **100**, **120** and **140** can be implemented in any sort or implementation of computer software, program, sets of instructions, code, ASIC, or specially designed chips, logic gates, or other hardware structured to directly effect or implement such software, programs, sets of instructions or code. The computer software, program, sets of instructions or code can be storable, writeable, or savable on any computer usable or readable media or other program storage device or media such as a floppy or other magnetic or optical disk, magnetic or optical tape, CD-ROM, DVD, punch cards, paper tape, hard disk drive, Zip™ disk, flash or optical memory card, microprocessor, solid state memory device, RAM, EPROM, or ROM.

Although the present invention has been described with respect to a preferred embodiment thereof, those skilled in the art will note that various substitutions may be made to those embodiments described herein without departing from the spirit and scope of the present invention.

The words "comprise," "comprises," "comprising," "include," "including," and "includes" when used in this specification and in the following claims are intended to specify the presence of stated features, elements, integers, components, or steps, but they do not preclude the presence or addition of one or more other features, elements, integers, components, steps, or groups thereof.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A method for providing feedback, comprising:
    receiving first data indicative of a physical characteristic of a first subject from a first device associated with said

first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and

providing a notification regarding said evaluation to a device.

**2**. The method of claim **1**, wherein said physical characteristic of said first subject includes at least one of the following:

said first subject's heart rate;

said first subject's blood pressure;

said first subject's blood sugar level;

said first subject's posture;

said first subject's weight;

said first subject's height;

said first subject's temperature;

said first subject's respiration rate;

a facial response of said first subject;

a galvanic skin response of said first subject;

a pheromone associated with said first subject;

a brain wave pattern of said first subject;

an odor generated by said first subject;

motion of said first subject;

a change in motion of said first subject;

a change in said first subject's heart rate;

a change in said first subject's blood pressure;

a change in said first subject's blood sugar level;

a change in said first subject's posture;

a change in said first subject's temperature;

a change in said first subject's respiration rate;

a change in a facial response of said first subject;

a change in a galvanic skin response of said first subject;

a change in a pheromone associated with said first subject;

a change in a brain wave pattern of said first subject; and

a change in an odor generated by said first subject.

**3**. The method of claim **1**, wherein said receiving first data indicative of a physical characteristic of a first subject includes at least one of the following:

receiving data from at least one observer of said first subject regarding at least one physical characteristic of said first subject;

receiving data indicative of at least one physical characteristic from at least one sensor worn by said first subject; and

receiving data indicative of at least one physical characteristic from at least one sensor associated with said first subject.

**4**. The method of claim **1**, further comprising:

receiving data indicative of one or more physical characteristics for each of a plurality of subjects, wherein said plurality of subjects includes said first subject and said second subject.

**5**. The method of claim **4**, further comprising:

determining a pattern in said data indicative of one or more physical characteristics for each of a plurality of subjects.

**6**. The method of claim **5**, further comprising:

providing a notification regarding said pattern to said device.

**7**. The method of claim **1**, wherein said determining an evaluation of said first data and said second data includes at least one of the following:

determining an aggregation of data indicative of a physical characteristic for each of a plurality of subjects, said plurality of subjects including said first subject and said second subject and at least one other subject;

determining an averaging of data indicative of a physical characteristic for each of a plurality of subjects, said plurality of subjects including said first subject and said second subject and at least one other subject;

computing a result based on a function of said first data and said second data;

comparing said physical characteristic of said first subject with a stored record of behavior;

comparing said physical characteristic of said second subject with a stored record of behavior;

determining a prediction regarding at least one action that might be taken by at least one of said first subject and said second subject;

determining a risk of violence associated with at least one of said first subject and said second subject;

determining a trading propensity associated with at least one of said first subject and said second subject;

determining an action that may be taken by at least one of said first subject and said second subject;

determining an action that is desired to be taken by at least one of said first subject and said second subject;

determining a course of entertainment to provide to at least one of said first subject and said second subject;

determining probability associated with an action that might be taken by said first subject;

determining at least one response to provide at least one of said first subject and said second subject;

determining at least one option to offer at least one of said first subject and said second subject;

selecting entertainment to provide at least one of said first subject and said second subject;

selecting information to provide at least one of said first subject and said second subject;

selecting at least one environmental condition for at least one of said first subject and said second subject; and

altering at least one environmental condition for at least one of said first subject and said second subject.

**8**. The method of claim **1**, further comprising:

determining which of a plurality of devices to provide said notification.

**9**. The method of claim **8**, further comprising:

identifying said plurality of devices.

**10**. The method of claim **1**, wherein said device includes at least one of the following:

ear phones;

a speaker;

a software program;

a visual display device;

an electronic storage device;

a server; and

a user device.

**11**. The method of claim **1**, wherein said notification includes at least one of the following:

an evaluation of said first data and said second data;

an email message;

17

a visual display;

an electronic signal;

an audible sound; and

a voice message.

**12**. The method of claim **1**, wherein said evaluation includes at least one of the following:

an aggregation of data indicative of a physical characteristic for each of a plurality of subjects;

an averaging of data indicative of a physical characteristic for each of a plurality of subjects;

a selection of a behavior associated with said physical characteristic of said first subject;

a selection of a behavior associated with said physical characteristic of said second subject;

a comparison of said physical characteristic of said first subject with a stored record of behavior;

a prediction regarding at least one action that might be taken by at least one of said first subject and said second subject;

a determination of a risk of violence associated with at least one of said first subject and said second subject;

a determination of a trading propensity associated with at least one of said first subject and said second subject;

a determination of a course of action;

a determination of a course of entertainment;

a determination of a probability associated with a course of action that might be taken by at least one of said first subject and said second subject;

a determination of at least one response to provide at least one of said first subject and said second subject;

a determination of a least one response to subject said first subject to;

a determination of at least one response to subject said first subject to;

a determination of at least one option to offer at least one of said first subject and said second subject;

a selection of entertainment;

a selection of information; and

a selection of at least one environmental condition.

**13**. The method of claim **1**, further comprising:

receiving a notification regarding a plurality of options.

**14**. The method of claim **13**, further comprising:

selecting one of said plurality of options based, at least in part, on said evaluation.

**15**. The method of claim **14**, further comprising:

selecting said device based, at least in part, on said selecting one of said plurality of options.

**16**. The method of claim **13**, wherein said device is associated with at least one of said plurality of options.

**17**. The method of claim **1**, further comprising:

determining a course of action based on said first data and said second data.

**18**. The method of claim **17**, further comprising:

providing a notification based on said course of action.

**19**. The method of claim **1**, further comprising:

determining a course of action based on said evaluation.

**20**. The method of claim **19**, further comprising:

providing a notification based on said course of action.

**21**. The method of claim **1**, wherein said determining an evaluation of said first data and said second data includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject.

18

**22**. The method of claim **21**, wherein said determining an evaluation includes determining a course of action based on said record of behavior.

**23**. The method of claim **1**, further comprising:

determining a desired course of action and wherein said determining an evaluation of said first data and said second data includes determining an action based, at least in part on said data and said desired course of action.

**24**. The method of claim **1**, wherein said physical characteristic of said first subject is the same as said physical characteristic of said second subject.

**25**. The method of claim **1**, wherein said physical characteristic of said first subject is different from said physical characteristic of said second subject.

**26**. The method of claim **1**, wherein said physical characteristic of said first subject is indicative of a response of said first subject to a first presentation.

**27**. The method of claim **26**, wherein said physical characteristic of said second subject is indicative of a response of said second subject to a second presentation.

**28**. The method of claim **26**, wherein said physical characteristic of said second subject is indicative of a response of second subject to said first persentation.

**29**. The method of claim **1**, wherein said first and second devices are the same.

**30**. The method of claim **1**, wherein said first device is associated with more than one subject.

**31**. A method for providing feedback, comprising:

receiving data indicative of a physical characteristic of each of a plurality of subjects, wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation;

determining a desired course of action associated with said plurality of subjects based, at least in part, on said data indicative of a physical characteristic of each of said plurality of subjects; and

providing a notification based, at least in part, on said course of action.

**32**. The method of claim **31**, wherein said determining a course of action based on said data indicative of a physical characteristic of each of a plurality of subjects includes one of the following:

determining a course of action based, at least in part, on said data indicative of a physical characteristic of each of a plurality of subjects and a desired action that can be taken by at least one of said plurality of subjects;

determining a course of action based, at least in part, on said data indicative of a physical characteristic of each of a plurality of subjects and a desired action that can be taken by said plurality of subjects; and

determining at least one behavior associated with said physical characteristic.

**33**. The method of claim **31**, further comprising:

determining a desired action to be taken by said plurality of subjects.

**34**. The method of claim **31**, wherein said plurality of subjects includes a first subject and a second subject and wherein said data indicative of a physical characteristic of each of a plurality of subjects includes data indicative of a characteristic of said first subject and data indicative of a characteristic of said second subject.

**35**. The method of claim **31**, wherein said characteristic of said first subject is different from said characteristic of said second subject.

**36**. A method for providing feedback, comprising:

determining a desired action associated with a group of subjects;

receiving data indicative of a physical characteristic of at least one of said group of subjects, wherein said physical characteristic of said at least one of said group of subjects is indicative of a response of said at least one of said group of subjects to a presentation;

determining a course of action expected to lead to said desired action based, at least in part, on said physical characteristic and said desired action; and

providing a notification based on said course of action.

**37**. A system for facilitating feedback, comprising:

a memory;

a communication port; and

a processor connected to said memory and said communication port, said processor being operative to:

receive first data indicative of a physical characteristic of a first subject and second data indicative of a physical characteristic of a second subject;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to device.

**38**. A computer program product in a computer readable medium for using feedback, comprising:

first instructions for obtaining receiving first data representative of a physical characteristic of a first subject and second data representative of a physical characteristic of a second subject;

second instructions for preparing an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

third instructions for sending third data indicative of said evaluation of said first data and said second data to a device.

**39**. A method for providing feedback, comprising:

receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said determining said evaluation includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject; and

providing a notification regarding said evaluation to a device.

**40**. The method of claim **39**, wherein said determining an evaluation includes determining a course of action based on said at least one record of behavior.

**41**. The method of claim **39**, wherein said determining said evaluation includes comparing said physical characteristic of said second subject to at least one record of said physical characteristic associated with said physical characteristic of said second subject.

* * * * *

**US District Court Electronic Case Filing System**
**District of Utah (Northern)**
**CIVIL DOCKET FOR CASE #: 1:11-cv-00167-BSJ**

Icon Health & Fitness v. Polar Electro Oy
Assigned to: Judge Bruce S. Jenkins
Case in other court: Federal Circuit, 15-01891
               Federal, 17-01886
Cause: 35:0271 Patent Infringement

Date Filed: 11/18/2011
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Icon Health & Fitness**
*a Delaware corporation*

represented by  **David R. Wright**
MASCHOFF BRENNAN PLLC
201 S MAIN ST STE 600
SALT LAKE CITY, UT 84111
(435)252-1360
Email: dwright@mabr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Larry R. Laycock**
MASCHOFF BRENNAN PLLC
201 S MAIN ST STE 600
SALT LAKE CITY, UT 84111
(435) 252-1360
Email: llaycock@mabr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tyson K. Hottinger**
MASCHOFF BRENNAN PLLC
20 PACIFICA STE 1130
IRVINE, CA 92618
(949)202-1900
Email: thottinger@mabr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam B. Beckstrom**
MASCHOFF BRENNAN PLLC
201 S MAIN ST STE 600
SALT LAKE CITY, UT 84111
(435)252-1360
Email: abeckstrom@mabr.com
*ATTORNEY TO BE NOTICED*

**Brent P. Lorimer**
WORKMAN NYDEGGER
1000 EAGLE GATE TOWER
60 E SOUTH TEMPLE

SALT LAKE CITY, UT 84111
(801)533-9800
Email: blorimer@wnlaw.com
*TERMINATED: 08/09/2012*
*ATTORNEY TO BE NOTICED*

**Gregory E. Jolley**
KELLER JOLLEY & PREECE
222 S MAIN ST STE 500
SALT LAKE CITY, UT 84111
(801)533-9800
Email: gjolley@kjpip.com
*TERMINATED: 11/07/2012*

**Jared J. Braithwaite**
MASCHOFF BRENNAN PLLC
201 S MAIN ST STE 600
SALT LAKE CITY, UT 84111
(435)252-1360
Email: jbraithwaite@mabr.com
*ATTORNEY TO BE NOTICED*

**Kirk R. Harris**
MASCHOFF BRENNAN
1389 CENTER DR STE 300
PARK CITY, UT 84098
(435)252-1360
Email: kharris@mabr.com
*TERMINATED: 08/23/2012*
*ATTORNEY TO BE NOTICED*

**Michael A. Manookin**
MASCHOFF BRENNAN PLLC
201 S MAIN ST STE 600
SALT LAKE CITY, UT 84111
(435)252-1368
Email: mmanookin@mabr.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Polar Electro Oy**
*a Finnish company*

represented by **Anthony J. Fuga**
HOLLAND & KNIGHT LLP
131 S DEARBORN ST 30TH FL
CHICAGO, IL 60603
(312)715-5771
Email: anthony.fuga@hklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P. Moran**
HOLLAND & KNIGHT LLP

**Appx41**

800 17TH ST NW STE 1100
WASHINGTON, DC 20006
(202)828-1848
Email: john.moran@hklaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James E. Magleby**
MAGLEBY CATAXINOS &
GREENWOOD
170 S MAIN ST STE 1100
SALT LAKE CITY, UT 84101
(801)359-9000
Email: magleby@mcgiplaw.com
*ATTORNEY TO BE NOTICED*

**Jennifer F. Parrish**
MAGLEBY CATAXINOS &
GREENWOOD
170 S MAIN ST STE 1100
SALT LAKE CITY, UT 84101
(801)359-9000
Email: parrish@mcgiplaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Polar Electro Inc.**                represented by   **Anthony J. Fuga**
*a Delaware corporation*                               (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John P. Moran**
                                                       (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *PRO HAC VICE*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **James E. Magleby**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

                                                       **Jennifer F. Parrish**
                                                       (See above for address)
                                                       *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Polar Electro Oy**                  represented by   **Anthony J. Fuga**
*a Finnish company*                                    (See above for address)
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

                                                       **John P. Moran**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James E. Magleby**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer F. Parrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Polar Electro Inc.**
*a Delaware corporation*

represented by **Anthony J. Fuga**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John P. Moran**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James E. Magleby**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer F. Parrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Icon Health & Fitness**
*a Delaware corporation*

represented by **David R. Wright**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Larry R. Laycock**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brent P. Lorimer**
(See above for address)
*TERMINATED: 08/09/2012*
*ATTORNEY TO BE NOTICED*

**Gregory E. Jolley**
(See above for address)
*TERMINATED: 11/07/2012*

Jared J. Braithwaite
(See above for address)
*ATTORNEY TO BE NOTICED*

Kirk R. Harris
(See above for address)
*TERMINATED: 08/23/2012*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Icon Health & Fitness**                represented by    David R. Wright
*a Delaware corporation*                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           Larry R. Laycock
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           Brent P. Lorimer
                                                           (See above for address)
                                                           *TERMINATED: 08/09/2012*
                                                           *ATTORNEY TO BE NOTICED*

                                                           Gregory E. Jolley
                                                           (See above for address)
                                                           *TERMINATED: 11/07/2012*

                                                           Jared J. Braithwaite
                                                           (See above for address)
                                                           *ATTORNEY TO BE NOTICED*

                                                           Kirk R. Harris
                                                           (See above for address)
                                                           *TERMINATED: 08/23/2012*
                                                           *ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Polar Electro Inc.**                   represented by    Anthony J. Fuga
*a Delaware corporation*                                   (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           John P. Moran
                                                           (See above for address)
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

                                                           James E. Magleby
                                                           (See above for address)

*ATTORNEY TO BE NOTICED*

**Jennifer F. Parrish**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Polar Electro Oy**                    represented by **Anthony J. Fuga**
*a Finnish company*                     (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **John P. Moran**
                                        (See above for address)
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **James E. Magleby**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

                                        **Jennifer F. Parrish**
                                        (See above for address)
                                        *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2011 | 1 | COMPLAINT against Polar Electro Oy (Filing fee $ 350, receipt number 4681047948) (Electronic document provided on disc. Original file stamped and signed document permanently retained), filed by Icon Health & Fitness. (Attachments: # 1 Civil Cover Sheet) Assigned to Magistrate Judge Paul M. Warner (jds) (Entered: 11/21/2011) |
| 11/21/2011 | 2 | Report on the Filing of an action sent to the Director of the U.S. Patent and Trademark Office. (Attachments: # 1 Copy of Complaint) (jds) (Entered: 11/21/2011) |
| 01/24/2012 | 3 | CORPORATE DISCLOSURE STATEMENT under FRCP 7.1 filed by Plaintiff Icon Health & Fitness identifying HF Holdings, Inc. as Corporate Parent. (Wright, David) (Entered: 01/24/2012) |
| 03/16/2012 | 4 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Polar Electro Oy. Instructions to Counsel: 1. Click on the document number. 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. 3. Print the issued summons for service. (rls) (Entered: 03/16/2012) |
| 03/23/2012 | 5 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Icon Health & Fitness as to Polar Electro Oy served on 3/19/2012, answer due 4/9/2012. (Wright, David) (Entered: 03/23/2012) |
| 03/29/2012 | 6 | MOTION for Extension of Time to Serve Complaint filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Jolley, Gregory) (Entered: 03/29/2012) |
| 03/31/2012 | 7 | ORDER granting 6 Motion for Extension of Time. Signed by Magistrate Judge Paul M. |

| | | |
|---|---|---|
| | | Warner on 03/30/2012. (asp) (Entered: 03/31/2012) |
| 04/09/2012 | 8 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Icon Health & Fitness as to Polar Electro Oy served on 4/3/2012, answer due 4/24/2012. (Wright, David) (Entered: 04/09/2012) |
| 06/08/2012 | 9 | AMENDED COMPLAINT against Polar Electro Inc., Polar Electro Oy with Jury Demand., filed by Icon Health & Fitness. (Wright, David) (Entered: 06/08/2012) |
| 06/19/2012 | 10 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Polar Electro Inc.. <br> Instructions to Counsel: <br> 1. Click on the document number. <br> 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. <br> 3. Print the issued summons for service. (jds) (Entered: 06/19/2012) |
| 06/19/2012 | 11 | **RESTRICTED DOCUMENT**Summons Issued Electronically as to Polar Electro Oy. <br> Instructions to Counsel: <br> 1. Click on the document number. <br> 2. If you are prompted for an ECF login, enter your 'Attorney' login to CM/ECF. <br> 3. Print the issued summons for service. (jds) (Entered: 06/19/2012) |
| 08/02/2012 | 12 | NOTICE of Appearance by Larry R. Laycock on behalf of Icon Health & Fitness (Laycock, Larry) (Entered: 08/02/2012) |
| 08/08/2012 | 13 | NOTICE OF WITHDRAWAL OF COUNSEL of Brent P. Lorimer filed by Brent P. Lorimer on behalf of Icon Health & Fitness (Lorimer, Brent) (Entered: 08/08/2012) |
| 08/22/2012 | 14 | NOTICE OF WITHDRAWAL OF COUNSEL of Kirk R. Harris filed by David R. Wright on behalf of Icon Health & Fitness (Wright, David) (Entered: 08/22/2012) |
| 10/08/2012 | 15 | **RESTRICTED DOCUMENT** SUMMONS Returned Executed by Icon Health & Fitness as to Polar Electro Inc. served on 10/5/2012, answer due 10/26/2012. (Wright, David) (Entered: 10/08/2012) |
| 10/15/2012 | 16 | WAIVER OF SERVICE Returned Executed filed by Icon Health & Fitness as to Polar Electro Oy Waiver sent on 10/12/2012, answer due 12/11/2012. (Braithwaite, Jared) (Entered: 10/15/2012) |
| 10/15/2012 | 17 | NOTICE OF REQUIREMENTS for appearance phv mailed to attorney John Moran, for Defendants Polar Electro Inc., Polar Electro Oy (alp) (Entered: 10/15/2012) |
| 11/06/2012 | 18 | SUBSTITUTION OF COUNSEL Larry R. Laycock as counsel on behalf of Icon Health & Fitness. (Laycock, Larry) (Entered: 11/06/2012) |
| 11/06/2012 | 19 | NOTICE OF WITHDRAWAL OF COUNSEL of Gregory E. Jolley filed by Gregory E. Jolley on behalf of Icon Health & Fitness (Jolley, Gregory) (Entered: 11/06/2012) |
| 11/13/2012 | 20 | NOTICE of REMOVING COUNSEL FROM SERVICE LIST filed by Gregory E. Jolley.Attorney Gregory E. Jolley will no longer receive notice from the court in this case including final judgment. (Jolley, Gregory) (Entered: 11/13/2012) |
| 11/15/2012 | 21 | NOTICE of Appearance by James E. Magleby on behalf of Polar Electro Inc., Polar Electro Oy (Magleby, James) (Entered: 11/15/2012) |
| 11/15/2012 | 22 | MOTION for Admission Pro Hac Vice of John P. Moran , Registration fee $ 15, receipt number 1088-1717213, filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Exhibit Exhibit A PHV Application, # 2 Exhibit Exhibit B ECF Registration, # 3 Text of Proposed Order)(Magleby, James) (Entered: 11/15/2012) |

| | | |
|---|---|---|
| 11/15/2012 | 23 | ORDER granting 22 Motion for Admission Pro Hac Vice of John P. Moran for Polar Electro Inc.,John P. Moran for Polar Electro Oy. *Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at http://www.utd.uscourts.gov* . Signed by Magistrate Judge Paul M. Warner on 11/15/2012. (asp) (Entered: 11/15/2012) |
| 11/19/2012 | 24 | NOTICE OF ADR, e-mailed or mailed to Plaintiff Icon Health & Fitness, Defendants Polar Electro Inc., Polar Electro Oy. (alp) (Entered: 11/19/2012) |
| 11/19/2012 | 25 | NOTICE - This case is assigned to a magistrate judge. To consent or request reassignment, use the form on this link or use the included form for non-efilers and send it to consents@utd.uscourts.gov within 15 days or mail to the court with *Attention: Consent Clerk* on the envelope. Notice e-mailed or mailed to Plaintiff Icon Health & Fitness, Defendants Polar Electro Inc., Polar Electro Oy. Form due by 12/4/2012. (alp) (Entered: 11/19/2012) |
| 11/19/2012 | 26 | NOTICE of Appearance by Jennifer F. Parrish on behalf of Polar Electro Inc., Polar Electro Oy (Parrish, Jennifer) (Entered: 11/19/2012) |
| 11/20/2012 | 27 | RECEIVED Consent/Reassignment Form from Defendants Polar Electro Inc., Polar Electro Oy. (alp) (Entered: 11/20/2012) |
| 11/20/2012 | 28 | RECEIVED Consent/Reassignment Form from Plaintiff Icon Health & Fitness. (alp) (Entered: 12/11/2012) |
| 12/11/2012 | 29 | All Consent/Reassignment Forms have now been received. After review of all forms, Case Reassigned to District Judge per request of one or more party(s). Case randomly assigned to Judge Bruce S. Jenkins. Magistrate Judge Paul M. Warner no longer assigned to the case. (alp) (Entered: 12/11/2012) |
| 12/12/2012 | 30 | ANSWER to 9 Amended Complaint with Jury Demand , COUNTERCLAIM against Icon Health & Fitness filed by Polar Electro Oy, Polar Electro Inc..(Parrish, Jennifer) (Entered: 12/12/2012) |
| 12/14/2012 | 31 | **NOTICE OF HEARING**: Initial Status and Scheduling Conference set for 1/25/2013 **01:15 PM in Room 420 before Judge Bruce S. Jenkins,** 350 South Main Street, Salt Lake City, Utah. The court advises counsel and parties appearing pro se that **not less than fourteen (14) days** prior to the initial conference they should meet with each other and prepare a proposed plan of discovery and case preparation pursuant to Rule 26(f)(1), (2), (3), and 4 of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 16(b) & DUCivR 16-1(a)(1). A written report outlining the proposed plan, as agreed, shall be filed with the court **no later than ten (10) days** prior to the above-scheduled hearing date. Counsel (and parties appearing pro se) should also gather and examine existing documents relevant to the case which are in the possession and control of parties or their counsel and either produce them at their initial Rule 26(f) planning meeting or, as part of the proposed discovery plan, agree as to a specific date upon which such documents shall be produced. See Fed. R. Civ. P. 26(a). (kms) (Entered: 12/14/2012) |
| 01/07/2013 | 32 | Stipulated MOTION for Extension of Time to File Response/Reply as to 30 Answer to Amended Complaint, Counterclaim filed by Plaintiff Icon Health & Fitness, Counter Defendant Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order Proposed Order Granting Stipulated Motion to Extend)(Braithwaite, Jared) (Entered: 01/07/2013) |
| 01/08/2013 | 33 | ORDER granting Stipulated 32 Motion for Extension of Time to File Response/Reply re 32 Stipulated MOTION for Extension of Time to File Response/Reply as to 30 Answer |

| | | |
|---|---|---|
| | | <span style="color:red">to Amended Complaint, Counterclaim . Responses due by 1/21/2013. Signed by Judge Bruce S. Jenkins on 1/7/13. (jmr) (Entered: 01/08/2013)</span> |
| 01/10/2013 | 70 | ERROR: Minute Entry for proceedings held before Judge Bruce S. Jenkins: Claim Construction Hearing held on 1/10/2013. Detailed minute entry to follow pending Judge Jenkins' approval. Attorney for Plaintiff: Adam B. Beckstrom, Jared J. Braithwaite, Attorney for Defendant: John P. Moran. Court Reporter: Laura Robinson. (kpf) Docketed the wrong year. Modified on 2/6/2014 (kpf). (Entered: 01/13/2014) |
| 01/17/2013 | 34 | REPORT OF ATTORNEY PLANNING MEETING. (Attachments: # 1 Text of Proposed Order Proposed Scheduling Order)(Braithwaite, Jared) (Entered: 01/17/2013) |
| 01/21/2013 | 35 | *ICON Health & Fitness, Inc.'s* ANSWER to 30 Counterclaim , COUNTERCLAIM against Polar Electro Inc., Polar Electro Oy filed by Icon Health & Fitness.(Braithwaite, Jared) (Entered: 01/21/2013) |
| 01/21/2013 | 36 | Plaintiff's MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Counter Defendant Icon Health & Fitness, Counter Claimant Icon Health & Fitness, Plaintiff Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order Proposed Order)(Braithwaite, Jared) Modified on 4/5/2013: updated motion relief (alt) (Entered: 01/21/2013) |
| 01/24/2013 | 37 | MOTION to Stay and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Affidavit John P. Moran, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Text of Proposed Order)(Moran, John) (Entered: 01/24/2013) |
| 01/25/2013 | 38 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Report & Scheduling Conference held on 1/25/2013. Discussion heard. Crt schedules:- Further, consideration at Status Report & Scheduling Conference 4/19/2013, at 1:30 PM.- Discovery (fact) as to the one and the three with cutoff nlt 4/30/2013. Attorney for Plaintiff: see Minute Entry, Attorney for Defendant: John P. Moran. Court Reporter: Laura Robinson.(Time Start: 1:20 PM, Time End: 1:40 PM, Room 420.) (mrw) (Entered: 02/08/2013) |
| 02/11/2013 | 39 | ANSWER to 35 Counterclaim filed by Polar Electro Inc., Polar Electro Oy.(Moran, John) (Entered: 02/11/2013) |
| 02/11/2013 | 40 | Plaintiff's MEMORANDUM in Opposition re 37 MOTION to Stay and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Beckstrom, Adam) (Entered: 02/11/2013) |
| 02/14/2013 | 41 | **NOTICE OF HEARING ON MOTION** re: 37 MOTION for Partial Stay : Motion Hearing set for 4/5/2013 02:30 PM in Room 420 before Judge Bruce S. Jenkins. (kms) (Entered: 02/14/2013) |
| 02/19/2013 | 42 | NOTICE of Change of Address by Larry R. Laycock (Laycock, Larry) (Entered: 02/19/2013) |
| 02/21/2013 | 43 | MEMORANDUM in Opposition re 36 Plaintiff's MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support filed by Counter Claimants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 02/21/2013) |
| 03/01/2013 | 44 | REPLY to Response to Motion re 37 MOTION to Stay and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 03/01/2013) |
| 03/06/2013 | 45 | **NOTICE OF HEARING ON MOTION** re: 36 Plaintiff's MOTION TO PARTIALLY DISMISS FOR FAILURE TO STATE A CLAIM : Motion Hearing set for 4/5/2013 |

| | | 02:30 PM in Room 420 before Judge Bruce S. Jenkins. (kms) (Entered: 03/06/2013) |
|---|---|---|
| 03/11/2013 | 46 | REPLY to Response to Motion re 36 Plaintiff's MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support of *ICON's Motion to Partially Dismiss Defendant's Counterclaims* filed by Counter Defendant Icon Health & Fitness, Counter Claimant Icon Health & Fitness, Plaintiff Icon Health & Fitness. (Braithwaite, Jared) (Entered: 03/11/2013) |
| 04/05/2013 | 47 | STIPULATION re 36 Plaintiff's MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM and Memorandum in Support by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order Proposed Order)(Braithwaite, Jared) (Entered: 04/05/2013) |
| 04/05/2013 | 48 | STIPULATION re 37 MOTION to Stay and Memorandum in Support by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order Proposed Order)(Braithwaite, Jared) (Entered: 04/05/2013) |
| 04/05/2013 | 49 | ORDER granting 36 Motion to Partially Dismiss Counterclaims without prejudice. Polar shall have 30 days leave to amend its counterclaims. Signed by Judge Bruce S. Jenkins on 4/5/13 (alt) (Entered: 04/05/2013) |
| 04/18/2013 | | **NOTICE VACATING STATUS AND SCHEDULING HEARING** set for April 19, 2013, 1:30 p.m. before Judge Jenkins. (kms) (Entered: 04/18/2013) |
| 05/13/2013 | 50 | **NOTICE OF HEARING ON MOTION** re: to consider 48 stipulation to partially stay in re: 37 MOTION to Stay : Motion Hearing set for 5/21/2013 at 01:10 PM in Room 420 before Judge Bruce S. Jenkins. (kms) (Entered: 05/13/2013) |
| 05/21/2013 | 54 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Motion Hearing held on 5/21/2013 re: MOTION Partially to Stay filed by Polar Electro Inc., Polar Electro Oy.Argument & discussion heard. Crt rules:- Grants, motion to consider stip to partially stay. Cnsl to finish construction research.Crt schedules :- Construction hearing set 12/6/2013, at 9:30 AM.Mr. Braithwaite to prepare & submit proposed order. Attorney for Plaintiff: see Minute Entry, Attorney for Defendant: see Minute Entry. Court Reporter: Kelly Hicken.(Time Start: 1:10 PM, Time End: 1:25 PM, Room 420.) (mrw) (Entered: 06/11/2013) |
| 05/22/2013 | 51 | ORDER for Partial Stay Pending Reexaminatgion of Two Patents-In-Suit re 48 Stipulation filed by Icon Health & Fitness. See order for details. Signed by Judge Bruce S. Jenkins on 5/21/13. (jmr) (Entered: 05/22/2013) |
| 05/30/2013 | 52 | STIPULATION *to Enter Scheduling Order* by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order Proposed Order)(Braithwaite, Jared) (Entered: 05/30/2013) |
| 05/31/2013 | 53 | SCHEDULING ORDER:Claim Construction Conference set for 12/6/2013 09:30 AM in Room 420 before Judge Bruce S. Jenkins. See Order for details. Signed by Judge Bruce S. Jenkins on 5/30/13. (jmr) (Entered: 05/31/2013) |
| 08/23/2013 | 55 | NOTICE OF FILING of Joint Claim Construction and Prehearing Statement filed by Counter Defendant Icon Health & Fitness, Counter Claimant Icon Health & Fitness, Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit A - Agreed Claim Term or Phrase Constructions, # 2 Exhibit B - Disputed Claim Term or Phrase Constructions) (Braithwaite, Jared) (Entered: 08/23/2013) |
| 10/18/2013 | 56 | Opening Claim Construction BRIEF re 55 Notice of Filing, filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit Exhibit A - Chicago Manual of Style Online Citation)(Beckstrom, Adam) (Entered: 10/18/2013) |
| 11/08/2013 | 57 | DECLARATION of John P. Moran re 55 Notice of Filing, *in Support of Polar Electro Oy's and Polar Electro Inc.'s Opening Claim Construction BRIEF* filed by Polar Electro |

| | | |
|---|---|---|
| | | Inc., Polar Electro Oy. (Attachments: # 1 Exhibit 1 - Excerpt IEEE100 The Authoritative Dictionary of IEEE Standards Terms 7th ed. (2000), # 2 Exhibit 2 - Excerpt Microsoft Computer Dictionary 4th ed. (1999), # 3 Exhibit 3 - Excerpt Microsoft Computer Dictionary 3d ed. (1997), # 4 Exhibit 4 - Collection of Passages from US Patent No. 6,921,351)(Moran, John) (Entered: 11/08/2013) |
| 11/08/2013 | 58 | Opening Claim Construction BRIEF re 55 Notice of Filing, 57 Declaration,, filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 11/08/2013) |
| 11/22/2013 | 59 | Stipulated MOTION for Extension of Time to File Response/Reply as to 56 Brief, 53 Scheduling Order filed by Counter Defendant Icon Health & Fitness, Counter Claimant Icon Health & Fitness, Plaintiff Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Braithwaite, Jared) (Entered: 11/22/2013) |
| 11/22/2013 | 60 | ORDER granting Stipulated 59 Motion for Extension of Time to File Response/Reply re 59 Stipulated MOTION for Extension of Time to File Response/Reply as to 56 Brief, 53 Scheduling Order . Replies due by 11/25/2013. Signed by Judge Bruce S. Jenkins on 11/22/13. (jmr) (Entered: 11/22/2013) |
| 11/25/2013 | 61 | NOTICE OF FILING of Motion to Transfer Related Case filed by Plaintiff Icon Health & Fitness. (Braithwaite, Jared) (Entered: 11/25/2013) |
| 11/25/2013 | 62 | MOTION for Scheduling Order and Memorandum in Support *to Reset Claim Constsruction Procedures* filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order Proposed Order)(Braithwaite, Jared) (Entered: 11/25/2013) |
| 11/25/2013 | 63 | AFFIDAVIT/DECLARATION of Jared J. Braithwaite in Support re 62 MOTION for Scheduling Order and Memorandum in Support *to Reset Claim Constsruction Procedures* filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit Polar's Preliminary Claim Constructions)(Braithwaite, Jared) (Entered: 11/25/2013) |
| 11/25/2013 | 64 | Reply to Polar's Opening Claim Constuction Brief BRIEF re 55 Notice of Filing, 58 Brief, 56 Brief, 61 Notice of Filing, 62 MOTION for Scheduling Order and Memorandum in Support *to Reset Claim Constsruction Procedures* filed by Plaintiff Icon Health & Fitness. (Braithwaite, Jared) (Entered: 11/25/2013) |
| 11/27/2013 | 65 | RESPONSE re 61 Notice of Filing,*and Opp'n to ICON's Mot for Transfer* filed by Polar Electro Inc., Polar Electro Oy. (Parrish, Jennifer) (Entered: 11/27/2013) |
| 12/02/2013 | 66 | Defendant's MEMORANDUM in Opposition re 62 MOTION for Scheduling Order and Memorandum in Support *to Reset Claim Constsruction Procedures* filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 12/02/2013) |
| 12/04/2013 | 67 | **NOTICE OF HEARING ON MOTION** re: to consider 62 MOTION to Reset Claim Construction Procedures and 66 OPPOSITION thereto: Motion Hearing set for 12/6/2013 09:30 AM in Room 420 before Judge Bruce S. Jenkins. (kms) (Entered: 12/04/2013) |
| 12/06/2013 | 68 | Minute Order. Proceedings held before Judge Bruce S. Jenkins: Motion Hearing held on 12/6/2013 re 62 MOTION for Scheduling Order and Memorandum in Support *to Reset Claim Constsruction Procedures* filed by Icon Health & Fitness. Motion Hearing set for 1/10/2014 at 01:30 PM in Room 420. Attorney for Plaintiff: Adam B. Beckstrom; Jared J. Braithwaite, Attorney for Defendant John P. Moran. Court Reporter: Patti Walker. (kpf). Attached detailed minute entry. Modified on 12/23/2013 (kpf). (Entered: 12/09/2013) |
| 12/23/2013 | | Modification of Docket: Attached detailed to minute entry. re 68 Motion Hearing. (kpf) (Entered: 12/23/2013) |

| 01/03/2014 | 69 | REPLY BRIEF re 58 Brief *ICON's Supplemental Reply to Polar's Opening Claim Construction Brief* filed by Plaintiff Icon Health & Fitness. (Wright, David) (Entered: 01/03/2014) |
|---|---|---|
| 01/10/2014 | 72 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Conference held on 1/10/2014. Attached detailed minute entry. Attorney for Plaintiff: Adam B. Beckstrom, Jared J. Braithwaite, Attorney for Defendant: John P. Morgan. Court Reporter: Laura Robinson (kpf). Attached detailed minute entry. Modified on 2/10/2014 (kpf). (Entered: 02/06/2014) |
| 01/14/2014 | 71 | NOTICE OF FILING re 70 Status Conference, *Record Copy of the Markman Submission to the Court at the January 10, 2014, Hearing* filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Exhibit Record Copy of Markman Submission to the Court)(Moran, John) (Entered: 01/14/2014) |
| 02/10/2014 | 73 | Modification of Docket: Correction: Attached detailed minute entry. re 72 Status Conference. (kpf) (Entered: 02/10/2014) |
| 07/18/2014 | 74 | **NOTICE OF HEARING**: Claim Construction Hearing in the above matter was held on 1/10/2014. The matter is set for re-argument in light of Nautilus, Inc. v. Blosig Instruments, Inc., 134 S.Ct. 2120 (2014). Hearing set for 8/21/2014 10:00 AM in Rm 7.200.<br>Court Address: NEW COURTHOUSE - 351 South West Temple, Salt Lake City, Utah (kms) (Entered: 07/18/2014) |
| 08/20/2014 | 75 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Claims Construction Hearing held on January 10, 2014 before Judge Bruce S. Jenkins. Court Reporter/Transcriber Laura W. Robinson, RPR, FCRR, CSR, CP, Telephone number (801)328-4800.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/10/2014. Redacted Transcript Deadline set for 9/22/2014. Release of Transcript Restriction set for 11/18/2014. (jmr) Modified on 11/18/2014 by removing restricted text (las). (Entered: 08/20/2014) |
| 08/21/2014 | 76 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Claim Construction Hearing (re-argument) held on 8/21/2014. After hearing from counsel, Court instructed counsel to file brief summarizing their arguments. Plaintiffs brief due within one week, defendants due 7 days after. Brief are to focus on the Supreme Court mandated new standard. Attorney for Plaintiff: Jared J. Braithwaite and Adam B. Beckstrom, Attorney for Defendant: John P. Moran. Court Reporter: Kelly Hicken.(Time Start: 10:00 am, Time End: 11:15 am, Room 7.200.) (ss) Modified on 9/9/2014 to add docket text and attach minute entry (ss). (ss). (Entered: 08/22/2014) |
| 08/28/2014 | 77 | Supplemental Claim Construction BRIEF re 76 Miscellaneous Hearing, 56 Brief filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit Exhibit A - MPEP 2173, # 2 Exhibit Exhibit B - US Pat. No. 6,921,351, # 3 Exhibit Exhibit C - Office Action, # 4 Exhibit Exhibit D- Amendment and Remarks, # 5 Exhibit Exhibit E - Notice of |

| | | Allowance, # 6 Exhibit Exhibit F - Mycone Dental Supply v. Creative Nail Design Opinion)(Braithwaite, Jared) (Entered: 08/28/2014) |
|---|---|---|
| 09/04/2014 | 78 | Supplemental Claim Construction Brief BRIEF re 76 Miscellaneous Hearing, *(Supplemental Markman Hearing)* filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 09/04/2014) |
| 09/05/2014 | 80 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Claims Construction Hearing held on 1/10/14 before Judge Bruce S. Jenkins. Court Reporter/Transcriber Laura Robinson.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/26/2014. Redacted Transcript Deadline set for 10/6/2014. Release of Transcript Restriction set for 12/4/2014. (ss) Modified on 12/4/2014 by removing restricted text(las). (Entered: 09/29/2014) |
| 09/09/2014 | 79 | Modification of Docket: Correction: Attached approved minute entry re 76 Miscellaneous Hearing. (ss) (Entered: 09/09/2014) |
| 10/03/2014 | 81 | NOTICE REGARDING CLAIM CONSTRUCTION (ss) (Entered: 10/03/2014) |
| 12/17/2014 | 82 | **NOTICE OF HEARING**: Status Report and Scheduling Conference set for 1/7/2015 at 01:20 PM in Rm 7.200 before Judge Bruce S. Jenkins. (kms) (Entered: 12/17/2014) |
| 01/07/2015 | 83 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Conference and Scheduling Conference held on 1/7/2015. Parties have been working on discovery. Counsel will file briefs by 2/13/15. Court set an Evidentiary Hearing for 2/27/2015 at 01:30 PM in Rm 7.200 before Judge Bruce S. Jenkins. Counsel are to have expert witnesses present. Attorney for Plaintiff: Jared J. Braithwaite, Attorney for Defendant: John P. Moran. Court Reporter: Laura Robinson.(Time Start: 1:30 pm, Time End: 1:35 am, Room 7.200.)(ss) Modified on 2/25/2015 to add docket text and attach minute entry (ss). (ss). (Entered: 01/08/2015) |
| 02/09/2015 | 84 | Defendant's MOTION for Summary Judgment and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Moran, John) (Entered: 02/09/2015) |
| 02/13/2015 | 85 | Second Supplemental Markman Brief BRIEF filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Moran, John) (Entered: 02/13/2015) |
| 02/13/2015 | 86 | Supplemental Claim Construction BRIEF filed by Plaintiff Icon Health & Fitness. (Braithwaite, Jared) (Entered: 02/13/2015) |
| 02/13/2015 | 87 | DECLARATION of Mohammed N. Islam re 86 Brief filed by Icon Health & Fitness. (Attachments: # 1 Exhibit Exhibit A - Report)(Braithwaite, Jared) (Entered: 02/13/2015) |
| 02/13/2015 | 88 | DECLARATION of Jared J. Braithwaite re 86 Brief filed by Icon Health & Fitness. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit Ex. A - Heppe Depo Transcript, # 2 Exhibit Ex. B - Heppe Declaration, # 3 Exhibit Ex. C - Islam Depo Transcript)(Braithwaite, Jared) (Entered: 02/13/2015) |
| 02/19/2015 | 89 | Emergency MOTION to Strike 87 Declaration and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Exhibit Excerpt of Depo Transcript of Mohammed Islam, # 2 Text of Proposed Order)(Moran, John) (Entered: 02/19/2015) |
| 02/19/2015 | 90 | MOTION to Expedite Briefing & Consideration of Emergency Motion to Strike Untimely February 13, 2015 Declaration of Mohammed Islam and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 02/19/2015) |
| 02/23/2015 | 91 | Plaintiff's MEMORANDUM in Opposition re 89 Emergency MOTION to Strike 87 Declaration and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Beckstrom, Adam) (Entered: 02/23/2015) |
| 02/23/2015 | 92 | DECLARATION of Adam B. Beckstrom re 91 Memorandum in Opposition to Motion *to Strike Declaration* filed by Icon Health & Fitness. (Attachments: # 1 Exhibit A - Islam Depo Transcript (Full))(Beckstrom, Adam) (Entered: 02/23/2015) |
| 02/24/2015 | 93 | REPLY to Response to Motion re 89 Emergency MOTION to Strike 87 Declaration and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 02/24/2015) |
| 02/24/2015 | 94 | REQUEST to Submit for Decision re 89 Emergency MOTION to Strike 87 Declaration and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 02/24/2015) |
| 02/25/2015 | 95 | Modification of Docket: Correction: Attached Approved Minute Entry re 83 Status and Scheduling Conference. (ss) (Entered: 02/25/2015) |
| 02/27/2015 | 96 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Evidentiary Hearing held on 2/27/2015, Set Deadlines/Hearing as to 89 Emergency MOTION to Strike 87 Declaration and Memorandum in Support , 90 MOTION to Expedite Briefing & Consideration of Emergency Motion to Strike Untimely February 13, 2015 Declaration of Mohammed Islam and Memorandum in Support , 84 Defendant's MOTION for Summary Judgment and Memorandum in Support :( Motion Hearing set for 3/30/2015 at 02:00 PM in Rm 7.200 before Judge Bruce S. Jenkins. Counsel for parties present. Plaintiff called Dr. Mohammed Islam. Witness sworn, testimony given. Plaintiff exhibit 2 (copy of patent) was offered and received. Defendant called Dr Stephen Heppe. Witness sworn, testimony given. Court reserved mling on the matter at this time. Court set a hearing for further argument on all pending motions on 3/30/15 at 2:00 pm. Attorney for Plaintiff: Jared J. Braithwaite, Adam B. Beckstrom, Attorney for Defendant: John Moran. Court Reporter: Laura Robinson.(Time Start: 1:40 pm, Time End: 4:40 pm, Room 7.200.) (ss) Modified on 4/20/2015 to add docket text and attach minute entry(ss). (ss). (Entered: 03/02/2015) |
| 03/09/2015 | 97 | RESPONSE to Motion re 90 MOTION to Expedite Briefing & Consideration of Emergency Motion to Strike Untimely February 13, 2015 Declaration of Mohammed Islam and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Braithwaite, Jared) (Entered: 03/09/2015) |
| 03/12/2015 | 98 | MEMORANDUM in Opposition re 84 Defendant's MOTION for Summary Judgment and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Braithwaite, Jared) (Entered: 03/12/2015) |

| 03/12/2015 | 99 | APPENDIX to 98 Memorandum in Opposition to Motion filed by Plaintiff Icon Health & Fitness *per DUCivR 56-1(f)*. (Attachments: # 1 Exhibit 1 - US 6921351, # 2 Exhibit 2 - 351 Patent Application, # 3 Exhibit 3 - Amendment and Remarks, # 4 Exhibit 4 - Notice of Allowability, # 5 Exhibit 5 - Joint Claim Construction and Prehearing Statement, # 6 Exhibit 6 - Islam Report, # 7 Exhibit 7 - Islam Depo Transcript, # 8 Exhibit 8 - Islam Declaration, # 9 Exhibit 9 - Heppe Depo Transcript, # 10 Exhibit 10 - In the Matter of Certain GPS Devices, USITC Inv.)(Braithwaite, Jared) (Entered: 03/12/2015) |
|---|---|---|
| 03/26/2015 | 100 | REPLY to Response to Motion re 84 Defendant's MOTION for Summary Judgment and Memorandum in Support filed by Defendant Polar Electro Inc.. (Moran, John) (Entered: 03/26/2015) |
| 03/30/2015 | 101 | <span style="color:red">ENTRY ERROR- Order entered in incorrect case.<br>ORDER REFERRING CASE to Magistrate Judge Paul M. Warner under 28:636 (b)(1) for for Settlement. No attached document. Signed by Judge Robert J. Shelby on 5/30/215. (las) Modified on 3/30/2015 added error text (las). (Entered: 03/30/2015)</span> |
| 03/30/2015 | 102 | Modification of Docket: Error: Order entered in incorrect case. Correction: Order will be entered in correct case. re 101 Order Referring Case to Magistrate Judge. (las) (Entered: 03/30/2015) |
| 03/30/2015 | 103 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Motion Hearing held on 3/30/2015 re 84 Defendant's MOTION for Summary Judgment and Memorandum in Support filed by Polar Electro Inc., Polar Electro Oy. The court determined the patent was impermissibly vague and lacked the clarity of specificity neccessayr to inform the world as to its claims. The court asked counsel for Defendants to submit a suggested form of order, reserving teh right to amplify the reasons idenfified therein as to the court's bases for its ruling. During hearing, the court made special referenced to the testimony of parties' experts and pointed out that they provided the footing for the court's decision. As the arguments made and the findings of the court go beyond the arguments made in Defendants' motion, the Motion for Summary Judgment is moot. Attorney for Plaintiff: Jared Braithwaite, Attorney for Defendant: Adam Beckstrom. Court Reporter: Clark Edwards.(Time Start: 2:00, Time End: 4:15, Room 7.200.)(las) (las). Modified on 5/19/2015 added minute entry text (las). (Entered: 04/03/2015) |
| 04/07/2015 | 104 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing Excerpt (Judge's Final Comments) held on 3/30/2015 before Judge Bruce S. Jenkins. Court Reporter/Transcriber Clark L. Edwards, RPR, Telephone number 801-983-2180.<br><br>**<span style="color:red">NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.</span>**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 4/28/2015. Redacted Transcript Deadline set for 5/8/2015. Release of Transcript Restriction set for 7/6/2015. (jwt) Modified on 9/11/2015 by removing restricted text(las). (Entered: 04/07/2015) |
| 04/14/2015 | 106 | NOTICE OF FILING of Proposed Memorandum Opinion & Order Regarding Claim Construction filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) |

| | | (Entered: 04/14/2015) |
|---|---|---|
| 04/16/2015 | 109 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Evidentiary Hearing held on 2/27/15 before Judge Bruce S. Jenkins. Court Reporter/Transcriber Laura Robinson.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact <u>personal data identifiers</u> from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/7/2015. Redacted Transcript Deadline set for 5/18/2015. Release of Transcript Restriction set for 7/15/2015. (ss) Modified on 9/11/2015 by removing restricted text (las). (Entered: 04/23/2015) |
| 04/20/2015 | 108 | Modification of Docket: Correction: Attached approved minute entry re 96 Evidentiary Hearing. (ss) (Entered: 04/20/2015) |
| 04/24/2015 | 110 | OBJECTIONS to 106 Notice of Filing filed by Icon Health & Fitness. (Braithwaite, Jared) (Entered: 04/24/2015) |
| 05/18/2015 | 111 | MEMORANDUM DECISION and ORDER REGARDING CLAIM CONSTRUCTION.As such, the court orders that Plaintiff's claim against Defendants for infringement of the '351 patent is DISMISSED WITH PREJUDICE. Signed by Judge Bruce S. Jenkins on 5/18/2015. (kpf) (Entered: 05/18/2015) |
| 06/05/2015 | 112 | CLERK'S JUDGMENT - It is ordered that judgment be entered in favor of the defendants and plaintiffs claim against the defendants for infringement of the '351 patent is dismissed with prejudice. signed by Louise S. York. Case Closed. (ss) (Entered: 06/08/2015) |
| 06/16/2015 | 113 | **NOTICE OF HEARING**: Status Conference set for 6/29/2015 at 01:20 PM in Rm 7.200 before Judge Bruce S. Jenkins. (kms) (Entered: 06/16/2015) |
| 06/29/2015 | 114 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Conference held on 6/29/2015, ( Status Report and Scheduling Conference set for 10/2/2015 at 01:30 PM in Rm 7.200 before Judge Bruce S. Jenkins. Counsel updated the court as to the status of claims that are re-examined. Court ordered the case reopened. Court set the matter for status and scheduling on 10/2/15 at 1 :30pm. Counsel to contact the court regarding the status of certification. Mr.Braithwaite to prepare an order. Attorney for Plaintiff: Larry R. Laycock and Jared J. Braithwaite, Attorney for Defendant: Jennifer F. Parrish. Court Reporter: Patti Walker.(Time Start: 1:20 pm, Time End: 1:30 pm, Room 7.200.)(ss) Modified on 7/20/2015 to add docket text and attach minute entry.(ss). (ss). (Entered: 06/29/2015) |
| 07/06/2015 | 115 | MOTION for Judgment under Rule 54(b) and Memorandum in Support *(Unopposed)* filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order) (Braithwaite, Jared) (Entered: 07/06/2015) |
| 07/06/2015 | 116 | NOTICE of Proposed Order Reopening Case and Setting Status Conference by Icon Health & Fitness re 114 Status Conference, Set Hearings,, (Attachments: # 1 Text of Proposed Order) (Braithwaite, Jared) (Entered: 07/06/2015) |

| 07/09/2015 | 117 | ORDER granting 115 Motion for Entry of Judgment under Rule 54(b). IT IS HEREBY ORDERED that the clerk enter judgment in favor of defendants Polar Electro Oy and Polar Electro, Inc. with respect to ICON's claim for infringement of the '351 patent. Signed by Judge Bruce S. Jenkins on 7/8/15. (jmr) (Entered: 07/09/2015) |
|---|---|---|
| 07/09/2015 | 118 | ORDER REOPENING CASE and Setting Status Conference ( Status Report and Scheduling Conference set for 10/2/2015 at 01:30 PM in Rm 7.200 before Judge Bruce S. Jenkins.). Signed by Judge Bruce S. Jenkins on 7/8/15. (jmr) (Entered: 07/09/2015) |
| 07/09/2015 | 119 | CLERK'S JUDGMENT - That final judgment be entered, pursuant to FRCP 54(b), in favor the defendant on plaintiff's third claim for relief for infringement of the '351 patent which is dismissed with prejudice. signed by Louise S. York. (ss) (Entered: 07/16/2015) |
| 07/20/2015 | 120 | Modification of Docket: Correction: Attached approved minute entry re 114 Status Conference. (ss) (Entered: 07/20/2015) |
| 07/28/2015 | 121 | NOTICE OF APPEAL as to 119 Clerk's Judgment, filed by Icon Health & Fitness. Appeals to the USCA for the Federal Circuit. Filing fee $ 505, receipt number 1088-2309333. (Braithwaite, Jared) (Entered: 07/28/2015) |
| 07/29/2015 | 122 | Transmission of Preliminary Record to USCA re 121 Notice of Appeal (Attachments: # 1 Appendix)(ss) (Entered: 07/29/2015) |
| 07/29/2015 | 123 | Transmission of Preliminary Record to USCA re 121 Notice of Appeal (Attachments: # 1 Appendix)(ss) (Entered: 07/29/2015) |
| 08/03/2015 | 124 | USCA Case Number Case Appealed to Federal Circuit Case Number 15-1891 for 121 Notice of Appeal filed by Icon Health & Fitness. (jmr) (Entered: 08/03/2015) |
| 08/03/2015 | 125 | ORDER of USCA Tenth Circuit as to 121 Notice of Appeal filed by Icon Health & Fitness. The captioned appeal was opened in error and is now administratively closed. (jmr) (Entered: 08/03/2015) |
| 08/11/2015 | 126 | NOTICE of Transcript Order and Statement of Issues it Intends to Present on Appeal by Icon Health & Fitness (Attachments: # 1 Exhibit Federal Circuit Form 22) (Braithwaite, Jared) (Entered: 08/11/2015) |
| 08/18/2015 | 127 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 1/7/2015 before Judge Bruce S. Jenkins, re 121 Notice of Appeal. Court Reporter/Transcriber Patti Walker.

**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 9/8/2015. Redacted Transcript Deadline set for 9/18/2015. Release of Transcript Restriction set for 11/16/2015. (ss) (Additional attachment(s) added on 9/15/2015: # 1 Corrected Transcript) (las). Modified on 9/15/2015 corrected date of transcript(las). Modified on 11/16/2015 by removing restricted text (las). (Entered: 08/18/2015) |

| | | |
|---|---|---|
| 09/17/2015 | [129](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on August 21, 2014 before Judge Bruce S. Jenkins. Court Reporter/Transcriber Kelly Brown Hicken, Telephone number 801-521-7238.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 10/8/2015. Redacted Transcript Deadline set for 10/19/2015. Release of Transcript Restriction set for 12/16/2015. (las) Modified on 12/16/2015 by removing restricted text (las). (Entered: 09/17/2015) |
| 10/02/2015 | [131](#) | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Conference held on 10/2/2015. Status and Scheduling Conference set for 1/8/2016 at 01:15 PM in Rm 7.200 before Judge Bruce S. Jenkins. Attorney for Plaintiff: Jared J. Braithwaite, Attorney for Defendant: Jennifer F. Parrish. Court Reporter: Laura Robinson.(kpf) Modified on 12/15/2015 to add docketing text and attach approved minute entry (kpf). (Entered: 10/02/2015) |
| 11/30/2015 | [132](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on March 30, 2015 before Judge Bruce S. Jenkins, re [121](#) Notice of Appeal. Court Reporter/Transcriber Clark L. Edwards, Telephone number 801-983-2180.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/21/2015. Redacted Transcript Deadline set for 12/31/2015. Release of Transcript Restriction set for 2/29/2016. (las) Modified on 2/29/2016 by removing restricted text (las). (Entered: 11/30/2015) |
| 12/14/2015 | [134](#) | NOTICE of Change of Firm Name and Email Addresses by Polar Electro Inc. (Parrish, Jennifer) (Entered: 12/14/2015) |
| 01/08/2016 | [135](#) | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Conference held on 1/8/2016. Status Report and Scheduling Conference set for 2/5/2016 at 01:15 PM in Rm 7.200 before Judge Bruce S. Jenkins. Attorney for Plaintiff: Jared J. Braithwaite, Attorney for Defendant: Jennifer F. Parrish. Court Reporter: Patti Walker.(kpf) Modified on 1/29/2016 added docketing text and attached approved minute entry (kpf). (Entered: 01/08/2016) |

| | | |
|---|---|---|
| 01/15/2016 | 136 | ORDER of USCA Federal Circuit as to 121 Notice of Appeal filed by Icon Health & Fitness . ORDER filed denying 34 motion to take judicial notice filed by Polar Electro Inc. and Polar Electro Oy as unecassary.; - FOR CALENDAR A copy of this order shall be transmitted to the merits panel assigned to hear the case. (las) (Entered: 01/15/2016) |
| 01/28/2016 | | **NOTICE VACATING STATUS AND SCHEDULING HEARING** set for 02/05/16, 1:15 p.m. before Judge Jenkins, per request and agreement of counsel. (kms) (Entered: 01/28/2016) |
| 01/28/2016 | 137 | **NOTICE OF HEARING**: Status Report and Scheduling Conference is set for 2/10/2016 at 01:20 PM in Rm 7.200 before Judge Bruce S. Jenkins, per request and agreement of counsel. (kms) (Entered: 01/28/2016) |
| 02/10/2016 | 138 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Conference held on 2/10/2016. Claim Construction Hearing set for 2/17/2017 at 10:00 AM in Rm 7.200. Attorney for Plaintiff: Jared J. Braithwaite, Attorney for Defendant: John P. Moran. Court Reporter: Clark Edwards.(kpf) Modified on 4/15/2016 to add text and image(kpf). (Entered: 02/10/2016) |
| 02/12/2016 | 139 | NOTICE OF FILING of Joint Submission of Proposed Scheduling Order re 138 Status Conference, Set Hearings,, filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Braithwaite, Jared) (Entered: 02/12/2016) |
| 02/18/2016 | 140 | NOTICE of Appearance by Michael A. Manookin on behalf of Icon Health & Fitness (Manookin, Michael) (Entered: 02/18/2016) |
| 02/23/2016 | 141 | SCHEDULING ORDER: Amended Pleadings due by 6/6/2016. Joinder of Parties due by 6/6/2016. See order for more details. Signed by Judge Bruce S. Jenkins on 2/22/2016. (las) (Entered: 02/23/2016) |
| 04/15/2016 | 142 | Modification of Docket: Correction: Attached approved minute entry. re 138 Status Conference. (kpf) (Entered: 04/15/2016) |
| 05/25/2016 | 143 | MOTION for Admission Pro Hac Vice of Anthony J. Fuga , Registration fee $ 250, receipt number 1088-2510312, filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Exhibit A - Application for Admission, # 2 Exhibit B - Electronic Case Filing Registration Form, # 3 Text of Proposed Order C- Order Granting Admission) (Magleby, James) (Entered: 05/25/2016) |
| 05/25/2016 | 144 | ORDER granting 143 Motion for Admission Pro Hac Vice of Anthony J. Fuga for Polar Electro Inc. Anthony J. Fuga for Polar Electro Oy. Attorneys admitted Pro Hac Vice may download a copy of the District of Utahs local rules from the courts web site at http://www.utd.uscourts.gov Signed by Judge Bruce S. Jenkins on 5/25/2016. (las) (Entered: 05/25/2016) |
| 06/06/2016 | 145 | Joint MOTION for Protective Order filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit 1 - Stipulated Protective Order, # 2 Text of Proposed Order) Attorney Tyson K. Hottinger added to party Icon Health & Fitness(pty:pla)(Hottinger, Tyson) (Entered: 06/06/2016) |
| 06/07/2016 | 146 | PROTECTIVE ORDER Signed by Judge Bruce S. Jenkins on 6/6/2016. (las) (Entered: 06/07/2016) |
| 07/19/2016 | 147 | MOTION for Judgment on the Pleadings and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Attachments: # 1 Exhibit 1 - US Patent 6,701,271)(Moran, John) (Entered: 07/19/2016) |
| 07/22/2016 | 148 | MOTION to Stay and Memorandum in Support *Motion To Stay Pending Resolution Of The Motion For Judgment On The Pleadings* filed by Defendants Polar Electro Inc., |

| | | |
|---|---|---|
| | | Polar Electro Oy. (Attachments: # 1 Text of Proposed Order)(Moran, John) (Entered: 07/22/2016) |
| 07/26/2016 | 149 | ORDER granting 148 Motion to Stay Pending Resolution of the Motion for Judgment on the Pleadings. Signed by Judge Bruce S. Jenkins on 7/22/2016. (las) (Entered: 07/26/2016) |
| 08/08/2016 | 150 | MANDATE of USCA Federal Circuit as to 121 Notice of Appeal filed by Icon Health & Fitness. According to the USCA the Mandate is Affirmed. (las) (Entered: 08/08/2016) |
| 08/15/2016 | 151 | STIPULATED Motion to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support *Extending Briefing Deadlines by One-Week* by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Hottinger, Tyson) Modified on 8/17/2016 changed from a Stipulation to a Stipulated Motion (las). (Entered: 08/15/2016) |
| 08/17/2016 | 152 | ORDER granting 151 Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support Replies due by 9/16/2016. Responses due by 8/26/2016. Signed by Judge Bruce S. Jenkins on 8/17/2016. (las) (Entered: 08/17/2016) |
| 08/25/2016 | 153 | Stipulated MOTION for Extension of Time to File Response/Reply re: 147 Motion for Judgment on the Pleading and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Hottinger, Tyson) Modified on 8/25/2016 changed Motion type to Motion for Extension of time to File Response/Reply and linked to the correct motion (las). (Entered: 08/25/2016) |
| 08/25/2016 | 154 | ORDER granting 153 Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support. Replies due by 9/23/2016. Signed by Judge Bruce S. Jenkins on 8/25/2016. (las) (Entered: 08/25/2016) |
| 09/02/2016 | 155 | STIPULATED Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Hottinger, Tyson) Modified on 9/2/2016 changed from a stipulation to a stipulated motion(las). (Entered: 09/02/2016) |
| 09/02/2016 | 156 | ORDER granting 155 Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support Replies due by 10/7/2016. Signed by Judge Bruce S. Jenkins on 9/2/2016. (las) (Entered: 09/02/2016) |
| 09/09/2016 | 157 | STIPULATED Motion for Extension of Time to File Response/Repley re 147 MOTION for Judgment on the Pleadings and Memorandum in Support *Extending Briefing Deadlines* by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Hottinger, Tyson) Modified on 9/9/2016 changed from a stipulation to a Stipulated Motion(las). (Entered: 09/09/2016) |
| 09/09/2016 | 158 | ORDER granting 157 Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support Replies due by 10/14/2016. Signed by Judge Bruce S. Jenkins on 9/9/2016. (las) (Entered: 09/09/2016) |
| 09/16/2016 | 159 | STIPULATED Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support *Extending Briefing Deadlines* by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Hottinger, Tyson) Modified on 9/20/2016 changed from a stipulation to a stipulated motion (las). (Entered: 09/16/2016) |
| 09/20/2016 | 160 | ORDER granting 159 Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support Replies due by |

| | | |
|---|---|---|
| | | 11/11/2016. Responses due by 9/30/2016 Signed by Judge Bruce S. Jenkins on 9/19/2016. (las) (Entered: 09/20/2016) |
| 09/30/2016 | 161 | STIPULATION to modify briefing schedule re 147 MOTION for Judgment on the Pleadings and Memorandum in Support *Extending Briefing Deadlines* by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order)(Hottinger, Tyson) Modified to modify event type on 10/4/2016 (kpf). (Entered: 09/30/2016) |
| 10/04/2016 | 162 | ORDER granting 161 Motion to modify briefing schedule. ICONS's deadline to file its opposition to Polar's motion for judgment on the pleadings (147) is extended to October 14, 2016 and Polar's deadline to file its reply in support of the Motion is extended to November 28, 2016. Signed by Judge Bruce S. Jenkins on 10/04/2016. (kpf) (Entered: 10/04/2016) |
| 10/13/2016 | 163 | STIPULATED Motion for Extension of Time to File Response/Reply re 147 MOTION for Judgment on the Pleadings and Memorandum in Support *Extending Briefing Deadlines* by Icon Health & Fitness. (Attachments: # 1 Text of Proposed Order) (Hottinger, Tyson) Modified on 10/14/2016 changed from a Stipulation to a Stipulated Motion (las). (Entered: 10/13/2016) |
| 10/24/2016 | 164 | MANDATE of USCA for the Federal Circuit as to 121 Notice of Appeal filed by Icon Health & Fitness. According to the USCA the Mandate of the USDC for the Dist of UT is Affirmed. (Attachments: # 1 Mandate Cover Letter)(las) (Entered: 10/24/2016) |
| 10/24/2016 | 165 | ORDER granting 163 Motion for Extension of Time to File Response/Reply re 163 MOTION for Extension of Time to File Response/Reply. It is hereby ordered that: ICON's no. 147 Motion is extended to October 28, 2016 and Polar's deadline to file its reply in support of the Motion is extended to December 12, 2016. Signed by Judge Bruce S. Jenkins on 10/24/2016. (kpf) (Entered: 10/24/2016) |
| 10/28/2016 | 166 | MEMORANDUM in Opposition re 147 MOTION for Judgment on the Pleadings and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Hottinger, Tyson) (Entered: 10/28/2016) |
| 10/28/2016 | 167 | AFFIDAVIT/DECLARATION of Tyson K. Hottinger in Opposition re 147 MOTION for Judgment on the Pleadings and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit A-Letter dated May 2, 2016, # 2 Exhibit B-Letter dated May 18, 2016, # 3 Exhibit C-Letter dated July 25, 2016)(Hottinger, Tyson) (Entered: 10/28/2016) |
| 10/28/2016 | 168 | AFFIDAVIT/DECLARATION of David Brienza in Opposition re 147 MOTION for Judgment on the Pleadings and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit A-CV)(Hottinger, Tyson) (Entered: 10/28/2016) |
| 10/28/2016 | 169 | REQUEST for Judicial Notice re 166 Memorandum in Opposition to Motion filed by Plaintiff Icon Health & Fitness. (Attachments: # 1 Exhibit 1-Office Action Summary, # 2 Exhibit 2-Reply to Office Action, # 3 Exhibit 3-Issue Notification, # 4 Exhibit 4-Response to Non-final Office Action, # 5 Exhibit 5-Office Action Summary, # 6 Exhibit 6-Response to Non-final Office Action, # 7 Exhibit 7-Issue Notification, # 8 Exhibit 8-Corrected Req Ex Parte Reexam, # 9 Exhibit 9-Order Granting Req Ex Parte Reexam, # 10 Exhibit 10-Patent Owner's Statement, # 11 Exhibit 11-Office Action, # 12 Exhibit 12-Ex Parte Reexam Interview Summary, # 13 Exhibit 13-Patent Owner's Interview, # 14 Exhibit 14-Amendment, # 15 Exhibit 15-Notice of Intent, # 16 Exhibit 16-Comments on Statement, # 17 Exhibit 17-Ex Parte Reexam Cert, # 18 Exhibit 18-Request for Inter Partes Reexam, # 19 Exhibit 19-Office Action, # 20 Exhibit 20-Order, # 21 Exhibit 21-Amendment, # 22 Exhibit 22-Comments, # 23 Exhibit 23-Action Closing Prosecution, # 24 Exhibit 24-Amendment B, # 25 Exhibit 25-Comments, # 26 Exhibit 26-Right of |

| | | |
|---|---|---|
| | | Appeal Notice, # 27 Exhibit 27-Third Party Requesters' Notice, # 28 Exhibit 28-Notice of Cross Appeal, # 29 Exhibit 29-Brief, # 30 Exhibit 30-Brief on Appeal, # 31 Exhibit 31-Respondent Brief, # 32 Exhibit 32-Respondent Brief, # 33 Exhibit 33-Examiner's Answer, # 34 Exhibit 34-Rebuttal Brief, # 35 Exhibit 35-Rebuttal Brief, # 36 Exhibit 36-Decision on Appeal, # 37 Exhibit 37-Order, # 38 Exhibit 38-Notice of Intent, # 39 Exhibit 39-Inter Partes Certificate)(Hottinger, Tyson) (Entered: 10/28/2016) |
| 10/31/2016 | 170 | **NOTICE OF HEARING ON MOTION** re: 147 MOTION for Judgment on the Pleadings : Motion Hearing set for 12/19/2016 at 10:00 AM in Rm 7.200 before Judge Bruce S. Jenkins. (kms) (Entered: 10/31/2016) |
| 12/12/2016 | 171 | REPLY to Response to Motion re 147 MOTION for Judgment on the Pleadings and Memorandum in Support filed by Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 12/12/2016) |
| 12/12/2016 | | **NOTICE VACATING MOTION HEARING** re: 147 MOTION for Judgment on the Pleadings, set for 12/19/2016, 10:00 a.m. before Judge Jenkins. (kms) (Entered: 12/12/2016) |
| 12/12/2016 | 172 | **AMENDED NOTICE OF HEARING ON MOTION** re: 147 MOTION for Judgment on the Pleadings : Motion Hearing is re-set for 1/10/2017 at 10:00 AM in Rm 7.200 before Judge Bruce S. Jenkins. (kms) (Entered: 12/12/2016) |
| 12/12/2016 | | **NOTICE VACATING MOTION HEARING** set for 1/10/2017, 10:00 a.m. before Judge Jenkins. (kms) (Entered: 12/12/2016) |
| 12/12/2016 | 173 | **AMENDED NOTICE OF HEARING ON MOTION** re: 147 MOTION for Judgment on the Pleadings : Motion Hearing is re-set for 1/19/2017 at 10:00 AM in Rm 7.200 before Judge Bruce S. Jenkins. (kms) (Entered: 12/12/2016) |
| 12/21/2016 | 174 | NOTICE of Errata by Polar Electro Inc., Polar Electro Oy re 171 Reply Memorandum/Reply to Response to Motion *for Judgment on the Pleadings* (Attachments: # 1 Exhibit A) (Moran, John) (Entered: 12/21/2016) |
| 01/19/2017 | 175 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Motion Hearing held on 1/19/2017 re 147 MOTION for Judgment on the Pleadings and Memorandum in Support filed by Polar Electro Inc., Polar Electro Oy. After discussion and argument, the court took the matter under advisement. Attorney for Plaintiff: Tyson K. Hottinger, David R. Wright, Attorney for Defendant: John P. Morgan. Court Reporter: Ray Fenlon.(kpf) Modified to add text and image 4/19/2017 (kpf). (Entered: 01/19/2017) |
| 01/20/2017 | 176 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion for Judgment on the Pleadings held on January 19, 2017 before Judge Bruce S. Jenkins. Court Reporter/Transcriber Ray Fenlon, Telephone number 801-809-4634.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 business days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the parties intent to redact personal data identifiers from the electronic transcript of the court proceeding. To redact additional information a Motion to Redact must be filed. The policy and forms are located on the court's website at www.utd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/10/2017. Redacted Transcript Deadline set for 2/21/2017. Release of Transcript Restriction set for |

| | | |
|---|---|---|
| | | 4/20/2017. (las) Modified on 4/20/2017 by removing restricted text (las). (Entered: 01/20/2017) |
| 01/27/2017 | 178 | Supplemental BRIEF re 147 MOTION for Judgment on the Pleadings and Memorandum in Support filed by Counter Claimant Polar Electro Inc., Defendants Polar Electro Inc., Polar Electro Oy. (Moran, John) (Entered: 01/27/2017) |
| 01/31/2017 | 179 | ORDER - The tutorial for the court[LPR 4.4] set for February 6, 2017, at 2:30 pm, is hereby vacated. Signed by Judge Bruce S. Jenkins on 1/31/2017. (las) (Entered: 01/31/2017) |
| 02/03/2017 | 180 | Supplemental Opposition to Polar Electro Oy's Motion for Judgment on the Pleadings BRIEF re 147 MOTION for Judgment on the Pleadings and Memorandum in Support filed by Plaintiff Icon Health & Fitness. (Hottinger, Tyson) (Entered: 02/03/2017) |
| 02/08/2017 | 181 | ORDER Provisionally granting 14 Defendants' Motion for Judgment on the Pleadings. Defendants shall prepare and submit a suggested form of final order as well as a proposed judgment granting their motion, with proper citations to the record, and do so within 21 days of the date of this order. Signed by Judge Bruce S. Jenkins on 2/8/2017. (las) (Entered: 02/08/2017) |
| 02/08/2017 | | **NOTICE VACATING CLAIM CONSTRUCTION HEARING** set for 2/17/17, 10:00 a.m. before Judge Jenkins. (kms) (Entered: 02/08/2017) |
| 02/28/2017 | 182 | NOTICE of Objections to Polar's Proposed Order and Judgment Re Motion For Judgment On The Pleadings by Icon Health & Fitness (Attachments: # 1 Exhibit A - Polar's Proposed Order, # 2 Exhibit B- Polar's Proposed Judgment) (Hottinger, Tyson) (Entered: 02/28/2017) |
| 03/01/2017 | 183 | NOTICE of Proposed Memorandum Opinion & Order Regarding Judgment on the Pleadings by Polar Electro Inc., Polar Electro Oy (Moran, John) (Entered: 03/01/2017) |
| 03/01/2017 | 184 | NOTICE of Proposed Judgment by Polar Electro Inc., Polar Electro Oy re 183 Notice (Other) (Moran, John) (Entered: 03/01/2017) |
| 03/10/2017 | 185 | MEMORANDUM DECISION AND ORDER.granting 147 Motion for Judgment on the Pleadings. See Order for Details. Signed by Judge Bruce S. Jenkins on 3/10/2017. (las) (Entered: 03/10/2017) |
| 03/27/2017 | 186 | CLERK'S JUDGMENT - It is Ordered and Adjudged that the Judgment be entered in favor of the defendants, and plaintiff's claim against defendants for infringement of U.S. Patent No. 6,701,271 is dismissed with prejudice signed by Anne Morgan. (las) (Entered: 03/27/2017) |
| 03/31/2017 | 187 | NOTICE OF APPEAL as to 185 Order on Motion for Judgment on the Pleadings, Memorandum Decision, 186 Clerk's Judgment, filed by Icon Health & Fitness. Appeals to the USCA for the Federal Circuit. Filing fee $ 505, receipt number 1088-2725433. (Laycock, Larry) (Entered: 03/31/2017) |
| 04/03/2017 | 188 | Transmission of Preliminary Record to USCA Federal Circuit re 187 Notice of Appeal., (Attachments: # 1 Appendix)(las) (Entered: 04/03/2017) |
| 04/05/2017 | 189 | **NOTICE OF HEARING**: Status Conference Re: the "800 Patent" set for 4/18/2017 at 01:30 PM in Rm 7.200 before Judge Bruce S. Jenkins. (kms) (Entered: 04/05/2017) |
| 04/07/2017 | 190 | USCA Case Number Case Appealed to Federal Case Number 17-1886 for 187 Notice of Appeal, filed by Icon Health & Fitness. (jmr) (Entered: 04/07/2017) |
| 04/14/2017 | 191 | NOTICE of Transcript Order by Icon Health & Fitness (Hottinger, Tyson) (Entered: 04/14/2017) |

| 04/18/2017 | 193 | Minute Entry for proceedings held before Judge Bruce S. Jenkins: Status Conference held on 4/18/2017. Status Report and Scheduling Conference set for 10/13/2017 at 10:00 AM in Rm 7.200 before Judge Bruce S. Jenkins. Approved minute entry to follow pending Judge Jenkins' approval. Attorney for Plaintiff: Jared J. Braithwaite, Attorney for Defendant: Jennifer Parrish. Court Reporter: Laura Robinson.(kpf) (Entered: 04/21/2017) |
|---|---|---|
| 04/19/2017 | <u>192</u> | Modification of Docket: Correction: Attached approved minute entry. re <u>175</u> Motion Hearing. (kpf) (Entered: 04/19/2017) |
| 05/06/2017 | <u>194</u> | MOTION for Judgment under Rule 54(b) and Memorandum in Support *(Unopposed)* filed by Plaintiff Icon Health & Fitness. (Attachments: # <u>1</u> Text of Proposed Order) (Hottinger, Tyson) (Entered: 05/06/2017) |
| 05/08/2017 | <u>195</u> | ORDER granting <u>194</u> Motion for Entry of Judgment under Rule 54(b). IT IS HEREBY ORDERED that the clerk enter final judgment in favor of defendants Polar Electro Oy and Polar Electro, Inc. with respect to ICON's Infringement Claim of the '271 Patent. Signed by Judge Bruce S. Jenkins on 5/8/2017. (las) (Entered: 05/08/2017) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| *06/04/2017 19:13:15* | | |
| **PACER Login:** | mg5206 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cv-00167-BSJ |
| **Billable Pages:** | 22 | **Cost:** | 2.20 |

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
(801) 359-9000
(801) 359-9011 (Facsimile)

John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
(202) 955-3000
(202) 955-5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

*Attorneys for Defendants Polar Electro Oy and Polar Electro Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ICON HEALTH & FITNESS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>POLAR ELECTRO OY et al.,<br><br>Defendants. | POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS<br><br>Case No.: 1:11-cv-00167-BSJ<br><br>Honorable Bruce S. Jenkins |

# **TABLE OF CONTENTS**

I.   STATEMENT OF RELIEF SOUGHT ........................................................................ 1

II.   INTRODUCTION .................................................................................................. 1

III.   FACTUAL BACKGROUND ................................................................................. 2

   A.   The Complaint ................................................................................................ 2

   B.   The Disclosed Method of Providing and Using Feedback ............................. 2

   C.   The Claimed Method of Providing and Using Feedback ............................... 4

IV.   ARGUMENT ....................................................................................................... 6

   A.   Applicable Law ............................................................................................... 7

      1.   The Two-Part Test for Patent-Eligible Subject Matter ........................... 8

         a)   Step One: Are the Claims Directed to a  Patent-Ineligible Abstract Idea? ......................... 8

         b)   Step Two: Do the Claims Recite Additional Elements Sufficient to  Transform Them Into Patent-Eligible Subject Matter? ....................... 9

   B.   The '271 Patent is Invalid for Claiming Patent-Ineligible Subject Matter ................................ 10

      1.   Step One: On Their Face, The Asserted Claims Recite an Abstract Idea ............................. 10

      2.   Step Two: The Claims Do Not Recite Inventive Concepts that Transform the Recited Abstract Idea Into Patent-Eligible Subject Matter ......................... 12

      3.   The '271 Patent Preempts the Abstract Idea of Providing and Using Feedback ................... 14

V.   CONCLUSION ..................................................................................................... 15

i

## TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*
134 S. Ct. 2347…..................................................................................................... *passim*

*Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012) ............................................................................... 7

*In re Bilski*,
545 F.3d 943 (Fed. Cir. 2008) ................................................................................. 7

*Bilski v. Kappos*,
561 U.S. 593 (2010)....................................................................................... 7, 8, 15

*Cloud Satchel, LLC v. Amazon.com, Inc., Barnes & Noble, Inc.*
76 F.Supp.3d 553 ..................................................................................................... 13

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*
776 F.3d 1343 ...................................................................................................... 8, 11

*Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*,
Nos. 2012-1673, 558 F. App'x 988 (Fed. Cir. 2014) ....................................... 15

*CyberSource Corporation v. Retail Decisions, Inc.*
654 F.3d 1366 ........................................................................................................... 14

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ............................................................................. 11

*Enfish, LLC v. Microsoft Corp.*,
2016 WL 2756255 (Fed. Cir. 2016) ...................................................................... 11

*Epic Tech., LLC v. Fitnow, Inc.*,
2015 WL 8160884 (D. Utah 2015).................................................................... 7, 12

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ........................................................................ 9, 14

*Joao Bock Transaction Sys., LLC v. Jack Henry & Associates, Inc.*,
76 F.Supp.3d 513, 521-522 (D. Del. Dec. 15, 2014), *aff'd* 803 F.2d 667 (Fed. Cir.
2015)............................................................................................................................ 14

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
132 S. Ct. 1289 ......................................................................................................... 8

*OIP Techs., Inc. v. Amazon.com, Inc.*,
788 F.3d 1359 (Fed. Cir.), cert. denied, 136 S. Ct. 701, 193 L. Ed. 2d 522 (2015) ........................... 9

*Planet Bingo, LLC v. VKGS LLC,*
   576 F. App'x 1005 (Fed. Cir. 2014) ............................................................................. 9

*In re TLI Communications LLC Patent Litigation,*
   2016 WL 2865693 (Fed. Cir. 2016) ........................................................................... 12

*Ultramercial, Inc. v. Hulu, LLC,*
   772 F.3d 709 ( Fed. Cir. 2014) .......................................................................... *passim*

*Wireless Media Innovations LLC v. Maher Terminals, LLC,*
   100 F.Supp.3d 405, 415-415, *aff'd* 2016 WL 463218 (Fed. Cir. 2016) ................... *passim*

*Wolf v. Capstone Photography,*
   2014 WL 7639820 (C.D. Cal 2014) ........................................................................... 13

**Statutes**

35 U.S.C. § 101 .................................................................................................... *passim*

**Other Authorities**

Rule 12 (b)(6) ............................................................................................................. 1

**Appx67**

## I.      STATEMENT OF RELIEF SOUGHT

Polar Electro Oy and Polar Electro Inc. (collectively, "Polar") request that this Court find the asserted method claims of U.S. Patent No. 6,601,271 (the "'271 Patent")[1] invalid under 35 U.S.C. § 101 because they claim an ordinary human activity - providing and using feedback based upon data gathered from subjects – and do so without adding any inventive claim limitations.

## II.     INTRODUCTION

The '271 Patent improperly attempts to monopolize an ordinary activity that human beings have conducted since they first walked the Earth – providing and using feedback based on ordinary physical characteristics, such as posture or facial response. The '271 Patent discloses nothing more than that: a method of gathering data from subjects, such as a physical characteristic, and using it. According to the patent, any physical characteristic, for example, posture or a facial response such as a smile, a frown, or a puzzled look, would fall within its ambit.[2] Of course, providing and using feedback based on such characteristics has always been integral in all forms of human interaction and communication. To invoke the same examples contained in the Background section of the patent, for as long as there have been teachers, they have been gathering data from their students by observing them, and where necessary, admonishing students to pay attention and to stop talking in class. Such ideas are not patent-eligible subject matter.

Polar appropriately asks this Court to address the issue of patentable subject matter early in this case.  The Federal Circuit has noted the importance of addressing this issue at the onset of the litigation.  *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714-717 ( Fed. Cir. 2014) (affirming a Rule 12 (b)(6) dismissal on the basis of claims directed to unpatentable subject matter).  Resolving whether patent claims are directed to unpatentable subject matter  saves judicial resources and protects the

---

[1] The '271 Patent, including the Reexamination Certificate, is attached hereto as Exhibit 1.
[2] *See e.g.,* Exhibit 1, '271 Patent, col. 1:58-64; col. 4:53-58.

1

public from "patents that stifle innovation and transgress the public domain." *Ultramercial*, 772 F.3d 709, 718-720 (Mayer, J., concurring).

The '271 Patent claims do not recite patent-eligible subject matter because they merely recite the ordinary human activity of providing and using feedback based on data gathered from subjects Furthermore, the '271 Patent runs the risk of effectively preempting all uses of the underlying abstract idea – providing and using feedback.  As explained in more detail below, the Court should hold that the asserted claims of the '271 Patent are invalid as a matter of law.

**III.     FACTUAL BACKGROUND**

**A.     The Complaint**

On June 8, 2012, Icon filed its amended complaint asserting the '271 Patent against Polar.[3] The Court stayed the litigation related to the '271 Patent pending finalization of reexamination proceedings.[4] The Court entered a Scheduling Order for the case concerning the '271 Patent after finalization of the '271 Patent reexamination.[5]

**B.     The Disclosed Method of Providing and Using Feedback**

The '271 Patent highlights the disclosed ordinary human activity of providing and using feedback, stating:

> A [method] for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation.[6]

This ordinary feedback has three common human activities: (1) observing physical characteristic(s) of subjects; (2) evaluating the characteristic(s); and (3) providing a notification of the

---

[3] Dkt. No. 9. Icon asserted two additional patents against Polar in this litigation but those are not relevant to this motion.
[4] Dkt. No. 51 (Order For Partial Stay Pending Reexamination of Two Patents-In-Suit).
[5] Dkt. No. 141.
[6] Exhibit 1, '271 Patent, Abstract.

evaluation.[7] The '271 Patent Background of the Invention also highlights such common human activity with the example of a teacher:

> [A] teacher may wish to know if the students in her class understand the material the teacher is discussing. A lecturer may wish to know what portions of his lecture the audience members find most interesting. Alternatively, the lecturer may want to have a better idea of when to take a break. An entertainer may wish to know what ending to provide to a story or song medley being presented to an audience.[8]

A teacher assessing students is not novel, nor is a teacher taking actions based on observations of the class. Indeed, Socrates developed the Socratic Method based on precisely this ordinary process of observation and feedback.

In another example of the disclosed ordinary human activity of providing and using feedback, the '271 Patent uses the ordinary actions of a person giving a speech:

> [A]ssume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the audience member's heart rates, posture, etc. may be obtained and used to help determine which of the themes the audience members are the most interested in. Once the information is communicated to the speaker, the speaker can direct the presentation appropriately.[9]

The speaker receives feedback information regarding the audience, such as posture (they are slumping in their seats) or facial response (they are yawning); the speaker can then make a decision based upon the information. For example, it might be time for the speaker to take a break, speak up, or move to a more rousing topic. Speakers assessing audiences and changing their delivery has been a common, ordinary human activity.

---

[7] *See also* Exhibit 1, '271 Patent, Fig. 1.
[8] Exhibit 1, '271 Patent, col. 1:18-30.
[9] Exhibit 1, '271 Patent, col. 4:2-11.

3

**C.     The Claimed Method of Providing and Using Feedback**

Icon asserts claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 (the "Asserted Claims").[10] The

Asserted Claims are all dependent method claims and ultimately depend from claim 1, which reads:

> A *method for providing feedback*, comprising:
>
>> receiving first data indicative of a physical characteristic
>> of a first subject from a first device associated with said
>> first subject and second data indicative of a physical
>> characteristic of a second subject from a second device
>> associated with said second subject;
>>
>> determining an evaluation of said first data and said
>> second data, wherein said evaluation is representative
>> of a state of both said first subject and said second
>> subject; and
>>
>> providing a notification regarding said evaluation to a
>> device. (emphasis added)

Claim 1 expressly recites the abstract idea: providing and using feedback based upon data

gathered from subjects, i.e., physical characteristics of subjects. The claimed feedback method utilizes

generic components, referred to in the above as first and second devices, and a device generally.

Because each Asserted Claim ultimately depends from claim 1, they each claim the same

abstract idea of providing and using feedback based on data gathered from subjects. Some of the

Asserted Claims also recite using conventional components to gather the data or to provide

notifications, such as devices, sensors, servers, the internet, cellular telephones, computers, and

touchscreens. The following table identifies the Asserted Claims and summarizes the method steps

and/or devices added by the respective claims.

---

[10] As a result of reexamination, the USPTO cancelled claims 1-14 and 16-41; all of the Asserted
Claims ultimately depend from claim 1, a cancelled claim. On April 25, 2016, Icon served its
Preliminary Infringement Contentions, asserting claims 15, 42, 46, 49, 51, 54, 60, 61, 80, 82, 84, 85,
90, 91, 92, 94, and 95.  By letter, Icon limited its infringement contentions to the Asserted Claims.

4

**Appx71**

| Dependent Claim | Added Subject Matter[11] |
|---|---|
| Claim 15 (depends from claim 14, which depends from claim 13, which depends from claim 1) | This claim adds receiving a notification regarding a plurality of options, and selecting the device to which the notification is sent based on selecting one of the plurality of options. |
| Claims 42, 80, and 90 (each depends from claim 1) | These claims add that the first device of claim 1 is a sensor that senses a physical characteristic of a subject; a remote server receives the first data from the first sensor through the internet; and the remote server determines which of multiple options to provide to the first subject based on first data and second data. |
| Claims 49 (depends from claim 42), 81 (depends from claim 80), and 91 (depends from claim 90) | These claims add that the device is a software application operating on a portable computer/cell phone that has a touchscreen input device. |
| Claims 51 (depends from claim 42) and 82 (depends from claim 80) | These claims add that the first device of claim 1 is a portable wireless sensor configured to wirelessly connect to a cell phone through a wireless connection; they also add that the remote server receives the first data from the first sensor through the internet through the wireless connection between the first sensor and cell phone through a wireless cellular connection of the cell phone to the internet. |
| Claim 54 (depends from claim 51) | This claim adds that the first portable wireless sensor of claim 51 is a heart rate sensor. |

As the above table shows, the Asserted Claims merely recite nothing more than the age-old abstract idea of providing and using feedback based on data gathered from subjects using conventional devices such as a sensor, server, a computer, the internet, cell phone, etc. Neither the Asserted Claims nor the '271 Patent in general purports to use these conventional components in any new or inventive way.  Instead, the '271 Patent describes routine, everyday uses for components in exactly the same fashion that they are intended to be used. For instance, the generic sensor is used for the purpose of

---

[11]  Exhibit 1 attached hereto includes the full text of these dependent claims to supplement this summary.

sensing; the internet is used to transfer data. Thus, the claimed conventional devices used conventionally do not affect the fundamental patent-ineligible nature of the abstract idea recited by the Asserted Claims.

## IV.    ARGUMENT

The Asserted Claims represent nothing more than the natural, human activity of providing and using feedback based on data gathered from subjects – e.g., a teacher determining when to take recess, a speech-giver understanding when to pause for audience laughter. The '271 Patent highlights this natural, human activity by explaining the method of providing feedback using examples of teachers and speakers doing things that teachers and speakers typically do: rely upon data, e.g., physical characteristics from the class or audience. If the crowd is feverish, a speaker may determine that it is time to tone back the excitement. If the class is nodding off, a teacher may determine that it is time for a break or recess. This ordinary and common human activity does not constitute patent-eligible subject matter.

The Asserted Claims' recitation of conventional components, such as common sensors, to provide feedback does not transform the abstract concept of providing and using feedback into patent-eligible subject matter. The Federal Circuit has confirmed that using common devices for their common purpose does not transform patent-ineligible subject matter into patentable subject matter. For example, in *Content Extraction*, the Federal Circuit affirmed that adding hard copy documents and a scanner to a method claim did <u>not</u> transform the method into patent-eligible subject matter. 776 F.3d 1343, 1348. The '271 Patent emphasizes the common nature of the claimed devices, including commonly available sensors, displays, such as cell phones, or touchscreens, and teaches that they are used in their intended, conventional ways.[12] The claimed conventional devices used conventionally

---

[12] *See e.g.*, Exhibit 1, '271 Patent, col. 11:37-50 ("A Pentium™ microprocessor such as the Pentium

does not transform the ordinary human activity of providing and using feedback based on data gathered from subjects into patent-eligible subject matter, and the '271 Patent should be held to be invalid.

### A.      Applicable Law

The Patent Statute defines patentable subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."[13] Despite the seeming breadth of that text, the Supreme Court has recognized an "important implicit exception: Laws of nature, natural phenomena and *abstract ideas* are not patentable." *Alice*, 134 S. Ct. at 2354 (emphasis added). These are not patentable because they are basic tools of invention and innovation that are free for all to use. *Bilski v. Kappos,* 561 U.S. 593, 602 (2010).

Whether a claim recites patent-ineligible subject matter is a question of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008). That determination is a threshold inquiry that is properly decided on the pleadings. *See Ultramercial*, 772 F.3d at 717. The Federal Circuit and district courts have made clear that § 101 patent eligibility may be, and regularly is, decided at the pleadings stage, without claim construction. *See, e.g.*, *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) (explaining the Federal Circuit "perceive[s] no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101"); *see also Epic Tech*, 2015 WL 8160884 at *5 (D. Utah 2015). Deciding the patent eligibility of the Asserted Claims is appropriate now.

---

III™ microprocessor, manufactured by Intel Corporation may be used for the processor 250. Equivalent processors are available from Motorola, Inc., AMD, or Sun Microsystems, Inc. The processor 250 also may comprise one or more microprocessors, computers, computer systems, etc.")
[13] 35 U.S.C. § 101.

**1.      The Two-Part Test for Patent-Eligible Subject Matter**

The Supreme Court in *Alice* reaffirmed the two-step process to determine whether a claim

recites patent-eligible subject matter. *Alice*, 134 S. Ct. at 2355 (citing *Mayo Collaborative Servs. v.*

*Prometheus Labs., Inc*., 132 S. Ct. 1289, 1296-97 (2012)). The first step is to determine whether the

claims at issue are directed to patent-ineligible concepts, such as laws of nature, natural phenomena, or

abstract ideas. *Id*.  If the claims recite an abstract idea, the Court proceeds in the second step to

determine if there are additional claim elements that introduce an inventive aspect to the claim

sufficient to elevate it to patent-eligible subject matter. *Alice*, 134 S. Ct. at 2355.

**a)      Step One: Are the Claims Directed to a**
**Patent-Ineligible Abstract Idea?**

In assessing the first step, the Supreme Court has repeatedly confirmed that abstract ideas, such

as ordinary human activities, are invalid under Section 101 as being directed to unpatentable subject

matter, unless the claim add inventive claim limitations to the activity. In *Alice Corp. Pty. Ltd. v. CLS*

*Bank Int'l*, the Supreme Court held that computerization of the ordinary human activity of maintaining

escrow accounts is not patentable subject matter. 134 S. Ct. 2347 (2014).  In *Bilski v. Kappos*, the

Supreme Court held that the ordinary activity of hedging losses is not patentable. 130 S. Ct. 3218,

3229-30 (2010). And in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, the Supreme Court held

that the ordinary human activity of observing correlations is not patentable. 132 S. Ct. 1289, 1293-94

(2012).

Following the Supreme Court's guidance, the Federal Circuit has confirmed that ordinary

human activity, such as collecting and utilizing data by conventional means is not patentable subject

matter. For example, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,

the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within

the collected data set, and 3) storing that recognized data in a memory" because they merely recited an

8

**Appx75**

abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014).  In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id.*

Abstract ideas are not limited to natural human activities or financial/business method and systems. The Federal Circuit has also invalidated patent claims directed to the following abstract ideas: (1) a method of managing a bingo game; (2) a method and system of tracking and documenting shipping containers; (3) a method of tracking financial transactions to determine whether they exceed a spending limit (i.e., budgeting); and (4) a method of price optimization.[14] These are just a few examples of patent-ineligible subject matter, but they have a commonality: abstract ideas such as natural human activity are not patent-eligible.

### b)    Step Two: Do the Claims Recite Additional Elements Sufficient to Transform Them Into Patent-Eligible Subject Matter?

As to the second step, the court "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. In other words, if a claim recites an abstract idea, it "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.*

Fundamental precedent holds that reciting generic or conventional components used in their conventional intended way does not transform an ordinary human activity into patentable subject matter.  *Alice*, 134 S. Ct. at 2359 (adding "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material). The Supreme

---

[14] *See respectively,* (1) *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014); (2) *Wireless Media Innovations LLC* 100 F.Supp.3d at 415-415; (3) *Intellectual Ventures I LLC v. Capital One Bank (USA),* 792 F.3d 1363, 1367 (Fed. Cir. 2015); and (4) *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir.), cert. denied, 136 S. Ct. 701, 193 L. Ed. 2d 522 (2015).

Court in *Alice* held that elements, such as a computer that adds nothing beyond their well-known functions, do not transform an abstract idea into patent-eligible subject matter. *Id.* at 2359-60 (using a computer to obtain data, adjust account balances based on the data, and issue automated instructions is well-known and does not transform and abstract idea into a patentable-eligible invention). The *Alice* Court explained that using a computer to complete the "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material. *Id.* at 2359; *see also Wireless Media Innovations LLC v. Maher Terminals, LLC*, 100 F.Supp.3d 405, 415-415, *aff'd* 2016 WL 463218 (Fed. Cir. 2016) (physical components such as vehicles, optical scanners, and computers do not transform an abstract idea into patentable subject matter).

### B.    The '271 Patent is Invalid for Claiming Patent-Ineligible Subject Matter

#### 1.    Step One: On Their Face, The Asserted Claims Recite an Abstract Idea

As noted above, the Asserted Claims each depends directly or indirectly from claim 1. On its face, claim 1 recites the abstract idea of providing and using feedback based on data gathered from subjects:

> A <u>method for providing feedback</u>, comprising:
>
> > 1. receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
> >
> > 2. determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
> >
> > 3. providing a notification regarding said evaluation to a device.  (emphasis and numbering added)

This method of providing and using feedback recites three common, ordinary human activities:

1. receiving data indicative of physical characteristics of two subjects;

10

2.  evaluating the data, which can be as simple as collecting the received data;[15] and

3.  providing a notification regarding the evaluation, which can be as simple as displaying the received data.[16]

These claimed activities are similar to the natural, human functions found patent-ineligible in *Content Extraction*.  In that case, the Federal Circuit held that the "concept of data collection, recognition, and storage is undisputedly well-known.  Indeed, humans have always performed these functions." *Content Extraction*, 776 F.3d at 1347.

In addition, the differences amongst the Asserted Claims are minor variations on the claimed basic human activity – e.g., providing options related to the feedback (claim 15); using sensors, a server and the internet (claims 42, 80, and 90); using software, a computer, and a cell phone (claims 49, 81, and 91); using a wireless sensor, a cell phone, the internet, and wireless connections (claims 51 and 82); or using a heart rate sensor (claim 54).[17]  These differences do nothing to alter the fundamental nature of the claimed invention – providing and using feedback based on data gathered from subjects.

This is not a case where the purported invention teaches an improvement in a computer's basic operation or in some other technology itself. *See Enfish, LLC v. Microsoft Corp.*, 2016 WL 2756255, at *5 (Fed. Cir. 2016) ("the plain focus of the claims is on an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity"); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257-58 (Fed. Cir. 2014) ("the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks"). The '271 Patent does not disclose or claim to improve any

---

[15] Exhibit 1, '271 Patent, col. 6:56-60.
[16] Exhibit 1, '271 Patent, col. 7:31-35.
[17] See the table set forth in Section III.C, which details the Asserted Claims and their specific limitations.

11

**Appx78**

particular device. It instead simply uses conventional devices in conventional ways, such as sensors to sense and displays to display. *See In re TLI Communications LLC Patent Litigation*, 2016 WL 2865693, at *3 (Fed. Cir. 2016) ("[the claims] are directed to the use of conventional or generic technology is a nascent but well-known environment without any claim that the invention reflects an inventive solution to any problem presented by combining the two."). Thus, the Asserted Claims recite the abstract idea of providing and using feedback based on data gathered from subjects.

      **2.    Step Two: The Claims Do Not Recite Inventive Concepts that Transform the Recited Abstract Idea Into Patent-Eligible Subject Matter**

      The Asserted Claims do not recite any inventive concepts to transform the claimed abstract idea into patent-eligible subject matter. *See Alice*, 134 S. Ct. at 2355; *see also Epic Tech., LLC v. Fitnow, Inc.*, 2015 WL 8160884 at *4-5 (D. Utah 2015) (claim limitation of physical products and barcodes in method for reading bar codes on a handheld device did not render subject matter significantly more than an abstract idea). To qualify as patent-eligible subject matter, a claim must recite "significantly more" than the abstract idea, for example by "improv[ing] an existing technological process," and not merely by "implement[ing] [the idea] on a computer." *Id*. at 2358. Incorporating computer hardware or common, generic devices does not render an abstract idea patent-eligible. In *Alice*, the Supreme Court found that the recitation of generic computer hardware did not, by itself, provide any additional inventive or transformative concept sufficient to confer patent eligibility. *Alice*, 134 S. Ct. at 2359; *see also In re TLI Communications*, 2016 WL 2865693 at *3. Here, the '271 Patent claims merely recite using conventional devices for their conventional purpose – e.g., sensors for sensing and displays for displaying.

      Reciting connections to the physical world also does not change abstract ideas into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2358; *see also Wireless Media Innovations*, 100 F.Supp.3d at 413-414 ("Plaintiff's arguments that the patent claims are not abstract because they require physical

**Appx79**

steps and include the use of tangible components is beside the point."); *Cloud Satchel, LLC,* 76 F.Supp.3d at 564.  Here, the '271 Patent claims merely recite using conventional components for their conventional purposes of processing and exchanging data, and thus are invalid as reciting patent-ineligible subject matter.

Additionally, incorporating "tangible components . . . is not enough [] to become patent-eligible subject matter." *Wireless Media Innovations*, 100 F.Supp.3d at 414. Nothing in the '271 Patent demonstrates that the generic components function in an unconventional manner or employ specific programming to themselves constitute inventive concepts. Instead, the Asserted Claims only provide feedback by conventional means, such as by using a generic sensor, cell phone, a computer, and the internet. These conventional components are not sufficient to transform the abstract idea of providing and using feedback based on data gathered from subjects, into patent-eligible subject matter. *See, e.g., Ultramercial*, 772 F.3d at 716-717 ("[T]he Internet does not transform an otherwise abstract idea into patent-eligible subject matter. . . . [The internet] is a ubiquitous information-transmitting medium, not a novel machine"); *Wolf v. Capstone Photography*, 2014 WL 7639820, at *12 (C.D. Cal 2014) ("Under *Alice*, these recitations of generic technology [e.g., a sensor, digital camera, web-site server] are insufficient to confer patent eligibility.").

The '271 Patent emphasizes the conventionality of the components, stating the use of "a conventional personal computer or workstation" and listing known computer processors.[18] Similar to these conventional hardware components, the claimed "software application" adds nothing inventive because it too is conventional.[19] For example, the '271 Patent states that "[a]ppropriate program

---

[18] Exhibit 1, '271 Patent, col. 11:37-50 ("A Pentium™ microprocessor such as the Pentium III™ microprocessor, manufactured by Intel Corporation may be used for the processor 250. Equivalent processors are available from Motorola, Inc., AMD, or Sun Microsystems, Inc. The processor 250 also may comprise one or more microprocessors, computers, computer systems, etc.")
[19] *See* Exhibit 1, '271 Patent, claims 49, 81, and 91.

elements are known to those skilled in the art, and need not be described in detail herein."[20] Requiring that the abstract idea be carried out using software provides no additional limitation beyond applying the abstract idea on a general purpose computer. *Intellectual Ventures*, 792 F.3d at 1370-71 ("Requiring the use of a 'software' . . . provides no additional limitation beyond applying an abstract idea . . .").

In short, the '271 Patent claims do not recite additional elements that transform the abstract idea of providing and using feedback based on data gathered from subjects, into patent-eligible subject matter. Allowing the Asserted Claims to survive would curb innovation utilizing the basic human activity of providing and using feedback based upon physical characteristics gathered from subjects. *Id*. at 2354. As a result, the Asserted Claims should be held invalid as being directed to patent-ineligible subject matter.

>        **3.      The '271 Patent Preempts the Abstract Idea of Providing and Using Feedback**

The Supreme Court has criticized patents that preempt the use of abstract ideas. *See Alice*, 134 S. Ct.. at 2354-55. Like other claims rejected as patent ineligible under § 101, the claims of the '271 Patent run the risk of effectively preempting uses of the underlying abstract idea of providing and using feedback. *See, e.g., CyberSource Corp.* 654 F.3d at 1372 ("Claim 3 does not limit its scope to any particular fraud detection algorithm . . . .  Rather, the broad scope of claim 3 extends to essentially any method of detecting credit card fraud based on information relating past transaction to a particular 'Internet address.'").

The Asserted Claims' generic recitation of conventional components and networks cannot overcome the Supreme Court's rebuke that patents not be allowed to preempt the use of abstract ideas. *See Alice*, 134 S. Ct.. at 2354-55; *see also Joao Bock Transaction Sys., LLC v. Jack Henry &*

---

[20] Exhibit 1, '271 Patent, col. 11:65-67.

*Associates, Inc.*, 76 F.Supp.3d 513, 521-522 (D. Del. Dec. 15, 2014), *aff'd* 803 F.2d 667 (Fed. Cir. 2015). Such basic concepts – whether it's hedging risk, budgeting expenses, tracking containers, or providing and using feedback – are abstract ideas, and the claims must contain something more in order to be patent-eligible. *Cyberfone Systems, LLC v. CNN Interactive Group, Inc.*, Nos. 2012-1673, 558 F. App'x 988, 991 (Fed. Cir. 2014).

The reason for not allowing patents on basic human activities, such as providing and using feedback based on data gathered from subjects, is the avoidance of harmful and unfair monopolies on abstract ideas, to the detriment of scientific innovation and the public interest. *See Bilski*, 561 U.S. at 611-12 (validating the patents at issue would preempt the use of basic concepts or algorithms in all fields, "and would effectively grant a monopoly over an abstract idea"). The method of providing and using feedback based on data gathered from subjects disclosed and claimed in the '271 Patent does not belong to this patentee or any patentee and should be held invalid.

**V.      CONCLUSION**

For the foregoing reasons, Polar respectfully requests that the Court find the Asserted Claims directed to patent-ineligible subject matter and thus invalid pursuant to 35 U.S.C. § 101.

DATED:  July 19, 2016                    HOLLAND & KNIGHT LLP

                                                    /s/  John P. Moran
                                                    John P. Moran (*pro hac vice*)
                                                    John.Moran@hklaw.com
                                                    HOLLAND & KNIGHT LLP
                                                    800 17th Street, N.W., Suite 1100
                                                    Washington, DC 20006
                                                    202 955 3000
                                                    202 955 5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
801 359 9000
801 359 9011 (Facsimile)

*Attorneys for Defendants Polar Electro Oy
and Polar Electro Inc.*

16

**Appx83**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 19, 2016 I filed the above paper entitled **POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS** with the Clerk of Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

<u>/s/ John P. Moran</u>

John P. Moran

1

# EXHIBIT 1

Case 1:11-cv-00167-BSJ Document 84 Filed 04/19/11 Page 1 of 1

US006701271B2

(12) **United States Patent** (10) Patent No.: **US 6,701,271 B2**
Willner et al. (45) Date of Patent: **Mar. 2, 2004**

(54) **METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

(75) Inventors: **Barry E. Willner**, Briarcliff Manor, NY (US); **Edith H. Stern**, Yorktown Heights, NY (US); **David P. Greene**, Ossining, NY (US); **Philip Shi-lung Yu**, Chappaqua, NY (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 22 days.

(21) Appl. No.: **09/859,827**

(22) Filed: **May 17, 2001**

(65) **Prior Publication Data**

US 2002/0173928 A1 Nov. 21, 2002

(51) Int. Cl.⁷ ............................ **G06F 15/00**; G01D 1/00
(52) U.S. Cl. ...................................... **702/127**; 702/182
(58) Field of Search ........................ 702/81, 127, 128, 702/130, 136, 182, 186; 600/300, 301, 310, 481; 128/903, 870; 434/257–259; 723/9–10, 14, 16; 705/1, 80

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,907,973 A * 3/1990 Hon ........................... 434/262

5,233,520 A * 8/1993 Kretsch et al. .............. 600/300
5,542,420 A * 8/1996 Goldman et al. ........... 600/301
5,762,503 A * 6/1998 Hoo et al. .................. 434/237

OTHER PUBLICATIONS

Cristiane G. Lau, "Shear Madness has right mix of character, audience", http://the–tech.mit.edc/V113/N45/madness.45a. txt.html, vol. 113, No. 45, 2 pages.*

* cited by examiner

Primary Examiner—Bryan Bui
(74) Attorney, Agent, or Firm—Buckley, Maschoff & Talwalker LLC; Stephen C. Kaufman

(57) **ABSTRACT**

A system, method, apparatus, and computer program code for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation. A physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

**41 Claims, 8 Drawing Sheets**



100

RECEIVE DATA INDICATIVE OF A PHYSICAL CHARACTERISTIC OF AT LEAST TWO SUBJECTS
102

DETERMINE AN EVALUATION OF THE PHYSICAL CHARACTERISTIC DATA
104

PROVIDE A NOTIFICATION OF THE EVALUATION TO A DEVICE
106



100

RECEIVE DATA INDICATIVE OF A PHYSICAL
CHARACTERISTIC OF AT LEAST TWO
SUBJECTS

<u>102</u>

DETERMINE AN EVALUATION OF THE
PHYSICAL CHARACTERISTIC DATA

<u>104</u>

PROVIDE A NOTIFICATION OF THE
EVALUATION TO A DEVICE

<u>106</u>

FIG. 1

**U.S. Patent**          Mar. 2, 2004          Sheet 2 of 8          US 6,701,271 B2

120

RECEIVE DATA INDICATIVE OF A PHYSICAL
CHARACTERISTIC OF AT LEAST TWO
SUBJECTS

<u>102</u>

DETERMINE A COURSE OF ACTION BASED
ON THE PHYSICAL CHARACTERISTIC DATA

<u>122</u>

PROVIDE A NOTIFICATION BASED ON THE
COURSE OF ACTION

<u>124</u>

FIG. 2



FIG. 3



FIG. 4



FIG. 5

~300

| SENSOR IDENTIFER 302 | SENSOR DESCRIPTION 304 | SENSOR OUTPUT 306 |
|---|---|---|
| S-123456 | HEART RATE SENSOR | HEART RATE DATA EVERY TEN SECONDS |
| S-387766 | TEMPERATURE SENSOR | TEMPERATURE READINGS ONCE A MINUTE |
| S-867454 | MOTION SENSOR | DATA SENT UPON MOTION |

FIG. 6

400

| OUTPUT IDENTIFIER 402 | OUTPUT DESCRIPTION 404 | SENSOR IDENTIFIER 406 |
|---|---|---|
| O-493 | SERVER C-14 | S-123456 S-867454 |
| O-601 | USER DEVICE U-12 | S-387766 |

FIG. 7

**U.S. Patent**          Mar. 2, 2004          Sheet 8 of 8          US 6,701,271 B2

~500

| EVALUATION IDENTIFIER 502 | EVALUATION DESCRIPTION 504 | SENSOR IDENTIFIER 506 |
|---|---|---|
| E-0234 | INTEREST LEVEL DETERMINATION | S-123456 S-867454 |
| E-4629 | RESTLESSNESS DETERMINATION | S-387766 |

FIG. 8

US 6,701,271 B2

1

# METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS

## FIELD OF THE INVENTION

The present invention relates to a method and apparatus for using information obtained from two or more subjects and, more particularly, embodiments of the present invention relate to methods, apparatus, and computer program code for determining a course of action based on information regarding one or more physical characteristics of two or more subjects.

## BACKGROUND OF THE INVENTION

There are many situations in which it might be desirable to have information regarding how a subject or a group of subjects feels about information being delivered or presented to them or how the subjects react while information is being delivered or presented to them. For example, a teacher may wish to know if the students in her class understand the material the teacher is discussing. A lecturer may wish to know what portions of his lecture the audience members find most interesting. Alternatively, the lecturer may want to have a better idea of when to take a break. An entertainer may wish to know what ending to provide to a story or song medley being presented to an audience.

While devices exist that allow take information from a single subject and provide information regarding the single subject, unfortunately, there is no way for an observer of two or more subjects to take objective measurements of the subjects and use the information to direct the observer or a device under the observer's control along one of several courses of action or to evaluate how best to alter or change what the observer or device is currently doing. It would be advantageous to provide a method and apparatus that overcame the drawbacks of the prior art. In particular, it would be desirable to use physical characteristic information obtained from or about two or more subjects and to determine a course of action based on such information or an evaluation of the information.

## SUMMARY OF THE INVENTION

Embodiments of the present invention provide a system, method, apparatus, and computer program code for using physical characteristic information obtained from or about two or more subjects and, more particularly, embodiments of the present invention relate to methods, apparatus, and computer program code for determining a course of action based on the information or an evaluation of the information. Information or other data regarding physical characteristics of two or more subjects may be received from one or more sensors carried, worn, or handled by the subjects or otherwise associated with the subjects. The data may be indicative of a variety of physical characteristics. For example, a physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

Based on the data received regarding one or more physical characteristics, an evaluation of the data may be determined or a course of action based on the data may be

2

determined. The results of the determination may be sent to one or more devices to provide feedback based on the physical characteristics of the subjects or to enable the device(s) to make an evaluation or determine a course of action based on the physical characteristics.

Additional objects, advantages, and novel features of the invention shall be set forth in part in the description that follows, and in part will become apparent to those skilled in the art upon examination of the following or may be learned by the practice of the invention.

According to embodiments of the present invention, a method for providing feedback includes receiving data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determining an evaluation of the data; and providing a notification regarding the evaluation to a device. In other embodiments of the present invention, a method for providing feedback includes receiving data indicative of a physical characteristic of a plurality of subjects; determining a course of action based, at least in part, on the data; and providing a notification based, at least in part, on the course of action. In still further embodiments, a method for providing feedback includes determining a desired action associated with a group of subjects; receiving data indicative of a physical characteristic of at least one of the subjects; determining a course of action based, at least in part, on the characteristic and the desired action; and providing a notification based on the course of action.

According to another embodiment of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determine an evaluation of the data; and provide a notification regarding the evaluation to device. In other embodiments of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a plurality of subjects; determine a course of action based, at least in part, on the data; and provide a notification based, at least in part, on the course of action. In other embodiments of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to determine a desired action associated with a group of subjects; receive data indicative of a physical characteristic of at least one of the subjects; determine a course of action based, at least in part, on the characteristic and the desired action; and provide a notification based on the course of action.

According to yet another further embodiment of the present invention, an apparatus for using feedback includes means for obtaining data representative of a physical characteristic of a first subject and a physical characteristic of a second subject; means for evaluating the data; and means for sending data indicative of the evaluation to a device. In other embodiments of the present invention, an apparatus for using feedback includes means for obtaining data indicative of a physical characteristic of a plurality of subjects; means for identifying a course of action based, at least in part, on the data; and means for sending a notification based, at least in part, on the course of action. In other embodiments of the present invention, an apparatus for using feedback includes means for identifying a desired action associated with a

US 6,701,271 B2

**3**

group of subjects; means for obtaining data indicative of a physical characteristic of at least one of the subjects; means for identifying a course of action based, at least in part, on the characteristic and the desired action; and means for sending a notification based on the course of action.

According to a further embodiment of the present invention, a computer program product in a computer readable medium for using feedback includes first instructions for obtaining receiving data representative of a physical characteristic of a first subject and a physical characteristic of a second subject; second instructions for evaluating the data; and third instructions for sending data indicative of the evaluation to a device. In other embodiments of the present invention, a computer program product in a computer readable medium for using feedback includes first instructions for obtaining data indicative of a physical characteristic of a plurality of subjects; second instructions for identifying a course of action based, at least in part, on the data; and third instructions for sending a notification based, at least in part, on the course of action. In other embodiments of the present invention, a computer program product in a computer readable medium for using feedback first instructions for identifying a desired action associated with a group of subjects; second instructions for obtaining data indicative of a physical characteristic of at least one of the subjects; third instructions for identifying a course of action based, at least in part, on the characteristic and the desired action; and fourth instructions for sending a notification based on the course of action.

With these and other advantages and features of the invention that will become hereinafter apparent, the nature of the invention may be more clearly understood by reference to the following detailed description of the invention, the appended claims and to the several drawings attached herein.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of the specification, illustrate the preferred embodiments of the present invention, and together with the descriptions serve to explain the principles of the invention.

FIG. 1 is a flowchart of a first embodiment of a method in accordance with the present invention;

FIG. 2 is a flowchart of a second embodiment of a method in accordance with the present invention;

FIG. 3 is a flowchart of a third embodiment of a method in accordance with the present invention;

FIG. 4 is a block diagram of system components for an embodiment of an apparatus usable with the methods of FIGS. 1–3;

FIG. 5 is a block diagram of a representative server of FIG. 4;

FIG. 6 is an illustration of one possible implementation of the sensor database of FIG. 5;

FIG. 7 is an illustration of one possible implementation of the output database of FIG. 5; and

FIG. 8 is an illustration of one possible implementation of the evaluation database of FIG. 5.

DETAILED DESCRIPTION

Applicants have recognized that there is a need for systems and methods that allow for biometric information and other physical characteristic data to be obtained regarding two or more subjects and evaluate or determine a course

**4**

of action or evaluation based on the information and data. For example, assume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the audience member's heart rates, posture, etc. may be obtained and used to help determine which of the themes the audience members are the most interested in. Once the information is communicated to the speaker, the speaker can direct the presentation appropriately.

Applicants have also recognized that there is a need for systems and methods that enable a desired action associated with a group of subjects to be determined to be obtained by obtaining biometric information and other physical characteristic data to be obtained from or about the group and using such information and data to help determine a course of action that will lead to or produce the desired action. For example, a math instructor may desire that students in a classroom memorize multiplication tables. Sensors may obtain information from two or more of the students regarding brain wave patterns, amount of movement (e.g., an indication of restlessness), heart and respiration rates, etc. Based on this information, a determination may be made as to a course of action the instructor should take to increase the chances of getting students to memorize the multiplication tables. For example, students who are determined to be bored or sleepy (e.g., have relatively slow heart rates, have not shifted position recently) may need to engage in a physical activity to wake them up or make them more alert prior to studying the multiplication tables. Students who are very active (e.g., have relatively high heart rates, are very fidgety) may need to be calmed down before beginning to memorize multiplication tables. Once the determination of a course of action is made, it can be provided to the instructor so that the instructor can proceed accordingly with an improved chance of reaching the desired activity.

These and other features will be discussed in further detail below, by describing a system, individual devices, and processes according to embodiments of the invention.

Process Description

Reference is now made to FIG. 1, where a flow chart **100** is shown which represents the operation of an embodiment of the present invention. The particular arrangement of elements in the flow chart **100** is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method **100** can be implemented by a server or other device.

Processing begins at a step **102** during which data indicative of one or more physical characteristics of two or more subjects (e.g., human beings, animals) is obtained or otherwise received. A physical characteristic of a subject might be or include the subjects' heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern, odor, motion, etc., or a change in any one or more of them.

The physical characteristic of one subject for which data is received during the step **102** may be the same as or different from the physical characteristic for which data is received for another subject during the step **102**. For example, during the step **102**, data might be received regarding the heart rate of one subject and the respiration and/or heart rate of a second subject. Data from more than one subject might be received simultaneously from multiple subjects during the step **102** or from different subjects at

US 6,701,271 B2

5

different periods of time during the step **102**. The data for different subjects can come from different sources or sensors, be in different formats and contain information regarding the same or different physical characteristics. In some embodiments, information regarding one or more sensors may be stored in, and accessed from, a sensor information database.

Data and other information regarding physical characteristics of a subject can be obtained directly or indirectly by having the subject wear, carry or hold a sensor or other data gathering device (e.g., heart rate sensor, blood pressure monitor, motion sensor), by having the subject sit in a chair having sensors or data gathering devices mounted in it or attached to it, etc. Thus, a sensor might be associated with a specific subject and provide data regarding only that subject. In some embodiments, a sensor or other data gathering device might detect or obtain data indicative of a physical characteristic for more than one subject. Data regarding or indicative of one or more physical characteristics of one or more subjects also may be received during the step **102** from observers watching the subject(s) and making, entering or recording observations.

During a step **104**, an evaluation is determined of the physical characteristic(s) by which data was received during the step **102** regarding one or more of the subjects for which data was received during the step **102**. The determination or evaluation may occur in a variety of ways and the evaluation may be directed toward a variety of behaviors. For example, based on the information received during the step **102** for a subject, the determination performed during the step **104** may include determining a risk of violence associated with one or more of the subjects, determining one or more options to provide to one or more of the subjects, determining a trading propensity associated with one or more of the subjects, predicting at least one action or course of action that might be taken or contemplated by one or more of the subjects (e.g., is the subject likely to leave the room) or is desired to be taken by one or more of the subjects, determining a probability associated with an action or course of action that might be taken, or is desired to be taken, by one or more of the subjects (e.g., how likely is a subject to leave the room, how likely is a subject to stop paying attention to a speaker, how likely is a subject to fall asleep), etc. In some embodiments, information regarding one or more evaluations may be stored in, or accessed from, an evaluation database.

In some embodiments, the step **104** may include determining one or more options to provide to a subject or a group of subjects. For example, the method **100** may include a step of receiving a notification of several possible endings to a play being presented to an audience. The step **104** may include determining which of the options to provide to the audience or determining which of the options the audience will be allowed to choose from. Suppose five possible endings are available for the play, two of which are happy endings and three of which are sad endings. If the audience appears or is determined to want a happy ending, the audience may be provided with the two options having happy endings for the play. If instead the audiences appears or is determined to want a sad ending, the audience may be provided with the three options having a sad ending for the play. A notification of the possible options may be provided to one or more of the audience members to allow them to make the selection on the desired ending.

In some embodiments, the determination made during the step **104** may include determining what type of response to provide to a subject or group of subjects. For example, two

6

or more subjects may be part of a group listening to a live lecture or training seminar. The data received during the step **102** may indicate that one or more of the subjects is sleepy, bored, restless, confused, etc. Thus, an evaluation of the data may indicate that the person conducting the lecture or seminar should change the responses given to questions asked by the subject(s) in order to hold the subjects' interest better and provide more effective instruction to the subject(s). In addition, the evaluation may indicate that the conductor should provide different information to the subjects (e.g., raise or lower the sophistication of the presentation to better match the subjects' interests, background, education, topic familiarity, etc.). As another example, the evaluation determined during the step **104** may indicate that a break or interruption is needed so that the subjects can stretch their legs, use the restroom, overcome boredom or fatigue, etc.

The determination made during the step **104** might include comparing the data received during the step **102** with stored records or examples of previously gathered data and associated behaviors or evaluations. The records or examples may be stored in a database. For example, the data collected during the step **102** may be from two or more subjects watching a new television show. The producers of the show may be trying to evaluate which ending to use for the show based on the subjects' reaction to earlier parts of the show. Thus, the step **104** may include determining a course of entertainment or response to provide to a subject. The data received during the step **102** may include heart rate information, respiration rate information, etc. By comparing the data received during the step **102** to data received for the subjects when they watched previous shows, the producers may be able to determine the subject's level of interest during various parts of the current show. Alternatively, by comparing the data received during the step **102** to data from other subjects who watched the same show, the producers may be able to predict what parts of the current show most interest the current subjects.

In some embodiments, determining an evaluation during the step **104** may include determining an environmental condition to alter or select. For example, the data received during the step **102** may indicate that some or all of a group of subjects are cold based on temperature and facial response information collected from the subjects. Thus, the determination made during the step **104** may be to increase the room temperature so as to improve the mood and enjoyment of the subjects.

In some embodiments, the evaluation determined during the step **104** may be or include an aggregating or averaging of data taken or received from multiple subjects or some other manipulation or transformation of the data. For example, the evaluation determined during the step **104** may be or include finding the average heart rate for a group of subjects, the average maximum and/or minimum heart rate for a group of subjects, the average respiration rate for the group of subjects, etc. Thus, determining an evaluation during the step **104** may be or include summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc. some or all of the raw physical characteristic data received during the step **102**. The evaluation may use other information in addition to the data received during the step **102**. As another example, determining an evaluation during the step **104** may be or include determining the total number of people in a room who have moved, yawned, slept, undergone a decrease/increase in heart rate or respiration rate, etc. during a given time period. Thus, determining an evaluation during the step **104** may be

7

or include collecting and preparing for later use the raw data received during the step **102** and/or a processed or altered version of the raw data received during the step **102**.

In some embodiments, determining an evaluation during the step **104** may be or include determining a pattern in data received during the step **102** from two or more subjects regarding one or more physical characteristics.

During a step **106**, a notification of the evaluation determined during the step **104** is provided to at least one device. The notification provided during the step **106** can be sent to more than one device and more than one type of device. The notification may be or include an email message, instant message communication, electronic signal or other communication (e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible sound, a visual display, a voice message, etc. The notification may be sent to a variety of devices such as, for example, ear phones, a speaker, a software program operating on a device, an electronic storage device (e.g., hard disk drive, CD-ROM drive), a server, and a user device (e.g., personal digital assistant, computer). The notification may be or include a summary, table, chart, correlation, comparison, graph, etc of some or all of the data received during the step **102**. In some embodiments, information regarding the notification or devices the notification is sent to may be stored in, or accessed from, an output or notification database.

As one example of the step **106**, assume a speaker is giving a lecture to a group of subjects. Data received from the subjects during the step **102** and evaluated during the step **104** may provide guidance as to what parts of the lecture the group is most interested in. Once the evaluation is determined during the step **104**, a notification of the evaluation may be sent to a computer being used by the speaker and displayed on the computer's screen as raw data, as a histogram, chart, graph, etc. Alternatively, the speaker may be wearing an ear phone that can pick up a wireless signal containing the notification. The audible notification may be created by a text-to-speech converter that converts the evaluation determined during the step **104** to a signal that is sent to the speaker's ear phone.

In some embodiments of the method **100**, the notification sent during the step **106** may include a suggested course of action based on the evaluation determined during the step **104** or the characteristic data received during the step **102**. Thus, the method **100** may include a step during which a suggested course of action is determined. For example, the data received during the step **102** may be indicative of heart rates, blood pressures, fidgetiness or restlessness, etc. for a group of subjects listening to a training lecture. The determination made during the step **104** of the data received during the step **102** may indicate that the group of subjects may be bored or in need of a break. Based on this evaluation and/or characteristic data of the subjects, a determination may be made that a ten-minute break should be given. The notification sent during the step **106** may include the suggestion or another notification may be sent after the step **106** that includes the suggestion.

In some embodiments, the method **100** may include a step of determining a desired action to be taken by a subject or group of subjects. Such a step may be completed before or after the step **102**. Thus, the evaluation determined during the step **104** may be directed to getting the subject or group of subjects to initiate, perform or complete the desired action based on the physical characteristic data received during the step **102**.

Reference is now made to FIG. 2, where a flow chart **120** is shown which represents the operation of an embodiment

8

of the present invention. The particular arrangement of elements in the flow chart **120** is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method **120** can be implemented by a server or other device.

The method **120** includes the step **102** as previously discussed above. In addition, after the step **102** the method includes a step **122** during which a course of action is determined based on the characteristic data received during the step **102**. For example, a storyteller may be telling a series of stories. The data received during the step **102** may be indicative of heart rate, respiration rate, etc. for one or more people in the audience. The data can be used to determine which type of story the audience likes the best, the preferred length of stories, etc. Thus, a course of action may be determined that suggests what type of stories the audience is most interested in and how long the stories should be for the storyteller. A database may exist of different stories that the storyteller can provide and, as a result, the course of action determined during the step **122** may include a list of stories, and perhaps a desired sequence of stories, that the storyteller can recite to the audience.

As another example, a film may be presented to an audience of people. The film may have a variety of possible endings. Data regarding physical characteristics of the audience members received during the step **102** may be used during the step **122** to determine which specific ending to provide to this particular audience.

The determination made during the step **122** may be performed by comparing the data received during the step **102** to stored records of behaviors and associated physical characteristics.

During a step **124**, a notification is provided regarding the course of action determined during the step **122**. The step **124** is similar to the step **106** previously discussed above. The notification may be sent to a variety of devices in a variety of formats. The notification provided during the step **124** may be sent in any format or form, including, but not limited to, HTTP, HTML or FTP transmission, XML feed, email message, instant message communication, facsimile transmission, telephone call, electronic signal or communication, etc., and may be sent to any type of device, such as a server or user device (e.g., computer, cellular telephone). In some embodiments, the notification may be sent to different devices depending on the course of action determined during the step **122**.

In some embodiments, the method **120** may include a step of determining a desired action to be taken by one or more of a group of subjects, as previously discussed above with regard to the method **100**. Thus, the course of action determined during the step **122** may be directed to getting a subject or group of subjects to perform or complete the desired action based on the physical characteristic data received during the step **102** for two or more of the subjects.

Reference is now made to FIG. 3, where a flow chart **140** is shown which represents the operation of an embodiment of the present invention. The particular arrangement of elements in the flow chart **140** is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method **140** can be implemented by a server or other device.

The method **140** includes a step **142** during which a desired action associated with a group of subjects is determined. For example, a motivational speaker may want to get a group of audience members to stand up and applaud and

US 6,701,271 B2

9

a specific time during a presentation. As another example, a researcher conducting a psychological examination via computer of a group of people may want to have the people communicate with each other at a specific time.

During a step 144, data indicative of one or more physical characteristics of at least one of the subjects is received. The step 144 is similar to the step 102 previously discussed above.

During a step 146, a course of action is determined based on the physical characteristic(s) for which data was received during the step 144. In addition, the course of action may be based on the desired action determined during the step 142. The course of action determined during the step 146 may be selected so as to improve the chances of a subject or group of subjects completing the action determined during the step 142 based on the physical characteristic data received during the step 144 for one or more of the subjects.

During a step 148, a notification regarding the course of action is provided. The step 148 is similar to the step 124 previously discussed above. The notification may be provided in any form or format.

System

Now referring to FIG. 4, an apparatus or system 200 usable with the methods 100, 120 and 140 is illustrated. The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204, and one or more user devices 206 that may communicate with a server 204, via a computer, data, or communications network 208. For purposes of further explanation and elaboration of the methods 100, 120 and 140, the method 100, 120 and 140 will be assumed to be operating on, or under the control of, one the servers 204.

In some embodiments, a server 204 may implement or host a Web site. A server 204 can comprise a single device or computer, a networked set or group of devices or computers, a workstation, etc. In some embodiments, a server 204 also may function as a database server, sensor controller, and/or as a user device. The use, configuration and operation of servers will be discussed in more detail below.

The sensors 202 preferably allow data to be obtained from one or more subjects regarding one or more physical characteristics of the subject(s). The sensors 202 may send data regarding physical characteristics to one or more of the servers 204 and one or more of the user devices 206. In some embodiments, a sensor 202 may be worn, carried or handled by a subject or otherwise in contact with the subject. In other embodiments, a sensor 202 may form part of a chair or other piece of furniture a subject is sitting in, resting or standing on, etc. In some embodiments, a sensor 202 may be not be in contact with a subject. For example, a heat sensor (e.g., an infrared signal detector) may be used to detect an amount of heat or energy being created by a subject, even though the sensor is not in contact with the subject.

There are many kinds of sensors that might be used with the apparatus 200. Potential sensors include heart rate monitors, blood pressure monitors, respiration rate monitors, water or perspiration detectors, temperature or heat detectors, pressure sensors, load sensors, motion detectors, acceleration sensors, brain wave monitors, etc.

The user devices 206 allow users to interact with the server 204 and the remainder of the apparatus 200. The user devices 206 also may enable a user or entity to access Web sites, software, databases, sensor data, etc. hosted or operated by, or stored on, the servers 204 and to receive communications or other notifications sent by the servers

10

204. If desired, the user devices 206 also may be connected to or otherwise in communication with other devices. Possible user devices include a personal computer, portable computer, mobile or fixed user station, workstation, network terminal or server, cellular telephone, kiosk, dumb terminal, personal digital assistant, radio, two-way pager, etc. In some embodiments, a user device 206 also may function as a server 204.

Many different types of implementations or hardware configurations can be used in the system 200 and with the methods 100, 120, 140 and the methods disclosed herein are not limited to any specific hardware configuration for the system 200 or any of its components.

The communications network 208 might be or include the Internet, the World Wide Web, or some other public or private computer, cable, telephone or communications network or intranet, as will be described in further detail below. The communications network 208 illustrated in FIG. 4 is only meant to be generally representative of cable, computer, telephone or other communication networks for purposes of elaboration and explanation of the present invention and other devices, networks, etc. may be connected to the communications network 208 without departing from the scope of the present invention. The communications network 208 can also include other public and/or private wide area networks, local area networks, wireless networks, data communication networks or connections, intranets, routers, satellite links, microwave links, cellular or telephone networks, radio links, fiber optic transmission lines, ISDN lines, T1 lines, DSL, etc. In some embodiments, a user device 206 or sensor 202 may be connected directly to a server 204 or a user device 206 without departing from the scope of the present invention. Moreover, as used herein, communications include those enabled by wired or wireless technology.

In some embodiments, a suitable wireless communication network 208 may include the use of Bluetooth technology, allowing a wide range of computing and telecommunication devices to be interconnected via wireless connections. Specifications and other information regarding Bluetooth technology are available at the Bluetooth Internet site www-.bluetooth.com. In embodiments utilizing Bluetooth technology, some or all of the devices of FIG. 4 may be equipped with a microchip transceiver that transmits and receives in a previously unused frequency band of 2.45 GHz that is available globally (with some variation of bandwidth in different countries). In addition to data, up to three voice channels are available. Connections can be point-to-point or multipoint over a current maximum range of ten (10) meters. Embodiments using Bluetooth technology may require the additional use of one or more receiving stations to receive and forward data from individual sensors 202, user devices 206 or servers 204.

Although three sensors 202, three user devices 206, and two servers 204 are shown in FIG. 4, any number of such devices may be included in the system 200. The devices shown in FIG. 4 need not be in constant communication. For example, a user device or sensor may communicate with a server only when such communication is appropriate or necessary.

Server

Now referring to FIG. 5, a representative block diagram of a server or controller 204 is illustrated. The server 204 may include a processor, microchip, central processing unit, or computer 250 that is in communication with or otherwise uses or includes one or more communication ports 252 for communicating with user devices and/or other devices.

US 6,701,271 B2

11

Communication ports may include such things as local area network adapters, wireless communication devices, Bluetooth technology, etc. The server **204** also may include an internal clock element **254** to maintain an accurate time and date for the server **204**, create time stamps for data, notifications and other communications received or sent by the server **204**, etc.

If desired, the server **204** may include one or more output devices **256** such as a printer, infrared or other transmitter, antenna, audio speaker, display screen or monitor, text to speech converter, etc., as well as one or more input devices **258** such as a bar code reader or other optical scanner, infrared or other receiver, antenna, magnetic stripe reader, image scanner, roller ball, touch pad, joystick, touch screen, microphone, computer keyboard, computer mouse, etc.

In addition to the above, the server **204** may include a memory or data storage device **260** to store information, software, databases, notifications and communications, device drivers, sensor data, potential responses or courses of action, etc. The memory or data storage device **260** preferably comprises an appropriate combination of magnetic, optical and/or semiconductor memory, and may include, for example, Random Read-Only Memory (ROM), Random Access Memory (RAM), a tape drive, flash memory, a floppy disk drive, a Zip™ disk drive, a compact disc drive, DVD drive, and/or a hard disk drive. The server **204** might also include ROM **262** and RAM **264** for additional storage and memory.

The processor **250** and the data storage device **260** in the server **204** each may be, for example: (i) located entirely within a single computer or other computing device; or (ii) connected to each other by a remote communication medium, such as a serial port cable, telephone line or radio frequency transceiver. In one embodiment, the server **204** may comprise one or more computers that are connected to a remote server computer for maintaining databases.

A conventional personal computer or workstation with sufficient memory and processing capability may be used as the server **204**. In one embodiment, the server **204** operates as or includes a Web server for an Internet environment. The server **204** preferably is capable of high volume transaction processing, performing a significant number of mathematical calculations in processing communications and database searches. A Pentium™ microprocessor such as the Pentium III™ microprocessor, manufactured by Intel Corporation may be used for the processor **250**. Equivalent processors are available from Motorola, Inc., AMD, or Sun Microsystems, Inc. The processor **250** also may comprise one or more microprocessors, computers, computer systems, etc.

Software may be resident and operating or operational on the server **204**. The software may be stored on the data storage device **260** and may include a control program **266** for operating the server, databases, etc. The control program **266** may control the processor **250**. The processor **250** preferably performs instructions of the control program **266**, and thereby operates in accordance with the present invention, and particularly in accordance with the methods described in detail herein. The control program **266** may be stored in a compressed, uncompiled and/or encrypted format. The control program **266** furthermore includes program elements that may be necessary, such as an operating system, a database management system and device drivers for allowing the processor **250** to interface with peripheral devices, databases, etc. Appropriate program elements are known to those skilled in the art, and need not be described in detail herein.

12

The server **204** also may include or store information regarding sensors, evaluations, outputs, etc. For example, information regarding sensors may be stored in a sensor database **268** for use by the server **204**, a user device, or another device or entity. Similarly, information regarding evaluation outputs and output devices might be stored in an output database **270** for use by the server **204**, a user device or another device or entity. Information regarding evaluations may be stored in an evaluation database **272** for use by the server or another device or entity. In some embodiments, a server **204**, a user device, or other device also may store, use, or access a subject database to keep information about one or more subjects, the data being collected from the subjects, subject activities, subject behavior patterns, evaluations, etc.

According to an embodiment of the present invention, the instructions of the control program may be read into a main memory from another computer-readable medium, such as from the ROM **262** to RAM **264**. Execution of sequences of the instructions in the control program causes the processor **250** to perform the process steps described herein. In alternative embodiments, hard-wired circuitry may be used in place of, or in combination with, software instructions for implementation of some or all of the methods of the present invention. Thus, embodiments of the present invention are not limited to any specific combination of hardware and software.

The processor **250**, communication port **252**, clock **254**, output device **256**, input device **258**, data storage device **260**, ROM **262**, and RAM **264** may communicate or be connected directly or indirectly in a variety of ways. For example, the processor **250**, communication port **252**, clock **254**, output device **256**, input device **258**, data storage device **260**, ROM **262**, and RAM **264** may be connected via a bus **272**.

While specific implementations and hardware configurations for servers **204** devices have been illustrated, it should be noted that other implementations and hardware configurations are possible and that no specific implementation or hardware configuration is needed. Thus, not all of the components illustrated in FIG. **5** may be needed for a server implementing the method **100**, method **120**, or the method **140**. Therefore, many different types of implementations or hardware configurations can be used in the system **200** and the methods disclosed herein are not limited to any specific hardware configuration.

User Device

As mentioned above, user device **206** may be any of a number of different types of devices, including, but not limited to a personal computer, portable computer, mobile or fixed user station, workstation, network terminal or server, telephone, beeper, kiosk, dumb terminal, personal digital assistant, facsimile machine, radio, two-way pager, cable set-top box, etc. In some embodiments, a user device might be or include speakers, earphones, a signal detector or receiver, etc. If desired, the user device **206** also may function as a server **204**. In some embodiments, a user device **206** may have the same structure, components or configuration as the server **204** illustrated in FIG. **5**.

Databases

As previously discussed above, in some embodiments a server, user device, or other device may include or access a sensor database for storing or keeping information about sensors. One representative sensor database **300** is illustrated in FIG. **6**.

The sensor database **300** may include a sensor identifier field **302** that may includes codes or other identifying

US 6,701,271 B2

13

information for one or more sensors and a sensor description field 304 that may include information describing the sensors identified in the field 302, such as information regarding a sensor's name, description, model number, tolerances, specifications, manufacturer, etc. The sensor database 300 also may include a sensor output field 306 that may include information regarding the type, timing and format of the information or other data generated or otherwise provided by the sensors identified in the field 302. Other or different fields also may be used in the sensor database 300. For example, a sensor database might include a field that stores information regarding one or more subjects associated with the sensor.

As illustrated in the sensor database 300 of FIG. 6, the sensor identified as "S-123456" in the field 302 is a heart rate sensor or monitor and provides heart rate data every ten seconds. The sensor identified as "S-867454" in the field 302 is a motion detector or sensor and provides data upon the detection of motion.

As previously discussed above, in some embodiments a server, user device, or other device may include or access an output database for storing or keeping information about information sent and received from one or more servers. One representative output database 400 is illustrated in FIG. 7.

The output database 400 may include an output identifier field 402 that contains codes or other identifying information regarding recipients of sensor data. The output database 400 also may include an output description field 404 that includes a name, identifier or other descriptive information for the output identifiers identified in the field 402 and a sensor identifier field 406 that identifies one or more sensors associated with the output identifiers provided in the field 402. Other or different fields also may be used in the output database 400. In some embodiments a specific output identifier might be associated with a specific evaluation to be determined or a specific course of action to be determined. Thus, the output database 400 might include a field that associates the devices identified in the field 402 with a specific determination being made or to be made.

As illustrated in the output database 400 of FIG. 7, the output identified as "O-493" in the field 402 is "SERVER C-14" and is associated with the data provided by the sensors "S-123456" and "S-867454". Thus, the data provided by the sensors identified as "S-123456" and "S-867454", or a notification of an evaluation of the data provided by the sensors "S-123456" and "S-867454", is provided to or received by the "SERVER C14", which is identified as "O-493" in the field 402.

As previously discussed above, in some embodiments a server, user device, or other device may include or access an evaluation database for storing or keeping information about evaluations or courses of action to be determined. One representative evaluation database 500 is illustrated in FIG. 8.

The evaluation database 500 may include an evaluation identifier field 502 that may include codes or other identifying information for one or more evaluations or courses of action being determined. In addition, the evaluation database 500 also may include a description field 504 that may include information regarding the evaluations or courses of action identified in the field 502. In some embodiments the evaluation database 500 also may include a sensor identifier field 506 that may contain identifiers or other information regarding the sensor data to be used in the evaluations identified in the field 502. Other or different fields also may be used in the evaluation database 500.

As illustrated in the evaluation database 500 of FIG. 8, the evaluation identified as "E-0234" in the field 502 is an

14

"INTEREST LEVEL DETERMINATION" based on data obtained or received from the sensors "S-123456" and "S-867454". Thus, during the determination during an implementation of the step 104, an evaluation is made using the data received during the step 102 from the sensors identified as "S-123456" and "S-867454" to determine if a subject or subject exhibits interest at one or more moments or during one or more periods of time.

In some embodiments a specific determination might be associated with a specific output device that will receive a notification of the determination. Thus, the evaluation database 500 might include a field that associates the evaluations identified in the field 502 with one or more devices that will receive information or other notifications regarding the evaluations.

The methods of the present invention may be embodied as a computer program developed using an object oriented language that allows the modeling of complex systems with modular objects to create abstractions that are representative of real world, physical objects and their interrelationships. However, it would be understood by one of ordinary skill in the art that the invention as described herein could be implemented in many different ways using a wide range of programming techniques as well as general-purpose hardware systems or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences without departing from the scope of the present invention and the claims should not be construed as being limited to any particular order or sequence, unless specifically indicated.

Each of the methods described above can be performed on a single computer, computer system, microprocessor, etc. In addition, two or more of the steps in each of the methods described above could be performed on two or more different computers, computer systems, microprocessors, etc., some or all of which may be locally or remotely configured. The methods 100, 120 and 140 can be implemented in any sort or implementation of computer software, program, sets of instructions, code, ASIC, or specially designed chips, logic gates, or other hardware structured to directly effect or implement such software, programs, sets of instructions or code. The computer software, program, sets of instructions or code can be storable, writeable, or savable on any computer usable or readable media or other program storage device or media such as a floppy or other magnetic or optical disk, magnetic or optical tape, CD-ROM, DVD, punch cards, paper tape, hard disk drive, Zip™ disk, flash or optical memory card, microprocessor, solid state memory device, RAM, EPROM, or ROM.

Although the present invention has been described with respect to a preferred embodiment thereof, those skilled in the art will note that various substitutions may be made to those embodiments described herein without departing from the spirit and scope of the present invention.

The words "comprise," "comprises," "comprising," "include," "including," and "includes" when used in this specification and in the following claims are intended to specify the presence of stated features, elements, integers, components, or steps, but they do not preclude the presence or addition of one or more other features, elements, integers, components, steps, or groups thereof.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. A method for providing feedback, comprising:
    receiving first data indicative of a physical characteristic of a first subject from a first device associated with said

US 6,701,271 B2

15

first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and

providing a notification regarding said evaluation to a device.

**2**. The method of claim **1**, wherein said physical characteristic of said first subject includes at least one of the following:

said first subject's heart rate;

said first subject's blood pressure;

said first subject's blood sugar level;

said first subject's posture;

said first subject's weight;

said first subject's height;

said first subject's temperature;

said first subject's respiration rate;

a facial response of said first subject;

a galvanic skin response of said first subject;

a pheromone associated with said first subject;

a brain wave pattern of said first subject;

an odor generated by said first subject;

motion of said first subject;

a change in motion of said first subject;

a change in said first subject's heart rate;

a change in said first subject's blood pressure;

a change in said first subject's blood sugar level;

a change in said first subject's posture;

a change in said first subject's temperature;

a change in said first subject's respiration rate;

a change in a facial response of said first subject;

a change in a galvanic skin response of said first subject;

a change in a pheromone associated with said first subject;

a change in a brain wave pattern of said first subject; and

a change in an odor generated by said first subject.

**3**. The method of claim **1**, wherein said receiving first data indicative of a physical characteristic of a first subject includes at least one of the following:

receiving data from at least one observer of said first subject regarding at least one physical characteristic of said first subject;

receiving data indicative of at least one physical characteristic from at least one sensor worn by said first subject; and

receiving data indicative of at least one physical characteristic from at least one sensor associated with said first subject.

**4**. The method of claim **1**, further comprising:

receiving data indicative of one or more physical characteristics for each of a plurality of subjects, wherein said plurality of subjects includes said first subject and said second subject.

**5**. The method of claim **4**, further comprising:

determining a pattern in said data indicative of one or more physical characteristics for each of a plurality of subjects.

**6**. The method of claim **5**, further comprising:

providing a notification regarding said pattern to said device.

16

**7**. The method of claim **1**, wherein said determining an evaluation of said first data and said second data includes at least one of the following:

determining an aggregation of data indicative of a physical characteristic for each of a plurality of subjects, said plurality of subjects including said first subject and said second subject and at least one other subject;

determining an averaging of data indicative of a physical characteristic for each of a plurality of subjects, said plurality of subjects including said first subject and said second subject and at least one other subject;

computing a result based on a function of said first data and said second data;

comparing said physical characteristic of said first subject with a stored record of behavior;

comparing said physical characteristic of said second subject with a stored record of behavior;

determining a prediction regarding at least one action that might be taken by at least one of said first subject and said second subject;

determining a risk of violence associated with at least one of said first subject and said second subject;

determining a trading propensity associated with at least one of said first subject and said second subject;

determining an action that may be taken by at least one of said first subject and said second subject;

determining an action that is desired to be taken by at least one of said first subject and said second subject;

determining a course of entertainment to provide to at least one of said first subject and said second subject;

determining probability associated with an action that might be taken by said first subject;

determining at least one response to provide at least one of said first subject and said second subject;

determining at least one option to offer at least one of said first subject and said second subject;

selecting entertainment to provide at least one of said first subject and said second subject;

selecting information to provide at least one of said first subject and said second subject;

selecting at least one environmental condition for at least one of said first subject and said second subject; and

altering at least one environmental condition for at least one of said first subject and said second subject.

**8**. The method of claim **1**, further comprising:

determining which of a plurality of devices to provide said notification.

**9**. The method of claim **8**, further comprising:

identifying said plurality of devices.

**10**. The method of claim **1**, wherein said device includes at least one of the following:

ear phones;

a speaker;

a software program;

a visual display device;

an electronic storage device;

a server; and

a user device.

**11**. The method of claim **1**, wherein said notification includes at least one of the following:

an evaluation of said first data and said second data;

an email message;

US 6,701,271 B2

17

a visual display;

an electronic signal;

an audible sound; and

a voice message.

12. The method of claim 1, wherein said evaluation includes at least one of the following:

an aggregation of data indicative of a physical characteristic for each of a plurality of subjects;

an averaging of data indicative of a physical characteristic for each of a plurality of subjects;

a selection of a behavior associated with said physical characteristic of said first subject;

a selection of a behavior associated with said physical characteristic of said second subject;

a comparison of said physical characteristic of said first subject with a stored record of behavior;

a prediction regarding at least one action that might be taken by at least one of said first subject and said second subject;

a determination of a risk of violence associated with at least one of said first subject and said second subject;

a determination of a trading propensity associated with at least one of said first subject and said second subject;

a determination of a course of action;

a determination of a course of entertainment;

a determination of a probability associated with a course of action that might be taken by at least one of said first subject and said second subject;

a determination of at least one response to provide at least one of said first subject and said second subject;

a determination of a least one response to subject said first subject to;

a determination of a least one response to subject said first subject to;

a determination of at least one option to offer at least one of said first subject and said second subject;

a selection of entertainment;

a selection of information; and

a selection of at least one environmental condition.

13. The method of claim 1, further comprising:

receiving a notification regarding a plurality of options.

14. The method of claim 13, further comprising:

selecting one of said plurality of options based, at least in part, on said evaluation.

15. The method of claim 14, further comprising:

selecting said device based, at least in part, on said selecting one of said plurality of options.

16. The method of claim 13, wherein said device is associated with at least one of said plurality of options.

17. The method of claim 1, further comprising:

determining a course of action based on said first data and said second data.

18. The method of claim 17, further comprising:

providing a notification based on said course of action.

19. The method of claim 1, further comprising:

determining a course of action based on said evaluation.

20. The method of claim 19, further comprising:

providing a notification based on said course of action.

21. The method of claim 1, wherein said determining an evaluation of said first data and said second data includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject.

18

22. The method of claim 21, wherein said determining an evaluation includes determining a course of action based on said record of behavior.

23. The method of claim 1, further comprising:

determining a desired course of action and wherein said determining an evaluation of said first data and said second data includes determining an action based, at least in part on said data and said desired course of action.

24. The method of claim 1, wherein said physical characteristic of said first subject is the same as said physical characteristic of said second subject.

25. The method of claim 1, wherein said physical characteristic of said first subject is different from said physical characteristic of said second subject.

26. The method of claim 1, wherein said physical characteristic of said first subject is indicative of a response of said first subject to a first presentation.

27. The method of claim 26, wherein said physical characteristic of said second subject is indicative of a response of said second subject to a second presentation.

28. The method of claim 26, wherein said physical characteristic of said second subject is indicative of a response of said second subject to said first persentation.

29. The method of claim 1, wherein said first and second devices are the same.

30. The method of claim 1, wherein said first device is associated with more than one subject.

31. A method for providing feedback, comprising:

receiving data indicative of a physical characteristic of each of a plurality of subjects, wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation;

determining a desired course of action associated with said plurality of subjects based, at least in part, on said data indicative of a physical characteristic of each of said plurality of subjects; and

providing a notification based, at least in part, on said course of action.

32. The method of claim 31, wherein said determining a course of action based on said data indicative of a physical characteristic of each of a plurality of subjects includes one of the following:

determining a course of action based, at least in part, on said data indicative of a physical characteristic of each of a plurality of subjects and a desired action that can be taken by at least one of said plurality of subjects;

determining a course of action based, at least in part, on said data indicative of a physical characteristic of each of a plurality of subjects and a desired action that can be taken by said plurality of subjects; and

determining at least one behavior associated with said physical characteristic.

33. The method of claim 31, further comprising:

determining a desired action to be taken by said plurality of subjects.

34. The method of claim 31, wherein said plurality of subjects includes a first subject and a second subject and wherein said data indicative of a physical characteristic of each of a plurality of subjects includes data indicative of a characteristic of said first subject and data indicative of a characteristic of said second subject.

35. The method of claim 31, wherein said characteristic of said first subject is different from said characteristic of said second subject.

US 6,701,271 B2

19

**36**. A method for providing feedback, comprising:

determining a desired action associated with a group of subjects;

receiving data indicative of a physical characteristic of at least one of said group of subjects, wherein said physical characteristic of said at least one of said group of subjects is indicative of a response of said at least one of said group of subjects to a presentation;

determining a course of action expected to lead to said desired action based, at least in part, on said physical characteristic and said desired action; and

providing a notification based on said course of action.

**37**. A system for facilitating feedback, comprising:

a memory;

a communication port; and

a processor connected to said memory and said communication port, said processor being operative to:

receive first data indicative of a physical characteristic of a first subject and second data indicative of a physical characteristic of a second subject;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to device.

**38**. A computer program product in a computer readable medium for using feedback, comprising:

first instructions for obtaining receiving first data representative of a physical characteristic of a first subject and second data representative of a physical characteristic of a second subject;

20

second instructions for preparing an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

third instructions for sending third data indicative of said evaluation of said first data and said second data to a device.

**39**. A method for providing feedback, comprising:

receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said determining said evaluation includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject; and

providing a notification regarding said evaluation to a device.

**40**. The method of claim **39**, wherein said determining an evaluation includes determining a course of action based on said at least one record of behavior.

**41**. The method of claim **39**, wherein said determining said evaluation includes comparing said physical characteristic of said second subject to at least one record of behavior associated with said physical characteristic of said second subject.

\*   \*   \*   \*   \*

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10753rd)

# United States Patent

Willner et al.

(10) **Number:** **US 6,701,271 C1**

(45) **Certificate Issued:** **Nov. 5, 2015**

(54) **METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

(75) Inventors: **Barry E. Willner**, Briarcliff Manor, NY (US); **Edith H. Stern**, Yorktown Heights, NY (US); **David P. Greene**, Ossining, NY (US); **Phillip Shi-lung Yu**, Chappaqua, NY (US)

(73) Assignee: **ICON HEALTH & FITNESS, INC.**, Logan, UT (US)

Reexamination Request:
 No. 90/013,409, Feb. 6, 2015

Reexamination Certificate for:
 Patent No.: 6,701,271
 Issued: Mar. 2, 2004
 Appl. No.: 09/859,827
 Filed: May 17, 2001

(51) **Int. Cl.**
 *A61B 5/00* (2006.01)
 *G06F 19/00* (2011.01)
 *G09B 23/00* (2006.01)
 *G09B 23/28* (2006.01)

(52) **U.S. Cl.**
 CPC ............ *A61B 5/0002* (2013.01); *G06F 19/322* (2013.01); *G06F 19/3418* (2013.01); *G06F 19/3487* (2013.01); *G09B 23/28* (2013.01)

(58) **Field of Classification Search**
 None
 See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,409, please refer to with the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Matthew Heneghan

(57) **ABSTRACT**

A system, method, apparatus, and computer program code for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation. A physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control number 95/002,337 filed Sep. 14, 2012. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceeding.**



100



RECEIVE DATA INDICATIVE OF A PHYSICAL CHARACTERISTIC OF AT LEAST TWO SUBJECTS
102

DETERMINE AN EVALUATION OF THE PHYSICAL CHARACTERISTIC DATA
104

PROVIDE A NOTIFICATION OF THE EVALUATION TO A DEVICE
106

US 6,701,271 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

ONLY THOSE PARAGRAPHS OF THE
SPECIFICATION AFFECTED BY AMENDMENT
ARE PRINTED HEREIN.

Column 10 line 36:

In some embodiments, a suitable wireless communication
network **208** may include the use of [Bluetooth] *Bluetooth™*
technology *that operates in the 2.4 GHz industrial, scientific
and medical (ISM) frequency band*, allowing a wide range of
computing and telecommunication devices to be intercon-
nected via wireless connections. Specifications and other
information regarding [Bluetooth] *Bluetooth™* technology
are available at the [Bluetooth] *Bluetooth™* Internet site
www.bluetooth.com. In embodiments utilizing [Bluetooth]
*Bluetooth™* technology, some or all of the devices of FIG. **4**
may be equipped with a microchip transceiver that transmits
and receives in a previously unused *ISM* frequency band of
2.45 GHz that is available globally (with some variation of
bandwidth in different countries). In addition to data, up to
three voice channels are available. Connections can be point-
to-point or multipoint over a current maximum range of ten
(10) meters. Embodiments using [Bluetooth] *Bluetooth™*
technology may require the additional use of one or more
receiving stations to receive and forward data from individual
sensors **202**, user devices **206** or servers **204**.

Column 10, line 62:

Now referring to FIG. **5**, a representative block diagram of
a server or controller **204** is illustrated. The server **204** may
include a processor, microchip, central processing unit, or
computer **250** that is in communication with or otherwise
uses or includes one or more communication ports **252** for
communicating with user devices and/or other devices. Com-
munication ports may include such things as local area net-
work adapters, wireless communication devices, [Bluetooth]
*Bluetooth™* technology *that operates in the 2.4 GHz ISM
frequency band*, etc. The server **204** also may include an
internal clock element **254** to maintain an accurate time and
date for the server **204**, create time stamps for data, notifica-
tions and other communications received or sent by the server
**204**, etc.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claim **1** is cancelled.
New claims **42-99** are added and determined to be
patentable.
Claims **2-41** were not reexamined.

42. The method of claim 1, wherein:
the first device is a first sensor;
the physical characteristic of the first subject is sensed by
the first sensor;

**2**

the receiving of the first data includes a remote server
receiving the first data from the first sensor through the
Internet; and
the determining of the evaluation includes the remote
server determining, based on the first data and based on
the second data, which of multiple options to provide to
the first subject for the first subject to select from.
43. The method of claim 42, wherein:
the determining, based on the first data and based on the
second data, of which of multiple options to provide to
the first subject for the first subject to select from
includes determining, based on the first data and based
on the second data, which of multiple endings to an event
to provide to the first subject for the first subject to select
from.
44. The method of claim 42, wherein:
the determining of the evaluation further includes the
remote server determining, based on the first data and
based on the second data, to provide different informa-
tion to the first subject and to the second subject.
45. The method of claim 42, wherein:
the determining of the evaluation includes the remote
server averaging the first data and the second data.
46. The method of claim 42, wherein:
the device is a device of a trainer of the first subject and the
second subject.
47. The method of claim 46, wherein:
the evaluation is an audible notification; and
the device of the trainer is a wireless earphone.
48. The method of claim 42, wherein:
the device is a software application operating on a cellular
telephone; and
the cellular telephone has a touch screen input device.
49. The method of claim 42, wherein:
the device is a software application operating on a portable
computer; and
the portable computer has a touch screen input device.
50. The method of claim 42, wherein:
the device is a software application operating on a per-
sonal computer; and
the personal computer has a touch screen input device.
51. The method of claim 42, wherein:
the first sensor is a first portable wireless sensor;
the first sensor is configured to wirelessly connect with a
cellular telephone through a wireless connection;
the cellular telephone is configured to wirelessly connect to
the Internet through a wireless cellular connection; and
the remote server receiving of the first data from the first
sensor through the Internet includes the remote server
receiving the first data from the first sensor through the
wireless connection between the first sensor and the
cellular telephone and through the wireless cellular
connection of the cellular telephone to the Internet.
52. The method of claim 51, wherein:
the wireless connection operates in the 2.4 GHz industrial,
scientific and medical (ISM) frequency band.
53. The method of claim 51, wherein:
the wireless connection is an infrared wireless connection.
54. The method of claim 51, wherein:
the first portable wireless sensor is a heart rate sensor.
55. The method of claim 51, wherein:
the first portable wireless sensor includes a blood pressure
sensor.
56. The method of claim 51, wherein:
the first portable wireless sensor includes a subject respi-
ration rate sensor.

US 6,701,271 C1

**3**

57. The method of claim 51, wherein:

the first portable wireless sensor includes a subject weight sensor.

58. The method of claim 51, wherein:

the first portable wireless sensor includes a subject brain wave pattern sensor.

59. The method of claim 51, wherein:

the first portable wireless sensor includes a subject brain wave rhythm sensor.

60. The method of claim 51, wherein:

the first portable wireless sensor includes a subject motion sensor.

61. The method of claim 51, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

62. The method of claim 42, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

63. The method of claim 62, wherein:

the first sensor is an acceleration sensor.

64. The method of claim 62, wherein:

the first sensor is a heart rate sensor.

65. The method of claim 62, wherein:

the first sensor is a temperature sensor.

66. The method of claim 42, wherein:

the first sensor is a first portable wireless; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over a first wireless connection to the Internet.

67. The method of claim 66, wherein:

the first wireless connection employs a first wireless receiving station that is connected to the Internet.

68. The method of claim 42, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

69. The method of claim 68, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is sitting on the stationary apparatus.

70. The method of claim 68, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is resting on the stationary apparatus.

71. The method of claim 68, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is standing on the stationary apparatus.

72. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

**4**

the method further comprises the remote server determining, based on the first data and based on the second data, an environmental condition of the first subject and of the second subject to alter.

73. The method of claim 72, wherein:

the environmental condition is the temperature of a room occupied by the first subject and by the second subject.

74. The method of claim 73, wherein:

the device is a software application operating on a computer; and

the computer has a touch screen input device.

75. The method of claim 73, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

76. The method of claim 73, wherein:

the first sensor is a wireless sensor; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through a wireless connection between the first sensor and remote server.

77. The method of claim 76, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

78. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet;

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection;

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet; and

the first portable wireless sensor includes a subject perspiration sensor.

79. The method of claim 78, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

80. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which of multiple options to provide to the first subject.

81. The method of claim 80, wherein:

the device is a software application operating on a cellular telephone; and

the cellular telephone has a touch screen input device.

US 6,701,271 C1

**5**

82. The method of claim 80, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet.

83. The method of claim 82, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

84. The method of claim 82, wherein:

the first portable wireless sensor includes a subject motion sensor.

85. The method of claim 82, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

86. The method of claim 80, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

87. The method of claim 86, wherein:

the first sensor is a subject motion sensor.

88. The method of claim 86, wherein:

the first sensor is a subject acceleration sensor.

89. The method of claim 80, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

90. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, to provide multiple options to the first

**6**

subject for the first subject to select from and to the second subject for the second subject to select from.

91. The method of claim 90, wherein:

the device is a software application operating on a cellular telephone; and

the cellular telephone has a touch screen input device.

92. The method of claim 90, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet.

93. The method of claim 92, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

94. The method of claim 92, wherein:

the first portable wireless sensor includes a subject motion sensor.

95. The method of claim 92, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

96. The method of claim 90, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

97. The method of claim 96, wherein:

the first sensor is a subject motion sensor.

98. The method of claim 96, wherein:

the first sensor is a subject acceleration sensor.

99. The method of claim 90, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

\* \* \* \* \*

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (1254th)

# United States Patent
Willner et al.

(10) **Number:** US 6,701,271 C2

(45) **Certificate Issued:** Mar. 31, 2016

(54) **METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

(75) Inventors: **Barry E. Willner**, Briarcliff Manor, NY (US); **Edith H. Stern**, Yorktown Heights, NY (US); **David P. Greene**, Ossining, NY (US); **Philip Shi-lung Yu**, Chappaqua, NY (US)

(73) Assignee: **ICON HEALTH & FITNESS, INC.**

**Reexamination Request:**
No. 95/002,337, Sep. 14, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,701,271** |
| Issued: | **Mar. 2, 2004** |
| Appl. No.: | **09/859,827** |
| Filed: | **May 17, 2001** |

Reexamination Certificate C1 6,701,271 issued Nov. 5, 2015

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/00* | (2006.01) |
| *G01D 1/00* | (2006.01) |
| *A61B 5/00* | (2006.01) |
| *G06F 19/00* | (2011.01) |
| *G09B 23/28* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61B 5/0002* (2013.01); *G06F 19/322*
(2013.01); *G06F 19/3418* (2013.01); *G06F 19/3487* (2013.01); *G09B 23/28* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/002,337, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Minh T Nguyen

(57) **ABSTRACT**

A system, method, apparatus, and computer program code for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation. A physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.



100



RECEIVE DATA INDICATIVE OF A PHYSICAL CHARACTERISTIC OF AT LEAST TWO SUBJECTS 102

DETERMINE AN EVALUATION OF THE PHYSICAL CHARACTERISTIC DATA 104

PROVIDE A NOTIFICATION OF THE EVALUATION TO A DEVICE 106

US 6,701,271 C2

**1**

**INTER PARTES
REEXAMINATION CERTIFICATE**

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claim **15** is confirmed.

Claims **1-14** and **16-41** are cancelled.

\*   \*   \*   \*   \*

**2**

Larry R. Laycock  (Bar No. 4868)
   *llaycock@mabr.com*
David R. Wright  (Bar No. 5164)
   *dwright@mabr.com*
Tyson K. Hottinger (Bar No. 13607)
   *thottinger@mabr.com*
MASCHOFF BRENNAN LAYCOCK
   GILMORE ISRAELSEN & WRIGHT PLLC
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone:   (435) 252-1360
Facsimile:   (435) 252-1361

Attorneys for plaintiff and counterdefendant ICON HEALTH & FITNESS, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **ICON HEALTH & FITNESS, INC.**, a Delaware corporation, | Civil Action No. 1:11-cv-00167-BSJ |
| Plaintiff and counterdefendant, | **ICON HEALTH & FITNESS, INC.'S *OPPOSITION* TO POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| vs. | |
| **POLAR ELECTRO OY**, a Finnish company, and **POLAR ELECTRO INC.**, a Delaware corporation, | Honorable Judge Bruce S. Jenkins |
| Defendants and counterclaimants. | |
| AND RELATED COUNTERCLAIM. | |

TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     BACKGROUND ................................................................................................ 4

        A.    The History of the '271 Patent .................................................................... 4

        B.    The Subject Matter of the '271 Patent ........................................................ 5

              1.    Overview of the '271 Patent's Subject Matter ................................ 5

              2.    The Multiple Methods Taught by the '271 Patent ......................... 7

        C.    The Claims of the '271 Patent ..................................................................... 9

              1.    Claim 15 ........................................................................................ 10

              2.    Claim 80 ........................................................................................ 10

III.    LEGAL STANDARDS ..................................................................................... 11

        A.    Judgment on the Pleadings ........................................................................ 11

        B.    A Motion for Judgment on the Pleadings Must be Directed to an Entire
              Claim ......................................................................................................... 12

        C.    Patent Eligibility under Section 101 ......................................................... 12

              1.    Step One: Is the Claim Directed to an Abstract Idea? ................. 13

              2.    Step Two: Does the Claim Include an Inventive Concept? .......... 14

IV.     ARGUMENT ................................................................................................... 15

        A.    Polar Has Not Shown that the Claims at Issue Are Directed to an Abstract
              Idea ............................................................................................................ 15

              1.    Polar Does Not Compare the Claims at Issue to any Claims
                    Previously Found to be Abstract .................................................. 15

              2.    The Claims at Issue Are Not Comparable to the Claims Found to
                    be Abstract in *Content Extraction* or any Other Cited Case ..................... 16

              3.    Polar's other Step-One Argument Is Improperly Untethered to the
                    Claim Language ............................................................................ 18

4.      The Claims Were Reexamined After Alice and Determined not to be Abstract ................................................................................. 20

B.      Polar's Step Two Analysis Fails to Consider the Claimed Elements as Ordered Combinations ............................................................... 20

C.      The '271 Patent Was an Improvement Upon Existing Technology ..................... 23

D.      Polar's Preemption Argument Is Unfounded ....................................... 24

V.      CONCLUSION ........................................................................ 25

### TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
573 U.S. __, 134 S. Ct. 2347, 189 L. Ed. 2d 296 (2014) ................................................. *passim*

*In re Amica, Inc.*,
130 B.R. 792 (Bankr. N.D. Ill. 1991) ....................................................................................12

*Association for Molecular Pathology v. Myriad Genetics, Inc.*,
569 U.S. ___, 133 S. Ct. 2107, 186 L. Ed. 2d 124 (2013) .....................................................12

*Atlantic Richfield Co. v. Farm Credit Bank of Wichita*,
226 F.3d 1138 (10th Cir. 2000) ............................................................................................11

*BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2016) ........................................................................................ *passim*

*Biggins v. Oltmer Iron Works*,
154 F.2d 214 (7th Cir.1946) ....................................................................................................2

*Bolender v. Carnival Corporation*,
2014 WL 12527190 (S.D. Fla. 2014) ....................................................................................12

*Bonda's Veevoederfabriek, Provimi, B.V. v. Provimi, Inc.*,
425 F.Supp. 1034 (E.D.Wis.1976) ...........................................................................................2

*In re Chatfield*,
545 F.2d 152 (C.C.P.A. 1976) ...............................................................................................14

*Colony Ins. Co. v. Burke*,
698 F.3d 1222 (10th Cir. 2012) ........................................................................................2, 11

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
776 F.3d 1343 (Fed. Cir. 2014)........................................................................15, 16, 17, 18

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)........................................................................................3, 23

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)........................................................................................ *passim*

**Appx114**

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) ............................................................13

*Mayo Collaborative Svcs. v. Prometheus Labs., Inc.*,
    566 U.S. ___, 132 S. Ct. 1289, 182 L.Ed.2d 321 (2012) ..................12, 13

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ............................................................11

*Shaw v. Valdez*,
    819 F.2d 965 (10th Cir. 1987) ...........................................................2, 11

*SiRF Tech., Inc. v. Int'l Trade Comm'n*,
    601 F.3d 1319 (Fed. Cir. 2010) ............................................................24

*Ultramercial, Inc. v. Hulu LLC*,
    772 F.3d 709 (Fed. Cir. 2014) .........................................................13, 18

*United States v. Any & All Radio Stations Transmission Equip.*,
    207 F.3d 458 (8th Cir. 2000) ..........................................................14, 25

**Statutes**

35 U.S.C. § 101 ......................................................................... *passim*

35 U.S.C. § 282(a) ...................................................................................9

**Rules**

Rule 12(b)(6)............................................................................................11

Rule 12(c)................................................................................................11

Plaintiff and counterdefendant ICON Health & Fitness, Inc. ("ICON") submits the following brief in *opposition* to the ". . . Motion for Judgment on the Pleadings" ("Motion," ECF No. 147) filed on behalf of defendants and counterclaimants Polar Electro Oy and Polar Electro Inc. (collectively, "Polar"). This opposition is accompanied by supporting declarations of Dr. David Brienza ("Brienza decl.") and Tyson K. Hottinger ("Hottinger decl.") and a request for judicial notice ("Request for Notice") of certain documents on file with the United States Patent and Trademark Office ("PTO").

## I.   INTRODUCTION

United States Patent No. 6,701,271 ("'271 patent") emerged from reexamination by the United States Patent and Trademark Office ("PTO") with 59 claims.[1] Polar's Motion seeks judgment that 10 of those claims,[2] which Polar inaccurately dubs the "Asserted Claims,"[3] are invalid under 35 U.S.C. § 101 ("§ 101"). Polar argues: (1) that what *was* claim 1 of the '271 and the focal point of Polar's argument is directed to an abstract idea, because it describes methods that teachers have used forever; (2) as further explained below, claim 1 was cancelled and is not at issue in this case; and (3) that the other so-called Asserted Claims, which depend from claim 1, do not add anything inventive to that starting point because the structural components recited in the claims are generic and used in a conventional way.  Significantly, none of the claims received a Section 101 rejection as part of the *ex parte* reexamination by the PTO.

---

[1] The '271 patent originally issued with 41 claims. During reexamination, all but one of the original claims (claim 15) was cancelled and claims 42–99 were added. (*See* Motion at 4 n. 10.)

[2] Polar's Motion targets claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91. (*See* Motion at 4.)

[3] As Polar acknowledges, ICON also alleges infringement of claims 46, 60, 61, 84, 85, 92, 94, and 95. (*See id.* at 4 n. 10.) Polar's allegation that ICON limited its contentions to the ten so-called "Asserted Claims" is untrue: ICON has agreed that Polar need not yet serve its own noninfringement and invalidity contentions as to certain of the asserted claims, but ICON has not limited its contentions. ICON had pointed out the error in Polar's statement even before Polar filed its Motion, but Polar nonetheless persists in repeating it. (Hottinger decl. ¶¶ 1-5, Exs. A-C.)

Because Polar seeks judgment *on the pleadings*, based on no evidence and before the claims at issue have even been construed:

(1) this Court "must accept as true [ICON's] well-pleaded factual allegations and all reasonable inferences must be indulged in favor of [ICON]," *Shaw v. Valdez*, 819 F.2d 965, 968 (10th Cir. 1987);

(2) Polar must "*clearly* establish[] that no material issue of fact remains to be resolved and [Polar] is entitled to judgment as a matter of law," *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (quoting *United States v. Any & All Radio Stations Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000)) (italics added);

(3) "in this procedural posture" the claims at issue *must* be "construed in favor of [ICON]," *BASCOM Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); and

(4) all asserted claims (i.e., ICON's entire patent infringement claim must be subject to the motion. (*Bonda's Veevoederfabriek, Provimi, B.V. v. Provimi, Inc.*, 425 F.Supp. 1034, 1036 (E.D.Wis.1976); *Biggins v. Oltmer Iron Works*, 154 F.2d 214, 216–17 (7th Cir.1946).

Especially given those constraints, Polar's Motion should be denied for at least the reasons that it inappropriately starts with the wrong claim and then applies a flawed analysis to that claim; i.e., it applies bad law to the wrong facts. And, as set forth below, even Polar itself contradicts its own argument and admits in proceedings before the PTO that adding things such as sensors (far less than what the '271 patent teaches) is sufficient to transform an abstract idea into something patent eligible.

**Appx117**

Starting with the facts, to determine patent-eligibility under Section 101, the Court "must first determine whether *the claims at issue* are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. __, 134 S. Ct. 2347, 2355, 189 L. Ed. 2d 296 (2014) (italics added). So the proper subject matter for the Section 101 analysis are the "the claims at issue." But cancelled claim 1, which is the focus of Polar's analysis, is not one of the claims at issue. Indeed it is no longer even a claim of the '271 patent because it was cancelled during reexamination. Among the claims actually at issue in this case, the proper starting points for the Section 101 analysis are claims 15 and 80. Polar's Motion should be denied because Polar's legally irrelevant analysis of cancelled claim 1 is inapplicable to claims 15 and 80.

In the context of governing law, Polar's analytical approach is inconsistent with three of the most recent Section 101 decisions from the United States Court of Appeals for the Federal Circuit—*BASCOM*; *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016); and *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258-59 (Fed. Cir. 2014). In *BASCOM*, *Enfish,* and *DDR*, district courts had ruled that certain inventions were unpatentable under Section 101. Nevertheless, and on appeal, the Federal Circuit reversed in each case. Polar's arguments concerning the '271 patent are flawed because if Polar's same analytical approach had been applied by the Federal Circuit in *BASCOM*, *Enfish*, and *DDR*, it would have yielded the wrong result—i.e., Polar's ill-conceived approach would yield the conclusion that the claims in *BASCOM*, *Enfish*, and *DDR* were all ineligible. Moreover, Polar's contradictory approach would invalidate many of Polar's own sensor patents, inconsistent with Polar's non-litigation statements made to the PTO.

## II.   BACKGROUND

**A.     The History of the '271 Patent**

ICON is a pioneer of increasingly popular "share and compare" technology in the wearable fitness device industry, by which people can connect with and motivate each other to greater physical achievement by sharing details about their own activities and comparing their own performance with others. In its pioneering role, ICON recognized early on the potential for new technology to enable not just better or faster but entirely new forms of "share and compare" functionality, including forms by which objective and accurate measurements of individual's physical characteristics could be taken with sensors, analyzed, compared, and then shared with other people around the globe.

The '271 patent issued to IBM on March 2, 2004, on an application which was filed on May 17, 2001. ICON, seeing the value and desiring to practice the patent as part of its "share and compare" fitness wearable offerings, thereafter acquired the patent from IBM. But Polar plays by a different set of rules: instead of obtaining and paying for rights to practice the valuable inventions of the '271 patent, as ICON did, it just started infringing. So ICON commenced this infringement suit to properly enforce its exclusive rights.

Polar's competitors in the wearable tracking device industry—Strava, Inc., MapMyFitness, Inc., and FitnessKeeper, Inc.—petitioned the PTO to reexamine the '271 patent. From overlapping *ex parte* and *inter partes* reexamination proceedings, the '271 patent emerged with the patentability of original claim 15 confirmed and 58 new claims (claims 42–99) added. Underscoring the patentable distinctions between them, claim 1 of the original patent—from which all the remaining claims depend—was cancelled during reexamination; but the PTO affirmed the patentability of all the claims now at issue in this action. Although the PTO

**Appx119**

necessarily considered compliance with all conditions of patentability, including Section 101, during the more than three years of post-*Alice* reexamination, the PTO did not reject a single claim under Section 101. The principal documents from the reexamination proceedings are submitted herewith as exhibits to an accompanying request for judicial notice.

**B.     The Subject Matter of the '271 Patent**

**1.     Overview of the '271 Patent's Subject Matter**

The '271 patent solved the problems and limitations of a human simply observing individuals by using highly sophisticated electronic sensors to *objectively* sense things that humans cannot sense, such as infrared heat, brain waves, blood sugar, blood pressure, respiration rates, and precise acceleration and motion. '271 patent at 9:56–61; 13:1–4.[4] Moreover, the '271 patent also uses electronic sensors to accurately and objectively sense things that humans can subjectively observe, though not precisely in a predictably measurable way. The '271 patent further teaches a method whereby multiple physical characteristics, which cannot be sensed by human means, can be sensed simultaneously. *Id*. at 4:20–23; 10:54–56. For example, the brain wave patterns, heat or energy produced, change in acceleration, and blood sugar could all be sensed at the same time for multiple individuals located in different parts of the globe under the '271 patent's unique solution to a new problem. *Id*.

The '271 patent teaches that different physical characteristics can be sensed for different individuals, either simultaneously or at different times. '271 patent at 4:20–27; 9:42–46. For example, it would be possible to gather blood sugar levels for one person and brain wave patterns for another person, using completely different sensors that gather and generate

---

[4] The '271 patent is reproduced as Exhibit 1 to Polar's Motion.

information in completely different formats. *Id*. at 4:53–58; 5:1–4. The '271 patent teaches methods that then identify the sensor generating the data and transform that data into a format that can be compared and analyzed in conjunction with data received from other and different types of sensors. *Id*. at 4:53–58; 5:1–4; 13:5–10; 14:11–15.

The '271 patent further teaches that these highly sophisticated electronic sensors can be wirelessly connected to a cell phone associated with a person, or even form a part of the cell phone itself. '271 patent at 9:44–48; 10:30–33. The wireless connection between the sensor and the cell phone can include communication protocols such as Bluetooth. *Id*. at 10:34–39. In turn, the cell phone can connect with a remote server via a communication network using satellite links, the internet, or other telecommunication networks, i*d*. at 10:14–17, thus allowing participants in the system to share, compare, analyze, and receive notice regarding objectively sensed data regardless of their physical location.

The '271 patent method also teaches methods that perform a unique evaluation of the sensed data, associate that evaluation with a particular user device and then send notifications of that user's unique evaluation to the specific devices associated with that individual. *Id*. at 14:3–8.

Based on this unique and inventive combination of elements, the method of the '271 patent allows for a single entity to use sensors to sense objective physical characteristics of multiple persons, in different and remote locations, compare and analyze that data and then determine a course of action based on an evaluation of the sensed data.  This was an improvement upon the technology at the time the '271 patent application was filed as it was not previously possible to perform the '271 method and then share and compare the information with multiple people throughout the world. This is inventive from the eyes of one of ordinary skill in

the art, and in light of the state of the art at the time the '271 patent application was filed. (Brienza decl. ¶¶ 11-13.)

Contrary to Polar's arguments, this sort of novel "share and compare" system could not be performed by humans, and was not being performed by humans, and requires a unique combination of sophisticated equipment, which extends far beyond an abstract idea.

**2.      The Multiple Methods Taught by the '271 Patent**

The written description or specification (as opposed to the claims) of the '271 patent does not describe just one type of method; instead, it describes multiple types of methods, which have some elements in common but differ in other respects. Polar ignores the variations taught by the '271 patent and focuses on only one type of method, exemplified by a teacher's observation and response to his students. *See, e.g.*, Motion at 1; '271 patent at 4:19–37.  The patent also describes a similar scenario involving a speaker.  *Id.* at 4:2–11. The teacher and speaker scenarios have this in common: information about two or more subjects (e.g., students or audience members) is obtained and analyzed for the benefit of a third-party observer (e.g., a teacher or speaker).

Polar seizes on those third-party-observer examples to argue that the patents-in-suit are just directed to "ordinary human activity." (*See, e.g.*, Motion at 1.) But even in those scenarios, Polar's proposed analogy between the patent's methods and "ordinary human activity" fails in at least two basic ways. First, a traditional teacher or speaker makes a qualitative assessment of audience or student behavior; the patent, by contrast, teaches the use of sensors that take "objective measurements" of physical characteristics such as "heart rate, blood pressure, blood

sugar level," etc. '271 patent at 1:33, 58–59.[5] Second, a traditional teacher makes his own assessment of how attentive his students are and whether they need a break; a traditional speaker likewise makes his own judgments about what his audience wants, based on his own observations. But in the third-party-observer methods described by the patent, the teacher is provided with "a course of action" based on objectively measured data that has already been determined for him and the speaker is told "which of the themes the audience members are the most interested in." *See* '271 patent at 4:8–10, 34–35.

Moreover, the '271 patent teaches methods that do not fit the third-party observer model, at all. For example, the '271 patent teaches methods in which instead of providing options to a third-party observer, options are instead provided to one or more of the objectively measured subjects. *See, e.g.,* '271 patent at 5:29–33 ("based on the information received . . . for a subject, the determination . . . may include . . . determining one or more options to provide to one or more of the subjects"), 47–49 ("some embodiments . . . may include determining one or more options to provide to a subject or a group of subjects"). The analogies with traditional teacher and speaker scenarios on which Polar bases its motion simply do not apply where the results of the data collection are used to inform or make choices available to one or more *subjects* of the data instead of a third-party observer.

_____

[5] The '271 patent does include, e.g., "facial response or position" in some listings of physical characteristics. *See, e.g.,* '271 patent at 1:61–62. But there is a difference between "facial response or position" that can be objectively measured by a sensor and, e.g., a speaker's perception that some audience members on the front row seem to have a glazed expression on their faces. The speaker, if asked, would not be able to describe the objectively measurable changes that a sensor would capture; conversely, a sensor would not pick up the glazed expression (although it might detect an absence of movement).

**C.      The Claims of the '271 Patent**

Some patent-eligibility cases begin by analyzing some foundational claim or claims; and then, instead of analyzing other claims "from the ground up," consider whether any variations between those other claims and those selected as a starting point justify a different result with regard to those other claims. It is not clear whether such an approach does justice to the statutory command that "[e]ach claim of a patent . . . be presumed valid independently of the validity of other claims." *See* 35 U.S.C. § 282(a). But if such an approach is to be employed, it is important to at least get the starting point right.

All of the claims at issue depend from what was claim 1 of the '271 patent.[6] However, claim 1 was cancelled and separate claims emerge as the asserted set.  If claim 1 were one of "the claims at issue" then there might be some justification for starting the analysis with it. *Cf. Alice*, 134 S. Ct. at 2355 ("We must first determine whether *the claims at issue* are directed to a patent-ineligible concept [italics added]."). But it is not; indeed it is no longer a claim of the '271 patent at all. The PTO found the claims at issue patentable, but Polar ignores the proper analytical point. Because the PTO has already found a patentable distinction between former claim 1, on the one hand, and its dependent claims, on the other, and because former claim 1 is not a claim at issue, there is no justification for basing the Section 101 analysis on a claim that does not exist.

---

[6] Claims 42, 80, and 90 are first-generation dependents (i.e., they depend directly from claim 1); claims 46, 49, 51, 81, 82, 91, and 92 are second-generation dependents (depending from claims 42, 80, and 90); claims 54, 60, 61, 84, 85, 94, and 95 are third-generation dependents (depending from claims 51, 82, and 92). Claim 15 also is a third-generation dependent, but in a separate line: claim 15 depends from former claim 14, which depends from former claim 13, which depends from former claim 1.

Of the claims at issue, claims 15, 42, 80, and 90 are the most basic; all the others depend

from them. And claims 42, 80, and 90 overlap substantially. Because claim 80 is broader than

claims 42 and 90,[7] the proper starting points for the Section 101 analysis are claims 15 and 80.

### 1.    Claim 15

With incorporated limitations, claim 15 covers:

> A method for providing feedback, comprising:
>
> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
>
> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
>
> providing a notification regarding said evaluation to a device[;]
>
> receiving a notification regarding a plurality of options[;]
>
> selecting one of said plurality of options based, at least in part, on said evaluation[; and]
>
> selecting said device based, at least in part, on said selecting one of said plurality of options.

'271 patent at 14:65–15:9, 17:43–50.

### 2.    Claim 80

Claim 80, with incorporated limitations, covers:

> A method for providing feedback, comprising:
>
> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data

---

[7] Claims 42 and 90 entirely replicate the language of claim 80; they differ from claim 80 only by virtue of their final clauses, which add a phrase after the text shared with claim 80 ends. Specifically, claim 42 adds the phrase "for the first subject to select from" to the end of the final clause and claim 90 adds the phrase "for the first subject to select from and to the second subject for the second subject to select from." *See* '271 patent *Ex Parte* Reexamination Certificate at 2:7, 6:1–2.

indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and

providing a notification regarding said evaluation to a device[; wherein]

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which of multiple options to provide to the first subject.

'271 patent at 14:65–15:9; '271 patent *Ex Parte* Reexamination Certificate at 4:53–63.

## III.   LEGAL STANDARDS

### A.   Judgment on the Pleadings

"A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000); *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) ("We apply regional circuit law to the review of motions to dismiss."). To decide Polar's Motion, this Court "must accept as true [ICON's] well-pleaded factual allegations and all reasonable inferences must be indulged in favor of [ICON]." *Shaw*, 819 F.2d at 968. "Judgment on the pleadings should not be granted 'unless [Polar] has clearly established that no material issue of fact remains to be resolved and [Polar] is entitled to judgment as a matter of law.'" *Colony Ins.*, 698 F.3d at 1228 (quoting *Any & All*, 207 F.3d at 462). And because Polar raises patent eligibility through a motion to dismiss, before claim construction—instead of at summary

judgment, *after* claim construction—the patent claims must be "construed in favor" of ICON. *See BASCOM*, 827 F.3d at 1350.

**B.      A Motion for Judgment on the Pleadings Must be Directed to an Entire Claim**

Although the District of Utah does not appear to have ruled on the issue, several other federal courts around the country have held that a motion for judgment on the pleadings is not proper unless it disposes of an entire claim or defense.  *See, e.g.*, *In re Amica, Inc.*, 130 B.R. 792, 796 (Bankr. N.D. Ill. 1991); *Bolender v. Carnival Corporation*, 2014 WL 12527190 * 1 (S.D. Fla. 2014).  Even if Polar's Motion were granted, it does not challenge all of ICON's asserted claims and would not result in a judgment against ICON on its patent infringement claim against Polar.  Polar's Motion should be denied on this basis alone.

**C.      Patent Eligibility under Section 101**

Under Section 101, a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. "[T]his provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable." *Association for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. ___, 133 S. Ct. 2107, 2116, 186 L. Ed. 2d 124 (2013). But "we tread carefully in construing this exclusionary principle lest it swallow all of patent law," *Alice*, 134 S. Ct. at 2354, because "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," *Mayo Collaborative Svcs. v. Prometheus Labs., Inc.*, 566 U.S. ___, 132 S. Ct. 1289, 1293, 182 L.Ed.2d 321 (2012).

A two-step "framework" is used "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts. First, we determine whether the claims at issue are directed to one of those patent-

ineligible concepts." *Alice*, 134 S. Ct. at 2355. If so then at "step two, we must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1294, 1298).

### 1.    Step One: Is the Claim Directed to an Abstract Idea?

In order for "the first step of the inquiry [to be] a meaningful one . . . . [t]he 'directed to' inquiry . . . cannot simply ask whether the claims *involve* a patent-ineligible concept," *Enfish*, 822 F.3d at 1335—because "at some level," "all inventions" qualify, *see Mayo*, 132 S. Ct. at 1293. Instead, "[u]nder step one . . . the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). What matters is not whether the claims "involve" an abstract idea but whether that is "the focus" of the claims. *See Enfish*, 822 F.3d at 1335–36.

As *Enfish* illustrates, the step-one inquiry cannot be settled by merely consulting the preamble of a claim, as Polar has done.  The district court in *Enfish* "concluded that the claims were directed to the abstract idea of 'storing, organizing, and retrieving memory in a logical table' or, more simply, 'the concept of organizing information using tabular formats,'" *Enfish*, 822 F.3d at 1337. The Federal Circuit reversed because "describing the claims at such a high level of abstraction and untethered from the language of the claims [themselves] all but ensures that the exceptions to § 101 swallow the rule." *Id.*

Finally, novelty "is a factor to be considered only in the second step of the *Alice* analysis," not (as Polar improperly does) in the first step. *See Ultramercial, Inc. v. Hulu LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014); *see also Mayo*, 132 S. Ct. at 1304 ("in evaluating the

significance of additional steps [at step two], the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap").  In this case, the Section 102 issues have been all resolved in favor of patentability.

2.     **Step Two: Does the Claim Include an Inventive Concept?**

Unless the focus of a claim is an abstract idea, the claim as a whole cannot be struck down under the abstract ideas exception. *See Enfish*, 822 F.3d at 1339 (if "the claims are not directed to an abstract idea under step one . . . we do not need to proceed to step two"). Only if the focus of a claim *is* an abstract idea does the inquiry moves to step two.

In contrast to step one of the patent-eligibility inquiry, which considers the overall gist of the asserted claims, step two focuses on specific limitations, asking whether they introduce "additional elements" that "'transform the nature of the claim' into a patent-eligible application." *See Alice*, 134 S. Ct. at 2355 (quoting *Mayo*, 132 S. Ct. at 1297). But that does not mean "a claim may be dissected, the claim components searched in the prior art, and, if the only component found novel is outside the statutory classes of invention, . . . rejected under 35 U.S.C. § 101." *See In re Chatfield*, 545 F.2d 152, 158 (C.C.P.A. 1976). To the contrary, at step two, "[t]he 'inventive concept' may arise in one or more of the individual claim limitations *or in the ordered combination* of the limitations." *See BASCOM*, 827 F.3d at 1349. (italics added). Thus in *BASCOM*, for example, even though "the limitations of the claims, taken individually, recite generic computer, network and Internet components, none of which is inventive by itself," "an inventive concept [was] found in the ordered combination of claim limitations." *Id.* at 1349, 1351.

Polar cannot prevail on its Motion without "clearly establish[ing]," *see Any & All Radio*, 207 F.3d at 462, that the claims at issue, "construed in favor of [ICON] as they must be in this

procedural posture," *BASCOM*, 827 F.3d at 1350, both (1) are focused on an abstract idea (step one) and (2) do not include any additional limitations which, taken individually or as an ordered combination, add an inventive concept (step two).

## IV.   ARGUMENT

As shown below, Polar has failed to carry its burden by clear and convincing evidence to show either that the claims are directed to an abstract idea or that they do not add an inventive concept.

**A.   Polar Has Not Shown that the Claims at Issue Are Directed to an Abstract Idea**

The first step of the patent-eligibility inquiry under Section 101 is to "determine whether *the claims at issue* are directed to" an abstract idea. *See Alice*, 134 S. Ct. at 2355 (italics added). There is no "definitive rule to determine what constitutes an 'abstract idea'"; instead, the determination is made by "compar[ing] *claims at issue* to those claims already found to be directed to an abstract idea in previous cases." *See Enfish*, 822 F.3d at 1334 (italics added). Polar tries to meet its burden at step one by comparing cancelled claim 1 of the '271 patent to claims found to be abstract in *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014); as shown below, Polar cannot and does not meet its heavy burden because it focuses on the wrong claim and the comparison it tries to make is untenable.

**1.   Polar Does Not Compare the Claims at Issue to any Claims Previously Found to be Abstract**

Polar's argument fails, first, because cancelled claim 1 is not even one of the "claims at issue" and Polar never compared the claims that are at issue, such as claims 15 and 80, to the claims found abstract in *Content Extraction* or any other case. That alone warrants denial of Polar's Motion.

**2.      The Claims at Issue Are Not Comparable to the Claims Found to be Abstract in *Content Extraction* or any Other Cited Case**

Polar's Motion should also be denied because the claims of the '271 patent that are at issue in this case are not comparable with those found abstract in *Content Extraction* or any other cited case. The claims invalidated in *Content Extraction* were found to be "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." *Content Extraction*, 776 F.3d at 1345-47.

Here, by contrast, claim 15 of the '271 patent, with incorporated limitations, reads:

> A method for providing feedback, comprising:
>
> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
>
> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
>
> providing a notification regarding said evaluation to a device[;]
>
> receiving a notification regarding a plurality of options[;]
>
> selecting one of said plurality of options based, at least in part, on said evaluation[; and]
>
> selecting said device based, at least in part, on said selecting one of said plurality of options.

'271 patent at 14:65–15:9, 17:43–50. The first step of the claimed method cannot be characterized as merely "collecting data" because separate devices (e.g., sensors) sense, measure, and create objective data concerning physical characteristics (e.g., brain waves) and then transmit the sensed characteristics in the form of data from each person.  In addition, instead of merely *recognizing* and *storing* data within the collected set, claim 15 evaluates a combination of

the collected data, provides a notification of that *evaluation* (not of the collected data), receives notification of options, selects an option, and selects a device based on the option selection. None of those have any counterpart in the *Content Extraction* claim.

> Likewise claim 80, with incorporated limitations, covers:
>
>> A method for providing feedback, comprising:
>>
>> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
>>
>> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
>>
>> providing a notification regarding said evaluation to a device[; wherein]
>>
>> the first device is a first sensor;
>>
>> the physical characteristic of the first subject is sensed by the first sensor;
>>
>> the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and
>>
>> the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which of multiple options to provide to the first subject

'271 patent at 14:65–15:9; '271 patent *Ex Parte* Reexamination Certificate at 4:53–63. Like claim 15, claim 80 does not recite merely *collecting, recognizing,* and *storing* data within the collected set but instead recites the evaluation of a combination of the objective measured data and providing notification of that *evaluation* (not of the collected data). Claim 80 also introduces a key inventive component in the last clause: determining which option(s) "to provide to the first subject," i.e., to one of the people whose physical characteristics are being monitored. But in

*Content Extraction*, the "subjects" are hard copy documents; and it would make no sense to provide options to documents.

Polar's Motion should be denied because the only comparison Polar tries to make with "claims already found to be directed to an abstract idea in previous cases," *see Enfish*, 822 F.3d at 1334, fails.[8]

### 3. Polar's other Step-One Argument Is Improperly Untethered to the Claim Language

Polar also suggests throughout its Motion that any process of "providing and using feedback based upon data gathered from subjects" is an abstract idea because teachers and others have been doing it "since they first walked the Earth." (*See* Motion at 1.) This "argument" (if that is how it was intended) fails because it is not supported by any comparison with "claims already found to be directed to an abstract idea in previous cases," *see Enfish*, 822 F.3d at 1334. Polar's preoccupation with what has been done before is also out of place in the step one analysis because "any novelty in implementation . . . is a factor to be considered only in the second step of the *Alice* analysis." *Ultramercial*, 772 F.3d at 715.

Polar also errs by "describ[ing] the claims [of the '271 patent] at such a high level of abstraction and untethered from the language of the claims." *Cf. Enfish*, 822 F.3d at 1337. Polar

---

[8] Polar also cites to *Epic Technology, LLC*, *OIP Tecnhologies, Inc.*, *Wireless Media Innovations, LLC*, *Wolf*, *Planet Bingo, LLC*, *Intellectual Ventures I LLC*, *Ultramercial, Inc.*, *Cyberfone Systems, LLC*, *CyberSource Corp.*, and *Cloud Sachtel, LLC* in support of its arguments. Each of these cases is distinguishable from this action and the technology of the '271 patent. These cases all involve something that was being performed by humans without the use of a computer, or without the need of any technology (e.g., tracking shipping containers, creating a nutritional log, or gathering and simply organizing data). The '271 patent is different because it does not relate to something that could be performed by humans or to simply gathering and organizing of data. Instead the '271 patent uses sensors to objectively measure and create predictably reliable data for characteristics that could not otherwise be sensed by a human (e.g., blood sugar and brain waves), or could not objectively be sensed by a human (acceleration of two persons located in different parts of the world). Polar has recognized that this even simpler technology (i.e., just a sensor) is sufficiently novel to prevent application of Section 101.

quotes cancelled claim 1 and emphasizes its preamble, "[a] method for providing feedback."

Because cancelled claim 1 is not one of the "claims at issue" and the claims that are at issue have

been found by the PTO to be patentably distinct, Polar's reliance on cancelled claim 1 is like

quoting only part of a claim and concluding, based on the preamble and a *partial* quotation of

what follows, that the entire claim is directed to an abstract idea. That approach is flawed

because it would yield the wrong result for *Enfish*. In *Enfish*, one of the claims at issue read:

> A data storage and retrieval system for a computer memory, comprising:
>
> means for configuring said memory according to a logical table, said logical table including:
>
>> a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;
>>
>> a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and
>
> means for indexing data stored in said table.

*Enfish*, 822 F.3d at 1336. Based on "step three of the 'means for configuring' algorithm," *Enfish*,

822 F.3d at 1337—i.e., based on "means for indexing data stored in said table," which does not

appear until the very end of the claim—the Federal Circuit held that the claim was not directed to

an abstract idea. *See id.* As the Federal Circuit explained, the district court reached its contrary

conclusion "that the claims were directed to the abstract idea of 'storing, organizing, and

retrieving memory in a logical table'" by improperly "describ[ing] the claims at such a high level

of abstraction and untethered from the language of the claims." *Enfish*, 822 F.3d at 1337. By

asking this Court to focus its analysis only on cancelled claim 1, which comprises only part of

any of the claims now at issue, and to focus specifically on cancelled claim 1's preamble, Polar is inviting this Court to make the same mistake.

Finally, as pointed out above, the patent teaches methods that diverge from the third-party observer model of Polar's attempted teacher analogy in several respects, including (1) sensing of objectively measured physical characteristics instead of qualitatively assessed behavior, (2) evaluation of the data produced by the sensors otherwise than by the third-party observer (e.g., the teacher), and (3) the provision of evaluations to other subjects, rather than the third-party observer. (*See supra* § II.A, pp. 4–9.) Claims 15 and 80 (and through them, the other claims at issue) exemplify (1) and (2), and claim 80 also exemplifies (3). Polar's attempt to analogize with Socrates is untethered from the actual language of the claims, which shows they are directed to methods wholly unlike those used by teachers.

### 4.   The Claims Were Reexamined After Alice and Determined not to be Abtract

The *ex parte* reexamination of the '271 patent was filed on February 6, 2015 and the reexamination certificate did not issue until November 5, 2015.  '271 patent, reexamination certificate.  The '271 patent was therefore examined post-*Alice* and the PTO already made the determination that the claims are patent eligible, including under Section 101.

### B.   Polar's Step Two Analysis Fails to Consider the Claimed Elements as Ordered Combinations

Polar's step two analysis consists of pointing out that the sensors and other technological elements recited by the claims are conventional; whereupon Polar concludes that the elements do not add any inventive concept. (*See* Motion at 12–14.) Polar's present litigation-driven argument is belied by its own prior representations to the PTO: Polar has obtained several patents by

persuading the PTO that what it now castigates as uninventive accretions transform otherwise unpatentable abstract ideas into patentable subject matter. For example:

- On February 20, 2009, the PTO rejected claims then pending in U.S. Patent Application 11/545,018 under § 101. (*See* Request for Notice Ex. __ at 2–3.) On May 15, 2009, Polar responded by amending the claims and arguing that the Section 101 rejection should "be reconsidered and withdrawn" because the claims were "amended to recite that the elements are performed by the user-specific performance monitor"—i.e., a sensor. (*See* Request for Notice Ex. __ at 10.) Thus, although in this case Polar argues that ICON's '271 patent should be invalidated because "[t]he Asserted Claims' recitation of conventional components, such as common sensors, . . . does not transform the abstract concept . . . into patent-eligible subject matter," (*see* Motion at 6)—before the PTO, in order to obtain a patent of its own, Polar took the position that the addition of a "user-specific performance monitor" *does* transform otherwise unpatentable subject matter into patentable subject matter. As a result, the PTO withdrew the Section 101 rejection and U.S. Patent No. 8,512,238 issued on August 20, 2013 (after Polar finally amended and argued over the prior art). (*See* Request for Notice Ex. 3.)

- On February 13, 2015, the PTO rejected claims then pending in U.S. Patent Application No. 13/418,781 under Section 101. (*See* Request for Notice Ex. 5 at 3–5.) At the time of the rejection, claim 1 of the application recited: measuring a physical characteristic ("measured local motion") to obtain certain metrics (a "walking motion metric" and a "running motion metric")—which parallels the recitation of sensors to measure physical characteristics in the claims at issue here; computing a "calibration value" based on the

relationship between those metrics—which parallels the evaluation step of the claims at issue here; and then calibrating the running and walking measurements. (*See* Request for Notice Ex. 4 at 6.) Polar traversed and overcame the examiner's characterization of the claims as directed to the abstract idea of "*acquiring signals from a source and performing calculations and calibrations*" in part by arguing, "the additional elements recited in the claims establish meaningful limitations that do not foreclose or monopolize all uses of such an abstract idea when viewed in combination." (Request for Notice Ex. 6 at 11; Request for Notice Ex. 7.) So too here, as more fully set forth below (in response to Polar's preemption argument), the additional elements recited in the claims at issue "do not foreclose or monopolizes all uses" of providing and using feedback—for example, the claims at issue here do not read on Polar's only example of a teacher gauging and responding to his students' behavior.

Polar's step-two approach is also misguided because it would have yielded the wrong result in *BASCOM*. In that case, too, "the limitations of the claims, taken individually, recite[d] generic computer, network and Internet components, none of which is inventive by itself." *BASCOM*, 827 F.3d at 1349. But the subject matter was patent-eligible because "an inventive concept [was] found in the ordered combination of claim limitations." *Id.* at 1352. So too here, Polar's argument fails and its Motion should be denied because Polar gives no consideration to whether the independently conventional elements recited by the claims at issue amount to an inventive concept when taken as an ordered combination.

As an ordered combination, the additional elements do introduce inventive concepts. For example, by putting a sensor that collects "data indicative of a physical characteristic" in

communication with a remote, internet-accessible server that also receives similar data about one or more other subjects, the claims at issue enable the combined evaluation of more than one subject's objective physical-characteristics data, resulting in the provision of one or more options not to a teacher or other third-party observer but to one of the subjects. (Brienza decl. ¶¶ 11-13) This was not being done in the prior art at the time the '271 patent application was filed. (*Id.*)[9] Indeed, as discussed in the immediate section below, it was an improvement upon existing technology.

**C.      The '271 Patent Was an Improvement Upon Existing Technology**

As confirmed during the recent *ex parte* reexamination, the '271 patent was reexamined in the context of wearable fitness tracking devices and the PTO considered such devices as relevant art (See Request for Notice, Ex. 11 (citations to Teller, Root, Bibl)). The '271 patent was directed toward solving a problem particular to the wearable fitness tracking industry.  Prior to the filing of the '271 patent application, the technology did not allow objective measurements taken by sensors of multiple persons around the world to be analyzed, compared, and then shared.  As set forth in the intrinsic record, which must be construed and assumed true in the context of this motion, *see BASCOM*, 827 F.3d at 1350, none of the other prior art methods or systems permitted such a method.  (*See* Request for Notice Exs. 8-39; Brienza decl. ¶¶ 11-13.) The '271 patent improved upon the existing technology to make such a "share and compare" possible.  This is alone is enough to render the claims of the '271 patent eligible for protection under Section 101.  *See DDR Holdings*, 773 F.3d at 1258-59.

---

[9] The claims are drafted to be read by persons of ordinary skill in the art, who are uniquely positioned to assess whether claim elements present inventive concepts not taught in the prior art.  However, Polar failed to present a declaration of one of ordinary skill in the art to support its motion, which relies solely on attorney argument.

One of the purposes of the inventions of the '271 patent is to obtain objective data that can be *effectively* compared to other objective data (as opposed to subjective data observed by a human) so a meaningful and predictable "share and compare" can take place.  Because the objective data is critical to a meaningful share and compare, the sensors of the '271 patent become a necessary component of the claims just as in *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1332 (Fed. Cir. 2010), which effectively prevents application of Section 101 as well.

## D.      Polar's Preemption Argument Is Unfounded

Polar's last argument in support of its Motion is that the '271 patent amounts to a monopoly on "providing and using feedback based on data gathered from subjects." (*See* Motion at 15.) But claims 15 and 80, for example, have no application whatsoever to Polar's favored example of a teacher observing students in his class and making adjustments accordingly. Claim 15 does not reach on Polar's teacher scenario because that scenario does not involve any of the several steps that in claim 15 follow "receiving . . . data indicative of . . . physical characteristic[s]" and "determining an evaluation" of that data—such as "providing a notification regarding said evaluation to a device," "receiving a notification regarding a plurality of options," "selecting one of said plurality of options based, at least in part, on said evaluation," and "selecting said device based, at least in part, on said selecting one of said plurality of options." *See* '271 patent at 15:8–9, 17:43–51. Claim 80 does not read on the teacher scenario for some of the same reasons and because claim 80 involves the presentation of options "to the first *subject*"—i.e., to what would be students (not teachers) in Polar's teacher scenario—but in that scenario, presenting options to students makes no sense: it is the teacher who receives physical

characteristics data, who evaluates the data, and who uses the evaluation. *Cf.* '271 patent at 14:66–15:9, '271 patent *Ex Parte* Reexamination Certificate at 4:56–63.

Polar's already indefensible argument becomes, if possible, even weaker when extended to the so-called second-generation claims of the '271 patent, that is, claims depending from claims 42, 80, and 90. Claim 82, for example, recites that "the first sensor is a first portable wireless sensor . . . configured to wirelessly connect with a cellular telephone through a wireless connection"; "the cellular telephone," in turn, "is configured to wirelessly connect to the Internet through a wireless cellular connection"; and "the remote server receiv[es] the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet." *See* '271 patent *Ex Parte* Reexamination Certificate at 5:2–12. Those highly specialized limitations remove the claims at issue far from a generic claim to providing and using feedback, as argued by Polar.

## V.   CONCLUSION

Based on the above, ICON requests that Polar's Motion be denied.  Especially when the claims of the '271 patent and allegations of the pleadings are construed favorably to ICON, as they must be, *see BASCOM*, 827 F.3d at 1350, Polar falls far short of "clearly establish[ing] that no material issue of fact remains to be resolved and [Polar] is entitled to judgment as a matter of law," *see Any & All*, 207 F.3d at 462.

Dated:  October 28, 2016       Larry R. Laycock
David R. Wright
Tyson K. Hottinger
MASCHOFF BRENNAN LAYCOCK
   GILMORE ISRAELSEN & WRIGHT PLLC

By:  /s/ *Tyson K. Hottinger*
     Tyson K. Hottinger
Attorneys for plaintiff and counterdefendant ICON
HEALTH & FITNESS, INC.

**Appx141**

Larry R. Laycock  (Bar No. 4868)
    *llaycock@mabr.com*
David R. Wright  (Bar No. 5164)
    *dwright@mabr.com*
Tyson K. Hottinger (Bar No. 13607)
    *thottinger@mabr.com*
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT PLLC
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone:   (435) 252-1360
Facsimile:    (435) 252-1361

Attorneys for plaintiff and counterdefendant ICON HEALTH & FITNESS, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **ICON HEALTH & FITNESS, INC.**, a Delaware corporation,<br><br>    Plaintiff and counterdefendant,<br><br>        vs.<br><br>**POLAR ELECTRO OY**, a Finnish company, and **POLAR ELECTRO INC.**, a Delaware corporation,<br><br>    Defendants and counterclaimants. | Civil Action No. 1:11-cv-00167-BSJ<br><br>**DECLARATION OF TYSON K. HOTTINGER IN SUPPORT OF ICON HEALTH & FITNESS, INC.'S OPPOSITION TO POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Honorable Judge Bruce S. Jenkins |
| AND RELATED COUNTERCLAIM. | |

I, Tyson K. Hottinger, declare:

1.      I am a member in good standing of the State Bar of Utah, a shareholder with the law firm Maschoff Brennan Laycock Gilmore Israelsen & Wright, PLLC, and one of the attorneys representing ICON Health & Fitness, Inc. ("ICON") in the above-captioned action ("Action").

2.      On or about April 25, 2016, ICON made its preliminary identification of assert claims in the Action ("Preliminary Identification").  ICON identified claims 15, 42, 46, 49, 51, 54, 60, 61, 80, 81, 82, 84, 85, 90, 91, 92, 94, and 95.  ICON stated in its Preliminary Identification that it could not further limit its asserted claims because Polar's initial disclosures were woefully deficient and that Polar had failed to provide the materials requested by LPR 2.2.

3.      Attached hereto as Exhibit A is a true and correct copy of correspondence I sent to Polar Electro Oy and Polar Electro Inc.'s (collectively, "Polar") counsel.  The correspondence further details why ICON could not limit its asserted claims to 10 until Polar provided sufficient initial disclosures.

4.      Attached hereto as Exhibit B is a true and correct copy of correspondence I sent to Polar's counsel further addressing Polar's failure to provide adequate initial disclosures.

5.      Attached hereto Exhibit C is a true and correct copy of additional correspondence I sent to Polar's counsel further addressing Polar's failure to provide adequate initial disclosures.

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Dated this 28th day of October, 2016.

                                                   */s/  Tyson K. Hottinger*
                                                  Tyson K. Hottinger

# EXHIBIT A

May 2, 2016


John P. Moran                                                   <u>Via E-Mail</u>
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
John.Moran@hklaw.com


      Re:  <u>ICON Health & Fitness, Inc. v. Polar Electro OY, <em>et al</em>.; Case No. 1:11-cv-00167</u>
            <u>BSJ; Polar's Deficient Initial Disclosures</u>

Dear John:

      I am in receipt of your April 28 email requesting ICON Health & Fitness, Inc.'s
("ICON") to limit the number of asserted claims in its preliminary infringement contentions.
As a preliminary matter, your email states that you received ICON's preliminary
infringement contentions "a little after 1:00 am [EDT] on Tuesday, April 26, 2016."  ICON
timely served its preliminary infringement contentions shortly after 11 p.m. MDT.

      Turning to the substance of your comments regarding the number of asserted claims,
ICON certainly wants to comply with Local Patent Rules ("Rule(s)") and work in good faith
to disclose its asserted claims.  However, ICON was limited in its ability to limit its asserted
claims because Polar Electro OY and Polar Electro Inc.'s (collectively, "Polar") initial
disclosures did not comply with Rule 2.2(b), which provides:

        (b) A party opposing a claim of patent infringement shall make available for
      inspection and copying, or serve control-numbered copies along with its Initial
      Disclosures the following non-privileged information in the party's possession,
      custody or control:
        (1) documents or things sufficient to show the operation and construction of
      all aspects or elements of each Accused Instrumentality identified with specificity
      in the pleading or Accused Instrumentality Disclosures of the party asserting
      patent infringement;
      …
        (3) the Accused Instrumentality…

      As you know, such an adequate disclosure is important for developing well-informed
and appropriately tailored infringement contentions. However, Polar has failed to meet its
obligations as described above with respect to "documents or things sufficient to show the
operation…of <em>all aspects or elements</em> of each Accused Instrumentality…" Of the 15 documents

**Appx145**

included in Polar's initial disclosures, only three documents are directed to describing the operation of the accused instrumentalities.  The bulk of Polar's disclosures are merely advertisements or press releases regarding the accused instrumentalities. Three of the disclosures provide some detail, but fail to provide a complete description of *all* the aspects of the accused instrumentalities. From these documents, it is apparent there are more features available that are not described. For instance, buried within the disclosures are references to login credentials for demo accounts salesmen may use to show prospective clients all the features of product. Polar has not authorized ICON to access these or similar demo accounts. This lack of access combined with bare disclosures, as more fully described below, has not provided ICON the benefit of reviewing all aspects or elements of each of the accused instrumentalities as required by the Rules.

**Polar GoFit**: The Initial Disclosures include only two documents directed to GoFit. These two documents are simply press releases that only describe very general features of GoFit. For example, PEI000178 simply states that teachers can analyze student data without describing how the data is analyzed or what features GoFit provides to the teachers for such an analysis. This lack of detail falls far short of describing all aspects or elements of GoFit.

**Polar Personal Trainer**: Similarly, of the two documents directed to Personal Trainer, one is a simple press release. The other document is a "Quick Guide" that provides a few screenshots with general comments about some of the features available. Moreover, the guide is not comprehensive; it mentions a feature that allows for challenging other users, but no description or screenshot is provided detailing the aspects or elements of this feature. Clearly, the disclosures related to Personal Trainer are incomplete.

**Challenges for Business**: The only two documents disclosed for Challenges for Business, are identical PowerPoint presentations with significant portions dedicated to market analysis and sales positioning. The slides describing the aspects and elements of Challenges for Business are ill-defined bullet points that lack any significant detail. Additionally, the slides do not appear to address every aspect of Challenges for Business. For example, the "Groups Feature" mentions different views for the "report pages" without showing or describing what those views or features actually provide.

**Polar Club**: The Polar Club documents also lack the detail required by the Rules. Of the seven documents directed toward Polar Club, all but one fail to describe any detailed aspects or elements of Polar Club. The one document that does provide some detail is a PowerPoint presentation similar to the Challenges for Business presentation. This presentation similarly provides information in ill-defined bullet points without detail or sufficient explanation. Furthermore, this presentation is an incomplete description of the product, as it mentions reports and data being available through the Polar Club website without any explanation or detail of what is actually provided.

Notwithstanding the deficiencies described above, ICON has managed to produce well-founded preliminary infringement contentions. As you have identified, ICON should reduce the number of asserted claims to comply with the Rules. However, because of Polar's inadequate disclosures, ICON does not have the benefit of taking such a position based on a

**Appx146**

foundation of adequate information. We will promptly reduce the number of asserted claims as soon as Polar is able to make a sufficient initial disclosure.

Please let us know if you would like to discuss further.


Sincerely,

MASCHOFF BRENNAN

Tyson Hottinger

# EXHIBIT B

May 18, 2016

John P. Moran                                                                    VIA E-EMAIL
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
John.Moran@hklaw.com

Re:  *ICON Health & Fitness, Inc. v. Polar Electro Oy, et al.*; Case No. 1:11-cv-00176 BSJ

Dear Mr. Moran:

It is unfortunate that you were not able to join the call this morning in an effort to move several current disputes toward resolution.  We set the call for the day and time frame you said you were available, emailed dial-in information, and we never heard from you.  I, and a colleague from my firm, joined the call at the appointed time and waited for 15 minutes for you to join, but neither you nor anyone representing Polar joined the call.  We are still open to discussing these matters, but the disputes and Polar's inaction have persisted for too long.  Unless we hear that Polar is interested in at least discussing these issues, we will proceed to seek an order with the Court requiring Polar to comply with the requirements of the Local Patent Rules (i.e., to provide a sufficient initial disclosure and to properly limit its prior art references to 12).

**POLAR'S DEFICIENT INITIAL DISCLOSURES**

ICON addressed Polar's deficient initial disclosures in its May 2, 2016 letter, which explained in detail why Polar's disclosures fall short of the duty imposed by the Local Patent Rules.  As we have explained, the Local Patent Rules require initial disclosures sufficient to "show the operation and construction of all aspects or elements of each Accused Instrumentality…" (Local Patent Rule 2.2(b)(1).)  This allows a patent owner to make an informed decision when limiting its initial infringement contentions to 10 claims per asserted patent, as required by the Local Patent Rules.

Despite its woefully deficient initial disclosures, Polar demanded that ICON limit its initial infringement contentions to 10 claims in its Thursday, April 28, 2016 email.  ICON responded the following Monday with a detailed analysis and explanation as to why it would not be fair for ICON, at this point, to limit its initial infringement contentions to 10 without the benefit of a sufficient initial disclosure from Polar.

**Appx149**

In turn, Polar tried to shift the blame for its deficient initial disclosures to ICON stating that Polar intended to produce source code that would reveal the operation and features of the accused instrumentalities, but it was unable to do so because ICON had not yet agreed to an amendment of the protective order.  We disagree with this position, but, in any event, ICON provided its comments concerning the amended protective order on May 9, but Polar has taken no action to produce source code, provide comments to ICON's changes to the amendment, or even attempt to offer the amendment to the Court.  And, importantly, Polar's deficiencies go beyond production of source code.  To date, Polar has never refuted the notion that additional technical information, besides source code, exists that would assist in demonstrating the operation of the accused instrumentalities. ICON's position is that Polar is in possession of undisclosed documents *other than source code* that "show the operation and construction of all aspects or elements of each Accused Instrumentality…" (Local Patent Rule 2.2(b)(1).) The withholding of these documents is improper and Polar has never denied such documents exist.  Polar's duty to disclose all documents in its possession describing the accused instrumentalities cannot be excused.  And, to be clear, Polar cannot meet its obligations under the Local Patent Rules by simply producing a mass of source code forcing ICON to incur significant expense and time to review and analyze.

**ICON'S OFFER TO LIMIT ITS INITIAL INFRINGEMENT CONTENTIONS**

There is no dispute that ICON is entitled to a sufficient initial disclosure before limiting its initial infringement contentions to 10 claims per asserted patent.  Despite this, ICON, in a good faith effort to reach a resolution of the current dispute, offered to limit its initial infringement contentions to 10 claims prior Polar's deadline to provide initial non-infringement and invalidity contentions.   ICON, of course, reserved its right to amend these 10 claims if Polar provided a supplemental initial disclosure that justified an amendment. Polar never even responded to this offer.

**POLAR'S DEFICIENT INVALIDITY AND NON-INFRINGEMENT CONTENTIONS**

Polar served a supplemental disclosure of prior art on April 29, 2016 with a total of 47 prior art references – in addition to the two references cited in Polar's initial disclosures – despite Local Patent Rule 2.4 limiting such references to 12 per patent.  Please limit the prior art references to 12.

In addition, Polar's non-infringement contentions are exceptionally deficient and evasive.  While it is not clear, the non-infringement contentions appear to rely on the simple and flawed premise that the accused instrumentalities do not include the devices that

measure individual characteristics.[1] This premise is without merit.  For starters, the asserted claims are method claims and ICON has made sufficient initial infringement contention demonstrating how the accused instrumentalities perform the method.  In addition, this flawed premise does not provide a distinction from the claimed element as required by the Local Patent Rules. In other words, your contentions have failed to explain why the Polar devices do not meet the claim element.

Moreover, the entirety of Polar's contentions flow from this flawed assertion (i.e., if the first element of the claim is not met, then the second cannot be met, then the third, and so on). Thus, Polar's non-infringement contentions simply state that because the first element of the claim is not met, there is no infringement. These positions fail to meet the requirements of Local Patent Rule 2.4, which requires a denial and distinction of *each* element of the claim. If Polar maintains its exceptional positions, ICON will take the position that Polar cannot assert non-infringement positions as to the elements that it has failed to address (basically every element of each asserted claim).  Polar should supplement its non-infringement contentions to address *every* element of each asserted claim.

As I have previously offered, ICON would agree to limit its initial infringement contentions to 10 claims on the condition that Polar will not object to ICON later amending its preliminary infringement contentions after being provided an opportunity to review all the documents that should have been provided in Polar's initial disclosures, including access to the accused instrumentalities.  Despite Polar's lack of a response to this offer, ICON limits its initial infringement contentions to claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91. ICON reserves its rights to amend this list should it discover something in discovery or any supplemental initial disclosure served by Polar that would justify an amendment.

Sincerely,

MASCHOFF BRENNAN

Tyson K. Hottinger

---

[1] Polar also appears to complain that ICON does not specify the exact Polar devices referenced. However, this complaint simply highlights Polar's deficient Initial Disclosures.

# EXHIBIT C

July 25, 2016

John P. Moran                                                          VIA E-EMAIL
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
John.Moran@hklaw.com

Re:  *ICON Health & Fitness, Inc. v. Polar Electro Oy, et al.*; Case No. 1:11-cv-00176 BSJ

Dear Mr. Moran:

We are in receipt of your Friday, July 22 letter.  We write because your letter fails to address many issues included in our previous correspondence to you, and only partially or inaccurately addresses the remaining issues.

**Website Access:**

You claim that Polar provided ICON with "prompt" access to Polar Club.  This is simply not true.  Polar's initial disclosures were due on March 14, 2016 and Polar did not provide ICON with access to Polar Club until June 20, 2016.  Polar's more than three-month delay is anything but "prompt."

You also seem puzzled as to why ICON had not gained earlier access to Polar's GoFit application (despite Polar's clear obligation—and failure—to provide access under the Local Patents Rules) as there is a "free trial" available.  Then you inquire whether our firm blocks access to the GoFit website.  To answer your question, no, our firm does not block access to the GoFit website.  But our firm does not believe in providing deceptive information to gain access to a competitor's products.  As you know, to gain access to the GoFit "free trial," one is required to provide information such as the name of the teacher and school that is seeking access:

**CONTACT TEACHER**

First name *

Last name *

Email *

Phone *

**SCHOOL**

Name *

Country *   Select country

Address *

Postal / zip code *

City *

We are not affiliated with a teaching or school program that would allow us to provide the above-listed information and gain access to the "free trial."

Regarding access to Challenges for Business, please clarify whether you are representing that it is not available in the United States and whether any companies or persons have used the application in the United States. Your letter was not clear on these points, and based on Polar's initial disclosures, it would appear the application is available in the United States. For example, in the enclosed documents, the offering price for Challenges for Business is included in Euros and Dollars and there are statements about U.S. sales, U.S. market share, and U.S. beta testing starting the same day as testing in Europe. In addition, we know that testing accounts exist and there was login and password information for Polar's sales persons in the initial disclosures as well. We are not convinced the Challenges for Business is only offered in Europe, and we sense from your letter that you are not certain either. Please clarify.

In summary, Polar delayed three months to provide access to Polar Club and four months to provide access to GoFit. These delays occurred despite our repeated demands for access, including written demands on May 27, June 14, and July 20. And, Polar continues in its refusal to provide access to Challenges for Business despite the clear existence of testing accounts and materials that appear to show use of Challenges for Business in the U.S.

**Appx154**

**Source Code and Source Code Specifications:**

Your July 22 letter then goes on to claim that ICON has not provided a definition for a "usable format" for Polar's production of source code, which Polar then seems to use as a justification for producing the source code in the most unusable and burdensome way possible. There are several problems with the position taken by Polar.

First, there is a clear requirement and court order that requires Polar to produce the source code in the manner in which it is kept in the ordinary course of Polar's business, fully compilable to execution thereby allowing it to be reasonably reviewed and searched. Polar clearly has not complied with this requirement. For starters, the filenames for the programming files have been change to the production control numbers and all folder structure has been removed. The removal of the filenames and folder structure renders the source files practically useless. Polar cannot maintain its source code in this manner, which is demonstrated by the file produced as PEO-0000188. This file is a "project" file similar to a master programming file that provides the programming environment where all other programing files can be located (images, other source code files, etc.). If that file is opened in a text format, it reveals files such as .png files, .m files, and .h files. These files are the references to other programming files that a programing environment would attempt to locate upon opening the above-referenced project file. But, because all the file names have been changed and the folder structure removed, the programing environment would not be able to open these other files. No company maintains its source code in such an unworkable format. This is just one problem with the format in which the source code was provided.

Polar is in the best position to determine how its source code is kept in the ordinary course of its business, and how it can be produced in a format that is "reasonably reviewed and searched." Polar cannot attempt place this burden upon ICON, and then use that as an excuse for its non-compliance with the protective order and its production in the current unusable format.

Second, Polar contends that it has produced some sort of source code "specifications." Because Polar has produced approximately 38,000 individual files without any file names, we have not been able to locate the specifications and do not believe they have been produced. We already asked you to identify the bates numbers for these specifications, but you have chosen not to. This only reinforces the clear intent of Polar to engage in a "source code" dump forcing ICON to mull through 38,000 individual files and spend countless hours to even locate the specifications for the source code. *We ask you again to promptly provide the bates numbers for the specifications.*

**Appx155**

**<u>Polar Deposition</u>s:**

We have invited you to engage in discussions regarding the location of Polar's witnesses' depositions since at least May 26, 2016 and have sent several letters to you about the depositions.  Despite this, you have refused to engage in those discussion and you continue with that refusal in your most recent letter.  Instead of proposing a location or engaging in a meaningful discussion, your most recent letter continues the pattern of delay and obfuscation.  We have noticed the depositions near your offices in Washington D.C. instead of near our offices and where the case is pending in Salt Lake City.  Please let us know immediately if Polar objects to the place of depositions.  And, if so, where Polar would agree to the depositions taking place.

**<u>Polar Contention that ICON is Misconstruing Discussions</u>:**

Lastly, you contend that ICON is somehow misconstruing our discussion on May 26.  I wrote a letter to you on May 27 summarizing our discussions on May 26 and specifically asked you at the end of the letter to "let us know if we have incorrectly summarized or misunderstood anything from our call."  You never responded to our inquiry.

<p align="center">*       *       *       *       *</p>

ICON remains willing to try and resolve these issues, but it cannot endure any more delay by Polar.  If Polar is willing to remedy the above-described issues, please let us know before the close of business on Tuesday, July 26 and provide the detail and timeline of any proposal.  Otherwise, we have no choice but to seek relief from the Court.

Sincerely,

MASCHOFF BRENNAN

Tyson K. Hottinger

Larry R. Laycock  (Bar No. 4868)
    *llaycock@mabr.com*
David R. Wright  (Bar No. 5164)
    *dwright@mabr.com*
Tyson K. Hottinger (Bar No. 13607)
    *thottinger@mabr.com*
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT PLLC
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone:   (435) 252-1360
Facsimile:   (435) 252-1361

Attorneys for plaintiff and counterdefendant ICON HEALTH & FITNESS, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **ICON HEALTH & FITNESS, INC.**, a Delaware corporation,<br><br>Plaintiff and counterdefendant,<br><br>vs.<br><br>**POLAR ELECTRO OY**, a Finnish company, and **POLAR ELECTRO INC.**, a Delaware corporation,<br><br>Defendants and counterclaimants.<br><hr>AND RELATED COUNTERCLAIM. | Civil Action No. 1:11-cv-00167-BSJ<br><br>**DECLARATION OF DR. DAVID BRIENZA IN SUPPORT OF ICON HEALTH & FITNESS, INC.'S OPPOSITION TO POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Honorable Judge Bruce S. Jenkins |

**Appx157**

I, David Brienza, Ph.D., declare as follows:

1.      I have been retained as an expert witness to provide testimony on behalf of the plaintiff and counterdefendant ICON Health & Fitness, Inc. in the above-captioned action ("Action").  I am being compensated for my time in the Action at a rate of $225 per hour.

### Expert Qualifications

2.      In 1986, I received my B.S. in Electrical Engineering from the University of Notre Dame.  I received M.S. and Ph.D. degrees in Electrical Engineering from the University of Virginia in 1988 and 1991, respectively.

3.      Since 1991, I have been a professor at the University of Pittsburgh with my principal focus being rehabilitation engineering research.  Over the course of my studies and career, I have devoted a substantial amount of time to developing methods and devices relating to rehabilitation research and practice.  I have a thorough understanding of fundamental electrical engineering concepts and principles related to sensors, communication, and computing devices through my undergraduate and graduate engineering coursework and research.  From 2004 through 2015, I served as the Director of the Rehabilitation Engineering Research Center (RERC) on Telerehabilitation.  I am also an inventor on six U.S. patents in the rehabilitation engineering field.

4.      My teaching, research, and development are particularly relevant to the inventions disclosed in U.S. Patent No. 6,701,271 ("'271 patent").  I have taught HRS 2702 – Instrumentation and Computer Interfaces where students learn practical knowledge concerning sensors, communication protocols, and computer networks among other topics.  I have also taught BIOE 1010 – Bioinstrumentation where students learn instrumentation used for

1

**Appx158**

monitoring a person's physical characteristics such as those related to heart function.  In research and development activities, part of my responsibility in the RERC on Telerehabilitation was to develop information technology infrastructure for the purpose of delivering and studying rehabilitation services. This activity first focused on the development of an Internet-based system for interaction between a caregiver, a client, and/or other interested parties. The resulting system was called VISYTER (Versatile and Integrated System for Telehealth). Later, a smartphone-based system called iMHere consisting of software including a suite of smartphone apps specifically designed for persons with disabilities, a clinician portal, and a communication system connecting the two was developed in the Center. iMHere IP has since been licensed to a startup company.

5.      During the 28 years I have spent in the field of exercise and rehabilitation, I have developed a familiarity with many exercise and rehabilitation devices.  Because of my engineering training and background, I understand how such exercise and rehabilitation devices function.  I have applied this knowledge to design specific devices in several instances over the course of my career.  I began work in the field of telerehabilitation in 1998 when I led a group of investigators at the University of Pittsburgh to develop concepts for the projects that would eventually be funded by the Federal Government in the RERC of Telerehabilitation.  My involvement in this work at that time has made me acutely aware of the state of the art and science in physical characteristic sensing and remote monitoring for the timeframe of the '271 patent application.

6.      A true and accurate copy of my current curriculum vitae is attached hereto as Exhibit A.

**Appx159**

**Facts and Data Considered**

7.      The following materials were provided to me by ICON's counsel and have been

relied upon, at least partially, in arriving at the opinions in this declaration:

 a.     The '271 patent;

 b.     The prosecution history for the '271 patent;

 c.     The *ex parte* reexamination history for the '271 patent;

 d.     The *inter partes* reexamination history for the '271 patent;[1]

 e.     ICON's initial infringement contentions;

 f.     Polar's initial non-infringement, unenforceability, and invalidity

        contentions ("Polar's Initial Invalidity Contentions");

 g.     U.S. Patent No. 5,157,604 (included as part of Polar's Initial Invalidity

        Contentions);

 h.     U.S. Patent No. 5,213,555 (included as part of Polar's Initial Invalidity

        Contentions);

 i.     U.S. Patent No. 6,415,188 (included as part of Polar's Initial Invalidity

        Contentions);

 j.     U.S. Patent No. 7,183,480 (included as part of Polar's Initial Invalidity

        Contentions);

---

[1] I reviewed the following prior art references that were part of the original prosecution history
and the *ex parte* and *inter partes* reexaminations:  U.S. Patent Nos. 3,744,712 (Papadopoulos);
4,907,973 (Hon); 5,233,520 (Kretsch); 5,542,240 (Goldman); 5,676,138 (Zawilinski); 5,762,503
(Hoo); 6,013,007 (Root); 6,292,688 (Patton); 6,605,038 (Teller); and U.S. Patent Appl.
2002/0111541 (Bibl).

3

**Appx160**

      k.     U.S. Patent No. 7,454,002 (included as part of Polar's Initial Invalidity

                Contentions); and

      l.      EPO Publication No. WO 01/08417 (included as part of Polar's Initial

                Invalidity Contentions).

8.      I have also relied on my background and experience in the field of sensors, communication, and computing devices.

## Legal Standard

9.      I understand that a patent may be obtained for any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof.  I also understand that there are limits to patent protection so that someone cannot patent laws of nature, natural phenomena, and abstract ideas.

10.      I understand that a two-step "framework" is used for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts.   First, one is to determine whether the claims at issue are directed to one of those patent-ineligible concepts.  If so then at step two, one must examine the elements of the claims to determine whether they contain an "inventive concept" sufficient to transform the claimed abstract idea into a patent-eligible application.

## '271 Inventive Concepts

11.      I have reviewed the prior art and references that were included in the '271 patent original prosecution history, *ex parte* reexamination, *inter partes* reexamination, and Polar's Invalidity Contentions.

4

**Appx161**

12.     It is my opinion that the claims of the '271 patent allow users to interact with one another and benefit from each other's data in a way that was not previous done or possible.  The '271 patent accomplished this through an inventive ordered combination of elements.  Claim 80, for example, includes the use of sophisticated sensors that collect *objective* "data indicative of a physical characteristics," including physical characteristics that are not observable by a human, in communication with a remote, internet-accessible server that also receives similar data about one or more other subjects, enabling the combined evaluation of more than one subject's physical-characteristics data, resulting in the provision of one or more options to one of the subjects.  Claim 82 adds more to this combination by requiring the sensor to be wireless, portable, and configured to wirelessly connect with a cellular telephone.  And, the cellular telephone is wirelessly connected to the internet through a cellular connection, and the remote server receives the sensor information through the internet.  The combination of elements in claims 80 and 82 were unique at the time the '271 patent was filed and they allow the analysis and options that were not previously done or available to users in the art.  I therefore conclude that the inventions of the '271 patent add inventive elements.  Furthermore, the inventive elements teach methods that were not performable by humans. (*See, e.g.*, '271 patent at 4:20-27; 4:53-58; 5:1-4; 9:42-48; 9:56-61; 10:54-56; 13:1-10; 10:30-33; 14:3-15).

13.     I am informed that the USPTO has reexamined the current claims of the '271 after the Supreme Court's *Alice* decision.  I further understand that the USPTO agrees with my assessment that the claims of the '271 patent are not abstract because the claims were allowed without ever rejecting them as abstract under § 101.

5

**Appx162**

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Dated this  27  day of October, 2016.

_____
David Brienza, Ph.D.

6

**Appx163**

# EXHIBIT A

<u>David M. Brienza</u>

**Curriculum Vitae**
**David Michael Brienza**
Updated May 24, 2016

**Biographical**

| | |
|---|---|
| Business address and contact information: | University of Pittsburgh<br>6425 Penn Ave. Suite 401<br>Pittsburgh, PA 15206 |
| | Telephone: (412) 624-6383<br>Fax:         (412) 624-6501<br>E-mail:     Dbrienza@pitt.edu |
| Home address and contact information: | 4124 Northampton Drive<br>Allison Park, PA 15101 |
| | Telephone: (412) 486-3806<br>E-mail:     Dave@Brienza.com |

**Education**

<u>Undergraduate</u>

| 1982-1986 | University of Notre Dame<br>Notre Dame, Indiana | BS | 1986 | Electrical Engineering |
|---|---|---|---|---|

<u>Graduate</u>

| 1986-1991 | University of Virginia<br>Charlottesville, Virginia | MS<br>Ph.D. | 1988<br>1991 | Electrical Engineering<br>Electrical Engineering |
|---|---|---|---|---|

**Appx165**

Appointments and Positions
Academic

| | | |
|---|---|---|
| 1986-1987 | University of Virginia Department of Electrical Engineering Charlottesville, Virginia | Graduate Teaching Assistant |
| 1987-1991 | University of Virginia Rehabilitation Engineering Center Charlottesville, Virginia | Research Assistant |
| 1991-1998 | University of Pittsburgh School of Health and Rehab Sciences Pittsburgh, Pennsylvania | Assistant Professor (Tenure stream) |
| 1998-2006 | University of Pittsburgh School of Health and Rehab Sciences Pittsburgh, Pennsylvania | Associate Professor (Tenure) |
| 1999-2006 | University of Pittsburgh Department of Bioengineering Pittsburgh, Pennsylvania | Associate Professor (Secondary appointment) |
| 2001-2005 | University of Pittsburgh Rehabilitation Engineering Research Center on Wheeled Mobility | Director |
| 2002-present | Xi'an Jiaotong University School of Life Sciences Xi'an, China | Adjunct Professor |
| 2004-2015 | University of Pittsburgh Rehabilitation Engineering Research Center on Telerehabilitation | Director |
| 2006-present | University of Pittsburgh School of Health and Rehab Sciences Pittsburgh, Pennsylvania | Professor (Tenure) |
| 2006-present | University of Pittsburgh Department of Bioengineering Pittsburgh, Pennsylvania | Professor (Secondary appointment) |
| 2007-2014 | University of Pittsburgh Rehabilitation Engineering Research Center on Spinal Cord Injury | Director |

David M. Brienza

| 2002-present | University of Pittsburgh McGowan Institute for Regenerative Medicine Pittsburgh, Pennsylvania | Professor (Secondary appointment) |
|---|---|---|
| 2012-2015 | Department of Rehabilitation Science and Technology, Orthotics and Prosthetics Program | Interim Director |
| 2012-2015 | University of Pittsburgh School of Health and Rehabilitation Sciences | Associate Dean for Strategic Initiatives and Planning |
| 2014-present | Duquesne University School of Nursing | Adjunct Faculty |
| 2015-present | University of Pittsburgh School of Health and Rehabilitation Sciences | Associate Dean for Research |

Non-Academic Positions

| 1984, 1985 | Harris Corporation Syosset, New York | Test Engineer |
|---|---|---|
| 1986 | National Security Agency Fort Meade, Maryland | Electronic Engineer |
| 1989-1997 | Pin Dot Products Niles, Illinois | Consultant on the development of seating products |
| 1995-2000 | Sentron Medical Cincinnati, Ohio | Consultant on the evaluation of seating products |
| 1996-2000 | ARTSCO Inc. Pittsburgh, Pennsylvania | Consultant on the development of cushion manufacturing systems |
| 1996-1997 | DEKA Manchester, New Hampshire | Consultant on seating products |
| 1995-present | Various | Legal consulting   Patent litigation   Personal Injury |
| 1998-1999, 2003 | Hill-Rom Charleston, SC | Consultant on seating and support surface products |

**Appx167**

David M. Brienza

| | | |
|---|---|---|
| 2000-2003 | Dynamic Contours, LLC | Research Scientist, Owner |
| 2002-2006 | SADMERC | Consultant on Medicare coding policy |
| 2003 | Smith & Nephew | Consultant on Pressure Ulcer Prevention |
| 2005-2007 | AireRx, LLC | Scientific Advisory Board |
| 2013-present | ROHO, Inc | Scientific Advisory Board |

Memberships in Professional and Scientific Societies

| | | |
|---|---|---|
| 1986-2000 | IEEE | Member |
| 1988-present | Rehabilitation Engineering and Assistive Technology Association of North America (RESNA) | Member Fellow (2007) |
| 1992-1997 | Pittsburgh Assistive Technology Association | Member |
| 1993-2000 | IEEE Engineering in Medicine and Biology Society | Member |
| 1995-2007, 2009-2016 | National Pressure Ulcer Advisory Panel | Member |
| 1995-2003 | Sigma Xi Scientific Research Society | Full Member |
| 2001-2002 | Association for the Advancement of Wound Care (AAWC) | Member |
| 2004-present | American Institute for Medical and Biological Engineering | Fellow (elected) |
| 2007-present | American Telemedicine Association | Member |
| 2009-2010 | Biomedical Engineering Society | Member |
| 2011-present | American Congress of Rehabilitation Medicine | Member |

*Leadership Positions*

National Pressure Ulcer Advisory Panel
- o   Collaborating Organization Representative (RESNA);
- o   Research Committee Co-chair (1996-98, 2001-2002);
- o   Board Member (2001-2003) (2004-2006) (2010-2012) (2013-2015); elected for 4 terms; Research Committee Chair (2003-2005)

Rehabilitation Engineering and Assistive Technology Association of North America (RESNA)

- o   Special Interest Group-09 Vice Chair (1995-96);
- o   Special Interest Group-09 Chair (1997-99);
- o   Board of Directors (2001-04)
- o   Vice Chair Wheelchair Standards subcommittee on seat cushions (1999-2000)
- o   Assistive Technology Standards Board (2003-present)

American Institute for Medical and Biological Engineering

- o   Nominations, Sub-committee on Rehab Engineering – Chair (2007-2009)
- o   Nominations Executive Committee – Member (2009-2013)

Biomedical Engineering Society

- o   2009 Conference Track Chair (Orthopedics and Rehab Engineering)

Pittsburgh Assistive Technology Association

- o   President (1994)

Sigma Xi Scientific Research Society

- o   Pittsburgh Chapter Secretary (1994-96);
- o   Vice-President (1997-98);
- o   President (1999-2001)

School of Health and Rehabilitation Sciences

- o   SHRS Space Utilization Committee – Chair (1998-2015)
- o   Executive Committee – Secretary, 1995

**Honors**

2007   Selected Fellow of the Rehabilitation Engineering and Assistive Technology Association of North America (RESNA)

2006   Advances in Skin and Wound Care Peer Reviewer of the Year Award

2004   Rehabilitation Engineering and Assistive Technology Association of North America (RESNA) Certificate of Appreciation

2004   Elected Fellow of the American Institute for Medical and Biological Engineering (AIMBE)

2003   RESNA Distinguished Service Award

2001   Elected to the Board of Directors of the Rehabilitation Engineering and Assistive Technology Association of North America (RESNA)

2001   Elected to National Pressure Ulcer Advisory Board of Directors. Reelected for second term in 2004.

1997   Chair of 1997 Annual RESNA Conference, Pittsburgh, PA June 20-24, 1997

1996   RESNA Sore Butts Cushion Design Competition, First Place

David M. Brienza

1996    Guest editor of *IEEE Transactions on Rehabilitation Engineering*, Special Issue on Soft Tissue Biomechanics

1995    The PinDot Award for outstanding paper published in *Assistive Technology*

1992    NIDRR, Mary E. Switzer, Rehabilitation Research Fellowship (Declined fellowship to assume position at the University of Pittsburgh.)

## Publications

**Refereed Articles** (Student-Authors are *italicized*)

Krishnan S, Karg P, Boninger M, **Brienza D.** Association between presence of pneumonia and pressure ulcer formation following traumatic spinal cord injury. J Spinal Cord Med. 2016; doi: 10.1080/10790268.2016.1180099.

Jonathan S Akins, Ph.D.; Jaxon J Vallely; Patricia E Karg, MS; Kara Kopplin; Amit Gefen, PhD; Prerna Poojary-Mazzotta; **David M Brienza, PhD.** Feasibility of freehand ultrasound to measure anatomical features associated with deep tissue injury risk. Submitted to Medical Engineering and Physics (Accepted for publication)

*Krishnan S*, Karg P, Boninger M, Vodovotz Y, Constantine G, Sowa G, **Brienza D**, Early detection of pressure ulcer development following traumatic spinal cord injury using inflammatory mediators, ARCHIVES OF PHYSICAL MEDICINE AND REHABILITATION (2016), doi: 10.1016/j.apmr.2016.01.003

Zanca JM, Heyn P, Horn S, Charlifue S, Hsieh CH, **Brienza DM**, Chen Y, Dyson-Hudson T, Backus D; (2015) Secondary Complications and Aging Task Force of the ACRM Spinal Cord Injury Interdisciplinary Special Interest Group. Arch Phys Med Rehabil. 2015 Nov;96(11):2089-90. Doi: 10.1016/j.apmr.2015.03.001. Epub 2015 Jul 21.

Dicianno, B. E., Fairman, A. D., McCue, M., Parmanto, B., Yih, E., McCoy, A., ... & **Brienza, D. M.** (2015). Feasibility of Using Mobile Health to Promote Self-Management in Spina Bifida. *American journal of physical medicine & rehabilitation/Association of Academic Physiatrists.*

Stone, A., **Brienza, D.,** Call, E., Fontaine, R., Goldberg, M., Hong, K. Z., ... & Sylvia, C. (2015). Standardizing Support Surface Testing and Reporting: A National Pressure Ulcer Advisory Panel Executive Summary. *Journal of Wound Ostomy & Continence Nursing*, 42(5), 445-449.

Ziraldo, Cordelia, Alexey Solovyev, Ana Allegretti, Shilpa Krishnan, M. Kristi Henzel, Gwendolyn A. Sowa, **David Brienza**, Gary An, Qi Mi, and Yoram Vodovotz. "A Computational, Tissue-Realistic Model of Pressure Ulcer Formation in Individuals with Spinal Cord Injury." PLOS Comput Biol 11, no. 6 (2015): e1004309.

Lachenbruch, Charlie; Tzen, Yi Ting; **Brienza, David**; Karg, Patricia E.;  Lachenbruch, Peter A. (2015) Relative contributions of interface pressure, shear stress, and temperature on ischemic-induced, skin-reactive hyperemia in healthy volunteers: A repeated measures laboratory study Ostomy Wound Management vol. 61(2) p. 16-25

**Brienza D**, Antokal S, Herbe L, et al. Friction-induced skin injuries - Are they pressure ulcers? (2014) An updated NPUAP white paper. *Journal of Wound, Ostomy and Continence Nursing.* 2014;42(1):62-64.

Zaaqoq AM1, Namas R, Almahmoud K, Azhar N, Mi Q, Zamora R, **Brienza DM,** Billiar TR, Vodovotz Y. (2014) Inducible Protein-10, a Potential Driver of Neurally Controlled Interleukin-10 and Morbidity in Human Blunt Trauma. Crit Care Med. 2014 Feb 26.

Huang W, Vodovotz Y, Kusturiss MB, Barclay D, Greenwald K, Boninger ML, Coen PM, **Brienza D**, Sowa G.  (2013) Identification of Distinct Monocyte Phenotypes and Correlation with Circulating Cytokine Profiles in Acute Response to Spinal Cord Injury: A Pilot Study. PM R. 2013 Oct 17. pii: S1934-1482(13)01138-6. doi: 10.1016/j.pmrj.2013.10.006.

C. Ziraldo, A. Solovyev, A. Allegretti, S. Krishnan, M.K. Henzel, G.A. Sowa, **D. Brienza,** G. An, Q. Mi, Y. Vodovotz (2013) A computational, tissue-realistic model of pressure ulcer formation in individuals with spinal cord injury. Journal of Critical Care. 02/2013; 28(1):e23.

*Turkovich, M*., Hu, J., Van Roosmalen, L., & **Brienza, D.** (2013). Computer simulations of obesity effects on occupant injury in frontal impacts. International Journal of Crashworthiness, 18(5), 502-515.

*Yi-Ting Tzen;* **David M. Brienza**; Patricia E. Karg; Patrick J. Loughlin. (2013) Effectiveness of local cooling for enhancing tissue ischemia tolerance in people with spinal cord injury. Journal of Spinal Cord Medicine, 36(4) pp. 357-364. DOI: http://dx.doi.org/10.1179/2045772312Y.0000000085

Solovyev A, Mi Q, Tzen Y-T, **Brienza D,** Vodovotz Y (2013) Hybrid Equation/Agent-Based Model of Ischemia-Induced Hyperemia and Pressure Ulcer Formation Predicts Greater Propensity to Ulcerate in Subjects with Spinal Cord Injury. PLoS Comput Biol 9(5): e1003070. doi:10.1371/journal.pcbi.1003070

Charlie Lachenbruch, PhD; Yi-Ting Tzen, PhD; **Dave M. Brienza, PhD**; Patricia E. Karg, MS; and Peter Anthony Lachenbruch, PhD. (2013) The Relative Effects of Interface Pressure, Shear Stress, and Temperature of Tissue Ischemia: a Cross-sectional Pilot Study. Ostomy Wound Manage. 2013;59(3):25–34.

*Becky L. Faett,* Mary Jo Geyer, Leslie A. Hoffman, and **David M. Brienza**, "Design and Development of a Telerehabilitation Self-Management Program for Persons with Chronic Lower Limb Swelling and Mobility Limitations: Preliminary Evidence," Nursing Research and Practice, vol. 2012, Article ID 608059, 10 pages, 2012. doi:10.1155/2012/608059

Boninger, ML, **D Brienza,** S Charlifue, Y-Y Chen, K C Curley, D E Graves, S Groah, A W Heinemann, L M Hudson, A B Jackson, K L Johnson, C Z Kalpakjian, A Kusiak, K E Larson, T S Agustin, A M Sherwood, N Shinowara, T Stripling and D Tate. State of the Science Conference in Spinal Cord Injury Rehabilitation 2011: introduction. Spinal Cord advance online publication, March 27, 2012; doi:10.1038/sc.2012.13

Allegretti, Ana Luiza; Malkiewicz, Andrew; **Brienza, David M**. Measuring Interface Pressure and Temperature in the Operating Room *Advances in Skin & Wound Care*. 25(5):226-230, May 2012. doi: 10.1097/01.ASW.0000414706.33267.db

Mi, Q., Constantine, G., Megas, C., Krishnan, S., Allegretti, A., Sowa, G., **Brienza, D** and Vodovotz, Y. (2011, March). URINARY TRACT INFECTIONS PRECEDE PRESSURE ULCERS IN SPINAL CORD INJURY PATIENTS. In WOUND REPAIR AND REGENERATION (Vol. 19, No. 2, pp. A39-A39).

Jennifer L Collinger; Brad E Dicianno; Douglas J Weber; Xinyan Tracy Cui; Wei Wang; **David M Brienza**; Michael L Boninger. Integrating rehabilitation engineering technology with biologics. PM R 3, 1480 (2011)

Schein Richard M; Schmeler Mark R; Holm Margo B; Pramuka Michael; Saptono Andi; **Brienza David M.** Telerehabilitation assessment using the Functioning Everyday with a Wheelchair-Capacity instrument. Journal of rehabilitation research and development 2011;48(2):115-24

*Akins JS*, Karg PE, **Brienza DM**. Interface shear and pressure characteristics of wheelchair seat cushions. J Rehabil Res Dev. 2011;48(3):203–12. DOI:10.1682/JRRD.2009.09.0145

Jan Y-K; **Brienza D M**; Boninger M L; Brenes G. Comparison of skin perfusion response with alternating and constant pressures in people with spinal cord injury. Spinal cord: the official journal of the International Medical Society of Paraplegia 2011;49(1):136-41

Parmanto B, Saptono A, Pramana G, Pulantara W, Schein RM, Schmeler MR, McCue MP, & **Brienza DM**. (2010). VISYTR: Versatile and Integrated System for Telerehabilitation. *Telemedicine and E-health, 16*(9), 939-944.

*Schein RM*, Schmeler MR, Saptono A, and **Brienza D**. Patient Satisfaction with Telerehabilitation Assessments for Wheeled Mobility and Seating. 2010 *Assistive Technology, 22*(4), 215-222

Lim S., Kim J., Ikpeama U., Porach E., Lynch R.D., **Brienza D.M.** Quantitative approach of Remote Accessibility Assessment System (RAAS) in telerehabilitation. *Lecture Notes in Computer Science (including subseries Lecture Notes in Artificial Intelligence and Lecture Notes in Bioinformatics).* 2010 vol. 6159 LNCS

**Brienza D**, Kelsey S, Karg P, Allegretti A, Olson M, Schmeler M, Zanca J, Geyer MJ, Kusturiss M, Holm M. A randomized clinical trial on preventing pressure ulcers with wheelchair seat cushions. J Am Geriatr Soc. 2010 Dec;58(12):2308-14. Epub 2010 Nov 10.

*Schein Richard M*; Schmeler Mark R; Holm Margo B; Saptono Andi; **Brienza David M.** Telerehabilitation wheeled mobility and seating assessments compared with in person. *Archives of physical medicine and rehabilitation* 2010;91(6):874-8

*Tzen YT*, **Brienza DM**, Karg P, Loughlin P. Effects of local cooling on sacral skin perfusion response to pressure: Implications for pressure ulcer prevention. *Journal of Tissue Viability,Volume 19, Issue 3, August 2010, Pages 86-97*

*Schein RM*. Schmeler MR. **Brienza D**. Saptono A. Parmanto B. Development of a service delivery protocol used for remote wheelchair consultation via telerehabilitation. *Telemedicine Journal & E-Health. 14(9):932-8, 2008 Nov.*

Kim J. **Brienza DM**. Lynch RD. Cooper RA. Boninger ML. Effectiveness evaluation of a remote accessibility assessment system for wheelchair users using virtualized reality. *Archives of Physical Medicine & Rehabilitation. 89(3):470-9, 2008 Mar.*

*Jan YK*, **Brienza DM**, Geyer MJ and Karg T. Wavelet analysis of sacral skin blood flow response to alternating pressure. Arch Phys Med Rehabil Vol 89, January 2008

W. Call, **David M. Brienza**, Mary Ellen Posthauer Development of Uniform Terminology for Support Surfaces Evan Journal of WOCN 01/2007 34(Supplement):S75-S76.

Kim, JB and **Brienza, DM**; Development of a remote accessibility assessment system through three-dimensional reconstruction technology. *Journal of Rehabilitation Research and Development* 2006; 43(2): 257–272.

Berlowitz DR. **Brienza** DM. Are all pressure ulcers the result of deep tissue injury? A review of the literature. [Review] [27 refs] [Journal Article. Review] *Ostomy Wound Management. 53(10):34-8, 2007 Oct.*

Jan, YK and **Brienza DM**. Technology for Pressure Ulcer Prevention. Topics in Spinal Cord Injury. Spring 2006; 11(4): 30-41.

Elicia M. Kohlenberg, Jeanne Zanca, **David M. Brienza,** Michelle A. Levasseur, Michael G. Sowa Spectroscopic detection of the blanch response at the heel of the foot: a possible diagnostic for stage I pressure ulcers. Proc SPIE 09/2005

Jan YK, **Brienza DM**, and Geyer MJ. Analysis of week-to-week variability in skin blood flow measurements using wavelet transforms. *Clinical Physiology and Functional Imaging* 2005; 25(5): 253-262.

**Brienza DM**, Geyer MJ, and Jan YK**.** A comparison of changes in rhythms of sacral skin blood flow in response to heating and indentation. *Archives of Physical Medicine and Rehabilitation*. 2005 June; (86)6: 1245-1251.

**Brienza, David M**. PhD; Geyer, Mary Jo PhD, PT, CWS, CLT-LANA. Using Support Surfaces to Manage Tissue Integrity. *Advances in Skin & Wound Care.* 18(3):151-157, April 2005

Geyer MJ, Jan YK, **Brienza DM**, and Boninger ML. Using wavelet analysis to characterize the thermoregulatory mechanisms of sacral skin blood flow. Journal of Rehabilitation Research and Development 2004; 41(6):797-806.

*Zanca, JM*; **Brienza, DM**; Ammer, ML; Bennett, RG; Lyder, CH; and the National Pressure Ulcer Advisory Board. Systematic Review of Acknowledged Funding Sources in Pressure Ulcer Literature. *Advances in Skin & Wound Care.* 18(2):84-91, 2005 Mar.

*LoPresti, EF*;  **Brienza, DM**. Adaptive Software for Head-Operated Computer Controls. *IEEE Transactions on Neural Systems and Rehabilitation Engineering*. Vol. 12, No. 1, March 2004; pp. 102-111.

Geyer, MJ; **Brienza, DM**; Bertocci, GE; Crane, B; Hobson, DA; Karg, PE; Schmeler, M; Trefler, E. Wheelchair Seating: A State of the Science Report. *Assistive Technology*. Vol. 15, No. 2, Winter 2003; pp. 120-128.

Cooper, RA; Boninger, ML; **Brienza, DM**; van Roosmalen, L; Koontz, AM; LoPresti, E; Speath, DM; Bertocci, GE; Guo, S; Buning, ME; Schmeler, M; Geyer, MJ; Fitzgerald, SG; Dan, D. Pittsburgh Wheelchair and Seating Biomechanics Research Program. *Journal of the Society of Biomechanisms* Japan.  27(3):144-157.

*Geyer, MJ*; **Brienza, DM**; *Chib, V; Wang, J*. Quantifying Fibrosis in Venous Disease: Mechanical Properties of Lipodermatosclerosis and Healthy Tissues. *Advances in Skin and Wound Care.* April 2004; 17(3):131-142.

*Zanca, J*; **Brienza, DM;** Berlowitz, D; Richard, G; Bennett, R. Pressure Ulcer Research Funding in America: Creation and Analysis of an Online Database. *Advances in Skin and Wound Care*. Jul-Aug 2003; 16(4):190-7.

David M. Brienza

*LoPresti, EF*; **Brienza, DM**; Angelo, J; Gilbertson L. Neck Range of Motion and Use of Computer Head Controls**. *Journal of Rehabilitation Research and Development*. Vol. 40, No. 3, May/June 2003; pp. 199-212.

*LoPresti, EF*; **Brienza, DM**; Angelo, JA. Head-Operated Computer Controls: Effect of Control Method on Performance for Subjects With and Without Disability. *Interacting with Computers*. 14 (2002):359-377**.**

*Geyer, MJ*; **Brienza, DM**; Karg, PE; Kelsey, S; Trefler, E. A randomized control trial to evaluate pressure-reducing seat cushions for elderly wheelchair users. *Advances in Skin and Wound Care*. May/June 2001; 14(3):120-129.

**Brienza, DM**; Karg, PE; *Geyer, MJ*; Kelsey, S; Trefler, E. The relationship between pressure ulcer incidence and buttock-seat cushion interface pressure in at-risk elderly wheelchair users. *Archives of Physical Medicine and Rehabilitation.* 2001 Apr; 82(4):529-533.

National Pressure Ulcer Advisory Panel Board of Directors. Summary Editors: Cuddigan, J; Berlowitz, DR; Ayello, EA. Pressure Ulcers in America: Prevalence, Incidence, and Implications for the Future. *Advances in Skin and Wound Care*. 2001; 14(4):208-215.

Cooper, RA; Fitzgerald, SG; Boninger, ML; **Brienza, DM**; Shapcott, N; Cooper, R; Flood, K. Telerehabilitation: Expanding Access to Rehabilitation Expertise. *Proceedings of the IEEE*. Vol. 89, No. 8, 2001.

Cooper, RA; **Brienza, DM**. Master of Science in Rehabilitation Science and Technology at the University of Pittsburgh. 12 *Technology and Disability.* (2000):107-117.

**Brienza, DM**; *Geyer, MJ*. Understanding Support Surface Technology. *Advances in Skin and Wound Care*. 2000; 13(5):237-44.

Yue, L; Aissaoui, R; **Brienza, DM**; Dansereau, J. Determination of generic body-seat interface shapes by cluster analysis. *IEEE Transactions on Rehabilitation Engineering*. 2000 8(4):481-489.

*Wang, J;* **Brienza, DM**; Yuan, Y-W; Karg, PE; Xue, Q. A Compound Device for Biomechanical Analysis of Buttock Soft Tissue in vivo. *Journal of Rehabilitation Research and Development.* 2000; 37(4):433-443.

**Brienza, DM**; Lin, CT; Karg, PE. A method for custom contoured cushion design using interface pressure measurements. *IEEE Transactions on Rehabilitation Engineering*. 1999; 7(1):99-108.

**Brienza, DM**; Brubaker, CE. A steering linkage for short wheelbase vehicles: Design and evaluation in a wheelchair power base. *Journal of Rehabilitation Res & Dev*. 1999; 36(1).

**Brienza, DM**; Karg, PE. Seat cushion optimization: A comparison of interface pressure and tissue stiffness characteristics for spinal cord injured and elderly patients. *Archives of Physical Medical and Rehabilitation*. April 1998; (79):388-394.

**Brienza, DM**; Karg, PE; Brubaker CE. Seat cushion design for elderly wheelchair users based on minimization of soft tissue deformation using stiffness and pressure measurements. *IEEE Transactions on Rehabilitation Engineering*. 1996; 4(4):320-328.

**Brienza, DM**; Chung, K-C; Brubaker, CE; *Wang, J*; Karg, PE; Lin, CT. A system for the analysis of seat support surfaces using surface shape control and simultaneous measurement of applied pressures. *IEEE Transactions on Rehabilitation Engineering*. 1996; 4(2):103-113.

**Appx174**

**Brienza, DM**; Angelo, J. A force feedback joystick and control algorithm for wheelchair obstacle avoidance. *Disability and Rehabilitation*. 1996; 18(3):123-129.

**Brienza, DM**; Angelo, J; Henry, K. Consumer participation in identifying research and development priorities for power wheelchair input devices and controllers. *Assistive Technology*. 1995; 7(1):55-62.

**Brienza, DM**; Chung, K-C; Brubaker, CE; Kwaitkowski , RJ. Design of a computer-controlled seating device for research applications. *IEEE Transactions on Rehabilitation Engineering*. 1993; 1(1):63-67.

**Brienza, DM**; Iñigo, RM; Chung, K-C; Brubaker, CE. Seat support surface optimization using force feedback. *IEEE Transactions on Biomedical Engineering*. 1993; 40(1):95-104.

**Brienza, DM**; Brubaker, CE; McLaurin, CA; Chung, K-C. A manufacturing system for contoured foam cushions. *Journal of Rehabilitation Res & Dev*. 1992; 29(4):32-40.

**Brienza, DM**; Chung, K-C; Brubaker, CE. Computer design and fabrication of custom contoured seating. *Medical Design and Material*. 1991; 1(1):32-41.

## 2. Reviews, invited published papers, proceedings of conferences and symposia, monographs, book chapters, and books

### Invited Published Papers

Development of a Modular Graduate Curriculum in Rehabilitation Science and Technology. Trefler, E; Boninger, M; Brienza, DM; Cooper, RA; Shapcott, NG; Hobson, DA; Robinson, CJ. **Technology Special Interest Section Quarterly**, 1997; 7(1):3-4.

Introduction to *Soft Tissue Interfaces in Rehabilitation:* Guest Editorial. Sanders, JE; Silver-Thorn, MB; Brienza, DM. **IEEE Transactions on Rehabilitation Engineering**, 1996; 4(4):285-288.

Pressure Mapping. David Brienza, **Advance for Providers of Post-Acute Care**. May/June 2005

Development of a Modular Graduate Curriculum in Rehabilitation Science and Technology. Trefler, E; Boninger, M; Brienza, DM; Cooper, RA; Shapcott, NG; Hobson, DA; Robinson, CJ. **Technology Special Interest Section Quarterly**, 1997; 7(1):3-4.

### Books and Book Chapters

Pressure ulcers in people with spinal cord injury. Brienza D and Karg P. Pressure Ulcers in America: Prevalence, Incidence, and Implications for the Future: 2nd Edition, ed. Pieper B. National Pressure Ulcer Advisory Panel; Washington, DC: NPUAP; 2012. p. 107-12.

Seating, Positioning and Support Surfaces. Brienza, DM; Geyer, MJ; Sprigle, S. Wound Care Essentials: Practice Principles, ed. Baranoski, S; Ayello, EA. Lippincott Williams & Wilkins, 3rd Edition. 2011

Mechanical loading and pressure ulcers. Brienza, DM; Ostrander, L. Cutaneous Ulcers and Pressure Ulcers, ed. Lee, BY and Burton, BL. Chapman and Hall, 1996; pp116-128.

Seating, Positioning and Support Surfaces. Brienza, DM; Geyer, MJ; Sprigle, S. Wound Care Essentials: Practice Principles, ed. Baranoski, S; Ayello, EA. Lippincott Williams & Wilkins, 2003; pp 187-216.

Seating, Positioning and Support Surfaces. Brienza, DM; Geyer, MJ; Sprigle, S. Wound Care Essentials: Practice Principles, ed. Baranoski, S; Ayello, EA. Lippincott Williams & Wilkins, 2nd Edition. 2008

Tissue Integrity Management, Brienza, DM, Jan, YK, and Zanca, JM. Rehabilitation Engineering. ed. Cooper,

Tissue Mechanics and Blood Flow Factors in Pressure Ulcers of Individuals with Spinal Cord Injury. Jan YK and Brienza DM. Research Signpost, 37/661 (2), Fort P.O., Trivandrum-695 023, Kerala, India

*Reviews*

1. Wheelchairs and seating. Brienza, DM; Cooper, RA; Brubaker, CE. **Current Opinion in Orthopedics**, 1996;7(vi).

2. Wheelchairs and seating. Cooper, RA; Brienza, DM; Brubaker, CE. **Current Opinion in Orthopaedics**, 1994; 5(vi):101-107.

*Proceedings of Conferences*

1. Smeresky, David, Andrew Malkiewicz, Patricia Karg, and David Brienza. "DESIGN AND EVALUATION OF A TEMPERATURE CONTROLLED AIR CELL BASED WHEELCHAIR CUSHION."

2. Brienza, DM; Allegretti, A; Karg PE; Kelsey, S; Holm, M; Schmeler, M. An RCT on Wheeled Mobility for Preventing Pressure Ulcers: A Report on Study Rationale and Design. International Seating Symposium, March7-9, 2012, Vancouver, BC, Canada.

3. Johnson M, Allegretti A, Brienza DM, Karg PE. (2011) Incidence of Pressure Ulcers in Spinal Cord Injury Patients Across Care Settings: Acute, and Inpatient- Preliminary Data The Clinical Symposium on Advances in Skin & Wound Care. September 9-12, 2011 Gaylord National Hotel & Convention Center, National Harbor, MD.

4. IMPROVING THE EFFICIENCY OF TELEREHABILITATION SERVICE DELIVERY WITH INTEGRATED SYSTEM. ndi Saptono, Health Information Management Department, Bambang Parmanto, PhD, David Brienza, PhD, Michael McCue, PhD, Rich Schein, PhD, Gede Pramana, MS, Wayan Pulantara. Telemedicine and e-Health. May 2011, 17(4): A-1-A-122. doi:10.1089/tmj.2011.9993.

5. Allegretti, A., Schein, R., Schmeler, M., & Brienza D. (2011). Using Telerehabilitation to educate remote therapists in prescribing wheeled mobility and seating devices, International Seating Symposium, Nashville, TN, USA

6. Allegretti, A., Brienza, D., Malkiewicz A. (2011). Measuring interface pressure and temperature in the operating room. A feasibility study, NPUAP, Las Vegas, NE

6. Tzen YT, Brienza DM, Karg PE, Loughlin PJ, Geyer MJ (2011).  Effectiveness of local cooling on enhancing tissue ischemia tolerance in people with spinal cord injury.

David M. Brienza

Proceedings of the National Pressure Ulcer Advisory Panel Biennial Conference. Las Vegas: NPUAP Press.

7. Tzen YT, Brienza DM, Karg PE, Loughlin PJ, Geyer MJ (2010).  Effectiveness of local fast and slow cooling on pressure induced reactive hyperemia (RH) in adult human participants. Proceedings of the RESNA 33rd International Conference on Technology and Disability. Las Vegas, NV: RESNA Press.

8. Schein, R.M., Schmeler, M.R., Brienza, D., & Saptono, A.  Comparing Wheeled Mobility and Seating Outcomes via Telerehabilitation and In-Person.  Paper Presented at the American Telemedicine Association.  San Antonio, TX. May, 2010.

9. Glauser K, Tzen YT, Brienza DM (2009).  Pressure ulcer prevention: examining the relative effects of pressure, shear force, and skin temperature. Proceedings of the University of Pittsburgh Science 2009 Annual Conference. Pittsburgh, PA.

10. Tzen YT, Loughlin PJ, Brienza DM (2009).  Analyzing the mechanisms of local cooling on pressure induced reactive hyperemia by applying short-time Fourier transform (STFT). Proceedings of the RESNA 32nd International Conference on Technology and Disability. New Orleans, LA: RESNA Press.

11. Schein, R.M., Schmeler, M.R., Brienza, D., & Saptono, A. Effectiveness of Wheeled Mobility and Seating by Telerehabilitation and In-Person.  Poster Presentation at the Rehabilitation Engineering and Assistive Technology Society of North America. New Orleans, LA, June, 2009.

12. Ziraldo, C.; Solovyev, A.; Henzel, M.; Sowa, G.A.; Brienza, D.; An, G.; Mi, Q., and Vodovotz, Y. Inferring mechanism from morphology: Understanding pressure ulcer formation in spinal cord injury patients using agent-based mechanistic simulations. 20th Wound Healing Society Annual Meeting.

13. Cohn, Ellen and Brienza, DM and McCue, Michael and Deliyannides, Timothy (2009) *Telerehabilitation E-Dissemination Opportunities: Three Vehicles for Academic Public Service.* In: American Telemedicine Association Annual Meeting, April 27, 2009, Las Vegas, Nevada.

14. Tzen Y, Jan YK, Brienza DM.  Development of a system to study the effect of local cooling on skin blood flow response to interface pressure. The Rehabilitation Engineering and Assistive Technology Society of North America (RESNA) Annual Conference, Washington, DC, 2008.

15. Allegretti, A., Brienza, D., Holm, M., & Schmeler, M. (2009) A Decision Making Process for a Wheelchair and Cushion Selection, International Seating Symposium Orlando, FL

16. Tzen Y, Jan YK, Porach EA, Karg PE, Brienza, DM.  Effects of local cooling on sacral skin perfusion response to pressure: implications for pressure ulcer prevention. National Pressure Ulcer Advisory Panel Annual Conference, Washington, DC, 2009.

17. Saptono, A., Schein, R., Parmanto, B., & Brienza, D. Remote wheelchair prescription: Initial system evaluation. Panel Presentation at the Rehabilitation Engineering and Assistive Technology Society of North America.  Phoenix, AZ, June, 2007.

18. Schein, R.M., Schmeler, M.R., Brienza, D., & Saptono, A. Telerehabilitation assessment using the Functioning Everyday with a Wheelchair-Capacity outcome tool. Panel presentation at the Rehabilitation Engineering and Assistive Technology Society of North

America. Washington, D.C. June, 2008.

19. Schein, R.M., Schmeler, M.R., & Brienza, DM. Measuring change in function following the provision of a wheeled mobility and seating intervention via telerehabilitation. Panel Presentation at the American Telemedicine Association. Seattle, WA. April, 2008.

20. Schein, R.M., Schmeler, M.R., & Brienza, D. Remote wheelchair prescription using telerehabilitation. Poster presentation at the International Conference on Aging, Disability, and Independence. St. Petersburg, FL, February, 2008.

21. Allegretti, A., Brienza, D., & Holm, M (2009). Pressure Ulcer Outcomes With and Without Use of Pressure Mapping, NPUAP, Washington, DC

22. Evan W. Call, MS, David M. Brienza, PhD, Mary Ellen Posthauer, RD, CD, LD.Development of Uniform Terminology for Support Surfaces, WOCN Society 39th Annual Conference, June 9-13, 2007, Salt Lake City Utah.

23. Call E, and Brienza DM. Support Surface Standards Initiative. EPUAP, Berlin, September 28-30, 2006

24. Call E, and Brienza DM. Support Surface Standards Initiative. Clinical Symposium, Orlando, 2006

25. Siekman, Allen and Brienza, DM. The effect of skin temperature on skin ulcer development. Nordic Seating Symposium, (Abstract) Copenhagen, Denmark. October 4-6, 2006.

26. McCue, M. Brienza, DM., Pramuka, M. & Seelman, KD. (2006). Telerehabilitation: Meeting rehabilitation consumer needs through rehabilitation engineering research (Abstract). Telemedicine and e-Health. 12(2), 221.

27. Parmanto, B., Saptono, A., Sugiantara, W., Brienza, D., Nnaji, B., "Information Technology Infrastructure for Supporting Telerehabilitation", Poster Presentation in RESNA Conference 2006, June 22-26, 2006, Atlanta, Georgia

28. Kohlenberg EM, Zanca JM, Brienza DM, Levasseur MA, Sowa MG. Spectroscopic Detection of the Blanch Response at the Heel of the Foot: A Possible Diagnostic for Stage I Pressure Ulcers.  In: Chan WC, Yu K, Krull UJ, Hornsey RI, Wilson BC, Weersink RA, editors. Photonic Applications in Biosensing and Imaging. Proceedings of SPIE (International Society for Optical Engineering); 2005 Sept 12-14; Bellingham, WA: SPIE; 2005. Volume 5969, p. 343-350.

29. Jan YK, Brienza DM, and Boninger ML. Analysis of skin blood flow responses to mechanical stresses with implications to alternating pressure support surfaces. RESNA International Conference on Technology and Disabilities, Atlanta, GA, 2005.

30.  Jan YK, Brienza DM, and Boninger ML. A time-frequency approach using wavelets to study week-to-week variability in blood flow oscillations. XXth Congress of the International Society of Biomechanics and 29th Annual Meeting of the American Society of Biomechanics, Cleveland, OH, 7/31-8/5, 2005.

31. Using Wavelet Analysis to Investigate Skin Blood Flow Control Mechanisms: Implications for Skin Thermoregulatory Mechanisms. **RESNA 27th International Annual Conference**, June, 2004, Orlando, Florida.

32. A comparison of changes in rhythms of sacral skin blood flow in response to heating and indentation. Jan YK, Brienza DM, and Geyer MJ. **Annual Meeting of the American Physical Therapy Association**, Chicago, IL, 2004.

33. Telerehabilitation: Concepts and Distance Wheelchair Functional Assessment. Brienza, DM. **2nd International Conference on Telemedicine and Multimedia Communication**, Kajetany, Poland, October 8 – 9, 2004.

34. Visible and near-infrared spectroscopy: A promising new tool for pressure ulcer diagnosis. Zanca, JM; Geyer, MJ; Brienza, DM. **RESNA 26th International Annual Conference**, June 19 – June 23, 2003, Atlanta, Georgia.

35. The virtual reality telerehabilitation system for analyzing accessibility of the physical environment: A comparison of camera systems. Kim, J; Brienza, DM. **RESNA 26th International Annual Conference**, June 19 – June 23, 2003, Atlanta, Georgia.

36. Development of a system to study the effect of alternating pressure loading on skin perfusion. Jan, Y-K; Geyer, MJ; Brienza, DM. **RESNA 26th International Annual Conference**, June 19 – June 23, 2003, Atlanta, Georgia.

37. A survey of alternating pressure seat cushions. Ammer, ML; Brienza, DM; Geyer, MJ. **Proceedings of the RESNA 25th International Conference**, June 27 – July1, 2002, Minneapolis, MN.

38. Viscoelastic properties of soft tissues with pressure ulcer susceptibility. Wang, J; Brienza, DM; Karg, PE; Bertocci, GE. **Proceedings of the RESNA 25th International Conference**, June 27– July1, 2002, Minneapolis, MN.

39. Automatic customization software for computer head controls. LoPresti, EF; Brienza, DM. **Proceedings of the RESNA 25th International Conference**, June 27 – July1, 2002, Minneapolis, MN.

40. The relationship between pressure and pressure ulcers: results from a preclinical trial on the effectiveness of pressure reliving seat cushions. Brienza, DM; Karg, PE; Geyer, MJ, **Proceedings of the International Symposium on Rehabilitation Engineering & Clinical Rehabilitation '02**, August 26 – 31, 2002, Dalian, China.

41. The development of wheelchair seating standards. Brienza, DM; Karg, PE. **Proceedings of the International Symposium on Rehabilitation Engineering & Clinical Rehabilitation '02**, August 26 – 31, 2002, Dalian, China.

42. Real-time tracing and measuring the biomechanical performance of human buttock soft tissues. Wang, J; Zhang G; Brienza, DM. **Proceedings of the International Symposium on Rehabilitation Engineering & Clinical Rehabilitation '02**, August 26 – 31, 2002, Dalian, China.

43. The Rehabilitation Engineering Center Program of the National Institute on Disability and Rehabilitation Research in the United States.  Seelman, K; Brienza, DM; Hobson, D. **3rd Chinese Conference on Rehabilitation Medicine**, Oct 22 – 26, 2001, Beijing, China.

44. A web-based model to disseminate "best lectures" in rehabilitation worldwide . Cohn, E; Brienza, DM; Brubaker, CE. **3rd Chinese Conference on Rehabilitation Medicine**, Oct 22 – 26, 2001, Beijing, China.

45. Comparison of five software interfaces for computer head controls. LoPresti, EF; Brienza, DM; Angelo, J. **Proceedings of the RESNA Annual Conference 2001**, Reno, NV.

46. Stress relaxation properties of buttock soft tissues: in vivo indentation test. Wang, J; Brienza, D; Bertocci, G; Karg, P. **Proceedings of the RESNA Annual Conference 2001**, Reno, NV.

47. Repeatability of determining effective Young's modulus of buttocks soft tissue across multiple subjects. Zeltwanger,  AP; Wang, J; Bertocci, G; Brienza, DM; Karg, P; Chib, V. **Proceedings RESNA Annual Conference 2001, Reno, NV**. Whitaker Scientific Paper Competition Award.

48. The Effect of Body Mass Index on Seat Interface Shape Patterns. Li Y., Aïssaoui R., Brienza D.M., Dansereau J. *Proceedings / Actes de conference* XXVe Congrès de la SOCIÉTÉ DE BIOMÉCANIQUE. du 23 au 26 août 2000 / August 23–26, 2000. Montréal, Canada.

49. "What is interface pressure?" Fay, BT; Brienza, DM.  **22nd Annual Conference of the Engineering in Medicine and Biology Society**, Chicago, IL, July 24 – 30, 2000.

50. Are commercial seat cushions efficacious in preventing pressure ulcers? Geyer, MJ; Brienza, DM; Karg, P; Kelsey, SF; Trefler, E. **Proceedings of the RESNA 2000 Annual Conference**, Orlando, FL, June 2000. RESNA Press, Washington, DC, 2000.

51. Effective young's modulus of buttocks soft tissue. Zeltwanger,  AP; Wang, J; Bertocci, G; Brienza, DM; Chib, VS. **Proceedings of the RESNA 2000 Annual Conference**, Orlando, FL, June 2000. RESNA Press, Washington, DC, 2000.

52. The effect of preconditioning on the repeatability of quasi-linear viscoelastic properties of buttocks soft tissue. Chib, V; Wang, J; Brienza, DM; Bertocci, G. **Proceedings of the RESNA 2000 Annual Conference**, Orlando, FL, June 2000. RESNA Press, Washington, DC, 2000.

53. Reliability of the in vivo test protocol for measuring biomechanical properties of buttock soft tissues. Wang, J; Brienza, DM; Bertocci, G; Chib, V; Karg, P; Yuan, Y-W. **Proceedings of the RESNA 2000 Annual Conference**, Orlando, FL, June 2000. RESNA Press, Washington, DC, 2000.

54. The Influence of Axial Compression Ratio of Buttock Soft Tissues on Quasi-Linear Viscoelastic Modeling Parameters. Wang, J; Brienza, DM; Bertocci, G; Chib, V; Karg, P. **Chicago 2000 World Congress on Medical Physics and Biomedical,** July 23 – 28, 2000, Chicago, IL.

55. Neck range of motion and use of computer head controls. LoPresti, E; Brienza, DM; Angelo, J; Gilbertson, L; Sakai, J. **The fourth international ACM conference on Assistive Technologies**, Arlington, Virginia, USA, 2000. pp. 121-128.

56. Neck Movement Patterns and Functional Performance for Computer Head Controls. LoPresti, EF; Brienza, DM; Angelo, J.  **BMES-EMBS 1st Joint Conference**, October 1999.

57. Computer Head Controls: Ergonomics and Effect of Neck Movement Limitations. LoPresti. EF; Angelo, J., Brienza, DM; Sakai, J; Gilbertson, L.  **CSUN's 15th Annual Conference "Technology and Persons with Disabilities"**, March 2000.

58. An Evaluation of an Obstacle Avoidance Force Feedback Joystick. Protho, JL; LoPresti, EF; Brienza, DM.  **Proceedings of the RESNA 2000 Annual Conference**,  June, 2000.

59. Are Commercial Seat Cushions Efficacious in Preventing Pressure Ulcers in the At-Risk, Elderly Nursing Home Population? Geyer, MJ; Brienza, DM; Karg, PE; Kelsey, SF; Trefler, E. **Symposium on Advanced Wound Care and Medical Research Forum on Wound Repair**, Dallas, TX, April 1-4, 2000.

60. In vivo characterization of Buttock Soft Tissue Using Quasi-linear Viscoelastic Modeling. Wang, J; Bertocci, G; Brienza, DM; Karg, PE; Yuan, Y. **First Joint Meeting of BMES & EMBS**, Atlanta, GA, October 13-16, 1999.

61. Neck Movement Patterns and Functional Performance for Computer Head Controls. LoPresti, EF; Brienza, DM; Angelo, J. **First Joint Meeting of BMES & EMBS**, Atlanta, GA, October 13-16, 1999.

62. Determination of Generic Seat Interface Shapes by Cluster Analysis. Li, Y; Aissaoui, R; Brienza, DM; Dansereau, J. **Proceedings of RESNA '99 Annual Conference**, Long Beach, CA, June 25-29, 1999.

63. A Case Report from Clinical Evaluations of the Prototype Body Map Cushion. Brienza, DM; Geyer, MJ; Karg, PE. **Proceedings of RESNA '99 Annual Conference**, Long Beach, CA, June 25-29, 1999.

64. Clinical Evaluation of Pressure-reducing seat cushions for Elderly Patients. Brienza, DM; Geyer, MJ; Karg, PE; Trefler, E; Kelsey, SF. **Proceedings of the 15th International Seating Symposium**, Orlando, Florida, March 3, 1999.

65. Efficacy of Seat Cushions in Preventing Pressure Ulcers for At-risk Elderly Nursing Home Residents. Geyer, MJ; Brienza, DM; Kelsey, SF; Karg, PE; Trefler, E. **Proceedings of 16th Annual RESNA Conference**, Minneapolis, MN, June 26-29, 1998.

66. A method for contour cushion design using pressure measurements. Brienza, DM; Karg, PE. **Proceedings of 16th Annual RESNA Conference**, Minneapolis, MN, June 26-29, 1998.

67. Ultrasound Measurements of Tissue Deformation Under Load. Brienza, DM; Wang, J; Ault, T; Lin, CT. **Dundee '97 - International Conference on Wheelchairs and Seating**, Dundee, Scotland, September 8-12, 1997.

68. CAD/CAM Custom Contoured Cushions. Brienza, DM; Karg, PE; Lin, CT; Wang, J. **Dundee '97 - International Conference on Wheelchairs and Seating**, Dundee, Scotland, September 8-12, 1997.

69. Standardized Test Procedures. Axelson, PW; Chesney, DA; Brienza, DM. **Dundee '97 - International Conference on Wheelchairs and Seating**, Dundee, Scotland, September 8-12, 1997.

70. A compound sensor for biomechanical analysis of load-bearing soft tissue. Wang, J; Brienza, DM; Yuan, YW; Karg, PE,; Brubaker, CE. **Proceedings of 16th Annual RESNA Conference**, Pittsburgh, PA, June 20-24, 1997, pp. 242-244.

71. A four-wheel steering mechanism for short wheelbase vehicles. Brienza, DM; Brubaker, CE. **Proceedings of 16th Annual RESNA Conference**, Pittsburgh, PA, June 20-24, 1997.

72. Seating and Mobility Research: What, Why, and How. Brienza, DM. **Proceedings of the 13th International Seating Symposium**, Pittsburgh, PA, January 23-25, 1997.

73. Introduction to *Soft Tissue Interfaces in Rehabilitation:* Guest Editorial. Sanders, JE; Silver-Thorn, MB; Brienza, DM. **IEEE Transactions on Rehabilitation Engineering**, 1996; 4(4):285-288.

74. Design and development of a wheelchair for enhanced access. Brienza, DM; Brubaker, CE. **Proceedings of 15th Annual RESNA Conference**, Salt Lake City, Utah, June 7-12, 1996.

75. A system for the design and analysis of seat support surfaces. Karg, PE; Brienza, DM; Brubaker, CE; Wang, J; Lin, CT. **Proceedings of 15th Annual RESNA Conference**, Salt Lake City, Utah, June 7-12, 1996.

76. Evaluation of a surface optimization technique for custom contoured cushion design. Karg, PE; Brienza, DM; Chung, K-C; Brubaker, CE. **Proceedings of 15th Annual RESNA Conference**, Salt Lake City, Utah, June 7-12, 1996.

77. The development of and AC motor drive in power wheelchair. Nho, WC; Brienza, DM; Boston, R. **Proceedings of 15th Annual RESNA Conference**, Salt Lake City, Utah, June 7-12, 1996.

78. Design of an ultrasound soft tissue characterization system for the CASS. Wang, J; Brienza, DM; Brubaker, CE; Yuan, Y-W. **Proceedings of 19th Annual RESNA Conference**, Salt Lake City, Utah, June 7-12, 1996.

**79.** Wheelchairs and seating. Brienza, DM; Cooper, RA; Brubaker, CE. **Current Opinion in Orthopedics**, 1996;7(vi).

80. Concept and implementation of a force feedback active joystick. Gehlot, NL; Brienza, DM. **Proceedings of 18th Annual RESNA Conference**, Vancouver, British Columbia, June 9-14, 1995.

81. A reusable mold for custom contour cushion manufacturing. Gehlot, NL; Brienza, DM; Silverman, MS. **Proceedings of 18th Annual RESNA Conference**, Vancouver, British Columbia, June 9 -14, 1995.

82. New battery technology for powered wheelchairs. Bayles, G; Ulerich, P; Palmer, K; Brienza, DM. **Proceedings of 17th Annual RESNA Conference**, Nashville, TN, June 17 - 22, 1994.

83. A passive four degree of freedom digitizing arm for seating surfaces. Brienza, DM; Chung, K-C; Lin, C-T. **Proceedings of 17th Annual RESNA Conference**, Nashville, Tennessee, June 17 - 22, 1994.

84. Assisted control and navigation of a powered wheelchair. Brienza, DM. **International Ergonomics Association's Conference on Rehabilitation Ergonomics**, August 1994. (Invited abstract accepted for publication and presentation.)

85. Seat support surface optimization algorithm development. Brienza, DM; Chung, K-C. **Proceedings of 1993 ASME Winter Annual Meetin**g, New Orleans, Louisiana, Nov. 28 - Dec. 3, 1993. (Invited abstract)

86. The effect of sampling frequency on seat contour reproduction for CAD/CAM seating systems. Brienza, DM. **Proceedings of 15th Annual RESNA Conference,** pp. 207-209, Toronto, Canada, June 1992.

David M. Brienza

87. Pressure relief — theory and practice. Brubaker, CE; Chung, K-C; Brienza, DM. **Proceedings of 7th International Seating Symposium**, Memphis, Tennessee, February 1991.

88. A new approach to seat contour design. Brienza, DM; Iñigo, RM; Chung, K-C; Brubaker, CE. **Proceedings of 12th Annual Conference of IEEE-EMBS**, Philadelphia, Pennsylvania, Nov. 1990.

89. A manufacturing system for custom contoured foam cushions. Brienza, DM; Brubaker, CE; McLaurin, CA. **Proceedings of 13th Annual RESNA Conference**, pp. 415-416, Washington, D.C., June 15-20, 1990.

90. Prescribing customized contoured seat cushions by computer-aided shape sensing. Sposato, BA; Chung, K-C; McLaurin, CA; Brubaker, CE; Brienza, DM. **Proceedings of 13th Annual RESNA Conference**, pp. 103-104, Washington, D.C., June 15-20, 1990.

91. A computer-aided shape sensing system for custom seat contours. Chung, K-C; McLaurin, CA; Brubaker, CE; Brienza, DM. **Proceedings of 13th Annual RESNA Conference**, pp. 395-396, Washington, D.C., June 15-20, 1990.

92. A comparison of force transducers suitable for an automatic body support system. Brienza, DM; Gordon, J; Thacker, JG. **Proceedings of 12th Annual RESNA Conference**, pp. 238-239, New Orleans, Louisiana, June 1989.

93. UVa custom contoured seating system technical and clinical evaluation. Chung, K-C; Sprigle, SH; Brienza, DM; Brubaker, CE; McLaurin, CA. **Proceedings of 12th Annual RESNA Conference**, pp. 236-237, New Orleans, Louisiana, June 1989.

94. A fiber optic force sensor for automated seating design. Brienza, DM; Iñigo, RM. **Proceedings of 12th Annual RESNA Conference**, pp. 232-233, New Orleans, Louisiana, June 1989.

95. Design of a CAM system for custom contoured wheelchair cushions. Brienza, DM; Chung, K-C; Iñigo, RM. **Proceedings of ICAART**, pp. 312-313, Montreal, Canada, June 1988.

96. Effect of contoured support surface on pressure distribution. Chung, K-C; Sprigle, SH; Brienza, DM; Brubaker, CE; McLaurin, CA. **Proceedings of ICAART**, pp. 314-315, Montreal, Canada, June 1988.


*Other publications*


1. Seat contour optimization using force feedback. Brienza DM. **UVa REC Technical Report No. 10691**, 1991.

2. A manufacturing system for custom contoured foam cushions. Brienza DM. **UVa REC Technical Report No. 10791**, 1991.

3. Improved seating design. Chung, K-C, Brubaker CE, McLaurin CA, Protz PR, Todd BA, Sposato BA, Brienza DM and Hughes CJ. **University of Virginia Rehabilitation Engineering Center Annual Report**, pp. 78-141, 1990.

4. Research and development to improve seating design. Chung K-C, Brubaker CE, McLaurin CA, Brienza  DM and Sprigle SH. **Rehabilitation R&D Progress Reports**, pp. 143-144,

David M. Brienza

Veterans Administration Rehabilitation Research and Development Service, Baltimore, MD, 1989.

5.  Seating and body support. Chung K-C, McLaurin CA, Brubaker CE, Reger SI, Sprigle SH and Brienza DM. **Wheelchair Mobility: A Summary of Activities at the University of Virginia Rehabilitation Engineering Center,** 1983-1988, pp. 39-118, 1988.

6.  Improved seating design. Chung K-C, Brubaker CE, McLaurin CA, Brienza DM, Sprigle SH, Schunkewitz J, Todd BA and Hughes CJ. **University of Virginia Rehabilitation Engineering Center Annual Report,** pp. 68-118, 1988.

7.  Seat contour optimization using force feedback. Brienza DM. **Ph.D. Dissertation**, University of Virginia, August 1991.

**8.**  Design of a CAM system for custom contoured wheelchair cushions. Brienza DM. **Master's Thesis**, University of Virginia, May 1988.

9.  **Brienza, D.,** Deppisch, M., Gillespie, C., Goldberg, M., Gruccio, P., Jordan, R., . . . Sylvia, C. (2015). Do Lift Slings Significantly Change the Efficacy of Therapeutic Support Surfaces? A National Pressure Ulcer Advisory Panel White Paper.

### Professional Activities

**Teaching**

HRS 2706        Introduction to Rehabilitation Engineering Design (Primary Professor)

HRS 2706        Rehabilitation Biomechanics (Primary Professor)

HRS 3704        Environmental Control Systems (Primary Professor)

HRS 2703        Rehabilitation Engineering Design (Primary Professor)

BIOE1010        Bioinstrumentation (Primary Professor)

BIOE1011        Bioinstrumentation Lab (Primary Professor)

HRS 3707:       Power Wheelchairs II (Primary Professor)

HRS 3702:       Seating Biomechanics (Primary Professor)

HRS 2701:       Rehabilitation Engineering and Technology (Pressure Relief Seating section and laboratory)

HRS 2702:       Instrumentation and Computer Interfacing  (Primary Professor)

HRS 2704:       Fundamentals of Rehabilitation Engineering (Pressure Relief Seating and Pressure Ulcers section)

HRS 2705:       Principles and Practice of Rehabilitation Engineering (Support Surface Evaluation section and laboratory)

**Appx184**

David M. Brienza

HRS 2706:    Analysis of Adaptations for Physical Impairment (Pressure Measurement and
             Devices)

EE 1695:     Senior Design Project, Controls (Primary Professor)

EE 2646:     Linear Control Systems Theory (Primary Professor)

BIOE 2023:   Bioengineering Seminar Series (Soft Tissue Biomechanics)

OTH 732:     Assistive Technology Applications in Occupational Therapy, Chatham College
             (Pressure Measurement laboratory)

OCCTH 550:   Environmental Adaptation & Rehabilitation Technology, Duquesne University
             (Pressure Ulcer Etiology, Pressure Measurement laboratory)


*Student Advising and Thesis Committee Participation*

David McLeary: Member of MS Thesis Committee, 1992-1993, Dept. of Physical Therapy,
   University of Pittsburgh. Thesis: *The effect of four ankle braces on calcaneal inversion/eversion
   angles and calcaneal torque when landing from a height of eighteen inches.*

Lori Baker: Member of MS Thesis Committee, 1992-1996, Dept. of Physical Therapy, University
   of Pittsburgh. Thesis: *The effect of semi-rigid orthotics on the center of pressure.*

Andrew Gordon: MS Academic and Research Advisor and Committee Chairman, 1993-1994,
   Bioengineering program, University of Pittsburgh (withdrew from program to attend medical
   school).

Paula Mehta: Independent Study Supervisor, 1993-1994, Dept. of Electrical Engineering,
   University of Pittsburgh.

Narayan Gehlot: Ph.D. Research Advisor, 1993-1995, Dept. of Electrical Engineering, University
   of Pittsburgh. Dissertation: *Novel burst and packet mode receiver architecture with automatic
   compensation for optical networks and communication systems.*

Won Nho: MS Research Advisor, 1993-1995, Dept. of Electrical Engineering, University of
   Pittsburgh. Thesis: *Pulse-width modulation voltage source inverter for induction motor in
   power wheelchair.*  Ph.D. Research Advisor, 1995-1997, 2003-2005, Dept. of Electrical
   Engineering.

Seun Onodipe: MS Research Advisor, 1993-1994, Dept. of Electrical Engineering, University of
   Pittsburgh.

Chen-Tse Lin: Member of Ph.D. Dissertation Committee, 1994, Dept. of Mechanical Engineering,
   University of Pittsburgh. Dissertation: *Unsteady, inhomogeneous motions of a generalized neo-
   hookean material.* Postdoctoral Research Mentor, 1993-1995, School of Health and
   Rehabilitation Sciences.

Heather Rushmore: MS Academic Advisor, 1995-1996, Dept. of Rehabilitation Science and
   Technology, University of Pittsburgh.

**Appx185**

David M. Brienza

Mostafa Khondakar: Member of MS Thesis Committee, 1995-1997, MS Thesis: *Monte carlo stochastic simulation of power system generation cost under time and system dependent constraints*, Dept. of Electrical Engineering, University of Pittsburgh.

Neal Row: MS Academic Advisor, 1995-1997, Dept. of Rehabilitation Science and Technology, University of Pittsburgh.

Rayanne DiCola: MS Academic Advisor, 1995-1997, Scholarly paper: *Secondary injuries associated with alternative computer access*, Dept. of Rehabilitation Science and Technology, University of Pittsburgh.

James Protho: MS Academic and Research Advisor, 1995-1998, Dept. of Rehabilitation Science and Technology, University of Pittsburgh. Thesis: *An evaluation of an obstacle avoidance force feedback joystick*

Jue Wang: Research Mentor/Advisor, 1994-2000; Ph.D. Academic and Research Advisor, Dept. of Rehabilitation Science and Technology, University of Pittsburgh. Dissertation: *Development of a compound ultrasonic device and in vivo biomechanical assessment of buttock soft tissue*

Thomas Ault: Member of Ph.D. Advisory Committee, 1996-2005, Dept. of Computer Science, Robotics Institute, Carnegie Mellon University.

Edmond Lopresti, Ph.D. Academic and Research Advisor, 1997-2002, Dept of Bioengineering, University of Pittsburgh. Dissertation: *Neck movement limitations and the use of head-operated computer controls for people with disabilities.*

Mary-Jo Geyer, Ph.D. Advisor, 1997-2001, SHRS Ph.D. Program, University of Pittsburgh, Dissertation: *The relationships between computed tomography and ultrasound indentation testing in characterizing fibrotic tissue associated with Chronic venous disease*

Robert Joseph, MS Academic Advisor, 1998-2000, Rehabilitation Science and Technology, University of Pittsburgh.

Thomas Bursic, MS Academic Advisor, 1998-2000, Rehabilitation Science and Technology, University of Pittsburgh.

Yih-Kuen Jan, Ph.D., PT, Research Mentor/Advisor, 2000-2004, University of Pittsburgh. Dissertation: *A study on skin blood flow control mechanisms using wavelet analysis: Implications for alternating pressure support surfaces*

Jeanne Zanca, Ph.D. Advisor, 2001-2006, SHRS Ph.D. Program, University of Pittsburgh. Dissertation: *Spectroscopic Assessment of the Blanch Response*

Vikram Chib, Undergraduate research and academic advisor, 1998-2001, Bioengineering, University of Pittsburgh

Jong Bae Kim, Ph.D. Research Mentor/Academic and research advisor, 2001-2005, SHRS Ph.D. Program, University of Pittsburgh, *A Virtualized Reality Telerehabilitation System for the accessibility analysis of the physical environment*

Sandra Hubbard, Ph.D. Academic Advisor, 2001-2002, SHRS Ph.D. Program, University of Pittsburgh

Yue Wang, Ph.D. Academic and Research advisor, 2003-2005, University of Pittsburgh, School of Health and Rehabilitation Sciences

David M. Brienza

Rohit Bafana, MS Academic and Research Advisor, 2003-2005, University of Pittsburgh, Dept of Bioengineering

Yi-Ting Tzen, MS Academic advisor, 2005-2008, University of Pittsburgh, Department of Rehabilitation Science, and Technology.

BC Deemer, Ph.D. Academic and Research Advisor. Dept of Bioengineering, University of Pittsburgh

Jonathan Akins, MS Academic and Research Advisor, 2006-2008, University of Pittsburgh, Department of Bioengineering.

Susan Fuhrman, Ph.D. Research Mentor/Academic and Research Advisor, 2005-2008, University of Pittsburgh, Department of Rehabilitation Science and Technology. *Pediatric Wheelchair and Headrest Design Guidelines and the Effect of Headrests on Relative Injury Risk Under Rear Impact Conditions.*

Richard Schein, Ph.D. Academic and Research Advisor, 2005-2009, University of Pittsburgh, Department of Rehabilitation Science and Technology. *Evaluation of Using a Telerehabilitation Consultation Model for Remote Wheelchair Prescription.*

Michael Turkovich, Ph.D. Academic and Research Advisor, 2008-2010, University of Pittsburgh, Department of Bioengineering, *The effects of obesity on occupant response in frontal impact.*

Yi-Ting Tzen, Ph.D. Academic and Research Advisor, 2008-2010, University of Pittsburgh, Department of Rehabilitation Science, and Technology. *Effectiveness of Local Cooling on Enhancing Tissue Ischemia Tolerance in People with Spinal Cord Injury*

Becky Faett, Ph.D. Academic and Research Advisor, 2009-2013, University of Pittsburgh, School of Health and Rehabilitation Sciences. *Remote delivery of a standardized educational protocol for self-management of chronic swelling of the lower limbs and individuals with limited mobility*

Andrew J. Malkiewicz, MS Academic and research Advisor, 2010-2011, University of Pittsburgh, Department of Bioengineering, *Development of a wheelchair seat cushion with site-specific temperature control for pressure ulcer prevention.*

Shilpa Krishnan, Ph.D. Academic and Research Advisor, 2010-2014, University of Pittsburgh, School of Health and Rehabilitation Sciences.

Charles Vukotich, Ph.D. (candidate) Academic and Research Advisor, 2010-present, University of Pittsburgh, Department of Bioengineering.

Hassan Sarsak, Ph.D. Academic and Research Advisor, 2010-2012, University of Pittsburgh, School of Health and Rehabilitation Sciences.

Prerna Poojary, Ph.D. (candidate) Academic and Research Advisor, 2012-present, University of Pittsburgh, School of Health and Rehabilitation Sciences.

Sara Peterson, Ph.D. (candidate) Academic and Research Advisor, 2012-2013, University of Pittsburgh, School of Health Rehabilitation Sciences.

David Smeresky, Ph.D. (Candidate) Academic and Research Advisor, 2012-present, University of PIttsburgh, School of Health and Rehabilitation Sciences.

Esteban Ruiz, Ph.D. (Candidate) Academic and Research Advisor, 2012-present, University of Pittsburgh, School of Health Rehabilitation Sciences.

**Appx187**

David M. Brienza

*Presentations and Instructional Courses*

1. Brienza DM, Kelsey S, Karg PE, Allegretti, A. Risk factors for developing pressure ulcers in nursing homes: A secondary analysis of data from an RCT on preventing pressure ulcers with seat cushions European Seating Symposium, November 8-10, 2011, Dublin Ireland.

2. Sprigle, S; Brienza, DM; Sonenblum, S. Strategies for Designing Wheeled Mobility and Seating Intervention Studies. 2011 ACRM-ASRM Annual Conference. October 11-15, 2011. Atlanta, GA.

3. Brienza, DM and Allegretti, A. The use of support surfaces in pressure ulcer prevention. Best Pracice journey on the Trail to Skin Health Maintenance and Restoration. October 1, 2011, Pittsburgh, PA.

4. Brienza, DM. Assistive technology research and development: Identifying needs and development trends in the US, Keynote Address. September 1, 2011, Goyang, Korea.

5. Brienza, DM. Caracteristicas de Almohadones. 1° Simposio Internacional de Adecuacion Postural al Sentado, August 18-20, 2011, Buenos Aires, Argentina

6. Brienza, DM. Practica Basada en la Evidencia en Asientos. 1° Simposio Internacional de Adecuacion Postural al Sentado, August 18-20, 2011, Buenos Aires, Argentina

7. Brienza, DM, Symposium for Advanced Wound Care West, September 24-26, 2010. Los Angeles, California

8. Rehabilitation Engineering and Assistive Technology Association of North America, June 26-29, 2010, Las Vegas, Nevada.

9. Posture Mobility Group Meeting, June 6-9, 2010, Glasgow, Scotland.

10. American Telemedicine Association, May 15-18, 2010, San Antonio, Texas.

11. Symposium on Advanced Wound Care, April 17-20, 2010, Orlando, Florida.

12. International Seating Symposium, March 13, 2010, Vancouver, Canada,

13. Walter Reed Medical Center, January 22, 2010.

14. Horton, JA; Henzel, MK; Wood, SL; and Brienza, DM. Pressure Ulcers: Clinical Update, Advances in Care, and Technological Horizons. American Academy of Physical Medicine and Rehabilitation, 70th Annual Assembly, Austin, Tx, Oct. 22-25, 2009.

15. Jan, Y-K; Brienza, DM; Boninger, ML; Brenes, G. "Comparison of Alternating and Constant Pressures on Soft Tissue Viability and Pressure Ulcer Risk in People with SCI" 2009 Congress on Spinal Cord Medicine and Rehabilitation, Dallas, Texas, Sept 23-26, 2009.

16. Brienza, DM; Mi, Q. "Tissue Integrity Management Research and Development at the Rehabilitation Engineering Research Center (RERC) on SCI" 2009 Congress on Spinal Cord Medicine and Rehabilitation, Dallas, Texas, Sept 23-26, 2009.

17. Brienza, "International standardization of medical devices" International Symposium on Medical Industry and Medical Devices Clinical Trial, Yeungam Unininversity, Deagu City, South Korea, April 29, 2009.

18. Brienza, DM, "An RCT on Preventing Pressure Ulcers with Seat Cushions." Feinberg School of Medicine, Northwestern University, April 23, 2009.

**Appx188**

David M. Brienza

19. Brienza, DM, "An RCT on Preventing Pressure Ulcers with Seat Cushions." International Seating Symposium, Orlando Florida, March 12, 2009.

20. Brienza, DM "Soft Tissue Interfaces: Seat Cushions of Maintain Tissue Integrity." Guest Lecture CMU/RI 16-899D Principles of Human Robot Interaction. September 12, 2006.

21. Brienza, DM. Critical question Debate: All pressure ulcers are he result of deep tissue damage. Evidence-based Practice in Wound Care. September 15-16, 2006. Case Western Reserve University, Cleveland Ohio

22. Siekman, Allen and Brienza, DM. The effect of skin temperature on skin ulcer development. Nordic Seating Symposium, (Abstract) Copenhagen, Denmark. October 4-6, 2006.

23. Brienza, DM. Pressure Ulcer Prevention with Cushions and Support Surfaces. Nordic Seating Symposium, (Abstract) Copenhagen, Denmark. October 4-6, 2006.

24. Seelman, K; Brienza, D; Peifer, J; Winters, J; Schiller, W. Telerehabilitation Across RERC Research and Development, RESNA 2006: Thriving in Challenging Times: The Future of Rehabilitation Engineering and Assistive Technology. June 22-26, 2006, Atlanta, Ga.

25. Siekman, A; Brienza, D; Call, E. The Effects of Skin Temperature and Moisture on Pressure Ulcer Development, RESNA 2006: Thriving in Challenging Times: The Future of Rehabilitation Engineering and Assistive Technology. June 22-26, 2006, Atlanta, Ga.

26. Brienza, DM and Kim, JB. Remote Accessibility Assessment of Built Environment for Individuals Who Use Wheeled Mobility Device, Workplace RERC State of the Science Conference, Atlanta, GA September 15-16, 2005

27. Brienza, DM. Telerehabilitation: An overview of the Rehabilitation Engineering Research Center at the University of Pittsburgh, McGowan Institute Seminar Series, March 31, 2005.

28. Brienza, DM "Pressure Ulcer Prevention and Early Detection." University of Pittsburgh, School of Medicine, Dept. of Physical Medicine and Rehabilitation, Rehabilitation Grand Rounds, Nov. 2005.

29. Brienza, DM. Telerehabilitation: Concepts and Distance Wheelchair Functional Assessment. 2nd International Conference on Telemedicine and Multimedia Communication, Kajetany, Poland, October 8 – 9, 2004.

30. Jan YK, Brienza DM, and Geyer MJ. A time-frequency approach using wavelets to study week-to-week variability in blood flow oscillations. Science 2004: No Boundaries, University of Pittsburgh, Pittsburgh, PA, 2004.

31. Jan YK, Brienza DM, and Geyer MJ. A comparison of skin blood flow responses to alternating pressure and constant loading. Department of Physical Medicine and Rehabilitation's Annual Resident Research Day, University of Pittsburgh, Pittsburgh, PA, 2004.

32. Jan YK, Brienza DM, and Geyer MJ. A comparison of changes in rhythms of sacral skin blood flow in response to heating and indentation. McGowan Institute for Regenerative Medicine Scientific Retreat, Farmington, PA, 2004.

33. Brienza, DM. "The RERC on Wheeled Mobility at the University of Pittsburgh," Hong Kong Polytechnic University, Hong Kong, China, December 17, 2002.

34. Geyer, MJ, Chib, V, Brienza, DM and Wang, J. "Quantifying Fibrosis in Chronic Venous Disease via Computed Tomography and Ultrasound Load-Indentation Testing," McGowan Institute for Regenerative Medicine Scientific Retreat, Feb 4-5, 2002.

35. Brienza, DM. "The Development of Rehabilitation Engineering in America," Xi'an Jiaotong University, P.R. China, August 22, 2002.

36. Geyer, MJ, Chib, V, Brienza, DM and Wang, J. "Quantifying Fibrosis in Chronic Venous Disease via Computed Tomography and Ultrasound Load-Indentation Testing," Science 2001: A Research Odyssey, University of Pittsburgh, Sept 12-14, 2001.

37. Brubaker, CE, Chung, K-C and Brienza, DM. "CAD/CAM Custom Seating System," RESNA Training Course, 13th Annual RESNA Conference, Washington, D.C., June 1990.

38. Brubaker, CE, Ferguson-Pell, M, Chung, K-C and Brienza, DM. "Pressure Measurement and Advanced Custom Contoured Seating Technology," RESNA Training Course, 14th Annual RESNA Conference, Kansas City, Missouri, June 1991.

39. Brienza, DM. "Seat Cushion Design Using Force Feedback," 1991 Annual Fall Meeting of the Biomedical Engineering Society, Charlottesville, Virginia, October 1991.

40. Brienza, DM. "Seat Contour Optimization," Physical Therapy Faculty Research Seminar, University of Pittsburgh, September 1992.

41. Brienza, DM. "Seat Contour Optimization," SHRS Faculty Research Seminar, University of Pittsburgh, October 1992.

42. Brienza, DM. "Seat Contour Optimization," SHRS Faculty Research Seminar, University of Pittsburgh, February 1993.

43. Brienza, DM. "Round Table Discussion Leader," 10th International Seating Symposium, Memphis Tennessee, February 1993.

44. Brienza, DM and Trefler, E. "Developments in Contoured Seating Technology," Workshop, 10th International Seating Symposium, Vancouver, BC, Canada, February 1994.

45. Brienza, DM. "Assisted Control and Navigation of a Powered Wheelchair," 12th Triennial Congress of the International Ergonomics Association, Symposium of Rehabilitation Ergonomics, Toronto, Canada, August 15-19, 1994.

46. Brienza, DM. "Custom Contoured Seating," SHRS Dept. of Occupational Therapy, University of Pittsburgh, November 1994.

47. Brienza, DM. "Soft Tissue Biomechanics for Seating," Bioengineering Seminar, University of Pittsburgh, January 1995.

48. Brienza, DM. "Session Chair for Seating and Positioning Technology," RESNA Annual Conference, June 1995.

49. Brienza, DM, Schuch, J and Sprigle, S. "Wheelchair Seating and Positioning: Improving your services from assessment through follow up," Continuing Education Workshop, University of Virginia, September 22-23, 1995.

50. Brienza, DM. "Past, Present and Future of Wheelchair Seating," University of Virginia, September 1995.

David M. Brienza

51. Brienza, DM. "Wheelchair Seating for Pressure Ulcer Prevention," SHRS Dept. of Rehabilitation Science and Technology, University of Pittsburgh, September 1995.

52. Brienza, DM. "The Internet: What the Future Holds for People with Disability," Pittsburgh Assistive Technology Association, Annual Fall Meeting, Pittsburgh, PA, October 1995.

53. Brienza, DM. "Custom Contoured Seating," SHRS Dept. of Occupational Therapy, University of Pittsburgh, November 1995.

54. Brienza, DM. "Soft Tissue Biomechanics," Dept. of Mechanical Engineering, Carnegie Mellon University, March 1996.

55. Brienza, DM. Session Chair for Wheeled Mobility and Seating, RESNA Annual Conference, June 1996.

56. Brienza, DM and Karg, PE. "Past, Present and Future of Seating and Mobility Research and Development," University of Virginia, Charlottesville, Virginia, Oct. 11-12, 1996.

57. Brienza, DM, Shapcott, N and Schmeler, M. "Wheelchair Seating: Cushion Selection," The 1996 Mid-Atlantic Regional RESNA Conference: Connections for Life, Philadelphia, PA, November 8-9, 1996.

58. Brienza, DM. "Pressure Ulcer Risk Factors," Assistive Technology Training Program for Rehabilitation Technology Suppliers, Pittsburgh, PA, March 13-14, 1997.

59. Brienza, DM. "Electrical Fundamentals," Assistive Technology Training Program for Rehabilitation Technology Suppliers, Pittsburgh, PA, March 13-14, 1997.

60. Brienza, DM. "Ultrasound Measurements of Tissue Distortion," Dundee '97 an International Conference on Wheelchairs and Seating, Dundee, Scotland, September 8-12, 1997.

61. Brienza, DM. "CAD/CAM Custom Contoured Cushions," Dundee '97 an International Conference on Wheelchairs and Seating, Dundee, Scotland, September 8-12, 1997.

62. Brienza, DM. "Pressure Measurement and Practice: Session Chair," Dundee '97 an International Conference on Wheelchairs and Seating, Dundee, Scotland, September 8-12, 1997.

**Research**

<u>*Current Grant Support*</u>

| Grant Number | Grant/Contract Title | Role (effort) | Years | Total Funding |
|---|---|---|---|---|
| R01HD04109 (6-10) | RCT on Wheeled Mobility for Preventing Pressure Ulcers | PI (20%) | 2010-2016 | $2.6M |
|  |  |  |  |  |
| Coulter Foundation | Pressure Redistribution Mattress with Targeted Cooling (PRO-TECT) | PI | 2014-16 | $119k |

\* - Currently in no-cost extension status

<u>*Prior Grant and Contract Support*</u>

| Grant/Contract Number | Grant/Contract Title | Role | Years | Source Amount |
|---|---|---|---|---|
| Pindot Products | Computer Interface for Pindot MSS: A Feasibility Study | PI | 1992-1993 | $6500 |
| R01HD30161 | Seat Design for Optimal Load Transfer to Soft Tissues | PI | 1992-1995 | $315k |
| #1218 (PVA-SCRF) | Design and Development of a Wheelchair for Enhanced Access | Co-I | 1993-1995 | $100k |
| Pindot Products | Development of a Prototype Digitizer for the KISS Simulator | PI | 1993 | $7000 |
| H133E0005 | Rehabilitation Engineering and Research Center on Technology to Improve Wheeled Mobility | Co-I, Task Leader | 1993-1998 | $3.5M |
| R43 HD30625 | A Reusable Mold for Custom Contoured Seat Cushions | Co-I | 1993-1994 | $50k |

David M. Brienza

| SW.S11514R-1 (Ben Franklin Technology Center of Western Pennsylvania) | An Innovative Wheelchair Cushion Contour Generator | Co-I | 1994-1995 | $35k |
|---|---|---|---|---|
| #1503 (PVA-SCRF) | An Ultrasound Device for Distortion Measurement and Biomechanical Analysis of in vivo Load Bearing Soft Tissue | PI | 1995-1998 | $150k |
| SHRS Faculty Dev. Award | A Review of Current Research in Load-Bearing Tissue and Support-Surface Interface Research. | PI | 1995-1998 | $5k |
| R43HD34603 | A Reusable Mold for Custom Contoured Seat Cushions | Co-I | 1996 | $88k |
| Sentron Medical Inc. | Evaluation of BodyMap Seat Cushion | PI | 1996-1998 | $13k |
| Otto Bock, Inc | Evaluation of Otto Bock Cloud, Advantage and Z-flo Seat Cushions | PI | 1996-1998 | $20k |
| H133G70076 (NIDRR) | A pilot study for the clinical evaluation of pressure relieving seat cushions for elderly, stroke patients | PI | 1997-1999 | $250k |
| Microsoft Corp. | Development of Compensatory Software for People with Neck Range of Motion Limitations | Co-I | 1999-2000 | $10k |
| VA Center for Excellence for Wheelchairs and Related Technology | Dermal blood flow response to static and repetitive loading in subjects with spinal cord injury; Modeling the Physical Environment; Skin Blood Flow Response to Alternating Pressure | PI (on research project) | 2000-2003 | $150k (est.) |
| H133E990001 (NIDRR) | Rehabilitation Engineering and Research Center on Technology to Improve Wheeled Mobility | PI | 1999-2005 | $4.65M |

Appx193

David M. Brienza

| AireRx Inc. | Evaluation and Testing of the Cooling Capacity of Wheelchair Seat Cushions for Pressure Ulcer Prevention | PI (0%) | 2006-2007 | $36k |
|---|---|---|---|---|
| H133G040222 (NIDRR) | A Study of Biophysical and Microvasclular Function in Individuals with SCI | PI (10%) | 2004-2007 | $450k |
| H133EF060025 (NIDRR) | Post-doctoral Fellowship, Yih-Kuen Jan: Skin blood flow oscillations and pressure ulcer risk in older adults with disabilities | Primary Mentor (10%) | 2007-2008 | $65k |
| PVA research grant | Remodeling ANS and Endothelium with Exercise for Preventing Pressure Ulcers | Co-I (13%) | 2007-2008 | $75k |
| R01HD04109 (1-5) | RCT on Prevention of Pressure ulcers with Seat Cushions | PI (20%) | 2003-2008 | $2.1M |
| H133E040012 (NIDRR) | Rehabilitation Engineering and Research Center on Telerehabilitation | Director (35%) | 2004-2010 | $4.25M |
| H133E07 | RERC on Workplace Accommodations Research Task: | Task leader (2%) | 2007-2011 | $30k |
| Hill-Rom Inc. | Relative effects of pressure temperature and shear | PI (2%) | 2010 2012 | $36k $21k |
| H133E070024 (NIDRR) | Rehabilitation Engineering and Research Center on Spinal Cord Injury | Director (35%) | 2007-2013 | $4.75M |
| Turncare | | PI | 2014 | $6k |
| Roho | | PI | 2014-15 | $35k |

**Appx194**

| H133E090002 (NIDRR) | Rehabilitation Engineering and Research Center on Telerehabilitation | Director (35%) | 2009-2015 | $4.75M |
|---|---|---|---|---|

*Patents*

C.E. Brubaker, C.A. McLaurin and D.M. Brienza, Custom Contoured Wheelchair Seat and Other Body Supports, Serial No. 320,959. Application filed March 9, 1989.

C. E. Brubaker, D.M. Brienza and M.J. Brienza, Reusable Die Shape for the Manufacture of Molded Cushions, Patent No. 5,470,590. Filed January 31, 1994.

D.M. Brienza and C.E. Brubaker, Steering linkage for short wheelbase four-wheeled vehicles, Patent No. 5,862,874 Filed June 19, 1997.

M. J. Brienza and D. M. Brienza, A Contour Replicating and Measuring Device, Patent No. 6,125,338. Filed April 22, 1998.

C.E. Brubaker and D. M. Brienza, Self-adjusting contouring cushioning system, Patent No. 6,519,797. Filed August 10, 2000

Sanna Gaspard  Mel Siegel  Todd M. Presbycien  James F. Antaki  David M. Brienza  Mark B. Friedman, Medical device for diagnosing pressure ulcers, Patent Application No. 20090234206 Filed 2009.

D.M. Brienza, Patricia E. Karg, Andrew Malkiewicz. Actively and selectively cooled cushioning surface Application number US 2014/0228918A1

*Peer Review and Editing Activities*

| | |
|---|---|
| 1992-present | RESNA SIG-09 (Wheeled Mobility and Seating), Reviewer of conference proceedings articles and instructional courses, |
| 1995-1997 | RESNA SIG-09 Review coordinator for papers, special sessions and instructional courses |
| 1993, 2002 | NSF Biomechanical Systems and Rehabilitation, Grant Reviewer |
| 1993-1995 | NIH SBIR/STTR Special Study Section Rehabilitation, Grant Reviewer |
| 1994 | NIH SBIR/STTR Special Study Section Safety, Grant Reviewer |
| 1995-1999 | IEEE Transactions on Rehabilitation Engineering, Assistant Editor |
| 1996-present | American Paraplegia Society, Grant Reviewer |
| 1997-present | Spinal Cord Research Foundation of Paralyzed Veterans of America, Grant Reviewer |
| 1997-present | Department of Veterans Affairs, Journal of Rehabilitation Research and Development, Reviewer |
| 1998-present | Advances in Skin and Wound Care, Reviewer, Editorial Board (2000-present) |

<u>David M. Brienza</u>

| | |
|---|---|
| 1999-present | Archives of Physical Medicine, Reviewer. |
| 2007-present | Journal of Clinical Biomechanics |
| 2007-present | Journal of Biomechanics |

**List of Current Research Interests:**

Pressure ulcer prevention
Assistive Technology – Wheeled Mobility, Seat Cushions, Support Surfaces
Telerehabilitation
Spinal Cord Injury
Exercise Technology

**Service**

*Service to the University of Pittsburgh and Health Center*

- o Provost's Ad-hoc IP and Copyright Policy Committee (2015-present)
- o CTSI Advisory Board (2012-present)
- o Coulter Oversight Committee (2012-2014)
- o University Senate Athletics Committee (2007-2010, 2010-13) (elected)
- o University Research Council (2000-2004)
- o Technology Management Advisory Committee (2002-present)
- o Health Science Information Technology Faculty Advisory Committee (2002-2004)
- o Central Research Development Fund Small Grants Program, Science and Engineering sub- committee – Chair (2000, 2002)
- o Academic Computing Council - Internet2 Pitt Faculty representative (2000)
- o Steering Committee for Health Promotion and Wellness (1999)
- o Health Sciences Space Committee SHRS rep. (2004-present)
- o University Public and Facilities Subcommittee of University Safety Committee (1995-1998)

*Service to the School of Health and Rehabilitation Sciences*

- o SHRS Ph.D. Steering Committee
- o SHRS Space Utilization Committee - Chair (2000-present)
- o SHRS Faculty Retreat 2000 Co-Chair
- o Appointment, Promotion, and Tenure (2004-2006, Elected Member) (1996, appointed)
- o SHRS Graduate Faculty Committee
- o SHRS Planning and Budgeting Committee (elected)
- o SHRS Ph.D. Admissions Committee
- o SHRS World Wide Web Planning Committee (Chair)
- o SHRS Space and Facilities Planning Committee
- o SHRS Marketing Task Force Committee
- o SHRS Aids Education Task Force Committee
- o SHRS IRB Scientific Review Committee
- o SHRS Planning and Budgeting Committee (elected)

**Appx196**

David M. Brienza

*Service to the Department of Rehabilitation Science and Technology*

- o  RST Curriculum Committee – Chair (1999-2006)
- o  RST Executive Committee
- o  RST Recruitment Committee
- o  RST Curriculum Committee
- o  RST New Building Committee
- o  RST computing and network resources administration

**Appx197**

Larry R. Laycock  (Bar No. 4868)
    *llaycock@mabr.com*
David R. Wright  (Bar No. 5164)
    *dwright@mabr.com*
Tyson K. Hottinger (Bar No. 13607)
    *thottinger@mabr.com*
Maschoff Brennan Laycock
    Gilmore Israelsen & Wright pllc
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone:   (435) 252-1360
Facsimile:   (435) 252-1361

Attorneys for plaintiff and counterdefendant ICON Health & Fitness, Inc.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| **ICON HEALTH & FITNESS, INC.**, a Delaware corporation,<br><br>    Plaintiff and counterdefendant,<br><br>    vs.<br><br>**POLAR ELECTRO OY**, a Finnish company, and **POLAR ELECTRO INC.**, a Delaware corporation,<br><br>    Defendants and counterclaimants.<br><br>AND RELATED COUNTERCLAIM. | Civil Action No. 1:11-cv-00167-BSJ<br><br>**ICON HEALTH & FITNESS, INC.'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Honorable Judge Bruce S. Jenkins |

Pursuant to Federal Rule of Evidence 201, plaintiff and counterdefendant ICON Health & Fitness Inc. requests that the Court take judicial notice of the following records from the United States Patent and Trademark Office ("PTO")—the authenticity of which can be accurately and readily determined from the PTO's website, the accuracy of which cannot reasonably be questioned:

1.     The following documents from the prosecution history file wrapper of U.S. Patent Application No. 11/545,018, which issued as U.S. Patent No. 8,512,238:

      a.     February 20, 2009 "Office Action Summary" reproduced as Exhibit 1 hereto;

      b.     May 15, 2009 "Reply to Non-final Office Action" reproduced as Exhibit 2 hereto; and

      c.     July 31, 2013 "Issue Notification" reproduced as Exhibit 3 hereto.

2.     The following documents from the prosecution history file wrapper of U.S. Patent Application No. 13/418,781, which issued as U.S. Patent No. 9,149,213:

      a.     December 9, 2014 "Response to Non-final Office Action" reproduced as Exhibit 4 hereto;

      b.     February 13, 2015 "Office Action Summary" reproduced as Exhibit 5 hereto;

      c.     May 13, 2015 "Response to Non-final Office Action" reproduced as Exhibit 6 hereto; and

      d.     September 16, 2015 "Issue Notification" reproduced as Exhibit 7 hereto.

3.     The following documents from the *ex parte* reexamination of U.S. Patent No.
6,701,271 that was assigned control no. 90/013,409:

     a.     February 6, 2015 "Corrected Request for Ex Parte Reexamination"
reproduced as Exhibit 8 hereto;

     b.     March 4, 2015 "Order Granting . . . Request for Ex Parte Reexamination"
reproduced as Exhibit 9 hereto;

     c.     May 4, 2015 "Patent Owner's Statement and Amendment under 37 C.F.R.
§ 1.530" reproduced as Exhibit 10 hereto;

     d.     July 7, 2015 "Office Action in an Ex Parte Reexamination" reproduced as
Exhibit 11 hereto;

     e.     August 27, 2015 "Ex Parte Reexamination Interview Summary"
reproduced as Exhibit 12 hereto;

     f.     August 28, 2015 "Patent Owner's Interview Summary" reproduced as
Exhibit 13 hereto;

     g.     August 28, 2015 "Amendment 'A' and Response to Non-final Office
Action" reproduced as Exhibit 14 hereto;

     h.     October 2, 2015 "Notice of Intent to Issue Ex Parte Reexamination
Certificate" reproduced as Exhibit 15 hereto;

     i.     October 5, 2015 "Comments on Statement of Reasons for Patentability
and/or Confirmation" reproduced as Exhibit 16 hereto; and

     j.     November 5, 2015 "Ex Parte Reexamination Certificate" reproduced as
Exhibit 17 hereto.

4.    The following documents from the *inter partes* reexamination of U.S. Patent No. 6,701,271 that was assigned control no. 95/002,337:

    a.    September 14, 2012 "Request for *Inter Partes* Reexamination of U.S. Patent No. 6,701,271 under 35 U.S.C. § 311 and 37 C.F'.R. §§ 1.913, 1.915" reproduced (without its own exhibits) as Exhibit 18 hereto;

    b.    December 7, 2012 "Office Action in *Inter Partes* Reexamination" reproduced as Exhibit 19 hereto;

    c.    December 7, 2012 "Order Granting . . . Request for *Inter Partes* Reexamination" reproduced as Exhibit 20 hereto;

    d.    March 7, 2013 "Amendment A and Response to Non-final Action" reproduced as Exhibit 21 hereto;

    e.    April 8, 2013 "Comments by Third Party Requesters to Patent Owner's Response in *Inter Partes* Reexamination Under 37 C.F.R. § 1.947" reproduced (without its own exhibits and appendices) as Exhibit 22 hereto;

    f.    August 12, 2013 "Action Closing Prosecution" reproduced as Exhibit 23 hereto;

    g.    September 12, 2013 "Amendment B and Response to Action Closing Prosecution" reproduced (without its own exhibits) as Exhibit 24 hereto;

    h.    October 15, 2013 "Comments by Third Parry Requesters to Patent Owner's Response to Action Closing Prosecution (ACP)" reproduced as Exhibit 25 hereto;

i.      January 23, 2014 "Right of Appeal Notice" reproduced as Exhibit 26 hereto;

j.      February 21, 2014 "Third Party Requesters' Notice of Appeal in *Inter Partes* Reexamination" reproduced as Exhibit 27 hereto;

k.      March 7, 2014 "Patent Owner's Notice of Cross Appeal Under 37 C.F.R. § 41.61(b)(1)" reproduced as Exhibit 28 hereto;

l.      May 6, 2014 "Patent Owner's Brief on Appeal Under 37 C.F.R. § 41.67" reproduced (without its own exhibits) as Exhibit 29 hereto;

m.     May 7, 2014 "Third Party Requesters' Brief on Appeal Under 37 C.F.R. § 41.67" reproduced (without its own exhibits) as Exhibit 30 hereto;

n.      June 6, 2014 "Third-Party Requesters' Respondent Brief Under 37 C.F.R. § 41.68" reproduced as Exhibit 31 hereto;

o.      June 9, 2014 "Patent Owner's Respondent Brief Under 37 C.F.R. § 41.68" reproduced as Exhibit 32 hereto;

p.      September 19, 2014 "Inter Partes Reexamination Examiner's Answer" reproduced as Exhibit 33 hereto;

q.      October 17, 2014 "Patent Owner's Rebuttal Brief Under 37 C.F.R. § 41.71" reproduced as Exhibit 34 hereto;

r.      October 20, 2014 "Third-Party Requester's Rebuttal Brief on Appeal Under 37 C.F.R. § 41.71" reproduced as Exhibit 35 hereto;

s.      August 31, 2015 "Decision on Appeal" reproduced as Exhibit 36 hereto;

t.      October 28, 2015 "Order" reproduced as Exhibit 37 hereto;

u.    February 25, 2016 "Notcie of Intent to Issue Inter Partes Reexamination Certificate" reproduced as Exhibit 38 hereto; and

v.    March 31, 2016 "Inter Partes Reexamination Certificate" reproduced as Exhibit 39 hereto.

Dated:  October 28, 2016

Larry R. Laycock
David R. Wright
Tyson K. Hottinger
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT PLLC

By:  /s/ *Tyson K. Hottinger*
       Tyson K. Hottinger
Attorneys for plaintiff and counterdefendant ICON
HEALTH & FITNESS, INC.

**Appx203**

# EXHIBIT 1



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/545,018 | 10/06/2006 | Juuso Nissilä | 187-110 | 8110 |

23869      7590      02/20/2009
HOFFMANN & BARON, LLP
6900 JERICHO TURNPIKE
SYOSSET, NY 11791

| EXAMINER |
|---|
| RAJAN, KAI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3769 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/20/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| | Application No. | Applicant(s) |
|---|---|---|
| | 11/545,018 | NISSILA ET AL. |
| ***Office Action Summary*** | **Examiner** | **Art Unit** | |
| | KAI RAJAN | 3769 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE *3* MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>13 November 2008</u>.
2a)☐ This action is **FINAL**.     2b)☒ This action is non-final.
3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) *1,3-6,8-11,13-16 and 18-29* is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5)☐ Claim(s) _____ is/are allowed.
6)☒ Claim(s) *1, 3-6, 8-11, 13-16, 18-29* is/are rejected.
7)☐ Claim(s) _____ is/are objected to.
8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.
10)☐ The drawing(s) filed on _____ is/are:  a)☐ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All  b)☐ Some * c)☐ None of:
      1.☐ Certified copies of the priority documents have been received.
      2.☐ Certified copies of the priority documents have been received in Application No. _____.
      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)
2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3)☐ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____.
5)☐ Notice of Informal Patent Application
6)☐ Other: _____.

Application/Control Number: 11/545,018                                              Page 2
Art Unit: 3769

## DETAILED ACTION

Examiner acknowledges the amendment filed November 13, 2008.

Note to Applicant Regarding Claim Interpretation

The term "configured to" in the claim(s) may be interpreted as intended use.  Intended use/functional language does not require that reference specifically teach the intended use of the element.  A recitation of the intended use of the claimed invention must result in a structural difference between the claimed invention and the prior art in order to patentably distinguish the claimed invention from the prior art.  If the prior art structure is capable of performing the intended use, then it meets the claim.

### *Claim Rejections - 35 USC § 101*

35 U.S.C. 101 reads as follows:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

Claims 1, 3 – 5, 22 and 23 are rejected under 35 U.S.C. 101 because the claimed invention is directed to non-statutory subject matter. In particular, claims 1, 3 – 5, 22 and 23 are drawn to a process. Under 35 U.S.C. §101 a process must 1) be tied to another statutory class (such as a particular apparatus) or 2) transform underlying subject matter (such as an article or materials) to a different state or thing. The claimed process steps do not transform underlying subject matter. Thus, to qualify as a 35 U.S.C. § 101 statutory process, the claims should

Application/Control Number: 11/545,018                                                    Page 3
Art Unit: 3769

positively recite the other statutory class (apparatus or thing) to which it is tied, for example by

identifying the apparatus that accomplishes the method steps.

Furthermore, claims 1, 3 – 5, 22 and 23 are rejected under 35 U.S.C. 101 because the

method steps do not provide a tangible result.  In particular, the method steps of the

aforementioned claims do not physically transform anything, and also do not provide display

information or provide a human observable result.

The Applicant is invited to explain, to make the record clear, reasons that the rejections

under 35 U.S.C. 101 do not apply.


### *Claim Rejections - 35 USC § 112*

The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 6 – 10, 24 and 25 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.  In particular, it is unclear to the Examiner whether "a

performance power determination unit," "an exertion level determination unit," and "a

performance estimation unit" comprise structure, or are merely software.  If the aforementioned

units are merely software, they are given limited patentable weight since they impart no

additional limiting *structure* on the apparatus claims.  The Applicant is suggested to positively

claim a processor that executes the claimed software, pending sufficient support from the written

disclosure, or is invited to explain the structure embodied by the aforementioned units.

Application/Control Number: 11/545,018                                    Page 4
Art Unit: 3769

    The Applicant is invited to explain, to make the record clear, reasons that the rejection

under 35 U.S.C. 112, second paragraph, do not apply.


                        ***Claim Rejections - 35 USC § 102***

    The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

        A person shall be entitled to a patent unless –

        (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on
        sale in this country, more than one year prior to the date of application for patent in the United States.

    **Claims 1, 3, 4, 6, 8, 9, 11, 13, 14, and 22 – 27 are rejected under 35 U.S.C. 102(b) as**

**being anticipated by Blau et al. U.S. Patent No. 6,176,241.**


    1. A method for determining the performance of the user of a user- specific performance

monitor on the basis of a physical exercise by the user, comprising:

        determining the performance power of the physical exercise by means of user movement

data registered by the user-specific performance monitor (Column 6 lines 24 – 66 VO2);

        determining the exertion level corresponding to the performance power of the physical

exercise by means of physiological information measured from the user, the physiological

information being registered by the user-specific performance monitor (Column 8 lines 1 – 51

HR);

        estimating the user's performance by means of the performance power of the physical

exercise and the exertion level corresponding to the performance power of the physical exercise

(Column 12 lines 8 – 52 training zones); and

Application/Control Number: 11/545,018                                              Page 5
Art Unit: 3769

taking into account the effect of the exertion history on the physiological information

measured (Column 11 lines 45 – 67, column 12 lines 1 – 52 training intensity levels are

identified and used for performance evaluation later).


3. A method according to claim 1, further comprising taking into account the effect of the

exertion history on the physiological information measured from the user by selecting the

performance power data characterizing the performance power of the physical exercise and the

exertion data characterizing the exertion level corresponding to the performance power of the

physical exercise, used in estimating performance, on the basis of the exertion history (Column

10 lines 8 – 51 HR corresponding to VO2 is determined).


4. A method according to claim 1, further comprising taking into account the effect of the

exertion history on the physiological information measured from the user by transforming the

exertion data characterizing the exertion level corresponding to the performance power of the

physical exercise to a constant exertion history point (Column 10 lines 8 – 51 HR corresponding

to VO2 max is determined).


6. A user-specific performance monitor comprising:

performance power determination unit for determining the performance power of a

physical exercise by the user by means of user movement data (Column 6 lines 24 – 66 VO2);

Application/Control Number: 11/545,018                                               Page 6
Art Unit: 3769

exertion level determination unit for determining the exertion level corresponding to the users physical exercise by means of physiological information measured from the user (Column 8 lines 1 – 51 HR); and

performance estimation unit for estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise, the performance estimation unit being configured to take into account the effect of the exertion history on the physiological information measured from the user (Column 11 lines 45 – 67, column 12 lines 1 – 52 training zones, training intensity levels are identified and used for performance evaluation later).


8. A user-specific performance monitor according to claim 7, wherein the performance estimation unit is configured to take into account the effect of the exertion history on the physiological information measured from the user by selecting the performance power data characterizing the performance power of the physical exercise and the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise, used in the estimation, on the basis of the exertion history (Column 10 lines 8 – 51 HR corresponding to VO2 is determined).


9. A user-specific performance monitor according to claim 7, wherein the performance power estimation unit is configured to take into account the effect of the exertion history on the physiological information measured from the user by transforming the exertion data characterizing the exertion level corresponding to the performance power of the physical

Application/Control Number: 11/545,018                                              Page 7
Art Unit: 3769

exercise to a constant exertion history point (Column 10 lines 8 – 51 HR corresponding to VO2

max is determined).

    11. A user-specific performance monitor comprising:

    performance power determination means for determining the performance power of a

physical exercise by the user by means of user movement data (Column 6 lines 24 – 66 VO2);

    exertion level determination means for determining the exertion level corresponding to

the user's physical exercise by means of physiological information measured from the user

(Column 8 lines 1 – 51 HR); and

    performance estimation means for estimating the user's performance by means of the

performance power of the physical exercise and the exertion level corresponding to the

performance power of the physical exercise, the performance estimation means being configured

to take into account the effect of the exertion history on the physiological information measured

from the user (Column 11 lines 45 – 67, column 12 lines 1 – 52 training zones, training intensity

levels are identified and used for performance evaluation later).

    13. A user-specific performance monitor according to claim 12, wherein the performance

estimation means are configured to take into account the effect of the exertion history on the

physiological information measured from the user by selecting the performance power data

characterizing the performance power of the physical exercise and the exertion data

characterizing the exertion level corresponding to the performance power of the physical

Application/Control Number: 11/545,018                                    Page 8
Art Unit: 3769

exercise, used in the estimation, on the basis of the exertion history (Column 10 lines 8 – 51 HR

corresponding to VO2 is determined).

14. A user-specific performance monitor according to claim 12, wherein the performance

power estimation means are configured to take into account the effect of the exertion history on

the physiological information measured from the user by transforming the exertion data

characterizing the exertion level corresponding to the performance power of the physical

exercise to a constant exertion history point (Column 10 lines 8 – 51 HR corresponding to VO2

max is determined).

22. A method according to claim 1, further comprising taking into account the effect of

the exertion history on the physiological information by using previously known exertion curves

(Column 11 lines 45 – 67, column 12 lines 1 – 52 training intensity levels are identified and used

for performance evaluation later).

23. A method according to claim 1, wherein the exertion history is proportional to a

variable characterizing time history (Table 1 threshold identification method factors).

24. A user specific performance monitor according to claim 6, wherein the performance

estimation unit is configured to take into account the effect of the exertion history on the

physiological information by using previously known exertion curves (Column 11 lines 45 – 67,

Application/Control Number: 11/545,018                                    Page 9
Art Unit: 3769

column 12 lines 1 – 52 training intensity levels are identified and used for performance

evaluation later).


25. A user-specific performance monitor according to claim 6, wherein the exertion

history is proportional to a variable characterizing time history (Table 1 threshold identification

method factors).


26. A user specific performance monitor according to claim 11, wherein the performance

estimation unit is configured to take into account the effect of the exertion history on the

physiological information by using previously known exertion curves (Column 11 lines 45 – 67,

column 12 lines 1 – 52 training intensity levels are identified and used for performance

evaluation later).


27. A user-specific performance monitor according to claim 11, wherein the exertion

history is proportional to a variable characterizing time history (Table 1 threshold identification

method factors).


**Claims 1, 5, 6, 10, 11, and 15 are rejected under 35 U.S.C. 102(e) as being**

**anticipated by Shallenberger U.S. PGPub No. 2005/0228237.**


<u>1</u>. A method for determining the performance of the user of a user- specific performance

monitor on the basis of a physical exercise by the user, comprising:

Application/Control Number: 11/545,018                                      Page 10
Art Unit: 3769

determining the performance power of the physical exercise by means of user movement data registered by the user-specific performance monitor (Paragraph 0015 watts);

determining the exertion level corresponding to the performance power of the physical exercise by means of physiological information measured from the user, the physiological information being registered by the user-specific performance monitor (Paragraph 0015 HR);

estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise (Paragraphs 0014 – 0017, 0031 estimating biological age and training zones); and

taking into account the effect of the exertion history on the physiological information measured (Paragraph 0017 breath and heart rate samples at rest).


5. A method according to claim 1, further comprising estimating the user's performance by using at least one of the following pieces of physical information: the user's maximum pulse rate, the user's rest pulse rate (Paragraph 0017 heart rate samples at rest).


6. A user-specific performance monitor comprising:

performance power determination unit for determining the performance power of a physical exercise by the user by means of user movement data (Paragraph 0015 watts);

exertion level determination unit for determining the exertion level corresponding to the users physical exercise by means of physiological information measured from the user (Paragraph 0015 HR); and

Application/Control Number: 11/545,018                                    Page 11
Art Unit: 3769

performance estimation unit for estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise, the performance estimation unit being configured to take into account the effect of the exertion history on the physiological information measured from the user (Paragraphs 0014 – 0017, 0031 estimating biological age and training zones, and heart rate samples at rest).

10. A user-specific performance monitor according to claim 6, wherein the performance estimation unit is further configured to estimate the user's performance by using at least one of the following pieces of physiological information: the user's maximum pulse rate, the user's rest pulse rate (Paragraph 0017 heart rate samples at rest).

11. A user-specific performance monitor comprising:

performance power determination means for determining the performance power of a physical exercise by the user by means of user movement data (Paragraph 0015 watts);

exertion level determination means for determining the exertion level corresponding to the user's physical exercise by means of physiological information measured from the user (Paragraph 0015 HR); and

performance estimation means for estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise, the performance estimation means being configured to take into account the effect of the exertion history on the physiological information measured

Application/Control Number: 11/545,018                                        Page 12
Art Unit: 3769

from the user (Paragraphs 0014 – 0017, 0031 estimating biological age and training zones, and

heart rate samples at rest).


     15. A user-specific performance monitor according to claim 11, wherein the performance

estimation means are further configured to estimate the user's performance by using at least one

of the following pieces of physiological information: the user's maximum pulse rate, the user's

rest pulse rate (Paragraph 0017 heart rate samples at rest).


### *Claim Rejections - 35 USC § 103*

     The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
> section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are
> such that the subject matter as a whole would have been obvious at the time the invention was made to a person
> having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the
> manner in which the invention was made.

    **Claims 16, 18 – 21, 28, and 29 are rejected under 35 U.S.C. 103(a) as being**

**unpatentable over Blau et al. U.S. Patent No. 6,176,241.**


     In regards to claim 16, Blau et al. discloses a process comprising:

     determining the performance power of the physical exercise by the user by means of user

movement data registered by the user-specific performance monitor (Column 6 lines 24 – 66

VO2);

     determining the exertion level corresponding to the performance power of the physical

exercise by the user by means of physiological information measured from the user, the

Application/Control Number: 11/545,018                                              Page 13
Art Unit: 3769

physiological information being registered by the user-specific performance monitor (Column 8

lines 1 – 51 HR); and

estimating the user's performance by means of the performance power of the physical

exercise and the exertion level corresponding to the performance power of the physical exercise

(Column 12 lines 8 – 52 training zones); and

taking into account the effect of the exertion history on the physiological information

measured from the user (Column 11 lines 45 – 67, column 12 lines 1 – 52 training intensity

levels are identified and used for performance evaluation later).

Blau et al. does not explicitly state the equipment that performs the process.  However, it

would have been obvious to one of ordinary skill in the art at the time of the invention to perform

a method and calculations either by hand or a computer readable medium with a processor.  In

other words it would have been obvious to one of ordinary skill in the art at the time the

invention was made to use a processor to perform calculations.


18. A computer program according to claim 16, further comprising:

receiving the user's movement data from the user-specific performance monitor (Column

10 lines 8 – 51); and

receiving physiological information measured from the user from the user-specific

performance monitor (Column 10 lines 8 – 51).


21. A computer program according to claim 16, further comprising taking into account

the effect of the exertion history on the physiological information measured from the user by

Application/Control Number: 11/545,018                                      Page 14
Art Unit: 3769

transforming the exertion data characterizing the exertion level corresponding to the performance

power of the physical exercise to a constant exertion history point (Column 10 lines 8 – 51 HR

corresponding to VO2 max is determined).

28. A computer program according to claim 16, further comprising taking into account

the effect of the exertion history on the physiological information by using previously known

exertion curves (Column 11 lines 45 – 67, column 12 lines 1 – 52 training intensity levels are

identified and used for performance evaluation later).

29. A computer program according to claim 16, wherein the exertion history is

proportional to a variable characterizing time history (Table 1 threshold identification method

factors).

**Claims 16, 19, and 20 are rejected under 35 U.S.C. 103(a) as being unpatentable**

**over Shallenberger U.S. PGPub No. 2005/0228237**.

Regarding claims 16, 19, and 20, Shallenberger discloses a process comprising:

determining the performance power of the physical exercise by the user by means of user

movement data registered by the user-specific performance monitor (Paragraph 0015 watts);

determining the exertion level corresponding to the performance power of the physical

exercise by the user by means of physiological information measured from the user, the

Application/Control Number: 11/545,018                                    Page 15
Art Unit: 3769

physiological information being registered by the user-specific performance monitor (Paragraph
0015 HR); and

    estimating the user's performance by means of the performance power of the physical
exercise and the exertion level corresponding to the performance power of the physical exercise
(Paragraphs 0014 – 0017, 0031 estimating biological age and training zones); and

    taking into account the effect of the exertion history on the physiological information
measured from the user (Paragraph 0017 breath and heart rate samples at rest).

    Shallenberger does not explicitly state the equipment that performs the process.
However, it would have been obvious to one of ordinary skill in the art at the time of the
invention to perform a method and calculations either by hand or a computer readable medium
with a processor.  In other words it would have been obvious to one of ordinary skill in the art at
the time the invention was made to use a processor to perform calculations.


*Response to Arguments*

    Applicant's arguments been considered but are moot in view of the new ground(s) of
rejection.  Although the Examiner neither agrees nor disagrees with Applicant's remarks
regarding the previously applied art, the previous rejection has been withdrawn, and a new non-
final rejection is presented above.

Application/Control Number: 11/545,018                                    Page 16
Art Unit: 3769

*Conclusion*

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to KAI RAJAN whose telephone number is (571)272-3077.  The

examiner can normally be reached on Monday - Friday 9:00AM to 4:00PM.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published applications

may be obtained from either Private PAIR or Public PAIR.  Status information for unpublished

applications is available through Private PAIR only.  For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would

like assistance from a USPTO Customer Service Representative or access to the automated

information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/Kai Rajan/
Examiner, Art Unit 3736

/Michael C. Astorino/
Primary Examiner, Art Unit 3769

February 17, 2009

# EXHIBIT 2

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant(s) | : | Nissilä et al. |
| Application No. | : | 11/545,018 |
| Filed | : | October 6, 2006 |
| Title | : | METHOD, PERFORMANCE MONITOR AND COMPUTER PROGRAM FOR DETERMINING PERFORMANCE |
| | | |
| TC/A.U. | : | 3736 |
| Examiner | : | Kai Rajan |
| | | |
| Confirmation No. | : | 8110 |
| Docket No. | : | 187-110 |
| Dated | : | May 15, 2009 |

Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia  22313-1450

<u>**Certificate of EFS-Web Transmission**</u>

I hereby certify that this correspondence is being transmitted to the U.S. Patent and Trademark Office via the Office's electronic filing system on  <u>**May 15, 2009**</u>

<u>Joyce Peterson</u>        <u>    /joyce peterson/    </u>
(Printed Name)              (Signature)

## <u>REPLY TO NON-FINAL OFFICE ACTION</u>

Sir:

      In response to the non-final Office Action mailed February 20, 2009, a reply to which is due by May 20, 2009, please amend the above-identified application as follows:

      **Amendments to the Claims** are reflected in the listing of claims that begins on page 2 of this paper.

      **Remarks** begin on page 10 of this paper.

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 2 of 18

## IN THE CLAIMS:

*The following listing of claims will replace all prior versions and listings of claims in the application:*

1.      (Currently Amended) A method for determining ~~the~~ a performance of ~~the a~~ user ~~of~~ using a user-specific performance monitor on the basis of a physical exercise by the user, comprising:

determining by the user-specific performance monitor ~~the~~ a performance power of the physical exercise by means of user movement data registered by the user-specific performance monitor, wherein the performance power is the physical performance power released from the user during the physical exercise;

determining by the user-specific performance monitor ~~the~~ an exertion level corresponding to the performance power of the physical exercise by means of physiological information measured from the user, wherein the exertion level is an expression of a tendency of the user's body to compensate for a change in metabolism caused by the physical exercise, the physiological information being registered by the user-specific performance monitor; and

estimating by the user-specific performance monitor ~~the~~ a user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise by taking into account the effect of the exertion history on the physiological information measured~~; and~~

~~taking into account the effect of the exertion history on the physiological information measured~~.

2.      (Cancelled)

**Appx224**

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 3 of 18

3.      (Currently Amended) A method according to claim 1, further comprising taking into account by the user-specific performance monitor the effect of the exertion history on the physiological information measured from the user by selecting the performance power data characterizing the performance power of the physical exercise and the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise, used in estimating performance, on the basis of the exertion history.

4.      (Currently Amended) A method according to claim [[2]] 1, further comprising taking into account by the user-specific performance monitor the effect of the exertion history on the physiological information measured from the user by transforming the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise to a constant exertion history point.

5.      (Currently Amended) A method according to claim 1, further comprising estimating the user's performance by the user-specific performance monitor by using at least one of the following pieces of physical information: the user's maximum pulse rate, the user's rest pulse rate.

6.      (Currently Amended) A user-specific performance monitor comprising:

a performance power determination unit for determining the performance power of a physical exercise by the user by means of user movement data, wherein the performance power is the physical performance power released from the user during the physical exercise;

an exertion level determination unit for determining the exertion level corresponding to the user's physical exercise by means of physiological information measured from the user, wherein the exertion level is an expression of a tendency of the user's body to compensate for a change in metabolism caused by the physical exercise; and

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 4 of 18

a performance estimation unit for estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise, the performance estimation unit ~~being configured to take~~ taking into account the effect of the exertion history on the physiological information measured from the user <u>the performance determination unit, exertion determination unit, and the performance estimation unit comprising at least one processing device</u>.

7.      (Cancelled)

8.      (Previously Presented)  A user-specific performance monitor according to claim 6, wherein the performance estimation unit is configured to take into account the effect of the exertion history on the physiological information measured from the user by selecting the performance power data characterizing the performance power of the physical exercise and the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise, used in the estimation, on the basis of the exertion history.

9.      (Previously Presented)  A user-specific performance monitor according to claim 6, wherein the performance power estimation unit is configured to take into account the effect of the exertion history on the physiological information measured from the user by transforming the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise to a constant exertion history point.

10.      (Original)  A user-specific performance monitor according to claim 6, wherein the performance estimation unit is further configured to estimate the user's performance by using at least one of the following pieces of physiological information: the user's maximum pulse rate, the user's rest pulse rate.

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 5 of 18

11.     (Currently Amended)  A user-specific performance monitor comprising:

performance power determination means for determining the performance power of a physical exercise by the user by means of user movement data, wherein the performance power is the physical performance power released from the user during the physical exercise;

exertion level determination means for determining the exertion level corresponding to the user's physical exercise by means of physiological information measured from the user, wherein the exertion level is an expression of a tendency of the user's body to compensate for a change in metabolism caused by the physical exercise; and

performance estimation means for estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise, the performance estimation means ~~being configured to take~~ taking into account the effect of the exertion history on the physiological information measured from the user.

12.     (Cancelled)

13.     (Previously Presented)  A user-specific performance monitor according to claim 11, wherein the performance estimation means are configured to take into account the effect of the exertion history on the physiological information measured from the user by selecting the performance power data characterizing the performance power of the physical exercise and the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise, used in the estimation, on the basis of the exertion history.

14.     (Previously Presented)  A user-specific performance monitor according to claim 11, wherein the performance power estimation means are configured to take into account the effect of the exertion history on the physiological information measured from the user by

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 6 of 18

transforming the exertion data characterizing the exertion level corresponding to the performance

power of the physical exercise to a constant exertion history point.

15.    (Original)  A user-specific performance monitor according to claim 11, wherein

the performance estimation means are further configured to estimate the user's performance by

using at least one of the following pieces of physiological information: the user's maximum pulse

rate, the user's rest pulse rate.

16.    (Currently Amended)  A computer program for determining the performance of

the user of a user-specific performance monitor, which computer program comprises coded

instructions for executing a computer process in a digital processor, the computer process

comprising:

determining the performance power of the physical exercise by the user by means of user

movement data registered by the user-specific performance monitor, wherein the performance

power is the physical performance power released from the user during the physical exercise;

determining the exertion level corresponding to the performance power of the physical

exercise by the user by means of physiological information measured from the user, wherein the

exertion level is an expression of a tendency of the user's body to compensate for a change in

metabolism caused by the physical exercise, the physiological information being registered by

the user-specific performance monitor;

estimating the user's performance by means of the performance power of the physical exercise

and the exertion level corresponding to the performance power of the physical exercise by taking into

account the effect of the exertion history on the physiological information measured; and

~~taking into account the effect of the exertion history on the physiological information~~

~~measured from the user~~.

**Appx228**

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 7 of 18

17.     (Cancelled)

18.     (Original)  A computer program according to claim 16, further comprising:

receiving the user's movement data from the user-specific performance monitor; and

receiving physiological information measured from the user from the user-specific
performance monitor.

19.     (Original)  A computer software product according to claim 16, comprising the
computer program.

20.     (Original)  A distribution medium according to claim 16, comprising the
computer program.

21.     (Previously Presented)  A computer program according to claim 16, further
comprising taking into account the effect of the exertion history on the physiological information
measured from the user by transforming the exertion data characterizing the exertion level
corresponding to the performance power of the physical exercise to a constant exertion history
point.

22.     (Currently Amended) A method according to claim 1, further comprising taking
into account by the user-specific performance monitor the effect of the exertion history on the
physiological information by using previously known exertion curves.

23.     (Previously Presented)  A method according to claim 1, wherein the exertion
history is proportional to a variable characterizing time history.

24.     (Previously Presented)  A user specific performance monitor according to claim 6,
wherein the performance estimation unit is configured to take into account the effect of the
exertion history on the physiological information by using previously known exertion curves.

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 8 of 18

25.     (Previously Presented)  A user-specific performance monitor according to claim 6, wherein the exertion history is proportional to a variable characterizing time history.

26.     (Previously Presented)  A user specific performance monitor according to claim 11, wherein the performance estimation unit is configured to take into account the effect of the exertion history on the physiological information by using previously known exertion curves.

27.     (Previously Presented)  A user-specific performance monitor according to claim 11, wherein the exertion history is proportional to a variable characterizing time history.

28.     (Previously Presented)  A computer program according to claim 16, further comprising taking into account the effect of the exertion history on the physiological information by using previously known exertion curves.

29.     (Previously Presented)  A computer program according to claim 16, wherein the exertion history is proportional to a variable characterizing time history.

30.     (New)    A method for determining a performance of a user using a user-specific performance monitor on the basis of a physical exercise by the user, comprising:

determining by the user-specific performance monitor a performance power of the physical exercise by means of user movement data registered by the user-specific performance monitor, wherein the performance power is the physical performance power released from the user during the physical exercise;

determining by the user-specific performance monitor an exertion level corresponding to the performance power of the physical exercise by means of physiological information measured from the user, wherein the exertion level is an expression of a tendency of the user's body to

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 9 of 18

compensate for a change in metabolism caused by the physical exercise, the physiological information being registered by the user-specific performance monitor; and

estimating by the user-specific performance monitor a user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise by taking into account the effect of the exertion history on the physiological information measured by transforming the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise to a constant exertion history point.

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 10 of 18

<u>**REMARKS**</u>

Pursuant to the non-final Office Action mailed February 20, 2009, which has been carefully considered, Applicants respectfully request reconsideration.  To further prosecution of this application, each of the issues raised in the Office Action is addressed herein.

Claims 1, 3-6, 8-11, 13-16, and 18-30 are currently pending in this application, of which Claims 1, 6, 11, and 16 are independent claims.  Claims 1, 3-6, 11, 16, and 22 have been amended and Claim 30 has been added to further clarify that which the Applicants regard as the invention.  Support for these amendments is provided throughout the specification, claims, and drawings, as originally filed.  Specifically, support for the claim amendments is provided at paragraph [0024] - [0026].   The application as now presented is believed to be in allowable condition.

A.    <u>Claim Interpretation</u>

The Examiner notes that the terms "configured to" may be interpreted as indicating an intended use.  Accordingly, Claims 6 and 11 have been amended to substitute for "the performance estimation unit taking into account the effect of the exertion history" with "the performance estimation unit being configured to take into account the effect of the exertion history".

B.    <u>Claim Rejections under 35 U.S.C. §101</u>

Claims 1, 3-5, and 23 were rejected under 35 U.S.C. §101 as being directed to non-statutory subject matter.  Accordingly, Claims 1, 3-5, and 22 have been amended to recite that the elements are performed by the user-specific performance monitor.  Therefore, it is requested that the rejection of Claims 1, 3-5, 22, and 23 be reconsidered and withdrawn.

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 11 of 18

The Office Action further comments regarding Claims 1, 3-5, 22, and 23 as not providing a tangible result are incorrect as they relay on the Freeman-Walter-Abele test from *State Street v. Signature Financial Group* that was specifically discarded by the CAFC in *In re Bilski* in preference for the "machine or transformation" test.

C.    Claim Rejections under 35 U.S.C. §112

Claims 6-10, 24, and 25 were rejected under 35 U.S.C. §112, second paragraph, as being indefinite.  The Office Action indicates that it is unclear whether the performance power determination unit, exertion level determination unit, and performance estimation unit include structure or are merely software.  However, it is clear that the user-specific performance monitor recited in Claim 6 requires that each of these units be more than merely software since software alone could not perform the functions of a user-specific performance monitor as claimed. Examples of implementations of these units are provided at paragraphs [0049], [0052], [0063], [0095], and [0106] – [0110] of the specification.  Accordingly, Claim 6 was amended to further clarify that these units include at least one processing device.  Therefore, it is requested that the rejection of Claims 6-10, 24, and 25 under 35 U.S.C. §112 second paragraph, be reconsidered and withdrawn.

D.    Claim Rejections under 35 U.S.C. §102 and §103

Claims 1, 3, 4, 6, 8, 9, 11, 13, 14, and 22-27 were rejected as being anticipated by U.S. Patent No. 6,176,241 to Blau et al. (*Blau*).  Claims 1, 5, 6, 10, 11, and 15 were rejected as being anticipated by U.S. Publication No. 2005/0228237 to Shallenberger (*Shallenberger*).  Claims 16, 18-21, 28, and 29 were rejected as being obvious over *Blau,* and Claims 1, 5, 6, 10, 11, and 15 were rejected as being obvious over *Shallenberger*.

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 12 of 18

Specifically, the Office Action indicates that the first element of Claim 1 (determining the performance power of the physical exercise by means of user movement data registered by the user-specific performance monitor) is described at column 6, lines 24-66 of *Blau* in its reference to $VO_2$ (oxygen consumption).  However, it is submitted that this portion of *Blau* merely describes measurement of fitness and identification of optimum intensity to establish zones related to anaerobic threshold (AT), respiratory compensation point (RCP), and/or $VO_2$ max.  The identification of AT and RCP are made through blood tests, gas exchange measurements, and other metabolic phenomena, but are not derived from user-movement data, as required by Claims 1, 6, 11, 16, and 30, such as velocity, acceleration, and/or movement parameters measured from the pedal of equipment, as disclosed at paragraph [0025] of the specification.  Also, $VO_2$ is not determined in the cited portion of *Blau*; just AT and RCP.

Regarding the second element of Claim 1 (determining the exertion level corresponding to the performance power of the physical exercise by means of physiological information measured from the user) the Office Action indicates that column 8, lines 1-51 describe this feature with respect to heart rate.  However, this portion of *Blau* merely refers to the calculation of AT and RCP while mentioning that $VO_2$ max is determined at the point of exercise-intolerance or volitional fatigue, but does not suggest determining exertion level corresponding to performance power by means of physiological information measured from the user, as required by Claims 1, 6, 11, 16, and 30, such as the pulse rate frequency, pulse rate interval, and/or variations of the pulse rate interval, as disclosed at paragraph [0027] of the specification.

Regarding the third element of Claim 1 (estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise) the Office Action indicates that column 12, lines 8-52 of *Blau* describe this feature with respect to training zones.  However, the cited portion of *Blau* refer to varying the intensity of training during exercise sessions, recalculating heart rate

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 13 of 18

zones, and determining when to change intensity based on habitual activity in the fitness level, but does not suggest estimating the user's performance from performance power and exertion level, as required by Claims 1, 6, 11, 16, and 30.

Regarding the fourth element of Claim 1 (taking into account the effect of the exertion history on the physiological information measured) the Office Action indicates that column 11, lines 45-67 and column 12, lines 1-52 of *Blau* describe this feature with respect to training intensity levels being identified and used for subsequent performance evaluation.  However, the additional cited portions of *Blau,* beyond those referred to with respect to the third element of Claim 1, merely indicate that any zone can encompass any training intensity as determined by the heart rate or $VO_2$ (which can range from $VO_2$ or heart rate at 50% of the anaerobic threshold to heart rate or $VO_2$ at the user's $VO_{2max}$) but do not suggest taking into account the exertion history of the physiological information measured, as required by Claims 1, 6, 11, 16, and 30.

Regarding Claim 4, the Office Action indicates that column 10, lines 8-51 of *Blau* describes transforming the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise to a constant exertion history point with reference to the heart rate corresponding to $VO_{2max}$.  However, the heart rate corresponding to $VO_{2max}$ is not a constant exertion history point, since at this stage of exercise the exertion level of the user clearly exhibits uncharacteristic maximums (similar to that of the exertion level after $T_F$ in Figure 9 of the subject application) rather than that of the constant exertion point defined between $T_C$ and $T_F$ in Figure 9.

The present invention is directed to a method for determining a performance of a user of a user-specific performance monitor on the basis of a physical exercise by the user, which includes determining the performance power of the physical exercise by means of user movement data registered by the user-specific performance monitor, wherein the performance power is the physical performance power released from the user during the physical exercise,

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 14 of 18

determining the exertion level corresponding to the performance power of the physical exercise
by means of physiological information measured from the user, wherein the exertion level is an
expression of a tendency of the user's body to compensate for a change in metabolism caused by
the physical exercise, and estimating the user's performance by means of the performance power
of the physical exercise and the exertion level corresponding to the performance power of the
physical exercise by taking into account the effect of the exertion history on the physiological
information measured.  The physiological information is registered by the user-specific
performance monitor.

The present invention is further directed to a user-specific performance monitor, which
includes a performance power determination unit, an exertion level determination unit, and a
performance estimation unit.  The performance power determination unit determines the
performance power of a physical exercise by the user by means of user movement data, wherein
the performance power is the physical performance power released from the user during the
physical exercise.  The exertion level determination unit determines the exertion level
corresponding to the user's physical exercise by means of physiological information measured
from the user, wherein the exertion level is an expression of a tendency of the user's body to
compensate for a change in metabolism caused by the physical exercise,.  The performance
estimation unit estimates the user's performance by means of the performance power of the
physical exercise and the exertion level corresponding to the performance power of the physical
exercise.  The performance power estimation unit is configured to take into account the effect of
the exertion history on the physiological information measured from the user.  The performance
determination unit, the performance determination unit, exertion determination unit, and the
performance estimation unit comprising at least one processing device, as now defined by
amended Claim 6.

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 15 of 18

The present invention is yet further directed to a user-specific performance monitor, which includes a performance power determination means, an exertion level determination means, and a performance estimation means.  The performance power determination means determines the performance power of a physical exercise by the user by means of user movement data, wherein the performance power is the physical performance power released from the user during the physical exercise.  The exertion level determination means determines the exertion level corresponding to the user's physical exercise by means of physiological information measured from the user, wherein the exertion level is an expression of a tendency of the user's body to compensate for a change in metabolism caused by the physical exercise.  The performance estimation means estimates the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise.  The performance power estimation means takes into account the effect of the exertion history on the physiological information measured from the user, as now defined by amended Claim 11.

The present invention is still further directed to a computer program for determining the performance of a user-specific performance monitor, which computer program comprises coded instructions for executing a computer process in a digital processor, which includes determining the performance power of the physical exercise by the user by means of user movement data registered by the user-specific performance monitor, wherein the performance power is the physical performance power released from the user during the physical exercise, determining the exertion level corresponding to the performance power of the physical exercise by the user by means of physiological information measured from the user, wherein the exertion level is an expression of a tendency of the user's body to compensate for a change in metabolism caused by the physical exercise, and estimating the user's performance by means of the performance power of the physical exercise and the exertion level corresponding to the performance power of the physical exercise by taking into account the effect of the exertion history on the physiological

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 16 of 18

information measured by transforming the exertion data characterizing the exertion level corresponding to the performance power of the physical exercise to a constant exertion history point, as now defined by new Claim 30.

Claims 1, 6, 11, 16, and 30 were amended to further clarify that:

a) performance power is the power released by the user, that is, the output power; and

b) exertion level is the tendency of the user's body to compensate for a change in metabolism caused by the physical exercise.

Nothing in the cited references would teach or suggest the measurement of performance power, determination of the exertion level, and estimation of performance by using these values.

*Blau* discloses cardiorespiratory conditioning.  In the portions of *Blau* referred to by the Office Action, *Blau* discloses that training intensity levels (expressed as heart rate HR) correspond to a certain percentage of maximal oxygen uptake (VO2max).  After a period of training, heart rate zones may be updated as VO2peak improves.  It is entirely unclear how user movement data could correspond with VO2max and, consequently, how the remaining claim elements of Claims 1, 6, 11, 16, and 30 are taught or suggested by *Blau*.

*Shallenberger* relates to biological age analysis, which is, whether an individual is aging rapidly or slowly as compared to his chronological age.  The portions referred to in the Office Action describe that breath-by-breath measurements are made, and that these measurements include work measured in watts during exercise, heart rate while resting, and heart rate during exercise.  The breath-by-breath measurements are then used to prepare data relating to the factors used for analyzing biological age.  These factors include (paragraph [0026]) energy production, basal metabolic rate, resting fat metabolism, exertional fat metabolism, and overall fitness.  As this reference does not have any figures, the identity of these data points would be unclear even

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 17 of 18

to one skilled in the art.  Paragraph [0031] indicates that a person may be treated so that their biological age is reduced, such as by zone interval training, in which zones are determined by the subject's energy production.  However, it is entirely unclear how *Shallenberger* would teach or suggest the elements required by Claims 1, 6, 11, 16, and 30.

Applicants note that in order to support a claim of *prima facie* anticipation, a single reference must teach or enable each of the claimed elements as arranged in the claim interpreted by one of ordinary skill in the art.  Further, Applicants note that in order to support a claim of *prima facie* obviousness, the cited references must teach or suggest each and every element of the invention, and there must be a basis in the references or the prior art to combine the references and prior art as suggested.  However, nothing in the art of record would teach or suggest, either alone or in combination, the claimed invention, as now defined by amended Claims 1, 6, 11, 16, and 30.

Applicants submit that Claims 3-5, 22, and 23, which depend from Claim 1; Claims 8-10, 24 and 25, which depend from Claim 6; Claims 13-15, 26, and 27, which depend from Claim 11; and Claims 18-21, 28, and 29, which depend from Claim 16 are patentable over the art of record by virtue of their dependence.  Further, Applicants submit that these claims define additional patentable subject matter in their own right.  Therefore, it is respectfully requested that the rejection of Claims 1, 3-6, 8-11, 13-15, and 22-27 under 35 U.S.C. §102 and the rejection of Claims 1, 5, 6, 10, 11, 15, 16, 18-21, 28, and 29 under 35 U.S.C. §103 be reconsidered and withdrawn.

## CONCLUSION

Entry of the amendments to Claims 1, 3-6, 11, 16, and 22, as amended; favorable consideration of new Claim 30 and the amendments to Claims 1, 3-6, 11, 16, and 22, as

Applicants:  Nissilä et al.
Application Serial No. 11/545,018
Filing Date:  October 6, 2006
Docket No.: 187-110
Reply to Non-Final Office Action mailed February 20, 2009
Page 18 of 18

amended; favorable reconsideration of Claims 8-10, 13-15, 18-21, and 23-29; and allowance of

pending Claims 1, 3-6, 8-11, 13-16, and 18-30 are solicited.

     In view of the foregoing amendments and remarks, this application should now be in

condition for allowance.  A notice to this effect is respectfully requested.  If the Examiner

believes, after this Amendment, that the application is not in condition for allowance, the

Examiner is requested to call the Applicants' attorney at the telephone number provided below to

discuss any outstanding issues.

                                       Respectfully submitted,

                                       /rod s. turner/
                                       Rod S. Turner
                                       Registration No.: 38,639
                                       Attorney for Applicants

HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, New York 11791
(516) 822-3550
RST:jp

315078_1.DOC

# EXHIBIT 3



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/545,018 | 08/20/2013 | 8512238 | 187-110 RCE | 8110 |

23869        7590        07/31/2013
Hoffmann & Baron LLP
6900 Jericho Turnpike
Syosset, NY 11791

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

**Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)**
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 1086 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Juuso Nissila, Ii, FINLAND;
Arto Niva, Jaali, FINLAND;
Jukka Jaatinen, Kempele, FINLAND;
Hannu Kinnunen, Oulu, FINLAND;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

# EXHIBIT 4

<u>IN THE UNITED STATES PATENT AND TRADEMARK OFFICE</u>

| | | |
|---|---|---|
| Applicant | : | Mika Niemimaki |
| Application No. | : | 13/418,781 |
| Filed | : | March 13, 2012 |
| Title | : | METHOD FOR CALIBRATING EXERCISE APPARATUS |
| | | |
| TC/A.U. | : | 4176 |
| Examiner | : | Catherine T. Rastovski |
| | | |
| Confirmation No. | : | 2256 |
| Docket No. | : | 187-198 |
| Dated | : | December 9, 2014 |

Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia  22313-1450

<u>Certificate of EFS-Web Transmission</u>

I hereby certify that this correspondence is being transmitted
to the U.S. Patent and Trademark Office via the Office's
electronic filing system on  <u>December 9, 2014</u>

Joyce Peterson          __/joyce peterson/____
(Printed Name)              (Signature)

<u>RESPONSE TO NON-FINAL OFFICE ACTION</u>

Sir:

In response to the non-final Office Action mailed September 9, 2014, a reply to which is due by December 9, 2014, please amend the above-identified application as follows.

**Amendments to the Specification** begin on page 2 of this paper.

**Amendments to the Claims** are reflected in the listing of claims that begins on page 6 of this paper.

**Remarks** begin on page 13 of this paper.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 2 of 18

## IN THE SPECIFICATION:

*On page 3, please amend paragraph [0009] as follows:*

**[0009]** In a further embodiment, the apparatus further comprises user interface means; means for informing the user through the user interface about the start of the calibration phase; means for detecting the start of a walking stage and ~~initiate~~ initiating measurement of the at least one walking motion metric; means for detecting the end of the walking stage and ~~terminate~~ terminating measurement of the at least one walking motion metric; means for detecting the start of a running stage and ~~initiate~~ initiating measurement of the at least one running motion metric; means for detecting the end of the running stage and terminate measurement of the at least one running motion metric; and means for informing the user through the user interface about the end of the calibration phase. The apparatus may further comprise means for instructing the user to at least one of start and end the walking stage and the running stage during the calibration phase. The apparatus may further comprise means for instructing the user to stand still at the beginning and end of the walking stage and the running stage so as to facilitate the detection of the walking stage and the running stage during the calibration phase.

*On page 5, please amend paragraph [0022] as follows:*

**[0022]** In an embodiment, the system comprises the wrist device 102 that may be worn around the wrist, like a watch, and a stride sensor 108. Polar ~~Electro®~~ Electro Inc. ~~(www.polarelectro.com)~~ designs and manufactures such apparatuses 102 and their accessories. At the time of filing this patent application, the apparatus ~~900~~ 102 may be implemented based on a ~~Polar~~ multi-sport sports computer RS800CX available from Polar Electro Inc. with the stride sensor 108, for example. The implementation of the embodiments in such an existing product requires relatively small and well-defined modifications. Naturally, as the products evolve, feasible platforms for the implementation of the embodiments described herein also evolve and emerge.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 3 of 18

*On page 9, please amend paragraph [0033] as follows:*

[0033] The end of the walking phase is detected in block 408. The detection may be based on detection of the user stopping walking and standing still on the basis of the measurements received from the motion sensor(s). The user may be instructed to stop and stand still for a while (display 506). If the start and stop of the walking phase are allowed to be determined by the user, the apparatus may be configured to verify that the walking phase was sufficiently long, e.g. by checking the duration of the walking phase $t_w$. If the duration of the walking phase $t_w$ is below a threshold, e.g. 30 seconds, the user is requested to repeat the walking phase through an appropriate display command. Upon detection of the end of the walking phase in block 408, the walking motion metric(s) $d_{w,m}$, $v_{w,m}$, $t_w$ is/are acquired in block 410.

*On page 10, please amend paragraph [0035] as follows:*

[0035] The end of the running phase is detected in block 408416. The detection may be based on detection of the user stop running and standing still on the basis of the measurements received from the motion sensor(s). The user may be instructed to stop and stand still for a while (display 510). If the start and stop of the running phase are allowed to be determined by the user, the apparatus may be configured to verify that the running phase was sufficiently long, e.g. by checking the duration of the running phase $t_r$. If the duration of the running phase $t_r$ is below a threshold, e.g. 15 seconds, the user is requested to repeat the running phase through an appropriate display command. Upon detection of the end of the running phase in block 416, the running motion metric(s) $d_{r,m}$, $v_{r,m}$, $t_r$ is/are acquired in block 418.

*On page 11, please amend paragraph [0038] as follows:*

[0038] With respect to calibrating the speed, let us first assume that the running speed measurements are less accurate. As a consequence, a calibration offset value $\Delta v_r$ may be computed according to the following Equation:

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 4 of 18

$$[[\Delta v_r = \frac{d_{w,m} - d_{r,m}}{t_r} = \frac{v_{w,m} x t_w - w_{r,m} x t_r}{t_r}]] \qquad \Delta v_r = \frac{d_{w,m} - d_{r,m}}{t_r} = \frac{v_{w,m} * t_w - w_{r,m} * t_r}{t_r} \qquad (2)$$

Then, the calibrated running speed may be acquired according to the following Equation:

$$v_{r,corrected} = v_{r.act} + \Delta v_r \qquad (3)$$

where $v_{r,act}$ represents a running speed value measured during the exercise (after the calibration phase). In other words, the measured running speed value is offset by an added calibration offset value $\Delta v_r$.

*On page 11, please amend paragraph [0039] as follows:*

**[0039]** Let us now assume that the walking speed measurements are less accurate. As a consequence, a calibration offset value $\Delta v_w$ may be computed according to the following Equation:

$$[[\Delta v_w = \frac{d_{r,m} - d_{w,m}}{t_w} = \frac{v_{r,m} x t_r - w_{w,m} x t_w}{t_w}]] \qquad \Delta v_w = \frac{d_{r,m} - d_{w,m}}{t_w} = \frac{v_{r,m} * t_r - w_{w,m} * t_w}{t_w} \qquad (4)$$

Then, the calibrated walking speed may be acquired according to the following Equation:

$$v_{w,corrected} = v_{w,act} + \Delta v_w \qquad (5)$$

where $v_{w,act}$ represents a walking speed value measured during the exercise (after the calibration phase). In other words, the measured walking speed value is offset by an added calibration offset value $\Delta v_w$.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 5 of 18

On page 17, please amend paragraph [0055] as follows:

[0055] The wireless link between the user interface apparatus 102 and the accessory apparatus 108 may be based on any one of the following wireless communication schemes: ~~Bluetooth~~ BLUETOOTH® such as ~~Bluetooth Low Energy (BLE)~~ BLUETOOTH® Low Energy Technology, ANT® communication originally introduced by Dynastream Innovations Inc., ~~Zigbee~~ ZIGBEE® communication based on IEEE 802.15.4 standard or its derivative, WiFi communications based on IEEE 802.11x standard, and inductive transmission technology. Communication circuitries 706, 810, 802 may all be configured to support the same wireless communication scheme(s) so as to enable compatible communications between the user interface apparatus 102 and the accessory apparatus 108.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 6 of 18

## IN THE CLAIMS:

*The following listing of claims will replace all prior versions and listings of claims in the application:*

1. (Currently Amended)  An apparatus comprising:

at least one processor configured to cause the apparatus to:

acquire, during a calibration phase, at least one walking motion metric obtained from a measured local motion of a user under a condition where the user has walked a first real distance, wherein the at least one walking motion metric comprises an estimated walking distance value acquired by employing a walking motion algorithm during the condition, wherein the estimated walking distance value represents an estimate of the first real distance acquired by employing the walking motion algorithm;

acquire, during the calibration phase, at least one running motion metric obtained from a measured local motion of the user under a condition where the user has run a second real distance which may be the same as or different from the first real distance, wherein the at least one running motion metric comprises an estimated running distance value acquired by employing a running motion algorithm during the condition, wherein the estimated running distance value represents an estimate of the second real distance acquired by employing the running motion algorithm;

compute a calibration value on the basis of a relation between the estimated walking distance value and the estimated running distance value~~the at least one walking motion metric and the at least one running motion metric~~; and

calibrate one of running and walking measurements with said calibration value during an exercise phase.

2. (Original)  The apparatus of claim 1, wherein the at least one processor is further configured to cause the apparatus to determine which one of the walking motion metric and the

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 7 of 18

running motion metric provides less accurate measurement results and to calibrate the less accurate motion metric with said calibration value during the exercise phase.

3.  (Original)  The apparatus of claim 2, wherein the at least one processor is further configured to cause the apparatus to determine by default that the running motion metric is less accurate.

4.  (Original)  The apparatus of claim 1, wherein when the second real distance is different from the first real distance, the apparatus is provided with information on relation between the first real distance and the second real distance, and wherein the at least one processor is further configured to cause the apparatus to scale at least one of the running motion metric and the walking motion metric according to said relation in order to make the running motion metric and the walking motion metric to represent the same real distance.

5.  (Original)   The apparatus of claim 1, wherein said at least one walking motion metric comprises time measured for the user to walk the first real distance and at least one of distance and speed measured from local motion of the user when walking the first real distance, and wherein said at least one running motion metric comprises time measured for the user to run the second real distance and at least one of distance and speed measured from local motion of the user when running the second real distance.

6.  (Currently amended)  The apparatus of claim 5, wherein the at least one processor is further configured to cause the apparatus to compute a running speed calibration value by dividing a difference between a measured walking distance and a measured running distance by the time measured for the user to walk the first real distance and to calibrate, during the exercise phase, measured running speed with the running speed calibration value.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 8 of 18

    7.  (Currently amended)  The apparatus of claim 6̶1, wherein the at least one processor is further configured to cause the apparatus to add the <u>running</u> speed calibration value to the measured running speed during the exercise phase.

    8.  (Currently amended)  The apparatus of claim 6̶1, wherein the at least one processor is further configured to cause the apparatus to further divide the <u>running</u> speed calibration value by a measured running speed measured as a̶ <u>the at least one</u> running motion metric and to multiply the measured running speed during the exercise phase by thus obtained divided speed calibration value.

    9.  (Currently amended)  The apparatus of claim 5̶1, wherein the at least one processor is further configured to cause the apparatus to compute a running distance calibration value by dividing the difference between a measured walking distance and a measured running distance by the measured running distance and to calibrate, during the exercise phase, measured running distance with the running distance calibration value.

    10.  (Previously presented)  The apparatus of claim 1, wherein the apparatus further comprises a user interface, and wherein the at least one processor is further configured to cause the apparatus during the calibration phase to:
        inform the user through the user interface about the start of the calibration phase;
        detect the start of a walking stage and initiate measurement of the at least one walking motion metric;
        detect the end of the walking stage and terminate measurement of the at least one walking motion metric;
        detect the start of a running stage and initiate measurement of the at least one running motion metric;

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 9 of 18

detect the end of the running stage and terminate measurement of the at least one running motion metric; and

inform the user through the user interface about the end of the calibration phase.

11.  (Original)  The apparatus of claim 10, wherein the at least one processor is further configured to cause the apparatus during the calibration phase to instruct the user to at least one of start and end the walking stage and the running stage.

12.  (Previously presented)  The apparatus of claim 10, wherein the at least one processor is further configured to cause the apparatus during the calibration phase to instruct the user to stand still at the beginning and end of the walking stage and the running stage so as to facilitate the detection of the walking stage and the running stage.

13.  (Original)  The apparatus of claim 1, wherein the at least one processor is further configured to cause the apparatus to display the calibrated measurement results to the user during and/or after the exercise through a user interface.

14.  (Currently amended)  A non-transitory computer-readable medium comprising instructions that, when executed by a processing device, cause the processing device to perform a method comprising:

acquiring, during a calibration phase, at least one walking motion metric obtained from a measured local motion of a user under a condition where the user has walked a first real distance, wherein the at least one walking motion metric comprises an estimated walking distance value acquired by employing a walking motion algorithm during the condition, wherein the estimated walking distance value represents an estimate of the first real distance acquired by employing the walking motion algorithm;

acquiring, during the calibration phase, at least one running motion metric obtained from a measured local motion of the user under a condition where the user has run a second real

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 10 of 18

distance which may be the same as or different from the first real distance, wherein the at least one running motion metric comprises an estimated running distance value acquired by employing a running motion algorithm during the condition, wherein the estimated running distance value represents an estimate of the second real distance acquired by employing the running motion algorithm;

computing a calibration value on the basis of a relation between the estimated walking distance value and the estimated running distance value the at least one walking motion metric and the at least one running motion metric; and

calibrating one of running and walking measurements with said calibration value during an exercise phase.

15. (New)      An apparatus comprising:

diagnostics circuitry, the diagnostics circuitry acquiring, during a calibration phase, at least one walking motion metric obtained from a measured local motion of a user under a condition where the user has walked a first real distance, wherein the at least one walking motion metric comprises an estimated walking distance value acquired by employing a walking motion algorithm during the condition, wherein the estimated walking distance value represents an estimate of the first real distance acquired by employing the walking motion algorithm, the diagnostics circuitry acquiring during the calibration phase, at least one running motion metric obtained from a measured local motion of the user under a condition where the user has run a second real distance which may be the same as or different from the first real distance, wherein the at least one running motion metric comprises an estimated running distance value acquired by employing a running motion algorithm during the condition, wherein the estimated running distance value represents an estimate of the second real distance acquired by employing the running motion algorithm; and

calibration parameter determiner circuitry, the calibration parameter determiner circuitry determining a calibration value on the basis of a relation between the estimated walking distance value and the estimated running distance value, the calibration parameter determiner circuitry

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 11 of 18

calibrating at least one of running and walking measurements with said calibration value during an exercise phase.

    16.  (New)  The apparatus of claim 1, wherein the diagnostics circuitry causes the apparatus to determine which one of the walking motion metric and the running motion metric provides less accurate measurement results and the calibration parameter determiner circuitry calibrates the less accurate motion metric with said calibration value during the exercise phase.

    17.  (New)  The apparatus of claim 2, wherein the calibration parameter determiner circuitry causes the apparatus to determine by default that the running motion metric is less accurate.

    18.  (New)  The apparatus of claim 1, wherein when the second real distance is different from the first real distance, the apparatus is provided with information on relation between the first real distance and the second real distance, and wherein the diagnostics circuitry causes the apparatus to scale at least one of the running motion metric and the walking motion metric according to said relation in order to make the running motion metric and the walking motion metric to represent the same real distance.

    19.  (New)  The apparatus of claim 1, wherein said at least one walking motion metric comprises time measured for the user to walk the first real distance and at least one of distance and speed measured from local motion of the user when walking the first real distance, and wherein said at least one running motion metric comprises time measured for the user to run the second real distance and at least one of distance and speed measured from local motion of the user when running the second real distance.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 12 of 18

    20.  (New)  The apparatus of claim 5, wherein the calibration parameter determiner circuitry causes the apparatus to compute a running speed calibration value by dividing a difference between a measured walking distance and a measured running distance by the time measured for the user to walk the first real distance and to calibrate, during the exercise phase, measured running speed with the running speed calibration value.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 13 of 18

## REMARKS

Pursuant to the Office Action mailed September 9, 2014, which has been carefully considered, Applicant requests reconsideration.  To further prosecution of this application, each of the issues raised in the Action is addressed herein.

Claims 1-20 are currently pending in this application, of which Claims 1, 14, and 15 are independent claims.  By this Amendment, Claims 15-20 have been added and Claims 1, 6-9, and 14 have been amended to further clarify the claimed subject matter.  Support for these amendments is provided throughout the specification, claims, and drawings as originally filed.  Specifically, support for the claim amendments is provided at paragraphs [0038] - [0045], [0138], and [0139] of the specification.  The application as now presented is believed to be in allowable condition.

A.    Telephonic Interview

The undersigned respectfully requests a telephonic interview with the Examiner to discuss advancing the subject application and awaits the Examiner's response thereto.

B.    Objections to the Drawings

The drawings were objected to as showing references 410 and 418, which were not described in the specification.  The drawings were also objected to as failing to show an apparatus 900.  Accordingly, paragraphs [0022], [0033], and [0035] were amended to address these objections.  Therefore, it is submitted that the objections to the drawings have been obviated.

C.    Objections to the Specification

The specification was objected to due to various informalities.  Paragraphs [0009], [0035], [0038], and [0039] have been amended to address these rejections.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 14 of 18

It is submitted that the objection to references regarding the internal sensor as element 708 is incorrect as these references appear to be accurate as shown in Figure 7 and described at paragraph [0049] of the specification.  The Action also indicates an objection to use of trademarks, hyperlinks, and company names at paragraphs [0022] and [0055] of the specification, which have been addressed by amending these paragraphs.  Therefore, it is submitted that the objections to the specification have been obviated.

D.      Objections to the Claims

Claims 6-8 were objected to due to various informalities.  Accordingly, Claims 6-8 were amended to address these objections.  Therefore, it is submitted that the objections to the claims have been obviated.

E.      Claim Rejections under 35 U.S.C. §112

Claims 8 and 12 were rejected as being indefinite.  Accordingly, Claim 8 has been amended to further clarify the claimed subject matter.

Regarding Claim 12, the Action indicates that it is unclear how standing still can be part of a walking measurement.  However, as disclosed at paragraphs [0032] – [0035] of the specification, the stand still period may be used in order to enable the apparatus to determine a starting time for the walking phase.  During the stand still period, the apparatus detects a rest stage upon acquiring no motion data or motion data indicating minimal motion from the motion sensors.  Similarly, for the running phase, the stand still phase, after the walking phase, may be used to enable the apparatus to determine the end of the walking phase (from cessation of the walking motion) and the start of the running phase.  Therefore, it is requested that the rejection of Claims 8 and 12 under 35 U.S.C. §112 be reconsidered and withdrawn.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 15 of 18

F.    <u>Claim Rejections under 35 U.S.C. §101</u>

      Claims 1, 14, and 15 were rejected as being directed to non-statutory subject matter.

      It is submitted that Claim 1 is patent-eligible as it is not solely directed to an abstract idea.  Specifically, the subject matter recited in Claim 1 is a physical structure rather than a mere mental process, and is thus not an abstract idea.  Unlike the claims under consideration in the *In re Bilski* decision, in which a risk hedging method could be performed mentally by a human being, or the *Alice v. CLS Bank* decision, in which a financial-trading method to reduce settlement risk could be performed mentally by a human being, the claimed embodiments provide for an apparatus that measures motion.  Thus, Claims 1-13 would not preempt or monopolize an entire field by restricting the use of a mental process.  Further, the claimed embodiments are not fundamental economic practices, methods of organizing human activities, an idea of itself, or mathematical formulas, as referred to in the *Alice* decision.

      In addition, it is submitted that the claimed elements amount to significantly more than an abstract idea as they provide for substantial improvements in the measurement of motion and the technology of measuring motion by providing various techniques to calibrate these measurements, thereby achieving greater accuracy in such technical measurements.

      Regarding Claim 14, *non-transitory* has been incorporated as recommended by the Examiner.

      Therefore, it is requested that the rejection of Claims 1-14 under 35 U.S.C. §101 be reconsidered and withdrawn.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 16 of 18

G.    Claim Rejections under 35 U.S.C. §§102 and 103

Claims 1, 5, 13, and 14 were rejected as being anticipated by U.S. Publication No. 2001/0022828 to Pyles.  Claims 2 and 3 were rejected as obvious over *Pyles*; Claim 4 was rejected as obvious over *Pyles* and U.S. Publication No. 2009/0043531 to Kahn; and Claims 10 and 11 were rejected as obvious over *Pyles* and U.S. Publication No. 2001/0032105 to Hoffman et al.

It is submitted that *Pyles* discloses a calibration method for a pedometer, wherein calibration enables the pedometer to more accurately compute the distance travelled when the user changes speed during exercise.  As disclosed at paragraphs [0045] – [0073], the user travels a predetermined distance with different walking/running speeds, steps per second are computed by employing the pedometer's motion sensor, and stride length is computed accordingly for each speed.  Paragraph [0072] describes that both walking and running speeds may be utilized in the calibration.  Thus, computed values serve as anchor points for a unique calibration curve, and other stride lengths for different speeds (strides per second) may be interpolated or extrapolated by employing that calibration curve.  Example curves are described in paragraphs [0138] and [0139].

In contrast, the algorithm of *Pyles* computes steps per second and stride length for the calibration curve with the assumption that the user has travelled the instructed distance.  The disclosed algorithm does not perform, in the calibration phase, an estimate of the travelled distance on the basis of the measured local motion and, thus, does not disclose the subject matter, as now defined by Claims 1, 14, and 15.

Therefore, it is submitted that the Action fails to provide references that teach or suggest each of the features recited in the claims in accordance with the All Elements Rule, which

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 17 of 18

requires that an asserted combination teach or suggest each and every feature of a claim, the failure of which is fatal to the rejection.[1]

Applicant notes that in order to support a claim of *prima facie* anticipation, a single reference must teach or suggest each of the claimed elements as arranged in the claim interpreted by one of ordinary skill in the art.  Further, in order to support a claim of *prima facie* obviousness, the cited references must teach or suggest each and every element of the invention, and there must be a basis to combine the references and prior art as suggested.  However, it is submitted that nothing in the art of record would teach or suggest, either alone or in combination, the claimed invention, as now defined by amended Claims 1, 14, and 15.

Applicant submits that Claims 2-13, and 16-20, which depend from Claim 1, are patentable over the art of record by virtue of their dependence.  Further, Applicant submits that Claims 2-13 and 16-20 define additional patentable subject matter in their own right.  Therefore, it is requested that the rejection of Claims 1, 5, 13, and 14 under 35 U.S.C. §102, and the rejection of Claims 2, 3, 10, and 11 under 35 U.S.C. § 103 be reconsidered and withdrawn.

---

[1] The All Elements Rule is delineated at MPEP § 2143.03 and requires consideration of every claim feature in an obviousness determination.  Thus, to render the claims unpatentable, the Office Action must do more than merely consider each and every feature of these claims.  Instead, the asserted references must teach or suggest each and every claim feature.  That is, to establish *prima facie* obviousness of a claimed invention, each of the claimed features must be taught or suggested by the prior art.  *In re Royka*, 490 F.2d 981 (CCPA 1974).  A proper obviousness determination requires that the examiner make "a searching comparison of the claimed invention – including all its limitations–with the teaching of the prior art".  *In re Wada and Murphy*, Appeal 2007-3733, citing *In re Ochiai*, 71 F.3d 1565, 1572 (Fed. Cir. 1995).  Further, the necessary presence of all claim features is axiomatic, since the Supreme Court has long held that obviousness is a question of law based on underlying factual inquiries, including … ascertaining the differences between the claimed invention and the prior art.  *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966).  Yet further, MPEP §904 requires that examiners conduct a prior art search that covers "the invention as described and claimed."  Lastly, MPEP § 2143 supports the conclusion that obviousness requires teaching of every feature of a claim, since the Supreme Court in *KSR Int'l v. Teleflex Inc.* stated that "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR Int'l v. Teleflex Inc.*, 127 S. Ct. 1727, 1741 (2007) (quoting *In re Kahn,* 441 F.3d 977, 988 (Fed. Cir. 2006).  In summary, it remains well-settled law that obviousness requires a teaching of every feature recited in a claim.  *In re Wada and Murphy* citing *CFMT, Inc. v. Yieldup Intern. Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) and *In re Royka*, 490 F.2d 981, 985 (CCPA 1974).

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 18 of 18

## **CONCLUSION**

Entry of new Claims 15-20 and the amendments to Claims 1, 6-9, and 14; favorable consideration of new Claims 15-20 and Claims 1, 6-9, and 14, as amended; and allowance of pending Claims 1-20 are solicited.

In view of the foregoing amendments and remarks, this application should now be in condition for allowance.  A notice to this effect is respectfully requested.  If the Examiner believes, after this Amendment, that the application is not in condition for allowance, the Examiner is requested to call the Applicant's attorney at the telephone number provided below to discuss any outstanding issues.

Respectfully submitted,

/rod s. turner/
Rod S. Turner
Registration No.: 38,639
Attorney for Applicant

HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, New York 11791
(516) 822-3550
RST:mak:jp

479148_1

Appx261

# EXHIBIT 5



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/418,781 | 03/13/2012 | Mika Niemimaki | 187-198 | 2256 |

23869      7590      02/13/2015

Hoffmann & Baron LLP
6900 Jericho Turnpike
Syosset, NY 11791

| EXAMINER |
|---|
| RASTOVSKI, CATHERINE T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2862 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/13/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| ***Office Action Summary*** | Application No.<br>13/418,781 | Applicant(s)<br>NIEMIMAKI, MIKA | |
|---|---|---|---|
| | Examiner<br>CATHERINE RASTOVSKI | Art Unit<br>2862 | AIA (First Inventor to File)<br>Status<br>No |

-- *The MAILING DATE of this communication appears on the cover sheet with the correspondence address* --

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>2</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.

- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>*12/09/2014*</u>.

☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

2a)☐ This action is **FINAL**.     2b)☒ This action is non-final.

3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.

4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims\***

5)☒ Claim(s) <u>*1-20*</u> is/are pending in the application.

    5a) Of the above claim(s) _____ is/are withdrawn from consideration.

6)☐ Claim(s) _____ is/are allowed.

7)☒ Claim(s) <u>*1-20*</u> is/are rejected.

8)☒ Claim(s) <u>*6,7,9 and 20*</u> is/are objected to.

9)☐ Claim(s) _____ are subject to restriction and/or election requirement.

\* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to PPHfeedback@uspto.gov.

**Application Papers**

10)☐ The specification is objected to by the Examiner.

11)☒ The drawing(s) filed on <u>*3/13/2012*</u> is/are: a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    **Certified copies:**

    a)☐ All   b)☐ Some\*\*  c)☐ None of the:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

\*\* See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☒ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b)<br>    Paper No(s)/Mail Date <u>*8/17/2012, 5/14/2012*</u>.

3)☐ Interview Summary (PTO-413)<br>    Paper No(s)/Mail Date. _____.

4)☐ Other: _____.

Application/Control Number: 13/418,781                                          Page 2
Art Unit: 2862

<div align="center">

**DETAILED ACTION**

***Notice of Pre-AIA or AIA Status***

</div>

1.      The present application is being examined under the pre-AIA first to invent provisions.

<div align="center">

***Drawings***

</div>

2.      Objections to the drawings are withdrawn due to applicant's amendments of the specification.

<div align="center">

***Specification***

</div>

3.       Objections to the specification regarding minor informalities and the use of trademarks, hyperlinks, and company names are withdrawn due to applicant's amendments of the specification.

4.      Applicant's arguments to examiner's objections regarding the internal sensor as element 708 are persuasive and these objections are withdrawn.

<div align="center">

***Claim Objections***

</div>

5.      **Regarding claims 6, 7, and 8,** objections are withdrawn due to applicant's amendments of the claims.

6.      **Claim 19** is objected to under 37 CFR 1.75 as being a substantial duplicate of claim 5.  When two claims in an application are duplicates or else are so close in content that they both cover the same thing, despite a slight difference in wording, it is proper after allowing one claim to object to the other as being a substantial duplicate of the allowed claim.  See MPEP § 706.03(k).

<div align="center">

**Appx265**

</div>

Application/Control Number: 13/418,781                                    Page 3
Art Unit: 2862

## *Claim Rejections - 35 USC § 112*

The following is a quotation of 35 U.S.C. 112(b):

(b)  CONCLUSION.—The specification shall conclude with one or more claims particularly
pointing out and distinctly claiming the subject matter which the inventor or a joint inventor
regards as the invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:

The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

7.      **Regarding claim 8,** rejections to claim 8 are withdrawn due to applicant's

amendments of the claim.

8.      **Regarding claim 12,** applicant's arguments are persuasive and the objections

are withdrawn.

9.      **Claims 16, 17, and 20** recites the limitation "the calibration parameter

determiner" in line 1.  There is insufficient antecedent basis for this limitation in the

claim.  For purposes of examination, "the calibration parameter determiner" will be

interpreted as a processor.

10.     **Claims 18** recites the limitation "the diagnostics circuitry" in line 3.  There is

insufficient antecedent basis for this limitation in the claim.  For purposes of

examination, "the diagnostics circuitry" will be interpreted as a processor.

## *Claim Rejections - 35 USC § 101*

35 U.S.C. 101 reads as follows:

Whoever invents or discovers any new and useful process, machine, manufacture, or
composition of matter, or any new and useful improvement thereof, may obtain a patent
therefor, subject to the conditions and requirements of this title.

Application/Control Number: 13/418,781                                                    Page 4
Art Unit: 2862

11.     **Claims 1, 14 and 15** are rejected under 35 U.S.C. 101 because the claimed invention is directed to non-statutory subject matter.

        The claimed invention is directed to non-statutory subject matter because the claim(s) as a whole, considering all claim elements both individually and in combination, do not amount to significantly more than an abstract idea.  The claims are directed to the abstract idea of a mathematical relationship or formula (acquiring signals from a source and performing calculations and calibrations).  The additional elements in the claims other than the abstract ideas per se amount to no more than: mere instructions to implement the idea on a computer, in this case a processor or computer readable medium. Viewed as a whole, these additional claim elements do not provide meaningful limitations to transform the abstract idea into a patent eligible application of the abstract idea such that the claims amount to significantly more than the abstract idea itself.  Therefore, the claims are rejected under 35 U.S.C. 101 as being directed to non-statutory subject matter.

        **Claims 2-13 and 16-20** are rejected under 35 U.S.C. 101 for the same reasons as in claim 1 and 15.

12.     Regarding the rejections of **Claims 1, 14 and 15** under 35 U.S.C. 101, the Applicant's arguments filed December 9, 2014 have been fully considered but they are not persuasive.

13.     **Regarding claim 14,** the rejection under 35 U.S.C. 101 because the claimed invention was directed to non-statutory subject matter (i.e. "a computer readable

Application/Control Number: 13/418,781                                    Page 5
Art Unit: 2862

medium") is withdrawn due to applicant's amendments of the claim to include the words

"non-transitory".

### *Claim Rejections - 35 USC § 103*

14.    The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis

for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described
> as set forth in section 102 of this title, if the differences between the subject matter sought to
> be patented and the prior art are such that the subject matter as a whole would have been
> obvious at the time the invention was made to a person having ordinary skill in the art to which
> said subject matter pertains.  Patentability shall not be negatived by the manner in which the
> invention was made.

15.    **Claim 1-3, 5, 13-20** are rejected under pre-AIA 35 U.S.C. 103(a) as being

unpatentable over Pyles (U.S. Publication No. 2001/0022828) and further in view of

Ananny *et al. (*U.S. Publication No. 2007/0270721)(hereinafter Ananny).

**Regarding claim 1, 14**, **and 15** Pyles teaches an apparatus ("pedometer", see

paragraph [0002]) comprising: at least one processor (e.g. "data processor", paragraph

[0013])(examiner notes that a processor inherently comprises a program and contains

circuitry that is used to determine the calibration) configured to cause the apparatus to:

acquire, during a calibration phase (e.g. "sampling mode", paragraph [0034]), at least

one walking motion metric obtained from a measured local motion of a user under a

condition where the user has walked a first real distance (e.g. "The steps counted by the

pedometer over the known distance", see paragraphs [0071] and [0023]);

acquire, during the calibration phase, at least one running motion metric obtained

from a measured local motion of the user under a condition where the user has run a

second real distance which may be the same as or different from the first real distance

Application/Control Number: 13/418,781                                    Page 6
Art Unit: 2862

(e.g. the number of steps during the run are counted by the pedometer, explained as "When used for running only, the method for calculating stride length is similar to the above walking method, except the points should be obtained during runs", see paragraphs [0072] and [0024]);

calibrate one of running and walking measurements with said calibration value during an exercise phase (e.g. determine an accurate distance walked, as in "These rates can then be used to generate a graph or table by interpolating and extrapolating the two rates to arrive at a stride length for any reasonable rate being walked by the user. This stride length can then be used to calculate a highly accurate distance being walked by a user" See paragraph [0071])(The examiner interprets "calculate a highly accurate distance" as -- calibrating a measurement).

Ananny teaches an estimated elapsed distance measured for a user (see paragraph [0055] and [0057]) and that the elapsed distance can be a distance run or walked during the calibration process (see paragraph [0054]) acquired after the initiation of a calibration request by a user (see paragraph [0052]).

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include an estimated elapsed distance measured for a user and that the elapsed distance can be a distance run or walked during the calibration process acquired after the initiation of a calibration request by a user as taught by Ananny into Pyles for the purpose of improving the accuracy of sensing systems for the monitoring of exercise as recited by Ananny (see paragraph [0011]).

Application/Control Number: 13/418,781                                          Page 7
Art Unit: 2862

    Although Pyles is silent regarding the limitation of computing a calibration value

on the basis of a relation between *the estimated walking distance value and the*

*estimated running distance value*, Pyles teaches computing a calibration value on the

basis of a relation between the at least one walking motion metric and the at least one

running motion metric (e.g. a calibration value stored in a chart is calculated from a

curve based on a relation between walking and running motion metrics of rate and step

length, "a total of five walks and runs are conducted over a fixed distance at a variety of

rates. The five steps per second rates that are obtained are used to generate a curve

derived by interpolating and/or extrapolating between the five rates and step lengths.  A

computer generated and stored chart can be used during subsequent trips to find a very

accurate stride length for a given step rate." See paragraph [0072]).

    It would have been obvious to one having ordinary skill in the art at the time the

invention was made to include the calibration value based on the relation between the

walking and running distance as taught by Pyles for the purpose of having a pedometer

with improved accuracy that is easily calibrated, as recited by Pyles (see paragraph

[0011]).

    **Regarding claims 2 and 16,** the combination Pyles and Ananny teaches the

limitations of claim 1.

    Pyles fails to explicitly teach the at least one processor further configured to

cause the apparatus to determine which one of the walking motion metric and the

running motion metric provides less accurate measurement results and to calibrate the

less accurate motion metric with said calibration value during the exercise phase.

Application/Control Number: 13/418,781                                    Page 8
Art Unit: 2862

However, Pyles teaches calibration values stored in a chart calculated from a curve based on a relation between walking and running motion metrics (see paragraph [0072].  It would have been obvious to one of ordinary skill in the art at the time the invention was made to identify the less accurate motion metric from the curve that was used to generate the calibration chart, and then calibrate it.

The advantage of identifying the less accurate motion metric and then calibrating it is to improve the apparatus accuracy since there is a need for a "simple but highly accurate pedometer" as recited by Pyles (see paragraph [0012]).

**Regarding claim 3 and 17,** the combination Pyles and Ananny teaches the limitations of claim 2.  Pyles fails to explicitly teach at least one processor further configured to cause the apparatus to determine by default that the running motion metric is less accurate.

However, it is recited in Pyles that the calibration for very fast running (sprinting) is less accurate (see paragraph [0044]), so including that the running motion metric is less accurate by default would have the advantage of increasing the calibration accuracy.

**Regarding claim 5 and 19,** the combination Pyles and Ananny teaches the limitations of claim 1.  Pyles further teaches  wherein the at least one walking motion metric comprises time measured for the user to walk the first real distance and (e.g. the apparatus includes a clock for measuring the time of each walk, see Fig. 1, item 48 and paragraph [0071]); and at least one distance and speed measured from local motion of the user when walking the first real distance, and (e.g. directly "The steps counted by

Application/Control Number: 13/418,781                                        Page 9
Art Unit: 2862

the pedometer over the known distance can be used with the time of each walk to calculate a steps per second rate for each walk," see paragraphs [0023] & [0071])(The examiner considers rate to be speed; and if rate and time are measured, distance is inherently measured); time measured for the user to run the second real distance and (e.g. the apparatus includes a clock for measuring the time of each walk, see Fig. 1, item 48 and paragraphs [0020] and [0072]); and at least one distance and speed measured from local motion of the user when running the second real distance (e.g. steps are counted by the apparatus over a known distance and used with time to calculate a steps per second rate for each run, see paragraphs [0020], [0024] and [0072]).

     **Regarding claim 13,** the combination Pyles and Ananny teaches the limitations of claim 1.  Pyles further teaches that the at least one processor is further configured to cause the apparatus to display the calibrated measurement results to the user during and/or after the exercise through a user interface (e.g. the calibration values are displayed after a walk or run, see paragraphs [0078] and [0088]).

     Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention was made to include by default that the running motion metric is less accurate in the processor configuration.

16.    **Claims 4 and 18** are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Pyles and Ananny and further in view of Kahn *et al.* (U.S. Publication No. 2009/0043531)(hereinafter Kahn).

Application/Control Number: 13/418,781                                    Page 10
Art Unit: 2862

The combination Pyles and Ananny teaches the limitations of claim 1.  Pyles also teaches that when the second real distance is different from the first real distance, the apparatus is provided with information on relation between the first real distance and the second real distance (e.g. two walks and three runs are conducted over a known distance, so the relation between the distances are known, see paragraph [0072]).

Pyles fails to explicitly teach that the apparatus scales at least one of the running motion metric and the walking motion metric according to said relation in order to make the running motion metric and the walking motion metric to represent the same real distance;

Kahn teaches scaling to represent the same real distance (see paragraph [0064]).

The advantage of including scaling to represent the same real distance in the first and second real distances is that the other walking and running metrics can be compared more easily.

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention was made to scale at least one of the running motion metric and the walking motion metric relation in order to make the running motion metric and the walking motion metric to represent the same real distance into the processor configuration.

17.     **Claim 10 and 11** are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over Pyles and Ananny and further in view of Hoffman *et al.* (U.S. Publication No. 2001/0032105 )(hereinafter Hoffman).

Application/Control Number: 13/418,781                                      Page 11
Art Unit: 2862

    **Regarding claim 10,** the combination Pyles and Ananny teaches the limitations of claim 1.  Pyles also teaches a user interface (e.g. "operator interface", see Fig.1, 46 and paragraph [0034]); and wherein the at least one processor is further configured to cause the apparatus during the calibration phase to: inform the user through the user interface about the start of the calibration phase (e.g. "Suitable LCD display screens can convey the necessary information to instruct the user on how to perform the calibration walks or runs." See paragraphs [0074] and [0075]); at the start of a walking stage, initiate measurement of the at least one walking motion metric (e.g. "When the START button is pressed, the word `WALK` will no longer be displayed, and the current calibration values will be displayed," see paragraph [0077]); at the end of the walking stage, terminate measurement of the at least one walking motion metric; (e.g. "When STOP is pressed, the display will show the calibration results for five seconds," see paragraph [0079];  at the start of a running stage, initiate measurement of the at least one running motion metric at the end of the running stage and terminate measurement of the at least one running motion metric (e.g. "When the START button is pressed, the words `SLOW RUN` will go away, and the current calibration values will be displayed," see paragraphs [0087-0088]); and inform the user through the user interface about the end of the calibration phase (see paragraphs [0074] and [0091]).

    Pyles does not explicitly teach "detecting" the beginning or ending of walking or running stages.

    Hoffman teaches detecting the beginning (e.g. "simply begin running (or other workout activity), which would be detected by a change in the pedometer sensor

Application/Control Number: 13/418,781                                      Page 12
Art Unit: 2862

output", see paragraph [0042]) or ending (e.g. "some examples of this invention may determine when a user has stopped moving", see paragraph [0106])(examiner interprets "determine" as – detect) of walking or running stages.

The advantage of including detecting the beginning and end of the walking and running stages is that is allows for a "quick start" feature, as recited in Hoffman *et al.* (see paragraph [0042]).

Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention was made to include the detection of the beginning or end of walking or running stages into the measurements of walking and running motion metrics.

**Regarding claim 11,** the combination Pyles and Ananny teaches the limitations of claim 10. Pyles further teaches that during the calibration phase to instruct the user to at least one of start and end the walking stage (e.g. the word WALK is displayed instruct the user to start the walking stage, see paragraph [0075]; the calibration results are displayed for five seconds instruct the user to the end of the walking stage, see paragraph [0081]); and the running stage phase (e.g. the words SLOW RUN are displayed to instruct the user to start the running stage, see paragraph [0085]; the calibration results are displayed for five seconds instruct the user to the end of the running stage, see paragraph [0091]).

**Regarding claim 12,** the combination Pyles and Ananny teaches the limitations of claim 10.

Application/Control Number: 13/418,781                                    Page 13
Art Unit: 2862

Pyles further teaches a user interface (e.g. "operator interface", see Fig.1, 46 and paragraph [0034]) configured to cause the apparatus during the calibration phase to inform the user about the start and end of the calibration phase (e.g. "Suitable LCD display screens can convey the necessary information to instruct the user on how to perform the calibration walks or runs," see paragraphs [0074] and [0075]; "When the START button is pressed, the word `WALK` will no longer be displayed, and the current calibration values will be displayed," see paragraph [0077]; "When STOP is pressed, the display will show the calibration results for five seconds," see paragraph [0079]).

Pyles and Annany are silent regarding the limitation that the apparatus instructs the user to stand still at the beginning and end of the walking stage and the running stage.

Hoffman teaches detecting the beginning (e.g. "simply begin running (or other workout activity), which would be detected by a change in the pedometer sensor output", see paragraph [0042]) or ending (e.g. "some examples of this invention may determine when a user has stopped moving", see paragraph [0106])(examiner interprets "determine" as – detect) of walking or running stages, which implies that the user stands still before and after the running or walking stages.

It would have been obvious to one having ordinary skill in the art at the time the invention was made to include detecting that a user is standing still at the beginning or end of a calibration run or walk as taught by Hoffman into the operator interface as taught by Pyles for the purpose of allowing for a "quick start" feature, as recited in Hoffman *et al.* (see paragraph [0042]).

Application/Control Number: 13/418,781                                Page 14
Art Unit: 2862

### *Allowable Subject Matter*

18.    **Claims 6, 7 and 9** are objected to as being dependent upon a rejected base

claim, but would be allowable if rewritten in independent form including all of the

limitations of the base claim and any intervening claims and after overcoming the 35

U.S.C. 101 rejection made above.

        The following is a statement of reasons for the indication of allowable subject

matter:

        **Regarding claim 6 and 20,** none of the prior art of record (Pyles, Ananny,

Hoffman, Kahn) teaches or fairly suggests an apparatus comprising at least one

processor wherein the at least one processor or calibration parameter determiner  is

further configured to cause the apparatus to compute a running speed calibration value

by dividing a difference between a measured walking distance and a measured running

distance by the time measured for the user to walk the first real distance and to

calibrate, during the exercise phase, measured running speed with the <u>running</u> speed

calibration value in combination with the rest of the claimed limitations as claimed and

defined by the applicant.

        **Regarding claim 7,** none of the prior art of record (Pyles, Ananny, Hoffman,

Kahn) teaches or fairly suggests an apparatus comprising at least one processor

wherein the at least one processor is further configured to cause the apparatus to add

the running speed calibration value to the measured running speed during the exercise

Application/Control Number: 13/418,781                                      Page 15
Art Unit: 2862

phase in combination with the rest of the claimed limitations as claimed and defined by the applicant.

   **Regarding claim 9**, none of the prior art of record (Pyles, Ananny, Hoffman, Kahn) teaches or fairly suggests an apparatus comprising at least one processor wherein the at least one processor is further configured to cause the apparatus to cause the apparatus to compute a running distance calibration value by dividing the difference between a measured walking distance and a measured running distance by the measured running distance and to calibrate, during the exercise phase, measured running distance with the running distance calibration value in combination with the rest of the claimed limitations as claimed and defined by the applicant.

### *Response to Arguments*

19.    Applicant's arguments with respect to the 35USC 101 rejection for claims **claims 1, 14, and 15** filed 12/09/2014 have been fully considered but they are not persuasive. Applicant argues " It is submitted that Claim 1 is patent-eligible as it is not solely directed to an abstract idea. Specifically, the subject matter recited in Claim 1 is a physical structure rather than a mere mental process, and is thus not an abstract idea. Unlike the claims under consideration in the In re Bilski decision, in which a risk hedging method could be performed mentally by a human being, or the Alice v. CLS Bank decision, in which a financial-trading method to reduce settlement risk could be performed mentally by a human being, the claimed embodiments provide for an apparatus that measures motion. Thus, Claims 1-13 would not preempt or monopolize an entire field by restricting the use of a mental process. Further, the claimed

Application/Control Number: 13/418,781                                          Page 16
Art Unit: 2862

embodiments are not fundamental economic practices, methods of organizing human

activities, an idea of itself, or mathematical formulas, as referred to in the Alice decision.

In addition, it is submitted that the claimed elements amount to significantly more than

an abstract idea as they provide for substantial improvements in the measurement of

motion and the technology of measuring motion by providing various techniques to

calibrate these measurements, thereby achieving greater accuracy in such technical

measurements."

        Examiner respectfully disagrees.  Although the claims may be directed to a

physical structure, the abstract idea of acquiring data, computing calibration values, and

calibrating data is merely implemented by a generic algorithm on a generic computer.

According to the Supreme Court decision Alice Corporation Pty. Ltd. v. CLS Bank

International, et al. ("Alice Corp.") if an abstract idea is listed in the claim, the additional

elements in the claim must be sufficient to ensure that the claim as a whole amounts to

significantly more than an abstract idea itself.  Further guidance on overcoming the 35

U.S.C. 101 rejection in view of Alice can be found on the USPTO website under

Examiner Guidance.


20.     Applicant's arguments with respect to claims **1, 5, 13, and 14** have been

considered but are moot because the arguments do not apply to any of the references

being used in the current rejection since applicants amendments of Claim 1 and 14

required new grounds of rejection.

21.     **Claims 15-19** are new claims and are rejected above.

Application/Control Number: 13/418,781                                      Page 17
Art Unit: 2862

### *Conclusion*

Any inquiry concerning this communication or earlier communications from the examiner should be directed to CATHERINE RASTOVSKI whose telephone number is (571)270-0349.  The examiner can normally be reached on Monday-Thursday 7:30-5pm est.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Arleen Vazquez can be reached on 571-272-2619.  The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system.  Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative or access to the automated information system, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.


/CATHERINE RASTOVSKI/
Examiner, Art Unit 2862

/SUJOY KUNDU/
Supervisory Patent Examiner, Art Unit 2862
February 9, 2015

# EXHIBIT 6

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Applicant | : | Mika Niemimaki |
| Application No. | : | 13/418,781 |
| Filed | : | March 13, 2012 |
| Title | : | METHOD FOR CALIBRATING EXERCISE APPARATUS |
| | | |
| TC/A.U. | : | 2862 |
| Examiner | : | Catherine T. Rastovski |
| | | |
| Confirmation No. | : | 2256 |
| Docket No. | : | 187-198 |
| Dated | : | May 13, 2015 |

Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia  22313-1450

**Certificate of EFS-Web Transmission**

I hereby certify that this correspondence is being transmitted
to the U.S. Patent and Trademark Office via the Office's
electronic filing system on  **May 13, 2015**

Joyce Peterson          /joyce peterson/
(Printed Name)          (Signature)

## RESPONSE TO NON-FINAL OFFICE ACTION

Sir:

In response to the non-final Office Action mailed February 23, 2015, a reply to which is due by May 23, 2015, please amend the above-identified application as follows.

**Amendments to the Claims** are reflected in the listing of claims that begins on page 2 of this paper.

**Remarks** begin on page 9 of this paper.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 2 of 15

## IN THE CLAIMS:

*The following listing of claims will replace all prior versions and listings of claims in the application:*

1.  (Currently Amended)  An apparatus comprising:

~~at least one processor configured to cause the apparatus to:~~a processor, the processor performing operations comprising:

~~acquire~~computing, during a calibration phase, at least one walking motion metric obtained from a measured local motion of a user under a condition where the user has walked a first real distance, wherein the at least one walking motion metric comprises an estimated walking distance value ~~acquired~~ computed by employing a walking motion algorithm during the condition, wherein the estimated walking distance value represents an estimate of the first real distance acquired by employing the walking motion algorithm;

~~acquire~~computing, during the calibration phase, at least one running motion metric obtained from a measured local motion of the user under a condition where the user has run a second real distance which may be the same as or different from the first real distance, wherein the at least one running motion metric comprises an estimated running distance value ~~acquired~~ computed by employing a running motion algorithm during the condition, wherein the estimated running distance value represents an estimate of the second real distance acquired by employing the running motion algorithm;

~~compute~~ computing a calibration value for one of running measurements and walking measurements on the basis of both the estimated running distance value and the estimated walking distance value by using a relation~~ship~~ between the estimated walking distance value and the estimated running distance value; and

~~calibrate~~ calibrating at least one of running and walking measurements with said calibration value during an exercise phase, thereby decreasing inaccuracy of the apparatus in its determination of at least one of the running and walking measurements during the exercise phase

CRITICAL

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 3 of 15

~~without requiring entry of a predetermined distance and use of an existing calibration model during the calibration phase~~.

    2.  (Currently Amended)  The apparatus of claim 1, wherein the ~~at least one processor is~~operations further ~~configured to cause the apparatus to determine~~comprise:
      <ins>determining</ins> which one of the walking motion metric and the running motion metric provides less accurate measurement results<ins>;</ins> and ~~to calibrate~~
      <ins>calibrating</ins> the less accurate motion metric with said calibration value during the exercise phase.

    3.  (Currently Amended)  The apparatus of claim 2, wherein the ~~at least one processor is~~operations further ~~configured to cause the apparatus to determine~~ <ins>comprise determining</ins> by default that the running motion metric is less accurate.

    4.  (Currently Amended)  The apparatus of claim 1, wherein when the second real distance is different from the first real distance, the apparatus is provided with information on relation between the first real distance and the second real distance, and wherein the ~~at least one processor is~~operations further ~~configured to cause the apparatus to scale~~comprise scaling at least one of the running motion metric and the walking motion metric according to said relation in order to make the running motion metric and the walking motion metric ~~to~~represent the same real distance.

    5.  (Original)   The apparatus of claim 1, wherein said at least one walking motion metric comprises time measured for the user to walk the first real distance and at least one of distance and speed measured from local motion of the user when walking the first real distance, and wherein said at least one running motion metric comprises time measured for the user to run the second real distance and at least one of distance and speed measured from local motion of the user when running the second real distance.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 4 of 15

6.  (Currently amended)  The apparatus of claim 5, wherein the ~~at least one processor is~~ operations further ~~configured to cause the apparatus to compute~~ comprise:

~~computing~~ a running speed calibration value by dividing a difference between a measured walking distance and a measured ~~unning~~ running distance by the time measured for the user to walk the first real distance; and ~~to calibrate~~

calibrating, during the exercise phase, measured running speed with the running speed calibration value.

7.  (Currently amended)  The apparatus of claim 1, wherein the ~~at least one processor is~~ further ~~configured to cause the apparatus to add~~ comprise adding the running speed calibration value to the measured running speed during the exercise phase.

8.  (Currently amended)  The apparatus of claim 1, wherein the ~~at least one processor is~~ operations further ~~configured to cause the apparatus to further divide~~ comprise:

dividing the running speed calibration value by a measured running speed measured as the at least one running motion metric; and

~~to multiply~~ multiplying the measured running speed during the exercise phase by thus obtained divided speed calibration value.

9.  (Currently amended)  The apparatus of claim 1, wherein the ~~at least one processor is~~ operations further ~~configured to cause the apparatus to compute~~ comprise:

computing a running distance calibration value by dividing the difference between a measured walking distance and a measured running distance by the measured running distance; and ~~to calibrate~~

calibrating, during the exercise phase, measured running distance with the running distance calibration value.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 5 of 15

10.  (Currently Amended)   The apparatus of claim 1, wherein the apparatus further comprises a user interface, and wherein the ~~at least one processor is~~ operations further ~~configured to cause the apparatus~~ comprise, during the calibration phase ~~to~~:

~~inform~~ informing the user through the user interface about the start of the calibration phase;

~~detect~~ detecting the start of a walking stage and initiate measurement of the at least one walking motion metric;

~~detect~~ detecting the end of the walking stage and terminate measurement of the at least one walking motion metric;

~~detect~~ detecting the start of a running stage and initiate measurement of the at least one running motion metric;

~~detect~~ detecting the end of the running stage and terminate measurement of the at least one running motion metric; and

~~inform~~ informing the user through the user interface about the end of the calibration phase.

11.  (Currently Amended)   The apparatus of claim 10, wherein the ~~at least one processor is~~ operations further ~~configured to cause the apparatus~~ comprise instructing, during the calibration phase ~~to instruct~~, the user to at least one of start and end the walking stage and the running stage.

12.  (Currently Amended)   The apparatus of claim 10, wherein the ~~at least one processor~~ is operations further ~~configured to cause the apparatus~~ comprise instructing, during the calibration phase ~~to instruct~~, the user to stand still at the beginning and end of the walking stage and the running stage ~~so as~~ to facilitate ~~the~~ detection of the walking stage and the running stage.

13.  (Currently Amended)  The apparatus of claim 1, wherein the ~~at least one processor~~ is operations further ~~configured to cause the apparatus to display~~ comprise displaying the

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 6 of 15

calibrated measurement results to the user ~~at least one of~~ during ~~and/or~~ and after the exercise through a user interface.

14.  (Currently amended)  A non-transitory computer-readable medium comprising instructions that, when executed by a processing device, cause the processing device to perform a method comprising:

~~acquiring~~computing, during a calibration phase, at least one walking motion metric obtained from a measured local motion of a user under a condition where the user has walked a first real distance, wherein the at least one walking motion metric comprises an estimated walking distance value ~~acquired~~ computed by employing a walking motion algorithm during the condition, wherein the estimated walking distance value represents an estimate of the first real distance acquired by employing the walking motion algorithm;

~~acquiring~~computing, during the calibration phase, at least one running motion metric obtained from a measured local motion of the user under a condition where the user has run a second real distance which may be the same as or different from the first real distance, wherein the at least one running motion metric comprises an estimated running distance value ~~acquired~~ computed by employing a running motion algorithm during the condition, wherein the estimated running distance value represents an estimate of the second real distance acquired by employing the running motion algorithm;

computing a calibration value for one of running measurements and walking measurements on the basis of both the estimated running distance value and the estimated walking distance value by using a relationship between the estimated walking distance value and the estimated running distance value; and

calibrating at least one of running and walking measurements with said calibration value during an exercise phase, thereby decreasing inaccuracy of the processing device in its determination of at least one of the running and walking measurements during the exercise phase without requiring entry of a predetermined distance and use of an existing calibration model during the calibration phase.

Applicant(s): Mika Niemimaki
Application Serial No. 13/418,781
Filing Date: March 13, 2012
Docket No.: 187-198
Page 7 of 15

15. (Currently Amended)      An apparatus comprising:

diagnostics circuitry, the diagnostics circuitry ~~acquiring~~computing, during a calibration phase, at least one walking motion metric obtained from a measured local motion of a user under a condition where the user has walked a first real distance, wherein the at least one walking motion metric comprises an estimated walking distance value ~~acquired~~ computed by employing a walking motion algorithm during the condition, wherein the estimated walking distance value represents an estimate of the first real distance acquired by employing the walking motion algorithm, the diagnostics circuitry ~~acquiring~~ computing during the calibration phase, at least one running motion metric obtained from a measured local motion of the user under a condition where the user has run a second real distance which may be the same as or different from the first real distance, wherein the at least one running motion metric comprises an estimated running distance value ~~acquired~~ computed by employing a running motion algorithm during the condition, wherein the estimated running distance value represents an estimate of the second real distance acquired by employing the running motion algorithm; and

calibration parameter determiner circuitry, the calibration parameter determiner circuitry determining a calibration value for one of running measurements and walking measurements on the basis of both the estimated running distance value and the estimated walking distance value by using a relationship between the estimated walking distance value and the estimated running distance value, the calibration parameter determiner circuitry calibrating at least one of running and walking measurements with said calibration value during an exercise phase, thereby decreasing inaccuracy of the processing device in its determination of at least one of the running and walking measurements during the exercise phase without requiring entry of a predetermined distance and use of an existing calibration model during the calibration phase.

16. (Currently Amended)  The apparatus of claim ~~1~~15, wherein the diagnostics circuitry causes the apparatus to determine which one of the walking motion metric and the running motion metric provides less accurate measurement results and the calibration parameter

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 8 of 15

determiner circuitry calibrates the less accurate motion metric with said calibration value during the exercise phase.

17.  (Currently Amended)  The apparatus of claim 2̶16, wherein the calibration parameter determiner circuitry causes the apparatus to determine by default that the running motion metric is less accurate.

18.  (Currently Amended)  The apparatus of claim 1̶15, wherein when the second real distance is different from the first real distance, the apparatus is provided with information on relation between the first real distance and the second real distance, and wherein the diagnostics circuitry causes the apparatus to scale at least one of the running motion metric and the walking motion metric according to said relation in order to make the running motion metric and the walking motion metric to represent the same real distance.

19.  (Currently Amended)  The apparatus of claim 1̶15, wherein said at least one walking motion metric comprises time measured for the user to walk the first real distance and at least one of distance and speed measured from local motion of the user when walking the first real distance, and wherein said at least one running motion metric comprises time measured for the user to run the second real distance and at least one of distance and speed measured from local motion of the user when running the second real distance.

20.  (Currently Amended)  The apparatus of claim 5̶19, wherein the calibration parameter determiner circuitry causes the apparatus to compute a running speed calibration value by dividing a difference between a measured walking distance and a measured running distance by the time measured for the user to walk the first real distance and to calibrate, during the exercise phase, measured running speed with the running speed calibration value.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 9 of 15

## REMARKS

Pursuant to the Office Action mailed February 23, 2015, which has been carefully considered, Applicant requests reconsideration.  To further prosecution of this application, each of the issues raised in the Action is addressed herein.

Claims 1-20 are currently pending in this application, of which Claims 1, 14, and 15 are independent claims.  By this Amendment, Claims 1-4 and 6-20 have been amended to further clarify the claimed subject matter.  Support for these amendments is provided throughout the specification, claims, and drawings as originally filed.  The application as now presented is believed to be in allowable condition.

A.    Telephonic Interview

The undersigned respectfully requests a telephonic interview based on this response to discuss advancing the subject application, and awaits the Examiner's response thereto following an opportunity to consider this submission, and before issuance of a further Office Action.

B.    Allowable Subject Matter

Claims 6-9 and 20 were objected to as dependent upon a rejected base claim, but would be allowable if rewritten in independent form including the limitations of the base claim and any intervening claims upon overcoming the 35 U.S.C. §101 rejections.  The indication of allowable subject matter is acknowledged and appreciated.

C.    Claim Objections

Claim 19 was objected to as being a duplicate of Claim 5.  Accordingly, Claim 19 has been amended to depend from Claim 15.  Therefore, it is submitted that the objection to Claim 19 has been obviated.

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 10 of 15

D.    Claim Rejections under 35 U.S.C. §112

Claims 16-18 and 20 were rejected concerning antecedent basis.  Accordingly, Claims 16-18 and 20 have been amended to depend from Claim 15.  Therefore, it is requested that the rejection of Claims 16-18 and 20 under 35 U.S.C. §112 be reconsidered and withdrawn.

E.    Claim Rejections under 35 U.S.C. §101

Claims 1-20 were rejected under 35 U.S.C. §101 as directed to non-statutory subject matter.

In accordance with the Examiner's recommendations during a telephonic interview on February 6, 2015, independent Claims 1, 14, and 15 were amended to overcome this rejection by reciting that inaccuracy of the apparatus in determining at least one of running and walking measurements during the exercise is decreased without requiring entry of a predetermined distance and use of an existing calibration model during a calibration phase.  Thus, the claims have been confined to a particular useful application in order to satisfy the requirement of reciting significantly more than an abstract idea in accordance with page 22 of the *Interim Guidance on Patent Subject Matter Eligibility* issued December 16, 2014 (79 FR 74618).

In accordance with the *Interim Guidance*, each of the claims is directed to a process, machine, manufacture, or composition of matter, as required by step 1 of the analysis.  Specifically, Claims 1-13 are directed to an apparatus, Claim 14 is directed to a non-transitory computer-readable medium, and Claims 15-20 are directed to an apparatus.

As a result, the analysis proceeds to step 2A, which determines whether each of the claims is directed to a law of nature, natural phenomenon, or abstract idea.  However, it is submitted that the claims do not simply recite an abstract idea as they do not solely recite the abstract ideas identified by the Court, which are fundamental economic practices, methods of organizing human activities, ideas of themselves, mathematical relationships/formulas.  Further,

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 11 of 15

it is submitted that the Action's characterization of the inventive subject matter as the abstract idea of *acquiring signals from a source and performing calculations and calibrations* is an over-simplification of the claimed subject matter.  Specifically, the claimed subject matter provides a calibration value for one of running measurements and walking measurements on the basis of both an estimated running distance value and an estimated walking distance value by using a relationship between the estimated walking distance value and the estimated running distance value.  These features advantageously result in decreasing inaccuracy of the apparatus in determining at least one of running and walking measurements during an exercise phase without requiring entry of a predetermined distance and use of an existing calibration model during a calibration phase.

In addition, in accordance with step 2B of the analysis, the claims as a whole amount to significantly more than *acquiring signals from a source and performing calculations and calibrations* since the additional elements recited in the claims establish meaningful limitations that do not foreclose or monopolize all uses of such an abstract idea when viewed in combination.  Specifically, by computing a calibration value for one of running measurements and walking measurements on the basis of both the estimated running distance value and the estimated walking distance value by using a relationship between the estimated walking distance value and the estimated running distance value, inaccuracies of the apparatus are substantially decreased without requiring entry of a predetermined distance and use of existing calibration model during a calibration phase.  Clearly, the claimed features as a whole ensure that the technical function of the apparatus is substantially improved.

In addition, the claimed features result in significant benefits to the technology of measuring running and walking parameters, which provides substantial advantages in highly technical fields, such as health care and exercise physiology.  Yet further, application of the claimed features results in transformation of running and walking measurement data to far more accurate information.  Still further, computing a calibration value for one of running measurements and walking measurements on the basis of both the estimated running distance

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 12 of 15

value and the estimated walking distance value by using a relationship between the estimated

walking distance value and the estimated running distance value is clearly not a well-understood,

routine or conventional operation.  This contention lacks any basis in the case law and ignores

the fundamental difference between what is *known* in the prior art and what is *conventional* in

industry practice.

      For something to be *conventional* it must not only be known, but widely-adopted.  Put

simply, the fact that space travel is *known* in human society by no means makes it a *conventional*

practice.  Conflating these two concepts and disregarding any element that has a basis in the

prior art makes it virtually impossible to satisfy step two.  As the Supreme Court recognized in

*Mayo*, *all inventions at some level embody, use, reflect, rest upon, or apply laws of nature,*

*natural phenomena, or abstract ideas*, and as a result *too broad an interpretation* of these

implicit exclusions from eligibility *would eviscerate patent law*.  Most inventions build on what

is known in the art, and an improvement to software will almost inevitably be an algorithm or

concept which, when viewed in isolation, will seem abstract.  This analysis would likely render

all software patents ineligible, contrary to Congress's wishes.  Thus, it is submitted that the

claimed subject matter as a whole amounts to substantially more than an abstract idea.

      The claimed subject matter calibrates motion measurements.  Measurement technology is

inherently a field of technology and, therefore, substantially more than an abstract idea.  An

abstract idea could include generating walking and running motion metrics arbitrarily, such as by

performance of a mental act.  However, the claimed subject matter defines that the metrics are

measured from local motion of the user, and the definition of using these measurements to

acquire motion metrics brings the claimed subject matter into the field of measurement

technology.  Thus, the claimed subject matter results in substantial improvements in a

technology and technical field of running and walking measurement, which is a basis for finding

significantly more than an abstract idea enumerated at page 22 of the *Interim Guidance*.  As

stated in the *Interim Guidance* in its analysis of *Diamond v. Diehr*, the combination of steps

recited in the claims, in addition to relationships between the claimed elements, show that the

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 13 of 15

claims are not to the relationships in isolation, but rather that the steps impose meaningful limits that apply the relationships to improve the existing technological process of determining running and walking measurements.  As a result, the claimed subject matter is rendered substantially more than an abstract idea.

Further, it is submitted that when the claims are viewed as whole, the claims clearly do not seek to tie up an abstract idea such that others cannot practice it.  Specifically, the abstract idea proposed in the Action of *acquiring signals from a source and performing calculations and calibrations* is clearly not preempted by the claimed subject matter.  As stated in the *Interim Guidance*, a robotic arm assembly having a control system that operates using certain mathematical relationships is clearly not an attempt to tie up use of the mathematical relationship and would not require a full analysis to determine eligibility.  Similarly, the claimed apparatus and computer readable medium recite elements of a control system that operate to decrease inaccuracy of the apparatus in determining at least one of running and walking measurements, which do not tie up all uses of these elements.  For example, others are clearly free to use running and walking measurements to perform gait analysis on individuals rather than improve estimation of running and walking distance values.  Therefore, it is submitted that Claims 1-20 are directed to patent-eligible subject matter, and it is requested that the rejection under 35 U.S.C. §101 be reconsidered and withdrawn.

F.    Claim Rejections under 35 U.S.C. §103

Claims 1-3, 5, and 13-19 were rejected as unpatentable over U.S. Publication No. 2001/0022828 to Pyles and U.S. Publication No. 2007/0270721 to Annany et al.  Claims 4 and 18 were rejected as unpatentable over *Pyles, Annany*, and U.S. Publication No. 2009/0043531 to Kahn.  Claims 10-12 were rejected as unpatentable over *Pyles*, *Annany,* and U.S. Publication No. 2001/0032105 to Hoffman et al.

Regarding Claims 1, 14, and 15, the Action indicates that paragraph [0072] of *Annany* discloses *a calibration value on the basis of a relation between the estimated walking distance*

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 14 of 15

*value and the estimated running distance value*.  However, it is submitted that *Pyles* describes obtaining five (5) rates (in units of steps per second) for walking and running, and counting the number of steps taken to traverse a <u>fixed distance</u> to determine stride length at the various rates. For example, if the fixed distance is 10m, the rate is 1 step/second, and if 10 steps are counted with a pedometer to traverse the <u>fixed distance</u>, then the stride length at this particular <u>fixed distance</u> and rate would be 1m.

However, nothing in *Pyles* would suggest computing a calibration value for at least one of running measurements and walking measurements on the basis of both a running distance value and a walking distance value using a relationship between an estimated walking distance value and the estimated running distance value.  In contrast, *Pyles* refers to only <u>one fixed distance</u> to be traversed for both walking and running.  However, calibrating anything based on a relationship between a fixed distance and that same fixed distance would be meaningless and inoperative to perform the calibration function, thus rendering the device described in *Pyles* unsatisfactory for its intended purpose and changing its principle of operation in violation of MPEP §2143.01.  The explicit purpose of the *Pyles* device is to determine stride length and distance as described at paragraph [0072].  Thus, it is submitted that nothing in the cited references would suggest using both running and walking motion metrics to calibrate one of running and walking motion metrics.

Applicant notes that in order to support a claim of *prima facie* obviousness, the cited references must teach or suggest each and every element of the invention, and there must be a basis to combine the references and prior art as suggested.  However, it is submitted that nothing in the art of record would teach or suggest, either alone or in combination, the claimed invention, as now defined by amended Claims 1, 14, and 15.

Applicant submits that Claims 2-13, which dependent from Claim 1; and Claims 16-20, which depend from Claim 15, are patentable over the art of record by virtue of their dependence. Further, Applicant submits that Claims 2-13 and 16-20 define additional patentable subject

Applicant(s):  Mika Niemimaki
Application Serial No. 13/418,781
Filing Date:  March 13, 2012
Docket No.: 187-198
Page 15 of 15

matter in their own right.  Therefore, it is requested that the rejection of Claims 1-5 and 10-19

under 35 U.S.C. §103 be reconsidered and withdrawn.

<u>CONCLUSION</u>

Entry of the amendments to Claims 1-4 and 6-20; favorable consideration of Claims 1-4

and 6-20, as amended; and allowance of pending Claims 1-20 are solicited.

In view of the foregoing amendments and remarks, this application should now be in

condition for allowance.  A notice to this effect is respectfully requested.  If the Examiner

believes, after this Amendment, that the application is not in condition for allowance, the

Examiner is requested to call the Applicant's attorney at the telephone number provided below to

discuss any outstanding issues.

Respectfully submitted,

/rod s. turner/
Rod S. Turner
Registration No.: 38,639
Attorney for Applicant

HOFFMANN & BARON, LLP
6900 Jericho Turnpike
Syosset, New York 11791
(516) 822-3550
RST:mak:jp

499097_1

# EXHIBIT 7



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | ISSUE DATE | PATENT NO. | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 13/418,781 | 10/06/2015 | 9149213 | 187-198 | 2256 |

23869        7590        09/16/2015
Hoffmann & Baron LLP
6900 Jericho Turnpike
Syosset, NY 11791

# ISSUE NOTIFICATION

The projected patent number and issue date are specified above.

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment is 691 day(s). Any patent to issue from the above-identified application will include an indication of the adjustment on the front page.

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702. Questions relating to issue and publication fee payments should be directed to the Application Assistance Unit (AAU) of the Office of Data Management (ODM) at (571)-272-4200.

APPLICANT(s) (Please see PAIR WEB site http://pair.uspto.gov for additional applicants):

Mika Niemimaki, Haukipudas, FINLAND;

The United States represents the largest, most dynamic marketplace in the world and is an unparalleled location for business investment, innovation, and commercialization of new technologies. The USA offers tremendous resources and advantages for those who invest and manufacture goods here. Through SelectUSA, our nation works to encourage and facilitate business investment. To learn more about why the USA is the best country in the world to develop technology, manufacture products, and grow your business, visit SelectUSA.gov.

IR103 (Rev. 10/09)

# EXHIBIT 8

Via eFILE                                                        REEXAMINATION
                                        Attorney Docket No.: I1618.10003US02

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*Ex Parte*
Reexamination of:        U.S. Patent No. 6,701,271

Control No.:             90/013,409                          Art Unit
                                                             3992
Inventors:               Barry E. Willner, et al.

Filed:                   November 25, 2014

For:                     METHOD AND APPARATUS FOR USING
                         PHYSICAL CHARACTERISTIC DATA
                         COLLECTED FROM TWO OR MORE SUBJECTS

Examiner:                McNeil, Jennifer C.

Customer No.:            97149

Confirmation No:         1069

## CORRECTED REQUEST FOR EX PARTE REEXAMINATION

**Mail Stop: Ex Parte Reexamination**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

In response to the "DECISION *SUA SPONTE* VACATING *EX PARTE* REEXAMINATION FILING DATE" mailed on February 3, 2015 (the "Decision"), Patent Owner submits the present "CORRECTED REQUEST FOR EX PARTE REEXAMINATION" of claim 1 of U.S. Patent No. 6,701,271 (the "Corrected Request"), which corrects the "REQUEST FOR EX PARTE REEXAMINATION" that was filed on November 25, 2014 (the "Original Request").

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 3

II.     CLAIM FOR WHICH REEXAMINATION IS REQUESTED ........................... 4

III.    CO-PENDING PROSECUTION AND LITIGATION ........................................ 4

IV.     THE REFERENCE RELIED UPON HEREIN PROVIDES NEW, NONCUMULATIVE TECHNICAL TEACHINGS ..................................................................................... 5

V.      CERTIFICATION STATEMENT UNDER 37 C.F.R. § 1.510(b)(6) .................................. 8

VI.     GROUNDS PRESENTING A SUBSTANTIAL NEW QUESTION OF PATENTABILITY WITH RESPECT TO AT LEAST ONE CLAIM OF THE '271 PATENT ......................... 9

VII.    COMPLIANCE WITH REQUIREMENTS OF THE DECISION ..................................... 15

VIII.   CONCLUSION .............................................................................................. 16

APPENDIX A – United States Patent No. 6,701,271

APPENDIX G – United States Patent No. 6,013,007 to Root

## I.  INTRODUCTION

U.S. Patent No. 6,701,271 (the "'271 patent") (Appendix A – submitted with the Original Request) issued on March 2, 2004 and is currently owned by Assignee ICON Health & Fitness, Inc. ("ICON" or "Patent Owner").

In this Corrected Request, Patent Owner presents two (2) grounds of unpatentability based on Root (U.S. Patent No. 6,013,007) (Appendix G – submitted with the Original Request) that have not been relied upon by the Office in any proceeding, including during original prosecution or during any post-grant proceeding of the '271 patent.

In accordance with 37 C.F.R. § 1.510(b) this Corrected Request includes the following:

1.  A statement pointing out each substantial new question of patentability based on a prior patent (Section VI).

2.  An identification of the claim for which reexamination is requested (*i.e.*, claim 1) (Section II), and a detailed explanation of the pertinency and manner of applying the cited prior art (*i.e.*, Root) to claim 1 (Section VI).

3.  A copy of the patent relied upon or referred to in paragraphs (1) and (2) above (Appendix G).

4.  A copy of the entire patent including the front face, drawings, and specification/claims (in double column format) for which reexamination is requested, and a copy of any disclaimer, certificate of correction, or reexamination certificate issued in the patent (Appendix A).

5.  A certification that the statutory estoppel provisions of 35 U.S.C. § 315(e)(1) or 35 U.S.C. § 325(e)(1) do not prohibit the requester from filing this Corrected Request (Section V).

In addition, an electronic payment in the amount of $12,000 for the *ex parte* reexamination fee specified by 37 C.F.R. § 1.20(c)(1) was previously paid at the time of the filing of the Original Request.

## II.     CLAIM FOR WHICH REEXAMINATION IS REQUESTED

In accordance with 37 C.F.R. § 1.510, Patent Owner ICON, the real party in interest and assignee of the '271 patent, requests *ex parte* reexamination of claim 1 of the '271 patent.

As explained below, a substantial new question of patentability of claim 1 is raised by Root (Appendix G) as identified and applied in this Corrected Request. As a result, the prior art patent relied upon in this Corrected Request, and the manner in which it applies to claim 1, present a substantial new question of patentability with respect to claim 1, under the following grounds:

Ground 1: Claim 1 is anticipated under 35 U.S.C. § 102(b) over Root.

Ground 2: Claim 1 is obvious under 35 U.S.C. § 103(a) over Root.

## III.    CO-PENDING PROSECUTION AND LITIGATION

Patent Owner is aware of the following co-pending prosecution and litigation related to the '271 patent:

- Co-Pending *Inter Partes* Reexamination, Control No. 95/002,337 filed September 14, 2012 (the "co-pending '337 Reexam");

- *ICON Health & Fitness et al. v. Garmin Ltd. et al.*, Civil Docket No. 1:11-cv-00166-DB, filed November 11, 2011;

- *ICON Health & Fitness et al. v. Polar Electro Oy*, Civil Docket No. 1:11-cv-00167-PMW, filed November 11, 2011;

- *ICON Health & Fitness et al. v. FitnessKeeper, Inc.*, Civil Docket No. 1:11-cv-00173-CW, filed December 9, 2011;

- *ICON Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB, filed December 9, 2011; and

- *ICON Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW, filed December 9, 2011.

## IV.   THE   REFERENCE   RELIED   UPON   HEREIN   PROVIDES   NEW, NONCUMULATIVE TECHNICAL TEACHINGS

Root (Appendix G) qualifies as prior art under 35 U.S.C. § 102(b) because Root issued on January 11, 2000, which is more than one year prior to the filing date of the '271 patent. It is believed that Root was not before the Examiner during original prosecution of the '271 patent. Root was identified in an IDS submitted in the co-pending '337 Reexam; however, the Office has not relied on Root in any rejection to date. Thus, the grounds of rejection based on Root as proposed herein pose substantial new questions of patentability with respect to claim 1 of the '271 patent.

Further, Root presents new, non-cumulative technological teachings that were not previously considered and discussed on the record during the prosecution of the '271 patent. In particular, Root discloses a "remote computer 801" (Fig. 8) that is configured to receive, via a telephone line (Fig. 8; 4:60-64; 8:58-62), first data indicative of a physical characteristic (e.g., heart rate and body temperature – 5:40-49) from a first subject (e.g., the athlete disclosed in FIG. 1) *from a first device* (Fig. 2; Fig. 3; Fig. 6; a "GPS-based personal performance monitor and feedback device 101" – 4:4-5) *that is associated with the first subject* (e.g., the device 101 is associated with the athlete disclosed in FIG. 2). Root also discloses that the "remote computer 801" (Fig. 8) is also configured to receive second data indicative of a physical characteristic of a second subject *from a second device associated with said second subject*. ("This remote computer 801 collects, stores and compiles athletic performance data from participants around the planet." – 8:62-64, which discloses that there are multiple subjects around the planet, each of whom is associated with a separate device 101). The above-emphasized technological teachings of Root do not appear to have been previously

considered nor discussed on the record during the prosecution of the application that resulted in the '271 patent.

In particular, during the prosecution of the '271 patent, the last office action made two separate rejections under 35 U.S.C. § 102(b) of claim 1. *See* '271 patent file history, Office Action mailed June 11, 2003, pages 3 and 4. In response to this rejection, independent claim 1 was amended to clarify that first data indicative of a physical characteristic of a first subject is received "***from a first device associated with said first subject***" and that second data indicative of a physical characteristic of a second subject is received "***from a second device associated with said second subject***." *See* '271 patent file history, Response and Amendment filed September 15, 2003, page 2. (Emphasis added). The applicant then argued that the first reference cited in the first rejection under 35 U.S.C. § 102(b) failed to teach the use of "a first devices associated with a first subject" and "a second device associated with a second subject" as required by claim 1, since the first reference failed to teach "use of any devices by audience members or the actors, association of devices with subjects, or the receiving of data from such devices." *Id*. at 13-14. Similarly, the applicant argued that the second reference cited in the second rejection under 35 U.S.C. § 102(b) failed to teach the use of "a first devices associated with a first subject" and "a second device associated with a second subject" as required by claim 1, since the second reference "does not associate the monitors/sensors with said subjects." *Id*. at 18. After applicant made these amendments and arguments, the application was allowed without the Examiner giving any statement of the reasons for allowance of claim 1. *See* Notice of Allowance mailed October 30, 2003. Given that the Examiner did not state why claim 1 was allowed, it can be inferred that the Examiner was persuaded by the amendments and arguments noted above. Therefore, Root presents new, non-cumulative technological teachings that were not previously considered and discussed on the record during the prosecution of the '271 patent because Root clearly teaches first data indicative of a physical characteristic of a first subject is received

"*from a first device associated with said first subject*" and that second data indicative of a physical characteristic of a second subject is received "*from a second device associated with said second subject*" where these teachings were not found to exist in either of the references cited in the last office action during the prosecution of the '271 patent.

Further, Root present a new, non-cumulative technological teaching that was not previously considered and discussed on the record during the prosecution of the co-pending '337 Reexam. In particular, during the prosecution of the co-pending '337 Reexam, Root was identified in an IDS but the Office has not relied on Root in any rejection to date, and Root was not discussed on the record. Further, the three rejections of claim 1 in the co-pending '337 Reexam rely on three prior art references that are all unnecessarily limited to purely localized devices with individual components interconnected with wires over short distances in a localized vicinity, despite the fact that the scope of claim 1 is broad enough to encompass remote, portable devices such as the device 101 disclosed in Fig. 2 of Root. *See* co-pending '337 Reexam, Office Action mailed December 7, 2012, pages 4-5. Indeed, the devices disclosed by each of the three cited references do not contemplate the new, non-cumulative technological teaching of a portable "Global Positioning System (GPS) based personal athletic performance monitor" 101 as taught in Fig. 2 of Root as corresponding to the "*first device associated with said first subject*" and the "*second device associated with said second subject*" as required by claim 1. Further, no such teaching was previously considered and discussed on the record of the co-pending '337 Reexam. The lack of appreciation for the broader scope of claim 1 in rejections made in the co-pending '337 Reexam unnecessarily limited the rejections of claim 1 in the co-pending '337 Reexam.

MPEP 2242(I) states:

> Where a second or subsequent request for reexamination of a patent is made before the conclusion of an earlier filed reexamination proceeding pending (ongoing) for that patent ... in order for the second or subsequent request for reexamination to be

granted, the second or subsequent requester must independently provide a substantial new question of patentability which is **different from** that raised in the pending reexamination for **the claims in effect at the time of the determination**. The decision on the second or subsequent request is thus based on the claims in effect at the time of the determination (37 CFR 1.515(a)).

(Emphasis in original). The substantial new question of patentability raised herein with respect to the above-noted portable device technological teachings of Root as applied to claim 1 are clearly different from the above-noted localized, wired device teachings of the three references cited in the rejections of claim 1 in the co-pending '337 Reexam. Further, the above-noted portable device technological teachings of Root are new and non-cumulative because no such teachings, or similar teachings, are found in any of the three reference cited in the co-pending '337 Reexam.

Finally, 37 CFR 1.530(k) states that, during reexamination, "Although the Office actions will treat proposed amendments as though they have been entered, the proposed amendments will ***not be effective until the reexamination certificate is issued and published***." (Emphasis added). Therefore, since no reexamination certificate has issued and published in the co-pending '337 Reexam, no amendments made to claim 1 in the co-pending '337 Reexam are yet "in effect." Therefore, the determination as to whether Root presents a substantial new question of patentability with respect to claim 1 should be decided by the Office based on the version of claim 1 that is currently "in effect at the time of the determination," which is the version of claim 1 as printed in the the'271 patent.

## V.      CERTIFICATION STATEMENT UNDER 37 C.F.R. § 1.510(b)(6)

Patent Owner hereby certifies that the statutory estoppel provisions of 35 U.S.C. § 315(e)(1) or 35 U.S.C. § 325(e)(1) do not prohibit Patent Owner from filing this Corrected Request, as Patent Owner has never been the "petitioner" in any *inter partes* review or post-grant review of the '271 patent.

## VI.   GROUNDS   PRESENTING   A   SUBSTANTIAL   NEW   QUESTION   OF PATENTABILITY WITH RESPECT TO AT LEAST ONE CLAIM OF THE '271 PATENT

A request for *ex parte* reexamination should be granted where "a substantial new question of patentability affecting any claim of the patent is raised by the request and the prior art cited therein." 37 C.F.R. § 1.515(a).  In this section, the instant Corrected Request is shown to be sufficient to justify reexamination of claim 1 of the '271 patent. The grounds of rejection proposed by this Corrected Request are new, substantial, and based on a patent (*i.e.*, Root) that is reasonably likely to be upheld as rendering the challenged claim unpatentable. Although Patent Owner believes that the grounds of rejection proposed by this Corrected Request raise substantial new questions of patentability with respect to claim 1 of the '271 patent, Patent Owner does not admit that claim 1 of the '271 patent is in fact unpatentable under either of these grounds.  Rather, the grounds of rejection proposed by this Corrected Request are merely presented to the USPTO for their consideration and reexamination without any express or implied waiver, disclaimer, or admission on the part of Patent Owner.

**Ground 1: Claim 1 is anticipated under 35 U.S.C. § 102(b) over Root**

In the claim chart provided below, Patent Owner sets forth the manner of applying Root to claim 1 under 35 U.S.C. § 102(b), thereby more fully demonstrating why Root is reasonably likely to be held to present a substantial new question of patentability with regard to claim 1.

| Claim 1 of U.S. Patent No. 6,701,271 | Root |
|---|---|
| 1.  A   method   for   providing   feedback, comprising: | Root discloses "A Global Positioning System (GPS) based personal athletic performance monitor" that is configured to perform a method "for providing an athlete with real-time athletic performance feedback data." (Abstract; |

| | |
|---|---|
| | see also 9:67-10:4 (discussing a "presentation method.")). |
| receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject; | Root discloses a "remote computer 801" (Fig. 8) that is configured to receive, via a telephone line (Fig. 8; 4:60-64; 8:58-62), first data indicative of a physical characteristic (e.g., heart rate and body temperature – 5:40-49) from a first subject (e.g., the athlete disclosed in FIG. 2) from a first device (Fig. 2; Fig. 3; Fig. 6; a "GPS-based personal performance monitor and feedback device 101" – 4:4-5) that is associated with the first subject (e.g., the device 101 is associated with the athlete disclosed in FIG. 2). Root also discloses that the "remote computer 801" (Fig. 8) is also configured to receive second data indicative of a physical characteristic of a second subject from a second device associated with said second subject. ("This remote computer 801 collects, stores and compiles athletic performance data from participants around the planet." – 8:62-64, which discloses that there are multiple subjects around the planet, each of |

| | whom is associated with a separate device 101). |
|---|---|
| determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and | Root discloses determining an evaluation of the first and second data ("A number of historical exercise session performance data sets … can be uploaded to the remote computer 801. … The uploaded data sets are collected, stored, and compiled for presentation on an Internet web site, which compares performances of participating athletes in a variety of ways." – 6:16-22). The comparison of performance data of participating athletes constitutes an evaluation of the first and second data. This comparison (evaluation) is representative of a state (e.g., a fitness state such as a cardiovascular state) of both the first and second subjects (i.e., the "participating athletes"). |
| providing a notification regarding said evaluation to a device. | Root discloses providing a notification regarding the comparison (evaluation) to a device. For example, Root discloses that "remote computer 801 is connected to the Internet 803. The uploaded data sets are collected, stored, and compiled for presentation |

| | on an Internet web site, which compares performances of participating athletes in a variety of ways." (6:19-22) This "Internet web site is then used to present performance data from participating athletes." (8:64-65.) Root discloses that the remote computer 801 provides the website, where the comparison (evaluation) is presented, to a personal computer 701 over the Internet 803. (Fig. 9; 6:29-41). |
|---|---|

**Ground 2: Claim 1 is obvious under 35 U.S.C. § 103(a) over Root**

In the claim chart provided below, Patent Owner sets forth the manner of applying Root to claim 1 under 35 U.S.C. § 103(a), thereby more fully demonstrating why Root is reasonably likely to be held to present a substantial new question of patentability with regard to claim 1. It is noted that Patent Owner presents Ground 1 and Ground 2 to provide the Central Reexamination Unit the option to order reexamination of claim 1 over Root under 35 U.S.C. § 102(b) and/or under 35 U.S.C. § 103(a).

| Claim 1 of U.S. Patent No. 6,701,271 | Root |
|---|---|
| 1. A method for providing feedback, comprising: | Root discloses "A Global Positioning System (GPS) based personal athletic performance monitor" that is configured to perform a method "for providing an athlete with real-time athletic performance feedback data." (Abstract; |

| | |
|---|---|
| | see also 9:67-10:4 (discussing a "presentation method.")). |
| receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject; | Root discloses a "remote computer 801" (Fig. 8) that is configured to receive, via a telephone line (Fig. 8; 4:60-64; 8:58-62), first data indicative of a physical characteristic (e.g., heart rate and body temperature – 5:40-49) from a first subject (e.g., the athlete disclosed in FIG. 2) from a first device (Fig. 2; Fig. 3; Fig. 6; a "GPS-based personal performance monitor and feedback device 101" – 4:4-5) that is associated with the first subject (e.g., the device 101 is associated with the athlete disclosed in FIG. 2). Root also discloses that the "remote computer 801" (Fig. 8) is also configured to receive second data indicative of a physical characteristic of a second subject from a second device associated with said second subject. ("This remote computer 801 collects, stores and compiles athletic performance data from participants around the planet." – 8:62-64, which discloses that there are multiple subjects around the planet, each of |

| | whom is associated with a separate device 101). |
|---|---|
| determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and | Root discloses determining an evaluation of the first and second data ("A number of historical exercise session performance data sets … can be uploaded to the remote computer 801. … The uploaded data sets are collected, stored, and compiled for presentation on an Internet web site, which compares performances of participating athletes in a variety of ways." – 6:16-22). The comparison of performance data of participating athletes constitutes an evaluation of the first and second data. This comparison (evaluation) is representative of a state (e.g., a fitness state such as a cardiovascular state) of both the first and second subjects (i.e., the "participating athletes"). |
| providing a notification regarding said evaluation to a device. | Root discloses providing a notification regarding the comparison (evaluation) to a device. For example, Root discloses that "remote computer 801 is connected to the Internet 803.   The uploaded data sets are collected, stored, and compiled for presentation |

| | on an Internet web site, which compares performances of participating athletes in a variety of ways." (6:19-22) This "Internet website is then used to present performance data from participating athletes." (8:64-65.) Root discloses that the remote computer 801 provides the website, where the comparison (evaluation) is presented, to a personal computer 701 over the Internet 803. (Fig. 9; 6:29-41). |
|---|---|

## VII.   COMPLIANCE WITH REQUIREMENTS OF THE DECISION

In the "REQUESTOR RECOURSE" section on pages 8-9 of the Decision, the Office laid out six (6) options for Patent Owner to correct the Original Request. For the sake of clarity, Patent Owner will address each option below.

**Option 1**

Patent Owner has updated section IV herein to address the deficiencies noted in Part I of the Decision.

**Option 2**

Patent Owner has withdrawn all references to all prior art references herein except references to Root, which is the sole prior art reference under which reexamination is requested herein.

**Option 3**

Patent Owner has withdrawn (by not including) any additional proposed rejections, other than the rejections over Root that are identified in Sections II, IV, and VI herein.

**Option 4**

In the Original Request, Patent Owner included several appendices that are objected to in the Decision. Patent Owner hereby explicitly withdraws the following appendices that were included in the Original Request:

- APPENDIX B – Request for *Inter Partes* Reexamination, Reexamination Control No. 95/002,337 filed September 14, 2012

- APPENDIX C – Order Granting Request for *Inter Partes* Reexamination, Reexamination Control No. 95/002,337

- APPENDIX D – United States Patent No. 6,292,688 to Patton

- APPENDIX E – United States Patent No. 5,676,138 to Zawilinski

- APPENDIX F – United States Patent No. 3,744,712 to Papadopoulos

Further, Patent Owner submits herewith a new form PTO/SB/08 that only lists Root, which is the sole prior art reference under which reexamination is requested herein.

**Option 5**

By explicitly withdrawing Appendix B (Request for *Inter Partes* Reexamination, Reexamination Control No. 95/002,337 filed September 14, 2012) above, Patent Owner has addressed the problem pointed out in Part III of the Decision.

**Option 6**

Patent Owner submits herewith a new form PTO/SB/08 that only list Root, thereby addressing the "Other Issue" raised in the Decision.

**VIII.   CONCLUSION**

From the foregoing charts, it can readily be seen that the teachings of Root raise substantial new questions of patentability with respect to claim 1 under 35 U.S.C. § 102(b) and under 35 U.S.C. § 103(a). Therefore, reexamination of issued claim 1 is hereby requested.

Dated this 6th day of February 2015.

Respectfully submitted,

**/JOHN T. GADD, Reg. No. 52928/**

JOHN T. GADD
Registration No. 52,928
Attorney for Patent Owner
Customer No. 97149
Telephone No. (435) 252-1360

# EXHIBIT 9



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,409 | 02/06/2015 | 6701271 | I1618.10003US02 | 1069 |

97149          7590          03/04/2015
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 03/04/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/013,409 | 6701271 |
| | Examiner | Art Unit |
| | MATTHEW HENEGHAN | 3992 |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>06 February 2015</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,   b)☒ PTO/SB/08,   c)☐ Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

   RESPONSE TIMES ARE SET AS FOLLOWS:

   For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

   For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐   The request for *ex parte* reexamination is DENIED.

   This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)).  **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

   In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

   a) ☐  by Treasury check or,

   b) ☐  by credit to Deposit Account No. _____,  or

   c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

cc:Requester ( if third party requester )
U.S. Patent and Trademark Office
PTOL-471 (Rev. 08-06)               **Office Action in *Ex Parte* Reexamination**               Part of Paper No. 20150217

Appx319

Application/Control Number: 90/013,409                                    Page 2
Art Unit: 3992

The present application is being examined under the pre-AIA first to invent

provisions.

## DECISION GRANTING *EX PARTE* EXAMINATION

### *Reexamination*

An Ex Parte Reexamination has been requested by the Patent Owner on 6

February 2015 for claim 1 of U.S. Patent No. 6,701,271 (hereinafter "the '271 patent"),

granted on 2 March 2004.

A substantial new question of patentability affecting claim 1 of United States

Patent Number 6,701,271 is raised by the request for *ex parte* reexamination.

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 6,701,271 throughout the course of this reexamination

proceeding.  See MPEP §§ 2207, 2282 and 2286.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

Application/Control Number: 90/013,409                                    Page 3
Art Unit: 3992

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).


It is noted that litigation concerning the '271 has been stayed pending

reexamination. As a result, the Patent Owner is notified all the shortened statutory

periods for reply to any office actions issued pursuant to this Order shall be set to ONE

(1) MONTH or 30 days, whichever is greater, until all stays have been lifted or litigation

has been concluded.


**Reference Submitted by Patent Owner**


U.S. Patent No. 6,013,007 to Root et al. (hereinafter Root)

This reference cited above was not discussed by the Office in a previous examination or

reexamination proceeding.

Application/Control Number: 90/013,409                                    Page 4
Art Unit: 3992

*Prosecution History*

The application 09/859,827 that resulted in the '271 patent was filed on May 17, 2001. The original application included claims 1-33, with claims 1, 26, 31, 32 and 33 being independent.

In the first non-final office action on the merits on August 12, 2002, claims 1-20 and 23-33 were rejected based on US Patent No. 5,542,420 to Goldman et al. ("Goldman") and claims 21 and 22 were indicated allowable.

In the response filed on October 17, 2002 to the first non-final office action, claims 1, 3, 7, 11, 17, 21, 23, 26, 27, 29, 31, 32 and 33 were amended and new claims 34-36 were added. The applicant further argued that the claims require two or more subjects or group of subjects whereas Goldman is directed to individual subjects.

The Office mailed a Notice of Allowance on December 20, 2002 in view of the amendment and arguments presented in the response filed on October 17, 2002.

The Office mailed a Notice of Withdrawal from Issue on May 22, 2003, reopening prosecution.

On June 11, 2003, a second non-final office action was mailed. Claims 1-31 and 34-36 were rejected based on the paper "Shear Madness has Right Mix of Character, Audience" and claims 1-36 were rejected based on US Patent No. 5,762,503 to Hoo et al. ("Hoo").

Application/Control Number: 90/013,409                                     Page 5
Art Unit: 3992

      In the response on September 15, 2003 to the second non-final office action,

claims 1, 26, 31 and 34 were amended, new claims 37-41 were added. The applicant

further argued that the references do not teach the claimed limitation that receiving data

indicative of a physical characteristic of each of a plurality of subjects. In particular,

claim 1 was amended to add the language "from a first device associated with said first

subject" and "from a second device associated with said second subject."

      On October 30, 2003, the examiner issued a second Notice of Allowance without

comment.

      An Inter Partes Reexamination, 95/002,337 (hereinafter the '337 reexamination),

was requested for claims 1-41 on 14 September 2012 by a Third Party Requester. This

was granted based on a RLP analysis by the Office on 7 December 2012. Since this

case is still pending, nothing from those proceedings shall be considered herein. Since

that proceeding did not involve any determination regarding Substantial Questions of

Patentability, determinations made regarding the applicability of references presented

therein have no bearing on the instant Order. It is important to note that, since different

prior art references are being considered, it should not be inferred that a finding of

patentability in the '337 reexamination, should one occur, would suggest that the '271

patent is patentable over the prior art being considered in the instant proceeding, or that

any finding of patentability in the instant proceeding would suggest that the '271 patent

is patentable over the prior art being considered in the '337 reexamination.

      None of the claims of the '271 patent have been subject to a final holding of

invalidity by a court.

Application/Control Number: 90/013,409                                              Page 6
Art Unit: 3992

**Claim of the '271 Patent**

The following is the relevant claim of the '271 patent:

Claim 1:

A method for providing feedback, comprising:

receiving first data indicative of a physical characteristic of a first subject ***from a first***

   ***device associated with said first subject*** and second data indicative of a

   physical characteristic of a second subject ***from a second device associated***

   ***with said second subject***;

determining an evaluation of said first data and said second data, wherein said

   evaluation is representative of a state of both said first subject and said second

   subject;  and

providing a notification regarding said evaluation to a device.

Application/Control Number: 90/013,409                                         Page 7
Art Unit: 3992

**_Substantial New Questions of Patentability (SNQ)_**

**Root**

Root discloses a system in which devices for monitoring personal athletic performances are attached to individuals and the collected data is later transmitted to a central location that analyzes comparative performances of two or more athletes. Specifically, it discloses that a remote computer receives data from at least a first device associated with a first subject and a second device associated with a second subject. See Root, column 8, lines 58-65. This was not taught by the art of record in the original prosecution. It is agreed that a reasonable examiner would have found this reference important in determining the patentability of claim 1.

Application/Control Number: 90/013,409                                       Page 8
Art Unit: 3992

### *Conclusion*

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed:
By Mail to:   Mail Stop *Ex Parte* Reexam
                      Central Reexamination Unit
                      Commissioner for Patents
                      United States Patent & Trademark Office
                      P.O. Box 1450
                      Alexandria, VA 22313-1450

By FAX to:  (571) 273-9900
                      Central Reexamination Unit

By hand:     Customer Service Window
                      Randolph Building
                      401 Dulany Street
                      Alexandria, VA 22314

Registered users of EFS-Web may alternatively submit such correspondence via the electronic
filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered. EFS-Web offers
the benefit of quick submission to the particular area of the Office that needs to act on the
correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded)
directly into the official file for the reexamination proceeding, which offers parties the opportunity
to review the content of their submissions after the "soft scanning" process is complete.

   Any inquiry concerning this communication should be directed to Examiner Matthew
Heneghan at telephone number (571)272-3834.

/Matthew Heneghan/

Primary Examiner, USPTO AU 3992


Conferees:

/MINH DIEU NGUYEN/

Primary Examiner, Art Unit 3992

/JENNIFER MCNEIL/

Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT 10

Via eFILE                                                    REEXAMINATION
                                     Attorney Docket No.: I1618.10003US02

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| *Ex Parte* | | |
| Reexamination of: | U.S. Patent No. 6,701,271 | |
| Control No.: | 90/013,409 | Art Unit 3992 |
| Inventors: | Barry E. Willner, et al. | |
| Filed: | February 6, 2015 | |
| For: | METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS | |
| Examiner: | Heneghan, Matthew E. | |
| Customer No.: | 97149 | |
| Confirmation No: | 1069 | |

### PATENT OWNER'S STATEMENT AND AMENDMENT UNDER 37 C.F.R. § 1.530

**Mail Stop: Ex Parte Reexamination**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

    Patent Owner provides this Statement and Amendment under 37 C.F.R. § 1.530 in response

to the Order Granting *Ex Parte* Reexamination (the "Order") of U.S. Patent No. 6,701,271 (the "'271

Patent") mailed on March 4, 2015.

    **Amendments to the Claims** begin on page 2 of this paper,

    **Status of Claims and Support for Claim Amendments** begin on page 11 of this paper, and

    **Remarks** begin on page 15 of this paper.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

## AMENDMENTS TO THE CLAIMS

Pursuant to 37 C.F.R. §§ 1.530(a)(b) and (d)(2), please amend U.S. Patent No. 6,701,271 by cancelling claim 1 and adding new claims 42-87:


1.      **(Cancelled)**


42.     **(New)**  The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor; and

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet.


43.     **(New)**  The method of claim 42, wherein:

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which of multiple options to provide to the first subject for the first subject to select from.


44.     **(New)**  The method of claim 43, wherein:

the determining, based on the first data and based on the second data, of which of multiple options to provide to the first subject for the first subject to select from includes determining, based on the first data and based on the second data, which of multiple endings to an event to provide to the first subject for the first subject to select from.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

45.     **(New)**  The method of claim 42, wherein:

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, to provide different information to the first subject and to the second subject.

46.     **(New)**  The method of claim 45, wherein:

the determining, based on the first data and based on the second data, to provide different information to the first subject and to the second subject includes determining, based on the first data and based on the second data, to provide information at a different level of sophistication to the first subject and to the second subject in order to better match characteristics of the first subject and of the second subject.

47.     **(New)**  The method of claim 42, wherein:

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which parts of an event most interest the first subject and the second subject.

48.     **(New)**  The method of claim 42, wherein:

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, an environmental condition of the first subject and of the second subject to alter.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

49.      **(New)**  The method of claim 48, wherein:

the environmental condition is the temperature of a room occupied by the first subject and by the second subject.

50.      **(New)**  The method of claim 42, wherein:

the determining of the evaluation includes the remote server averaging the first data and the second data.

51.      **(New)**  The method of claim 42, wherein:

the determining of the evaluation includes the remote server summarizing the first data and the second data.

52.      **(New)**  The method of claim 42, wherein:

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, a pattern that is common between the first data and the second data.

53.      **(New)**  The method of claim 42, wherein:

the device is a device of a trainer of the first subject and the second subject.

54.      **(New)**  The method of claim 53, wherein:

the evaluation is an audible notification; and

the device of the trainer is a wireless earphone.

55.    **(New)**  The method of claim 42, wherein:

the device is a software application operating on a cellular telephone; and

the cellular telephone has a touch screen input device.


56.    **(New)**  The method of claim 42, wherein:

the device is a software application operating on a portable computer; and

the portable computer has a touch screen input device.


57.    **(New)**  The method of claim 42, wherein:

the device is a software application operating on a personal computer; and

the personal computer has a touch screen input device.


58.    **(New)**  The method of claim 42, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet.

59.      **(New)**  The method of claim 58, wherein:

   the wireless connection is a Bluetooth wireless connection.


60.      **(New)**  The method of claim 58, wherein:

   the wireless connection is an infrared wireless connection.


61.      **(New)**  The method of claim 58, wherein:

   the first portable wireless sensor is a heart rate sensor.


62.      **(New)**  The method of claim 58, wherein:

   the first portable wireless sensor includes a blood pressure sensor.


63.      **(New)**  The method of claim 58, wherein:

   the first portable wireless sensor includes a subject blood sugar level sensor.


64.      **(New)**  The method of claim 58, wherein:

   the first portable wireless sensor includes a subject posture sensor.


65.      **(New)**  The method of claim 58, wherein:

   the first portable wireless sensor includes a subject respiration rate sensor.


66.      **(New)**  The method of claim 58, wherein:

   the first portable wireless sensor includes a subject facial response sensor.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

67.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject facial position sensor.

68.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject weight sensor.

69.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject height sensor.

70.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject galvanic skin response sensor.

71.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject pheromone emission sensor.

72.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject brain wave pattern sensor.

73.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject brain wave rhythm sensor.

74.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject odor sensor.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

75.      **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject motion sensor.

76.      **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject perspiration sensor.

77.      **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

78.      **(New)**  The method of claim 42, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

79.      **(New)**  The method of claim 78, wherein:

the first sensor is an acceleration sensor.

80.      **(New)**  The method of claim 78, wherein:

the first sensor is a heart rate sensor.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

81.      **(New)**  The method of claim 78, wherein:

the first sensor is a temperature sensor.


82.      **(New)**  The method of claim 42, wherein:

the first sensor is a first portable wireless sensor; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over a first wireless connection to the Internet.


83.      **(New)**  The method of claim 82, wherein:

the first wireless connection employs a first wireless receiving station that is connected to the Internet.


84.      **(New)**  The method of claim 42, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.


85.      **(New)**  The method of claim 84, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is sitting on the stationary apparatus.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

86.    **(New)**  The method of claim 84, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is resting on the stationary apparatus.


87.    **(New)**  The method of claim 84, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is standing on the stationary apparatus.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

### STATUS OF CLAIMS AND SUPPORT FOR CLAIM AMENDMENTS
### PURUSANT TO 37 C.F.R. § 1.530(e)

**A.    Status of Claims**

Claim 1 is the subject of reexamination. By this paper, claim 1 is cancelled and new claims 42-87 have been added. Thus, claims 42-87 are now pending.

**B.    Support for Claim Amendments**

Support for the following new claim limitations are found *at least* in the following locations in the present patent, U.S. Patent No. 6,701,271 (the "'271 Patent"). Other locations in the '271 Patent may provide additional support for the following new claim limitation. To save space, each claim limitation is identified by claim number/limitation number, where each limitation ends in a semicolon and a hard return. For example, dependent claim 42 includes three (3) limitations (numbered below as limitations 42-1, 42-2, and 42-3). To further save space, columns and lines in the specification of the '271 Patent are identified by [column]:[lines] (e.g., column 9, lines 24-29 of the '271 Patent is identified as 9:24-29). Also, where support for a limitation can be found in a location already identified in connection with a previous limitation, the previous limitation will simply be identified (e.g., "*See* 43-1"). It is noted, however, that multiple limitations finding support in the same location does not mean that the limitations are identical, equivalent, or even related, as a single location or locations in the present patent can provide support for various distinct and unrelated claim limitations.

| Claim-Limitation | SUPPORT |
|---|---|
| 42-1 | *See* 9:24-29 |
| 42-2 | *See* 9:42-44 |
| 42-3 | *See* 9:44-46 ("The sensors 202 may send data regarding physical characteristics to one or more of the servers 204...."); *see also* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204 ... via a computer, data, or communications network 208."); *see also* 10:14-17 ("The communications network 208 might be or |

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

| | |
|---|---|
| | include the Internet...."); *see also* 14:33-37 ("...two or more of the steps in each of the methods described above could be performed on two or more different computers, computer systems, microprocessors, etc., some or all of which may be locally or remotely configured.") |
| 43-1 | *See* 5:47-64 |
| 44-1 | *See* 43-1 |
| 45-1 | *See* 6:9-13 |
| 46-1 | *See* 45-1 |
| 47-1 | *See* 6:18-38 |
| 48-1 | *See* 6:39-47 |
| 49-1 | *See* 48-1 |
| 50-1 | *See* 6:48-60 |
| 51-1 | *See* 50-1 |
| 52-1 | *See* 7:4:7 |
| 53-1 | *See* 7:8-9 ("During a step 106, a notification of the evaluation determined during the step 104 is provided to at least one device."); *see also* 7:27-40 ("...assume a speaker is giving a lecture to a group of subjects....a notification of the evaluation may be sent to a computer being used by the speaker...."); *see also* 7:46-49 (the speaker may be a trainer giving a "training lecture.") |
| 54-1 | *See* 7:35-40 |
| 54-2 | *See* 54-1 |
| 55-1 | *See* 7:16-21 ("The notification may be sent to ... a software program operating on a device...."); *see also* 8:34-45 ("The notification ... may be sent to any type of devices, such as a ... user device (e.g., computer, cellular telephone).") |
| 55-2 | *See* 12:57-59 ("In some embodiments, a user device 206 may have the same structure, components or configuration as the server 204 illustrated in FIG. 5."); *see also* 11:8-15 ("If desired, the server 204 may include ... one or more input devices 258 such as a ... touch screen....") |
| 56-1 | *See* 55-1; *see also* 10:2-6 ("Possible user devices include a personal computer, portable computer....") |
| 56-2 | *See* 55-2 |
| 57-1 | *See* 56-1 |
| 57-2 | *See* 55-2 |
| 58-1 | *See* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204 ... via a computer, data, or communications network 208."); *see also* 10:24-25 ("The communications network 208 can also include ... wireless networks....Moreover, as used herein, communications include those enabled by ... |

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

| | |
|---|---|
| | wireless technology."); *see also* 9:46 ("In some embodiments, a sensor 202 may be ... carried ... by a subject....") |
| 58-2 | *See* 9:44-46 ("The sensors 202 may send data regarding physical characteristics to ... one or more of the user devices 206."); *see also* 10:2-6 ("Possible user devices include a ... cellular telephone...."); ("The communications network 208 can also include ... wireless networks....Moreover, as used herein, communications include those enabled by ... wireless technology.") |
| 58-3 | *See* 9:24-29 ("...one or more user devices 206 ... may communicate with a server 204, via a computer, data, or communications network 208."); *see also* 10:14-17 ("The communications network 208 might be or include the Internet...."); *see also* 10:24-17 ("The communications network 208 can also include ... cellular ... networks...."); |
| 58-4 | *See* 58-3; *see also* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with ... one or more user devices 206 that may communicate with a server 204, via a computer, data, or communications network 208.") |
| 59-1 | *See* :10:36-49 |
| 60-1 | *See* 12:57-59 ("In some embodiments, a user device 206 may have the same structure, components or configuration as the server 204 illustrated in FIG. 5."); *see also* 11:8-15 ("If desired, the server 204 may include ... one or more input devices 258 such as a ... infrared or other receiver....") |
| 61-1 | *See* 9:56-61 |
| 62-1 | *See* 61-1 |
| 63-1 | *See* 61-1 |
| 64-1 | *See* 61-1 |
| 65-1 | *See* 4:50-58; *see also* 5:1-4 ("The data for different subjects can come from different ... sensors....") |
| 66-1 | *See* 65-1 |
| 67-1 | *See* 65-1 |
| 68-1 | *See* 65-1 |
| 69-1 | *See* 65-1 |
| 70-1 | *See* 65-1 |
| 71-1 | *See* 65-1 |
| 72-1 | *See* 65-1; *see also* Abstract ("A physical characteristic of a subject might be or includes the subject's ... brain wave pattern....") |
| 73-1 | *See* 65-1; *see also* Abstract ("A physical characteristic of a subject might be or includes the subject's ... brain wave ... rhythm....) |
| 74-1 | *See* 65-1 |
| 75-1 | *See* 61-1 |
| 76-1 | *See* 61-1 |

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

| | |
|---|---|
| 77-1 | *See* 61-1 |
| 78-1 | *See* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with ... one or more user devices 206 that may communicate with a server 204, via a computer, data, or communications network 208."); *see also* 10:30-35 ("In some embodiments, a ... sensor 202 may be connected directly to ... a user device 206 without departing from the scope of the present invention."); *see also* 10:2-6 ("Possible user devices include a ... cellular telephone...."); |
| 78-2 | *See* 58-3 |
| 78-3 | *See* 58-4 |
| 79-1 | *See* 77-1 |
| 80-1 | *See* 61-1 |
| 81-1 | *See* 61-1 |
| 82-1 | *See* 58-1 |
| 82-2 | *See* 9:44-46 ("The sensors 202 may send data regarding physical characteristics to one or more of the servers 204...."); *see also* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204 ... via a computer, data, or communications network 208."); *see also* 10:14-17 ("The communications network 208 might be or include the Internet...."); *see also* 10:24-25 ("The communications network 208 can also include ... wireless networks....Moreover, as used herein, communications include those enabled by ... wireless technology.") |
| 83-1 | *See* 10:36-53 |
| 84-1 | *See* 9:49-51 |
| 84-2 | *See* 84-1 |
| 85-1 | *See* 84-1 |
| 86-1 | *See* 84-1 |
| 87-1 | *See* 84-1 |

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

## REMARKS

Patent Owner submits this Patent Owner's Statement and Amendment pursuant to 37 C.F.R. 1.530 and in response to the Order Granting *Ex Parte* Reexamination of the '271 Patent mailed on November 7, 2014 (the "Order").

### A.    Original Claim 1

Pursuant to the Order, U.S. Patent No. 6,013,007 ("Root") is relied upon as creating a substantial new question of patentability affecting claim 1 of the '271 Patent. Patent Owner herein cancels claim 1 in order to focus this reexamination on prosecution of new claims that depend from claim 1.

### B.    New Claims 42-87

In order to advance prosecution, Patent Owner has added new claims 42-87 herein. Support for these new claims is discussed above. Patent Owner respectfully submits that no new matter is introduced in these amendments and these amendments should therefore be entered by Examiner. In addition, Patent Owner respectfully submits that each of new claims 82-87 is patentably distinct over Root. For the convenience of Examiner, Patent Owner will provide a non-exhaustive discussion of these distinctions below. Please note that Patent Owner does not intend the following remarks to be an exhaustive enumeration of the distinctions between Root and the claims. Rather, Patent Owner presents the distinctions below solely by way of example to illustrate some of the differences between the claims and Root. Finally, Applicants request that Examiner carefully review Root to ensure that Applicants' understanding and discussion of Root is consistent with Examiner's understanding.

#### a.    claim 42

Claim 42 requires, among other things, that "the receiving of the first data includes a remote server receiving the first data from the first sensor ***through the Internet***." (Emphasis added).

Page **15** of **22**

Appx342

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

Root does appear to teach a remote computer 801 receiving data from a performance monitor 101 ("monitor data"). *See e.g.*, Root, Fig. 8. However, Root does ***not*** appear to teach that the monitor data received by the remote computer 801 is received ***through*** the Internet 803 of Fig. 8.  Instead, as clearly shown in FIG. 8 of Root (reproduced below), the monitor data received by the remote computer 801 from the performance monitor 101 is received over "a standard telephone line." *See* Root, 6:12-22.



Fig. 8

Appx343

And although the remote computer 801 is connected to the Internet 803, as shown in Fig. 8 of Root (reproduced above), the monitor data received from the performance monitor 101 is not received *through* the Internet 803, but is instead received over a standard telephone line that *completely bypasses* the Internet 803.

Root also appears to teach a personal computer 701 receiving monitor data from the performance monitor 101 in Fig. 7, and the personal computer 701 also separately accessing a web site on the remote computer 801 through the Internet 803 in Fig. 9. However, Root does *not* appear to teach that the monitor data received by the personal computer 701 from the performance monitor 101 is then transferred to the remote computer 801. Instead, the connection between the personal computer 701 and the remote computer 801 in Fig. 9 is *only* taught in Root to be utilized for accessing monitor data on the remote computer 801 that was previously uploaded to the remote computer 801 over a standard phone line, as disclosed in Fig. 8 of Root and discussed above. Therefore, while Fig. 9 of Root does teach communication between the remote computer 801 and the personal computer 701 that goes through the Internet 803, this communication does not include *monitor data* (that was generated by the performance monitor 101) being received by the remote computer 801. *See* Root, 6:29-41. Thus, Root does not teach "a remote server receiving the *first data from the first sensor through the Internet*" as required by claim 42.

Not only does Root fail to disclose the above-noted limitation of claim 42, Root *teaches away from* this limitation. Specifically, one of ordinary skill in the art at the time of the Invention of the '271 patent would have been led away from modifying the performance monitor 101 of *Root* to *indirectly* send the monitor data over the Internet 803 to the remote computer 801 because *Root* instead teaches *directly* uploading the monitor data from the performance monitor 101 to the remote computer 801 "via its internal modem 613 and a standard telephone line plugged into connector 113." (*Root*, column 6, lines 12-16.) This capability to *directly* upload the monitor data from the

Page **17** of **22**

performance monitor 101 to the remote computer 801 makes any modification for indirect uploading of the monitor data through the personal computer 701 of Fig. 7 and through the Internet 803 less direct, superfluous, and potentially more difficult and less convenient since at the time of the Invention standard phone line connections were definitely more abundant than connections to the Internet. "'Teaching away' does not require that the prior art foresaw the specific invention that was later made, and warned against taking that path." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011). Indeed, "[a] reference may be said to teach away when a person of ordinary skill, upon reading the reference, ... would be led in a direction divergent from the path that was taken by the applicant." *In re ICON Health & Fitness*, 496 F.3d 1374, 1381 (Fed. Cir. 2007) (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)).

For at least these reasons, claim 42, and claims 43-87 which depend therefrom, should be allowed over Root.

**b.      claims 43-52**

Claims 43-49 and 52 require various determinations "based on the first data [that is indicative of a physical characteristic of a first subject] and based on the second data [that is indicative of a physical characteristic of a second subject]." Further, claims 50 and 51 require "[averaging/summarizing] the first data [that is indicative of a physical characteristic of a first subject] and the second data [that is indicative of a physical characteristic of a second subject]."

Root does appear to teach the remote computer 801 "comparing performance of participating athletes in a variety of ways." *See* Root. 6:16-22. However, this simple "comparing" of performance data in Root does not appear to anticipate or make obvious the advanced limitations recited in claims 43-52.Therefore, for at least these additional reasons, claims 43-53 should be allowed over Root.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

### c.     claim 53

Claim 53 requires that "the device [to which a notification regarding an evaluation of the first data and second data] is a device *of a trainer* of the first subject and the second subject." (Emphasis added).

Root does appear to teach the personal computer 701 accessing an Internet web site that presents a comparison of performances of athletes. *See* Root, 16-22 and Fig. 9. However, the personal computer 701 appears to be the personal computer 701 *of the athlete*, instead of a personal computer 701 *of a trainer* of the athlete. Therefore, Root does not appear to teach "the device [to which a notification regarding an evaluation of the first data and second data] is a device *of a trainer* of the first subject and the second subject" as required by claim 53.

Therefore, for at least these additional reasons, claim 53, and claim 54 which depends therefrom, should be allowed over Root.

### d.     claim 58

Claim 58 requires that "the first sensor is a first portable *wireless* sensor" where "the first sensor is configured to *wirelessly* connect with a *cellular telephone* through a *wireless* connection" and where "the cellular telephone is configured to *wirelessly* connect *to the Internet* through a *wireless cellular* connection." (Emphasis added).

Root does appear to teach a remote computer 801 receiving monitor data from a performance monitor 101. *See e.g.*, Root, Fig. 8. However, as noted above in connection with claim 42, Root does not appear to teach that the monitor data received by the remote computer 801 is received *through* the Internet 803, and instead *teaches away from* the remote computer 801 receiving monitor data *through* the Internet 803.

In addition, Root does *not* appear to teach any kind of *wireless* communication of monitor data between the performance monitor 101 and the remote computer 801, much less *cellular*

*wireless* communication. And not only does Root fail to disclose the above-noted "wireless" limitations of claim 58, Root *teaches away from* these limitations. Specifically, one of ordinary skill in the art at the time of the Invention of the '271 patent would have been led away from modifying the performance monitor 101 of *Root* to *wirelessly* send the monitor data over the Internet 803 to the remote computer 801 because *Root* instead teaches uploading the monitor data from the performance monitor 101 to the remote computer 801 over a *wired* connection, namely, "via its internal modem 613 and a standard telephone line plugged into connector 113." (*Root*, column 6, lines 12-16.) This capability to upload the monitor data from the performance monitor 101 to the remote computer 801 over a *wired* connection makes any modification for wireless uploading of the monitor data potentially more expensive and less convenient since at the time of the Invention standard phone line connections were definitely more abundant than wireless connections, and a wireless transmitter being added to the performance monitor 101 of Root would have been expensive and costly. "'Teaching away' does not require that the prior art foresaw the specific invention that was later made, and warned against taking that path." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011). Indeed, "[a] reference may be said to teach away when a person of ordinary skill, upon reading the reference, ... would be led in a direction divergent from the path that was taken by the applicant." *In re ICON Health & Fitness*, 496 F.3d 1374, 1381 (Fed. Cir. 2007) (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)).

For at least these reasons, claim 58, and claims 66-77 which depend therefrom, should be allowed over Root.

**e.      claim 82**

Claim 82 includes limitations similar to claim 58. Therefore, for similar reasons to those noted above in connection with claim 58, claim 82, and claim 83 which depends therefrom, should be allowed over Root.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

### f.    claim 84

Claim 84 requires that "the first sensor is formed in a ***stationary*** apparatus." (Emphasis added).

Root does appear to teach a performance monitor 101. *See e.g.*, Root, Figs. 1A and 1B. However, the performance monitor 101 is configured as a "***portable*** GPS unit that is small and light enough to be carried or worn by an outdoor athlete." See Root, 1:59-64. Therefore, Root does not appear to teach that "the first sensor is formed in a ***stationary*** apparatus" as required by claim 84 (Emphasis added).

Not only does Root fail to disclose the above-noted "***stationary***" limitation of claim 84, Root ***teaches away from*** this limitation. Specifically, one of ordinary skill in the art at the time of the Invention of the '271 patent would have been led away from modifying the performance monitor 101 of *Root* to be ***stationary*** because *Root* disparages sensors that are built into stationary apparatuses due to the fact that "Running, bicycling, and other ***outdoor*** sports are becoming increasingly popular" and sensors that are built into stationary apparatuses, such as treadmills, limit "accurately measur[ing] one's performance and progress" to "***only*** be[ing] done ***indoors***." *See* Root, 1:16-22. "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference[.]" *In re ICON Health & Fitness*, 496 F.3d 1374, 1381 (Fed. Cir. 2007) (citing *In re Gurley*, 27 F.3d 551, 553 (Fed.Cir.1994)).

For at least these reasons, claim 84, and claims 85-87 which depend therefrom, should be allowed over Root.

Patent Owner's Statement and Amendment Under 37 C.F.R. § 1.530
Reexamination Control No.: 90/013,409

**Charge Authorization**

 The Commissioner is hereby authorized to charge payment of any of the following fees that may be applicable to this communication, or credit any overpayment, to Deposit Account No. 50-5394: (1) any filing fees required under 37 C.F.R. § 1.16, (2) any patent application and reexamination processing fees under 37 C.F.R. § 1.17, and/or (3) any post issuance fees under 37 C.F.R. § 1.20.

 Dated this 4th day of May, 2015.

<div style="margin-left:40%">

Respectfully submitted,

**/John T. Gadd, Reg. No. 52,928/**

JOHN T. GADD
Registration No. 52,928
Attorney for Patent Owner
Customer No. 97149

</div>

# EXHIBIT 11



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,409 | 02/06/2015 | 6701271 | I1618.10003US02 | 1069 |

97149          7590          07/07/2015
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 07/07/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Office Action in Ex Parte Reexamination* | Control No. 90/013,409 | | Patent Under Reexamination 6701271 | |
|---|---|---|---|---|
| | Examiner MATTHEW HENEGHAN | | Art Unit 3992 | AIA (First Inventor to File) Status No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

a.☒  Responsive to the communication(s) filed on <u>5/4/15</u> .
　　☐  A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____ .

b.☐  This action is made FINAL.

c.☐  A statement under 37 CFR 1.530 has not been received from the patent owner.

A shortened statutory period for response to this action is set to expire <u>2</u> month(s) from the mailing date of this letter.
Failure to respond within the period for response will result in termination of the proceeding and issuance of an *ex parte* reexamination certificate in accordance with this action. 37 CFR 1.550(d).  **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**
If the period for response specified above is less than thirty (30) days, a response within the statutory minimum of thirty (30) days will be considered timely.

Part I    THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☒ Notice of References Cited by Examiner, PTO-892.　　3. ☐ Interview Summary, PTO-474.
2. ☐ Information Disclosure Statement, PTO/SB/08.　　4. ☐ \_\_\_\_\_.

Part II    SUMMARY OF ACTION

1a. ☒ Claims <u>42-87</u> are subject to reexamination.

1b. ☒ Claims <u>2-41</u> are not subject to reexamination.

2. ☒ Claims <u>1</u> have been canceled in the present reexamination proceeding.

3. ☐ Claims \_\_\_\_\_ are patentable and/or confirmed.

4. ☒ Claims <u>42, 45-75, and 77-87</u> are rejected.

5. ☒ Claims <u>43,44 and 76</u> are objected to.

6. ☐ The drawings, filed on \_\_\_\_\_ are acceptable.

7. ☐ The proposed drawing correction, filed on \_\_\_\_\_ has been (7a) ☐ approved (7b)☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).

　　a) ☐ All  b) ☐ Some* c)☐ None    of the certified copies have

　　1 ☐ been received.

　　2 ☐ not been received.

　　3 ☐ been filed in Application No. \_\_\_\_\_ .

　　4 ☐ been filed in reexamination Control No. \_\_\_\_\_.

　　5 ☐ been received by the International Bureau in PCT application No. \_\_\_\_\_.

　　* See the attached detailed Office action for a list of the certified copies not received.

9. ☐ Since the proceeding appears to be in condition for issuance of an *ex parte* reexamination certificate except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte* Quayle, 1935 C.D. 11, 453 O.G. 213.

10. ☐ Other: \_\_\_\_\_

cc: Requester (if third party requester)

U.S. Patent and Trademark Office
PTOL-466 (Rev. 08-13)　　　　　　Office Action in Ex Parte Reexamination　　　　　　Part of Paper No. 20150616

Application/Control Number: 90/013,409                                              Page 2
Art Unit: 3992

     The present application is being examined under the pre-AIA first to invent

provisions.

## DETAILED ACTION

### *Reexamination*

     An Ex Parte Reexamination has been granted U.S. Patent No. 6,701,271

(hereinafter "the '271 patent"). See Order, mailed 4 March 2015.

     The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 6,701,271  throughout the course of this reexamination

proceeding.  See MPEP §§ 2207, 2282 and 2286.

     Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that

*ex parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in *ex parte* reexamination proceedings are provided

for in 37 CFR 1.550(c).

Application/Control Number: 90/013,409                                    Page 3
Art Unit: 3992

In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to this Office action.  Submissions after the next Office action, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, after final rejection and 37 CFR 41.33 after appeal, which will be strictly enforced.

In response to the Order Granting Ex Parte Reexamination, claim 1 was cancelled and claims 42-87 were added. Claims 42-87 have been examined. Claims 2-41 are not subject to reexamination.

The use of the trademark Bluetooth™ has been noted in this application.  It should be capitalized wherever it appears and be accompanied by the generic terminology.

Although the use of trademarks is permissible in patent applications, the proprietary nature of the marks should be respected and every effort made to prevent their use in any manner which might adversely affect their validity as trademarks.

### *Claim Rejections - 35 USC § 112*

The following is a quotation of the first paragraph of pre-AIA 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly

Application/Control Number: 90/013,409                                      Page 4
Art Unit: 3992

connected, to make and use the same, and shall set forth the best mode contemplated by the
inventor of carrying out his invention.

The following is a quotation of 35 U.S.C. 112 (pre-AIA), second paragraph:
The specification shall conclude with one or more claims particularly pointing out and distinctly
claiming the subject matter which the applicant regards as his invention.

Claims 63, 64, 66, 67, 69-71, and 74 are rejected under 35 U.S.C. 112 (pre-AIA),

first paragraph, as failing to comply with the written description requirement.  The

claim(s) contains subject matter which was not described in the specification in such a

way as to reasonably convey to one skilled in the relevant art that the inventor or a joint

inventor, or for pre-AIA the inventor(s), at the time the application was filed, had

possession of the claimed invention. Also the original disclosure recites that data should

be collected for physical characteristics and that sensors may be used to collect some

physical characteristics, the disclosure does not recite that sensors are to be used to

measure blood sugar levels, posture, facial response, facial position, height, galvanic

skin response pheromone emissions, or subject odor.


Claims 46-49, 52, and 59 are rejected under 35 U.S.C. 112 (pre-AIA), second

paragraph, as being indefinite for failing to particularly point out and distinctly claim the

subject matter which the applicant regards as the invention.

The term "level of sophistication" in claim 46 is a relative term which renders the

claim indefinite.  The term "level of sophistication" is not defined by the claim, the

specification does not provide a standard for ascertaining the requisite degree, and one

of ordinary skill in the art would not be reasonably apprised of the scope of the

Application/Control Number: 90/013,409                                    Page 5
Art Unit: 3992

invention. For purposes of the prior art search in this office action, claim 46 stands or

falls with base claim 45.

    The term "most interest[s] the first subject" in claim 47 is a relative term which

renders the claim indefinite.  The term "interest" is not defined by the claim, the

specification does not provide a standard for ascertaining the requisite degree, and one

of ordinary skill in the art would not be reasonably apprised of the scope of the

invention. For purposes of the prior art search in this office action, claim 47 stands or

falls with base claim 42.

    Regarding claim 52, the term "determining … a pattern that is common" is an

indefinite term, in that the specification does not provide a standard for ascertaining

what would constitute such a pattern. As such, one of ordinary skill in the art would not

be reasonably apprised of the scope of the invention. For purposes of the prior art

search in this office action, claim 52 stands or falls with base claim 42.

    Regarding claim 59, the recitation of the trademark Bluetooth™ renders the claim

indefinite because it is unclear what the scope of the trademark will encompass for the

remainder of the patent term.


    Claims 48 and 49 are rejected under 35 U.S.C. 112(b) or 35 U.S.C. 112 (pre-

AIA), second paragraph, as being incomplete for omitting essential steps, such

omission amounting to a gap between the steps.  See MPEP § 2172.01.  The omitted

steps are: No step is recited that shows the manner in which "an environmental

condition of the first subject and of the second subject to alter" is performed or how it

Application/Control Number: 90/013,409                                                    Page 6
Art Unit: 3992

relates to the other steps being performed. This step is recited as part of an evaluation,

rather than as a determination of an action to be taken.

## *Claim Rejections - 35 USC § 102*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(e) the invention was described in (1) an application for patent, published under section 122(b), by
another filed in the United States before the invention by the applicant for patent or (2) a patent
granted on an application for patent by another filed in the United States before the invention by the
applicant for patent, except that an international application filed under the treaty defined in section
351(a) shall have the effects for purposes of this subsection of an application filed in the United States
only if the international application designated the United States and was published under Article 21(2)
of such treaty in the English language.

Claims 42, 45-47, 52-54, 56, 57, and 82-87 are rejected under 35 U.S.C. 102(e) as

being anticipated by U.S. Patent Application Publication No. 2002/0111541 to Bibl et al.

(hereinafter Bibl).

As per claim 42, 47, and 52, Bibl discloses a method for providing feedback,

comprising: receiving first data indicative of a physical characteristic of a first subject

from a first device (a PSA, see paragraph 24) associated with said first subject and

second data indicative of a physical characteristic of a second subject from a second

device associated with said second subject (different users may have different PSAs,

see paragraph 27);  determining an evaluation of said first data and said second data,

wherein said evaluation is representative of a state of both said first subject and said

Application/Control Number: 90/013,409                                    Page 7
Art Unit: 3992

second subject (data from many devices may be analyzed by a third party, see

paragraphs 27 and 30);  and providing a notification regarding said evaluation to a

device (feedback information provided, see paragraph 27); wherein the first device is a

first sensor; the physical characteristic of the first subject is sensed by the first sensor (a

PSA functions as a sensor sensing the subject's characteristics, see paragraph 24); and

the receiving of the first data includes a remote server receiving the first data from the

first sensor through the Internet (see paragraph 28).

      As per claims 45 and 46, information provided to each user is customized for that

user (see paragraph 27). Therefore, different information is provided to different

subjects, based on the first and second information.

      As per claim 53, the data may be used by a trainer (see paragraph 31).

      As per claim 54, audible notifications may be received by any user, including the

trainer, via wireless earphone (see paragraphs 46 and 54).

      As per claims 56 and 57, Bibl discloses the use of portable or personal

computers with touch screen inputs for the devices (e.g. PalmPilot™, see paragraph

29).

      As per claims 82, Bibl's PSA is portable and may send data to the server via a

wireless connection (see paragraph 26).

      Regarding claim 83, wireless systems inherently have receiving stations, since

transmissions must have a receiver to function.

Application/Control Number: 90/013,409                                    Page 8
Art Unit: 3992

As per claims 84-87, Bibl discloses a sensor in a stationary apparatus (a stationary bike or a weight scale), which functions when the subject is sitting, resting, or standing on it (see paragraph 45).

## Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

Claims 50 and 51 are rejected under 35 U.S.C. 103(a) as being unpatentable over Bibl as applied to claim 42 above, and further in view of U.S. Patent No. 6,292,688 to Patton (hereinafter Patton).

Regarding claim 50, Bibl does not suggest the averaging of the first and second data.

Patton discloses the averaging of data for more than one subject, in order that the influence of unusual individuals on the response may be tempered or eliminated in analysis (see column 19, lines 54-61).

Therefore it would have been obvious to one of ordinary skill in the art at the time the invention was made to modify Bibl to employ averaging among subjects, as per

Application/Control Number: 90/013,409                                      Page 9
Art Unit: 3992

Patton, in order that the influence of unusual individuals on the response may be
tempered or eliminated in analysis.

Regarding claim 51, Bibl does not disclose a summarizing of the first and second
data.

Patton further discloses the compiling of aggregate data (see column 18, line 61
to column 19, line 53), in order to allow for the comparing of statistics.

Therefore it would have been obvious to one of ordinary skill in the art at the time
the invention was made to further modify Bibl to employ aggregating data among
subjects, as per Patton, in order to allow for the comparing of statistics.


Claims 55, 58-65, 68, 70, 75, and 77-81 are rejected under 35 U.S.C. 103(a) as being
unpatentable over Bibl as applied to claim 42 above, and further in view of U.S. Patent
No. 6,605,038 to Teller et al. (hereinafter Teller).

Regarding claims 55, although Bibl discloses the use of touch screen input
devices using software applications (e.g. PalmPilot™, see paragraph 29) and
transmitting to a server using a wireless carrier (see paragraph 26), Bibl does not
explicitly disclose the use of a cellular telephone for transmitting data from the device.

Teller discloses the use of a cellular phone in conjunction with the sensor to
transmit data (see column 7, lines 49-54). One skilled in the art would recognize that
this allows for greater mobility.

Application/Control Number: 90/013,409                                         Page 10
Art Unit: 3992

Therefore, it would be obvious to one of ordinary skill in the art at the time the

invention was made to implement the invention of Bibl using a cellular telephone as the

device, to allow for greater mobility.

Further regarding claims 58 and 61, Bibl discloses the use of a wireless heart

rate sensor (see paragraph 45). One skilled in the art would recognize that all data to

the server in Bibl in view of Teller could be sent from the cellular telephone via the

Internet.

Regarding claim 59 and 60, although Bibl does not specifically state which

technologies to use for wireless transmissions from sensors, Teller further disclose that

transmission from sensors in similar situations could be made using Bluetooth™ or

infrared (see column 24, lines 14-17). It would therefore be obvious to one of ordinary

skill in the art to implement Bibl's transmissions as per Teller.

As per claims 62 and 63, Bibl further recites that the sensor may be a blood

pressure or glucose (sugar) meter  (see paragraph 45).

As per claim 64, 65, 70, and 77 Teller discloses a sensor for body position

(posture), respiration rate, galvanic skin response, acceleration (see Table 1).

As per claim 68, Bibl discloses the use of a weight sensor (see paragraph 45).

Regarding claim 69, Teller discloses that height may be entered as an attribute

(see column 19, lines 52-58).

As per claim 75, Bibl discloses the use of a motion sensor (see paragraph 45).

Application/Control Number: 90/013,409                                          Page 11
Art Unit: 3992

　　　Regarding claim 78, one skilled in the art would recognize that all data to the

server in Bibl in view of Teller could be sent from the cellular telephone via the Internet

and that the cellular telephone could be physically connected to the sensor.

　　　Regarding claims 79-81, Teller discloses a sensor for acceleration, heart rate,

and temperature (see Table 1).


Claims 66 and 67 are rejected under 35 U.S.C. 103(a) as being unpatentable over Bibl

in view of Teller as applied to claim 58 above, and further in view of U.S. Patent No.

5,676,138 to Zawilinski (hereinafter Zawilinski).

　　　Regarding claims 66 and 67, Bibl and Teller do not include facial response on

their lists on attribute to sense.

　　　Zawilinski discloses the detecting of facial position and expressions, in order to

detect pleasure (see column 4, lines 19-23).

　　　Therefore it would have been obvious to one of ordinary skill in the art at the time

the invention was made to further modify Bibl and Teller to support the sensing of facial

expressions, as per Zawilinski, to detect pleasure.


Claims 72 and 73 are rejected under 35 U.S.C. 103(a) as being unpatentable over Bibl

in view of Teller as applied to claim 58 above, and further in view of Patton.

　　　Regarding claims 72 and 73, Bibl and Teller do not include brain wave patterns

or rhythms on their list of attributes to sense.

Application/Control Number: 90/013,409                                      Page 12
Art Unit: 3992

Patton discloses the detection of brain wave patterns (i.e. rhythms) to detect emotional reactions (see abstract).

Therefore it would have been obvious to one of ordinary skill in the art at the time the invention was made to further modify Bibl and Teller to support the sensing of brain wave patterns and rhythms, as per Patton, to detect emotional reactions.

### *Patentable Subject Matter*

Claims 43, 44, and 76 are objected to as being dependent upon a rejected base claim, but would be patentable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

Claims 48 and 49 would be patentable if rewritten to overcome the rejection(s) under 35 U.S.C. 112 (pre-AIA), 2nd paragraph, set forth in this Office action and to include all of the limitations of the base claim and any intervening claims.

The following is a statement of reasons for the indication of allowable subject matter:

Regarding claim 43, the art of record does not suggest that providing of multiple options for a subject to select from where the determining of which options to provide is based upon data about both the user (the first subject) and a second subject.

Claims 44 would be allowable based upon its dependence upon claim 43.

Application/Control Number: 90/013,409                                      Page 13
Art Unit: 3992

Regarding claims 48 and 49, none of the art of record discloses the altering of an

environmental condition in response as part of a data evaluation.

Regarding claim 76, none of the art of record discloses a perspiration sensor.

Application/Control Number: 90/013,409                                        Page 14
Art Unit: 3992

*Conclusion*

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed:
By Mail to:   Mail Stop *Ex Parte* Reexam
                     Central Reexamination Unit
                     Commissioner for Patents
                     United States Patent & Trademark Office
                     P.O. Box 1450
                     Alexandria, VA 22313-1450

By FAX to:  (571) 273-9900
                     Central Reexamination Unit

By hand:       Customer Service Window
                     Randolph Building
                     401 Dulany Street
                     Alexandria, VA 22314

Registered users of EFS-Web may alternatively submit such correspondence via the electronic
filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered. EFS-Web offers
the benefit of quick submission to the particular area of the Office that needs to act on the
correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded)
directly into the official file for the reexamination proceeding, which offers parties the opportunity
to review the content of their submissions after the "soft scanning" process is complete.

    Any inquiry concerning this communication should be directed to Examiner Matthew
Heneghan at telephone number (571)272-3834.

/Matthew Heneghan/


Primary Examiner, USPTO AU 3992


Conferees:  /Mary Steelman/ Primary Examiner Art Unit 3992


/ALEXANDER KOSOWSKI/

Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT 12



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,409 | 02/06/2015 | 6701271 | I1618.10003US02 | 1069 |

97149          7590          08/27/2015
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/27/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Ex Parte Reexamination Interview Summary* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/013,409 | 6701271 |
| | Examiner | Art Unit |
| | MATTHEW HENEGHAN | 3992 |

All participants (USPTO personnel, patent owner, patent owner's representative):

| | | | |
|---|---|---|---|
| (1) | _MATTHEW HENEGHAN_ | (3) | _Mary Steelman_ |
| (2) | _Alex Kosowski_ | (4) | _John Gadd_ |

Date of Interview: _31 July 2015_

Type :  a)☒ Telephonic   b)☐  Video Conference
c)☐ Personal (copy given to:  1)☐ patent owner    2)☐ patent owner's representative)

Exhibit shown or demonstration conducted:  d)☒ Yes    e)☐  No.
    If Yes, brief description: _See attachment_

Agreement with respect to the claims  f)☐  was reached.  g)☐  was not reached.  h)☒  N/A.
Any other agreement(s) are set forth below under "Description of the general nature of what was agreed to…"

Claim(s) discussed: _42-87_.

Identification of prior art discussed: _N/A_.

Description of the general nature of what was agreed to if an agreement was reached, or any other comments:
_The Patent Owner's attorney proposed amendments would overcome rejections under 35 U.S.C. 102 and 103. No agreement was reached on claims rejected under 35 U.S.C. 112. Proposed amendments attached._

(A fuller description, if necessary, and a copy of the amendments which the examiner agreed would render the claims patentable, if available, must be attached.  Also, where no copy of the amendments that would render the claims patentable is available, a summary thereof must be attached.)

A FORMAL WRITTEN RESPONSE TO THE LAST OFFICE ACTION MUST INCLUDE PATENT OWNER'S STATEMENT OF THE SUBSTANCE OF THE INTERVIEW.  (See MPEP § 2281). IF A RESPONSE TO THE LAST OFFICE ACTION HAS ALREADY BEEN FILED, THEN PATENT OWNER IS GIVEN **ONE MONTH** FROM THIS INTERVIEW DATE TO PROVIDE THE MANDATORY STATEMENT OF THE SUBSTANCE OF THE INTERVIEW (37 CFR 1.560(b)). THE REQUIREMENT FOR PATENT OWNER'S STATEMENT CAN NOT BE WAIVED. **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

| /MATTHEW HENEGHAN/ | /MICHAEL FUELLING/ | |
|---|---|---|
| Primary Examiner, Art Unit 3992 | Supervisory Patent Examiner, Art Unit 3992 | |

cc: Requester (if third party requester)

U.S. Patent and Trademark Office
PTOL-474 (Rev. 04-01)          *Ex Parte* **Reexamination Interview Summary**          Paper No. 20150824

**Appx368**

# EXHIBIT 13

Via eFILE                                                  REEXAMINATION
Attorney Docket No.: I1618.10003US02

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*Ex Parte*
Reexamination of:      U.S. Patent No. 6,701,271

Control No.:          90/013,409                          Art Unit
                                                 3992

Inventors:           Barry E. Willner, et al.

Filed:               February 6, 2015

For:                 METHOD AND APPARATUS FOR USING
                      PHYSICAL CHARACTERISTIC DATA
                      COLLECTED FROM TWO OR MORE SUBJECTS

Examiner:           Heneghan, Matthew E.

Customer No.:       97149

Confirmation No:    1069

## PATENT OWNER'S INTERVIEW SUMMARY

**Mail Stop: Ex Parte Reexamination**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

     Pursuant to 37 C.F.R. § 1.560(b), please accept the following as Patent Owner's written statement of the substance of the interview.

     As set forth in the Ex Parte Reexamination Interview Summary mailed August 27, 2015 (the "Interview Summary"), a telephonic interview was conducted on July 30, 2015[1] in connection with the ex parte reexamination of U.S. Patent No. 6,701,271 (the "'271 patent"). During the interview, Patent Owner's representative discussed various of the rejections and objections in the Nonfinal

---

[1] Patent Owner notes that the interview was held on Thursday, July 30th, not Friday, July 31st.

Patent Owner's Interview Summary
Reexamination Control No.: 90/013,409

Office Action mailed on July 7, 2015 (the "Office Action") as well as various potential claim limitations that can be found attached to the Interview Summary.

Patent Owner's representative explained amendments to the specification to add generic terminology to the "Bluetooth" trademark.

Patent Owner's representative discussed that support for claims 63, 64, 66, 67, 69-71, and 74 can be found in column 1, lines 54-64 of the specification. However, to expedite prosecution, Patent Owner's representative has decided to cancel these claims.

Patent Owner's representative discussed a proposed amendment to claim 59 to add generic terminology to resolve the rejection of claim 59 under § 112.

Patent Owner's representative discussed the cancellation of claims 46, 47, and 52.

Patent Owner's representative discussed a potential amendment to claim 48 to overcome the rejections of claim 48 and 49 under § 112.  Patent Owner's representative has made the potential amendment to claim 48 that was suggested by Examiner in the interview.

Patent Owner's representative discussed rewriting of claim 42 to include the allowed limitation of claim 43 to render moot the rejection of claim 42 and the rejection of all other claims that depend from claim 42.

Patent Owner's representative discussed rewriting claim 48 to depend directly from claim 1 to overcome the objections to claims 48 and 49.

Patent Owner's representative discussed rewriting claim 76 to depend directly from claim 1 to overcome the objection to claim 76.

Patent Owner's representative discussed new claims 88-90. Patent Owner's representative has moved forward with claims 88 and 90, and dropped claim 89, as suggested by Examiner in the interview.

Patent Owner's Interview Summary
Reexamination Control No.: 90/013,409

Dated this 28th day of August, 2015.

Respectfully submitted,

**/John T. Gadd, Reg. No. 52,928/**

JOHN T. GADD
Registration No. 52,928
Attorney for Patent Owner
Customer No. 97149

# EXHIBIT 14

Via eFILE                                                          REEXAMINATION
                                                 Attorney Docket No.: I1618.10003US02

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*Ex Parte*
Reexamination of:      U.S. Patent No. 6,701,271

Control No.:           90/013,409                              Art Unit
                                                               3992
Inventors:             Barry E. Willner, et al.

Filed:                 February 6, 2015

For:                   METHOD    AND    APPARATUS    FOR    USING
                       PHYSICAL      CHARACTERISTIC      DATA
                       COLLECTED FROM TWO OR MORE SUBJECTS

Examiner:              Heneghan, Matthew E.

Customer No.:          97149

Confirmation No:       1069

## AMENDMENT 'A' AND RESPONSE TO NON-FINAL OFFICE ACTION

**Mail Stop: Ex Parte Reexamination**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Patent Owner submits the following in response to the Non-Final Office Action mailed July

7, 2015 (the "Office Action") and the telephonic interview conducted on July 30, 2015 (the

"Interview"):

**Amendments to the Specification** begin on page 2 of this paper,

**Amendments to the Claims** begin on page 4 of this paper,

**Status of Claims and Support for Claim Amendments** begin on page 18 of this paper, and

**Remarks** begin on page 24 of this paper.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

## AMENDMENTS TO THE SPECIFICATION

Pursuant to 37 C.F.R. §§ 1.530(a)(b) and (d)(1), please amend the '271 Patent by amending the specification as directed below.

▪ Please replace the paragraph that begins on column 10, line 36 with the following amended paragraph:

In some embodiments, a suitable wireless communication network 208 may include the use of Bluetooth™ technology that operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band, allowing a wide range of computing and telecommunication devices to be interconnected via wireless connections. Specifications and other information regarding Bluetooth™ technology are available at the Bluetooth™ Internet site www.bluetooth.com. In embodiments utilizing Bluetooth™ technology, some or all of the devices of FIG. 4 may be equipped with a microchip transceiver that transmits and receives in a previously unused ISM frequency band of 2.45 GHz that is available globally (with some variation of bandwidth in different countries). In addition to data, up to three voice channels are available. Connections can be point-to-point or multipoint over a current maximum range of ten (10) meters. Embodiments using Bluetooth™ technology may require the additional use of one or more receiving stations to receive and forward data from individual sensors 202, user devices 206 or servers 204.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

▪ Please replace the paragraph that begins on column 10, line 62 with the following amended paragraph:

> Now referring to FIG. 5, a representative block diagram of a server or controller 204 is illustrated. The server 204 may include a processor, microchip, central processing unit, or computer 250 that is in communication with or otherwise uses or includes one or more communication ports 252 for communicating with user devices and/or other devices. Communication ports may include such things as local area network adapters, wireless communication devices, Bluetooth™ technology <u>that operates in the 2.4 GHz ISM frequency band</u>, etc. The server 204 also may include an internal clock element 254 to maintain an accurate time and date for the server 204, create time stamps for data, notifications and other communications received or sent by the server 204, etc.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

## <u>AMENDMENTS TO THE CLAIMS</u>

Pursuant to 37 C.F.R. §§ 1.530(a)(b) and (d)(2), please amend U.S. Patent No. 6,701,271 by cancelling claims 43, 46, 47, 51, 52, 63, 64, 66, 67, 69-71, and 74, amending claims 42, 44, 45, 48, 59, and 76, and adding new claims 88-112, as follows. Patent Owner notes that these amendments are comprehensive and this listing of claims replaces all prior versions and listings of claims in this reexamination.

1.      **(Cancelled)**

42.     **(New)**  The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which of multiple options to provide to the first subject for the first subject to select from.

43.     **(Cancelled)**

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

44.      **(New)**  The method of claim 42, wherein:

the determining, based on the first data and based on the second data, of which of multiple options to provide to the first subject for the first subject to select from includes determining, based on the first data and based on the second data, which of multiple endings to an event to provide to the first subject for the first subject to select from.

45.      **(New)**  The method of claim 42, wherein:

the determining of the evaluation further includes the remote server determining, based on the first data and based on the second data, to provide different information to the first subject and to the second subject.

46-47.  **(Cancelled)**

48.      **(New)**  The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the method further comprises the remote server determining, based on the first data and based on the second data, an environmental condition of the first subject and of the second subject to alter.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

49.    **(New)** The method of claim 48, wherein:

    the environmental condition is the temperature of a room occupied by the first subject and by the second subject.

50.    **(New)** The method of claim 42, wherein:

    the determining of the evaluation includes the remote server averaging the first data and the second data.

51-52.   **(Cancelled)**

53.    **(New)** The method of claim 42, wherein:

    the device is a device of a trainer of the first subject and the second subject.

54.    **(New)** The method of claim 53, wherein:

    the evaluation is an audible notification; and

    the device of the trainer is a wireless earphone.

55.    **(New)** The method of claim 42, wherein:

    the device is a software application operating on a cellular telephone; and

    the cellular telephone has a touch screen input device.

56.    **(New)** The method of claim 42, wherein:

    the device is a software application operating on a portable computer; and

    the portable computer has a touch screen input device.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

57.     **(New)**  The method of claim 42, wherein:

the device is a software application operating on a personal computer; and

the personal computer has a touch screen input device.


58.     **(New)**  The method of claim 42, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet.


59.     **(New)**  The method of claim 58, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.


60.     **(New)**  The method of claim 58, wherein:

the wireless connection is an infrared wireless connection.


61.     **(New)**  The method of claim 58, wherein:

the first portable wireless sensor is a heart rate sensor.

Appx380

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

62.    **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a blood pressure sensor.

63-64.  **(Cancelled)**

65.    **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject respiration rate sensor.

66-67.  **(Cancelled)**

68.    **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject weight sensor.

69-71.  **(Cancelled)**

72.    **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject brain wave pattern sensor.

73.    **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject brain wave rhythm sensor.

74.    **(Cancelled)**

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

75.    **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject motion sensor.


76.    **(New)**  The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet;

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection;

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet; and

the first portable wireless sensor includes a subject perspiration sensor.


77.    **(New)**  The method of claim 58, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

78.     **(New)**  The method of claim 42, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

79.     **(New)**  The method of claim 78, wherein:

the first sensor is an acceleration sensor.

80.     **(New)**  The method of claim 78, wherein:

the first sensor is a heart rate sensor.

81.     **(New)**  The method of claim 78, wherein:

the first sensor is a temperature sensor.

82.     **(New)**  The method of claim 42, wherein:

the first sensor is a first portable wireless sensor; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over a first wireless connection to the Internet.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

83.      **(New)**  The method of claim 82, wherein:

the first wireless connection employs a first wireless receiving station that is connected to the Internet.

84.      **(New)**  The method of claim 42, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

85.      **(New)**  The method of claim 84, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is sitting on the stationary apparatus.

86.      **(New)**  The method of claim 84, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is resting on the stationary apparatus.

87.      **(New)**  The method of claim 84, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is standing on the stationary apparatus.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

88.      **(New)**  The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first

sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first

data and based on the second data, which of multiple options to provide to the first subject.


89.      **(New)**  The method of claim 88, wherein:

the device is a software application operating on a cellular telephone; and

the cellular telephone has a touch screen input device.


90.      **(New)**  The method of claim 88, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a

wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless

cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes

the remote server receiving the first data from the first sensor through the wireless connection

between the first sensor and the cellular telephone and through the wireless cellular connection of

the cellular telephone to the Internet.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

91.      **(New)**  The method of claim 90, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

92.      **(New)**  The method of claim 90, wherein:

the first portable wireless sensor includes a subject motion sensor.

93.      **(New)**  The method of claim 90, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

94.      **(New)**  The method of claim 88, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

95.      **(New)**  The method of claim 94, wherein:

the first sensor is a subject motion sensor.

96.      **(New)**  The method of claim 94, wherein:

the first sensor is a subject acceleration sensor.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

97.     (**New**)  The method of claim 88, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.


98.     (**New**)  The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, to provide multiple options to the first subject for the first subject to select from and to the second subject for the second subject to select from.


99.     (**New**)  The method of claim 98, wherein:

the device is a software application operating on a cellular telephone; and

the cellular telephone has a touch screen input device.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

100.    (**New**)  The method of claim 98, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet.


101.    (**New**)  The method of claim 100, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.


102.    (**New**)  The method of claim 100, wherein:

the first portable wireless sensor includes a subject motion sensor.


103.    (**New**)  The method of claim 100, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

104.    **(New)**  The method of claim 98, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

105.    **(New)**  The method of claim 104, wherein:

the first sensor is a subject motion sensor.

106.    **(New)**  The method of claim 104, wherein:

the first sensor is a subject acceleration sensor.

107.    **(New)**  The method of claim 98, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

108.    **(New)**  The method of claim 49, wherein:

the device is a software application operating on a computer; and

the computer has a touch screen input device.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

109.    **(New)**  The method of claim 49, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.


110.    **(New)**  The method of claim 49, wherein:

the first sensor is a wireless sensor; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through a wireless connection between the first sensor and remote server.


111.    **(New)**  The method of claim 110, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.


112.    **(New)**  The method of claim 76, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

<u>STATUS OF CLAIMS AND SUPPORT FOR CLAIM AMENDMENTS
PURSUANT TO 37 C.F.R. § 1.530(e)</u>

**A.      Status of Claims**

Claim 1 is the subject of reexamination. In a previous paper, claim 1 was cancelled and claims 42-87 were added. By this paper, claims 43, 46, 47, 51, 52, 63, 64, 66, 67, 69-71, and 74 are cancelled; claims 42, 44, 45, 48, 59, and 76 are amended; and new claims 88-112 are added. Thus, claims 42, 44, 45, 48-50, 53-62, 65, 68, 72, 73, and 75-112 are now pending.

**B.      Support for Claim Amendments**

Support for the following new claim limitations are found *at least* in the following locations in the present patent, U.S. Patent No. 6,701,271 (the "'271 Patent"). Other locations in the '271 Patent may provide additional support for the following new claim limitations. To save space, each claim limitation is identified by claim number/limitation number, where each limitation ends in a semicolon and a hard return. For example, dependent claim 42 includes four (4) limitations (numbered below as limitations 42-1, 42-2, 42-3, and 42-4). To further save space, columns and lines in the specification of the '271 Patent are identified by [column]:[lines] (e.g., column 9, lines 24-29 of the '271 Patent is identified as 9:24-29). Also, where support for a limitation can be found in a location already identified in connection with a previous limitation, the previous limitation will simply be identified (e.g., "*See* 42-1"). It is noted, however, that multiple limitations finding support in the same location does not mean that the limitations are identical, equivalent, or even related, as a single location or locations in the present patent can provide support for various distinct and unrelated claim limitations.

| Claim-Limitation | SUPPORT |
|---|---|
| 42-1 | *See* 9:24-29 |
| 42-2 | *See* 9:42-44 |

Page **18** of **32**

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

| | |
|---|---|
| 42-3 | *See* 9:44-46 ("The sensors 202 may send data regarding physical characteristics to one or more of the servers 204...."); *see also* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204 ... via a computer, data, or communications network 208."); *see also* 10:14-17 ("The communications network 208 might be or include the Internet...."); *see also* 14:33-37 ("...two or more of the steps in each of the methods described above could be performed on two or more different computers, computer systems, microprocessors, etc., some or all of which may be locally or remotely configured.") |
| 42-4 | *See* 5:47-64 |
| 44-1 | *See* 42-4 |
| 45-1 | *See* 6:9-13 |
| 48-1 | *See* 42-1 |
| 48-2 | *See* 42-2 |
| 48-3 | *See* 42-3 |
| 48-4 | *See* 6:39-47 |
| 49-1 | *See* 48-1 |
| 50-1 | *See* 6:48-60 |
| 53-1 | *See* 7:8-9 ("During a step 106, a notification of the evaluation determined during the step 104 is provided to at least one device."); *see also* 7:27-40 ("...assume a speaker is giving a lecture to a group of subjects....a notification of the evaluation may be sent to a computer being used by the speaker...."); *see also* 7:46-49 (the speaker may be a trainer giving a "training lecture.") |
| 54-1 | *See* 7:35-40 |
| 54-2 | *See* 54-1 |
| 55-1 | *See* 7:16-21 ("The notification may be sent to ... a software program operating on a device...."); *see also* 8:34-45 ("The notification ... may be sent to any type of device, such as a ... user device (e.g., computer, cellular telephone).") |
| 55-2 | *See* 12:57-59 ("In some embodiments, a user device 206 may have the same structure, components or configuration as the server 204 illustrated in FIG. 5."); *see also* 11:8-15 ("If desired, the server 204 may include ... one or more input devices 258 such as a ... touch screen....") |
| 56-1 | *See* 55-1; *see also* 10:2-6 ("Possible user devices include a personal computer, portable computer....") |
| 56-2 | *See* 55-2 |
| 57-1 | *See* 56-1 |
| 57-2 | *See* 55-2 |
| 58-1 | *See* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may |

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

| | |
|---|---|
| | communicate directly or indirectly with one or more servers, controllers or other devices 204 ... via a computer, data, or communications network 208."); *see also* 10:24-25 ("The communications network 208 can also include ... wireless networks....Moreover, as used herein, communications include those enabled by ... wireless technology."); *see also* 9:46-48 ("In some embodiments, a sensor 202 may be ... carried ... by a subject....") |
| 58-2 | *See* 9:44-46 ("The sensors 202 may send data regarding physical characteristics to ... one or more of the user devices 206."); *see also* 10:2-6 ("Possible user devices include a ... cellular telephone...."); *see also* 10:24-35 ("The communications network 208 can also include ... wireless networks....Moreover, as used herein, communications include those enabled by ... wireless technology.") |
| 58-3 | *See* 9:24-29 ("...one or more user devices 206 ... may communicate with a server 204, via a computer, data, or communications network 208."); *see also* 10:14-17 ("The communications network 208 might be or include the Internet...."); *see also* 10:24-30 ("The communications network 208 can also include ... cellular ... networks....") |
| 58-4 | *See* 58-3; *see also* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with ... one or more user devices 206 that may communicate with a server 204, via a computer, data, or communications network 208.") |
| 59-1 | *See* 10:36-49; *see also* Amendments to the Specification, pages 2-3 herein. |
| 60-1 | *See* 12:57-59 ("In some embodiments, a user device 206 may have the same structure, components or configuration as the server 204 illustrated in FIG. 5."); *see also* 11:8-15 ("If desired, the server 204 may include ... one or more input devices 258 such as a ... infrared or other receiver....") |
| 61-1 | *See* 9:56-61 |
| 62-1 | *See* 61-1 |
| 65-1 | *See* 4:50-58; *see also* 5:1-4 ("The data for different subjects can come from different ... sensors....") |
| 68-1 | *See* 65-1 |
| 72-1 | *See* 65-1; *see also* Abstract ("A physical characteristic of a subject might be or includes the subject's ... brain wave pattern....) |
| 73-1 | *See* 65-1; *see also* Abstract ("A physical characteristic of a subject might be or includes the subject's ... brain wave ... rhythm....) |
| 75-1 | *See* 61-1 |
| 76-1 | *See* 42-1 |
| 76-2 | *See* 42-2 |
| 76-3 | *See* 42-3 |
| 76-4 | *See* 58-1 |
| 76-5 | *See* 58-2 |
| 76-6 | *See* 58-3 |

Page **20** of 32

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

| 76-7 | *See* 58-4 |
|------|-----------|
| 76-8 | *See* 61-1 |
| 77-1 | *See* 61-1 |
| 78-1 | *See* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with ... one or more user devices 206 that may communicate with a server 204, via a computer, data, or communications network 208."); *see also* 10:30-35 ("In some embodiments, a ... sensor 202 may be connected directly to ... a user device 206 without departing from the scope of the present invention."); *see also* 10:2-6 ("Possible user devices include a ... cellular telephone...."); |
| 78-2 | *See* 58-3 |
| 78-3 | *See* 58-4 |
| 79-1 | *See* 77-1 |
| 80-1 | *See* 61-1 |
| 81-1 | *See* 61-1 |
| 82-1 | *See* 58-1 |
| 82-2 | *See* 9:44-46 ("The sensors 202 may send data regarding physical characteristics to one or more of the servers 204...."); *see also* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204 ... via a computer, data, or communications network 208."); *see also* 10:14-17 ("The communications network 208 might be or include the Internet...."); *see also* 10:24-35 ("The communications network 208 can also include ... wireless networks....Moreover, as used herein, communications include those enabled by ... wireless technology.") |
| 83-1 | *See* 10:36-53 |
| 84-1 | *See* 9:49-51 |
| 84-2 | *See* 84-1 |
| 85-1 | *See* 84-1 |
| 86-1 | *See* 84-1 |
| 87-1 | *See* 84-1 |
| 88-1 | *See* 42-1 |
| 88-2 | *See* 42-2 |
| 88-3 | *See* 42-3 |
| 88-4 | *See* 42-4 |
| 89-1 | *See* 55-1 |

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

| 89-2 | *See* 55-2 |
|------|-----------|
| 90-1 | *See* 58-1 |
| 90-2 | *See* 58-2 |
| 90-3 | *See* 58-3 |
| 90-4 | *See* 58-4 |
| 91-1 | *See* 59-1 |
| 92-1 | *See* 75-1 |
| 93-1 | *See* 77-1 |
| 94-1 | *See* 78-1 |
| 94-2 | *See* 78-2 |
| 94-3 | *See* 78-3 |
| 95-1 | *See* 75-1 |
| 96-1 | *See* 77-1 |
| 97-1 | *See* 84-1 |
| 97-2 | *See* 84-2 |
| 98-1 | *See* 42-1 |
| 98-2 | *See* 42-2 |
| 98-3 | *See* 42-3 |
| 98-4 | *See* 42-4 |
| 99-1 | *See* 55-1 |
| 99-2 | *See* 55-2 |
| 100-1 | *See* 58-1 |
| 100-2 | *See* 58-2 |
| 100-3 | *See* 58-3 |
| 100-4 | *See* 58-4 |
| 101-1 | *See* 59-1 |
| 102-1 | *See* 75-1 |
| 103-1 | *See* 77-1 |
| 104-1 | *See* 78-1 |
| 104-2 | *See* 78-2 |

Appx395

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

| 104-3 | *See* 78-3 |
|---|---|
| 105-1 | *See* 75-1 |
| 106-1 | *See* 77-1 |
| 107-1 | *See* 84-1 |
| 107-2 | *See* 84-2 |
| 108-1 | *See* 55-1 |
| 108-2 | *See* 55-2 |
| 109-1 | *See* 84-1 |
| 109-2 | *See* 84-2 |
| 110-1 | *See* 9:24-29 ("The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204 ... via a computer, data, or communications network 208."); *see also* 10:24-35 ("The communications network 208 can also include ... wireless networks....Moreover, as used herein, communications include those enabled by ... wireless technology.") |
| 110-2 | *See* 10:14-17 ("The communications network 208 might be or include the Internet...."); *see also* 110-1 |
| 111-1 | *See* 59-1 |
| 112-1 | *See* 59-1 |

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

## **REMARKS**

The paper is in response to the Office Action. Patent Owner respectfully requests reconsideration of the application in view of the above amendments and the following remarks. For Examiner's convenience and reference, Patent Owner presents remarks in the order that the Office Action raises the corresponding issues.

In connection with the prosecution of this case, Patent Owner may discuss various aspects of the disclosure of the cited references as those references are currently understood by Patent Owner. Because such discussion could reflect an incomplete or incorrect understanding of one or more of the references, the position of Patent Owner with respect to a reference is not necessarily fixed or irrevocable. Patent Owner thus hereby reserves the right, both during and after prosecution of this case, to modify the views expressed with regard to any reference.

Please note that Patent Owner does not intend the following remarks to be an exhaustive enumeration of the distinctions between any cited references and the claims. Rather, Patent Owner presents the distinctions below solely by way of example to illustrate some of the differences between the claims and the cited references. Finally, Patent Owner requests that Examiner carefully review any references discussed below to ensure that Patent Owner's understanding and discussion of any reference is consistent with Examiner's understanding.

Unless otherwise explicitly stated, the term "Patent Owner" is used herein generically and may refer to a single inventor, a set of inventors, an appropriate assignee, or any other entity or person with authority to prosecute this application.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

## Explanation of Amendments to the Specification

The Office Action notes the use of the trademark Bluetooth™. *See* Office Action, page 3. In an effort to advance prosecution, Patent Owner makes two amendments to the specification herein in an effort to respect the proprietary nature of this trademark. Each of these two amendments will now be discussed in turn.

The first amendment includes adding the "™" symbol to each instance of the trademark "Bluetooth" in this paragraph, and describing "Bluetooth technology" as technology "that operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band." This subject matter comes directly from page 19 of the Bluetooth Specification Version 1.1 which issued on February 22, 2001, just a few weeks prior to the May 17, 2001 filing date of the application of the '271 patent. *See* http://www.tscm.com/BluetoothSpec.pdf.

The second amendment includes adding the "™" symbol to the trademark "Bluetooth" in this paragraph, and describing "Bluetooth technology" as technology "that operates in the 2.4 GHz ISM frequency band," which is also taken from the Bluetooth Specification Version 1.1.

Since the amendments to the specification only add generic terminology to the trademark Bluetooth™, Patent Owner submits that no new matter is added in the amendments to the specification and these amendments should therefore be entered.

## Explanation of Amendments to the Claims

The Office Action rejects various claims. Although Patent Owner does not necessarily agree with these rejections, in an effort to advance prosecution Patent Owner herein makes various amendments to the claims, in addition to cancelling various claims. Each of these amendments to the claims will now be discussed in turn. In this discussion, the limitations will be numbered as above (e.g., claim 58, third limitation will be labeled claim limitation 58-3).

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

Claim 42 is amended to incorporate the limitations of claim 43, since claim 43 is indicated as being allowable in the Office Action if rewritten to include the limitations of the intervening dependent claims from which it depends, rendering claim 42 allowable.

Claim 44 is amended to depend from claim 42 instead of claim 43, since claim 43 is cancelled herein.

Claim limitation 45-1 is amended to add the term "further" in light of the amendment to claim 42 herein.

Claim 48 is amended to replace the phrase "the determining of the evaluation includes" with the phrase "the method further comprises" as discussed in the Interview to overcome the rejection of claim 48 under 35 U.S.C. § 112. Claim 48 is also rewritten to incorporate the limitations of previous claims 42 and 58 and to depend directly from claim 1, since claim 48 is indicated as being allowable in the Office Action if rewritten to include the limitations of the intervening dependent claims 42 and 58 from which it depends, rendering claim 48 allowable.

Claim 59 is amended to replace the phrase "is a Bluetooth wireless connection" with the generic phrase "operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band" to overcome the rejection of claim 59 under 35 U.S.C. § 112.

Claim 76 is rewritten to incorporate the limitations of previous claims 42 and 58 and to depend directly from claim 1, since claim 76 is indicated as being allowable in the Office Action if rewritten to include the limitations of the intervening dependent claims 52 and 58 from which it depends, rendering claim 76 allowable.

**Rejections Under 35 U.S.C. § 112, ¶ 1**

The Office Action rejects claims 63, 64, 66, 67, 69-71, and 74 under 35 U.S.C. § 112, ¶ 1 for purportedly failing to comply with the written description requirement. *See* Office Action, page 4.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

Although Patent Owner does not necessarily agree with these rejections, Patent Owner herein cancels claims 63, 64, 66, 67, 69-71, and 74, rendering moot the rejections of these claims under 35 U.S.C. § 112, ¶ 1.

## Rejections Under 35 U.S.C. § 112, ¶ 2

The Office Action rejects claims 46-49, 52, and 59 under 35 U.S.C. § 112, ¶ 1 for purportedly failing to comply with the written description requirement. *See* Office Action, pages 4-6.

### a.    claims 46, 47, and 52

Although Patent Owner does not necessarily agree with the rejections of claim 46, 47, and 52, Patent Owner herein cancels claims 46, 47, and 52, rendering moot the rejections of these claims under 35 U.S.C. § 112, ¶ 2.

### b.    claims 48 and 49

Although Patent Owner does not necessarily agree with the rejections of claim 48 and 49, Patent Owner herein amends claim 48 to replace the phrase "the determining of the evaluation includes" with the phrase "the method further comprises," as discussed in the Interview, to overcome the rejection of claims 48 and 49 under 35 U.S.C. § 112, ¶ 2.

### c.    claim 59

Although Patent Owner does not necessarily agree with the rejections of claim 59, Patent Owner herein amends claim 59 to replace the phrase "is a Bluetooth wireless connection" with the generic phrase "operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band" to overcome the rejection of claim 59 under 35 U.S.C. § 112, ¶ 2.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

## Rejections Under 35 U.S.C. § 102 and § 103

The Office Action rejects new claims 42, 45-47, 52-54, 56, 57, and 82-87 under 35 U.S.C. § 102(e) over Bibl (U.S. Patent Application Publication No. 2002/0111541). *See* Office Action, pages 6-8. The Office Action also rejects new claims 50 and 51 under 35 U.S.C. § 103(a) over Bibl in view of Patton (U.S. Patent No. 6,292,688). *See* Office Action, pages 8-9. The Office Action also rejects new claims 55, 58-65, 68, 70, 75, and 77-81 under 35 U.S.C. § 103(a) over Bibl in view of Teller (U.S. Patent No. 6,605,038). *See* Office Action, pages 9-11. The Office Action also rejects new claims 66 and 67 under 35 U.S.C. § 103(a) over Bibl and Teller in view of Zawilinski (U.S. Patent No. 5,676,138). *See* Office Action, page 11. The Office Action also rejects new claims 72 and 73 under 35 U.S.C. § 103(a) over Bibl and Teller in view of Patton. *See* Office Action, pages 11-12.

Although Patent Owner does not necessarily agree with the rejections under 35 U.S.C. § 102(e) and § 103(a), in the interest of expediting prosecution and without conceding Examiner's contention that claim 42 is anticipated, Applicants have herein amended claim 42 to incorporate the limitations of allowed claim 43, thereby rendering moot the rejection of claim 42 under 35 U.S.C. § 102(e).  Further, since all of the other claims that are rejected under 35 U.S.C. § 102(e) and § 103(a) depend from claim 42, all other rejections under 35 U.S.C. § 102(e) and § 103(a) are also rendered moot.

## Allowable Subject Matter

The Office Action objects to claims 43, 48, and 76 as each being dependent on a rejected base claim, but indicates that each of claims 43, 48, and 76 would be allowable if rewritten in independent form to include all of the elements of the base claim and any intervening claims.

As noted above, Patent Owner herein amends claim 42 to incorporate the limitations of allowed claim 43, rendering claim 42, and all claims that depend therefrom, allowable.

Page **28** of **32**

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

Further, Patent Owner herein rewrites allowed claims 48 and 76 to depend directly from independent claim 1, thereby rendering moot the objections to claims 48 and 76.

Patent Owner thanks Examiner for the careful review and allowance of claims 43, 48, and 76. Patent Owner agrees with Examiner that claims 43, 48, and 76 are patentable, but respectfully disagrees with Examiner's statement of reasons for allowance as set forth in the Office Action. Patent Owner submits that it is the claim as a whole, rather than any particular element, that makes each of the claims allowable. No single element should be construed as the reason for allowance of a claim because it is each of the elements of a claim that makes it allowable. Therefore, Patent Owner does not concede that the reasons for allowable subject matter given by Examiner are the only reasons that make, or would make, the claims allowable and does not make any admission or concession concerning Examiner's statement in the Office Action.

**New Claims 88-112**

Patent Owner herein adds new claims 88-112.

New claim 88 includes a limitation similar to allowed claim 43, as discussed in the Interview, and therefore is allowable for similar reasons as claim 43, as are new claims 89-97 which depend from claim 88.

New claim 98 also includes a limitation similar to allowed claim 43, as discussed in the Interview, and therefore is allowable for similar reasons as claim 43, as are new claims 99-107 which depend from claim 98.

New claims 108-111 depend from allowable claim 48, and are therefore allowable.

New claim 112 depends from allowable claim 76, and is therefore allowable.

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

**Merger or Suspension Would Not Be Appropriate in the Present Reexamination**

Given that the present reexamination is copending with *inter partes* reexamination control number 95/002,337 (the "'337 reexamination"), the possibility exists that the Office would consider merging or suspending one or both of these two reexaminations.

Patent Owner respectfully submits that neither merger nor suspension would be appropriate in this situation.  MPEP § 2686.01 covers merger and suspension in the present situation where both an *inter partes* reexamination (*e.g.*, the '337 reexamination) and an *ex parte* reexamination (*e.g.*, the present reexamination) are copending for the same patent (*e.g.*, the '271 Patent). MPEP § 2686.01(IV) directs:

> Pursuant to 35 U.S.C. 314(c), "[u]nless otherwise provided by the Director for good cause, all inter partes reexamination proceedings under this section…shall be conducted with special dispatch within the Office." This statutory provision is grounded on the need for certainty and finality as to the question of patentability raised by the request for reexamination. Thus, *if a second request for reexamination will unduly delay the first reexamination proceeding, the two proceedings generally will not be merged*. If the Office were to merge the two proceedings, the first reexamination proceeding would need to be withdrawn from its place in the process, thus delaying, instead of advancing, prosecution.

(emphasis added).  As of today's date, the '337 reexamination is on appeal, with oral arguments having already taken place, and with the only remaining step on appeal being the final written decision of the Patent Trial and Appeal Board (PTAB). However, due to current delays at the PTAB, it is likely that the '337 reexamination will remain on appeal for several more months. In contrast, the present reexamination has allowed claims, and is amended herein to place the reexamination in condition for a prompt conclusion through the issuance of a reexamination certificate. If the '337 reexamination were to be merged with the present reexamination, such a merger would unduly delay the prompt conclusion of the present reexamination. Therefore, according to the direction in MPEP §

<div align="center">Page <b>30</b> of <b>32</b></div>

<div align="center">Appx403</div>

2686.01(IV) that under these circumstances these "two proceedings generally *will not be merged*," Patent Owner respectfully submits that merger would not be appropriate in this circumstance.

In addition, Patent Owner notes that the only identical claim between the '337 reexamination and the present reexamination is claim 1. However, claim 1 has been cancelled in both the '337 reexamination and the present reexamination, rendering no overlapping claims between the two reexaminations. Therefore, since *there are no common pending claims* for examination between the '337 reexamination and the present reexamination, Patent Owner respectfully submits that merger would not be appropriate in this circumstance.

Finally, Patent Owner notes that suspension of the present reexamination would also not be appropriate. "*A suspension will only be granted in exceptional (extraordinary) instances* because of the statutory requirements that examination proceed with "special dispatch", and the express written approval by the OPLA must be obtained. Suspension will not be granted when there is an outstanding Office action." MPEP § 2686.01(II) (emphasis added). Suspension of the present reexamination would not be appropriate because there is no exceptional or extraordinary circumstance that would justify such a suspension. Also, the Office Action is outstanding in the present reexamination, so should "not be granted." Further, even after the present Office Action is no longer outstanding, the lack of any common pending claims between the'337 reexamination and the present reexamination weighs heavily in favor of allowing each to proceed "with special dispatch" to the issuance of separate reexamination certificates without suspension of either reexamination.

## Charge Authorization

The Commissioner is hereby authorized to charge payment of any of the following fees that may be applicable to this communication, or credit any overpayment, to Deposit Account No. 50-5394: (1) any filing fees required under 37 C.F.R. § 1.16, (2) any patent application and

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

reexamination processing fees under 37 C.F.R. § 1.17, and/or (3) any post issuance fees under 37

C.F.R. § 1.20.

Dated this 28th day of August, 2015.

Respectfully submitted,

**/John T. Gadd, Reg. No. 52,928/**

JOHN T. GADD
Registration No. 52,928
Attorney for Patent Owner
Customer No. 97149

# EXHIBIT 15

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/013,409 | 02/06/2015 | 6701271 | I1618.10003US02 | 1069 |

97149      7590      10/02/2015
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| HENEGHAN, MATTHEW E |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/02/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

| *Notice of Intent to Issue* *Ex Parte Reexamination Certificate* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/013,409 | 6701271 |
| | Examiner | Art Unit | AIA (First Inventor to File) Status |
| | MATTHEW HENEGHAN | 3992 | No |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

1. ☒ Prosecution on the merits is (or remains) closed in this *ex parte* reexamination proceeding.  This proceeding is subject to reopening at the initiative of the Office or upon petition.  *Cf.* 37 CFR 1.313(a).  A Certificate will be issued in view of
    (a) ☒ Patent owner's communication(s) filed: <u>28 August 2015</u>.
    (b) ☐ Patent owner's failure to file an appropriate timely response to the Office action mailed: _____.
    (c) ☐ Patent owner's failure to timely file an Appeal Brief (37 CFR 41.31).
    (d) ☐ The decision on appeal by the ☐ Board of Patent Appeals and Interferences ☐ Court dated _____
    (e) ☐ Other: _____.

2.    The Reexamination Certificate will indicate the following:
    (a)  Change in the Specification: ☒ Yes ☐ No
    (b)  Change in the Drawing(s): ☐ Yes ☒ No
    (c)  Status of the Claim(s):
        (1) Patent claim(s) confirmed: _____.
        (2) Patent claim(s) amended (including dependent on amended claim(s)): _____
        (3) Patent claim(s) canceled: <u>1</u>.
        (4) Newly presented claim(s) patentable: <u>42,44,45,48-50,53-62,65,68,72,73 and 75-112</u>.
        (5) Newly presented canceled claims: <u>43,46,47,51,52,63,64,66,67,69,70 and 74</u>.
        (6) Patent claim(s) ☐ previously ☐ currently disclaimed: _____
        (7) Patent claim(s) not subject to reexamination: <u>2-41</u>.

3. ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.

4. ☒ Note the attached statement of reasons for patentability and/or confirmation.  Any comments considered necessary by patent owner regarding reasons for patentability and/or confirmation must be submitted promptly to avoid processing delays.  Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."

5. ☐ Note attached NOTICE OF REFERENCES CITED (PTO-892).

6. ☒ Note attached LIST OF REFERENCES CITED (PTO/SB/08 **or PTO/SB/08 substitute**).

7. ☐ The drawing correction request filed on _____ is: ☐ approved ☐ disapproved.

8. ☐ Acknowledgment is made of the priority claim under 35 U.S.C. § 119(a)-(d) or (f).
    a)☐ All  b)☐ Some*  c)☐ None    of the certified copies have
        ☐ been received.
        ☐ not been received.
        ☐ been filed in Application No. _____.
        ☐ been filed in reexamination Control No. _____.
        ☐ been received by the International Bureau in PCT Application No. _____.
    * Certified copies not received: _____.

9. ☐ Note attached Examiner's Amendment.

10. ☐ Note attached Interview Summary (PTO-474).

11. ☐ Other: _____.

**All correspondence** relating to this reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

cc: Requester (if third party requester)

U.S. Patent and Trademark Office
PTOL-469 (Rev. 08-13)    **Notice of Intent to Issue Ex Parte Reexamination Certificate**    Part of Paper No 20150917

Application/Control Number: 90/013,409                                   Page 2
Art Unit: 3992

The present application is being examined under the pre-AIA first to invent provisions.

**DETAILED ACTION**

***Reexamination***

An Ex Parte Reexamination has been granted U.S. Patent No. 6,701,271 (hereinafter "the '271 patent"). See Order, mailed 4 March 2015.

The patent owner is reminded of the continuing responsibility under 37 CFR 1.565(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving Patent No. 6,701,271 throughout the course of this reexamination proceeding. See MPEP §§ 2207, 2282 and 2286.

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

Application/Control Number: 90/013,409                                        Page 3
Art Unit: 3992

In response to the Order Granting Ex Parte Reexamination, claim 1 was cancelled and claims 42-87 were added. Claims 42-87 have been examined. Claims 2-41 are not subject to reexamination.

The '271 patent is also the subject of Inter Partes Reexamination 95/002,337 (hereinafter the '337 reexamination), which is still pending. The issues decided herein have no bearing on that proceeding. The '337 reexamination shall be continued to its logical conclusion in accordance with the applicable rules and statutes.

### *Information Disclosure Statement*

The Information Disclosure Statements filed on 28 August 2015 and 31 August 2015 have been considered to the extent which they have been explained by the Patent Owner. It is noted that many of the citations in the IDS were cited in accordance with the rules, but not made with sufficient specificity for them to uniquely identify attached items.

### *Patentable Subject Matter*

Claims 42, 44, 45, 48-50, 53-62, 65, 68, 72, 73, and 75-112 are patentable.

Application/Control Number: 90/013,409                                     Page 4
Art Unit: 3992

The following is a statement of reasons for the indication of allowable subject

matter:

Regarding claims 42, 88, and 98, the art of record does not suggest that

providing of multiple options for a subject to select from where the determining of which

options to provide is based upon data about both the user (the first subject) and a

second subject.

Regarding claim 48, none of the art of record discloses the altering of an

environmental condition in response as part of a data evaluation.

Regarding claim 76, none of the art of record discloses a perspiration sensor.

All other claims are patentable based upon their dependence on patentable

claims.

Application/Control Number: 90/013,409                                    Page 5
Art Unit: 3992

### *Conclusion*

**All** correspondence relating to this *ex parte* reexamination proceeding should be directed:
By Mail to:   Mail Stop *Ex Parte* Reexam
          Central Reexamination Unit
          Commissioner for Patents
          United States Patent & Trademark Office
          P.O. Box 1450
          Alexandria, VA 22313-1450

By FAX to:  (571) 273-9900
          Central Reexamination Unit

By hand:      Customer Service Window
          Randolph Building
          401 Dulany Street
          Alexandria, VA 22314

Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered. EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

Any inquiry concerning this communication should be directed to Examiner Matthew Heneghan at telephone number (571)272-3834.

/Matthew Heneghan/


Primary Examiner, USPTO AU 3992


Conferees:   /Mary Steelman/  Primary Examiner  CRU 3992


/ALEXANDER KOSOWSKI/

Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT 16

Via eFILE                                                        REEXAMINATION
                                          Attorney Docket No.: I1618.10003US02

### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*Ex Parte*
Reexamination of:        U.S. Patent No. 6,701,271

Control No.:             90/013,409                          Art Unit
                                                             3992
Inventors:               Barry E. Willner, et al.

Filed:                   February 6, 2015

For:                     METHOD     AND    APPARATUS    FOR    USING
                         PHYSICAL     CHARACTERISTIC       DATA
                         COLLECTED FROM TWO OR MORE SUBJECTS

Examiner:                Heneghan, Matthew E.

Customer No.:            97149

Confirmation No:         1069

### COMMENTS ON STATEMENT OF REASONS FOR PATENTABILITY AND/OR CONFIRMATION

Patent Owner submits the following in response to the "statement of reasons for the indication of allowable subject matter" on page 4 of the "Notice of Intent to Issue Ex Parte Reexamination Certification" that was mailed on October 2, 2015 (the "Notice").

The Notice acknowledges that claims 42, 44, 45, 48-50, 53-62, 65, 68, 72, 73, and 75-112 are directed to allowable subject matter. Patent Owner thanks Examiner for the careful review and allowance of these claims. Patent Owner agrees with Examiner that these claims are patentable, but respectfully disagrees with Examiner's "statement of reasons for the indication of allowable subject matter" as set forth in the Notice. Patent Owner submits that it is the claim as a whole, rather than any particular element, that makes each of the claims allowable. No single element should be construed as the reason for allowance of a claim because it is each of the elements of a claim that makes it allowable. Therefore, Patent Owner does not concede that the reasons for patentability

Amendment 'A' and Response to Non-Final Office Action
Reexamination Control No.: 90/013,409

and/or confirmation given by Examiner are the only reasons that make, or would make, the claims

allowable and does not make any admission or concession concerning Examiner's statement in the

Notice. Finally, Patent Owner does not necessarily agree with the characterizations of the art of

record or with the characterization of the scope of the allowed claims that is set forth in Examiner's

statement in the Notice.

Dated this 5th day of October, 2015.

Respectfully submitted,

**/John T. Gadd, Reg. No. 52,928/**

JOHN T. GADD
Registration No. 52,928
Attorney for Patent Owner
Customer No. 97149
Telephone No. (435) 252-1360

# EXHIBIT 17

US006701271C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (10753rd)

# United States Patent
Willner et al.

(10) **Number:** US 6,701,271 C1
(45) **Certificate Issued:** Nov. 5, 2015

(54) **METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

(75) Inventors: **Barry E. Willner**, Briarcliff Manor, NY (US); **Edith H. Stern**, Yorktown Heights, NY (US); **David P. Greene**, Ossining, NY (US); **Phillip Shi-lung Yu**, Chappaqua, NY (US)

(73) Assignee: **ICON HEALTH & FITNESS, INC.**, Logan, UT (US)

**Reexamination Request:**
No. 90/013,409, Feb. 6, 2015

**Reexamination Certificate for:**
Patent No.: **6,701,271**
Issued: **Mar. 2, 2004**
Appl. No.: **09/859,827**
Filed: **May 17, 2001**

(51) **Int. Cl.**
*A61B 5/00* (2006.01)
*G06F 19/00* (2011.01)
*G09B 23/00* (2006.01)
*G09B 23/28* (2006.01)

(52) **U.S. Cl.**
CPC ............ *A61B 5/0002* (2013.01); *G06F 19/322* (2013.01); *G06F 19/3418* (2013.01); *G06F 19/3487* (2013.01); *G09B 23/28* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/013,409, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Matthew Heneghan

(57) **ABSTRACT**

A system, method, apparatus, and computer program code for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation. A physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control number 95/002,337 filed Sep. 14, 2012. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceeding.**

100



RECEIVE DATA INDICATIVE OF A PHYSICAL CHARACTERISTIC OF AT LEAST TWO SUBJECTS
102

DETERMINE AN EVALUATION OF THE PHYSICAL CHARACTERISTIC DATA
104

PROVIDE A NOTIFICATION OF THE EVALUATION TO A DEVICE
106

US 6,701,271 C1

# 1
# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

**Matter enclosed in heavy brackets [ ] appeared in the
patent, but has been deleted and is no longer a part of the
patent; matter printed in italics indicates additions made
to the patent.**

ONLY THOSE PARAGRAPHS OF THE
SPECIFICATION AFFECTED BY AMENDMENT
ARE PRINTED HEREIN.

Column 10 line 36:

In some embodiments, a suitable wireless communication
network **208** may include the use of [Bluetooth] *Bluetooth*™
technology *that operates in the 2.4 GHz industrial, scientific
and medical (ISM) frequency band,* allowing a wide range of
computing and telecommunication devices to be intercon-
nected via wireless connections. Specifications and other
information regarding [Bluetooth] *Bluetooth*™ technology
are available at the [Bluetooth] *Bluetooth*™ Internet site
www.bluetooth.com. In embodiments utilizing [Bluetooth]
*Bluetooth*™ technology, some or all of the devices of FIG. **4**
may be equipped with a microchip transceiver that transmits
and receives in a previously unused *ISM* frequency band of
2.45 GHz that is available globally (with some variation of
bandwidth in different countries). In addition to data, up to
three voice channels are available. Connections can be point-
to-point or multipoint over a current maximum range of ten
(10) meters. Embodiments using [Bluetooth] *Bluetooth*™
technology may require the additional use of one or more
receiving stations to receive and forward data from individual
sensors **202**, user devices **206** or servers **204**.

Column 10, line 62:

Now referring to FIG. **5**, a representative block diagram of
a server or controller **204** is illustrated. The server **204** may
include a processor, microchip, central processing unit, or
computer **250** that is in communication with or otherwise
uses or includes one or more communication ports **252** for
communicating with user devices and/or other devices. Com-
munication ports may include such things as local area net-
work adapters, wireless communication devices, [Bluetooth]
*Bluetooth*™ technology *that operates in the 2.4 GHz ISM
frequency band,* etc. The server **204** also may include an
internal clock element **254** to maintain an accurate time and
date for the server **204**, create time stamps for data, notifica-
tions and other communications received or sent by the server
**204**, etc.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

Claim **1** is cancelled.

New claims **42-99** are added and determined to be
patentable.

Claims **2-41** were not reexamined.

*42. The method of claim 1, wherein:
the first device is a first sensor;
the physical characteristic of the first subject is sensed by
the first sensor;*

# 2
*the receiving of the first data includes a remote server
receiving the first data from the first sensor through the
Internet; and
the determining of the evaluation includes the remote
server determining, based on the first data and based on
the second data, which of multiple options to provide to
the first subject for the first subject to select from.
43. The method of claim 42, wherein:
the determining, based on the first data and based on the
second data, of which of multiple options to provide to
the first subject for the first subject to select from
includes determining, based on the first data and based
on the second data, which of multiple endings to an event
to provide to the first subject for the first subject to select
from.
44. The method of claim 42, wherein:
the determining of the evaluation further includes the
remote server determining, based on the first data and
based on the second data, to provide different informa-
tion to the first subject and to the second subject.
45. The method of claim 42, wherein:
the determining of the evaluation includes the remote
server averaging the first data and the second data.
46. The method of claim 42, wherein:
the device is a device of a trainer of the first subject and the
second subject.
47. The method of claim 46, wherein:
the evaluation is an audible notification; and
the device of the trainer is a wireless earphone.
48. The method of claim 42, wherein:
the device is a software application operating on a cellular
telephone; and
the cellular telephone has a touch screen input device.
49. The method of claim 42, wherein:
the device is a software application operating on a portable
computer; and
the portable computer has a touch screen input device.
50. The method of claim 42, wherein:
the device is a software application operating on a per-
sonal computer; and
the personal computer has a touch screen input device.
51. The method of claim 42, wherein:
the first sensor is a first portable wireless sensor;
the first sensor is configured to wirelessly connect with a
cellular telephone through a wireless connection;
the cellular telephone is configured to wirelessly connect to
the Internet through a wireless cellular connection; and
the remote server receiving of the first data from the first
sensor through the Internet includes the remote server
receiving the first data from the first sensor through the
wireless connection between the first sensor and the
cellular telephone and through the wireless cellular
connection of the cellular telephone to the Internet.
52. The method of claim 51, wherein:
the wireless connection operates in the 2.4 GHz industrial,
scientific and medical (ISM) frequency band.
53. The method of claim 51, wherein:
the wireless connection is an infrared wireless connection.
54. The method of claim 51, wherein:
the first portable wireless sensor is a heart rate sensor.
55. The method of claim 51, wherein:
the first portable wireless sensor includes a blood pressure
sensor.
56. The method of claim 51, wherein:
the first portable wireless sensor includes a subject respi-
ration rate sensor.*

US 6,701,271 C1

**3**

57. The method of claim 51, wherein:

the first portable wireless sensor includes a subject weight sensor.

58. The method of claim 51, wherein:

the first portable wireless sensor includes a subject brain wave pattern sensor.

59. The method of claim 51, wherein:

the first portable wireless sensor includes a subject brain wave rhythm sensor.

60. The method of claim 51, wherein:

the first portable wireless sensor includes a subject motion sensor.

61. The method of claim 51, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

62. The method of claim 42, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

63. The method of claim 62, wherein:

the first sensor is an acceleration sensor.

64. The method of claim 62, wherein:

the first sensor is a heart rate sensor.

65. The method of claim 62, wherein:

the first sensor is a temperature sensor.

66. The method of claim 42, wherein:

the first sensor is a first portable wireless sensor; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over a first wireless connection to the Internet.

67. The method of claim 66, wherein:

the first wireless connection employs a first wireless receiving station that is connected to the Internet.

68. The method of claim 42, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

69. The method of claim 68, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is sitting on the stationary apparatus.

70. The method of claim 68, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is resting on the stationary apparatus.

71. The method of claim 68, wherein:

the physical characteristic of the first subject is sensed by the first sensor while the first subject is standing on the stationary apparatus.

72. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

**4**

the method further comprises the remote server determining, based on the first data and based on the second data, an environmental condition of the first subject and of the second subject to alter.

73. The method of claim 72, wherein:

the environmental condition is the temperature of a room occupied by the first subject and by the second subject.

74. The method of claim 73, wherein:

the device is a software application operating on a computer; and

the computer has a touch screen input device.

75. The method of claim 73, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

76. The method of claim 73, wherein:

the first sensor is a wireless sensor; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through a wireless connection between the first sensor and remote server.

77. The method of claim 76, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

78. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet;

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection;

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet; and

the first portable wireless sensor includes a subject perspiration sensor.

79. The method of claim 78, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

80. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which of multiple options to provide to the first subject.

81. The method of claim 80, wherein:

the device is a software application operating on a cellular telephone; and

the cellular telephone has a touch screen input device.

US 6,701,271 C1

**5**

82. The method of claim 80, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet.

83. The method of claim 82, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

84. The method of claim 82, wherein:

the first portable wireless sensor includes a subject motion sensor.

85. The method of claim 82, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

86. The method of claim 80, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

87. The method of claim 86, wherein:

the first sensor is a subject motion sensor.

88. The method of claim 86, wherein:

the first sensor is a subject acceleration sensor.

89. The method of claim 80, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

90. The method of claim 1, wherein:

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, to provide multiple options to the first

**6**

subject for the first subject to select from and to the second subject for the second subject to select from.

91. The method of claim 90, wherein:

the device is a software application operating on a cellular telephone; and

the cellular telephone has a touch screen input device.

92. The method of claim 90, wherein:

the first sensor is a first portable wireless sensor;

the first sensor is configured to wirelessly connect with a cellular telephone through a wireless connection;

the cellular telephone is configured to wirelessly connect to the Internet through a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor through the wireless connection between the first sensor and the cellular telephone and through the wireless cellular connection of the cellular telephone to the Internet.

93. The method of claim 92, wherein:

the wireless connection operates in the 2.4 GHz industrial, scientific and medical (ISM) frequency band.

94. The method of claim 92, wherein:

the first portable wireless sensor includes a subject motion sensor.

95. The method of claim 92, wherein:

the first portable wireless sensor includes a subject acceleration sensor.

96. The method of claim 90, wherein:

the first sensor is physically connected to a cellular telephone;

the cellular telephone is configured to wirelessly connect to the Internet over a wireless cellular connection; and

the remote server receiving of the first data from the first sensor through the Internet includes the remote server receiving the first data from the first sensor over the wireless cellular connection of the cellular telephone to the Internet.

97. The method of claim 96, wherein:

the first sensor is a subject motion sensor.

98. The method of claim 96, wherein:

the first sensor is a subject acceleration sensor.

99. The method of claim 90, wherein:

the first sensor is formed in a stationary apparatus; and

the physical characteristic of the first subject is sensed by the first sensor while the first subject is on the stationary apparatus.

*    *    *    *    *

# EXHIBIT 18

| IN THE UNITED STATES PATENT AND TRADEMARK OFFICE | |
|---|---|
| *In re* reexamination of: | Confirmation No.: *To Be Assigned* |
| Willner *et al.* | Art Unit: *To Be Assigned* |
| U.S. Patent No. 6,701,271 B2 | Examiner: *To Be Assigned* |
| Issued: March 2, 2004 | Third Party Requester Docket No.: 3271.001REX0 |
| For: **Method and Apparatus for Using Physical Characteristic Data Collected from Two or More Subjects** | |

## Request for *Inter Partes* Reexamination of U.S. Patent No. 6,701,271 under 35 U.S.C. § 311 and 37 C.F.R. §§ 1.913, 1.915

**Mail Stop "*Inter Partes* Reexam"**
Attn: Central Reexamination Unit
Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Sir:

Inter partes reexamination under 35 U.S.C. § 311 and 37 C.F.R. §§ 1.913, 1.915 is requested of United States Patent No. 6,701,271 B2 to Barry E. Willner, Edith H. Stern, David P. Greene, and Philip Shi-lung Yu, titled "Method and Apparatus for Using Physical Characteristic Data Collected from Two or More Subjects" ("the '271 patent"). The '271 patent issued from an original application filed after November 29, 1999, and is thus eligible for *inter partes* reexamination. This Request for *inter partes* reexamination is being made during the period of enforceability of the '271 patent. This Request is brought on behalf of Strava, Inc., MapMyFitness, Inc., and FitnessKeeper, Inc.. (collectively, "Requesters"). The '271 patent appears to be assigned to ICON Health & Fitness, Inc. ("ICON"), according to United States Patent and Trademark Office ("USPTO") records at the time of this request's filing. In accordance with 37 C.F.R. § 1.915(a), this Request is accompanied by the appropriate fee for requesting *inter partes* reexamination as set forth in 37 C.F.R. § 1.20(c)(2).

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

## LIST OF EXHIBITS

The exhibits to this Request are arranged in the following groups: patent for reexamination, prior art, claim charts and other items.

## PATENT FOR REEXAMINATION

| | |
|---|---|
| Exhibit A | U.S. Patent No. 6,701,271 B2, issued March 2, 2004 from Appl. No. 09/859,827, filed May 17, 2001 [hereinafter "the '271 patent"]. |

## PRIOR ART

| | |
|---|---|
| Exhibit US1 | U.S. Patent No. 6,292,688 to Patton, filed February 28, 1996, issued September 18, 2001 [hereinafter "Patton"]. |
| Exhibit US2 | U.S. Patent No. 5,676,138 to Zawilinski, filed March 15, 1996, issued October 14, 1997 [hereinafter "Zawilinski"]. |
| Exhibit US3 | U.S. Patent No. 3,744,712 to Papadopoulos et al., filed June 12, 1972, issued July 10, 1973 [hereinafter "Papadopoulos"]. |

## CLAIM CHARTS

| | |
|---|---|
| Exhibit CC1 | Claims 1-41 are anticipated under 35 U.S.C. § 102 by Patton |
| Exhibit CC2 | Claims 1-12, 21, 24-30, 37-39, and 41 are anticipated under 35 U.S.C. § 102 by Zawilinski |
| Exhibit CC3 | Claims 8, 9, 13-20, 22, 23, 31-36, and 40 are obvious under 35 U.S.C. § 103 over Zawilinski in view of Papadopoulos |
| Exhibit CC4 | Claims 1-30 and 39-41 are obvious under 35 U.S.C. § 103 over Patton in view of Papadopoulos |

- i -

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

    A.    The art cited here was not applied during prosecution............................2

    B.    The allegedly inventive element is disclosed in the newly-applied art .................3

    C.    All of the claims in the '271 patent are unpatentable.............................3

II.    CLAIMS FOR WHICH REEXAMINATION IS REQUESTED .......................4

III.    CITATION OF PRIOR PATENTS AND PRINTED PUBLICATIONS PRESENTED TO SHOW REASONABLE LIKELIHOOD TO PREVAIL ............................................4

IV.    OVERVIEW OF THE '271 PATENT ...............................................................5

    A.    Specification ............................................................................................5

    B.    Issued claims ...........................................................................................5

    C.    Prosecution History of the '271 Patent ..................................................6

        1.    First Non-Final Office Action on the Merits and Response.......................6

        2.    First Notice of Allowance and Withdrawal From Issue ...........................8

        3.    Second Non-Final Office Action on the Merits and Response .................9

        4.    Second Notice of Allowance and Issuance................................12

V.    OVERVIEW OF APPLICABLE PATENT LAW .........................................12

    A.    Anticipation ...........................................................................................12

    B.    Obviousness...........................................................................................12

VI.    STATEMENT POINTING OUT EACH SHOWING THAT THERE IS A REASONABLE LIKELIHOOD THAT REQUESTERS WILL PREVAIL ..................15

    A.    Patton discloses using physical characteristic information to determine the emotional response of one or more subjects to a presentation ............................16

    B.    Zawilinski describes using physical characteristic information to determine the emotional response of one or more subjects to a presentation or other stimulus ..18

    C.    Papadopoulos describes determining an audience response to a presentation using physical characteristic data.................................................................19

VII.    DETAILED EXPLANATION OF THE PERTINENCE AND MANNER OF APPLYING THE CITED PRIOR ART TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED.................................................................20

    A.    RLP 001 – Claims 1-41 are anticipated under 35 U.S.C. §102(e) over Patton .....21

- ii -

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

B.    RLP 002 – Claims 1-12, 21, 24-30, 37-39, and 41 are anticipated under 35 U.S.C. §102(b) over Zawilinski .................................................................................25

C.    RLP 003 – Claims 8-9, 13-20, 22-23, 31-36, and 40 are obvious under 35 U.S.C. §103 over Zawilinski in view of Papadopoulos ...................................................28

D.    RLP 004 – Claims 1-30, and 39-41 are obvious under 35 U.S.C. §103 over Patton in view of Papadopoulos...............................................................................33

VIII.    STATEMENT IDENTIFYING THE REAL PARTY IN INTEREST ............................36

IX.    CERTIFICATION THAT ESTOPPEL DOES NOT PROHIBIT THE PRESENT INTER PARTES REEXAMINATION...........................................................................................36

X.    DISCLOSURE OF CONCURRENT LITIGATION .................................................36

XI.    DISCLOSURE OF CONCURRENT REEXAMINATIONS ..........................................37

XII.    CERTIFICATION OF SERVICE ON PATENT OWNER .............................................37

XIII.    CONCLUSION ..................................................................................................38

- iii -

Atty. Docket 3271.001REX0

# I.   INTRODUCTION

Requesters respectfully request reexamination of the '271 patent, which relates to using physical characteristic data collected from two or more subjects viewing a presentation. Because every claim of the patent is unpatentable over the prior art cited herein, the Office should order its reexamination and reject all claims.

The owner of the '271 patent, ICON, has filed the following lawsuits in the U.S. District Court for the District of Utah alleging infringement of the '271 patent:

> (1) *Icon Health & Fitness et al. v. Garmin Ltd. et al.*, Civil Docket No. 1:11-cv-00166-DB, filed November 11, 2011;

> (2) *Icon Health & Fitness et al. v. Polar Electro Oy*, Civil Docket No. 1:11-cv-00167-PMW, filed November 11, 2011;

> (3) *Icon Health & Fitness et al. v. FitnessKeeper, Inc.*, Civil Docket No. 1:11-cv-00173-CW, filed December 9, 2011;

> (4) *Icon Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB December 9, 2011; and

> (5) *Icon Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW December 9, 2011.

The '271 patent, however, should never have been granted.  None of the '271 patent's claims recites a patentable invention. By asserting this patent, ICON is attempting to take from the public, and in particular from its many competitors, technology that was already in the public domain. This is wrong, and this is the reason Congress created the reexamination process.  Had the best prior art been provided to, and properly considered by, the examiner during the original examination of the application that issued as the '271 patent, these overly broad claims would never have issued.

The claims of the '217 patent are generally directed to evaluating physical characteristics of audience members to determine their reaction or response to a presentation.  This is not a novel concept but has been around for decades.  The majority of the independent claims recite little more than evaluating physical characteristic data from a plurality of subjects who have viewed a presentation.  During the brief prosecution of the '271 patent, the Applicants noted that

- 1 -

Atty. Docket 3271.001REX0

using a device to evaluate two or more subjects was a key differentiating limitation of the claims of the '271 patent over the previously-cited prior **art**.   Requesters disagree.   Gauging an audience's (e.g., two or more subjects) reaction to a presentation using a device was neither novel nor nonobvious at the time of filing of the '271 patent, and in fact goes back to at least as early as 1972[1].

One of ordinary skill at the time of the filing of the '271 patent would have recognized the multitude of prior art solutions readily accessible.   To the extent that there are differences from the prior art and the claims of the '271 patent, such differences were not **patentably** significant and would have been obvious to a person of ordinary skill in the art.

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007) at 417.

The basis for rejecting the issued claims of the '271 patent over the prior art is set forth in detail in this request.

### A.      The Office did not consider the art cited here during the original prosecution of the '271 patent

All of the prior art cited in this Request are patents that were neither cited nor considered during the prosecution of the '271 patent.   As will be discussed in greater detail below, during the prosecution of the '271 patent, allowable subject matter was identified in the first office action response.   Then, after providing the Applicants with an initial Notice of Allowance, the Office reopened prosecution, and the Examiner cited two additional pieces of prior art before finding all the claims of the '271 patent allowable.   However, none of the prior art patents cited and discussed herein were cited during the original prosecution of the '271 patent.

---

[1] The Papadopoulos patent cited as prior art herein was filed on July 12, 1972

- 2 -

Atty. Docket 3271.001REX0

**B.      The art cited here discloses the allegedly inventive element**

The first Office Action (dated August 12, 2002), cited U.S. Patent No. 5,542,420 to Goldman et al. (hereinafter, "Goldman") which relates "to a health care system for specifying edibles to individual subjects." (Goldman, Abstract). In a response (dated October 11, 2002) to the first Office Action, the Applicants argued that, in contrast to Goldman, the then-pending claims of the '271 patent required data from two or more subjects and performed an evaluation on that data. As an example of an evaluation, the Applicants argued that the evaluation could indicate that "the subjects are in a state of being sleepy, restless, prone to violence, overactive, bored, confused, fatigued, likely to leave a room or other location, happy, in need of a restroom visit, etc." (10/11/2002 Office Action Response, p. 7). Based on the Applicants argument that the claims of the '271 patent were directed to two or more subjects, on December 20, 2002, the Examiner issued a Notice of Allowance for all the claims of the '271 patent.

On May 22, 2003, the Office withdrew the patent application from issue to permit reopening of prosecution. The Office mailed a second Office Action on June 11, 2003. In differentiating the then-pending claims from the cited art, the Applicants argued that the physical characteristics of the subjects came from a "device [that] may be worn, carried, or held by the subject, or the chair that the subject sits in may be outfitted with one or more devices." (9/21/2003 Office Action Response, p.12). The Applicants argued that neither piece of cited art disclosed a device by which to determine physical characteristics. Based on the Applicants arguments in response to the second non-final Office Action, the Examiner issued a second Notice of Allowance on January 30, 2004.

The alleged inventive element of receiving physical characteristics of two or more subjects from a device (or devices) is disclosed by the new prior art cited herein.

**C.      All of the claims in the '271 patent are unpatentable**

Neither the independent claims nor the dependent claims distinguish the alleged invention from the newly-cited art. All of the independent claim features and many of the dependent claim features are disclosed by the primary references cited herein. But even where a feature is not clearly taught, it is either inherent in the primary reference or would have been

- 3 -

Atty. Docket 3271.001REX0

obvious to a person having ordinary skill in the art.  Further, a secondary reference is used to show that these features were known in the prior art.  Specifically, these features are old elements performing their usual functions and yielding the expected results.

## II.   CLAIMS FOR WHICH REEXAMINATION IS REQUESTED

In accordance with 35 U.S.C. § 311 and 37 C.F.R. § 1.913, Requesters request reexamination of each of claims 1-41 of the '271 patent, attached hereto as Exhibit A. These claims may be referred to herein individually, or collectively as "the claims subject to reexamination," or "the claims under reexamination."

## III.   CITATION OF PRIOR PATENTS AND PRINTED PUBLICATIONS PRESENTED TO SHOW REASONABLE LIKELIHOOD TO PREVAIL

Reexamination of the '271 patent is requested in view of the below-listed patents, which are also listed on the attached Form PTO/SB/08A. These references were not considered during the original prosecution. These prior art references alone or in the combinations set forth herein demonstrate a reasonable likelihood that the Requesters will prevail with respect to at least one of the claims challenged herein.  The table below summarizes the showings of a reasonable likelihood to prevail ("RLP") and the pertinence and manner of applying the prior art cited in this Request. In accordance with 37 C.F.R. § 1.915(b)(4), a copy of each of the following patents and printed publications is attached:

| RLP# | Statute | References | Claims | Claim Chart |
|------|---------|------------|--------|-------------|
| 001 | § 102 | Patton | 1-41 | CC-1 |
| 002 | § 102 | Zawilinski | 1-12, 21, 24-30, 37-39, 41 | CC-2 |
| 003 | § 103 | Zawilinski in view of Papadopoulos | 8, 9, 13-20, 22, 23, 31-36, 40 | CC-3 |
| 004 | § 103 | Patton in view of Papadopoulos | 1-30, 39-41 | CC-4 |

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

## IV.   OVERVIEW OF THE '271 PATENT

This section provides an overview of the '271 patent, including its disclosure and claims.

### A.   Specification

The Background section of the '271 patent describes a situation in which a presenter would want to "have information regarding how a subject or a group of subjects feels about information being delivered or presented to them." ('271, Col. 1, lines 18-22). The '271 patent Background goes on to state that the presenter could use this information to determine what portions the audience finds most interesting or when to take a break. Further, the '271 patent Background states that "it would be desirable to use physical characteristic information obtained from or about two or more subjects and to determine a course of action based on such information or an evaluation of the information." ('271, Col. 1, lines 39-43).

### B.   Issued claims

The '271 patent issued with 41 claims including independent claims 1, 31, 36, 37, 38 and 39. Claims 1-36 and 39-41 are directed to a method for providing feedback. Claim 37 is directed to a system for facilitating feedback. Claim 38 is directed to a computer program product for using feedback.

In reexamination, "the PTO must give claims their broadest reasonable construction consistent with the specification." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (quoting *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007)); see also MPEP § 2111.01 (Claims "must be given their plain meaning unless the plain meaning is inconsistent with the specification."). "[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (quotations omitted). For example, the context in which a term is used within the claim "can be highly instructive." *Id.* at 1303. Also, differences between claims can provide guidance. "For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15. Although it is improper to import claim limitations from the

- 5 -

Atty. Docket 3271.001REX0

specification, an inventor may be his own lexicographer or intentionally disavow claim scope. Any such disavowal, however, must be clear. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1320 (Fed. Cir. 2008) (quotations omitted).

Requesters emphasize that their interpretations of the '271 patent claims in this Request are under the broadest reasonable interpretation standard appropriate in original examination and reexamination before the Office. The interpretations of the '271 patent claims in this Request are offered to be consistent with the broadest reasonable interpretation standard and do not reflect the interpretations Requesters believe should be given to the claims in any litigation, or in any other proceeding that does not apply the broadest reasonable interpretation standard. Requesters acknowledge, however, that a court's "correct" claim construction during litigation can be no broader than the broadest reasonable interpretation as determined or applied by the Office in this reexamination.

## C.      Prosecution History of the '271 Patent

The application that eventually issued as the '271 patent was filed on May 17, 2001, and was assigned Application No. 09/859,827.  The Applicants did not claim priority to any U.S. or international patent document.  The application included 33 originally-filed claims (referred to herein as "application claims"), of which 1, 26, 31, 32, and 33 were independent claims.

### 1.      First Non-Final Office Action on the Merits and Response

On August 12, 2002, the Examiner mailed a Non-Final Office Action.  The Examiner allowed claims 21 and 22, and rejected claims 1-20 and 23-33 over U.S. Patent No. 5,542,420 to Goldman *et al.*

On October 11, 2002, the Applicants filed a response to the Non-Final Office Action (the response was received by the Office on October 17, 2002).  In the response, Applicants amended application claims 1, 3, 7, 11, 17, 21, 23, 26, 27, 29, 31, 32, and 33.  For example, independent application claims 1, 26, 31, 32 and 33 were amended as follows:

1. (Amended) A method for providing feedback, comprising:

- 6 -

Atty. Docket 3271.001REX0

receiving <u>first</u> data indicative of a physical characteristic of a first subject and <u>second</u> data indicative of a physical characteristic of a second subject;

determining an evaluation of said <u>first</u> data and <u>said second data, wherein said evaluation is representative of a state of both said first subject and said second subject</u>; and

providing a notification regarding said evaluation to a device.

26. (Amended) A method for providing feedback, comprising:

receiving data indicative of a physical characteristic of each of a plurality of subjects;

determining a <u>desired</u> course of action <u>associated with said plurality of subjects</u> based, at least in part, on said data <u>indicative of a physical characteristic of each of said plurality of subjects;</u> and

providing a notification based, at least in part, on said course of action.

31. (Amended) A method for providing feedback, comprising:

determining a desired action associated with a group of subjects;

receiving data indicative of a physical characteristic of at least one of said group of subjects;

determining a course of action <u>expected to lead to said desired action</u> based, at least in part, on said physical characteristic and said desired action; and

providing a notification based on said course of action.

32. (Amended) A system for facilitating feedback, comprising:

a memory;

a communication port; and

a processor connected to said memory and said communication port, said processor being operative to:

receive <u>first</u> data indicative of a physical characteristic of a first subject and <u>second data indicative of</u> a physical characteristic of a second subject;

determine an evaluation of said <u>first</u> data <u>and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject;</u> and

provide a notification regarding said evaluation to device.

33. (Amended) A computer program product in a computer readable medium for using feedback, comprising:

first instructions for ~~obtaining~~ receiving <u>first</u> data representative of a physical characteristic of a first subject and <u>second data representative of</u> a physical characteristic of a second subject;

second instructions for preparing an evaluation of said <u>first</u> data and <u>said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject;</u> and

- 7 -

Atty. Docket 3271.001REX0

third instructions for sending <u>third</u> data indicative of said evaluation of said <u>first</u> data <u>and said second data</u> to a device.

(10/11/2002 Office Action Response). In connection with this amendment, the Applicants argued:

> With regard to the Examiner's rejection of claims 1-20 and 23-33 under 35 U.S.C. §102(b), the Applicants' respectfully point out that the Goldman et al. patent cited by the Examiner discloses the reception of data on the conditions and characteristics **of individual subjects** and the providing to the individual subjects of personalized prescriptions of edibles based on the data. In contrast, Applicants' invention can be used to determine an evaluation and/or a course of action based on data received from or regarding **two or more subjects**, the evaluation or course of action being applicable to all of the subjects.

(10/11/2002 Office Action Response, p. 7, emphasis added). With regard to claim 31, Applicants argued:

> Furthermore, the Goldman et al. patent does not disclose, teach or even fairly suggest determining a desired action associated with a **group of subjects** and/or determining a course of action expected to lead to said desired action based, at least in part, on a physical characteristic associated with at least of **the group of subjects** and the desired action, as recited in Applicants' claim 31.

(10/11/2002 Office Action Response, p. 8, emphasis added). In addition, new claims 34-36 were added.

### 2.    First Notice of Allowance and Withdrawal From Issue

On December 20, 2002, the Office mailed a Notice of Allowability and Notice of Allowance. In the Notice of Allowability, the Examiner provided the following statement of reasons for allowability:

> The following is an examiner's statement of reasons for allowance:
>
> Claims 1-36 are allowable over the prior art of record because none of the prior art whether taken singularly or in combination to teach the claims [*sic.*] invention, especially when these limitations are considered within the specific claimed combination, particularly, require such the limitations as: determining an evaluation of first data indicative of a physical characteristic of a first subject and a second data indicative of a physical characteristic of a second subject, wherein

- 8 -

Atty. Docket 3271.001REX0

the evaluation is representative of a state of both the first and second subjects; determining a desired course of action associated with a plurality of subjects based, at least in part, on data indicative of a physical characteristic of each of the plurality of subjects; determining a course action expected to lead to desired action, based at least in part, on a physical characteristic associated with at least of the group of subjects and the desired action.

(12/20/2002 Notice of Allowability, page. 2).

On May 22, 2003, the Office mailed a Notice of Withdrawal from Issue, reopening prosecution.

### 3.   Second Non-Final Office Action on the Merits and Response

On June 11, 2003, the Examiner mailed a second Non-Final Office Action.  In the Office Action, the Examiner issued the following rejections:

Claims 1-31 and 34-36 were rejected under 35 U.S.C. 102(b) as being anticipated by "Shear Madness has right mix of character, audience," (from http://thetech.mit.edu/V113/N45 /madness.45a.txt.html); and

Claims 1-36 were rejected under 35 U.S.C. 102(b) as being anticipated by Hoo et al. (U.S. Patent No. 5,762,503).

On September 11, 2003, Applicants filed a response to the Non-Final Office Action.  In the response, Applicants amended independent application claims 1, 26, 31 and 34.  Specifically, these claims were amended as follows:

1. (Currently amended) A method for providing feedback, comprising:
receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
providing a notification regarding said evaluation to a device.

26. (Currently amended) A method for providing feedback, comprising:
receiving data indicative of a physical characteristic of each of a plurality of subjects, wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation;

- 9 -

Atty. Docket 3271.001REX0

determining a desired course of action associated with said plurality of subjects based, at least in part, on said data indicative of a physical characteristic of each of said plurality of subjects; and

providing a notification based, at least in part, on said course of action.

31. (Currently amended) A method for providing feedback, comprising:
determining a desired action associated with a group of subjects;
receiving data indicative of a physical characteristic of at least one of said group of subjects, wherein said physical characteristic of said at least one of said group of subjects is indicative of a response of said at least one of said group of subjects to a presentation;
determining a course of action expected to lead to said desired action based, at least in part, on said physical characteristic and said desired action; and

providing a notification based on said course of action.

34. (Currently amended) A method for providing feedback, comprising:
receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
determining an evaluation of said first data and said second data, wherein said determining said evaluation includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject; and

providing a notification regarding said evaluation to a device.

In the remarks accompanying these amendments, the Applicants argued:

Claims 1 and 34 are amended to point out that the data indicative of physical characteristics of the subjects comes from devices associated with the subjects. As described in the specification, for example at page 7, lines 20-29, the device may be worn, carried, or held by the subject, or the chair that the subject sits in may be outfitted with one or more devices. These devices may "be associated with a specific subject and provide data regarding only that subject" (page 7, lines 24-25).

(9/11/2003 Office Action response, p. 12). With regard to the amendments to application claims 26 and 31, the Applicants argued: "Claims 26 and 31 are amended to point out, and new claims 37-39 point out that, according to some embodiments, the physical characteristics of the subjects may be indicative of one or more subject's response to one or more presentations." (9/11/2003 Office Action Response, p. 13).

- 10 -

Atty. Docket 3271.001REX0

Other specific arguments made by the Applicants in an attempt to distinguish Shear Madness include:

> Nowhere in the Shear Madness reference is there a teaching or suggestion of "receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject" as recited in Applicants' amended claim 1.

(9/11/2003 Office Action Response, p. 13); and

> Nowhere in the Shear Madness reference is there a teaching or suggestion of "receiving data indicative of a physical characteristic of each of a plurality of subjects, wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation" as recited in amended claim 26. The members of the audience described in the Shear Madness reference view on-stage actors. However, data is not received or provided by the audience members or the actors regarding physical characteristics of subjects that are indicative of responses of the subjects to a presentation.

(9/11/2003 Office Action Response, p. 15).

> With regard to Hoo, Applicants argued:

> Nowhere in the Hoo reference is there a teaching or suggestion of "receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject." The Hoo reference does not associate the monitors/sensors with subjects. The monitors/sensor devices described by the Hoo reference are designed to be triggered by any team member that arrives at a location and/or takes an action that a particular monitor/sensor is programmed to detect. The monitors/sensors described in the Hoo reference do not indicate which team member has triggered the monitor/sensor, and thus are not devices associated with subjects as recited in amended claim 1.

(9/11/2003 Office Action Response, p. 19); and

> Nowhere in the Hoo reference is there a teaching or suggestion of "receiving data indicative of a physical characteristic of each of a plurality of subjects, wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation". The Hoo reference does not teach or suggest the use or existence of a presentation. As noted herein, the Hoo reference generally describes a team-building obstacle course composed of monitors and sensors. No

- 11 -

Atty. Docket 3271.001REX0

use or creation of data regarding physical characteristics related to responses to a
presentation are taught or suggested anywhere in the Hoo reference.

(9/11/2003 Office Action Response, p. 21).

### 4.    Second Notice of Allowance and Issuance

On October 30, 2003, in response to the Response filed on September 11, 2003 (received
by the Office on September 15, 2003), the Examiner issued a second Notice of Allowance for all
claims of the '271 patent.  Applicants paid the issue fee in November 2003, and the '271 patent
issued on March 2, 2004.

## V.    OVERVIEW OF APPLICABLE PATENT LAW

### A.    Anticipation

Section 102 states that a person is not entitled to a patent if the claimed invention was
described in a printed publication anywhere in the world before the alleged invention thereof or
more than one year prior to the filing date of the patent application. 35 U.S.C. §§ 102(a), (b). A
single reference anticipates the claimed invention under § 102 if it contains an enabling
disclosure of each and every limitation of the claimed invention. *Schering Corp. v. Geneva
Pharms., Inc.*, 339 F.3d 1373, 1377, 1380 (Fed. Cir. 2003).

### B.    Obviousness

Section 103 forbids issuance of a patent when "the differences between the subject
matter sought to be patented and the prior art are such that the subject matter as a whole would
have been obvious at the time the invention was made to a person having ordinary skill in the art
to which said subject matter pertains." 35 U.S.C. § 103(a). Obviousness is a question of law
based on underlying findings of fact. *In re Kubin*, 561 F.3d 1351, 1355 (Fed. Cir. 2009). The
underlying factual inquiries are: (1) the scope and content of the prior art, (2) the differences
between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art,
and (4) secondary considerations of nonobviousness. *KSR*, 550 U.S. at 408 (citing *Graham v.
John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

- 12 -

Atty. Docket 3271.001REX0

The legal test to determine the question of obviousness is an "expansive and flexible" one, and there is "need for caution in granting a patent based on the combination of elements found in the prior art." *KSR*, 550 U.S. at 415. This is because "a patent for a combination which only unites old elements with no change in their respective functions . . . withdraws what is already known into the field of its monopoly and diminishes the resources available to skillful men." *Id.* at 415-16. Thus, when assessing the obviousness of a claim, the PTO "must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.* at 417. Because a skilled artisan is "not an automaton," but "a person of ordinary creativity," often the "person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id.* at 420-21. Moreover, when the differences between claimed subject matter and the prior art are so "trivial . . . that [it] would have been a matter of common sense to one of ordinary skill in the art," the claim is obvious. *Western Union Co. v. MoneyGram Payment Systems, Inc.*, 626 F. 3d 1361, 1372 (Fed. Cir. 2010).

The motivation to combine prior art references can come from a variety of sources, not just the prior art itself or the specific problem the patentee was trying to solve. *KSR*, 550 U.S. at 421. Moreover, the Federal Circuit's expansive approach encourages, rather than restricts, the use of "common sense" when addressing obviousness. *Id.* Indeed, the references themselves need not provide a "specific hint or suggestion" of the alteration needed to arrive at the claimed invention; the analysis "may include recourse to logic, judgment, and common sense available to a person of ordinary skill that do not necessarily require explication in any reference or expert opinion." *Perfect Web Techs. v. Info USA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009). And, the "reason, suggestion, or motivation to combine may be found explicitly or implicitly: 1) in the prior art references themselves; 2) in the knowledge of those of ordinary skill in the art that certain references, or disclosures in those references, are of special interest or importance in the field; or 3) from the nature of the problem to be solved . . . ." *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 665 (Fed. Cir. 2000). Finally, a claim can be proved obvious by merely showing that the combination of elements was obvious to try:

- 13 -

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance *the fact that a combination was obvious to try might show that it was obvious under § 103.*

*KSR*, 550 U.S. at 420; *see also id* at 417 ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.").

Applying the obviousness test is particularly straightforward in cases that involve "the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement." *Id.* at 417. In such cases, the simple substitution of a single element must achieve unexpected results:

> [W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination *must* do more than yield a predictable result.

*Id.* at 418 (citing *United States v. Adams*, 383 U.S. 39, 50-51 (1966)). In fact, in view of the "little difference" between the prior art and claimed invention in *KSR*, the Court held that the asserted claim "*must* be found obvious." *Id.* at 422.

The MPEP's examination guidelines for obviousness, consistent with the above principles, identify multiple rationales for obviousness rejections including:

(A)   Combining prior art elements according to known methods to yield predictable results;

(B)   Simple substitution of one known element for another to obtain predictable results;

(C)   Use of known technique to improve similar devices (methods, or products) in the same way;

(D)   Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

(E)   "Obvious to try" - choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

- 14 -

(F)  Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;

(G)  Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

MPEP §§ 2141, 2143.

## VI.  STATEMENT POINTING OUT EACH SHOWING THAT THERE IS A REASONABLE LIKELIHOOD THAT REQUESTERS WILL PREVAIL

The references presented herein were not applied during the original prosecution of the '271 patent. Each reference presents information about pre-existing technology and supports a showing that there is a reasonable likelihood that Requesters would prevail with respect to at least one claim challenged in this Request. In fact, as summarized in the table below and set forth in detail in the attached claim charts, these references establish a reasonable likelihood that Requesters will prevail with respect to each and every claim of the '271 patent. Requesters propose herein rejections corresponding to each showing of a reasonable likelihood to prevail ("RLP"). Accordingly, the Office should order *inter partes* reexamination and reject each and every claim of the '271 patent.

The following table summarizes the pertinence and manner of applying the cited prior art to show each ground for prevailing and support each proposed rejection (as described in detail in Section VII and the attached claim charts).

| RLP# | Statute | References | Claims | Claim Chart |
|------|---------|------------|--------|-------------|
| 001 | § 102 | Patton | 1-41 | CC-1 |
| 002 | § 102 | Zawilinski | 1-12, 21, 24-30, 37-39, 41 | CC-2 |
| 003 | § 103 | Zawilinski in view of Papadopoulos | 8, 9, 13-20, 22, 23, 31-36, 40 | CC-3 |
| 004 | § 103 | Patton in view of Papadopoulos | 1-30, 39-41 | CC-4 |

- 15 -

Atty. Docket 3271.001REX0

As detailed below and in the accompanying claim charts, the cited references establish a reasonable likelihood of prevailing and grounds for rejection with respect to each of claims 1-41.

**A.** ~~Patton discloses using physical characteristic information to determine the emotional response of one or more subjects to a presentation~~

Exhibit US1, Patton was filed on February 28, 1996, and issued on September 18, 2001, qualifying it as prior art under 35 U.S.C. §102(e).  It presents non-cumulative information about pre-existing technology that was not cited or applied by the Examiner during the original examination of the '271.

As highlighted above, to distinguish the cited prior art during prosecution of the '271 patent, Applicants amended the claims to stress that that the alleged invention operated on data from a plurality of test subjects.  For example:

> claim 1 was amended to recite the step of "determining an evaluation of said <u>first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject</u>;"

> claim 26 was amended to recite the step of "determining a <u>desired</u> course of action <u>associated with said plurality of subjects</u> based, at least in part, on said data <u>indicative of a physical characteristic of each of said plurality of subjects</u>;"

> claim 32 was amended to recite "determine an evaluation of said <u>first</u> data <u>and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject</u>;" and

> claim 33 was amended to recite "second instructions for preparing an evaluation of said <u>first</u> data and <u>said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject</u>."

(The underlining in these claim elements indicates the language added to the claim element by Applicants' amendment.)  Claim 31, which was not amended, recites the step of "determining a desired action associated with a group of subjects."

In addition to these amendments, the Applicants repeatedly made arguments to stress the importance of these claim limitations.  For example, the Applicants argued:

Atty. Docket 3271.001REX0

With regard to the Examiner's rejection of claims 1-20 and 23-33 under 35 U.S.C. §102(b), the Applicants' respectfully point out that the Goldman et al. patent cited by the Examiner discloses the reception of data on the conditions and characteristics **of individual subjects** and the providing to the individual subjects of personalized prescriptions of edibles based on the data. In contrast, Applicants' invention can be used to determine an evaluation and/or a course of action based on data received from or regarding **two or more subjects**, the evaluation or course of action being applicable to all of the subjects.

(10/11/2002 Office Action Response, p. 7, emphasis added).    With regard to claim 31, Applicants argued:

Furthermore, the Goldman et al. patent does not disclose, teach or even fairly suggest determining a desired action associated with a **group of subjects** and/or determining a course of action expected to lead to said desired action based, at least in part, on a physical characteristic associated with at least of **the group of subjects** and the desired action, as recited in Applicants' claim 31.

(10/11/2002 Office Action Response, p. 8, emphasis added).

Patton clearly teaches these allegedly patentable features of the '271 patent. As detailed in the appended claim charts, Patton teaches a method and apparatus for analyzing a neurological response of a group of test subjects to stimuli and providing real-time feedback. For example, Patton states:

The nature of the feedback, according to the present invention, might instead be determined in real time, and the detected emotional component could be arranged to directly control a follow-on presentation or other response without the need to interrogate the subject. (Patton, col. 25, lines 4-8).

From the use of a plurality of subjects, such as 10 or more, the influence of unusual individuals on the response may be tempered or eliminated.  Thus if the test method is utilized to determine the reaction of a particular individual, only that individual needs to be tested.  However, if the purpose of the test is to determine an average, median, or other value with statistically valid frequency measurements, then a number of individuals are tested and the data are analyzed accordingly. (Patton, col. 19, lines 54-61).

A major portion of the foregoing discussion has been directed to describing how an overall emotional profile can be established for one or more subjects who have viewed advertising material.  The description illustrates the potential for noting and evaluating the nature and extent of various changes in the emotional state or

- 17 -

Atty. Docket 3271.001REX0

condition of the subjects as the stimuli are presented to them over a given duration." (Patton, col. 23, lines 18-24).

As such, Patton is better prior art than any reference applied by the Examiner during the original examination and establishes at least a reasonable likelihood that Requesters will prevail with respect to at least one claim. Further explanation of the basis for the reasonable likelihood of prevailing on the unpatentability of representative claims of the '271 patent based on Patton is provided in Section VII below. Further, an element-by-element comparison of each of claims 1-41 to Patton is provided in the claim charts set forth in Exhibit CC1.

> ### B.   Zawilinski describes using physical characteristic information to determine the emotional response of one or more subjects to a presentation or other stimulus

Exhibit US2, Zawilinski was filed on March 15, 1996 and granted on October 14, 1997, qualifying it as prior art under §102(b). It presents non-cumulative information about pre-existing technology that was not cited or applied by the Examiner during the original examination of the '271.

The discussion set forth above with respect to Patton highlights the arguments and amendments made by Applicants during the original examination of the '271 patent. Like Patton, Zawilinski also discloses these allegedly patentable features of the '271 patent.

Zawilinski is directed to determining the response of an individual or individuals watching a presentation or receiving a stimulus. Zawilinski discloses "[a] system for detecting emotional responses of human beings and the changes therein over time." (Zawilinski, Abstract). Measuring devices associated with each individual measure and record values while the test subjects receive the stimulus (e.g., view a television commercial). (Zawilinski, Abstract) The measured values are "associated with each of a plurality of physiological variables, such as heartrate, electromyography and electrodermal activity, each associated with one or more individuals." (Zawilinski, Abstract). Zawilinski further discloses that a presenter or researcher "can obtain an immediate visual impression of both the momentary impact of a stimulus presented, and, see the emotional tendency and progression of an individual as the stimulus changes over time." (Zawilinski, col. 9, lines 16-20).

- 18 -

Atty. Docket 3271.001REX0

As such, Zawilinski is better prior art than any reference applied by the Examiner during the original examination and establishes at least a reasonable likelihood that Requesters will prevail with respect to at least one claim. Further explanation of the basis for the reasonable likelihood of prevailing on the unpatentability of representative claims of the '271 patent based on Zawilinski is provided in Section VII below. Further, an element-by-element comparison of each of claims 1-12, 21, 24-30, 37-39 and 41 to Zawilinski is provided in the claim charts set forth in Exhibit CC2.

> **C.    Papadopoulos describes determining an audience response to a presentation using physical characteristic data**

Exhibit US3, Papadopoulos was filed on June 12, 1972, and issued on July 10, 1973, qualifying it as prior art under §102(b). It presents non-cumulative information about pre-existing technology that was not cited or applied by the Examiner during the original examination of the '271.

The discussion set forth above with respect to Patton highlights the arguments and amendments made by Applicants during the original examination of the '271 patent. Like Patton and Zawilinski, Papadopoulos also discloses these allegedly patentable features of the '271 patent.

Similar to the '271 patent, Papadopoulos is directed to determining the response of an audience watching a presentation. Papadopoulos discloses that:

> [a] system is described for measuring the response of selected members of an audience, averaging the selected responses and presenting the average to the presenter as the presentation is being made to enable the presenter to adjust his presentation accordingly or respond to the audience response.

(Papadopoulos, Abstract). While the audience is viewing the presentation, physical characteristics of the audience are detected (e.g., by using a number of response devices) and "a display device or meter 57 [is] mounted on the console 36 to enable an operator to view the composite response of the selected audience." (Papadopoulos, col. 3, lines 5-7, col. 4, lines 60-64). Similar to the allegedly inventive features argued by Applicants during the prosecution of the '271 patent, Papadopoulos discloses that multiple devices with sensors or knobs are used to

- 19 -

detect the physical characteristics indicating the audience member's responses. As referenced, Papadopoulos also states that the invention could be used on multiple selected members of an audience.

Papadopoulos discloses that "[t]he purpose of the system 22 is to obtain the reaction of a viewing or listening audience 20 that may be located in a classroom, theater, or auditorium to a presentation and feed the composite continuous response to the presenter at a presenter's console or lectern 21 to enable the presenter to respond to the audience and adjust his presentation accordingly." (Papadopoulos, col. 2, lines 38-46).

As such, Papadopoulos is better prior art than any reference applied by the Examiner during the original examination. Explanation of the basis for the reasonable likelihood of prevailing on the unpatentability of representative claims of the '271 patent based on the combination of Zawilinski and Papadopoulos and the combination of Patton and Papadopoulos is provided in Section VII below. Further, an element-by-element comparison of each of claims 8-9, 13-20, 22-23, 31-36 and 40 to the combination of Zawilinski and Papadopoulos is provided in the claim charts set forth in Exhibit CC3. An element-by-element comparison of each of claims 1-30 and 39-41 to the combination of Patton and Papadopoulos is provided in the claim charts set forth in Exhibit CC4.

## VII. DETAILED EXPLANATION OF THE PERTINENCE AND MANNER OF APPLYING THE CITED PRIOR ART TO EVERY CLAIM FOR WHICH REEXAMINATION IS REQUESTED

This section and the attached claim charts lay out the pertinence and manner of applying the cited art to every claim for which reexamination is requested. All proposed rejections and grounds for prevailing are based on the totality of the teachings in each cited reference in its entirety. Pinpoint citations to references are meant to show examples of a particular claim element disclosed or other teaching described therein, and do not limit the proposed or actual application of the reference. Each exemplary rationale provided for supporting a conclusion of obviousness implicitly incorporates the *Graham* factors and provides an example rationale, but does not limit the proposed or actual rationales for finding the claims obvious under *KSR*.

- 20 -

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

**A.      RLP 001 – Claims 1-41 are anticipated under 35 U.S.C. §102(e) over Patton**

Representative claims are discussed below to demonstrate that Patton establishes at least a reasonable likelihood that Requesters will prevail with respect to at least one claim of the '271 patent.  An element-by-element comparison of each of claims 1-41 to Patton is provided in the claim charts set forth in Exhibit CC1.  These claim charts show that Patton anticipates each and every claim of the '271 patent and that those claims should be rejected.

Independent claim 1 recites the limitations of receiving physical characteristic data from two subjects, determining an evaluation of the data, and providing a notification regarding the evaluation.  Similarly, Patton describes:

> how an overall emotional profile can be established for one or more subjects who have viewed advertising material.  The description illustrates the potential for noting and evaluating the nature and extent of various changes in the emotional state or condition of the subjects as the stimuli are presented to them over a given duration.

(Patton, col. 23, lines 18-24).  Patton discloses that notification can be provided by way of a graph of the emotions (states) of the users. (Patton, FIG. 6).

Dependent claim 2 attempts to provide an additional limitation as to what is meant by physical characteristic by providing a laundry list of twenty-seven features, any one of which, if present in a reference would anticipate the claim.  Among the twenty-seven enumerated features exist two features directed to detecting a pattern and a change in the pattern of brain waves, which are disclosed by Patton.  For example, Patton states that "[w]hile the subject views the presentation, **periodic variations** in the intensity component of the brain waves of each of the particular frequencies selected is measured." (Patton, Abstract, emphasis added).

Dependent claim 5 recites the limitation of detecting a pattern in data indicative of a physical characteristic for each of the subjects.  Patton, for example, describes that each subject is plotted into an angular placement chart in which the quadrants correspond to a pleasure/arousal scale, and that the chart can be used to construct an aggregate emotional profile for a group of subjects. (Patton, col. 19, lines 32-53).  Further as noted above, Patton also discloses detecting brain wave patterns as they relate to emotions. (Patton, Abstract).

- 21 -

Atty. Docket 3271.001REX0

Dependent claims 7 and 12, similar to claim 2, provide laundry lists of features, any one of which, if present in a reference anticipates the claims.   The features of the claims are themselves broad and overlapping.    For example, claim 7 recites the steps of determining/selecting a course of entertainment, selecting information, and selecting/altering at least one environmental variable.  Patton's option to provide a short video commercial or a radio commercial anticipates each of these claim limitations (Patton, col. 24, lines 19-23).  These and the remaining features are enumerated in CC1, along with the relevant portions of Patton.

Dependent claims 13-16 each include the limitation of a "plurality of options."  The specification of the '271 patent provides context to the definition of "plurality of options" which includes simply the ability to make any of several decisions based on the reaction of one or more of the subjects.  For example, the '271 patent states that:

> [i]n some embodiments, the step 104 may include determining **one or more options to provide to a subject or group of subjects**.  For example, the method 100 may include a step of receiving a notification of several possible endings to a play being presented to an audience.  The step 104 may include **determining which of the options to provide** to the audience or determining which of the options the audience will be allowed to choose from.

('271, col. 5, lines 47-54, emphasis added).  As such, any disclosure of picking options based on the responses of test subjects would be enough to anticipate the claimed "plurality of options." Patton makes such a disclosure, and provides the specific example of a manufacturer picking out which instrument panel to include on a vehicle based on the responses of test subjects. (Patton, col. 24, lines 38-51).

Dependent claims 17-20, similar to claims 13-16, each include the limitation of a "course of action."  The specification of the '271 patent provides an example by which a storyteller determining which kinds of stories an audience prefers constitutes a "course of action." ('271, col. 8, lines 7-16).  As such, any choice amongst a plurality of options could be construed as a course of action.  Patton discloses this feature of the claims where Patton discloses that a maker or manufacturer could choose (a course of action) a display that is most rapidly comprehended and/or approved. (Patton, col 24, lines 38-51).

- 22 -

Atty. Docket 3271.001REX0

Independent claim 31, in addition to reciting one or more limitations included in independent claim 1, includes the limitations of: the physical characteristics being indicative of responses of subjects to a "presentation," and determining a "desired course of action."  As referenced above, Patton clearly discloses the responses to the presentation in that Patton states "[t]he test subject is positioned to observe the presentation for a given duration." (Patton, Abstract).  With regard to a "desired course of action," the specification of the '271 patent provides the example of a storyteller determining which kinds of stories an audience prefers. ('271, col. 8, lines 7-16).  As such, any choice amongst a plurality of options could be construed as a desired course of action.  Patton discloses this feature of the claims where Patton discloses that the maker or manufacturer could then choose (the course of action) the display that is most rapidly comprehended and/or approved. (Patton, col 24, lines 38-51).

Dependent claim 35 includes a step that states a characteristic of a first subject is different from a characteristic of a second subject.  As such, any disclosure that describes measuring multiple characteristics for multiple subjects would anticipate this feature, as necessarily a first characteristic measured for a first subject is different from a second characteristic measured for a second subject.  Patton discloses this feature by disclosing that "[t]he intensity component of each of at least two different brain wave frequencies is measured during the exposure, and each frequency is associated with a particular emotion."  (Patton, Abstract). Taking a plurality of frequency measurements from a plurality of test subjects anticipates this claimed feature, since a first frequency indicative of a first emotion (from a first test subject) would be different than a second frequency indicative of a second emotion (from a second test subject).

Independent claim 36 recites a method for providing feedback.  The method broadly states that "a desired action" associated with a group of subjects is determined.  The '271 patent itself states that a desired action could be as simple as a storyteller who tells stories to an audience determining what kind of stories the audience likes best. ('271 patent, col. 8, lines 7-16).  Patton clearly discloses a similar example in which an automobile manufacturer determines what kind of instrument panel was "most rapidly comprehended and/or created approval or pleasure in the test subject." (Patton, col. 24, lines 38-51).

- 23 -

Atty. Docket 3271.001REX0

Independent claim 36 also includes another broad limitation in which a course of action expected to lead to said desired action is determined. The '271 patent states with regard to this limitation that "[t]he course of action determined during step 146 may be selected so as to **improve the chances** of a subject or group of subjects completing the action." ('271 patent, col. 9, lines 13-15, emphasis added). Similarly, Patton discloses advertisements, including portions thereof, will be selected that are expected to "**impel viewers to use more of such product, or favor it over that of a competitor.**" (Patton, col. 1, lines 36-55, emphasis added).

Independent claim 37 recites a system for facilitating feedback, including a memory, communication port, and processor (connected to the memory and the communication port). With the exception of not requiring a first device and a second device, the processor of claim 37 performs substantially the same steps to those recited in independent claim 1 and as discussed above. With regard to the memory, communication port and processor, it would be apparent to a person skilled in the art that that these features are well known in the art and would be inherent in any computer, such as that disclosed by Patton. For example, Patton discloses "analog-to-digital (A/D) converters 46, 48 which are interfaced with a digital microcomputer such as a microcomputer made by Commodore or IBM." (Patton, col. 7, lines 26-32).

Independent claim 38 recites a computer program product in a computer readable medium comprising instructions for performing steps corresponding to the functionality of the processor recited in claim 37. Thus, the analysis of claim 1 set forth above also applies to claim 38.

Independent claim 39 recites another method for providing feedback, similar to independent claim 1, except that claim 39 includes the additional limitation that "determining said evaluation includes comparing said physical characteristics of said first subject to at least one record of behavior." Patton clearly discloses an evaluation based on a comparison of a physical characteristic to a record of behavior. For example, Patton states that "emotional content of **the second test is then compared to the first** to determine whether the intervening event changed the perceptions or feelings of the subject." (Patton, col. 25, lines 9-22). The comparison to the first test is a comparison to a record of behavior.

- 24 -

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

As set forth in the accompanying claim chart CC1, Patton anticipates claims 1-41.

**B.      RLP 002 – Claims 1-12, 21, 24-30, 37-39, and 41 are anticipated under 35 U.S.C. §102(b) over Zawilinski**

Representative claims are discussed below to demonstrate that Zawilinski establishes at least a reasonable likelihood that Requesters will prevail with respect to at least one claim of the '271 patent.  An element-by-element comparison of each of claims 1-12, 21, 24-30, 37-39, and 41 to Zawilinski is provided in the claim charts set forth in Exhibit CC2.  These claim charts show that Zawilinski anticipates each of these claims and that these claims should be rejected.

Independent claim 1 recites the limitations of receiving physical characteristic data from two subjects, determining an evaluation of the data, and providing a notification regarding the evaluation.  Similarly, Zawilinski provides "a stimulus presentation device for presenting a stimulus occurring over a predetermined period of time to each of one or more individuals forming a population sample, measuring devices to measure a change in each of a plurality of physiological variables . . ." (Zawilinski, col. 5, lines 50-55).

Dependent claim 2 attempts to provide an additional limitation as to what is meant by physical characteristic, and provides a laundry list of twenty-seven features, any one of which, if present in a reference anticipates the claim.  Zawilinski however discloses a number of the enumerated features.  For example, Zawilinski discloses that "Physiological variables have been traditionally used to measure changes in emotions, typically employing devices to measure **galvanic skin response (GSR), blood pressure, heart rate, respiration, as well as, electromyography (EMG) and electrocardiography (EKG).**" (Zawilinski, col. 1, lines 18-29, emphasis added).

Dependent claim 5 adds the limitation of detecting a pattern in data indicative of a physical characteristic for each of the subjects.  Zawilinski, for example, describes that there exists an accepted theory of emotional response, and that when a pattern of physiological variable measurements correlate with the accepted theory, a graph is appropriately labeled and the emotional response can be determined. (Zawilinski, col. 4, lines 1-19).

- 25 -

Atty. Docket 3271.001REX0

Dependent claim 6 is directed to providing a notification of the pattern of claim 5. Zawilinski, clearly provides notification of the pattern which may be seen in fig. 2.



*Fig.2*

Dependent claims 7 and 12, similar to claim 2, provide laundry lists of features, any one of which, if present in a reference, anticipates the claims. The features of the claims are themselves overlapping. For example, claim 7 includes the features of determining/selecting a course of entertainment, selecting information, and selecting/altering at least one environmental variable. A single feature of Zawilinski, such as changing the stimulus presented to a test subject anticipates each of these features (Zawilinski, col. 9, lines 16-22). These and the remaining features are enumerated in CC2, along with the relevant portions of Zawilinski that disclose one or more of the features.

Dependent claim 25 recites the limitation of comparing a characteristic of the first subject to a "record of behavior" associated with the first subject. Record of behavior could include any previous record of how a subject responded, such as a subject's progression in emotional responses over a period of time. Zawilinski discloses a comparison to a record of behavior by allowing a researcher to observe and determine "the emotional tendency and progression of an individual as the stimulus changes over time." (Zawilinski, col. 9, lines 16-20).

Independent claim 37 recites a system for facilitating feedback, including a memory, communication port, and processor (connected to the memory and the communication port).

- 26 -

Atty. Docket 3271.001REX0

With the exception of not requiring a first device and a second device, the processor of claim 37 performs substantially the same steps as those recited in independent claim 1 and as discussed above. With regard to the memory, communication port and processor, it would be apparent to a person skilled in the art that these features are well-known in the art and would be inherent in any computer, such as that disclosed by Zawilinski. For example, Zawilinski discloses "The software program or translation means includes a statistical and graphics program run on a **computer processing means** having a **memory** on which the software program is installed and **operationally linked** to the measuring means and programmed to receive the measured output value as input for the program." (Zawilinski, col. 3, line 63-col. 4, line 1).

Independent claim 38 recites a computer program product in a computer readable medium comprising instructions for performing steps corresponding to the functionality of the processor recited in claim 37. Thus, the analysis of claim 1 set forth above also applies to claim 38.

Independent claim 39 recites another method for providing feedback, similar to independent claim 1, except that claim 39 includes the additional limitation that "determining said evaluation includes comparing said physical characteristics of said first subject to at least one record of behavior." Zawilinski clearly discloses an evaluation based on a comparison of a physical characteristic to a record of behavior that occurs during the progression of an individual over a period of time. For example, Zawilinski states that "[t]hus, a researcher can obtain an immediate visual impression of both the momentary impact of a stimulus presented, and, see the emotional tendency and **progression of an individual** as the stimulus changes over time." (Zawilinski, col. 9, lines 16-20).

As set forth in the accompanying claim chart CC2, Zawilinski, alone, anticipates claims 1-12, 21, 24-30, 37-39 and 41.

C.  **RLP 003 – Claims 8-9, 13-20, 22-23, 31-36, and 40 are obvious under 35 U.S.C. §103 over Zawilinski in view of Papadopoulos**

Representative claims are discussed below to demonstrate that the combination of Zawilinski and Papadopoulos establishes at least a reasonable likelihood that Requesters will

- 27 -

Atty. Docket 3271.001REX0

prevail with respect to at least one claim of the '271 patent. An element-by-element comparison of each of claims 8-9, 13-20, 22-23, 31-36, and 40 to the combination of Zawilinski and Papadopoulos is provided in the claim charts set forth in Exhibit CC3. These claim charts show that the combination of Zawilinski and Papadopoulos renders obvious claims 8-9, 13-20, 22-23, 31-36, and 40, and that these claims should be rejected. Each proposed rejection and ground for prevailing based on obviousness includes at least one exemplary rationale further described in Section V above.

It would have been obvious to combine Zawilinski with Papadopoulos as both are from the same field of detecting responses of audience members to stimuli. For example, Zawilinski discloses a "system for detecting emotional responses of human beings and the changes therein over time" (Zawilinski, Abstract) and states that "a researcher can obtain an immediate visual impression of both the momentary impact of a stimulus presented" (Zawilinski, col. 9, lines 16-20). Similarly, Papadopoulos discloses a system "for measuring the response of selected members of an audience… to enable the presenter to adjust [based on the immediate feedback] his presentation accordingly or respond to the audience response." (Papadopoulos, Abstract).

One skilled in the art would have been motivated to combine the teachings of Papadopoulos with Zawilinski so that the system of Papadopoulos could be used with a live audience, and the real-time feedback is provided to a presenter who is providing the stimulus. Such a combination represents use of known techniques (i.e., the teachings of Papadopoulos) to improve a similar device (i.e., the device of Zawilinski) and would yield predictable results

Dependent claims 13-16 are each dependent, either directly or indirectly, upon independent claim 1, which as described above is anticipated by Zawilinski. Dependent claims 13-16 each include the limitation a "plurality of options." To the extent that the owner of the '271 patent argues that "receiving a notification regarding a plurality of options" is not inherently disclosed by Zawilinski, this limitation is taught by Papadopoulos.

The specification of the '271 patent provides context to the definition of "plurality of options" which includes simply the ability to make any of several decisions based on the reaction of one or more of the subjects. For example, the '271 patent states that:

- 28 -

Atty. Docket 3271.001REX0

> [i]n some embodiments, the step 104 may include determining **one or more options to provide to a subject or group of subjects**. For example, the method 100 may include a step of receiving a notification of several possible endings to a play being presented to an audience. The step 104 may include **determining which of the options to provide** to the audience or determining which of the options the audience will be allowed to choose from.

('271, col. 5, lines 47-54, emphasis added). As such, any disclosure of picking options based on the responses of test subjects would be enough to disclose the feature of "plurality of options."

Papadopoulos clearly teaches this "plurality of options" limitation of the claims. For example, Papadopoulos discloses that:

> it is one of the principal objects of this invention to provide a participation presenter-audience reaction system in which the audience response is simultaneously displayed before the person or persons making the presentation so that the **presenter may respond to the audience's reaction or modify his presentation accordingly or elicit information from the audience**.

(Papadopoulos, col. 1, lines 56-63, emphasis added).

Dependent claims 17-20 are each dependent, either directly or indirectly, upon independent claim 1 which, as described above, is anticipated by Zawilinski. Dependent claims 17-20, similar to claims 13-16, each include a limitation of a "course of action." To the extent that the owner of the '271 patent argues that determining a course of action is not inherently disclosed by Zawilinski, this limitation is taught by Papadopoulos.

Without providing a precise definition of "course of action," the specification of the '271 patent provides an example context of what constitutes a "course of action." The '271 patent states:

> [f]or example, assume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the audience member's heart rates, posture, etc. may be obtained and used to help determine which of the themes the audience members are the most interested in. Once the information is communicated to the speaker, **the speaker can direct the presentation appropriately**.

- 29 -

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

('271, col. 4, lines 1-11, emphasis added).

In this context, any choice amongst a plurality of options could be construed as a course of action. Papadopoulos clearly teaches this "plurality of options" limitation of the claims. For example, Papadopoulos discloses that "it one of the principal objects of this invention to provide a participation presenter-audience reaction system in which the audience response is simultaneously displayed before the person or persons making the presentation so that the **presenter may respond to the audience's reaction or modify his presentation accordingly or elicit information from the audience.**" (Papadopoulos, col. 1, lines 56-63, emphasis added). Papadopoulos discloses this limitation of the claims, as the presenter would necessarily choose the course of action by which to proceed with the presentation.

Independent claim 31, in addition to reciting one or more limitations included in independent claim 1 (as discussed above as being anticipated by Zawilinski), includes the limitations "wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation" and "determining a desired course of action." As referenced above, Zawilinski clearly discloses the responses to the presentation in that Zawilinski discloses "a stimulus presentation device for presenting a stimulus occurring over a predetermined period of time to each of one or more individuals forming a population sample, measuring devices to measure a change in each of a plurality of physiological variables . . ." (Zawilinski, col. 5, lines 50-55). See also FIG. 1.

- 30 -

Atty. Docket 3271.001REX0

**Appx455**

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*



**Fig. 1**

According to the specification of the '271 patent, the term "desired course of action" could include a storyteller determining which kinds of stories an audience prefers. ('271, col. 8, lines 7-16). To the extent that the owner of the '271 patent argues that determining a desired course of action is not inherently disclosed by Zawilinski, this limitation is taught by Papadopoulos.

The '271 patent describes as an example of determining a desired course of action:

> assume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the audience member's heart rates, posture, etc. may be obtained and used to help determine which of the themes the audience members are the most interested in. Once the information is communicated to the speaker, the speaker can direct the presentation appropriately.

('271, col. 4, lines 1-11).

In this context, any choice amongst a plurality of options could be construed as choosing a desired course of action. As the above discussion illustrates, Papadopoulos discloses this feature. Papadopoulos further discloses that:

- 31 -

Atty. Docket 3271.001REX0

[a] system is described for measuring the response of selected members of the audience, averaging the selected responses and presenting the average to the presenter as the presentation is being made to enable the presenter to adjust his presentation accordingly or respond to the audience response.

(Papadopoulos, Abstract). It would have been obvious to a person of ordinary skill in the art that the presenter would necessarily make a choice on how to proceed with the presentation.

Dependent claim 35 includes a step that recites that a characteristic of a first subject is different from a characteristic of a second subject. Any disclosure that describes measuring multiple characteristics for multiple subjects would disclose this feature, as necessarily a first characteristic measured for a first subject is different from a second characteristic measured for a second subject. Zawilinski discloses this feature in that depending on the research goals, any one of GSR, blood pressure, heart rate, respiration, EMG, and EKG could be measured for different subjects. (Zawilinski, col. 1, lines 17-29).

Independent claim 36 recites a method for providing feedback. The method broadly states that "a desired action" associated with a group of subjects is determined. The '271 patent itself acknowledges that such a desired action was already well-known in the art. For example, the '271 patent states in the background section of the patent that "[a] lecturer may wish to know what portions of his lecture the audience members find most interesting. Alternatively, the lecturer may want to have a better idea of when to take a break." ('271 patent, col. 1, lines 24-27). The desired action would be for the audience to take a break, where the break is taken by at least one or a plurality of the subjects.

Independent claim 36 also includes another limitation in which a course of **action** expected to lead to said desired action is determined. The '271 patent states with regard to this limitation that "a speaker is giving a presentation to an audience of ten people and that the **speaker may want to direct the presentation** along one of several potential themes depending on the interest of the audience." ('271 patent, col. 4, lines 1-11, emphasis added). Similarly, Papadopoulos discloses that "[a] system is described for measuring **the response of selected** members of the audience, averaging the selected responses and **presenting the average to the**

- 32 -

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

presenter as the presentation is being made to enable the presenter to adjust his presentation accordingly or respond to the audience response." (Papadopoulos, Abstract).

As set forth in the accompanying claim chart CC3, Zawilinski in view of Papadopoulos renders obvious claims 8-9, 13-20, 22-23, 31-36, and 40.

### D.    RLP 004 – Claims 1-30, and 39-41 are obvious under 35 U.S.C. §103 over Patton in view of Papadopoulos

Representative claims are discussed below to demonstrate that the combination of Patton and Papadopoulos establishes at least a reasonable likelihood that Requesters will prevail with respect to at least one claim of the '271 patent.  An element-by-element comparison of each of claims 1-30 and 39-41 to the combination of Patton and Papadopoulos is provided in the claim charts set forth in Exhibit CC4.  These claim charts show that the combination of Patton and Papadopoulos renders obvious claims 1-30 and 39-41, and that these claims should be rejected. Each proposed rejection and ground for prevailing based on obviousness includes at least one exemplary rationale further described in Section V above.

Independent claim 1 includes the limitation "receiving first data indicative of a physical characteristic of a first subject **from a first device** associated with said first subject and second data indicative of a physical characteristic of a second subject **from a second device** associated with said second subject."  To the extent the owner of the '271 patent may argue that Patton does not anticipate claim 1, because (a) claim 1 requires a first device that is distinct from a second device; and (b) Patton does not explicitly disclose distinct first and second devices, Papadopoulos clearly discloses distinct first and second devices.  While such an interpretation is incorrect (because, for example, dependent claim 29 recites that "said first and second devices are the same"), claim 1 would nonetheless be obvious in view of Patton in view of Papadopoulos.

Papadopoulos clearly discloses receiving first data from a first device and receiving second data from a second device, wherein each device is associated with a subject.  For example, Papadopoulos discloses "[e]ach response circuit 24 includes a manually operated variable resistance **response device** or potentiometer 30 that is **distributable to each of the**

- 33 -

Atty. Docket 3271.001REX0

**members of the audience.**" (Papadopoulos, col. 3, lines 1-4, emphasis added). It is clear that each member of the audience having a response device meets the first and second device limitations of claim 1.

It would have been obvious to combine Patton with Papadopoulos as both are from the same field of detecting responses of audience members to stimuli. One skilled in the art would have been motivated to combine the teachings of Papadopoulos with Patton so that the multiple devices of Papadopoulos could be used with the emotional response analyzer system of Patton to provide a more precise determination of the emotional state of the subjects to portions of a presentation. For example, Patton states that "if a particular subject were to report that he were 'turned off' by a particular commercial… it is at least possible if not likely that certain features of that exact same commercial might have had strong attraction for the viewer… then the attractive parts of any given presentation could be retained and unsatisfactory portions could be eliminated or modified." (Patton, col. 3, line 50 – col. 4, line 2). Further both encompass elements well known in the art that could be combined to produce a predictable result.

Dependent claims 2-7, 10-12, and 17-30 are each dependent, either directly or indirectly, upon independent claim 1, which as described above is obvious over Patton in view of Papadopoulos. To the extent that the owner of the '271 patent argues that Patton does not anticipate claim 1 for the reasons provided above, dependent claims 2-7, 10-12, and 17-30, are each obvious over Patton in view of Papadopoulos for the reasons described above with respect to claim 1.

Dependent claim 8 recites the limitation of "determining which of a plurality of devices to provide said notification." To the extent the owner of the '271 patent argues this limitation is not inherently disclosed by Patton, this limitation is clearly taught by Papadopoulos. For example, Papadopoulos teaches a display device or meter mounted on a console, a chart recorder, and light indicators each of which can provide a notification. (Patton, col. 4, line 60 – col. 5, line 11).

Atty. Docket 3271.001REX0

Dependent claims 13-16 each include the limitation a "plurality of options."  To the extent that the owner of the '271 patent argues that "receiving a notification regarding a plurality of options" is not inherently disclosed by Patton, this limitation is taught by Papadopoulos.

The specification of the '271 patent provides context to the definition of "plurality of options" which includes simply the ability to make any of several decisions based on the reaction of one or more of the subjects.  For example, the '271 patent states that:

> [i]n some embodiments, the step 104 may include determining **one or more options to provide to a subject or group of subjects**.  For example, the method 100 may include a step of receiving a notification of several possible endings to a play being presented to an audience.  The step 104 may include **determining which of the options to provide** to the audience or determining which of the options the audience will be allowed to choose from.

('271, col. 5, lines 47-54, emphasis added).  As such, any disclosure of picking options based on the responses of test subjects would be enough to disclose the feature of "plurality of options."

Papadopoulos clearly teaches this "plurality of options" limitation of the claims.  For example, Papadopoulos discloses that:

> it one of the principal objects of this invention to provide a participation presenter-audience reaction system in which the audience response is simultaneously displayed before the person or persons making the presentation so that the **presenter may respond to the audience's reaction or modify his presentation accordingly or elicit information from the audience**.

(Papadopoulos, col. 1, lines 56-63, emphasis added).

Independent claim 39 recites another method for providing feedback, similar to independent claim 1, except that claim 39 includes the additional limitation that "determining said evaluation includes comparing said physical characteristics of said first subject to at least one record of behavior."  Patton clearly discloses an evaluation based on a comparison of a physical characteristic to a record of behavior.  For example, Patton states that "emotional content of **the second test is then compared to the first** to determine whether the intervening event changed the perceptions or feelings of the subject." (Patton, col. 25, lines 9-22).  The comparison to the first test is a comparison to a record of behavior.

- 35 -

As set forth in the accompanying claim chart CC4, Patton in view of Papadopoulos renders obvious claims 1-30 and 39-41.

## VIII.   STATEMENT IDENTIFYING THE REAL PARTY IN INTEREST

The real parties in interest are:

Strava, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 901 Mission Street, San Francisco, California 94103;

MapMyFitness, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 1810 Blake Street, Denver, Colorado 80202; and

FitnessKeeper, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 60 Canal Street, Boston, MA 02114.

REQUESTERS' CORRESPONDENCE ADDRESS:

Michael B. Ray, Esq.
Sterne, Kessler, Goldstein & Fox, PLLC
1100 New York Ave., N.W.,
Washington, DC 20005-3934

## IX.   CERTIFICATION THAT ESTOPPEL DOES NOT PROHIBIT THE PRESENT INTER PARTES REEXAMINATION

It is certified by the real parties in interest, Strava, Inc., MapMyFitness, Inc., and FitnessKeeper, Inc., that the estoppel provisions of 37 C.F.R. § 1.907 do not prohibit this reexamination.

## X.   DISCLOSURE OF CONCURRENT LITIGATION

The '271 patent is currently the subject of litigation in the U.S. District Court for the District of Utah in the following actions:

(1) *Icon Health & Fitness et al. v. Garmin Ltd. et al.*, Civil Docket No. 1:11-cv-00166-DB, filed November 11, 2011;

- 36 -

Atty. Docket 3271.001REX0

**Appx461**

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

(2) *Icon Health & Fitness et al. v. Polar Electro Oy*, Civil Docket No. 1:11-cv-00167-PMW, filed November 11, 2011;

(3) *Icon Health & Fitness et al. v. FitnessKeeper, Inc.*, Civil Docket No. 1:11-cv-00173-CW, filed December 9, 2011;

(4) *Icon Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB December 9, 2011; and

(5) *Icon Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW December 9, 2011.

These cases are presently pending before the district court, and no judgment has been issued with respect to the validity of the claims of the '271 patent or the prior art references and issues applied herein. Because of the concurrent litigation, Requesters request that this Request be granted and the reexamination be conducted with "special dispatch".

The USPTO is legally bound to give claims their broadest reasonable interpretation. Requesters emphasize that the interpretations of the '271 patent claims in this Request are offered to be consistent with the broadest reasonable interpretation standard appropriate in reexamination and do not reflect the interpretations Requesters believe should be given to the claims in the Litigation, or in any other proceeding that does not apply the broadest reasonable interpretation standard.

## XI.   DISCLOSURE OF CONCURRENT REEXAMINATIONS

Requesters are not aware of any concurrent reexamination involving the '271 patent.

## XII.   CERTIFICATION OF SERVICE ON PATENT OWNER

The undersigned hereby certifies that the above captioned Request for *Inter Partes* Reexamination under 37 C.F.R. § 1.915 was served in its entirety by First Class Mail upon the attorney of record at the current correspondence address in the '271 patent file, as provided in 37 C.F.R. § 1.33(c):

REED SMITH LLP
2500 ONE LIBERTY PLACE
1650 MARKET STREET
PHILADELPHIA, PA  19103

- 37 -

Atty. Docket 3271.001REX0

*Request for Reexamination of*
*U.S. Patent No. 6,701,271 B2*

## XIII.  CONCLUSION

As described above and in the attached exhibits, each and every claim of the '271 patent is unpatentable over the prior art patents and printed publications cited herein. Therefore, Requesters respectfully request the Office order *inter partes* reexamination of the patent and reject all claims.

Respectfully submitted,
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Michael B. Ray
Registration No. 33,997

Harish Ruchandani
Registration No. 58,770

Attorneys for Third Party Requesters

Date: 9/14/2012

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

1584569_2

- 38 -

Atty. Docket 3271.001REX0

**Appx463**

# EXHIBIT 19

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | 3271.001REX0 | 1254 |

7066          7590          12/07/2012
REED SMITH LLP
2500 ONE LIBERTY PLACE
1650 MARKET STREET
PHILADELPHIA, PA 19103

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/07/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

Appx465

| *OFFICE ACTION IN* INTER PARTES *REEXAMINATION* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/002,337 | 6701271 |
| | Examiner | Art Unit |
| | MINH T. NGUYEN | 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on 14 September, 2012

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response*:
    2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response*:
    30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II.  SUMMARY OF ACTION:**

1a. ☒ Claims 1-41 are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims 1-41 are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____    ☐ are acceptable    ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:   ☐ approved.   ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
    ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No 95/002,337.
10. ☐ Other _____

U.S. Patent and Trademark Office
PTOL-2064 (08/06)

Paper No.  20120121

Application/Control Number: 95/002,337                                    Page 2

Art Unit: 3992

### INTER PARTES REEXAMINATION INITIAL OFFICE ACTION

This first non-final Office action on the merits is being mailed with the order granting reexamination. In the attached order granting the request, the examiner determines that the third party requester has shown a reasonable likelihood of prevailing ("RLP") in its proposed rejections of claims 1-41 of the United States Patent Number 6,701,217 (the '217 patent).

#### *References Cited in the Request*

U.S. Patent No. 6,292,688 to Patton, ("Patton").

U.S. Patent No. 5,676,138 to Zawilinski, ("Zawilinski").

U.S. Patent No. 3,744,7t2 to Papadopoulos et al. ("Papadopoulos").

#### *Adopted Proposed Rejections*

A reasonable likelihood of prevailing (RLP) was shown for each the following proposed rejections in the Request.

**Proposed Rejection 1**.

Claims 1-41 are anticipated by Patton as shown in the claim chart provided as Exhibit CC1.

**Proposed Rejection 2**.

Claims 1-12, 21, 24-30, 37-39, 41 are anticipated by Zawilinski as shown in the claim chart provided as Exhibit CC2.

Application/Control Number: 95/002,337                                        Page 3

Art Unit: 3992

**Proposed Rejection 3**.

Claims 8, 9, 13-20, 22, 23, 31-36 and 40 are obvious over Zawilinski in view of the

Papadopoulos as shown in the claim chart provided as Exhibit CC3.

**Proposed Rejection 4**.

Claims 1-30 and 39-41 are obvious over Patton in view of Papadopoulos as shown in the

claim chart provided as Exhibit CC4.


*Statutes*

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the

basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b)        the invention was patented or described in a printed publication in this or a foreign country or in public

use or on sale in this country, more than one year prior to the date of application for patent in the United States.

(e)        the invention was described in (1) an application for patent, published under section 122(b), by another

filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application

for patent by another filed in the United States before the invention by the applicant for patent, except that an

international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this

subsection of an application filed in the United States only if the international application designated the United

States and was published under Article 21(2) of such treaty in the English language.


The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

(a)        A patent may not be obtained though the invention is not identically disclosed or described as set forth

in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are

Application/Control Number: 95/002,337                                      Page 4

Art Unit: 3992

     such that the subject matter as a whole would have been obvious at the time the invention was made to a person

     having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the

     manner in which the invention was made.

**Proposed Rejection 1**.

     Claims 1-41 are rejected under 35 U.S.C. 102(e) as being anticipated by Patton.  This rejection is proposed by the third party requester and is adopted.  See Request Claim Chart Exhibit CC1, which is incorporated herein by reference as to these claims.

**Proposed Rejection 2**.

     Claims 1-12, 21, 24-30, 37-39, 41 are rejected under 35 U.S.C. 102(b) as being anticipated  by Zawilinski.  This rejection is proposed by the third party requester and is adopted.  See Request Claim Chart Exhibit CC2, which is incorporated herein by reference as to these claims.

**Proposed Rejection 3**.

     Claims 8, 9, 13-20, 22, 23, 31-36 and 40 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Papadopoulos.  This rejection is proposed by the third party requester and is adopted.  See Request Claim Chart Exhibit CC3, which is incorporated herein by reference as to these claims.

**Proposed Rejection 4**.

Application/Control Number: 95/002,337                                    Page 5

Art Unit: 3992

Claims 1-30 and 39-41 are rejected under 35 U.S.C. 103(a) as being obvious over Patton

in view of Papadopoulos. This rejection is proposed by the third party requester and is adopted.

See Request Claim Chart Exhibit CC4, which is incorporated herein by reference as to these

claims.

## Service of Papers

After the filing of a request for reexamination by a third party requester, any document

filed by either the patent owner or the third party requester must be served on the other party (or

parties where two or more third party requester proceedings are merged) in the reexamination

proceeding in the manner provided in 37 CFR 1.248.  See 37 CFR 1.550(f).

## Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes*

reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant"

and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 314(c) requires that

inter partes reexamination proceedings "will be conducted with special dispatch" (37 CFR

1.937). Patent owner extensions of time in inter partes reexamination proceedings are provided

for in 37 CFR 1.956. Extensions of time are not available for third party requester comments,

because a comment period of 30 days from service of patent owner's response is set by statute.

35 U.S.C. 314(b)(3). Time periods may be extended only upon a strong showing of sufficient

cause.

Application/Control Number: 95/002,337                                              Page 6

Art Unit: 3992

## Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the

'271 patent throughout the course of this reexamination proceeding. The third party requester is

also reminded of the ability to similarly apprise the Office of any such activity or proceeding

throughout the course of this reexamination proceeding. See MPEP 2686 and 2686.04.

## Correspondence

**All** correspondence relating to this *inter partes* reexamination proceeding should be directed

as follows:

By U.S. Postal Service Mail to:

      Mail Stop *Inter Partes* Reexam
      ATTN:  Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA  22313-1450

By FAX to:

      (571) 273-9900
      Central Reexamination Unit

By Hand to:

      Customer Service Window
      Randolph Building
      401 Dulany St.
      Alexandria, VA  22314

By EFS-Web:

Application/Control Number: 95/002,337                                          Page 7

Art Unit: 3992


      Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at
      https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html
      EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

      Any inquiry concerning this communication or as to the status of this proceeding, should

be directed to the Central Reexamination Unit at telephone number (571) 272-7705.




      /Minh Nguyen/
      Minh Nguyen
      Primary Examiner
      Central Reexamination Unit 3992
      571-272-1748



      <u>Conferees</u>:

      /Tuan H. Nguyen/
      Primary Examiner
      Central Reexamination Unit 3992

      /ANDREW J. FISCHER/
      Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT 20

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | 3271.001REX0 | 1254 |

7066        7590        12/07/2012
REED SMITH LLP
2500 ONE LIBERTY PLACE
1650 MARKET STREET
PHILADELPHIA, PA 19103

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/07/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

Appx474

| *ORDER GRANTING/DENYING REQUEST FOR INTER PARTES REEXAMINATION* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/002,337 | 6701271 |
| | Examiner | Art Unit |
| | MINH T. NGUYEN | 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

The request for *inter partes* reexamination has been considered. Identification of the claims, the references relied on, and the rationale supporting the determination are attached.

Attachment(s):   ☐ PTO-892   ☒ PTO/SB/08   ☐Other: _____

1. ☒ The request for *inter partes* reexamination is GRANTED.

  ☒ An Office action is attached with this order.

  ☐ An Office action will follow in due course.

2. ☐ The request for *inter partes* reexamination is DENIED.

This decision is not appealable. 35 U.S.C. 312(c). Requester may seek review of a denial by petition to the Director of the USPTO within ONE MONTH from the mailing date hereof. 37 CFR 1.927. EXTENSIONS OF TIME ONLY UNDER 37 CFR 1.183. In due course, a refund under 37 CFR 1.26(c) will be made to requester.

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Order.

Appx475

Application/Control Number: 95/002,337                                              Page 2

Art Unit: 3992

## ORDER GRANTING REEXAMINATION REQUEST

The present request for *inter* partes reexamination establishes a reasonable likelihood that the requester will prevail with respect to claims 1-41 of the United States Patent Number 6,701,271 (the '271 patent).

### References Cited in the Request

U.S. Patent No. 6,292,688 to Patton, ("Patton").

U.S. Patent No. 5,676,138 to Zawilinski, ("Zawilinski").

U.S. Patent No. 3,744,7t2 to Papadopoulos et al. ("Papadopoulos").

### Prosecution History

The application 09/859,827 that resulted in the '271 patent was filed on May 17, 2001. The original application included claims 1-33, with claims 1, 26, 31, 32 and 33 being independent.

In the first non-final office action on the merits on August 12, 2002, claims 1-20 and 23-33 were rejected based on US Patent No. 5,542,420 to Goldman et al. ("Goldman") and claims 21 and 22 were indicated allowable.

In the response filed on October 17, 2002 to the first non-final office action, claims 1, 3, 7, 11, 17, 21, 23, 26, 27, 29, 31, 32 and 33 were amended and new claims 34-36 were added. The applicant further argued that the claims require two or more subjects or group of subjects whereas Goldman is directed to individual subjects.

Application/Control Number: 95/002,337                                          Page 3

Art Unit: 3992

The Office mailed a Notice of Allowance on December 20, 2002 in view of the amendment and arguments presented in the response filed on October 17, 2002.

The Office mailed a Notice of Withdrawal from Issue on May 22, 2003, reopening prosecution.

On June 11, 2003, a second non-final office action was mailed. Claims 1-31 and 34-36 were rejected based on the paper "Shear Madness has Right Mix of Character, Audience" and claims 1-36 were rejected based on US Patent No. 5,762,503 to Hoo et al. ("Hoo").

In the response on September 15, 2003 to the second non-final office action, claims 1, 26, 31 and 34 were amended, new claims 37-41 were added. The applicant further argued that the references do not teach the claimed limitation that receiving data indicative of a physical characteristic of each of a plurality of subjects.

On October 30, 2003, the examiner issued a second Notice of Allowance.

### *Summary of the Proposed Rejections*

The following rejections are proposed in the Request (see pg. 4 of the Request):

**Proposed Rejection 1**.

Claims 1-41 are anticipated by Patton as shown in the claim chart provided as Exhibit CC1.

**Proposed Rejection 2**.

Claims 1-12, 21, 24-30, 37-39, 41 are anticipated by Zawilinski as shown in the

Application/Control Number: 95/002,337                                      Page 4

Art Unit: 3992

claim chart provided as Exhibit CC2.

      **Proposed Rejection 3**.

      Claims 8, 9, 13-20, 22, 23, 31-36 and 40 are obvious over Zawilinski in view of

the Papadopoulos as shown in the claim chart provided as Exhibit CC3.

      **Proposed Rejection 4**.

      Claims 1-30 and 39-41 are obvious over Patton in view of Papadopoulos as

shown in the claim chart provided as Exhibit CC4.


                        ***Analysis of the Proposed Rejections***


      **Proposed Anticipation Rejection 1 (Patton)**:

      The examiner agrees that a reasonable likelihood of prevailing (RLP) is shown as

to claims 1-41.

      The proposed rejection of claims 1-41 as set forth in Exhibit CC1 is incorporated

herein by reference to show a reasonable likelihood that the requester will prevail with

respect to the claims.  Exhibit CC1 provides a detailed application of Patton to each

limitation of these claims. The requester's application of the reference to the claims

appears reasonable, therefore the examiner finds that requester has shown a RLP with

respect to claims 1-41.

Application/Control Number: 95/002,337                                    Page 5

Art Unit: 3992

**Proposed Anticipation Rejection 2 (Zawilinski):**

The examiner agrees that a reasonable likelihood of prevailing (RLP) is shown as to claims 1-12, 21, 24-30, 37-39, 41.

The proposed rejection of claims 1-12, 21, 24-30, 37-39, 41 as set forth in Exhibit CC2 is incorporated herein by reference to show a reasonable likelihood that the requester will prevail with respect to the claims.  Exhibit CC2 provides a detailed application of Zawilinski to each limitation of these claims. The requester's application of the reference to the claims appears reasonable, therefore the examiner finds that requester has shown a RLP with respect to claims 1-12, 21, 24-30, 37-39, 41.

**Proposed Obviousness Rejection 3 (Zawilinski and Papadopoulos):**

The examiner agrees that a reasonable likelihood of prevailing (RLP) is shown as to claims 8, 9, 13-20, 22, 23, 31-36 and 40.

The proposed obviousness rejection of claims 8, 9, 13-20, 22, 23, 31-36 and 40 as set forth in Exhibits CC3 is incorporated herein by reference to show a reasonable likelihood that the requester will prevail with respect to those claims. Exhibit CC3 provides a detailed application of Zawilinski and Papadopoulos to each limitation of these claims. For example, in claim 8, the third party requester shows that Zawilinski teaches every limitation either expressly or inherently. To the extent that the limitation "determining which of a plurality of devices to provide said notification" is not inherently taught by Zawilinski, the requester points out that this limitation is expressly taught in Papadopoulos. The requester's application of the references and analysis to the claims

Application/Control Number: 95/002,337                                   Page 6

Art Unit: 3992

appear reasonable, therefore the examiner finds that requester has shown a RLP with

respect to claims 8, 9, 13-20, 22, 23, 31-36 and 40.


**Proposed Obviousness Rejection 4 (Patton and Papadopoulos):**

The examiner agrees that a reasonable likelihood of prevailing (RLP) is shown as

to claims 1-30 and 39-41.

The proposed obviousness rejection of claims 1-30 and 39-41 as set forth in

Exhibit CC4 is incorporated herein by reference to show a reasonable likelihood that the

requester will prevail with respect to those claims. Exhibit CC4 provides a detailed

application of Patton and Papadopoulos to each limitation of these claims. For example,

in claim 1, the third party requester shows that Patton teaches every limitation either

expressly or inherently. To the extent that Patton does not expressly teach distinct first

and second devices, the requester points out that Papadopoulos expressly teaches this

limitation. The requester's application of the references and analysis to the claims appear

reasonable, therefore the examiner finds that requester has shown a RLP with respect to

claims 1-30 and 39-41.


**Service of Papers**

After the filing of a request for reexamination by a third party requester, any

document filed by either the patent owner or the third party requester must be served on

the other party (or parties where two or more third party requester proceedings are

merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248.  See 37 CFR 1.550(f).


## Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes* reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 314(c) requires that inter partes reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.937). Patent owner extensions of time in inter partes reexamination proceedings are provided for in 37 CFR 1.956. Extensions of time are not available for third party requester comments, because a comment period of 30 days from service of patent owner's response is set by statute. 35 U.S.C. 314(b)(3). Time periods may be extended only upon a strong showing of sufficient cause.


## Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the '271 patent throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP 2686 and 2686.04.

Application/Control Number: 95/002,337                                              Page 8

Art Unit: 3992

## Correspondence

**All** correspondence relating to this *inter partes* reexamination proceeding should be

directed as follows:

By U.S. Postal Service Mail to:

> Mail Stop *Inter Partes* Reexam
> ATTN:  Central Reexamination Unit
> Commissioner for Patents
> P.O. Box 1450
> Alexandria, VA  22313-1450

By FAX to:

> (571) 273-9900
> Central Reexamination Unit

By Hand to:

> Customer Service Window
> Randolph Building
> 401 Dulany St.
> Alexandria, VA  22314

By EFS-Web:

> Registered users of EFS-Web may alternatively submit such correspondence via
> the electronic filing system EFS-Web, at
> > https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html
> EFS-Web offers the benefit of quick submission to the particular area of the
> Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft
> scanned" (i.e., electronically uploaded) directly into the official file for the reexamination
> proceeding, which offers parties the opportunity to review the content of their
> submissions after the "soft scanning" process is complete.

Application/Control Number: 95/002,337                                    Page 9

Art Unit: 3992


      Any inquiry concerning this communication or as to the status of this proceeding,

should be directed to the Central Reexamination Unit at telephone number (571) 272-

7705.

      /Minh Nguyen/
      Minh Nguyen
      Primary Examiner
      Central Reexamination Unit 3992
      571-272-1748


      <u>Conferees</u>:

      /Tuan H. Nguyen/
      Primary Examiner
      Central Reexamination Unit 3992

      /ANDREW J. FISCHER/
      Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT 21

Via eFILE                                                                    REEXAMINATION
                                                    Attorney Docket No.: I1618.10003US01


### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Reexamination of: | U.S. Patent No. 6,701,271 | |
| Control No.: | 95/002,337 | Art Unit 3992 |
| Inventor: | Willner, Barry E., et al. | |
| Filed: | September 14, 2012 | |
| For: | METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS | |
| Examiner: | Nguyen, Minh T. | |
| Customer No.: | 97149 | |
| Confirmation No: | 1254 | |


### AMENDMENT A AND RESPONSE TO NON-FINAL ACTION

**Mail Stop: Inter Partes Reexamination**
Attn: Central Reexamination Unit
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the Non-Final Office Action mailed December 7, 2012, please consider the following:

**Amendments to the Claims** begin on page 2 of this paper; and

**Remarks** begin on page 22 of this paper.


Page 1 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

## AMENDMENTS TO THE CLAIMS

Pursuant to 37 CFR §1.941, please amend the above identified patent by canceling claims 1-14, 21-30, and 36; amending claims 17-20, 31, 33, and 37-39; and adding new claims 42-228:

17.    (Amended)  The method of claim 1, further comprising:
determining a course of action based on said first data and said second data,
wherein said determining said course of action is performed by a server.

18.    (Amended)  The method of claim 17, further comprising:
providing a notification based on said course of action,
wherein said notification based on said course of action is provided over the Internet by said server.

19.    (Amended)  The method of claim 1, further comprising:
determining a course of action based on said evaluation,
wherein said determining said course of action is performed by a server.

20.    (Amended)  The method of claim 19, further comprising:
providing a notification based on said course of action,
wherein said notification based on said course of action is provided over the Internet by said server.

31.    (Amended)  A method for providing feedback, comprising:
employing a remote server to perform the following:
receiving, from a plurality of local sensors and over the Internet, data indicative of a physical characteristic of each of a plurality of subjects, wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation;
determining a desired course of action associated with said plurality of subjects based, at least in part, on said data indicative of a physical characteristic of each of said plurality of subjects; and
providing a notification based, at least in part, on said course of action.

33.    (Amended)  The method of claim 31, further comprising <u>employing the remote server to perform the following</u>:

      determining a desired action to be taken by said plurality of subjects.

37.    (Amended)  A system for facilitating feedback, comprising:

      <u>a remote server including:</u>

            a memory;

            a communication port <u>operative to receive data over the Internet</u>; and

            a processor connected to said memory and said communication port, said processor being operative to:

                  receive<u>, over the Internet and through said communication port,</u> first data indicative of a physical characteristic of a first subject <u>from a local first sensor operative to sense said first data</u> and second data indicative of a physical characteristic of a second subject <u>from a local second sensor operative to sense said second data</u>;

                  <u>store said first and second data in said memory;</u>

                  determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

                  provide a notification regarding said evaluation to <u>a</u> device.

38.    (Amended)  A computer program product in a computer readable medium for using feedback, comprising:

      first instructions for [obtaining receiving] <u>employing a remote server to obtain and receive over the Internet</u> first data representative of a physical characteristic of a first subject <u>from a local first sensor operative to sense said first data</u> and second data representative of a physical characteristic of a second subject <u>from a local second sensor operative to sense said second data</u>;

      second instructions for [preparing] <u>employing said remote server to prepare</u> an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

      third instructions for [sending] <u>employing said remote server to send</u> third data indicative of said evaluation of said first data and said second data to a device.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

39.    (Amended)  A method for providing feedback, comprising:

   employing a remote server to perform the following:

         receiving, over the Internet, first data indicative of a physical characteristic of a first subject from a local first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a local second device associated with said second subject;

         determining an evaluation of said first data and said second data, wherein said determining said evaluation includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject; and

         providing a notification regarding said evaluation to a device.


42.    (New)   The system of claim 37, wherein said server is a Web server that hosts a Web site.


43.    (New)   The system of claim 37, wherein said first sensor is formed in equipment operative to sense said first data while said first subject is sitting on said equipment.


44.    (New)   The system of claim 37, wherein said first sensor is formed in equipment operative to sense said first data while said first subject is standing on said equipment.


45.    (New)   The system of claim 37, wherein said first sensor is operative to be worn by said first subject.


46.    (New)   The system of claim 37, wherein said first sensor is operative to be carried by said first subject.


47.    (New)   The system of claim 37, wherein:

         said server further includes an internal clock element that is operative to maintain a time and date for said server;

         said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server; and

         said internal clock element is operative to create time stamps for said notification provided by said server.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

48.    (New)   The system of claim 37, wherein said processor is further operative to store, in said memory, information regarding said first and second subjects in addition to said first data and said second data.

49.    (New)   The system of claim 37, further comprising a sensor database accessible to said server.

50.    (New)   The system of claim 49, wherein said sensor database includes a sensor identifier field that contains information for identifying said first and second sensors.

51.    (New)   The system of claim 50, wherein said sensor database further includes a sensor description field that contains information describing said first and second sensors.

52.    (New)   The system of claim 51, wherein said sensor database further includes a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second sensors.

53.    (New)   The system of claim 37, further comprising an output database accessible to said server.

54.    (New)   The system of claim 53, wherein said output database includes an output identifier field that contains identifying information regarding said first and second subjects.

55.    (New)   The system of claim 54, wherein said output database further includes an output description field that contains descriptive information regarding said first and second subjects.

56.    (New)   The system of claim 55, wherein said output database further includes a sensor identifier field that identifies that said first and second sensors are associated with said first and second subjects.

57.    (New)   The system of claim 37, further comprising an evaluation database accessible to said server.

58.    (New)   The system of claim 57, wherein said evaluation database includes an evaluation identifier field that contains identifying information for said evaluation.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

59.     (New)   The system of claim 58, wherein said evaluation database further includes a description field that contains descriptive information regarding said evaluation.

60.     (New)   The system of claim 59, wherein said evaluation database further includes a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation.

61.     (New)   The system of claim 60, wherein said evaluation database further includes a field that associates said evaluation with said device to which said notification is provided.

62.     (New)   The system of claim 37, wherein said device is a server.

63.     (New)   The system of claim 37, wherein said device is a computer.

64.     (New)   The system of claim 37, wherein said device is a cellular telephone.

65.     (New)   The system of claim 37, wherein said device includes a flash memory card.

66.     (New)   The system of claim 37, wherein said device includes a display screen that is operative to visually illustrate said notification.

67.     (New)   The system of claim 66, wherein said display screen is a touch screen.

68.     (New)   The system of claim 37, wherein said device includes a keyboard and a computer mouse.

69.     (New)   The system of claim 37, wherein said processor is further operative to provide said notification to one or more additional devices.

70.     (New)   The system of claim 69, wherein said devices include at least two cellular telephones.

71.     (New)   The system of claim 69, wherein said devices include more than one type of device.

72.     (New)   The system of claim 71, wherein said devices include a cellular telephone and a computer.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

73.   (New)   The system of claim 37, wherein said notification includes an email message.

74.   (New)   The system of claim 37, wherein said notification includes an instant message communication.

75.   (New)   The system of claim 37, wherein said notification includes an electronic signal.

76.   (New)   The system of claim 37, wherein said notification includes a wireless transmission.

77.   (New)   The system of claim 37, wherein said notification includes an HTTP transmission.

78.   (New)   The system of claim 37, wherein said notification includes an HTML transmission.

79.   (New)   The system of claim 37, wherein said notification includes an XML transmission.

80.   (New)   The system of claim 37, wherein said notification includes audible information.

81.   (New)   The system of claim 80, wherein said audible information includes a voice message.

82.   (New)   The system of claim 80, wherein said audible information includes a telephone call.

83.   (New)   The system of claim 37, wherein said notification includes visually perceptible information.

84.   (New)   The system of claim 37, wherein said notification includes a summary of some or all of said first data and said second data.

85.   (New)   The system of claim 37, wherein said notification includes a table containing some or all of said first data and said second data.

86.   (New)   The system of claim 37, wherein said notification includes a comparison of some or all of said first data and said second data.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

87.    (New)   The system of claim 37, wherein said notification includes a graph of some or all of said first data and said second data.

88.    (New)   The system of claim 37, wherein said processor is further operative to determine a course of action based on said first and second data.

89.    (New)   The system of claim 88, wherein said processor is further operative to provide a notification of said course of action to said device.

90.    (New)   The system of claim 37, wherein said processor is further operative to determine a desired action for said first and second subjects.

91.    (New)   The system of claim 90, wherein said processor is further operative to determine a course of action based, at least in part, on said desired action.

92.    (New)   The system of claim 91, wherein said course of action is selected to improve the chances that said first and second subjects will perform said desired action.

93.    (New)   The system of claim 37, wherein said first data and said second data are indicative of the same physical characteristic of said first and second subjects.

94.    (New)   The system of claim 37, wherein said first data and said second data are indicative of different physical characteristics of said first and second subjects.

95.    (New)   The system of claim 37, wherein said processor is operative to receive said first and second data simultaneously from said first and second subjects.

96.    (New)   The system of claim 37, wherein said processor is operative to determine one or more options to provide to said first subject.

97.    (New)   The system of claim 96, wherein said processor is further operative to provide a notification of said one or more options to said device.

Page 8 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

98.     (New)   The system of claim 37, wherein said processor is operative to determine whether said first subject is in need of a break.

99.     (New)   The system of claim 98, wherein said processor is further operative to provide a notification to said device concerning whether said first subject is in need of a break.

100.    (New)   The system of claim 37, wherein said determining said evaluation includes aggregating or averaging of said first and second data.

101.    (New)   The system of claim 37, wherein said determining said evaluation includes collecting and preparing for later use said first and second data.

102.    (New)   The system of claim 37, wherein said determining said evaluation includes determining a pattern in said first and second data.

103.    (New)   The system of claim 37, wherein said processor is operative to receive said first data directly from said first sensor and said processor is operative to receive said second data directly from said second sensor.

104.    (New)   The system of claim 37, further comprising:
            said first sensor; and
            said second sensor,
            wherein:
                said first sensor is operative to transmit said first data to a local first user device;
                said second sensor is operative to transmit said second data to a local second user device; and
                said processor is operative to receive, over the Internet and through said communication port, said first data from said first user device and said second data from said second user device.

105.    (New)   The system of claim 104, wherein said processor is operative to provide said notification to both of said first and second user devices over the Internet.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

106.    (New)   The system of claim 104, wherein said processor is operative to provide said notification to said first user device over the Internet.

107.    (New)   The system of claim 106, wherein said first user device is a cellular telephone.

108.    (New)   The system of claim 106, wherein said first user device is a portable computer.

109.    (New)   The system of claim 108, wherein said first user device includes a display screen that is operative to visually illustrate said notification.

110.    (New)   The system of claim 106, wherein said display screen is a touch screen.

111.    (New)   The system of claim 106, wherein said first user device includes a microphone.

112.    (New)   The system of claim 106, wherein said first user device includes a flash memory card.

113.    (New)   The system of claim 110, wherein said first user device is operative to communicate first data directly to said second user device.

114.    (New)   The system of claim 104, wherein said first sensor is wearable by said first subject.

115.    (New)   The system of claim 104, further comprising a local third sensor that is operative to obtain third data indicative of a second physical characteristic of said second subject.

116.    (New)   The system of claim 115, wherein said second sensor is a heart rate sensor and said third sensor is an acceleration sensor.

117.    (New)   The system of claim 115, wherein said second sensor is a heart rate sensor and said third sensor is a motion sensor.

118.    (New)   The system of claim 115, wherein said second sensor is a heat sensor and said third sensor is an acceleration sensor.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

119.    (New)   The system of claim 115, further comprising a local fourth sensor that is operative to obtain fourth data indicative of a third physical characteristic of said second subject.

120.    (New)   The system of claim 119, wherein said second sensor is a heart rate sensor, said third sensor is a respiration sensor, and said fourth sensor is a heat sensor.

121.    (New)   The system of claim 104, wherein said first sensor is operative to transmit said first data to said first user device over a wired communication link.

122.    (New)   The system of claim 104, wherein said first sensor is operative to transmit said first data to said first user device over a wireless communication link.

123.    (New)   The system of claim 122, wherein said wireless communication link is a radio wireless communication link.

124.    (New)   The system of claim 122, wherein said wireless communication link is a Bluetooth wireless communication link.

125.    (New)   The system of claim 104, wherein said first and second user devices are operative to access said first and second data stored in said memory of said server.

126.    (New)   The system of claim 104, further comprising:
                 said first user device; and
                 said second user device,
                 wherein:
                        said first user device is operative to receive said first data from said first sensor over a first communication link, and
                        said second user device is operative to receive said second data from said second sensor over a second communication link.

127.    (New)   The system of claim 126, wherein said processor is operative to provide said notification to said first user device.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

128.     (New)   The system of claim 127, wherein said first user device includes a display screen that is operative to visually illustrate said notification.

129.     (New)   The system of claim 128, wherein said display screen is a touch screen.

130.     (New)   The system of claim 127, wherein said first user device includes a flash memory card.

131.     (New)   The system of claim 126, wherein said first sensor and said first user device are not operative to be in constant communication.

132.     (New)   The system of claim 126, wherein said first sensor and said first user device are operative to be in constant communication..

133.     (New)   The system of claim 126, further comprising a third sensor that is operative to obtain third data indicative of a physical characteristic of said second subject.

134.     (New)   The system of claim 133, wherein said second sensor is a heart rate sensor and said third sensor is an acceleration sensor.

135.     (New)   The system of claim 133, wherein said second sensor is a heart rate sensor and said third sensor is a blood pressure sensor.

136.     (New)   The system of claim 133, wherein said second sensor is a heart rate sensor and said third sensor is a motion sensor.

137.     (New)   The system of claim 133, further comprising a fourth sensor that is operative to obtain fourth data indicative of a physical characteristic of said second subject.

138.     (New)   The system of claim 137, wherein said second sensor is a heart rate sensor, said third sensor is a respiration sensor, and said fourth sensor is a heat sensor.

139.     (New)   The system of claim 126, wherein said first communication link is a wired communication link.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

140.    (New)   The system of claim 126, wherein said first communication link is a wireless communication link.

141.    (New)   The system of claim 140, wherein said wireless communication link is a radio wireless communication link.

142.    (New)   The system of claim 140, wherein said wireless communication link is a Bluetooth wireless communication link.

143.    (New)   The system of claim 140, further comprising a receiving station that is operative to receive said first data from said first sensor over said wireless communication link and forward said first data to said first user device.

144.    (New)   The system of claim 143, wherein said wireless communication link is a radio wireless communication link.

145.    (New)   The system of claim 126, wherein said first and second user devices are operative to access a database hosted by, operated by, or stored on said server.

146.    (New)   The system of claim 126, wherein said first and second user devices are operative to access said first and second data stored in said memory of said server.

147.    (New)   The method of claim 39, wherein said server is a Web server and the method further comprises employing said server to host a Web site.

148.    (New)   The method of claim 39, wherein said first device is formed in equipment operative to sense said first data while said first subject is sitting on said equipment.

149.    (New)   The method of claim 39, wherein said first device is formed in equipment operative to sense said first data while said first subject is standing on said equipment.

150.    (New)   The method of claim 39, wherein said first device is operative to be worn by said first subject.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

151.    (New)   The method of claim 150, wherein said first device is operative to be carried by said first subject.

152.    (New)   The method of claim 150, wherein:
said server further includes an internal clock element that is operative to maintain a time and date for said server;
said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server; and
said internal clock element is operative to create time stamps for data, notifications, or other communications sent by said server.

153.    (New)   The method of claim 39, wherein said server includes a memory and the method further comprises employing said server to store, within said memory, said first data and said second data.

154.    (New)   The method of claim 153, further comprising employing said server to store, within said memory, information regarding said first and second subjects in addition to said first data and said second data.

155.    (New)   The method of claim 39, further comprising employing said server to access, at said server, a sensor database.

156.    (New)   The method of claim 155, wherein said sensor database includes a sensor identifier field that contains information for identifying said first and second devices.

157.    (New)   The method of claim 156, wherein said sensor database further includes a sensor description field that contains information describing said first and second devices.

158.    (New)   The method of claim 157, wherein said sensor database further includes a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second devices.

159.    (New)   The method of claim 39, further comprising employing said server to access, at said server, an output database.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

160.    (New)   The system of claim 159, wherein said output database includes an output identifier field that contains identifying information regarding said first and second subjects.

161.    (New)   The system of claim 160, wherein said output database further includes an output description field that contains descriptive information regarding said first and second subjects.

162.    (New)   The system of claim 161, wherein said output database further includes a sensor identifier field that identifies that said first and second devices are associated with said first and second subjects.

163.    (New)   The method of claim 39, further comprising employing said server to access, at said server, an evaluation database.

164.    (New)   The method of claim 163, wherein said evaluation database includes an evaluation identifier field that contains identifying information for said evaluation.

165.    (New)   The method of claim 164, wherein said evaluation database further includes a description field that contains descriptive information regarding said evaluation.

166.    (New)   The method of claim 165, wherein said evaluation database further includes a sensor identifier field that contains information for identifying said first and second devices associated with said evaluation.

167.    (New)   The method of claim 166, wherein said evaluation database further includes a field that associates said evaluation with said device.

168.    (New)   The method of claim 39, wherein said device is a server.

169.    (New)   The method of claim 39, wherein said device is a computer.

170.    (New)   The method of claim 39, wherein said device is a cellular telephone.

171.    (New)   The method of claim 39, wherein said device includes a flash memory card.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

172.   (New)   The method of claim 39, wherein said device includes a display screen that is operative to visually illustrate said notification.

173.   (New)   The method of claim 172, wherein said display screen is a touch screen.

174.   (New)   The method of claim 39, wherein said device includes a keyboard and a computer mouse.

175.   (New)   The method of claim 39, further comprising employing said server to provide said notification regarding said evaluation to an additional device.

176.   (New)   The method of claim 175, wherein said device and said additional device are cellular telephones.

177.   (New)   The method of claim 175, wherein said device and said additional device are different types of devices.

178.   (New)   The method of claim 177, wherein said device is a cellular telephone and said additional device is a personal computer.

179.   (New)   The method of claim 39, wherein said notification includes an email message.

180.   (New)   The method of claim 39, wherein said notification includes an instant message communication.

181.   (New)   The method of claim 39, wherein said notification includes an electronic signal.

182.   (New)   The method of claim 39, wherein said notification includes a wireless transmission.

183.   (New)   The method of claim 39, wherein said notification includes an HTTP transmission.

184.   (New)   The method of claim 39, wherein said notification includes an HTML transmission.

185.   (New)   The method of claim 39, wherein said notification includes an XML transmission.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

186.   (New)   The method of claim 39, wherein said notification includes audible information.

187.   (New)   The method of claim 186, wherein said audible information includes a voice message.

188.   (New)   The method of claim 186, wherein said audible information includes a telephone call.

189.   (New)   The method of claim 39, wherein said notification includes visually perceptible information.

190.   (New)   The method of claim 39, further comprising employing said server to determine a course of action based on said first and second data.

191.   (New)   The method of claim 190, further comprising employing said server to provide a notification regarding said course of action.

192.   (New)   The method of claim 39, further comprising employing said server to determine a desired action for said first and second subjects.

193.   (New)   The method of claim 192, further comprising employing said server to determine a course of action based, at least in part, on said desired action.

194.   (New)   The method of claim 193, wherein said course of action is selected to improve the chances that said first and second subjects will perform said desired action.

195.   (New)   The method of claim 39, wherein said first data and said second data are indicative of the same physical characteristic of said first and second subjects.

196.   (New)   The method of claim 39, wherein said first data and said second data are indicative of different physical characteristics of said first and second subjects.

197.   (New)   The method of claim 39, wherein said remote server receives said first and second data simultaneously from said first and second subjects.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

198.    (New)   The method of claim 39, further comprising employing said server to determine one or more options to provide to said first subject.

199.    (New)   The method of claim 198, further comprising employing said server to provide a notification regarding said one or more options.

200.    (New)   The method of claim 39, further comprising employing said server to determine whether said first subject is in need of a break.

201.    (New)   The method of claim 200, further comprising employing said server to provide a notification regarding whether said first subject is in need of a break.

202.    (New)   The method of claim 39, wherein said first device is a first sensor and said second device is a second sensor.

203.    (New)   The method of claim 202, further comprising:
        collecting said first data at said first sensor;
        sending said first data from said first sensor to a local first user device;
        collecting said second data at said second sensor;
        sending said second data from said second sensor to a local second user device;
        receiving said first data at said first user device; and
        sending said first data from said first user device to said server.

204.    (New)   The method of claim 203, further comprising employing said server to provide said notification to said first user device.

205.    (New)   The method of claim 204, wherein said first user device is a cellular telephone.

206.    (New)   The method of claim 204, wherein said first user device includes a display screen that is operative to visually illustrate said notification.

207.    (New)   The method of claim 206, wherein said display screen is a touch screen.

208.    (New)   The method of claim 204, wherein said first user device is a portable computer.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

209.    (New)   The method of claim 204, wherein said first user device includes a microphone.

210.    (New)   The method of claim 204, wherein said first user device includes a speaker.

211.    (New)   The method of claim 208, wherein said first user device is operative to communicate said first data directly to said second user device.

212.    (New)   The method of claim 203, wherein said first sensor is wearable by said first subject.

213.    (New)   The method of claim 203, further comprising:
              collecting, at a local third sensor, third data indicative of a second physical characteristic of said first subject;
              sending said third data from said third sensor to said first user device;
              receiving said third data at said first user device; and
              sending said third data from said first user device to said server.

214.    (New)   The method of claim 213, wherein said first sensor is a heart rate sensor and said third sensor is an acceleration sensor.

215.    (New)   The method of claim 213, wherein said first sensor is a heart rate sensor and said third sensor is a motion sensor.

216.    (New)   The method of claim 213, wherein said first sensor is a heart rate sensor and said third sensor is an acceleration sensor.

217.    (New)   The method of claim 213, further comprising:
              collecting, at a local fourth sensor, fourth data indicative of a third physical characteristic of said first subject;
              sending said fourth data from said fourth sensor to said first user device;
              receiving said fourth data at said first user device;
              sending said fourth data from said first user device to said server.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

218.    (New)   The system of claim 217, wherein said second sensor is a heart rate sensor, said third sensor is a respiration sensor, and said fourth sensor is a heat sensor.

219.    (New)   The method of claim 203, wherein said first sensor sends said first data to said first user device over a wired communication link.

220.    (New)   The method of claim 203, wherein said first sensor sends said first data to said first user device over a wireless communication link.

221.    (New)   The method of claim 220, wherein said wireless communication link is a radio wireless communication link.

222.    (New)   The method of claim 220, wherein said wireless communication link is a Bluetooth wireless communication link.

223.    (New)   The method of claim 202, further comprising:
            collecting said first data at said first sensor;
            sending said first data from said first sensor to a local receiving station over a wireless communication link; and
            transmitting said first data from said receiving station to a local user device, wherein said first user device is operative to receive said first data and send said first data to said server.

224.    (New)   The method of claim 223, wherein said wireless communication link is a radio wireless communication link.

225.    (New)   The method of claim 203, wherein said server includes a memory and the method further comprises employing said server to store, within said memory, said first data and said second data.

226.    (New)   The method of claim 225, wherein said first and second user devices are operative to access said first and second data stored within said memory.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

227.    (New)   The system of claim 37, wherein:

said server is a Web server that hosts a Web site;

said processor is operative to provide said notification regarding said evaluation to said device via said Web site;

the system further comprises said first sensor and a local portable computer;

said first sensor is a heart rate monitor operative to be worn by said first subject;

said portable computer is operative to receive, over a radio wireless communication link, said first data from said heart rate monitor and to transmit said first data to said server over the Internet; and

said portable computer includes a visual display.


228.    (New)   The method of claim 39, wherein:

said first device is a heart rate monitor;

said server is a Web server that hosts a Web site; and

said providing a notification regarding said evaluation to said device includes providing said notification regarding said evaluation to said device via said Web site; and

the method further comprises:

collecting said first data at said heart rate monitor operative to be worn by said first subject;

sending said first data from said heart rate monitor over a radio wireless communication link to a local portable computer having a visual display;

receiving said first data at said portable computer; and

sending said first data from said portable computer to said server over the Internet.

Page 21 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

## STATUS OF CLAIMS AND SUPPORT FOR CLAIM AMENDMENTS PURSUANT TO 37 C.F.R. § 1.530(e)

**A.    Status of Claims**

Claims 1-41 are the subject of reexamination. By this paper, claims 1-14, 21-30, and 36 have been canceled; claims 17-20, 31, 33, and 37-39 have been amended; new claims 42-228 have been added; and no amendments have been made to claims 15, 16, 32, 34, 35, 40, and 41. Thus, claims 15-20, 31-35, and 37-228 are now pending. Support for the following amended claim limitation and new claim limitations is found *at least* in the following locations in the present patent. Other locations in the present patent may provide additional support for the following new claim limitations. To save space, columns and lines in the specification are identified by column:line numbers (e.g., column 3, lines 45-50 is identified as 3:45) or by column:line number-column:line number (e.g., column 3, line 45 to column 4, line 15 is identified as 3:45-4:15).

**B.    Support for Claim Amendments and New Claims**

| CLAIM(S) | SUPPORT |
|---|---|
| 17, 18 | FIG. 2; 122, 124; 8:4-6; FIG. 4, 204, 208; 9:29-33; 10:14-17. |
| 19, 20 | FIG. 1, 106; 7:41-44; 4:47-49; FIG. 2; 122, 124; 8:4-6; FIG. 4, 204, 208; 9:29-33; 10:14-17. |
| 31, 33 | FIG. 3, 140; 8:61-63; FIG. 4; 204, 208; 9:23-29 (local sensors 202 may communicate with a remote server over a network 208); 10: 14-17 (network 208 may include the Internet); 14:32-37 (computer systems may be locally or remotely configured). |
| 37 | FIG. 4, 204, 208; 9:23-29 (local sensors 202 may communicate with a remote server 204 over a network 208); 10:14-17 (network 208 may include the Internet); 14:32-37 (computer systems may be locally or remotely configured); FIG. 6, 252; 10:63-67 (the server 204 may communicate with sensors 202 (e.g. "other devices") using the communication port 252); 5:8-18; 11:16-20. |
| 38 | FIG. 1, 100; 4:47-49; FIG. 4, 204, 208; 9:23-29 (local sensors 202 may communicate with a remote server 204 over a network 208); 10:14-17 (network 208 may include the Internet); 14:32-37 (computer systems may be locally or remotely configured); 5:8-18. |

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

| | |
|---|---|
| 39 | FIG. 1, 100; 4:47-49; FIG. 4, 204, 208; 9:23-29 (local sensors 202 may communicate with a remote server 204 over a network 208); 10:14-17 (network 208 may include the Internet); 14:32-37 (computer systems may be locally or remotely configured). |
| 42 | 9:34-35; 11:39-40. |
| 43, 44, 45, 46 | 9:42-55. |
| 47 | 11:3-7. |
| 48 | 11:16-20; 12:10-15; 13:9-12. |
| 49, 50, 51, 52 | FIG. 6, 300; 12:1-15; 12:66-13:18. |
| 53, 54, 55, 56 | FIG. 7, 400; 12:1-15; 13:19-47. |
| 57, 58, 59, 60, 61 | FIG. 8, 500; 12:1-15; 13:48-14:15. |
| 62 | 7:16-21. |
| 63, 64 | 7:16-21 (notification may be sent to a user device); 10:2-8 (user device may be a computer, cellular telephone). |
| 65, 66, 67, 68 | 7:16-21 (notification can be sent to a user device); 12:57-59 (user device 206 may have the same structure, components or configuration as server 204); 11:8-28 (server 204 may include flash memory; a display screen, a touch screen, computer keyboard, and computer mouse); 14:43-50 (flash memory card is form of flash memory). |
| 69, 70, 71, 72 | 7:8-26 (notification may be sent to more than one device and more than one type of device; notification may be sent to user device); 10:2-8 (user device may be computer, cellular telephone). |
| 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83 | 7:10-21; 8:38-45. |
| 84, 85, 86, 87 | 7:21-23. |
| 88, 89 | FIG. 2; 122, 124; 8:4-6. |
| 90, 91, 92 | FIG. 3, 142, 146; 8:48-9:4; 7:58-65; 9:11-17. |

Page 23 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

| | |
|---|---|
| 93, 94 | 5:1-4. |
| 95 | 4:65-5:1. |
| 96, 97 | FIG. 1, 104, 106; 4:47-49; 5:28-64; 7:8-9. |
| 98, 99 | FIG. 1, 104, 106; 4:47-49; 6:13-17; 7:8-9. |
| 100 | 6:48-59. |
| 101 | 6:67-7:3. |
| 102 | 7:4-7. |
| 103 | 9:24-29. |
| 104 | FIG. 4, 202, 206, 204, 208; 9:23-46 and 10:30-33 (local sensors 202 may communicate with local user devices 206, which may communicate with a remote server 204 over a network 208); 10:14-17 (network 208 may include the Internet); 14:32-37 (computer systems may be locally or remotely configured); 10:63-67 (the server 204 may communicate with user devices using the communication port 252). |
| 105, 106 | 7:10-21; 8:38-45. |
| 107, 108 | 10:2-8. |
| 109, 110, 111, 112 | 12:57-59 (user device 206 may have the same structure, components or configuration as server 204); 11:8-28 (server 204 may include a display screen, a touch screen, a microphone, and flash memory); 14:43-50 (flash memory card is form of flash memory). |
| 113 | 9:44-46; 10:1-8; 10:30-35. |
| 114 | 9:46-48. |
| 115, 116, 117, 118, 119, 120 | FIG. 4, 202; 9:23-29; 9:42-44; 9:56-61; 10:54-56. |
| 121, 122, 123 | FIG. 4, 202, 206; 9:23-29 (sensors 202 may communicate directly or indirectly with one or more user devices 206 via a communication network 208); 10:14-35 (communications may be wired or wireless, including radio wireless). |
| 124 | FIG. 4, 202, 206; 9:23-29 (sensors 202 may communicate directly or indirectly with one or more user devices 206 via a communication network 208); 10:36-53. |

Page 24 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

| | |
|---|---|
| 125 | 5:4-7; 9:62-10:1. |
| 126 | FIG. 4, 202, 206, 10:14-35. |
| 127 | 7:10-21; 8:38-45. |
| 128, 129, 130 | 12:57-59 (user device 206 may have the same structure, components or configuration as server 204); 11:8-28 (server 204 may include a display screen, and flash memory); 14:43-50 (flash memory card is form of flash memory). |
| 131, 132 | FIG. 4; 202, 206; 10:54-60. |
| 133, 134, 135, 136, 137, 138 | FIG. 4, 202; 9:23-29; 9:42-44; 9:56-61; 10:54-56. |
| 139, 140, 141 | FIG. 4, 202, 206; 9:23-29 (sensors 202 may communicate directly or indirectly with one or more user devices 206 via a communication network 208); 10:14-35 (communications may be wired or wireless, including radio wireless). |
| 142, 143, 144 | FIG. 4, 202, 206; 9:23-29 (sensors 202 may communicate directly or indirectly with one or more user devices 206 via a communication network 208); 10:36-53 (Bluetooth is a form of radio wireless communication). |
| 145, 146 | 5:4-7; 9:62-10:1. |
| 147 | 9:34-35; 11:39-40. |
| 148, 149, 150, 151 | 9:42-55. |
| 152 | 11:3-7. |
| 153, 154 | 11:16-20; 12:10-15; 13:9-12. |
| 155, 156, 157, 158 | FIG. 6, 300; 12:1-15; 12:66-13:18. |
| 159, 160, 161, 162 | FIG. 7, 400; 12:1-15; 13:19- 47. |
| 163, 164, 165, 166, 167 | FIG. 8, 500; 12:1-15; 13:48-14:15. |
| 168 | 7:16-21. |
| 169, 170 | 7:16-21 (notification may be sent to a user device); 10:2-8 (user device may be a computer, cellular telephone). |

Appx509

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

| | |
|---|---|
| 171, 172, 173, 174 | 7:16-21 (notification can be sent to a user device); 12:57-59 (user device 206 may have the same structure, components or configuration as server 204); 11:8-28 (server 204 may include flash memory; a display screen, a touch screen, computer keyboard, and computer mouse); 14:43-50 (flash memory card is form of flash memory). |
| 175, 176, 177, 178 | 7:8-26 (notification may be sent to more than one device and more than one type of device; notification may be sent to user device); 10:2-8 (user device may be computer, cellular telephone). |
| 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189 | 7:10-21; 8:38-45. |
| 190, 190 | FIG. 2; 122, 124; 8:4-6. |
| 192, 193, 194 | FIG. 3, 142, 146; 8:48-9:4; 7:58-65; 9:11-17. |
| 195, 196 | 5:1-4. |
| 197 | 4:65-5:1. |
| 198, 199 | FIG. 1, 104, 106; 4:47-49; 5:28-64; 7:8-9. |
| 200, 201 | FIG. 1, 104, 106; 4:47-49; 6:13-17; 7:8-9. |
| 202 | FIG. 4, 202; 9:24-29. |
| 203 | FIG. 4, 202, 206, 204, 208; 9:23-46 and 10:30-33 (local sensors 202 may communicate with local user devices 206, which may communicate with a remote server 204 over a network 208); 10:14-17 (network 208 may include the Internet); 14:32-37 (computer systems may be locally or remotely configured). |
| 204 | 7:10-21; 8:38-45. |
| 205 | 7:11-21 (notification can be sent to a variety of devices including but not limited to a user device); 8:38-45 (user device may be a cellular telephone). |
| 206, 207, 208, 209, 210 | 7:16-21 (notification can be sent to a user device); 12:57-59 (user device 206 may have the same structure, components or configuration as server 204); 11:8-28 (server 204 may include a display screen, a touch screen, a microphone, and a |

| | |
|---|---|
| | speaker); 10:1-8 (user device may be a portable computer). |
| 211 | 9:44-46; 10:1-8; 10:30-35. |
| 212 | 9:46-48. |
| 213, 214, 215, 216, 217, 218 | FIG. 4, 202; 9:23-29; 9:42-44; 9:56-61; 10:54-56. |
| 219, 220, 221 | FIG. 4, 202, 206; 9:23-29 (sensors 202 may communicate directly or indirectly with one or more user devices 206 via a communication network 208); 10:14-35 (communications may be wired or wireless, including radio wireless). |
| 222, 223, 224 | FIG. 4, 202, 206; 9:23-29 (sensors 202 may communicate directly or indirectly with one or more user devices 206 via a communication network 208); 10:36-53 (Bluetooth is a form of radio wireless communication). |
| 225 | 11:16-20; 12:10-15; 13:9-12. |
| 226 | 5:4-7; 9:62-10:1. |
| 227 | 9:34-35; 11:39-40; 9:62-10:1; FIG. 4, 202, 206; 10:1-6 (user device 206 can be a portable computer); 9:56-61 (sensor can be a heart rate monitor); 9:46-48 (sensor may be word by subject); FIG. 4, 202, 206, 208; 9:23-29 (local sensors 202 may communicate with local user devices 206, which may communicate with a remote server 204 over a network 208); 10:14-17 (network 208 may include the Internet); 10:14-35 (communications may be wired or wireless, including radio wireless); 12:57-59 (user device 206 may have the same structure, components or configuration as server 204); 11:8-28 (server 204 may a visual display). |
| 228 | 9:56-61 (sensor can be a heart rate monitor); 9:34-35; 11:39-40; 9:62-10:1; 9:46-48 (sensor may be word by subject); FIG. 4, 202, 206, 208; 9:23-29 (local sensors 202 may communicate with local user devices 206, which may communicate with a remote server 204 over a network 208); 10:14-35 (communications may be wired or wireless, including radio wireless); FIG. 4, 202, 206; 10:1-6 (user device 206 can be a portable computer); 12:57-59 (user device 206 may have the same structure, components or configuration as server 204); 11:8-28 (server 204 may a visual display); 10:14-17 (network 208 may include the Internet). |

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

<div align="center">

**REMARKS**

</div>

The paper is responsive to the non-final Office Action mailed December 7, 2012 (the "Office Action"). The Office Action rejects all of the claims of U.S. Patent No. 6,701,271 (the "'271 Patent"), incorporating by reference many of the Third Party Requester's ("TPR's") proposed rejections of these claims in the Request for *Inter Partes* Reexamination (the "Request"). (Office Action at pp. 4-5.) Patentee respectfully submits the rejections of original claims 15 and 16 and amended claims 17-20, 31-35, and 37-41 should be withdrawn. Patentee also respectfully submits that new claims 42-228 should be allowed.

**A.      ORIGINAL CLAIMS 15 AND 16 ARE VALID OVER THE CITED ART**

With regard to claims 15 and 16, the Office Action (through its incorporation by reference of the Request) rejects claim 15 and 16 under 35 U.S.C. §102(b) as being anticipated by U.S. Patent No. 6,292,688 ("*Patton*") and rejects claims 15 and 16 under 35 U.S.C. §103(a) as being obvious over U.S. Patent No. 5,676,138 ("*Zawilinski*") in view of U.S. Patent No. 3,744,712 ("*Papadopoulos*"). Patentee respectfully traverses the foregoing rejections of claims 15 and 16 at least because the Office Action fails to establish a *prima facie* case that dependent claims 15 and 16 are anticipated or obvious over the cited references. In particular, Patentee respectfully submits that none of the cited references teach each limitation of the rejected claims, as discussed below.

Under the guidelines in the MPEP, Examiner must establish that the references teach or suggest each and every claim element or explain "why the difference(s) between the prior art and the claimed invention would have been obvious." *See* MPEP §2143.03 ("'All words in a claim must be considered in judging the patentability of that claim against the prior art.' *In re Wilson*, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970).")

Further, Patentee notes that inherency is not readily established. "To establish inherency, the extrinsic evidence must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *In re Robertson*, 169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999) (internal citations omitted). "The fact that a certain result or characteristic may occur or be present in the prior art is not sufficient to establish the inherency of that result or characteristic." MPEP §2112(IV); *see also In re Robertson*, 169 F.3d at 745, 49 USPQ2d at 1950-51 ("Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.").

<div align="center">

Page 28 of 42

</div>

<div align="center">

**Appx512**

</div>

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

Claim 15 depends from claim 14, which depends from claim 13, which depends from claim 1. Thus, claim 15 requires all of the limitations of claims 14, 13, and 1. When rewritten in independent form (with corresponding claims identified in square brackets), claim 15 requires:

> [claim 1] A method for providing feedback, comprising:
> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject;
> providing a notification regarding said evaluation to *a device*;
> [claim 13] receiving a notification regarding a plurality of options;
> [claim 14] *selecting one of said plurality of options based, at least in part, on said evaluation*; and
> [claim 15] selecting *said device* based, at least in part, on said selecting one of said plurality of options.

('271 Patent, col. 14, line 65 to col. 15, line 9 and col. 15, lines 43-51 (emphasis added).)

Claim 16 also depends from claim 14, which depends from claim 13, which depends from claim 1. Thus, claim 16 also requires all of the limitations of claims 14, 13, and 1. When rewritten in independent form (with corresponding claims identified in square brackets), claim 16 requires:

> [claim 1] A method for providing feedback, comprising:
> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject;
> providing a notification regarding said evaluation to *a device*;
> [claim 13] receiving a notification regarding a plurality of options;
> [claim 14] *selecting one of said plurality of options based, at least in part, on said evaluation*; and
> [claim 16] wherein *said device* is associated with at least one of said plurality of options.

('271 Patent, col. 14, line 65 to col. 15, line 9 and col. 15, lines 43-48 and 52-53 (emphasis added).)

1.   *Patton* **Does Not Teach Each Limitation Of Claims 15 And 16 And Thus Does Not Anticipate Claims 15 And 16**

    a.   *Patton* **does not teach "selecting said device based, at least in part, on said selecting one of said plurality of options" as required by claim 15.**

As emphasized above, claim 15, by virtue of its dependence on claim 1, requires that "a notification regarding said evaluation" be provided "to *a device*" and that "*said device*" be selected "based, at least in part, on said selecting one of said plurality of options."   The use of the term "said"

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

before the term "device" in claim 15 refers back to the earlier recitation of the term "a device" in claim 1, namely, the recitation of "providing a notification regarding said evaluation to *a device*." Therefore, the device that is selected "based, at least in part, on said selecting one of said plurality of options" in claim 15 is *the same device* to which "a notification regarding said evaluation" is provided in claim 1. In the rejection of claim 15, the Request appears to fundamentally misinterpret this requirement of claim 15 that the device that is selected "based, at least in part, on said selecting one of said plurality of options" in claim 15 be *the same device* to which "a notification regarding said evaluation" is provided in claim 1.

In particular, the Request cites to column 24, lines 38-51 of *Patton* as providing support for the limitations added by claims 13-15. (Request, Exhibit CC1, pages 18-19.) This paragraph of *Patton* teaches:

> By way of another example, in vehicle training, including auto and aircraft management, the manufacturer may be interested in the reaction of the respondent to the seating and control panel of the vehicle. An epoch of measurement longer than just a second or two might be indicated because of the length of an acquaintance, orientation or familiarity period. Thus, comprehension could be measured during a comparatively longer duration as the subject successively views the individual element of an instrument panel. Several different forms of panels, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the display that was most rapidly comprehended and/or created approval or pleasure in the test subject.

In the rejection of the requirement of claim 15 that "*said device*" be selected "based, at least in part, on said selecting one of said plurality of options," the Request asserts that "It is inherent that the different forms of control panels are each associated with a device (e.g., upon which to display the selected control panel). As such, based on which control panel option is selected, a different device (*e.g.*, device panel) may be selected for a vehicle." (Request, Exhibit CC1, page 19.)

It appears from this assertion, however, that the Request fundamentally misinterprets the requirements of claim 15. In particular, the Request appears to be equating the "vehicle control panel" chosen by a vehicle manufacturer, or some purportedly inherent device that displays the selected control panel, with "said device" that is selected "based, at least in part, on said selecting one of said plurality of options" as required by claim 15. The Request also appears to be interpreting the "selecting *said device*" requirement of claim 15 to cover a manufacturer choosing a control panel for a vehicle based on which control panel "was most rapidly comprehended and/or created approval or pleasure in the test subject." This interpretation of claim 15 is *fatally flawed*, however, because, as noted above, the device that is selected "based, at least in part, on said selecting one of said plurality of options" in claim 15 is *the same device* to which "a notification regarding said evaluation" is provided in claim 1. It is unreasonable for the Request to equate the "vehicle control panel" discussed in the cited portion of *Patton*, or some

Page 30 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

purportedly inherent device that displays the selected control panel, to correspond to *the same device* to which "a notification regarding said evaluation" is provided in claim 1 since the vehicle control panel is clearly not capable of being provided "a notification regarding said evaluation" as required by claim 15. Instead, the vehicle control panel is expressly designed for "presenting information *needed to operate the vehicle*," and there appears to be *no* teaching or suggestion in *Patton* that the vehicle control panel is capable of being provided "a notification regarding said evaluation" as required by claim 15.

Therefore, the rejection of claim 15 as stated in the Request fails entirely to establish that *Patton* teaches or suggests that *the same device* to which "a notification regarding said evaluation" is provided in claim 1 is selected "based, at least in part, on said selecting one of said plurality of options" as required in claim 15.

The Request also appears to assert that the "selecting *said device*" requirement of claim 15 is inherently taught in *Patton*. Patentee respectfully disagrees for at least two reasons.

First, the method step that the Request asserts is inherently taught by *Patton*, namely, that a vehicle control panel device is selected based on which control panel "was most rapidly comprehended and/or created approval or pleasure in the test subject," fails to read on the actual requirement of claim 15, as noted above, that the device that is selected "based, at least in part, on said selecting one of said plurality of options" in claim 15 be *the same device* to which "a notification regarding said evaluation" is provided in claim 1. The Request fails to even assert, much less establish, that the vehicle control panel discussed in the cited portion of *Patton* is in any way capable of being provided "a notification regarding said evaluation" as required by claim 15. Therefore, the Request's assertion in the rejection of claim 15 that the additional limitation of claim 15 is inherently taught by *Patton* is also based on a misinterpretation of the requirements of claim 15. Thus, the rejection of claim 15 is fatally flawed.

Second, despite the assertion of inherency in the Office Action, Patentee submits that the discussion in the cited paragraph of *Patton* does *not* inherently teach that the a device that is selected "based, at least in part, on said selecting one of said plurality of options" is *the same device* to which "a notification regarding said evaluation" is provided. The "device" identified in rejection of claim 15 in the Request is a "vehicle control panel" chosen by a vehicle manufacturer, or some purportedly inherent device that displays the selected control panel. Patentee notes that the "vehicle control panel" of *Patton* that is expressly designed for "presenting information *needed to operate the vehicle*" can function just fine without the capability of being provided "a notification regarding said evaluation." Therefore, Patentee submits that the "vehicle control panel" discussed in the cited portion of *Patton* does *not necessarily include* this capability. Therefore, since the capability of being provided "a notification regarding said evaluation" is not necessarily present in *Patton*, *Patton* does *not* inherently teach that a device that is selected "based, at least in part, on said selecting one of said plurality of options" as

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

required by claim 15 be **the same device** to which "a notification regarding said evaluation" as required by claim 1.

> **b.** ***Patton* does not teach that "*said device* is associated with at least one of said plurality of options" as required by claim 16.**

As emphasized above, claim 16, by virtue of its dependence on claim 1, requires that "a notification regarding said evaluation" be provided "to ***a device***" and that "***said device*** [be] associated with at least one of said plurality of options." The use of the term "said" before the term "device" in claim 16 refers back to the earlier recitation of the term "a device" in claim 1, namely, the recitation of "providing a notification regarding said evaluation to ***a device***." Therefore, the device that is "associated with at least one of said plurality of options" in claim 16 is ***the same device*** to which "a notification regarding said evaluation" is provided in claim 1. In the rejection of claim 16, the Request appears to fundamentally misinterpret this requirement of claim 16 that the device that is "associated with at least one of said plurality of options" in claim 16 be ***the same device*** to which "a notification regarding said evaluation" is provided in claim 1.

In particular, the Request cites to column 24, lines 38-51 of *Patton* as providing support for the limitations added by claims 13, 14, and 16. (Request, Exhibit CC1, pages 18-20.) As noted above, this paragraph of *Patton* teaches:

> By way of another example, in vehicle training, including auto and aircraft management, the manufacturer may be interested in the reaction of the respondent to the seating and control panel of the vehicle. An epoch of measurement longer than just a second or two might be indicated because of the length of an acquaintance, orientation or familiarity period. Thus, comprehension could be measured during a comparatively longer duration as the subject successively views the individual element of an instrument panel. Several different forms of panels, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the display that was most rapidly comprehended and/or created approval or pleasure in the test subject.

In the rejection of the requirement of claim 16 that "***said device*** is associated with at least one of said plurality of options," the Request asserts that "[i]t is clear that a particular control panel (e.g., device) would be associated with at least one of the display options." (Request, Exhibit CC1, page 20.)

It appears from this assertion, however, that the Request fundamentally misinterprets the requirements of claim 16. In particular, the Request appears to be equating the "vehicle control panel" chosen by a vehicle manufacturer with "said device" that is "associated with at least one of said plurality of options" as required by claim 16. The Request also appears to be interpreting the "***said device*** [being] associated" requirement of claim 16 to cover a manufacturer choosing a control panel for a vehicle based on which vehicle control panel "was most rapidly comprehended and/or created approval or pleasure in

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

the test subject." This interpretation of claim 16 is *fatally flawed*, however, because, as noted above, the device that is "associated with at least one of said plurality of options" in claim 16 is *the same device* to which "a notification regarding said evaluation" is provided in claim 1. It is unreasonable to equate the "vehicle control panel" discussed in the cited portion of *Patton* to correspond to *the same device* to which "a notification regarding said evaluation" is provided since the vehicle control panel is clearly not capable of being provided "a notification regarding said evaluation" as required by claim 16. Instead, the vehicle control panel is expressly designed for "presenting information *needed to operate the vehicle*," and there appears to be *no* teaching or suggestion in *Patton* that the vehicle control panel is capable of being provided "a notification regarding said evaluation" as required by claim 16.

Therefore, the rejection of claim 16 as stated in the Request fails entirely to establish that *Patton* teaches or suggests that *the same device* to which "a notification regarding said evaluation" is provided in claim 1 is "associated with at least one of said plurality of options" as required by claim 16.

### 2. The Combinations Of *Zawilinski* In View Of *Papadopoulos* Does Not Render Claims 13-16 Obvious

The Request appears to concede that *Zawilinski* fails to teach the limitations of claims 13, 14, 15, and 16. (*See* Request, Exhibit CC3, pages 2-5.) The Request asserts that the requirements of claims 13, 14, 15, and 16 are instead taught by *Papadopoulos*. (*See id.*)

#### a. *Papadopoulos* does not teach "receiving a notification regarding a plurality of options" as required by claim 13.

Claim 13 requires "receiving a notification regarding a plurality of options." In the rejection of claim 13, the Request cites to column 1, lines 56-63 of *Papadopoulos* as providing support for the limitations added by claim 13. (Request, Exhibit CC3, pages 2-3.) This portion of *Papadopoulos* teaches: "Thus it is one of the principal objects of this invention to provide a participation presenter-audience reaction system in which the audience response is simultaneously displayed before the person or persons making the presentation so that the presenter may respond to the audience's reaction or modify his presentation accordingly or elicit information from the audience."

In the rejection of the "receiving a notification regarding a plurality of options" requirement of claim 13, the Request asserts that:

> Similar to what is described in the '271 patent, the presenter, as disclosed by Papadopoulos, has a plurality of options on how to respond to the audience's reaction, and may select one. The presenter receiving a notification regarding the options is inherent. Without the notification, the presenter could not know what options (e.g., responding to the audience reaction, modify the presentation, or elicit information) were available.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

(Request, Exhibit CC3, pages 2-3.) Thus the Request appears to assert that the "receiving a notification regarding a plurality of options" requirement of claim 13 is inherently taught in *Papadopoulos*. Patentee respectfully disagrees.

Despite the above assertions of inherency, Patentee notes that the "receiving a notification regarding a plurality of options" requirement of claim 13 is ***not necessarily present*** in the cited portion of *Papadopoulos*. In particular, Patentee notes that the presenter mentioned in *Papadopoulos* may very well be aware of his options for responding to the audience's reaction to his presentation without ***receiving a notification*** regarding these options.

For example, prior to the beginning of his presentation, the presenter may have conceived, ***entirely within his own mind***, of options available during his presentation including responding to an audience reaction, modifying his presentation, or eliciting information from the audience. For example, where the audience is not reacting in a desired manner to the presenter's presentation, the presenter may have conceived entirely within his own mind prior to the presentation or during the presentation to respond by modifying his presentation to include remarks memorized by the presenter and that exist entirely within the presenter's mind or by eliciting information from the audience using memorized questions or spontaneous questions. Thus, the presenter, while giving a live presentation, may very well be prepared to respond to various audience reactions with options that exist entirely within the presenter's mind in the form of memorized remarks, memorized questions, or spontaneous questions, without any kind of external "receiving" of "a notification" regarding his options for response. Patentee notes that it would be unreasonable to read the "***receiving*** a notification of a plurality of options" step of claim 13 so broadly as to assert that it covers these examples above where the "plurality of options" ***was conceived and exists entirely within the presenter's own mind*** without any kind of external "***receiving*** a notification" regarding his options for response.

Patentee has demonstrated by these simple examples that the presenter mentioned in *Papadopoulos* may very well know exactly what options are available for responding to the audience's reactions without ***receiving a notification*** regarding these options, contrary to the assertions in the Request. Thus, since the step of "receiving a notification regarding a plurality of options" is ***not necessarily present*** in the cited portion of *Papadopoulos*, this requirement of claim 13 is ***not inherent*** in *Papadopoulos*, and thus the Request has failed to establish a *prima facie* case that claim 13 is obvious over *Zawilinski* in view of *Papadopoulos*.

> **b.** ***Papadopoulos* does not teach "said plurality of options" as required by claims 14, 15, and 16.**

Claim 14 requires "selecting one of said plurality of options based, at least in part, on said evaluation." The use of the term "said" before the phrase "plurality of options" in claim 14 refers back to

Page 34 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

the earlier recitation of the phrase "a plurality of options" in claim 13, namely, the recitation of "receiving a notification regarding a plurality of options." Therefore, the plurality of options from which one option is selected in claim 14 is ***the same plurality of options*** regarding which "a notification" was received in claim 13.

Similarly, claim 15 requires "selecting said device based, at least in part, on said selecting one of said plurality of options." The use of the term "said" before the phrase "selecting one of said plurality of options" in claim 15 refers back to the earlier recitation of the phrase "selecting one of said plurality of options" in claim 14. Also, the use of the term "said" before the phrase "plurality of options" in claim 15 refers back to the earlier recitation of the phrase "a plurality of options" in claim 13, namely, the recitation of "receiving a notification regarding a plurality of options." Therefore, the "plurality of options" from which one option is selected in claim 14 and the selecting of one, which in claim 15 serves as at least a part of the basis for selecting said device in claim 15, is ***the same plurality of options*** for which "a notification" was received in claim 13.

Similarly, claim 16 requires that "said device is associated with at least one of said plurality of options." The use of the term "said" before the phrase "plurality of options" in claim 16 refers back to the earlier recitation of the phrase "a plurality of options" in claim 13, namely, the recitation of "receiving a notification regarding a plurality of options." Therefore, the "plurality of options" with which "said device is associated" in claim 16 is ***the same plurality of options*** regarding which "a notification" was received in claim 13.

However, as discussed above, the Request has failed to establish that *Papadopoulos* teaches or suggests the step of "receiving a notification regarding a plurality of options" as required by claim 13. Therefore, since *Papadopoulos* fails to teach all of the limitations of claim 13, the Request has failed to establish a *prima facie* case that claim 13 is obvious over *Zawilinski* in view of *Papadopoulos*, and the Request has also failed to establish a *prima facie* case that claims 14, 15, and 16 are obvious over *Zawilinski* in view of *Papadopoulos* due to the dependence of claims 14, 15, and 16 on claim 13.

      c.      ***Papadopoulos* does not teach a single consistent "plurality of options" as required by claims 13, 14, 15, and 16.**

The Request appears to switch mid-stream its assertions as to which teaching of *Papadopoulos* corresponds to the "plurality of options" recited in claims 13, 14, 15, and 16. In particular, even though the "plurality of options" recited in claim 13 is ***the same plurality of options*** recited as "said plurality of options" in claims 14, 15, and 16, as demonstrated above, the Request appears to assert a first teaching in *Papadopoulos* as corresponding to the "plurality of options" recited in claims 13 and 14 and ***completely separate*** teachings in *Papadopoulos* as corresponding to the "plurality of options" recited in claims 15 and 16.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

For example, in the rejection of claims 13 and 14 the Request asserts that the recited "plurality of options" corresponds to "the presenter … [having] a plurality of options **on how to respond to the audience's reaction**." (Request, Exhibit CC3, pages 2-3 (emphasis added).)  In contrast, in the rejection of claim 15, the Request appears to assert that the recited "said plurality of options" corresponds to "after performance adjustments" or "during the performance adjustments" inherently taught by *Papadopoulos*. (Request, Exhibit CC3, pages 3-4 (emphasis added).) Further, in the rejection of claim 16, the Request appears to assert that the recited "said plurality of options" corresponds to options to "respond to the audience's reaction, modify presentation, or elicit information from the audience." (Request, Exhibit CC3, pages 4-5 (emphasis added).)

Thus, it is clear from a comparison of the rejections of claims 13 and 14 and the rejections of claims 15 and 16 that the Request switches mid-stream from asserting that the recited "plurality of options" corresponds to "a plurality of options on *how* to respond to the audience's reaction" in claims 13 and 14 to asserting that the recited "plurality of options" corresponds to a plurality of options on *when* to adjust a presentation (i.e., after a performance or before a performance) in claim 15 and then to a plurality of options on *what* action to take (e.g., modify a presentation or elicit a response from the audience). Since the "plurality of options" recited in claims 13 and 14 is *the same plurality of options* recited in claims 15 and 16, this switching mid-stream in its assertions as to which teaching of *Papadopoulos* corresponds to the recited "plurality of options" is *inconsistent* and fails to establish that *Papadopoulos* teaches or suggests a single *consistent* "plurality of options" as required by claims 13, 14, 15, and 16.

**B.     AMENDED CLAIMS 17-20 AND 33 ARE VALID OVER THE CITED ART**

Claims 17-20 and 33 have been amended to specify that certain steps of the claimed methods are performed by a server. Amended claims 17-20 and 33 are reproduced below.

> 17.     (Amended)  The method of claim 1, further comprising:
> determining a course of action based on said first data and said second data,
> wherein said determining said course of action is performed by a server.

> 18.     (Amended)  The method of claim 17, further comprising:
> providing a notification based on said course of action,
> wherein said notification based on said course of action is provided over the Internet by said server.

> 19.     (Amended)  The method of claim 1, further comprising:
> determining a course of action based on said evaluation,
> wherein said determining said course of action is performed by a server.

> 20.     (Amended)  The method of claim 19, further comprising:
> providing a notification based on said course of action,

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

> wherein said notification based on said course of action is provided over the
> Internet by said server.

33. (Amended) The method of claim 31, further comprising employing the remote server to perform the following: determining a desired action to be taken by said plurality of subjects.

As can be seen, claims 17 and 19 have been amended to specify that the "determining said course of action is performed by a server." Claims 18 and 20 have been amended to specify that a "notification . . . is provided over the Internet by said server." Claim 33 has been amended to specify that the remote server is employed to determine "a desired action." These steps, to the extent they are performed in the cited references, are **not** performed by a **server**; rather, they are performed by one or more **people**.

Claims 17-20 and 33 have been rejected as anticipated by *Patton* and obvious based on *Zawilinski* in view of *Papadopoulos* and *Patton* in view of *Papadopoulos*. Patentee respectfully requests that these rejections be withdrawn because none of the cited references teach each limitation of the amended claims, as discussed below.

1. ***Patton* Does Not Teach Each Limitation Of Amended Claims 17-20 And 33 And Thus Does Not Anticipate These Claims**

The Request cites to column 24, lines 38-51 of *Patton* as providing support for the limitations added by claims 17-20 and 33. (Request, Exhibit CC1, pages 20-24 and 34-35.) As noted above, this paragraph of *Patton* teaches:

> By way of another example, in vehicle training, including auto and aircraft management, the manufacturer may be interested in the reaction of the respondent to the seating and control panel of the vehicle. An epoch of measurement longer than just a second or two might be indicated because of the length of an acquaintance, orientation or familiarity period. Thus, comprehension could be measured during a comparatively longer duration as the subject successively views the individual element of an instrument panel. Several different forms of panels, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the display that was most rapidly comprehended and/or created approval or pleasure in the test subject.

With regard to claims 17 and 19, the Request acknowledges that it is "***the maker*** . . . [who] determine[s] the preferences of the test subjects and a course of action to take based on the data/preferences." (Request, Exhibit CC1 at 20-21 and 23 (emphasis added).) *Patton* does **not** teach that a determination of a course of action is performed by a **server**.

Similarly, with regard to claims 18 and 20, the Request acknowledges that the "notification ***by the manufacturer*** is in selecting which instrument panel to include in the vehicle." (Request, Exhibit CC1 at 22 and 24 (emphasis added).) *Patton* does **not** teach that this notification is provided by a **server**.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

Finally, with regard to claim 33, the Request does not identify who or what determines a desired action, but rather merely identifies what the desired action is. Specifically, the Request states that "[t]he desired action of the plurality of the subjects would be rapidly comprehending and/or approving the instrument panel selected by the manufacturer." ((Request, Exhibit CC1 at 34.) *Patton* does **not** teach that the determination of a desired action is performed by a **server**.

Because *Patton* does **not** disclose that a **server** provides a notification based on a course of action or determines a course of action or a desired action, *Patton* does not anticipate amended claims 17-20 or 33.

### 2.   The Combination Of *Zawilinski* In View Of *Papadopoulos* Does Not Render Claims 17-20 Or 33 Obvious

The Request appears to concede that *Zawilinski* fails to teach the limitations of claims 17-20 and 33. (*See* Request, Exhibit CC3, pages 5-9 and 17.) The Request asserts that the requirements of claims 17-20 and 33 are instead taught by *Papadopoulos*. (*See id.*)   The Request cites to the Abstract of *Papadopoulos* as providing support for the limitations added by claims 17-20. (Request, Exhibit CC3, pages 5-9.) This paragraph of *Papadopoulos* teaches:

> A system . . . for measuring the response of selected members of the audience, averaging the selected responses and presenting the average to the presenter as the presentation is being made to enable the presenter to adjust his presentation accordingly or respond to the audience response.

With regard to claims 17 and 19, the Request acknowledges that "***the presenter*** of Papadopoulos determines which course of action (respond to the audience reaction or modify the presentation) to take based on the data (e.g., the measure of the response of selected members of the audience)." (Request, Exhibit CC3, pages 6 and 8 (emphasis added).) *Papadopoulos* does **not** teach that a determination of a course of action is performed by a **server**.

With regard to claims 18 and 20, the request does not identify who or what provides the notification based on said course of action. Rather, the Request states that "the notification of the audience reaction is provided to the presenter/speaker based on a course of action." (Request, Exhibit CC3, pages 7 and 9 (emphasis added).) *Papadopoulos* does **not** teach that this notification is provided by a **server**.

With regard to claim 33, the Request states that the "determining a desired action to be taken by [a] plurality of subjects" was well-known in the art. (Request, Exhibit CC3, page 17.) Patentee disagrees that determining a desired action where the determination of the desired action is performed by a **server**, as required by amended claim 33, was well-known. *Papadopoulos* does **not** teach that a determination of a desired action is performed by a **server**.

Page 38 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

Because *Papadopoulos* does **not** teach or otherwise disclose that a **server** provides a notification based on a course of action or determines a course of action or a desired action, the combination of *Zawilinski* and *Papadopoulos* does not render obvious claims 17-20 or 33.

### 3. The Combination Of *Patton* In View Of *Papadopoulos* Do Not Render Claims 17-20 Or 33 Obvious

As provided hereinabove, neither *Patton* nor *Papadopoulos* teach or otherwise disclose that a **server** provides a notification based on a course of action or determines a course of action or a desired action as required by amended claims 17-20 and 33. Thus, the combination of *Patton* and *Papadopoulos* does not render obvious claims 17-20 or 33.

### C. AMENDED INDEPENDENT CLAIMS 31 AND 37-39 ARE VALID OVER THE CITED ART

Claims 31 and 39 have been amended to specify that the each action required in claims 31 and 39 be performed by a server. As outlined above, none of the cited references teach or otherwise disclose these limitations. These claims (and all claims that are dependent on these claims) are allowable over the cited art for this reason alone.

In addition, each of independent claims 31 and 37-39 have been amended to require that a "remote server" receive, or be operative to receive, data over the Internet. Patent FIG. 4 of the '271 Patent is reproduced below:



FIG. 4

As illustrated in FIG. 4, system 200 includes sensors 202 and user devices 206 that may communicate with one or more servers, controllers, or other devices 204 via a communications network 208. ('271 Patent, col. 9, lines 23-29.) The communications network 208 might be or include the Internet. ('271 Patent, col. 10, lines 14-17.) Thus, the invention described in the '271 Patent contemplates a system

Page 39 of 42

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

that enables communication over the Internet such that individual components of the system (for example the sensors 202 and the servers 204) may be in geographically-distinct locations, such as where the sensors 202 are locally located and the server 204 is remotely located.

The cited references lack any disclosure that data may be transmitted from a local device to a remote server over a network such as the Internet. Indeed, the systems disclosed by *Zawilinski* and *Papadopoulos* are clearly purely localized systems. For example, Figure 1 of *Zawilinski* and Figure 3 of *Papadopoulos* are reproduced below:



Figure 1, *Zawilinski*            Figure 3, *Papadopoulos*

As can be seen in these Figures, the systems contemplated by *Zawilinski* and *Papadopoulos* are purely localized systems with individual components interconnected with wires over short distances in a localized vicinity. These systems do not contemplate the communication of data over the Internet. For this additional reason, these claims (and all claims that are dependent on these claims) are allowable over the cited art.

**D.    NEW CLAIMS 42-228 ARE VALID OVER CITED ART**

New claims 42-228 are each dependent on either amended independent claim 37 or amended independent claim 39. Inasmuch as these new claims are dependent on allowable independent claims, Patentee respectfully requests allowance. In addition, as many of new claims 42-228 recite additional limitations that are not taught or otherwise suggested by the cited references, these claims should be allowed independent of their dependence on allowable base claims.

Amendment "A" and Response to Non-Final Office Action mailed December 7, 2012
Reexamination Control No.: 95/002,337

## <u>CHARGE AUTHORIZATION</u>

The Commissioner is hereby authorized to charge payment of any of the following fees that may be applicable to this communication, or credit any overpayment, to Deposit Account No. 50-5394: (1) any filing fees required under 37 C.F.R. §1.16; (2) any patent application and reexamination processing fees under 37 C.F.R. §1.17; and/or (3) any post issuance fees under 37 C.F.R. §1.20. In addition, if any additional extension of time is required, which has not otherwise been requested, please consider this a petition therefor and charge any additional fees that may be required to Deposit Account No. 50-5394.

## <u>CONCLUSION</u>

In view of the foregoing, Patentee submits that the pending claims are allowable.


Dated this 7th day of March, 2013.


<div style="margin-left: 40%;">

Respectfully submitted,

**/Mark W. Ford, Reg. No. 67,732/**

MARK W. FORD
Registration No. 67,732
Attorney for Patentee
Customer No. 97149
Telephone No. (435) 252-1360

</div>

# EXHIBIT 22

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*In re* reexam of: U.S. Patent 6,701,271 B2 to     Examiner: Nguyen, Minh T.

    WILLNER *et al.*                    Art Unit: 3992

For:    **Method and Apparatus for Using**      Atty. Docket: 3271.001REX0

      **Physical Characteristic Data Collected**

      **from Two or More Subjects**

Reexam Control No.: 95/002,337           Confirmation No.: 1254

    Filed: Sept 14, 2012

## Comments by Third Party Requesters to Patent Owner's Response in *Inter Partes* Reexamination Under 37 C.F.R. § 1.947

                               **Mail Stop "*Inter Partes* Reexam"**

Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

    Pursuant to 37 C.F.R. § 1.947, the Third Party Requesters Strava, Inc., MapMyFitness, Inc., and FitnessKeeper, Inc. (collectively, "Requesters") timely submit herewith Comments to Patent Owner ICON Health & Fitness, Inc. ("ICON") Response to the Office Action filed on March 7, 2013 ("Response") for the above-captioned merged proceedings, which is herein incorporated by reference. Requesters' comments are directed to points and issues raised in Patent Owner's Response.

**I.     Introduction**

    In its Response (p.22), ICON cancelled claims 1-14, 21-30, and 36, amended claims 17-20, 31, 33, and 37-39, and added new claims 42-228. No amendments were made to claims 15, 16, 32, 34, 35, 40 and 41. ICON provided arguments to prior art rejections in the Office Action, with regard to claims 15, 16, 17-20, 33, 31, and 37-39. Requesters respond to ICON's arguments in the order presented in the Response and propose rejections for amended claims 17-20, 31, 33, and 37-39, and new claims 42-228.

    Throughout this document, references are made to the Request for the above-captioned *Inter Partes* Reexamination ("Request"), including accompany claim charts 1-4 (CC1-CC4), which is incorporated herein by reference to comply with page limitations.

## II.   Claims 15, 16, 17-20, 31, 33, 37-39 Remain Unpatentable

### A.   Previously Cited Art

The Office Action adopted the rejections from the Request citing the following references: Patton (U.S. Patent No. 6,292,688), Zawilinski (U.S. Patent No. 5,676,138), and Papadopoulos (U.S. Patent No. 3,744,712), which are referred to herein. The rejections from the Request for the still pending claims are provided below.

| RLP# | Statute | References | Still Pending Claims | Claim Chart |
|------|---------|-----------|----------------------|-------------|
| 001 | § 102 | Patton | 15-20, 31-35, 37-41 | CC-1 |
| 002 | § 102 | Zawilinski | 37-39, 41 | CC-2 |
| 003 | § 103 | Zawilinski in view of Papadopoulos | 15-20, 31-35, 40 | CC-3 |
| 004 | § 103 | Patton in view of Papadopoulos | 15-20, 39-41 | CC-4 |

### B.   Rejections of Claims 15 and 16 Should be Maintained

Claims 15 and 16 were not amended.  ICON's arguments in support of patentability must fail, because they are based on erroneous interpretations of the claim language that are inconsistent with the well-established legal standards for reexamination, and because the prior art cited by the Examiner anticipates or renders obvious the claims as written.  ICON's attempt to narrow the claims through argument to escape invalidity in reexamination while preserving a broader scope for assertion in litigation is improper.  The broadest reasonable construction rule defined in the law and articulated in the M.P.E.P. is required in reexamination to protect the public from just such legal maneuvers. *See e.g., In re Prater*, 415 F.2d 1393, 1404-05 (CCPA 1969); M.P.E.P. § 2100.   Therefore, ICON's arguments must fail, and the Examiner's outstanding rejections in the Office Action under 35 U.S.C. § 102 and 103 should be maintained.

### C.   Amended Claims 17-20, 31-35, and 37-41 Remain Unpatentable

Claims 17-20 and 33 have been generally amended to recite the additional limitations of using a server to determine a course of action (claims 17, 19), using a server to provide notification of the course of action over the Internet (claims 18, 20), and using a server to determine a desired action (claim 33).

Claims 32, 34, 35, 40 and 41, have not been directly amended, but rely on one of amended base independent claims 31 or 39.

Claims 31 and 37-38 have been generally amended to recite the use of a "remote server" that receives data over the Internet from "local sensors."  Claim 39 has been similarly amended to recite the use of a "remote server" that receives data over the Internet from "local devices."

ICON fails to argue that the previously cited art does not disclose the pre-amendment limitations of the claims, and as such accepts (at least by acquiescence) that those limitations are

Willner et al.
Control No. 95/002,337

taught by the cited art.  ICON's primary argument for patentability based on its amendments is directed to performing the known limitations by a server and using Internet communication. Unfortunately for ICON, however, simply implementing well-known processes on a server and using the Internet as a communications medium is insufficient to impart patentability.  As discussed in greater detail below, Requesters submit new art (Bibl and Teller), necessitated by ICON's amendments, to show these newly recited limitations.

### III.    Claims 13-16 Remain Unpatentable, being Anticipated by Patton

#### A.    Rejections of Claims 15 and 16 Should be Maintained in View of Patton

Properly interpreting the claim limitations according to their broadest reasonable construction, the Office Action found claims 15 and 16 to be anticipated by Patton under 35 U.S.C. §102(b).  ICON's arguments are addressed below.

#### B.    Patton teaches "selecting said device based, at least in part, on said selecting one of said plurality of options" as required by claim 15

ICON argues that Patton does not teach "selecting said device based, at least in part, on said selecting one of said plurality of options," as required by claim 15. (Response, pp.29-30). ICON further argues that "the Request appears to fundamentally misinterpret this requirement of claim 15 that the device that is selected 'based, at least in part, on said selecting one of said plurality of options' in claim 15 be **the same device** to which 'a notification regarding said evaluation' is provided in claim 1." (*Id.*).  Requesters disagree with ICON's characterization of the Request and with ICON's claim construction.

When rewritten in independent form (with the source claim language indicated in brackets), claim 15 reads (in part, with emphasis added):

[Claim 1]        A method comprising…
                determining an evaluation of said first data and said second data…;
                providing **a notification** regarding said evaluation to **a device**;
[Claim 13]      receiving **a notification** regarding a plurality of options;
[Claim 14]      selecting one of said plurality of options based, at least in part, on said evaluation; and
[Claim 15]      selecting **said device** based, at least in part, on said selecting one of said plurality of options.

As detailed in the Request, Patton teaches that "[s]everal different forms of panels, each presenting information needed to operate a vehicle, could be viewed in succession." (Request, CC1(cl.13)).  This teaching of Patton clearly meets the "receiving a notification regarding a plurality of options" limitation of claim 13.  ICON does not dispute this fact.

Also as provided in the Request, Patton teaches that "the maker could then choose the display that was most rapidly comprehended and/or created approval or pleasure in the test

Willner et al.
Control No. 95/002,337

subject," (Request, CC1(cl.14)).  This teaching of Patton clearly meets the "selecting one of said plurality of options based, at least in part, on said evaluation" limitation of claim 14. <u>ICON does not dispute this fact</u>.

ICON argues, however, that "Patton does not inherently teach that the a device that is selected 'based, at least in part, on said selecting one of said plurality of options' is **the same device** to which 'a notification <u>regarding said evaluation</u>' is provided… [and that] Patentee notes that the 'vehicle control panel' of Patton that is expressly designed for 'presenting information **needed to operate the vehicle**' can function just fine without the capability of being provided 'a notification <u>of said evaluation</u>.' " (Response, p.31, underlined emphasis added).

ICON'S arguments fail to impart patentability to claim 15 for several reasons.  First, ICON's primary argument is based on an improper claim construction.  Claim 1 recites the limitation of "providing a notification <u>regarding</u> said evaluation to a device."  Claim 1 does not require that the notification itself be the evaluation.  Claim 1 only requires that the notification <u>regard</u> the evaluation.  Nor does claim 1 specify in what form the notification of said evaluation must be provided, only that a notification is provided <u>regarding</u> an evaluation.

Second, Patton discloses "selecting said device based, at least in part, on said selecting one of said plurality of options," and "providing a notification regarding said evaluation to a device," as provided in claim 15, in which the <u>same device</u> that is selected is provided with the notification.

For example, Patton discloses:

[b]y way of another example, in vehicle training, including auto and aircraft management, the manufacturer may be interested in the reaction of the respondent to the seating and control panel of the vehicle… [S]everal different forms of panels, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the display that was most rapidly comprehended and/or created approval in the test subject.

(Patton, 24:38-51).  Thus, according to Patton, an auto or aircraft manufacturer may be interested in a respondent's reaction to different forms of control panels.  Based on this, Patton clearly teaches that:

[Claim 1]      a notification regarding the evaluation is provided to a device (e.g., control panel options are provided to a respondent via a physical control panel of a vehicle);
[Claim 13]     the respondent receives a notification regarding a plurality of options (e.g., a plurality of control panel options are provided to the respondent);
[Claim 14]     based on an evaluation (e.g., comprehension and/or approval) by the respondent, a manufacturer may select one of the control panels; and
[Claim 15]     based on which control panel option is selected by a respondent, a device (e.g., a control panel) may be selected by the manufacturer of the vehicle.

Thus, Patton anticipates claim 15.

ICON argues that "[i]t is unreasonable… to equate the 'vehicle control panel'… to correspond to **the same device** to which 'a notification regarding said evaluation' is provided in claim 1 since the vehicle control panel is not capable of being provided 'a notification regarding said evaluation' as required by claim 15." (Response, pp.30-31, emphasis in original).

Requesters disagree with ICON's argument that the vehicle control panel is not capable of being provided a notification regarding an evaluation. It is reasonable to read that the vehicle control panel of Patton as capable of being provided a notification <u>regarding</u> an evaluation. In fact, it is just as reasonable a construction as any construction of the specification of the '271 patent that allegedly supports ICON's implied construction of claim 15. For example, at col. 5, lines 23-64, the '271 patent describes providing options to an audience and allowing the audience to choose from the options. Starting at col. 9, lines 23, the '271 patent describes the system 200 of FIG. 4 which includes sensors 202, other devices 204, servers 204, and user devices 206. The '271 patent, however, provides no disclosure of how any of these devices would provide a notification regarding the evaluation to **a device**; receive a notification regarding a plurality of options; select one of said plurality of options based, at least in part, on said evaluation; and select **said device** based, at least in part, on said selecting one of said plurality of options. Nor does the '271 patent provide any guidance as to which device is being referenced in claim 15. Without specific guidance from the '271 patent as to a narrower construction of claim 15, the Requesters have selected the broadest reasonable construction. Given that construction, claim 15 clearly reads on Patton, as illustrated by the foregoing analysis.

ICON further argues that the vehicle control panel of Patton is "expressly designed for 'presenting information needed to operate the vehicle' [and] can function just fine without the capability of being provided 'a notification regarding said evaluation.' " (Response, p.31). Whether something can function "just fine" without a capability bears no relevance to whether the feature is taught explicitly or inherently.

### C.   Patton teaches that "said device is associated with at least one of said plurality of options" as required by claim 16

ICON, with regard to claim 16, misinterprets its own claim. ICON alleges that "claim 16 also requires all the limitations of claims 14, 13, and 1." (Response, p.31). However, claim 16, which is unamended, depends upon claim 13, which depends upon claim 1. Claim 16 does not depend from claim 14. As such, any of ICON's arguments for the patentability of claim 16, which depend upon the limitations of claim 14, must be disregarded as being irrelevant.

ICON argues that "claim 16, by virtue of its dependence on claim 1, requires that 'a notification regarding said evaluation' be provided 'to **a device**' and that **'said device** [be]

Wilner *et al.*
Control No. 95/002,337

associated with at least one of said plurality of options.' " (Response, p.32).  ICON emphasizes that "the device that is 'associated with at least one of said plurality of options' in claim 16 be **the same device** to which 'a notification regarding said evaluation" is provided in claim 1.' " (*Id.*).

The text of claim 16, written in independent format, is provided in the Response at p.29. However, note ICON's error of improperly reading claim 14 into claim 16.  Claim 16 adds to claim 13 the limitation: "wherein **said device** is associated with at least one of said plurality of options."

As shown above, in the discussion of claim 15, Patton clearly teaches the limitations of claim 13.  Claim 15 recites that said <u>device is selected based on</u> one of said plurality of options, while claim 16 recites that said <u>device is associated with</u> at least one of said plurality of options. It is clear that if a device is selected based on an option, the device is associated with the option. For example, Patton teaches providing a test subject with several different control panel options for selection.  Certainly the device (i.e., the selected control panel) is associated with the control panel options.  As such, Patton anticipates claim 16.

## IV.   Claims 13-16 Remain Unpatentable, being Obvious over Zawilinski in view of Papadopoulos

### A.   Rejections of Claims 13-16 Under 35 U.S.C. § 103(a) of Zawilinski in view of Papadopoulos Should be Maintained

Properly interpreting the claim limitations according to their broadest reasonable construction, Zawilinski in view of Papadopoulos discloses each and every limitation recited in claims 13-16, as held in the Office Action. ICON's arguments regarding the rejections based on Zawilinski in view of Papadopoulos are addressed below.

### B.   Claims 13-14 have been cancelled

ICON argues that Zawilinski in view of Papadopoulos does not teach claims 13 and 14. (Response, pp.33-34).  Requesters disagree for at least the reasons previously provided in the Request.  Further, ICON's arguments with regard to the patentability of claims 13 and 14 are moot, as ICON has cancelled claims 13 and 14.  ICON clearly states that "[b]y this paper, claims 1-14, 21-30, and 36 have been cancelled." (Response, p.22).  Further, the Office Action found claims 13 and 14 to be anticipated by Patton, which ICON failed to refute. For the sake of completeness however, ICON's arguments with respect to claims 13 and 14 are addressed below due to the dependence of claims 15 and 16 on one or both of claims 13 and 14.

### C.   Zawilinski in view of Papadopoulos teaches "receiving a notification regarding a plurality of options" as required by claim 13

ICON argues that Papadopoulos fails to teach "receiving a notification of a plurality of options," as recited by claim 13. (Response, p.34).  ICON explains:

Thus, the presenter, while giving a live presentation, may very well be prepared to respond to various audience reactions with options that exist entirely within the presenter's mind in the form of memorized remarks, memorized questions, or spontaneous questions, without any kind of <u>external</u> "receiving" of "a notification" regarding his options for response. Patentee notes that it would be unreasonable to read the "receiving a notification of a plurality of options" step of claim 13 so broadly as to assert that it covers these examples above where the "plurality of options" was conceived and exists entirely within the presenter's own mind without any kind of <u>external</u> "receiving a notification" regarding his options for response.

(*Id.*, original emphasis omitted, underlined emphasis added). Requesters note that claim 13 does not require that the notification be "external" as now argued by ICON.

Requesters further note that, while it is possible that a presenter may have conceived of such options entirely within his own mind, "what is possible," is not the relevant inquiry. The relevant inquiry is what would a person skilled in the relevant art understand from Papadopoulos' teachings. Requesters submit that a person skilled in the relevant art would understand from Papadopoulos that it is inherent that the presenter receives a notification (whether internal or external) regarding the options available to him to respond to the audience's reaction. Such notification would be necessary to trigger the response by the presenter. For example, the only way a presenter could become aware of the options available to him by which he may respond to the audience's reaction is by being provided a notification as to what options are available. It does not matter whether the notification is received internally (i.e., from his own mind), or externally (e.g., from another device). In both situations, the presenter must receive a notification and claim 13 fails to specify from what source (internal or external) the notification is received.

Furthermore, ICON broadly interprets Papadopoulos as including the possibility of the presenter conceiving options (as a notification) entirely within his own mind. At the same time, ICON narrowly interprets claim 13 as requiring an "external" notification. ICON's interpretations are <u>self-interested and contradictory</u>.

"During reexamination, as with original examination, the PTO must give claims their broadest reasonable construction consistent with the specification." *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007). In contrast to the standards for construing claims in an infringement suit, "the PTO applies to verbiage of the proposed claims the broadest reasonable meaning of the words in their ordinary usage as they would be understood by one of ordinary skill in the art, taking into account whatever enlightenment by way of definitions or

otherwise that may be afforded by the written description contained in applicant's specification." *In re Morris*, 127 F.3d 1048, 1054-55 (Fed. Cir. 1997); M.P.E.P. § 2111.

It is clear ICON desires to apply a double standard when determining the standard of what a reasonably broad interpretation is with regard to Papadopoulos and its own claims. This is clearly unreasonable and cannot be allowed. ICON alleges that their own interpretation when applied to Papadopoulos is reasonably broad, but if the same exact interpretation is then applied to their own claims it suddenly and inexplicably becomes unreasonable. ICON cannot have it both ways.

For argument's sake and without acquiescing to the allegation of ICON, if, as ICON alleges, Papadopoulos may be reasonably read as involving a mental step by the speaker of determining what options are available to the speaker, then so too may claim 13 which recites "receiving a notification regarding a plurality of options," read on a mental step as disclosed by Papadopoulos. Claim 13 fails to indicate the form (e.g., mental, visual, audio, etc.) of the notification of which options are available. As such, applying to its own claims ICON's "reasonably broad" interpretation of Papadopoulos, it is clear that claim 13 covers even the mental notification of what options are available to a speaker. ICON has provided no substantively valid argument as to why its own claims exclude mental notification.

### D.   Zawilinski in view of Papadopoulos teaches "said plurality of options" as required by claims 14, 15, and 16

ICON emphasizes the term "said" in alleging that the plurality of options recited by claims 15 and 16, are the same plurality of options as recited in claims 13 and 14, one or both of which claims 15 and 16 depend. (Response, p.35). As provided in the Request, it would have been obvious that the same plurality of options may be used in Zawilinski in view of Papadopoulos. (Request, CC3(cl.13-16)).

ICON fails to provide any rationale as to why it would not have been obvious to have the same plurality of options as provided in the Request. ICON relies only on its previous allegation, which is addressed above, that because "the Request has failed to establish that Papadopoulos teaches or suggests the step of 'receiving a notification regarding a plurality of options' as required by claim 13," that "the Request has also failed to establish a prima facie case that claims 14, 15, and 16 are obvious over Zawilinski in view of Papadopoulos." (Response, p.34). However, as shown above with regard to claim 13, ICON's allegation is false. Zawilinski in view of Papadopoulos not only teaches all the elements actually recited in claim 13, but also those recited by claims 14, 15, and 16. It would have been obvious to a person of ordinary skill in the art to use the same options in all the claims.

**E.    Zawilinski in view of Papadopoulos teaches a plurality of options required by claims 13, 14, 15, and 16**

ICON argues that:

> The Request appears to switch mid-stream its assertions as to which teaching of Papadopoulos corresponds to the "plurality of options" recited in claims 13, 14, 15, and 16. In particular, even though the "plurality of options" recited in claim 13 is **the same plurality of options** recited as "said plurality of options" in claims 14, 15, and 16, as demonstrated above, the Request appears to assert a first teaching in Papadopoulos as corresponding to the "plurality of options" recited in claims 13 and 14 and **completely separate** teachings in Papadopoulos as corresponding to the "plurality of options" recited in claims 15 and 16.

(Response, p. 35, emphasis in original). ICON does not allege that the cited examples from Papadopoulos fail to disclose all the limitations of claims 13-16, but instead only argues that the cited examples that disclose all the limitations of claims 13 and 14 are directed to **how** to respond to the audience's reaction, and that the cited examples that disclose all the limitations of claims 15 and 16 are directed to **when** to respond to the audience's reaction. (Response, p.36). ICON further argues that determining how to respond to an audience reaction is so dissimilar from determining when to respond to an audience reaction as to be inconsistent, despite appearing in the same reference, being used with the same system, and being directed to responding to the audience reaction. Requesters disagree.

For each of claims 13-16, Requesters have cited teachings from Papadopoulos that disclose the claim limitations. See Request, CC3 (cl.13-16). None of claims 13-16 include limitations of how or when to respond to an audience's reaction. These claims only recite a notification of options, selecting an option, selecting a device based on an option, and a device that is associated with an option. The examples from Papadopoulos cited in the Request meet these claim limitations. ICON's discussion of "how" and "when" is irrelevant to the **subject** matter of claims 13-16. As such, it should be ignored by the Office, and the rejection of claims 15-16 should be maintained.

Though not relevant to the *claimed* subject matter, for purposes of completeness, Requesters provide the following additional comment on ICON's argument. ICON fails to explain any inconsistencies between 'how' a presenter modifies a presentation and 'when' a presenter modifies a presentation. In fact, "how" a presentation is modified is closely related to "when" a presentation is modified. For example, during a presentation, a presenter may only modify a portion of the presentation that has not yet been presented to the audience. After a presentation has completed, however, a presenter may modify any portion of a presentation, but only for use during a subsequent presentation. As such, 'when' and 'how' a presentation may be modified are clearly consistent. ICON's argument is without merit.

### F.    Patton teaches all the limitations of claims 13-14

In addition to cancelling claims 13 and 14, ICON failed to dispute the fact that Patton alone discloses all the limitations of claims 13 and 14, as provided in the Request. (Request, CC1(cl.13-14)).  As such, Requesters resubmit that Patton discloses all the limitations of claims 13 and 14.  For at least the reasons provided above, Requesters submit all the limitations of claims 15 and 16 are disclosed by the previously cited art in the Request, and the rejections should be maintained.

## V.    Newly Cited Art for the Rejections of Amended Claims 17-20, 31-35, 37-41, and New Claims 42-228

### A.    Previously Cited Art is Admitted Art

ICON has failed to refute that the previously cited art teaches all the limitations of claims 17-20, 31-35 and 37-41.  ICON has only amended the claims (or the claims upon which they depend) to recite new limitations, and alleges only that the new limitations distinguish the claims from the previously cited art.  As such, Requesters submit that all unamended features of the claims are admitted as being obvious or anticipated by the previously submitted, now admitted art combinations.   As such, Requesters comments are directed only to the amended/new limitations of the claims, which are provided in view of new art Bibl and Teller, each of which are necessitated by the amended/new limitations of the claims, and render the claims obvious in view of the admitted art.

As noted above, claims 31 and 37-38 have been generally amended to recite the use of a "remote server" that receives data over the Internet from "local sensors."  Claim 39 has been similarly amended to recite the use of a "remote server" that receives data over the Internet from "local devices."  ICON's primary argument for patentability based on its amendments is directed to simply implementing well-known processes on a server and using the Internet as a communications medium, which is insufficient to impart patentability.

### B.    Overview of Bibl – New Cited Art

Bibl (U.S. Patent Appl. Pub. No. 2002/0111541 to Bibl *et al.*) was filed on March 27, 2002, and is a divisional of U.S. Patent Appl. No. 09/476,142, filed on January 3, 2000, qualifying it as prior art under 35 U.S.C. §102(e).  Bibl presents non-cumulative information about pre-existing technology that was not cited or applied by the Examiner during the original examination of the '271.

Generally, Bibl describes "an interactive system for monitoring personal data via a wide area network." (Bibl, [0002]).  "[P]ersonal data of a subscriber is captured in a personal data capture device.  The personal data is transmitted from the personal data capture device to a

Case 1:11-cv-00167-BSJ    Document 169-22    Filed 10/28/16    Page 12 of 35
Ziser et al.
Control No. 95/002,337

network server. The transmitted personal data is analyzed to generate feedback information. The feedback information is then presented to the subscriber via the network." (Bibl, [0018]).

An example of a personal data capture device is a portable sports appliance (PSA) 110 that may be coupled to a cradle, and "may be used to monitor and store physical and biometrical parameters of its user." (Bibl, [0024]). "Cradle 120 is used to upload data from personal data capture device 100 to network 150… [a]lternatively, the data may be transmitted from personal capture device to server 160 using a wireless transmitter." (Bibl, [0025-26]). The system may collect data from numerous PSA users, and may communicate over the wide area network, including the Internet. (Bibl, [0027-28]).  The personal data may be analyzed by a software program to generate feedback information. (Bibl, [0058]). The server may include a webserver and may post information for subscribers to a website. (Bibl, [0032,0042]).

    1.    **Summary of New Proposed Rejections for New and Amended Claims in view of Bibl**

| Statute | References | Pending Claims | Claim Chart |
|---|---|---|---|
| § 103 | Patton in view of Bibl | 17-20, 31-35, 37-72, 74-117, 119, 121-137, 139-178, 180-217,219-228 | BCC |
| § 103 | Zawilinski in view of Bibl | 37-39, 41-72, 74-87, 93-117, 119, 121-137, 139-178, 180-189, 195,196, 198-217, 219-228 | BCC |
| § 103 | Zawilinski in view Papadopoulos in view of Bibl | 17-20, 31-35, 40, 88-92, 96, 97, 190-194, 197, 199 | BCC |

    2.    **Patton in View of Bibl**

Patton in view of Bibl, under 35 U.S.C. § 103(a), makes obvious claims 17-20, 31-35, 37-72, 74-117, 119, 121-137, 139-178, 180-217, and 219-228.  It would have been obvious to combine Patton with Bibl as both are from the same field of detecting physiological reactions of a subject in response to stimuli.  One skilled in the art would have been motivated to combine the teachings of Patton with Bibl to automate the monitoring of subjects by using a processor and to take advantage of the network, network server and World Wide Web features taught by Bibl. Further both encompass elements well known in the art that could be combined to produce a predictable result. *See* Koperda Dec., ¶12.[1]

    3.    **Zawilinski in view of Bibl**

---

[1] Declaration of Frank Koperda Under 37 C.F.R. § 1.132 ("Koperda Dec.") is attached hereto as Exhibit A.

Zawilinski in view of Bibl, under 35 **U.S.C.** § 103(a), makes obvious claims 37-39, 41-72, 74-87, 93-117, 119, 121-137, 139-178, 180-189, 195,196, 198-217, and 219-228. It would have been obvious to combine Zawilinski with Bibl as they are both from the same field of detecting physiological reactions of a subject in response to stimuli. One skilled in the art would have been motivated to combine the teachings of Zawilinski with Bibl to automate the monitoring of subjects by using a processor and to take advantage of the network, network server and World Wide Web features taught by Bibl. Further both encompass elements well known in the art that could be combined to produce a predictable result. *See* Koperda Dec., ¶12.

### 4.   Zawilinski in view of Papadopoulos further in view of Bibl

Zawilinski in view of Papadopoulos further in view of Bibl, under 35 U.S.C. § 103(a), makes obvious claims 17-20, 31-35, 40, 88-92, 96, 97, 190-194, 197, and 199. It would have been obvious to combine Zawilinski in view of Papadopoulos with Bibl as they are from the same field of detecting physiological reactions of a subject in response to stimuli. One skilled in the art would have been motivated to combine the teachings of Zawilinski in view of Papadopoulos with Bibl to automate the monitoring of subjects by using a processor and to take advantage of the network, network server and World Wide Web features taught by Bibl. Further all encompass elements well known in the art that could be combined to produce a predictable result. *See* Koperda Dec., ¶12.

### C.   Overview of Teller – New Cited Art

Teller (U.S. Patent No. 6,605,038 to Teller *et al.*) was filed on June 23, 2000, and is a continuation-in-part of U.S. Appl. No. 09/595,660, filed on June 16, 2000, qualifying it as prior art under 35 U.S.C. §102(e). It presents non-cumulative information about pre-existing technology that was not cited or applied by the Examiner during the original examination of the '271.

Generally, Teller discloses

[a] system for detecting, monitoring, and reporting physiological information includes a sensor device adapted to be worn on the upper arm that includes at least one of an accelerometer, a GSR sensor, and a heat flux sensor… The system includes a central monitoring unit that generates analytical status data from at least one of the data indicative of at least one of activity… [and] a means for establishing electronic communication between the sensor device and the central monitoring unit, and a means for transmitting data to the recipient. (Teller, Abstract).

"Sensor device 10 generates data indicative of various physiological parameters of an individual." (Teller, 4:14-15). "That data is periodically uploaded from sensor device 10 and sent to remote central monitoring unit 30." (Teller, 7: 8-10). "Feedback may also be provided to

a user directly through sensor device…" or "… on the web site maintained by central monitoring unit 30." (Teller, 9:14-48).

### 1.    Summary of New Proposed Rejections for new and amended claims in view of Teller

| Statute | References | Pending Claims | Claim Charts |
|---|---|---|---|
| § 103 | Patton in view of Teller | 17-20, 31-35, 37-42, 45-147, 150-228 | TCC |
| § 103 | Zawilinski in view of Teller | 37-39, 41, 42, 45-87, 93-95, 98-147, 150-189, 195, 196, 198, 200-228 | TCC |
| § 103 | Zawilinski in view Papadopoulos in view of Teller | 17-20, 31-35, 40, 88- 92, 96, 97, 190-194, 197, 199 | TCC |

### 2.    Patton in View of Teller

Patton in view of Teller, under 35 U.S.C. § 103(a), makes obvious claims 17-20, 31-35, 37-42, 45-147, and 150-228. It would have been obvious to combine Patton with Teller as both are from the same field of detecting physiological reactions of a subject in response to stimuli. One skilled in the art would have been motivated to combine the teachings of Patton with Teller to automate the monitoring of subjects by using a processor and to take advantage of the internet, server and web site features taught by Teller.  Further both encompass elements well known in the art that could be combined to produce a predictable result. *See* Koperda Dec., ¶12.

### 3.    Zawilinski in view Teller

Zawilinski in view Teller, under 35 U.S.C. § 103(a), makes obvious claims 37-39, 41, 42, 45-87, 93-95, 98-147, 150-189, 195, 196, 198, and 200-228.  It would have been obvious to combine Zawilinski with Teller as they are from the same field of detecting physiological reactions of a subject in response to stimuli.  One skilled in the art would have been motivated to combine the teachings of Zawilinski with Teller to automate the monitoring of subjects by using a processor and to take advantage of the internet, server and web site features taught by Teller.  Further both encompass elements well known in the art that could be combined to produce a predictable result. *See* Koperda Dec., ¶12.

### 4.    Zawilinski in view of Papadopoulos further in view of Teller

Zawilinski in view of Papadopoulos further in view of Teller, under 35 U.S.C. § 103(a), make obvious claims 17-20, 31-35, 40, 88- 92, 96, 97, 190-194, 197, and 199.  It would have been obvious to combine Zawilinski in view of Papadopoulos with Teller as they are from the

Case 1:11-cv-00167-BSJ Document 169-22 Filed 10/28/16 Page 15 of 35
Kuder et al.
Control No. 95/002,337

same field of detecting physiological reactions of a subject in response to stimuli. One skilled in the art would have been motivated to combine the teachings of Zawilinski in view of Papadopoulos with Teller to automate the monitoring of subjects by using a processor and to take advantage of the internet, server and web site features taught by Teller. Further all encompass elements well known in the art that could be combined to produce a predictable result. *See* Koperda Dec., ¶12.

## VI. New Proposed Rejections for Still Pending Claims 17-20, 31-35, and 37-41

In view of the page limitations placed on this paper, full claim charts are not provided. Rather, the following sections detail the proposed rejections for the pending, amended claims. These sections make reference to short-form claim charts appended hereto: BCC (Bibl Claim Chart) and TCC (Teller Claim Chart). In each claim chart the left-most column labeled "Arg" provides an Argument reference number. The middle column provides the claims to which the argument applies. The right-most column provides example teachings from the respective prior art reference (i.e., Bibl or Teller) to support a proposed rejection. References to these claim charts take the form of "BCC,A17" (e.g., Bibl claim chart, Arg. 17).

### A. Overview of Proposed Rejections

As discussed above, still pending claims 17-20, 31-35, and 37-41 have each been amended to recite new features (or depend from an amended claim that recites new features) to overcome the previously cited, now admitted art. The unamended limitations of the claims are admitted as being well-known in the previously submitted art combinations of Patton, Zawilinski, and Zawilinski in view of Papadopoulos, herein collectively referred to as "admitted art." ICON does not dispute the unamended limitations of the claims are disclosed by the admitted art, which are still applicable and are incorporated by reference.

The arguments below are directed primarily to the amended/new limitations of the claims which are obvious combinations of admitted art in view of Bibl, and admitted art in view of Teller. Support for rejections of the amended limitations and newly added claims is provided below with cites to the corresponding portions of the Bibl and Teller claim charts (BCC and TCC, respectively).

### B. Overview of Limitations of Independent Claims 31 and 37-39

Independent claims 31 and 37-39 are each similarly amended with similar new limitations. With regard to these claims, ICON's arguments for patentability are limited to the newly added amended limitations of the claims. ICON's primary argument is that the well-known processes (as evidenced by the previously cited art from the Request) are now patentable

because, by virtue of the amendments, they are now being performed by a processor/server and include communication over the Internet. Specifically, iCON alleges that the "cited references lack any disclosure that data may be transmitted from a local device to a remote server over a network such as the Internet." (Response, p.40). Bibl and Teller disclose at least these new limitations of the amended claims. Simply implementing well-known processes on a server and using the Internet as a communications medium is insufficient to impart patentability. *See* Koperda Dec., ¶13.

### 1.    Rejection of Independent Claims 31 and 37-39 in view of Bibl

The unamended limitations of claims 31 and 37-39 are disclosed by admitted art (Patton, Zawilinski, and Zawilinski in view of Papadopoulos) as provided in the Request (CC1 (cl. 31, 37-39), CC2 (cl. 37-39), CC3 (cl. 31)). As to the amended limitations of claim 37, Bibl discloses a remote server including a communication port operative to receive data over the Internet that stores data in memory. (BCC,A1). Bibl also discloses receiving sensor data over the Internet. (BCC,A2). Determining an evaluation is disclosed by the previously cited art as provided in the Request. Providing a notification to a device is disclosed both by the previously cited art, and by Bibl. (BCC,A3).

The amended limitations of claim 31 recite a remote server (BCC,A1), and receiving data from a plurality of local sensors over the Internet (BCC,A2). The amended limitations of claim 38 recite a remote server (BCC,A1), receiving data from a plurality of local sensors over the Internet (BCC,A2), and employing the server to send the evaluation (BCC,A3). The amended limitations of claim 39 recite a remote server (BCC, A1), and receiving physical characteristic data from a first and second device (BCC, A2). The unamended limitations of claims 31 and 39 that recite providing a notification are provided both by previously cited art and by Bibl (BCC,A3).

### 2.    Rejection of Independent Claims 31 and 37-39 in view of Teller

The unamended limitations of claims 31 and 37-39 are disclosed by admitted art (Patton, Zawilinski, and Zawilinski in view of Papadopoulos) as provided in the Request (CC1(cl.31,37-39), CC2(cl.37-39), CC3(cl.31)). As to the amended limitations of claim 37, Teller discloses a remote server including a communication port operative to receive data over the Internet that stores data in memory. (TCC,A1). Teller also discloses receiving sensor data over electronic communication or an electronic network including the Internet. (TCC,A2). Determining an evaluation is disclosed by the previously cited art as provided in the Request. Providing a notification to a device is disclosed both by the previously cited art, and by Teller. (TCC,A3).

The amended limitations of claim 31 recite a remote server (TCC,A1), and receiving data from a plurality of local sensors over the Internet (TCC,A2). The amended limitations of claim 38 recite a remote server (TCC,A1), receiving data from a plurality of local sensors over the Internet (TCC,A2), and employing the server to send the evaluation (TCC,A3). The amended limitations of claim 39 recite a remote server (TCC, A1), and receiving physical characteristic data from first and second devices (TCC, A2). The unamended portions of claims 31 and 39 that recite providing a notification are provided both by previously cited art and by Teller (TCC,A3).

## C.    Rejections of Amended Claims 17-20, 32-35, and 40-41 in view of Bibl

### 1.    The amended limitations of Claims 17 and 19

The amended limitations of claims 17 and 19 recite the feature of determining a course of action by a server. Both Patton and Zawilinski in view of Papadopoulos teach determining a course of action (Request, CC1(cl.17,19), CC3(cl.17,19). Bibl discloses performing the determining by a server. (BCC,A17). It would have been obvious to combine the teachings of Patton with Bibl, or Zawilinski in view of Papadopoulos with Bibl, for the reasons provided above, to have the server determine the course of action.

### 2.    The amended limitations of Claims 18 and 20

The amended limitations of claims 18 and 20 recite the feature of providing a notification based on a course of action over the Internet by a server. Both Patton and Zawilinski in view of Papadopoulos teach providing a notification (Request, CC1(cl.18,20), CC3(cl.18,20). Bibl discloses providing a notification to a device by a processor/server over the Internet (through a website). (BCC,A18). It would have been obvious to combine the teachings of Patton with Bibl, or Zawilinski in view of Papadopoulos with Bibl, for the reasons provided above, to have the server provide the notification over the Internet.

### 3.    The amended limitations of Claim 33

The amended limitations of claim 33 recite the feature employing a remote server to determine a desired action. Both Patton and Zawilinski in view of Papadopoulos teach determining a desired course of action (Request, CC1(cl.33), CC3(cl.33). Bibl discloses employing a server to determine a desired action. (BCC,A17). It would have been obvious to combine the teachings of Patton with Teller, or Zawilinski in view of Papadopoulos with Bibl, for the reasons provided above, to have the server determine the desired action.

### 4.    Unamended Claims 32, 34, 35, 40 and 41

Unamended claims 32, 34, 35, 40 and 41 recite features disclosed by Patton (32, 34, 35, 40, 41), Zawilinski (41), and Zawilinski in view of Papadopoulos (32, 34, 35, 40) (see Request, CC1(cl.32,34,35,40,41), CC2(41) CC3(cl.32,34,35,40,41)). Claims 32, 34, and 35 each depend

Case 1:11-cv-00167-BSJ   Document 169-22   Filed 10/28/16   Page 18 of 35
Wilber et al.
Control No. 95/002,337

from independent claim 31, and claims 40 and 41 depend from independent claim 39.  Claims 31 and 39 are obvious for the reasons provided above.  As such, so too are claims 32, 34, 35, 40 and 41 obvious over the previously cited art for the reasons provided above.

### D.    Rejection of Amended Claims 17-20, 32-35, and 40-41 in view of Teller

#### 1.    The amended limitations of Claims 17 and 19

The amended limitations of claims 17 and 19 recite the feature of determining a course of action by a server.  Both Patton and Zawilinski in view of Papadopoulos teach determining a course of action (Request, CC1(cl.17,19), CC3(cl.17,19).  Teller discloses performing the determining by a server. (TCC,A15).  It would have been obvious to combine the teachings of Patton with Teller, or Zawilinski in view of Papadopoulos with Teller, for the reasons provided above, to have the server determine the course of action.

#### 2.    The amended limitations of Claims 18 and 20

The amended limitations of claims 18 and 20 recite the feature of providing a notification based on a course of action over the Internet by a server.  Both Patton and Zawilinski in view of Papadopoulos teach providing a notification (Request, CC1(cl.18,20), CC3(cl.18,20).  Bibl discloses providing a notification to a device by a processor/server over the Internet (through a website). (TCC,A15).  It would have been obvious to combine the teachings of Patton with Teller, or Zawilinski in view of Papadopoulos with Teller, for the reasons provided above, to have the server provide the notification over the Internet.

#### 3.    The amended limitations of Claim 33

The amended limitations of claim 33 recite the feature employing a remote server to determine a desired action.  Both Patton and Zawilinski in view of Papadopoulos teach determining a desired course of action (Request, CC1(cl.33), CC3(cl.33).  Bibl discloses employing a server to determine a desired action. (TCC,A15).  It would have been obvious to combine the teachings of Patton with Teller, or Zawilinski in view of Papadopoulos with Teller, for the reasons provided above, to have the server determine the desired action.

#### 4.    Unamended Claims 32, 34, 35, 40 and 41

Unamended claims 32, 34, 35, 40 and 41 recite features disclosed by Patton (claims 32, 34, 35, 40, 41), Zawilinski (claim 41), and Zawilinski in view of Papadopoulos (claims 32, 34, 35, 40) (Request, CC1(cl.32, 34, 35, 40, 41), CC2(41) CC3(cl.32, 34, 35, 40, 41)).  Claims 32, 34, and 35 each depend from independent claim 31, and claims 40 and 41 depend from independent claim 39. Claims 31 and 39 are obvious for the reasons provided above.  As such, so

Case 1:11-cv-00167-BSJ   Document 169-22   Filed 10/28/16   Page 19 of 35

Miller et al.
Control No. 95/002,337

too are claims 32, 34, 35, 40 and 41 obvious over the previously cited art for the reasons provided above.

## VII.   New Claims 42-228 Should Be Rejected for **Undue Multiplicity**

ICON added 187 new claims.  Per MPEP 2173.05(n), "[m]ore than one claim may be presented provided they differ substantially from each other and are not unduly multiplied."  The new claims added by ICON are unduly multiplied, are repetitious, and recite only simple, obvious details relating to the subject matter of the original claims.  The net result of new claims 42-228 is "to confuse rather than to clarify" the scope of the invention. MPEP 2173.05(n).  Due to the repetitious and confusing nature of new claims 42-228, these claims appear to have been presented to create more work for the Office and for Requesters, and thus slow the reexamination proceedings.  In the interest of special dispatch within the Office, the ICON should be required to elect a reasonable number of claims, not unduly multiplicative, on which to proceed, and that without such an election, all of the newly added claims should be rejected for at least the reasons provided above.

## VIII.   **New Rejections for New Claims over Admitted Art in view of Bibl**

### A.    **Overview of New Proposed Rejections**

Newly added claims 42-72, 74-117, 119, 121-137, 139-178, 180-217, and 219-228 are dependent claims that depend directly or indirectly upon one of claims 37 or 39.  The rejection of claims 37 and 39 is addressed above, and is hereby incorporated by reference in each of the rejections of the newly added claims below as being obvious in view of the previously cited art in combination with Bibl.  To comply with page limitations, the new claims are grouped based on a similarity of features.  Support for the arguments are provided with cites to Bibl as included in the claim chart for Bibl (BCC) in the Appendix to this document.  The new claims will be discussed below only in reference to newly cited art Bibl.

### B.    **Claims 42 and 147**

Claims 42 and 147 recite a web server that hosts a web site.  Bibl discloses a web server that posts information for subscribers to a website that it hosts. (BCC,A4).

### C.    **Claims 43, 44, 148, and 149**

Claims 43, 44, 148, and 149 recite a sensor on which the first subject sits (43,148) or stands (44,149).  Bibl discloses that data may be captured from a weight scale (stand) or stationary bike (sit). (BCC,A5).

### D.    **Claims 45, 46, 114, 150, 151, and 212**

Claims 45, 46, 114, 150, 151, and 212 recite a sensor which the first subject wears (45, 114,150,149) or carries (46,151).  Bibl discloses a device that may be worn on the breast or wrist,

or secured to a user's belt or waist band.  Bibl also discloses the device may be held (i.e., carried). (BCC,A6).

**E.    Claims 48, 153, 154 and 225**

Claims 48, 153, 154 and 225 recite storing the first and second data in memory (48, 153, 154, 225) and storing information regarding first and second subjects in memory (48, 154).  Bibl discloses a computer system with RAM and ROM memory and software that stores and analyzes personal data in memory.  In addition, account information (e.g., passwords) regarding the subjects is stored. (BCC,A7).

**F.    Claims 49 and 155**

Claims 49 and 155 recite a sensor database accessible to the server.  Bibl discloses that personal data (including sensor info), account information, and feedback information may be stored in a database. (BCC,A8). *See* Koperda Dec., ¶17.

**G.    Claims 50-52 and 156-158**

Claims 50-52 and 156-158 recite sensor identifier, sensor description, and sensor output/format fields of the sensor database.  Bibl discloses a sensor database. (BCC,A8).  It would have been obvious to a person of ordinary skill in the art that, in order to properly track the information received from the various sensors, the sensor database would include various fields, including a sensor identifier field, format fields since different sensors provide different data (e.g., GPS position, heart rate, motion, etc.), and descriptions of the sensors. (BCC,A9). *See* Koperda Dec., ¶17.

**H.    Claims 53-56 and 159-162**

Claims 53-56 and 159-162 recite an output database accessible to the server, the output database including information for identifying subjects, descriptive information about the subjects, and information associating subjects with sensors.  Bibl discloses an output database. (BCC,A8).  It would have been obvious to a person of ordinary skill in the art that, in order to properly track the information received from the various sensors for the various users, the output database would include information for identifying subjects, descriptive information about the subjects, and information associating subjects with sensors. (BCC,A10). *See* Koperda Dec., ¶18.

**I.    Claims 57-61 and 163-167**

Claims 57-61 and 163-167 recite an evaluation database accessible to the server, the evaluation database including an evaluation identifier, description, sensors associated with the evaluation, and information that associates the evaluation with the device to which the notification is provided.  Bibl discloses an evaluation/feedback database. (BCC,A8).  It would have been obvious to a person of ordinary skill in the art , in a feedback database that collects

various sensor information (e.g., GPS position, heart rate, motion, etc.) from various subjects (i.e., from numerous PSA users), to have an identifier, a description field, and association fields of which sensors are evaluated. It would also have been obvious to a person of ordinary skill in the art to have a field identifying the device to which a notification is provided since a notification can be provided to different devices or different ways. (BCC,A11). *See* Koperda Dec., ¶19.

### J. Claims 62-68 and 168-174

Claims 62-68 and 168-174 recite the device that receives the notification is a server, computer, cell phone, flash memory, display screen with a visual display, touch screen, and includes a keyboard and mouse. Bibl discloses that the server communicates with clients that include a computer system, a network computer (server), a laptop, a palmtop computing device (touchscreen), a digital TV (visual display), a conventional computer with a mouse (keyboard is inherently part of conventional computer system), cellular service (cell phone), computer system which includes EEPROM (flash memory). (BCC,A12). *See* Koperda Dec., ¶¶15,20,21.

### K. Claims 69-72 and 175-178

Claims 69-72 and 175-178 recite that output is provided to one or more additional devices, which may include two cell phones, more than one type of device, or a cell phone and a computer. Bibl discloses that output is provided to a various number of clients, which may include different devices, including a cell phone and a computer (BCC, A13).

### L. Claims 75-80, 83, 181-186, and 189

Claims 75-80, 83, 181-186, and 189 recite that the notification includes an electronic signal, a wireless, HTTP, HTML, or XML transmission, or includes visually perceptible information or audible information. Bibl discloses that HTTP and HTML transmissions (electronic signals) may be used to provide clients with video, audio, or tactile data. Bibl discloses that clients may access a server via a two-way Internet connection; that data may be transmitted wirelessly; that a personal capture device may be configured over the network (which may be wireless); and that a client may receive digital audio feedback. Bibl discloses the use of database communications for the communication of various data (e.g., from different sensors) for which it would have been obvious to one skilled in the art to use XML. (BCC,A14). *See* Koperda Dec., ¶16.

### M. Claims 81, 82, 187, and 188

Claims 81, 82, 187, and 188 recite that the audible information includes a voice message or a telephone call. Bibl discloses that a personal trainer or software may place a voice message

Case 1:11-cv-00167-BSJ   Document 169-22   Filed 10/28/16   Page 22 of 35
Milner et al.
Control No. 95/002,337

for the user in a master computer, and that the notification includes a telephone call to provide audible information. (BCC, A15).

### N.      Claims 84-87

Claims 84-87 recite that the notification includes a summary, table, comparison, or graph of some/all of the first and second data.  Bibl discloses personal data may be presented in numerous forms including graphs, tables, charts, and comparisons with data of other subscribers. Tables, graphs, charts, and comparisons are all summaries of data. (BCC,A16).

### O.      Claims 88 and 190

Claims 88 and 190 recite that said processor/server determines a course of action based on said first and second data. Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining a course action based on first and second data, which is not disputed by ICON. (Request, CC1(cl.17), CC3(cl.17)).  Bibl discloses a computer determining a course of action (e.g., exercise regimen), and that personal data may be analyzed by a software program (running on a processor) to create feedback information (including determining a course of action). (BCC,A17).

### P.      Claims 89 and 191

Claims 89 and 191 recite said processor/server providing notification of said course of action to said device.  Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining a course action based on first and second data, which is not disputed by ICON. (Request, CC1(cl.18), CC3(cl.18)).  Bibl discloses providing a notification to a device by a processor/server. (BCC,A17,A18).

### Q.      Claims 90 and 192

Claims 90 and 192 recite that said processor/server determines desired action for first and second subjects.  Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining a desired course of action based on first and second data, which is not disputed by ICON. (Request, CC1(cl.23,32,33), CC3(cl.23,32,33)).  Bibl discloses that personal data may be analyzed by a software program (running on a processor) to create feedback information (including determining a course of action). (BCC,A19).

### R.      Claims 91, 92, 193, and 194

Claims 91, 92, 193, and 194 recite said process/server determining a course of action based on said desired action, and wherein the course of action is selected to improve the chances the subjects will perform the desired action.  Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining course of action based on a desired action, wherein the course of action is selected to improve the chances the subjects will

perform the desired action, which is not disputed by ICON. (Request, CC1(cl.23,32), CC3(cl.23,32)). Bibl discloses that personal data may be analyzed by a software program (running on a processor) to create feedback information (including determining a course of action). (BCC,A20).

**S.      Claims 93, 94, 195, and 196**

Claims 93, 94, 195, and 196 recite first and second data are indicative of the same or different physical characteristics. Bibl discloses various physical characteristics that may be measured (e.g., blood pressure, weight, glucose) for various subjects. (BCC,A21).

**T.      Claims 95 and 197**

Claims 95 and 197 recite receiving data simultaneously from the subjects. Bibl discloses different users may have their own PSA, each of which may individually transmit data to the server. (BCC,A22).

**U.      Claims 96, 97, 198, and 199**

Claims 96, 97, 198, and 199 recite a processor determining one or more options to said first subject, and providing notification of the option(s) to a device. Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses these limitations. (Request, CC1(cl.13), CC3(cl.13)). Bibl discloses providing a user with options to add new features, and notifying the user of the options. (BCC,A23).

**V.      Claims 98, 99, 200, and 201**

Claims 98, 99, 200, and 201 recite said processor determines and provides notification that a first subject is in need of a break. Bibl discloses personal capture device (e.g., beeper) is configured with information for determining when a user needs a break (e.g., high heartbeat), and provides notification (e.g., beep/digital recording) informing user of such. (BCC,A24).

**W.      Claims 100-102**

Claims 100-102 recite aggregating or averaging, collecting and preparing for later use, or determining a pattern in first and second data. Admitted art (Patton and Zawilinski) discloses determining an average, median, and other statistical measurements. (Request, CC1,(cl.7), CC2(cl.7)). Bibl discloses progressive charts (pattern) in the data. Data is collected and prepared (e.g., averaged) for later use, as any amount of time between the collecting, preparing, and use (display) is "later." (BCC,A25).

**X.      Claims 103 and 202**

Claims 103 and 202 recite that the first and second devices are sensors and that the processor receive first and second data directly from first and second sensors. Bibl discloses the

data may be transmitted directly from personal capture device to server 160 using a wireless transmitter.  Personal capture device is a sensor (e.g., may include a motion sensor). (BCC,A26).

**Y.      Claims 104, 126, and 203**

Claims 104, 126, and 203 recite sensors that provide data to devices, and a processor that receives the data from the devices over the Internet and through a communication port.  Bibl discloses a cradle which may be used to connect a personal data capture device so that data may be uploaded over the Internet through a communication port. (BBC,A27).

**Z.      Claims 105, 106, 127, and 204**

Claims 105, 106, 127, and 204 recite providing a notification to the first and second user devices over the Internet.  Bibl discloses the cradle may have a direct two-way connection to the Internet.  The two-way connection may be used to both provide data from the device to the server, and receive/access data/notifications from the server.  Bibl also discloses that cradle connected to the client (device) communicates with the server over the Internet. (BCC,A28).

**AA.      Claims 107-112, 128-130, and 205-210**

Claims 107-112,128-130, and 205-210 recite the first device being a cell phone, portable computer, display screen with a visual display, touch screen, or include a flash memory. (BCC,A27).  The claims also recite that the first device may include a microphone or speakers. Bibl describes that the client may be a fully loaded computer that includes a video, camera, speakers, sound card, and many other conventional options.  Bibl also discloses an interactive voice response computer, which requires use of a microphone to respond to voice commands. (BCC,A29).

**BB.      Claims 115-117, 133-136, and 213-216**

Claims 115-117, 133-136, and 213-216 recite a third sensor that obtains data of a second physical characteristic of said second subject, the sensors including a heart rate, acceleration, motion, or heat sensors.  Bibl discloses a heart rate sensor, GPS, weight, blood pressure, glucose, exercise data, and a motion sensor.  Velocity and acceleration can be measured by a GPS device. (BCC,A31).

**CC.      Claims 119, 137 and 217**

Claims 119, 137 and 217 recite a fourth sensor to obtain data of a third physical characteristic of said second subject.  Bibl discloses a plurality of sensors. (BCC,A32).

### DD.   Claims 121, 139 and 219

Claims 121, 139 and 219 recite that a first sensor transmits data to a first device over a wired communication link.  Bibl discloses that a personal capture data device may be placed in a cradle, thus transferring data over a direct (e.g., not wireless) link.  Bibl also discloses the personal capture device which may be placed in a cradle, is connected to a computer. (BCC,A33).

### EE.   Claims 122, 140, and 220

Claims 122, 140, and 220 recite first sensor transmits data to first user device over a wireless communication link.  Bibl discloses that personal capture data device may itself be a user device and wirelessly transmit data it receives from sensors to a server.  Personal capture data device may receive wireless signals from a sensor (heart rate transmitter).  Bibl also discloses the personal capture device which may be placed in a cradle, is connected to a computer. (BCC,A34).

### FF.   Claims 125 and 226

Claims 125 and 226 recite first and second user devices can access data stored in memory of the server.  Bibl discloses that a cradle is connected to a client and that the client can access data on the server using two-way communication. (BCC,A35).

### GG.   Claims 131 and 132

Claims 131 and 132 recite that the first sensor and first user device are or are not operative to be in constant communication.  Bibl discloses not constant communication when the personal capture device acts a sensor (e.g., motion sensor) a cradle is used to transmit data from the personal capture device to the computer.  Bibl also discloses that personal data capture device includes a GPS signal receiver or motion sensor, which as part of the personal data capture device would be in constant communication with the personal data capture device. (BCC,A36).

### HH.   Claim 143

Claim 143 recites a receiving station that receives data from a first sensor over a wireless communications link and forwards said data to said first user device.  Bibl discloses that personal data capture device (receiving station) may receive wireless signals from a (heart) sensor. Personal capture device then forwards information to computer when placed in cradle. (BCC,A34,A37).

### II.   Claims 145 and 146

Claims 145 and 146 recite user devices can access data stored in database or memory of a server.  Bibl discloses that data may reside either directly on web server or on a separate computer accessible to web server, in a repository (memory) or a database, and that there may

exist a two-way communication link. Bibl discloses that a cradle is connected to a client, and that a client can access data on the server, in memory or database, using two-way communication. (BCC,A38).

### JJ.   Claim 223

Claim 223 recites collecting first data a first sensor, sending first data from the first sensor to a local receiving station over a wireless link, and transmitting data from the receiving station to a user device that can communicate the data to the server. Bibl discloses that a personal data capture device may both be a sensor and receive wireless data from another sensor. Bibl discloses that the personal data capture device may transmit data directly to the server, or may be placed in a cradle (receiving station), connected to a client (user device) and then transmit data to a server. (BCC,A39).

### KK.   Claims 227 and 228

Claims 227 and 228 recite that the server is a web server hosting a website and notification regarding the evaluation is posted to the website. Bibl discloses that the server is a web server and may post notifications to the website it hosts. Claims 227 and 228 further recite that the system includes a heart rate monitor worn by the subject. Bibl discloses that the sensor may be worn by the subject, and may include a heart rate monitor. Claims 227 and 228 further recite that the system includes a local portable computer with a visual display that receives data over a radio wireless communication link from the heart rate monitor, and transmits the data to a server over the internet. Bibl discloses that the personal data capture device is a local portable computer (with processor, memory, software, and electronics). Bibl discloses that personal data capture devices can include a visual display for reading data. Bibl discloses that the data may be transmitted wirelessly to the server from the personal data capture device using the Internet. (BCC,A12,A40). *See* Koperda Dec., ¶¶21, 23.

### LL.   Claims 113 and 211

Claims 113 and 211 recite that the first user device is operative to communicate first data directly to the second user device. Bibl discloses that a first user device (personal capture device) is operative to communicate first data directly to a second user device (cradle). A first personal data capture device may receive information from a sensor (e.g., a wireless heart monitor), and may communicate the data wirelessly over the Internet to a server. The first user device may include a touchscreen device, and may receive notifications from the server. Bibl discloses that a second personal capture device may include or be a sensor (e.g., motion sensor), and that the sensor transmits data to a second user device (cradle) that communicates the data

Case 1:11-cv-00167-BSJ   Document 169-22   Filed 10/28/16   Page 27 of 35
Wilner *et al.*
Control No. 95/002,337

over the Internet to a server. It would have been an obvious design choice to include the capability of being able to transmit the data both wirelessly and via the cradle using the first personal data capture device. As such, the first personal data capture device would be operative to transmit the first data to the second user device (cradle). (BCC,A12, A41). *See* Koperda Dec., ¶22.

> **MM.  Claim 74 and 180**
> Claims 74 recites the notification including an instant message communication is provided to a device. Bibl discloses that feedback information is posted on a web site. (BCC,A42). A person of ordinary skill in the art would recognize that such content can also be communicated using push technology such as instant messaging. Such messaging would have been obvious to a personal of ordinary skill in the relevant art. *See* Koperda Dec., ¶23.1.

> **NN.  Claims 47 and 152**
> Claims 47 and 152 recite using an internal clock element that maintains a time and date for the server. Bibl teaches that personal data stored in memory of the personal data capture device includes a timestamp, which may be stored in a database. (BCC, A43). Thus, it would have been obvious to a person of ordinary skill in the art at the time of filing for a server to use an internal clock element that maintains a time and date for a server. *See* Koperda Dec., ¶14.

> **OO.  Claims 123, 124, 141, 142, 144, 221, and 224**
> Claims 123, 124, 141, 142, 144, 221, and 224 recite using either radio wireless transmissions or Bluetooth transmissions. Bibl teaches using wireless transmissions. It would have been obvious to a personal of ordinary skill in the art that radio wireless or Bluetooth transmissions could be used. (BCC, A44). *See* Koperda Dec., ¶23.

**IX.    New Rejections for New Claims over Admitted Art in view of Teller**

> **A.      Overview of New Proposed Rejections**
> Newly added claims 42, 45-147, and 150-228 are dependent claims that depend directly or indirectly upon one of claims 37 or 39. The rejection of claims 37 and 39 is addressed above, and is hereby incorporated by reference in each of the rejections of the newly added claims below as being obvious in view of the previously cited art in combination with Teller. To comply with page limitations, the new claims are grouped based on a similarity of features. Support for the arguments are provided with cites to Teller as included in the claim chart for Teller (TCC) in the appendix to this document. The new claims will be discussed below only in reference to newly cited art Teller.

> **B.      Claims 42 and 147**

Case 1:11-cv-00167-BSJ   Document 169-22   Filed 10/28/16   Page 28 of 35

Wilber et al.
Control No. 95/002,337

Claims 42 and 147 recite a web server that hosts a web site.  Teller discloses that the central monitoring unit maintains/hosts a website. (TCC,A4).

**C.      Claims 45, 114, 150, and 212**

Claims 45, 114, 150, and 212 recite a sensor which the first subject wears.  Teller discloses a device that may be worn on the arm. (TCC,A5).

**D.      Claims 46 and 151**

Claims 46, and 151 recite a sensor which the first subject carries.  Teller discloses a device that may be worn on the arm, when a device is worn, it is inherently carried. (TCC,A6).

**E.      Claims 48, 153, 154, and 225**

Claims 48, 153, 154, and 225 recite storing the first and second data in memory (48, 153, 154, 225) and storing information regarding first and second subjects in memory (48, 154). Teller discloses storing the sensor information in a database (memory).  Information regarding the subjects (life activities) is stored at the server as well. (TCC,A7).

**F.      Claims 49 and 155**

Claims 49 and 155 recite a sensor database accessible to the server.  Teller discloses storing the sensor information in a database (memory). (TCC, A7). *See* Koperda Dec., ¶24.

**G.      Claims 50-52 and 156-158**

Claims 50-52 and 156-158 recite an identifier, description, and output/format fields of the sensor database.  Teller discloses a sensor database. (TCC,A7).  It would have been obvious to a person of ordinary skill in the art that, in order to properly track the information received from the various sensors, the sensor database would include various fields, including a sensor identifier field, format fields since different sensors provide different data (e.g., heart rate, temperature, motion), and descriptions of the sensors. (TCC,A8). *See* Koperda Dec., ¶24.

**H.      Claims 53-56 and 159-162**

Claims 53-56 and 159-162 recite an output database accessible to the server, the output database including information for identifying subjects, descriptive information about the subjects, and information associating subjects with sensors.  Teller discloses an output database. (TCC,A7).  It would have been obvious to a person of ordinary skill in the art that, in order to properly track the information received from the various sensors for the various users, the output database would include information for identifying subjects, descriptive information about the subjects, and information associating subjects with sensors. (TCC,A8). *See* Koperda Dec., ¶25.

**I.      Claims 57-61 and 163-167**

Claims 57-61 and 163-167 recite an evaluation database accessible to the server, the evaluation database including identifier, description, sensors associated with the evaluation, and

Case 1:11-cv-00167-BSJ   Document 269-22   Filed 10/28/16   Page 29 of 35

Wilber et al.
Control No. 95/002,337

output device fields. Teller discloses an evaluation/feedback database. (TCC,A7). It would have been obvious to a person of ordinary skill in the art to have, in a feedback database that collects various sensor information (e.g., heart rate, temperature, motion) from various **subjects (from** numerous users) identifier, description, and association fields of which sensors are evaluated. It would also have been obvious to a person of ordinary skill in the art to have a field identifying the device to which a notification is provided since notification can be provided to many different devices or different methods of providing notification (e.g., e-mail/website). **(TCC,A8).** *See* Koperda Dec., ¶26.

### J.    Claims 62-68 and 168-174

Claims 62-68 and 168-174 recite that the device that receives the notification is a server, computer, cell phone, flash memory, **display screen** with a visual display, touch screen, and includes a keyboard and mouse. Teller discloses that feedback may be provided to sensor device, including a visual display. Sensor device includes a flash memory to which notification may be provided. Teller further discloses that a notification may be received at a computer/server, cell phone, or PDA. It is inherent that a computer has a keyboard and a mouse. Teller discloses the Palm VII PDA which employed a touchscreen. (TCC,A9). *See* Koperda Dec., ¶27,28.

### K.    Claims 69-72 and 175-178

Claims 69-72 and 175-178 recite that output is provided to one or more additional devices, which may include two cell phones, more than one type of device, or a cell phone and a computer. Teller discloses that output is provided to various types of clients. See discussion of claims 62-68 and 168-174 above in Section IX.J. A person skilled in the relevant art would understand that, according to the Teller ,different users could receive notification over different devices. The different devices may include a cell phone and a computer (TCC,A10).

### L.    Claims 73, 74, 179, and 180

Claims 73, 74, 179, and 180 recite that a notification includes an e-mail message or an instant message. Teller discloses that the central monitoring unit can send notifications as e-mail messages or two-way pager. (TCC,A11,A34). It would have been obvious to a person of ordinary skill in the art to use a push notification or instant message rather than email or two-way pager. *See* Koperda Dec., ¶29.

### M.    Claims 75-80, 83, 181-186, and 189

Claims 75-78, 80, 83, 181-184, 186, and 189 recite that the notification includes an electronic signal, a wireless, HTTP, or HTML transmission, or includes visually perceptible information or audible information. Teller discloses that output is provided over the world wide web (HTTP transmissions are inherently used on the world wide web), files may be HTML, both

of which are electronic signals. Teller further discloses feedback may be visual or audio/acoustic. Teller discloses wireless communications between the device and the server. Teller discloses the use of database communications for the communication of various data for which it would have been obvious to one skilled in the art to use XML. (TCC,A12). *See* Koperda Dec., ¶¶16, 30.

### N.   Claims 81, 82, 187, and 188

Claims 81, 82, 187, and 188 recite that the audible information includes a voice message, or a telephone call. Teller discloses that the server can place a telephone call, and that notification questions (via voice messages) may be posed to the user. (TCC,A13).

### O.   Claims 84-87

Claims 84-87 recite the notification includes a summary, table, comparison, or graph of some/all of the first and second data. Teller discloses that some/all of the data may be presented in graphs or charts. Graphs and charts are summaries of data. FIGs. 5 and 10 of Teller show data presented in tabular format. (TCC,A14).

### P.   Claims 88 and 190

Claims 88 and 190 recite said processor/server determines a course of action based on said first and second data. Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining a course action based on first and second data, which is not disputed by ICON. (Request, CC1(cl.17), CC3(cl.17)). Teller discloses determining a course of action based on the data input and data from sensors to determine a course of action with regard to nutrition and provides a suggested healthy daily routine. (TCC, A15).

### Q.   Claims 89 and 191

Claims 89 and 191 recite said processor/server providing notification of said course of action to said device. Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining a course action based on first and second data, which is not disputed by ICON. (Request, CC1(cl.18), CC3(cl.18)). Teller discloses providing a notification (via a webpage) to a device by a processor/server. (TCC,A15).

### R.   Claims 90 and 192

Claims 90 and 192 recite said processor/server determines a desired action for first and second subjects. Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining a desired (course of) action based on first and second data, which is not disputed by ICON. (Request, CC1(cl.23,32,33), CC3(cl.23,32,33)). Teller discloses that the desired action is determined to reach a healthy daily routine or to increase/improve sleep. (TCC,A16).

**S.      Claims 91, 92, 193, and 194**

Claims 91, 92, 193, and 194 recite said process/server determining a course of action based on said desired action, and wherein the course of action is selected to improve the chances the subjects will perform the desired action. Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses determining course of action based on a desired action, wherein the course of action is selected to improve the chances the subjects will perform the desired action, which is not disputed by ICON. (Request, CC1(cl.23,32), CC3(cl.23,32)). Teller discloses that suggestions to improve sleep (i.e., improve the chances subjects will perform the action). (TCC,A16).

**T.      Claims 93, 94, 195, and 196**

Claims 93, 94, 195, and 196 recite that first and second data are indicative of the same or different physical characteristics. Teller discloses various physical characteristics that may be measured (e.g., blood pressure, respiration, heat) by sensors for various subjects. It would have been obvious that the same or different physical characteristics may be measured for the subjects. (TCC,A17).

**U.      Claims 95 and 197**

Claims 95 and 197 recite receiving data simultaneously from the subjects. Teller discloses that the system receives data and makes data available over the Internet. It would have been obvious to a person of ordinary skill in the relevant art that data may be received simultaneously from users over the Internet. (TCC,A18)

**V.      Claims 96, 97, 198, and 199**

Claims 96, 97, 198, and 199 recite a processor determining one or more options to provide to said first subject and providing notification of the option(s) to a device. Admitted art (Patton and Zawilinski in view of Papadopoulos), as provided in the Request, discloses these limitations. (Request, CC1(cl.13), CC3(cl.13)). Teller discloses options, selectable charts/graphs, provided to the user. (TCC,A19).

**W.      Claims 98, 99, 200, and 201**

Claims 98, 99, 200, and 201 recite that said processor determines and provides notification that a first subject is in need of a break. Teller discloses that when it is determined that sleep levels are low, it provides the user ways to improve or get more sleep. (TCC,A20).

**X.      Claims 100-102**

Claims 100-102 recite aggregating or averaging, collecting and preparing for later use, or determining a pattern in first and second data. Admitted art (Patton and Zawilinski) discloses determining an average, **median**, and other statistical measurements. (Request, CC1,(cl.7),

CC2(cl.7).).  Teller discloses collecting and manipulating (preparing) the data for later use. (TCC,A21).

### Y.      Claims 103 and 202

Claims 103 and 202 recite that the first and second devices are sensors and that the processor receive first and second data directly from first and second sensors.  Teller discloses a kiosk (sensor) that may collect physiological data as a sensor and transmit data directly to the server, or that sensor may wirelessly transmit data. (TCC,A22).

### Z.      Claims 104, 126, and 203

Claims 104, 126, and 203 recite sensors that provide data to devices, and a processor that receives the data from the devices over the Internet and through a communication port.  Teller discloses uploading data to a computer, then the computer transmits the data to the server over the Internet.  The communication port is inherent. (TCC,A23).

### AA.     Claims 105, 106, 127, and 204

Claims 105, 106, 127, and 204 recite providing a notification to the first and second user devices over the Internet.  Teller discloses that a computer can be used to send data to the server over the Internet, and that feedback may be provided over the Internet to a webpage, which may be accessed by the same device. (TCC,A24).

### BB.     Claims 107-112, 128-130, and 205-210

Claims 107-112, 128-130, and 205-210 recite the first device being a cell phone, portable computer, display screen with a visual display, touch screen, include a flash memory, microphone, or speakers.  See discussion of claims 62-68 and 168-174 above in Section IX.J. Regarding a microphone or speakers, Teller discloses that the sensor (device) can sense sound level/quality.  It would have been obvious to a person of ordinary skill in the art that a microphone is used to measure the sound level/quality.  Teller also discloses that the user can receive acoustic feedback for which speakers would have been obvious to a person of ordinary skill in the art. (BCC,A25).

### CC.     Claims 115-118, 133-136, and 213-216

Claims 115-118, 133-136, and 213-216 recite a third sensor that obtains data of a second physical characteristic of said second subject, the sensors including a heart rate, acceleration, motion, or heat sensors.  Teller discloses a variety of sensors including a heart rate, acceleration, motion and heat sensors.  It would have been obvious to a person of ordinary skill in the art that such sensors can be used in various combinations. (TCC,A26).

### DD.     Claims 119, 120, 137, 138, 217, and 218

Claims 119, 120, 137, 138, 217, and 218 recite that sensors include heart rate, motion, blood pressure, acceleration, heat, and respiration sensors. Teller discloses sensors for heart rate, acceleration, heat, and respiration. It would have been obvious to a person of ordinary skill in the art that such sensors can be used in various combinations. (TCC,A26).

### EE.   Claims 121, 139, and 219

Claims 121, 139, and 219 recite first sensor transmits data to first device over a wired communication link. Teller discloses that data from a sensor device is transferred using a serial connection/USB. (TCC,A27).

### FF.   Claims 122, 140, and 220

Claims 122, 140, and 220 recite first sensor transmits data to first user device over a wireless communication link. Teller discloses transfer by short-range wireless connection. (TCC,A28).

### GG.   Claims 123, 124, 141, 142, 144, 221, 222 and 224

Claims 123, 124, 141, 142, 144, 221, 222 and 224 recite that wireless communication is radio wireless communication, including Bluetooth. Teller discloses RF (radio frequency) transceivers, which may include Bluetooth technology that may be used to transmit and receive notifications. (TCC,A29).

### HH.   Claims 125 and 226

Claims 125 and 226 recite that first and second user devices can access data stored in memory of the server. Teller discloses that a user can access the website (data stored in the memory of server), thus accessing the data delivered from the memory of the server. (TCC,A30).

### II.   Claims 131 and 132

Claims 131 and 132 recite that the first sensor and first user device are or are not operative to be in constant communication. Teller discloses communication (i.e., uploading of data) to a personal computer periodically or continuously. (TCC,A31)

### JJ.   Claims 227 and 228

Claims 227 and 228 recite that the server is a web server hosting a website and notification regarding the evaluation is posted to the website. Teller discloses that the server is a web server and may post notifications to the website. Claims 227 and 228 further recite that the system includes a heart rate monitor worn by the subject. Teller discloses that the sensor may be worn by the subject, and may include a heart rate monitor. Claims 227 and 228 further recite that the system includes a local portable computer with a visual display that receives data over a radio wireless communication link from the heart rate monitor, and transmits the data to a server over the internet. Teller discloses that the personal data capture device is a local portable computer

(with processor). Teller discloses that the sensor device can include a visual display for receiving feedback, and that data may be transmitted wirelessly to the server from the sensor device using radio wireless communications. (TCC,A32).

### KK.   Claims 113 and 211

Claims 113 and 211 recite that the first user device is operative to communicate first data directly to the second user device. Bibl discloses that a first user device (sensor device) is operative to communicate first data directly to a second user device (cradle). A first sensor device may receive information from a sensor (e.g., a wireless heart monitor), and may communicate the data wirelessly over the Internet to a server. The first user device may include a touchscreen device, and may receive notifications from the server. Teller discloses that a second sensor device may include or be a sensor (e.g., GSR), and that the sensor transmits data to a second user device (cradle) that communicates the data over the Internet to a server. It would have been an obvious design choice to include the capability of being able to transmit the data both wirelessly and via the cradle using the first personal data capture device. As such, the first personal data capture device would be operative to transmit the first data to the second user device (cradle). (TCC,A33). *See* Koperda Dec., ¶22.

### LL.   Claims 47 and 152

Claims 47 and 152 recite using an internal clock element that maintains a time and date for the server. It would have been obvious at the time of the invention for a server to use an internal clock element that maintains a time and date for a server. (TCC,A34). *See* Koperda Dec., ¶14.

### MM.   Claims 145 and 146

Claims 145 and 146 recite that the first and second user devices are operative to access data stored in a memory or database of the server. Teller teaches that personal data stored on a server memory or database may be accessed by clients. (TCC, A35).

### NN.   Claims 143

Claim 143 recites that a receiving station is operative to receive first data from a first sensor over a wireless communication link and forward said first data to said first user device. Teller teaches that data may be received by a cradle (receiving station), uploaded to a computer, and then transmitted to the server. (TCC, A36).

### OO.   Claims 223

Claim 223 recites that first data is collected at a first sensor, sent over a wireless link to a local receiving station, and transmitted from the receiving station to a local device operative to send the data to the server. Teller teaches that data may be received wirelessly from heart rate monitor at sensor device, and that the data may be transferred to a cradle, and the cradle transmits data to the server. (TCC, A36).

**X.     Conclusion**

For these reasons, Requesters respectfully request that the Office rejects claims 15-20, 31-35, and 37-228.

Respectfully submitted,
Sterne, Kessler, Goldstein & Fox P.L.L.C

Michael B. Ray (Reg. No. 33,997)
Attorney for Third Party Requesters

Harish Ruchandani (Reg. No. 58,770)
Attorney for Third Party Requesters

Date:   4/8/13

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

1670129_4.DOCX

## CERTIFICATE OF SERVICE

I, Tyson K. Hottinger, counsel for appellant Icon Health & Fitness, Inc., hereby certify that on this 10th day of June, 2017, the foregoing **CORRECTED JOINT APPENDIX** was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the following counsel of record, by means of electronic mail:

> John P. Moran
> 　john.moran@hklaw.com
> Anthony J. Fuga
> 　anthony.fuga@hklaw.com
> HOLLAND & KNIGHT LLP
> 131 South Dearborn Street
> Chicago, IL 60603
> Telephone: (312) 263-3600
>
>
> *Counsel for Appellants*
> *Polar Electro Oy and Polar Electro Inc.*

　　　　　　　　　　　　/s/ *Tyson K. Hottinger*
　　　　　　　　　　　　Tyson K. Hottinger