**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**ICON HEALTH & FITNESS, INC., a Delaware corporation,**

*Plaintiff-Appellant,*

**v.**

**POLAR ELECTRO OY, a Finnish company, POLAR ELECTRO, INC., a Delaware corporation,**

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH IN 1:11-CV-00167-BSJ, JUDGE BRUCE S. JENKINS

**CORRECTED JOINT APPENDIX**

LARRY R. LAYCOCK
DAVID R. WRIGHT
TYSON K. HOTTINGER
**MASCHOFF BRENNAN P.L.L.C.**
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 297-1851

*Attorneys for Plaintiff-Appellant*

June 10, 2017

# TABLE OF CONTENTS

Page(s)

Fed. R. Civ. P. 12(c) Judgment

Filed March 27, 2017 ........................................................................Appx1

Memorandum Decision and Order

Filed March 10, 2017 ........................................................................Appx2

U.S. Patent No. 6,701,271

N/A ....................................................................................................Appx21

Docket Sheet from District Court Proceedings
(Fed. Cir. R. 30 (a)(2)(A)(i))

N/A ....................................................................................................Appx40

Polar Electro Oy and Polar Electro Inc.'s Motion for Judgment
on the Pleadings

Filed June 7, 2016 .............................................................................Appx64

Ex. 1 to Motion for Judgment on the Pleadings
(U.S. Patent 6,701,271)

Filed June 7, 2016 .............................................................................Appx85

ICON Health & Fitness, Inc.'s Opposition to Polar Electro Oy and
Polar Electro Inc.'s Motion for Judgment on the Pleadings

Filed October 28, 2016 ...................................................................Appx111

Declaration of Tyson K. Hottinger in Support of ICON Health &
Fitness, Inc.'s Opposition to Polar Electro Oy and Polar Electro
Inc.'s Motion for Judgment on the Pleadings

Filed October 28, 2016 ...................................................................Appx142

Ex. A to the Declaration of Tyson K. Hottinger
        (Letter dated May 2, 2016)

        Filed October 28, 2016 ....................................................Appx144

Ex. B to the Declaration of Tyson K. Hottinger
        (Letter dated May 18, 2016)

        Filed October 28, 2016 ....................................................Appx148

Ex. C to the Declaration of Tyson K. Hottinger
        (Letter dated July 25, 2016)

        Filed October 28, 2016 ....................................................Appx152

Declaration of Dr. David Brienza in Support of ICON Health &
        Fitness, Inc.'s Opposition to Polar Electro Oy and Polar
        Electro Inc.'s Motion for Judgment on the Pleadings

        Filed October 28, 2016 ....................................................Appx157

Ex. A to the Declaration of D. David Brienza (Curriculum Vitae)

        Filed October 28, 2016 ....................................................Appx164

ICON Health & Fitness, Inc.'s Request for Judicial Notice in
        Support of ICON Health & Fitness, Inc.'s Opposition to
        Polar Electro Oy and Polar Electro Inc.'s Motion for Judgment
        on the Pleadings

        Filed October 28, 2016 ....................................................Appx198

Ex. 1 to ICON's Request for Judicial Notice
        (Office Action Summary)

        Filed October 28, 2016 ....................................................Appx204

Ex. 2 to ICON's Request for Judicial Notice
        (Reply to Office Action)

        Filed October 28, 2016 ....................................................Appx222

Ex. 3 to ICON's Request for Judicial Notice (Issue Notification)

    Filed October 28, 2016 ...................................................................Appx241

Ex. 4 to ICON's Request for Judicial Notice
(Response to Non-final Office Action)

    Filed October 28, 2016 ...................................................................Appx243

Ex. 5 to ICON's Request for Judicial Notice
(Office Action Summary)

    Filed October 28, 2016 ...................................................................Appx262

Ex. 6 to ICON's Request for Judicial Notice
(Response to Non-final Office Action)

    Filed October 28, 2016 ...................................................................Appx281

Ex. 7 to ICON's Request for Judicial Notice (Issue Notification)

    Filed October 28, 2016 ...................................................................Appx297

Ex. 8 to ICON's Request for Judicial Notice
(Corrected Request Ex Parte Reexam)

    Filed October 28, 2016 ...................................................................Appx299

Ex. 9 to ICON's Request for Judicial Notice
(Order Granting Request Ex Parte Re)

    Filed October 28, 2016 ...................................................................Appx317

Ex. 10 to ICON's Request for Judicial Notice
(Patent Owner's Statement)

    Filed October 28, 2016 ...................................................................Appx327

Ex. 11 to ICON's Request for Judicial Notice (Office Action)

    Filed October 28, 2016 ...................................................................Appx350

Ex. 12 to ICON's Request for Judicial Notice
(Ex Parte Reexam Interview Summary)

Filed October 28, 2016 ..................................................................Appx366

Ex. 13 to ICON's Request for Judicial Notice
(Patent Owner's Interview)

Filed October 28, 2016 ..................................................................Appx369

Ex. 14 to ICON's Request for Judicial Notice (Amendment)

Filed October 28, 2016 ..................................................................Appx373

Ex. 15 to ICON's Request for Judicial Notice (Notice of Intent)

Filed October 28, 2016 ..................................................................Appx406

Ex. 16 to ICON's Request for Judicial Notice
(Comments on Statement)

Filed October 28, 2016 ..................................................................Appx413

Ex. 17 to ICON's Request for Judicial Notice
(Ex Parte Reexam Certificate)

Filed October 28, 2016 ..................................................................Appx416

Ex. 18 to ICON's Request for Judicial Notice
(Request for Inter *Partes* Reexam)

Filed October 28, 2016 ..................................................................Appx421

Ex. 19 to ICON's Request for Judicial Notice (Office Action)

Filed October 28, 2016 ..................................................................Appx464

Ex. 20 to ICON's Request for Judicial Notice (Order)

Filed October 28, 2016 ..................................................................Appx473

Ex. 21 to ICON's Request for Judicial Notice (Amendment

Filed October 28, 2016 ..................................................................Appx484

Ex. 22 to ICON's Request for Judicial Notice (Comments)

    Filed October 28, 2016 ...................................................................Appx526

Ex. 23 to ICON's Request for Judicial Notice
    (Action Closing Prosecution)

    Filed October 28, 2016 ...................................................................Appx561

Ex. 24 to ICON's Request for Judicial Notice (Amendment B)

    Filed October 28, 2016 ...................................................................Appx639

Ex. 25 to ICON's Request for Judicial Notice (Comments)

    Filed October 28, 2016 ...................................................................Appx694

Ex. 26 to ICON's Request for Judicial Notice
    (Right of Appeal Notice)

    Filed October 28, 2016 ...................................................................Appx719

Ex. 27 to ICON's Request for Judicial Notice
    (Third Party Requesters' Notice)

    Filed October 28, 2016 ...................................................................Appx757

Ex. 28 to ICON's Request for Judicial Notice
    (Notice of Cross Appeal)

    Filed October 28, 2016 ...................................................................Appx760

Ex. 29 to ICON's Request for Judicial Notice (Brief)

    Filed October 28, 2016 ...................................................................Appx763

Ex. 30 to ICON's Request for Judicial Notice (Brief on Appeal)

    Filed October 28, 2016 ...................................................................Appx807

Ex. 31 to ICON's Request for Judicial Notice (Respondent Brief)

    Filed October 28, 2016 ...................................................................Appx843

Ex. 32 to ICON's Request for Judicial Notice (Respondent Brief)

    Filed October 28, 2016 ....................................................................Appx873

Ex. 33 to ICON's Request for Judicial Notice (Examiner's Answer)

    Filed October 28, 2016 ....................................................................Appx895

Ex. 34 to ICON's Request for Judicial Notice (Rebuttal Brief)

    Filed October 28, 2016 ....................................................................Appx899

Ex. 35 to ICON's Request for Judicial Notice (Rebuttal Brief)

    Filed October 28, 2016 ....................................................................Appx914

Ex. 36 to ICON's Request for Judicial Notice (Decision on Appeal)

    Filed October 28, 2016 ....................................................................Appx924

Ex. 37 to ICON's Request for Judicial Notice (Order)

    Filed October 28, 2016 ....................................................................Appx964

Ex. 38 to ICON's Request for Judicial Notice (Notice of Intent)

    Filed October 28, 2016 ....................................................................Appx969

Ex. 39 to ICON's Request for Judicial Notice
(Inter *Partes* Certificate)

    Filed October 28, 2016 ....................................................................Appx976

Polar Electro Oy and Polar Electro Inc.'s Reply in support of their
Motion for Judgment on the Pleadings

    Filed December 12, 2016 .................................................................Appx979

Transcript of January 19, 2017 Hearing

    Filed January 20, 2017 ....................................................................Appx995

Polar Electro Oy and Polar Electro Inc.'s Supplemental Brief
in Support of their Motion for Judgment on the Pleadings

    Filed January 27, 2017 ..................................................................Appx1047

ICON Health & Fitness, Inc.'s Supplemental Brief in Opposition
to Polar's Motion for Judgment on the Pleadings

Filed February 3, 2017 ................................................................Appx1055

Provisional Order Granting Defendants' Motion for Judgment
on the Pleadings

Filed February 8, 2017 ................................................................Appx1066

ICON Health & Fitness, Inc.'s Objections to Defendants' Proposed
Memorandum Opinion & Order Regarding Polar Electro O
and Polar Electro Inc.'s Motion for Judgment on the
Pleadings

Filed February 28, 2017 ..............................................................Appx1067

Ex. A to ICON's Objections to Proposed Order (Proposed Order)

Filed February 28, 2017 ..............................................................Appx1078

Ex. B to ICON's Objections to Proposed Order
(Proposed Judgment)

Filed February 28, 2017 ..............................................................Appx1101

Notice of Proposed Memorandum Opinion & Order Regarding
Polar Electro Oy and Polar Electro Inc.'s Motion for Judgment
on the Pleadings

Filed March 1, 2017 ....................................................................Appx1103

Notice of Proposed Judgment by Polar Electro Oy and Polar
Electro Inc.'s Motion for Judgment on the Pleadings

Filed March 1, 2017 ....................................................................Appx1125

# EXHIBIT 23

UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | I1618.10003US01 | 1254 |

97149          7590          08/12/2013
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/12/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

Appx562

| ***ACTION CLOSING PROSECUTION*** ***(37 CFR 1.949)*** | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/002,337 | 6701271 |
| | Examiner | Art Unit |
| | MINH T. NGUYEN | 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

**Responsive to the communication(s) filed by:**
Patent Owner on 07 March, 2013
Third Party(ies) on 08 April, 2013

Patent owner may once file a submission under 37 CFR 1.951(a) within 1 month(s) from the mailing date of this Office action. Where a submission is filed, third party requester may file responsive comments under 37 CFR 1.951(b) within 30-days (not extendable- 35 U.S.C. § 314(b)(2)) from the date of service of the initial submission on the requester. **Appeal <u>cannot</u> be taken from this action.** Appeal can only be taken from a Right of Appeal Notice under 37 CFR 1.953.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II.  SUMMARY OF ACTION:**

1a. ☒ Claims <u>1-228</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☒ Claims <u>1-14,21-30 and 36</u> have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims <u>15-20,31-35,37-228</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____   ☐ are acceptable   ☐ are not acceptable.
8 ☐ The drawing correction request filed on _____ is:   ☐ approved.   ☐ disapproved.
9 ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
    ☐ been received.   ☐ not been received.   ☐ been filed in Application/Control No _____
10. ☐ Other _____

### *INTER PARTES* REEXAMINATION ACTION CLOSING PROSECUTION

This Action Closing Prosecution (ACP) is in response to the patent owner's Response
and Amendment filed on 3/7/13 and the requester's Comments filed on 4/8/13.

### Status of the Claims

In the amendment, claims 1-14, 21-30 and 36 have been canceled, claims 17-20, 31, 33
and 37-39 have been amended, and claims 42-228 have been added. No amendment were made
to claims 15, 16, 32, 34, 35, 40 and 41. Thus, claims 15-20, 31-35 and 37-228 are now pending.

### Prior Art

Claims 15-20, 31-35 and 37-228 of the United States Patent Number 6,701,271 ("the
'271 patent") are reexamined in view of the following patents and publications:

U.S. Patent No. 6,292,688 to Patton, ("Patton").

U.S. Patent No. 5,676,138 to Zawilinski, ("Zawilinski").

U.S. Patent No. 3,744,7t2 to Papadopoulos et al. ("Papadopoulos").

U.S. Patent Application Publication US 2002/0111541 to Bibl et al ("Bibl").

U.S. Patent No. 6,605,038 to Teller ("Teller").

### Preliminary Notes

At page 18 of the Comments, the requester proposes to reject claims 42-228 for undue
multiplicity as stated in MPEP 2173.05(n). The requester alleges that these claims appear to have
been presented to create more work for the Office and for the requester due to the repetitious and
confusing nature of these new claims.

MPEP 2173.05(n) states that:

37 C.F.R. 1.75   Claim(s).

(a) The specification must conclude with a claim particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention or discovery.
(b) More than one claim may be presented provided they differ substantially from each other and are not unduly multiplied.
*****

Where, in view of the nature and scope of applicant's invention, applicant presents an unreasonable number of claims which ** are repetitious and multiplied, the net result of which is to confuse rather than to clarify, a rejection on undue multiplicity based on 35 U.S.C. 112, second paragraph, may be appropriate. As noted by the court in In re Chandler, 319 F.2d 211, 225, 138 USPQ 138, 148 (CCPA 1963), "applicants should be allowed reasonable latitude in stating their claims in regard to number and phraseology employed. The right of applicants to freedom of choice in selecting phraseology which truly points out and defines their inventions should not be abridged. Such latitude, however, should not be extended to sanction that degree of repetition and multiplicity which beclouds definition in a maze of confusion. The rule of reason should be practiced and applied on the basis of the relevant facts and circumstances in each individual case." See also In re Flint, 411 F.2d 1353, 1357, 162 USPQ 228, 231 (CCPA 1969). Undue multiplicity rejections based on 35 U.S.C.112, second paragraph, should be applied judiciously and should be rare.

In this instant case, the examiner declines to adopt the requester's proposed rejection on undue multiplicity ground because this kind of rejection should be rare. Although the number of claims appears to be excessive, the rejection can be combined into groups. For example, the rejection of claims 62-65 can be combined since it would be obvious to a person with ordinary skill in the relevant art to know that the device can be a server, a computer, a cellular telephone or a memory card. However, the examiner agrees with the requester that the number of claims appears to be excessive and the quality of the reexamination may be affected.

**Statutes**

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

A person shall be entitled to a patent unless –

(b)      the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

(e)      the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section

Application/Control Number: 95/002,337                                         Page 4

Art Unit: 3992

> 351(a) shall have the effects for purposes of this subsection of an application filed in the United States
> only if the international application designated the United States and was published under Article 21(2)
> of such treaty in the English language.

5      The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as
> set forth in section 102 of this title, if the differences between the subject matter sought to be
> patented and the prior art are such that the subject matter as a whole would have been obvious at
10 > the time the invention was made to a person having ordinary skill in the art to which said subject
> matter pertains.  Patentability shall not be negatived by the manner in which the invention was
> made.

15 **Proposed Rejection 1: Patton reference**

     In the previous non-final Office action, claims 1-41 were rejected under 35 U.S.C. 102(e) as being anticipated by Patton. This rejection was proposed by the requester in the Request for Reexamination, and was adopted. In view of the amendment, the previous rejection is withdrawn in part and maintained in part. Specifically:

20      (i)      the rejection of claims 1-14, 21-30 and 36 is withdrawn because they are canceled,

     (ii)      the rejection of claims 17-20, 31-35 and 37-41 is withdrawn because the added limitations to the claims or to their base claims overcome the anticipation rejection in the previous Office action,

25      (iii)      the rejection of claims 15-16 is maintained.

Claim 15:

**Patent owner**:

     Patent owner argues that:

30      (i)      Patton does not teach "selecting said device based, at least in part, on said selecting one of said plurality of options," as required by claim 15. (Response, pp.29-30).

Application/Control Number: 95/002,337                                       Page 5
Art Unit: 3992

Patent owner further argues that "the Request appears to fundamentally misinterpret this
requirement of claim 15 that the device that is selected 'based, at least in part, on said selecting
one of said plurality of options' in claim 15 be **the same device** to which 'a notification regarding
said evaluation is provided in claim 1." Specifically, patent owner argues that "Patton does not
5   inherently teach that a device that is selected 'based, at least in part, on said selecting one of said
plurality of options' is **the same device** to which 'a notification <u>regarding said valuation</u>' is
provided ... [and that] Patentee notes that the 'vehicle control panel' of Patton that is expressly
designed for 'presenting information **needed to operate the vehicle**' can function just fine
without the capability of being provided 'a notification <u>of said evaluation</u>.'" (Response, p,31,
10  underlined emphasis added).

          (ii)     "It is unreasonable ... to equate the 'vehicle control panel'.. to correspond to **the
**same device** to which 'a notification regarding said evaluation' is provided in claim 1 since the
vehicle control panel is not capable of being provided 'a notification regarding said evaluation' as
required by claim 15." (Response, pp.30-31, emphasis in original).

15        (iii)    the vehicle control panel of Patton is "expressly designed for 'presenting
information needed to operate the vehicle' [and] can function just fine without the capability of
being provided 'a notification regarding said evaluation.'" (Response, p. 31).


**Requester**:

20        Regarding (i), the requester asserts that patent owner's arguments fail to impart
patentability to claim 15 for several reasons. First, patent owner's primary argument is based on
an improper claim construction. Claim 1 recites the limitation of "providing a notification
<u>regarding</u> said evaluation to a device." Claim 1 does not require that the notification itself be the
evaluation. Claim 1 only requires that the notification regard the evaluation. Nor does claim 1
25  specify in what form the notification of said evaluation must be provided, only that a notification
is provided <u>regarding</u> an evaluation.

          Second, Patton discloses "selecting said device based, at least in part, on said selecting
one of said plurality of options," and "providing a notification regarding said evaluation to a
device," as provided in claim 15, in which the <u>same device</u> that is selected is provided with the

Application/Control Number: 95/002,337                                      Page 6

Art Unit: 3992

notification. (Comments, page 4). Specifically, the requester asserts that Patton at col. 24:38-51

discloses:

> [Claim 1]        a notification regarding the evaluation is provided to a device (e.g., control
>
> panel options are provided to a respondent via a physical control panel of a vehicle);

5

> [Claim 13]       the respondent receives a notification regarding a plurality of options (e.g.,
>
> a plurality of control panel options are provided to the respondent);
>
> [Claim 14]       based on an evaluation (e.g., comprehension and/or approval) by the
>
> respondent, a manufacturer may select one of the control panels; and
>
> [Claim 15]       based on which control panel option is selected by a respondent, a device

10

> (e.g., a control panel) may be selected by the manufacturer of the vehicle.

Regarding (ii), the requester indicates that he disagrees with patent owner's argument that

the vehicle control panel is not capable of being provided a notification regarding an evaluation.

The requester contends that it is reasonable to read that the vehicle control panel of Patton as

capable of being provided a notification regarding an evaluation. In fact, it is just as reasonable a

15    construction as any construction of the specification of the '271 patent. (Comments, page 5)

Regarding (iii), the requester argues that whether something can function "just fine"

without a capability bears no relevance to whether the feature is taught explicitly or inherently.

(Comments, page 5).


20    **Examiner**:

Regarding (i), because the requester does not dispute the fact that the device recited in

claim 15 must be the same device recited in claim 1 (see requester's Comments, page 4, lines 15-

18) the issue here is whether Patton discloses the selected device "based, at least in part, on said

selecting one of said plurality of options" recited in claim 15 being the same device "receiving a

25    notification regarding said evaluation" recited in claim 1.

According to the requester, Patton discloses this limitation at col. 24:38-51. Patton at col.

24:38-51 states:

> [b]y way of another example, in vehicle training, including auto and aircraft
>
> management, the manufacturer may be interested in the reaction of the respondent to the

30    seating and control panel of the vehicle …. [S]everal different forms of panels, each

Application/Control Number: 95/002,337                                          Page 7
Art Unit: 3992

> presenting information needed to operate the vehicle, could be viewed in succession, and
> the maker could then choose the display that was most rapidly comprehended and/or
> created approval in the test subject.

5       According to this paragraph, there is only one "device" which is the vehicle control
panel. This vehicle control panel is used to display a plurality of display formats in succession
and one of these display formats will be chosen by the manufacturer depending on the approval
of the test subject.

        The recited limitation "providing a notification regarding said evaluation to a device" in
10   claim 1 is met because Patton discloses that a plurality of display formats (functioned as a
notification because when the display formats are displayed, the test subject is notified by their
displays) which are subjected to (regarding) evaluation is provided to a vehicle control panel
(device). In other words, the manufacturer (note that the claim does not require who does the
function of providing) provides a notification (in the form of a plurality of display formats)
15   regarding said evaluation (the plurality of formats are subjected to the evaluation) to the vehicle
control panel (device).

        The recited limitation "selecting said device based, at least in part, on said selecting one
of said plurality of options" recited in claim 15 is met because Patton discloses that the vehicle
display panel (note that because there is only one vehicle display panel, it must be the one
20   discussed in claim 1) with one of the selected display format (the selection of this vehicle display
panel with a selected display format). Also note that claim 29 supports this interpretation because
the claim allows "said first and second devices are the same." In other words, Patton discloses
"selecting said device based, at least in part, on said selecting one of said plurality of options."

        Regarding (ii), the limitation "providing a notification regarding said evaluation to a
25   device" recited in claim 1 is met because the vehicle display panel (device) in Patton receives a
plurality of display options. In other words, a notification in the form of display options is
provided to the vehicle display panel. Note that the claim does not require any particular subject
to provide a notification. In other words, vehicle display panel (device) in Patton receives
notification in the form of a plurality of options subjected to evaluation (regarding said
30   evaluation).

Application/Control Number: 95/002,337                                                  Page 8
Art Unit: 3992

Regarding (iii), as discussed in (ii), the vehicle control panel has the capability of being provided 'a notification regarding said evaluation."

Claim 16:

For the same reasons discussed above in claim 15, Patton discloses the limitation ""said device is associated with at least one of said plurality of options" as recited in claim 16.

For the above reasons, the rejection of claims 15 and 16 is maintained and repeated below:

Claims 15 and 16 are rejected under 35 U.S.C. 102(e) as being anticipated by Patton. This rejection is the same as the proposed rejection provided by the requester in the Requester for Reexamination, claim chart CC1 which is incorporated herein by reference.

**Proposed Rejection 2: Zawilinski reference**

In the previous Office action, claims 1-12, 21, 24-30, 37-39, 41 were rejected under 35 U.S.C. 102(b) as being anticipated by Zawilinski. This rejection was proposed by the requester in the Request for Reexamination, and was adopted. In view of the amendment, the previous rejection is withdrawn. Specifically:

(i)      the rejection of claims 1-12, 21, 24-30 and 36 is withdrawn because they are canceled,

(ii)      the rejection of claims 37-39 and 41 is withdrawn because the added limitations to the claims or to their base claims overcome the anticipation rejection in the previous Office action,

The patent owner and requester have not provided any arguments regarding the rejection in this section.

**Proposed Rejection 3: Zawilinski and Papadopoulos references**

In the previous Office action, claims 8, 9, 13-20, 22, 23, 31-36 and 40 were rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Papadopoulos. This

Application/Control Number: 95/002,337                                      Page 9
Art Unit: 3992

rejection was proposed by the requester in the Request for Reexamination, and was adopted. In view of the amendment,

       (i)     the rejection of claims 8-9, 13-14, 22-23 and 36 is withdrawn because they are canceled,

       (ii)    the rejection of claims 17-20, 31-35 and 40 is withdrawn because the added limitations to the claims or to their base claims overcome the obviousness rejection in the previous Office action,

       (iii)   the rejection of claims 15 and 16 is maintained.

Claim 13:

     Patent owner argues that Papadopoulos does not teach "receiving a notification regarding a plurality of options" as required by claim 13. Patent owner argues that "receiving a notification regarding a plurality of options" is not necessary present in Papadopoulos because the presenter mentioned in Papadopoulos may very well be aware of his options for responding to the audience's reaction to his presentation without receiving a notification regarding these options. (Response, page 34).

     Requester asserts that claim 13 does not require that the notification be "external" as argued by the patent owner. Requesters further note that, while it is possible that a presenter may have conceived of such options entirely within his own mind, "what is possible," is not the relevant inquiry. The relevant inquiry is what would a person skilled in the relevant art understand from Papadopoulos' teachings. The requester argues that a person skilled in the relevant art would understand from Papadopoulos that it is inherent that the presenter receives a notification (whether internal or external) regarding the options available to him to respond to the audience's reaction. Such notification would be necessary to trigger the response by the presenter. For example, the only way a presenter could become aware of the options available to him by which he may respond to the audience's reaction is by being provided a notification as to what options are available. It does not matter whether the notification is received internally (i.e., from his own mind), or externally (e.g., from another device). In both situations, the presenter must receive a notification and claim 13 fails to specify from what source (internal or external)

Application/Control Number: 95/002,337                                    Page 10
Art Unit: 3992

the notification is received. Furthermore, patent owner broadly interprets Papadopoulos as
including the possibility of the presenter conceiving options (as a notification) entirely within his
own mind. At the same time, patent owner narrowly interprets claim 13 as requiring an
"external" notification. Patent owner interpretations are self-interested and contradictory.

5          The examiner agrees with the requester. Claim 13 does not require that the notification be
"external". The fact that the presenter in Papadopoulos knows the options available to him, he
must receive a notification, and this notification can be "external" or "internal".


Claims 14, 15, 16:

10         Patent owner argues that Papadopoulos does not teach "said plurality of options" as
required by claims 14, 15 and 16. Specifically, patent owner argues that the "plurality of options"
recited in claims 14, 15 and 16 are required to be the same as the "plurality of options" recited in
claim 13. (Response, page 35)
           The requester contends that in the proposed rejection, the requester suggests that it would
15    have been obvious that the same plurality of options may be used in Zawilinski in view of
Papadopoulos and the patent owner fails to provide any rational as to why it would not have been
obvious to have the same plurality of options as provided in the Request. (Comments, page 8).
           The examiner agrees with the requester. When a prima facie has been established in a
rejection, the patent owner needs to provide evidence or at least rationale to show that it would
20    not have been obvious to have the same plurality of options as provided by the Request.


Claims 13-16:

           Patent owner argues that Papadopoulos does not teach a single consistent "plurality of
options" as required by claims 13, 14, 15 and 16. Specifically, patent owner argues that the
25    requester appears to assert a first teaching in Papadopoulos as corresponding to the "plurality of
options" recited in claims 13 and 14 and completely separate teachings in Papadopoulos as
corresponding to the "plurality of options" recited in claims 15 and 16. (Response, page 36)
           Requester contends that for each of claims 13-16, the requesters have cited teachings
from Papadopoulos that disclose the claim limitations. See Request, CC3 (cl. 13-16). None of

Application/Control Number: 95/002,337                                      Page 11
Art Unit: 3992

claims 13-16 include limitations of how or when to respond to an audience's reaction. These claims only recite a notification of options, selecting an option, selecting a device based on an option, and a device that is associated with an option. The examples from Papadopoulos cited in the Request meet these claim limitations. Patent owner's discussion of "how" and "when" is
5  irrelevant to the subject matter of claims 13-16.

     The examiner agrees with the requester. Because the claims only requires a notification of options, selecting an option, selecting a device based on an option, and a device that is associated with an option, the examples from Papadopoulos cited in the Request meet these claim limitations. Patent owner's discussion of "how" and "when" is irrelevant to the subject
10  matter of claims 13-16.

     For the above reasons, the rejection of claims 15 and 16 is maintained and repeated below (noted that the rejection of claims 13 and 14 is withdrawn because they are canceled).

     Claims 15 and 16 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Papadopoulos. This rejection is the same as the proposed rejection provided by the
15  requester in the Requester for Reexamination, claim chart CC4 which is incorporated herein by reference.


**Proposed Rejection 4:  Patton and Papadopoulos references**

     In the previous Office action, claims 1-30 and 39-41 were rejected under 35 U.S.C.
20  103(a) as being obvious over Patton in view of Papadopoulos. This rejection was proposed by the third party requester and was adopted. In view of the amendment, the previous rejection is withdrawn in part and maintained in part. Specifically:

          (i)     the rejection of claims 1-14 and 21-30 is withdrawn because they are canceled,

25        (ii)    the rejection of claims 17-20, 39, 40 and 41 is withdrawn because the added limitations to these claims or to their base claims overcome the obviousness rejection in the previous Office action,

          (iii)   the rejection of claims 15-16 is maintained.

Application/Control Number: 95/002,337                                    Page 12
Art Unit: 3992

The patent owner and requester have not provided any arguments regarding the rejection in this section.

For the reasons discussed in the "Proposed Rejection 1" section, the rejection of claims 15-16 is maintained and repeated below:

5      Claims 15 and 16 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Papadopoulos.

The rejection is the same as the proposed rejection provided by the requester in the Requester for Reexamination, claim chart CC4 which is incorporated herein by reference.

10   **Proposed Rejection 5:  Patton and Bibl references**

Claims 17-20, 31-35, 37-72, 74-117, 119, 121-137, 139-178, 180-217 and 219-228 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Bibl. This rejection is proposed by the requester in the requester's comments and is adopted.

15   Claims 17 and 19:

For the limitations recited in the patent claims 17 and 19 wherein claim 1 is the parent of these claims, these limitations have been discussed in claim chart CC1 provided by the requester in the Requester for Reexamination which is incorporated herein by reference.

Regarding the amended limitations of claims 17 and 19 which recite the feature of
20   determining a course of action by a server, these limitations are not taught in Patton. Bibl discloses performing the determining by a server. (Requester's Comments, claim chart BCC, page 39, Arg 17). It would have been obvious to combine the teachings of Patton with Bibl as both are from the same field of detecting physiological reactions of a subject in response to stimuli. One skilled in the art would have been motivated to combine the teachings of Patton and
25   Bibl to automate the monitoring of subjects by using a processor and to take advantage of the network, network server and World Wide Web taught by Bibl. Further both encompass elements well known in the art that could be combined to produce a predictable result.

Claims 18 and 20:

Application/Control Number: 95/002,337                                    Page 13
Art Unit: 3992

     For the limitations recited in the patent claims 18 and 20 wherein claims 1, 17 and 19 are
the parents of these claims, these limitations have been discussed in claim chart CC1 provided by
the requester in the Requester for Reexamination which is incorporated herein by reference.

     Regarding the amended limitations of claims 18 and 20 which recite the feature of
providing a notification based on a course of action over the Internet by a server, these
limitations are not taught in Patton. Bibl discloses providing a notification to a device by a
processor/server over the Internet (through a website) (Requester's Comments, claim chart BCC,
page 39, Arg 18). It would have been obvious to combine the teachings of Patton with Bibl for
the same reasons and motivation discussed in the rejection of claims 17 and 19 above which are
incorporated herein by reference.


Claim 31:

     For the unamended limitations of claim 31, these limitations are disclosed by Patton as
discussed in claim chart CC1 provided by the requester in the Requester for Reexamination
which is incorporated herein by reference.

     Regarding the amended limitations of claim 31 which recite a remote server and
receiving data from a plurality of local sensors over the Internet, these limitations are not taught
in Patton. Bibl discloses a remote server (Requester's Comments, claim chart BCC, page 35, Arg
1), and receiving data from a plurality of local sensors over the Internet (Requester's Comments,
claim chart BCC, page 35, Arg 2). It would have been obvious to combine the teachings of
Patton with Bibl for the same reasons and motivation discussed in the rejection of claims 17 and
19 above which are incorporated herein by reference.


Claim 32:

     Claim 32 depends from claim 31, the rejection of this claim includes the rejection of
claim 31 discussed above and the rejection of claim 32 discussed in claim chart CC1 which is
incorporated herein by reference.


Claim 33:

Application/Control Number: 95/002,337                                    Page 14
Art Unit: 3992

      The amended limitations of claim 33 recite the feature employing a remote server to determine a desired action. Patton teaches determining a desire action (Patton, claim chart CC1) but does not disclose employing a server. Bibl discloses employing a server to determine a desired action. (Requester's Comments, claim chart BCC, page 39, Arg 17). It would have been
5    obvious to combine the teachings of Patton with Bibl for the same reasons and motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by reference.

Claims 34 and 35:
      Claims 34 and 35, each depends from claim 31, the rejection of this claim includes the
10   rejection of claim 31 discussed above and the rejection of claims 34 and 35 discussed in claim chart CC1 which is incorporated herein by reference.

Claims 37 and 38:
      For the unamended limitations of claims 37 and 38, these limitations are disclosed by
15   Patton as discussed in claim chart CC1 provided by the requester in the Requester for Reexamination which is incorporated herein by reference.
      Regarding the amended limitations of claim 37 which recite a remote server, including a communicating port operative to receive data over the Internet that store data in memory, these limitations are not taught in Patton. Bibl discloses a remote server including a communication
20   port operative to receive data over the Internet that stores data in memory (Requester's Comments, claim chart BCC, page 35, Arg 1). Bibl also discloses receiving sensor data over the Internet (Requester's Comments, claim chart BCC, page 35, Arg 2).
      Regarding the amended limitations of claim 38 recite a remote server (Requester's Comments, claim chart BCC, page 35, Arg 1), receiving data from a plurality of local sensors
25   over the Interact (Requester's Comments, claim chart BCC, page 35, Arg 2), and employing the server to send the evaluation (Requester's Comments, claim chart BCC, page 35, Arg 3).
      It would have been obvious to combine the teachings of Patton with Bibl for the same reasons and motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by reference.

Application/Control Number: 95/002,337                                        Page 15
Art Unit: 3992

Claim 39:

For the unamended limitations of claim 39, these limitations are disclosed by Patton as discussed in claim chart CC1 provided by the requester in the Requester for Reexamination
5    which is incorporated herein by reference.

Regarding the amended limitations of claim 39 which recite a remote server and receiving physical characteristic data from a first and second device, these limitations are not taught in Patton. Bibl discloses a remote server (Requester's Comments, claim chart BCC, page 35, Arg 1) and receiving physical characteristic data from a first and second device (Requester's
10   Comments, claim chart BCC, page 35, Arg 2). It would have been obvious to combine the teachings of Patton with Bibl for the same reasons and motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by reference.

Claims 40 and 41:

15   Claims 40 and 41, each depends from claim 39, the rejection of these claims include the rejection of claim 39 discussed above and the rejection of claims 40 and 41 discussed in claim chart CC1 which is incorporated herein by reference.

Claims 42 and 147:

20   Claims 42 and 147 recite a web server that hosts a web site which are not disclosed by Patton. Bibl discloses a web server that posts information for subscribers to a website that it hosts (Requester's Comments, claim chart BCC, page 36, Arg 4). It would have been obvious to combine the teachings of Patton with Bibl for the same reasons and motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by reference.

25

Claims 43, 44, 148, and 149

Claims 43, 44, 148, and 149 recite a sensor on which the first subject sits (claims 43,148) or stands (claims 44,149). Patton does not disclose these limitations. Bibl discloses that data may be captured from a weight scale (stand) or stationary bike (sit). (Requester's Comments, claim

Application/Control Number: 95/002,337                                    Page 16
Art Unit: 3992

chart BCC, page 36, Arg 5). It would have been obvious to combine the teachings of Patton with
Bibl for the same reasons and motivation discussed in the rejection of claims 17 and 19 above
which are incorporated herein by reference.

5      Claims 45, 46, 114, 150, 151, and 212

       Claims 45, 46, 114, 150, 151, and 212 recite a sensor which the first subject wears (45,
114,150,149) or carries (46,151). Patton does not disclose these limitations. Bibl discloses a
device that may be worn on the breast or wrist, or secured to a user's belt or waist band. Bibl also
discloses the device may be held (i.e., carried) (Requester's Comments, claim chart BCC, page
10     35, Arg 6). It would have been obvious to combine the teachings of Patton with Bibl for the same
reasons and motivation discussed in the rejection of claims 17 and 19 above which are
incorporated herein by reference.

       Claims 48, 153, 154 and 225

15     Claims 48, 153. 154 and 225 recite storing the first and second data in memory (claims
48, 153,  154, 225) and storing information regarding first and second subjects in memory
(claims 48, 154). Patton does not disclose these limitations. Bibl discloses a computer system
with RAM and ROM memory and software that stores and analyzes personal data in memory. In
addition, account information (e.g., passwords) regarding the subjects is stored. (Requester's
20     Comments, claim chart BCC, page 35, Arg 7). It would have been obvious to combine the
teachings of Patton with Bibl for the same reasons and motivation discussed in the rejection of
claims 17 and 19 above which are incorporated herein by reference.

       Claims 49 and 155

25     Claims 49 and 155 recite a sensor database accessible to the server. Patton does not
disclose these limitations. Bibl discloses that personal data (including sensor info), account
information, and feedback information may be stored in a database. (Requester's Comments,
claim chart BCC, page 35, Arg 8). It would have been obvious to combine the teachings of

Application/Control Number: 95/002,337                                    Page 17

Art Unit: 3992

Patton with Bibl for the same reasons and motivation discussed in the rejection of claims 17 and

19 above which are incorporated herein by reference.


Claims 50-52 and 156-158

5          Claims 50-52 and 156-158 recite sensor identifier, sensor description, and sensor

output/format fields of the sensor database. Patton does not disclose these limitations. Bibl

discloses a sensor database. (Bibl, paragraphs 41, 57 and 58). It would have been obvious to a

person of ordinal skill in the art that, in order to properly track the information received from the

various sensors, the sensor database would include various fields, including a sensor identifier

10     field, format fields since different sensors provide different data (e.g., GPS position, heart rate,

motion, etc.), and descriptions of the sensors. (Requester's Comments, claim chart BCC, page

37, Arg 9).


Claims 53-56 and 159-162

15         Claims 53-56 and 159-162 recite an output database accessible to the server, the output

database including information for identifying subjects, descriptive information about the

subjects and information associating subjects with sensors. Patton does not disclose these

limitations. Bibl discloses an output database. (Bibl, paragraphs 41, 57 and 58). It would have

been obvious to a person of ordinary skill in the art that, in order to properly track the

20     information received from the various sensors for the various users, the output database would

include information for identifying subjects, descriptive information about the subjects, and

information associating subjects with sensors. (Requester's Comments, claim chart BCC, page

37, Arg 10).


25     Claims 57-61 and 163-167

           Claims 57-61 and 163-167 recite an evaluation database accessible to the server, the

evaluation database including an evaluation identifier, description, sensors associated with the

evaluation, and information that associates the evaluation with the device to which the

notification is provided. Patton does not disclose these limitations. Bibl discloses an

Application/Control Number: 95/002,337                                              Page 18

Art Unit: 3992

evaluation/feedback database. (Bibl, paragraphs 41, 57 and 58). it would have been obvious to a

person of ordinary skill in the art, in a feedback database that collects various sensor information

(e.g., GPS position, heart rate, motion, etc.) from various subjects (i.e., from numerous PSA

users), to have an identifier, a description field, and association fields of which sensors are

5    evaluated. It would also have been obvious to a person of ordinary skill in the art to have a field

identifying the device to which a notification is provided since a notification can be provided to

different devices or different ways. (Requester's Comments, claim chart BCC, page 37, Arg 11).


Claims 62-68 and 168-174

10      Claims 62-68 and 168-174 recite the device that receives the notification is a server,

computer, cell phone, flash memory, display screen with a visual display, touch screen, and

includes a keyboard and mouse. Patton does not disclose these limitations. Bibl discloses that the

server communicates with clients that include a computer system, a network computer (server). a

laptop, a palmtop computing device (touchscreen), a digital TV (visual display), a conventional

15   computer with a mouse (keyboard is inherently part of conventional computer system), cellular

service (cell phone), computer system which includes EEPROM (flash memory). (Requester's

Comments, claim chart BCC, page 37, Arg 12).


Claims 69-72 and 175-178

20      Claims 69-72 and 175-178 recite that output is provided to one or more additional

devices, which may include two cell phones, more than one type of device, or a cell phone and a

computer. Patton does not disclose these limitations. Bibl discloses that output is provided to a

various number of clients, which may include different devices, including a cell phone and a

computer (Requester's Comments, claim chart BCC, page 38, Arg 13).

25

Claims 75-80, 83, 181-186, and 189

        Claims 75-80, 83, 181-186, and 189 recite that the notification includes an electronic

signal, a wireless. HTTP. HTML. or XML transmission, or includes visually perceptible

information or audible information. Patton does not disclose these limitations. Bibl discloses that

Application/Control Number: 95/002,337                                    Page 19

Art Unit: 3992

HTTP arid HTML transmissions (electronic signals) may be used to provide clients with video, audio, or tactile data. Bibl discloses that clients may access a server via a two-way Internet connection; that data may be transmitted wirelessly; that a personal capture device may be configured over the network (which may be wireless); and that a client may receive digital audio feedback. Bibl discloses the use of database communications for the communication of various data (e.g., from different sensors) for which it would have been obvious to one skilled in the art to use XML. (Requester's Comments, claim chart BCC, page 38, Arg 14).

Claims 81-82, 187 and 188

Claims 81, 82, 187, and 188 recite that the audible information includes a voice message or a telephone call. Patton does not disclose these limitations. Bibl discloses that a personal trainer or software may place a voice message for the user in a master computer, and that the notification includes a telephone call to provide audible information. (Requester's Comments, claim chart BCC, page 38, Arg 15).

Claims 84-87

Claims 84-87 recite that the notification includes a summary, table, comparison, or graph of some/all of the first and second data. Patton does not disclose these limitations. Bibl discloses personal data may be presented in numerous forms including graphs, tables, charts, and comparisons with data of other subscribers. Tables, graphs, charts, and comparisons are all summaries of data. (Requester's Comments, claim chart BCC, page 39, Arg 16).

Claims 88 and 190

Claims 88 and 190 recite that said processor/server determines a course of action based on said first and second data. Patton discloses determining a course action based on first and second data, which is not disputed by the patent owner. Bibl discloses a computer determining a course of action (e.g., exercise regimen), and that personal data may be analyzed by a software program (running on a processor) to create feedback information (including determining a course of action). (Requester's Comments, claim chart BCC, page 39, Arg 17).

Application/Control Number: 95/002,337                                      Page 20

Art Unit: 3992

Claims 89 and 191

     Claims 89 and 191 recite said processor/server providing notification of said course of

action to said device. Patton discloses determining a course action based on first and second data,

5    which is not disputed by the patent owner. Bibl discloses providing a notification to

a device by a processor/server. (Requester's Comments, claim chart BCC, page 39, Arg 17 and

Arg 18).

Claims 90 and 192

10      Claims 90 and 192 recite that said processor/server determines desired action for first and

second subjects. Patton discloses determining a desired course of action based on first and

second data, which is not disputed by the patent owner. Bibl discloses that personal data may be

analyzed by a software program (running on a processor) to create feedback information

(including determining a course of action). (Requester's Comments, claim chart BCC, page 39,

15    Arg 19).

Claims 91, 92, 193, and 194

     Claims 91, 92, 193, and 194 recite said process/server determining a course of action

based on said desired action, and wherein the course of action is selected to improve the chances

20    the subjects will perform the desired action. Patton discloses determining course of action based

on a desired action, wherein the course of action is selected to improve the chances the subjects

will perform the desired action, which is not disputed by the patent owner Bibl discloses that

personal data may be analyzed by a software program (running on a processor) to create

feedback information (including determining a course of action). (Requester's Comments, claim

25    chart BCC, page 39, Arg 20).

Claims 93, 94, 195 and 196

     Claims 93, 94, 195 and 196 recite first and second data are indicative of the same or

different physical characteristics. Bibl discloses various physical characteristics that may be

Application/Control Number: 95/002,337                                      Page 21

Art Unit: 3992

measured (e.g., blood pressure, weight, glucose) for various subjects. (Requester's Comments, claim chart BCC, page 39, Arg 21).

Claims 95 and 197

Claims 95 and 197 recite receiving data simultaneously from the subjects. Bibl discloses different users may have their own PSA, each of which may individually transmit data to the sensor. (Requester's Comments, claim chart BCC, page 39, Arg 22).

Claims 96, 97, 198 and 199

Claims 96, 97, 198, and 199 recite a processor determining one or more options to said first subject, and providing notification of the option(s) to a device. Patton discloses these limitations. Bib discloses providing a user with options to add new feature, and notifying the user of the options, (Requester's Comments, claim chart BCC, page 39, Arg 23)

Claims 98, 99, 200, and 201

Claims 98, 99, 200 and 201 recite said processor determines and provides notification that a first subject is in need of a break. Bibl discloses personal capture device (e.g., beeper) is configured with information for determining when a user needs a break (e.g., high heartbeat), and provides notification (e.g., beep/digital recording) informing user of such. (Requester's Comments, claim chart BCC, page 39, Arg 24).

Claims 100-102

Claims 100-102 recite aggregating or averaging, collecting and preparing for later use, or determining a pattern in first and second data. Patton discloses determining an average, median, and other statistical measurements. Bibl discloses progressive charts (pattern) in the data. Data is collected and prepared (e.g. averaged) for later use, as an amount of time between the collecting, preparing and use (display) is "later." (Requester's Comments, claim chart BCC, page 40, Arg 25).

Application/Control Number: 95/002,337                                    Page 22
Art Unit: 3992

Claims 103 and 202

Claims 103 and 202 recite that the first and second devices are sensors, and that the
processor receive first and second data directly from first and second sensors. Bibl discloses
data may be transmitted directly from personal capture device to server 160 using a wireless
5   transmitter. Personal capture device is a sensor (e.g. may include a motion sensor). (Requester's
Comments, claim chart BCC, page 40, Arg 26).

Claims 104, 126, and 203

Claims 104, 126, and 203 recite sensors that provide data to devices, and a processor that
10  receives data from the devices over the Internet and through a communication port. Bibl
discloses a cradle which may be used to connect a personal data capture device so that data may
be uploaded over the Internet through a communication port. (Requester's Comments, claim
chart BCC, page 40, Arg 27).

Claims 105, 106, 127 and 204

15  Claims 105, 106, 127 and 204 recite providing a notification to the first and second user
devices over the Internet. Bibl discloses the cradle may have a direct two-way connection to the
Internet. The two-way connection may be used to both provide data from the device to the
server, and receive/access data/notifications from the server. Bibl also discloses that cradle
20  connected to the client (device) communications with the server over the Internet. (Requester's
Comments, claim chart BCC, page 40, Arg 28).

Claims 107-112, 128-130 and 205-210

Claims 107-112, 128- 130, and 205-210 recite the first device being a cell phone,
25  portable computer, display screen with a visual display, touch screen, or include a flash memory.
The claims also recite that the first device may include a microphone or speakers. Bibl describes
that the client may be a fully loaded computer that includes a video, camera, speakers, sound
card, and many other conventional options. Bibl also discloses an interactive voice response

Application/Control Number: 95/002,337                                    Page 23

Art Unit: 3992

computer, which requires use of a microphone to respond to voice commands. (Requester's
Comments, claim chart BCC, page 40, Arg 29).


Claims 115-117, 133-136, and 213-216

Claims 115-117, 133-136, and 213-216 recite a third sensor that obtains data of a second
physical characteristic of said second subject, the sensors including a heart rate, acceleration,
motion or heat sensors. Bibl discloses a heart rate sensor, GPS, weight, blood pressure, glucose,
exercise data, and a motion sensor. Velocity and acceleration can be measured by a GPS device.
(Requester's Comments, claim chart BCC, page 40, Arg 31).


Claims 119, 137 and 217

Claims 119, 137 and 217 recite a fourth sensor to obtain data of a third physical
characteristic of said second subject. Bibl discloses a plurality of sensors. (Requester's
Comments, claim chart BCC, page 40, Arg 32).


Claims 121,139 and 219

Claims 121, 139 and 219 recite that a first sensor transmits data to a first device over a
wired communication link. Bibl discloses that a personal capture data device may be placed in a
cradle, thus transferring data over a direct (e.g., not wireless) link. Bibl also discloses the
personal capture device which may be placed in a cradle, is connected to a computer.
(Requester's Comments, claim chart BCC, page 40, Arg 33).


Claims 122, 141 and 220

Claims 122, 140 and 220 recite first sensor transmits data to first user device over a
wireless communication link. Bibl discloses that personal capture data device may itself be a
user device and wirelessly transmit data it receives from sensors to a server. Personal capture
data device may receive wireless signals from a sensor (heart rate transmitter). Bibl also
discloses the personal capture device which may be placed in a cradle, is connected to a
computer. (Requester's Comments, claim chart BCC, page 40, Arg 34).

Application/Control Number: 95/002,337                                    Page 24

Art Unit: 3992

Claims 125 and 226

     Claims 125 and 226 recite first and second user devices can access data stored in memory

of the server. Bibl discloses that a cradle is connected to a client and that the client can access

5   data on the server using two-way communication. (Requester's Comments, claim chart BCC,

page 40, Arg 35).

Claims 131 and 132

     Claims 131 and 132 recite that the first sensor and first user device are or are not

10  operative to be in constant communication. Bibl discloses not constant communication when the

personal capture device acts a sensor (e.g., motion sensor) a cradle is used to transmit data from

the personal capture device to the computer. Bibl also discloses that personal data capture device

includes a GPS signal receiver or motion sensor, which as part of the personal data capture

device would be in constant communication with the personal data capture device. (Requester's

15  Comments, claim chart BCC, page 40, Arg 36).

Claim 143

     Claim 143 recites a receiving station that receives data from a first sensor over a wireless

communications link and forwards said data to said first user device. Bibl discloses that personal

20  data capture device (receiving station) may receive wireless signals from a (heart) sensor.

Personal capture device then forwards information to computer when placed in cradle.

(Requester's Comments, claim chart BCC, page 40, Arg 37).

Claims 145 and 146

25     Claims 145 and 146 recite user devices can access data stored in database or memory of a

server. Bibl discloses that data may reside either directly on web server or on a separate

computer accessible to web server, in a repository (memory) or a database, and that there may

Application/Control Number: 95/002,337                                    Page 25
Art Unit: 3992

exist a two-way communication link. Bibl discloses that a cradle is connected to a client, and that
a client can access data on the server, in memory or database, using two-way
communication. (Requester's Comments, claim chart BCC, page 40, Arg 38).

5   Claim 223

Claim 223 recites collecting first data a first sensor, sending first, data from the first
sensor to a local receiving station over a wireless link, and transmitting data from the receiving
station to a user device that can communicate the data to the server. Bibl discloses that a personal
data capture device may both be a sensor and receive wireless data from another sensor. Bibl
10  discloses that the personal data capture device may transmit data directly to the server, or may be
placed in a cradle (receiving station), connected to a client (user device) and then transmit data to
a server. (Requester's Comments, claim chart BCC, page 41, Arg 39)

Claims 227 and 228

15  Claims 227 and 228 recite that the server is a web server hosting a website and
notification regarding the evaluation is posted to the website. Bibl discloses that the server is a
web server and may post notifications to the website it hosts. Claims 227 and 228 further recite
that the system includes a heart rate monitor worn by the subject. Bibl discloses that the sensor
may be worn by the subject, and may include a heart rate monitor. Claims 227 and 228 further
20  recite that the system includes a local portable computer with a visual display that receives data
over a radio wireless communication link from the heart rate monitor, and transmits the data to a
server over the interact. Bibl discloses that the personal data capture device is a local portable
computer (with processor, memory, software, and electronics). Bibl discloses that personal data
capture devices can include a visual display for reading data. Bibl discloses that the data may be
25  transmitted wirelessly to the server from the personal data capture device using the Internet.
(Comments, page 37, Arg 12 and page 41, Arg 40)

Claims 113 and 211

Claims 113 and 211 recite that the first user device is operative to communicate first data

Application/Control Number: 95/002,337                                         Page 26
Art Unit: 3992

directly to the second user device. Bibl discloses that a first user device (personal
capture device) is operative to communicate first data directly to a second user device (cradle).
A first personal data capture device may receive information from a sensor (e.g., a wireless heart
monitor) and may communicate the data wirelessly over the internet to a server. The first user
5      device may include a touchscreen device, and may receive notifications from the server. Bibl
discloses that a second personal capture device may include or be a sensor (e.g., motion sensor),
and that the sensor transmits data to a second user device (cradle) that communicates the data
over the Internet to a server. It would have been an obvious design choice to include the
capability of being able to transmit the data both wirelessly and via the cradle using the first
10     personal data capture device. As such, the first personal data capture device would be operative
to transmit the first data to the second user device (cradle). (Requester's Comments, claim chart
BCC, page 37, Arg 12 and page 41, Arg 41).


Claim 74 and 180

15           Claims 74 and 184 recite the notification including an instant message communication is
provided to a device. Bibl discloses that feedback information is posted on a web site.
(Requester's Comments, claim chart BCC, page 41, Arg 42). A person of ordinary skill in the art
would recognize that such content can also be communicated using push technology such as
instant messaging. Such messaging would have been obvious to a person of ordinary skill in the
20     relevant art.


Claims 47 and 152

             Claims 47 and 152 recite using an internal clock element that maintains a time and date
for the server. Bibl teaches that personal data stored in memory of the personal data capture
25     device includes a timestamp, which may be stored in a database. (Requester's Comments, claim
chart BCC, page 41, Arg 43). Thus, it would have been obvious to a person of ordinary skill in
the at the time of filing for a server to use an internal clock element that maintains a time and
date for a server.

Application/Control Number: 95/002,337                                          Page 27

Art Unit: 3992

Claims 123, 124, 141, 142, 144, 221, and 224

      Claims 123, 124, 141, 142, 144, 221 and 224 recite using either radio wireless
transmissions or Bluetooth. transmissions. Bibl teaches using wireless transmissions, It would
have been obvious to a personal of ordinary skill in the art that radio wireless or Bluetooth.

5   transmissions could be used. (Requester's Comments, claim chart BCC, page 42, Arg 44).

**Proposed Rejection 6:  Zawilinski and Bibl references**

      Claims 37-39, 41-72, 74-87, 93-117, 119, 121-137, 139-178, 180-189, 195, 196, 198-217
and 219-228 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of

10  Bibl. This rejection is proposed by the requester in the comments and is adopted.

Claims 37 and 38:

      For the unamended limitations of claims 37 and 38, these limitations are disclosed by
Zawilinski as discussed in claim chart CC2 provided by the requester in the Requester for

15  Reexamination which is incorporated herein by reference.

      Regarding the amended limitations of claim 37 which recite a remote server, including a
communicating port operative to receive data over the Internet that store data in memory, these
limitations are not taught in Zawilinski. Bibl discloses a remote server including a
communication port operative to receive data over the Internet that stores data in memory

20  (Requester's Comments, claim chart BCC, page 35, Arg 1). Bibl also discloses receiving sensor
data over the Internet (Requester's Comments, claim chart BCC, page 35, Arg 2).

      Regarding the amended limitations of claim 38 recite a remote server (Requester's
Comments, claim chart BCC, page 35, Arg 1), receiving data from a plurality of local sensors
over the Interact (Requester's Comments, claim chart BCC, page 35, Arg 2), and employing the

25  server to send the evaluation (Requester's Comments, claim chart BCC, page 35, Arg 3).

      It would have been obvious to combine the teachings of Zawilinski with Bibl as both are
from the same field of detecting physiological reactions of a subject in response to stimuli. One
skilled in the art would have been motivated to combine the teachings of Zawilinski and Bibl to
automate the monitoring of subjects by using a processor and to take advantage of the network,

Application/Control Number: 95/002,337                                                              Page 28
Art Unit: 3992

network server and World Wide Web taught by Bibl. Further both encompass elements well
known in the art that could be combined to produce a predictable result..

Claim 39:

5          For the unamended limitations of claim 39, these limitations are disclosed by Zawilinski
as discussed in claim chart CC2 provided by the requester in the Requester for Reexamination
which is incorporated herein by reference.

           Regarding the amended limitations of claim 39 which recite a remote server and
receiving physical characteristic data from a first and second device, these limitations are not
10        taught in Patton. Bibl discloses a remote server (Requester's Comments, claim chart BCC, page
35, Arg 1) and receiving physical characteristic data from a first and second device (Requester's
Comments, claim chart BCC, page 35, Arg 2). It would have been obvious to combine the
teachings of Zawilinski with Bibl for the same reasons and motivation discussed in the rejection
of claim 37 above which are incorporated herein by reference.

15

Claim 41:

           Claim 41 depends from claim 39, the rejection of these claims include the rejection of
claim 39 discussed above and the rejection of claim 41 discussed in claim chart CC2 which is
incorporated herein by reference.

20

Claims 42 and 147:

           Claims 42 and 147 recite a web server that hosts a web site which are not disclosed by
Zawilinski. Bibl discloses a web server that posts information for subscribers to a website that it
hosts (Requester's Comments, claim chart BCC, page 36, Arg 4). It would have been obvious to
25        combine the teachings of Zawilinski with Bibl for the same reasons and motivation discussed in
the rejection of claim 37 above which are incorporated herein by reference.

Claims 43, 44, 148, and 149

           Claims 43, 44, 148, and 149 recite a sensor on which the first subject sits (claims 43,148)

Application/Control Number: 95/002,337                                   Page 29
Art Unit: 3992

or stands (claims 44,149). Zawilinski does not disclose these limitations. Bibl discloses that data

may be captured from a weight scale (stand) or stationary bike (sit). (Requester's Comments,

claim chart BCC, page 36, Arg 5). It would have been obvious to combine the teachings of

Zawilinski with Bibl for the same reasons and motivation discussed in the rejection of claim 37

5    above which are incorporated herein by reference.


Claims 45, 46, 114, 150, 151, and 212

        Claims 45, 46, 114, 150, 151, and 212 recite a sensor which the first subject wears (45,

114,150,149) or carries (46,151). Zawilinski does not disclose these limitations. Bibl discloses a

10   device that may be worn on the breast or wrist, or secured to a user's belt or waist band. Bibl also

disclose the device may be held (i.e., carried) (Requester's Comments, claim chart BCC, page

35, Arg 6). It would have been obvious to combine the teachings of Zawilinski with Bibl for the

same reasons and motivation discussed in the rejection of claim 37 above which are incorporated

herein by reference.

15

Claims 48, 153, 154 and 225

        Claims 48, 153. 154 and 225 recite storing the first and second data in memory (claims

48, 153,  154, 225) and storing information regarding first and second subjects in memory

(claims 48, 154). Zawilinski does not disclose these limitations. Bibl discloses a computer

20   system with RAM and ROM memory and software that stores and analyzes personal data in

memory. In addition, account information (e.g., passwords) regarding the subjects is stored.

(Requester's Comments, claim chart BCC, page 35, Arg 7). It would have been obvious to

combine the teachings of Zawilinski with Bibl for the same reasons and motivation discussed in

the rejection of claim 37 above which are incorporated herein by reference.

25

Claims 49 and 155

        Claims 49 and 155 recite a sensor database accessible to the server. Zawilinski does not

disclose these limitations. Bibl discloses that personal data (including sensor info), account

information, and feedback information may be stored in a database. (Requester's Comments,

Application/Control Number: 95/002,337                                          Page 30
Art Unit: 3992

claim chart BCC, page 35, Arg 8). It would have been obvious to combine the teachings of
Zawilinski with Bibl for the same reasons and motivation discussed in the rejection of claim 37
above which are incorporated herein by reference.

5    Claims 50-52 and 156-158

          Claims 50-52 and 156-158 recite sensor identifier, sensor description, and sensor
output/format fields of the sensor database. Zawilinski does not disclose these limitations. Bibl
discloses a sensor database. (Bibl, paragraphs 41, 57 and 58). It would have been obvious to a
person of ordinal skill in the art that, in order to properly track the information received from the
10   various sensors, the sensor database would include various fields, including a sensor identifier
field, format fields since different sensors provide different data (e.g., GPS position, heart rate,
motion, etc.), and descriptions of the sensors. (Requester's Comments, claim chart BCC, page
37, Arg 9).

15   Claims 53-56 and 159-162

          Claims 53-56 and 159-162 recite an output database accessible to the server, the output
database including information for identifying subjects, descriptive information about the
subjects and information associating subjects with sensors. Zawilinski does not disclose these
limitations. Bibl discloses an output database. (Bibl, paragraphs 41, 57 and 58). It would have
20   been obvious to a person of ordinary skill in the art that, in order to properly track the
information received from the various sensors for the various users, the output database would
include information for identifying subjects, descriptive information about the subjects, and
information associating subjects with sensors. (Requester's Comments, claim chart BCC, page
37, Arg 10).

25

Claims 57-61 and 163-167

          Claims 57-61 and 163-167 recite an evaluation database accessible to the server, the
evaluation database including an evaluation identifier, description, sensors associated with the
evaluation, and information that associates the evaluation with the device to which the

Application/Control Number: 95/002,337                                        Page 31
Art Unit: 3992

notification is provided. Zawilinski does not disclose these limitations. Bibl discloses an

evaluation/feedback database. (Bibl, paragraphs 41, 57 and 58). it would have been obvious to a

person of ordinary skill in the art, in a feedback database that collects various sensor information

(e.g., GPS position, heart rate, motion, etc.) from various subjects (i.e., from numerous PSA

5   users), to have an identifier, a description field, and association fields of which sensors are

evaluated. It would also have been obvious to a person of ordinary skill in the art to have a field

identifying the device to which a notification is provided since a notification can be provided to

different devices or different ways. (Requester's Comments, claim chart BCC, page 37, Arg 11).


10   Claims 62-68 and 168-174

Claims 62-68 and 168-174 recite the device that receives the notification is a server,

computer, cell phone, flash memory, display screen with a visual display, touch screen, and

includes a keyboard and mouse. Zawilinski does not disclose these limitations. Bibl discloses

that the server communicates with clients that include a computer system, a network computer

15   (server). a laptop, a palmtop computing device (touchscreen), a digital TV (visual display), a

conventional computer with a mouse (keyboard is inherently part of conventional computer

system), cellular service (cell phone), computer system which includes EEPROM (flash

memory). (Requester's Comments, claim chart BCC, page 37, Arg 12).


20   Claims 69-72 and 175-178

Claims 69-72 and 175-178 recite that output is provided to one or more additional

devices, which may include two cell phones, more than one type of device, or a cell phone and a

computer. Zawilinski does not disclose these limitations. Bibl discloses that output is provided to

a various number of clients, which may include different devices, including a cell phone and a

25   computer (Requester's Comments, claim chart BCC, page 38, Arg 13).


Claims 75-80, 83, 181-186, and 189

Claims 75-80, 83, 181-186, and 189 recite that the notification includes an electronic

signal, a wireless. HTTP. HTML. or XML transmission, or includes visually perceptible

Application/Control Number: 95/002,337                                        Page 32
Art Unit: 3992

information or audible information. Zawilinski does not disclose these limitations. Bibl discloses

that HTTP arid HTML transmissions (electronic signals) may be used to provide clients with

video, audio, or tactile data. Bibl discloses that clients may access a server via a two-way

Internet connection; that data may be transmitted wirelessly; that a personal capture device may

5    be configured over the network (which may be wireless); and that a client may receive digital

audio feedback. Bibl discloses the use of database communications for the communication of

various data (e.g., from different sensors) for which it would have been obvious to one skilled in

the art to use XML. (Requester's Comments, claim chart BCC, page 38, Arg 14).


10    Claims 81-82, 187 and 188

Claims 81, 82, 187, and 188 recite that the audible information includes a voice message

or a telephone call. Zawilinski does not disclose these limitations. Bibl discloses that a personal

trainer or software may place a voice message for the user in a master computer, and that the

notification includes a telephone call to provide audible information. (Requester's Comments,

15    claim chart BCC, page 38, Arg 15).


Claims 84-87

Claims 84-87 recite that the notification includes a summary, table, comparison, or graph

of some/all of the first and second data. Zawilinski does not disclose these limitations. Bibl

20    discloses personal data may be presented in numerous forms including graphs, tables, charts, and

comparisons with data of other subscribers. Tables, graphs, charts, and comparisons are all

summaries of data. (Requester's Comments, claim chart BCC, page 39, Arg 16).


Claims 93, 94, 195 and 196

25    Claims 93, 94, 195 and 196 recite first and second data are indicative of the same or

different physical characteristics. Bibl discloses various physical characteristics that may be

measured (e.g., blood pressure, weight, glucose) for various subjects. (Requester's Comments,

claim chart BCC, page 39, Arg 21).

Application/Control Number: 95/002,337                                    Page 33
Art Unit: 3992

Claim 95

Claim 95 recites receiving data simultaneously from the subjects. Bibl discloses different users may have their own PSA, each of which may individually transmit data to the sensor. (Requester's Comments, claim chart BCC, page 39, Arg 22).

5

Claims 96, 97, 198 and 199

Claims 96, 97, 198, and 199 recite a processor determining one or more options to said first subject, and providing notification of the option(s) to a device. Zawilinski discloses these limitations. Bib discloses providing a user with options to add new feature, and notifying the user

10    of the options, (Requester's Comments, claim chart BCC, page 39, Arg 23)

Claims 98, 99, 200, and 201

Claims 98, 99, 200 and 201 recite said processor determines and provides notification that a first subject is in need of a break. Bibl discloses personal capture device (e.g., beeper) is

15    configured with information for determining when a user needs a break (e.g., high heartbeat), and provides notification (e.g., beep/digital recording) informing user of such. (Requester's Comments, claim chart BCC, page 39, Arg 24).

Claims 100-102

20    Claims 100-102 recite aggregating or averaging, collecting and preparing for later use, or determining a pattern in first and second data. Zawilinski discloses determining an average, median, and other statistical measurements. Bibl discloses progressive charts (pattern) in the data. Data is collected and prepared (e.g. averaged) for later use, as an amount of time between the collecting, preparing and use (display) is "later." (Requester's Comments, claim chart BCC,

25    page 40, Arg 25).

Claims 103 and 202

Claims 103 and 202 recite that the first and second devices are sensors, and that the processor receive first and second data directly from first and second sensors. Bibl discloses

Application/Control Number: 95/002,337                                        Page 34
Art Unit: 3992

data may be transmitted directly from personal capture device to server 160 using a wireless
transmitter. Personal capture device is a sensor (e.g. may include a motion sensor). (Requester's
Comments, claim chart BCC, page 40, Arg 26).

5      Claims 104, 126, and 203

Claims 104, 126, and 203 recite sensors that provide data to devices, and a processor that
receives data from the devices over the Internet and through a communication port. Bibl
discloses a cradle which may be used to connect a personal data capture device so that data may
be uploaded over the Internet through a communication port. (Requester's Comments, claim
10    chart BCC, page 40, Arg 27).

Claims 105, 106, 127 and 204

Claims 105, 106, 127 and 204 recite providing a notification to the first and second user
devices over the Internet. Bibl discloses the cradle may have a direct two-way connection to the
15    Internet. The two-way connection may be used to both provide data from the device to the
server, and receive/access data/notifications from the server. Bibl also discloses that cradle
connected to the client (device) communications with the server over the Internet. (Requester's
Comments, claim chart BCC, page 40, Arg 28).

20    Claims 107-112, 128-130 and 205-210

Claims 107-112, 128- 130, and 205-210 recite the first device being a cell phone,
portable computer, display screen with a visual display, touch screen, or include a flash memory.
The claims also recite that the first device may include a microphone or speakers. Bibl describes
that the client may be a fully loaded computer that includes a video, camera, speakers, sound
25    card, and many other conventional options. Bibl also discloses an interactive voice response
computer, which requires use of a microphone to respond to voice commands. (Requester's
Comments, claim chart BCC, page 40, Arg 29).

Application/Control Number: 95/002,337                                            Page 35
Art Unit: 3992

Claims 115-117, 133-136, and 213-216

     Claims 115-117, 133-136, and 213-216 recite a third sensor that obtains data of a second physical characteristic of said second subject, the sensors including a heart rate, acceleration, motion or heat sensors. Bibl discloses a heart rate sensor, GPS, weight, blood pressure, glucose, exercise data, and a motion sensor. Velocity and acceleration can be measured by a GPS device. (Requester's Comments, claim chart BCC, page 40, Arg 31).

Claims 119, 137 and 217

     Claims 119, 137 and 217 recite a fourth sensor to obtain data of a third physical characteristic of said second subject. Bibl discloses a plurality of sensors. (Requester's Comments, claim chart BCC, page 40, Arg 32).

Claims 121,139 and 219

     Claims 121, 139 and 219 recite that a first sensor transmits data to a first device over a wired communication link. Bibl discloses that a personal capture data device may be placed in a cradle, thus transferring data over a direct (e.g., not wireless) link. Bibl also discloses the personal capture device which may be placed in a cradle, is connected to a computer. (Requester's Comments, claim chart BCC, page 40, Arg 33).

Claims 122, 141 and 220:

     Claims 122, 140 and 220 recite first sensor transmits data to first user device over a wireless communication link. Bibl discloses that personal capture data device may itself be a user device and wirelessly transmit data it receives from sensors to a server. Personal capture data device may receive wireless signals from a sensor (heart rate transmitter). Bibl also discloses the personal capture device which may be placed in a cradle, is connected to a computer. (Requester's Comments, claim chart BCC, page 40, Arg 34).

Claims 125 and 226:

Application/Control Number: 95/002,337                                          Page 36

Art Unit: 3992

Claims 125 and 226 recite first and second user devices can access data stored in memory of the server. Bibl discloses that a cradle is connected to a client and that the client can access data on the server using two-way communication. (Requester's Comments, claim chart BCC, page 40, Arg 35).

5

Claims 131 and 132:

Claims 131 and 132 recite that the first sensor and first user device are or are not operative to be in constant communication. Bibl discloses not constant communication when the personal capture device acts a sensor (e.g., motion sensor) a cradle is used to transmit data from

10   the personal capture device to the computer. Bibl also discloses that personal data capture device includes a GPS signal receiver or motion sensor, which as part of the personal data capture device would be in constant communication with the personal data capture device. (Requester's Comments, claim chart BCC, page 40, Arg 36).

15   Claim 143:

Claim 143 recites a receiving station that receives data from a first sensor over a wireless communications link and forwards said data to said first user device. Bibl discloses that personal data capture device (receiving station) may receive wireless signals from a (heart) sensor. Personal capture device then forwards information to computer when placed in cradle.

20   (Requester's Comments, claim chart BCC, page 40, Arg 37).

Claims 145 and 146:

Claims 145 and 146 recite user devices can access data stored in database or memory of a server. Bibl discloses that data may reside either directly on web server or on a separate

25   computer accessible to web server, in a repository (memory) or a database, and that there may exist a two-way communication link. Bibl discloses that a cradle is connected to a client, and that a client can access data on the server, in memory or database, using two-way communication. (Requester's Comments, claim chart BCC, page 40, Arg 38).

Application/Control Number: 95/002,337                                           Page 37

Art Unit: 3992

Claim 223:

Claim 223 recites collecting first data a first sensor, sending first, data from the first sensor to a local receiving station over a wireless link, and transmitting data from the receiving station to a user device that can communicate the data to the server. Bibl discloses that a personal
5   data capture device may both be a sensor and receive wireless data from another sensor. Bibl discloses that the personal data capture device may transmit data directly to the server, or may be placed in a cradle (receiving station), connected to a client (user device) and then transmit data to a server. (Requester's Comments, claim chart BCC, page 41, Arg 39)

10  Claims 227 and 228:

Claims 227 and 228 recite that the server is a web server hosting a website and notification regarding the evaluation is posted to the website. Bibl discloses that the server is a web server and may post notifications to the website it hosts. Claims 227 and 228 further recite that the system includes a heart rate monitor worn by the subject. Bibl discloses that the sensor
15  may be worn by the subject, and may include a heart rate monitor. Claims 227 and 228 further recite that the system includes a local portable computer with a visual display that receives data over a radio wireless communication link from the heart rate monitor, and transmits the data to a server over the interact. Bibl discloses that the personal data capture device is a local portable computer (with processor, memory, software, and electronics). Bibl discloses that personal data
20  capture devices can include a visual display for reading data. Bibl discloses that the data may be transmitted wirelessly to the server from the personal data capture device using the Internet. (Requester's Comments, claim chart BCC, page 37, Arg 12 and page 41, Arg 40)

Claims 113 and 211:

25  Claims 113 and 211 recite that the first user device is operative to communicate first data directly to the second user device. Bibl discloses that a first user device (personal capture device) is operative to communicate first data directly to a second user device (cradle). A first personal data capture device may receive information from a sensor (e.g., a wireless heart monitor) and may communicate the data wirelessly over the internet to a server. The first user

Application/Control Number: 95/002,337                                         Page 38

Art Unit: 3992

device may include a touchscreen device, and may receive notifications from the server. Bibl

discloses that a second personal capture device may include or be a sensor (e.g., motion sensor),

and that the sensor transmits data to a second user device (cradle) that communicates the data

over the Internet to a server. It would have been an obvious design choice to include the

5    capability of being able to transmit the data both wirelessly and via the cradle using the first

personal data capture device. As such, the first personal data capture device would be operative

to transmit the first data to the second user device (cradle). (Requester's Comments, claim chart

BCC, page 37, Arg 12 and page 41, Arg 41).


10   Claim 74 and 180:

Claims 74 and 184 recite the notification including an instant message communication is

provided to a device. Bibl discloses that feedback information is posted on a web site.

(Requester's Comments, claim chart BCC, page 41, Arg 42). A person of ordinary skill in the art

would recognize that such content can also be communicated using push technology such as

15   instant messaging. Such messaging would have been obvious to a person of ordinary skill in the

relevant art.


Claims 47 and 152:

Claims 47 and 152 recite using an internal clock element that maintains a time and date

20   for the server. Bibl teaches that personal data stored in memory of the personal data capture

device includes a timestamp, which may be stored in a database. (Requester's Comments, claim

chart BCC, page 41, Arg 43). Thus, it would have been obvious to a person of ordinary skill in

the at the time of filing for a server to use an internal clock element that maintains a time and

date for a server.


25

Claims 123, 124, 141, 142, 144, 221, and 224:

Claims 123, 124, 141, 142, 144, 221 and 224 recite using either radio wireless

Application/Control Number: 95/002,337                                    Page 39
Art Unit: 3992

transmissions or Bluetooth. transmissions. Bibl teaches using wireless transmissions, It would
have been obvious to a personal of ordinary skill in the art that radio wireless or Bluetooth,
transmissions could be used. (Requester's Comments, claim chart BCC, page 42, Arg 44).

5      **Proposed Rejection 7: Zawilinski, Papadopoulos and Bibl references**

Claims 17-20, 31-35, 40, 88-92, 96, 97, 190-194, 197, 199 are rejected under 35 U.S.C.
103(a) as being obvious over Zawilinski in view of Papadopoulos and further in view of Bibl.
This rejection is proposed by the requester in the Comments and is adopted.

10     Claims 17 and 19:

For the limitations recited in the patent claims 17 and 19 wherein claim 1 is the parent of
these claims, these limitations have been discussed in claim chart CC3 provided by the requester
in the Requester for Reexamination which is incorporated herein by reference.

Regarding the amended limitations of claims 17 and 19 which recite the feature of
15     determining a course of action by a server, these limitations are not taught in Zawilinski and
Papadopoulos. Bibl discloses performing the determining by a server (Requester's Comments,
claim chart BCC, page 39, Arg 17). It would have been obvious to combine the teachings of
Zawilinski and Papadopoulos with Bibl as both are from the same field of detecting
physiological reactions of a subject in response to stimuli. One skilled in the art would have been
20     motivated to combine the teachings of Zawilinski, Papadopoulos and Bibl to automate the
monitoring of subjects by using a processor and to take advantage of the network, network server
and World Wide Web taught by Bibl. Further both encompass elements well known in the art
that could be combined to produce a predictable result.

25     Claims 18 and 20:

For the limitations recited in the patent claims 18 and 20 wherein claims 1, 18 and 19 are
the parents of these claims, these limitations have been discussed in claim chart CC3 provided by
the requester in the Requester for Reexamination which is incorporated herein by reference.

**Appx601**

Application/Control Number: 95/002,337                                    Page 40
Art Unit: 3992

      Regarding the amended limitations of claims 18 and 20 which recite the feature of
providing a notification based on a course of action over the Internet by a server, these
limitations are not taught in Zawilinski and Papadopoulos. Bibl discloses providing a notification
to a device by a processor/server over the Internet (through a website) (Requester's Comments,
5    claim chart BCC, page 39, Arg 18). It would have been obvious to combine the teachings of
Zawilinski and Papadopoulos with Bibl for the same reasons and motivation discussed in the
rejection of claims 17 and 19 above which are incorporated herein by reference.


Claim 31:

10      For the unamended limitations of claim 31, these limitations are disclosed by Zawilinski
and Papadopoulos as discussed in claim chart CC3 provided by the requester in the Requester for
Reexamination which is incorporated herein by reference.

      Regarding the amended limitations of claim 31 which recite a remote server and
receiving data from a plurality of local sensors over the Internet, these limitations are not taught
15    in Zawilinski and Papadopoulos. Bibl discloses a remote server (Requester's Comments, claim
chart BCC, page 35, Arg 1), and receiving data from a plurality of local sensors over the Internet
(Requester's Comments, claim chart BCC, page 35, Arg 2). It would have been obvious to
combine the teachings of Zawilinski and Papadopoulos with Bibl for the same reasons and
motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by
20    reference.


Claim 32:

      Claim 32 depends from claim 31, the rejection of this claim includes the rejection of
claim 31 discussed above and the rejection of claim 32 discussed in claim chart CC3 which is
25    incorporated herein by reference.


Claim 33:

      The amended limitations of claim 33 recite the feature employing a remote server to
determine a desired action. The combination of Zawilinski and Papadopoulos teaches

determining a desire action (claim chart CC3) but does not disclose employing a server. Bibl
discloses employing a server to determine a desired action. (Requester's Comments, claim chart
BCC, page 39, Arg 17). It would have been obvious to combine the teachings of Zawilinski,
Papadopoulos with Bibl for the same reasons and motivation discussed in the rejection of claims
5    17 and 19 above which are incorporated herein by reference.


Claims 34 and 35:

        Claims 34 and 35, each depends from claim 31, the rejection of this claim includes the
rejection of claim 31 discussed above and the rejection of claims 34 and 35 discussed in claim
10   chart CC3 which is incorporated herein by reference.


Claim 40:

        Claim 40 depends from claim 39, the rejection of this claim includes the rejection of
claim 39 discussed above and the rejection of claim 40 discussed in claim chart CC3 which is
15   incorporated herein by reference.


Claims 88 and 190

        Claims 88 and 190 recite that said processor/server determines a course of action based
on said first and second data. The combination of Zawilinski and Papadopoulos discloses
20   determining a course action based on first and second data, which is not disputed by the patent
owner. Bibl discloses a computer determining a course of action (e.g., exercise regimen), and
that personal data may be analyzed by a software program (running on a processor) to create
feedback information (including determining a course of action). (Requester's Comments, claim
chart BCC, page 39, Arg 17).

25

Claims 89 and 191

        Claims 89 and 191 recite said processor/server providing notification of said course of
action to said device. The combination of Zawilinski and Papadopoulos discloses determining a
course action based on first and second data, which is not disputed by the patent owner. Bibl

Application/Control Number: 95/002,337                                          Page 42
Art Unit: 3992

discloses providing a notification to a device by a processor/server. (Requester's Comments,
claim chart BCC, page 39, Arg 17 and Arg 18).


Claims 90 and 192

5        Claims 90 and 192 recite that said processor/server determines desired action for first and
second subjects.  The combination of Zawilinski and Papadopoulos discloses determining a
desired course of action based on first and second data, which is not disputed by the patent
owner. Bibl discloses that personal data may be analyzed by a software program (running on a
processor) to create feedback information (including determining a course of action).
10      (Requester's Comments, claim chart BCC, page 39, Arg 19).


Claims 91, 92, 193, and 194

         Claims 91, 92, 193, and 194 recite said process/server determining a course of action
based on said desired action, and wherein the course of action is selected to improve the chances
15      the subjects will perform the desired action. The combination of Zawilinski and Papadopoulos
discloses determining course of action based on a desired action, wherein the course of action is
selected to improve the chances the subjects will perform the desired action, which is not
disputed by the patent owner Bibl discloses that personal data may be analyzed by a software
program (running on a processor) to create feedback information (including determining a course
20      of action). (Requester's Comments, claim chart BCC, page 39, Arg 20).


Claims 96, 97 and 199

         Claims 96, 97 and 199 recite a processor determining one or more options to said
first subject, and providing notification of the option(s) to a device. The combination of
25      Zawilinski and Papadopoulos discloses these limitations. Bib discloses providing a user with
options to add new feature, and notifying the user of the options, (Requester's Comments, claim
chart BCC, page 39, Arg 23)

Claim 197:

Claim 197 recites receiving data simultaneously from the subjects. Bibl discloses different users may have their own PSA, each of which may individually transmit data to the sensor. (Requester's Comments, claim chart BCC, page 39, Arg 22).

5

**Proposed Rejection 8:  Patton and Teller references**

Claims 17-20, 31-35, 37-42, 45-147 and 150-228 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Teller. This rejection is proposed by the requester in the
10    Comments and is adopted.

Claims 17 and 19:

The amended limitations of claims 17 arid 19 recite the feature of determining a course of action by a server. Patton teaches determining a course of action (Request for Reexamination,
15    Claim chart CC1). Teller discloses performing the determining by a server. (Requester's Comments, claim chart TCC, page 44, Arg 15). It would have been obvious to combine the teachings of Patton with Teller to have the server determine the course of action. One skilled in the art would have been motivated to combine the teachings of Patton with Teller to automate the monitoring of subjects by using a processor and to take advantage of the internet, server and web
20    site features taught by Teller. Further both encompass elements well known in the art that could be combined to produce a predictable result.

Claims 18 and 20:

The amended limitations of claims 18 and 20 recite the feature of providing a notification
25    based on a course of action over the Interact by a server. Patton teaches providing a notification (Request, claim chart CC1). Bibl discloses providing a notification to a device by a processor/ server over the internet (through a website). (Requester's Comments, claim chart TCC, page 44, Arg 15). It would have been obvious to combine the teachings of Patton with Teller for the reasons provided above, to have the server provide the notification over the internet.

Application/Control Number: 95/002,337                                              Page 44
Art Unit: 3992

Claim 31:

      The unamended limitations of claim 31 are disclosed by Patton as provided in the
Request (Request for Reexamination, claim chart CC1).

5          As to the amended limitations of claim 31 which recite a remote server and receiving data
from a plurality of local sensors over the Internet. Teller discloses a remote server (Requester's
Comments, claim chart TCC, page 42, Arg 1), and receiving data from a plurality of local
sensors over the Internet (Requester's Comments, claim chart TCC, page 42, Arg 2). It would
have been obvious to combine the teachings of Patton with Teller for the reasons and motivation

10     discussed in claim 17 above.

Claim 32:

      Claim 32 depends from claim 31, the rejection of this claim includes the rejection of
claim 31 discussed above and the rejection of claim 32 discussed in claim chart CC1 which is

15     incorporated herein by reference.

Claim 33:

      The amended limitations of claim 33 recite the feature employing a remote server to
determine a desired action. Patton teaches determining a desired course of action (Request, claim

20     chart CC1. Teller discloses employing a server to determine a desired action. (Requester's
Comments, claim chart TCC, page 44, Arg 15). It would have been obvious to combine the
teachings of Patton with Teller for the same reasons and motivation provided above regarding
claim 17.

25     Claims 34 and 35:

      Claims 34 and 35, each depends from claim 31, the rejection of this claim includes the
rejection of claim 31 discussed above and the rejection of claims 34 and 35 discussed in claim
chart CC1 which is incorporated herein by reference.

Application/Control Number: 95/002,337                                    Page 45

Art Unit: 3992

Claim 37:

The unamended limitations of claim 37 are disclosed by Patton as provided in the
Request (Request for Reexamination, claim chart CC1).

As to the amended limitations of claim 37, Teller discloses a remote server including a
5    communication port operative to receive data over the Internet that stores data in memory
(Requester's Comments, claim chart TCC, page 42, Arg 1). Teller also discloses receiving sensor
data over electronic communication or an electronic network including the Internet (Requester's
Comments, claim chart TCC, page 42, Arg 2). Determining an evaluation is disclosed by the
Patton as provided in the Request. Providing a notification to a device is disclosed by Teller
10   (Requester's Comments, claim chart TCC, page 42, Arg 3). It would have been obvious to
combine the teachings of Patton with Teller for the reasons and motivation discussed in claim 17
above.

Claim 38:

15   The unamended limitations of claim 38 are disclosed by Patton as provided in the
Request (Request for Reexamination, claim chart CC1).

As to the amended limitations of claim 38, Teller discloses a remote server (Requester's
Comments, claim chart TCC, page 42, Arg 1), receiving data from a plurality of local sensors
over the Internet (Requester's Comments, claim chart TCC, page 42, Arg 2) and employing the
20   server to send the evaluation (Requester's Comments, claim chart TCC, page 42, Arg 3). It
would have been obvious to combine the teachings of Patton with Teller for the reasons and
motivation discussed in claim 17 above.

Claim 39:

25   The unamended limitations of claim 39 are disclosed by Patton as provided in the
Request (Request for Reexamination, claim chart CC1).

As to the amended limitations of claim 39, Teller discloses a remote server (Requester's
Comments, claim chart TCC, page 42, Arg 1), receiving physical characteristic data from first
and second devices (Requester's Comments, claim chart TCC, page 42, Arg 2). It would have

Application/Control Number: 95/002,337                                    Page 46

Art Unit: 3992

been obvious to combine the teachings of Patton with Teller for the reasons and motivation

discussed in claim 17 above.

Claims 40 and 41:

5          Claims 40 and 41, each depends from claim 39, the rejection of these claims include the

rejection of claim 39 discussed above and the rejection of claims 40 and 41 discussed in claim

chart CC1 which is incorporated herein by reference.

Claims 42 and 147:

10          Claims 42 and 147 recite a web server that hosts a web site which are not disclosed by

Patton. Teller discloses that the central monitoring unit maintains/hosts a website (Requester's

Comments, claim chart TCC, page 42, Arg 4). It would have been obvious to combine the

teachings of Patton with Teller for the same reasons and motivation discussed in the rejection of

claim 17 above which are incorporated herein by reference.

15

Claims 45, 114, 150, and 212

          Claims 45, 114, 150, and 212 recite a sensor which the first subject wears. Teller

discloses a device that may be worn on the arm. (Requester's Comments, claim chart TCC, page

42, Arg 5).

20

Claims 46 and 151

          Claims 46, and 151 recite a sensor which the first subject carries. Teller discloses a

device that may be worn on the arm, when a device is worn, it is inherently carried. (Requester's

Comments, claim chart TCC, page 42, Arg 6).

25

Claims 48, 153, 154, and 225

          Claims 48, 153, 154, and 225 recite storing the first and second data in memory (48, 153,

154, 225) and storing information regarding first and second subjects in memory (48, 154).

Teller discloses storing the sensor information in a database (memory). Information regarding

Application/Control Number: 95/002,337                                    Page 47

Art Unit: 3992

the subjects (life activities) is stored at the server as well. (Requester's Comments, claim chart
TCC, page 42, Arg 7).

Claims 49 and 155

Claims 49 and 155 recite a sensor database accessible to the server. Teller discloses
storing the sensor information in a database (memory). (Requester's Comments, claim chart
TCC, page 42, Arg 7).

Claims 50-52 and 156-158

Claims 50-52 and 156-158 recite an identifier, description, and outputs format fields of
the sensor database. Teller discloses a sensor database. (Requester's Comments, claim chart
TCC, page 42, Arg 7). It would have been obvious to a person of ordinary skill in the art that, in
order to properly track the information received from the various sensors, the sensor database
would include various fields, including a sensor identifier field, format fields since different
sensors provide different data (e.g., heart rate, temperature, motion), and descriptions of the
sensors. (Requester's Comments, claim chart TCC, page 42, Arg 8).

Claims 53-56 and 159-162

Claims 53-56 and 159-162 recite an output database accessible to the server, the output
database including information for identifying subjects, descriptive information about the
subjects, and information associating subjects with sensors. Teller discloses an output database.
(Requester's Comments, claim chart TCC, page 42, Arg 7). It would have been obvious to a
person of ordinary skill in the art that, in order to properly track the information received from
the various sensors for the various users, the output database would include information for
identifying subjects, descriptive information about the subjects, and information associating
subjects with sensors. (Requester's Comments, claim chart TCC, page 42, Arg 8).

Claims 57-61 and 163-167

Application/Control Number: 95/002,337                                    Page 48
Art Unit: 3992

Claims 57-61 and 163-167 recite an evaluation database accessible to the server, the
evaluation database including identifier, description, sensors associated with the evaluation, and
output device fields. Teller discloses an evaluation/feedback database. (Requester's Comments,
claim chart TCC, page 42, Arg 7). it would have been obvious to a person of ordinary skill in the
art to have, in a feedback database that collects various sensor information (e.g., heart rate.
temperature, motion) from various subjects (from numerous users) identifier, description, and
association fields of which sensors are evaluated. It would also have been obvious to a person of
ordinary skill in the art to have a field identifying the device to which a notification is provided
since notification can be provided to many different devices or different methods of providing
notification (e.g., e-mail/website). (Requester's Comments, claim chart TCC, page 42, Arg 8).

Claims 62-68 and 168-174
        Claims 62-68 and 168-t 74 recite that the device that receives the notification is a server,
computer, cell phone, flash memory, display screen with a visual display, touch screen, and
includes a keyboard and mouse. Teller discloses that feedback may be provided to sensor device.
including a visual display. Sensor device includes a flash memory to which notification may be
provided. Teller further discloses that a notification may be received at a computer/server, cell
phone, or PDA. It is inherent that a computer has a keyboard and a mouse. Teller discloses the
Palm VII PDA which employed a touchscreen. (Requester's Comments, claim chart TCC, page
43, Arg 9).

Claims 69-72 and 175-178
        Claims 69-72 and 175-178 recite that output is provided to one or more additional
devices, which may include two cell phones, more than one type of device, or a cell phone and a
computer. Teller discloses that output is provided to various types of clients. See discussion of
claims 62-68 and 168-174 above. A person skilled in the relevant art would understand that,
according to the Teller ,different users could receive notification over different devices. The
different devices may include a cell phone and a computer (Requester's Comments, claim chart
TCC, page 43, Arg 10).

Application/Control Number: 95/002,337                                    Page 49
Art Unit: 3992

Claims 73, 74, 179, and 180

     Claims 73, 74, 179, and 180 recite that a notification includes an e-mail message or an instant message. Teller discloses that the central monitoring unit can send notifications as e-mail messages or two-way pager. (Requester's Comments, claim chart TCC, page 43, Arg 11 and page 46 , Arg 34), It would have been obvious to a person of ordinary skill in the art to use a push notification or instant message rather than email or two- way pager,

Claims 75-80, 83, 181-186, and 189

     Claims 75-78, 80, 83, 181-184, 186 and 189 recite that the notification includes an electronic signal, a wireless, HTTP or HTML transmission or includes visually perceptible information or audible information. Teller discloses that output is provided over the world wide web (HTTP transmissions are inherently used on the world wide web), files may be HTML both of which are electronic signals. Teller further discloses feedback may be visual or audio/acoustic. Teller discloses wireless communications between the device and the server. Teller discloses the use of database communications for the communication of various data for which it would have been obvious to one skilled in the art to use XML. (Requester's Comments, claim chart TCC, page 43, Arg 12).

Claims 81, 82, 187, and 188

     Claims 81, 82, 187, and 188 recite that the audible information includes a voice message, or a telephone call. Teller discloses that the server can place a telephone call, and that notification questions (via voice messages) may be posed to the user. (Requester's Comments, claim chart TCC, page 43, Arg 13).

Claims 84-87

     Claims 84-87 recite the notification includes a summary, table, comparison, or graph of some/all of the first and second data. Teller discloses that some/all of the data may be presented in graphs, or charts, Graphs and charts are summaries of data. Figs 5 and 10 of Teller show data

Application/Control Number: 95/002,337                                          Page 50

Art Unit: 3992

presented in tabular format. (Requester's Comments, claim chart TCC, page 43, Arg 14).

Claims 88 and 190

Claims 88 and 190 recite said processor/server determines a course of action based on
said first and second data. Patton, as provided in the Request discloses determining a course
action based on first and second data, which is not disputed by the patent owner. Teller discloses
determining a course of action based on the data input and data from sensors to determine a
course of action with regard to nutrition and provides a suggested healthy daily routine.
(Requester's Comments, claim chart TCC, page 44, Arg 15).

Claims 89 and 191

Claims 89 and 191 recite said processor/server providing notification of said course of
action to said device. Patton, as provided in the Request, discloses determining a course action
based on first and second data, which is not disputed by the patent owner. Teller discloses
providing a notification (via a webpage) to a device by a processor/server. (Requester's
Comments, claim chart TCC, page 44, Arg 15).

Claims 90 and 192

Claims 90 and 192 recite said processor/server determines a desired action for first and
second subjects. Patton, as provided in the Request, discloses determining a desired (course of)
action based on first and second data, which is not disputed by the patent owner. Teller discloses
that the desired action is determined to reach a healthy daily routine or to increase/improve sleep.
(Requester's Comments, claim chart TCC, page 44, Arg 16).

Claims 91, 92, 193, and 194

Claims 91, 92, 193. and 194 recite said processor/server determining a course of action
based on said desired action, and wherein the course of action is selected to improve the chances
the subjects will perform the desired action. Patton, as provided in the Request, discloses
determining course of action based on a desired action, wherein the course of action is selected

Application/Control Number: 95/002,337                                    Page 51
Art Unit: 3992

to improve the chances the subjects will perform the desired action, which is not disputed by the
patent owner. Teller discloses that suggestions to improve sleep (i.e., improve the chances
subjects will perform the action). (Requester's Comments, claim chart TCC, page 44, Arg 16).

5   Claims 93, 94, 195, and 196

         Claims 93, 94, 195, and 196 recite that first and second data are indicative of the same or
different physical characteristics. Teller discloses various physical characteristics that may be
measured (e.g., blood pressure, respiration, heat) by sensors for various subjects. It would have
been obvious that the same or different physical characteristics may be measured for the
10   subjects. (Requester's Comments, claim chart TCC, page 44, Arg 17).

     Claims 95 and 197

         Claims 95 and 197 recite receiving data simultaneously from the subjects. Teller
discloses that the system receives data and makes data available over the internet. It would have
15   been obvious to a person of ordinary skill in the relevant art that data may be received
simultaneously from users over the Internet. (Requester's Comments, claim chart TCC, page 44,
Arg 18)

     Claims 96, 97, 198, and 199

20   Claims 96, 97, 198, and 199 recite a processor determining one or more options to
provide to said first subject and providing notification of the option(s) to a device. Patton, as
provided in the Request, discloses these limitations. Teller discloses options, selectable
charts/graphs, provided to the user. (Requester's Comments, claim chart TCC, page 44, Arg 19),

25   Claims 98, 99, 200, and 201

         Claims 98, 99, 200, and 201 recite that said processor determines and provides
notification that a first subject is in need of a break. Teller discloses that when it is determined
that sleep level are low, it provides the user ways to improve or get more sleep (Requester's
Comments, claim chart TCC, page 44, Arg 20).

Application/Control Number: 95/002,337                                          Page 52
Art Unit: 3992

Claims 100-102

Claims 100-102 recite aggregating or averaging, collecting and preparing for later use, or determining a pattern in first and second data. Patton discloses determining an average, median, and other statistical measurements. Teller discloses collecting and manipulating (preparing) the data for later use. (Requester's Comments, claim chart TCC, page 44, Arg 21).

Claims 103 and 202

Claims 103 and 202 recite that the first and second devices are sensors and that the processor receive first and second data directly from first and second sensors. Teller discloses a kiosk (sensor) that may collect physiological data as a sensor and transmit data directly to the server, or that sensor may wirelessly transmit data. (Requester's Comments, claim chart TCC, page 44, Arg 22).

Claims 104, 126 and 203

Claims 104, 126, and 203 recite sensors that provide data to devices, and a processor that receives the data from the devices over the Internet and through a communication port. Teller discloses uploading data to a computer, then the computer transmits the data to the server over the internet. The communication port is inherent. (Requester's Comments, claim chart TCC, page 45, Arg 23).

Claims 105, 106, 127, and 204

Claims 105, 106. 127, and 204 recite providing a notification to the first and second user devices over the Internet. Teller discloses that a computer can be used to send data to the server over the Internet, and that feedback may be provided over the Internet to a webpage, which may be accessed by the same device. (Requester's Comments, claim chart TCC, page 45, Arg 24).

Claims 107-112, 128-130, and 205-210

Claims 107-112, 128-130. and 205-210 recite the first device being a cell phone, portable

Application/Control Number: 95/002,337                                    Page 53
Art Unit: 3992

computer, display screen with a visual display, touch screen, include a flash memory,
microphone , or speakers. See discussion of claims 62-68 and 168-174 above. Regarding a
microphone, or speakers, Teller discloses that the sensor (device) can sense sound level/quality.
It would have been obvious to a person of ordinary skill in the art that a microphone is used to
5    measure the sound level/quality. Teller also discloses that the user can receive acoustic feedback
for which speakers would have been obvious to a person of ordinary skill in the art. (Requester's
Comments, claim chart TCC, page 45, Arg 25).

Claims 115-118, 133-136, and 213-216:

10        Claims 115-118, 133-136, and 213-216 recite a third sensor that obtains data of a second
physical characteristic of said second subject, the sensors including a heart rate, acceleration,
motion, or heat sensors. Teller discloses a variety of sensors including a heart rate, acceleration,
motion and heat sensors. It would have been obvious to a person of ordinary skill in the art that
such sensors can be used in various combinations. (Requester's Comments, claim chart TCC,
15   page 45, Arg 26).

Claims 119, 120, 137,  138, 217 and 218:

        Claims 119, 120, 137, 217 and 218 recite that sensors include heart rate, motion, blood
pressure, acceleration, heat, and respiration sensors. Teller discloses sensors for heart rate,
20   acceleration, heat, and respiration. It would have been obvious to a person skill in the art that
such sensors can be used in various combinations. (Requester's Comments, claim chart TCC,
page 45, Arg 26).

Claims 121, 139, and 219:

25        Claims 121, 139, and 219 recite first sensor transmits data to first device over a wired
communication link. Teller discloses that data from a sensor device is transferred using a serial
connection/USB. (Requester's Comments, claim chart TCC, page 45, Arg 27).

Claims 122, 140, and 220:

Application/Control Number: 95/002,337                                                Page 54
Art Unit: 3992

Claims 122. 140, and 220 recite first sensor transmits data to first user device over a
wireless communication link. Teller discloses transfer by short-range wireless connection.
(Requester's Comments, claim chart TCC, page 45, Arg 28).

5       Claims 123, 124, 141,142, 144, 221, 222 and 224:
        Claims 123, 124, 141, 142, 144, 221, 222 and 224 recite that wireless communication is
radio wireless communication, including Bluetooth. Teller discloses RF (radio frequency)
transceivers, which may include Bluetooth technology that may be used to transmit and receive
notifications. (Requester's Comments, claim chart TCC, page 45, Arg 29).

10

        Claims 125 and 226:
        Claims 125 and 126 recite that first and second user devices can access data stored in
memory of the server. Teller discloses that a user can. access the website (data stored in the
memory of server), thus accessing the data delivered from the memory of the server.
15      (Requester's Comments, claim chart TCC, page 45, Arg 30).

        Claims 131 and 132:
        Claims 131 and 132 recite that the first sensor and first user device are or are not
operative to be in constant communication. Teller discloses communication (i.e., uploading of
20      data.) to a personal computer periodically or continuously. (Requester's Comments, claim chart
TCC, page 45, Arg 31)

        Claims 227 and 228:
        Claims 227 and 228 recite that the server is a web server hosting a website and
25      notification regarding the evaluation is posted to the web site. Teller discloses that the server is a
web server and may post notifications to the web site. Claims 227 and 228 further recite that the
system includes a heart rate monitor worn by the subject. Teller discloses that the sensor may be
worn by the subject, and may include a heart rate monitor. Claims 227 and 228 further recite that
the system includes a local portable computer with a visual display that receives data over a radio

Application/Control Number: 95/002,337                                              Page 55
Art Unit: 3992

wireless communication link from the heart rate monitor and transmits the data to a server over
the internet. Teller discloses that the personal data capture device is a local portable computer
(with processor). Teller discloses that the sensor device can include a visual display for receiving
feedback, and that data may be transmitted wirelessly to the server from the sensor device using
5   radio wireless communications. (Requester's Comments, claim chart TCC, page 45, Arg 32).

Claims 131 and 211:
        Claims 131 and 211 recite that the first user device is operative to communicate first data
directly to the second user device. Teller discloses that a first user device (sensor device) is
10   operative to communicate first data directly to a second user device (cradle). A first sensor
device may receive information from a sensor (e.g., a wireless heart monitor) and may
communicate the data wirelessly over the internet to a server. The first user device may include a
touchscreen device, and may receive notifications from the server. Feller discloses that a second
sensor device may include or be a sensor (e.g., GSR) and that the sensor transmits data to a
15   second user device (cradle) that communicates the data over the Internet to a server. It would
have been an obvious design choice to include the capability of being able to transmit the data
both wirelessly and via the cradle using the first personal data capture device. As such, the first
personal data capture device would be operative to transmit the first data to the second user
device (cradle). (Requester's Comments, claim chart TCC, page 46, Arg 33).

20

Claims 47 and 152:
        Claims 47 and 152 recite using an internal clock element that maintains a time and date
for the server, It would have been obvious at the time of the invention for a server to use an
internal clock element that maintains a time and date for a server. (Requester's Comments, claim
25   chart TCC, page 46, Arg 34).

Claims 145 and 146:
        Claims 145 and 146 recite that the first and second user devices are operative to access
data stored in a memory or database of the server. Teller teaches that personal data stored on a

Application/Control Number: 95/002,337                                             Page 56
Art Unit: 3992

sever memory or database may be accessed by clients. (Requester's Comments, claim chart
TCC, page 46, Arg 35).


Claims 143:

Claim 143 recite that a receiving station is operative to receive first data from a first
sensor over a wireless communication link and forward said first data to said first user device.
Teller teaches that data may be received by a cradle (receiving station), uploaded to a computer,
and then transmitted to the server. (Requester's Comments, claim chart TCC, page 46, Arg 36).


Claim 223:

Claim 223 recites that first data is collected at a first sensor, sent over a wireless link to a
local receiving station, and transmitted from the receiving station to a local device operative to
send the data to the server. Teller teaches that data may be received wirelessly from heart rate
monitor at sensor device, and that the data may be transferred to a cradle, and the cradle
transmits data to the server. (Requester's Comments, claim chart TCC, page 46, Arg 36).


**Proposed Rejection 9:  Zawilinski and Teller references**

Claims 37-39, 41, 42, 45-87, 93-95, 98-147, 150-189, 195, 196, 198 and 200-228 are
rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Teller. This
rejection is proposed by the requester in the Comments section and is adopted.


Claim 37:

The unamended limitations of claim 37 are disclosed by Zawilinski as provided in the
Request (Request for Reexamination, claim chart CC2).

As to the amended limitations of claim 37, Teller discloses a remote server including a
communication port operative to receive data over the Internet that stores data in memory
(Requester's Comments, claim chart TCC, page 42, Arg 1). Teller also discloses receiving sensor
data over electronic communication or an electronic network including the Internet (Requester's

Application/Control Number: 95/002,337                                      Page 57

Art Unit: 3992

Comments, claim chart TCC, page 42, Arg 2). Determining an evaluation is disclosed by the

Zawilinski as provided in the Request. Providing a notification to a device is disclosed by Teller

(Requester's Comments, claim chart TCC, page 42, Arg 3). It would have been obvious to

combine the teachings of Zawilinski with Teller.

5     One skilled in the art would have been motivated to combine the teachings of Zawilinski with

Teller to automate the monitoring of subjects by using a processor and to take advantage of the

internet, server and web site features taught by Teller. Further both encompass elements well

known in the art that could be combined to produce a predictable result.


10     Claim 38:

        The unamended limitations of claim 38 are disclosed by Zawilinski as provided in the

Request (Request for Reexamination, claim chart CC2).

        As to the amended limitations of claim 38, Teller discloses a remote server (Requester's

Comments, claim chart TCC, page 42, Arg 1), receiving data from a plurality of local sensors

15    over the Internet (Requester's Comments, claim chart TCC, page 42, Arg 2) and employing the

server to send the evaluation (Requester's Comments, claim chart TCC, page 42, Arg 3). It

would have been obvious to combine the teachings of Zawilinski with Teller for the reasons and

motivation discussed in claim 37 above.


20    Claim 39:

        The unamended limitations of claim 39 are disclosed by Zawilinski as provided in the

Request (Request for Reexamination, claim chart CC2).

        As to the amended limitations of claim 39, Teller discloses a remote server (Requester's

Comments, claim chart TCC, page 42, Arg 1), receiving physical characteristic data from first

25    and second devices (Requester's Comments, claim chart TCC, page 42, Arg 2). It would have

been obvious to combine the teachings of Zawilinski with Teller for the reasons and motivation

discussed in claim 37 above.


Claim 41:

Application/Control Number: 95/002,337                                      Page 58
Art Unit: 3992

Claim 41 depends from claim 39. The rejection of this claim includes the rejection of
claim 39 discussed above and the rejection of claim 41 discussed in claim chart CC2 which is
incorporated herein by reference.

5    Claims 42 and 147:

Claims 42 and 147 recite a web server that hosts a web site which are not disclosed by
Zawilinski. Teller discloses that the central monitoring unit maintains/hosts a website
(Requester's Comments, claim chart TCC, page 42, Arg 4). It would have been obvious to
combine the teachings of Zawilinski with Teller for the same reasons and motivation discussed
10   in the rejection of claim 37 above which are incorporated herein by reference.

Claims 45, 114, 150, and 212

Claims 45, 114, 150, and 212 recite a sensor which the first subject wears. Teller
discloses a device that may be worn on the arm. (Requester's Comments, claim chart TCC, page
15   42, Arg 5).

Claims 46 and 151

Claims 46, and 151 recite a sensor which the first subject carries. Teller discloses a
device that may be worn on the arm, when a device is worn, it is inherently carried. (Requester's
20   Comments, claim chart TCC, page 42, Arg 6).

Claims 48, 153, 154, and 225

Claims 48, 153, 154, and 225 recite storing the first and second data in memory (48, 153,
154, 225) and storing information regarding first and second subjects in memory (48, 154).
25   Teller discloses storing the sensor information in a database (memory). Information regarding
the subjects (life activities) is stored at the server as well. (Requester's Comments, claim chart
TCC, page 42, Arg 7).

Claims 49 and 155

Application/Control Number: 95/002,337                                          Page 59
Art Unit: 3992

Claims 49 and 155 recite a sensor database accessible to the server. Teller discloses storing the sensor information in a database (memory). (Requester's Comments, claim chart TCC, page 42, Arg 7).

Claims 50-52 and 156-158

Claims 50-52 and 156-158 recite an identifier, description, and outputs format fields of the sensor database. Teller discloses a sensor database. (Requester's Comments, claim chart TCC, page 42, Arg 7). It would have been obvious to a person of ordinary skill in the art that, in order to properly track the information received from the various sensors, the sensor database would include various fields, including a sensor identifier field, format fields since different sensors provide different data (e.g., heart rate, temperature, motion), and descriptions of the sensors. (Requester's Comments, claim chart TCC, page 42, Arg 8).

Claims 53-56 and 159-162

Claims 53-56 and 159-162 recite an output database accessible to the server, the output database including information for identifying subjects, descriptive information about the subjects, and information associating subjects with sensors. Teller discloses an output database. (Requester's Comments, claim chart TCC, page 42, Arg 7). It would have been obvious to a person of ordinary skill in the art that, in order to properly track the information received from the various sensors for the various users, the output database would include information for identifying subjects, descriptive information about the subjects, and information associating subjects with sensors. (Requester's Comments, claim chart TCC, page 42, Arg 8).

Claims 57-61 and 163-167

Claims 57-61 and 163-167 recite an evaluation database accessible to the server, the evaluation database including identifier, description, sensors associated with the evaluation, and output device fields. Teller discloses an evaluation/feedback database. (Requester's Comments, claim chart TCC, page 42, Arg 7). It would have been obvious to a person of ordinary skill in the art to have, in a feedback database that collects various sensor information (e.g., heart rate.

Application/Control Number: 95/002,337                                        Page 60
Art Unit: 3992

temperature, motion) from various subjects (from numerous users) identifier, description, and
association fields of which sensors are evaluated. It would also have been obvious to a person of
ordinary skill in the art to have a field identifying the device to which a notification is provided
since notification can be provided to many different devices or different methods of providing
5   notification (e.g., e-mail/website). (Requester's Comments, claim chart TCC, page 42, Arg 8).

Claims 62-68 and 168-174
        Claims 62-68 and 168-174 recite that the device that receives the notification is a server,
computer, cell phone, flash memory, display screen with a visual display, touch screen, and
10  includes a keyboard and mouse. Teller discloses that feedback may be provided to sensor device.
including a visual display. Sensor device includes a flash memory to which notification may be
provided. Teller further discloses that a notification may be received at a computer/server, cell
phone, or PDA. It is inherent that a computer has a keyboard and a mouse. Teller discloses the
Palm VII PDA which employed a touchscreen. (Requester's Comments, claim chart TCC, page
15  43, Arg 9).

Claims 69-72 and 175-178:
        Claims 69-72 and 175-178 recite that output is provided to one or more additional
devices, which may include two cell phones, more than one type of device, or a cell phone and a
20  computer. Teller discloses that output is provided to various types of clients. See discussion of
claims 62-68 and 168-174 above. A person skilled in the relevant art would understand that,
according to the Teller, different users could receive notification over different devices. The
different devices may include a cell phone and a computer (Requester's Comments, claim chart
TCC, page 43, Arg 10).

25
Claims 73, 74, 179, and 180:
        Claims 73, 74, 179, and 180 recite that a notification includes an e-mail message or an
instant message. Teller discloses that the central monitoring unit can send notifications as e-mail
messages or two-way pager. (Requester's Comments, claim chart TCC, page 43, Arg 11 and

Application/Control Number: 95/002,337                                    Page 61
Art Unit: 3992

page 46 , Arg 34), It would have been obvious to a person of ordinary skill in the art to use a
push notification or instant message rather than email or two- way pager,

Claims 75-80, 83, 181-186, and 189:

5          Claims 75-80, 83, 181-184, 186 and 189 recite that the notification includes an electronic
signal, a wireless, HTTP or HTML transmission or includes visually perceptible information or
audible information. Teller discloses that output is provided over the world wide web (HTTP
transmissions are inherently used on the world wide web), files may be HTML both of which are
electronic signals. Teller further discloses feedback may be visual or audio/acoustic. Teller
10        discloses wireless communications between the device and the server. Teller discloses the use of
database communications for the communication of various data for which it would have been
obvious to one skilled in the art to use XML. (Requester's Comments, claim chart TCC, page 43,
Arg 12).

Claims 81, 82, 187, and 188:
15        Claims 81, 82, 187, and 188 recite that the audible information includes a voice message,
or a telephone call. Teller discloses that the server can place a telephone call, and that
notification questions (via voice messages) may be posed to the user. (Requester's Comments,
claim chart TCC, page 43, Arg 13).

20

Claims 84-87:
          Claims 84-87 recite the notification includes a summary, table, comparison, or graph of
some/all of the first and second data. Teller discloses that some/all of the data may be presented
in graphs, or charts, Graphs and charts are summaries of data. Figs 5 and 10 of Teller show data
25        presented in tabular format. (Requester's Comments, claim chart TCC, page 43, Arg 14).

Claims 93, 94, 195, and 196
          Claims 93, 94, 195, and 196 recite that first and second data are indicative of the same or
different physical characteristics. Teller discloses various physical characteristics that may be

Application/Control Number: 95/002,337                                      Page 62
Art Unit: 3992

measured (e.g., blood pressure, respiration, heat) by sensors for various subjects. It would have
been obvious that the same or different physical characteristics may be measured for the
subjects. (Requester's Comments, claim chart TCC, page 44, Arg 17).

5       Claim 95:

        Claim 95 recites receiving data simultaneously from the subjects. Teller discloses that the
system receives data and makes data available over the internet. It would have been obvious to a
person of ordinary skill in the relevant art that data may be received simultaneously from users
over the Internet. (Requester's Comments, claim chart TCC, page 44, Arg 18)

10

        Claims 98, 99, 200, and 201:

        Claims 98, 99, 200, and 201 recite that said processor determines and provides
notification that a first subject is in need of a break. Teller discloses that when it is determined
that sleep level are low, it provides the user ways to improve or get more sleep (Requester's
15      Comments, claim chart TCC, page 44, Arg 20).

        Claims 100-102:

        Claims 100-102 recite aggregating or averaging, collecting and preparing for later use, or
determining a pattern in first and second data. Zawilinski discloses determining an average,
20      median, and other statistical measurements. Teller discloses collecting and manipulating
(preparing) the data for later use. (Requester's Comments, claim chart TCC, page 44, Arg 21).

        Claims 103 and 202:

        Claims 103 and 202 recite that the first and second devices are sensors and that the
25      processor receive first and second data directly from first and second sensors. Teller discloses a
kiosk (sensor) that may collect physiological data as a sensor and transmit data directly to the
server, or that sensor may wirelessly transmit data. (Requester's Comments, claim chart TCC,
page 44, Arg 22).

Application/Control Number: 95/002,337                                           Page 63

Art Unit: 3992

Claims 104, 126 and 203:

Claims 104, 126, and 203 recite sensors that provide data to devices, and a processor that
receives the data from the devices over the Internet and through a communication port. Teller
discloses uploading data to a computer, then the computer transmits the data to the server over
the internet. The communication port is inherent. (Requester's Comments, claim chart TCC,
page 45, Arg 23).

Claims 105, 106, 127, and 204:

Claims 105, 106. 127, and 204 recite providing a notification to the first and second user
devices over the Internet. Teller discloses that a computer can be used to send data to the server
over the Internet, and that feedback may be provided over the Internet to a webpage, which may
be accessed by the same device. (Requester's Comments, claim chart TCC, page 45, Arg 24).

Claims 107-112, 128-130, and 205-210:

Claims 107-112, 128-130. and 205-210 recite the first device being a cell phone, portable
computer, display screen with a visual display, touch screen, include a flash memory,
microphone , or speakers. See discussion of claims 62-68 and 168-174 above. Regarding a
microphone, or speakers, Teller discloses that the sensor (device) can sense sound level/quality.
It would have been obvious to a person of ordinary skill in the art that a microphone is used to
measure the sound leveI/quality. Teller also discloses that the user can receive acoustic feedback
for which speakers would have been obvious to a person of ordinary skill in the art. (Requester's
Comments, claim chart TCC, page 45, Arg 25).

Claims 115-118, 133-136, and 213-216:

Claims 115-118, 133-136, and 213-216 recite a third sensor that obtains data of a second
physical characteristic of said second subject, the sensors including a heart rate, acceleration,
motion, or heat sensors. Teller discloses a variety of sensors including a heart rate, acceleration,
motion and heat sensors. It would have been obvious to a person of ordinary skill in the art that

Application/Control Number: 95/002,337                                    Page 64

Art Unit: 3992

such sensors can be used in various combinations. (Requester's Comments, claim chart TCC, page 45, Arg 26).

Claims 119, 120, 137, 138, 217 and 218:

Claims 119, 120, 137, 138, 217 and 218 recite that sensors include heart rate, motion, blood pressure, acceleration, heat, and respiration sensors. Teller discloses sensors for heart rate, acceleration, heat, and respiration. It would have been obvious to a person skill in the art that such sensors can be used in various combinations. (Requester's Comments, claim chart TCC, page 45, Arg 26).

Claims 121, 139, and 219:

Claims 121, 139, and 219 recite first sensor transmits data to first device over a wired communication link. Teller discloses that data from a sensor device is transferred using a serial connection/USB. (Requester's Comments, claim chart TCC, page 45, Arg 27).

Claims 122, 140, and 220:

Claims 122. 140, and 220 recite first sensor transmits data to first user device over a wireless communication link. Teller discloses transfer by short-range wireless connection. (Requester's Comments, claim chart TCC, page 45, Arg 28).

Claims 123, 124, 141,142, 144, 221, 222 and 224:

Claims 123, 124, 141, 142, 144, 221, 222 and 224 recite that wireless communication is radio wireless communication, including Bluetooth. Teller discloses RF (radio frequency) transceivers, which may include Bluetooth technology that may be used to transmit and receive notifications. (Requester's Comments, claim chart TCC, page 45, Arg 29).

Claims 125 and 226:

Claims 125 and 126 recite that first and second user devices can access data stored in memory of the server. Teller discloses that a user can access the website (data stored in the

Application/Control Number: 95/002,337                                            Page 65
Art Unit: 3992

memory of server), thus accessing the data delivered from the memory of the server.
(Requester's Comments, claim chart TCC, page 45, Arg 30).

Claims 131 and 132:

5        Claims 131 and 132 recite that the first sensor and first user device are or are not
operative to be in constant communication. Teller discloses communication (i.e., uploading of
data) to a personal computer periodically or continuously. (Requester's Comments, claim chart
TCC, page 45, Arg 31)

10   Claims 227 and 228:

        Claims 227 and 228 recite that the server is a web server hosting a website and
notification regarding the evaluation is posted to the web site. Teller discloses that the server is a
web server and may post notifications to the web site. Claims 227 and 228 further recite that the
system includes a heart rate monitor worn by the subject. Teller discloses that the sensor may be
15   worn by the subject, and may include a heart rate monitor. Claims 227 and 228 further recite that
the system includes a local portable computer with a visual display that receives data over a radio
wireless communication link from the heart rate monitor and transmits the data to a server over
the internet. Teller discloses that the personal data capture device is a local portable computer
(with processor). Teller discloses that the sensor device can include a visual display for receiving
20   feedback, and that data may be transmitted wirelessly to the server from the sensor device using
radio wireless communications. (Requester's Comments, claim chart TCC, page 45, Arg 32).

Claims 131 and 211:

        Claims 131 and 211 recite that the first user device is operative to communicate first data
25   directly to the second user device. Teller discloses that a first user device (sensor device) is
operative to communicate first data directly to a second user device (cradle). A first sensor
device may receive information from a sensor (e.g., a wireless heart monitor) and may
communicate the data wirelessly over the internet to a server. The first user device may include a
touchscreen device, and may receive notifications from the server. Feller discloses that a second

sensor device may include or be a sensor (e.g., GSR) and that the sensor transmits data to a

second user device (cradle) that communicates the data over the Internet to a server. It would

have been an obvious design choice to include the capability of being able to transmit the data

both wirelessly and via the cradle using the first personal data capture device. As such, the first

5      personal data capture device would be operative to transmit the first data to the second user

device (cradle). (Requester's Comments, claim chart TCC, page 46, Arg 33).


Claims 47 and 152:

        Claims 47 and 152 recite using an internal clock element that maintains a time and date

10     for the server, It would have been obvious at the time of the invention for a server to use an

internal clock element that maintains a time and date for a server. (Requester's Comments, claim

chart TCC, page 46, Arg 34).


Claims 145 and 146:

15     Claims 145 and 146 recite that the first and second user devices are operative to access

data stored in a memory or database of the server. Teller teaches that personal data stored on a

sever memory or database may be accessed by clients. (Requester's Comments, claim chart

TCC, page 46, Arg 35).


20     Claims 143:

        Claim 143 recite that a receiving station is operative to receive first data from a first

sensor over a wireless communication link and forward said first data to said first user device.

Teller teaches that data may be received by a cradle (receiving station), uploaded to a computer,

and then transmitted to the server. (Requester's Comments, claim chart TCC, page 46, Arg 36).


25     Claim 223:

        Claim 223 recites that first data is collected at a first sensor, sent over a wireless link to a

local receiving station, and transmitted from the receiving station to a local device operative to

send the data to the server. Teller teaches that data may be received wirelessly from heart rate

Application/Control Number: 95/002,337                                        Page 67

Art Unit: 3992

monitor at sensor device, and that the data may be transferred to a cradle, and the cradle

transmits data to the server. (Requester's Comments, claim chart TCC, page 46, Arg 36).


**Proposed Rejection 10: Zawilinski, Papadopoulos and Teller references**

5           Claims 17-20, 31-35, 40, 88-92, 96, 97, 190-194, 197 and 199 are rejected under 35

U.S.C. 103(a) as being obvious over Zawilinski in view of Papadopoulos and further in view of

Teller. This rejection is proposed by the requester in the Comments section and is adopted.


Claims 17 and 19:

10          For the limitations recited in the patent claims 17 and 19 wherein claim 1 is the parent of

these claims, these limitations have been discussed in claim chart CC3 provided by the requester

in the Requester for Reexamination which is incorporated herein by reference.

            Regarding the amended limitations of claims 17 and 19 which recite the feature of

determining a course of action by a server, these limitations are not taught in the combination of

15   Zawilinski and Papadopoulos. Teller discloses performing the determining by a server

(Requester's Comments, claim chart TCC, page 44, Arg 15). It would have been obvious to

combine the teachings of Zawilinski and Papadopoulos with Teller as they are from the same

field of detecting physiological reactions of a subject in response to stimuli. One skilled in the art

would have been motivated to combine the teachings of Zawilinski, Papadopoulos and Teller to

20   automate the monitoring of subjects by using a processor and to take advantage of the internet,

server, and web site features taught by Teller. Further both encompass elements well known in

the art that could be combined to produce a predictable result.


Claims 18 and 20:

25          For the limitations recited in the patent claims 18 and 20 wherein claims 1, 18 and 19 are

the parents of these claims, these limitations have been discussed in claim chart CC3 provided by

the requester in the Requester for Reexamination which is incorporated herein by reference.

            Regarding the amended limitations of claims 18 and 20 which recite the feature of

providing a notification based on a course of action over the Internet by a server, these

Application/Control Number: 95/002,337                                          Page 68
Art Unit: 3992

limitations are not taught in the combination of Zawilinski and Papadopoulos. Teller discloses

providing a notification to a device by a processor/server over the Internet (through a website)

(Requester's Comments, claim chart TCC, page 44, Arg 15). It would have been obvious to

combine the teachings of Zawilinski and Papadopoulos with Teller for the same reasons and

5  motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by

reference.


Claim 31:

        For the unamended limitations of claim 31, these limitations are disclosed by Zawilinski

10  and Papadopoulos as discussed in claim chart CC3 provided by the requester in the Requester for

Reexamination which is incorporated herein by reference.

        Regarding the amended limitations of claim 31 which recite a remote server and

receiving data from a plurality of local sensors over the Internet, these limitations are not taught

in Zawilinski and Papadopoulos. Teller discloses a remote server (Requester's Comments, claim

15  chart TCC, page 42, Arg 1), and receiving data from a plurality of local sensors over the Internet

(Requester's Comments, claim chart TCC, page 42, Arg 2). It would have been obvious to

combine the teachings of Zawilinski and Papadopoulos with Teller for the same reasons and

motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by

reference.

20

Claim 32:

        Claim 32 depends from claim 31, the rejection of this claim includes the rejection of

claim 31 discussed above and the rejection of claim 32 discussed in claim chart CC3 which is

incorporated herein by reference.

25

Claim 33:

        The amended limitations of claim 33 recite the feature employing a remote server to

determine a desired action. The combination of Zawilinski and Papadopoulos teaches

determining a desire action (claim chart CC3) but does not disclose employing a server. Teller

Application/Control Number: 95/002,337                                              Page 69
Art Unit: 3992

discloses employing a server to determine a desired action. (Requester's Comments, claim chart TCC, page 44, Arg 15). It would have been obvious to combine the teachings of Zawilinski, Papadopoulos with Teller for the same reasons and motivation discussed in the rejection of claims 17 and 19 above which are incorporated herein by reference.

5

Claims 34 and 35:

    Claims 34 and 35, each depends from claim 31, the rejection of this claim includes the rejection of claim 31 discussed above and the rejection of claims 34 and 35 discussed in claim chart CC3 which is incorporated herein by reference.

10

Claim 40:

    Claim 40 depends from claim 39, the rejection of this claim includes the rejection of claim 39 discussed above and the rejection of claim 40 discussed in claim chart CC3 which is incorporated herein by reference.

15

Claims 88 and 190:

    Claims 88 and 190 recite that said processor/server determines a course of action based on said first and second data. The combination of Zawilinski and Papadopoulos discloses determining a course action based on first and second data, which is not disputed by the patent

20 owner. Teller discloses determining a course of action based on the data input and data from sensors to determine a course of action with regard to nutrition and provides a suggested healthy daily routine. (Requester's Comments, claim chart TCC, page 44, Arg 15).

Claims 89 and 191:

25     Claims 89 and 191 recite said processor/server providing notification of said course of action to said device. The combination of Zawilinski and Papadopoulos discloses determining a course action based on first and second data, which is not disputed by the patent owner. Teller discloses providing a notification (via a webpage) to a device by a processor/server. (Requester's

Application/Control Number: 95/002,337                                      Page 70

Art Unit: 3992

Comments, claim chart TCC, page 44, Arg 15).

Claims 90 and 192:

Claims 90 and 192 recite that said processor/server determines desired action for first and

second subjects.  The combination of Zawilinski and Papadopoulos discloses determining a

desired course of action based on first and second data, which is not disputed by the patent

owner. Teller discloses that the desired action is determined to reach a healthy daily routine or to

increase/improve sleep. (Requester's Comments, claim chart TCC, page 44, Arg 16).

Claims 91, 92, 193, and 194:

Claims 91, 92, 193, and 194 recite said process/server determining a course of action

based on said desired action, and wherein the course of action is selected to improve the chances

the subjects will perform the desired action. The combination of Zawilinski and Papadopoulos

discloses determining course of action based on a desired action, wherein the course of action is

selected to improve the chances the subjects will perform the desired action, which is not

disputed by the patent owner. Teller discloses that suggestions to improve sleep (i.e., improve the

chances subjects will perform the action). (Requester's Comments, claim chart TCC, page 44,

Arg 16).

Claims 96, 97 and 199:

Claims 96, 97 and 199 recite a processor determining one or more options to said

first subject, and providing notification of the option(s) to a device. The combination of

Zawilinski and Papadopoulos discloses these limitations. Teller discloses options, selectable

charts/graphs, provided to the user. (Requester's Comments, claim chart TCC, page 44, Arg 19).

Claim 197:

Claim 197 recites receiving data simultaneously from the subjects. Teller discloses that

the system receives data and makes data available over the internet. It would have been obvious

to a person of ordinary skill in the relevant art that data may be received simultaneously from

Application/Control Number: 95/002,337                                                    Page 71

Art Unit: 3992

users over the Internet. (Requester's Comments, claim chart TCC, page 44, Arg 18).

Application/Control Number: 95/002,337                                   Page 72
Art Unit: 3992

## Service of Papers

After the filing of a request for reexamination by a third party requester, any document filed by either the patent owner or the third party requester must be served on the other party (or parties where two or more third party requester proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248.  See 37 CFR 1.550(f).

## Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in inter partes reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 314(c) requires that inter partes reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.937). Patent owner extensions of time in inter partes reexamination proceedings are provided for in 37 CFR 1.956. Extensions of time are not available for third party requester comments, because a comment period of 30 days from service of patent owner's response is set by statute 35 U.S.C. 314(b)(3). Time periods may be extended only upon a strong showing of sufficient cause.

## Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent proceeding, involving the '271 patent throughout the course of this reexamination proceeding. The third party requester is also reminded of the ability to similarly apprise the Office of any such activity or proceeding throughout the course of this reexamination proceeding. See MPEP 2686 and 2686.04.

## *Conclusion*

This is an **ACTION CLOSING PROSECUTION (ACP)**; see MPEP § 2671.02.

(1)      Pursuant to 37 CFR 1.951(a), the patent owner may once file written comments limited to the issues raised in the reexamination proceeding and/or present a proposed amendment to the claims which amendment will be subject to the criteria of   37 CFR 1.116 as to

Application/Control Number: 95/002,337                                         Page 73
Art Unit: 3992

whether it shall be entered and considered. Such comments and/or proposed amendments must be filed within a time period of 30 days or one month (whichever is longer) from the mailing date of this action. Where the patent owner files  such comments and/or a proposed amendment, the third party requester may once file  comments under 37 CFR 1.951(b) responding to the patent owner's submission within  30 days from the date of service of the patent owner's submission on the third party  requester.

     (2)    If the patent owner does not timely file comments and/or a proposed  amendment pursuant to 37 CFR 1.951(a), then the third party requester is precluded  from filing comments under 37 CFR 1.951(b).

     (3)    Appeal cannot be taken from this action, since it is not a final Office action.

Application/Control Number: 95/002,337                                    Page 74

Art Unit: 3992

### *Correspondence*

All correspondence relating to this *inter partes* reexamination proceeding should be

directed as follows:

By **U.S. Postal Service Mail** to:

> Mail Stop *Inter Partes* Reexam
> ATTN:   Central Reexamination Unit
> Commissioner for Patents
> P.O. Box 1450
> Alexandria, Virginia 22313-1450

By **FAX** to:

> 571-273-9900
> Central Reexamination Unit

By **Hand** to:

> Customer Service Window
> Randolph Building
> 401 Dulany St.
> Alexandria, VA 22314

Registered users of EFS-Web may alternatively submit such correspondence via the electronic

filing system EFS-Web, at https://sportal.uspto.gov/authenticate/ authenticateuserlocalepf.html.

EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to

act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically

uploaded) directly into the official file for the reexamination proceeding, which offers parties the

opportunity to review the content of their submissions after the "soft scanning" process is

complete.

Application/Control Number: 95/002,337                                      Page 75

Art Unit: 3992

## NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an *ex parte*

5   reexamination or an *inter partes* reexamination is designated as the correspondence address of

the patent.

*Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter*

*Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

**The correspondence address for any pending reexamination proceeding not**

10  **having the same correspondence address as that of the patent is, by way of this revision**

**to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the

Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any

reexamination proceeding which is filed after that date.

15        Parties are to take this change into account when filing papers, and direct

communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for

the present proceeding is different from the correspondence address of the patent, it is strongly

encouraged that the patent owner affirmatively file a Notification of Change of Correspondence

20  Address in the reexamination proceeding and/or the patent (depending on which address patent

owner desires), to conform the address of the proceeding with that of the patent and to clarify

the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

Reexamination Practice                          (571) 272-7703

25  Central Reexam Unit (CRU)                       (571) 272-7705

Reexamination Facsimile Transmission No.        (571) 273-9900

Application/Control Number: 95/002,337                                    Page 76

Art Unit: 3992


        Any inquiry concerning this communication or earlier communication from the examiner,

or as to the status of the proceeding, should be directed to the Central Reexamination Unit at

telephone number (571) 272-7705.

5


/Minh  Nguyen/
Minh Nguyen
Patent Reexamination Specialist
10   571-272-1748, AU 3992



    Conferees:

15   /Tuan H.  Nguyen/
Patent Reexamination Specialist
571-272-1694
AU 3992

20
/Andrew J. Fischer/
Supervisory Patent Reexamination Specialist,
Central Reexamination Unit, Art Unit 3992

# EXHIBIT 24

Via eFILE                                                    REEXAMINATION
                                          Attorney Docket No.: I1618.10003US01


### IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Reexamination of: | U.S. Patent No. 6,701,271 | |
| Control No.: | 95/002,337 | Art Unit 3992 |
| Inventor: | Willner, Barry E., et al. | |
| Filed: | September 14, 2012 | |
| For: | METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS | |
| Examiner: | Nguyen, Minh T. | |
| Customer No.: | 97149 | |
| Confirmation No: | 1254 | |


### AMENDMENT B AND RESPONSE TO ACTION CLOSING PROSECUTION

**Mail Stop: Inter Partes Reexamination**
Attn: Central Reexamination Unit
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the Action Closing Prosecution mailed August 12, 2013, please consider the following:

**Amendments to the Claims** begin on page 2;

**Status of Claims, Support for Claim Amendments, and Reasons for Affidavits and Other Evidence** begin on page 19; and

**Remarks** begin on page 22.

Appx640

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

## AMENDMENTS TO THE CLAIMS

Pursuant to 37 CFR §§ 1.530(d)(2) and 1.116, please amend the above identified patent by cancelling claims 17-46, 48-49, 57, 62-64, 66-78, 80-94, 96-97, 99-123, 125-228 and amending claims 47, 50-56, 58-61, 65, 79, 95, 98, and 124 as follows:

47.     (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an internal clock element that is operative to maintain a time and date for said server, wherein said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification provided by said server.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

50.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>a sensor database accessible to said server, wherein said sensor database includes a sensor identifier field that contains information for identifying said first and second sensors.</u>

Page 3 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

51.　　(New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

a sensor database accessible to said server, wherein said sensor database includes:

a sensor identifier field that contains information for identifying said first and second sensors; and

a sensor description field that contains information describing said first and second sensors.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

52.    (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

a sensor database accessible to said server, wherein said sensor database includes:

a sensor identifier field that contains information for identifying said first and second sensors;

a sensor description field that contains information describing said first and second sensors; and

a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second sensors.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

53.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

    <u>a memory;</u>

    <u>a communication port operative to receive data over the Internet;</u>

    <u>a processor connected to said memory and said communication port, said processor being operative to:</u>

        <u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

        <u>store said first and second data in said memory;</u>

        <u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

        <u>provide a notification regarding said evaluation to a device; and</u>

    <u>an output database accessible to said server.</u>

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

54.     (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an output database accessible to said server, wherein said output database includes an output identifier field that contains identifying information regarding said first and second subjects.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

55.     (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>an output database accessible to said server, wherein said output database includes:</u>

<u>an output identifier field that contains identifying information regarding said first and second subjects; and</u>

<u>an output description field that contains descriptive information regarding said first and second subjects.</u>

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

56.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>an output database accessible to said server, wherein said output database includes:</u>

<u>an output identifier field that contains identifying information regarding said first and second subjects;</u>

<u>an output description field that contains descriptive information regarding said first and second subjects; and</u>

<u>a sensor identifier field that identifies that said first and second sensors are associated with said first and second subjects.</u>

58.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>an evaluation database accessible to said server, wherein said evaluation database includes an evaluation identifier field that contains identifying information for said evaluation.</u>

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

59.     (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an evaluation database accessible to said server, wherein said evaluation database includes:

an evaluation identifier field that contains identifying information for said evaluation; and

a description field that contains descriptive information regarding said evaluation.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

60.      (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an evaluation database accessible to said server, wherein said evaluation database includes:

an evaluation identifier field that contains identifying information for said evaluation;

a description field that contains descriptive information regarding said evaluation; and

a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

61.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>an evaluation database accessible to said server, wherein said evaluation database includes:</u>

<u>an evaluation identifier field that contains identifying information for said evaluation;</u>

<u>a description field that contains descriptive information regarding said evaluation;</u>

<u>a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation; and</u>

<u>a field that associates said evaluation with said device to which said notification is provided.</u>

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

65.    (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet; and

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device, wherein said device includes a flash memory card.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

79.  (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet; and

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device, wherein said notification includes an XML transmission.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

95.   (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet; and

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data, wherein said processor is operative to receive said first and second data simultaneously from said first and second subjects;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

98.     (New) A system for facilitating feedback, comprising:

a remote server including:

    a memory;

    a communication port operative to receive data over the Internet; and

    a processor connected to said memory and said communication port, said processor being operative to:

        receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

        store said first and second data in said memory;

        determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

        provide a notification regarding said evaluation to a device,

        wherein, said processor is operative to determine whether said first subject is in need of a break.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

124.    (New) A system for facilitating feedback, comprising:

a local first sensor;

a local second sensor; and

a remote server including:

a memory;

a communication port operative to receive data over the Internet; and

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from said first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from said second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device,

wherein:

said first sensor is operative to transmit said first data to a local first user device over a Bluetooth wireless communication link;

said second sensor is operative to transmit said second data to a local second user device; and

said processor is operative to receive, over the Internet and through said communication port, said first data from said first user device and said second data from said second user device.

Appx657

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

**STATUS OF CLAIMS; SUPPORT FOR CLAIM AMENDMENTS
PURSUANT TO 37 C.F.R. § 1.530(e); AND REASONS FOR AFFIDAVITS
AND OTHER EVIDENCE PURSUANT TO 37 C.F.R. § 1.116(e)**

**A.     Status of Claims**

Claims 15-20, 31-35, and 37-228 are the subject of reexamination. By this paper, claims 17-46, 48-49, 57, 62-64, 66-78, 80-94, 96-97, 99-123, and 125-228 are canceled and claims 47, 50-56, 58-61, 65, 79, 95, 98, and 124 are amended. Claims 1-14, 21-30, and 36 were cancelled in a previous paper. Thus, claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 are now pending.

**B.     Support for Claim Amendments**

Each claim amendment herein does nothing more than rewrite a dependent claim in independent form. Therefore each claim amendment is considered proper under 37 C.F.R. § 1.116(B)(1). Claims 47, 50-56, 58-61, 65, 79, 95, 98, and 124 have been rewritten in independent form as follows:

- Claim 47 has been amended to be written in independent form. Claim 47 incorporates the limitations of amended claim 37, from which claim 47 previously depended. No new limitations have been added to claim 47.

- Claim 50 has been amended to be written in independent form. Claim 50 incorporates the limitations of claim 49 and amended claim 37, from which claim 50 previously depended. No new limitations have been added to claim 50.

- Claim 51 has been amended to be written in independent form. Claim 51 incorporates the limitations of claims 49, 50, and amended claim 37, from which claim 51 previously depended. No new limitations have been added to claim 51.

- Claim 52 has been amended to be written in independent form. Claim 52 incorporates the limitations of claims 49, 50, 51, and amended claim 37, from which claim 52 previously depended. No new limitations have been added to claim 52.

- Claim 53 has been amended to be written in independent form. Claim 53 incorporates the limitations of amended claim 37, from which claim 53 previously depended. No new limitations have been added to claim 53.

Page 19 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

- Claim 54 has been amended to be written in independent form. Claim 54 incorporates the limitations of claim 53 and amended claim 37, from which claim 54 previously depended. No new limitations have been added to claim 54.

- Claim 55 has been amended to be written in independent form. Claim 55 incorporates the limitations of claims 53, 54, and amended claim 37, from which claim 55 previously depended. No new limitations have been added to claim 55.

- Claim 56 has been amended to be written in independent form. Claim 56 incorporates the limitations of claims 53, 54, 55, and amended claim 37, from which claim 56 previously depended. No new limitations have been added to claim 56.

- Claim 58 has been amended to be written in independent form. Claim 58 incorporates the limitations of claim 57 and amended claim 37, from which claim 58 previously depended. No new limitations have been added to claim 58.

- Claim 59 has been amended to be written in independent form. Claim 59 incorporates the limitations of claims 57, 58, and amended claim 37, from which claim 59 previously depended. No new limitations have been added to claim 59.

- Claim 60 has been amended to be written in independent form. Claim 60 incorporates the limitations of claims 57, 58, 59, and amended claim 37, from which claim 60 previously depended. No new limitations have been added to claim 60.

- Claim 61 has been amended to be written in independent form. Claim 61 incorporates the limitations of claims 57, 58, 59, 60, and amended claim 37, from which claim 61 previously depended. No new limitations have been added to claim 61.

- Claim 65 has been amended to be written in independent form. Claim 65 incorporates the limitations of amended claim 37, from which claim 65 previously depended. No new limitations have been added to claim 65.

- Claim 79 has been amended to be written in independent form. Claim 79 incorporates the limitations of amended claim 37, from which claim 79 previously depended. No new limitations have been added to claim 79.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

- Claim 95 has been amended to be written in independent form. Claim 95 incorporates the limitations of amended claim 37, from which claim 95 previously depended. No new limitations have been added to claim 95.
- Claim 98 has been amended to be written in independent form. Claim 98 incorporates the limitations of amended claim 37, from which claim 98 previously depended. No new limitations have been added to claim 98.
- Claim 124 has been amended to be written in independent form. Claim 124 incorporates the limitations of claims 104, 122, and amended claim 37, from which claim 124 previously depended. No new limitations have been added to claim 124.

**C.     Reasons For Affidavits And Other Evidence**

With this response, Patentee is submitting a declaration from Darren Ashby. Mr. Ashby's declaration provides opinions regarding what one of ordinary skill in the art would have understood from the disclosures contained in prior art references *first* cited in the Action Closing Prosecution ("ACP") mailed on August 12, 2013—specifically U.S. Patent Application Publication No. US2002/0111541 ("Bibl") and U.S. Patent No. 6,605,038 ("Teller"). Mr. Ashby's opinions with regard to these references are necessary and could not have been presented earlier, as both *Bibl* and *Teller* were ***not*** relied upon by either TPR or the Office prior to the ACP.

Mr. Ashby also considers and rebuts opinions contained in the Declaration of Mr. Frank Koperda, which is attached to and relied upon in TPR's "Comments to Patent Owner Response" ("Comments") filed on April 8, 2013. Again, Mr. Ashby's opinions with regard to this declaration are necessary and could not have been presented earlier, as the declaration was first presented in TPR's Comments.

Finally, Patentee is submitting dictionary definitions for the terms "receiving a notification" and "break." These dictionary definitions are necessitated by claim construction positions first taken by Third Party Requestor ("TPR") in its Comments and adopted in the ACP. These dictionary definitions are necessary and could not have been presented earlier, as the definitions provided rebut claim construction positions first taken by TRP in its Comments and adopted by the ACP.

## REMARKS

The paper is responsive to the Action Closing Prosecution mailed August 12, 2013. The ACP rejects all of the claims of U.S. Patent No. 6,701,271 ("the '271 Patent"), incorporating by reference many of the Third Party Requester's proposed rejections of these claims. Patentee respectfully submits the rejections of claims 15, 16, 47, 50-56, 58-61, 65, 95, 98-99, and 124 should be withdrawn.

### A.   ORIGINAL CLAIMS 15 AND 16 ARE VALID OVER THE CITED ART

With regard to claims 15 and 16, the ACP maintains the following rejections of claims 15 and 16:

- Proposed Rejection 1: under 35 U.S.C. § 102(b) over U.S. Patent No. 6,292,688 ("*Patton*");

- Proposed Rejection 3: under 35 U.S.C. § 103(a) over U.S. Patent No. 5,676,138 ("*Zawilinski*") in view of U.S. Patent No. 3,744,712 ("*Papadopoulos*"); and

- Proposed Rejection 4: under 35 U.S.C. § 103(a) over *Patton* in view of *Papadopoulos*.

Patentee respectfully traverses the foregoing rejections of claims 15 and 16 at least because the ACP fails to establish a *prima facie* case that dependent claims 15 and 16 are anticipated or obvious over the cited references, as discussed below.

Claim 15 depends from claim 14, which depends from claim 13, which depends from claim 1. Thus, claim 15 requires all of the limitations of claims 14, 13, and 1. When rewritten in independent form (with corresponding claims identified in square brackets), claim 15 requires:

[claim 1] A method for providing feedback, comprising:
   *receiving* first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
   *determining* an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject;
   *providing* a notification regarding said evaluation to *a device*;
   [claim 13] *receiving* a notification regarding a plurality of options;
   [claim 14] selecting one of said plurality of options based, at least in part, on said evaluation; and
   [claim 15] selecting *said device* based, at least in part, on said selecting one of said plurality of options.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

('271 Patent, col. 14, line 65 to col. 15, line 9 and col. 17, lines 43-51 (emphasis added).)

Claim 16 depends from claim 13, which depends from claim 1. Thus, claim 16 also requires all of the limitations of claims 13 and 1. When rewritten in independent form (with corresponding claims identified in square brackets), claim 16 requires:

> [claim 1] A method for providing feedback, comprising:
> *receiving* first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
> *determining* an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject;
> *providing* a notification regarding said evaluation to *a device*;
> [claim 13] *receiving* a notification regarding a plurality of options; and
> [claim 16] wherein *said device* is associated with at least one of said plurality of options.

('271 Patent, col. 14, line 65 to col. 15, line 9 and col. 17, lines 43-48 and 52-53 (emphasis added).)

## 1.   *Patton* Does Not Teach Each Limitation Of Claims 15 And 16 And Thus Does Not Anticipate Claims 15 And 16

In the rejections of claims 15 and 16, the ACP maintains that all of the additional limitations of claims 13-16 are taught in a single paragraph of *Patton* located at column 24, lines 38-51. (ACP, pages 6-8.) In its entirety, this paragraph of *Patton* teaches:

> By way of another example, in vehicle training, including auto and aircraft management, the manufacturer may be interested in the reaction of the respondent to the *seating and control panel of the vehicle*. An epoch of measurement longer than just a second or two might be indicated because of the length of an acquaintance, orientation or familiarity period. Thus, comprehension could be measured during a comparatively longer duration as the subject successively views the individual element of an *instrument panel*. Several *different forms of panels*, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the *display* that was most rapidly comprehended and/or created approval or pleasure in the test subject.

(Emphasis added.)

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

> a. ***Patton* does not teach or suggest the specific order of steps required by claims 15 and 16, where "providing a notification regarding said evaluation to a device" is required to be performed as a *third* step.**

The express language of claims 15 and 16 require, among other things, a certain order of steps. In particular, in a first step, "first data indicative of a physical characteristic of a first subject" and "second data indicative of a physical characteristic of a second subject" must be received. Then, in a second step, "an evaluation of said first data and said second data" must be determined. Finally, in a third step, "a notification regarding said evaluation" must be provided "to a device." This order of steps is required by claims 15 and 16 because the second step ("determining an evaluation of said first data and said second data") requires "said first data and said second data" that were received in the first step, and because the third step ("providing a notification regarding said evaluation") requires "said evaluation" that was determined in the second step.

Further, as noted in Patentee's Response A, claim 15 also requires that a ***single*** device have ***dual-functionality***, namely a single device that is selected "based, at least in part, on said selecting one of said plurality of options" also be provided "a notification regarding said evaluation." Similarly, claim 16 also requires a ***single*** device having a ***dual-functionality***, namely a single device that is "associated with at least one of said plurality of options" also be provided "a notification regarding said evaluation." Patentee argued in its Response A that *Patton* fails to teach the ***single*** device having a ***dual-functionality*** as required by claims 15 and 16.

In the rejections of claims 15 and 16, the ACP appears to ***concede*** that claims 15 and 16 require a ***single*** device having a ***dual-functionality***. (*See* ACP, page 6, lines 21-23.) The ACP then asserts that the "vehicle control panel" discussed in the above-cited paragraph of *Patton* corresponds to this ***single*** device having a ***dual-functionality***. (*See* ACP, page 7, lines 5-6 ("According to this paragraph, there is only one 'device' which is the vehicle control panel.").) The ACP also asserts that the displaying of the "several different forms of [vehicle control] panels" on the vehicle control panel in succession to a test subject (as discussed in the above-cited paragraph of *Patton*) corresponds to the third step ("providing a notification of said evaluation") required by claims 15 and 16. (*See* ACP, page 7, lines 9-13.)

Despite these assertions, however, Patentee notes that the interpretation of *Patton* in the ACP fails to teach or suggest the specific order of steps, noted above, that is required by claims

Page 24 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

15 and 16. In particular, claims 15 and 16 require that physical characteristics of test subjects be received (the first step) and an evaluation on the received physical characteristics be determined (the second step) *before* a notification regarding said evaluation is provided to a device (the third step). However, the above-cited paragraph of *Patton* clearly teaches that it is only *after* the different forms of vehicle display panels are displayed to the test subject (the purported third step) that the reaction of the test subject can be measured (the purported first step) and the best form of the vehicle display panel can be chosen by the manufacturer (the purported second step).

Therefore, even assuming that the "vehicle control panel" corresponds to the single dual-functionality device of claims 15 and 16 (which Patentee does not concede), it is clear that the above-cited paragraph of *Patton* fails to teach or suggest performing the first step ("receiving first data indicative of a physical characteristic of a first subject . . . and second data indicative of a physical characteristic of a second subject") and the second step ("determining an evaluation of said first data and said second data") of claims 15 and 16 *before* performing the third step ("providing a notification regarding said evaluation") as required by claims 15 and 16. Therefore, Patentee respectfully submits that the rejection of claims 15 and 16 under 35 U.S.C. § 102(b) over *Patton* should be withdrawn.

### 2.   The Combinations Of *Zawilinski* In View Of *Papadopoulos* Does Not Render Claims 15 and 16 Obvious

The Request appears to concede that *Zawilinski* fails to teach the limitations of claims 13, 14, 15, and 16. (*See* Request, Exhibit CC3, pages 2-5.) The Request asserts that the requirements of claims 13, 14, 15, and 16 are instead taught by *Papadopoulos*. (*See id.*)

#### a.   *Papadopoulos* does not teach "receiving a notification regarding a plurality of options" as required by claims 15 and 16.

Claims 15 and 16 both require "*receiving* a notification regarding a plurality of options." (Emphasis added.) In the rejection of claims 15 and 16, the TPR cites to column 1, lines 56-63 of *Papadopoulos* as providing support for the limitations added by claim 13. (Request, Exhibit CC3, pages 2-3.) This portion of *Papadopoulos*, in its entirety, merely teaches: "Thus it is one of the principal objects of this invention to provide a participation presenter-audience reaction system in which the audience response is simultaneously displayed before the person or persons making the presentation so that the presenter may respond to the audience's reaction or modify his presentation accordingly or elicit information from the audience."

Page 25 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

In the previous rejection of claims 15 and 16, the TPR asserted, with respect to the above-cited portion of *Papadopoulos*, that "The presenter receiving a notification regarding the options is inherent. Without the notification, the presenter could not know what options (e.g., responding to the audience reaction, modify the presentation, or elicit information) were available." (Request, Exhibit CC3, page 3.) In Patentee's Response A, Patentee argued that this act of "***receiving***" a notification regarding a plurality of options, as required by claims 15 and 16, is ***not inherent*** because the presenter mentioned in the above-cited portion of *Papadopoulos* may very well be aware of his options for responding to the audience's reaction to his presentation without ***receiving*** a notification regarding these options. For example, prior to the beginning of his presentation, the presenter may have conceived, ***entirely within his own mind***, of options available during his presentation including responding to an audience reaction, modifying his presentation, or eliciting information from the audience. Patentee noted in Patentee's Response A that it would be unreasonable to interpret the "***receiving*** a notification of a plurality of options" requirement of claims 15 and 16 so broadly as to assert that it covers situations in which the "plurality of options" ***was conceived and exists entirely within the presenter's own mind*** without any kind of external "***receiving*** [of] a notification" regarding his options for response.

In the current rejections of claims 15 and 16, the ACP appears to ***concede*** that the above-cited portion of *Papadopoulos* allows for the possibility that "a presenter may have conceived of such options entirely within his own mind," but nevertheless the ACP interprets the term "receiving" of claims 15 and 16 broadly enough to include the possibility of the presenter conceiving options (as a notification) entirely within his own mind (i.e., receiving an "internal" notification). For example, the ACP agrees with the position of the TPR that "It does not matter whether the notification is received internally (i.e., from his own mind), or externally (e.g., from another device). In both situations, the presenter must receive a notification and claim 13 fails to specify from what source (internal or external) the notification is received." (*See* ACP, pages 9-10, lines 27-1 and page 10, lines 5-7.)

Patentee respectfully notes that this interpretation of the phrase "***receiving*** a notification" in claim to include a notification conceived ***entirely within the mind*** of a human presenter is ***unreasonably broad***.

Although "During reexamination, claims are given the broadest reasonable interpretation," this interpretation must be "consistent with the specification." (*See* MPEP §

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

2258(I)(G).) Further "Under a broadest reasonable interpretation, words of the claim must be given their ***plain meaning***, unless such meaning is inconsistent with the specification. The plain meaning of a term means the ***ordinary and customary meaning*** given to the term by those of ordinary skill in the art at the time of the invention." (MPEP § 2111.01(I) (emphasis added).) The MPEP also dictates that:

> It is the use of the words ***in the context of the written description*** and ***customarily by those skilled in the relevant art*** that accurately reflects both the "ordinary" and the "customary" meaning of the terms in the claims. *Ferguson Beauregard/Logic Controls v. Mega Systems*, 350 F.3d 1327, 1338, 69 USPQ2d 1001, 1009 (Fed. Cir. 2003) (***Dictionary definitions were used to determine the ordinary and customary meaning*** of the words "normal" and "predetermine" to those skilled in the art. In construing claim terms, the general meanings gleaned from reference sources, such as dictionaries, must always be compared against the use of the terms in context, and the intrinsic record must always be consulted to identify which of the different possible dictionary meanings is most consistent with the use of the words by the inventor.);

(MPEP § 2111.01(III) (emphasis added).)

At the time that the '271 patent was filed, on May 17, 2001, the ordinary and customary meaning given to the phrase "receiving a notification" by those of ordinary skill in the art can be gleaned from the use of this phrase in the written description of the '271 patent and from the definition of the terms "receiving" and "notification" in a contemporary dictionary. The phrase "receiving a notification" appears only once in the written description of the '271 patent, other than its appearance in claim 13 (from which claims 15 and 16 depend). This phrase appears in context as follows in the following paragraph of the "DETAILED DESCRIPTION" section of the written description:

> In some embodiments, the step 104 may include determining one or more options to provide to a subject or a group of subjects. For example, the method 100 may include a step of ***receiving a notification*** of several possible endings to a play being presented to an audience. The step 104 may include determining which of the options to provide to the audience or determining which of the options the audience will be allowed to choose from. Suppose five possible endings are available for the play, two of which are happy endings and three or which are sad endings. If the audience appears or is determined to want a happy ending, the audience may be provided with the two options having happy endings for the play. If instead the audiences appears or is determined to want a sad ending, the audience may be provided with the three options having a sad ending for the play.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

> A notification of the possible options may be provided to one or more of the audience members to allow them to make the selection on the desired ending.

(Column 5, lines 47-64 (emphasis added).) Although the TPR attempts to combine the embodiment described in the sentence where the phrase "receiving a notification" appears with the embodiment described in the next sentence, it is clear that these two sentences describe **separate and distinct embodiments** that are in no way equivalent. In particular, the first sentence describes "receiving a notification" of several possible endings to a play, and the second sentence describes "determining" which of the possible endings (that were "received" in the first embodiment) "to provide to the audience" or to allow "the audience to choose from." While Patentee concedes that a human presenter could perform the embodiment in the second sentence (i.e., the "determining" embodiment) entirely **within** the human presenter's own mind, Patentee notes that a human presenter can only perform the embodiment in the first sentence (i.e., the "receiving a notification" embodiment) by the human presenter acquiring a notification from **outside** the human presenter's own mind. In short, "receiving a notification" is separate and distinct from "determining which of the options to provide to the autidence"  since determining may be a mental step, while receiving a notification, as this phrase is used in the '271 patent, may not be.

This use of the phrase "**receiving** a **notification**" in the written description of the '271 patent is consistent with contemporary dictionary definitions of the terms "receive" and "notification" which include "To accept data from an **external** communications system, such as a local area network (LAN) or a telephone line, and store the data as a file" and "A signal from the operating system that an event has occurred." (Microsoft Computer Dictionary, Fifth Edition, copyright ©2002 by Microsoft Corporation, pages 442 and 368) (attached hereto as "Exhibit 1".) Further, in an ordinary dictionary, the first two definitions of the term "receive" are "To take or acquire (something given, offered, or transmitted); get" and "To hear or see (information, for example): *receive bad news; received a good report of the group's activities*." (The American Heritage® Dictionary of the English Language, Fourth Edition, copyright ©2000 by Houghton Mifflin Company, page 1458) (attached hereto as "Exhibit 2".) The first two definitions of the term "notification" are "The act or an instance of notifying" and "Something, such as a letter, by which notice is given." (*Id.*, page 1203.)

Therefore, the phrase "receiving a notification," as used **in the context of the written description** and **customarily by those skilled in the relevant art**, would clearly require that the

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

human presenter discussed in *Papadopoulos* acquire the notification from a source ***external*** to the human presenter's own mind. For example, in the first definition, "to take or acquire" requires that the human presenter takes or acquires the notification from somewhere outside the human presenter's own mind. Similarly, in the second definition, "to hear or see" requires that the human presenter hears or sees the notification outside the human presenter's own mind (i.e., ears don't hear internal thoughts, and eyes don't see internal thoughts). Further, the term "notification" also clearly has an ***external*** connotation, such that one skilled in the art at the time of the invention, and when understood in the light of the specification, would not interpret the phrase "receiving a notification" to include a human presenter ***conceiving*** a ***thought*** entirely within the own mind.

It is possible that TPR will argue that definition number 11 of Exhibit 2 should be used instead to interpret the term "receiving," since definition number 11 states: "To perceive or acquire mentally: *receive a bad **impression**.*" (*Id* (emphasis added).) However, Patentee notes that a "notification" is distinct from an "impression," and while this obscure definition of the term "receive" (note it is eleven definitions down the list) apparently allows for the receiving of an "impression," it would be unreasonable, even for this obscure definition, to allow for the receiving of a "notification." Further, when read in light of the computer system of the written description (see FIG. 4, computer system 200), definition number 11 clearly does not apply.

Thus, the assertion by the TPR that a human presenter (i.e., a ***single*** entity) can perform the act of "***receiving*** a notification" as required by claims 15 and 16 by simply thinking of a notification, ***conceived entirely within the own mind*** of the human presenter, without acquiring the notification from outside the human presenter's own mind, amounts to throwing out the term "***reasonable***" in the "broadest ***reasonable*** interpretation" standard of claim interpretation.

Therefore, at least because *Papadopoulos* fails to teach or suggest "***receiving*** a ***notification*** regarding a plurality of options" as required by claims 15 and 16, Patentee respectfully submits that the rejection of claims 15 and 16 under 35 U.S.C. § 103(a) over *Zawilinski* in view of *Papadopoulos* should be withdrawn.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

### 3. The Combination Of *Patton* In View Of *Papadopoulos* Does Not Render Claims 15 and 16 Obvious

The TPR appears to concede that *Patton* fails to teach the limitations of claims 13, 14, 15, and 16. (*See* Request, Exhibit CC4, pages 17-21.) The TPR asserts that the requirements of claims 13, 14, 15, and 16 are instead taught by *Papadopoulos*. (*See id.*)

### a. *Papadopoulos* does not teach "receiving a notification regarding a plurality of options" as required by claims 15 and 16.

Claims 15 and 16 both require "*receiving* a notification regarding a plurality of options." (Emphasis added.) However, as noted above in Section A.2.a, *Papadopoulos* fails to teach or suggest "*receiving* a notification regarding a plurality of options" as required by claims 15 and 16, because the interpretation of the phrase "receiving a notification" in claims 15 and 16 asserted by the TPR and the ACP to include a notification conceived **entirely within the own mind** of a human presenter is **not reasonable**. Therefore, the rejection of claims 15 and 16 under 35 U.S.C. § 103(a) over *Patton* in view of *Papadopoulos* should be withdrawn for at least the same reasons as those discussed above in Section A.2.a.

## B. CLAIM 47 IS VALID OVER THE CITED ART

Claim 47 has been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject this claim. Claim 47 recites a remote server that a processor that receives data over the Internet from first and second sensors that is indicative of physical characteristics of first and second subjects, respectively. Claim 47 also requires that the remote server include:

> an internal clock element that is operative to maintain a time and date for said server, wherein said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification provided by said server.

*Bibl* discloses a system where a personal data capture device may gather personal data, store that data in a memory, and transmit that data to a web server. (*Bibl*, ¶ [0054].) *Bibl* states that "the personal data in memory 480 of the personal data capture device . . . may include a timestamp and information identifying a source of a personal parameter." (*Id.*) *Teller* discloses a system where a sensor device may gather data and upload that data to a central monitoring unit.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

*Teller* states that "[s]ensor device 10 may be provided with a button to be used to time stamp events such as time to bed, wake time, and time of meals. These time stamps are stored in sensor device 10 and are uploaded to central monitoring unit 30 with the rest of data." (*Teller*, 7:66-8:3.) TPR identifies these passages of *Bibl* and *Teller* to support its proposed rejections of claim 47 (Comments at 26, 33) and the ACP cites to TPR's assertions to support its rejections this claim (ACP at 26, 38, 55, and 66).

Patentee does not dispute that *Bibl* and *Teller* both disclose the presence of an internal clock *in*, and placement of time stamps *by*, **devices that collect data indicative of a physical characteristic**. However, neither *Bibl* nor *Teller* disclose the presence of an internal clock **at a server that receives data from sensors**. *Bibl* does not disclose that **the web is server** is capable of creating time stamps for data, notifications, or other communications received from a personal data capture device. *Teller* does not disclose that **the central monitoring** unit is a server that is capable of creating time stamps for data, notifications, or other communications received from a sensor device. Neither *Bibl* nor *Teller* disclose placing any time stamps on any notifications sent out by the web server (*Bibl*) or the central monitoring unit (*Teller*).

Not only do *Bibl* and *Teller* fail to disclose the limitations of claim 47, they **teach away from** the recited internal clock and time stamp limitations. Specifically, one of ordinary skill in the art at the time of the '271 patent invention would have been led away from creating a system that included **a server** having an internal clock that created time stamps for data, notifications, and other communications **received at the server**. "'Teaching away' does not require that the prior art foresaw the specific invention that was later made, and warned against taking that path." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1343 (Fed. Cir. 2011). Indeed, "[a] reference may be said to teach away when a person of ordinary skill, upon reading the reference, . . . would be led in a direction divergent from the path that was taken by the applicant." *In re ICON Health & Fitness*, 496 F.3d 1374, 1381 (Fed. Cir. 2007) (citing *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)).

Time stamps may be placed on data by either a device that collects the data or by another device to which the collecting device sends the data. Both *Bibl* and *Teller* teach placing time stamps on data **by the collecting device**, before the data is sent **to a server**. While it would have been possible to place time stamps on data that was sent and received, one of ordinary skill in the art would not have been motivated to create such a system. Such a practice would be redundant

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

and unnecessarily increase the cost of the system. Thus, a person of ordinary skill, upon reading *Bibl* and *Teller*, would have been led in a direction divergent from the claimed system where the internal clock is located at the server and time stamps are placed on data, notifications, and other communications when they are received at the server.

TPR's expert, Mr. Koperda, states that "[p]rior to the filing date of the '271 patent, common hardware platforms . . . ***normally*** had a hardware clock." (Koperda Dec., ¶ 14, emphasis added.) Mr. Koperda's statement acknowledges that common hardware platforms did not ***always*** include a hardware clock. TPR relies on Mr. Koperda's statement to support its assertion that it would have been obvious for one of ordinary skill in the art to use a hardware platform that included a clock. TPR's argument is a classic example of improper reliance on hindsight reconstruction.

> A rejection based on Section 103 clearly must rest on a factual basis, and these facts must be interpreted without hindsight reconstruction of the invention from the prior art. In making this evaluation, all facts must be considered. The Patent Office has the initial duty of supplying the factual basis for its rejection. It may not, because it may doubt that the invention is patentable, resort to speculation, unfounded assumptions or hindsight reconstruction to supply deficiencies in its factual basis. To the extent that Patent office rulings are so supported, there is no basis for resolving doubts against their correctness. Likewise, we may not resolve doubts in favor of the Patent Office determination when there are deficiencies in the record as to the necessary factual bases supporting its legal conclusion of obviousness.

*In re Warner*, 154 USPQ 173, 178 (CCPA 1967) (emphasis added).

TPR provides no factual basis to support its position that, to one of ordinary skill in the art at the time of the '271 patent, a system having a server that includes a hardware clock would have been obvious. TPR fails to identify a single reason why it would have been obvious to a person of ordinary skill in the art to use a hardware platform that includes a hardware clock instead of a hardware platform that lacks an internal clock. Further, TPR fails to identify a single reason why it would have been obvious to a person of ordinary skill in the art to redundantly create time stamps for data, notifications, and other communications received at a server, especially where time stamps are already placed on the data ***by the collecting device***, before the data is sent ***to a server***, as in *Bibl* and *Teller*. TPR's speculation and unfounded assumption cannot remedy its failure to provide any factual support for its position.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

## C.     CLAIMS 50-52 ARE VALID OVER THE CITED ART

Claims 50-52 have been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject these claims.

Claims 50-52 each recite a system for facilitating feedback that includes a remote server and a sensor database that is accessible to the server. Claim 50 additionally requires that the sensor database include "a sensor identifier field that contains information for identifying said first and second sensors." Claim 51 additionally requires that the "sensor database further includes a sensor description field that contains information describing said first and second sensors." Claim 52 additionally requires that the "sensor database further includes a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second sensors." These limitations are not taught nor rendered obvious by the disclosures in either *Bibl* or *Teller*.

### 1.     *Bibl* Fails To Disclose Or Make Obvious Claims 50-52

TPR asserts that the sensor database limitation of claim 49 would have been obvious to a person of ordinary skill in the art based on *Bibl's* disclosure of a database that stores feedback information. (Comments at 19.) *Bibl* does not disclose (and TPR does not suggest that *Bibl* discloses) any of the additional limitations recited in claims 50-52. Rather, it is TPR's position that the limitations recited in claims 50-52 would have been obvious in view of *Bibl's* disclosure of a database that stores feedback information.

Patentee first disagrees that *Bibl's* disclosure of a database that stores "feedback information" is a "sensor database" or makes a "sensor database" obvious. "Feedback data" in *Bibl* is not the data that is collected from a sensor. Creation of feedback data in *Bibl* requires analysis of personal data. (*Bibl*, Abstract ("[P]ersonal data is . . . analyzed to generate feedback information. This feedback information is presented to the subscriber via the network.").) On the other hand, the purpose of a sensor database is "for storing or keeping information about sensors." ('271 patent, 12:61-64.) A database that stores "feedback information," which is created by analyzing personal data, is not a "sensor database."

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

Patentee further disagrees that a disclosure of a database that stores feedback information is sufficient to disclose specific fields in a sensor database, including "a *sensor identifier field* that contains information for identifying said first and second sensors," "a *sensor description field* that contains information describing said first and second sensors," or "a *sensor output field* that contains information regarding *a type, timing, or format of data* provided by said first and second sensors." In order for a rejection of these claims to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). TPR fails to cite any facts, gleaned from *Bibl*, to support its position that the specific database fields recited in claims 50-52 would have been obvious to one of ordinary skill in light of a disclosure of a database that stores feedback information.

To support its position on claims 50-52, TPR cites to the declaration of Mr. Koperda. Mr. Koperda's statements, however, merely restate the ultimate legal conclusion at issue. "Although factual evidence is preferable to opinion testimony, such testimony is entitled to consideration and some weight *so long as the opinion is not on the ultimate legal conclusion at issue*." MPEP §716.01(c). The entirety of Mr. Koperda's opinion with regard to *Bibl* and claims 50-52 is as follows:

> New claims 49-52 recite using a sensor database including: a sensor identifier field for identifying the sensors, a sensor description field that contains information describing the sensors, and a sensor output field that contains information about a type, timing, or format of data provided by the sensors. Bibl teaches the use of a database to store data from multiple sensors for each of multiple different users. (Bibl, ¶¶ 0027, 0045, 0057-0058). It would have been obvious to one skilled in the art to store the various sensor information in a sensor database having the aforementioned fields.

(Koperda Decl. at ¶ 17.) Mr. Koperda's statements are pure legal conclusions. As such, Mr. Koperda's opinion regarding claims 50-52 should not be entitled to any weight.

TPR's speculation, its unfounded assumptions, and its reliance on an opinion that consists entirely of a legal conclusion cannot support the rejection of claims 50-52.

### 2. *Teller* Fails To Disclose Or Make Obvious Claims 50-52

TPR asserts that the limitations of claims 50-52 would have been obvious to a person of ordinary skill in the art based on *Teller's* disclosure of a database that stores data that is uploaded

Page 34 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

from a sensor device. (Comments at 27; TCC,A7.) *Teller* does not disclose (and TPR does not suggest that *Teller* discloses) any of the additional limitations recited in claims 50-52. Rather, it is *TPR's* position that the limitations recited in claims 50-52 would have been obvious in view of *Teller's* disclosure of a database that stores data that is uploaded from a sensor device.

Patentee disagrees that a disclosure of a database that stores data that is uploaded from a sensor device is sufficient to disclose specific fields in a sensor database, including "a *sensor identifier field* that contains information for identifying said first and second sensors," "a *sensor description field* that contains information describing said first and second sensors," or "a *sensor output field* that contains information regarding *a type, timing, or format of data* provided by said first and second sensors." In order for a rejection of these claims to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). TPR fails to cite any facts, gleaned from *Teller*, to support its position that the specific database fields recited in claims 50-52 would have been obvious to one of ordinary skill in light of a disclosure of a database that stores data that is uploaded from a sensor device.

To support its position on claims 50-52, TPR cites to the declaration of Mr. Koperda. Mr. Koperda's statements, however, merely restate the ultimate legal conclusion at issue. "Although factual evidence is preferable to opinion testimony, such testimony is entitled to consideration and some weight *so long as the opinion is not on the ultimate legal conclusion at issue*." MPEP §716.01(c). The entirety of Mr. Koperda's opinion with regard to *Teller* and claims 50-52 is as follows:

> New claims 49-52 recite using a sensor database including: a sensor identifier field for identifying the sensors, a sensor description field that contains information describing the sensors, and a sensor output field that contains information about a type, timing, or format of data provided by the sensors. Teller teaches receiving information or data from a variety of different sensors for different users, and storing that information in a database. (Teller, 4:14-30; 7:7-12; 9:63-67). It would have been obvious to one skilled in the art to store the various sensor information in a sensor database having the aforementioned fields. With reference to the sensor output field of claim 52, for example, a person skilled in the art would have understood that, given a particular output (e.g., the desired specific output information), there is only a limited number of known ways (e.g., a field in the database) of achieving that output.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

(Koperda Decl. at ¶ 24.) Mr. Koperda asserts that there is a "limited number of known ways" to achieve the limitation recited in claim 52. Mr. Koperda, however, fails to provide any rational basis as to why "a field in the database" would have been obvious over the other purportedly known ways of achieving the recited output. Therefore, Mr. Koperda's statements with regard to claim 52 are pure legal conclusions. Similarly, Mr. Koperda offers nothing more than pure legal conclusions with regard to the limitations of claims 50 and 51. As such, Mr. Koperda's opinion regarding claims 50-52 should not be entitled to any weight.

TPR's speculation, its unfounded assumptions, and its reliance on an opinion that consists entirely of a legal conclusion cannot support the rejection of claims 50-52.

**D.    CLAIMS 53-56 ARE VALID OVER THE CITED ART**

Claims 53-56 have been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject these claims.

Claim 53 recites a system for facilitating feedback that includes a remote server and an "output" database that is accessible to the server. Claim 54 additionally requires that the "output database includes an output identifier field that contains identifying information regarding said first and second subjects." Claim 55 additionally requires that the "output database further includes an output description field that contains descriptive information regarding said first and second subjects." Claim 56 additionally requires that the "output database further includes a sensor identifier field that identifies that said first and second sensors are associated with said first and second subjects." These limitations are not taught nor rendered obvious by the disclosures in either *Bibl* or *Teller*.

**1.    *Bibl* Fails To Disclose Or Make Obvious Claims 53-56**

TPR asserts that "Bibl discloses an output database." (Comments at 19.) To support its assertion that *Bibl* discloses an output database, ***TPR identifies the very same portions of Bibl that TPR asserts disclose both the "sensor database" of claim 49 and the "evaluation database" of claim 57***. Specifically, TPR identifies the portion of its *Bibl* claim charts identified as "(BCC,A8)." (Comments at 19.) In other words, TPR argues that *Bibl's* disclosure of a database that stores feedback information is sufficient to disclose or render obvious (1) the

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

"sensor database" recited in claim 49, with the specific sensor database fields of claims 50-52, (2) the "output database" recited in claim 53, with the specific output database fields of claims 54-56, and (3) the "evaluation database" recited in claim 57, with the specific evaluation database fields of claims 58-61.

The specification and Figures in the '271 patent do not support TPR's position that a single database may constitute a sensor database, an output database, and an evaluation database. For example, Figure 5 of the '271, which is reproduced below, clearly shows three separate databases within data storage device 260:



FIG. 5

Describing this Figure, the '271 patent states:

> The server 204 also may include or store information regarding sensors,
> evaluations, outputs, etc. For example, information regarding sensors may be
> stored in a sensor database 268 for use by the server 204, a user device, or another
> device or entity. Similarly, information regarding evaluation outputs and output
> devices might be stored in an output database 270 for use by the server 204, a user
> device or another device or entity. Information regarding evaluations may be
> stored in an evaluation database 272 for use by the server or another device or
> entity.

('271 patent, 12:1-10.) Figures 6, 7, and 8 illustrate possible implementations of the sensor, output, and evaluation databases. Based on this disclosure, one of ordinary skill in the art at the

Page 37 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

time of the '271 patent would have understood a sensor database, an output database, and an evaluation database to be different and distinct databases.

Even if a person of ordinary skill in the art would have understood that sensor, output, and evaluation databases could be a single database, *Bibl* still fails to disclose the recited "output database." *Bibl's* disclosure of a database that stores *feedback information* is not a disclosure of a database that stores "information regarding evaluation outputs and output devices." ('271 patent, 12:5-8.) Patentee disagrees with TPR that "Bibl discloses an output database."

Patentee also disagrees with TPR's assertion that the limitations of claims 54-56 would have been obvious to a person of ordinary skill in the art at the time of the '271 patent invention. TPR's position is based, again, on *Bibl's* disclosure of a database that stores feedback information. (Comments at 19; BCC,A10.) As provided above, *Bibl* does not disclose or otherwise teach an output database. As such, *Bibl* also fails to disclose or otherwise teach specific fields in an output database, including "an **output identifier field** that contains **identifying information** regarding said first and second subjects," "an **output description field** that contains **descriptive information** regarding said first and second subjects," or "a **sensor identifier field** that **identifies that said first and second sensors are associated with said first and second subjects**."

In order for a rejection of these claims to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). TPR fails to cite any facts, gleaned from *Bibl*, to support its position that the specific database fields recited in claims 54-56 would have been obvious to one of ordinary skill in light of *Bibl's* disclosure of a database that stores feedback.

To support its position on claims 53-56, TPR cites to the declaration of Mr. Koperda. Mr. Koperda's statements, however, merely restate the ultimate legal conclusion at issue. "Although factual evidence is preferable to opinion testimony, such testimony is entitled to consideration and some weight *so long as the opinion is not on the ultimate legal conclusion at issue*." MPEP §716.01(c). The entirety of Mr. Koperda's opinion with regard to *Bibl* and claims 53-56 is as follows:

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

New claims 53-56 recite using an output database including: an output identifier field for identifying the users, an output description field with descriptive information regarding the subjects, and a sensor identifier field that associates sensors to users. Bibl teaches a database to store data from multiple sensors for each of multiple users. (Bibl, ¶¶ 0027, 0045, 0057-0058). It would have been obvious to one skilled in the art that, to properly store the information, an output database having the aforementioned fields would be necessary. For example, it would have been obvious to have an output identifier field and an output description field to identify and describe the users, and a sensor identifier field that associates users with sensors.

(Koperda Decl. at ¶ 18.) The portions of *Bibl* cited by Mr. Koperda do not disclose or render obvious the recited database or fields. Further, Mr. Koperda's opinion that the fields recited in claims 54-56 would have been "necessary" in a database that isn't even disclosed in *Bibl* is based on conjecture and hindsight. Mr. Koperda's statements are pure legal conclusions. As such, Mr. Koperda's opinion regarding claims 53-56 should not be entitled to any weight.

TPR's speculation, its unfounded assumptions, and its reliance on an opinion that consists entirely of a legal conclusion cannot support the rejection of claims 53-56.

### 2.  *Teller* Fails To Disclose Or Make Obvious Claims 53-56

TPR asserts that "Teller discloses an output database." (Comments at 27.) To support its assertion that *Teller* discloses an output database, ***TPR identifies the very same portions of Teller that TPR asserts disclose both the "sensor database" of claim 49 and the "evaluation database" of claim 57.*** Specifically, TPR identifies the portion of its *Teller* claim charts identified as "(TCC,A7)." (Comments at 27.) In other words, TPR argues that *Teller's* disclosure of a database that stores data that is uploaded from a sensor device is sufficient to disclose or render obvious (1) the "sensor database" recited in claim 49, with the specific sensor database fields of claims 50-52, (2) the "output database" recited in claim 53, with the specific output database fields of claims 54-56, and (3) the "evaluation database" recited in claim 57, with the specific evaluation database fields of claims 58-61.

As provided above, the specification and Figures in the '271 patent do not support TPR's position that a single database may constitute a sensor database, an output database, and an evaluation database. Based on the disclosure in the '271 patent, one of ordinary skill in the art at the time of the '271 patent would have understood a sensor database, an output database, and an evaluation database to be different and distinct databases.

Page 39 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

Even if a person of ordinary skill in the art would have understood that sensor, output, and evaluation databases could be a single database, *Teller* still fails to disclose the recited "output database." *Teller's* disclosure of a database that stores ***data that is uploaded from a sensor device*** is not a disclosure of a database that stores "information regarding evaluation outputs and output devices." ('271 patent, 12:5-8.) Patentee disagrees with TPR that "Teller discloses an output database."

Patentee also disagrees with TPR's assertion that the limitations of claims 54-56 would have been obvious to a person of ordinary skill in the art at the time of the '271 patent invention. TPR's position is based, again, on *Teller's* disclosure of a database that stores data that is uploaded from a sensor. (Comments at 27; TCC,A8.) As provided above, *Teller* does not disclose or otherwise teach an output database. As such, *Teller* also fails to disclose or otherwise teach specific fields in an output database, including "an ***output identifier field*** that contains identifying information regarding said first and second subjects," "an ***output description field*** that contains descriptive information regarding said first and second subjects," or "a ***sensor identifier field*** that identifies that said first and second sensors are associated with said first and second subjects."

In order for a rejection of these claims to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). TPR fails to cite any facts, gleaned from *Teller*, to support its position that the specific database fields recited in claims 54-56 would have been obvious to one of ordinary skill in light of *Teller's* disclosure of a database that stores data that is uploaded from a sensor.

To support its position on claims 53-56, TPR cites to the declaration of Mr. Koperda. Mr. Koperda's statements, however, merely restate the ultimate legal conclusion at issue. "Although factual evidence is preferable to opinion testimony, such testimony is entitled to consideration and some weight ***so long as the opinion is not on the ultimate legal conclusion at issue***." MPEP §716.01(c). The entirety of Mr. Koperda's opinion with regard to *Teller* and claims 53-56 is as follows:

> New claims 53-56 recite using an output database including: an output identifier field for identifying the users, an output description field with descriptive information regarding the subjects, and a sensor identifier field that associates

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

> sensors to users. Teller teaches receiving information or data from multiple
> sensors for each of multiple users, and storing that information in a database.
> (Teller, 4:14-30; 7:7-12; 9:63-67). It would have been obvious to one skilled in
> the art that, to properly store the information, an output database having the
> aforementioned fields would be necessary. For example, it would have been
> obvious to have an output identifier field and an output description field to
> identify and describe the users, and a sensor identifier field that associates users
> with sensors.

(Koperda Decl. at ¶ 25.) The portions of *Teller* cited by Mr. Koperda do not disclose or render obvious the recited database or fields. Further, Mr. Koperda's opinion that the fields recited in claims 54-56 would have been "necessary" in a database that isn't even disclosed in *Teller* is based on conjecture and hindsight. Mr. Koperda's statements are pure legal conclusions not based on any fact. As such, Mr. Koperda's opinion regarding claims 53-56 should not be entitled to any weight.

TPR's speculation, its unfounded assumptions, and its reliance on an opinion that consists entirely of a legal conclusion cannot support the rejection of claims 53-56.

**E.     CLAIMS 58-61 ARE VALID OVER THE CITED ART**

Claims 58-61 have been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject these claims.

Claims 58-61 recite a system for facilitating feedback that includes a remote server and an evaluation database that is accessible to the server. Claim 58 additionally requires that the "evaluation database includes an evaluation identifier field that contains identifying information for said evaluation." Claim 59 additionally requires that the "evaluation database further includes a description field that contains descriptive information regarding said evaluation." Claim 60 additionally requires that the "evaluation database further includes a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation." Claim 61 additionally requires that the "evaluation database further includes a field that associates said evaluation with said device to which said notification is provided." These limitations are not taught nor rendered obvious by the disclosures in either *Bibl* or *Teller*.

Appx680

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

### 1.     *Bibl* Fails To Disclose Or Make Obvious Claims 58-61

TPR's assertion that the limitations of claims 58-61 would have been obvious to a person of ordinary skill in the art is based on *Bibl's* disclosure of a database that stores feedback information. (Comments at 19-20.) *Bibl* does not disclose (and TPR does not suggest that *Bibl* discloses) any of the additional limitations recited in claims 58-61. Rather, it is TPR's position that the limitations recited in claims 58-61 would have been obvious in view of *Bibl's* disclosure of a database that stores feedback information.

Patentee disagrees that a disclosure of a feedback database is sufficient to disclose specific fields in an evaluation database, including "an **evaluation identifier field** that contains identifying information for said evaluation," "a **description field** that contains descriptive information regarding said evaluation," "a **sensor identifier field** that contains information for identifying said first and second sensors associated with said evaluation," or "a fi**eld that associates said evaluation with said device** to which said notification is provided." In order for a rejection of these claims to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). TPR fails to cite any facts, gleaned from *Bibl*, to support its position that the specific evaluation database fields recited in claims 58-61 would have been obvious to one of ordinary skill.

To support its position on claims 58-61, TPR cites to the declaration of Mr. Koperda. Mr. Koperda's statements, however, merely restate the ultimate legal conclusion at issue. "Although factual evidence is preferable to opinion testimony, such testimony is entitled to consideration and some weight *so long as the opinion is not on the ultimate legal conclusion at issue*." MPEP §716.01(c). The entirety of Mr. Koperda's opinion with regard to Bibl and claims 58-61 is as follows:

> New claims 57-61 recite using an evaluation database including: an evaluation identifier field for identifying an evaluation, a description field with descriptive information regarding the evaluation, a sensor identifier field that associates sensors with the evaluation, and a field that associates the evaluation with a device to which the notification is provided. Bibl teaches the use of a database to store data from multiple sensors for each of multiple users and teaches evaluating the data. (Bibl, ¶¶ 0027, 0045, 0057-0058). Bibl further teaches that the feedback/evaluation can be provided in any number of ways including recorded messages delivered over the phone, with digital recordings or other audio

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

provided to the sensor device, or on a website accessible by any number of devices. (Bibl, ¶¶ 0006, 0046, 0059). It would have been obvious to one skilled in the art that, to properly store all the evaluation information, an evaluation database having the aforementioned fields would be necessary. For example, it would have been obvious to include an evaluation identifier field and an evaluation description field to identify and describe the evaluation such as for whom (i.e., which users) the evaluation is generated, a sensor identifier field that associates sensors with the evaluation, and a field to track how the evaluation/feedback was output (e.g., to which device/method of output).

(Koperda Decl. at ¶ 19.) The portions of *Bibl* cited by Mr. Koperda do not disclose or render obvious the recited evaluation database fields. Mr. Koperda's statements with regard to these fields are pure legal conclusions. As such, Mr. Koperda's opinion regarding claims 58-61 should not be entitled to any weight.

TPR's speculation, its unfounded assumptions, and its reliance on an opinion that consists entirely of a legal conclusion cannot support the rejection of claims 58-61.

### 2. *Teller* Fails To Disclose Or Make Obvious Claims 58-61

TPR asserts that the evaluation database limitation of claims 57 would have been obvious to a person of ordinary skill in the art based on *Teller's* disclosure of a database that stores data that is uploaded from a sensor device. (Comments at 19.) *Teller* does not disclose (and TPR does not suggest that *Teller* discloses) any of the additional limitations recited in claims 58-61. Rather, it is TPR's position that the limitations recited in claims 58-61 would have been obvious in view of *Teller's* disclosure of a database that stores data that is uploaded from a sensor device.

Patentee first disagrees that *Teller's* disclosure of a database that stores data that is uploaded from a sensor device is an "evaluation database" or makes an "evaluation database" obvious. The purpose of an evaluation database is for storing "[i]nformation regarding evaluations." ('271 patent, 12:8-10.) A database that stores data that is uploaded from a sensor device is not an "evaluation database."

Patentee further disagrees that a disclosure of a database that stores data that is uploaded from a sensor device is sufficient to disclose specific fields in an evaluation database, including "an evaluation identifier field that contains identifying information for said evaluation," "a description field that contains descriptive information regarding said evaluation," "a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation," or "a field that associates said evaluation with said device to which said

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

notification is provided." In order for a rejection of these claims to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). TPR fails to cite any facts, gleaned from *Teller*, to support its position that the specific database fields recited in claims 58-61 would have been obvious to one of ordinary skill in light of a disclosure of a database that stores data that is uploaded from a sensor device.

To support its position on claims 58-61, TPR cites to the declaration of Mr. Koperda. Mr. Koperda's statements, however, do not establish that the limitations in claims 58-61 are disclosed or rendered obvious by *Teller*. Some of Mr. Koperda's statements cite portions of *Teller* that are completely irrelevant to the claims that he suggests are disclosed. In other places, Mr. Koperda merely restates the ultimate legal conclusion at issue. "Although factual evidence is preferable to opinion testimony, such testimony is entitled to consideration and some weight *so long as the opinion is not on the ultimate legal conclusion at issue*." MPEP §716.01(c). An analysis of Mr. Koperda's statements with regard to *Teller* and claims 58-61 is provided below:

| Statement from Paragraph 26 of Koperda Decl. | Analysis |
|---|---|
| "Teller teaches receiving information or data from multiple sensors for multiple users, and storing that information in a database as required by claim 57. (Teller, 4:14-30; 7:7-12; 9:63-67)." | Claim 57 does not recite a database that stores information from multiple sensors/users. Claim 49 recites such a database. Claim 57 recites an evaluation database. Mr. Koperda's statement is conclusory and irrelevant to claim 57. |
| "Teller teaches that the Central Monitoring Unit (30) (see FIG. 3) contains the database (database server 110) and can send an evaluation (i.e., an alert) to the user. [Teller, 9:37-41]. The alert (e.g. a reminder to eat a meal or take medication [Teller, 9:19-22]) inherently requires that Teller's database include an identifying field for that alert [as required by claim 58]." | Claim 58 requires the evaluation database to include "an evaluation identifier field that contains identifying information for said evaluation." Patentee disagrees the recited evaluation identifier field is necessarily present in *Teller*. Indeed, the alert described in Teller could be provided without necessarily having the recited evaluation identifier field. "The mere fact that a certain thing may result from a given set of circumstances is not sufficient to establish inherency." *In re Rijckaert*, 9 F.3d 1531, 28 USPQ2d 1955, 1957 (Fed. Cir. 1993). |
| "Claim 59 requires the system of claim 58 and includes a field that contains descriptive information regarding the evaluation. Teller identifies such a descriptive message, a digitally recorded voice message that is | The cited portion of *Teller* relates to time stamps that may be "a digitally recorded voice message" that may be translated into text by the central monitoring unit. This passage says nothing about description field recited by claim |

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

| Statement from Paragraph 26 of Koperda Decl. | Analysis |
|---|---|
| translated to text via voice recognition technology. [Teller, 8:3-8]." | 59. Mr. Koperda's statement is conclusory and irrelevant to claim 59. |
| "Teller clearly shows in Table 1. [Teller 4:37 - 5:23] a plurality of sensors,. the sensed parameters and whether further processing (e.g. evaluation) is needed for each. For example, for a "time to eat" alert, the sensor monitoring the glucose level is available. Teller describes the operation of the sensors and its indication of physiological parameters for evaluation. [Teller. 4:14-36]." | Claim 60 requires the evaluation database to further include "a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation." The cited portion of *Teller* does not disclose capabilities of an evaluation database that is at or accessible to a remote server, as required by claim 60. Table 1 describes the capabilities of "sensor device 10." Indeed, Teller states that "[t]he types of data listed in Table 1 are intended to be the types of data *that can be generated by sensor device 10.*" (Teller, 5:24-26 (emphasis added).) With regard to claim 60, Mr. Koperda's statement is conclusory and irrelevant. |
| "Claim 61 requires the system of claim 60 where the database has a field that associates the evaluation with a device to which the notification is provided. In the above example of Teller, the alert message of a reminder to eat was sent to the specific user identified device (which had to be inherently stored in the database) and could have been based on the sensor identified in Table 1 (e.g., glucose sensor) that was evaluated." | As with claim 60, the portion of Teller that Mr. Koperda cites does not relate to a database at or accessible to a remote server. Thus, with regard to claim 61, Mr. Koperda's statement is conclusory and irrelevant. |

TPR's speculation, its unfounded assumptions, and its reliance on an opinion that consists entirely of a legal conclusion cannot support the rejection of claims 58-61.

## F.   CLAIM 65 IS VALID OVER THE CITED ART

Claim 65 has been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject this claim. Claim 65 recites a remote server that includes, inter alia, a processor that is operative to "provide a notification regarding [an] evaluation to a device, wherein said device includes a flash memory card."

Page 45 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

### 1. *Bibl* Fails To Disclose Or Make Obvious Claim 65

*Bibl* discloses that a server may communicate with "clients 130 and 170." (*Bibl*, ¶ [0029].) *Bibl* discloses that "[c]lients 130 and 170 represent any device that may enable user's access to data"; however, *Bibl* does not expressly disclose that clients 130 or 170 include a flash memory card and flash memory cards are not necessary components in a computer or other device that allows a user to access data.

*Bibl* also discloses that, an "apparatus for performing the operations" disclosed in *Bibl* "may comprise a general purpose computer selectively activated or reconfigured by a computer program stored in the computer. Such a computer program may be stored in a computer readable storage medium, such as . . . EEPROMs[.]" (*Bibl*, ¶ [0022].) TPR asserts that *Bibl's* disclosure of EEPROM is a disclosure of the recited "flash memory card." (Comments, 20 ("Bibl discloses that the server communicates with clients that include a . . . computer system which includes EEPROM (flash memory).".) TPR's reliance on an EEPROM an the "apparatus for performing operations" is flawed for at least two reasons.

First, *Bibl's* disclosure regarding the "apparatus for performing the operations" is referring to the ***server, not a device that receives a notification*** (which Bibl identifies as "clients 130 and 170"). *Bibl* lacks any disclosure that explicitly states that clients 130 or 170 include EEPROM. *Bibl's* disclosure regarding the structural components of "clients 130 and 170" is limited to the statement that they "may represent any device that may enable user's access to data." TPR does not argue that the presence of EEPROM or compatibility with a flash memory card would have been necessary for clients 130 or 170 to enable user's access to data. TPR further fails to provide any factual support or motivation for a person of ordinary skill in the art to incorporate the EEPROM in a server into clients 130 or 170. Thus, even if a disclosure of EEPROM was sufficient to disclose the recited "flash memory card" (which it isn't), *Bibl* would still fail to disclose or render obvious the flash memory card limitation of claim 65.

Further, disclosure of EEPROM is not a disclosure of a flash memory card and would not have made a flash memory card obvious. One of ordinary skill in the art at the time the '271 patent was invented would have understood the term "flash memory card" to mean a memory card that is easily removable from a host device. (Ashby Decl. at ¶ 12) (attached hereto as "Exhibit 3".) One of ordinary skill in the art at the time of the '271 patent invention would not have understood the term "flash memory card" to include memory that is permanently

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

incorporated into a host device, such as part of a microprocessor or soldered onto a printed circuit board. (*Id.*) Further, one of ordinary skill in the art would have understood *Bibl's* disclosure of EEPROM to be permanent system memory incorporated into the general purpose computer that is described by *Bibl*. (*Id.*)

### 2. *Teller* Fails To Disclose Or Make Obvious Claim 65

Teller discloses that a device that receives a notification from a server may include "flash memory." (Teller, 6:64-66.) Teller's disclosure of "flash memory" is not equivalent to or render obvious the recited "flash memory *card*." One of ordinary skill in the art would not have understood the term "flash memory" to mean the same thing as a "flash memory card." "Flash memory" is not necessarily removable but may be permanently incorporated into a host device, such as the internal memory in a computer. TPR attempts to read out the term "card" from claim 65 by asserting that Teller's disclosure of "flash memory" is adequate to disclose the recited "flash memory card." *See In re Wilson*, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) ("All words in a claim must be considered in judging the patentability of that claim against the prior art."); *see also* MPEP § 2143.03.

## G. CLAIM 79 IS VALID OVER THE CITED ART

Claim 79 has been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject this claim. Claim 79 recites a remote server having a processor that is operative to "provide a notification regarding said evaluation to a device, wherein said notification includes an XML transmission."

*Bibl* discloses that "using the HTTP protocol and the HTML coding language across a network, web server 160 may communicate . . . with clients 130 and 170." (*Bibl*, ¶ [0032].) *Teller* discloses that notifications may be provided on web pages and that "web pages refers to a block or blocks of data available on the World-Wide Web comprising a file or files written in Hypertext Markup Language or HTML, and a web site commonly refers to any computer on the Internet running a World-Wide Web server process." (*Teller*, 10:26-31.) Neither *Bibl* nor *Teller* disclose providing a notification regarding an evaluation via an XML transmission. TPR asserts

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

that the teaching of database communications in *Bibl* and *Teller* would have made the "XML transmission" of claim 79 obvious.

Patentee first disagrees with TPR's speculative and unfounded assertions that the purported database communications in *Bibl* and *Teller* would have made the "XML transmission" of claim 79 obvious. As a preliminary matter, TPR does not specifically identify example which "database communications" in *Bibl* and *Teller* are referred to in its statement. Further, in contrast to TPR's assertions, at the time of the invention there were a variety of communication protocols for communicating data between databases. Of the communications protocols known at the time of filing, XML is but one example, and because of the overhead of tags around all data in XML documents, XML would have required much more bandwidth than many other communication protocols. Therefore, XML would not have been an obvious choice in *Bibl* and *Teller*.

In addition, Patentee notes that claim 79 does not require any "database" or "database communication." Therefore, it is not at all clear why it would have been obvious to employ XML to "provide a notification regarding said evaluation to a device, wherein said notification includes an XML transmission" as required by claim 79.

To support its position on claim 79, TPR cites to the declaration of Mr. Koperda. The entirety of Mr. Koperda's opinion with regard to *Bibl* and claim 79 is as follows:

> New claim 79 recites the use of an XML transmission. As was known in by those skilled in the art at the time of the filing, XML is a preferred solution when data is sent and retrieved for a database. An advantage of XML is that it provides a description of the data (name, format, range value) and then the data. Because the data is "tagged," it makes it easy to share the data between dissimilar systems. For example a date can be in Month, Day, Year format in the US or as Year, Month, Day format in other countries. It would have been obvious to one skilled in the art at the time of the filing to use XML for communication with a database.

(Koperda Decl. at ¶ 16.) Mr. Koperda's statements are deficient for at least four reasons. First, Mr. Koperda's statements make no mention of *Bibl* or *Teller*, and do not even attempt to explain which teachings of *Bibl* or *Teller* it would have been obvious to modify in order to arrive at the "XML transmission" required by claim 79. Second, Mr. Koperda's assertions that "XML is a preferred solution when data is sent and retrieved for a ***database***" and "It would have been obvious to one skilled in the art at the time of the filing to use XML for communication with a ***database***" are not relevant to the requirements of claim 79, because claim 79 does not require a

Page 48 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

"*database*." Third, Mr. Koperda's assertion that XML exhibits certain "advantages" is not helpful in this context because Mr. Koperda does not identify which technology XML is "advantageous" over, rendering this statement indefinite. Fourth, Mr. Koperda's statement that "Because the data is 'tagged,' it makes it easy to share the data between *dissimilar systems*" is not relevant to the requirements of claim 79, because claim 79 does not require "*dissimilar systems*." In light of these deficiencies, Mr. Koperda's opinion regarding claim 79 should not be entitled to any weight.

TPR's speculation, its unfounded assumptions, and its reliance on an opinion that is entirely deficient cannot support the rejection of claim 79.

## H.   CLAIM 95 IS VALID OVER THE CITED ART

Claim 95 has been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject this claim. Claim 95 recites a remote server that includes a processor that receives first and second data, over the Internet, from first and second sensors that is indicative of physical characteristics of first and second subjects, respectively. Claim 95 requires that the processor be "operative to receive said first and second data simultaneously from said first and second subjects."

### 1.   *Bibl* Fails To Disclose Or Make Obvious Claim 95

TPR asserts that "Bibl discloses different users may have their own PSA [or "portable sports appliance"], each of which may individually transmit data to the server." (Comments at 22.) Patentee does not dispute that individuals in *Bibl* may have their own portable sports appliance or that these portable sports appliances may individually transmit data to the server. *Bibl*, however, says nothing about the server receiving data *simultaneously* from multiple portable sports appliances. TPR does not even assert that *Bibl* discloses or renders obvious a system in which a server that receives data simultaneously from multiple devices, as required by claim 95. The fact that a server may receive data from multiple devices *does not* make simultaneous reception of data from multiple devices obvious.

### 2.   *Teller* Fails To Disclose Or Make Obvious Claim 95

Page 49 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

With regard to *Teller*, TPR asserts that "[i]t would have been obvious to a person of ordinary skill in the relevant art that data may be received simultaneously from users over the Internet." In support of its assertion, TPR states that "Teller discloses that the system receives data and makes data available over the Internet." (Comments at 30.) Again, Patentee does not dispute that in the system disclosed in *Teller*, data is received and made available over the Internet. Patentee disagrees that *Teller's* disclosure of a system that receives data and makes data available over the Internet is sufficient to disclose or render obvious a server that receives data from multiple devices **simultaneously**.

## I.    CLAIMS 98 AND 99 ARE VALID OVER THE CITED ART

Claims 98 and 99 have been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject these claims. Claim 98 recites a remote server that includes a processor that receives first and second data, over the Internet, from first and second sensors that is indicative of physical characteristics of first and second subjects, respectively. Claim 98 requires that the "processor is operative to determine whether said first subject is in need of a break." Claim 99 further requires the processor to be "further operative to provide a notification to [a] device concerning whether said first subject is in need of a break."

### 1.    *Bibl* Fails To Disclose Or Make Obvious Claim 98

Bibl discloses that a personal data capture device (as shown in Fig. 4) may include a microprocessor (460), a memory (480), and a beeper (470) for providing audio signals. (*Bibl*, ¶ [0046].) "[W]hen personal data capture device 400 is configured over the network . . . electronic beeper 470 can be set to signal low and high heart rate target limits[.]" *(Id.)* TPR relies upon this disclosure to support its proposed rejection of claim 98. (Comments at 22, BCC, A24.) The determination of whether a user's heart rate has reached a target limit, however, is made **by a microprocessor of a personal data capture device**. Claim 98 requires that the determination of whether a first subject is in need of a break is performed **by a processor of a remote server**.

In another embodiment, *Bibl* discloses a "panic button 486 [that] is coupled to [personal data capture device] microprocessor 460." (*Bibl*, ¶ [0051].) Software (482), which resides within the personal data capture device, analyzes data in the personal data capture device's memory.

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

(*Id.*) "If the personal data includes a parameter that is below or exceeds a certain panic parameter (e.g., heart rate is too low or too high), software 482 may cause microprocessor 460 to invoke panic button 486." (*Id.*) TPR relies upon this disclosure to support its proposed rejection of claim 98. (BCC,A24.) The determination of whether a user's heart rate is too low or too high, however, is made **by software 482, which is part of personal data capture device**. Claim 98 requires that the determination of whether a first subject is in need of a break is performed **by a processor of a remote server**.

### 2.    *Teller* Fails To Disclose Or Make Obvious Claim 98

TPR cites to *Teller*'s disclosure of a system that determines whether a user's sleep levels are low, and provides the user with ways to improve or get more sleep in support of its proposed rejection of claim 98. (Comments at 30.) Specifically, the referenced portion of *Teller* states that "if the system detects that a user's Sleep levels have been low, which suggest that the user has been having trouble sleeping, Problem Solver 158 can provide suggestions for way[s] to improve sleep." (*Teller*, 19:42-45.)

A processor that is operative to determine whether a subject is "in need of a break" is neither disclosed by nor rendered obvious by a processor that is operative to determine whether a user is in need of sleep. Several different definitions for the noun "break" exist. (*See* Exhibit 2, page 227.) Two of those definitions (numbers 6 and 7 under in the noun section) are "An interruption or disruption in continuity or regularity: television programming without commercial breaks" and "A pause or interval, as from work: *a coffee break*." (*Id.*) These definitions are consistent with how the term "break" is used in the '271 patent. For example, the detailed description of the '271 patent uses the term "break" in the following ways:

- "As another example, the evaluation determined during the step 104 may indicate that **a break or interruption** is needed so that the subjects can stretch their legs, use the restroom, overcome boredom or fatigue, etc." ('271 patent, 6:13-17 (emphasis added).)

- "The determination made during the step 104 of the data received during the step 102 may indicate that the group of subjects may be bored or in need of a break. Based on this evaluation and or characteristic data of the subjects, a determination may be made that a ten-minute break should be given." ('271 patent, 7:49-54.)

Page 51 of 54

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

Sleep does not appear in any of the various definitions for the term "break." (*See id.*) Defining the term "break" to mean "sleep" is inconsistent with how the term "break" is used in the '271 patent, how the term "break" is defined, and what one of ordinary skill in the art would have understood the term to mean at the time of the '271 patent invention. Defining the term "break" to mean "sleep" would be an unreasonably broad construction. Understanding the proper construction for the term "break," it is clear that *Teller* does not disclose or make obvious a "processor [that] is operative to determine whether said first subject is in need of a break" as recited by claim 98.

### 3.    Claim 99 Should Be Allowed

The ACP also rejects claim 99. By virtue of its dependence on claim 98, which is allowable for at least the reasons presented above, claim 99 is also allowable.

## J.    CLAIM 124 IS VALID OVER THE CITED ART

Claim 124 has been rejected as obvious over (i) *Patton* in light of *Bibl*; (ii) *Zawilinski* in view of *Bibl*; (iii) *Patton* in light of *Teller*; and (iv) *Zawilinski* in view of *Teller*. The disclosures contained in *Bibl* and *Teller* are relied upon in both the TPR's Comments and in the ACP to reject this claim. Claim 124 recites a local first sensor, a local second sensor, and a remote server. The first sensor "is operative to transmit said first data to a local first user device over a Bluetooth wireless communication link."

*Bibl* discloses that a personal data capture device may transmit data to a server "using a wireless transmitter." (*Bibl*, ¶ [0026].) *Bibl* fails to disclose that **Bluetooth** wireless transmission may be used to transmit data. *Teller* also discloses wireless data transmission and specifically identifies radio frequency and infrared transmission. (Teller, 22:47-58.)

According to TPR's expert, Mr. Koperda, "[t]he use of Bluetooth for wireless radio transmission would have been an obvious design choice for one skilled in the art, because Bluetooth technology is optimized for short distance, low power, low cost, and low weight." Mr. Koperda's testimony is irrelevant to the obviousness inquiry because it focuses on how the current state of Bluetooth technology and not on Bluetooth technology as it existed at the time of the '271 patent invention. Indeed, while Mr. Koperda's statement regarding how "Bluetooth is optimized" may be true of Bluetooth today, it was not true of Bluetooth at the time of the '271 patent invention. (Exhibit 3 at ¶ 17.)

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

The focus in an obviousness determination is on what a person of ordinary skill in the pertinent art would have known *at the time of the invention*. 35 U.S.C. § 103; MPEP § 2141(II). This requirement exists in order to avoid impermissible hindsight in obviousness rejections. MPEP § 2141(III).

At the time of the '271 patent invention, Bluetooth wireless transmission had a high energy profile. (Exhibit 3 at ¶ 16.) Due to the large amount of power required to transmit data, Bluetooth devices were not suitable for small battery-powered handheld or portable applications. (*Id.*) This is because if too few batteries were used, they would need to be recharged or replaced very frequently. (*Id.*) Alternatively, if an adequate amount of battery power was provided to allow the device to operate for an extended period of time, the weight of the battery would have limited the portability of the device. (*Id.*) In addition, at the time of the '271 patent invention, Bluetooth was expensive relative to other forms of wireless data transmission technologies. (*Id.*) Thus, at the time of the '271 patent invention, other forms of wireless data transmission protocols would have been preferred over Bluetooth for the applications described in the '271 patent. (*Id.*) As such, a person of ordinary skill in the art at the time of the '271 patent invention would not have found Bluetooth wireless transmission an obvious replacement for radio frequency, infrared, or other wireless transmission protocols. (*Id.* at ¶ 17.)

Amendment B and Response to Action Closing Prosecution mailed August 12, 2013
Reexamination Control No.: 95/002,337

## <u>CONCLUSION</u>

In view of the foregoing, Applicants submit that the pending claims are allowable. In the event that Examiner finds remaining impediment to a prompt allowance of this application that may be clarified through a telephone interview or overcome by an Examiner's Amendment, Examiner is requested to contact the undersigned attorney.

Dated this 12th day of September, 2013.

Respectfully submitted,

**/Mark W. Ford, Reg. No. 67,732/**

Mark W. Ford
Registration No. 67,732
Attorney for Patentee
Customer No. 97149
Telephone No. (435) 252-1360

Page 54 of 54

# EXHIBIT 25

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*In re* reexam of: U.S. Patent 6,701,271 B2 to      Examiner: Nguyen, Minh T.
     WILLNER *et al.*      Art Unit: 3992

For:   **Method and Apparatus for Using**      Atty. Docket: 3271.001REX0
      **Physical Characteristic Data Collected**
      **from Two or More Subjects**

Reexam Control No.: 95/002,337      Confirmation No.: 1254
    Filed: Sept 14, 2012

### Comments by Third Party Requesters to Patent Owner's Response to Action Closing Prosecution (ACP)

**Mail Stop *"Inter Partes* Reexam"**

Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450
Sir:

    The Third Party Requesters Strava, Inc., MapMyFitness, Inc., and FitnessKeeper, Inc. (collectively, "Requesters") timely submit herewith Comments to Patent Owner ICON Health & Fitness, Inc. ("ICON") Response to the ACP filed on September 12, 2013 ("Response") for the above-captioned merged proceedings, which is herein incorporated by reference. Requesters' comments are directed to points and issues raised in Patent Owner's Response.

## I.    Introduction

    In its Response (p. 2), ICON, hereinafter Patent Owner ("PO"), cancelled claims 17-46, 48-49, 57, 62-64, 66-78, 80-94, 96-97, 99-123, 125-228, and amended claims 47, 50-56, 58-61, 65, 79, 95, 98, and 124. Claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 remain pending and stand rejected by the Examiner.

    Throughout its Response to the ACP, PO argues strained interpretations of the claims in an effort to create minor differences between the claims and the prior art. However, even

Appx695

assuming only for argument's sake that their claim interpretations are correct (which Requesters do no concede), the claims would still be unpatentable because even the differences cited by PO are minor and are not patentably significant.  "Section 103 forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.' " *KSR* Int'l Co. v. *Teleflex*, Inc., 550 U.S. 398 (2007).  PO fails to provide any evidence that the cited differences create results that are unexpected, unobvious and statistically and practically significant.  The rejections of claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 are proper and should be upheld.

## II.   Response to ICON's Request for Interview/Examiner's Amendment

In its Response (p. 54), PO requested a telephone interview or Examiner's Amendment to overcome the standing rejections.  PO's request for an examiner interview or amendment is improper and should be denied.  Examiner interviews are not permitted in Inter Partes Reexamination.  See 37 C.F.R. §1.955 and MPEP §2685.  Similarly, any Examiner's Amendment that would overcome a standing rejection is not permitted in Inter Partes Reexamination.  See MPEP §2673.01 and §2687(III).

## III.   Response to PO's Remarks

Claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98-99, and 124 stand rejected by the Examiner as provided in the Action Closing Prosecution (ACP) dated August 9, 2013.  Below are Requesters' comments on PO's "Remarks" in PO's Response to the ACP.

### A. <u>Response to Claims 15 and 16 in view of Patton</u>

PO traversed the existing rejections of claims 15 and 16 in view of Patton, arguing that "[t]he express language of claims 15 and 16 require, among other things, a certain order of steps." (Response, p. 24). It is important to note that PO **does not dispute that Patton discloses all the recited steps.** PO only argues that the claim requires the steps be performed in a particular order. Requesters disagree with PO's argument about order.

In the ACP the Examiner applies Patton to the claims in one way[1], while Requesters apply Patton in an alternative way[2]. Given the breadth of the wording of the claims (particularly for the language "providing a notification *regarding* an evaluation"), both applications of Patton to the claims are appropriate and are addressed below. But PO's argument about order applies only to the Examiner's application of Patton. PO specifically argues that "**the interpretation of Patton in the ACP** fails to teach or suggest the specific order of steps . . . required by claims 15 and 16.**" (Response, p. 24-25, emphasis added). Contrary to PO's argument, however, no order is required by the claims. And a method claim does not require that the steps have to be

---

[1] Specifically, in discussing claim 15, the Examiner finds the limitation of claim 1 (upon which claim 15 indirectly depends) of "providing a notification regarding said evaluation to a device" to be met by Patton because "Patton discloses that a plurality of display formats (functioned as a notification because when the display formats are displayed, the test subject is notified by their displays) which are subjected to (regarding) evaluation is provided to a vehicle control panel (device). In other words, the manufacturer (note that the claim does not require who does the function of providing) provides a notification (in the form of a plurality of display formats) regarding said evaluation (the plurality of formats are subjected to the evaluation) to the vehicle control panel (device)." (ACP, p. 7). Thus, the Examiner's position is that providing the options is the notification.

[2] Requesters, in discussing claim 15, stated that "a plurality of options are provided to the maker who makes a selection: 'Several different forms of panels, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the display that was most rapidly comprehended and/or created approval or pleasure in the test subject.' (Patton, col. 24, lines 46-51)." (Request, CC1, p. 19). Thus, Requester's position is that the maker choosing one of the options based on the reaction of a test subject is the notification.

Reexam Control No. 95/002,337

performed in any particular order, unless specified within the claim.  See *Altiris Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371, 65 USPQ2d 1865, 1869-70 (Fed. Cir. 2003) (Although the specification discussed only a single embodiment, the court held that it was improper to read a specific order of steps into method claims where, as a matter of logic or grammar, the language of the method claims did not impose a specific order on the performance of the method steps, and the specification did not directly or implicitly require a particular order).  **Neither claim 15 nor 16 require that the steps be performed in any particular order**, and as such, PO's argument is without merit.  In fact, the specification of the '271 patent specifically states that:

> In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences without departing from the scope of the present invention and the claims should not be construed as being limited to any particular order or sequence, unless specifically indicated.

'271 patent, 14:25-31. Thus, the '271 patent itself disclaims any order or sequence of steps.

Furthermore, PO's argument about order is not relevant to Requester's application of Patton to claim 15 and 16 which is set forth in the Request at CC1, pages 19-20.  As set forth therein, Patton discloses each step of claims 15 and 16 in the order alleged by PO to be required.

PO further alleges that "claim 15 also requires that a **single device** have **dual-functionality**." (Response, p. 24).  The "dual-functionality" alleged by PO, however, is not functionality performed by the device itself.  For example, the first "functionality" alleged by the PO is that the device is selected. (Response, p. 24).  The selection of a device by a third party or other system (the claim language is silent as to who/what selects the device) is not a functionality performed by the device or a functionality of the device.

Reexam Control No. 95/002,337

PO alleges that the second "functionality" of the device is when the device is provided (by some other unnamed system or party not specified by the claim language) a notification. (Response, p. 24). Providing a notification to a device, however, is not a functionality of the device (i.e., it is not a functionality performed by the device). If the claim actually recited that the devices *receives* a notification or *displays* the notification, those claimed features would be functions of the device. But the claims do not recite such functionality.

The Examiner properly found that Patton discloses all the features actually recited in claims 15 and 16. (ACP, pp. 4-8). PO does not dispute that all the steps are disclosed by Patton, instead PO incorrectly alleges that claims 15 and 16 require steps be performed in a specific order and further argues that **unclaimed limitations** (e.g., a dual functionality device) are not disclosed in the cited art. If PO desired to have a specific ordering of steps or a dual-functionality device, PO should have amended the claims to recite such limitations so that the patentability of those features could have been considered by the Office.

## B. Response to Claims 15 and 16 in view of Papadopoulos

Claim 13 recites "receiving a notification regarding a plurality of options." The Examiner previously found that, due to the breadth of the claim language, "[c]laim 13 does not require that the notification be 'external.' The fact that the presenter in Papadopoulos *knows* the options available to him means that he must receive a notification, which inherently can be 'external' or 'internal.' " (ACP, p. 10). PO previously argued without success that, if the presenter conceives of options within his/her own mind, then it is not a receipt of a notification. (ACP, p. 9). **Here PO simply repeats its previous argument, an argument upon which the Examiner has already properly ruled against PO.**

PO alleges that "prior to the beginning of his presentation, the presenter may have conceived, entirely within his own mind, of options available during his presentation," and that "'receiving a notification' in claim [*sic.*] to include a notification conceived entirely within the mind of a human presenter is unreasonably broad." (Response, p.26). **PO however fails to point to any claim language** that would render such an interpretation as being "unreasonably broad."

PO points to the only portion of the '271 patent that includes the claim language "receiving a notification," stating that "the method 100 may include a step of receiving a notification of several possible endings to a play being presented to the audience." (Response, p.27). However, even this cited portion of the '271 patent specification fails to indicate from what source the notification is received or even what form the notification takes, and clearly includes the possibility of a director, writer, producer, or actor in the play of perceiving the notification within his/her own mind. For example, receiving a notification may involve a presenter observing an audience for visual and/or auditory cues, which may reasonably be considered "receiving a notification" from an external source. (Requesters however do not concede that an external source is required by the claim language.)

Finally, PO tries to distinguish between "receiving a notification," and "receiving an impression," acknowledging that the definition of receive is "obscure." (Response, p. 29). PO attempts to change the scope of its claim language by choosing the definition of receiving that is most favorable to it, all the while acknowledging that other definitions are certainly reasonable, so reasonable in fact that PO acknowledges that it "[i]t is possible that TPR will argue" such reasonable definitions. *Id.* PO is correct. Requester respectfully submits to the Office that: (1) the claim language is to be given its broadest reasonable interpretation in light of the specification, (2) PO is attempting to redefine claim terms outside of the specification by citing a

dictionary and therein focusing only on one possible definition, and (3) the alternate definition of receiving to mean "to perceive or acquire mentally" is equally valid as any definition proposed by PO.   PO's attempted distinction between "receiving a notification" and "receiving an impression" is therefore without merit.

### C. Response to Claim 47

Claim 47 recites a server that receives data, processes/evaluates the data, and provides notifications, and that has an internal clock element operative to maintain a time/date and create time stamps for the data and notifications.  PO acknowledges that both Bibl and Teller disclose the presence of internal clocks. (Response, p. 31).

PO admits that Bibl and Teller collectively disclose  devices that collect data and place a timestamp on the data, but argues that Bibl and Teller somehow fail to disclose a server that is capable of creating time stamps for data and notifications. (Response, p. 31).  PO then alleges that the references **teach away** from having an internal clock on a server, acknowledging that "[w]hile it would have been possible to place time stamps on data that was sent and received, one of ordinary skill in the art **would not have been motivated** to create such a system." (Response, p. 31, emphasis added).

PO clearly confuses what is required for two references to teach away from one another, versus what is required for the motivation to create the disclosed system.  First, just because a reference teaches a functional solution does not mean that it "teaches away" from other possible solutions, as long as such a combination would not render the solution inoperable for its intended purpose.  (*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314 (Fed. Cir. 2009).  PO fails to allege that the combination would render the device inoperative for its intended purpose.

Second, a strict finding of teaching, suggestion, or motivation is not required to combine references, and a failure to identify every possible additional solution does not mean one skilled in the art could not combine the references.  PO only alleges that there existed an alternative embodiment, a design choice, that one skilled in the art may or may not have made.  However, even accepting PO's argument as true (for argument's sake only), at worst the device would include redundant features, which may not have prevented one skilled in the art from doing it anyways and would not have rendered the device inoperable for its intended purpose.

For example, PO alleges that if timestamps are already placed on data by the collecting device, there would be no motivation for a server receiving the data to have an internal clock for timestamping the received data.  (Response, p. 32).  Requestors disagree.  PO has acknowledged that data is sent from a first data collection device to a server that receives and processes the data.  It would have been obvious to a person of ordinary skill in the relevant art to have an internal clock that timestamps the received data to indicate when it was received instead of, or in addition to, when it was collected so that it may be processed in order of receipt.

Further, Requesters disagree with PO's interpretation of the references.  For example, PO's allegation is based on a misinterpretation of Bibl (for which PO fails to provide any citations to supporting portions of Bibl).  Bibl specifically discloses that "personal data includes a date and a timestamp associated with each physical data and biometrical parameter." (Bibl, p. 17).  Bibl however does not specifically state from which device the timestamp is generated, be it a data capture device, a remote server that receives the data, or both.  One skilled in the art could

reasonably interpret both devices to have an internal clock, as supported by Mr. Koperda's declaration. (Koperda Dec., ¶14).[3]

### D. Response to Claims 50-52

Claims 50-52 recite a sensor database including a sensor identifier field, **a sensor description field, and a sensor output field.** PO alleges that " 'feedback data' in Bibl is the data that is collected from a sensor. Creation of **feedback data in Bibl requires analysis of personal data."** (Response, p.33, emphasis added). PO acknowledges that feedback data includes personal data, or at least an analysis thereof. Bibl clearly states that "personal data comprises **physical data and biometrical parameters of the subscriber,**" which is captured by sensors. (Bibl, p. 17, emphasis added). As such, feedback data does include data collected from a sensor, including physical data and biometrical parameters, which may be further analyzed.

PO further "disagrees that a disclosure of a database that stores feedback information is sufficient to disclose specific fields in a sensor database," alleging that impermissible hindsight is being used. (Response, p. 34). Requesters disagree and point Examiner to previously cited portions of Bibl that describe receiving data from multiple sensors for different users, the data of which would obviously be stored in the enumerated sensor database fields recited by the claims. (See Bibl, ¶¶ 0027, 0045, 0057-0058, and Koperda Dec., ¶ 17).

### E. Response to PO's Allegation Regarding Declaration Being Legal Conclusions

With regard to claims 50-52, 53-56, and 58-61, PO fails to rebut the testimony provided by Mr. Koperda. Instead, PO alleges that Mr. Koperda's declaration merely restates the ultimate legal conclusions and should be disregarded. (Response, pp.34-36 and 38-45). Requesters

---

[3] References to "Koperda Dec." are to the Declaration of Frank Koperda, dated April 6, 2013. References to "Koperda Suppl. Dec." are to the Supplemental Declaration of Frank Koperda submitted herewith.

disagree.  First, Mr. Koperda's declaration does not merely provide legal conclusions as alleged by PO.  Mr. Koperda is a recognized expert in the field and is offering his opinion as to what is described by the prior art and how the teaching of the prior art would be understood by a personal having ordinary skill in the relevant art.  Mr. Koperda's declaration clearly provides factual support for his opinions.  Such opinion testimony is properly considered by the Office:

> While objective factual evidence going towards a § 103 determination is preferable to statements of opinion on the issue, the nature of the matter sought to be established, as well as the strength of the opposing evidence, must be taken into consideration in assessing the probative value of expert opinion. Opinion testimony rendered by experts must be given consideration, and while not controlling, generally is entitled to some weight. Lack of factual support for expert opinion going to factual determinations, however, may render the testimony of little probative value in a validity determination.

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 294 (Fed. Cir. 1985).*

To the extent that the Examiner finds a portion of Mr. Koperda's declaration to offer a legal conclusion, the Examiner is urged to carefully consider the factual support provided by Mr. Koperda for his opinion and to form his or her own opinion on the matter, with due consideration of Mr. Koperda's opinion if the Examiner finds it instructive.  This is consistent with the case law which provides that:

> An expert's opinion on the legal conclusion of obviousness is neither necessary nor controlling.  While it is proper to give some weight to a persuasively supported statement of one skilled in the art on what was not obvious to him, obviousness is a question of law which we must decide.

*Ex Parte White*, APL 2009-000650, 2009 WL 4004964, at *5 (Bd. Pat. App. & Interf. Nov. 19, 2009).

### F.  Response to Claims 53-56 in view of Bibl

Claims 53-56 recite an output database with an output identifier field, an output description field, and a sensor identifier field.  (Response, p. 36).  PO does not argue that Bibl fails to disclose an output database with the specified fields.  Rather, PO argues that a single database cannot constitute a sensor database, an output database, and an evaluation database. *Id.* PO's argument concerning the sensor database and the evaluation database, however, is not relevant to the claim language, since claims 53-56 recite only an output database.

Further, using a single database or three databases is a mere design choice that would have been obvious to a person having ordinary skill in the relevant art. No patentable significance is imparted by such detail.  Certainly not based on the teachings of the '271 patent which describes an output database, a sensor database and an evaluation database, but then states:  "However, it would be understood by one of ordinary skill in the art that the invention as described herein could be implemented in many different ways using a wide range of programming techniques . . ." '271 patent, 14:21-24.  Additionally, it is well-settled that multiple limitations may be met by a single component.  (See *Dolly Inc. v. Spalding & Evenflo Cos.,* 16 F.3d 394, 398 (Fed. Cir. 1994), "Equivalency thus can exist when two components of the accused device perform a single function of the patented invention… Equivalency can also exist when separate claim limitations are combined into a single component of the accused device.")

PO's secondary argument is that Bibl fails to disclose an output database. (Response, p. 38).  PO contends that "Bibl's disclosure of a database that stores **feedback information** is not a disclosure of a database that stores 'information regarding evaluation outputs and output devices.'

" *Id.*, emphasis added.  PO's second argument however is not only contrary to the explicit teaching of Bibl, but also PO's previous argument, which stated that " **'feedback data' in Bibl is the data that is collected [output] from a sensor.  Creation of feedback data in Bibl requires analysis of personal data.**" (Response, p. 33, emphasis added).  Clearly feedback data includes information regarding evaluation outputs/analysis and output devices.  The Examiner previously found that Bibl discloses an output database, and PO has offered no new argument to justify overturning the decision. (ACP, p. 30).

### G. Response to Claims 53-56 in view of Teller

Claims 53-56 recite an output database with an output identifier field, an output description field, and a sensor identifier field.  (Response, p. 36).  PO's primary allegation is not that Teller fails to disclose an output database with the specified fields, but instead PO only alleges that a single database cannot constitute a sensor database, an output database, and an evaluation database.  *Id.*  As discussed above, however, using a single database or three databases is a mere design choice that would have been obvious to a person having ordinary skill in the relevant art. No patentable significance is imparted by such detail.  Certainly not based on the teachings of the '271 patent that explains that "it would be understood by one of ordinary skill in the art that the invention as described herein could be implemented in many different ways using a wide range of programming techniques . . ."  '271 patent, 14:21-24.  Placing data in a single database or in several database would be just the sort of detail that would be understood by one of ordinary skill in the art, and are not entitled to patentable weight.

PO's secondary argument is that Teller fails to explicitly disclose every recited field of the claims. (Response, p. 40).  The claim language only requires that the database stores "information **regarding** evaluation outputs and output devices."  And the Examiner properly

found that Teller includes information *regarding* evaluation outputs and output devices. (ACP, p. 47). Further, Mr. Koperda submitted a declaration that a person skilled in the art would have included the data fields of claims 54-56 to store information received from multiple sensors for each of multiple users as is provided by Teller. (*See* Koperda Dec., ¶ 25). PO fails to contradict, or provide any testimony or other evidence to contradict Mr. Koperda's declaration. PO offers no new reason as to why Examiner should overturn the previous finding that claims 54-56 are rendered obvious by Teller.

### H. Response to Claims 58-61 in view of Bibl

Claims 58-61 recite an evaluation database with an evaluation identifier, a description field, and a sensor identifier field. (Response, p. 41). PO acknowledges that Bibl discloses a feedback database but only "disagrees that a disclosure of a feedback database is sufficient to disclose specific field in an evaluation database." (Response, p. 42). Requestors submitted Mr. Koperda's declaration to support Examiner's finding that it would have been obvious to one skilled in the art to include the recited fields. (*See* Koperda Dec., ¶ 19). PO fails to contradict, or provide any testimony or other evidence to contradict Mr. Koperda's declaration. PO offers no new reason as to why Examiner should overturn the previous finding that claims 58-61 are rendered obvious by Bibl.

### I. Response to Claims 58-61 in view of Teller

PO disagrees with the Examiner's finding that Teller makes claims 58-61 obvious, but does not offer any support for its disagreement other than simply stating that "[a] database that stores data that is uploaded from a sensor is not an 'evaluation database.' " (Response, p. 43). PO fails to provide any further arguments or support as to why Examiner should overturn the previous finding that Teller makes claims 58-61 obvious.

PO further alleges that the disclosure of an evaluation database by Teller is not enough to disclose the specified fields of the evaluation database. (Response, p. 43). Requestors submitted Mr. Koperda's declaration to support the Examiner's previously finding that it would have been obvious to one skilled in the art to include the recited fields. (*See* Koperda Dec., ¶ 26). PO fails to contradict, or provide any testimony or other evidence to contradict Mr. Koperda's declaration.

Requesters address PO's arguments in the table of pages 44-45 of Response below:

Claim 57 recites "an evaluation database accessible to said server." Mr. Koperda stated that Teller teaches an evaluation database that receives and stores information or data from multiple sensors for multiple users. (*See* Koperda Dec., ¶ 26). The evaluation database is accessible to the server as provided by Teller. "Switch 85, connected to firewall 80, is used to direct data flow between middleware servers 95 *a* through 95 *c* and database server 110." (Teller, 9:51-53). PO's allegation that this statement is "irrelevant to claim 57" is wrong.

Claim 58 recites "an evaluation identifier field that contains identifying information for said evaluation." Mr. Koperda stated that Teller teaches a central monitoring unit (CMU) that contains a database that can send an evaluation to a user, and that the database would inherently include an identifying field for the alert. *Id.* PO alleges that "the alert described in Teller could be provided without necessarily having the recited evaluation identifier field." (Response, p. 44). PO, however, fails to provide or suggest how Teller could operate by providing an alert to a user without identifying which user is to receive the alert. Requesters disagree with PO's allegation, and submit that Examiner's previous finding is proper.

Claim 59 recites "a description field that contains descriptive information regarding said evaluation." Mr. Koperda previously testified that: "Claim 59 requires the system of claim 58 and includes a field that contains descriptive information regarding the evaluation. Teller

identifies such a descriptive message, a digitally recorded voice message that is translated to text via voice recognition technology. [Teller, 8:3-8]."  (Koperda Dec., ¶ 26.)  PO argues that Teller describes that timestamps are the digitally recorded voice messages.  Teller does not state that the timestamps *are* digitally recorded voice messages, but instead clearly states that the timestamps may *include* a digitally recorded message.  "The time stamps may include a digitally recorded voice message that, after being uploaded to central monitoring unit 30, are translated using voice recognition technology into text or some other information format that can be used by central monitoring unit 30." (Teller, 8:3-8).  Further, without acquiescing to PO's allegation, even if true, a timestamp **regarding** an evaluation still meets the claim language as being descriptive information.

Claim 60 recites "a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation."  Mr. Koperda stated that Teller describes various sensors associated with various evaluations, including for a sensor that monitors glucose level, which when evaluated, generates an alert that it is time to eat. (*See* Koperda Dec., ¶ 26).  PO alleges that this information cannot be stored in a database.  But as described above (with regard to claim 57, upon which claim 60 depends), Teller clearly describes a database that stores sensor and evaluation information.

Claim 61 recites "a field that associates said evaluation with said device to which said notification is provided."  Mr. Koperda stated that it would have been obvious for the database to have such a field so that the proper alert could be sent to the proper user. *Id.*  PO alleges that the portion of Teller cited to by Mr. Koperda does not explicitly use the word "database," but fails to recognize that Mr. Koperda is offering his opinion, as an expert as to how a person skilled in the art would have read Teller.  PO fails to provide any testimony or other evidence to support PO's

allegation that one skilled in the art would not have understood Teller to be as Mr. Koperda declared.

### J.   Response to Claim 65 in view of Bibl

Claim 65 recites "provide a notification to a device, wherein said device includes a flash memory card."  One skilled in the art would not know how to provide a notification directly to a flash memory card without the presence of a supporting device. (Koperda, Suppl. Dec., ¶ 4). PO's first argument is that Bibl does not disclose that a device that receives a notification has an EEPROM (flash). (Response, p. 46).  Requesters disagree.  PO selects portions of Bibl that it interprets out of context and in a way that is inconsistent with Bibl as a whole.  For example, Bibl describes that:

> **The present invention also relates to apparatus for performing the operations herein**. This apparatus may be specially constructed for the required purposes, or it may comprise a general purpose computer selectively activated or reconfigured by a computer program stored in the computer. **Such a computer program may be stored in a computer readable storage medium, such as, but is not limited to, any type of disk including floppy disks, optical disks, CD-ROMs, and magnetic-optical disks, read-only memories (ROMs), random access memories (RAMs), EPROMs, EEPROMs**, magnetic or optical cards, or any type of media suitable for storing electronic instructions, and each coupled to a computer system bus. (Bibl, p. 5, emphasis added).

PO alleges that Bibl does not describe a device that receives a notification and has an EEPROM (flash memory card), because Bibl's disclosure is about an apparatus for "performing the operations herein."  However, PO ignores the fact that the operations include ALL or ANY

Page 16 of 24

of the operations described by Bibl, including but not limited to the sending and receiving notification operations.   As such, Bibl discloses a device with an EEPROM that receives a notification.

PO's second allegation is that one skilled in the art would not understand EEPROM to render a flash memory card as being obvious. (Response, p. 46).  To support this allegation, PO cites to the declaration of Mr. Ashby, who is a long-time employee of ICON Health & Fitness Inc. and not an independent expert. (Ashby, ¶ 1).

Mr. Ashby alleges that "[a] person of ordinary skill... would have understood the term 'flash memory card' to be a memory card that is removably engagable with a host device." (Ashby, ¶ 12).  Mr. Ashby however provides no support for his opinion.  Requesters disagree and cite to Mr. Koperda's supplemental declaration as support.

The term "removably engagable" was not a term of art with regard to flash memory and would not have had any consistently recognizable meaning to a person skilled in the art. (Koperda, Suppl. Dec., ¶¶ 5-6).  While some flash memory cards may have been removable, others were not. (Koperda, Suppl. Dec., ¶¶ 6-11).  An example flash memory card used at the time of the invention is described in Intel's Application Note AP-758, which based on the manner in which it interacted with the PCI bus, was "unsuitable for a 'removably engagable' device that could be randomly plugged into and removed for the host system." *Id.*  As such, one skilled in the art would not have necessarily understood a "flash memory card" as being "removably engagable with a host device."

Mr. Ashby further alleges that "[o]ne of ordinary person of ordinary skill... would not have understood the term 'flash memory card' to include memory that is permanently incorporated into a structure." (Ashby, ¶ 12).  Mr. Ashby again provides no support for his

Reexam Control No. 95/002,337

opinion.   Requesters disagree and cite to Mr. Koperda's supplemental declaration as support. What qualifies as being "permanently incorporated into a structure" is ambiguous, because even a part that has been soldered can be removed, albeit with greater level of difficulty.  For example, the exemplary flash memory card cited by Mr. Koperda in the Intel Application Note AP-758 was incorporated into the structure of a PC that can only be removed with great difficulty. (See Koperda, Suppl. Dec, ¶¶ 6-11).

Mr. Ashby further alleges that "one of ordinary skill in the art would have understood the disclosure of EEPROM in paragraph [0022] of Bibl to be nonremovable memory incorporated into the general purpose computer that is described by that paragraph." (Ashby, ¶ 12).  Mr. Ashby again provides no support for his opinion.  Requesters disagree with Mr. Ashby's unsupported opinion and cite to Mr. Koperda's supplemental declaration as support.  Even if one skilled in the art would have found that flash memory card includes removable memory (which Requesters do not conceded), removable EEPROM (flash) cards were readily available at the time of the invention, such as 28F016SV EEPROM. (See Koperda, Suppl. Dec., ¶¶ 8-17).

Mr. Ashby also states that "I disagree with Mr. Koperda that flash memory is a type of EEPROM.  EEPROM and flash memory are different forms of memory." (Ashby, ¶ 13).  Mr. Ashby again provides no basis or support for his opinion.  Mr. Koperda states that "flash memory was a form of EEPROM that was well known by those of ordinary skill in the art at the time," and cites to numerous publications that support his opinion. (See Koperda, Suppl. Dec., ¶¶ 12-17).

### K.  Response to Claim 65 in view of Teller

PO alleges that Teller's disclosure of "flash memory" would not render obvious the recited "flash memory card."  PO fails to provide any testimony or other evidence to support

Appx712

their opinion here, but instead simply argues that flash memory is different from flash memory **cards**. It was well understood, however, that a flash memory card contains flash memory. (*See also* Koperda, Suppl. Dec., ¶¶ 8-11). As such Teller's disclosure of flash memory necessarily makes obvious the recited flash memory card. (*See also* Koperda, Suppl. Dec., ¶ 7). It is clear that flash memory makes flash memory cards obvious and that Examiner's previous finding as such was proper.

### L. <u>Response to Claim 79</u>

Claim 79 recites that "said notification includes an XML transmission." PO acknowledges that XML transmissions were known at the time, and could have been used by one skilled in the art when applied to the teachings of either Bibl or Teller. For example, PO acknowledges that "[o]f the communication protocols known at the time of filing, XML is but one example." (Response, p. 48). PO attempts to discredit Mr. Koperda's expert opinion by offering PO's own opinion, rather than providing any factual support or testimony from an expert, that XML though readily available, would not have been obvious because of a bandwidth requirement. PO clearly confuses what would have been obvious to one skilled in the art, with a simple design choice.

PO acknowledges that it would have been obvious to one skilled in the art to consider the use of XML transmissions. For example, PO states that "Of the communications protocols known at the time of filing, XML is but one example." (Response, p. 48). Whether or not one skilled in the art would have actually used XML transmissions in various embodiments of the invention is not enough to overcome the fact that it would have been obvious to use XML. PO merely provides attorney argument as to whether or not one skilled in the art would have used XML transmissions. Requesters can provide opposing argument that is at least equally plausible

Appx713

as that argued by PO that one skilled in the art would have used XML transmissions, especially as it would have been obvious to at least consider the use of XML transmissions as is clearly acknowledged by PO (as noted above). Further, the use of XML is supported by the expert opinion of Mr. Koperda who stated that "[a]n advantage of XML is that is provides a description of the data (name, format, range value) and then the data. Because the data is 'tagged,' it makes it easy to share the data between dissimilar systems." (*See* Koperda Dec., ¶ 16).

### M. <u>Response to Claim 95</u>

Claim 95 recites a processor that is "operative to receive first and second data simultaneously from said first and second subjects." PO alleges, with regard to Bibl, that "the fact that a server may receive data from multiple devices [operating simultaneously] does not make simultaneous reception of data from multiple devices obvious." (Response, p. 49). Requesters disagree. The Examiner properly found that a server that can receive data from multiple devices operating simultaneously with regard to different users does make obvious receiving data simultaneously. (ACP, p. 33).

The disclosure of Bibl is analogous to what is described by the '271 patent with regard to the simultaneous receipt of data from different users. "The physical characteristic of one subject for which data is received during the step 102 may be the same as or different from the physical characteristic for which data is received for another subject during the step 102… **Data from more than one subject might be received simultaneously** from multiple subjects during the step 102… The data for **different subjects can come from different sources** or sensors, be in different formats and contain information regarding the same or different physical characteristics." ('271, 4:59-5:4, emphasis added).

With regard to Teller, PO provides mere, unsupported argument that, just because Teller discloses a system that can work over the Internet, Teller does not render obvious a server that can receive data from multiple devices simultaneously. But it is obvious that a machine that operates on the Internet can send/receive transmissions simultaneously, and PO failed to provide any rationale as to why the Examiner should overturn the previous finding. (ACP, p. 51).

### N.   Response to Claims 98 in view of Bibl

Claim 98 recites that the "processor is operative to determine whether said first subject is in need of a break." Claim 99 recites "processor is further operative to provide a notification to said device whether said first subject is in need of a break."

With regard to Bibl, PO alleges that the determination of whether a first subject is in need of a break is performed by "a processor of a remote server." (Response, p. 50).   PO acknowledges that Bibl describes determining whether a first subject is in need of a break, but then only argues that the determination is not performed by a "remote sever." *Id.*   Requesters disagree with PO's argument.   Bibl clearly states that "personal data capture device 400 may include heart rate receiver 430 which **receives heart beat rate from wireless heart rate transmitter** 420." (Bibl, p. 11, emphasis added).   PO acknowledges that "[t]he determination of whether a user's heart rate has reached a target limit, however, is made by a microprocessor of a personal data capture device." (Response, p. 50).   As described by Bibl, the personal data capture device is remote from the wireless heart rate transmitter.   **Further, the personal capture device which is capable of sending/receiving files over a network is a server**, because "[a] person of ordinary skill in the art at the time of filing would have understood that any computer or device connected to a network that can send/receive files can be a server." (*See* Koperda Dec., ¶15).

Reexam Control No. 95/002,337

### O.  Response to Claim 98 in view of Teller

With regard to Teller, PO tries to redefine what is meant by "break," and alleges that sleep (as disclosed by Teller) is not a break. (Response, pp. 51-52).  PO acknowledges that "[s]everal different definitions of the noun 'break' exist, but alleges that "sleep" is not included amongst any them. *Id.*  Sleep is clearly is a break, if anything, sleep is the epitome of what a break.  One of the definitions cited by PO for break is "A pause or interval, as from work: a coffee break." *Id.*  Sleep falls even within this definition of break, for example, a pause from work could include a nap/sleep, or a person could even go to sleep during a coffee break.  PO further cites to the '271 patent for the definition of break, which includes that which "is needed so that the subjects can use the restroom, **overcome boredom or fatigue**, etc." (*Id.*, emphasis added).  Clearly going to sleep will allow a subject to stretch their legs and overcome fatigue or boredom.  Sleep is consistent with how "break" is used in the '271 patent, and also how "break" is used within the claims.

### P.  Response to Claim 99

The Examiner properly found claim 99 to be unpatentable over both Bibl (ACP, p. 33) and Teller (ACP, p. 51).  PO does not provide any additional rationale particular to claim 99 as to why Examiner should overturn the standing rejection of claim 99.  PO, instead, relies exclusively only on claim 99's dependence upon claim 98. (Response, p. 52).  Requesters submit that for at least the reasons provided above with respect to claim 98, the rejection of claim 99 is also proper and should also be upheld.

### Q.  Response to Claim 124

Claim 124 recites that "wireless communication link is a Bluetooth communication link." PO alleges that it would not have been obvious to use Bluetooth at the time of the invention

because Bluetooth was not as optimized at the time of the invention as it is today. (Response, p. 52).

PO acknowledges that it would have been obvious to one skilled in the art at the time of the invention to use Bluetooth, and only alleges that due to a design choice, the person skilled in the art *may* not use it. PO incorrectly attempts to apply a more stringent requirement for obviousness than is required. PO relies on the declaration of Mr. Ashby, who provides no factual support for his opinion that Bluetooth, though available, would not have been used for wireless data transmissions and that "other forms of wireless data transmission protocols would have been preferred over Bluetooth for the applications described in the '271 patent." (Ashby, ¶16). Despite this broad statement, Mr. Ashby fails to name a single alternative wireless data transmission protocol that one skilled in the art may have used instead of Bluetooth.

Contrary to Mr. Ashby's assertions, Bluetooth technology was known, standardized, and had numerous products on the market at the time the '271 patent was filed. (Koperda, Suppl. Dec., ¶¶ 18-30). For example, Bluetooth technology was being used in Motorola headsets. *Id.*, ¶¶21-23. Further, Bluetooth technology was actually being used to transmit sensor information. *Id.*, ¶¶26-28.

At a minimum, it is clear Bluetooth would have been obvious at the time of invention to provide wireless transmissions, as provided by Bibl, even if different experts may make different design choices in determining whether or not to implement in different systems with different requirements. For the reasons provided, PO has failed to provide sufficient rationale to justify Examiner overturning the previous finding that the use of Bluetooth as wireless communications would have been obvious.

## IV.    Reasons for Supplemental Declaration

With these comments, Requesters are submitting a Supplemental Declaration from Frank Koperda.  Mr. Koperda's opinions are offered as evidence in response to the new evidence provided by PO's expert Mr. Ashby and in response to new arguments made by PO.  To the extent that PO is allowed to submit new evidence, particularly in the form of the declaration of Mr. Ashby, Requesters are entitled to submit evidence in response.  Along with the declaration of Mr. Koperda, Requesters submit Exhibits B-N upon which Mr. Koperda bases his opinion.

## V.    Conclusion

For these reasons, Requesters respectfully request that the Office maintain the rejection of all previously rejected claims (15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99, and 124).

Respectfully submitted,
Sterne, Kessler, Goldstein & Fox P.L.L.C

Michael B. Ray (Reg. No. 33,997)
Attorney for Third Party Requesters

Harish Ruchandani (Reg. No. 58,770)
Attorney for Third Party Requesters

Date:  10/15/2013
1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600

1759152_1.DOCX

# EXHIBIT 26

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | I1618.10003US01 | 1254 |

97149        7590        01/23/2014
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 01/23/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| *Right of Appeal Notice* (37 CFR 1.953) | Control No. | Patent Under Reexamination |
|---|---|---|
| | 95/002,337 | 6701271 |
| | Examiner | Art Unit |
| | MINH T. NGUYEN | 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on <u>12 September, 2013</u>
Third Party(ies) on <u>15 October, 2013</u>

Patent owner and/or third party requester(s) may file a notice of appeal with respect to any adverse decision with payment of the fee set forth in 37 CFR 41.20(b)(1) within **one-month or thirty-days (whichever is longer)**. See MPEP 2671. In addition, a party may file a notice of **cross** appeal and pay the 37 CFR 41.20(b)(1) fee **within fourteen days of service** of an opposing party's timely filed notice of appeal. See MPEP 2672.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

If no party timely files a notice of appeal, prosecution on the merits of this reexamination proceeding will be concluded, and the Director of the USPTO will proceed to issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

The proposed amendment filed <u>12 September, 2013</u>     ☒ will be entered     ☐ will not be entered*

*Reasons for non-entry are given in the body of this notice.

1a. ☒ Claims <u>1-228</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☒ Claims <u>See Continuation Sheet</u> have been cancelled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims].
4. ☒ Claims <u>47</u> are patentable. [Amended or new claims].
5. ☒ Claims <u>15,16,50-56,58-61,65,79,95,98,99 and 124</u> are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____ ☐ are acceptable. ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is ☐ approved. ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d) or (f). The certified copy has:
     ☐ been received. ☐ not been received. ☐ been filed in Application/Control No. _____.
10. ☐ Other _____

<u>**Attachments**</u>
1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**Continuation Sheet (PTOL-2066)**                                           **Control No.** 95/002,337

Continuation of 2. Claims have been canceled are: 1-14,17-46,48,49,57,62-64,66-78,80-94,96,97,100-123 and 125-228.

2

**Appx722**

Control Number: 95/002,337                              Paper No. 20140113 - Page 2
Art Unit: 3992

### INTER PARTES REEXAMINATION RIGHT OF APPEAL NOTICE (RAN)

#### Pertinent Prosecution History

5          The Office mailed an Action Closing Prosecution (ACP) on August 12, 2013 ("2013
ACP"). In response to the 2013 ACP, Patent Owner filed a response on September 12, 2013
("Sept 2013 PO Response").  The Sept 2013 PO Response contained, among other things,
"REMARKS" ("Sept 2013 PO Remarks"), claim amendments ("Sept 2013 Claim Amendments").
           In response to the 2013 ACP and the Sept 2013 PO Response, the Requester filed a
10   document titled "Comments by Third Party Requesters to Patent Owner's Response to Action
Closing Prosecution" on October 15, 2013 ("Oct 2013 Requester's Comments").
           Other documents relied on by the Patent Owner and Requester are claim charts CC1-
CC4 filed on September 14, 2012 ("Claim chart CC1-CC4"), claim charts BBC and TCC filed on
April 8, 2013 ("Claim chart BBC, TCC"), Declaration of Frank Koperda on April 8, 2013
15   ("Koperda Declaration"), Declaration of Darren Ashby on September 12, 2013 ("Ashby
Declaration") and Supplemental Declaration of Frank Koperda on October 15, 2013 (Supp
Koperda Declaration").
           This Right of Appeal Notice (RAN) is in response to the Sept 2013 PO Response and
the Oct 2013 Requester's Comments.
20

#### Status of the Claims

          The following is the status of the claims: Claims 1-228 is subject to reexamination.
Claims 1-14, 17-46, 48-49, 57, 62-64, 66-78, 80-94, 96-97, 100-123, and 125-228 have been
canceled. Thus, claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 are now pending.
25

#### Prior Art
          Claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 of the United States Patent
Number 6,701,271 ("the '271 patent") are reexamined in view of the following patents and
publications:

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 3
Art Unit: 3992

U.S. Patent No. 6,292,688 to Patton, ("Patton").
U.S. Patent No. 5,676,138 to Zawilinski, ("Zawilinski").
U.S. Patent No. 3,744,7t2 to Papadopoulos et al. ("Papadopoulos").
U.S. Patent Application Publication US 2002/0111541 to Bibl et al ("Bibl").
5      U.S. Patent No. 6,605,038 to Teller ("Teller").


**Preliminary Notes**

A.      At page 54 of the Sept 2013 PO Remarks, the Patent Owner requests a telephone interview or Examiner's amendment to overcome the standing rejections. At page 2 of the Oct
10  2013 Requester's Comments, the Requester indicates that the Patent Owner requests for an interview and/or amendment is improper and should be denied. The Examiner agrees with the Requester. Examiner interview and/or Examiner's amendment is not permitted in *Inter Partes* Reexamination. See 37 CFR 1.955 and MPEP 2685.

B.      At pages 2 and 19 of the Sept 2013 Claim Amendments, the Patent Owner indicates that
15  claim 99 is canceled; however, at page 19 of the Sept 2013 PO Remarks, the Patent Owner also indicates that claim 99 is pending.  Because the Patent Owner provides arguments regarding claim 99 at page 52 of the Sept 2013 PO Remarks and the Requester responses to the argument at page 22 of the Oct 2013 Requester's Comments, the Examiner assumes that claim 99 is not canceled for the purpose of reexamination in this RAN office action.

20


**Statutes**

The following is a quotation of 35 U.S.C. 112, second paragraph:

> The specification shall conclude with one or more claims particularly pointing out
> and distinctly claiming the subject matter which the applicant regards as his
25  > invention.

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless –


*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                          Paper No. 20140113 - Page 4
Art Unit: 3992

        (b)      the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of application for patent in the United States.

        (e)      the invention was described in (1) an application for patent, published under section
5      122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for purposes of this subsection of an application filed in the United States only if the international application designated the United
10     States and was published under Article 21(2) of such treaty in the English language.

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

        (a)      A patent may not be obtained though the invention is not identically disclosed or
15     described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

20

**Indefiniteness Rejections**:

       Claims 50-56, 58-61 and 65 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which
25   the Patent Owner regards as the invention.

Claim 50

       Regarding claim 50, the phrase "a sensor database accessible to said server" in line 17 renders claim 50 indefinite because it is unclear if the scope of claim 50 is drawn to the *sub-*
30  *combination* "remote server" *alone*, or if the scope of claim 50 is drawn to a *combination* of a "remote server" *and* a "sensor database."

       First and based upon the text as currently set forth in claim 50, the Examiner concludes that one of ordinary skill in the art could interpret the scope of claim 50 as limited a "system ... comprising a remote server including" various elements of the remote server.  See claim 50,

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                         Paper No. 20140113 - Page 5
Art Unit: 3992

lines 3-19 which explicitly sets forth the elements of the sub-combination "remote server" (*i.e.*, "the remote server comprises a memory; a communication port ..." *etc.*).  In other words, a person of ordinary skill in the art could interpret the structure of claim 50 as being drawn to a "remote sever" alone.

5      Alternatively, the Examiner also finds that the body of claim 50 also expressly recites "a sensor database accessible to said remote server ...." The Examiner finds that claim 50 also recites various structural components of the "sensor database."  See claim 50, lines 17-19 for the various components (*e.g.* "a sensor identifier") of the "sensor database."  Based upon this particular language in the body of claim 50 (*i.e.* lines 17-19 in claim 50), the "sensor database"

10     must be <u>outside</u> the scope of the "remote server" because claim 50 explicitly requires that "sensor <u>database</u>" be "accessible <u>***to***</u> said [remote] server...."[1]

       And if the "sensor database" is therefore *outside* the scope of the "remote sever," one of ordinary skill in this particular art can *alternatively* conclude that the scope of claim 50 is drawn to a "remote server" *in combination with* a "sensor database."

15     Because a potential infringer of claim 50 would not know if direct infringement required creation or importation (*i.e.* possession) of the <u>sub-combination</u> "remote sever" alone, or if direct infringement required possession of the <u>combination</u> "remote sever " <u>*and*</u> " sensor database," the structure of claim 50 cannot be reasonable determined and claim 50 is therefore indefinite under 35 U.S.C. § 112, 2nd paragraph.

20

<u>Claims 51-56, 58-61 and 65</u>

       Regarding claims 51-52, the same problem exists as discussed above in claim 50.
       Regarding claims 53, the same problem exists for the phrase "output database accessible to said server."

25     Regarding claims 54-56, the same problem exists as discussed in claim 53.
       Regarding claims 58, the same problem exists for the phrase "an evaluation database accessible to said server…"
       Regarding claims 59-61, the same problem exists as discussed in claim 58.

---

[1] The Examiner notes that the opposite conclusion (*i.e.* the conclusion that the "sensor database" is within "[remote] server") would make neither logical nor grammatical sense because it would require the "sensor database" to be accessible to itself.  Moreover, this opposition conclusion is a position that would be supported by neither the claimed words themselves nor the prosecution history.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                     Paper No. 20140113 - Page 6
Art Unit: 3992

Regarding claim 65, the same problem exists for the phrase "said device includes a flash memory card."

**Prior Art Rejections**:

5  **Claims 15 and 16**:

In the 2013 ACP office action, claims 15 and 16 were rejected under:

(i)     35 USC 102(b) over Patton,
(ii)    35 USC 103(a) over Zawilinski in view of Papadopoulos, and
(iii)   35 USC 103(a) over Patton in view of Papadopoulos.

10

In view of the arguments provided by the Patent Owner and Requester, the rejections of claims 15-16 **are maintained** in this RAN office action

**Patent Owner**:

15     Regarding (i), the Patent Owner argues that Patton does not teach or suggest the specific order of steps required by claims 15 and 16 where "providing a notification regarding said evaluation to a device" is required to be performed as a third step. (Sept 2013 PO Remarks, p. 24). Patent Owner further argues that "claim 15 also requires that a single device have dual-functionality." (Sept 2013 PO Remarks, p. 24).

20     Regarding (ii), the Patent Owner argues that Papadopoulos fails to teach or suggest "receiving a notification regarding a plurality of options" as required by claims 15 and 16. Patent Owner argues that "receiving a notification regarding a plurality of options" is not necessary present in Papadopoulos because the presenter mentioned in Papadopoulos may very well be aware of his options for responding to the audience's reaction to his presentation without

25  receiving a notification regarding these options. (Sept 2013 PO Remarks, page 26). The Patent Owner further argues that "prior to the beginning of his presentation, the presenter may have conceived, entirely within his own mind, of options available during his presentation," and that "'receiving a notification" in claim to include a notification conceived entirely within the mind of a human presenter is unreasonably broad." (Sept 2013 PO Remarks, p. 26).

30     Regarding (iii), the Patent Owner argues that Papadopoulos fails to teach or suggest "receiving a notification regarding a plurality of options" as required by claims 15 and 16 because the interpretation of the phrase "receiving a notification" in claim 15 and 16 asserted by

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                     Paper No. 20140113 - Page 7
Art Unit: 3992

the Requester to include a notification conceived entirely within the own mind of a human
presenter is not reasonable. (Sept 2013 PO Remarks, p. 30).

**Requester**:

5      Regarding (i), the Requester responses that the Patent Owner's argument about order is
not relevant to the Requester's application of Patton to claims 15 and 16 which is set forth in the
claim chart CC1 included in the Request for Reexamination at pages 19-20. (Oct 2013
Requester's Comments, p. 4). Specifically, at page 19 of CC1, the Requester states that:

10             a plurality of options are provided to the maker who makes a selection: "Several different
               forms of panels, each presenting information needed to operate the vehicle, could be
               viewed in succession, and the maker could then choose the display that was most rapidly
               comprehended and/or created approval or pleasure in the test subject."
               (Patton, col. 24, lines 46-51).

15     The Requester responses that the "dual functionality" alleged by the Patent Owner is not
functionality performed by the device itself. (Oct 2013 Requester's Comments, p. 4). The
Requester argues that the Patent Owner's argument is irrelevant because it is unclaimed
limitations (e.g. a dual functionality device). (Oct 2013 Requester's Comments, p. 5)

20     Regarding (ii) and (iii), the Requester asserts that claim 13 does not require that the
notification be "external" as argued by the Patent Owner. The Requester further notes that,
while it is possible that a presenter may have conceived of such options entirely within his own
mind, "what is possible," is not the relevant inquiry. The relevant inquiry is what would a person
skilled in the relevant art understand from Papadopoulos' teachings. The Requester argues that
25  a person skilled in the relevant art would understand from Papadopoulos that it is inherent that
the presenter receives a notification (whether internal or external) regarding the options
available to him to respond to the audience's reaction. Such notification would be necessary to
trigger the response by the presenter. For example, the only way a presenter could become
aware of the options available to him by which he may respond to the audience's reaction is by
30  being provided a notification as to what options are available. It does not matter whether the
notification is received internally (i.e., from his own mind), or externally (e.g., from another
device). In both situations, the presenter must receive a notification and claim 13 fails to specify

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                              Paper No. 20140113 - Page 8
Art Unit: 3992

from what source (internal or external) the notification is received. Furthermore, Patent Owner broadly interprets Papadopoulos as including the possibility of the presenter conceiving options (as a notification) entirely within his own mind. At the same time, Patent Owner narrowly interprets claim 13 as requiring an "external" notification. Patent Owner interpretations are self-interested and contradictory.

**Examiner**:

The Examiner agrees with the Requester. For the above reasons provided by the Requester, the rejections of claims 15 and 16 are maintained and repeated below:

A.      Claims 15 and 16 are rejected under 35 U.S.C. 102(e) as being anticipated by Patton. Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference.

B.      Claims 15 and 16 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Papadopoulos. Claim chart CC3 provides detailed discussion of how the combination of Zawilinski and Papadopoulos is applied to the rejection which is incorporated herein by reference.

C.      Claims 15 and 16 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Papadopoulos. Claim chart CC4 provides detailed discussion of how the combination of Patton and Papadopoulos is applied to the rejection which is incorporated herein by reference.

**Claim 47**:

In the 2013 ACP, claim 47 was rejected as obvious under:
(i)      35 USC 103(a) over Patton in view of Bibl,
(ii)     35 USC 103(a) over Zawilinski in view of Bibl.
(iii)    35 USC 103(a) over Patton in view of Teller, and
(iv)     35 USC 103(a) over Zawilinski in view of Teller.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                          Paper No. 20140113 - Page 9
Art Unit: 3992

     In view of the arguments provided by the Patent Owner and Requester, the rejections of claim 47 **are withdrawn** in this RAN office action

**Patent Owner**:

5      Regarding (i) and (ii), the Patent Owner argues that Bibl does **not** disclose "the present of an internal clock at a server that receives data from sensors". (Sept 2013 PO Remarks, p. 31). The Patent Owner further argues that Bibl does not disclose "placing any timestamps on any notifications sent out by the web server." (Sept 2013 PO Remarks, p. 31). The Patent Owner alleges that Bibl teaches away from the recited internal clock and timestamp limitations.

10 The Patent Owner argues that Bibl teaches placing timestamps on data by the collecting device, before that data is sent to a server and one of ordinary skill in the art would not have been motivated to place timestamps on data that was sent and received because such a practice would be redundant and unnecessarily increase the cost of the system. (Sept 2013 PO Remarks, pages 31-32). The Patent Owner points out that the Requester's expert, Mr. Koperda,

15 acknowledges that common hardware platforms did not always include hardware clock. The Patent Owner further argues that the Requester fails to identify a single reason why it would have been obvious to use a hardware platform that includes a hardware clock and why it would have been obvious to redundantly create timestamps for data, notifications, and other communications received at a server, especially where timestamps are already placed on the

20 data by the collecting device, before the data is sent to a server.

     Regarding (iii) and (iv), the Patent Owner's arguments are similar to the arguments regarding (i) and (ii), thus, the above arguments regarding Bibl are incorporated herein by reference.

25 **Requester**:

     Regarding (i) and (ii), the Requester responses that Bibl does not teach away from the primary reference. The Requester argues that the Patent Owner fails to show that the combination of the references would render the device inoperative for its intended purpose and a failure to identify every possible additional solution does not mean one skilled in that art could

30 not combine the references (Oct 2013 Requester's Comments, p. 7). The Requester further argues that even accepting the Patent Owner's argument as true, the device would only include redundant features, which may not have prevented one skilled in the art from doing it anyways

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                              Paper No. 20140113 - Page 10
Art Unit: 3992

and would not have rendered the device inoperable for its intended purpose. (Oct 2013
Requester's Comments, p. 8).

 For the first time, the Requester provides a motivation for adding an internal clock that
timestamps the received data to indicate when it was received instead of, or in addition to, when

5 it was collected so that it may be processed in order of receipt. (Oct 2013 Requester's
Comments, p. 8).

 The Requester argues that Bibl "does not specifically state from which device the time
stamp is generated, be it a data capture device, a remote server that receives the data, or both"
(Oct 2013 Requester's Comments, p. 8). The Requester relies on Mr. Koperda to argue that it is

10 reasonable to expect both devices to have an internal clock.

 Regarding (iii) and (iv), the Requester does not separately provide further arguments
regarding Teller, so the arguments regarding Bibl are also applied here.


**Examiner**:

15 Regarding (i) and (ii), the Examiner does not agree with the Requester's argument that
Bibl "does not specifically state from which device the timestamp is generated, be it a data
capture device, a remote server that receives the data, or both." (Oct 2013 Requester's
Comments, p. 8). Reading the description of the flow diagram shown in Fig. 6 of Bibl at
paragraphs 53, 54 and 55, it is clear that personal data is received by personal parameter

20 receivers (block 604) and then the personal data is stored in memory 480 of the personal data
capture device (block 606). Bibl clearly describes that the personal data which stored in memory
480 of the personal data capture device may include a timestamp and information identifying a
source of a personal parameter. After that, the personal data is transmitted from memory 480 to
the web server via the wide area network (block 608). In other words, Bibl **does not** disclose

25 that timestamp is generated by the web server.

 In the proposed rejection of claim 47, the Requester relied on Bibl for the missing
internal clock element in the server for creating timestamps for data and notifications, however,
Bibl does not teach this limitation. In order to properly establish a *prima facie* case of
obviousness, one of the requirements is that the combination of the references must teach or

30 make obvious every limitations recited in the claim. In this instant case, it is clear that the
combination of Patton and Bibl or the combination of Zawilinski and Bibl fails to teach the recited
internal clock element in the server for creating timestamps for data and notifications. Now the

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                      Paper No. 20140113 - Page 11
Art Unit: 3992

question is whether the combination of Patton and Bibl or the combination of Zawilinski and Bibl
suggests a person with ordinary skill in the art at the time of the invention was filed to add an
internal clock element to the server to create timestamps for data, notifications in addition to the
timestamp provided by the personal capture device. The Requester failed to provide any
5   motivation to do that in the proposed rejection and only provides a motivation when raised by
the Patent Owner in the response. Timeline, the provided motivation is late and improper. In
addition, even with the provided motivation which is "so that it may be processed in order of
receipt" the Examiner does not convince that it is a reasonable motivation because it appears
that it is merely an improper reliance on hindsight reconstruction. Further, as admitted by Mr.
10   Koperda and pointed out by the Patent Owner, Mr. Koperda, acknowledges that common
hardware platform does not always include a hardware clock. Because the required element
must be exist and positively identified, the Requester cannot rely on Mr. Koperda to argue that
the server in Bibl has internal clock element to create timestamp for data and notifications.

     Although the Examiner agrees with the Requester that Bibl does not teach away from
15   adding an internal clock element and creating timestamp for data and notification for the
reasons provided by the Requester, however, for the reasons discussed in the previous
paragraph, the proposed rejection of claim 47 in view of Bibl is withdrawn in this RAN office
action.

     Regarding (iii) and (iv), for the same reasons discussed in (i) and (ii), the rejections in
20   view of Teller are also withdrawn in this RAN office action.


**Claims 50-52**:

     In the 2013 ACP, claims 50-52 was rejected as obvious under:
25   (i)      35 USC 103(a) over Patton in view of Bibl,
     (ii)     35 USC 103(a) over Zawilinski in view of Bibl.
     (iii)    35 USC 103(a) over Patton in view of Teller, and
     (iv)     35 USC 103(a) over Zawilinski in view of Teller.


30   In view of the arguments provided by the Patent Owner and Requester, the rejections of
claims 50-52 in view of Bibl **are withdrawn** but the rejections of these claims in view of Teller
**are maintained** in this RAN office action.


*Inter Parte Reexamination – Right of Appeal Notice (RAN)*


**Appx732**

Control Number: 95/002,337                    Paper No. 20140113 - Page 12
Art Unit: 3992

**Patent Owner**:

Regarding (i) and (ii), the Patent Owner argues that the fact that Bibl's disclosure of a
database that stores "feedback information" is not the same as the recited "sensor database" or
5    makes a "sensor database" obvious. "Feedback data" in Bibl is not the data that is collected
from a sensor because the creation of feedback data in Bibl requires analysis of personal data.
On the other hand, the purpose of a sensor database is "for storing or keeping information about
sensors." (Sept 2013 PO Remarks, p. 33). The Patent Owner further argues that a database
that stores feedback information cannot include "a sensor identifier field that contains
10   information for identifying said first and second sensors," " a sensor description field that
contains information describing said first and second sensors, " or "a sensor output field that
contains information regarding a type, timing, or format of data provided by said first and second
sensors." The Patent Owner indicates that the Requester fails to cite any facts, gleaned from
Bibl, to support its position that the specific database fields recited in claims 50-52 would have
15   been obvious to one of ordinary skill in light of a disclosure of a database that stores feedback
information. (Sept 2013 PO Remarks, p. 34).

The Patent Owner alleges that the statements in the declaration of Mr. Koperda with
regard to Bibl and claims 50-52 are pure legal conclusions and should not entitled to any weight.

Regarding (iii) and (iv), the Patent Owner argues that a Teller's disclosure of a database
20   that stores data that is uploaded from a sensor device is not sufficient to disclose specific fields
of a sensor database, including "a sensor identifier field that contains information for identifying
said first and second sensors," " a sensor description field that contains information describing
said first and second sensors" or "a sensor output field that contains information regarding a
type, timing, or format of data provided by said first and second sensors." The Patent Owner
25   indicates that the Requester fails to cite any facts, gleaned from Teller, to support its position
that the specific database fields recited in claims 50-52 would have been obvious to one of
ordinary skill in light of a disclosure of a database that stores data that is uploaded from a
sensor device. (Sept 2013 PO Remarks, p. 35).

The Patent Owner alleges that the statements in the declaration of Mr. Koperda with
30   regard to Teller and claims 50-52 are pure legal conclusions and should not entitled to any
weight.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

**Appx733**

Control Number: 95/002,337                     Paper No. 20140113 - Page 13
Art Unit: 3992

**Requester**:

     Regarding (i) and (ii), the Requester responses that feedback data does include data collected from a sensor, including physical data and biometrical parameters, which may be further analyzed. (Oct 2013 Requester's Comments, p. 9). The Requester further argues that
5  the Patent Owner fails to rebut the testimony provided by Mr. Koperda. The Requester points out that "[o]pinion testimony rendered by experts must be given consideration, and while not controlling, generally is entitled to some weight." (Oct 2013 Requester's Comments, p. 10).

     Regarding (iii) and (iv), the Requester does not provide any further separate argument regarding Teller.

10

**Examiner**:

     Regarding (i) and (ii), the Examiner agrees with the Patent Owner that "feedback data" in Bibl is not the data that is collected from a sensor because the creation of feedback data in Bibl requires analysis of personal data. Bibl clearly discloses that "personal data" are stored in a
15  repository of personal data, not a database. (Bibl, paras. 56, 57 and 58). The fact that Bibl clearly discloses that "[t]he feedback information may be stored either in the repository of personal data or in a separate database residing on the web server 160," (Bibl, para. 58) whereas personal data are only stored in the repository (notes that nowhere in Bibl discloses that personal data are stored in a database) indicates that if the personal data were stored in a
20  database, it would be described as such. For this reason, the examine agrees with the Patent Owner's argument that Bibl does not disclose a sensor database as recited in each of claims 50-52.

     Regarding (iii) and (iv), the Patent Owner does not dispute the fact that Teller discloses a database that stores data from sensor device, however, he argues that the claims also recite
25  "a sensor identifier field that contains information for identifying said first and second sensors." " a sensor description field that contains information describing said first and second sensors, " or "a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second sensors." The Examiner believes that these missing limitations are obvious because it is a common practice to provide identifiers to each of the elements
30  stored in a database so that data in a database can be quickly sorted, rearranged, retrieved … later.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                                 Paper No. 20140113 - Page 14
Art Unit: 3992

For the above reasons, the rejections of claim 50-52 under 35 USC in view of Bibl are withdrawn, however, the rejections of claims 50-52 under 35 USC in view of Teller are maintained and repeated below:

5    A.    Claims 50-52 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Teller.

Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart TCC, Args. 1-3, 7 and 8 provides detailed discussion of how Teller is applied to the rejection which is also incorporated herein by

10   reference.

B.    Claims 50-52 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Teller.

Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the

15   rejection which is incorporated herein by reference. Also claim chart TCC, Args. 1-3, 7 and 8 provides detailed discussion of how Teller is applied to the rejection which is also incorporated herein by reference.

20   **Claims 53-56**:

In the 2013 ACP, claims 53-56 was rejected as obvious under:

(i)    35 USC 103(a) over Patton in view of Bibl,

(ii)    35 USC 103(a) over Zawilinski in view of Bibl.

(iii)    35 USC 103(a) over Patton in view of Teller, and

25   (iv)    35 USC 103(a) over Zawilinski in view of Teller.

In view of the arguments provided by the Patent Owner and Requester, the rejections of claims 53-56 in view of Bibl **are maintained** but the rejections of these claims in view of Teller **are withdrawn** in this RAN office action.

30

**Patent Owner**:

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                              Paper No. 20140113 - Page 15
Art Unit: 3992

  Regarding (i) and (ii), the Patent Owner argues that Bibl's disclosure of a database that
stores feedback information is not sufficient to disclose or render obvious (1) the "sensor
database" recited in claim 50, (2) the "output database" recited in claim 53 and (3) the
"evaluation database" recited in claim 58. The Patent Owner further argues that Bibl's disclosure

5  of a database the stores feedback information is not a disclosure of database that stores
"information regarding evaluation outputs and output devices." The Patent Owner further argues
that it is not obvious to include "an output identifier field that contains identifying information
regarding information regarding said first and second subjects," "an output description field that
contains descriptive information regarding said first and second subjects," or "a sensor identifier

10  field that identifies that said first and second sensors are associated with said first and second
subjects." (Sept 2013 PO Remarks, pages 37-38)

  The Patent Owner alleges that the statements in Koperda Decla with regard to Bibl to
claims 53-56 are pure legal conclusions and should not entitled to any weight. (Sept 2013 PO
Remarks, p. 39)

15

  Regarding (iii) and (iv), the Patent Owner argues that Teller's disclosure of a database
that stores data that is uploaded from a sensor device is not sufficient to disclose or render
obvious (1) the "sensor database" recited in claim 50, (2) the "output database" recited in claim
53 and (3) the "evaluation database" recited in claim 58. The Patent Owner further argues that

20  Teller's disclosure of a database that stores data  that is uploaded from a sensor device is not a
disclosure of database that stores "information regarding evaluation outputs and output
devices." The Patent Owner further argues that it is not obvious to include "an output identifier
field that contains identifying information regarding information regarding said first and second
subjects," "an output description field that contains descriptive information regarding said first

25  and second subjects," or "a sensor identifier field that identifies that said first and second
sensors are associated with said first and second subjects." (Sept 2013 PO Remarks, p. 39-40)

  The Patent Owner alleges that the statements in Koperda Decla with regard to Teller to
claims 53-56 are pure legal conclusions and should not entitled to any patentable weight. (Sept
2013 PO Remarks, p. 41)

30

**Requester**:


*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 16
Art Unit: 3992

      Regarding (i) and (ii), the Requester responses that the Patent Owner's argument that a single database cannot constitute a sensor database, an output database, and an evaluation database is irrelevant because claims 53-56 recited only an output database. The Requester further argues that the feedback data includes information regarding evaluation outputs/analysis

5 and output devices. (Oct 2013 Requester's Comments, p. 11)

      Regarding (iii) and (iv), the Requester responses that the Patent Owner's argument that a single database cannot constitute a sensor database, an output database, and an evaluation database is irrelevant because claims 53-56 recited only an output database. The Requester further argues that the claim language only requires that the database stores "information

10 regarding evaluation outputs and output devices." The declaration from Mr. Koperda shows that a person skilled in the art would have included the data fields of claims 53-56 to store information received from multiple sensors for each of multiple users as is provided by Teller. (Oct 2013 Requester's Comments, p. 12).

15 **Examiner**:

      Regarding (i) and (ii), the Examiner agrees with the Requester that the statement "a single database cannot constitute a sensor database, an output database, and an evaluation database" is irrelevant in this instant case because claims 53-56 recited only an output database. What matter is whether Bibl's disclosed database can be reasonable seen as the

20 recited "output database" in claims 53-56. The Examiner thinks so. Bibl's disclosure of a database that stores feedback information is a disclosure of "an output database" because the feedback information is stored in a database and can be posted (outputted) on a web site. In the disclosure, Bibl discloses that "[t]he feedback information may be stored …. in a separate database residing on web server 160" (Bibl, para. 58, last sentence) and "the feedback

25 information is posted on a web site." (Bibl, para. 59, first sentence). Regarding the recited identifier fields included in the output database in claims 54-56, the Examiner believes that these missing limitations are obvious because it is a common practice to provide identifiers to each of the elements stored in a database so that data in a database can be quickly sorted, rearranged, retrieved … later.

30       Regarding (iii) and (iv), the Examiner agrees with the Patent Owner that Teller's database is not an "output database" because Teller's database stores data that is uploaded

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 17
Art Unit: 3992

from a sensor device. It qualifies as a "sensor database" or "input database" because it stores sensor data uploaded from sensor devices.

For the above reasons, the rejections of claim 53-56 under 35 USC in view of Bibl are maintained and repeated below, but the rejections of claims 53-56 under 35 USC in view of Teller are withdrawn.

A.      Claims 53-56 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Bibl.

Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart BCC, Args. 1-3 and 10 provides detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by reference.

B.      Claims 53-56 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Bibl.

Claim chart CC2 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart BCC, Args. 1-3 and 10 provides detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by reference.

**Claims 58-61**:

In the 2013 ACP, claims 58-61 were rejected as obvious under:

(i)      35 USC 103(a) over Patton in view of Bibl,

(ii)     35 USC 103(a) over Zawilinski in view of Bibl.

(iii)    35 USC 103(a) over Patton in view of Teller, and

(iv)     35 USC 103(a) over Zawilinski in view of Teller.

In view of the arguments provided by the Patent Owner and Requester, the rejections of claims 58-61 in view of Bibl **are maintained** but the rejections of these claims in view of Teller **are withdrawn** in this RAN office action

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 18
Art Unit: 3992

**Patent Owner**:

Regarding (i) and (ii), the Patent Owner argues that Bibl's disclosure of a database that
stores feedback information is not sufficient to disclose specific fields in an evaluation database,
including "an evaluation identifier field that contains identifying information for said evaluation,"
"a description field that contains descriptive information regarding said evaluation," "a sensor
identifier field that contains information for identifying said first and second sensors associated
with said evaluation," or " a field that associates said evaluation with said device to which said
notification is provided." (Sept 2013 PO Remarks, p. 42)

The Patent Owner alleges that the statements in Koperda Declaration with regard to Bibl
to claims 58-61 are pure legal conclusions and should not entitled to any weight. (Sept 2013 PO
Remarks, p. 42)

Regarding (iii) and (iv), the Patent Owner argues that Teller's disclosure of a database
the stores data that is uploaded from a sensor device is not sufficient to disclose specific fields
in an evaluation database, including "an evaluation identifier field that contains identifying
information for said evaluation,"  "a description field that contains descriptive information
regarding said evaluation," "a sensor identifier field that contains information for identifying said
first and second sensors associated with said evaluation," or " a field that associates said
evaluation with said device to which said notification is provided." (Sept 2013 PO Remarks, p.
43)

The Patent Owner alleges that the statements in Koperda Declaration with regard to
Teller to claims 58-61 are pure legal conclusions and should not entitled to any weight. (Sept
2013 PO Remarks, pages 44-45)

**Requester**:

Regarding (i) and (ii), the Requester argues that it would have been obvious to include
the recited fields in view of the statements provided by Mr. Koperda in the Koperda Declaration.
(Oct 2013 Requester's Comments, p. 13)

Regarding (iii) and (iv), the Requester also argues that it would have been obvious to
include the recited fields in view of the statements provided by Mr. Koperda in the Koperda
Declaration. (Oct 2013 Requester's Comments, pages 14-15)

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                              Paper No. 20140113 - Page 19
Art Unit: 3992

**Examiner**:

Regarding (i) and (ii), the Examiner agrees with the Requester that the statement "a single database cannot constitute a sensor database, an output database, and an evaluation database" is irrelevant in this instant case because claims 58-61 recited only an evaluation
5   database. Bibl's disclosure of a database that stores feedback information is a disclosure of "an evaluation database" because the feedback information which is stored in the database is already evaluated by specialists. In the disclosure, Bibl discloses "[o]ne or more fitness or health specialists may analyze (evaluate) the personal data and create the feedback information." (Bibl, para. 58). In other words, Bibl's data is an "evaluation database" because Bibl's
10  database stores "evaluated data." Regarding the recited identifier fields included in the evaluation database in claims 58-61, the Examiner believes that these missing limitations are obvious because it is a common practice to provide identifiers to each of the elements stored in a database so that data in a database can be quickly sorted, rearranged, retrieved … later.

Regarding (iii) and (iv), the Examiner agrees with the Patent Owner that Teller's
15  database is not an "evaluation database accessible to said server" because Teller's database stores data that is uploaded from a sensor device. It qualifies as a "sensor database" because it stores sensor data uploaded from sensor devices.


For the above reasons, the rejections of claim 53-56 under 35 USC in view of Bibl are
20  maintained and repeated below, but the rejections of claims 53-56 under 35 USC in view of Teller are withdrawn.


A.      Claims 58-61 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Bibl.
25  Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart BCC, Args. 1-3 and 11 provides detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by reference.


30  B.      Claims 58-61 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Bibl.


*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 20
Art Unit: 3992

     Claim chart CC2 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart BCC, Args. 1-3 and 11 provides detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by reference.

5

**Claim 65**:

     In the 2013 ACP, claim 65 was rejected as obvious under:

(i)       35 USC 103(a) over Patton in view of Bibl,

(ii)     35 USC 103(a) over Zawilinski in view of Bibl.

10   (iii)    35 USC 103(a) over Patton in view of Teller, and

(iv)   35 USC 103(a) over Zawilinski in view of Teller.

     In view of the arguments provided by the Patent Owner and Requester, the rejections of claim 65 **are maintained** in this RAN office action.

15

**Patent Owner**:

     Regarding (i) and (ii), the Patent Owner argues that Bibl's disclosure regarding the "apparatus for performing the operations" is referring to the server, not a device that receives a notifications. Bibl lacks any disclosure that explicitly states that clients 130 or 170 include

20  EEPROM. The Patent Owner further argues that the disclosure of EEPROM is not a disclosure of a flash memory card and would not make the flash memory card obvious. The Patent Owner indicates that the term "flash memory card" would mean a memory card that is easily removable from a host device. (Ashby Declaration, para. 12). (Sept 2013 PO Remarks, p. 46)

     Regarding (iii) and (iv), the Patent Owner argues that Teller merely discloses "flash

25  memory", not "flash memory card" as required in the claim. (Sept 2013 PO Remarks, p. 47)

**Requester**:

     Regarding (i) and (ii), the Requester responses that the Patent Owner ignores the fact that the operations include ALL or ANY of the operations described by Bibl, including but not

30  limited to the sending and receiving notification operations. (See Bibl, para. 22). As such, Bibl discloses a device with an EEPROM that receives a notification. The Requester argues that a "flash memory card" does not need to be "removable engagable" as noted in Ashby Declaration.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                          Paper No. 20140113 - Page 21
Art Unit: 3992

The Requester points out that Intel's Application Note AP-758 describes a flash memory card
that is "unsuitable for a 'removable engagable' device that could be randomly plugged into and
removed for the host system." (Supp Koperda Declaration, paragraphs 6-11) (Oct 2013
Requester's Comments, pages 16-18).

5          Regarding (iii) and (iv), the Requester argues that the Patent Owner fails to provide any
testimony or other evidence to support his opinion here, but instead simply argues that flash
memory is different from flash memory cards. As such, Teller's disclosure of flash memory
necessarily makes obvious the recited flash memory cards. (Supp Koperda Declaration, para.
7). (Oct 2013 Requester's Comments, page 19)

10

**Examiner**:

          Regarding the Patent Owner's argument that "Bibl's disclosure regarding the "apparatus
for performing the operations" is referring to the server, not a device that receives a
notifications", the Examiner notes that the way claim 65 is organized clearly implies that the
15     "device includes a flash memory card" is inside the remote server. Please also see the
indefiniteness, 112, second paragraph rejection in the previous section.
          Other than the above mentioned, the Examiner agrees with the Requester for the
reasons provided by the Requester. Thus, the rejection in the ACP office action is maintained in
this RAN office action and repeated below.

20

A.     Claim 65 is rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Bibl.
          Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection
which is incorporated herein by reference. Also claim chart BCC, page 35, Args, 1-3 and 12
provides detailed discussion of how Bibl is applied to the rejection which is also incorporated
25     herein by reference.

B.     Claim 65 is rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of
Bibl.
          Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the
30     rejection which is incorporated herein by reference. Also claim chart BCC, Args. 1-3 and 12
provides detailed discussion of how Bibl is applied to the rejection which is also incorporated
herein by reference.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                          Paper No. 20140113 - Page 22
Art Unit: 3992

C.      Claim 65 is rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of
Teller.

        Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection
5   which is incorporated herein by reference. Also claim chart TCC, Args. 1-3 and 9 provides
detailed discussion of how Teller is applied to the rejection which is also incorporated herein by
reference.

D.      Claim 65 is rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of
10  Teller.

        Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the
rejection which is incorporated herein by reference. Also claim chart TCC, Args. 1-3 and 9
provides detailed discussion of how Teller is applied to the rejection which is also incorporated
herein by reference.

15

**Claim 79**:

        In the 2013 ACP, claim 79 was rejected as obvious under:

        (i)      35 USC 103(a) over Patton in view of Bibl,
20      (ii)     35 USC 103(a) over Zawilinski in view of Bibl.
        (iii)    35 USC 103(a) over Patton in view of Teller, and
        (iv)     35 USC 103(a) over Zawilinski in view of Teller.

        In view of the arguments provided by the Patent Owner and Requester, the rejections of
25  claim 79 **are maintained** in this RAN office action.

**Patent Owner**:

        Patent Owner argues that neither Bibl nor Teller disclose providing a notification
regarding an evaluation via an XML transmission. The Patent Owner further argues that XML
30  would have required much more bandwidth than many other communication protocols because
of the overhead of tags around all data in XML documents, thus, XML would not have been an
obvious choice in Bib and Teller. (Sept 2013 PO Remarks, pages 47-48)

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

**Appx743**

Control Number: 95/002,337                                    Paper No. 20140113 - Page 23
Art Unit: 3992

**Requester**:

The Requester responses that whether or not one skilled in the art would have actually
used XML transmissions in various embodiments of the invention is not enough to overcome the
fact that it would have been obvious to use XML. Further, the Requester relies on the expert,
Mr. Koperda, to argue that it would have been obvious to use XML transmission protocol
because the XML protocol allows a description of the data (name, format, range value) and then
the data, thus, make it easy to share the data between dissimilar system. (Oct 2013 Requester's
Comments, p. 19).

**Examiner**:

The Examiner agrees with the Requester. It would have been obvious to use XML
protocol for the reasons provided by the Requester.

The Examiner further notes that the '271 patent merely provides a list of available
protocols such as HTTP, HTML, FTP, XML … It does not describe any advantage or
disadvantage for using XML protocol over other protocols. As such, patentable weight is given
to this limitation only to the extend that it is merely one of the many possible choices that can be
chosen by a system designer. Because it is clear that XML protocol can be used in Bibl or
Teller, choosing XML protocol is merely a design choice.

For the above reasons, the rejections of claim 79 in the ACP office action is maintained
and repeated below.

A.      Claim 79 is rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Bibl.
Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection
which is incorporated herein by reference. Also claim chart BCC, Args. 1-3 and 14 provides
detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by
reference.

B.      Claim 79 is rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of
Bibl.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

**Appx744**

Control Number: 95/002,337                              Paper No. 20140113 - Page 24

Art Unit: 3992

   Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the rejection which is incorporated herein by reference. Also claim chart BCC, Args. 1-3 and 14 provides detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by reference.

5

   C.    Claim 79 is rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Teller.

   Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart TCC, Args 1-3 and 12 provides

10   detailed discussion of how Teller is applied to the rejection which is also incorporated herein by reference.

   D.    Claim 79 is rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Teller.

15   Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the rejection which is incorporated herein by reference. Also claim chart TCC, Args 1-3 and 12 provides detailed discussion of how Teller is applied to the rejection which is also incorporated herein by reference.

20

**Claims 95**:

In the 2013 ACP, claims 95 was rejected as obvious under:

   (i)     35 USC 103(a) over Patton in view of Bibl,

   (ii)    35 USC 103(a) over Zawilinski in view of Bibl.

25   (iii)   35 USC 103(a) over Patton in view of Teller, and

   (iv)    35 USC 103(a) over Zawilinski in view of Teller.

   In view of the arguments provided by the Patent Owner and Requester, the rejections of claim 95 in view of Bibl **are withdrawn** but the rejections of claim 95 in view of Teller **are**

30   **maintained** in this RAN office action.

**Patent Owner**:

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                              Paper No. 20140113 - Page 25
Art Unit: 3992

     Regarding (i) and (ii), the Patent Owner argues that Bibl merely discloses different users may have their own PSA and each of which may individually transmit data to the server, however, Bibl says nothing about the server receiving data simultaneously from multiple portable sports appliances. (Bibl, paras. 26-27). The fact that a server may receive data from

5   multiple devices does not make simultaneous reception of data from multiples devices obvious. (Sept 2013 PO Remarks, p. 49)

     Regarding (iii) and (iv), the Patent Owner argues that Teller discloses that the system receives data and makes data available over the Internet, however, this teaching is not sufficient to disclose or render obvious a server that receives data from multiple devices simultaneously.

10  (Sept 2013 PO Remarks, p. 50)


**Requester**:

     Regarding (i) and (ii), the Requester responses that the disclosure of Bibl is analogous to what is described by the '271 patent with regard to the simultaneously receipt of data from

15  different users. (Oct 2013 Requester's Comments, p. 20)

     Regarding (iii) and (iv), the Requester argues that it is obvious that a machine that operates on the Internet can send/receive transmission simultaneously. (Oct 2013 Requester's Comments, p. 20)


20  **Examiner**:

     Regarding (i) and (ii), the Examiner agrees with the Patent Owner's argument that the fact that a server may receive data from multiple devices does not imply or make obvious simultaneous reception of data from multiples devices.

     Regarding (iii) and (iv), Teller teaches a server which includes multiple middleware

25  servers (Fig. 3, servers 95a-95c, col. 9:42-61), network storage 100 which is the Symmetrix product sold by EMC Corp. (col.10:1-3), data transmitted over the Internet, collecting data devices which include wireless devices 50 (Fig. 1), personal computer 35 (Fig. 1) and kiosk (col. 8, lines 9-40). The existence of these devices in a system clearly implies, or at least suggests that the server receives data from multiple devices simultaneously. It is obvious that allowing

30  simultaneous data reception from multiple devices would improve the efficiency of the system.


*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                          Paper No. 20140113 - Page 26
Art Unit: 3992

        For the above reasons, the rejections of claim 95 under 35 USC in view of Bibl are
withdrawn, but the rejections of claim 95 under 35 USC in view of Teller are maintained and
repeated below:

5   A.      Claim 95 is rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of
Teller.
        Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection
which is incorporated herein by reference. Also claim chart TCC, Args. 1-3 and 18 provides
detailed discussion of how Teller is applied to the rejection which is also incorporated herein by
10  reference.

    B.      Claim 95 is rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of
Teller.
        Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the
15  rejection which is incorporated herein by reference. Also claim chart TCC, Args. 1-3 and 18
provides detailed discussion of how Teller is applied to the rejection which is also incorporated
herein by reference.


20  **Claims 98 and 99**:
        In the 2013 ACP, claims 98 and 99 were rejected as obvious under:
        (i)      35 USC 103(a) over Patton in view of Bibl,
        (ii)     35 USC 103(a) over Zawilinski in view of Bibl.
        (iii)    35 USC 103(a) over Patton in view of Teller, and
25      (iv)     35 USC 103(a) over Zawilinski in view of Teller.


        In view of the arguments provided by the Patent Owner and Requester, the rejections of
claims 98-99 in view of Bibl **are withdrawn** but the rejections of these claims in view of Teller
**are maintained** in this RAN office action.

30
    **Patent Owner**:


*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

**Appx747**

Control Number: 95/002,337                          Paper No. 20140113 - Page 27
Art Unit: 3992

     Regarding (i) and (ii), the Patent Owner argues that in Bibl, the determination of whether
a user's heart rate reached a target limit is made by a microprocessor of a personal data
capture device (Bibl, para. 46) or in other embodiment, the determination of whether a user's
heart rate is too low or too high is made by software 482, which is part of a personal data
5  capture device. However, claim 98 requires that the determination of whether a first subject is in
need of a break is performed by a processor of a remote server. (Sept 2013 PO Remarks, p.
50)

     Regarding (iii) and (iv), the Patent Owner argues that sleep does not appear in any of
the various definitions for the term "break." Defining the term "break" to mean "sleep" is
10  inconsistent with how the term "break" is used in the '271 patent. Defining the term "break" to
mean "sleep" would be an unreasonable broad construction. Understanding the proper
construction for the term "break," it is clear that Teller does not disclose or make obvious a
"processor [that] is operative to determine whether said first subject is in need of a break" as
recited in claim 98. (Sept 2013 PO Remarks, p. 51)

15     Regarding claim 99, the Patent Owner argues that by virtue of its dependence on claim
98, claim 99 should be allowable for the reasons presented in claim 98. Not further argument is
presented. (Sept 2013 PO Remarks, p. 52)

**Requester**:

20     Regarding (i) and (ii), the Requester responses that Bibl clearly states that "personal
data capture device 400 may include heart rate receiver 430 which receives heart beat rate from
wireless heart rate transmitter 420." Thus, personal data capture device in Bibl is remote from
the wireless heart rate transmitter. Personal capture device is seen as a server because it is
capable of sending/receiving files over a network. (Oct 2013 Requester's Comments, p. 21)

25     Regarding (iii) and (iv), the Requester indicates that the Patent Owner cites to the '271
patent for the definition of break, which includes that which "is needed so that the subjects can
use the restroom, overcome boredom or fatigue, etc." ('271 patent, 6:13-17). The Requester
argues that going to sleep will allow a subject to stretch their legs and overcome fatigue or
boredom, thus, sleep is consistent with how "break" is used in the '271 patent, and also how
30  "break" is used within the claims. (Oct 2013 Requester's Comments, p. 22)

     Regarding claim 99, the Requester suggests that the rejection should be maintained
because the rejection of claim 98 is maintained. (Oct 2013 Requester's Comments, p. 22)

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                          Paper No. 20140113 - Page 28
Art Unit: 3992

**Examiner**:

Regarding (i) and (ii), the Examiner agrees with the Patent Owner. The Requester may be correct when considering a personal capture device as a server because it is capable of
5    sending/receiving files over a network. However, in this instant case, it is not the "remote server" recited in claim 98 because it is not the same server interpreted by the Requester in the claim chart BCC, Arg. 1.

Regarding (iii) and (iv), the Examiner agrees with the Requester that defining the term "break" to mean "sleep" is consistent with how the term "break" being used in the '271 patent for
10   the reasons provided by the Requester.

Claim 99 stands or falls together with claim 98.

For the above reasons, the rejections of claim 98-99 under 35 USC in view of Bibl are withdrawn, but the rejections of claims 98-99 under 35 USC in view of Teller are maintained and
15   repeated below:

A.    Claim 98-99 are rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Teller.

Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection
20   which is incorporated herein by reference. Also claim chart TCC, Args. 1-3 and 20 provides detailed discussion of how Teller is applied to the rejection which is also incorporated herein by reference.

B.    Claims 98-99 are rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in
25   view of Teller.

Claim chart CC2 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart TCC, Args. 1-3 and 20 provides detailed discussion of how Teller is applied to the rejection which is also incorporated herein by reference.

30
<u>**Claim 124**</u>:

In the 2013 ACP, claim 124 was rejected as obvious under:

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 29
Art Unit: 3992

    (i)      35 USC 103(a) over Patton in view of Bibl,

    (ii)     35 USC 103(a) over Zawilinski in view of Bibl.

    (iii)    35 USC 103(a) over Patton in view of Teller, and

    (iv)    35 USC 103(a) over Zawilinski in view of Teller.

5

    In view of the arguments provided by the Patent Owner and Requester, the rejections of claim 124 **are maintained** in this RAN office action.


**Patent Owner**:

10    The Patent Owner argues that Bibl and Teller fail to disclose that Bluetooth wireless transmission may be used to transmit data. Mr. Koperda in the Declaration states the advantages of using Bluetooth, however, Mr. Koperda's testimony is irrelevant because it focuses on how the current state of Bluetooth technology and not on Bluetooth as it existed at the time of the '271 patent invention. A person of ordinary skill in the art at the time of the '271 invention would not have found Bluetooth wireless transmission an obvious replacement for radio frequency, infrared, or other wireless transmission protocols because of the large amount of power required to transmit data and expensive. (Sept 2013 PO Remarks, pages 52-53)


**Requester**:

20    The Requester responses that the Patent Owner incorrectly attempts to apply a more stringent requirement for obviousness than is required. The Patent Owner relies on Ashby Declaration, however, Mr. Ashby provides no factual support for his opinion that Bluetooth, though available, would not have been used for wireless data transmission and that "other form of wireless data transmission protocols would have been preferred over Bluetooth for the applications described in the '271 patent." The Requester relies on the declaration of Mr. Koperda regarding Bluetooth technology was known, standardized, and had numerous products on the market at the time the '271 patent was filed. (Supp Koperda Declaration paras. 18-30). (Oct 2013 Requester's Comments, p. 23)


30    **Examiner**:

    The Examiner agrees with the Requester. It is clear that Bluetooth technology was known, standardized, and had numerous products on the market at the time the '271 patent was

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                          Paper No. 20140113 - Page 30
Art Unit: 3992

filed. For example, Bluetooth technology was being used in Motorola headsets. Thus, Bluetooth technology is one of the many options for transmitting data wirelessly.

For the reasons discussed above, the rejections of claim 124 are maintained and
5   repeated below:

A.      Claim 124 is rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Bibl.
        Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection
10  which is incorporated herein by reference. Also claim chart BCC, Args. 1-3, 27, 34 and 44 provides detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by reference.

B.      Claim 124 is rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of
15  Bibl.
        Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the rejection which is incorporated herein by reference. Also claim chart BCC, Args. 1-3, 27, 34 and 44 provides detailed discussion of how Bibl is applied to the rejection which is also incorporated herein by reference.

20

C.      Claim 124 is rejected under 35 U.S.C. 103(a) as being obvious over Patton in view of Teller.
        Claim chart CC1 provides detailed discussion of how Patton is applied to the rejection which is incorporated herein by reference. Also claim chart TCC, Args. 1-3, 23, 28 and 29
25  provides detailed discussion of how Teller is applied to the rejection which is also incorporated herein by reference.

D.      Claim 124 is rejected under 35 U.S.C. 103(a) as being obvious over Zawilinski in view of Teller.
30      Claim chart CC2 provides detailed discussion of how Zawilinski is applied to the rejection which is incorporated herein by reference. Also claim chart TCC, Args 1-3, 23, 28 and

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 31
Art Unit: 3992

29 provides detailed discussion of how Teller is applied to the rejection which is also
incorporated herein by reference.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

**Appx752**

Control Number: 95/002,337                          Paper No. 20140113 - Page 32
Art Unit: 3992

   **This is a RIGHT OF APPEAL NOTICE (RAN)**; see MPEP § 2673.02 and § 2674. The
decision in this Office action as to the patentability or unpatentability of any original patent claim,
any proposed amended claim and any new claim in this proceeding is a FINAL DECISION.

5  No amendment can be made in response to the Right of Appeal Notice in an *inter partes*
reexamination. 37 CFR 1.953(c). Further, no affidavit or other evidence can be submitted in an
*inter partes* reexamination proceeding after the right of appeal notice, except as provided in  37
CFR 1.981 or as permitted by 37 CFR 41.77(b)(1). 37 CFR 1.116(f).

   Each party has a **thirty-day or one-month time period, whichever is longer**, to file a
10  notice of appeal. The Patent Owner may appeal to the Board of Patent Appeals and
Interferences with respect to any decision adverse to the patentability of any original or
proposed amended or new claim of the patent by filing a notice of appeal and paying the fee set
forth in 37 CFR 41.20(b)(1).  The third party Requester may appeal to the Board of Patent
Appeals and Interferences with respect to any decision favorable to the patentability of any
15  original or proposed amended or new claim of the patent by filing a notice of appeal and paying
the fee set forth in 37 CFR 41.20(b)(1).

   In addition, a Patent Owner who has not filed a notice of appeal may file a notice of
cross appeal within **fourteen days of service** of a third party Requester's timely filed notice of
appeal and pay the fee set forth in 37 CFR 41.20(b)(1).  A third party Requester who has not
20  filed a notice of appeal may file **a notice of cross appeal within fourteen days of service** of a
Patent Owner's timely filed notice of appeal and pay the fee set forth in 37 CFR 41.20(b)(1).
Any appeal in this proceeding must identify the claim(s) appealed, and must be signed by the
Patent Owner (for a Patent Owner appeal) or the third party Requester (for a third party
Requester appeal), or their duly authorized attorney or agent.

25  Any party that does not file a timely notice of appeal or a timely notice of cross appeal
will lose the right to appeal from any decision adverse to that party, but will not lose the right to
file a respondent brief and fee where it is appropriate for that party to do so. If no party files a
timely appeal, the reexamination prosecution will be terminated, and the Director will proceed to
issue and publish a certificate under 37 CFR 1.997 in accordance with this Office action.

30

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                    Paper No. 20140113 - Page 33
Art Unit: 3992

## NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

5      The Patent Owner's correspondence address for all communications in an *ex parte* reexamination or an *inter partes* reexamination is designated as the correspondence address of the patent.

*Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination*, 72 FR 18892 (April 16, 2007)(Final Rule)

10     **The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any

15     reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the Patent Owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly

20     encouraged that the Patent Owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address Patent Owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

25     Telephone Numbers for reexamination inquiries:

Reexamination Practice                    (571) 272-7703
Central Reexam Unit (CRU)                 (571) 272-7705
Reexamination Facsimile Transmission No.  (571) 273-9900

30

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                      Paper No. 20140113 - Page 34
Art Unit: 3992

## Communication with the USPTO

All correspondence relating to this *inter partes* reexamination proceeding should be
directed as follows:

5

By **U.S. Postal Service Mail** to:

Mail Stop *Inter Partes* Reexam
ATTN:   Central Reexamination Unit
Commissioner for Patents
10          P.O. Box 1450
Alexandria, Virginia 22313-1450

By FAX to:

571-273-9900
15          Central Reexamination Unit

By hand to:

Customer Service Window
Randolph Building
20          401 Dulany St.
Alexandria, VA 22314

By EFS-Web:

Registered users of EFS-Web may alternatively submit such correspondence via the
25      electronic filing system EFS-Web, at

https://sportal.uspto.gov/authenticate/authenticateuserlocalepf.html

EFS-Web offers the benefit of quick submission to the particular area of the Office that
needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e.,
electronically uploaded) directly into the official file for the reexamination proceeding, which
30      offers parties the opportunity to review the content of their submissions after the "soft scanning"
process is complete.

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

Control Number: 95/002,337                                   Paper No. 20140113 - Page 35

Art Unit: 3992

      Any inquiry concerning this communication or earlier communication from the Examiner, or as to the status of the proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

5

/Minh Nguyen/
Minh Nguyen
Primary Examiner
10     571-272-1748
AU 3992

Conferees:

15    /Tuan H. Nguyen/
Tuan H.  Nguyen
Primary Examiner
AU 3992

20    /Andrew J. Fischer/
Supervisory Patent Reexamination Specialist, Art Unit 3992

*Inter Parte Reexamination – Right of Appeal Notice (RAN)*

# EXHIBIT 27

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| *In re* reexam of: U.S. Patent 6,701,271 B2 to | Examiner: Nguyen, Minh T. |
|     WILLNER *et al.* | |
| For: **Method and Apparatus for Using Physical Characteristic Data Collected from Two or More Subjects** | Art Unit: 3992<br>Atty. Docket: 3271.001REX0 |
| Reexam Control No.: 95/002,337<br>Filed: Sept 14, 2012 | Confirmation No.: 1254 |

## Third Party Requesters' Notice of Appeal in *Inter Partes* Reexamination

Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**Mail Stop "*Inter Partes* Reexam"**

Sir:

    Responsive to the Right of Appeal Notice mailed January 23, 2014, the undersigned, on behalf of the Third Party Requesters Strava, Inc., MapMyFitness, Inc., and FitnessKeeper, Inc. (collectively, "Requesters") hereby appeal the Office's decision not to maintain the following rejections of the claims of U.S. Patent No. 6,701,271:

    Claim 47 is obvious under 35 USC §103(a) over U.S. Patent No. 6,292,688 to Patton ("Patton") in view of U.S. Published Application No. 2002/0111541 to Bibl *et al.* ("Bibl");

    Claim 47 is obvious under 35 USC §103(a) over U.S. Patent No. 5,676,138 to Zawilinski ("Zawilinski") in view of Bibl;

    Claim 47 is obvious under 35 USC §103(a) over Patton in view of U.S. Patent No. 6,605,038 to Teller ("Teller");

    Claim 47 is obvious under 35 USC §103(a) over Zawilinski in view of Teller;

    Claims 50-52 are obvious under 35 USC §103(a) over Patton in view of Bibl;

    Claims 50-52 are obvious under 35 USC §103(a) over Zawilinski in view of Bibl;

    Claims 53-56 are obvious under 35 USC §103(a) over Patton in view of Teller;

    Claims 53-56 are obvious under 35 USC §103(a) over Zawilinski in view of Teller;

- 2 -                                                                    Willner *et al.*
                                                                        Control No. 95/002,337

Claims 58-61 are obvious under 35 USC §103(a) over Patton in view of Teller;

Claims 58-61 are obvious under 35 USC §103(a) over Zawilinski in view of Teller;

Claim 95 is obvious under 35 USC §103(a) over Patton in view of Bibl;

Claim 95 is obvious under 35 USC §103(a) over Zawilinski in view of Bibl;

Claims 98-99 are obvious under 35 USC §103(a) over Patton in view of Bibl; and

Claims 98-99 are obvious under 35 USC §103(a) over Zawilinski in view of Bibl.


The required fee is provided through online credit card payment authorization in the amount of $800.00 in payment of the fee for a Notice of Appeal. If necessary, the U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment to Deposit Account No 19-0036.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Michael B. Ray
Attorney for Third Party Requesters
Registration No. 33,997

Date: _2/21/14_

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600


1815187_1.DOCX

# EXHIBIT 28

Via eFILE                                                           REEXAMINATION
                                              Attorney Docket No.: I1618.10003US01


**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | | |
|---|---|---|
| Reexamination of: | U.S. Patent No. 6,701,271 | |
| Control No.: | 95/002,337 | Art Unit 3992 |
| Inventor: | Willner, Barry E., et al. | |
| Filed: | September 14, 2012 | |
| For: | METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA CONLLECTED FROM TWO OR MORE SUBJECTS | |
| Examiner: | Nguyen, Minh T. | |
| Customer No.: | 97149 | |
| Confirmation No: | 1254 | |


**PATENT OWNER'S NOTICE OF CROSS APPEAL UNDER 37 C.F.R. § 41.61(b)(1)**

**Mail Stop: Inter Partes Reexamination**
Attn: Central Reexamination Unit
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

On January 23, 2014, the Examiner issued a Right of Appeal Notice ("RAN"). Third-party requestor filed a Notice of Appeal on February 21, 2014. Pursuant to 37 C.F.R. § 41.61(b)(1), the undersigned Patent Owner cross appeals to the Board from the decision of the Examiner finally rejecting claims 15, 16, 50-56, 58-61, 65, 79, 95, 98, 99 and 124. Patent Owner intends to contest each and every rejection of these claims contained in the RAN.


1

**Appx761**

Patent Owner's Notice of Cross Appeal
Reexamination Control No.: 95/002,337

The fee set forth in fee set forth in 37 C.F.R. § 41.20(b)(1) is submitted herewith. The Director is hereby authorized to charge any additional fees that may be due, or credit any overpayment of same, to the undersigned's Deposit Account No. 50-5394.

Dated this 7th day of March, 2014.

Respectfully submitted,

**/Mark W. Ford, Reg. No. 67,732/**

Mark W. Ford
Registration No. 67,732
Attorney for Patent Owner
Customer No. 97149
Telephone No. (435) 252-1360

2

# EXHIBIT 29

Via eFILE                                                          REEXAMINATION
                                              Attorney Docket No.: I1618.10003US01


**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

Reexamination of:      U.S. Patent No. 6,701,271

Control No.:           95/002,337                              Art Unit
                                                               3992
Inventor:              Willner, Barry E., et al.

Filed:                 September 14, 2012

For:                   METHOD AND APPARATUS FOR USING PHYSICAL
                       CHARACTERISTIC DATA CONLLECTED FROM TWO
                       OR MORE SUBJECTS

Examiner:              Nguyen, Minh T.

Customer No.:          97149

Confirmation No:       1254


**PATENT OWNER'S BRIEF ON APPEAL UNDER 37 C.F.R. § 41.67**


**Mail Stop: Inter Partes Reexamination**
Attn: Central Reexamination Unit
P.O. Box 1450
Alexandria, VA 22313-1450



Dear Sir:

    Patent Owner hereby appeals to the Patent Trial and Appeal Board from the Right of Appeal Notice ("RAN") mailed on January 23, 2014, in the *inter partes* reexamination proceedings for U.S. Patent No. 6,701,271 ("the '271 Patent"). As required by 37 C.F.R. § 41.66, Patent Owner files this Appeal Brief in support of its Notice of Cross-Appeal, which was filed on March 7, 2014. The fee required under 37 C.F.R. § 41.20(b)(2) is filed currently herewith. The Director is further authorized to charge any additional fees that may be due, or credit any overpayment of same to Deposit Account No. 50-5394.

1

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

**TABLE OF CONTENTS**

I.     REAL PARTY IN INTEREST ...................................................................................... 3

II.    RELATED APPEALS AND INTERFERENCES ........................................................ 3

III.   STATUS OF CLAIMS ................................................................................................ 3

IV.   STATUS OF AMENDMENTS .................................................................................. 3

V.    SUMMARY OF CLAIMED SUBJECT MATTER .................................................. 4

VI.   ISSUES TO BE REVIEWED ON APPEAL ............................................................ 7

VII.  ARGUMENT .............................................................................................................. 7

   A.  Background ............................................................................................................ 7

   B.  Claims 50-56, 58-61, and 65 Are Not Indefinite ................................................ 8

   C.  Claims 15 And 16 Are Valid And Should Be Allowed ...................................... 10

      1.  *Patton* does not teach each limitation of claims 15 and 16 and thus does not anticipate claims 15 and 16 ............................................................................................................... 11

      2.  The combination of *Zawilinski* in view of *Papadopoulos* does not render claims 15 and 16 obvious ...................................................................................................................... 13

      3.  The combination of *Patton* in view of *Papadopoulos* does not render claims 15 and 16 obvious ...................................................................................................................... 16

   D.  Claims 50-52 Are Valid Over The Cited Art ..................................................... 16

   E.  Claims 53-56 and 58-61 Are Valid Over The Cited Art .................................... 17

   F.  Claim 65 Is Valid Over The Cited Art ............................................................... 19

      1.  *Bibl* fails to disclose or make obvious claim 65 ...................................... 20

      2.  *Teller* fails to disclose or make obvious claim 65 .................................... 21

   G.  Claim 79 Is Valid Over The Cited Art ............................................................... 21

   H.  Claim 95 Is Valid Over The Cited Art ............................................................... 23

   I.  Claims 98 And 99 Are Valid Over The Cited Art ............................................. 24

   J.  Claim 124 Is Valid Over The Cited Art ............................................................. 25

   K.  Conclusion ........................................................................................................... 26

VIII. CLAIMS APPENDIX ............................................................................................. 27

IX.   EVIDENCE APPENDIX ......................................................................................... 42

X.    RELATED PROCEEDINGS APPENDIX .............................................................. 43

XI.   CERTIFICATE OF SERVICE ................................................................................ 44

**Appx765**

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

## I.     REAL PARTY IN INTEREST

By virtue of the Assignment recorded April 13, 2011, at Reel 026120, Frame 0528, the real party in interest is ICON Health & Fitness, Inc., Patent Owner and Appellant.

## II.    RELATED APPEALS AND INTERFERENCES

The '271 Patent is currently involved in the following judicial proceedings:

- ICON Health & Fitness, Inc. v. Strava, Inc.
  Civil Action No.: 1:11-cv-00175
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. FitnessKeeper, Inc.
  Civil Action No.: 1:11-cv-00173
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. MapMyFitness, Inc.
  Civil Action No.: 1:11-cv-00174
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. Polar Electro Oy et al
  Civil Action No.: 1:11-cv-00167
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. Garmin Ltd., et al
  Civil Action No.: 1:11-cv-00166
  U.S. District Court, District of Utah

No final decisions have been rendered in any of these cases. Patent Owner is not aware of any other prior or pending appeals, interferences, or judicial proceedings that may have a bearing on the Board's decision in the pending appeal.

## III.   STATUS OF CLAIMS

Claims 1-41 were originally issued in the '271 Patent. Reexamination was granted on all of the original claims. During the course of the instant reexamination, all of the original claims except claims 15 and 16 were cancelled. Claims 42-228 were added and of these, claims 47, 50-56, 58-61, 65, 79, 95, 98, and 124 remain pending. The validity of claim 47 has been confirmed. Claims 15, 16, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 currently stand rejected. Patent Owner is appealing the rejections set forth in the RAN of claims 15, 16, 50-56, 58-61, 65, 79, 95, 98, 99, and 124.

## IV.    STATUS OF AMENDMENTS

Subsequent to the close of prosecution, Patent Owner amended claims 50-56, 58-61, 65, 79, 95, 98, and 124. These amendments were entered in the RAN. No amendments were filed after the RAN.

3

Appx766

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

## V.     SUMMARY OF CLAIMED SUBJECT MATTER

A concise explanation of the subject matter defined in each of the independent claims involved in this appeal is set forth in the table below, which refers to the drawings by figure numbers and references characters and to the specification by column and line number. Each limitation and corresponding specification section is also designated with a [L#] and [S#] shorthand. These shorthand designations are used where a limitation has been identified and the subject matter has been defined in a previous claim. No claims involved in this appeal include any means-plus-function or step-plus-function limitations. Patent Owner does not represent or intend that this brief presentation of claims and accompanying references to the drawings and specification is exhaustive. The claims, drawings, and specification described within are exemplary and for summary only. All claims are understood to be viewed within the context of the specification.

| Claim 50 | Specification |
|---|---|
| [L1] A system for facilitating feedback, comprising: | [S1] Abstract; 1:47-3:35. |
| [L2] a remote server including: | [S2] FIG. 4 (204); 9:23-41; 14:32-37. |
| [L3] a memory; | [S3] FIG. 5 (260), (262), (264); 11:16-28. |
| [L4] a communication port operative to receive data over the Internet; | [S4] FIG. 5 (252); 10:14-17; 10:62-67; 11:37-40. |
| [L5] a processor connected to said memory and said communication port, said processor being operative to: | [S5] FIG. 5 (250); 11:40-50. |
| [L6] receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data; | [S6] FIG. 1 (102); FIG. 2 (102); FIG. 4 (202), (208); FIG. 5 (252); 4:65-5:7; 5:8-18; 9:5-8; 9:44-46; 10:62-67; 11:16-20; 11:37-40. |
| [L7] store said first and second data in said memory; | [S7] FIG. 5 (260); 4:65-5:7; 9:62-10:1; 11:16-20; 12:1-8. |
| [L8] determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and | [S8] FIG. 1 (104); FIG. 8; 5:23-46; 6:2-18. |
| [L9] provide a notification regarding said evaluation to a device; and | [S9] FIG. 1 (106); 7:8-26. |
| [L10] a sensor database accessible to said server, wherein said sensor database includes a sensor identifier field that contains information for identifying said first and second sensors. | [S10] FIG. 5 (268); FIG. 6 (302); 12:1-15; 12:66-13:5. |

| Claim 51 | Specification |
|---|---|
| *See* [L1]-[L10] | *See* [S1]-[S10] |

4

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

| | |
|---|---|
| [L11] wherein said sensor database includes: . . . a sensor description field that contains information describing said first and second sensors. | [S11] FIG. 6 (304); 12:1-15; 12:66-13:5. |

| Claim 52 | Specification |
|---|---|
| *See* [L1]-[L11] | *See* [S1]-[S11] |
| [L12] a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second sensors. | [S12] FIG. 6 (306); 12:1-15; 13:6-12. |

| Claim 53 | Specification |
|---|---|
| *See* [L1]-[L9] | *See* [S1]-[S9] |
| [L13] an output database accessible to said server. | [S13] FIG. 5 (270); FIG. 7 (400); 12:1-15; 13:19-23. |

| Claim 54 | Specification |
|---|---|
| *See* [L1]-[L9]; [L13] | *See* [S1]-[S9]; [S13] |
| [L14] wherein said output database includes an output identifier field that contains identifying information regarding said first and second subjects. | [S14] FIG. 7 (402); 12:1-15; 13:24-26. |

| Claim 55 | Specification |
|---|---|
| *See* [L1]-[L9]; [L13]-[L14] | *See* [S1]-[S9]; [S13]-[S14] |
| [L15] wherein said output database includes . . . an output description field that contains descriptive information regarding said first and second subjects. | [S15] FIG. 7 (404); 12:1-15; 13:26-32. |

| Claim 56 | Specification |
|---|---|
| *See* [L1]-[L9]; [L13]-[L15] | *See* [S1]-[S9]; [S13]-[S15] |
| [L16] wherein said output database includes: . . . a sensor identifier field that identifies that said first and second sensors are associated with said first and second subjects. | [S16] FIG. 7 (406); 12:1-15; 13:26-32. |

| Claim 58 | Specification |
|---|---|
| *See* [L1]-[L9] | *See* [S1]-[S9] |
| [L17] an evaluation database accessible to said server, wherein said evaluation database includes an evaluation identifier field that contains identifying information for said evaluation. | [S17] FIG. 5 (272); FIG. 8 (502); 12:1-15; 13:48-57. |

| Claim 59 | Specification |
|---|---|
| *See* [L1]-[L9]; [L17] | *See* [S1]-[S9]; [S17] |
| [L18] wherein said evaluation database includes: . . . a description field that contains descriptive information regarding said evaluation. | [S18] FIG. 8 (504); 12:1-15; 13:57-60. |

5

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

| Claim 60 | Specification |
|---|---|
| *See* [L1]-[L9]; [L17]-[L18] | *See* [S1]-[S9]; [S17]-[S18] |
| [L19] wherein said evaluation database includes: . . . a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation. | [S19] FIG. 8 (506); 12:1-15; 13:60-65. |

| Claim 61 | Specification |
|---|---|
| *See* [L1]-[L9]; [L17]-[L19] | *See* [S1]-[S9]; [S17]-[S19] |
| [L20] wherein said evaluation database includes: . . . a field that associates said evaluation with said device to which said notification is provided. | [S20] FIG. 8 (502); 12:1-15; 14:9-15. |

| Claim 65 | Specification |
|---|---|
| *See* [L1]-[L9] | *See* [S1]-[S9] |
| [L21] wherein said device includes a flash memory card. | [S21] 11:8-28; 14:43-50. |

| Claim 79 | Specification |
|---|---|
| *See* [L1]-[L9] | *See* [S1]-[S9] |
| [L22] wherein said notification includes an XML transmission. | [S22] 7:10-21; 8:38-45. |

| Claim 95 | Specification |
|---|---|
| *See* [L1]-[L6] | *See* [S1]-[S6] |
| [L23] wherein said processor is operative to receive said first and second data simultaneously from said first and second subjects; | [S23] 4:65-9:1. |
| *See* [L7]-[L9] | *See* [S7]-[S9] |

| Claim 98 | Specification |
|---|---|
| *See* [L1]-[L9] | *See* [S1]-[S9] |
| [L24] wherein, said processor is operative to determine whether said first subject is in need of a break. | [S24] FIG. 1 (104); 4:47-49; 6:13-17; 7:49-52. |

| Claim 124 | Specification |
|---|---|
| *See* [L1] | *See* [S1] |
| [L25] a local first sensor; | [S25] FIG. 4 (202). |
| [L26] a local second sensor; and | [S26] FIG. 4 (204). |
| *See* [L2]-[L9] | *See* [S2]-[S9] |
| [L27] wherein: said first sensor is operative to transmit said first data to a local first user device over a Bluetooth wireless communication link; | [S27] 10:36-53. |
| [L28] said second sensor is operative to transmit said second data to a local second user device; and | [S28] 9:42-46. |
| *See* [L6] | *See* [S6] |

6

## VI.    ISSUES TO BE REVIEWED ON APPEAL

Patent Owner seeks review of all of the Examiner's grounds for rejecting claims 15, 16, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 in this reexamination proceeding. The following prior art is relied upon to reject these claims:

- U.S. Patent No. 6,292,688 ("*Patton*");
- U.S. Patent No. 5,676,138 ("*Zawilinski*");
- U.S. Patent No. 3,744,712 ("*Papadopoulos*");
- U.S. Patent Application Publication US 2002/0111541 ("*Bibl*"); and
- U.S. Patent No. 6,605,038 ("*Teller*").

The issues on appeal are as follows:

1.  Whether the Examiner erred in rejecting claims 50-56, 58-61, and 65 as indefinite under 35 U.S.C. § 112, second paragraph.

2.  Whether the Examiner erred in rejecting claims 15 and 16 as anticipated by *Patton* and as obvious over *Zawilinski* in view of *Papadopoulos* and *Patton* in view of *Papadopoulos*.

3.  Whether the Examiner erred in rejecting claims 50-52 as obvious over *Patton* in view of *Teller* and *Zawilinski* in view of *Teller*.

4.  Whether the Examiner erred in rejecting claims 53-56 and 58-61 as obvious over *Patton* in view of *Bibl* and *Zawilinski* in view of *Bibl*.

5.  Whether the Examiner erred in rejecting claim 65 as obvious over *Patton* in view of *Bibl*, *Zawilinski* in view of *Bibl*, *Patton* in view of *Teller*, and *Zawilinski* in view of *Teller*.

6.  Whether the Examiner erred in rejecting claim 79 as obvious over *Patton* in view of *Bibl*, *Zawilinski* in view of *Bibl*, *Patton* in view of *Teller*, and *Zawilinski* in view of *Teller*.

7.  Whether the Examiner erred in rejecting claim 95 as obvious over *Patton* in view of *Teller* and *Zawilinski* in view of *Teller*.

8.  Whether the Examiner erred in rejecting claims 98 and 99 as obvious over *Patton* in view of *Teller* and *Zawilinski* in view of *Teller*.

9.  Whether the Examiner erred in rejecting claim 124 as obvious over *Patton* in view of *Bibl*, *Zawilinski* in view of *Bibl*, *Patton* in view of *Teller*, and *Zawilinski* in view of *Teller*.

## VII.    ARGUMENT

### A.    Background

Third party requestor ("TPR") initiated the present *inter partes* reexamination by filing its request for reexamination on September 14, 2012 ("Reexamination Request"). The Reexamination Request was granted in an Order mailed on December 7, 2012. On that same day, a non-final Office Action was mailed

(Non-Final Office Action). Patent Owner responded to the Non-Final Office Action on March 7, 2013 ("Patent Owner's 3/7/13 Response"). TPR filed its comments to Patent Owner's 3/7/13 Response on April 8, 2013 ("TPR's 4/8/13 Comments"). An Action Closing Prosecution was mailed on August 12, 2013 ("ACP"). Patent Owner responded to the ACP on September 12, 2013 ("Patent Owner's 9/12/13 Response"). TPR filed its comments to Patent Owner's 9/12/13 Response on October 15, 2013 ("TPR's 10/15/13 Comments"). The RAN was mailed on January 23, 2014.

### B.    Claims 50-56, 58-61, and 65 Are Not Indefinite

The Examiner rejects claims 50-56, 58-61, and 65 as indefinite under 35 U.S.C. § 112, second paragraph. The Examiner provides a detailed explanation for the indefiniteness rejection of claim 50 and rejects claims 51-56, 58-61, and 65 because "the same problem exists" for each of these claims. (RAN at 4-6.) Patent Owner limits its response to the specifics of the Examiner's rejection of claim 50. However, Patent Owner's arguments are equally applicable to claims 51-56, 58-61, and 65 because the indefiniteness rejections of these claims are all based on the "same problem" that is alleged to exist in claim 50. Since the Examiner's claim 50 indefiniteness rejection is flawed, all of the indefiniteness rejections of claims 50-56, 58-61, and 65 should be withdrawn.

With regard to claim 50, the Examiner asserts that the phrase "a sensor database accessible to said server" renders claim 50 indefinite "because it is unclear if the scope of claim 50 is drawn to the _sub-combination_ 'remote server' _alone_, or if the scope of claim 50 is drawn to a combination of a 'remote server' _and_ a 'sensor database.'" (RAN at 4 (emphasis in original).) The Examiner finds that "a person of ordinary skill in the art could interpret the structure of claim 50 as being drawn to a 'remote server' alone." (RAN at 5.) The Examiner also finds that "one of ordinary skill in this particular art can _alternatively_ conclude that the scope of claim 50 is drawn to a 'remote server' _in combination with_ a sensor database.""[1] (_Id._) The Examiner explains his indefiniteness reasoning as follows:

> Because a potential infringer of claim 50 would not know if direct infringement required
> creation or importation (i.e. possession) of the sub-combination "remote server" alone, or
> if direct infringement required possession of the combination "remote server" and

---

[1] The Examiner notes that the conclusion that the "sensor database" is within the "[remote] server" would make "neither logical nor grammatical sense because it would require the 'sensor database' to be accessible to itself." (RAN, FN 1.) Patent Owner disagrees that this would be illogical or grammatically incorrect. The term "accessible" is commonly understood to mean "capable of being reached." Thus, for example, it is not logically or grammatically incorrect to say that the internal memory within a computer is accessible to (or capable of being reached by) the computer.

"sensor database," the structure of claim 50 cannot be reasonable [sic] determined and

claim 50 is therefore indefinite under 35 U.S.C. § 112, 2nd paragraph.

RAN at 5.) Patent Owner disagrees that claim 50 is indefinite because a person of ordinary skill in the art would understand it to cover (1) a remote server that includes a sensor database **and** (2) a remote server in combination with a sensor database. Indeed, the fact that the Examiner recognizes that a person of ordinary skill in the art would clearly understand these two different scenarios are **both** covered by claim 50 not only establishes that claim 50 **is not indefinite**, it establishes that claim 50 **is definite**.

The test for definiteness under pre-AIA 35 U.S.C. § 112, second paragraph, is whether "those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1576 (Fed. Cir. 1986). To meet the definiteness requirement, "the exact claim terms are not required to be used in the specification as long as the specification provides the needed guidance on the meaning of the terms . . . so that the meaning of the terms is readily discernable to a person of ordinary skill in the art. *See, e.g., Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1373 (Fed. Cir. 2004)." MPEP § 2173.03. It is only when "the language of the claim is such that a person of ordinary skill in the art could not interpret the metes and bounds of the claim" that an indefiniteness rejection is appropriate. MPEP § 2173.02(II); *Morton Int'l, Inc. v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993). Further, "Examiners, however, are cautioned against confusing claim breadth with claim indefiniteness. A broad claim is not indefinite merely because it encompasses a wide scope of subject matter provided the claim is clearly defined." MPEP § 2173.02(I).

Claim 50 recites a remote server that includes, inter alia, a sensor database that is "accessible to said server." With regard to the indefiniteness rejection of claim 50, the Examiner **admits** that one of ordinary skill in the art would understand claim 50 to be cover **both** a remote server that includes a sensor database **as well as** a remote server in combination with a sensor database. Patent Owner does not disagree with the Examiner's position in this regard. Indeed, this interpretation of claim 50 is also supported by the '271 Patent specification. Figure 5 illustrates a server 204 that includes a sensor database 268, an output database 270, and an evaluation database 272. ('271 Patent 12:1-15.) The '271 Patent is also clear that a server "may include or access a sensor database for storing or keeping information about sensors." ('271 Patent, 12:61-64.)

Based on the plain language of claim 50 and in light of the specification, a person of ordinary skill in the art would understand that direct infringement of claim 50 would occur **both** when a remote server includes a sensor database **as well as** when a remote server is combined with a sensor database. That claim 50 can be directly infringed under two different scenarios does not justify an indefiniteness

9

rejection. MPEP § 2173.04 ("Breadth of a claim is not to be equated with indefiniteness. *In re Miller*, 441 F.2d 689, 169 USPQ 597 (CCPA 1971).").

Because those skilled in the art would understand the scope of claims 50-56, 58-61, and 65 when read in light of the '271 Patent specification, these claims are not indefinite.

### C.  Claims 15 And 16 Are Valid And Should Be Allowed

The RAN maintains three rejections of claims 15 and 16. First, claims 15 and 16 are rejected as anticipated based on *Patton*. Second, claims 15 and 16 are rejected as obvious based on *Patton* in view of *Papadopoulos*. Finally, claims 15 and 16 are rejected as obvious based on *Zawilinski* in view of *Papadopoulos*. Each of these rejections should be withdrawn.

Claim 15 depends from claim 14, which depends from claim 13, which depends from claim 1. Thus, claim 15 requires all of the limitations of claims 15, 14, 13, and 1. When rewritten in independent form (with corresponding claims identified in square brackets), claim 15 requires:

[claim 1] A method for providing feedback, comprising:

receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject;

providing a notification regarding said evaluation to a device;

[claim 13] receiving a notification regarding a plurality of options;

[claim 14] selecting one of said plurality of options based, at least in part, on said evaluation; and

[claim 15] selecting said device based, at least in part, on said selecting one of said plurality of options.

Claim 16 depends from claim 13, which depends from claim 1. Thus, claim 16 requires all of the limitations of claims 16, 13, and 1. When rewritten in independent form (with corresponding claims identified in square brackets), claim 16 requires:

[claim 1] A method for providing feedback, comprising:

receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

10

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject;

providing a notification regarding said evaluation to a device;

[claim 13] receiving a notification regarding a plurality of options; and

[claim 16] wherein said device is associated with at least one of said plurality of options.

1.    ***Patton*** **does not teach each limitation of claims 15 and 16 and thus does not anticipate claims 15 and 16.**

A specific sequence of steps may be required for a prior art reference to disclose a recited method if "the sequential nature of the claim steps is apparent from the plain meaning of the claim language and nothing in the written description suggests otherwise." *Mantech Envtl. Corp. v. Hudson Envtl. Servs.*, 152 F.3d 1368 (Fed. Cir. 1998).

The express language of claims 15 and 16 requires a certain order of steps and nothing in the written description of the '271 Patent suggests otherwise. In the first step (from claim 1), "first data indicative of a physical characteristic of a first subject" and "second data indicative of a physical characteristic of a second subject" are received. In the second step (also from claim 1), "an evaluation of said first data and said second data" is determined. Claims 15 and 16 (by virtue of their dependence on claim 13) also require that "a notification regarding a plurality of options" be received. A third step for both of claims 15 and 16 is that "a notification regarding said evaluation" be provided "to a device." This "device" must be (1) selected based at least in part on selecting one of said plurality of options (claim 15), or (2) associated with at least  one of said plurality of options. The first, second, and third steps of claims 15 and 16 are required to be performed in the sequence identified above, which matches the sequence of these steps as recited in claims 15 and 16, because the second step ("determining an evaluation of said first data and said second data") requires "said first data and said second data" that were received in the first step, and because the third step ("providing a notification regarding said evaluation") requires "said evaluation" that was determined in the second step. Thus, the language of these claims imposes a specific sequence on the performance of the method and this sequence must be present in a prior art reference to be invalidating.

The anticipatory rejections of claims 15 and 16 should be withdrawn because *Patton* fails to teach or suggest the sequence of steps that is required by claims 15 and 16. In particular, *Patton* fails to disclose that physical characteristics of test subjects are received (the first step) and an evaluation of the received physical characteristics is determined (the second step) ***before*** a notification regarding the evaluation is provided to a device (the third step).

11

The "device" that TPR identifies in its proposed rejection of claim 1 is a "display element in FIG. 1" of *Patton*. (Reexamination Request, Exhibit CC1, page 3.) However, in claims 15 and 16, TPR no longer relies on the "display element in FIG. 1" for the recited "device." (Reexamination Request, Exhibit CC1, pages 19-20.) Rather, in claims 15 and 16, TPR relies on a "vehicle control panel" as corresponding to the "device." (*Id.*) The vehicle control panel that TPR relies upon as disclosing the recited "device" is described in the following excerpt from *Patton*:

> By way of another example, in vehicle training, including auto and aircraft management, the manufacturer may be interested in the reaction of the respondent to the seating and control panel of the vehicle. An epoch of measurement longer than just a second or two might be indicated because of the length of an acquaintance, orientation or familiarity period. Thus, comprehension could be measured during a comparatively longer duration as the subject successively views the individual element of an instrument panel. Several different forms of panels, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the display that was most rapidly comprehended and/or created approval or pleasure in the test subject.

(*Patton*; 24:38-51; ACP at 6-8.)

In its rejection of claims 15 and 16, the Examiner adopts TPR's position that the "vehicle control panel" of *Patton* corresponds to the "device" recited in these claims. (*See* ACP, page 7, lines 5-6 ("According to this paragraph, there is only one 'device' which is the vehicle control panel.").) The Examiner also asserts that the displaying of the "several different forms of [vehicle control] panels" on the vehicle control panel in succession to a test subject (as discussed in the above-cited paragraph of *Patton*) corresponds to the third step ("providing a notification of said evaluation") required by claims 15 and 16. (*See* ACP, page 7, lines 9-13.)

If, as the Examiner holds, the vehicle control panel is the "device" that is recited in claims 15 and 16, then the sequence of steps required by these claims is lacking. Indeed, it is only *after* the different forms of vehicle display panels are displayed to the test subject (the purported third step) that the reaction of the test subject can be measured (the purported first step) and the best form of the vehicle display panel can be chosen by the manufacturer (the purported second step).

In addition, the vehicle control panel *is not* selected, "at least in part, on said selecting one of said plurality of options" (which is based at least in part on the evaluation) as required by claim 15. Further, the vehicle control panel *is not* "associated with at least one of said plurality of options" as required by claim 16.

In TPR's 10/15/13 Comments, TPR asserts that the rejection that the Examiner makes is not the rejection that TPR proposes. (*See* pg. 3 ("In the ACP the Examiner applies Patton to the claims in one

12

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

way, while Requesters apply Patton in an alternative way.").) TPR asserts that its position "is that the maker choosing one of the options based on the reaction of a test subject is the notification." (*Id.* at FN 2.) Patent Owner disagrees that a manufacturer's "choosing one of the options" constitutes a "notification" much less a notification that is provided to a device. Indeed, the manufacturer may choose an option (e.g., a display panel) without ever providing a notification to anyone or anything. TPR's proposed rejection appears to confuse the requirement of "***selecting*** said device" (as recited in claim 15) with "***providing*** a notification" to that device (as recited in claim 1). According to TPR, these two steps are both accomplished by a manufacturer's "choosing one of the options."

      2.      **The combination of *Zawilinski* in view of *Papadopoulos* does not render claims 15 and 16 obvious.**

Claims 15 and 16 both (by virtue of their dependence on claim 13) require "***receiving*** a notification regarding a plurality of options." In the rejection of claims 15 and 16, the Examiner relies on TPR citation to column 1, lines 56-63 of *Papadopoulos* as providing support for the limitations added by claim 13. (RAN at 8; Reexamination Request, Exhibit CC3, pages 2-3.) This portion of *Papadopoulos*, in its entirety, teaches: "Thus it is one of the principal objects of this invention to provide a participation presenter-audience reaction system in which the audience response is simultaneously displayed before the person or persons making the presentation so that the presenter may respond to the audience's reaction or modify his presentation accordingly or elicit information from the audience."

In its rejection of claims 15 and 16, the Examiner adopts TPR's assertion that, with respect to the above-cited portion of *Papadopoulos*: "The presenter receiving a notification regarding the options is inherent. Without the notification, the presenter could not know what options (e.g., responding to the audience reaction, modify the presentation, or elicit information) were available." (RAN at 8 (incorporating by reference portions of the Reexamination Request).) This act of "***receiving***" a notification regarding a plurality of options is ***not inherent*** because the presenter mentioned in the above-cited portion of *Papadopoulos* may be aware of his options for responding to the audience's reaction to his presentation without ***receiving*** a notification regarding these options. For example, prior to the beginning of his presentation, the presenter may have conceived, ***entirely within his own mind***, of options available during his presentation including responding to an audience reaction, modifying his presentation, or eliciting information from the audience.

The Examiner adopts a construction of the term "receiving" that includes the possibility of the presenter conceiving options (as a notification) entirely within his own mind (i.e., a human presenter receiving an "internal" notification in the human presenter's mind from the human presenter's own mind). For example, the RAN agrees with the position of TPR that: "It does not matter whether the notification is received internally (i.e., from his own mind), or externally (e.g., from another device). In both situations,

13

the presenter must receive a notification and claim 13 fails to specify from what source (internal or external) the notification is received." (RAN at 7-8.) This interpretation of the phrase "*receiving* a notification," which includes a notification conceived *entirely within the mind* of a human presenter, is unreasonably broad.

At the time that the '271 Patent was filed, on May 17, 2001, the ordinary and customary meaning of the phrase "receiving a notification" by those of ordinary skill in the art can be gleaned from the use of this phrase in the written description of the '271 Patent and from the definition of the terms "receiving" and "notification" in a contemporary dictionary. The phrase "receiving a notification" appears only once in the written description of the '271 Patent, other than its appearance in claim 13 (from which claims 15 and 16 depend). This phrase appears in context as follows in the following paragraph of the "DETAILED DESCRIPTION" section of the written description:

> In some embodiments, the step 104 may include determining one or more options to provide to a subject or a group of subjects. For example, the method 100 may include a step of *receiving a notification* of several possible endings to a play being presented to an audience. The step 104 may include determining which of the options to provide to the audience or determining which of the options the audience will be allowed to choose from. Suppose five possible endings are available for the play, two of which are happy endings and three or which are sad endings. If the audience appears or is determined to want a happy ending, the audience may be provided with the two options having happy endings for the play. If instead the audience appears or is determined to want a sad ending, the audience may be provided with the three options having a sad ending for the play. A notification of the possible options may be provided to one or more of the audience members to allow them to make the selection on the desired ending.

(5:47-64 (emphasis added).)

In its Reexamination Request, TPR attempts to combine the step described in the sentence where the phrase "receiving a notification" appears with the step described in the next sentence. (Reexamination Request at CC3.) It is clear, however, that these two sentences describe *separate and distinct steps* that are in no way equivalent. In particular, the first sentence describes "receiving a notification" of several possible endings to a play, and the second sentence describes "determining" which of the possible endings (that were "received" in the first step) "to provide to the audience" or to allow "the audience to choose from." While Patent Owner concedes that a human presenter could perform the step in the second sentence (i.e., the "determining" step) entirely within the human presenter's own mind, Patent Owner notes that a human presenter can only perform the step in the first sentence (i.e., the "receiving a notification" step) by acquiring a notification from *outside* the human presenter's own mind. In short,

14

"receiving a notification" is separate and distinct from "determining which of the options to provide to the audience" since determining may be a mental step, while receiving a notification, as this phrase is used in the '271 Patent, may not be.

This use of the phrase "***receiving a notification***" in the written description of the '271 Patent is consistent with contemporary dictionary definitions of the terms "receive" and "notification" which include "[t]o accept data from an ***external*** communications system, such as a local area network (LAN) or a telephone line, and store the data as a file" and "[a] signal from the operating system that an event has occurred." (Microsoft Computer Dictionary, Fifth Edition, copyright ©2002 by Microsoft Corporation, pages 442 and 368) (attached hereto as "Exhibit 1").) Further, in an ordinary dictionary, the first two definitions of the term "receive" are "[t]o take or acquire (something given, offered, or transmitted); get" and "[t]o hear or see (information, for example): *receive bad news; received a good report of the group's activities*." (The American Heritage® Dictionary of the English Language, Fourth Edition, copyright ©2000 by Houghton Mifflin Company, page 1458) (attached hereto as "Exhibit 2").) The first two definitions of the term "notification" are "[t]he act or an instance of notifying" and "[s]omething, such as a letter, by which notice is given." (*Id.*, page 1203.)

Therefore, the phrase "receiving a notification," as used ***in the context of the written description*** and ***customarily by those skilled in the relevant art***, would clearly require that the human presenter discussed in *Papadopoulos* acquire the notification from a source ***external*** to the human presenter's own mind. For example, the first definition, "to take or acquire" requires that the human presenter takes or acquires the notification from somewhere outside the human presenter's own mind. Similarly, in the second definition, "to hear or see" requires that the human presenter hears or sees the notification ***external*** to the human presenter's own mind (i.e., ears don't hear internal thoughts, and eyes don't see internal thoughts). Further, the term "notification" also clearly has an ***external*** connotation, such that one skilled in the art at the time of the invention, and when understood in the light of the specification, would not interpret the phrase "receiving a notification" to include a human presenter ***conceiving*** a ***thought*** entirely within his/her own mind.

Thus, the assertion by TPR that a human presenter (i.e., a ***single*** entity) can perform the act of "***receiving a notification***" as required by claims 15 and 16 by simply thinking of a notification, ***conceived entirely within the human presenter's own mind***, without acquiring the notification from outside the human presenter's own mind, is unreasonable.

In TPR's 10/15/13 Comments, TPR asserts that "receiving a notification may involve a presenter observing an audience for visual and/or auditory cues, which may reasonably be considered 'receiving a notification' from an external source." (Pg. 6.) While Patent Owner acknowledges that this scenario appears to involve an external source, TPR fails to identify any teaching or suggestion in *Papadopoulos*,

15

and indeed *Papadopoulos* appears to fail to disclose any such "visual and/or auditory cues" that are received from merely observing the audience. Further, even if *Papadopoulos* did include this teaching, TPR fails to explain how "observing an audience for visual and/or auditory cues" constitutes a "notification" as required by claims 15 and 16. In addition, *Papadopoulos* fails to disclose that the device to which the notification is provided is selected "based, at least in part, on" or "associated with" any received plurality of options as required by claims 15 and 16.

       **3.**     **The combination of *Patton* in view of *Papadopoulos* does not render claims 15 and 16 obvious.**

As noted above in Section VII(C)(2), *Papadopoulos* fails to teach or suggest "***receiving*** a notification regarding a plurality of options" as required by claims 15 and 16. Therefore, the rejection of claims 15 and 16 under 35 U.S.C. § 103(a) over *Patton* in view of *Papadopoulos* (which relies on the same disclosure from *Papadopoulos* for the "receiving a notification regarding a plurality of options") should be withdrawn for at least the same reasons as those discussed above.

    **D.**     **Claims 50-52 Are Valid Over The Cited Art**

The RAN maintains two rejections of claims 50-52. First, claims 50-52 are rejected as obvious based on *Patton* in light of *Teller*. Second, claims 50-52 are rejected as obvious based on *Zawilinski* in view of *Teller*. Both of these rejections should be withdrawn.

Claims 50-52 each recite a system for facilitating feedback that includes a remote server and a sensor database that is accessible to the server. Claims 50-52 require that the sensor database include "a sensor identifier field that contains information for identifying said first and second sensors." Claims 51 and 52 additionally require that the "sensor database further includes a sensor description field that contains information describing said first and second sensors." Claim 52 additionally requires that the "sensor database further includes a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second sensors." These limitations are not taught nor rendered obvious by the disclosure in *Teller*.

The Examiner holds that the limitations of claims 50-52 would have been obvious to a person of ordinary skill in the art based on *Teller's* disclosure of a database that stores data that is uploaded from a sensor device. (RAN at 11-14 (incorporating by reference portions of TPR's 10/15/13 Comments).) *Teller* does not disclose (and TPR does not suggest in its 4/8/13 Comments that *Teller* discloses) any of the additional limitations recited in claims 50-52. Rather, it is TPR's position (which is adopted by the Examiner) that the limitations recited in claims 50-52 would have been obvious in view of *Teller's* disclosure of a database that stores data that is uploaded from a sensor device.

Patent Owner disagrees that a disclosure of a database that stores data that is uploaded from a sensor device is sufficient to disclose the specific fields in the sensor database required by claims 50-52,

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

including "a *sensor identifier field* that contains information for identifying said first and second sensors" as required by claims 50-52, "a *sensor description field* that contains information describing said first and second sensors" as required by claims 51 and 52, or "a *sensor output field* that contains information regarding *a type, timing, or format of data* provided by said first and second sensors" as required by claim 52. In order for a rejection of these claims to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). In rejecting claims 50-52, the Examiner fails to cite any facts, gleaned from *Teller*, to support a position that the specific database fields recited in claims 50-52 would have been obvious to one of ordinary skill in light of a disclosure of a database that stores data that is uploaded from a sensor device.

> ### E.   Claims 53-56 and 58-61 Are Valid Over The Cited Art

The RAN maintains two rejections of claims 53-56 and 58-61. First, claims 53-56 and 58-61 are rejected as obvious based on *Patton* in light of *Bibl*. Second, claims 53-56 and 58-61 are rejected as obvious based on *Zawilinski* in view of *Bibl*. Both of these rejections should be withdrawn.

Claims 53-56 recite a system for facilitating feedback that includes a remote server and an "output" database that is accessible to the server. Claims 54-56 additionally require that the "output database includes an output identifier field that contains identifying information regarding said first and second subjects." Claims 55 and 56 additionally require that the "output database further includes an output description field that contains descriptive information regarding said first and second subjects." Claim 56 additionally requires that the "output database further includes a sensor identifier field that identifies that said first and second sensors are associated with said first and second subjects." Claims 58-61 recite a system for facilitating feedback that includes a remote server and an evaluation database that is accessible to the server. Claims 58-61 additionally require that the "evaluation database includes an evaluation identifier field that contains identifying information for said evaluation." Claims 59-61 additionally require that the "evaluation database further includes a description field that contains descriptive information regarding said evaluation." Claims 60 and 61 additionally require that the "evaluation database further includes a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation." Claim 61 additionally requires that the "evaluation database further includes a field that associates said evaluation with said device to which said notification is provided." These limitations are not taught nor rendered obvious by the disclosure of *Bibl*.

The Examiner asserts that *Bibl* discloses both an "output database" and an "evaluation database." (RAN at 16-17 and 19-20 (incorporating by reference portions of TPR's 10/15/13 Comments).) To

17

support its assertion that *Bibl* discloses the "output database" of claims 53-56 and the "evaluation database" of claims 58-61, TPR identifies a "database" in paragraph [0058] of *Bibl* that TPR asserts (and the Examiner adopts) as the "output database" of claims 53-56 and the "evaluation database" of claims 58-61. The entire disclosure regarding this database of paragraph [0058] of *Bibl* consists of the following statement "The feedback information may be stored ... in a separate database residing on web server 160."

In contrast to this passing mention of a generic and general "database" in *Bibl*, the elements recited in claims 53-56 regarding the "output database" and recited in claims 58-61 regarding the "evaluation database" are very detailed and specific. Further, examples of these elements are supported in the specification and Figures in the '271 Patent. For example, Figure 5 of the '271 Patent, which is reproduced below, clearly shows an example of the "output" and "evaluation" databases within data storage device 260:



FIG. 5

Describing this Figure, the '271 Patent states:

The server 204 also may include or store information regarding sensors, evaluations, outputs, etc. For example, information regarding sensors may be stored in a sensor database 268 for use by the server 204, a user device, or another device or entity. Similarly, information regarding evaluation outputs and output devices might be stored in an output database 270 for use by the server 204, a user device or another device or entity. Information regarding evaluations may be stored in an evaluation database 272 for use by the server or another device or entity.

18

('271 Patent, 12:1-10.) Figures 7 and 8 illustrate possible implementations of the output and evaluation databases. Based on this disclosure, one of ordinary skill in the art at the time of the '271 Patent would have understood that the "output database" of claims 53-56 and the "evaluation database" of claims 58-61 are required to include the very specific and detailed elements recited in those claims.

*Bibl's* disclosure in paragraph [0058] of a generic "database," that is mentioned only in passing and without any detail whatsoever, is ***not*** a disclosure of an "***output*** database" as required by claims 53-56, including "an ***output identifier field*** that contains ***identifying information*** regarding said first and second subjects" as required by claims 54-56, "an ***output description field*** that contains ***descriptive information*** regarding said first and second subjects" as required by claims 55 and 56, or "a ***sensor identifier field*** that ***identifies that said first and second sensors are associated with said first and second subjects***" as required by claim 56. In addition, the passing mention of the generic "database" in paragraph [0058] of *Bibl* does ***not*** disclose "an ***evaluation identifier field*** that contains identifying information for said evaluation" as required by claims 58-61, "a ***description field*** that contains descriptive information regarding said evaluation" as required by claims 59-61, "a ***sensor identifier field*** that contains information for identifying said first and second sensors associated with said evaluation" as required by claims 60 and 61, or "a fi***eld that associates said evaluation with said device*** to which said notification is provided" as required by claim 61.

In order for a rejection of these claims 53-56 and 58-61 to be proper, it must be based on facts gleaned from the prior art—interpreted without hindsight reconstruction. *In re Warner*, 154 USPQ 173, 178 (CCPA 1967); MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion [of obviousness] must be reached on the basis of the facts gleaned from the prior art."). In rejecting claims 53-56 and 58-61, the Examiner fails to cite any facts, gleaned from *Bibl*, to support a position that the specific databases and database fields recited in claims 53-56 and 58-61 would have been obvious to one of ordinary skill in light of *Bibl's* one-sentence disclosure of a generic "database" that stores feedback. Therefore, the rejections of claims 53-56 and 58-61 are improper and should be withdrawn.

**F.      Claim 65 Is Valid Over The Cited Art**

The RAN maintains four rejections of claim 65. First, claim 65 is rejected as obvious based on *Patton* in light of *Bibl*. Second, claim 65 is rejected as obvious based on *Zawilinski* in view of *Bibl*. Third, claim 65 is rejected as obvious based on *Patton* in view of *Teller*. Finally, claim 65 is rejected as obvious based on *Zawilinski* in view of *Teller*. Each of these rejections should be withdrawn.

Claim 65 recites a remote server that includes, inter alia, a processor that is operative to "provide a notification regarding [an] evaluation to a device, wherein said device includes a flash memory card." The disclosures contained in *Bibl* and *Teller* are relied upon to reject this claim. (RAN at 20-22.) Neither *Bibl* nor *Teller* teach or otherwise disclose this limitation recited in claim 65.

19

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

### 1. *Bibl* fails to disclose or make obvious claim 65.

*Bibl* discloses that a server may communicate with "clients 130 and 170." (*Bibl*, ¶ [0029].) According to *Bibl*, "[c]lients 130 and 170 represent any device that may enable user's access to data." *Bibl*, however, does not expressly disclose that clients 130 or 170 include a flash memory card and flash memory cards are not necessary components in a computer or other device that allows a user to access data.

*Bibl* also discloses that, an "apparatus for performing the operations" disclosed in *Bibl* "may comprise a general purpose computer selectively activated or reconfigured by a computer program stored in the computer. Such a computer program may be stored in a computer readable storage medium, such as . . . EEPROMs[.]" (*Bibl*, ¶ [0022].) It is this mention of EEPROM that the Examiner finds discloses the recited "flash memory card." (RAN at 20-22.) The Examiner's rejection of claim 65 is flawed for at least two reasons.

First, *Bibl's* disclosure regarding the "apparatus for performing the operations" is referring to the *server, not a device that receives a notification* (which *Bibl* identifies as "clients 130 and 170"). *Bibl* lacks any disclosure that explicitly states that clients 130 or 170 include EEPROM. *Bibl's* disclosure regarding the structural components of "clients 130 and 170" is limited to the statement that they "may represent any device that may enable user's access to data." TPR does not argue that the presence of EEPROM or compatibility with a flash memory card would have been necessary for clients 130 or 170 to enable user's access to data. TPR further fails to provide any factual support or motivation for a person of ordinary skill in the art to incorporate the EEPROM in a server into clients 130 or 170. Thus, even if a disclosure of EEPROM was sufficient to disclose the recited "flash memory card" (which it isn't), *Bibl* would still fail to disclose or render obvious the flash memory card limitation of claim 65.

In its rejection of claim 65, the Examiner does not dispute that the "apparatus for performing the operations" in *Bibl* is the server and not a device that receives a notification. (RAN at 21.) However, the Examiner states that "the way claim 65 is organized clearly implies that the 'device includes a flash memory card' *is inside the remote server*." (*Id.* (emphasis added).) Thus, the Examiner finds that "said device" is referring to the server and not the device that receives a notification. The Examiner misinterprets the claim, which clearly requires that the device to which "a notification regarding said evaluation" is provided "includes a flash memory card."

Further, disclosure of EEPROM is not a disclosure of a flash memory card and would not have made a flash memory card obvious. One of ordinary skill in the art at the time the '271 Patent was invented would have understood the term "flash memory card" to mean a memory card that is easily removable from a host device. (Declaration of Darren Ashby ("Ashby Decl.") attached hereto as Exhibit 3 at ¶12.) One of ordinary skill in the art at the time of the '271 Patent invention would not have understood

20

the term "flash memory card" to include memory that is permanently incorporated into a host device, such as part of a microprocessor or soldered onto a printed circuit board. (*Id.*) Further, one of ordinary skill in the art would have understood *Bibl's* disclosure of EEPROM to be a permanent system memory incorporated into the general-purpose computer that is described by *Bibl*. (*Id.*)

### 2.    *Teller* fails to disclose or make obvious claim 65.

Teller discloses that a device that receives a notification from a server may include "flash memory." (Teller, 6:64-66.) Teller's disclosure of "flash memory" is not equivalent to or does not render obvious the recited "flash memory *card*." One of ordinary skill in the art would not have understood the term "flash memory" to mean the same thing as a "flash memory card." "Flash memory" is not necessarily removable but may be permanently incorporated into a host device, such as the internal memory in a computer. TPR ignores the term "card" in claim 65 by asserting that Teller's disclosure of "flash memory" is adequate to disclose the recited "flash memory card." *See In re Wilson*, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970) ("All words in a claim must be considered in judging the patentability of that claim against the prior art."); *see also* MPEP § 2143.03.

In TPR's 10/15/13 Comments, TPR states that "[i]t was well understood, however, that a flash memory card contains flash memory." (At 19.) TPR's argument is a classic straw man. The issue is not whether a flash memory card contains flash memory but rather whether disclosure of "flash memory" makes the recited "flash memory card" obvious. TPR states that "Teller's disclosure of flash memory *necessarily makes obvious* the recited flash memory card." (*Id.* (emphasis added).) Patent Owner disagrees. Contrary to TPR's assertion, not all flash memory is contained exclusively within flash memory cards. Disclosure of "flash memory" alone is insufficient to disclose a flash memory card.

### G.    Claim 79 Is Valid Over The Cited Art

The RAN maintains four rejections of claim 79. First, claim 79 is rejected as obvious based on *Patton* in light of *Bibl*. Second, claim 79 is rejected as obvious based on *Zawilinski* in view of *Bibl*. Third, claim 79 is rejected as obvious based on *Patton* in view of *Teller*. Finally, claim 79 is rejected as obvious based on *Zawilinski* in view of *Teller*. Each of these rejections should be withdrawn.

Claim 79 recites a remote server having a processor that is operative to "provide a notification regarding said evaluation to a device, wherein said notification includes an XML transmission." Neither *Bibl* nor *Teller* teach or otherwise disclose this limitation recited in claim 79.

In TPR's 10/15/13 Comments, TPR acknowledges that "[n]either *Bibl* nor *Teller* disclose providing a notification regarding an evaluation via an XML transmission." (At 47.) Rather, TPR argues, and the Examiner finds, that claim 79 is obvious based on *Bibl's* disclosure of HTTP and HTML and *Teller's* disclosure of HTML. Patent Owner disagrees that the purported database communications in *Bibl* and *Teller* would have made the "XML transmission" of claim 79 obvious.

21

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

Hypertext Transfer Protocol (HTTP), which is mentioned in passing in *Bibl*, is an application protocol for distributed, collaborative, hypermedia information systems and is the foundation of data communication for the World Wide Web. HyperText Markup Language (HTML), which is mentioned in passing in *Bibl* and *Teller*, is the standard markup language used to create web pages on the World Wide Web.  In contrast, Extensible Markup Language (XML), as required by claim 79, is a markup language that defines a set of rules for encoding documents in a format that is both human-readable and machine-readable. The structure and function of XML is ***completely different*** from HTML and HTTP, and thus the requirement of an "XML transmission" in claim 79 is ***not*** merely an obvious "design choice" as asserted by the Examiner. (*See In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975) ("[D]esign choice may be an acceptable rationale for an obviousness rejection when a claimed product merely arranges known elements in a configuration recognized as functionally equivalent to a known configuration.").) In particular, the overhead of tags around all data in XML documents results in an XML transmission requiring much more bandwidth than an HTML transmission. Further, an XML transmission is in a completely different category from an HTTP transmission, since XML is a markup language and HTTP is a transfer protocol. Therefore, since an XML transmission is ***not functionally equivalent*** to an XML transmission or an HTML transmission, it would ***not*** have been an obvious "design choice," in light of *Bibl's* mere passing reference to HTTP and *Bibl* and *Teller's* mere passing references to HTML, to "provide a notification regarding said evaluation to a device, wherein said notification includes an XML transmission" as required by claim 79.

To support its position on claim 79, TPR cites to, and the Examiner adopts, the declaration of TPR's expert, Mr. Koperda. The entirety of Mr. Koperda's opinion with regard to claim 79 is as follows:

> New claim 79 recites the use of an XML transmission. As was known in by those skilled in the art at the time of the filing, XML is a preferred solution when data is sent and retrieved for a database. An advantage of XML is that it provides a description of the data (name, format, range value) and then the data. Because the data is "tagged," it makes it easy to share the data between dissimilar systems. For example a date can be in Month, Day, Year format in the US or as Year, Month, Day format in other countries. It would have been obvious to one skilled in the art at the time of the filing to use XML for communication with a database.

(Koperda Decl. at ¶ 16.) Mr. Koperda's statements are deficient for at least four reasons. First, Mr. Koperda's statements make no mention of *Bibl* or *Teller*, and do not even attempt to explain which teachings of *Bibl* or *Teller* it would have been obvious to modify in order to arrive at the "XML transmission" required by claim 79. Second, Mr. Koperda's assertions that "XML is a preferred solution when data is sent and retrieved for a ***database***" and "It would have been obvious to one skilled in the art

22

at the time of the filing to use XML for communication with a *database*" are not relevant to the requirements of claim 79, because claim 79 does not require a "*database*." Third, Mr. Koperda's assertion that XML exhibits certain "advantages" is not helpful in this context because Mr. Koperda does not identify which technology XML is "advantageous" over, rendering this statement indefinite. Fourth, Mr. Koperda's statement that "Because the data is 'tagged,' it makes it easy to share the data between *dissimilar systems*" is not relevant to the requirements of claim 79, because claim 79 does not require "*dissimilar systems*." In light of these deficiencies, Mr. Koperda's opinion regarding claim 79 should not be entitled to any weight. TPR's speculation, its unfounded assumptions, and its reliance on an opinion that is entirely deficient cannot support the rejection of claim 79.

**H.     Claim 95 Is Valid Over The Cited Art**

The RAN maintains two rejections of claim 95. First, claim 95 is rejected as obvious based on *Patton* in view of *Teller*. Second, claim 95 is rejected as obvious based on *Zawilinski* in view of *Teller*. Claim 95 recites a remote server that includes a processor that receives first and second data, over the Internet, from first and second sensors that is indicative of physical characteristics of first and second subjects, respectively. Each of these rejections should be withdrawn because *Teller* fails to teach or otherwise disclose this limitation.

In TPR's 4/8/13 Comments, TPR asserts that "[i]t would have been obvious to a person of ordinary skill in the relevant art that data may be received simultaneously from users over the Internet." (At 30.) In support of its assertion, TPR states that "Teller discloses that the system receives data and makes data available over the Internet." (*Id.*) Patent Owner does not dispute that in the system disclosed in *Teller*, data is received and made available over the Internet. Patent Owner disagrees that *Teller's* disclosure of a system that receives data and makes data available over the Internet is sufficient to disclose or render obvious a server that receives data from multiple devices *simultaneously*.

In rejecting claim 95, the Examiner states that "the Examiner agrees with Patent Owner's argument that the fact that a server may receive data from multiple devices does not imply or make obvious simultaneous reception of data from multiples devices." (RAN at 25.) Nevertheless, the Examiner then goes on to assert that the server described by *Teller* "clearly implies, or at least suggests that the server receives data from multiple devices simultaneously" because there are multiple middleware servers 95a-95c in FIG. 3 of *Teller* and multiple devices in FIG. 1 of *Teller*. (RAN at 25.) This assertion, however, seems to contradict the Examiner's earlier statement, because if multiple devices communicating with a single server "does not imply or make obvious *simultaneous* reception of data from multiples devices," then it follows logically that multiple devices communicating with multiple middleware servers also "does not imply or make obvious *simultaneous* reception of data from multiples

23

devices." Patent Owner disagrees that any disclosure in *Teller* implies or suggests simultaneous transmission, and the Examiner's own statement in the RAN appears to support Patent Owner's position that the mere disclosure of multiple devices communicating with a single server or multiple middleware servers in *Teller* does not teach or suggest or make obvious receiving "said first and second data ***simultaneously*** from said first and second subjects" as required by claim 95.

## I.   Claims 98 And 99 Are Valid Over The Cited Art

The RAN maintains two rejections of claims 98 and 99. First, claims 98 and 99 are rejected as obvious based on *Patton* in view of *Teller*. Second, claims 98 and 99 are rejected as obvious based on *Zawilinski* in view of *Teller*. Each of these rejections should be withdrawn.

Claim 98 recites a remote server that includes a processor that receives first and second data, over the Internet, from first and second sensors that is indicative of physical characteristics of first and second subjects, respectively. Claim 98 requires that the "processor is operative to determine whether said first subject is in need of a break." Claim 99 further requires the processor to be "further operative to provide a notification to [a] device concerning whether said first subject is in need of a break." The disclosure contained in *Teller* is relied upon in both TPR's Comments and in the RAN to reject these claims.

In its rejection of claim 98, the Examiner holds that *Teller*'s disclosure of a system that determines whether a user's sleep levels are low and provides the user with ways to improve or get more sleep is a disclosure of a processor that is operative to determine whether a subject is "in need of a break." (RAN at 28.) Specifically, the referenced portion of *Teller* states that "if the system detects that a user's Sleep levels have been low, which suggest that the user has been having trouble sleeping, Problem Solver 158 can provide suggestions for way[s] to improve sleep." (*Teller*, 19:42-45.)

A processor that is operative to determine whether a subject is "in need of a break" is neither disclosed by nor rendered obvious by a processor that is operative to determine whether a user is in need of sleep. Several different definitions for the noun "break" exist. (*See* Exhibit 2, page 227.) Two of those definitions (numbers 6 and 7 in the noun section) are "An interruption or disruption in continuity or regularity: television programming without commercial breaks" and "A pause or interval, as from work: *a coffee break*." (*Id.*) These definitions are consistent with how the term "break" is used in the '271 Patent. For example, the detailed description of the '271 Patent uses the term "break" in the following ways:

- "As another example, the evaluation determined during the step 104 may indicate that ***a break or interruption*** is needed so that the subjects can stretch their legs, use the restroom, overcome boredom or fatigue, etc." ('271 Patent, 6:13-17 (emphasis added).)
- "The determination made during the step 104 of the data received during the step 102 may indicate that the group of subjects may be bored or in need of a break. Based on this

evaluation and or characteristic data of the subjects, a determination may be made that a ten-minute break should be given." ('271 Patent, 7:49-54.)

Sleep does not appear in any of the various definitions for the term "break." (*See id.*) Defining the term "break" to mean "sleep" is inconsistent with how the term "break" is used in the '271 Patent, how the term "break" is defined, and what one of ordinary skill in the art would have understood the term to mean at the time of the '271 Patent invention. In TPR's 10/15/13 Comments, TPR attempts to redefine the term "break" to mean nap or sleep. According to TPR, "sleep is the epitome of . . . a break." (At 22.) Patent Owner disagrees. In support of its argument, TPR states that "a person could even go to sleep during a . . . break." (*Id.*) If, as TPR suggests, "[s]leep is clearly a break" then TPR's own statement that "a person could even go to sleep during a . . . break" would be redundant and nonsensical. The statement "a person can sleep during a break," however, is not redundant because sleep and a break are not equivalent.

Defining the term "break" to mean "sleep" would be an unreasonably broad construction. Understanding the proper construction for the term "break," it is clear that *Teller* does not disclose or make obvious a "processor [that] is operative to determine whether said first subject is in need of a break" as recited by claim 98. By virtue of its dependence on claim 98, which is allowable for at least the reasons presented above, claim 99 is also allowable.

### J.    Claim 124 Is Valid Over The Cited Art

The RAN maintains four rejections of claim 124. First, claim 124 is rejected as obvious based on *Patton* in light of *Bibl*. Second, claim 124 is rejected as obvious based on *Zawilinski* in view of *Bibl*. Third, claim 124 is rejected as obvious based on *Patton* in view of *Teller*. Finally, claim 124 is rejected as obvious based on *Zawilinski* in view of *Teller*. Each of these rejections should be withdrawn.

Claim 124 recites a local first sensor, a local second sensor, and a remote server. The first sensor "is operative to transmit said first data to a local first user device over a Bluetooth wireless communication link." Neither *Bibl* nor *Teller* teach or otherwise disclose this limitation recited in claim 124.

*Bibl* discloses that a personal data capture device may transmit data to a server "using a wireless transmitter." (*Bibl*, ¶ [0026].) *Bibl* fails to disclose that **Bluetooth** wireless transmission may be used to transmit data. *Teller* also discloses wireless data transmission and specifically identifies radio frequency and infrared transmission. (*Teller*, 22:47-58.) *Teller* fails to disclose that **Bluetooth** wireless transmission may be used to transmit data.

According to TPR's expert, Mr. Koperda, "[t]he use of Bluetooth for wireless radio transmission would have been an obvious design choice for one skilled in the art, because Bluetooth technology is optimized for short distance, low power, low cost, and low weight." Mr. Koperda's testimony is irrelevant

25

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

to the obviousness inquiry because it focuses on how the current state of Bluetooth technology and not on Bluetooth technology as it existed at the time of the '271 Patent invention. Indeed, while Mr. Koperda's statement regarding how "Bluetooth is optimized" may be true of Bluetooth today, it was not true of Bluetooth at the time of the '271 Patent invention. (Exhibit 3 at ¶ 17.)

The focus in an obviousness determination is on what a person of ordinary skill in the pertinent art would have known *at the time of the invention*. 35 U.S.C. § 103; MPEP § 2141(II). This requirement exists in order to avoid impermissible hindsight in obviousness rejections. MPEP § 2141(III).

At the time of the '271 Patent invention, Bluetooth wireless transmission had a high energy profile. (Exhibit 3 at ¶ 16.) Due to the large amount of power required to transmit data, Bluetooth devices were not suitable for small battery-powered handheld or portable applications. (*Id*.) This is because if too few batteries were used, they would need to be recharged or replaced very frequently. (*Id*.) Alternatively, if an adequate amount of battery power was provided to allow the device to operate for an extended period of time, the weight of the battery would have limited the portability of the device. (*Id*.) In addition, at the time of the '271 Patent invention, Bluetooth was expensive relative to other forms of wireless data transmission technologies. (*Id*.) Thus, at the time of the '271 Patent invention, other forms of wireless data transmission protocols would have been preferred over Bluetooth for the applications described in the '271 Patent. (*Id*.) As such, a person of ordinary skill in the art at the time of the '271 Patent invention would not have found Bluetooth wireless transmission an obvious replacement for radio frequency, infrared, or other wireless transmission protocols. (*Id*. at ¶ 17.)

Since the characteristics of Bluetooth wireless transmission at the time of the invention would have rendered the systems of *Teller* and *Bibl* unsatisfactory for their intended purposes, *Teller* and *Bibl* **teach away** from the use of Bluetooth. According to MPEP § 2143.01(V), a "proposed modification cannot render the prior art unsatisfactory for its intended purpose." When such is the case, the prior art teaches away from the proposed modification. Therefore, it would **not** have been obvious to employ Bluetooth in the systems of *Teller* and *Bibl* as "one of many options for transmitting data wirelessly" as asserted by the Examiner. Accordingly, *Teller* and *Bibl* fail to teach or suggest or make obvious a first sensor "operative to transmit said first data to a local first user device over a Bluetooth wireless communication link" as required by claim 124.

## K.    Conclusion

For the reasons set forth herein, the rejections of claims 1, 2, 4, 5, 10, 22, 24, 25, 28, 30, 31, 36, 38, 40, 42, 44, 45, 52, 54, and 56 should be withdrawn and these claims should be allowed to issue.

Dated this 6th day of May, 2014.                    Respectfully submitted,

                                                     **/Mark W. Ford, Reg. No. 67,732/**

                                                     Mark W. Ford

26

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

## VIII.   CLAIMS APPENDIX

15.     The method of claim 14, further comprising: selecting said device based, at least in part, on said selecting one of said plurality of options.

16.     The method of claim 13, wherein said device is associated with at least one of said plurality of options.

50.     (New) A system for facilitating feedback, comprising:
   a remote server including:
      a memory;
      a communication port operative to receive data over the Internet;
      a processor connected to said memory and said communication port, said processor being operative to:
         receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;
         store said first and second data in said memory;
         determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and
         provide a notification regarding said evaluation to a device; and
      a sensor database accessible to said server, wherein said sensor database includes a sensor identifier field that contains information for identifying said first and second sensors.

27

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

51.    (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

a sensor database accessible to said server, wherein said sensor database includes:

a sensor identifier field that contains information for identifying said first and second sensors; and

a sensor description field that contains information describing said first and second sensors.

28

**Appx791**

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

52.    (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

a sensor database accessible to said server, wherein said sensor database includes:

a sensor identifier field that contains information for identifying said first and second sensors;

a sensor description field that contains information describing said first and second sensors; and

a sensor output field that contains information regarding a type, timing, or format of data provided by said first and second sensors.

29

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

53.    (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an output database accessible to said server.

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

54.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>an output database accessible to said server, wherein said output database includes an output identifier field that contains identifying information regarding said first and second subjects.</u>

31

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

55.    (New) A system for facilitating feedback, comprising:

a remote server including:

    a memory;

    a communication port operative to receive data over the Internet;

    a processor connected to said memory and said communication port, said processor being operative to:

        receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

        store said first and second data in said memory;

        determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

        provide a notification regarding said evaluation to a device; and

an output database accessible to said server, wherein said output database includes:

        an output identifier field that contains identifying information regarding said first and second subjects; and

        an output description field that contains descriptive information regarding said first and second subjects.

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

56.     (New) A system for facilitating feedback, comprising:
        a remote server including:
                a memory;
                a communication port operative to receive data over the Internet;
                a processor connected to said memory and said communication port, said processor being
        operative to:
                        receive, over the Internet and through said communication port of said server,
                first data indicative of a physical characteristic of a first subject from a local first sensor
                operative to sense said first data and second data indicative of a physical characteristic of
                a second subject from a local second sensor operative to sense said second data;
                        store said first and second data in said memory;
                        determine an evaluation of said first data and said second data, wherein said
                evaluation is representative of a state associated with both said first subject and said
                second subject; and
                        provide a notification regarding said evaluation to a device; and
                an output database accessible to said server, wherein said output database includes:
                        an output identifier field that contains identifying information regarding said first
                and second subjects;
                        an output description field that contains descriptive information regarding said
                first and second subjects; and
                        a sensor identifier field that identifies that said first and second sensors are
                associated with said first and second subjects.

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

58.    (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an evaluation database accessible to said server, wherein said evaluation database includes an evaluation identifier field that contains identifying information for said evaluation.

34

**Appx797**

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

59.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>an evaluation database accessible to said server, wherein said evaluation database includes:</u>

<u>an evaluation identifier field that contains identifying information for said evaluation; and</u>

<u>a description field that contains descriptive information regarding said evaluation.</u>

35

**Appx798**

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

60.     (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an evaluation database accessible to said server, wherein said evaluation database includes:

an evaluation identifier field that contains identifying information for said evaluation;

a description field that contains descriptive information regarding said evaluation; and

a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation.

36

61.   (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

> <u>a memory;</u>
>
> <u>a communication port operative to receive data over the Internet;</u>
>
> <u>a processor connected to said memory and said communication port, said processor being operative to:</u>

>> <u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>
>>
>> <u>store said first and second data in said memory;</u>
>>
>> <u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>
>>
>> <u>provide a notification regarding said evaluation to a device; and</u>

> <u>an evaluation database accessible to said server, wherein said evaluation database includes:</u>

>> <u>an evaluation identifier field that contains identifying information for said evaluation;</u>
>>
>> <u>a description field that contains descriptive information regarding said evaluation;</u>
>>
>> <u>a sensor identifier field that contains information for identifying said first and second sensors associated with said evaluation; and</u>
>>
>> <u>a field that associates said evaluation with said device to which said notification is provided.</u>

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

65.    (New) <u>A system for facilitating feedback, comprising:</u>

    <u>a remote server including:</u>

        <u>a memory;</u>

        <u>a communication port operative to receive data over the Internet; and</u>

        <u>a processor connected to said memory and said communication port, said processor being operative to:</u>

            <u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

            <u>store said first and second data in said memory;</u>

            <u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

            <u>provide a notification regarding said evaluation to a device, wherein said device includes a flash memory card.</u>

79.    (New) <u>A system for facilitating feedback, comprising:</u>

    <u>a remote server including:</u>

        <u>a memory;</u>

        <u>a communication port operative to receive data over the Internet; and</u>

        <u>a processor connected to said memory and said communication port, said processor being operative to:</u>

            <u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

            <u>store said first and second data in said memory;</u>

            <u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

            <u>provide a notification regarding said evaluation to a device, wherein said notification includes an XML transmission.</u>

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

95.    (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet; and

a processor connected to said memory and said communication port, said processor being operative to:

receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data, wherein said processor is operative to receive said first and second data simultaneously from said first and second subjects;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device.

39

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

98.     (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

    <u>a memory;</u>

    <u>a communication port operative to receive data over the Internet; and</u>

    <u>a processor connected to said memory and said communication port, said processor being operative to:</u>

        <u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;</u>

        <u>store said first and second data in said memory;</u>

        <u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

        <u>provide a notification regarding said evaluation to a device,</u>

        <u>wherein, said processor is operative to determine whether said first subject is in need of a break.</u>

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

124.     (New) A system for facilitating feedback, comprising:

a local first sensor;

a local second sensor; and

a remote server including:

    a memory;

    a communication port operative to receive data over the Internet; and

    a processor connected to said memory and said communication port, said processor being operative to:

        receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from said first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from said second sensor operative to sense said second data;

        store said first and second data in said memory;

        determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

        provide a notification regarding said evaluation to a device,

wherein:

    said first sensor is operative to transmit said first data to a local first user device over a Bluetooth wireless communication link;

    said second sensor is operative to transmit said second data to a local second user device; and

    said processor is operative to receive, over the Internet and through said communication port, said first data from said first user device and said second data from said second user device.

41

**Appx804**

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

## IX.    EVIDENCE APPENDIX

The following evidence, submitted pursuant to §§ 1.130, 1.131, or 1.132, was entered by the Examiner and is relied upon by appellant in this appeal:

- Attached hereto as Exhibit 1 is Microsoft Computer Dictionary, Fifth Edition, copyright ©2002 by Microsoft Corporation, pages 368 and 442. This Exhibit was previously entered as Exhibit 1 to Patent Owner's 9/12/13 Response.

- Attached hereto as Exhibit 2 is The American Heritage® Dictionary of the English Language, Fourth Edition, copyright ©2000 by Houghton Mifflin Company, pages 227, 1203, and 1458. This Exhibit was previously entered as Exhibit 2 to Patent Owner's 9/12/13 Response.

- Relevant portions of the declaration of Darren Ashby are attached hereto as Exhibit 3. This Declaration was previously entered as Exhibit 3 to Patent Owner's 9/12/13 Response. A complete version of this Declaration can be found there.

42

**Appx805**

Patent Owner's Appeal Brief
Reexamination Control No.: 95/002,337

## X.       RELATED PROCEEDINGS APPENDIX

None.

# EXHIBIT 30

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| *In re* reexam of: U.S. Patent 6,701,271 B2 to WILLNER *et al.* | Examiner: Nguyen, Minh T. |
| For: **Method and Apparatus for Using Physical Characteristic Data Collected from Two or More Subjects** | Art Unit: 3992 |
| | Atty. Docket: 3271.001REX0 |
| Reexam Control No.: 95/002,337 | Confirmation No.: 1254 |
| Filed: Sept 14, 2012 | Examiner: Nguyen, Minh T. |

## Third-Party Requesters' Brief on Appeal
## Under 37 C.F.R. § 41.67

Mail Stop "*Inter Partes* Reexam"
ATTN: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

Pursuant to the Right of Appeal Notice mailed on January 23, 2014 ("RAN," Exhibit 1), the Third-Party Requesters ("TPR") timely filed a Notice of Appeal on February 21, 2014, from the determination favorable to patentability of claim 47 of U.S. Patent No. 6,701,271 ("the 271 patent") and the determination not to maintain certain proposed rejections with regard to claims 50-52, 53-56, 58-61, 95, and 98-99. Patent Owner subsequently filed a Notice of Cross Appeal on March 7, 2014.

Requesters hereby timely file this Appeal Brief ("Appeal Brief"), together with the required fee set forth in 37 C.F.R. § 41.20(b)(2). If any additional fees are necessary to prevent abandonment of this reexamination proceeding, then any such fees required therefore are hereby authorized to be charged to our Deposit Account No. 19-0036.

- 2 -                                                    Willner *et al.*
                                                Reexam Control No. 95/002,337

## TABLE OF CONTENTS

I.      REAL PARTY IN INTEREST......................................................................... 3

II.     RELATED APPEALS, INTERFERENCES, AND OTHER PROCEEDINGS ............... 4

III.    STATUS OF CLAIMS ................................................................................ 5

IV.     STATUS OF AMENDMENTS ...................................................................... 6

V.      SUMMARY OF CLAIMED SUBJECT MATTER .......................................... 7

        A.      Summary of Independent Claim 47 ..............................................7

        B.      Overview of treatment of claim 47 during the reexamination
                proceeding.....................................................................................12

VI.     ISSUES TO BE REVIEWED ON APPEAL ..................................................... 14

VII.    ARGUMENT............................................................................................ 15

        A.      The Examiner did not apply Broadest Reasonable Interpretation ........................15

                1.      The internal clock limitation of claim 47 does not specify
                        what data is timestamped by the internal clock element .......................... 15

                2.      Claim 47, as properly construed under the BRI, would have
                        been obvious ................................................................... 18

        B.      Under both the Examiner's overly narrow construction and the
                BRI, claim 47 is obvious ...........................................................19

                1.      The Examiner improperly applied an anticipation standard
                        to an obviousness argument.................................................. 19

                2.      It would have been obvious for web servers to timestamp
                        incoming data, including data received from personal data
                        capture devices................................................................. 23

        C.      Neither Bibl nor Teller teaches away from including an internal
                clock and timestamps.................................................................24

        D.      Requesters' valid motivation to include an internal clock was not
                untimely, as the Examiner alleged ..............................................26

VIII.   CONCLUSION.......................................................................................... 29

IX.     CLAIMS APPENDIX ................................................................................ 31

X.      EVIDENCE APPENDIX............................................................................. 33

XI.     RELATED PROCEEDINGS APPENDIX......................................................... 34

Certificate of Compliance with 37 C.F.R. § 1.943(c) Word Count Requirement for an
Appeal Brief.......................................................................................................... 35

## I.   *REAL PARTY IN INTEREST*

The real parties in interest are:

Strava, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 901 Mission Street, San Francisco, California 94103;

MapMyFitness, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 1810 Blake Street, Denver, Colorado 80202; and

FitnessKeeper, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 60 Canal Street, Boston, MA 02114.

REQUESTERS' CORRESPONDENCE ADDRESS:

Michael B. Ray, Esq.
Sterne, Kessler, Goldstein & Fox, PLLC
1100 New York Ave., N.W.,
Washington, DC 20005-3934

- 4 -                                                                  Willner *et al.*<br>
Reexam Control No. 95/002,337

## II.   *RELATED APPEALS, INTERFERENCES, AND OTHER PROCEEDINGS*

The '271 patent is currently the subject of litigation in the U.S. District Court for the

District of Utah in the following actions:

(1) *Icon Health & Fitness et al. v. Garmin Ltd. et al.*, Civil Docket No. 1:11-cv-00166-DB, filed November 11, 2011;

(2) *Icon Health & Fitness et al. v. Polar Electro Oy*, Civil Docket No. 1:11-cv-00167-PMW, filed November 11, 2011;

(3) *Icon Health & Fitness et al. v. FitnessKeeper, Inc.*, Civil Docket No. 1:11-cv-00173-CW, filed December 9, 2011;

(4) *Icon Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB December 9, 2011; and

(5) *Icon Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW December 9, 2011.

These cases are presently pending before the district court, and no judgment has been

issued with respect to the validity of the claims of the '271 patent or the prior art references

and issues set forth herein.

- 5 -                                         Willner *et al.*
                                   Reexam Control No. 95/002,337

### III.    STATUS OF CLAIMS

The '271 patent issued with claims 1-41. Reexamination was requested of and granted

for all claims.

During reexamination, Patent Owner cancelled claims 1-14, 21-30 and 36, amended

claims 17-20, 31, 33 and 37-39, and added new claims 42-228.

The Action Closing Prosecution (ACP) (Exhibit 2) found all pending claims to be

unpatentable.

Patent Owner then cancelled claims 17-46, 48-49, 57, 62-64, 66-78, 80-94, 96-97, 99-

123 and 125-228, and amended claims 47, 50-56, 58-61, 65, 79, 95, 98, and 124.

As a result, only claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99 and 124 are

pending in the present reexamination.

In the Right of Appeal Notice (RAN), only claim 47 was found to be patentable.

## IV.    *STATUS OF AMENDMENTS*

No amendments to the claims are pending. A complete listing of claims involved in this appeal and their associated statuses are included in the Claims Appendix section.

## V.    SUMMARY OF CLAIMED SUBJECT MATTER

The '271 patent's claims are directed to receiving physical characteristic data about a plurality of subjects from sensors operative to collect the physical characteristic data, evaluating the data, and providing a notification regarding the data. During this reexamination proceeding, the Patent Owner ("PO") added 187 new claims to the original 41 claims. All claims were either cancelled or rejected through the Action Closing Prosecution. But in the Right of Appeal Notice (RAN), the Examiner for the first time found amended new claim 47 to be patentable because the prior art allegedly did not teach or suggest the "internal clock limitation." Thus, only one pending claim, claim 47, was found allowable in the RAN, while the rejections of the remaining pending claims (15, 16, 50-56, 58-61, 65, 79, 95, 98, 99 and 124) in view of the art were maintained.

### A.    Summary of Independent Claim 47

Independent Claim 47 is directed to a remote server including a memory, a communication port operative to receive data over the Internet, and a processor connected to the memory and communication port. ('271 patent, 11:29-36). Claim 47 recites that the remote server "receive[s], over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a second sensor operative to sense said second data," ('271 patent, 4:50-63), "store[s] said first and second data in said memory," "determine[s] an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject," ('271 patent, 5:23-26), and "provide[s] a notification regarding said evaluation to a device." ('271 patent, 7:8-56). Each of these features appear in the original version of the claim (which was newly added during reexamination).

- 8 -                                         Willner *et al.*
                                        Reexam Control No. 95/002,337

The claim chart below uses examples from the '271 patent to summarize the claim elements.

| Claim 47 | The Specification |
|---|---|
| 47.    A system for facilitating feedback, comprising: | According to another embodiment of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determine an evaluation of the data; and provide a notification regarding the evaluation to device. In other embodiments of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a plurality of subjects; determine a course of action based, at least in part, on the data; and provide a notification based, at least in part, on the course of action. ('271 patent, 2:29-34.) |

- 9 -

Willner *et al.*
Reexam Control No. 95/002,337

| Claim 47 | The Specification |
|---|---|
| a remote server including:<br>a memory;<br>a communication port operative to receive data over the Internet;<br>a processor connected to said memory and said communication port, said processor being operative to: | The processor **250** and the data storage device **260** in the server **204** each may be, for example: (i) located entirely within a single computer or other computing device; or (ii) connected to each other by a remote communication medium, such as a serial port cable, telephone line or radio frequency transceiver. In one embodiment, the server **204** may comprise one or more computers that are connected to a remote server computer for maintaining databases. ('271 patent, 11:29-36.)<br><br>A conventional personal computer or workstation with sufficient memory and processing capability may be used as the server **204**. In one embodiment, the server **204** operates as or includes a Web server for an Internet environment. ('271 patent, 11: 37-40.)<br><br>In addition to the above, the server **204** may include a memory or data storage device **260** to store information, software, databases, notifications and communications, device drivers, sensor data, potential responses or courses of action, etc. ('271 patent, 11:16-20.) |

Appx816

| Claim 47 | The Specification |
|---|---|
| receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a second sensor operative to sense said second data; | Processing begins at a step **102** during which data indicative of one or more physical characteristics of two or more subjects (e.g., human beings, animals) is obtained or otherwise received. A physical characteristic of a subject might be or include the subjects' heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern, odor, motion, etc., or a change in any one or more of them. ('271 patent, 4:50-63.)

Now referring to FIG. 4, an apparatus or system **200** usable with the methods **100, 120** and **140** is illustrated. The apparatus **200** includes one or more sensors **202** that may communicate directly or indirectly with one or more servers, controllers or other devices **204**, and one or more user devices **206** that may communicate with a server **204**, via a computer, data, or communications network **208**. ('271 patent, 9:23-29.)

The communications network **208** might be or include the Internet, the World Wide Web, or some other public or private computer, cable, telephone or communications network or intranet, as will be described in further detail below. ('271 patent, 10:14-17.) |
| store said first and second data in said memory; | In addition to the above, the server **204** may include a memory or data storage device **260** to store information, software, databases, notifications and communications, device drivers, sensor data, potential responses or courses of action, etc. ('271 patent, 11:16-20.) |

| Claim 47 | The Specification |
|---|---|
| determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and | Applicants have recognized that there is a need for systems and methods that allow for biometric information and other physical characteristic data to be obtained regarding two or more subjects and evaluate or determine a course of action or evaluation based on the information and data. ('271 patent, 3:64-4:1.)<br><br>During a step **104**, an evaluation is determined of the physical characteristic(s) for which data was received during the step **102** regarding one or more of the subjects for which data was received during the step **102**. ('271 patent, 5:23-26.) |
| provide a notification regarding said evaluation to a device; and | During a step **106**, a notification of the evaluation determined during the step **104** is provided to at least one device. The notification provided during the step **106** can be sent to more than one device and more than one type of device. The notification may be or include an email message, instant message communication, electronic signal or other communication (e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible sound, a visual display, a voice message, etc. The notification may be sent to a variety of devices such as, for example, ear phones, a speaker, a software program operating on a device, an electronic storage device (e.g., hard disk drive, CD-ROM drive), a server, and a user device (e.g., personal digital assistant, computer). The notification may be or include a summary, table, chart, correlation, comparison, graph, etc of some or all of the data received during the step **102**. In some embodiments, information regarding the notification or devices the notification is sent to may be stored in, or accessed from, an output or notification database. ('271 patent, 7:8-26.) |

- 12 -                                                          Willner *et al.*
                                                    Reexam Control No. 95/002,337

| Claim 47 | The Specification |
|---|---|
| an internal clock element that is operative to maintain a time and date for said server, wherein said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification provided by said server. | The server **204** also may include an internal clock element **254** to maintain an accurate time and date for the server **204**, create time stamps for data, notifications and other communications received or sent by the server **204**, etc. ('271 patent, 11:3-7.) |

### B.   *Overview of treatment of claim 47 during the reexamination proceeding*

Most importantly to this appeal, is the following limitation of claim 47:

> an internal clock element that is operative to maintain a time and date for said
> server, wherein said internal clock element is operative to create time stamps
> for data, notifications, and other communications received at said server and
> said internal clock element is operative to create time stamps for said
> notification provided by said server.

(this limitation generally referred to herein as the "internal clock limitation").  (11:3-7).

The Examiner properly rejected claim 47 in the ACP as obvious under 35 U.S.C. §

103 over both Patton (Exhibit 9) in view of Bibl (Exhibit 7) (ACP, p. 26) and Zawilinski

(Exhibit 10) in view of Bibl (ACP, p. 38), finding that both combinations taught or suggested

each of these claim limitations, including the internal clock limitation. The Examiner likewise

properly found that both Patton in view of Teller (Exhibit 9) (ACP, p. 55) and Zawilinski in

view of Teller (ACP, p. 66) teach or suggest each of these claim limitations under 35 U.S.C.

§ 103.

In its Response to the ACP (mailed August 12, 2013) (herein, "PO Response to

ACP," Exhibit 3), the PO did not dispute any of the Examiner's findings with regard to the

claim limitations provided above, with the exception of the findings relating to the internal

clock limitation. (PO Response to ACP, pp. 30-32). In the RAN, the Examiner withdrew the

previously applied rejections of claim 47, concluding that neither Bibl nor Teller teach or

- 13 -                               Willner *et al.*
                              Reexam Control No. 95/002,337

suggest the internal clock limitation of claim 47. (RAN, pp. 8-11). Thus, the only issue on

appeal for claim 47 is whether the proposed combinations of cited art render obvious the

internal clock limitation of claim 47.

- 14 -   Willner *et al.*
Reexam Control No. 95/002,337

## VI.   *ISSUES TO BE REVIEWED ON APPEAL*

1.   Whether the Examiner should have maintained the rejection of claim 47 under 35 U.S.C. § 103 for being obvious over Patton in view of Bibl;

2.   Whether the Examiner should have maintained the rejection of claim 47 under 35 U.S.C. § 103 for being obvious over Zawilinski in view of Bibl;

3.   Whether the Examiner should have maintained the rejection of claim 47 under 35 U.S.C. § 103 for being obvious over Patton in view of Teller; and

4.   Whether the Examiner should have maintained the rejection of claim 47 under 35 U.S.C. § 103 for being obvious over Zawilinski in view of Teller.

## VII.   ARGUMENT

The Examiner improperly allowed claim 47, solely on the basis of the internal clock limitation. Indeed, the PO does not dispute that the remaining limitations of claim 47 are disclosed, taught, and/or suggested by the prior art. (PO Response to ACP, pp. 30-32). In allowing claim 47, the Examiner used an overly narrow interpretation of the internal clock limitation rather than the broadest reasonable interpretation ("BRI") required by law, and improperly applied the "inherency" standard of anticipation to an obviousness argument. Had the Examiner applied the proper standard with regard to either of these errors, claim 47 would have remained rejected as obvious.

### A.      The Examiner did not apply Broadest Reasonable Interpretation

The Examiner read into claim 47 a requirement that the timestamp be applied to a certain type of data. The Examiner then used that limitation to distinguish the prior art. But that limitation finds no support or hook in the claim language itself, which violates the Office's mandate to give claims their broadest reasonable interpretation. Properly construed, the claimed feature is obvious.

#### 1.      The internal clock limitation of claim 47 does not specify what data is timestamped by the internal clock element

In the ACP, the Examiner properly found that both Patton in view of Bibl (ACP, p. 26) and Zawilinski in view of Bibl (ACP, p. 38) teach or suggest the internal clock limitation of claim 47. But in the RAN, the Examiner read into the internal clock limitation a feature not supported by the claim language. This is contrary to settled law for interpreting claims in the Office. Even in reexamination, "the PTO must give claims their broadest reasonable construction consistent with the specification." *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010) (quoting *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379 (Fed. Cir. 2007)); *see also* MPEP § 2111.01. Giving claims their broadest reasonable construction

while they can be amended serves the public interest by reducing the possibility that issued

claims will later be given broader scope than is justified. *In re Am. Acad. of Sci. Tech Ctr.*,

367 F.3d 1359, 1364 (Fed. Cir. 2004). The broadest reasonable construction is used because

the patentee "has the opportunity to amend the claims to obtain more precise claim

coverage," correct any ambiguities or errors, and adjust the scope as needed. *Id.*

Here neither the PO nor the Examiner applied the broadest reasonable interpretation.

Both incorrectly interpret the language of claim 47 to require that data that is timestamped by

the server be the **same data** as the sensor data sent to the server in other claim limitations. In

other words, they read into claim 47 that the internal clock be operative to create time stamps

for the ***first*** and ***second*** data.[1]  But the claim language does not require that the sensor data be

timestamped by the server. It states only that "said internal clock element is operative to

create time stamps **for data**." (Emphasis added).  The Examiner's construction effectively

narrows the general term "data" in a manner that finds no support in the plain language of the

claim. This is contrary to the BRI standard.

Under the broadest reasonable interpretation, which the PTO must apply to pending

claims (*see* MPEP § 2111.01), the claim language does not require that the data that is

timestamped at the server is the same data received from the sensors (which may or may not

have been previously timestamped). In fact, claim 47 actually identifies three different types

of data. For example, claim 47 recites: first data, second data, and data that is received at the

server that is timestamped by the server. Claim 47 recites that the web server "receive[s]…

first data indicative of a physical characteristic of a first subject from a first sensor operative

---

[1] For example, PO alleged that "Bibl does not disclose that the web server is capable of creating time stamps for data, notifications, or other communications received **from a personal data capture device**." (PO Response to ACP, p. 31, emphasis added); the Examiner in the RAN accepted the PO's construction and withdrew the rejection, stating "[n]ow the question is whether the combination of Patton and Bibl or the combination of Zawilinski and Bibl suggests… to add an internal clock element to the server to create timestamps for data, notifications **in addition to** the timestamp provided **by the personal capture device**." (RAN, pp.10-11, emphasis added).

to sense said first data and second data indicative of a physical characteristic of a second

subject from a second sensor operative to sense said second data." The "first data" and

"second data" of claim 47 are both data received from a sensor that is indicative of a physical

characteristic of a subject (i.e., sensor data).

The proper inference, and certainly the broadest reasonable inference, is that the word

"data" in the internal clock limitation is used in its general sense and is not limited to any

specific kind of data. The Examiner nonetheless interpreted the claim as requiring that the

server must timestamp either the first data or the second data. That narrow interpretation is

inconsistent with the claim, as noted above.  If the patentee had intended for the server to

timestamp only the sensor data (i.e., the "first data" or the "second data"), the claim could

have been drafted to state as much.  As the claim now stands, there is no specific limitation

that the data received by the server is limited to only the first data or the second data. The

PO's choiceto maintain broader claim language, over the course of prosecution should be

respected and enforced. [2]

Further, the specification of the '271 patent supports the broadest reasonable claim

interpretation that the data to be timestamped is not limited to sensor data. The '271 patent

provides a limited discussion on time stamps, and only mentions creating time stamps in one

place, col. 11, lines 3-7, which states that "[t]he server 204 also may include an internal clock

element 254 to maintain an accurate time and date for the server 204, create time stamps for

data, notifications and other communications received or sent by the server 204, etc." Here,

---

[2]  In Reexamination of Patent 5,561,707 (Reexam Control No. 90/006,968, Decision on Reconsideration, p. 5), the Board of Patent Appeals and Interferences held that "[P]atent claims in a reexamination proceeding in the USPTO are ordinarily given their broadest reasonable interpretation consistent with the patent disclosure. *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004)). Construing claims broadly is proper because the patentee has the opportunity to amend the claims to obtain more precise claim coverage. *Id.* at 1364." In the instant case, PO had an opportunity to amend the claims, and twice did so. However, PO chose not to amend the language of claim 47 to recite the alleged features relied upon by the Examiner, and should not now be afforded a narrow claim construction.

as in the claim, there is no designation of any specific kind of data that receives timestamps. Rather, this passage from the '271 patent states that the server can create time stamps for "data, notifications and other communications received or sent by the server 204." There is no other reference to timestamping in the '271 patent. So there is no basis in the specification of the '271 patent to limit claim 47 to requiring timestamping to only data received from the personal data capture devices.

For these reasons, the Examiner's claim interpretation is overly narrow and contrary to the BRI standard. The Examiner erred by reading limitations into the claim that are unsupported by the claim language and the specification.

> 2.   **Claim 47, as properly construed under the BRI, would have been obvious**

Under a proper interpretation of claim 47, a person having ordinary skill in the art ("PHOSITA") would have understood that the server of Bibl is capable of maintaining a time and date, creating timestamps for data received at the server, and creating timestamps for data provided by the server. Whether the data timestamped at the server also includes sensor data is irrelevant as to whether the claim would have been obvious in view of the cited prior art.

To be more specific, Bibl discloses timestamping data by a processor when the data is from several different sources. (Bibl, 0054). The received information is timestamped and the sources are identified. (*Id.*) Both the web server and personal capture device of Bibl receive information from multiple sources. (Bibl, 0054, 0027) As previously noted by Requesters "Bibl specifically discloses that 'personal data includes a date and a timestamp associated with each physical data and biometrical parameter.' (Bibl, 0054)." (Requesters' Comments After ACP, p. 8 (Exhibit 4)). Further, although Bibl describes timestamping by the personal capture device, the web server of Bibl also receives information at various times from various sources. For example, Bibl states that "[p]ersonal data of each family member is then

- 19 -                                                    Willner *et al.*
                                                         Reexam Control No. 95/002,337

uploaded to server 160 at various points of time. Server 160 may receive personal data from

numerous PSA users. This personal data may then be processed by third parties that may

provide feedback information to those PSA users who subscribe to this service." (Bibl, 0027).

As such, it would have been obvious to a PHOSITA that the web server of Bibl that receives

information at various times from various sources could have included the capability to

timestamp data. Doing so would have been nothing more than applying to the web server of

Bibl the known timestamping techniques disclosed by Bibl for timestamping data at the

personal capture devices.

The Examiner applied the same erroneous rationale and unduly narrow interpretation

of claim 47 in withdrawing the rejections in view of Teller. For example, the Examiner stated

that "Teller does not disclose that the central monitoring unit is a server capable of creating

time stamps for data, notifications, or other communications received from a sensor device"

(PO Response to ACP, p. 31), in withdrawing the rejections in view of Teller.

Teller does, however, disclose timestamping data (Teller, 7:66-67 and 8:1-8), and

under the required BRI of claim 47, it would have been obvious to a PHOSITA that both the

web server of Bibl and the central monitoring unit (CMU) of Teller would have had an

internal clock and the ability to time stamp data as recited in claim 47. The rejections of claim

47 in view of the combinations involving Bibl and the combinations involving Teller should

therefore be reinstated.

**B.**     ***Under both the Examiner's overly narrow construction and the BRI, claim 47 is obvious***

**1.**     ***The Examiner improperly applied an anticipation standard to an obviousness argument***

Even if claim 47 is narrowly interpreted to require timestamping of sensor data—i.e.,

of the first and second data of claim 47—by the server, claim 47 is still unpatentable for

being obvious over Patton in view of Bibl, Zawilinski in view of Bibl, Patton in view of

- 20 -                                                       Willner *et al.*
                                                    Reexam Control No. 95/002,337

Teller, and Zawilinski in view of Teller.  Bibl specifically identifies that its server may

"comprise a general purpose computer," and states that the systems described "are not

inherently related to any particular computer or other apparatus.  Various general purpose

systems may be used with various programs in accordance with the teachings herein."  Bibl at

¶¶ 0022-3.  Requesters provided expert opinions of Frank Koperda, an expert in computer

system design and networking (ACP, pp. 26, 38, 55, 66) providing unrebutted testimony that

internal clocks used to timestamp incoming data were common in web servers at the relevant

time period. (Requesters' Comments to PO Response After Non-Final, p. *26* (Exhibit 5),

*citing* Koperda Decl., ¶14 (Exhibit 6)).

     Under 35 U.S.C. § 103, Requesters only needed to demonstrate that the internal clock

limitation was taught or suggested by the art, or even that it was within the common sense of

a PHOSITA.  Here, it is undisputed that general purpose computers were known at the time

of filing to contain internal clocks for timestamping data. Requesters used this common

knowledge to establish a prima facie case of obviousness which the PO has not rebutted.

Accordingly, the rejection should stand even under the narrow claim interpretation adopted

by the Examiner.

     In withdrawing the rejection of claim 47 in the RAN, however, the Examiner did not

apply the applicable standards of 35 U.S.C. § 103. Instead, the Examiner appears to have

applied the inherency standard of 35 U.S.C. § 102, finding the claim allowable because

Requesters had not demonstrated that common hardware platforms **always** include an

internal clock. (RAN, p. 11).  The reliance on the incorrect standard by the Examiner is legal

error.

     Under 35 U.S.C § 103(a) "[a] patent may not be obtained... if the differences between

the subject matter sought to be patented and the prior art are such that the subject matter as a

whole would have been obvious at the time the invention." The legal test to determine the question of obviousness is an "expansive and flexible" one, and there is "need for caution in granting a patent based on the combination of elements found in the prior art." (See *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007)). The Supreme Court's *KSR* decision established the proper analysis for obviousness. *Id.* The Court loosened the standard for showing the obviousness of combining prior art references by overturning the Federal Circuit's teaching-suggestion-motivation test as too "rigid" and "narrow" and reaffirming the Graham factors. *Id.* at 415, 419-21.

In defining the obviousness standard, the Court emphasized that its long-standing precedent confirms that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* at 417. Thus, when assessing the obviousness of a claim, the USPTO "must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." *Id.* at 417. Significantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.* at 421. Indeed, beyond simple cases that merely require the combination of two prior art references, "a person of ordinary skill [often] will be able to fit the teachings of multiple patents together like pieces of a puzzle." *Id* at 420.

In contrast to this flexible standard for an obviousness rejection under Section 103, the PTO applies the more rigorous inherency standard to find that a single reference anticipates a claim under Section 102. "In order to prove that a claim is anticipated under 35 U.S.C. § 102(b), defendants must present clear and convincing evidence that a single prior art reference discloses, either expressly or inherently each limitation of the claim." *In re Cruciferous Sprout Litigation*, 301 F.3d 1343, 1349 (Fed. Cir. 2002) (quoting *Minn. Mining & Mfg. Co. v. Johnson & Johnson Orpthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed. Cir.

- 22 -                                                         Willner *et al.*
                                                    Reexam Control No. 95/002,337

1992)). Further, the prior art reference "must necessarily include the unstated limitation, [or

the reference] cannot inherently anticipate the claims." *Rexnord Indus., L.L.C. v. Kappos*, 705

F.3d 1347, 1355 (Fed. Cir. 2013) (quoting *In re Omeprazole Patent Litigation*, 483 F.3d

1364, 1378 (Fed. Cir. 2007)). Under the strict anticipation standard, the evidence "must make

clear that the missing descriptive matter is necessarily present in the thing described in the

reference, and that it would be so recognized by persons of ordinary skill. Inherency,

however, may not be established by probabilities or possibilities." *See* MPEP § 2112

(citation omitted).

> Here, in the RAN, the Examiner withdrew the previous ACP rejections, stating that:

> Mr. Koperda acknowledges that common hardware platform does not **always**
> include a hardware clock. Because the required element **must be exist and**
> **positively identified** [*sic.*], the Requester cannot rely on Mr. Koperda to argue
> that the server in Bibl has an internal clock element to create timestamp for
> data and notifications.

(RAN, p. 11, emphasis added). The Examiner's stated reason for withdrawing the rejection of

claim 47—that the "the required element **must be exist and positively identified** [*sic.*]" and

that Requester has not demonstrated that common hardware platform **always** include a

hardware clock—improperly relies on the standard for inherency under the anticipation. (*See*

MPEP § 2112, "the missing descriptive matter [must be] ***necessarily present*** in the thing

described in the reference…"). But anticipation was not a basis for rejection of claim 47.

Further, the Examiner's language is contrary to the flexible approach to obviousness

mandated by *KSR*.

> Under the correct obviousness standard, *KSR* encourages an expansive approach and

the use of "common sense" when addressing obviousness. *See KSR,* 550 U.S. at 418. Indeed,

the references themselves need not provide a "specific hint or suggestion" of the alteration

needed to arrive at the claimed invention; the analysis "may include recourse to logic,

judgment, and common sense available to the person of ordinary skill that do not necessarily

require explication in any reference or expert opinion." *Perfect Web Techs. v. Info USA, Inc.*,

587 F.3d 1324, 1329 (Fed. Cir. 2009). Mr. Koperda's opinions that internal clocks for

timestamping incoming data were common in web servers at the relevant time period (See

Koperda Decl., ¶14) was sufficient to establish that this element was obvious at the time.

Under an obviousness standard, Requesters were not legally required to establish that web

servers **always or necessarily** had such internal clocks at the time to demonstrate that this

common feature was obvious.

     In sum, the Examiner committed a legal error by disregarding to Mr. Koperda's

unrebutted testimony regarding common features in web servers, such as those described in

Bibl and Teller, when the Examiner applied the inherency test to the obviousness arguments.

Notably, neither the PO nor the Examiner contest Mr. Koperda's testimony regarding the

common inclusion of internal clocks in servers and general purpose computers such as those

identified in Bibl and Teller. Under the proper obviousness standard, and as explained in

more detail below, it would have been obvious for both the web server of Bibl and the central

monitoring unit (CMU) of Teller to have had an internal clock operative to time stamp data in

the manner recited in claim 47, even under the Examiner's narrow construction.

     **2.**    ***It would have been obvious for web servers to timestamp incoming***
               ***data, including data received from personal data capture devices***

     The presence of an internal clock element at a server, as recited in claim 47, was well-

known in the art at the time of invention. As Mr. Koperda stated:

> Prior to the filing date of the '271 patent, common hardware platforms
> included Sun Workstations, IBM Compatible PCs, and HP servers, all of
> which normally had a hardware clock. The major server operating systems of
> that period included Windows NT 4.0, IBM OS/2, and UNIX, all of which
> implemented the functions of utilizing a clock to maintain an accurate time
> and date for the server, create timestamps for data, notifications, and other
> communications received or sent by the server. As an example of this, Bibl
> teaches that personal data stored in memory of the personal data capture
> device includes a timestamp, which may be stored in a database. (Bibl,

- 24 -                                                      Willner *et al.*
                                              Reexam Control No. 95/002,337

¶¶0054, 0057). Teller also teaches that a timestamp captured by a sensor
device is uploaded and stored on the server. (Teller, 7:66-8:3).

(Koperda Decl., ¶14). A PHOSITA would have understood, as Mr. Koperda stated, that a

common hardware platform would normally have an internal clock.

As Mr. Koperda's opinions demonstrate, any incoming data would normally have

been timestamped by the internal clock element, common in web servers at the relevant time.

The Bibl and Teller references include such a standard web server.  Thus, even under the

Examiner's narrow construction, it would have been obvious for the incoming data received

at the server from the personal capture device to be timestamped by the internal clock

element that was common in web servers at the time.

The fact that some subset of web servers at the time may not have had an internal

clock (as stated by the Examiner) is irrelevant as to what a PHOSITA would have found to be

obvious at the time of invention. Because it was normal for many such systems to have a

hardware clock capable of timestamping, it would have been obvious to a PHOSITA that the

hardware platforms in both Bibl and Teller would include a hardware clock and a server

operating system to maintain time and timestamps for received/sent data.[3] Since it was

common for any incoming data to be timestamped, it would have been obvious to timestamp

the specific kind of data called for in claim 47.

### C.    *Neither Bibl nor Teller teaches away from including an internal clock and timestamps*

PO acknowledged that "it would have been possible to place time stamps on data that

was sent and received [by a server]." (PO Response to ACP, p. 31). But PO then alleges that

"one of ordinary skill in the art would not have been motivated to create such a system...

---

[3] In fact, the '271 patent itself states that  "it would be understood by one of ordinary skill in the art that
the invention as described herein could be implemented in many different ways using a wide range of
programming techniques as well as general-purpose hardware systems or dedicated controllers." ('271 patent,
14:21-25). Thus, the '271 patent acknowledges that it uses a standard web server.

- 25 -                                                          Willner *et al.*
                                                        Reexam Control No. 95/002,337

[because] [s]uch a practice would be redundant and unnecessarily increase the cost of the system." (*Id.*, pp. 31-32), and that as such Bibl and Teller "teach away from the recited internal clock and time stamp limitations." (*Id.*, p.31).

This argument fails for two reasons. First, PO's argument is based on an improper interpretation of claim 47. As discussed above, this improper claim interpretation reads into the claim language a requirement that the data received from the sensors is necessarily the same data that is timestamped by the server. However, as noted above, the claim language does not include this limitation and does not require or prohibit that data is twice or redundantly timestamped. Instead the claim language only requires that some received data is timestamped by the server, regardless of whether the data has been previously timestamped or whether it is the first or second data. As such, PO's argument is without merit.

Second, PO's argument that "[s]uch a practice would be redundant and necessarily increase the cost of the system," is not a valid basis upon which to find a combination non-obvious. For example, in an appeal to the Board of Patent Appeals and Interferences (PBAI) in *Ex Parte Wolfgang Hahnl*, the appellants argued that "it cannot be obvious to combine the heat shield with the spring when the spring is already made of material that is heat-resistant because this would increase the cost and require additional effort . . . " (*Ex Parte Wolfgang Hahnl, Robin Willats, Jurgen Lesch, Klaus Regenold, & Melvyn Caunt*, Appeal 2009-001035, 2009 WL 2206880 at 5 (Bd. Pat. App. & Interf. July 23, 2009)). Like PO here, the appellants in *Hahnl* then argued that this redundancy teaches away from the proposed combination. *Id.* But the Board disagreed stating:

> The Federal Circuit held that "[t]he fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another." *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000). Here, that the benefit gained by using a heat shield as disclosed by Marcotte

- 26 -                                                    Willner *et al.*
                                              Reexam Control No. 95/002,337

> may come at the expense of additional cost and effort of using only a heat-
> resistant spring as disclosed by Suzuki should not nullify its use as the basis to
> modify the Suzuki spring. One of ordinary skill in the art could see a benefit in
> adding additional heat protection to the spring.

*Id.* In the instant case, timestamping at the server first data and second data that has already

been timestamped by the sensors, even if redundant as argued by PO, would not result in a

teaching away, as PO has alleged. A PHOSITA could have weighed the cost and benefits of

doing so.[4] Thus, it would have been obvious to a PHOSITA for the web server of Bibl and the

central monitoring unit of Teller to have an internal clock that could provide timestamping to

the received sensor data.  To do so would have been nothing more than the use of known

techniques for their intended purpose.

        The Examiner agreed with Requesters that "Bibl does not teach away from adding an

internal clock element and creating timestamp for data and notification for the reasons

provided by the Requester . . .," (RAN, p. 11), and appears to have agreed that Teller also

does not teach away from adding an internal clock, addressing arguments relating to that

reference simply by referring to the Bibl discussion.

        **D.      Requesters' valid motivation to include an internal clock was not untimely,
                  as the Examiner alleged**

        PO also argued that "TPR fails to identify a single reason why it would have been

obvious to a person of ordinary skill in the art to **redundantly** create time stamps for data,

notifications, and other communications received at a server, especially where time stamps

are already placed on the data by the collecting device, before data is sent to a server." (PO

Response to ACP, p. 32, emphasis added). The Examiner alleged that "[t]he Requester failed

to provide any motivation to do that in the proposed rejection and only provides a motivation

---

[4] In any event, Bibl teaches only that its "personal data *may* include a timestamp" put on by the sensor
(Bibl at ¶ 0054, emphasis added), which necessarily means that Bibl also teaches systems by which no
timestamp is put on by the sensor.  In such a system, the timestamping of data by the server would *not* be
redundant.

- 27 -                                                    Willner *et al.*
                                                Reexam Control No. 95/002,337

when raised by the Patent Owner in the response. Timeline, the provided motivation is late and improper." (RAN, p. 11). That is, the Examiner found that Requesters' argument was untimely. Requesters disagree.

The Examiner's position that this argument was untimely is contrary to the statutory language of 35 U.S.C. § 314 (B)(2), which states "[e]ach time that the patent owner files a response to an action on the merits from the Patent and Trademark Office, the third-party requester shall have one opportunity to file written comments addressing issues raised by the action of the Office or the patent owner's response thereto." Because the arguments Requesters provided were directly responsive to new arguments made in response to the ACP, the arguments regarding motivation to combine were timely.

Claim 47 was not part of the original claim set of the '271 patent. The PO only added claim 47 (along with 186 other new claims) after all of the original claims (1-41) were found to be unpatentable. In response to PO's addition of claim 47, Requesters provided new grounds of rejections under 35 U.S.C. 103(a) that addressed all of the new limitations of claim 47. The new grounds of rejections for claim 47 proposed by Requesters made a prima facie case that claim 47 was obvious over Patton in view of Bibl, Zawilinski in view of Bibl, Patton in view of Teller, and Zawilinski in view of Teller.

The Examiner adopted all of Requesters' proposed rejections of claim 47 in the ACP, acknowledging that Requesters had indeed presented a prima facie case of unpatentability for claim 47, including providing proper motivations to combine the references. (ACP, pp. 12, 26, 38, and 55). In response to the ACP, PO argued that "[w]hile it would have been possible to place time stamps on data that was sent and received, one of ordinary skill in the art would not have been motivated to create such a system. Such a practice would be redundant and

unnecessarily increase the cost of the system."[5] (PO Response to ACP, pp. 31-32). PO further

alleged that "TPR fails to identify a single reason why it would have been obvious to a person

of ordinary skill in the art to use a hardware platform that includes a hardware clock instead

of a hardware platform that lacks an internal clock." (PO Response to ACP, p.32).

Requesters' response simply addressed this new issue raised by PO's allegations,

stating that "[i]t would have been obvious to a person of ordinary skill in the relevant art to

have an internal clock that timestamps the received data to indicate when it was received

instead of, or in addition, when it was collected so that it may be processed in the order of

receipt." (Requesters' Comments After ACP, p. 8). It was this argument that the Examiner

held to be untimely. But Requesters are statutorily entitled to respond to issues raised by PO

in a response to an action on the merits. There is no allegation by the Examiner that

Requesters' response is outside of the scope of the new issues raised by PO. After initially

providing a prima facie case of obviousness in the rejections of claim 47 (which were

adopted by the Examiner), Requesters then provided arguments in response to the new issues

raised by PO, as Requesters are statutorily entitled to do. For at least these reasons,

Requesters' provided motivation is timely and must be considered.

---

[5] As discussed above in Section VIII. C., PO's argument that redundancy somehow equates to a per se
teaching away is legally unfounded. See, *supra*, *Ex Parte Wolfgang Hahnl*.

## VIII.   CONCLUSION

Of the 228 claims that were at one time pending in this reexamination, the Examiner only found claim 47 distinguishable from the prior art. Particularly, the Examiner cited to the "internal clock limitation" of claim 47 as being the distinguishing feature.  But, as shown herein, the internal clock limitation (and claim 47 as a whole) would have been obvious to a PHOSITA.

The Examiner first erred in withdrawing the rejections of claim 47 by failing to properly apply the BRI standard to the claim interpretation when the Examiner required that the server time stamp the first and second data, rather than any data, as provided by the claim. The Examiner further erred by incorrectly applying an inherency standard to the evidence of obviousness, requiring that the evidence "always" contain the allegedly novel feature, rather than using the expansive and flexible approach required for an obviousness analysis. Finally, the Examiner erred in rejecting arguments as untimely, which were only made in direct response to new arguments presented by the PO.

In view of the foregoing, Requesters respectfully request that the Board:

A.       reverse the Examiner's finding that claim 47 is patentable and finally reject claim 47 under 35 U.S.C. § 103 for being obvious over Patton in view of Bibl;

B.       reverse the Examiner's finding that claim 47 is patentable and finally reject claim 47 under 35 U.S.C. § 103 for being obvious over Zawilinski in view of Bibl;

C.       reverse the Examiner's finding that claim 47 is patentable and finally reject claim 47 under 35 U.S.C. § 103 for being obvious over Patton in view of Teller; and

D.       reverse the Examiner's finding that claim 47 is patentable and finally reject claim 47 under 35 U.S.C. § 103 for being obvious over Zawilinski in view of Teller

- 30 -                                        Willner *et al.*
                                  Reexam Control No. 95/002,337

No fee is believed to be necessary for the filing of this Appeal Brief. If necessary, the

U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit

any overpayment, to Deposit Account No. 19-0036.

Service of this paper has been made on Patent Owner's attorneys. The proof of said

service is attached.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Michael B. Ray, Registration No. 33,997

Harish Ruchandani, Registration No. 58,770
Attorneys for Third Party Requesters

Date: 5/7/14

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600
1846100_13.DOC

**Appx837**

## IX.   CLAIMS APPENDIX

Claims 15, 16, 47, 50-56, 58-61, 65, 79, 95, 98, 99 and 124 remain pending in the

present reexamination, however only claim 47 is currently involved in this appeal.  Pursuant

to 37 C.F.R. § 41.67(c)(1)(viii), Requesters provide the following listing of claim 47

currently under reexamination and involved in this appeal. Claim 47 was newly added during

the reexamination:

47.   (New) A system for facilitating feedback, comprising:

a remote server including:

a memory;

a communication port operative to receive data over the Internet;

a processor connected to said memory and said communication port, said

processor being operative to:

receive, over the Internet and through said communication port of said

server, first data indicative of a physical characteristic of a first subject

from a first sensor operative to sense said first data and second data

indicative of a physical characteristic of a second subject from a

second sensor operative to sense said second data;

store said first and second data in said memory;

determine an evaluation of said first data and said second data, wherein

said evaluation is representative of a state associated with both said

first subject and said second subject; and

provide a notification regarding said evaluation to a device; and

an internal clock element that is operative to maintain a time and date for said

server, wherein said internal clock element is operative to create time stamps

for data, notifications, and other communications received at said server and

- 32 -                                        Willner *et al.*
                                  Reexam Control No. 95/002,337

<u>said internal clock element is operative to create time stamps for said</u>

<u>notification provided by said server.</u>

- 33 -                                                     Willner *et al.*
Reexam Control No. 95/002,337

## X.    EVIDENCE APPENDIX

Pursuant to 37 C.F.R. § 41.67(c)(1)(ix), the following statement sets forth where

evidence relied upon in this appeal was entered in the record by the Office.

No extrinsic evidence is relied upon for this Brief.

| Ex. | Short Description | Entered Into Record |
|---|---|---|
| Ex. 1 | Right of Appeal Notice (RAN) | Entered by Examiner on January 23, 2014 |
| Ex. 2 | Action Closing Prosecution (ACP) | Entered by Examiner on August 12, 2013 |
| Ex. 3 | U.S. Patent No. 6,292,688 B1 to Patton | Submitted by Patent Owner on September 14, 2012, and entered by the Examiner in the Non-Final Office Action issued December 7, 2012 |
| Ex. 4 | U.S. Patent Appl. Pub. No. 2002/0111541 to Bibl, *et al.* | Submitted by Requester on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |
| Ex. 5 | U.S. Patent No. 5,676,138 to Zawilinski | Submitted by Patent Owner on September 14, 2012, and entered by the Examiner in the Non-Final Office Action issued December 7, 2012 |
| Ex. 6 | U.S. Patent No. 6,605,038 B1 to Teller *et al.* | Submitted by Requester on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |
| Ex. 7 | Patent Owner Response to ACP | Submitted by Patent Owner on September 12, 2013, and entered by the Examiner in the RAN issued January 23, 2014 |
| Ex. 8 | Requesters' Comments After ACP | Submitted by Requester on October 15, 2013, and entered by the Examiner in the RAN issued January 23, 2014 |
| Ex. 9 | Requesters' Comments to PO Response After Non-Final | Submitted by Requester on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |
| Ex. 10 | Declaration of Frank Koperda | Submitted by Requester on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |

- 34 -                                         Willner *et al.*
                                   Reexam Control No. 95/002,337

## XI.   *RELATED PROCEEDINGS APPENDIX*

As indicated in Section II above, the above-referenced patent is currently being

litigated, with the following lawsuit ongoing:

(1) *Icon Health & Fitness et al. v. Garmin Ltd. et al.*, Civil Docket No. 1:11-cv-00166-DB, filed November 11, 2011;

(2) *Icon Health & Fitness et al. v. Polar Electro Oy*, Civil Docket No. 1:11-cv-00167-PMW, filed November 11, 2011;

(3) *Icon Health & Fitness et al. v. FitnessKeeper, Inc.*, Civil Docket No. 1:11-cv-00173-CW, filed December 9, 2011;

(4) *Icon Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB December 9, 2011; and

(5) *Icon Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW December 9, 2011.

These lawsuits are currently stayed pending the outcome of this reexamination.

# Certificate of Compliance with 37 C.F.R. § 1.943(c) Word Count Requirement for an Appeal Brief

The foregoing Patent Owner's Brief on Appeal Under 37 C.F.R. § 41.67 contains less than 8000 words, excluding the parts of the brief exempted by 37 C.F.R. § 1.943(c), as counted by Microsoft® Word 2010.

Michael B. Ray

# EXHIBIT 31

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| *In re* reexam of: U.S. Patent 6,701,271 B2 to WILLNER *et al.*<br>For: **Method and Apparatus for Using Physical Characteristic Data Collected from Two or More Subjects** | Examiner: Nguyen, Minh T.<br>Art Unit: 3992<br>Atty. Docket: 3271.001REX0 |
| Reexam Control No.: 95/002,337<br>Filed: Sept 14, 2012 | Confirmation No.: 1254 |

## Third-Party Requesters' Respondent Brief
## Under 37 C.F.R. § 41.68

**Mail Stop "*Inter Partes* Reexam"**
ATTN: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

In response to Patent Owner's Appeal Brief filed May 6, 2014,[1] Requesters hereby timely file this Respondent Brief, together with the required fee set forth in 37 C.F.R. § 41.20(b)(2). If any additional fees are necessary to prevent abandonment of this reexamination proceeding, then any such fees required therefore are hereby authorized to be charged to our Deposit Account No. 19-0036.

---

[1] Proper service was not completed until May 13, 2014. The originally filed Appeal Brief included an incorrect attorney name and address in the Certificate of Service.

Willner *et al.*
Reexam Control No. 95/002,337

**TABLE OF CONTENTS**

I.     REAL PARTY IN INTEREST ........................................................................1

II.    RELATED APPEALS, INTERFERENCES, AND OTHER
PROCEEDINGS ..........................................................................................1

III.   STATUS OF CLAIMS ...................................................................................2

IV.   STATUS OF AMENDMENTS .......................................................................2

V.    SUMMARY OF CLAIMED SUBJECT MATTER .........................................2

VI.   ISSUES TO BE REVIEWED ON APPEAL ...................................................2

VII.  ARGUMENT.................................................................................................2

      A.     The Examiner Correctly Rejected Claims 50-56, 58-61, and 65 as
Indefinite. ...................................................................................2

      B.     The Examiner Correctly Rejected Claims 15 and 16 as Being Both
Anticipated and Obvious.............................................................4

            1.     Patton Anticipates Claims 15 and 16 Under 35 U.S.C. §
102(b)..........................................................................5

                  (a)    The '271 patent expressly states that the claimed
steps are not "limited to any particular order or
sequence." ...........................................................5

                  (b)    The claim language does not require a particular
order of steps...................................................6

            2.     Claims 15 and 16 are obvious over either Zawilinski in
view of Papadopoulos or Patton in view of Papadopoulos...........7

                  (a)    The Patent Owner fails to rebut the Examiner's
proper finding that Patton discloses the limitations
added by dependent claims 15 and 16. ...........................7

                  (b)    The Patent Owner fails to show that the plain and
ordinary meaning of "receiving" excludes mental
processes. ...........................................................8

                  (c)    Papadopoulos discloses receiving a notification
from an external source..................................................9

Willner *et al.*
Reexam Control No. 95/002,337

C.   The Examiner Correctly Rejected Claims 50-52 as Obvious over both Patton in view Teller and Zawilinski in view of Teller. ...............................9

D.   The Examiner Correctly Rejected Claims 53-56 and 58-61 as Obvious in view Bibl. ..........................................................................11

E.   The Examiner Correctly Rejected Claim 65 as Being Obvious. ...........................12

     1.   Claim 65 is obvious in view of Bibl. .......................................................12

     2.   Claim 65 is obvious in view of Teller......................................................14

F.   The Examiner Correctly Rejected Claim 79 as Being Obvious. ...........................15

G.   The Examiner Correctly Rejected Claim 95 as Being Obvious. ...........................17

H.   The Examiner Correctly Rejected Claims 98-99 as Being Obvious.....................18

I.   The Examiner Correctly Rejected Claim 124 as Being Obvious. .........................19

VIII.   CONCLUSION.................................................................................................22

IX.   EVIDENCE APPENDIX ...................................................................................23

X.   RELATED PROCEEDINGS APPENDIX ...........................................................25

XI.   CERTIFICATE OF COMPLIANCE WITH 37 C.F.R. § 1.943(c) WORD COUNT REQUIREMENT FOR A RESPONDENT'S BRIEF .......................................26

Appx846

## I.     REAL PARTY IN INTEREST

The real parties in interest are:

- Strava, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 901 Mission Street, San Francisco, California 94103;

- MapMyFitness, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 1810 Blake Street, Denver, Colorado 80202; and

- FitnessKeeper, Inc., a corporation formed under the laws of the State of Delaware, with its headquarters and principal business address at 60 Canal Street, Boston, MA 02114.

REQUESTERS' CORRESPONDENCE ADDRESS:

> Michael B. Ray, Esq.
> Sterne, Kessler, Goldstein & Fox, PLLC
> 1100 New York Ave., N.W.,
> Washington, DC 20005-3934.

## II.    RELATED APPEALS, INTERFERENCES, AND OTHER PROCEEDINGS

U.S. Patent No. 6,701,271 ("the '271 patent") is asserted in the following actions in the U.S. District Court for the District of Utah:

(1) *Icon Health & Fitness et al. v. Garmin Ltd. et al.*, Civil Docket No. 1:11-cv-00166-DB, filed November 11, 2011;

(2) *Icon Health & Fitness et al. v. Polar Electro Oy*, Civil Docket No. 1:11-cv-00167-PMW, filed November 11, 2011;

(3) *Icon Health & Fitness et al. v. FitnessKeeper, Inc.*, Civil Docket No. 1:11-cv-00173-CW, filed December 9, 2011;

- 1 -

**Appx847**

(4) *Icon Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB December 9, 2011; and

(5) *Icon Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW December 9, 2011.

These cases are pending before the district court, and no judgment has issued with respect to the validity of the claims of the '271 patent, the prior-art references, or any other issue set forth herein.

## III.   STATUS OF CLAIMS

Requesters do not dispute Patent Owner's statement regarding the status of the claims.

## IV.   STATUS OF AMENDMENTS

Requesters do not dispute Patent Owner's statement regarding the status of any amendments to the claims.

## V.   SUMMARY OF CLAIMED SUBJECT MATTER

Requesters do not dispute Patent Owner's statement regarding the summary of the claimed subject matter.

## VI.   ISSUES TO BE REVIEWED ON APPEAL

Requesters do not dispute Patent Owner's statement regarding the issues to be reviewed on appeal.

## VII.   ARGUMENT

### A.   The Examiner Correctly Rejected Claims 50-56, 58-61, and 65 as Indefinite.

The Examiner rejected claims 50-56, 58-61, and 65 as indefinite under 35 U.S.C. §112, second paragraph, because, according to the Examiner, "it is unclear if the scope of claim 50 is

- 2 -

**Appx848**

drawn to the **sub-combination** 'remote server' *alone*, or if the scope of claim 50 is drawn to a **combination** of a 'remote server' *and* a 'sensor database.'" (RAN at 4 (emphasis in original).) Claim 50 recites in part (emphasis added):

> A system for facilitating feedback, comprising:
>
> **a remote server including:**
>
>> a memory;
>>
>> a communication port . . .;
>>
>> a processor . . . ; and
>>
>> **a sensor database** accessible to said server. . . .

As drafted, claim 50 is susceptible to two alternative—and mutually exclusive—interpretations. According to a first interpretation, this claim appears to require a remote server that **includes** a sensor database, because this claim explicitly recites "a remote server including . . . a sensor database." (*See* RAN at 5.) According to an alternative interpretation, this claim appears to require a remote server **in combination with** an external sensor database, because this claim explicitly requires the sensor database to be "accessible to" the remote server. (*See id.*) These two interpretations cannot both be correct, however, because a sensor database cannot be both **included in** and **external to** a remote server.

This ambiguity in claim 50 could have been fixed by amending the claim in a multitude of possible ways. Yet the Patent Owner has not done so. And the specification fails to shed any light on which of these two mutually exclusive interpretations is correct. In fact, the Patent Owner argues that the specification would lead a skilled artisan to conclude that both of these contradictory interpretations of claim 50 are simultaneously correct. (*See* Appeal Br. at 9.) But reading this claim to encompass both interpretations defies logic because, again, a sensor database cannot be both **inside** and **outside** a remote server.

- 3 -

**Appx849**

Until recently, a patent claim would have satisfied 35 U.S.C. § 112, ¶ 2 "so long as the claim [wa]s 'amenable to construction,' and the claim, as construed, [wa]s not 'insolubly ambiguous.'" *Nautilus, Inc. v. Biosig Instruments, Inc.*, No. 13-369, Slip Op. at 1, __ U.S. __, __ (2014). But the Supreme Court recently held that this test "does not satisfy the statute's definiteness requirement." *Id.* According to the Supreme Court's newly adopted standard, the definiteness requirement under 35 U.S.C. § 112, ¶ 2 mandates that "a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Id.*, No. 13-369, Slip Op. at 11. This new heightened standard of definiteness is not satisfied when, as here, there is no way to "know what correction [to a claim] is necessarily appropriate or how the claim should be interpreted." *See Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1358 (Fed. Cir. 2003). Dependent claims 51-52, 53, 54-56, 58, and 59-61 carry the same deficiencies as independent claim 50 from which they depend. (*See* RAN at 5.) Accordingly, claims 50-56, 58-61, and 65 must be held invalid as indefinite.

**B.      The Examiner Correctly Rejected Claims 15 and 16 as Being Both Anticipated and Obvious.**

The Examiner rejected claims 15 and 16 on the following grounds:

- Under 35 U.S.C. § 102(b) as anticipated by Patton; and

- Under 35 U.S.C. § 103(a) as obvious over both (i) Zawilinksi in view of Papadopolous and (ii) Patton in view of Papadopolous.

Each of these rejections is proper, despite the Patent Owner's arguments to the contrary.

- 4 -

### 1.    *Patton Anticipates Claims 15 and 16 Under 35 U.S.C. § 102(b).*

The Examiner properly found that Patton anticipates claims 15 and 16, because Patton discloses each and every limitation of these claims. (RAN at 8.) The Patent Owner asserts that the Examiner's interpretation of Patton's "vehicle control panel" fails to meet the limitations of claims 15 and 16. (*See* Appeal Br. at 12.) But the Patent Owner's bald assertion—without any explanation—is insufficient to overturn this rejection.

In fact, the Patent Owner seems to recognize the insufficiency of its unsupported assertion and instead focuses its attack on Patton's alleged failure to "teach or suggest the sequence of steps that is required by claims 15 and 16." (Appeal Br. 11.) But, as explained below, neither the specification nor the claims require any specific sequence of steps.

> (a)    *The '271 patent expressly states that the claimed steps are not "limited to any particular order or sequence."*

The Patent Owner acknowledges that the sequence in which method steps are recited in a claim is **not** considered a limitation of the claim when "the written description suggests otherwise." (Appeal Br. at 11.) The written description of the '271 patent expressly states that the claims are not limited to "any particular order or sequence":

> In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in **one or more alternative orders or sequences** without departing from the scope of the present invention and the claims should **not be construed as being limited to any particular order or sequence, unless specifically indicated**.

('271 Patent, 14:25-31 (emphasis added).) Thus, the '271 patent itself disavows any required sequence or order in which the claimed steps must be performed.

Without rebutting this explicit disavowal, the Patent Owner cannot now argue that the steps of claims 15 and 16 must be performed in a particular order. Thus, the Examiner's rejection that Patton anticipates claims 15 and 16 should be affirmed.

> *(b)       The claim language does not require a particular order of steps.*

Neither claim 15 nor 16 requires that the steps be performed in any particular order. As such, it is improper to read a specific order into these method claims. *See Altiris Inc. v. Symantec Corp.*, 318 F.3d 1363, 1371, 65 USPQ2d 1865, 1869-70 (Fed. Cir. 2003) (holding that it was improper to read a specific order of steps into method claims where such an order was not required by the claim language).

Nonetheless, the Patent Owner asserts that "[t]he express language of claims 15 and 16 requires a certain order of steps" (Appeal Br. at 11), but fails to reference any such "express language" in support of its assertion. Instead, the Patent Owner's argument that these claims require a certain order of steps hinges on an impermissibly narrow interpretation of the term "regarding" as recited in these claims. According to the Patent Owner, the method steps must be performed in an order because the notification must be "of" an evaluation, implying that the evaluation must be ***completed*** before the notification can be provided. (*See* Appeal Br. at 12.) But  the claim requires only a notification "regarding" the evaluation, not a notification "of" the evaluation as the Patent Owner argues. A notification "regarding" the evaluation (as required by the claim) could refer to any notification related to the evaluation, whether completed or not.

- 6 -

Willner *et al.*
Reexam Control No. 95/002,337

Contrary to the Patent Owner's impermissibly narrow interpretation, and consistent with the broadest reasonable interpretation,[2] the Examiner properly found that Patton describes a notification *regarding* the evaluation. (ACP at 7 (emphasis added).) The Patent Owner fails to cite any portion of the '271 patent that supports its narrow interpretation of the claim language, and also fails to cite any portion of the '271 patent that is contrary to the Examiner's interpretation. Thus, the Examiner's rejection that Patton anticipates claims 15 and 16 should be affirmed.

### 2.    *Claims 15 and 16 are obvious over either Zawilinski in view of Papadopoulos or Patton in view of Papadopoulos.*

Requesters have shown in Claim Charts CC3 and CC4 that two different combinations of references render claims 15 and 16 obvious. The Examiner properly rejected these claims as obvious in view of both combinations of references. (RAN at 8.) The Patent Owner's attempts to overcome these rejections fail, for reasons set forth in more detail below.

#### (a)    *The Patent Owner fails to rebut the Examiner's proper finding that Patton discloses the limitations added by dependent claims 15 and 16.*

Requesters' claim charts show that both Papadopoulos and Patton disclose "selecting said device based, at least in part, on said selecting one of said plurality of options" (as required by claim 15) and "where said device is associated with at least one of said plurality of options" (as required by claim 16). (*See* Requesters' Claim Chart CC4.) These claim charts are incorporated by reference in the Examiner's obviousness rejection of these claims over Patton in view of Papadopoulos. (RAN at 8.)

---

[2] Patent claims in a reexamination proceeding in the USPTO are ordinarily given their broadest reasonable interpretation consistent with the patent disclosure. *In re Am. Acad. of Sci. Tech. Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004).

- 7 -

**Appx853**

Although the Patent Owner argues that ***Papadopoulos*** does not disclose the limitations added by claims 15 and 16 (Appeal Br. at 16 (emphasis added)), the Patent Owner fails to present any evidence or argument to rebut the Examiner's proper finding that ***Patton*** discloses these features. As such, the Patent Owner has no basis to assert that claims 15 and 16 are not obvious over Patton in view of Papadopoulos. Thus, the Examiner's rejection of claims 15 and 16 as obvious over Patton in view of Papadopoulos should be affirmed.

> (b)   *The Patent Owner fails to show that the plain and ordinary meaning of "receiving" excludes mental processes.*

The Patent Owner acknowledges that the '271 patent discloses both the concept of "determining" and the concept of "receiving a notification." According to the Patent Owner, however, only the concept of "determining" could be a mental step; the concept of "receiving a notification" could not. (Appeal Br. at 14-15.) But the Patent Owner fails to cite anything in the '271 patent to support this alleged dichotomy between "determining" and "receiving."

In fact, contrary to the Patent Owner's naked assertion, one of its own dictionaries shows that the process of "receiving" can be a mental step. Specifically, the American Heritage® Dictionary of the English Language defines "receive" as "11. **To perceive or acquire mentally:** receive a bad impression . . ." (Appeal Br., Exhibit 2 (emphasis added).) Nothing in the '271 patent or the other dictionary cited by the Patent Owner—the Microsoft Computer Dictionary— contradicts or excludes this plain and ordinary meaning of "receiving." As such, the plain and ordinary meaning of the term "receive" is consistent with the Examiner's proper findings that claims 15 and 16 are obvious over either Zawilinski in view of Papadopoulos or Patton in view of Papadopoulos.

Willner *et al.*
Reexam Control No. 95/002,337

       (c)     *Papadopoulos discloses receiving a notification from an external source.*

Even assuming for the sake of argument that the claimed "receiving a notification" cannot be satisfied by a mental step and the notification must be received from an external source (as the Patent Owner argues), Papadopoulos discloses this feature.

Papadopoulos discloses that a notification may be received from the audience:

> [T]he audience response is simultaneously displayed before the person or persons making the presentation so that the presenter may **respond to the audience's reaction** or modify his presentation accordingly or elicit information from the audience.

(Papadopoulos, 1:58-63 (emphasis added).) The "audience's reaction" (as disclosed by Papadopoulos) is an external notification that is received by the presenter. In response, the presenter may decide to proceed in a whole host of ways—i.e., the presenter has "a plurality of options" (as required by these claims). Accordingly, even if the Patent Owner's strained interpretation of "receiving a notification" is correct (which it is not), claims 15 and 16 are still obvious over either (i) Zawilinski in view Papadopoulos or (ii) Patton in view of Papadopoulos, as the Examiner properly found.

**C.    The Examiner Correctly Rejected Claims 50-52 as Obvious over both Patton in view Teller and Zawilinski in view of Teller.**

Requesters submitted claims charts CC1, CC2, and TCC, showing how claims 50-52 were obvious over either (i) Patton in view of Teller or (ii) Zawilinski in view of Teller. And this showing of obviousness was buttressed by the Koperda declaration. Incorporating Requesters' claim charts by reference, the Examiner rejected these claims for the reasons set forth by Requesters. (RAN at 11-14.) The Patent Owner asserts that these rejections are based on impermissible hindsight. (Appeal Br. at 16-17.) But the Patent Owner's mere attorney argument

- 9 -

is insufficient to rebut the record evidence that these claims are obvious. *See Monolithic Power Systems, Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1349-1350 (Fed. Cir. 2009) (explaining that "substantial evidence" regarding what a reference teaches cannot be rebutted by "attorney arguments").

It is undisputed that Teller discloses a database that stores data from sensor device. (*See* RAN at 13.) The Patent Owner argues, however, that the prior art does not disclose various database fields as recited in claims 50-52—such as, "a sensor identifier field that contains information for identifying said first and second sensors," "a sensor description field that contains information describing said first and second sensors," or "a sensor output field that contains information regarding a type, timing, or format of data provided by first and second sensors." (Appeal Br. at 16-17.) But whether the claims' exact wording for those database fields are expressly disclosed in the prior art is irrelevant. Instead, the proper inquiry is whether those fields would have been obvious.

The record evidence shows that they would have been obvious. Specifically, Requesters' expert, Mr. Koperda, opined that "[i]t would have been obvious to one skilled in the art to store the various sensor information in a sensor database having the aforementioned fields." (Koperda Dec, ¶ 24.) Mr. Koperda's opinion was based on the fact that Teller teaches receiving information or data from a variety of different sensors for different users, and storing that information in a database. (Teller, 4:14-30, 7:7-12, 9:63-67.) The Patent Owner offered no evidence to rebut this conclusion. Accordingly, the Examiner properly found that the allegedly "missing limitations are obvious because it is common practice to provide identifiers to each of the elements stored in a database so that data in a database can be quickly sorted, rearranged, retrieved . . . later." (RAN at 13.)

- 10 -

Because the Examiner's obviousness rejection of claims 50-52 is supported by the evidence of record, which has not been rebutted, this rejection should be affirmed.

### D. The Examiner Correctly Rejected Claims 53-56 and 58-61 as Obvious in view Bibl.

The Examiner rejected claims 53-56 and 58-61 under 35 U.S.C. § 103(a) as obvious over: (i) Patton in view of Bibl; and (ii) Zawilinski in view of Bibl. (RAN at 14-20.) The Patent Owner's mere attorney argument is insufficient to overcome the Examiner's rejection of these claims. *See Monolithic Power*, 558 F.3d at 1349-1350.

Claims 53-56 are directed to an "output database" accessible to a server, which the Examiner properly found was met by Bibl's disclosure. (RAN at 14-17.) The Patent Owner argues that "the elements recited in claims 53-56 . . . are very detailed and specific," and that "Bibl's disclosure . . . is not a disclosure of an 'output database.'" (Appeal Br. at 18-19.) The claims, however, are not as "detailed and specific" as the Patent Owner alleges. These claims recite nothing more than data fields having information that would naturally be included in any output database, and therefore would have been obvious in view of the prior art.

For example, Mr. Koperda opines that the claimed data fields would have been obvious in view of Bibl's disclosure. Mr. Koperda states:

> Bibl teaches a database to store data from multiple sensors for each of multiple users (Bibl, ¶¶0027, 0045, 0057-0058). It would have been obvious to one skilled in the art that, to properly store information, an output database having the aforementioned fields would be necessary.

(Koperda Dec ¶ 18; *see also id.*, ¶¶ 17, 19.) In response, the Patent Owner offers nothing but attorney argument that is insufficient to overcome the record evidence—i.e, Bibl's teachings and

Mr. Koperda's declaration—which supports the Examiner's obviousness rejection. *See Monolithic Power*, 558 F.3d at 1349-1350.

The Patent Owner made substantially similar arguments with respect to claims 58-61. These claims are directed to an "evaluation database" accessible to a server. (Appeal Br. 18-19.) Like the "output database" of claims 53-56, the "evaluation database" of claims 58-61 recites nothing more than data fields with information that would naturally be included in any evaluation database. And like claims 53-56, Mr. Koperda opined that it would have been obvious for a skilled artisan to include such data fields in a database. (Koperda Dec. ¶ 19.) The Patent Owner, again, offers nothing but attorney argument in the face of this record evidence. Based on the evidence of record, claims 53-56 would have been obvious to one skilled in art in view of Bibl, as the Examiner properly found.

**E.     The Examiner Correctly Rejected Claim 65 as Being Obvious.**

The Examiner rejected claim 65 under 35 U.S.C. § 103(a) as obvious over: (i) Patton in view of Bibl; (ii) Zawilinski in view of Bibl; (iii) Patton in view of Teller; and (iv) Zawilinski in view of Teller. Claim 65 adds the limitation that a processor "provide[s] a notification regarding said evaluation to a device, wherein said device includes a flash memory card." The Patent Owner attacks these rejections by arguing that Bibl and Teller fail to disclose or suggest the recited "flash memory card." As explained below, the Patent Owner is wrong.

*1.     Claim 65 is obvious in view of Bibl.*

The Examiner properly found that the flash memory card of claim 65 is obvious in view of the EEPROM disclosed by Bibl. (ACP at 18.) And the Examiner's finding is supported by the Koperda declaration. Mr. Koperda stated:

- 12 -

> Bibl discloses that a notification can be stored in memory (Bibl, ¶ 0051). It would have been obvious to a person skilled in the art that the memory could be a flash memory which is a type of EEPROM, which is also taught by Bibl as being capable of being used for storage.

(Koperda Dec. ¶ 20.) Thus, the Examiner's rejection is firmly grounded in the record evidence.

In response, the Patent Owner acknowledges that the clients disclosed by Bibl receive a notification, but asserts that neither of these clients are an "apparatus for performing operations" as required by claim 65. (Appeal Br. 20.) But Bibl expressly states that clients 130 and 170 may perform various operations, including "present[ing] feedback to the subscriber." (Bibl, claim 35.) Bibl further states that "clients 130 and 170 can be implemented as any device described above," including the apparatus for performing operations. (Bibl, ¶ 0035.)

The Patent Owner also contends that the claimed "device [that] includes a flash memory card" must be *outside* the claimed "server." (Appeal Br. 20 (emphasis added).) Under the broadest reasonable interpretation, however, the organization of claim 65 implies the exact opposite—the claimed "device" (which includes a flash memory card) is *inside* the claimed "remote server." (*See* RAN at 21.) Indeed, claim 65 expressly recites, in relevant part:

> a remote server including:
>
> . . .
>
> a processor . . . [that is] operative to:
>
> . . .
>
> provide a notification regarding said evaluation to a device [that] . . . includes a flash memory card."

Thus, contrary to the Patent Owner's contention, and as the Examiner properly found, the claimed "device" that includes "a flash memory card" does not have to be outside of the claimed "remote server." (*See* RAN at 21.)

The Patent Owner further contends that Bibl's disclosure of EEPROM does not encompass the claimed "flash memory card," because a skilled artisan "would have understood the term 'flash memory card' to mean a memory card that is easily removable from a host device." (Appeal Br. at 20.) But the Patent Owner points to nothing in claim 65 that would require this understanding of the term "flash memory card" under the broadest reasonable interpretation.

Moreover, even assuming that a skilled artisan would understand the claimed "flash memory card" to be one that is only easily removable from a host device (which a skilled artisan would not), EEPROM cards that were removable from a computer system were known and commercially available before the earliest effective filing date of the '271 patent. For example, Mr. Koperda explained that "Toshiba produced an EPROM based removable memory card for computer use at least as early as 1992." (Koperda Supp. Dec. ¶ 10; *see also id.* ¶ 14.)

For the foregoing reasons, the Examiner properly found that claim 65 is obvious in view of Bibl.

2.      ***Claim 65 is obvious in view of Teller.***

The Patent Owner acknowledges that Teller discloses "flash memory," but contends that "'flash memory' is not equivalent to or does not render obvious the recited 'flash memory card.'" (Appeal Br. 21.) The Patent Owner's contention, however, is contrary to record evidence.

A flash memory card is nothing more than a card that contains flash memory. Because flash memory existed in both card and non-card form before the earliest effective filing date of

- 14 -

the '271 patent (*see* Koperda Supp. Dec. ¶¶ 10, 14, 17), Teller's disclosure of flash memory makes obvious the use of any type of flash memory, whether or not it is implemented as a "card." Accordingly, the Examiner's rejection of claim 65 as obvious in view of Teller should be affirmed.

### F.   The Examiner Correctly Rejected Claim 79 as Being Obvious.

The Examiner rejected claim 79 under 35 U.S.C. § 103(a) as obvious over: (i) Patton in view of Bibl; (ii) Zawilinski in view of Bibl; (iii) Patton in view of Teller; and (iv) Zawilinski in view of Teller. Claim 79 adds the limitation that a processor "provide[s] a notification regarding said evaluation to a device, wherein said notification includes an XML transmission." The Patent Owner contends that neither Bibl nor Teller explicitly disclose "an XML transmission" as recited in this claim. But, as the Examiner properly found, the claimed "XML transmission" would have been obvious to a skilled artisan in view of Bibl's and/or Teller's disclosure.

The inventors of the '271 patent did not invent XML. Instead, the '271 patent merely lists XML as just one type of transmission protocol—among a whole host of other transmission protocols—that could potentially be used to provide a notification. (*See* '271 patent, 7:11-21, 8:38-45.) The '271 patent does not describe any novel or unexpected results by using XML over other types of transmission protocols. In fact, the Patent Owner itself acknowledged that "[o]f the communications protocols known at the time of filing, XML is but one example." (Response to ACP at 48.) As such, the Examiner properly found (RAN at 23) that the recited "XML transmission" is merely a design choice that would have been obvious in view of Bibl's and Teller's disclosures. *See In re Kuhle*, 526 F.2d 553, 555 (CCPA 1975) ("Use of such a means of electrical connection in lieu of those used in the references solves no stated problem and would be an obvious matter of design choice within the skill of the art.").

- 15 -

In response, the Patent Owner argues that XML is not a design choice because, according to the Patent Owner, "[t]he structure and function of XML is completely different from HTML and HTTP." (Appeal Brief at 22.) Yet none of these alleged differences is described in the '271 patent. Nor does the '271 patent explain how these alleged differences would lead to any benefit by using "an XML transmission." As such, the recitation of "an XML transmission" is "nothing more than the 'combination of familiar elements according to known methods,' 'each performing the same function it had been known to perform,' [and] 'yielding predictable results.'" *Randall Mfg. v. Rea*, 733 F.3d 1355, 1363 (Fed. Cir. 2013) (quoting *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416-17 (2007)). Because Requesters presented a prima facie case of obviousness and because the Patent Owner did not point to any objective indicia of non-obviousness to rebut that prima facie case, the Examiner properly rejected claim 79 as obvious. *See Randall*, 733 F.3d at 1363.

Further, the alleged differences between HTTP and HTML, on the one hand, and XML, on the other, are unsupported by any record evidence. Indeed, the Patent Owner does not cite any articles, patents, or expert declarations to support its assertion regarding such alleged differences. By contrast, the Examiner relied on the record evidence to support his determination that the recited "XML transmission" is merely a design choice. For example, Mr. Koperda opined:

> XML is a preferred solution when data is sent and retrieved for a
> database. . . . It would have been obvious to one skilled in the art at
> the time of filing to use XML for communication with a database.

(Koperda Dec. ¶ 16.)

The Patent Owner tries to discredit Mr. Koperda's opinion, arguing that "claim 79 does not require a database." (Appeal Br. 22-23.) But whether or not claim 79 requires a database is

- 16 -

**Appx862**

irrelevant. The presence of a database would not destroy the purpose of the system recited in claim 79. Nor does the Patent Owner argue that it would.

The Patent Owner also tries to discredit Mr. Koperda's opinion as indefinite, asserting that "Mr. Koperda does not identify which technology XML is 'advantageous' over, rendering this statement indefinite." (Appeal Br. at 23.) That assertion is without merit. Mr. Koperda explained:

> An **advantage** of XML is that it provides a description of the data (name, format, range value) and then the data. Because the data is 'tagged' it makes it easy to share the data between dissimilar systems.

(Koperda Dec. ¶ 16 (emphasis added).) Given the context of these statements, the "advantage" referenced by Mr. Koperda is clearly over any technology that does not provide "tagged" data.

The Patent Owner also argues that "Mr. Koperda's statements make no mention of Bibl or Teller, and do not even attempt to explain which teachings of Bibl or Teller it would have been obvious to modify." (Appeal Br. at 22.) But Mr. Koperda expressly states that "XML is a preferred solution when data is sent and retrieved for a database." (Koperda Decl. ¶ 16.) As noted above with respect to claims 49-52, 53-56, and 58-61, Bibl and Teller both describe the use of databases with their servers. Consequently, it would have been obvious to use XML transmissions in both Bibl and Teller, as Mr. Koperda opined and the Examiner properly found.

### G.    The Examiner Correctly Rejected Claim 95 as Being Obvious.

The Examiner rejected claim 95 under 35 U.S.C. § 103(a) as obvious over: (i) Patton in view of Teller; and (ii) Zawilinski in view of Teller. Claim 95 adds the limitation that a processor "receives[s], over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense

- 17 -

said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data, wherein said processor is operative to **receive said first and second data simultaneously from said first and second subjects**" (emphasis added).

In the RAN, the Examiner withdrew a previous rejection based on Bibl, explaining that "the fact that **a server** may receive data from multiple devices does not imply or make obvious simultaneous reception of data from multiple devices." (RAN at 25 (emphasis added).) The Examiner, however, maintained a rejection based on Teller, explaining that "Teller teaches a server which includes **multiple middleware servers** . . . network storage . . . data transmitted over the Internet, [and] **collecting data devices**," and that "[t]he existence of these **devices** in a system clearly implies, or at least suggests, that the server receives data from multiple devices simultaneously." (*Id.* (emphasis added).)

The Patent Owner argues that the Examiner's rejection based on Teller conflicts with the Examiner's decision to withdraw the rejection based on Bibl. (Appeal Br. at 23.) But the Patent Owner ignores the fact that Teller does not have a **single** server receiving information, like Bibl. Instead, Teller discloses **multiple** servers equipped to simultaneously receive information over the Internet, and Teller further discloses load balancers that facilitate the simultaneous receipt of information. (*See* Teller, 9:53-62.) Accordingly, the Examiner properly found that "[i]t is obvious that allowing simultaneous data reception from multiple devices would improve the efficiency of the system." (RAN at 25.)

### H.    The Examiner Correctly Rejected Claims 98-99 as Being Obvious.

The Examiner rejected claims 98-99 under 35 U.S.C. § 103(a) as obvious over: (i) Patton in view of Teller; and (ii) Zawilinski in view of Teller. Claim 98 adds the limitation that a

- 18 -

Willner *et al.*
Reexam Control No. 95/002,337

"processor [is] operative to determine whether first subject is in need of a break." And claim 99 adds the limitation that the processor is "further operative to provide a notification to [a] device concerning whether the subject is in need of a break."

The Patent Owner admits that Teller discloses a processor that is operative to determine whether a user is "in need of sleep," but argues that this disclosure does not make obvious a processor that is operative to determine whether a subject is "in need of a break," as recited in claim 99. (Appeal Br. 24.) According to the Patent Owner, "[d]efining the term 'break' to mean 'sleep' would be an unreasonably broad construction." (Appeal Br. 25.) But Patent Owner's assertion is contrary to the teachings of the '271 patent.

The '271 patent discloses that "the evaluation determined during the step 104 may indicate that a break or interruption is needed so that the subjects can stretch their legs, use the restroom, **overcome boredom or fatigue**, etc." ('271 Patent, 6:13-17 (emphasis added).) One of the most well-known ways to "overcome . . . fatigue" is to sleep. And none of the dictionary definitions proffered by the Patent Owner exclude the commonsense notion that "sleep" is an example of a type of "break."[3] Indeed, the Examiner properly found that going to sleep is a type of break that may overcome boredom or fatigue. (RAN at 28.)

## I.   The Examiner Correctly Rejected Claim 124 as Being Obvious.

The Examiner rejected claim 124 under 35 U.S.C. § 103(a) as obvious over: (i) Patton in view of Bibl; (ii) Zawilinski in view of Bibl; (iii) Patton in view of Teller; and (iv) Zawilinski in view of Teller. Claim 124 adds the limitation that a "first sensor is operative to transmit said first

---

[3] The Patent Owner's Exhibit 2 only includes a portion of the dictionary definition of "break." The Patent Owner did not provide any explanation as to why it chose to exclude the remainder of that definition.

data to a local first user device over a **Bluetooth wireless communication link**" (emphasis added).

The inventors of the '271 patent did not invent Bluetooth technology. Instead, as the Examiner explained, such technology was known in the art and was included in, for example, Motorola headsets. (RAN at 29-30.) Accordingly, the Examiner properly found claim 124 to be obvious.

The Patent Owner argues, however, that there may have been design considerations as to why "other forms of wireless data transmission would have been **preferred** over Bluetooth for the applications." (Appeal Br. at 26 (emphasis added).) In particular, the Patent Owner asserts that "Bluetooth devices were not suitable for small battery-powered handheld or portable applications." (*Id.*)

That assertion, however, is not only unsupported by any documentary evidence, but is also directly contracted by evidence that is already of record. Specifically, Mr. Koperda stated:

> The Motorola headset is a **small, battery-powered, hand-held device** that used Bluetooth technology.

(Koperda Supp. Dec. ¶ 21 (emphasis added) (citing Motorola Bluetooth Wireless Headset User Guide).) As such, the Patent Owner's attorney argument that Bluetooth technology would not have been suitable for small, battery-powered, handheld devices is directly refuted by evidence of record. *See Monolithic Power*, 558 F.3d at 1349-1350.

The Patent Owner also alleges that "Bluetooth was expensive relative to other forms of wireless data transmission technologies." (Appeal Br. 26.) The Patent Owner's allegation is again unsupported by any documentary evidence, and is directly contracted by the Bluetooth Whitepaper cited by Mr. Koperda. Mr. Koperda stated:

- 20 -

**Appx866**

> The Bluetooth concept offers several benefits compared with other techniques. The main advantages of Bluetooth are: The minimal hardware dimensions. **The lower price on Bluetooth components. The low power consumption for Bluetooth connections**.

(Koperda Supp. Dec. ¶ 23 (emphasis added).) As such, the Patent Owner's argument regarding the expense of Bluetooth is without merit.

Without providing any support for its opinion, and without citing to a single sentence of Teller or Bibl, the Patent Owner also asserts that "Teller and Bibl teach away from the use of Bluetooth." (Appeal at 26.) But the Patent Owner failed to show that, upon reading Teller and Bibl, a skilled artisan "would be discouraged from following the path set out in the[se] reference[s], or would be led in a direction divergent from the path that was taken by the applicant." *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994). In fact, Mr. Koperda provided substantial evidence to the contrary. He stated:

> [I]t was obvious for one skilled in the art to use the Bluetooth technology as the wireless connection technology between the first sensor and the first device as stated in the system of Claim 124 . . . because it was low power, low cost, and low weight.

(Koperda Supp. Dec. ¶ 30.)

There are no additional design considerations cited by the Patent Owner that would cause one of ordinary skill in the art to choose any other technology over Bluetooth. But even if the Patent Owner's allegations are accepted as true (which they are not), the fact that there may have been design considerations that would have caused a skilled artisan to **prefer** one technology over another, does not make the recitation of Bluetooth unobvious. The Patent Owner does not— and cannot—dispute the fact that Bluetooth was widely known as of the earliest effective filing

- 21 -

date. *See Kuhle*, 526 F.2d at 555. As such, the Examiner properly found that this technology would have been obvious.

## VIII. CONCLUSION

Based on the above, Requester respectfully submits that the rejections of claims 15, 16, 50-56, 58-61, 65, 79, 95, 98, 99, and 124 of the '271 patent should be affirmed by the Board.

If necessary, the U.S. Patent and Trademark Office is hereby authorized to charge any fee deficiency, or credit any overpayment, to Deposit Account No. 19-0036.

Service of this paper has been made on Patent Owner's attorneys. The proof of said service is attached.

Respectfully submitted,

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

Michael B. Ray, Reg. No. 33,997

Jonathan Tuminaro, Reg. No. 61,327

Harish Ruchandani, Reg. No. 58,770
Attorneys for Third-Party Requesters

Date: 6/6/14

1100 New York Avenue, N.W.
Washington, D.C. 20005-3934
(202) 371-2600
FINAL Respondent Brief (as of 6 JUNE 2014).DOC

- 22 -

**Appx868**

Willner *et al.*
Reexam Control No. 95/002,337

## IX.   EVIDENCE APPENDIX

Pursuant to 37 C.F.R. § 41.67(c)(1)(ix), the following statement sets forth where

evidence relied upon in this appeal was entered in the record by the Office.

No extrinsic evidence is relied upon for this Brief. Exhibits 1-10 were previously

submitted with Requesters' Appeal Brief filed on May 7, 2014.  To avoid unnecessary

duplication only Exhibits 11-16 are provided herewith.

| Ex. | Short Description | Entered Into Record |
|---|---|---|
| Ex. 1 | Right of Appeal Notice (RAN) | Entered by Examiner on January 23, 2014 |
| Ex. 2 | Action Closing Prosecution (ACP) | Entered by Examiner on August 12, 2013 |
| Ex. 3 | U.S. Patent No. 6,292,688 B1 to Patton | Submitted by Patent Owner on September 14, 2012, and entered by the Examiner in the Non-Final Office Action issued December 7, 2012 |
| Ex. 4 | U.S. Patent Appl. Pub. No. 2002/0111541 to Bibl, *et al.* | Submitted by Requesters on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |
| Ex. 5 | U.S. Patent No. 5,676,138 to Zawilinski | Submitted by Patent Owner on September 14, 2012, and entered by the Examiner in the Non-Final Office Action issued December 7, 2012 |
| Ex. 6 | U.S. Patent No. 6,605,038 B1 to Teller *et al.* | Submitted by Requesters on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |
| Ex. 7 | Patent Owner Response to ACP | Submitted by Patent Owner on September 12, 2013, and entered by the Examiner in the RAN issued January 23, 2014 |
| Ex. 8 | Requesters' Comments After ACP | Submitted by Requesters on October 15, 2013, and entered by the Examiner in the RAN issued January 23, 2014 |

- 23 -

| Ex. 9 | Requesters' Comments to PO Response After Non-Final | Submitted by Requesters on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |
|---|---|---|
| Ex. 10 | Declaration of Frank Koperda | Submitted by Requesters on April 8, 2013, and entered by the Examiner in the ACP issued August 12, 2013 |
| Ex. 11 | Supplemental Declaration of Frank Koperda | Submitted by Requesters on October 15, 2013, and entered by the Examiner in the RAN issued January 23, 2014 |
| Ex. 12 | Claim Chart 1 (CC1) | Submitted by Requesters on September 14, 2012, and entered by the Examiner in the Non-Final Action issued December 7, 2012 |
| Ex. 13 | Claim Chart 2 (CC2) | Submitted by Requesters on September 14, 2012, and entered by the Examiner in the Non-Final Action issued December 7, 2012 |
| Ex. 14 | Claim Chart 3 (CC3) | Submitted by Requesters on September 14, 2012, and entered by the Examiner in the Non-Final Action issued December 7, 2012 |
| Ex. 15 | Claim Chart 4 (CC4) | Submitted by Requesters on September 14, 2012, and entered by the Examiner in the Non-Final Action issued December 7, 2012 |
| Ex. 16 | Teller Claim Chart (TCC) | Submitted by Requesters on April 8, 2013 as Appendix to Requesters' Comments to PO Response After Non-Final, and entered by the Examiner in the ACP issued August 12, 2013 |

Willner *et al.*
Reexam Control No. 95/002,337

X.     **RELATED PROCEEDINGS APPENDIX**

The above-referenced patent is being asserted in the following suits:

(1) *Icon Health & Fitness et al. v. Garmin Ltd. et al.*, Civil Docket No. 1:11-cv-00166-DB, filed November 11, 2011, which is pending;

(2) *Icon Health & Fitness et al. v. Polar Electro Oy*, Civil Docket No. 1:11-cv-00167-PMW, filed November 11, 2011, which is pending;

(3) *Icon Health & Fitness et al. v. FitnessKeeper, Inc.*, Civil Docket No. 1:11-cv-00173-CW, filed December 9, 2011, which is stayed;

(4) *Icon Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB December 9, 2011, which is stayed; and

(5) *Icon Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW December 9, 2011, which is stayed.

**XI.   CERTIFICATE OF COMPLIANCE WITH 37 C.F.R. § 1.943(c) WORD COUNT
REQUIREMENT FOR A RESPONDENT'S BRIEF**

The foregoing Third-Party Requesters' Respondent Brief under 37 C.F.R. § 41.68

contains 6,682 words, excluding the parts exempted by 37 C.F.R. § 1.943(c), as counted by

Microsoft® Word 2010.

6/6/14

Michael B. Ray
Registration No. 33,997

- 26 -

**Appx872**

# EXHIBIT 32

Via eFILE                                                REEXAMINATION
                                Attorney Docket No.: I1618.10003US01


## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

*Inter Partes*
Reexamination of:        U.S. Patent No. 6,701,271

Control No.:             95/002,337                           Art Unit
                                                              3992
Inventor:                Willner, Barry E., et al.

Filed:                   September 14, 2012

For:                     METHOD AND APPARATUS FOR USING PHYSICAL
                         CHARACTERISTIC DATA CONLLECTED FROM TWO
                         OR MORE SUBJECTS

Examiner:                Nguyen, Minh T.

Customer No.:            97149

Confirmation No:         1254

### PATENT OWNER'S RESPONDENT BRIEF UNDER 37 C.F.R. § 41.68


**Mail Stop: Inter Partes Reexamination**
Attn: Central Reexamination Unit
P.O. Box 1450
Alexandria, VA 22313-1450


Dear Sir:

        Patent Owner ("PO") files this Respondent Brief, which responds to the issues raised in the

Appeal Brief filed by the Third Party Requester ("TPR") on May 7, 2014, in the *inter partes*

reexamination proceeding for U.S. Patent No. 6,701,271 ("the '271 Patent").  The Director is further

authorized to charge any additional fees that may be due, or credit any overpayment of same to Deposit

Account No. 50-5394.

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

**TABLE OF CONTENTS**

I.      REAL PARTY IN INTEREST ............................................................................... 3

II.     RELATED APPEALS AND INTERFERENCES ................................................. 3

III.     STATUS OF CLAIMS ........................................................................................... 3

IV.     STATUS OF AMENDMENTS ............................................................................. 3

V.      SUMMARY OF CLAIMED SUBJECT MATTER ............................................. 4

    A.   Summary of Independent Claim 47 .................................................................... 4

    B.   Overview of Treatment of Claim 47 During the Reexamination Proceeding ..................... 4

VI.     ISSUES TO BE REVIEWED ON APPEAL ....................................................... 4

VII.     ARGUMENT .......................................................................................................... 4

    A.   Background ........................................................................................................... 4

    B.   TPR's Claim Construction Argument Is Unsupported And Irrelevant .................. 5

       *1. PO does not propose and Examiner does not adopt any claim construction that violates the BRI standard.* .................................................................................. 6

       *2. Even under TPR's proposed construction, the cited references do not render claim 47 obvious.* .. 7

    C.   The Recited Limitations Of Claim 47 Are Not Disclosed In The Cited Art And Mr. Koperda's Declaration Is Insufficient To Establish "Record Evidence" That These Limitations Were Known In The Prior Art ................................................................................................ 7

       *1. Neither Bibl nor Teller disclose, either expressly or inherently, the Remote Server Internal Clock Limitation.* ............................................................................... 8

       *2. Mr. Koperda's statements are insufficient to establish "record evidence" that the Remote Server Internal Clock Limitation was a known prior art element.* ................................. 10

    D.   The Allowance Of Claim 47 Should Be Maintained Because TPR's Identification Of A Motivation To Combine Was Untimely And Improper ................................................ 12

       *1. TPR did not identify any motivation to combine in its proposed rejection of claim 47.* ................ 12

       *2. TPR was not statutorily entitled to supplement its proposed rejection of claim 47 with a post-ACP identification of a motivation to combine.* ............................................... 14

       *3. Even if the motivation identified by TPR is considered, it is improper because it is based on speculation, unfounded assumptions, and hindsight reconstruction.* ........................... 15

    E.   The Cited References Teach Away From Claim 47 ............................................ 16

VIII.    CLAIMS APPENDIX ......................................................................................... 19

IX.     EVIDENCE APPENDIX .................................................................................... 20

X.      RELATED PROCEEDINGS APPENDIX ......................................................... 21

XI.     CERTIFICATE OF SERVICE ........................................................................... 22

2

**Appx875**

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

## I.    REAL PARTY IN INTEREST

By virtue of the Assignment recorded April 13, 2011, at Reel 026120, Frame 0528, the real party in interest is ICON Health & Fitness, Inc., PO and Respondent.

## II.    RELATED APPEALS AND INTERFERENCES

The '271 Patent is currently involved in the following judicial proceedings:

- ICON Health & Fitness, Inc. v. Strava, Inc.
  Civil Action No.: 1:11-cv-00175
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. FitnessKeeper, Inc.
  Civil Action No.: 1:11-cv-00173
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. MapMyFitness, Inc.
  Civil Action No.: 1:11-cv-00174
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. Polar Electro Oy et al
  Civil Action No.: 1:11-cv-00167
  U.S. District Court, District of Utah
- ICON Health & Fitness, Inc. v. Garmin Ltd., et al
  Civil Action No.: 1:11-cv-00166
  U.S. District Court, District of Utah

No final decisions have been rendered in any of these cases.  PO is not aware of any other prior or pending appeals, interferences or judicial proceedings that may have a bearing on the Board's decision in the pending appeal.

## III.    STATUS OF CLAIMS

PO accepts TPR's statement of the Status of Claims.

## IV.    STATUS OF AMENDMENTS

PO accepts TPR's statement of the Status of Amendments.

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

## V.     SUMMARY OF CLAIMED SUBJECT MATTER

### A.     Summary of Independent Claim 47

PO accepts TPR's Summary of independent claim 47.  PO notes, however, that TPR's references to the drawings and written description of the '271 Patent do not represent an exhaustive identification of specification support for the identified claim limitations.  To the extent that TPR represents that the support identified is exhaustive, PO disputes its assertion.

### B.     Overview of Treatment of Claim 47 During the Reexamination Proceeding

PO disputes TPR's assertion that "[t]he Examiner properly rejected claim 47 in the ACP as obvious[.]"  (TPR Appeal Brief at 12.)  Contrary to TPR's assertion, the Examiner properly allowed claim 47 in the Right of Appeal Notice ("RAN").

## VI.    ISSUES TO BE REVIEWED ON APPEAL

PO accepts TPR's statement of the Issues to be Reviewed on Appeal.  PO notes, however, that in TPR's Notice of Appeal, TPR purports to appeal the Office's decision not to maintain certain rejections of claims 50-52, 53-56, 58-61, 95, and 98-99.  In its Appeal Brief, TPR chose to only argue the withdrawn rejections of claim 47. Because TPR elected not to include in its Appeal Brief any argument directed to claims 50-52, 53-56, 58-61, 95, or 98-99, TPR appears to have waived its right to appeal the Office's decision not to maintain the rejections of these claims that TPR identified in its Notice of Appeal.

## VII.   ARGUMENT

With regard to the issues that TPR presents for review in this appeal, PO disputes TPR's contentions. The errors in TPR's argument are specified hereafter.

### A.     Background

TPR initiated the present *inter partes* reexamination by filing its request for reexamination on September 14, 2012 ("Reexamination Request"). The Reexamination Request was granted in an Order mailed on December 7, 2012. On that same day, a non-final Office Action was mailed (Non-Final Office Action). PO responded to the Non-Final Office Action on March 7, 2013 ("PO's 3/7/13 Response"). TPR filed its comments to PO's 3/7/13 Response on April 8, 2013 ("TPR's 4/8/13 Comments"). An Action

4

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

Closing Prosecution was mailed on August 12, 2013 ("ACP").  PO responded to the ACP on September 12, 2013 ("PO's 9/12/13 Response"). TPR filed its comments to PO's 9/12/13 Response on October 15, 2013 ("TPR's 10/15/13 Comments").   A Right of Appeal Notice was mailed on January 23, 2014 ("RAN").

PO added new claim 47 (the allowance of which TPR appeals) in PO's 3/7/13 Response to the Non-Final Office Action. In TPR's 4/8/13 Comments (in which it responded to PO's 3/7/13 Response), TPR proposes four separate obviousness rejections for claim 47. To support its four proposed rejections, TPR relies on disclosures from *Bibl* and *Teller*, which teach placing time stamps on data by a collecting device before the data is sent to a server. TPR also relies on a declaration of Frank Koperda, who states that "[p]rior to the filing date of the '271 patent, common hardware platforms . . . normally had a hardware clock." (At ¶ 14.) Mr. Koperda also states that "major operating systems . . . implemented the functions of utilizing a clock to maintain an accurate time and date for the server, create time stamps for data, notifications and other communications received or sent by the server." (*Id.*)

Based on the disclosures contained in *Bibl* and *Teller* and the statements of Mr. Koperda, TPR asserts that "[i]t would have been obvious at the time of the invention for a server to use an internal clock element that maintains a time and date for a server." (TPR's 4/8/13 Comments at 33.) PO disagrees. The allowance of claim 47 should be maintained.

### B.      TPR's Claim Construction Argument Is Unsupported And Irrelevant

TPR argues that the Examiner has failed to apply the broadest reasonable interpretation ("BRI") standard to claim 47 by requiring that the recited timestamp be "applied to a certain type of data" and that based on this erroneous construction, the prior art is improperly distinguished. (Appeal Brief at 15.) TPR is wrong on both counts. First, PO does not propose and the Examiner does not adopt the claim construction that TPR asserts violates the BRI standard. Second, the cited prior art does not teach or otherwise disclose the recited limitations of claim 47 ***even under TPR's proposed construction***, thus making this claim construction issue irrelevant to the proposed rejections of claim 47.

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

        *1.      PO does not propose and Examiner does not adopt any claim construction that*
        *violates the BRI standard.*

      TPR argues that PO proposes, and the Examiner adopts, a construction of claim 47 that **requires** the remote server to affix timestamps on data that it receives from a personal capture device. (Appeal Brief at 16.) TPR argues that under the BRI, "the claim language does not require that the data that is timestamped at the server is the same data received from the sensors[.]" (*Id.*)

      The only evidence that TPR cites to support its assertion that PO has proposed this construction and that the Examiner has adopted it is in Footnote 1 to TPR's Appeal Brief. In that single footnote, TPR quotes PO's statement that "Bibl does not disclose that the web server is capable of creating time stamps for data, notifications, or other communications received from a personal data capture device." TPR also quotes the Examiner's statement that "[n]ow the question is whether the combination of Patton and Bibl or the combination of Zawilinski and Bibl suggests . . . to add an internal clock element to the server to create timestamps for data, notifications in addition to the timestamp provided by the personal capture device." Based on these statements, TPR asserts that both PO and the Examiner "incorrectly interpret the language of claim 47 to require that data that is timestamped by the server be the **same data** as the sensor data sent to the server[.]"(*Id.*)

      Despite this assertion, PO does not propose and the Examiner does not adopt a construction that requires that data that is timestamped by the server be the **same data** as the sensor data sent to the server. PO and Examiner focus their comments on data that is sent from the personal capture device to the remote server **because this is the data from the cited prior art references that TPR identifies in its proposed rejection for claim 47**. (*See* TPR's 4/8/13 Comments at 26; BCC, A43; TCC, A34.) Thus, in the statements that TPR quotes in Footnote 1 of its Appeal Brief, both PO and Examiner are simply pointing out the deficiencies in TPR's proposed rejection of claim 47. Specifically, PO and the Examiner point out that the data that is timestamped by a personal capture device and then sent to a remote server (which PO acknowledges is disclosed by the cited prior art references) is insufficient to render claim 47 obvious. These statements should not be taken as a proposal or adoption of any construction of claim 47.

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

Indeed, PO does not disagree with TPR that claim 47 does not **require** that the data that is timestamped at the remote server be the same data that is received from the personal capture devices. This distinction, however, makes absolutely no difference to the proposed rejections because the cited references do not disclose a remote server that places timestamps on **any data**, including data that is not received from a personal capture device.

>    2.   *Even under TPR's proposed construction, the cited references do not render claim 47 obvious.*

TPR argues (referring to the limitation that it claims is improperly construed) that "[t]he Examiner then used that limitation to distinguish the prior art." (Appeal Brief at 15.) PO disagrees. The prior art is distinguishable even under TPR's proposed construction. Indeed, the cited prior art does not disclose a remote server having an internal clock or placing timestamps on **any** incoming data. TPR does not argue otherwise. Rather, TPR asserts that "[u]nder a proper interpretation of claim 47," a person having ordinary skill in the art ("PHOSITA") "**would have understood that the server of Bibl is capable of** maintaining a time and date, creating timestamps for data received at the server, and creating timestamps for data provided by the server." (Appeal Brief at 18 (emphasis added).) Thus, even if the limitations of claim 47 could be met by a remote server that timestamps data other than the data received from a personal capture device, the cited references would still fail to render claim 47 obvious because the cited art does not disclose or otherwise teach a remote server that affixes timestamps to **any** incoming data.

>    **C.   The Recited Limitations Of Claim 47 Are Not Disclosed In The Cited Art And Mr. Koperda's Declaration Is Insufficient To Establish "Record Evidence" That These Limitations Were Known In The Prior Art**

"Record evidence" is required to support an assertion that structural elements of a claim are known prior art elements for an obviousness rejection. *K/S HIMPP v. Hear-Wear Technologies, LLC*, Appeal 2013-1549 at *6 (Fed. Cir. May 27, 2014). Consistent with the requirement that record evidence be present, the Examiner holds that each element of claim 47 "must . . . exist and [be] positively identified." (RAN at 11.)

7

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

In the present case, TPR has not provided "record evidence" of a system, as recited in claim 47, for facilitating feedback, comprising a remote server that includes, *inter alia*:

> an internal clock element that is operative to maintain a time and date for said server, wherein said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification[1] provided by said server.

(Hereafter the "Remote Server Internal Clock Limitation.")

Neither *Bibl* nor *Teller* discloses the Remote Server Internal Clock Limitation either expressly or inherently. Further, the statements of Mr. Koperda are insufficient to establish "record evidence" that the Remote Server Internal Clock Limitation was known in the prior art.

> 1.    *Neither Bibl nor Teller disclose, either expressly or inherently, the Remote Server Internal Clock Limitation.*

PO does not dispute that *Bibl* and *Teller* both disclose the presence of an internal clock in, and placement of time stamps by, devices that collect data indicative of a physical characteristic. However, neither *Bibl* nor *Teller* disclose the presence of an internal clock ***at a remote server that receives data from sensors***. Specifically *Bibl* does not disclose that ***the web server*** is capable of creating time stamps for data, notifications, or other communications received from ***any*** source. Similarly, *Teller* also does not disclose that ***the central monitoring*** unit is a server that is capable of creating time stamps for data, notifications, or other communications received from ***any*** source. Further, neither *Bibl* nor *Teller* disclose placing any time stamps on any notifications sent out by the web server (*Bibl*) or the central monitoring unit (*Teller*).

TPR does not dispute that *Bibl* fails to explicitly disclose the Remote Server Internal Clock Limitation. Rather, TPR cites to *Bibl's* disclosure of the web server receiving "information at various times from various sources" to support the conclusion that "it would have been obvious to a PHOSITA

---

[1] The term "said notification" refers to the notification regarding an evaluation of data received from a first and second sensor that is indicative of a physical characteristic of a first and second subject. The evaluation is required to be "representative of a state associated with both said first subject and said second subject." (*See* claim 47.)

8

that the web server of Bibl . . . could have included the capability to timestamp data." (Appeal Brief at 19.) The cited portions of *Bibl* do not teach the Remote Server Internal Clock Limitation and TPR's conclusory statement of what would have been obvious to a PHOSITA are insufficient to establish obviousness. *K/S HIMPP v. Hear-Wear Technologies, LLC*, Appeal 2013-1549 at *6 (Fed. Cir. May 27, 2014) ("The determination of patentability of claims with this limitation therefore requires a core factual finding, and as such, requires more than a conclusory statement from [the Requester].").

TPR also does not dispute that *Teller* fails to explicitly disclose the Remote Server Internal Clock Limitation. Rather, TPR states "Teller does, however, disclose time stamping data (Teller, 7:66-67 and 8:1-8), and under the required BRI of claim 47, it would have been obvious to a PHOSITA that . . . the central monitoring unit (CMU) of Teller would have had an internal clock and the ability to time stamp data as recited in claim 47." (Appeal Brief and 19.) The cited portions of *Teller* do not disclose that the CMU timestamps incoming or outgoing data. Rather, these cited portions of *Teller* disclose timestamping data by **sensor device 10** and uploading that data to central monitoring unit 30. Thus, the cited portions of *Teller* do not teach the Remote Server Internal Clock Limitation and TPR's conclusory statement of what would have been obvious to a PHOSITA are insufficient to establish obviousness. *K/S HIMPP v. Hear-Wear Technologies, LLC*, Appeal 2013-1549 at *6 (Fed. Cir. May 27, 2014) ("The determination of patentability of claims with this limitation therefore requires a core factual finding, and as such, requires more than a conclusory statement from [the Requester].").

The Remote Server Internal Clock Limitation is also not inherently disclosed by either *Bibl* or *Teller*. TPR asserts that the Examiner has improperly applied an anticipatory-type inherency standard in its obviousness analysis, thereby committing "legal error." (Appeal Brief at 20-22.) PO disagrees. Considering not only what *Bibl* and *Teller* expressly disclose, but also their inherent disclosure is necessary because "[t]he express, implicit, and inherent disclosures of a prior art reference may be relied upon in the rejection of claims under 35 U.S.C. 102 or 103." MPEP § 2112; *see also In re Napier*, 55 F.3d 610, 613, 34 USPQ2d 1782, 1784 (Fed. Cir. 1995).

9

In the RAN the Examiner finds that the Remote Server Internal Clock Limitation is not inherently disclosed by either *Bibl* or *Teller* based on a statement made by TPR's expert, Mr. Koperda. According to Mr. Koperda, "[p]rior to the filing date of the '271 patent, common hardware platforms . . . **normally** had a hardware clock." (Koperda Dec., ¶ 14, emphasis added.) Mr. Koperda's statement acknowledges that common hardware platforms did not **always** include a hardware clock. Thus, in addition to failing to expressly disclose the Remote Server Internal Clock Limitation, *Bibl* and *Teller* also fail to inherently disclose this limitation.

> 2.     *Mr. Koperda's statements are insufficient to establish "record evidence" that the Remote Server Internal Clock Limitation was a known prior art element.*

TPR argues that "Mr. Koperda's opinions that internal clocks for timestamping incoming data were common in web servers at the relevant time period (See Koperda Decl., ¶14) was sufficient to establish that this element was obvious at the time." (Appeal Brief at 23.) PO disagrees. The entirety of Mr. Koperda's opinion with regard to claim 47 is as follows:

> Prior to the filing date of the '271 patent, common hardware platforms included Sun Workstations, IBM Compatible PCs, and HP servers, all of which normally had a hardware clock. The major server operating systems of that period included Windows NT 4.0, IBM OS/2, and UNIX, all of which implemented the functions of utilizing a clock to maintain an accurate time and date for the server, create time stamps for data, notifications and other communications received or sent by the server. These were normal functions of the server hardware and software at that time. As an example of this, *Bibl* teaches that personal data stored in memory of the personal data capture device includes a timestamp, which may be stored in a database. *Teller* also teaches that a timestamp captured by a sensor device is uploaded and stored on the server.

(Koperda Decl. at ¶14 (internal citations omitted).)

Mr. Koperda's statements do not establish record evidence of the Remote Server Internal Clock Limitation for at least two reasons. First, Mr. Koperda's statements are factually erroneous. In particular, Mr. Koperda's statements offer as examples of "server hardware and software" devices that clearly are **not** "servers." In particular, Mr. Koperda's statements offer the "**personal** capture device" 110 of *Bibl* and

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

the "sensor device" 10 of *Teller* (which is "preferably worn by an ***individual user*** on his or her body" - *see* Teller, 4:2-5) as ***examples*** of "normal functions of the ***server*** hardware and software at that time." (Emphasis added.) These two examples of "server hardware and software" are factually erroneous, as it is abundantly clear from the disclosures of *Bibl* and *Teller* that these devices are not "sever hardware" and do not run "server software" as asserted by Mr. Koperda. *See e.g.*, Figure 1 of *Bibl* and FIG. 1 of *Teller*. "In assessing the probative value of an expert opinion, the examiner must consider the nature of the matter sought to be established ... and the presence or absence of ***factual support*** for the expert's opinion. Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 227 USPQ 657 (Fed. Cir. 1985), cert. denied, 475 U.S. 1017 (1986)." (MPEP § 716.01(c)(III).)  The factual errors in Mr. Koperda's statements should diminish the probative value of Mr. Koperda's expert opinion.

Second, Mr. Koperda's statements fail to support a *prima facie* case of obviousness with respect to claim 47 based on either *Bibl* or *Teller*.  In particular, the question is not whether purported servers such as "Sun Workstations, IBM Compatible PCs, and HP servers" or "Windows NT 4.0, IBM OS/2, and UNIX" included the Remote Server Internal Clock Limitation, but whether it would have been obvious to modify the specific server disclosed in *Bibl* (namely the web server 160) or the specific server disclosed in *Teller* (namely the central monitoring unit 30) to include the Remote Server Internal Clock Limitation. Mr. Koperda's statements fail to provide any opinion, much less factual evidence, that would support a finding that it would have been obvious to modify the specific web server 160 of *Bibl* or the specific central monitoring unit 30 of *Teller* to include the Remote Server Internal Clock Limitation. "In assessing the probative value of an expert opinion, the examiner must consider the ***nature of the matter*** sought to be established ... and the presence or absence of ***factual support*** for the expert's opinion. Ashland Oil, Inc. v. Delta Resins & Refractories, Inc., 776 F.2d 281, 227 USPQ 657 (Fed. Cir. 1985), cert. denied, 475 U.S. 1017 (1986)." (MPEP § 716.01(c)(III).)  The lack of factual support for modification of the specific web server 160 of Bibl or the specific central monitoring unit 30 of Teller to include the Remote Server Internal Clock Limitation in Mr. Koperda's statements should also diminish the probative value of Mr. Koperda's expert opinion.

11

Therefore, at least because of the two deficiencies noted above in Mr. Koperda's statements, Mr. Koperda's expert opinion does not establish record evidence of the Remote Server Internal Clock Limitation.

### D. The Allowance Of Claim 47 Should Be Maintained Because TPR's Identification Of A Motivation To Combine Was Untimely And Improper

*1.    TPR did not identify any motivation to combine in its proposed rejection of claim 47.*

Even if there did exist "record evidence" of the Remote Server Internal Clock Limitation, the patentability of claim 47 should still be confirmed because TPR failed to properly identify a motivation to combine in its proposed rejection of claim 47. Rejections that a third party requester proposes for new claims added by a patent owner during a reexamination must comply with the same rules that apply to proposed rejections that a third party requester proposes in its request for reexamination. According to MPEP § 2666.05(II):

A newly proposed rejection based on the newly presented art, or on art already of record, may only be presented if the patent owner has presented an amendment to the patent claims, or proposed new claims, which necessitated the newly proposed rejection. The third party requester must present each newly proposed rejection in compliance with the guidelines set forth in MPEP § 2617, since any such new proposed rejection stands on the same footing as a proposed rejection presented with the request for reexamination, and is treated the same way as to future Office actions and any appeal. See MPEP § 2617 as to the required discussion of the pertinency of each reference to the patentability of at least one claim presented for the newly submitted prior art. An explanation pursuant to the requirements of 35 U.S.C. 311 of how the art is applied is no less important at this stage of the prosecution, than it is when filing the request.

Therefore, with regard to new claims added during a reexamination, any proposed rejection by a third party requester "stands on the same footing as a proposed rejection presented with the request for reexamination" and must "set forth the pertinency and manner of applying cited prior art[.]" 35 U.S.C. 311(b)(2). The analysis supporting a rejection under 35 U.S.C. § 103 should be made explicit. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 538, 418, 82 USPQ2d 1385, 1396 (2007). The proposed rejection must

include "[a] statement pointing out each substantial new question of patentability based on the cited patents and printed publications, and a detailed explanation of the pertinency and manner of applying the patents and printed publications to every claim for which reexamination is requested." 37 CFR 1.915(b)(3). "The mere citation of new patents or printed publications without an explanation does not comply with 37 CFR 1.915(b)(3). Requester should present *an explanation of how* the cited patents or printed publications are *applied* to all claims which the requester considers to merit reexamination." MPEP § 2617(I) (emphasis in original). "For proposed obviousness rejections, requester **must provide** at least one basis for combining the cited references, and a statement of why the claim(s) under reexamination would have been obvious over the proposed reference combination." (*Id.* (emphasis in original).) The purpose for requiring a third party requester to provide this level of detail in its proposed rejections is simple, it "not only sets forth the requester's position to the Office, but also to the patent owner." (*Id.* at (I).)

In TPR's 4/8/13 Comments (where TPR proposes rejections for claim 47), TPR failed to identify any motivation for a PHOSITA to create a system that includes a server having an internal clock that places time stamps on incoming and outgoing data. TPR's assertion that "[u]nder 35 U.S.C. § 103, Requesters only needed to demonstrate that the internal clock limitation was taught or suggested by the art, or even that it was within the common sense of a PHOSITA" (Appeal Brief at 20) TPR is simply not correct. As provided above, a proper proposed rejection under 35 U.S.C. § 103 must identify at least one basis for combining the cited references.

TPR also claims that "[t]he new grounds of rejections for claim 47 proposed by Requesters made a prima facie case that claim 47 was obvious." (Appeal Brief at 27.) PO disagrees again. "In determining whether a case of prima facie obviousness exists, it is necessary to ascertain whether the prior art teachings would appear to be sufficient to one of ordinary skill in the art to suggest making the claimed substitution or other modification." *In re Lalu*, 747 F.2d 703, 705 (Fed. Cir. 1984). This principle was reaffirmed by the Supreme Court's opinion in *KSR International Co. v. Teleflex Inc.*, which acknowledged the importance of identifying "a reason that would have prompted a person of ordinary

13

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

skill in the relevant field to combine the elements in the way the claimed new invention does." 550 U.S. 398, 418 (2007). Thus, given its failure to identify any motivation to combine in its 4/8/13 Comments, TPR **did not** make a *prima facie* case that claim 47 was obvious.

Because TPR fails to identify a single reason why a PHOSITA would have been motivated to use a hardware platform that includes an internal clock (as opposed to a hardware platform that lacks an internal clock) in its 4/8/13 Comments, its proposed rejection was improper. Recognizing the deficiency with the proposed rejection in its 4/8/13 Comments, TPR attempted to cure the deficiency by identifying a motivation to combine in its 10/15/13 Comments (which TPR filed after PO pointed out this deficiency and after the mailing of the ACP). TPR's identification of a motivation to combine in its 10/15/13 Comments is improper and late because TPR's 4/8/13 Comments were required to provide a complete explanation for its proposed rejections, including at least one basis for combining the cited references and a statement of why the claims under reexamination would have been obvious over the proposed reference combination. (*See* MPEP § 2617(I).)

The Examiner recognizes the deficiency in TPR's proposed rejection. In the RAN, the Examiner states that "[t]he Requester failed to provide any motivation [to combine references as proposed] and only provides a motivation when raised by the Patent Owner in [PO's 9/12/13] response. Timeline, the provided motivation is late and improper." (RAN at 11.) The Examiner's holding is legally sound. TPR cannot cure its failure to identify a motivation to combine in its 4/8/13 Comments by providing a motivation to combine in its 10/15/13 Comments.

> 2. *TPR was not statutorily entitled to supplement its proposed rejection of claim 47 with a post-ACP identification of a motivation to combine.*

TPR argues that it was statutorily entitled to make arguments regarding motivation to combine in its 10/15/13 Comments because these arguments "were directly responsive to new arguments made in [PO's] response to the ACP." (Appeal Brief at 27.) PO disagrees. While (pre-AIA) 35 U.S.C. § 314(B)(2) allows a third-party requester one opportunity to file written comments addressing issues raised by the action of the Office or the patent owner's response thereto, a third-party requester is not allowed to supplement a proposed obviousness rejection with a basic element of that rejection, such as identifying a

14

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

motivation to combine, just because a patent owner identifies the deficiency in a subsequent response. Basic elements of a rejection, including identifying a motivation to combine, must be included in a proposed rejection. MPEP § 2617(I). If a third-party requester were allowed to leave out basic elements of its proposed rejections, it could effectively hide its complete argument and position until a time when the patent owner's only opportunity to respond to the complete proposed rejection is during an appeal. Such a situation would preclude the patent owner from submitting evidence (for example, a declaration from a PHOSITA) to rebut the motivation to combine identified by a third party requester.

This is exactly what TPR proposes should happen and has happened in this case. Indeed, PO—for the first time in this Respondent Brief—is responding to TPR's motivation to combine argument. Because TPR waited to identify its motivation to combine until after the ACP, it has prevented PO from submitting its own evidence to rebut the identified motivation to combine. TPR's failure to identify a motivation to combine **_in its proposed rejection_** renders its proposed rejection incomplete and improper. The allowance of claim 47 should be confirmed for this additional reason.

> 3.   *Even if the motivation identified by TPR is considered, it is improper because it is based on speculation, unfounded assumptions, and hindsight reconstruction.*

Even if the motivation to combine that TPR identifies in its 10/15/13 Comments is substantively considered, it is improper because it is based on impermissible hindsight reconstruction. According to TPR's 10/15/13 Comments, "[i]t would have been obvious to a person of ordinary skill in the relevant art to have an internal clock that timestamps the received data to indicate when it was received instead of, or in addition to, when it was collected so that it may be processed in order of receipt." (TPR's 10/15/13 Comments at 8.) As noted by the Examiner, this is not "a reasonable motivation because it appears that it is merely an improper reliance on hindsight reconstruction." (RAN at 11.) The Examiner is correct.

> A rejection based on section 103 clearly must rest on a factual basis, and these facts must be interpreted without hindsight reconstruction of the invention from the prior art. In making this evaluation, all facts must be considered. The patent office has the initial duty of supplying the factual basis for its rejection. It may not, because it may doubt that the invention is patentable, resort to speculation, unfounded assumptions or hindsight reconstruction to supply deficiencies in its factual basis. To the extent that patent office

15

rulings are so supported, there is no basis for resolving doubts against their correctness. Likewise, we may not resolve doubts in favor of the patent office determination when there are deficiencies in the record as to the necessary factual basis supporting its legal conclusion of obviousness.

*In re Warner*, 154 USPQ 173, 178 (CCPA 1967); *see also* MPEP § 2142 ("[I]mpermissible hindsight must be avoided and the legal conclusion must be reached on the basis of the facts gleaned from the prior art.").

The motivation that TPR identifies does not rest on any factual basis. Mr. Koperda's statement includes a legal conclusion ("[i]t would have been obvious to a person of ordinary skill in the relevant art to have an internal clock that timestamps the received data to indicate when it was received instead of, or in addition to, when it was collected") and a factually unsupported and hindsight reconstructed conclusion ("so that it may be processed in order of receipt"). This is legally insufficient to establish a *prima facie* case of obviousness.

###### E.     The Cited References Teach Away From Claim 47

In PO's 9/12/13 Response, PO argued that one of ordinary skill in the art would not have been motivated to modify the systems disclosed in *Bibl* or *Teller* by placing timestamps on incoming and outgoing data at the remote server. (PO's 9/12/13 Response at 31-32.) Indeed, *Bibl* and *Teller* teach away from the Remote Server Internal Clock Limitation because incorporating it would result in a system that redundantly timestamps incoming data and unnecessarily increases the cost of the system. (*Id.*)

TPR argues that PO's argument fails for two reasons. First, TPR argues that PO's argument is based on an "improper interpretation of claim 47." (Appeal Brief at 25.) According to TPR (and as addressed in Section VII(C), above), the Remote Server Internal Clock Limitation does not require that the remote server timestamp data received from a sensor. PO's argument, however, is based on TPR's proposed modifications to the systems disclosed by *Bibl* and *Teller*, which disclose timestamping data at the sensor level and prior to sending that data to a remote server. Thus, if *Bibl* and/or *Teller* were modified as proposed by TPR (so that the remote server includes an internal clock and timestamps incoming data), the data received from at least the sensors would receive two separate time stamps. One

16

when the data is sent by the sensor and another when the data is received by the remote server. This would be redundant and unnecessarily drive up the cost of the system.

Second TPR argues that an increase to the cost of a system "is not a valid basis upon which to find a combination non-obvious." (Appeal Brief at 25.) TPR cites to *Ex Parte Wolfgang Hahnl*, which holds that increased expense associated with a motivating benefit "should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another." (*Id.* at 25-26.) *Hahnl* does not state that an increase to the cost of a system is an invalid basis upon which to find a combination non-obvious, as suggested by TPR. Rather, *Hahnl* states that the benefits, both lost and gained should be weighed against each other.

TPR argues that:

timestamping at the server first data and second data that has already been timestamped by the sensors, even if redundant as argued by PO, would not result in a teaching away, as PO has alleged. A PHOSITA could have weighed the cost and benefits of doing so. Thus, it would have been obvious to a PHOSITA for the web server of Bibl and the central monitoring unit of Teller to have an internal clock that could provide timestamping to the received sensor data.

(Appeal Brief at 26.) PO disagrees.

To begin, TPR's argument is a legal conclusion based on pure speculation. TPR does not identify a single reason why the benefit of redundantly timestamping data would outweigh the cost of doing so. TPR merely states that "[a] PHOSITA could have weighed the cost and benefits of doing so" and that "it would have been obvious to a PHOSITA" to make the proposed modification. TPR has failed to carry its burden to establish that claim 47 is "more likely than not . . . unpatentable." MPEP § 706(I).

Finally, contrary to TPR's argument, after weighing the costs and benefits of modifying *Bibl* and/or *Teller* to include an internal clock and timestamping incoming data at the remote server level and PHOSITA would not make such a modification. No significant benefit would be realized that would justify the cost associated with the modification.

17

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

Dated this 9th day of June, 2014.

Respectfully submitted,

**/Mark W. Ford, Reg. No. 67,732/**

Mark W. Ford
Registration No. 67,732
Attorney for Patent Owner
Customer No. 109488
Telephone No. (435) 252-1360

18

**Appx891**

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

## VIII.    CLAIMS APPENDIX

47.    (New) <u>A system for facilitating feedback, comprising:</u>

<u>a remote server including:</u>

<u>a memory;</u>

<u>a communication port operative to receive data over the Internet;</u>

<u>a processor connected to said memory and said communication port, said processor being operative to:</u>

<u>receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a second sensor operative to sense said second data;</u>

<u>store said first and second data in said memory;</u>

<u>determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and</u>

<u>provide a notification regarding said evaluation to a device; and</u>

<u>an internal clock element that is operative to maintain a time and date for said server, wherein said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification provided by said server.</u>

19

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

## IX.    EVIDENCE APPENDIX

None.

20

Patent Owner's Respondent Brief
Reexamination Control No.: 95/002,271

## X.       RELATED PROCEEDINGS APPENDIX

None.

# EXHIBIT 33

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | I1618.10003US01 | 1254 |

97149        7590        09/19/2014
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/19/2014 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Application/Control Number: 95/002,337                                      Page 2
Art Unit: 3992

## Summary of Appeal Record

1.      The Office mailed Right of Appeal Notice (RAN) on January 23, 2014.

      (a)      Claims 15, 16, 47, 50-56, 58-61,65, 79, 95, 98, 99, and 124 are pending.

      (b)      Claims 15, 16, 50-56, 58-61,65, 79, 95, 98, 99, and 124 are finally rejected.

      (c)      Claim 47 is patentable.

2.      The Third Party Requester ("Requester") filed Notice of Appeal on February 21, 2014.

3.      The Patent Owner ("PO") filed Notice of Cross Appeal on March 7, 2014

4.      The PO filed Appeal Brief on May 6, 2014 to seek review of all of the Examiner's grounds for rejecting claims 15, 16, 50-56, 58-61,65, 79, 95, 98, 99, and 124.

5.      The Requester filed Appeal Brief on May 7, 2014 to appeal the Examiner's decision to withdraw the proposed rejection of claim 47.

6.      The Requester filed Respondent Brief on June 6, 2014 to rebut arguments presented in the PO's Appeal Brief.

7.      The PO filed Respondent Brief on June 9, 2014 to rebut arguments presented in the Requester's Appeal Brief.

| *Inter Partes Reexamination* *Examiner's Answer* | Application No. | Applicant(s) |
| | 95/002,337 | 6701271 |
| | Examiner | Art Unit | |
| | MINH T. NGUYEN | 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

**Incorporation by Reference of the Right of Appeal Notice**

The Right of Appeal Notice (RAN) mailed on 1/23/14, including all of the grounds of rejection, determinations of patentability, and explanations set forth in the RAN is incorporated by reference. Every ground of rejection and every determination not to make a proposed rejection set forth in the RAN are being maintained by the examiner.

This examiner's answer does not contain any new ground of rejection and any new determination not to make a proposed rejection.

**Status of Amendment After Action Closing Prosecution**

The amendment(s) filed on _____ has/have been entered.
The amendment(s) filed on _____ has/have not been entered.

**Period for providing a Rebuttal Brief**

Appellant(s) is/are given a period of ONE MONTH from the mailing date of this examiner's answer within which to file a rebuttal brief in response to the examiner's answer. Prosecution otherwise remains closed.

The rebuttal brief of the patent owner may be directed to the examiner's answer and/or any respondent's brief. The rebuttal brief of the third party requester(s) may be directed to the examiner's answer and/or the respondent's brief of the patent owner. The rebuttal brief must (1) clearly identify each issue, and (2) point out *where* the issue was raised in the examiner's answer and/or in the respondent's brief. In addition, the rebuttal brief must be limited to issues raised in the examiner's answer or in the respondent's brief. The time for filing the rebuttal brief may not be extended. No further submission (other than the rebuttal brief(s)) will be considered, and any such submission will be treated in accordance with 37 CFR 1.939 and MPEP 2667.

☒   Attachment(s)
     <u>Summary of Appeal Record</u>

☐   Other:
     _____

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at one of the following addresses:

Please mail any communications to:
Attn:  Mail Stop "Inter partes Reexam"
Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria VA 22313-1450

Please hand-deliver any communication to:
Customer Service Window
Attn:  Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria VA 22314

Please FAX any communications to: (571) 273-9900

/Minh Nguyen/
Patent Reexamination Specialist
CRU, AU 3992

Conferees:
/Tuan H. Nguyen/
Patent Reexamination Specialist
CRU, AU 3992

/Andrew J. Fischer/
Supervisory Patent Reexamination Specialist ,
CRU, Art Unit 3992

# EXHIBIT 34

Via eFILE                                                                          REEXAMINATION
                                              Attorney Docket No.: I1618.10003US01

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Reexamination of: | U.S. Patent No. 6,701,271 | |
| Control No.: | 95/002,337 | Art Unit 3992 |
| Inventor: | Willner, Barry E., et al. | |
| Filed: | September 14, 2012 | |
| For: | METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA CONLLECTED FROM TWO OR MORE SUBJECTS | |
| Examiner: | Nguyen, Minh T. | |
| Customer No.: | 97149 | |
| Confirmation No: | 1254 | |

## PATENT OWNER'S REBUTTAL BRIEF UNDER 37 C.F.R. § 41.71

**Mail Stop: Inter Partes Reexamination**
Attn: Central Reexamination Unit
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

Patent Owner files this Rebuttal Brief, which responds to the issues raised in the Respondent Brief filed by Third Party Requester ("TPR") on June 6, 2014, and the Examiner's Answer mailed on September 19, 2014, in the *inter partes* reexamination proceeding for U.S. Patent No. 6,701,271 ("the '271 patent"). The Director is hereby authorized to charge any additional fees that may be due, or credit any overpayment of same, to the undersigned's Deposit Account No. 50-5394.

1

**Appx900**

## VII.    ARGUMENT

For simplicity, this Rebuttal Brief responds to the issues raised in the Respondent Brief in the exact order that they are presented in the Respondent Brief. Thus, this "Argument" section intentionally begins with Section VII instead of Section I so as to maintain consistency with the Respondent Brief.

### A.    Claims 50-56, 58-61, And 65 Are Not Indefinite

Subsequent to Patent Owner's filing of its Appeal Brief, the Supreme Court decided *Nautilus, Inc. v. Biosig Instruments, Inc.*—a case that reviewed the definiteness standard of 35 U.S.C. § 112, ¶ 2. (134 S. Ct. 2120 (2014).)   According to *Nautilus*, claims satisfy the definiteness requirement of 35 U.S.C. § 112, ¶ 2 if they "inform those skilled in the art about the scope of the invention with reasonable certainty" when "viewed in light of the specification and prosecution history." (*Id.* at 2123.) Claims 50-56, 58-61, and 65 satisfy this requirement.

Claim 50 requires a sensor database that is both "includ[ed]" in and "accessible to" a remote server.  In light of the specification and drawings of the '271 patent—which teaches that a server "may include or access a sensor database" (12:61-64) and illustrates in Figure 5a a server 204 that includes sensor database 268—a person of ordinary skill in the art would understand, with reasonable certainty, that a sensor database may be both included in and accessible to the remote server. In particular, the "or" between "include" and "access" in 12:61-64 is not a logical "exclusive OR" or "XOR," but is instead a common "or" which allows either of the two alternatives or both, namely, any one of "include," "access," and "include" and "access."

TPR asserts that "claim 50 is susceptible to two alternative . . . interpretations." (Respondent Brief at 3.)  TPR argues that these two alternative interpretations (namely: (1) a

system in which the sensor database is included in the remote server, and (2) a system in which the sensor database is external to the remote server) render the claim indefinite because these interpretations are mutually exclusive.  In other words, according to TPR, claim 50 is indefinite "because a sensor database cannot be both **included in** and **external to** a remote sever."  (*Id.* (emphasis in original).)

Claim 50, however, does not require that a sensor database be both included in and external to a remote server.  TPR's argument that the claim somehow requires both scenarios be present at the same time is simply not supported by the plain language of the claim.  Claim 50 instead requires only that a sensor database be "includ[ed]" in and "accessible" to a remote server.  A sensor database may be both accessible to and included in the remote server, where the components of a server with multiple components are accessible to the server, as disclosed in Figure 5a.  Therefore, the requirement in claim 50 that the sensor database be "accessible to" the remote server simply does not give rise to any reasonable argument that the sensor database must be "external to" the remote server.

### B.    Claims 15 And 16 Are Neither Anticipated Nor Obvious

#### 1.    *Patton does not anticipate claims 15 or 16.*

It is Patent Owner's position that the methods recited in claims 15 and 16 require a specific sequence of steps and that *Patton* fails to disclose this required sequence.  TPR does not dispute that *Patton* fails to disclose the sequence of steps that Patent Owner asserts are required.  Rather, TPR disputes Patent Owner's contention that claims 15 and 16 require a specific sequence.  According to TPR, no specific sequence of steps is required by claims 15 or 16.

3

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

(a)     *The specification of the '271 patent does not preclude claim 15 or 16 from requiring a specific sequence.*

TPR relies heavily on a form paragraph at the end of the written description of the '719 patent to establish that "the '271 patent itself disavows any required sequence or order in which the claimed steps must be performed." (Respondent Brief at 5.) The '271 patent makes no such disavowal. The '271 patent states that "the claims should not be construed as being limited to any particular order or sequence, **unless specifically indicated**." ('271 patent, 14:29-31 (emphasis added).) With regard to claims 15 and 16, a particular order or sequence *is specifically indicated* because the claims would not make sense unless performed in the sequence recited.

(b)     *Claims 15 and 16 require a specific sequence of steps.*

Claims 15 and 16 are each dependent on independent claim 1. The first step of claim 1 recites:

> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject[.]

(14:66-15:3.) The second step of claim 1 recites:

> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject[.]

(15:4-7.) Clearly, the second step, which requires "determining an evaluation of said first data and second data" cannot be accomplished without first "receiving first data . . . and second data" as recited in the first step. The third step of claim 1 recites:

> providing a notification regarding said evaluation to a device.

4

**Appx903**

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

(15:8-9.)  The third step cannot be accomplished without the second step being performed first. The third step requires that a notification *regarding said evaluation* be provided to a device. The evaluation, however, does not exist until the second step is accomplished (where the evaluation is determined).  It would be impossible to provide a notification regarding an evaluation (as required by the third step) if that evaluation has not yet been determined (as required by the second step).

TPR argues that Patent Owner's position is based on an "impermissibly narrow interpretation of the term 'regarding.'"  (Respondent Brief at 6.)  According to TPR, "[a] notification 'regarding' the evaluation . . . could refer to any notification related to the evaluation, whether completed or not."  (*Id.*)  Patent Owner disagrees that a notification regarding an evaluation can be provided if the evaluation does not yet exist.  Tellingly, TPR fails to provide a single example of what type of notification regarding an evaluation could be provided if the evaluation has not been completed.  Patent Owner is also unable to come up with any examples.

    **2.**    *Claims 15 and 16 are valid over the combinations of Patton in view of Papadopoulos and Zawilinski in view of Papadopoulos.*

    *(a)*    *The combination of Patton in view of Papadopoulos fails to render obvious claims 15 and 16.*

TPR argues that the rejections of claims 15 and 16 over the combination of *Patton* and *Papadopoulos* must be maintained because Patent Owner did not present any argument to rebut the Examiner's findings that *Patton* discloses the limitations added by claims 15 and 16.  Indeed, TPR go so far as to assert that that Patent Owner has "no basis to assert that claims 15 and 16 are not obvious over Patton in view of Papadopoulos."  Not so.

5

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

Claims 15 and 16 are dependent claims and each depend, directly or indirectly, on claims 1 and 13. As such, claims 15 and 16 include all of the limitations recited in claims 1 and 13. As provided above, *Patton* fails to disclose the limitations of claim 1 because it fails to disclose the required sequence of steps that are recited in claim 1. TPR has ***never*** alleged that *Papadopoulos* discloses the steps recited in claim 1, much less the specific sequence of steps that claim 1 requires. Rather, TPR (and the Examiner) have relied entirely on *Patton* to disclose the limitations recited in claim 1. Thus, the combination of *Patton* in view of *Papadopoulos* fails to render claims 15 and 16 obvious for the same reason that *Patton* fails to anticipate claims 15 and 16: there is no disclosure of the limitations recited by claim 1.

To the extent that *Papadopoulos* is relied upon (as it is in the obviousness rejection based on the combination of *Zawilinski* in view of *Papadopoulos*) to disclose the limitations recited in claim 13, this rejection would fail for the additional reason that *Papadopoulos* does not disclose the limitation recited in claim 13, as discussed below.

> (b)   *The broadest reasonable interpretation of the term "receiving" excludes the conception of options entirely within a person's mind.*

Claims 15 and 16 each require "receiving a notification regarding a plurality of options." Whether *Papadopoulos* discloses this limitation depends on the broadest reasonable interpretation of the term "receiving." Patent Owner argues that the broadest reasonable interpretation of the term "receiving" does not include options that are conceived entirely within a person's mind.

TPR proposes that the terms "receiving" and "determining" should be construed in the exact same way. (Respondent Brief at 8.) According to TPR, the term "receiving" is sufficiently broad to include options that are conceived entirely within a person's mind. TPR relies upon the ***eleventh*** definition provided in the American Heritage Dictionary (Appeal Brief, Exhibit 2) of

6

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

the term "receive" to support its position.  Patent Owner, on the other hand, relies upon the ***first***

***two*** definitions of the term "receive," which are "[t]o take or acquire (something given, offered,

or transmitted); get" and "[t]o hear or see (information, for example): *receive bad news; received*

*a good report of the group's activities*." (*See* Exhibit 2 to Appeal Brief.)  The fact that TPR's

proposed definition is only supported by the eleventh definition provided, while Patent Owner's

is supported by the first two is telling.

> (c)     *Observing audience reaction does not convey a plurality of options*
> *to the observer.*

TPR argues that even if Patent Owner's proposed construction of the term "receiving" is

adopted, *Papadopoulos* still discloses "receiving a notification of a plurality of options."

(Respondent Brief at 9.)   TPR relies on *Papadopoulos'* disclosure that "the presenter may

respond to the audience's reaction to modify his presentation accordingly or elicit information

from the audience." (*Id.*)

Claims 15 and 16 each require that a notification ***regarding a plurality of options*** be

received.   The cited portion of *Papadopoulos* does not teach that the audience, through its

"reaction," provides to an observer any plurality of options.  Rather, based on the observation of

the audience's reaction, the observer may determine potential options.  For example, if the

perceived audience reaction to a story is boredom, the presenter may decide to either (1) take a

break so that the audience can get some snacks, or (2) modify the story to make it more exciting.

These options, however, are not conveyed by the audience or received by the presenter.  These

options are determined entirely within the mind of the presenter.   *Papadopoulos* does not

disclose that the audience provides any options to the presenter.  For the reasons provided above,

options that are conceived entirely within a person's mind are not "received."  *Papadopoulos*

does not disclose this limitation.

7

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

### C.    Claims 50-52 Are Valid Over The Cited Art

TPR does not dispute that the art relied upon to reject claims 50-52 fails to explicitly disclose the limitations recited in claims 50-52.  Rather, it is TPR's position that the limitations recited in claims 50-52 "would have been obvious."  (Respondent Brief at 10.)  To establish obviousness, TPR relies entirely upon the opinion of its expert, Mr. Koperda, who states "[i]t would have been obvious to one skilled in the art to store the various sensor information in a sensor database having the aforementioned fields."  (*Id.*)  Mr. Koperda's opinion, however, should be disregarded as it is conclusory and merely restates the ultimate legal conclusion at issue.

While "factual evidence is preferable to opinion testimony, such testimony is entitled to consideration and some weight *so long as the opinion is not on the ultimate legal conclusion at issue*."  MPEP § 716.01(c).  In this case, Mr. Koperda's opinions regarding claims 50-52 are pure legal conclusions.  Even TPR describes Mr. Koperda's testimony as a "conclusion."  (*Id.* ("The Patent Owner offered no evidence to rebut this conclusion.").)  As such, Mr. Koperda's opinion regarding claims 50-52 should be entitled no weight.  Claims 50-52 should be allowed to issue as there is no evidence of record to support the rejections of these claims.

### D.    Claims 53-56 And 58-61 Are Valid Over The Cited Art

To support the rejections of claims 53-56 and 58-61, TPR cites to *Bibl's* passing mention of a "database" and the opinion of Mr. Koperda.  TPR does not assert that *Bibl* explicitly discloses all of the limitations of claims 53-56 or 58-61.  Rather, it is TPR's position that *Bibl's* passing mention of a "database" together with the opinion of its expert, Mr. Koperda, establishes record evidence that these claims are invalid.  Patent Owner disagrees.

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

*Bibl's* passing mention of a "database" is insufficient to render obvious the specific databases and database features recited in claims 53-56 and 58-61. As with his opinion regarding claims 50-52, Mr. Koperda's opinion regarding claims 53-56 and 58-61 are conclusory and merely restate the ultimate legal conclusion at issue. (Respondent Brief at 11-12.) As such, Mr. Koperda's opinion regarding claims 53-56 and 58-61 should be entitled no weight. Claims 53-56 and 58-61 should be allowed to issue as there is no evidence of record to support the rejections of these claims.

### E.     Claim 65 Is Valid Over The Cited Art

#### 1.     *Claim 65 is not obvious in view of Bibl.*

Claim 65 recites "a remote server including: . . . a processor . . . [that is] operative to: . . . provide a notification regarding said evaluation to a device [that] . . . includes a flash memory card." (Respondent Brief at 13.) Patent Owner asserts that the broadest reasonable interpretation of the term "device," as that term is used in claim 65, requires that the "device" be outside of the claimed server. According to TPR, "the organization of claim 65 implies the exact opposite— the claimed 'device' (which includes a flash memory card) is inside the claimed 'remote server.'" (Respondent Brief at 13.) Patent Owner disagrees.

It is unclear how TPR reads claim 65 to imply that the "device" is part of the "remote server." The plain language of claim 65 simply requires that the processor of a remote server be "operative to . . . provide a notification to a device." There is simply no support, either in the plain language of claim 65 or the specification of the '271 patent, that mandates or even suggests that the device is part of the remote server. Construing the term "device" to cover a scenario where the device is part of the remote server would be unreasonably broad.

9

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

In the event that the "device" is separate from the remote server (as Patent Owner argues), TPR identifies clients 130 and 170 of *Bibl* as corresponding to the recited "device." TPR does not dispute, however, that *Bibl* fails to expressly disclose that clients 130 or 170 include a flash memory card. Instead, TPR argues that including flash memory cards in clients 130 and 170 would be obvious based on *Bibl's* disclosure that a general-purpose computer (which provides a notification to clients 130 and 170) includes a computer-readable storage medium, such as EEPROM. According to TPR, this disclosure, together with the opinion of Mr. Koperda renders claim 65 obvious. Patent Owner again disagrees.

To establish that clients 130 and 170 can include the features of the "general purpose computer," TPR relies on *Bibl's* disclosure that "clients 130 and 170 can be implemented as any device described above." [*Bibl*, ¶ 0035.] TPR asserts that "any device described above" includes the apparatus for performing operations, or the general-purpose computer, which includes the EEPROM. The Examiner did not rely on Paragraph 0035 of *Bibl* in its rejection of claim 65. Indeed, prior to the Respondent Brief, TPR *never* identified this paragraph of *Bibl* in any of its papers to support a rejection of claim 65. TPR, for the first time in its Respondent Brief, attempts to alter the rejection of claim 65 to include reliance on *Bibl's* Paragraph 0035. TPR's identification of a new section of *Bibl* in its Respondent Brief is improper. (37 C.F.R. § 41.68(c) (prohibiting "any new or non-admitted affidavit or other evidence" in a respondent brief).) TPR could have and should have identified its reliance on Paragraph 0035 of *Bibl* much earlier in this proceeding.

Even if Paragraph 0035 of *Bibl* is considered, claim 65 is still patentable over *Bibl* because *Bibl's* disclosure of EEPROM does not render obvious the recited "flash memory card." One of ordinary skill in the art would have understood a "flash memory card" to be a memory

10

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

card that is easily removable from a host device.  (*See* Declaration of Darren Ashby at ¶ 12, attached to Appeal Brief as Exhibit 3.)  TPR argues that "Patent Owner points to nothing in claim 65 that would require this understanding of the term 'flash memory card' under the broadest reasonable interpretation."  (Respondent Brief at 14.)  TPR completely ignores the Declaration of Darren Ashby, which was attached to Patent Owner's Appeal Brief as Exhibit 3.

Even if a skilled artisan would understand a "flash memory card" to be one that is easily removable from a host device, TPR asserts that the disclosure of EEPROM is sufficient to render flash memory cards obvious because "EEPROM ***cards*** that were removable from a computer system were known and commercially available before the earliest effective filing date of the '271 patent."  (Respondent Brief at 14 (emphasis added).)  The problem with TPR's argument (and Mr. Koperda's opinion) is that *Bibl* does not disclose EEPROM ***cards***; *Bibl* only discloses "a general purpose computer" that may store programs "in a computer readable storage medium, such as . . . EEPROMs[.]"  [*Bibl*, ¶ 0022.]  TPR's attempt to supplement the disclosure of *Bibl* to recite an EEPROM ***card*** is improper.

2.      *Claim 65 is not obvious in view of Teller.*

TPR acknowledges that "flash memory existed in both card and non-card form before the earliest effective filing date of the '271 patent."  (Respondent Brief at 14-15.)  TPR asserts that *Teller's* disclosure of "flash memory" is sufficient to make obvious "the use of any type of flash memory, whether or not it is implemented as a 'card.'"  (*Id.*)  Patent Owner disagrees.  *Teller's* disclosure of "flash memory" alone, without any disclosure or teaching that the flash memory is in the form of a card or another portable medium, is insufficient to render claim 65 obvious.

11

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

### F.      Claim 79 Is Valid Over The Cited Art

In its Appeal Brief, Patent Owner identifies several significant differences between XML and HTML/HTTP.  (Appeal Brief at 22.)  TPR attempts to discredit these differences by arguing that "none of these alleged differences is described in the '271 patent."  (Respondent Brief at 16.)  It is because the '271 patent does not explicitly identify differences between XML and HTML/HTTP or "explain how these alleged differences would lead to any benefit by using 'an XML transmission'" that TPR concludes that "the recitation of 'an XML transmission' is 'nothing more than the 'combination of familiar elements according to known methods,' 'each performing the same function it had been known to perform' [and] 'yielding predictable results.'"  (*Id.*)

Even though the differences between XML and HTML/HTTP are not explicitly recited in the '271 patent, one of ordinary skill in the art would know of these differences.  Indeed, even Mr. Koperda identifies differences between XML and HTML/HTTP in explaining why XML would be a "preferred solution" over HTML/HTTP.  (*See* Koperda Decl. at ¶ 16 and Respondent Brief at 17.)  XML and HTML/HTTP do not function equivalently and substituting HTML or HTTP transmission with XML transmission would not have been an obvious design choice.

### G.      Claim 95 Is Valid Over The Cited Art

TPR does not dispute that *Teller* fails to explicitly disclose a server that receives data from multiple devices simultaneously.  Rather, TPR points to *Teller's* disclosure of "multiple middleware servers."  (Respondent Brief at 18.)  According to TPR and the Examiner, "[t]he existence of these devices in a system clearly implies, or at least suggests that the server receives data from multiple devices simultaneously."  (*Id.*)  Claim 95, however, requires that "a remote server . . . receive said first and second data simultaneously."  Claim 95 does not recite "a

12

plurality of remote servers." Claim 95 requires that a single remote server receive data from two different sensors simultaneously. Thus, even if the multiple middleware servers of *Teller* imply or suggest that data may be simultaneously received, there is no disclosure that any one server receives data from different sensors simultaneously. Patent Owner disagrees that the existence of multiple servers renders obvious claim 95.

### H.    Claims 98-99 Are Valid Over The Cited Art

TPR asserts that *Teller's* disclosure of a processor that is operative to determine whether a user is "in need of sleep" is sufficient to disclose or render obvious a processor that is "operative to determine whether said first subject is in need of a break." The parties dispute whether the broadest reasonable interpretation of the term "break" includes "sleep."

To support its assertion that the broadest reasonable construction of the term "break" includes "sleep," TPR relies upon the '271 patent, which discloses that "a break or interruption [may be] needed so that the subjects can . . . overcome boredom or fatigue[.]" (Respondent Brief at 19.) According to TPR, "[o]ne of the most well-known ways to 'overcome . . . fatigue' is to sleep." (*Id.*) TPR does not assert that sleeping is the *only* way to overcome fatigue. Indeed, there are a number of ways that a person may overcome fatigue that do not require sleep, such as sitting down, taking a drink of water, eating food, ingesting an energy-boosting drug, getting a massage, etc. One of ordinary skill in the art would not understand the term "break" as used in the '271 patent to include sleep. Rather, one of ordinary skill in the art would understand a "break" to be a "pause or interval, as from work." This definition is consistent with the '271 patent and contemporaneous dictionaries.

TPR points out that "none of the dictionary definitions proffered by the Patent Owner exclude the commonsense notion that 'sleep' is an example of a type of 'break.'" (Respondent

Patent Owner's Rebuttal Brief
Reexamination Control No.: 95/002,337

Brief at 19.)  More relevant is the fact that none of the dictionary definitions *include* the notion that sleep is an example of a break.  The fact that TPR was unable to provide a dictionary that defines "break" to include "sleep" is evidence that such a definition is not as commonsensical as TPR suggests.

Dated this 17th day of October, 2014.

Respectfully submitted,

**/Mark W. Ford, Reg. No. 67,732/**

Mark W. Ford
Registration No. 67,732
Attorney for Patent Owner
Customer No. 97149
Telephone No. (435) 252-1360

14

**Appx913**

# EXHIBIT 35

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| *In re* reexam of: U.S. Patent 6,701,271 B2 to WILLNER *et al.* | Examiner: Nguyen, Minh T. |
| | Art Unit: 3992 |
| For:   **Method and Apparatus for Using Physical Characteristic Data Collected from Two or More Subjects** | Atty. Docket: 3271.001REX0 |
| Reexam Control No.: 95/002,337 | Confirmation No.: 1254 |
| Filed: Sept 14, 2012 | |

**Third-Party Requester's Rebuttal Brief on Appeal
Under 37 C.F.R. § 41.71**

**Mail Stop "*Inter Partes* Reexam"**
ATTN: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

In response to the Examiner's Answer mailed September 19, 2014 ("Examiner's Answer") and Patent Owner's Respondent Brief filed June 9, 2014 ("Respondent Brief"), Requester hereby timely files this Rebuttal Brief ("Rebuttal Brief"). It is believed that no fees are required for filing this Rebuttal Brief. If any fees are required, please charge such fees to our Deposit Account No. 19-0036.

Third Party Requester Dkt. No. 3271.001REX0

**Appx915**

- ii -                                                                    Willner *et al.*
                                                       Reexam Control No. 95/002,337

# TABLE OF CONTENTS

I.   **ARGUMENT** ..................................................................................................... 1

    A.   Claim 47 Is Unpatentable. ...................................................................... 1

        1.   The Examiner incorrectly found that there was no
            motivation to add an internal clock element to a server. ........................... 1

        2.   Whether data is timestamped before being uploaded to the
            server is irrelevant. ....................................................................................... 3

        3.   Even though not required, Requesters showed that a POSA
            would have been motivated to add an internal clock
            element to a server. ....................................................................................... 4

        4.   The internal clock element of claim 47 is a known element
            used to yield predictable results. ................................................................. 4

    B.   Contrary to PO's allegation, Mr. Koperda's declaration is record evidence. ......... 5

II.  **CONCLUSION** ............................................................................................... 7

Third Party Requester Dkt. No. 3271.001REX0

**Appx916**

## I.   ARGUMENT

### A.   Claim 47 Is Unpatentable.

Third Party Requesters ("Requesters") urge the Board to reinstate the rejection of claim 47 in the underlying reexamination of U.S. Patent No. 6,701,271 ("the '271 Patent").

The Examiner erred in overturning the original rejection of claim 47 (*see* Action Closing Prosecution, pp. 26, 38, 55, 66) and in finding claim 47 patentable. (RAN, pp. 10-11.) Specifically, the Examiner incorrectly found that an internal clock element at a server was a patentable feature. The Examiner's finding is contrary to the record evidence, which includes both the unrebutted expert testimony of Mr. Koperda as well as cited prior-art references. The "internal clock element" of claim 47 was already well known in the prior art at the time of the alleged invention and adds no patentable weight to the claim. The claim does nothing more than use a known element to yield predictable results, making it obvious.

Requesters respectfully request that the Board reverse the Examiner and hold claim 47 unpatentable.

> #### 1.   *The Examiner incorrectly found that there was no motivation to add an internal clock element to a server.*

Claim 47 recites, in part:

> **an internal clock element that is operative to maintain a time and date for said server**, wherein said internal clock element is **operative to create time stamps** for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification provided by said server (emphasis added).

The Examiner held that Requesters failed to provide motivation as to why a person having ordinary skill in the relevant art ("POSA") at the time of the alleged invention would **add**

Third Party Requester Dkt. No. 3271.001REX0

**Appx917**

an internal clock element to a server. (RAN, pp. 10-11.) In so doing, the Examiner ignored the

evidence of record. The unrebutted evidence shows that servers at the time of the alleged

invention typically **already had** an internal clock element. (Koperda Decl., ¶14.) Since prior-art

servers normally had an internal clock element, there would have been no need for a separate

motivation to **add** an internal clock element to a server. Stated another way, a POSA would have

understood that such servers already included a hardware clock to perform all the claimed

functions of the internal clock element. (*See* Koperda Decl., ¶14.)

     In fact, Requesters provided evidence that a POSA would have known at the time of the

alleged invention that servers normally include a hardware clock. Specifically, Mr. Koperda

testified:

> Prior to the filing date of the '271 patent, common hardware platforms included
> Sun Workstations, IBM Compatible PCs, and HP servers, **all of which normally**
> **had a hardware clock**. The major server operating systems of that period
> included Windows NT 4.0, IBM OS/2, and UNIX, all of which implemented the
> functions of utilizing a clock to **maintain an accurate time and date for the**
> **server, create time stamps** for data, notifications and other communications
> received or sent by the server. **These were normal functions of the server**
> **hardware and software at that time.**

(Koperda Decl., ¶14, emphasis added.) In support of his opinion, Mr. Koperda further stated:

> As an example of this, Bibl teaches that personal data stored in memory of the
> personal data capture device inc1udes a timestamp, which may be stored in a
> database. (Bibl, ¶¶0054, 0057). Teller also teaches that a timestamp captured by a
> sensor device is uploaded and stored on the server. (Teller, 7:66-8:3).

(Koperda Decl., ¶14.) This record evidence shows that a POSA would have known at the time of

the alleged invention that a server includes a hardware clock.

     Because a POSA would have understood this basic fact about servers, the "internal clock

element" recited in claim 47 does not make this claim patentable. *See Dann v. Johnston,* 425

U.S. 219, 230 (1976) (The "mere existence of differences between the prior art and an invention does not establish the invention's nonobviousness."). Based on the cited prior-art references and Mr. Koperda's testimony, Requesters explained that "it would have been obvious to a person of ordinary skill in the art at the time of filing for a server to use an internal clock element that maintains a time and date for a server." (Requesters' Comments after Non-Final Action, pp. 26 and 33.) No showing of a motivation to **add** an internal clock element to a server was required. A *prima facie* case of obviousness of claim 47 was presented without requiring such motivation.

2.     *Whether data is timestamped before being uploaded to the server is irrelevant.*

The record illustrates that timestamping data was well known and routinely performed at the time of the alleged invention. For example, both Bibl and Teller disclose that personal capture (sensor) devices were capable of timestamping data. (Koperda Decl., ¶14.) Since timestamping data was known in the prior art and servers with hardware clocks capable of timestamping were also known in the prior art, it would have been obvious to a POSA that a server used in a system with those sensor devices would also include such timestamping capability (e.g., by way of a hardware clock).

In finding claim 47 allowable, the Examiner inquired whether a server would include a timestamping capability "in addition to the timestamp provided by the personal capture device." (RAN, p. 11.) However, PO concedes, and Requesters agree, that whether data is timestamped on a sensor device before being uploaded to a server is **irrelevant** to the inquiry of whether the server timestamps data. Specifically, "PO does not disagree with TPR that claim 47 does not require that the data that is timestamped at the remote server be the same data that is received

Third Party Requester Dkt. No. 3271.001REX0

from the personal capture devices. . . *any data*, including data that is not received from a personal capture device" that is timestamped at the server would suffice to make obvious the claim language. (*See* PO Respondent Brief, p. 7.)

> 3.    **Even though not required, Requesters showed that a POSA would have been motivated to add an internal clock element to a server.**

Nothing in either Bibl or Teller contradicts or teaches away from the general knowledge at the time of the alleged invention that servers had a hardware clock. Indeed, the Examiner expressly stated that "Bibl does not teach away from adding an internal clock element and creating timestamp for data and notification for the reasons provided by Requester." (RAN, p. 11.) A similar finding was applied to Teller. *Id.*

However, in the unusual scenario that a server may not have already had a hardware clock, Requesters provided sufficient explanation of why a POSA would have been motivated to add a hardware clock to the server: "It would have been obvious to a person of ordinary skill in the relevant art to have an internal clock that timestamps the received data to indicate when it was received instead of, or in addition, when it was collected so that it may be processed in the order of receipt." (Requesters' Comments After ACP, p. 8.)

> 4.    **The internal clock element of claim 47 is a known element used to yield predictable results.**

The internal clock element of claim 47 is also unpatentably obvious, because it does nothing more than use the known prior-art element of a hardware clock according to its established functions of maintaining time and creating timestamps. (*See* Koperda Decl., ¶14.) "The combination of familiar elements according to known methods is likely to be obvious when

Third Party Requester Dkt. No. 3271.001REX0

**Appx920**

- 5 -                                                              Willner *et al.*
                                                    Reexam Control No. 95/002,337

it does no more than yield predictable results." *KSR International Co. v. Teleflex Inc. (KSR),* 550

U.S. 415, 82 USPQ2d 1395 (2007). "[T]he conclusion that when a patent simply arranges old

elements with each performing the same function it had been known to perform and yields no

more than one would expect from such an arrangement, the combination is obvious." *Id.* at 417

(internal quotations omitted).

  **B.**  **Contrary to PO's allegation, Mr. Koperda's declaration is record evidence.**

  Requesters have provided unrebutted testimony from an expert in the field, Mr. Koperda,

as to what a POSA would have known at the time of the alleged invention. This expert testimony

is record evidence. See McMullin v. Carroll, 153 Fed. Appx. 738, 744 n.1 (Fed. Cir. 2005)

(holding that expert declaration testimony is substantial evidence that supports the Patent

Office's factual findings, even if the Patent Office did not explicitly rely on that evidence) (citing

In re Huston, 308 F.3d 1267, 1281 n.9 (Fed. Cir. 2002)).

  PO cites to *K/S Himpp v. Hear-Wear Technologies LLC*, 751 F.3d 1362 (Fed. Cir. 2014)

for the erroneous proposition that "TPR has not provided 'record evidence' of a system, as

recited in claim 47." (PO Respondent Brief, p. 8; *see also id.*, p. 9.)   But *K/S Himpp* is

distinguishable from the present facts.

  In *K/S Himpp*, the Federal Circuit affirmed both the Examiner's and the Board's refusal to

adopt a proposed rejection of certain claims because there was "not a suitable basis on the

record" for concluding that the structural features of those claims were known prior-art elements.

*K/S Himpp*, 751 F.3d at 1366.

         Third Party Requester Dkt. No. 3271.001REX0

- 6 -                                                        Willner *et al.*
                                              Reexam Control No. 95/002,337

Unlike *K/S Himpp*, however, here the record contains Mr. Koperda's unrebutted

testimony that:

> Prior to the filing date of the '271 patent, common hardware platforms included
> Sun Workstations, IBM Compatible PCs, and HP servers, **all of which normally
> had a hardware clock**. The major server operating systems of that period
> included Windows NT 4.0, IBM OS/2, and UNIX, all of which implemented the
> functions of utilizing a clock to **maintain an accurate time and date for the
> server, create time stamps** for data, notifications and other communications
> received or sent by the server. **These were normal functions of the server
> hardware and software at that time.**

(Koperda Decl., ¶14, emphasis added.) Mr. Koperda further testified that Bibl and Teller

disclosed the timestamping of data at the personal capture devices (Bibl) and sensor devices

(Teller):

> As an example of this, Bibl teaches that personal data stored in memory of the
> personal data capture device includes a timestamp, which may be stored in a
> database. (Bibl, ¶¶0054, 0057). Teller also teaches that a timestamp captured by a
> sensor device is uploaded and stored on the server. (Teller, 7:66-8:3).

(Koperda Decl., ¶14).

Based on this record evidence, it is clear that timestamping was already well-known in

the art at the time of the alleged invention, and that "it would have been obvious to a person of

ordinary skill in the art at the time of filing for a server [of Bibl or Teller] to use an internal clock

element that maintains a time and date for a server." (Requesters' Comments after Non-Final

Action, pp. 26 and 33.)  This declaration testimony as to what a POSA knew at the time of the

alleged invention, in combination with the cited prior-art references (e.g., Bibl and Teller),

provides compelling record evidence that supports a finding that claim 47 is unpatentable. *See*

*McMullin*, 153 Fed. Appx. at 744 n.1 (citing *Huston*, 308 F.3d at 1281 n.9).  The Examiner's

Third Party Requester Dkt. No. 3271.001REX0

- 7 -                                                                    Willner *et al.*
                                                                Reexam Control No. 95/002,337

finding that claim 47 is allowable is both contrary to the uncontested record evidence and

inconsistent with the Federal Circuit's finding in *K/S Himpp*.


II.    **CONCLUSION**

    The Board should reverse the Office's withdrawal of the proposed obviousness rejections

of claim 47 because the allegedly patentable feature of an "internal clock element" was already

well known in the art at the time of the alleged invention and the asserted prior art renders claim

47 obvious.


                Respectfully submitted,

                STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.

                Michael B. Ray, Registration No. 33,997
                Harish Ruchandani, Registration No. 58,770
                Attorneys for Third Party Requesters

1917926


                Third Party Requester Dkt. No. 3271.001REX0

# EXHIBIT 36



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | 11618.10003US01 | 1254 |

97149    7590    08/31/2015
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 08/31/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE

—————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————

STRAVA, INC., MAPMYFITNESS, INC., and
FITNESSKEEPER, INC.
Requester,

v.

ICON HEALTH & FITNESS, INC.
Patent Owner

—————

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2
Technology Center 3900

—————

Before JOHN A. JEFFERY, STEPHEN C. SIU, and JENNIFER L. McKEOWN,
*Administrative Patent Judges*.

McKEOWN, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

## STATEMENT OF CASE

Strava, Inc., MapMyFitness, Inc., and FitnessKeeper, Inc. (collectively, the "Requester") made a third party request for *inter partes* reexamination of U.S. Patent No. 6,701,271 ("the '271 patent") to Barry E. Willner, et al., entitled *Method and Apparatus for Using Physical Characteristic Data Collected From Two or More Subjects*, issued March 2, 2004.

Both ICON Health & Fitness, Inc. ("Patent Owner") and the Requester indicate that the '271 patent is the subject of several litigations: (1) *Icon Health & Fitness, Inc. v. Garmin Ltd., et al.*, Civil Docket No.1: 11-cv-00166-DB; (2) *Icon Health & Fitness, Inc. v. Polar Electro Oy, et al.,* Civil Docket No.1: 11-cv-00167-PMW; (3) *Icon Health & Fitness, Inc. v. FitnessKeeper, Inc.*, Civil Docket No.1: 11-cv-OOI73-CW; (4) *Icon Health & Fitness, Inc. v. MapMyFitness, Inc.*, Civil Docket No.1: 11-cv-00174-DB; and (5) *Icon Health & Fitness, Inc. v. Strava, Inc.*, Civil Docket No.1: 11-cv-00175-CW.  PO App. Br. 3; 3PR App. Br. 4, 34 (Related Proceedings App'x).[1]

Additionally, both the Patent Owner and the Requester filed a notice of concurrent proceedings indicating that an *ex parte* reexamination request of the '271 Patent was filed and the reexamination was granted on March 4, 2015, having Control No. 95/000,682.  *See* Patent Owner's Supplemental Notice of Prior and

---

[1] We refer to Patent Owner's Appeal Brief, filed May 6, 2014 ("PO App. Br."); Examiner's Answer, mailed September 19, 2014, incorporating by reference the Examiner's Right of Appeal Notice, mailed January 23, 2014 (hereinafter "RAN"); Requester's Respondent Brief, filed June 6, 2014 ("3PR Resp. Br."); Patent Owner's Rebuttal Brief, filed October 17, 2014 ("PO Reb. Br."); Requester's Appeal Brief, filed May 7, 2014 ("3PR App. Br."); Patent Owner's Responsive Brief, filed June 9, 2014 ("PO Resp. Br."); and Requester's Rebuttal Brief, filed October 20, 2014("3PR Reb. Br.").

2

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

Concurrent Proceedings Pursuant to 37 C.F.R. §1.985(a), filed June 12, 2015;
Requester's Notification of Concurrent Proceedings Pursuant to 37 C.F.R.
§1.985(b), filed June 8, 2015.

The Patent Owner appeals from the decision in the Examiner's Right of
Appeal Notice (RAN) rejecting claims 15, 16, 50–56, 58–61, 65, 79, 95, 98, 99,
and 124 of the '271 patent.  PO App. Br. 3; RAN 1.  The Requester filed a
responsive brief, and the Patent Owner filed a rebuttal brief.  *See generally* 3PR
Resp. Br. and PO Reb. Br.

Requester also appeals the Examiner's determination favorable to
patentability of claim 47.  3PR App. Br. 1, 29.  The Patent Owner filed a
responsive brief, and the Requester filed a rebuttal brief.  *See generally* PO Resp.
Br. and 3PR Reb. Br.

The Examiner's Answer relies on the RAN, incorporating it by reference.
*See* Ans. 1.

An oral hearing was conducted on July 22, 2015.  The transcript of the oral
hearing will be made of record.

We have jurisdiction under 35 U.S.C. §§ 134(b) and 315.

We AFFIRM-IN-PART with respect to the Patent Owner's appeal, but
REVERSE as to the Requester's cross-appeal, and enter a New Ground of
Rejection as to claim 47.

## The Claims on Appeal

Canceled claims 1, 13, and 14 as well as claims 15, 16, 47, and 50, are
reproduced below:

1. A method for providing feedback, comprising:

3

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

receiving first data indicative of a physical characteristic of a
first subject from a first device associated with said first subject and
second data indicative of a physical characteristic of a second subject
from a second device associated with said second subject;
determining an evaluation of said first data and said second
data, wherein said evaluation is representative of a state of both said
first subject and said second subject; and
providing a notification regarding said evaluation to a device.

13. The method of claim 1, further comprising:
receiving a notification regarding a plurality of options.

14. The method of claim 13, further comprising:
selecting one of said plurality of options based, at least in part,
on said evaluation.

15. The method of claim 14, further comprising:
selecting said device based, at least in part, on said selecting
one of said plurality of options.

16. The method of claim 13, wherein said device is associated with at
least one of said plurality of options.

47. (New) A system for facilitating feedback, comprising:
a remote server including:
a memory;
a communication port operative to receive data over the
Internet;
a processor connected to said memory and said communication
port said processor being operative to:
receive, over the Internet and through said
communication port of said server, first data indicative of a
physical characteristic of a first subject from a first sensor
operative to sense said first data and second data indicative of a
physical characteristic of a second subject from a second sensor
operative to sense said second data;
store said first and second data in said memory;

4

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

provide a notification regarding said evaluation to a device; and an internal clock element that is operative to maintain a time and date for said server, wherein said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification provided by said server.

50.  (New) A system for facilitating feedback, comprising:
a remote server including:
    a memory;
    a communication port operative to receive data over the Internet;
    a processor connected to said memory and said communication port, said processor being operative to:
        receive, over the Internet and through said communication port of said server, first data indicative of a physical characteristic of a first subject from a local first sensor operative to sense said first data and second data indicative of a physical characteristic of a second subject from a local second sensor operative to sense said second data;
        store said first and second data in said memory;
        determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and
        provide a notification regarding said evaluation to a device; and
    a sensor database accessible to said server, wherein said sensor database includes a sensor identifier field that contains information for identifying said first and second sensors.

5

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

*Prior Art Relied Upon*

The Examiner relies on the following as evidence of unpatentability:

| | | |
|---|---|---|
| Papadopoulos | US 3,744,712 | July 10, 1973 |
| Zawilinski | US 5,676,138 | October 14, 1997 |
| Patton | US 6,292,688 | September 18, 2001 |
| | | (Feb. 28, 1996) |
| Teller | US 6,605,038 | August 12, 2003 |
| | | (June 23, 2000) |
| Bibl | US 2002/0111541 | August 15, 2002 |
| | | (Jan. 3, 2000) |

The Requester additionally relies on the Declaration of Frank Koperda, dated April 8, 2013 ("Koperda Decl. I") and the Supplemental Declaration of Frank Koperda, dated October 15, 2013 ("Koperda Decl. II").

The Patent Owner additional relies on the Declaration of Darren Ashby, dated September 11, 2013 ("Ashby Decl.").

*Adopted and Withdrawn Rejections*

The Examiner maintains the following proposed rejection, for which Owner appeals:

1. Claims 50–56, 58–61, and 65 are rejected under 35 U.S.C. § 112, second paragraph as indefinite. RAN 4–6

2. Claims 15 and 16 are rejected under 35 U.S.C. § 102(a) as being anticipated by Patton. RAN 6–8.

3. Claims 15 and 16 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Zawilinski and Papadopoulos. RAN 6–8.

4. Claims 15 and 16 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Patton and Papadopoulos. RAN 6–8.

6

**Appx931**

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

5. Claims 50–52, 65, 79, 95, 98, 99, and 124 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Patton and Teller.  RAN 11–14, 20–31.

6. Claims 50–52, 65, 79, 95, 98, 99, and 124 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Zawilinski and Teller.  RAN 11–14, 20–31.

7. Claims 53–56, 58–61, 65, 79, and 124 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Patton and Bibl.  RAN 14–24, 28–30.

8. Claims 53–56, 58–61, 65, 79, and 124 are rejected under 35 U.S.C. § 103(a) as being unpatentable over Zawilinski and Bibl.  RAN 14–24, 28–30.

The Examiner withdrew the following proposed rejections, for which Requester appeals:

1. Claim 47 under 35 U.S.C. § 103(a) as being unpatentable over Patton and Bibl.  RAN 8–11.

2. Claim 47 under 35 U.S.C. § 103(a) as being unpatentable over Zawilinski and Bibl.  RAN 8–11.

3. Claim 47 under 35 U.S.C. § 103(a) as being unpatentable over Patton and Teller.  RAN 8–11.

4. Claim 47 under 35 U.S.C. § 103(a) as being unpatentable over Zawilinski and Teller.  RAN 8–11.

7

**Appx932**

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

## PRINCIPLES OF LAW

During examination of a patent application, a claim is given its broadest reasonable construction "in light of the specification, as it would be interpreted by one of ordinary skill in the art." *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004) (internal citations and quotations omitted). There is a "heavy presumption" that a claim term carries its ordinary and customary meaning. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). A patentee may rebut this presumption, however, by acting as his own lexicographer, providing a definition of the term in the specification with "reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

## PATENT OWNER'S APPEAL

### ISSUES

We review the appealed rejections for error based upon the issues identified, and in light of the arguments and evidence produced thereon. *Cf. Ex parte Frye*, 94 USPQ2d 1072, 1075 (BPAI 2010) (precedential) (citing *In re Oetiker*, 977 F.2d 1443, 1445 (Fed. Cir. 1992)). "Any arguments or authorities not included in the briefs permitted under this section or [37 C.F.R.] §§ 41.68 and 41.71 will be refused consideration by the Board, unless good cause is shown." 37 C.F.R. § 41.67(c)(1)(vii).

Based on the disputed errors presented by Patent Owner and Requester, the main issues on appeal are:

8

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

(1) Did the Examiner err in rejecting claims 50–56, 58–61, and 65 as indefinite?

(2) Did the Examiner err in rejecting claims 15 and 16 under 35 U.S.C. § 102(b) as anticipated by Patton?

(3) Did the Examiner err in rejecting claims 15 and 16 under 35 U.S.C. § 103(a) as being unpatentable over the cited combinations of prior art?

(4) Did the Examiner err in rejecting claims 50–56, 58–61, 65, 79, 95, 98, 99, and 124 under 35 U.S.C. § 103(a) as being unpatentable over the cited combinations of prior art?

ANALYSIS

A. THE INDEFINITENESS REJECTION

The Examiner finds the recited phrase "a sensor database accessible to said server" renders claim 50 indefinite because it is unclear whether the "scope of claim 50 is drawn to the sub-combination 'remote server' alone, or if the scope of claim 50 is drawn to a combination of a 'remote server' and a 'sensor database.'" RAN 4; *see also* RAN 5–6 (noting that claims 51–56, 58–61 and 65 each have a similar issue). The Examiner explains that, on one hand, the text of the claim reasonably suggests to a skilled artisan that the recited sensor database is part of the remote server. *See* RAN 5-6 (noting that the sensor database is listed as a component included in the remote server). But, on the other hand, the claim recites that the sensor database is *accessible to* said remote server. RAN 6. According to the Examiner, this language reasonably suggests to a skilled artisan that the sensor database is outside of, or in other words separate from, the remote server. *Id.*

9

Appx934

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

Because the Examiner finds that these are two reasonable interpretations, the Examiner rejects claim 50 as indefinite. *Id.*

We disagree. Namely, we find that the Examiner erred in finding that because the claim recites that the sensor database is accessible to the remote server, it suggests that the sensor database is outside of, or separate from, the remote server. As the Patent Owner points out, a skilled artisan would understand the term "accessible" to mean "capable of being reached." PO App. Br. 8 n.1. For example, an internal memory within a computer may be accessible to, or capable of being reached by, the computer. *Id.* Moreover, the recited language of the claim is consistent with the disclosure of the '271 patent that broadly describes a server. *See, e.g.,* '271 patent, col. 9, ll. 35–37 ("A server 204 can comprise a single device or computer, a networked set or group of devices or computers, a workstation, etc.); *see also* PO Reb. Br. 3. Since a server may include, for example, a networked set or group of devices, it is reasonable to consider that these devices, all within the server, would be accessible to one another.

Accordingly, we determine that the Examiner erred in rejecting claims 50–56, 58–61, and 65 as indefinite.


B. THE ANTICIPATION REJECTION OF CLAIMS 15 AND 16 BASED ON PATTON

The Examiner rejects claims 15 and 16 as anticipated by Patton. RAN 6–8. Patton is directed to a method and apparatus for neurological testing. Patton, col. 1, ll. 6–7. More specifically, in Patton, a test subject's brain waves are monitored while viewing some time-varying stimuli. Patton, Abstract. The received data is analyzed and used to construct a graph of the composite emotional reaction of the subject as the presentation continues. *Id.* One practical application, suggested by

10

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

Patton, is consumer response testing or, in other words, using the method to determine whether a program or presentation create favorable responses in the test subjects. Patton, col. 1, ll. 10–20.

The Examiner applies one exemplary embodiment, the in vehicle training embodiment described at column 24, lines 38–51, to the recited limitations of claims 15 and 16. *See, e.g.*, Action Closing Prosecution (nonfinal), dated August 12, 2013 ("ACP"), 6–7. We outline our understating of the Examiner's rejection applying Patton to claim 15 (including the limitations of claims 1, 13, and 14 from which claim 15 depends) in the table below.

| '271 Limitations – Claims 1, 13, 14, and 15 | Patton Disclosure |
| --- | --- |
| A method for providing feedback, comprising: | Patton teaches a method of receiving data from test subjects and analyzing the data to determine an emotional reaction to the stimuli. |
| receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject; | In the "in vehicle training" embodiment, data is received from devices monitoring the neurological response of respondents or test subjects while viewing vehicle control panel display formats. |
| determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; | The received neurological response data is evaluated to determine, for example, the display (vehicle control panel display format) that was most rapidly comprehended and/or created approval or pleasure in the test subject. |

11

**Appx936**

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

| providing a notification regarding said evaluation to a device; | The "in vehicle training" vehicle control panel device is provided a notification of the evaluation by providing a vehicle control panel display format to the vehicle control panel device for evaluation by the test subject. |
| --- | --- |
| [claim 13] receiving a notification regarding a plurality of options; | The vehicle control panel device receives a notification of a plurality of options by receiving the several vehicle control panel display formats. |
| [claim 14] selecting one of said plurality of options based, at least in part, on said evaluation; and | The manufacturer selects one of the vehicle control panel display formats based on the evaluation of the data to determine the display that was most rapidly comprehended and/or created approval or pleasure in the test subject. |
| [claim 15] selecting said device based, at least in part, on said selecting one of said plurality of options. | The manufacturer selects the only vehicle control panel device by selecting the vehicle control panel display format. |

We now turn to the Patent Owner's arguments with respect to the anticipation rejection of claims 15 and 16.  First, the Patent Owner contends that Patton fails to disclose providing a notification regarding said evaluation to a device because Patton fails to provide the recited notification regarding said evaluation *after* completion of the evaluation.  PO App. Br. 11–12.  Next, with respect to claim 15, the Patent Owner maintains that Patton does not include the recited step of selecting said device based, at least in part, on said selecting one of said plurality of options.  PO App. Br. 12.  And finally, the Patent Owner argues

12

**Appx937**

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

that Patton lacks the limitation of claim 16, namely that the device is associated

with at least one of the plurality of options. *Id.*

    1. *Sequence of steps*

    The parties dispute whether the notification regarding the evaluation

provided to a device must be performed after completion of the determining the

evaluation step. *See* PO App. Br. 11–12; PO Reb. Br. 3–4; 3PR Resp. Br. 5–7.

According to the Patent Owner, the recited sequence of steps limits the scope of

the claim

> . . .because the second step ("determining an evaluation of said first
> data and said second data") requires "said first data and said second
> data" that were received in the first step, and because the third step
> ("providing a notification regarding said evaluation") requires "said
> evaluation" that was determined in the second step. Thus, the
> language of these claims imposes a specific sequence on the
> performance of the method and this sequence must be present in a
> prior art reference to be invalidating.

PO App. Br. 11; *see also* PO Reb. Br. 4–5 ("It would be impossible to provide a

notification regarding an evaluation (as required by the third step) if that evaluation

has not yet been determined (as required by the second step).").

    The Requester responds that "neither the specification nor the claims require

any specific sequence of steps." 3PR Resp. Br. 5; *see also* RAN 8. The

Specification also provides that the order of steps identified within the various

embodiments is not limiting and expressly states that the steps can be performed in

any order. 3PR Resp. Br. 5–6. The Requester further asserts that "the Patent

Owner's argument that these claims require a certain order of steps hinges on an

impermissibly narrow interpretation of the term 'regarding.'" 3PR Resp. Br. 6.

According to the Requester, the recited phrase "regarding said evaluation" does not

13

**Appx938**

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

require the evaluation to be complete, but could refer to any notification related to the evaluation. 3PR Resp. Br. 6.

We agree with the Requester. Claim 1 merely recites "providing a notification regarding said evaluation," without any limitation on when the notification is provided or how the notification relates to the evaluation. The plain and ordinary meaning of "regarding" includes "with regard to; respecting; concerning."[2] A notification "regarding said evaluation," then, may include notifications that concern or relate to an evaluation, such as a notification indicating the start of an evaluation, or even a notification indicating that the evaluation will occur at a later point in time. The Patent Owner fails to persuasively explain why these types of notifications, that would be provided prior to completion of the evaluation, would be precluded from satisfying the recited limitation. *See also Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323 (Fed. Cir. 2001) ("Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one.")

The '271 patent disclosure further supports the Requester's interpretation. Namely, the '271 patent discloses, with respect to each exemplary embodiment, that the recited order of steps is not fixed and "can be practiced in any order that is practicable." '271 patent, col. 4, ll. 44–47; *see also* '271 patent, col. 8, ll. 1–4; col. 8, ll. 58–61; col. 14, ll. 25–31. We are not persuaded that the Examiner erred by adopting the Requester's interpretation of a notification regarding the evaluation.

---

[2] Definition of "regarding" (preposition). Merriam-Webster's Online Dictionary, 11th ed., *available at* http://www.merriam-webster.com/dictionary/composite (last visited Aug. 27, 2015).

14

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

Because we find that claim 1 does not require providing the notification to a device after the evaluation is complete, Patton discloses this limitation. *See* ACP 7–8. As the Examiner explains, and as outlined above, Patton describes that a device, namely a vehicle control panel device, is provided a notification regarding said evaluation by receiving a vehicle control panel display format. *Id.*

> 2. *"selecting said device based, at least in part, on said selecting one of said plurality of options"*

Nevertheless, we find that the Examiner erred in rejecting claim 15 as anticipated by Patton because we agree with the Patent Owner that Patton fails to disclose "selecting said device based, at least in part, on said selecting one of said plurality of options." *See, e.g.,* PO App. Br. 12.

Column 24, lines 38–51 of Patton discusses one embodiment where respondents or test subjects review different vehicle control panel display formats.

> By way of another example, in vehicle training, including auto and aircraft management, the manufacturer may be interested in the reaction of the respondent to the seating and control panel of the vehicle. . . . Several different forms of panels, each presenting information needed to operate the vehicle, could be viewed in succession, and the maker could then choose the display that was most rapidly comprehended and/or created approval or pleasure in the test subject.

Patton, col. 24, ll. 38–51. In other words, in this embodiment, Patton describes receiving and analyzing the neurological response from respondents or test subjects that review each vehicle control panel display format through the vehicle control panel device. The results of the analysis are then provided to the manufacturer for the manufacturer to select the vehicle control panel display format.

According to the Examiner,

15

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

> The recited limitation "selecting said device based, at least in part, on said selecting one of said plurality of options" recited in claim 15 is met because Patton discloses that the vehicle display panel [device] (note that because there is only one vehicle display panel [device], it must be the one discussed in claim 1) with one of the selected display format (the selection of this vehicle display panel with a selected display format).

ACP 7. As such, we understand the Examiner's position to be that because there is only one vehicle control panel device, the manufacturer's single action of selecting a vehicle control panel display format must also select a vehicle control panel device.

The Examiner findings, though, fail to consider that claim 15, through its dependence on claim 14, requires *two* selecting steps. Namely, the method selects one of the plurality of options based on the evaluation, and also selects said device based on the selected one of the plurality of options. While we recognize that Patton discloses selecting a vehicle control panel display format, Patton does not disclose selecting a device separate from the vehicle control panel display format selection.

Moreover, we fail to see how the manufacturer "selects" a device based on the selected option when there is only one possible device to select. We note that "select" is commonly understood to mean "to choose in preference to another or others; pick out."[3] Given the Examiner's express finding that there is only one device, we disagree that this single device is selected, let alone selected *based on* the selecting one of the plurality of options. For example, no matter the selected

---

[3] Definition of "select" (preposition). Merriam-Webster's Online Dictionary, 11th ed., *available at* http://www.merriam-webster.com/dictionary/composite (last visited Aug. 27, 2015).

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

one of the plurality of options, the same, one and only vehicle control panel device, must also be "selected." As such, we are persuaded that Patton fails to disclose "selecting said device based, at least in part, on said selecting one of said plurality of options."

Accordingly, we determine that the Examiner erred in rejecting claim 15 as anticipated by Patton.

> 3. *"wherein said device is associated with at least one of said plurality of options"*

Claim 16, unlike claim 15, does not recite a second selecting step or that the device be selected based on selected one of said plurality of options. Instead, claim 16 merely requires that "said device [(that is provided a notification regarding said evaluation)] is associated with at least one of said plurality of options." We are not persuaded that this limitation is absent from Patton. Namely, Patton describes that each of the plurality of vehicle control panel display formats (i.e. plurality of options) are provided to the vehicle control panel device. ACP 6–8. Accordingly, Patton's device is associated with at least one of the plurality of options.

We note that claim 16 does not require that the device be associated with the selected option. As such, a device being associated with one or all of the options would satisfy the claim limitation. Patton's vehicle control panel device would both receive a notification regarding said evaluation (i.e. receive a vehicle control panel display format), and would be associated with the plurality of options by receiving and displaying each of the vehicle control panel display formats. We agree with the Examiner then that Patton discloses this limitation.

Therefore, we determine that the Examiner did not err in rejecting claim 16 as anticipated by Patton.

17

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

## C. THE OBVIOUSNESS REJECTIONS OF CLAIM 15

The Patent Owner's arguments with respect to the obviousness rejections of claim 15 focus primarily on whether Papadopoulos teaches "receiving a notification regarding a plurality of options." *See* PO App. Br. 13–16. The Patent Owner also asserts that Papadopoulos lacks "the recited selecting said device based, at least in part, on said selecting one of said plurality of options." PO App. Br. 16.

### 1. "receiving a notification regarding a plurality of options"

The Patent Owner contends that Papadopoulos does not teach receiving a notification regarding a plurality of options. *See* PO App. Br. 13–16; PO Reb. Br. 6–7. Specifically,

> Claims 15 and 16 each require that a notification regarding a plurality of options be received. The cited portion of Papadopoulos does not teach that the audience, through its "reaction," *provides to an observer* any plurality of options. Rather, based on the observation of the audience's reaction, the observer may determine potential options. For example, if the perceived audience reaction to a story is boredom, the presenter may decide to either (1) take a break so that the audience can get some snacks, or (2) modify the story to make it more exciting. *These options, however, are not conveyed by the audience or received by the presenter*. These options are determined entirely within the mind of the presenter. Papadopoulos does not disclose that the audience *provides any options to the presenter*. For the reasons provided above, options that are conceived entirely within a person's mind are not "received." Papadopoulos does not disclose this limitation.

PO Reb. Br. 7 (emphasis added).

This argument, though, is not commensurate with the scope of the claim. As discussed above, the plain and ordinary meaning of "regarding" includes with

18

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

regard to; respecting; concerning.[4]  A notification "regarding" a plurality of options then does not require, like the Patent Owner asserts, that the notification *convey or provide* the plurality of options.  Instead, a notification concerning or related to a plurality of options would satisfy the recited limitation.

Papadopoulos describes that the audience response is simultaneously displayed to the presentation and that the presenter "may respond to the audience's reaction or modify his presentation accordingly or elicit information from the audience."  Papadopoulos, col. 1, ll. 56–62; *see also* 3PR Resp. Br. 9.  For example, the simultaneous display of the audience response may inform or notify the presentation to use one or more of the externally provided or internally conceived plurality of options.  It follows, then, that because Papadopoulos describes that a presenter take actions, such as responding to the audience reaction, modifying the presentation or eliciting information from the audience, a skilled artisan would understand that some notification *regarding* these plurality of options was received by the presenter.  We are not persuaded by the Patent Owner that this teaching of Papadopoulos fails to satisfy this recited limitation.

Therefore, we determine that the Examiner did not err in finding that Papadopoulos teaches this disputed limitation.

---

[4] Definition of "regarding" includes "with regard to; respecting; concerning." Merriam-Webster's Online Dictionary, 11th ed., *available at* http://www.merriam-webster.com/dictionary/composite (last visited August 27, 2015).

19

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

2. *"selecting said device based, at least in part, on said selecting one of said plurality of options"*

As discussed above, we determine that Patton fails to teach the recited selecting said device limitation. For similar reasons, we find that this limitation is also absent from Papadopoulos.

The Requester maintains that Papadopoulos teaches the limitations of claims 13–15. *See, e.g.*, Request for *Inter Partes* Reexamination (Request), CC3, p. 2–4 (emphasis). With respect to claim 15, the Requester explains,

> As shown, Papadopoulos clearly shows that a presenter may have multiple devices available by which to receive notifications. Each device is associated with at least one option, the applause devices are associated with determining the gross response at the conclusion of a performance allowing adjustment of a performance after it is completed, while laughter sound measuring devices provide feedback during a performance allowing for adjustment during the presentation. Based on selecting either option (after the performance adjustments, or during the performance adjustments), the appropriate device may be selected to provide the notification..[sic]

Request for *Inter Partes* Reexamination ("Request"), CC3, p. 4. We understand, based on these assertions, that the Requester relies on the applause measuring device or laughter measuring device to satisfy the recited "device" limitations of claim 1 and claim 15.

In particular, the Requester asserts that based on selecting the time to adjust the presentation, "the appropriate device may be selected *to provide the notification*." Request, CC3, p. 4 (emphasis added). We do not dispute that a skilled artisan may understand that these devices in Papadopoulos *provide* notifications to a presenter, such as providing the measured applause or laughter, but the claim instead requires that these devices *receive* a notification regarding said evaluation. From the relied-upon disclosure of Papadopoulos, these

20

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

measuring devices would *receive* data from test subjects, i.e. receive the first and second data, which is separately recited in the claim. As such, we fail to see how either of the laughter or applause measuring devices *receive* a notification regarding an evaluation.

Alternatively, the Requester suggests that either Patton or Zawilinski teaches providing a notification to a device, as required by claim 1, but Papadopoulos satisfies the selecting the device limitation of claim 15. *See* Request, CC1, p. 4; CC2, pp. 4–5.[5] The Requester, however, fails to sufficiently support these combinations. For example, Patton's control panel device is used by test subjects to provide evaluation data, whereas Papadopoulos's device is used by the presenter to obtain applause and laughter measuring results. *Compare* ACP 6 *with* Request, CC4, p. 4; *see also* App. Br. 12 (identifying the inconsistency in what device of Patton is identified as satisfying the recited device limitations). With respect to Zawilinski, it is not clear how would it have been obvious to a skilled artisan to select Zawilinski's interactive multimedia computer (that is used to analyze and display emotional responses from test subjects) based on a presenter's selecting to adjust a presentation at a particular time, as allegedly taught by Papadopoulos.

The Requester also fails to persuasively explain how Papadopoulos teaches that either applause measuring device and laughter measuring device are selected based, at least in part, on said selecting one of said plurality of options or why it would have been obvious to a skilled artisan at the time of the invention. Papadopoulos merely generally describes that these devices were known in the art at the time and that both are helpful to provide feedback to a comedian during his

---

[5] The parties do not dispute that the selected device (claim 15) must be the same device that is provided a notification (claim 1). ACP 6.

21

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

presentation. *See* Papadopoulos, col. 1, ll. 8–18. Papadopoulos also at least
suggests that both devices may be used during the presentation.

Finally, we note that in applying Papadopoulos to the invention of claim 15,
the Requester refers to the plurality of options as the particular time of providing
the feedback to the presenter and making adjustments, i.e. one option is at the
conclusion of the presentation and another option is during the presentation. *See*
Request, CC3, p 4. These options are not necessarily consistent with the plurality
of options identified as satisfying the limitations of claim 13, from which claim 15
indirectly depends. *See* Request, CC3, p 4 (identifying the types of actions taken
presenter in response to the audience response to be the plurality of options,
namely responding to the audience reaction, modifying the presentation, or
eliciting information from the audience). The Requester neither rectifies this
inconsistency nor explains how Papadopoulos teaches receiving a notification
regarding *the timing* of providing feedback or timing of making presentation
adjustments.

For the reasons discussed above, we are persuaded that the Examiner erred
in finding that the cited combinations of prior art teach providing a notification
regarding said evaluation to a device as well as selecting said device based, at least
in part, on said selecting one of said plurality of options. Therefore, we determine
that the Examiner erred in rejecting claim 15 as obvious.

D. THE OBVIOUSNESS REJECTIONS OF CLAIM 16

Our conclusion that the Examiner did not err in rejecting claim 16 as
anticipated by Patton, discussed above, renders it unnecessary to reach the
propriety of the remaining obviousness rejections of claim 16. *See Beloit Corp. v.*

22

Appx947

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

*Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984); *In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009).

E. THE OBVIOUSNESS REJECTIONS OF CLAIMS 50–56, 58–61, 65, 79, 95, 98, 99, AND 124

The Examiner rejects claims 50–56, 58–61, 65, 79, 95, 98, 99, and 124 as obvious. *See* RAN 11–31. As discussed below, we are not persuaded of error in the Examiner's rejection of these claims. *See, e.g.*, 3PR Resp. Br. 9–22.

*1. Claims 50–52*

Claims 50–52 include limitations regarding fields in a sensor database. Namely, one limitation requires a sensor identifier field that includes information to identify the first and second sensor (claim 50). Another limitation recites a sensor description field that includes information describing the first and second sensors (claim 51). And finally a sensor output field is also recited (claim 52) that includes information regarding a type, timing or format of data provided by the first and second sensor. The Examiner rejects each of these claims as obvious over the combination of Patton and Teller and Zawilinski and Teller. RAN 11–14.

The "Patent Owner disagrees that [Teller's] disclosure of a database that stores data that is uploaded from a sensor device is sufficient to disclose the specific fields in the sensor database required by claims 50-52." PO App. Br. 16. According to the Patent Owner, the Examiner improperly relied on hindsight to find these claims obvious. PO App. Br. 17.

We agree with Requester that the specific fields in the sensor database are obvious in view of Teller. In particular, because Teller "teaches received information or data from a variety of different sensors for different users, and

23

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

storing that information in a database," the recited limitations of claims 50–52 are obvious. 3PR Resp. Br. 10; *see also* Koperda Decl. I ¶ 24. As the Examiner further explains, the "missing limitations are obvious because it is common practice to provide identifiers to each of the elements stored in a database so that data in a database can be quickly sorted, rearranged, retrieved ... later." 3PR Resp. Br. 10 (citing RAN at 13). As such, we determine that the Examiner did not err in rejecting these claims as obvious.

> 2. Claims 53–56 and 58–61

The Examiner rejects claims 53–56 and 58–61 as obvious based on Patton and Bibl and Zawilinski and Bibl. See RAN 14–20. These claims recite particular fields in either an output database or an evaluation database. The Patent Owner maintains that the limitations of these claims are "very detailed and specific" in contrast to the "generic and general 'database' in Bibl." PO App. Br. 17–18; *see also* PO App. Br. 19 ("the Examiner fails to cite any facts, gleaned from Bibl, to support a position that the specific databases and database fields recited in claims 53–56 and 58–61 would have been obvious to one of ordinary skill in light of Bibl's one-sentence disclosure of a generic 'database' that stores feedback.").

We disagree. As the Requester points out, "these claims recite nothing more than data fields having information that would naturally be included in any output database, and therefore would have been obvious in view of the prior art." 3PR Resp. Br. 11. The Requester's expert, Mr. Koperda, notes that Bibl teaches a database to store data from multiple sensors for each of multiple users and then opines that "[i]t would have been obvious to one skilled in the art that, to properly store information, an output database having the aforementioned fields would be

24

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

necessary." 3PR Resp. Br. 11 (citing Koperda Decl. I ¶¶ 18 and 19)[6]; *see also* 3PR Resp. Br. 12 (discussing similar arguments regarding claims 53–56); RAN 16 ("the Examiner believes that [the identifier fields recited in claims 54–56] are obvious because it is a common practice to provide identifiers to each of the elements stored in a database so that data in a database can be quickly sorted, rearranged, retrieved ... later."); RAN 19 (providing the same reasoning with respect to claims 58–61). As such, we determine that the Examiner did not err in rejecting these claims as obvious.

    3. Claim 65

    Claim 65 recites that a remote server that includes, inter alia, a processor that is operative to provide a notification regarding an evaluation to a device, wherein said device includes a flash memory card. The Examiner rejected this claim as obvious based on Patton in view of Bibl, Zawilinski in view of Bibl, Patton in view of Teller, and Zawilinski in view of Teller. RAN 20–22.

    The Patent Owner maintains that neither Bibl nor Teller renders the recited flash memory card obvious. *See* PO App. Br. 20–21; PO Reb. Br. 9–11. Specifically, the Patent Owner states that at the time of the invention, a flash memory card would be understood to mean a memory card that is easily removable from a host device. PO App. Br. 20 (citing Ashby Decl. ¶ 12). According to the Patent Owner, Bibl's EEPROM and Teller's flash memory are permanently

---

[6] We also disagree with the Patent Owner that Mr. Koperda's statements with respect to these claims are conclusory and entitled to no weight. *See* PO Reb. Br. 9. In particular, the Koperda Declaration explains that at the time of the invention, skilled artisan would understand that to in order to store all the evaluation information, fields such as those claimed would be necessary.

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

incorporated into the memory of a computer and thus fail to teach the recited flash memory card.  PO App. Br. 20–21.

> Further, with respect to Teller, the Patent Owner asserts that

> Teller's disclosure of "flash memory" is not equivalent to or does not render obvious the recited "flash memory card."  One of ordinary skill in the art would not have understood the term "flash memory" to mean the same thing as a "flash memory card."  "Flash memory" is not necessarily removable but may be permanently incorporated into a host device, such as the internal memory in a computer.  TPR ignores the term "card" in claim 65 by asserting that Teller's disclosure of "flash memory" is adequate to disclose the recited "flash memory card."

PO App. Br. 21.

We find this argument unavailing.  First, we agree with Requester that the Patent Owner fails to persuasively support the interpretation that a flash memory card is "easily removable." *See* 3PR Resp. Br. 14; Koperda Decl. II ¶¶ 6–9. Moreover, contrary to the Patent Owner's assertions, it is not necessary for Teller's flash memory to necessarily be removable to establish that the recited flash memory card is obvious. *See* 3PR Resp. Br. 14–15.  As the Requester points out, a flash memory card is merely a card containing flash memory.  Teller teaches flash memory and it was known at the time of the invention that flash memory could be in a card or non-card form.  3PR Resp. Br. 14–15 (citing Koperda Decl. I ¶¶ 10, 14, 17).  As such, we determine that the Examiner did not err in rejecting claim 65 as obvious in view of the teachings of Teller.[7]

---

[7] Because we affirm the rejections of claim 65 based on the cited combinations with Teller, we do not determine whether Bibl also teaches this limitation. *See Beloit Corp. v. Valmet Oy*, 742 F.2d 1421, 1423 (Fed. Cir. 1984); *In re Gleave*, 560 F.3d 1331, 1338 (Fed. Cir. 2009).

26

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

### 4. Claim 79

Claim 79 recites that a remote server having a processor that is operative to provide a notification regarding said evaluation to a device, wherein said notification includes an XML transmission. The Examiner rejected claim 79 as obvious based on Patton in view of Bibl, Zawilinski in view of Bibl, Patton in view of Teller, and Zawilinski in view of Teller. RAN 22–24.

The Patent Owner argues that Bibl's disclosure of HTTP and HTML and Teller's disclosure of HTML does not make an XML transmission obvious. PO App. Br. 21. According to the Patent Owner, "[t]he structure and function of XML is completely different from HTML and HTTP, and thus the requirement of an 'XML transmission' in claim 79 is not merely an obvious 'design choice' as asserted by the Examiner." PO App. Br. 22. The Patent Owner also challenges the Examiner's reliance on the Koperda Declaration. PO App. Br. 22–23.

We find the Patent Owner's arguments unpersuasive and agree with the Requester's responsive arguments. *See* 3PR Resp. Br. 15–17. It was known in the art at the time of the invention that XML is one type of transmission protocol among many known types at the time of filing. 3PR Resp. Br. 15; Koperda Decl. II. ¶16; *see also* RAN 23 (noting that XML is merely listed in the'271 patent with other available protocols, such as HTTP, HTML, FTP, etc.). It is merely a design choice to substitute one known transmission protocol for another known transmission protocol. 3PR Resp. Br. 15–17; RAN 23. As such, we determine that the Examiner did not err in finding claim 79 obvious.

### 5. Claim 95

Claim 95 recites that "said processor [included in a remote server] is operative to receive said first and second data simultaneously from said first and

27

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

second subjects." The Examiner rejects claim 95 as obvious based on either Patton or Zawilinski with Teller. RAN 24–26.

To challenge these rejections, the Patent Owner alleges that Teller does not render obvious a server that receives data from multiple devices simultaneously. PO App. Br. 23. More specifically, Teller fails to teach a *single* server receiving first and second data simultaneously. PO Reb. Br. 12–13.

The Patent Owner's argument, however, is not commensurate with the scope of the claim. Namely, claim 95 does not recite *a single* server. Instead, claim 95 merely recites a processor included in a remote server. Notably, as discussed above with respect to the indefiniteness rejection, the '271 patent broadly defines that a server may include a group of computers or devices. *See, e.g.,* '271 patent, col. 9, ll. 35–37 ("A server 204 can comprise a single device or computer, a networked set or group of devices or computers, a workstation, etc.).

We also note that the Federal Circuit has "has repeatedly emphasized [the general rule] that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising. . . . [except] where the language of the claims themselves, the specification, or the prosecution history necessitate departure from the rule." *Baldwin Graphic Systems, Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342-1443 (Fed. Cir. 2008) (citations omitted). The Patent Owner does not identify any claim language or Specification disclosure that suggests departure from this general rule. Instead, the Patent Owner relies on the lack of "a plurality of" as support. *See, e.g.,* PO Reb. Br. 12–13 ("Claim 95 does not recite "a plurality of remote servers."). Given the plain language of the claim and the Specification's broad

28

**Appx953**

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

disclosure, we find this argument unpersuasive. As such, the recited remote server of claim 95 is not limit to only one server.

The Examiner here finds that given Teller's teaching of substantial volume, requiring multiple middleware servers to collect data from various data devices, a skilled artisan would understand Teller to at least suggest simultaneous receipt of first and second data. RAN 25–26; *see also* 3PR Resp. Br. 18. We are not persuaded of error in these findings. Therefore, we determine that the Examiner has not erred in rejecting claim 95 as obvious.

6. Claim 98 and 99

Claim 98 further requires that the processor is operative to determine whether first subject is in need of a break. Claim 99 recites similar limitations. The Examiner rejects claims 98 and 99 as obvious based on either Patton or Zawilinski with Teller. RAN 26–28.

The Examiner here relies on Teller's determining whether a user sleep levels are low as satisfying the disputed limitation. RAN 27–28. According to the Patent Owner, determining a need for sleep is distinct from determining whether a user is in need of a break, e.g. break from work. PO App. Br. 24–25. We disagree. Notably, the '271 patent describes that the claimed invention may receive and analyze data to indicate whether one or more subject is "sleepy, bored, restless, confused, etc." '271 patent, col. 6, ll. 2–4; *see also* '271 patent, col. 6, ll. 13–17 ("As another example, the evaluation determined during the step 104 may indicate that a break or interruption is needed so that the subjects can stretch their legs, use the restroom, overcome boredom or fatigue, etc."). As such, we agree with the Examiner that the Requester's interpretation is consistent with the '271 patent. We

29

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

are not persuaded of error in the Examiner's findings and determine that the Examiner did not err in rejecting claims 98–99 as obvious.

    7.  Claim 124

    Claim 124 requires that the first sensor is operative to transmit data over a Bluetooth wireless communication link.  The Examiner rejected claim 124 as obvious based on Patton in view of Bibl, Zawilinski in view of Bibl, Patton in view of Teller, and Zawilinski in view of Teller.  RAN 28–31.

    While neither Bibl nor Teller expressly disclose using Bluetooth wireless transmission, both describe transmitting data using a wireless transmitter.  *See* Bibl ¶26; Teller 22:47–58.  The Examiner finds that "Bluetooth technology was known, standardized, and had numerous products on the market at the time the '271 patent was filed.  For example, Bluetooth technology was being used in Motorola headsets. Thus, Bluetooth technology is one of the many options for transmitting data wirelessly."  RAN 29–30.

    The Patent Owner argues neither Bibl nor Teller disclose that Bluetooth wireless transmission may be used to transmit data and that the Examiner improperly relied on the Koperda Declaration.  PO App. Br. 25.  In particular, "Mr. Koperda's testimony is irrelevant to the obviousness inquiry because it focuses on how the current state of Bluetooth technology and not on Bluetooth as it existed at the time of the '271 Patent invention."  PO App. Br. 26.  According to the Patent Owner, Bluetooth devices at the time were not suitable for small battery-powered handheld or portable applications because of Bluetooth's high energy profile.  PO App. Br. 26 (citing Ashby Decl. ¶17).

    We find the Patent Owner's argument unconvincing.  For example, as the Requester points out, the Motorola Bluetooth Wireless Headset User Guide depicts

30

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

that Motorola's headset at the time of the invention was a "small, battery-powered, hand-held device that used Bluetooth technology." 3PR Resp. Br. 20 (citing Koperda Decl. II ¶21). The Bluetooth Whitepaper similarly describes that

> The Bluetooth concept offers several benefits compared with other techniques. The main advantages of Bluetooth are:
> - The minimal hardware dimensions.
> - The lower price on Bluetooth components.
> - The lower power consumption for Bluetooth connections.

Koperda Decl. II ¶23. We agree with the Requester and the Examiner that "Bluetooth technology was known, standardized, and had numerous products on the market at the time the '271 patent was filed." RAN 29–30; *see also* Koperda ¶¶ 18–30.

The Patent Owner's conclusory assertion that Teller and Bibl teach away from the use of Bluetooth is likewise unavailing. *See* PO App. Br. 26. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away […] if it merely expresses a general preference for an alternative invention[.]").

Therefore, we determine that the Examiner did not err in rejecting claim 124 as obvious.

## REQUESTER'S APPEAL

### ISSUE

Did the Examiner err in withdrawing the proposed rejections of claim 47 under 35 U.S.C. § 103(a) as obvious based on the cited combinations of prior art?

### ANALYSIS

31

Appx956

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

Requester appeals the Examiner's confirmation of claim 47. 3PR App. Br. 2; RAN 1. Claim 47 requires "an internal clock element that is operative to maintain a time and date for said server, wherein said internal clock element is operative to create time stamps for data, notifications, and other communications received at said server and said internal clock element is operative to create time stamps for said notification provided by said server."

The Examiner agreed with the Patent Owner that Bibl does not disclose that a time stamp is generated by the web server but is instead generated by the personal data capture machine. RAN 10. According to the Examiner then, the question is whether either of the cited combinations suggests to a skilled artisan at the time of the invention "to add an internal clock to the server to create timestamps for data, notifications in addition to the timestamp provided by the personal capture device." RAN 11. The Examiner discounts the motivation provided by the Requester because it is allegedly untimely[8] and improperly relies on hindsight. RAN 11.

Additionally, the Examiner states:

> Further, as admitted by Mr. Koperda and pointed out by the Patent Owner, Mr. Koperda, acknowledges that common hardware platform does not always include a hardware clock. Because the required element must be exist and positively identified, the Requester cannot rely on Mr. Koperda to argue that the server in Bibl has internal clock element to create timestamp for data and notifications.

RAN 11.

---

[8] We note that the parties dispute whether certain of Requester's arguments or motivation were timely provided during the reexamination proceedings. See PO Resp. Br. 12–15; 3PR App. Br. 26–28. The rejection here though is entered as a *new* ground of rejection and thus the Patent Owner will be afforded an opportunity to respond to any previously alleged untimely arguments or analysis.

32

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

The Requester argues that the Examiner erred by (1) applying an overly narrow interpretation of the internal clock limitation (3PR App. Br. 15–19) and (2) by improperly applying the inherency standard of anticipation to an obviousness argument.  3PR App. Br. 19–23.

Despite the Patent Owner's assertions to the contrary (PO Resp. Br. 6), we agree with the Requester that the Examiner's reasoning at least seems to improperly limit the time stamped data to only data received from the personal data capture machine.  *See* 3PR App. Br. 15.  Namely, in deciding to withdraw the rejection, the Examiner notes that there is no motivation to create time stamps for the data *in addition* to the time stamp provided by the personal capture device.  *See* RAN 11.  The claim, however, broadly recites an internal clock element operative to create time stamps for data, as well as notifications and other communications, received at the server.  The claim is not limited to creating time stamps just for the first and second data indicative of a physical characteristic (i.e. data from the personal data capture machine).

We are also persuaded by the Requester that while the Examiner acknowledges that the issue here is one of obviousness, the Examiner appears to rely on principles of inherency to find that the recited time stamping is nonobvious. *See* RAN 11.  In particular, the Examiner states that "Mr. Koperda, acknowledges that common hardware platform does not always include a hardware clock."  RAN 11.  It is not necessary for hardware platforms to *always* include a hardware clock in order to establish obviousness.  Rather, the issue is whether it would have been obvious to a skilled artisan at the time of the invention that Bibl or Teller's web servers would include an internal clock that creates time stamps for received data.

33

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

Notably, Mr. Koperda's declaration is directly on point. Mr. Koperda testifies that, at the time of the invention, common hardware platforms normally had a hardware clock and known server operating systems used a clock to maintain an accurate time and date for the server, create time stamps for data, notification and other communications received or sent by the server. These were normal functions of the server hardware and software at the time. Koperda Decl. I ¶ 14; *see also* 3PR App. Br. 23–24; 3PR Reb. Br. 2. The Koperda Declaration also recognizes Bibl and Teller as demonstrating that creating time stamps were known and routinely performed at the time of the invention. 3PR Reb. Br. 3 (Koperda Decl. I ¶ 14). We find the Koperda Declaration persuasive. Namely, a skilled artisan would have understood that servers at the time of the invention would have included a hardware clock and the hardware clock would perform the claimed internal clock limitations. *See* 3PR Reb. Br. 2–3.

Although we agree with the Requester that it is unnecessary to identify a motivation to add an internal clock to a server, we determine that the Requester provides sufficient reasoning as to why a skilled artisan would have added an internal clock that creates time stamps to Bibl and Teller's servers that receive data "to indicate when [the data] was received instead of, or in addition, when it was collected so that it may be processed in the order of receipt." 3PR Reb. Br. 4; *see also* 3PR Reb. Br. 4–5 (explaining that adding an internal clock that creates time stamps "does nothing more than use the known prior-art element of a hardware clock according to its established functions of maintaining time and creating timestamps.")

We find the Patent Owner's remaining arguments unconvincing and agree with the Requester's responsive arguments. *See, e.g.*, PO Resp. Br. 7–11, 16–17;

34

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

3PR Reb. Br. 4–7. For example, we find unavailing the Patent Owner's argument
that Bibl and Teller teach away from claim 47. PO Resp. Br. 16–17. The Patent
Owner unsupported assertions that the combination would be redundant and
unnecessarily drive up the cost of the system does not identify any teaching of Bibl
or Teller that teaches away from the combination. *See DePuy Spine, Inc. v.
Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) ("A
reference does not teach away […] if it merely expresses a general preference for
an alternative invention[.]").

Based on the record before us, we determine that the Examiner erred in
confirming claim 47 and therefore reverse the Examiner's decision. We enter the
NEW GROUNDS OF REJECTION as proposed by the Requester.

## IV. CONCLUSION

The Examiner's decisions to reject claim 16 as anticipated by Patton and
claims 50–56, 58–61, 65, 79, 95, 98, 99, and 124 as obvious based on the cited
combinations of prior art are affirmed. The Examiner's decisions to reject claim
15 as anticipated and obvious are reversed.

The Examiner's decision to confirm claim 47 as patentable is also reversed.
We enter the following new grounds of rejection:

Claim 47 is rejected as obvious over Patton and Bibl;

Claim 47 is rejected as obvious over Zawilinski and Bibl;

Claim 47 is rejected as obvious over Patton and Teller; and

Claim 47 is rejected as obvious over Zawilinski and Teller.

35

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

This decision contains new grounds of rejection pursuant to 37 C.F.R. § 41.77(b) which provides that "[a]ny decision which includes a new ground of rejection pursuant to this paragraph shall not be considered final for judicial review." Correspondingly, no portion of the decision is final for purposes of judicial review. The Requester may also request rehearing under 37 C.F.R. § 41.79, if appropriate, however, the Board may elect to defer issuing any decision on such request for rehearing until such time that a final decision on appeal has been issued by the Board.

For further guidance on new grounds of rejection, see 37 C.F.R. § 41.77(b)-(g). The decision may become final after it has returned to the Board. 37 C.F.R. § 41.77(f).

37 C.F.R. § 41.77(b) also provides that the Patent Owner, WITHIN ONE MONTH FROM THE DATE OF THE DECISION, must exercise one of the following two options with respect to the new grounds of rejection to avoid termination of the appeal as to the rejected claims:

> (1) *Reopen prosecution.* The owner may file a response requesting reopening of prosecution before the examiner. Such a response must be either an amendment of the claims so rejected or new evidence relating to the claims so rejected, or both.
> (2) *Request rehearing.* The owner may request that the proceeding be reheard under § 41.79 by the Board upon the same record. …

Any request to reopen prosecution before the Examiner under 37 C.F.R. § 41.77(b)(1) shall be limited in scope to the "claims so rejected." Accordingly, a request to reopen prosecution is limited to issues raised by the new ground(s) of rejection entered by the Board. A request to reopen prosecution that includes issues other than those raised by the new ground(s) is unlikely to be granted. Furthermore, should the Patent Owner seek to substitute claims, there is a

36

**Appx961**

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

presumption that only one substitute claim would be needed to replace a cancelled claim.

The Requester may file comments in reply to a Patent Owner response. 37 C.F.R. § 41.77(c). The Requester comments under 37 C.F.R. § 41.77(c) shall be limited in scope to the issues raised by the Board's opinion reflecting its decision to reject the claims and the Patent Owner's response under paragraph 37 C.F.R. § 41.77(b)(1). A newly proposed rejection is not permitted as a matter of right. A newly proposed rejection may be appropriate if it is presented to address an amendment and/or new evidence properly submitted by the Patent Owner, and is presented with a brief explanation as to why the newly proposed rejection is now necessary and why it could not have been presented earlier.

Compliance with the page limits pursuant to 37 C.F.R. § 1.943(b), for all patent owner responses and requester comments, is required.

The Examiner, after the Board's entry of a patent owner response and requester comments, will issue a determination under 37 C.F.R. § 41.77(d) as to whether the Board's rejection is maintained or has been overcome. The proceeding will then be returned to the Board together with any comments and reply submitted by the Patent Owner and/or Requester under 37 C.F.R. § 41.77(e) for reconsideration and issuance of a new decision by the Board as provided by 37 C.F.R. § 41.77(f).

Requests for extensions of time in this *inter partes* reexamination proceeding are governed by 37 C.F.R. § 1.956.

## AFFIRMED-IN-PART; 37 C.F.R. § 41.77 (b)

37

Appeal 2015-002161
Reexamination Control 95/002,337
Patent 6,701,271 B2

FOR PATENT OWNER:

Maschoff Brennan
1389 Center Drive
Suite 300
Park City, UT 84098

FOR THIRD-PARTY REQUESTER:

Michael B. Ray
Sterne Kessler Goldstein & Fox, PLLC
1100 New York Ave., NW
Washington, DC 20005

38

**Appx963**

# EXHIBIT 37



U̲NITED S̲TATES P̲ATENT AND T̲RADEMARK O̲FFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | I1618.10003US01 | 1254 |

97149          7590          10/28/2015
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/28/2015 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE
PATENT TRIAL & APPEAL BOARD
_____

STRAVA, INC., MAPMYFITNESS, INC., and
FITNESSKEEPER, INC.
Requester,

v.

ICON HEALTH & FITNESS, INC.
Patent Owner
_____

Appeal 2015-002161
*Inter partes* Reexamination Control 95/002,337
United States Patent 6,701,271 B2
Technology Center 3900
_____

Before JEFFERY B. ROBERTSON, *Administrative Patent Judge*.

ORDER

BOARD RULE 41.77(f)

This proceeding is now before the Board for finalization of the Board's
Decision mailed August 31, 2015 (hereinafter "Decision"). In that Decision, the
Board affirmed-in-part with respect to the Patent Owner's appeal, but reversed as
to the Requester's cross-appeal, and entered new grounds of rejection.
Specifically, the Board affirmed the Examiner's rejection of claim 16 under
35 U.S.C. § 102(b) as anticipated by Patton, and rejections of claims 50–56, 58–61,

Appeal 2015-002161
*Inter partes* Reexamination Control 95/002,337
United States Patent 6,701,271 B2

65, 79, 95, 98, 99, and 124 under 35 U.S.C. § 103(a) as obvious based on the cited combinations of prior art.[1]

In its Decision, the Board also reversed the Examiner's decision to confirm claim 47 as patentable.[2]  The Board entered new grounds of rejection of claim 47 under 35 U.S.C. § 103(a) as obvious over Patton and Bibl; Zawilinski and Bibl; Patton and Teller; and Zawilinski and Teller, pursuant to 37 C.F.R. § 41.77(b).[3]

In response to the new grounds of rejection(s) of claim 47, the Patent Owner has not filed either a request for reopening of prosecution pursuant to 37 C.F.R. § 41.77(b)(1), nor a request for rehearing.  As a consequence, the appeal proceeding as to the rejection of claim 47 is terminated.  *See* 37 C.F.R. § 41.77(b).

With regard to the rejection(s) of claims 16, 50–56, 58-61, 65, 79, 95, 98, 99, and 124, the Board's Decision is now final and appealable to the United States Court of Appeals for the Federal Circuit, as the parties' rights to request rehearing are exhausted.  *See* 37 C.F.R. § 41.81, which refers to 37 C.F.R. § 1.983.


ORDER

The appeal proceeding as to the rejection(s) of claim 47 is terminated.

The decision affirming Examiner's rejection(s) of claims 16, 50–56, 58–61, 65, 79, 95, 98, 99, and 124 is final and appealable.

This paper serves as the new decision under 37 C.F.R. § 41.77(f), to the extent the rule calls for a decision.  Any requirement beyond that of the rule is hereby waived.

---

[1] *Id.* at 3–36.
[2] *Id.* at 7, 31–36.
[3] *Id.* at 35–36.

2

Appeal 2015-002161
*Inter partes* Reexamination Control 95/002,337
United States Patent 6,701,271 B2


Counsel for Patent Owner:
Maschoff Brennan
1389 Center Drive
Suite 300
Park City, UT 84098


Counsel for Third Party Requester:
Michael B. Ray
Sterne Kessler Goldstein & Fox, PLLC
1100 New York Ave., NW
Washington, DC 20005

3

# EXHIBIT 38



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,337 | 09/14/2012 | 6701271 | I1618.10003US01 | 1254 |

97149          7590          02/25/2016
Maschoff Brennan
1389 Center Drive, Suite 300
Park City, UT 84098

| EXAMINER |
|---|
| NGUYEN, MINH T |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 02/25/2016 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

Appx970

| ***NOTICE OF INTENT TO ISSUE INTER PARTES REEXAMINATION CERTIFICATE*** | **Control No.**<br>95/002,337 | **Patent Under Reexamination**<br>6701271 |
|---|---|---|
| | **Examiner**<br>MINH T. NGUYEN | **Art Unit**<br>3992 |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --***

1. ☒ Prosecution on the merits is (or remains) closed in this *inter partes* reexamination proceeding. This proceeding is subject to reopening at the initiative of the Office or upon petition. *Cf.* 37 CFR 1.313(a). A Certificate will be issued in view of:

    a. ☐ The communication filed on     by     .

    b. ☐ Patent owner's failure to file an appropriate timely response to the Office action dated     .

    c. ☐ The failure to timely file an Appeal with fee by all parties to the reexamination proceeding entitled to do so. 37 CFR 1.959 and 41.61.

    d. ☐ The failure to timely file an Appellant's Brief with fee by all parties to the reexamination proceeding entitled to do so. 37 CFR 41.66(a).

    e. ☒ The decision on appeal by the ☒ Board of Patent Appeals and Interferences ☐ Court dated     .

    f. ☐ Other:     .

2. ☒ The Reexamination Certificate will indicate the following:

    a. Change in the Specification: ☐ Yes ☒ No

    b. Change in the Drawings: ☐ Yes ☒ No

    c. Status of the Claims:

        (1) Patent claim(s) confirmed:15.

        (2) Patent claim(s) amended (including dependent on amended claim(s)):

        (3) Patent claim(s) cancelled: 1-14 and 16-41.

        (4) Newly presented claim(s) patentable:     .

        (5) Newly presented cancelled claims: 42-228.

        (6) Patent claim(s) ☐ previously ☐ currently disclaimed:     .

        (7) Patent claim(s) not subject to reexamination:     .

3. ☐ Note the attached statement of reasons for patentability and/or confirmation. Any comments considered necessary by patent owner regarding reasons for patentability or confirmation must be submitted promptly to avoid processing delays. Such submission(s) should be labeled: "Comments On Statement of Reasons for Patentability and/or Confirmation."

4. ☐ Note attached NOTICE OF REFERENCE CITED, (PTO-892).

5. ☐ Note attached LIST OF REFERENCES CITED (PTO/SB/08 or PTO/SB/08 substitute).

6. ☐ The drawings filed on _____ is: ☐ approved ☐ disapproved.

7. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. § 119(a) - (d) or (f).

    a)☐ All    b)☐ Some*    c)☐ None    of the certified copies have

        ☐ been received.

        ☐ not been received.

        ☐ been filed in Application No.     .

        ☐ been filed in reexamination Control No.     .

        ☐ been received by the International Bureau in PCT Application No.     .

    * Certified copies not received:     .

8. ☒ Note Examiner's Amendment.

9. ☐ Other:     .

**All correspondence** relating to this *inter partes* reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

| | MINH T NGUYEN<br>Primary Examiner<br>Art Unit: 3992 |
|---|---|

U.S. Patent and Trademark Office                      Part of Paper No. 20160127

PTOL-2068 (07-10)      **NOTICE OF INTENT TO ISSUE *INTER PARTES* REEXAMINATION CERTIFICATE**

Application/Control Number: 95/002,337                                         Page 2
Art Unit: 3992

## Notice of Intend to Issue a Reexamination Certificate

The periods for seeking court review of, or a rehearing of, the decision of the Board rendered on October 28,2015 have expired and no further action has been taken by any party to the appeal. Accordingly, the appeal in this reexamination proceeding is considered terminated; see 37 CFR 1.979(f). The present Notice of Intent to Issue *Inter Partes* Reexamination Certificate (NIRC) is issued in accordance with MPEP § 2687 in order to terminate the present reexamination prosecution.

### Pertinent Prosecution History

The Office mailed Right of Appeal Notice (RAN) on January 23, 2014. In this RAN:

(a)      Claims 15, 16, 47, 50-56, 58-61,65, 79, 95, 98, 99, and 124 are pending.

(b)      Claims 15, 16, 50-56, 58-61,65, 79, 95, 98, 99, and 124 are finally rejected.

(c)      Claim 47 is patentable.

The PO filed Appeal Brief on May 6, 2014 to seek review of all of the Examiner's grounds for rejecting claims 15, 16, 50-56, 58-61,65, 79, 95, 98, 99, and 124 and filed Respondent Brief on June 9, 2014 to rebut arguments presented in the Requester's Appeal Brief.

The Requester filed Appeal Brief on May 7, 2014 to appeal the Examiner's decision to withdraw the proposed rejection of claim 47 and filed Respondent Brief on June 6, 2014 to rebut arguments presented in the PO's Appeal Brief.

The Board issued a decision on August 31, 2015 to affirm the Examiner's rejections of claims 16, 50-56, 58-61,65, 79, 95, 98, 99, and 124 and reverse the Examiner's rejection of claim 15. The Board also reversed the Examiner's confirmation of claim 47 and entered new grounds of rejection to claim 47 and reminded the PO the right to request for reopening of prosecution pursuant to 37 CFR 41.77(b) or request for rehearing within one month from the date of decision.

PO has not filed either a request for reopening of prosecution pursuant to 37 CFR 41.77(b) or a request for rehearing.

The Board entered a final decision affirming the Examiner's rejections of claims 16, 50-56, 58-61,65, 79, 95, 98, 99, and 124 and terminated the appeal proceeding as to the rejection of claim 47.

**Examiner's Amendment**

Claims 16, 47, 50-56, 58-61,65, 79, 95, 98, 99, and 124 have been canceled as a result of the decision of the Board dated October 28, 2015.

**Communication with the USPTO**

All correspondence relating to this inter partes reexamination proceeding should be directed:

By Mail to:     Mail Stop Inter Partes Reexam
                Attn: Central Reexamination Unit
                Commissioner for Patents
                United States Patent & Trademark Office
                P.O. Box 1450
                Alexandria, VA 22313-1450


By FAX to:      (571) 273-9900
                Central Reexamination Unit


By hand:        Customer Service Window
                Randolph Building
                401 Dulany Street
                Alexandria, VA 22314


Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered. EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

**Notice Re Patent Owner's Correspondence Address**

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that:

The patent owner's correspondence address for all communications in an ex parte reexamination or an inter partes reexamination is designated as the correspondence address of the patent.

Revisions and Technical Corrections Affecting Requirements for Ex Parte and Inter Partes Reexamination, 72 FR 18892 (April 16, 2007)(Final Rule)

The correspondence address for any pending reexamination proceeding not having the same correspondence address as that of the patent is, by way of this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.
This change is effective for any reexamination proceeding which is pending before the Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for the present proceeding is different from the correspondence address of the patent, it is strongly encouraged that the patent owner affirmatively file a Notification of Change of Correspondence Address in the reexamination proceeding and/or the patent (depending on which address patent owner desires), to conform the address of the proceeding with that of the patent and to clarify the record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

| | |
|---|---|
| Reexamination Practice | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facsimile Transmission No. | (571) 273-9900 |

Application/Control Number: 95/002,337                                         Page 5
Art Unit: 3992


        Any inquiry concerning this communication or earlier communication from the Examiner,
or as to the status of the proceeding, should be directed to the Central Reexamination Unit at
telephone number (571) 272-7705.


/Minh Nguyen/
Primary Examiner
571-272-1748
CRU, AU 3992



<u>Conferees</u>:

/Tuan H.Nguyen /
Primary Examiner
CRU, AU 3992



/MICHAEL FUELLING/
Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT 39


US006701271C2

(12) **INTER PARTES REEXAMINATION CERTIFICATE** (1254th)

# United States Patent

Willner et al.

(10) **Number:** US 6,701,271 C2

(45) **Certificate Issued:** Mar. 31, 2016

(54) **METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

(75) Inventors: **Barry E. Willner**, Briarcliff Manor, NY (US); **Edith H. Stern**, Yorktown Heights, NY (US); **David P. Greene**, Ossining, NY (US); **Philip Shi-lung Yu**, Chappaqua, NY (US)

(73) Assignee: **ICON HEALTH & FITNESS, INC.**

**Reexamination Request:**
No. 95/002,337, Sep. 14, 2012

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **6,701,271** |
| Issued: | **Mar. 2, 2004** |
| Appl. No.: | **09/859,827** |
| Filed: | **May 17, 2001** |

Reexamination Certificate C1 6,701,271 issued Nov. 5, 2015

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/00* | (2006.01) |
| *G01D 1/00* | (2006.01) |
| *A61B 5/00* | (2006.01) |
| *G06F 19/00* | (2011.01) |
| *G09B 23/28* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61B 5/0002* (2013.01); *G06F 19/322*

(2013.01); *G06F 19/3418* (2013.01); *G06F 19/3487* (2013.01); *G09B 23/28* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 95/002,337, please refer to the USPTO's public Patent Application Information Retrieval (PAIR) system under the Display References tab.

*Primary Examiner* — Minh T Nguyen

(57) **ABSTRACT**

A system, method, apparatus, and computer program code for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation. A physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

100 —



RECEIVE DATA INDICATIVE OF A PHYSICAL CHARACTERISTIC OF AT LEAST TWO SUBJECTS

102

DETERMINE AN EVALUATION OF THE PHYSICAL CHARACTERISTIC DATA

104

PROVIDE A NOTIFICATION OF THE EVALUATION TO A DEVICE

106

US 6,701,271 C2

**1**

# INTER PARTES
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS
INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claim **15** is confirmed.

Claims **1-14** and **16-41** are cancelled.

\* \* \* \* \*

**2**

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
(801) 359-9000
(801) 359-9011 (Facsimile)

John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
(202) 955-3000
(202) 955-5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

*Attorneys for Defendants Polar Electro Oy and Polar Electro Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ICON HEALTH & FITNESS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>POLAR ELECTRO OY et al.,<br><br>Defendants. | POLAR ELECTRO OY AND POLAR ELECTRO INC.'S REPLY IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS<br><br>Case No.: 1:11-cv-00167-BSJ<br><br>Honorable Bruce S. Jenkins |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

II.    THE ASSERTED CLAIMS ARE INVALID BECAUSE THEY ARE DIRECTED TO
PATENT INELIGIBLE SUBJECT MATTER ........................................................... 2

    A.    The Asserted Claims Are Directed to an Abstract Idea........................................ 2

        1.    Polar correctly analyzed the subject matter of the Asserted Claims............................ 2

        2.    Case law confirms that the Asserted Claims are directed to an abstract idea............... 2

    B.    The Asserted Claims do not Add an "Inventive Concept" to the Abstract Idea................. 6

        1.    Patentability over prior art is irrelevant. ....................................................... 6

        2.    *DDR* and *Bascom* do not support the argument that the Asserted Claims recite
an inventive concept. ................................................................................ 7

        3.    Recent Federal Circuit case law confirms that the Asserted Claims do not add
an inventive concept to the claim 1 subject matter. ....................................... 8

    C.    Icon's Declaration is Inappropriate in a Motion on the Pleadings ...................... 9

    D.    The '271 Patent Preempts an Abstract Idea...................................................... 10

    E.    Polar's Patent Applications are Irrelevant to the Section 101 Analysis ............ 10

III.   CONCLUSION..................................................................................................... 10

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Accenture Global Servs. Guidewire Software, Inc.*
  728 F.3d 1336 (Fed. Cir. 2013) ........................................................................... 9

*Bilski v. Kappos*,
  561 U.S. 593 (2010) .............................................................................................. 8

*Burkett v. Convergys Corp.*,
  2015 WL 4487706 (D. Utah July 23, 2015) ......................................................... 9

*Cardpool, Inc. v. Plastic Jungle, Inc.*,
  817 F.3d 1316 (Fed. Cir. 2016) ............................................................................ 8

*Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
  776 F.3d 1343 (Fed. Cir. 2014) ............................................................................ 3

*Electric Power Group, LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016) ................................................................... *passim*

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016) ............................................................................ 5

*Epic Technology, LLC v. Fitnow, Inc.*,
  151 F.Supp.3d 1245 (D. Utah 2015) ..................................................................... 4

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2016) ............................................................................ 7

*Genband US LLC v. Metaswitch Networks Corp.*,
  2016 WL 98745 (E.D. Tex. Jan. 8, 2016) ............................................................ 9

*Global Internet Services, Inc. v. AT&T Mobility, LLC*,
  827 F.3d 1341 (Fed. Cir. 2016) ............................................................................ 7

*Listingbook, LLC v. Market Leader, Inc.*,
  144 F.Supp.3d 777 (M.D.N.C. 2015) ................................................................... 7

*In re NTP, Inc.*,
  654 F.3d 1268 (Fed. Cir. 2011) ............................................................................ 8

*OIP Technologies, Inc. v. Amazon.com, Inc.*
  788 F.3d 1359 (Fed. Cir. 2015) ......................................................................... 10

*Shortridge v. Foundation Constr. Payroll Serv., LLC,*
  655 Fed.Appx. 848 (Fed. Cir. 2016) ................................................................. 9

*SiRF Tech., Inc. v. International Trade Commission,*
  601 F.3d 1319 (Fed. Cir. 2010) ......................................................................... 8

*TDE Petro. Data Solutions, Inc. v. AKM Enterprise, Inc.,*
  2016 WL 4271975 (Fed. Cir. August 15, 2016) ............................................ 6, 9

*In re TLI Commc'ns LLC Patent Litigation,*
  823 F.3d 607 (Fed. Cir. 2016) ......................................................................... 5

*Ultramercial, Inc. v. Hulu LLC,*
  772 F.3d 709 (Fed. Cir. 2014) ...................................................................... 2, 7

**Statutes**

35 U.S.C. § 103 .................................................................................................. 8

35 U.S.C. § 112 .................................................................................................. 2

## I.       INTRODUCTION

Controlling Federal Circuit precedent shows that the Asserted Claims recite an abstract idea, and nothing in the claims transforms the abstract idea into patentable subject matter. The '271 patent provides examples, such as the teacher and speaker examples, which show the abstract nature of the claimed invention of providing and using feedback based on data gathered from subjects. Icon advances several red herring arguments attempting to draw attention away from the fundamental abstractness of the Asserted Claims, namely, Polar's own patent applications, the '271 patent's reexamination, and the fact that the US Patent and Trademark Office ("PTO") canceled claim 1 of the '271 Patent. This misdirection does not change the abstract nature of the Asserted Claims or transform the claimed abstract idea into patent eligible subject matter.

Icon also attempts to escape the Asserted Claims' recitation of an abstract idea by arguing that the claimed sensors provide "objective" data. That is another way of describing the essence of sensors – they provide objective data of something sensed. Icon's rephrasing of the claimed "sensors" adds nothing to the claims; it uses different words to say what is already there. This does not change the abstract nature of the claims. Moreover, the '271 patent's specification emphasizes that Icon's reliance on hardware to impart something special to the abstract idea is groundless. The '271 patent plainly states that no special hardware is needed to practice the claimed invention: "embodiments of the present invention are not limited to any specific combination of hardware and software."[1] Thus, the '271 patent teaches using conventional devices (e.g., sensors) to do conventional things (e.g., sense). This adds nothing special to transform the Asserted Claims into patent eligible subject matter.

Icon's submission of a declaration from a supposed expert does nothing more than proffer unsupported legal conclusions. Because the declaration is not a pleading, it should not be considered on this motion for judgment on the pleadings.

[1] Dkt. No. 147, Ex. A, '271 patent, 12:25-27.

## II.  THE ASSERTED CLAIMS ARE INVALID BECAUSE THEY ARE DIRECTED TO PATENT INELIGIBLE SUBJECT MATTER

### A.  The Asserted Claims Are Directed to an Abstract Idea

#### 1.  Polar correctly analyzed the subject matter of the Asserted Claims.[2]

Icon argues that Polar's analysis of claim 1 focused on the wrong claim. It argues that "cancelled claim 1 . . . is no longer even a claim of the '271 patent because it was cancelled during reexamination . . .[and] the proper starting points for the Section 101 analysis are claims 15 and 80."[3] However, even Icon admits that "[a]ll of the claims at issue depend from what was claim 1 of the '271 patent."[4] The Patent Act dictates that the Asserted Claims, which are admittedly all dependent claims, "be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112 (fourth paragraph). Thus, Polar's analysis of claim 1, from which all Asserted Claims depend, is statutorily required. Icon's argument is legally groundless. Icon knows this because even it includes the language of claim 1 into the text of claims 15 and 80 describing it as "incorporated text." In short, Polar's analysis of the subject matter of claim 1 is statutorily required and inherently proper. As Polar discussed in its opening brief and as discussed below, claim 1 recites an abstract idea and the Asserted Claims do not add anything to transform that abstract idea into patent eligible subject matter. Finally, because Icon expressly limited its infringement contentions to the Asserted Claims, this Court's determination that they are invalid disposes of this case.[5]

#### 2.  Case law confirms that the Asserted Claims are directed to an abstract idea.

Icon argues that Polar's analysis is flawed because Polar does not compare the Asserted Claims to

---

[2] The "Asserted Claims" are: 15, 42, 51, 54, 80, 81, 82, 90, and 91. Icon unequivocally limited its infringement contentions to the Asserted Claims in a letter dated May 18, 2016. (Dkt. No. 167-2, p. 3). Specifically, and as required by LR 2.3, Icon stated: "ICON limits its initial infringement contentions to [ten] claims 15, 42, 49, 51, 80, 81, 82, 90, and 91." For Icon to now say that it did not limit its contentions is unsupportable.

[3] Dkt. No. 166, p. 8 of 31.

[4] Dkt. No. 166, p. 14 of 31.

[5] Icon also implicitly argues that all claims should be analyzed separately, instead of looking to representative claims, stating "[i]t is not clear whether such an approach does justice . . ." (Dkt. No. 166, p. 14 of 31). This may not be clear to Icon, but it has been clear to both the U.S. Supreme Court and the Federal Circuit. *See, e.g., Ultramercial, Inc. v. Hulu LLC*, 772 F.3d 709, 712 (Fed. Cir. 2014)("As the other claims of the patent are drawn to a similar process, they suffer from the same infirmity as claim 1 and need not be considered further.").

claims previously held invalid.[6] Icon's argument is groundless, as underscored by its attempt to distinguish the claims in only one of the cases Polar analyzed, *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343 (Fed. Cir. 2014). The subject matter of the *Content Extraction* claims is comparable to the Asserted Claims. As discussed in the Opening Brief, the abstract idea recited by the Asserted Claims includes three ordinary human activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data;[7] and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data.[8] In a similar fashion, the *Content Extraction* claims are drawn to the abstract idea of collecting, recognizing, and storing data. *Id*. at 1347. The Federal Circuit has consistently found collecting and analyzing information or data, even when limited, to be an abstract idea. *See e.g.*, *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016)(collecting cases). The Asserted Claims fall squarely within the type of abstract idea discussed in *Content Extraction* and *Electric Power*.

Icon dismisses *Content Extraction* because the Asserted Claims include additional limitations not in *Content Extraction*'s claims. However, simply because the Assert Claims recite "providing a notification" and utilizing "a sensor" is not relevant. The relevant point is *Content Extraction's* holding that claims reciting common hardware to perform functions a human could not, such as a scanner to collect data, does not negate the abstract nature of a claim.[9] The Federal Circuit in *Content Extraction* held that added limitations must "involve more than performance of 'well-understood, routine [and] conventional activities previously known in the industry." 776 F.3d at 1347-48. Icon's argument rests on sensors providing "objective data," which is the conventional use of sensors. Icon's argument that sensors make the Asserted

---

[6] Dkt No. 166, p. 20 of 31, § IV.A.1.
[7] Exhibit 1 to the Opening Brief, '271 Patent, col. 6:56-60.
[8] Exhibit 1 to the Opening Brief, '271 Patent, col. 7:31-35.
[9] A scanner inherently senses the data on a document, and provides "objective data." Icon's touting of sensors providing "objective data" is nothing more than a restatement of the generic purpose of a sensor. This legally adds nothing to the Asserted Claims' recitation of an abstract idea.

Claims not abstract is legally insufficient to transform the abstract idea into patent eligible subject matter.[10]

Icon disregards the remainder of Polar's cited cases stating, the "'271 patent is different [than the cited cases] because it does not relate to something that could be performed by humans . . ." and that the '271 patent uses sensors to do things that humans cannot do.[11] Icon's "could not be performed by humans" argument is legally unfounded. For example, a case from this Court, *Epic Technology, LLC v. Fitnow, Inc.*, found claims abstract even though they included hardware that performed functions that a human could not perform. 151 F.Supp.3d 1245, 1246 (D. Utah, 2015). The method claim in *Epic* recited "using a computing device, scanning a product bar code and obtaining a product identity . . . displaying a record."[12] Humans cannot scan a bar code to obtain a product identity or display a record of what is scanned. This did not save the *Epic* claims. The Asserted Claims are similarly patent ineligible because they claim an abstract idea and recite common hardware (e.g. sensor, display, heart rate sensor, and Internet) that does nothing beyond its common and intended functions.

Icon further attempts to impart legal significance to the claimed sensors, describing them as highly sophisticated electronic sensors" that sense "infrared heat, brain waves, blood sugar."[13] Regardless of the sensor's alleged sophistication, the '271 patent does not describe anything but commonly available sensors used in their conventional, intended way.[14] Moreover, consistent with the '271 patent's lack of disclosure of any novel hardware, the Asserted Claims, only recite generic, devices such as "a first device," "a sensor," "a cell phone," "a portable wireless sensor," and a "heart rate sensor."[15] These are conventional components used conventionally to carry out the abstract idea and are legally insufficient to transform the

---

[10] As discussed in Polar's opening brief, the first step looks at "the focus of the claims, their character as a whole." *Electric Power*, 830 F.3d at 1353. In the second step, the court determines whether additional limitations represent a patent-eligible application of the abstract idea. *Id*. Icon conflates the first and second steps of the *Alice* analysis. Polar addresses certain of Icon's step two arguments here to avoid confusion because it is where Icon included the arguments in its opposition brief.
[11] *See* Dkt. No. 166, p. 23 of 31, n. 8.
[12] Claim 9 in *Epic* surely cannot be performed by a human because it is not a method or process; it is an actual device. *Id*. at 1246-47. Thus, whether something cannot be performed by humans is legally irrelevant.
[13] *See* Dkt. No. 166, p. 10 of 31 ("by using highly sophisticated electronic sensors to objectively sense things that humans cannot sense, such as infrared heat, blood sugar, blood pressure, respiration rates, and precise acceleration and motion.").
[14] *See* n. 1, *supra*.
[15] *See* Dkt. No. 147, p. 9 of 21.

claimed abstract idea into patent eligible subject matter. *In re TLI Commc'ns LLC Patent Litigation*, 823 F.3d 607, 613-14 (Fed. Cir. 2016)(Recitation of "components and functions [that] were well-understood, routine, conventional activities previously known in the industry" insufficient to transform the abstract idea into patent eligible subject matter.).

Furthermore, Federal Circuit opinions issued after Polar's opening brief reinforce the abstract nature of the Asserted Claims. In *Electric Power,* the Federal Circuit analyzed patent eligibility of three patents that claimed systems and methods for "performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results," used to determine power grid vulnerability. 830 F.3d at 1350-52. The Federal Circuit reiterated that it "treat[s] collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." *Id*. at 1353 (internal citations omitted). Just as in *Electric Power*, the Asserted Claims do not require a new source of information or technique for analyzing the information. *Id*. at 1355. The Asserted Claims are no less abstract, and no less invalid than the *Electric Power* claims.

*Electric Power* also shows that *Enfish* does not support Icon's argument that the Asserted Claims are not abstract.[16] The *Enfish* claims were not abstract because they claimed "an improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016). Icon does not assert that the '271 patent teaches an improvement in how a computer functions. Instead, Icon admits that the claims use a computer to evaluate data, send notifications and make determinations.[17] Because the '271 patent claims are not directed to an improvement in how sensors or computers function, *Enfish* is inapplicable. The Asserted Claims, like in *Electric Power*, recite generic technology to perform the claimed abstract ideas. The recitation of common sensors and other hardware used conventionally does not change the abstract

---

[16] *See* Dkt. No. 166, pp. 23-25 of 31.
[17] *See e.g.*, Dkt. No. 166, p. 11 of 31:1-3 and ¶¶ 2 and 3.

nature of the Asserted Claims.[18]

Another recent Federal Circuit opinion again shows the abstract nature of the Asserted Claims. The Federal Circuit held that claims "generally reciting 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are 'a familiar class of claims directed to a patent-ineligible concept' . . . [I]t is evident from our precedent that claim 1 is the sort of data gathering and processing claim that is directed to an abstract idea under step one of the *Alice* analysis." *TDE Petro. Data Solutions, Inc. v. AKM Enterprise, Inc.*, 2016 WL 4271975, *2 (Fed. Cir. August 15, 2016). Again, the Federal Circuit confirmed that the general steps of collecting, analyzing, and displaying data – like the Asserted Claims – is an abstract idea. Icon's reliance on common sensors (regardless of any alleged sophistication), to perform their common, intended function (such as to provide "objective data") is legally insufficient to render the Asserted Claims anything other than being directed to an abstract idea.

**B.    The Asserted Claims do not Add an "Inventive Concept" to the Abstract Idea**

1.    **Patentability over prior art is irrelevant.**

Icon alleges that the Asserted Claims improve so-called "share and compare" technology by the ordered combination of sensors sending data over the Internet, evaluating the data, and providing options to subjects.[19] These limitations are nothing more than conventional technology used conventionally, and do not change the abstract nature of the Asserted Claims. Also, Icon presents no basis for the existence of such technology. Even assuming, *arguendo*, there is such technology, its existence does nothing to transform the abstract idea into a patent-eligible subject matter. Sharing and/or comparing data itself is an abstract idea and something humans have done since they could communicate. Merely sharing and/or comparing data does not transform the abstract idea of providing

---

[18] Polar notes that this is related to the second step of the *Alice* analysis (whether additional limitations represent a patent-eligible application of the abstract idea). Polar addresses Icon's argument here to avoid confusion because it is where Icon included the arguments in its opposition brief.

[19] Dkt. No. 166, p. 27-28 of 31.

and using feedback into anything less abstract.[20] *See, e.g., Listingbook, LLC v. Market Leader, Inc.*, 144 F.Supp.3d 777, 786-88 (M.D.N.C. 2015)(claims directed to the idea of sharing information between a real estate agent and clients are abstract and invalid under section 101).

2. **DDR and Bascom do not support the argument that the Asserted Claims recite an inventive concept.**

The Federal Circuit in *DDR Holdings, LLC v. Hotels.com, L.P.* found the claims patent-eligible because they recited an improvement to the operation of the Internet, stating the "claimed solution amounts to an inventive concept for resolving" the Internet-centric problem of making two web pages look the same. 773 F.3d 1245, 1258 (Fed. Cir. 2016). The Asserted Claims do not teach an improvement to the Internet operation. Icon does not argue that they do. The Asserted Claims recite using the Internet for its intended purpose, to transmit data. In short, like in *Electric Power*, the Asserted Claims "specify what information . . . to gather, analyze, and display . . . by use of [nothing] but entirely conventional, generic technology." 830 F.3d at 1356 (analyzing the claims-at-issue against *DDR Holdings*), which does not change the abstract nature of the Asserted Claims.

*Bascom Global Internet Services, Inc. v. AT&T Mobility, LLC* fails to support Icon's argument for a similar reason. 827 F.3d 1341, 1351 (Fed. Cir. 2016). In *Bascom*, the Federal Circuit found that the claims recited "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems . . . the claimed invention represents a software-based invention that improves the performance of the computer system itself." *Id*. None of the Asserted Claims relate to improving the function of a computer or the Internet.[21] The Asserted Claims

---

[20] Polar assessed the added subject matter of the Asserted Claims in its Opening Brief at p. 9 of 21, none of which added an inventive concept.

[21] Icon also relies upon *SiRF Tech*. but this is unhelpful for multiple reasons. For one, the Supreme Court had not yet decided *Alice Corp*. in 2010; the *Alice Corp*. decision completely changed the Section 101 landscape with the Federal Circuit finding about 90% of the patents appealed under Section 101 to be invalid. Second, in the same vein, the Federal

merely claim using technology in its conventional manner.

Icon also argues that the reexamination of the Asserted Claims shows that they recite an improvement to technology, and the improvement is sufficient to transform the Asserted Claims from an abstract idea into patent-eligible subject matter.[22] Icon's argument is legally unfounded. The PTO cannot review patent eligibility under Section 101. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . *may not be raised* in reexamination proceedings.") (emphasis added). Instead, reexamination investigates patentability under 35 U.S.C. §103 in view of prior art. *Cardpool, Inc. v. Plastic Jungle, Inc.*, 817 F.3d 1316, 1318–19 (Fed. Cir. 2016). Icon's arguments that rely upon the '271 Patent's reexaminations are legally baseless.

### 3. Recent Federal Circuit case law confirms that the Asserted Claims do not add an inventive concept to the claim 1 subject matter.

Two recent Federal Circuit cases make it even more apparent that the Asserted Claims do not add an inventive concept to the claim 1 subject matter. In *Electric Power*, the Federal Circuit confirmed that monitoring and collecting data from multiple data sources, analyzing the data, and displaying the results is an abstract idea. 830 F.3d at 1351. The Federal Circuit reasoned that "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *Id*. at 1355. Nothing in the claims "requires anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" and, therefore, do not include an "inventive concept of the application." *Id.* The Asserted Claims recite, and Icon argues, nothing beyond conventional technology used conventionally, which does

---

Circuit found the claims patentable because they explicitly require the use of a machine. *SiRf Tech. v. ITC*, 601 F.3d 1319, 1332-33 (Fed. Cir. 2010). While the machine-or-transformation test may provide a useful clue, the machine-or-transformation test is not the sole test for deciding whether an invention is a patent-eligible process. *See Bilski v. Kappos*, 561 U.S. 593, 604 (2010).

[22] *See e.g.*, Dkt. No. 166, p. 28 of 31, §IV.C.

not constitute an inventive step to save them from fatal abstractness.

Moreover, the Federal Circuit recently rejected similar hardware-based arguments in *TDE Petroleum Data Solutions, Inc. v. AKM Enterprise, Inc.,* stating: "TDE does not and cannot argue that storing state values, receiving sensor data, validating sensor data, or determining a state based on sensor data is individually inventive. And none of TDE's arguments show that some inventive concept arises from the ordered combination of these steps, which, even if true, would be unpersuasive given that they are the most ordinary of steps in data analysis and are recited in the ordinary order." 2016 WL 4271975 at *2. Icon does not even explain how the Asserted Claims' alleged ordered combination is an inventive concept. Regardless, as discussed above, the alleged ordered combination is nothing more than that which the Federal Circuit found insufficient to transform an abstract idea into patent eligible subject matter. The Asserted Claims contain no inventive concept and the Federal Circuit's recent case law affirms this.

## C.     Icon's Declaration is Inappropriate in a Motion on the Pleadings

Icon submits a declaration from a supposed expert that is unhelpful for many reasons. First, a motion for judgment on the pleadings considers only the Complaint, the Answer, and the documents attached as exhibits to either. *See Burkett v. Convergys Corp.*, 2:14-CV-376-EJF, 2015 WL 4487706 at *9 (D. Utah July 23, 2015).[23] The declaration is none of these, and should not be considered here. Second, whether the Asserted Claims are directed to patent-eligible subject matter is a question of law, and the declaration offers nothing but unfounded legal conclusions. This is unhelpful. *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013); *see also Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33-JRG-RSP, 2016 WL 98745 at *3 (E.D. Tex. Jan. 8, 2016) (striking an expert's opinion on subject matter eligibility because it did nothing more than analyze the law and offer legal conclusions). Third, the declaration only addresses some elements of claims 80 and 82. It does not address the subject matter of claim 1 or any other Asserted Claim. It is unhelpful in assessing the

---

[23] For this same reason, a section 101 analysis does not require a person of ordinary skill in the art. Only the pleadings are required. *See, e.g.*, *Shortridge v. Foundation Constr. Payroll Serv., LLC*, 655 Fed.Appx. 848, 851 (Fed. Cir. 2016).

issue before the court. Lastly, the declaration relies upon the '271 patent's reexamination. A reexamination cannot assess patent eligibility under § 101 and the supposed expert's reliance upon it is legal error. See section II.B.2. above. In short, the declaration is unnecessary and inappropriate to decide this motion on the pleadings, especially where it does nothing more than offer unsupported legal conclusions.

### D.     The '271 Patent Preempts an Abstract Idea

Icon's argument regarding preemption curiously focuses upon the '271 patent's teacher example. That example, as discussed in Polar's opening brief, illustrates that the Asserted Claims are abstract ideas. That example is irrelevant to the preemption issue. What is relevant is that the claimed generic steps embody the abstract idea of providing and using feedback based upon data gathered from subjects. No inventive concept transforms this abstract idea into patentable subject matter. And while Icon asserts that limitations such as "physical characteristic" are "advanced" (e.g., blood sugar, brain waves), the Asserted Claims do not include such limitations. "Physical characteristic" is broad and as the '271 patent explains can include any number of characteristics, from posture, height, weight, movement, to brain waves.[24] While some dependent claims recite common wireless connections to transfer data, etc., the mere fact that these claims do not preempt all feedback activities does not make the claims any less abstract or cure the preemption concern. *OIP Technologies Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362-63 (Fed. Cir. 2015).

### E.     Polar's Patent Applications are Irrelevant to the Section 101 Analysis

Icon dedicates pages of its opposition brief to discussing Polar's patent applications, including mentioning Polar's arguments to the PTO. This is irrelevant, and those patent applications and arguments are not being challenged before the Court. Icon makes no argument as to why Polar's patent applications affect the abstract nature of the Asserted Claims.

## III.    CONCLUSION

For the foregoing reasons, Polar respectfully requests that the Court find the Asserted Claims directed to patent-ineligible subject matter and thus invalid pursuant to 35 U.S.C. § 101.

---

[24] *See, e.g.*, Exhibit 1 to the Opening Brief, '271 Patent, abstract, col. 1:58-34; col. 4:5-9, 20-23, 53-58.

DATED:  December 12, 2016                HOLLAND & KNIGHT LLP


                                         /s/  John P. Moran_____
                                         John P. Moran (*pro hac vice*)
                                         John.Moran@hklaw.com
                                         HOLLAND & KNIGHT LLP
                                         800 17th Street, N.W., Suite 1100
                                         Washington, DC 20006
                                         202 955 3000
                                         202 955 5564 (Facsimile)

                                         Anthony J. Fuga (*pro hac vice*)
                                         anthony.fuga@hklaw.com
                                         HOLLAND & KNIGHT LLP
                                         131 S. Dearborn, 30th Floor
                                         Chicago, Illinois 60611
                                         (312) 715-5771
                                         (312) 578-6666 (Facsimile)

                                         James E. Magleby (7247)
                                         magleby@mgpclaw.com
                                         Jennifer Fraser Parrish (11207)
                                         parrish@mgpclaw.com
                                         MAGLEBY & GREENWOOD, P.C.
                                         170 South Main Street, Suite 850
                                         Salt Lake City, Utah 84101
                                         801 359 9000
                                         801 359 9011 (Facsimile)


                                         *Attorneys for Defendants Polar Electro Oy*
                                         *and Polar Electro Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 12, 2016 I filed the above paper entitled **POLAR ELECTRO OY AND POLAR ELECTRO INC.'S REPLY IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS** with the Clerk of Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

/s/ John P. Moran

John P. Moran

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

 2                            NORTHERN DIVISION

 3    _____

 4    ICON HEALTH & FITNESS, INC.,
      A DELAWARE CORPORATION,              CASE NO. 1:11-CV-167
 5
             PLAINTIFF AND COUNTERDEFENDANT,
 6
        VS.
 7
      POLAR ELCTRO OY, A FINNISH           SALT LAKE CITY, UTAH
 8    COMPANY, AND PLLAR ELECTRO,          JANUARY 19, 2017
      INC., A DELAWARE CORPORATION,
 9
             DEFENDANTS AND COUNTERCLAIMANTS,
10    _____

11    AND RELATED COUNTERCLAIM.
      _____
12
             DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS
13                BEFORE THE HONORABLE BRUCE S. JENKINS
                    UNITED STATES DISTRICT COURT JUDGE
14
      APPEARANCES:
15    FOR THE PLAINTIFF:
                              MASCHOFF BRENNAN LAYCOCK GILMORE
16                             ISRAELSEN & WRIGHT
                              BY:  LARRY R. LAYCOCK, ESQ.
17                                 DAVID R. WRIGHT, ESQ.
                                   TYSON K. HOTTINGER, ESQ.
18                            201 SOUTH MAIN STREET, SUITE 600
                              SALT LAKE CITY, UTAH 84111
19                            (435) 252-1360

20    FOR THE DEFENDANTS:
                              HOLLAND & KNIGHT
21                            BY:  JOHN P. MORAN, ESQ.
                              800 17TH STREET, N.W., SUITE 1100
22                            WASHINGTON, D.C. 20006
                              (202) 955-3000
23
      COURT REPORTER:
24                            RAYMOND P. FENLON
                              351 SOUTH WEST TEMPLE, #7.430
25                            SALT LAKE CITY, UTAH 84101
                              (801) 809-4634
```

1

**Appx995**

```
 1                    P-R-O-C-E-E-D-I-N-G-S

 2                        (10:00 AM)

 3           THE COURT:  Good morning.  And why don't we turn to

 4    Icon Health & Fitness versus Polar Electro.  It's 11-C-167,

 5    here today on a motion for judgment on the pleadings.  And

 6    those who are making appearances, if you'll be good enough to

 7    make a record.  Tell us again who you are and whom you

 8    represent.

 9           MR. WRIGHT:  Good morning, Your Honor, David Wright

10    and Tyson Hottinger of Maschoff Brennan on behalf of Icon

11    Health & Fitness.

12           MR. MORAN:  Good morning, Your Honor, John Moran on

13    behalf of the defendants, Polar Electro, Inc. and Polar

14    Electro Oy.

15           THE COURT:  Okay.  You go ahead.

16           MR. MORAN:  Good morning, Your Honor.  The issue

17    before the court today is a legal issue, and that is whether

18    the claims are directed to an abstract idea.  And that legal

19    issue is analyzed under a two-step framework.  In this case

20    the first step is to assess whether the claims are directed to

21    an abstract idea, such as providing and using feedback

22    gathered from subjects.

23        The second step in this particular case is directed to

24    assessing whether sensors or other claim limitations transform

25    the abstract idea from patent ineligible subject matter to
```

2

 1     patent eligible subject matter.  The focus in the opposition
 2     that Icon filed was on the second step, and that is focusing
 3     on sensors and other limitations.
 4         However, with respect to sensors, the patent discloses
 5     only using conventional technology conventionally regardless
 6     of the complexity of the sensor.  And to illustrate that point
 7     the cases are pretty clear that for example a general purpose
 8     computer used for its own -- its inherent purpose does not
 9     save a claim from patent ineligibility.
10         There's no dispute that a computer, such as all of the
11     desktops here in the courtroom, are pretty complex machines.
12     Complexity is not the issue.  It's whether or not in this case
13     conventional technology is used conventionally.
14         You need go further to the patent which says embodiments
15     of the present invention are not limited to any specific
16     combination of hardware and software.  And that's at column 12
17     lines 25 dash 27.  So the patent clearly discloses that
18     whatever technology it uses is conventional technology used
19     conventionally.
20         The Federal Circuit's opinion in Electric Power controls
21     this case.  And in the Electric Power case there was a
22     utilities power grid wherein the claims recited bringing in
23     data from the power grid, analyzing that data, and then
24     providing feedback in terms of grid vulnerability to the
25     control people in the utilities control room.

3

**Appx997**

1        The Federal Circuit repeated the principle that

2   combination of collecting data, analyzing data, and then

3   presenting the analysis of the data, that in that case the

4   vulnerability of the power grid, or in this case simply

5   feedback, was ineligible subject matter.

6        The Federal Circuit also repeated the principle that

7   conventional off-the-shelf technology used conventionally does

8   not transform patent ineligible subject matter into something

9   that would be eligible.  And as I just noted here, the patent

10  plainly states that only -- nothing special is needed, that is

11  conventional technology is used as its conventional intended

12  form.

13       With respect to the claim limitations that have been

14  discussed in the briefs, for example an evaluation, an

15  evaluation is nothing special.  There's no improvement in

16  technology.  In fact the patent plainly states, and you need

17  go further than the patent, plainly states that it can be just

18  summarizing, tabulating, charting or even just collecting the

19  information, and that's straight out of the patent.  And

20  that's at column 6 lines 56 through column 7 line 3.  So the

21  evaluation that's disclosed in the patent is nothing unique.

22  It's something rudimentary and ordinary.

23       Furthermore, with respect to providing a notification to

24  whomever the notification goes, the patent plainly states it

25  could be as simple as an audible sound.  And that's at the

4

1    patent again at column 7 lines 11 through 16.

2        Moreover, providing a notification and evaluating are

3    simply steps that are necessary to apply the abstract idea of

4    gathering data, analyzing it and providing feedback.  And that

5    in the Supreme Court's case Mayo held that it was insufficient

6    to transform patent ineligible subject matter into something

7    else.

8        The Icon -- the plaintiffs also submitted a declaration

9    from a purported expert.  That declaration, as we've noted in

10   all our briefs, is legally irrelevant, as is the hundreds of

11   pages of patent office prosecution history that the plaintiffs

12   have asked the court to take judicial notice of.

13       The reason I say that is because the Supreme Court in the

14   Diamond v. Diehr case plainly stated, and I'll state, the

15   novelty of any element or steps in a process, or even of the

16   process itself, is of no relevance in determining the subject

17   matter of a claim falls in section 101 categories.

18   Consequently, the expert's purported opinion is legally

19   irrelevant, in addition to having the other flaws that we've

20   noted in the -- our briefs.

21       With respect to the purported testimony, the expert

22   simply gives unsupported conclusory statements regarding his

23   opinion of what is in the patent that's before the court and

24   what was in the prior art.  That is addressing the classic

25   analysis of whether something is obvious or novel under

```
 1    Sections 102 and 103 of the patent statute, and under Diehr
 2    that analysis is irrelevant.
 3         One other -- two other points, Your Honor, that is the
 4    teacher example that were used by Polar in its briefs and
 5    discussed by Icon in its opposition.  Polar did not create
 6    that example.  That example comes straight out of the patent,
 7    and it's at column 1 lines 22 through 26.
 8         The purpose of discussing and presenting that example in
 9    the briefs was to demonstrate and illustrate the abstractness
10    of the patent claims here at issue before the court.  And that
11    is, for example, there is -- as the teacher example
12    illustrates, it's an ordinary activity of observing,
13    evaluating and providing feedback.  The patent merely
14    discloses using conventional technology conventionally in such
15    a process and legally applying those conventional technology
16    in a conventional manner does not transform or remove the
17    abstractness of the claimed idea.
18         In short, the Federal Circuit's Electric Power opinion
19    analyzing the power grid of the utility, the claims in that --
20    or the claims before the court in that particular case have
21    more or -- more than is in the claims at issue before the
22    court.  In other words, nothing in this claim -- or this
23    patent saves the claims or is -- goes beyond what was
24    insufficient in the Electric Power case.  And, consequently,
25    in view of the patent itself as well as the Supreme Court and
```

**Appx1000**

1    Federal Circuit opinion, it's defendants' position that the

2    court can legally conclude that the claims are directed to

3    patent ineligible subject matter.

4         With that, Your Honor, that concludes my remarks and I

5    would be glad to entertain any questions that you may have.

6              THE COURT:   Thank you.

7         Counsel.

8              MR. WRIGHT:   Good afternoon -- or good morning, Your

9    Honor.   May it please the court.

10             THE COURT:   It's afternoon somewhere.

11             MR. WRIGHT:   Somewhere it's afternoon.   It seems

12   like afternoon to me after dealing with the snowy morning.   So

13   may it please the court, my name is David Wright of Maschoff

14   Brennan.   I represent Icon Health & Fitness, and we appreciate

15   the court's time today in addressing this important issue.

16        And just quickly before I address in fullness some of the

17   statements that were made, counsel for Polar indicated that it

18   would be irrelevant for this court to consider issues of

19   novelty or otherwise patentability, and that simply is

20   contrary to the cases.   In fact a case was decided just

21   yesterday by the Federal Circuit and its evolving area of the

22   law, and I can cite that to the Court.   And obviously we

23   didn't have a chance to submit this as part of the briefs, but

24   yesterday in a case entitled Trading Technologies

25   International, Inc. versus CQG, Inc.   And I have the opinion

**Appx1001**

1    of the court.  I have copies that I can --

2              THE COURT:  Fine.

3              MR. WRIGHT:  May I approach the court?  Plenty of

4    copies for everyone, Your Honor.  And that case is 2016 dash

5    1616, and again decided January 18th, 2017.  In this case it

6    recognized that a specific technological modification to solve

7    a problem or improve functionality of a known system generally

8    produced patentable eligible subject matter.  And in this case

9    it involved nothing more than the gathering and displaying of

10   data on a graphical user interface for use in electronic

11   trading of stocks.

12        So one would argue perhaps in that case that it was

13   nothing more than gathering data and analyzing the data, but I

14   think what's important is the Federal Circuit and other courts

15   have indicated that a careful analysis needs to be performed

16   on determining whether or not there's patent eligibility for a

17   claimed subject matter.

18        And specifically on the point of whether or not issues of

19   patentability or novelty, anticipation are relevant, at page

20   nine of the decision the Federal Circuit indicated that

21   applying an overview of this evolving jurisprudence, the

22   public interest in innovation advance is best served when

23   close questions of eligibility are considered along with the

24   understanding flowing from review of the patentability

25   criteria of novelty, unobviousness, and enablement, for when

**Appx1002**

 1   these classical criteria are evaluated, the issue of subject

 2   matter eligibility is placed in the context of the

 3   patent-based incentive to technologic process.

 4        So I think that is an instruction as recent as yesterday

 5   from controlling courts.

 6              THE COURT:  Well, tell me why yours is eligible.

 7              MR. WRIGHT:  Well, and that's an important question.

 8   And perhaps I could start with a little procedural backdrop

 9   because I think it's important in the context of this Rule

10   12(c) motion.

11        This case was brought in February 2012, and during the

12   almost five years of time that -- since the case was brought,

13   the case has been stayed pending inter partes and ex parte

14   reexaminations of the patent.  So Icon and other parties,

15   perhaps not Polar, have been busy before the Patent Office

16   arguing about these very issues of novelty and patentability,

17   and that has taken quite some time.

18              THE COURT:  One aspect of this went up if I remember

19   correctly.

20              MR. WRIGHT:  Well, actually there was a case before

21   Your Honor.  We have three claims at issue in the complaint.

22   This patent at issue today is the '271 patent.  We have the

23   '351 patent that was decided by Your Honor on summary judgment

24   following a fullsome record regarding claim construction on an

25   issue of indefiniteness under the Nautilus standard.  That

1    issue went up.

2            THE COURT:  They affirmed us if I remember

3    correctly.

4            MR. WRIGHT:  Pardon me?

5            The COURT:   That was affirmed.

6            MR. WRIGHT:  Yes, Your Honor got it right according

7    to the Federal Circuit, that's correct.

8            THE COURT:  Yes.  Nobody else has said I haven't got

9    it right on that particular subject.

10            MR. WRIGHT:  So this case now before the court is an

11    issue relating to the '271 patent.

12            The Court:  Yeah.  That's one that we stayed waiting

13    around for others to do something and they finally got to the

14    point where they did something.

15            MR. WRIGHT:  Right.  And that something I think is

16    important and at least informative to the court based on this

17    language that I just read from the Federal Circuit because it

18    talked about the novelty and the patentability of every single

19    claim that is issued before the court.  So the Patent Office

20    in an inter partes context, in other words, there were

21    adversaries arguing with one another before the Patent Office,

22    determined that there was something novel here.

23        And one of the arguments that was presented is precisely

24    what Polar is arguing here, and that argument was this has

25    been around forever.  And the Patent Office reviewed the

**Appx1004**

1    arguments, reviewed the record in their fullness and all the

2    prior art, and concluded that all of the patents before the

3    court today represent patentable subject matter.

4            THE COURT:  They issued.

5            MR. WRIGHT:  They issued, that's correct, and

6    confirmed the patentability of Claim 15 which is important for

7    this case today.  So I think that's important because under a

8    12(b) motion this court has to take as true all of the record

9    before it, including the allegations that have been made by

10   Icon in this case.

11       And I think it's very informative because issues of

12   inventive concept that are part of that step two analysis

13   under the Alice/Mayo framework is very akin to a determination

14   of novelty or patentability under these other provisions of

15   the statute.  So I think it's informative, and perhaps this is

16   a unique case, where we're at the initial stages of a case,

17   albeit five years from filing, but the court has the benefit

18   of someone making a determination on novelty in an adversarial

19   proceeding confirming that these patent claims represent

20   something new and novel.

21           THE COURT:  Now, did they reissue after

22   reconsideration?

23           MR. WRIGHT:  So what happened, there were two

24   reexaminations that were filed, one filed by Icon because it

25   was presented with prior art that was not available to it

**Appx1005**

1    previously so it put its own patent into reexamination, and as

2    a result it canceled Claim 1 and some other claims and

3    proposed amendments to new claims, and those claims were

4    examined in that ex parte reexamination and new claims issued

5    from that reexamination.

6           THE COURT:  Okay.  Now, are we talking here about

7    the new claims?

8           MR. WRIGHT:  We're talking about the new claims and

9    Claim 15, your Honor, which was an old claim, and that was the

10   subject of an inter partes reexamination, so a separate

11   proceeding before the Patent Office.

12          THE COURT:  It took them five years to do that.

13          MR. WRIGHT:  It takes them a while to do that.

14          THE COURT:  Well, am I talking about -- are you

15   talking about the newly issued claim?

16          MR. WRIGHT:  I'm talking about Claim 15.

17          THE COURT:  Is that the newly issued claim?

18          MR. WRIGHT:  No.  That's a claim from the original

19   patent that survived this inter partes reexamination.

20          THE COURT:  Okay, the reexamination.

21          MR. WRIGHT:  Correct.

22          THE COURT:  Okay.  And that -- all they did was

23   reaffirm what they had previously done.

24          MR. WRIGHT:  So there was an initial prosecution of

25   the patent before the Patent Office, and then this inter

**Appx1006**

```
 1    partes reexamination had an opportunity with a different
 2    examiner to take a look at prior art that was submitted,
 3    arguments that were submitted.  It's an adversarial proceeding
 4    unlike a prosecution where an applicant goes in and argues --
 5              THE COURT:  What I'm trying to figure out is if I've
 6    got the original here.
 7              MR. WRIGHT:  You do have one original claim and
 8    that's Claim 15.
 9              THE COURT:  That's the one we're talking about?
10              MR. WRIGHT:  We're talking about Claim 15 and there
11    are 17 other claims that --
12              THE COURT:  No.  This issue before me right now has
13    to do with a specific claim.
14              MR. WRIGHT:  So this issue has to do -- so they've
15    brought a motion for judgment on the pleadings on Icon's --
16    the entirety of Icon's claim of infringement.  Icon's claim of
17    infringement --
18              THE COURT:  I don't have 17 claims in front of me.
19              MR. WRIGHT:  Well, there are 18 claims that Icon has
20    identified that are being infringed according to its view by
21    Polar Systems.  And what this --
22              THE COURT:  Have I got 18 claims?
23              MR. WRIGHT:  You do, Your Honor.
24              THE COURT:  Point that out to me.  I thought I had
25    three.
```

13

**Appx1007**

```
 1              MR. WRIGHT:  Certainly.

 2              THE COURT:   We dealt with one.  They sat on it for

 3    five years.  It was reexamined and you're back here with one.

 4              MR. WRIGHT:  Well, let me -- let me sort of give you

 5    the procedural history in the context of the claims and

 6    perhaps that will assist the court.  If you can turn to the

 7    patent, which is exhibit --

 8              THE COURT:  I'm interested in the pleadings.

 9              MR. WRIGHT:  Oh, the pleadings.

10              THE COURT:  Where in the pleadings does it say,

11    Judge, you've got 17 claims here?  You had three but you've

12    got an additional 14.

13              MR. WRIGHT:  Yeah.  So originally there were --

14              THE COURT:  Where in the pleadings do they say, hey,

15    you've got 17 claims here?

16              MR. WRIGHT:  In the pleadings?

17              THE COURT:  In the pleadings.

18              MR. WRIGHT:  In the pleadings the allegation is that

19    Polar violates claims of the 3 -- of the '271 patent.  It also

20    claims that Polar violated claims of the '351 patent.  Your

21    Honor has already dealt with that, affirmed on appeal.  And we

22    also asserted claims of infringement of the '800 patent.  And

23    I'm happy to inform the court as to the status of that issue

24    if you'd like.  But what we have before you today is Icon's

25    claim in the complaint for infringement of the '271 patent.
```

14

**Appx1008**

```
 1              THE COURT:  I've got one item.

 2              MR. WRIGHT:  One item.  That one item, the patents

 3    have claims, and each claim is --

 4              THE COURT:  I don't care about the others.

 5              MR. WRIGHT:  Okay.

 6              THE COURT:  I'm interested in the one that's in

 7    front of me.

 8              MR. WRIGHT:  Okay.  The one claim, the one cause of

 9    action before the court, is Icon's claim that Polar violates

10    Icon's '271 patent.

11              THE COURT:  Okay.  I don't have 17 claims here.

12              MR. WRIGHT:  Well, the '271 patent has more than 40

13    claims, and Icon has identified 18 of those claims that are at

14    play in this case that are being infringed by Polar.

15              THE COURT:  In your pleadings?

16              MR. WRIGHT:  Not in the pleadings.  That's --

17              THE COURT:  Well, if they're not in the pleadings

18    they're not here.

19              MR. WRIGHT:  Okay.  That's not typically done, Your

20    Honor.  Typically the exchange of exact --

21              THE COURT:  I have to understand what people are

22    complaining about, and in order to do that you file pleadings.

23    And I don't read in the pleadings what's not there.  If

24    there's been a change of circumstance, people tell me about

25    it.  I can't fathom what's in somebody else's mind unless they
```

**Appx1009**

1    tell me about it.

2            MR. WRIGHT:  So the pleadings have set forth a cause

3    of action for infringement of the '271 patent and that's

4    what's before this court.  That --

5            THE COURT:  Tell me what's so unique about this one

6    item.

7            MR. WRIGHT:  Certainly.  So the patent -- and we can

8    read some language specifically from the patent that the

9    patent itself describes what was unique that was not known.

10           THE COURT:   I want you to tell me what's unique.

11           MR. WRIGHT:  Certainly.  What's unique about this

12   patent, Your Honor, is it's the first time that anybody had --

13   had aggregated fragmented information about -- that was

14   measured by a sensor, obtained by a sensor, so this is

15   objective data that's obtained by sensors.  It's the first

16   time that anyone had aggregated that data from multiple people

17   and then analyzed it in a central server, and then based on

18   that analysis made a recommendation for customized content to

19   be provided for one of the members of the group being

20   analyzed.

21       And that is something that was recognized to be novel by

22   the Patent Office during these reexams, and that is the

23   essence of what this patent is all about.  It doesn't relate

24   to any human activity, any activity that could be conducted

25   solely by a human.

16

**Appx1010**

```
1              THE COURT:   What sources do you gather the data
2    from?
3              MR. WRIGHT:   The sources are gathered specifically
4    from sensors, and that's set forth in the claims.
5              THE COURT:   Sensors where?
6              MR. WRIGHT:   The sensors that are associated with a
7    person.  So every person in the system would have sensors
8    associated with him or her.  So take for example a heart rate
9    monitor.
10             THE COURT:   What's the nature of the data?
11             MR. WRIGHT:   The nature of the data is data that's
12   generated by that sensor that reflects a physical
13   characteristic that is objective and measurable by that
14   sensor.
15             THE COURT:   Of a particular person.
16             MR. WRIGHT:   Of a particular person.  And what's
17   unique about this patent is it aggregates for the first time
18   all of these fragmented data points and analyzes --
19             THE COURT:   Other people?
20             MR. WRIGHT:   Of other people.  It's sort of a
21   network, a social --
22             THE COURT:   How does that help anything?
23             MR. WRIGHT:   Well, what it helps is, according to
24   the patent, it helps because once you have the data of this
25   group, you can analyze it to be able to prescribe customized
```

17

**Appx1011**

1   content --

2          THE COURT:  Such as?

3          MR. WRIGHT:  -- a course of action, an option.

4          THE COURT:  We gather the data, and I'm on a

5   machine, and what do you tell me?

6          MR. WRIGHT:  So we tell you that we've analyzed the

7   heart rate of people who have run -- that have ridden the same

8   course that you're riding.  Your heart rate is different and

9   we're going to make a recommendation to you based on the

10  differences that we see with other people who have run the

11  same course or ridden the same course that relates to heart

12  rate or relates to cadence or relates to --

13         THE COURT:  What are you going to tell me?

14         MR. WRIGHT:  We're going to give you options that

15  are based on the analysis of that data.

16         THE COURT:  Are these predetermined options?

17         MR. WRIGHT:  These are options that are already

18  determined in the computer, and a correlation is then made

19  based on that aggregation and analysis of the data.

20         THE COURT:  Give me a predetermined prescription?

21         MR. WRIGHT:  We've given you a prescription that's

22  sort of customized based on the evaluation of that aggregated

23  data.

24         THE COURT:  How does that help me?

25         MR. WRIGHT:  Well, it helps to improve your

18

**Appx1012**

1   experience and perhaps provide some motivation for you to

2   increase your activity level or fitness level in a different

3   way or to modify the way that you might be exercising, and

4   that's where it's beneficial to you.

5          THE COURT:  Why does gathering information from a

6   dozen, a hundred, a million sources in reference to a

7   particular function useful to me?  Why do I even give a damn?

8          MR. WRIGHT:  Well, there are a lot of people that

9   are currently motivated by social networks.  So a comparison

10  of how you might be performing with that same exercise based

11  on objective metrics with somebody else might constitute

12  motivation for some people to increase or adjust an exercise.

13  So perhaps, Your Honor, that could be a benefit of this sort

14  of aggregation, evaluation and provision of customized options

15  to a user.

16         THE COURT:  Now, how do you find comparables?

17                  (MULTIPLE SPEAKERS)

18         MR. WRIGHT:  I'm sorry?

19         THE COURT:  I say how do you find comparables of

20  persons who are made up of individuals that provide

21  information that's useful at all?

22         MR. WRIGHT:  So you can use the data because it is

23  an aggregation of fragmented data.  You can granularize the

24  analysis so that in your mind what you're doing is you're

25  receiving some output beneficial because you're comparing

**Appx1013**

1    against what you consider to be comparable.  So you could find
2    gentlemen of the same age that are doing the same exercise and
3    they may have a certain heart rate that's different or a
4    certain output that's different.
5             THE COURT:  How do I know that they're of the same
6    age and how do I know that they're gentlemen?  How do I know?
7             MR. WRIGHT:  This is part of the aggregation of
8    data.  So the sensor in the patent is associated with users.
9    That user has a profile, and when that sensor senses the data,
10   the data including profile information is part of the
11   aggregation that's then considered.
12            THE COURT:  Do you ever feel like you work for a
13   computer?
14            MR. WRIGHT:  Your Honor, I wonder about that
15   sometimes, and --
16            THE COURT:  I wonder about that all the time.
17            MR. WRIGHT:  But the patent represents something
18   that had not been done before and it reflects that in --
19            THE COURT:  Lots of aggregations, aggregators, often
20   compile, even in encyclopedias, a whole passel of useless
21   information, you know, or useful information.  The idea of
22   assembling information in and of itself, is that unique?
23            MR. WRIGHT:  The idea of assembling --
24            THE COURT:  Done that since writing was invented.
25            MR. WRIGHT:  The idea of assembling information is

Appx1014

1 not unique, but we have to be careful in how we characterize

2 the patented technology here because if we strip some of the

3 elements that are claimed out so that we can talk about truly

4 abstract concepts just to get to the point of abstraction,

5 that's not allowed by the courts.  We have to put it all in

6 context.

7   And what we have here is not just the aggregation of data

8 but it's data that's being sensed.  It's not -- we can't -- a

9 human cannot observe the information that -- physical

10 characteristics that's being sensed.  And that data is then

11 aggregated and analyzed and evaluated so that a prescription

12 can be provided, a customized content can be provided to an

13 individual.

14   THE COURT:  Well, they give you a list basically or

15 the machines choice of a list that's been predetermined.

16   MR. WRIGHT:  Well, the predetermination has not

17 happened.  What the computer does is it compiles a list of all

18 possible content, motivational content or otherwise, and then

19 it, based on the aggregation as it may be unique to you as a

20 member of the system, it then analyzes and then provides for

21 you an output that is unique to you.  It's customized.

22   THE COURT:  I've used this illustration before but

23 it's a fun one.  It's a Dwight Eisenhower observation I think

24 coming from an old New Yorker cartoon, and where all of the

25 computer whizzes of the world were in Nepal climbing the

21

**Appx1015**

1    mountain, and they put a question to the master computer, the

2    current personification of the early room-sized computers.

3    And the question is, is there a God?  Is there a God?  And

4    everybody waits with bated breath.  And the answer comes back

5    from the computer, there is now.  There is now.  I mean what

6    got your patent -- I mean really tell me what useful function

7    it serves.

8            MR. WRIGHT:  Well, the useful function it serves is

9    it's a more robust analysis of biometric data in a network of

10   people that allows you to then receive some -- some customized

11   content that could be beneficial to you.  It could be

12   motivational.  It could be informative.  It's customized to

13   you, and that's the output that we're talking about.

14       The patent achieves that by way of employing technology,

15   sensors, a network that has an associative database of both

16   the sensor database, the evaluation database, and the output

17   database so that aggregated data once analyzed could then flow

18   to the benefit of an individual user.

19           THE COURT:  When I was in the service years ago the

20   lead man in our company was a skinny little guy about

21   five-feet-two.  He was the most physically fit of everybody in

22   the company.  He could do more push-ups.  He could do more

23   pull-ups.  He could do more squat jumps.  He could do

24   everything except run faster than anybody else, little tiny

25   guy, skinny guy, wiry guy, smart guy, and those of us standing

1    next to him over six-feet.  And you tell me that the

2    information from my skinny little friend is useful to me?

3              MR. WRIGHT:  Yes, according to the patent that's

4    absolutely correct, Your Honor.

5              THE COURT:  Okay.

6              MR. WRIGHT:  And we have to believe the patent is

7    true for purposes of this motion.

8              THE COURT:  Yeah.

9              MR. WRIGHT:  Now, whether or not I would use that

10   system, it would be helpful to me or to you, I'm not sure

11   that's the issue, but that's what the patent teaches.

12             THE COURT:  No, that's a source of data.  That's a

13   source of data that you say motivates me.  I can be motivated

14   but I still can't do the push-ups you see.

15             MR. WRIGHT:  Right.

16             THE COURT:  He can do the push-ups.  I can't do the

17   push-ups.  His doing the push-ups doesn't motivate me.

18             MR. WRIGHT:  Well --

19             THE COURT:  It makes me envious but it doesn't

20   motivate me.

21             MR. WRIGHT:  Perhaps the data sensed from your

22   friend would indicate that his motion is slightly altered or

23   different than what you perceive, and that would inform you if

24   I try it maybe in this way I could perhaps do a push-up just

25   as well as my friend.  Your Honor --

23

**Appx1017**

```
 1              THE COURT:  Counsel's argument is that you -- and I
 2    take it you agree with the argument as an argument, that you
 3    can't patent an abstract idea.
 4              MR. WRIGHT:  Absolutely.  But this is far from an
 5    abstract idea.
 6              THE COURT:  Now, tell me on an item specific basis
 7    why it's different.
 8              MR. WRIGHT:  Than an abstract idea?  Well, first of
 9    all it's based on data that -- that is generated by sensors
10    that cannot be observed by a human.  It's objective data
11    that's measured by a sensor for more than one person.  So this
12    fragmented data comes into the system and the system analyzes
13    it and evaluates the data based on what it describes as these
14    very unique associative databases, and then it compares --
15              THE COURT:  It sets up -- it has to set up some kind
16    of a protocol to look at the information that it's getting.
17              MR. WRIGHT:  Yes.  So -- and if that question was
18    directed to first of all you obtain the sensed data that's
19    generated, and then that sensed data is communicated to a
20    central server, the patent talks about the means by which that
21    communication occurs.  And that's in the context of May 2001
22    where it talks about portable computing devices that are
23    connected to the internet.  And I think -- I'm not sure
24    there's any evidence at all that as of May 2001 that was the
25    case.
```

24

```
 1          So that's one of the first potential unconventional uses
 2   of any technology is it takes the sensed data from multiple
 3   people, communicates that in ways that were not conventional
 4   at the time to a central server that then analyzes the data in
 5   this unique associative database structure that's reflected in
 6   figures 6, 7 and 8 of the patent and described in columns 12
 7   through 14 of the patent.  And then it -- after that
 8   comparison or analysis or evaluation of the data, it lines you
 9   up based on who you are with a customized content or output or
10   options and then communicates that to a device.
11          THE COURT:   What are typical directions for
12   example?  What does it say to me?
13          MR. WRIGHT:  So it could say that, you know --
14          THE COURT:   What does it say under the patent?
15          MR. WRIGHT:  What does it say out of the patent?  So
16   that evaluation could be -- take the form of many content.  It
17   gives some examples.  So in the examples that are given in the
18   patent you're in a classroom setting.  You acquire this data
19   from -- this fragmented data from many people, and you've got
20   different options of how that lecture is going to proceed that
21   might be unique to a certain person --
22          THE COURT:   In the patent, what does the patent say
23   you tell me?
24          MR. WRIGHT:  What does it say to tell you?  That you
25   provide customized content --
```

Appx1019

1          THE COURT:  That doesn't mean anything to me.  I'm
2   interested in the specific instruction.  You know, customized
3   content doesn't convey anything to me.  What does it say to
4   me?
5          MR. WRIGHT:  Well, I'll read from the --
6          THE COURT:  Your heart is too fast?  You pedal too
7   slow?
8          MR. WRIGHT:  Yes.
9          THE COURT:  But what does the patent say?
10         MR. WRIGHT:  The patent says that that customized
11  output could be in many forms.  Let me just read from -- from
12  the patent starting at column 5, and that's lines 23.  During
13  a step 104, an evaluation is determined of the physical
14  characteristics for which data was received during the step
15  102 regarding one or more of the subjects for which data was
16  received during the step.  The determination or evaluation may
17  occur in a variety of ways and the evaluation may be directed
18  toward a variety of behaviors.  For example, based on the
19  information received during the step 102 for a subject, the
20  determination performed during the step 104 may include
21  determination -- determining a risk of violence associated
22  with one or more of the subjects, determining one or more
23  options to provide to one or more of the subjects, determining
24  a trading propensity associated with one or more of the
25  subjects, predicting at least one action or course of action

26

1    that might be taken or contemplated by one or more of the

2    subjects, for example, is the subject likely to leave the

3    room, or is desired to be taken by one or more of the

4    subjects, determining a probability associated with an action

5    or course of action that might be taken, or is desired to be

6    taken, by one or more of the subjects, in other words, how --

7    for example, how likely is the subject to leave the room, how

8    likely is the subject to stop paying attention to a speaker,

9    how likely is the subject to fall asleep, etcetera.  In some

10   embodiments, information regarding one or more evaluations may

11   be stored in or accessed from an evaluation database.

12       And it goes on, Your Honor, giving other examples, but in

13   the context of fitness devices, it could be a -- an indication

14   that if you increased your heart rate --

15           THE COURT:  You'd have a heart attack.

16           MR. WRIGHT:  You'd either have a heart attack or

17   you're not quite in your zone of fat burn that you need to be

18   in, so if you increase your cadence or pace by a certain

19   amount, get into that 80 percent zone, then perhaps you can

20   achieve your goals quicker than what you're currently doing.

21   That certainly is one of the options that could be

22   contemplated.

23       Your Honor, let me just continue.  I think it's important

24   to understand the uniqueness of this associative database

25   that's aggregating this fragmented data and the association by

**Appx1021**

```
 1    way of -- of associating to a sensor the data that's receiving
 2    so that at the output end of the analysis it knows where to
 3    send this customized information.  So that's unique and it
 4    wasn't -- didn't exist in the prior art, as recognized
 5    recently by the Patent Office, because --
 6            THE COURT:  What did they actually say?  What did
 7    the Patent Office actually say in reference to that?
 8            MR. WRIGHT:  The Patent Office says that the
 9    determination of options for the end-user based on this
10    aggregated analysis of biosensed data was novel.
11            THE COURT:  Gathering information in a central
12    location and making the recommendation based upon a computer
13    algorithm of some kind tells you something.  I'm really
14    interested -- I had the opportunity of riding in a fancy car
15    the other day, a new experience for me, with sensors on the
16    right-hand and sensors on the left-hand and sensors in front
17    and sensors in back and sitting in the passenger seat to
18    noting how that information was made available to the driver
19    of the car so that he was enabled to park in a very tight
20    parking place.  Information from point A and information from
21    point B, back, back, front, front, aggregated, available.  How
22    does this differ from that?
23            MR. WRIGHT:  Well, it differs because the focus of
24    these patents goes to sensed data that is representative or
25    indicates a physical characteristic of humans, so heart rates,
```

28

**Appx1022**

1    the blood sugar content, the brain waves, the galvanic skin
2    response.   Things that are sensed that couldn't be observed by
3    the human eye is what's at issue here in this patent.
4              THE COURT:   Okay.
5              MR. WRIGHT:   And, Your Honor, perhaps I could cite
6    just a few cases as supplementation, because as indicated by
7    the Federal Circuit yesterday, this is a fluid area of the law
8    and there are several decisions, and these recent decisions
9    I'll cite for the court perhaps are informative on -- we
10   believe are informative on the issues.
11       First of all, we believe that -- and these were cited in
12   the briefs.   I'll make mention to the ones that were not.   But
13   the Enfish decision, which is 822 F.3d 1327, which recognized
14   by the Federal Circuit that -- that what was a unique database
15   structure that didn't exist before that used what was argued
16   to be conventional equipment constituted patentable subject
17   matter and was not an abstract idea.   And the analysis towards
18   that determination I think is informative for the court.   And
19   that is again 822 F.3d 1327.
20       The Court should also take into consideration the BASCOM
21   decision.   And that case dealt with patent claims directed to
22   internet filtering.   And again the argument was made that
23   there was no inventive step taught by the claims, that it used
24   conventional things like the internet and conventional
25   filtering that has occurred on the internet.

 1          But BASCOM teaches that when somebody uses what may have
 2     been known in a novel way in a technological solution to
 3     something that hadn't been done before, in this case combining
 4     the advantages of localized customized filtering to the
 5     administrative advantages of a server-based or ISP-based
 6     filtering, and being able to do that by way of an associative
 7     database based on a log-in information, constituted an
 8     inventive step or at least the combination, the unique
 9     combination of those elements represented in inventive
10     concept.  And that decision in BASCOM is at 827 F.3d 1341.
11          The other case that is more recent that was decided after
12     the briefs were submitted by Icon is Amdocs versus Openet
13     Telecom, Inc., and that's at 841 F.3d 1288.  And this case was
14     decided on November 1st, 2016, and it comes from the Federal
15     Circuit.
16          And in that case it dealt with the ordered combination
17     providing an inventive step based on generic hardware
18     based -- because of a unique distributed architecture that was
19     taught by the patent.  And it dealt with arguably the
20     collection of data, the analysis of data related to an
21     accounting and billing system, and a network for using and
22     storage and analyzing that data.
23          But because it used a unique distributed architecture to
24     be able to accomplish that, much like the architecture of the
25     database that is referenced in the patent for analyzing the

1    fractured data, the biosensed data that we're talking about

2    here, in that case the Second Circuit found that there was

3    inventive concept even though there was an argument that the

4    abstraction was nothing more than collecting and analyzing

5    data, as has been the argument made here.  And, again, that

6    decision is at 841 F.3d 1288.

7        A couple of other decisions that would be I think helpful

8    for the court's analysis that issued after the briefing.  One

9    of them comes from the Southern District of New York.  That's

10   TNS Media Research LLC versus TIVO Research and Analytics,

11   Inc., and that is found at 2016 Westlaw 6993768.  And we have

12   copies of these new cases that we can provide for the court

13   and for counsel.  And that was a case decided on November

14   29th, 2016.

15       And that case involved the gathering and evaluated of

16   fractured data, much like we have here, for a granular

17   analysis.  And in that case they were obtaining viewing

18   information from people all over the country and to be able to

19   determine the efficacy of advertising that was being placed on

20   television systems.

21       And that, according to the court, satisfied both step one

22   and step two of the Alice/Mayo decision.  And it had a

23   matching function, much like the associative databases that

24   are described in the patent, for being able to take this

25   fragmented data in order to obtain a granular option

**Appx1025**

 1    determination for a particular individualized person.

 2         Another case that would be instructive is the Finjan

 3    versus Blue Coat Systems case.  And that citation is 2016 WL

 4    7212322, again a case decided after the briefing.  And that

 5    was a decision rendered on the 13th of December, 2016 by the

 6    Northern District of California.

 7         And in that case it recognized in connection with the

 8    patents directed to virus software, which had been known and

 9    conventional, to be able to prevent by way of a software

10    application the introduction of malware or spyware into one's

11    computer system.  What this court recognized, that a paradigm

12    shift in the way that you look at that constitutes a -- at

13    least in the second step of the Mayo/Alice a recognition of an

14    inventive concept.

15         And that's precisely what we have here in our case, Your

16    Honor, is a paradigm shift because prior to the patent you

17    only have the data of yourself that was instructive to you

18    alone, rather than the ability to be able to now access the

19    biometric data of many people in a network and then analyze

20    that data in a way that becomes relevant for you.  And that is

21    the sort of thing, this paradigm shift, that is recognized by

22    courts to be patentable.

23         And let me just quote some language from that case, and

24    this is at page eight.  It says in assessing patent

25    eligibility here, the court must restrict itself to the

1   language of the asserted claims of the patent at issue, which
2   recite, in relatively broad terms, only three basic functions:
3   Receiving, deriving, and storing.  Nevertheless, each of these
4   functions should be read in light of the specification,
5   including its detailed description of how a downloadable is
6   received or how security profile data is derived.  Because the
7   court must construe the pleadings in favor of the nonmoving
8   party, the court must err on the side of incorporating more,
9   not less, particularities from the specification into its
10  understanding of the claims, while still refraining from
11  importing limitations from the specification into the claim.
12      So that's why it's important really to understand the
13  full scope of what we're dealing with.  And this court has the
14  advantage of having the Patent Office recently determining
15  that full scope and finding that there's patentable subject
16  matter which is akin to this inventive concept under the
17  Mayo/Alice test.
18      And finally I'll make reference to another case from the
19  Southern District of New York, Verint Systems, Inc. versus Red
20  Box Recorders, that's Southern District of New York decided on
21  the 7th of December, 2016.  And in that case it found that a
22  method of recording a telephone conversation and then
23  filtering that information was -- represented not an abstract
24  concept or idea but patentable subject matter, and in
25  connection with that determination took into account the

1   declaration of an expert as part of the record.  It also found
2   under step two there was certainly inventive concept.
3        And in this -- in connection with this case, at page
4   seven the court stated that, certainly if an invention passes
5   a Section 102 or 103 analysis, it should pass Alice step two.
6   It also indicated at page one that virtually any invention
7   could be described as simply addressing that which others long
8   ago addressed, for example, the Socratic method to acquire
9   information.  Many recent motions seeking determination of
10  patent ineligibility suffer from the problem of reductionist
11  simplicity, from characterizing as simple a mouse trap which
12  is in fact a better mouse trap.  Courts faced with such a
13  motion must scrutinize reductive descriptions with great care.
14  In short, the current fad of ineligibility motions in patent
15  cases has in certain respects gotten ahead of itself.  There
16  are instances in which a patent or a single claim may truly be
17  ineligible, but courts should make such determinations on a
18  proper record and should not confuse such determinations with
19  the inquiries properly made under Sections 102 and 103, the
20  sections of the patent law governing novelty and obviousness.
21       There is, it concluded, significant complexity in the
22  patents obscured by reductionist simplicity, and whether that
23  complexity is novel or obvious is not at issue in this motion.
24  Rather, the two questions properly addressed here whether the
25  patents simply claim an abstract concept, which they do not,

34

1   and whether, even if they do, they're sufficiently inventive

2   to be patentable nonetheless, and it indicates that most are.

3        So, Your Honor, we don't believe that under either step

4   of the Alice doctrine that Polar has met its burden by clear

5   and convincing evidence that the patent is directed, not

6   involves, but it's directed to ineligible patent or subject

7   matter because it involves technology in a unique way that was

8   not present before the invention and provides results that

9   weren't available to anyone because of this unique combination

10  of elements.  And that is the essence of patentable subject

11  matter.

12       And, Your Honor, we appreciate your time, and should

13  there be any questions, we're happy to address.

14            THE COURT:  What are they doing that infringes?

15            MR. WRIGHT:  What are they doing?  So they have

16  sensors incorporated in hand-held devices that communicate

17  with a cell phone that is connected to the internet that they

18  then send this data from all of the users that participate in

19  their system to a Polar trainer -- or polarpersonaltrainer.com

20  web cite, it's a social network, where that data is then

21  aggregated, compared and analyzed, and then specific outputs

22  customized to each user is given based on the information

23  that's aggregated.

24            THE COURT:  What's wrong with that?

25            MR. WRIGHT:  What's wrong with it is it's a

35

Appx1029

 1    infringement of Icon's patent, Your Honor.

 2            THE COURT:  And how does it infringe?

 3            MR. WRIGHT:  It incorporates each of the method

 4    steps that are taught in the asserted claims.

 5            THE COURT:  Such as?

 6            MR. WRIGHT:  Such as the receipt of aggregated data,

 7    biosensed data, and then the --

 8            THE COURT:  People can do that, can't they?  Can't

 9    they use sensors if they want?

10            MR. WRIGHT:  Yes, they can.  But what's prohibited

11    by the patent is aggregating that data and then making it an

12    evaluation or determination of an -- of options or content --

13            THE COURT:  What's wrong with that?  Why can't

14    people evaluate data that's gathered whatever method is used?

15            MR. WRIGHT:  Well, if you develop a system that

16    aggregates biosensed data and then evaluates it and provides a

17    unique options or content to one of the members of the system

18    that participated in that aggregated data, that's a violation

19    of Icon's patent.

20            THE COURT:  I walk down to the doctor's office and

21    he has a half a dozen associates, and he has each of the half

22    a dozen associates look at me.  They've accumulated over the

23    years an aggregation of data in each of their respective

24    minds.  And the doctors talk with one another.  They aggregate

25    their information in reference to my status or condition.  And

 1   then collectively they say, Mr. Jenkins, it's our considered

 2   opinion that you should exercise more.  Violation of your

 3   patent?

 4            MR. WRIGHT:  No, Your Honor.

 5            THE COURT:  Why not?  Same process, isn't it?

 6            MR. WRIGHT:  Well, and it's complete abstraction --

 7   abstractness and eliminating --

 8            THE COURT:  Live doctors.  They're live doctors.

 9   They're not abstract.  I'm not abstract.

10            MR. WRIGHT:  They are live doctors, and they're

11   making a subjective determination based on what they see of

12   you.

13            THE COURT:  They've taken their data.  They've taken

14   my heart, they've taken my blood, everything else as far as

15   samples go.  They've looked at things objectively.  They make

16   an evaluation.  They don't use a computer to evaluate, but

17   they evaluate.  They give me their specific evaluation, not

18   only from what they know about me but what they learned in

19   medical school and what they've learned by experience and what

20   they've accumulated by way of knowledge.  It appears on their

21   shelves in a volume of books, up-to-date opinions from local

22   examiners of human beings.  You try to use the so-called

23   scientific method, one version anyway, of observing and

24   recording and accumulating and evaluating.  It goes on every

25   day, doesn't it?

```
 1              MR. WRIGHT:  Well, perhaps.  Sounds like you've got
 2    a good physician.  But what's missing there, Your Honor, from
 3    what's described by the patent is the aggregation of this
 4    biosensed data from a variety of people to make that -- the
 5    evaluation.  And I suspect that although they're relying upon
 6    this knowledge that they obtained in medical school and their
 7    experience, they're making an evaluation about you based on
 8    the data that you present.
 9              THE COURT:  That's what the machine does when I sit
10    on it and pedal at one of the Icon locations.
11              MR. WRIGHT:  And that, as you've described it, would
12    not even come close to the patents that we're talking about
13    here.
14              THE COURT:  Well, why can't people accumulate data?
15    Gosh.
16              MR. WRIGHT:  People can accumulate data, but what
17    we're talking about here is a very specific technological
18    presentation of the accumulation of biosensed data in a
19    particular way to obtain a particular result.
20              THE COURT:  Okay.  Well, they use their expert with
21    his algorithms, and you use your expert with their algorithms,
22    and they may use different algorithms.  You end up with a
23    particular computer generated piece of advice.  They end up
24    with a computer generated piece of advice, and it's about like
25    Marie Osmond on television saying how to lose weight.  She
```

**Appx1032**

1   accumulates data, her own.  She relates her experience.

2            MR. WRIGHT:  She certainly does.  And, Your Honor, I

3   think it would be a mistake to sort of compare that sort of

4   abstraction to this very specific context of what we're

5   talking about in this patent.

6            THE COURT:  Okay.  Well, let's hear from counsel.

7            MR. WRIGHT:  Thank you, Your Honor.

8            MR. MORAN:  Thank you, Your Honor.  We've addressed,

9   at least my colleague addressed, in general legal principles

10  with respect to some initial cases that came out, as well as

11  then a great deal of what I would characterize as attorney

12  testimony.

13      I would like to focus for a moment on the newly presented

14  case that Icon presented to Your Honor this morning and with

15  respect to whether or not the Patent Office's determination

16  and declaration of Icon's alleged expert is at all relevant.

17  Nothing in that Federal Circuit opinion that was presented to

18  the Court today changes the law.  Polar presented its case

19  based on the Supreme Court precedent Diamond v. Diehr.  The

20  case -- the issue before that court was very clear, whether or

21  not 102 and 103 is part of the 101 analysis.  It was not.

22      And specific to the case that Icon presented to the court

23  this morning, in its conclusion of that opinion, on the slip

24  opinion that was handed to me this morning on page nine, the

25  second sentence I believe reads, for Section 101 purposes,

1    precedent does not consider the substantive criteria of

2    patentability, which is totally in line with the Supreme

3    Court's dictation or principle announced or put forth in

4    Diamond v. Diehr.

5          So without -- with regard to the other cases that were

6    listed to the court this morning verbally, I can't speak to

7    those because they weren't previously put on any kind of

8    notice of supplemental authority so I don't have copies of

9    then, have not looked at them.

10          THE COURT:   He indicates he's going to give you a

11    copy and he's going to leave a copy with us.

12          MR. MORAN:   That would be -- I appreciate that, but

13    I can't speak to them now --

14          The COURT:   I understand.

15          MR. MORAN:   -- because I don't know what they are.

16          THE COURT:   Sure.

17          MR. MORAN:   With respect to the attorney testimony,

18    I certainly can address some of those issues if Your Honor

19    wishes, but nothing that was said so far this morning takes

20    this case out of the Electric Power purview, and that is in

21    the context of a utility company's distribution system sensors

22    are gathering data from all over, aggregated data, making an

23    evaluation, telling the company the power grid is vulnerable,

24    feedback.

25          The Federal Circuit was consistent in its application of

1   all the previous precedent.  None of the sensors in that case,

2   none of the evaluation in that case, none of the databases in

3   that case, none of the display in that case rendered the

4   claims patent eligible.  They remained patent ineligible.

5       In this particular case we heard a lot of information

6   from my colleague on the opposing side with respect to

7   aggregation of data that had never been done before.

8           THE COURT:  Now, counsel suggested as to the one

9   claim that we're talking about here that there was indeed a

10  patent issued or at least reissued or reaffirmed.

11          MR. MORAN:  Yes.

12          THE COURT:  So that you start out with the

13  presumption supposedly of validity, do you not?

14          MR. MORAN:  That particular issue of whether or not

15  there is a presumption of validity, whether or not that

16  applies within the context of patentable subject matter is not

17  a settled question of law.  The issue -- the bating on both

18  sides of the questions is whether or not patent eligibility

19  even gets to patentable subject matter and consequently a

20  valid patent.

21          THE COURT:  But they did indeed issue a document.

22          MR. MORAN:  Oh, yes, Your Honor.  Yes, they did

23  issue a document.

24          THE COURT:  And when that document was issued,

25  supposedly -- traditionally once the document was issued,

41

**Appx1035**

1    supposedly there's a presumption.

2            MR. MORAN:   There's a presumption of validity.

3    However, as noted in our briefs, Your Honor, the issue of

4    Section 101 patent eligible subject matter is not part of the

5    reexamination process.   So whatever validity presumption

6    exists, it doesn't exist to an issue that was not considered

7    and is not supposed to be considered through --

8            THE COURT:   Isn't that implicit in every patent that

9    is issued, that it's eligible, otherwise there's no issuance?

10           MR. MORAN:   No.   I'm speaking directly to the case

11   that we have here before the court, and that is whether or not

12   the reexamination imparts any presumption of validity with

13   respect to patentable subject matter, and the answer is no,

14   and that's based on the clear legal principles --

15           THE COURT:   But the initial, the initial issuance --

16           MR. MORAN:   The initial issuance has the presumption

17   that the patent -- the administrator patent presumption that

18   the Patent Office did its presumptuous -- did its

19   administrative job properly.   Yes, that exists in all

20   patents.

21           THE COURT:   That's the presumption that we're really

22   talking about.   Reexamination didn't change that.

23           MR. MORAN:   No.   And with respect -- So separating

24   my comments with respect to the reexamination specifically,

25   which the Section 101 was not considered, and addressing Your

**Appx1036**

 1    Honor's more general principle as whether or not the

 2    presumption of validity applies in a Section 101 analysis is a

 3    area of law that has not been definitively settled.  And part

 4    of the --

 5                 THE COURT:  You want me to settle it?

 6                 MR. MORAN:  No, because the arguments on one side

 7    are patent eligible subject matter question is -- arises even

 8    before the question of is this a valid patent.  So no court at

 9    least as I understand it has taken -- no controlling court as

10    I understand it has taken a definitive position of saying the

11    patent statutes's presumption of validity applies in Section

12    101 disputes.  To the extent that some courts have addressed

13    it, they have addressed it in the context -- well, we're not

14    sure.  It's an evolving part of the case.

15                 THE COURT:  Was it inherent in that dispute?

16                 MR. MORAN:  I'm sorry, Your Honor?

17                 THE COURT:  I say isn't it inherent to that dispute?

18                 MR. MORAN:  Well, that's part of the dispute is

19    whether or not it is inherent.  On one side of the cases the

20    party saying that the presumption does apply would argue that

21    it is inherent.  On the other side of the -- side would be the

22    party taking that it does not apply, saying it is not inherent

23    in the presumption because it is a more threshold patent

24    question of whether or not the subject matter in that patent

25    should even have gotten into the Patent Office's process.  So

1    there's two sides to that.

2         THE COURT:  But the fact that they issue one decides

3    that question, doesn't it?

4         MR. MORAN:  I'm sorry?

5         THE COURT:   Doesn't the fact that one is issued

6    says they rapped on the door appropriately?

7         MR. MORAN:  Oh, the party on that side of the case

8    would say yes, yes, Your Honor, that because they knocked on

9    the door and because it went in through the patent process,

10   the administrative -- the presumption of administrative

11   correctness would apply.  Yes, I agree with that general

12   proposition.  However, it doesn't apply, at least in the -- to

13   the factor that the plaintiff Icon here in this case wants to

14   impart some special meaning --

15        THE COURT:  You say they shouldn't limit the door at

16   all.  I mean that's your argument.

17        MR. MORAN:  No.  I would -- I have not --

18                   (MULTIPLE SPEAKERS)

19        THE COURT:  Door at all because we're dealing with

20   abstractions that are not eligible.  Say goodbye.

21        MR. MORAN:  In cases for example that are -- that

22   are being -- I'll address the hypothetical, and that is in

23   cases that are before the Patent Office where the patent

24   applications are being rejected and the dialogue of Section

25   101 is actively part of the process, obviously there is no

                                                            44

**Appx1038**

1    doubt that the presumption applies.

2         In cases where the examiner never raises it, no party

3    ever raises it, then there's still a question, at least under

4    controlling law, of whether or not the presumption arises with

5    respect to those patents.  This is a hypothetical where the

6    issue had never been discussed before the Patent Office.  At

7    that point at best there would be an administrative

8    correctness.

9         However, to the extent that even is a principle, and

10   assuming that it does apply, the factors here before this

11   court illustrate that the -- that the assumption is incorrect.

12   The patent teaches a pretty plain example of teachers.

13   Nothing that the plaintiff has said this morning so far takes

14   it out of that realm.  All we have is --

15             THE COURT:  What do I do -- what do I do with the

16   paper that's issued and the presumption that ordinarily

17   applies?

18             MR. MORAN:  In this case Your Honor would simply

19   take a look at -- first of all you would look at the law and

20   say it's unsettled law.  And if you want to take a position

21   that even in this case if it did apply, it does not hold --

22   does not save the patent because the abstract idea presented

23   in the patent itself illustrates that it's an abstract idea,

24   teachers receiving information, doctors aggregating

25   information.  The patent, as I said earlier, teaches sensor --

**Appx1039**

1    conventional technology used conventionally.

2           THE COURT:  Why don't you attack the validity of the

3    patent?

4           MR. MORAN:  We're not at that stage of the case yet,

5    Your Honor.

6           THE COURT:  Why aren't we?  Why aren't we?

7           MR. MORAN:  Because we have the motion pending that

8    this is not even a patent that need be attacked on 101 or --

9           THE COURT:  They've issued a paper.

10          MR. MORAN:  Say again.

11          THE COURT:  The Patent Office issued a paper.

12          MR. MORAN:  Yes, it did, but --

13          THE COURT:  Should I just ignore that?

14          MR. MORAN:  No.

15          THE COURT:  What do I do with that?  What do I do

16    with the presumption?

17          MR. MORAN:  Well, as I just said, is that you can --

18    if indeed as -- addressing the presumption, recognizing that

19    it's an unsettled question of law, but no matter which side of

20    the law ultimately becomes the controlling one, under the

21    facts of this particular case it's clear that the presumption

22    doesn't apply because looking at the patent itself, the

23    examples laid out and the technology presented, there's an

24    abstract idea.

25        So whether or not the presumption applies does not -- is

Appx1040

 1    not determinative given the specific facts of this particular
 2    case where we have an abstract idea disclosed by the patent in
 3    its own words, and we have conventional technology used
 4    conventionally described in the patent's own words, and under
 5    controlling precedent, using conventional technology
 6    conventionally does not save a patent, an abstract idea from
 7    patent ineligible subject matter.
 8            THE COURT:  You say you don't reach the question of
 9    the presumption, that comes later, but it exists.  The Patent
10    Office did what it did, and it exists.  You say, well, they
11    shouldn't have done that because it's obvious on the face of
12    the patent that you're dealing with something that's incapable
13    of being patented.  That's the vagueness argument as much as
14    anything.  It's abstraction or vagueness in another form.
15    Let's put it that way.
16            MR. MORAN:  Yes, it is our position that the
17    question before the court is not the validity in the
18    traditional sense under prior art circumstances, but patent
19    eligible subject matter, yes, Your Honor, that's correct.
20        One other point addressing your reference to the computer
21    and the question that was presented to the computer and the
22    answer provided by the computer.  With respect to some of the
23    information that was presented for the first time through
24    attorney this morning, I would just submit to the court that
25    receiving -- as the court already recognized, receiving

**Appx1041**

1   information from multiple people and aggregating it is not

2   something that's -- it's common and it's been common for a

3   long time, and the court need go no further than the well

4   known United States space program and the Apollo and Gemini

5   programs where they had multiple astronauts.  Houston was

6   receiving information, aggregating it and telling them to slow

7   down, your heart rate is too big.  So besides the points that

8   you made, it's a simple one that ordinary people -- well, many

9   ordinary people will recognize depending on their age.

10          Without -- I have no further responses.  If Your Honor

11  would like to have any more questions I'll be glad to answer

12  them.

13              THE COURT:  I'm fine.  I think you should have a

14  chance to look at the documents that they -- that is the newly

15  referenced cases, and if you wish to respond to them, respond

16  within a particular time that we can fix.

17              MR. MORAN:  Within -- by within -- next Friday for

18  example, would that be satisfactory?

19              THE COURT:  That would be fine.  Get them today

20  and --

21              MR. WRIGHT:  Your Honor --

22              THE COURT:  Do you have anything else to say?

23              MR. WRIGHT:  I do, just a couple --

24              The Court:  Well, go ahead and say it and distribute

25  your -- it's interesting that you distributed it in paper

 1    form, which gives some truth to the utility of paper form as

 2    being -- having a longevity greater than what you have in

 3    magnetic recordings or otherwise.

 4              MR. WRIGHT:  Your Honor, I will agree a hundred

 5    percent with you on that one.  I'm a paper guy.

 6              THE COURT:  Why don't you give counsel his copies,

 7    and we're happy to receive your copies, and we're happy to

 8    have you respond, and then we'll go from there.

 9              MR. WRIGHT:  And, Your Honor, since we're talking

10    about additional briefing, I'm not sure what's going to be

11    addressed, but I'd simply ask for an opportunity to respond.

12              THE COURT:  Yeah.  You can have -- he suggests

13    next -- that is a week from Friday if I understood him

14    correctly.

15              MR. MORAN:  Yes, Your Honor.

16              The Court:  Which is what, the --

17              MR. WRIGHT:  27th.

18              The Court:  And you could respond or reply if you

19    desire to by the following Friday.

20              MR. WRIGHT:  Okay.  Thank you, Your Honor.  I just

21    failed to mention one thing.  Since we're at a 12(b)(6) motion

22    and the pleadings must be taken as true and construed in

23    favor -- all inferences in favor of the nonmoving party, which

24    is Icon at this time, I point out for the record document

25    35 -- docket number 35, which is Icon's answer to

1 counterclaims asserted by Polar, and that is a document that

2 was submitted January 21st, 2013.  Second affirmative defense

3 on page seven Icon stated that -- that every one of Polar's

4 related claims for relief fail because each claim of the '271

5 patent is valid, enforceable and in full compliance with the

6 patentability requirements of, inter alia, 35 USC Section 101.

7    Thank you, Your Honor.  We have nothing further.

8     THE COURT:  Thank you.  Well, with the supplements

9 to be filed on or prior to the dates indicated, I'll reserve

10 on the matter and we'll see further what you have to say.

11   The matter in which historically we've received and

12 recorded information and thereafter provided information to

13 one or more people goes all the way back to physically doing

14 that to the invention of writing, whether it be the Chinese

15 system or the Persian system or the Egyptian system.

16   Prior to the invention of writing, you had memory artists

17 who recorded often for a community in their specialized memory

18 the songs and records of their own particular form of

19 civilization.  We improved upon that recording with eventually

20 movable type.

21   I noticed that a Chinese scholar who assisted the Chinese

22 in one sense Anglicizing their alphabet and ending up using a

23 phonetic alphabet rather than a graphic picture, just died the

24 other day at the ripe old age of 111.  But the aggregation of

25 information, the aggregation of information, and the use to

**Appx1044**

1    which the encyclopedia materials are provided and used in the

2    advice to people has been something that's gone on for a long

3    long time.  The swiftness with which that's done nowadays of

4    course is perhaps indebted to Moore's law and the

5    miniaturization of electronic circuits.

6         Electronic sensors are one device for gathering

7    information, whether it exists on your refrigerator or in your

8    hall or on top of your heater or furnace or in the temperature

9    control that you might have, so that information gathering

10   from particular sources through the use of sensors standing

11   alone doesn't do a lot absent the uniqueness of the sensor and

12   the transmission materials the sensor might have to an

13   aggregator.

14        It's a fascinating area.  I appreciate your help.  Thank

15   you very much.  And we'll look forward to hearing from you and

16   the response.  And we'll reserve on the matter.  Thanks a lot.

17   We'll be in recess.

18             MR. WRIGHT:  Thank you, Your Honor.

19             MR. MORAN:  Thank you, Your Honor.

20                  (HEARING CONCLUDED AT 11:28 AM)

21

22

23

24

25

**Appx1045**

1

2

3

4

5                                  Certificate of Reporter

6            I, Raymond P. Fenlon, Official Court Reporter for the

7     United States District Court, District of Utah, do hereby

8     certify that I reported in my official capacity, the

9     proceedings had upon the motion hearing in the case of

10    Icon Health & Fitness, Inc. Vs. Polar Electro Oy, et al.,

11    case No. 1:11-CV-167, in said court, on the 19th day of

12    January, 2017.

13           I further certify that the foregoing pages constitute

14    the official transcript of said proceedings as taken from my

15    machine shorthand notes.

16           In witness whereof, I have hereto subscribed my name

17    this 19th day of January, 2017.

18

19

20

21                                      /s/ Raymond P. Fenlon

22

23

24

25

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
(801) 359-9000
(801) 359-9011 (Facsimile)

John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
(202) 955-3000
(202) 955-5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

*Attorneys for Defendants Polar Electro Oy and Polar Electro Inc.*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ICON HEALTH & FITNESS, INC., <br><br> Plaintiff, <br><br> v. <br><br> POLAR ELECTRO OY et al., <br><br> Defendants. | POLAR ELECTRO OY AND POLAR ELECTRO INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS <br><br> Case No.: 1:11-cv-00167-BSJ <br><br> Honorable Bruce S. Jenkins |

## I.  INTRODUCTION

Without notice to either this Court or the Defendants ("Polar"), at the January 19, 2017 hearing, Icon Health & Fitness, Inc. ("Icon") presented new arguments and authorities in opposition to Polar's motion for judgment on the pleadings.[1] Icon's new arguments and authorities do not alter either the '271 patent or the Asserted Claims. Nor do they alter the controlling Supreme Court and Federal Circuit precedent – especially *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016) – which demonstrate that the Asserted Claims are abstract in nature, and that the recitation of conventional technology used conventionally does not render the Asserted Claims eligible for a patent under Section 101.[2]

## II.  THE NEW CASES DO NOT ALTER THE CONCLUSION THAT THE ASSERTED CLAIMS ARE PATENT INELIGIBLE

### A.  *Trading Technologies International, Inc. v. CQG, Inc. et al.*

Icon asserted that *Trading Technologies* supports its argument that the Court should to take into account the issues of patentability, novelty, and anticipation when deciding whether the Asserted Claims are invalid under Section 101.[3] This is not so. *Trading Technologies* does not diverge from  the Supreme Court's ruling in *Diamond v. Diehr*, 450 U.S. 175, 188-189 (1981), that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." Indeed, *Trading Technologies* explicitly endorsed the *Diehr* precedent,

---

[1] The five new cases are: (1) *Trading Technologies International, Inc. v. CQG, Inc.et al.*, No. 2016-1616, 2017 WL 192716 (Fed. Cir. January 18, 2017)(non-precedential); (2) *Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016); (3) *TNS Media Research LLC v. TIVO Research and Analytics, Inc.*, No. 11-cv-4039, 2016 WL 6993768 (S.D.N.Y. Nov. 29, 2016); (4) *Finjan, Inc. v. Blue Coat Systems*, *LLC*, No. 15-cv-03295, 2016 WL 7212322 (N.D. Cal. Dec. 13, 2016); (5) *Verint Systems Inc. et al. v. Red Box Records Ltd.*, No. 14-cv-5403, 2016 WL 7156768 (S.D.N.Y. Dec. 7, 2016). For the sake of ease, Polar will refer to these five cases as the "new cases."

[2] In accordance with this Court's instruction, Polar limits this supplemental brief to Icon's discussion of the new cases it presented at hearing. Nevertheless, in view of Icon presenting new argument at the hearing, Polar reserves the right to respond should Icon again present new arguments to this Court.

[3] *See* Hearing Transcript, at 8:18 – 9:3.

1

**Appx1048**

stating that "[f]or Section 101 purposes, precedent does not consider the substantive criteria of patentability . . ." 2017 WL 192716 at *4. Notably, the *TNS Media Research* case cited by Icon also follows this precedent, stating "[t]he Court must not delve into whether the patents-in-suit are invalid under §§ 102 or 103 for lack of novelty or non-obviousness – *Alice* did not strike down the statutory distinctions between eligibility under § 101 and invalidity under §§ 102 and 103." 2016 WL 6993768 at *9 (citations omitted).

### B. *Amdocs (Israel) Limited v. Openet Telecom, Inc.*

Icon notes that the *Amdocs* court found that the claims at issue in that case recited an inventive concept at step two of the *Alice* test because those claims recited an "ordered combination" and "because of a unique distributed architecture that was taught by the patent."[4] At the hearing, Icon attempted to analogize *Amdocs* to this case, stating *Amdocs* is "much like the architecture of the database that is referenced in the patent for analyzing the fractured data."[5] The '271 patent demonstrates that Icon's new "architecture" argument is baseless. No unique or special architecture is disclosed in the '271 patent, nor is any special architecture recited by the Asserted Claims. Instead, the '271 patent plainly states that no special implementation is needed:

> the invention described herein *could be implemented in many different ways using a wide range of programming techniques* as well as *general-purpose hardware* or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences.[6]

In short, the '271 patent teaches that no special or unique architecture is needed, and instead discloses nothing beyond using conventional technology conventionally to implement the disclosed idea.

### C. *TNS Media Research LLC v. TIVO Research and Analytics, Inc.*

Icon submits that the *TNS Media* case is relevant because it "involved gathering and evaluated [sic] of fractured data, much like we have here, for a granular analysis."[7] Icon failed to

---

[4] *See* Hearing Transcript, at 30:16-24.
[5] *See* Hearing Transcript, at 30:24 – 31:2.
[6] Exhibit 1 to the Opening Brief, '271 patent, col. 14:22-28 (emphasis added).
[7] *See* Hearing Transcript, at 30:15-17.

delineate exactly how the two cases are alike. In any event, *TNS Media* is not persuasive authority. It involved two different district court judges reaching opposite conclusions about the patent eligibility of the claims at issue. Judge Scheindlin ruled in February 2016 that the claim involved an abstract idea under step one of the *Alice* test and failed step two because it only recited well-understood or conventional data collection, data storage, and "post-solution" activities.  2016 WL 6993768 at *6-7. Judge Forrest reached the opposite conclusion as to both steps of the *Alice* analysis, *id.* at *10, and vacated Judge Scheindlin's decision. But, with all respect, Judge Forrest's reasoning is neither clear nor persuasive. Moreover, Judge Forrest acknowledged the analytical framework that governs these issues:

> Reciting "only routine and conventional steps" is insufficient to state an inventive concept, ... ("[A]ppending purely conventional steps to an abstract idea does not supply a sufficiently inventive concept."); as is simply adding a computer to an abstract idea, <u>DDR Holdings, LLC v. Hotels.com, L.P.</u>, 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("[R]ecitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible."). However, claims that " 'purport[ ] to improve the functioning of the computer itself' or 'effect an improvement in any other technology or technical field' " suffice under step two.

*Id.* at *9 (citations omitted). Applying this framework to the facts of this case results in the conclusion that the Asserted Claims do not pass muster.

### D.  *Finjan, Inc. v. Blue Coat Systems, LLC*

It unclear why Icon cites *Finjan*. Icon began its discussion of this case by referencing a supposed "paradigm shift" that it infers the '271 patent discloses compared to the prior art, saying that the disclosed idea allowed "the ability to be able to now access the biometric data of many people in a network and then analyze that data in a way that becomes relevant for you."[8] But this is just another way of restating the claimed abstract idea: providing and using feedback based on data gathered from subjects. The '271 patent discloses no special way of using a network to communicate or ton provide feedback. It merely discloses an abstract idea which uses conventional technology conventionally.[9]

Icon closed its discussion of *Finjan* by referring to the '271 patent's reexamination, stating

---

[8] *See* Hearing Transcript, at 32:15-20.
[9] *See* Exhibit 1 to the Opening Brief, '271 patent, col. 14:22-28.

"this court has the advantage of having the Patent Office recently determining that full scope and finding that there's patentable subject matter which is akin to this inventive concept under the Mayo/Alice test."[10] But *Finjan* does not even mention a patent's reexamination. Furthermore, this argument is legally unfounded. The USPTO cannot review patent eligibility under Section 101 during a reexamination. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011)(citing 37 C.F.R. § 1.552 ("[Q]ualifications as patentable subject matter under § 101 . . . *may not be raised* in reexamination proceedings")(emphasis added).[11] Icon's argument at the hearing that the "Patent Office recently . . . [found] that there's patentable subject matter" is legally and factually baseless.

To the extent Icon intended to argue that *Finjan* supports this court considering the substantive criteria of patentability (e.g., novelty, anticipation) for §101 purposes, that position is legally baseless as discussed above with regard to the *Trading Technologies* case.

### E. *Verint Systems Inc. v. Red Box Records, Ltd.*

Icon correctly notes that in *Verint* there was a declaration of record before the court. But that case involved summary judgment, not a motion for judgment on the pleadings. *Verint*, 2016 WL 7156768 at *7. Furthermore, the declaration submitted by Icon here is legally irrelevant.[12]

At the hearing, Icon recited quotes from the *Verint* opinion that primarily constitute a discussion of how inventions can be described. But *Verint* does not alter the abstract nature of the Asserted Claims. Under questioning by this Court, Icon could not explain how the '271 patent disclosed anything beyond conventional technology used conventionally to provide feedback based on data gathered from subjects.

Finally, whatever role the *Verint* court believed § 102 and § 103 play in the § 101 analysis, its discussion of this issue is unclear and internally contradictory. Notably, the *Verint* court did not mention the controlling Supreme Court *Diehr* precedent. Thus, the *Verint* court's discussion of the issue is not well grounded and is of little value as guidance.

---

[10] *See* Hearing Transcript, at 33.
[11] *See also* Dkt. No. 171, at 12 of 16.
[12] *See* Dkt. No. 171, at 13-14 of 16.

### III.    CONCLUSION

Nothing in the new cases takes this case out of the direct purview of *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016). In that case, the Federal Circuit confirmed that monitoring and collecting data from multiple data sources, analyzing the data, and displaying the results is an abstract idea. *Electric Power*, 830 F.3d at 1351. Additionally, like the Asserted Claims, the patent-at-issue in *Electric Power* required nothing "other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" and therefore did not include an "inventive concept of the application." *Id.* at 1355.

For the foregoing reasons, along with the reasons presented in the briefing and at the hearing, Polar respectfully requests that the Court find the Asserted Claims directed to patent-ineligible subject matter and thus are invalid pursuant to 35 U.S.C. § 101.

5

DATED:  January 27, 2017                    HOLLAND & KNIGHT LLP

/s/  John P. Moran

John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
202 955 3000
202 955 5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101
801 359 9000
801 359 9011 (Facsimile)

*Attorneys for Defendants Polar Electro Oy
and Polar Electro Inc.*

6

**Appx1053**

**CERTIFICATE OF SERVICE**

I hereby certify that on January 27, 2017 I filed the above paper entitled **POLAR ELECTRO OY AND POLAR ELECTRO INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS** with the Clerk of Court using the CM/ECF system which will send notification of such filing via electronic mail to all counsel of record.

/s/ John P. Moran


John P. Moran

1

**Appx1054**

Larry R. Laycock  (Bar No. 4868)
    *llaycock@mabr.com*
David R. Wright  (Bar No. 5164)
    *dwright@mabr.com*
Tyson K. Hottinger (Bar No. 13607)
    *thottinger@mabr.com*
MASCHOFF BRENNAN LAYCOCK
    GILMORE ISRAELSEN & WRIGHT PLLC
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone:   (435) 252-1360
Facsimile:   (435) 252-1361

Attorneys for plaintiff and cross-defendant ICON HEALTH & FITNESS, INC.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **ICON HEALTH & FITNESS, INC.**, a Delaware corporation, | Civil Action No. 1:11-cv-00167-BSJ |
| Plaintiff, | **ICON HEALTH & FITNESS, INC.'S SUPPLEMENTAL BRIEF IN OPPOSITION TO POLAR'S MOTION FOR JUDGMENT ON THE PLEADINGS** |
| vs. | |
| **POLAR ELECTRO OY**, a Finnish company, and **POLAR ELECTRO INC.**, a Delaware corporation, | |
| Defendants. | Honorable Judge Bruce S. Jenkins |
| AND RELATED COUNTERCLAIM. | |

## I.     INTRODUCTION

Since the Supreme Court's landmark decision in *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, patent eligibility jurisprudence has evolved rapidly and frequently. The new cases cited by ICON Health & Fitness, Inc. ("ICON") during the January 19, 2017 hearing represent the most current understanding of section 101 available. Contrary to Defendants' ("Polar's") contention, the newly cited case law should be afforded due consideration in assessing patent eligibility.

## II.     NEWLY CITED CASES

### A.     Trading Technologies International, Inc. v. CGQ, Inc. et al.

ICON cited *Trading Technologies* for the Federal Circuit's recognition that "at some level, all inventions ... embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," and that therefore, the "threshold level of [patent] eligibility is often usefully explored by way of the substantive statutory criteria of patentability, for an invention that is new, useful and unobvious is more readily distinguished from the generalized knowledge that characterizes ineligible subject matter."[1] Accordingly, a patent eligibility analysis should abide by "the general rule that patent claims must be considered as a whole," and "close questions of eligibility [should be] considered along with the understanding flowing from review of the patentability criteria of novelty, unobviousness, and enablement."[2]

---

[1] *Trading Technologies International, Inc. v CGQ, Inc. et. al.*, 2017 WL 192716 at *4 (Fed. Cir. Jan. 18, 2017) (internal quotation marks omitted).
[2] *Id.* (internal quotation marks omitted).

**B.     Amdocs (Israel) Limited v. Openet Telecom, Inc.**

ICON cited *Amdocs* as the latest example of patent eligible subject matter by virtue of a particular ordered combination of otherwise arguably generic parts. In *Amdocs*, the claims were not found to be abstract because they entailed an unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases), despite the fact that the solution required generic components such as network devices, because the generic components operated in an unconventional manner to achieve the improvement.[3] Furthermore, the claims were held to contain an inventive concept because the solution depended on the invention's "distributed architecture" working together in a "distributed manner" with the network devices.[4]

Like the *Amdocs* claims, the '271 Patent claims entail an extraordinary technological application (an ordered combination of sensor, output, and associative evaluation databases) to provide unique features (multi-user biometric evaluations and individualized options/content therefrom) previously impracticable through a conventional network of sensors. The claims achieve this through the inventive concept of utilizing a unique distributed architecture of associative databases working in a distributed manner with a server to allow "an observer of two or more subjects to take objective measurements of the subjects and use the information to direct the observer or a device under the observer's control along one of several courses of action or to evaluate how best to alter or change what the observer or device is currently doing."[5]

---

[3] *Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (Fed. Cir. 2016).
[4] *Id.*
[5] '271 Patent, 1:32-37.

In order to reconcile the varying sets of biometric data received from various sensors used by various subjects, the disclosed methods require a sensor database.[6] Correspondingly, the methods require an output database to organize the information sent to and received from servers, including codes and other identifying information regarding recipients of sensor data.[7] Lastly, an evaluation database is required to store codes and other identifying information in order to perform the claimed "evaluation representative of a state of both said first subject and said second subject" and to provide the claimed "plurality of/multiple options" to the appropriate subject.[8] The culmination of these three distinct associated databases enables "a specific determination…[to] be associated with a specific output device that will receive a notification of the determination."[9] This ordered combination of specific databases working in conjunction with servers represents ICON's particular solution to a technical limitation of biometric server

[6] "The sensor database **300** may include a sensor identifier field **302** that may includes codes or other identifying information for one or more sensors and a sensor description field **304** that may include information describing the sensors identified in the field **302**, such as information regarding a sensor's name, description, model number, tolerances, specifications, manufacturer, etc. The sensor database **300** also may include a sensor output field **306** that may include information regarding the type, timing and format of the information or other data generated or otherwise provided by the sensors identified in the field **302**." '271 Patent, 12:66-13:9.

[7] "The output database **400** may include an output identifier field **402** that contains codes or other identifying information regarding recipients of sensor data. The output database **400** also may include an output description field **404** that includes a name, identifier or other descriptive information for the output identifiers identified in the field **402** and a sensor identifier field **406** that identifies one or more sensors associated with the output identifiers provided in the field **402**. Other or different fields also may be used in the output database **400**. In some embodiments a specific output identifier might be associated with a specific evaluation to be determined or a specific course of action to be determined. Thus, the output database **400** might include a field that associates the devices identified in the field **402** with a specific determination being made or to be made." '271 Patent, 13:24-38.

[8] "The evaluation database **500** may include an evaluation identifier field **502** that may include codes or other identifying information for one or more evaluations or courses of action being determined. In addition, the evaluation database **500** also may include a description field **504** that may include information regarding the evaluations or courses of action identified in the field **502**. In some embodiments the evaluation database **500** also may include a sensor identifier field **506** that may contain identifiers or other information regarding the sensor data to be used in the evaluations identified in the field **502**." '271 Patent, 13:54-65.

[9] '271 Patent, 14:9-11.

systems: an inability to reconcile and utilize diverse datasets from multiple sensors and multiple subjects in order to determine content therefrom.[10]

### C.    TNS Media Research LLC v. TIVO Research and Analytics, Inc.

The claims found to be patent eligible in *TNS Media* are closely analogous to the present claims of the '271 Patent. In *TNS Media*, the claims were directed to a method of "gathering, storing, and analyzing data relating to media consumption (such as television programming)," specifically with regard to advertisements.[11] Although the claims could ultimately be reduced to the abstract idea of "collecting viewing and purchasing data to analyze the utility of an advertising campaign," the claims were instead found to embody the concrete idea of reconciling numerous media platforms which can be mined for information of varying levels of granularity and particularity in real time, and then subsequently analyzed in a variety of ways.[12] This "multi-sourced, granular collection of data that allows for real-time calculations of utility" was sufficient to remove the claims from abstractness.[13]

The present claims of the '271 Patent are directed to a similar method of utilizing physical characteristic sensors to receive data from multiple subjects of varying levels of granularity and particularity in real time, in order to analyze the data and provide options derived

---

[10] '271 Patent, 4:12-18.
[11] *TNS Media Research LLC v. TIVO Research and Analytics, Inc.*, 2006 WL 6993768 at *2 (S.D.N.Y. Nov. 29, 2016).
[12] *Id.* at 10 ("claim 71 is directed at the concrete idea that there are today numerous digital media platforms which can be mined for information about second-by-second or minute-by-minute household viewing; that data can be as granular as whether the volume is turned down during a commercial break, or whether the channel is switched away and then switched back. That viewing data can be gathered as to a substantial number of households—privacy protected—and compared to equally granular data on purchasing behavior, and then various analyses can be created that rely on this level of detail. This is no abstraction and is described at an advancement.").
[13] *Id.*

therefrom.[14] The method is designed to reconcile a multitude of unrelated parameters[15] collected from various types of sensors in order to determine and analyze the parameters necessary to provide options (e.g. custom content) to end users.[16]

Furthermore, even if it were directed to an abstract concept, the *TNS Media* claims were held to embody an inventive concept because the claimed method directly addressed specific issues that advertisers had previously encountered in the prior art, including an inability to assess utility in real time or with a sufficiently large sample size.[17]

The '271 Patent claims address the same prior art shortcomings that biometric sensor systems faced at the time: barriers to assessing a large sample size of physical characteristics from multiple subjects, an inability to evaluate the diverse and voluminous data collected from various sensors in real time, and the difficulties with determining and providing options derived from the evaluations of such data.[18]

---

[14] '271 Patent, 5:23-28 ("During a step **104**, an evaluation is determined of the physical characteristic(s) for which data was received during the step **102** regarding one or more of the subjects for which data was received during the step **102**. The determination or evaluation may occur in a variety of ways and the evaluation may be directed toward a variety of behaviors.").

[15] '271 Patent, 4:50-58 ("heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern, odor, motion, etc.").

[16] '271 Patent, 5:28-43 (" For example, based on the information received during the step **102** for a subject, the determination performed during the step **104** may include determining a risk of violence associated with one or more of the subjects, determining one or more options to provide to one or more of the subjects, determining a trading propensity associated with one or more of the subjects, predicting at least one action or course of action that might be taken or contemplated by one or more of the subjects (e.g., is the subject likely to leave the room) or is desired to be taken by one or more of the subjects, determining a probability associated with an action or course of action that might be taken, or is desired to be taken, by one or more of the subjects (e.g., how likely is a subject to leave the room, how likely is a subject to stop paying attention to a speaker, how likely is a subject to fall asleep), etc.").

[17] *TNS Media Research LLC*, 2006 WL 6993768 at *11 ("As an initial matter, the specification sets out various problems to be addressed by the patent: Advertisers not having an ability assess utility in real time, or with a sufficiently large sample size, are just two examples described above. The method disclosed in claim 71 directly addresses these issues and provides for the improvement needed: a method that can only be implemented on a computer given the size and complexity of the task at hand, and a step-by-step way to collect, store, cleanse, and analyze data.")

[18] '271 Patent, 3:64-4:1.

Lastly, Polar's attempt to downplay the *TNS Media* holding and to rely on a vacated decision in its procedural history is ill-founded. The present decision cited by ICON ordered the vacatur of the previous decision relied upon by Polar because the "Court determined that the development of further clarity in the law, and the interpretation of the patents against such law" required vacutur of prior decisions.. Polar has offered no reason why this prevailing decision, which has the benefit of nearly a full year of additional patent eligibility jurisprudence, is unpersuasive and should be set aside in favor of a decision that it directly overturns.

### D.    Finjan, Inc. v. Blue Coat Systems, LLC

ICON cited *Finjan* as yet another illustration of how a "non-conventional and non-generic arrangement of known, conventional pieces" can, taken as an ordered combination, constitute an inventive concept.[19] The *Finjan* claims were directed to a method and system for computer virus protection. At the time of invention, virus protection was localized and reactive: virus protection programs were installed on individual, end-user computers and only monitored incoming files for viruses.[20] The *Finjan* patent effected a paradigm shift by introducing both spatial and temporal alterations to conventional virus protection.[21] Spatially, Finjan moved malware profiling from its traditional location on end-user computers to an intermediate location on a network server.[22] Temporally, Finjan shifted the malware profiling process from profiling of

---

[19] *Finjan, Inc. v. Blue Coat Systems, LLC*, 2016 WL 7212322 at *11 (N.D. Cal. Dec. 13, 2016).
[20] *Id.* at 11.
[21] *Id.*
[22] *Id.* ("First, spatially, the '494 claims move malware profiling from its traditional location on end-user computers to an intermediate location on the network. Although not explicit in the claims, the specification makes clear that all of the asserted claims recite operations that are performed on a network server, not an end-user's computer.").

complete files to profiling of file aspects or components (e.g., operations).[23] The former (spatial) improvement utilized ordinary networking technology unconventionally by harnessing specific network architecture to improve malware protection across an entire computer network. The latter (temporal) improvement creatively rearranged an otherwise normal malware profiling process to bolster the preemptiveness of the process. The combination of these two improvements, taken as an ordered combination, was found to recite an inventive concept.

As explained above, the '271 Patent claims similarly achieve its objective through an unconventional arrangement of components. Spatially, ICON's invention moves data analysis from the end user device/sensor to a network server that maintains the aforementioned sensor, output, and evaluation databases in a unique associative manner to allow for the evaluation of multiple sets of data and the provision of options therefrom.[24] Temporally, collected biometric data is maintained at a granular level until the data can be properly contrasted against the information and protocols stored in the three databases.[25] The inventive combination of these two improvements represent an ordered combination that not only enables a user to access biometric data analyses representing large numbers of people, but enables the user to access customized content and options particular to one user's data in relation to other users' data.

Lastly, contrary to Polar's mischaracterization, ICON read into the hearing some helpful guidance offered by *Finjan* in assessing patent eligibility: the Court must restrict itself to the language of the asserted claims, but the disclosed limitations (broad as they may be) should be

---

[23] *Id.* ("Second, temporally, the '494 claims shift malware profiling logic from something that must be applied to a single, complete file to something that must be applied to extracted aspects or components of a file (namely, operations) after it has been decomposed.").

[24] '271 Patent, 12:60-14-8.

[25] '271 Patent, 6:18-22.

read in light of the detail provided in the specification.[26] Because Finjan was the nonmovant, the Court acknowledged that it "must err on the side of incorporating more—not less—particularities from the specification into its understanding of the claims."[27] ICON's mention of the recent reexamination of the '271 Patent by the USPTO was merely to focus attention on the narrowing limitations added therein, which, when read in light of the specification, shed light on the inventive concept at the heart of the claims.

> **E.   Verint Systems Inc. v. Red Box Records, Ltd.**

Finally, ICON cited *Verint* as an example of method claims held to claim concrete steps after they were "read in light of its limitations and against the parameters outlined in the specification," despite initially appearing to be a relatively simple method.[28] In *Verint*, Judge Forrest warns against a recent trend of "reductionist simplicity [that] may obscure underlying complexity, and [] may jeopardize the innovative improvements upon longstanding accomplishments that patents are intended to incent."[29] Accordingly, the claims before Judge Forrest were ultimately found to be patent eligible after proper consideration of the claim limitations in view of the specification. For example, a key step of "recording at least a portion of the communication," a simple instruction at first glance, was explained in the specification as including the real time determination of whether to include or exclude the recording of sensitive information.[30] The additions of a "computerized, automated process" to identify sensitive

---

[26] *Finjan*, 2016 WL 7212322 at *8
[27] *Id.*
[28] *Verint Systems Inc. v. Red Box Recorders Ltd.*, 2016 WL 7156768 at *6 (S.D.N.Y. Dec. 7, 2016).
[29] *Id.* at 1.
[30] *Id.* at 6 ("A key step of claim 1 includes recording at least a portion of an overall communication that includes sensitive information for which protection is sought; one learns from the specification that such recording need not include, and in certain embodiments may in real time exclude, the capture of the sensitive information.").

information, and a step for preventing unauthorized access to certain information by rendering the information unintelligible, were also held by the Court to be "additional, concrete limitations" that moved the claims beyond the realm of mere abstractness.[31]

Polar attempts to ride the wave of reductionist simplicity to characterize the '271 Patent as "conventional technology used conventionally to provide feedback."  Polar relied upon *Electric Power Group*[32] during the January 19 hearing in its efforts to oversimplify the '271 Patent.  The *Electric Power Group* claims comprise "monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results."[33] Unlike the *Electric Power Group* claims, the '271 Patent does more than simply collect data and display that data at a fixed location.  The '271 Patent actually performs an evaluation using the sensor data rather than just displaying the data like the *Electric Power Group* claims.  The '271 Patent, also unlike the *Electric Power Group* claims, then utilizes the analysis to generate a customized recommendation that is sent to a specific device associated with the user (rather than a fixed terminal on a power grid).  These distinguishing and unique features of the '271 Patent are accomplished using the associative database discussed above.  The *Electric Power G*roup claims are not comparable to the '271 Patent claims.

Although the claim language of the '271 Patent may appear simple, the recited limitations, when read in view of the specification, similarly give way to a concrete method of utilizing sensors to provide both a real-time, computerized, and automated evaluation of data

---

[31] *Id.* at 6-7 ("It is more accurate to describe these claims as a method to contemporaneously and automatically record, screen, and protect sensitive information exchanged over an electronic network. Access to such information may either be permitted for those with authorization, or there may be a deletion of the information that occurs in real time, thereby preventing access. This not an abstract concept.").
[32] *Electric Power Group, LLC v. Alstom S.A., 830 F.3d 1350 (Fed Cir. 2016).*
[33] *Id.* at 1351.

from multiple subjects and specific options tailored to specific subjects in relation to the overall evaluation. As explained above, the culmination of three separate associative databases working in conjunction at the network server level to parse, analyze, and utilize granular biometric data collected from a variety of sensors and subjects cannot be dismissed as mere data gathering and analysis.[34]

## III.    CONCLUSION

The new case law cited by ICON comprises the most current and reliable representation of section 101 jurisprudence available, and reveals an emerging trend toward considered review of claim scope in light of the specification. Polar's oversimplification of the '271 Patent does a disservice, not only to the present claims, but to the spirit of innovation that the patent system is designed to advance.

Dated:  February 3, 2017

Larry R. Laycock
David R. Wright
Tyson K. Hottinger
MASCHOFF BRENNAN LAYCOCK
   GILMORE ISRAELSEN & WRIGHT PLLC

By: _/s/ Tyson K. Hottinger_
      Tyson K. Hottinger
Attorneys for plaintiff and cross-defendant
ICON HEALTH & FITNESS, INC.

---

[34] '271 Patent, 12:60-14-8.

Appx1065

FILED
2017 FEB 8 PM 1:09
CLERK
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ICON HEALTH & FITNESS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>POLAR ELECTRO OY et al.,<br><br>Defendants. | PROVISIONAL ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS<br><br>Case No.: 1:11-cv-00167-BSJ<br><br>Honorable Bruce S. Jenkins |

Having considered the parties' briefs, the arguments of counsel, and the relevant law, the court finds that the asserted claims of U.S. Patent No. 6,701,271 are not patent eligible under 35 U.S.C. § 101, because, among other reasons, they are directed to a patent-ineligible abstract idea and do not recite inventive concepts sufficient to transform the claimed abstract idea into a patent-eligible application. As such, the court finds that Defendants' Motion for Judgment on the Pleadings (CM/ECF No. 147) is provisionally granted.

Defendants shall prepare and submit a suggested form of final order as well as a proposed judgment granting their motion, with proper citations to the record, and do so within 21 days of the date of this order.

DATED this 8ᵀʰ day of February, 2017.

_____
Bruce S. Jenkins
United States Senior District Judge

**Appx1066**

Larry R. Laycock (Utah State Bar No. 4868)
    *llaycock@mabr.com*
David R. Wright (Utah State Bar No. 5164)
    *dwright@mabr.com*
Tyson K. Hottinger (Utah State Bar No. 13607)
    *thottinger@mabr.com*
MASCHOFF BRENNAN
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone:    (435) 252-1360
Facsimile:    (435) 252-1361

Attorneys for Plaintiff
ICON HEALTH & FITNESS, INC.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| **ICON HEALTH & FITNESS, INC.**, a Delaware corporation, <br><br> Plaintiff, <br><br> v. <br><br> **POLAR ELECTRO OY**, a Finnish company, **POLAR ELECTRO INC.**, a Delaware corporation, <br><br> Defendant. | Civil Action No. 1:11-cv-00167-BSJ <br><br> **ICON HEALTH & FITNESS, INC.'S OBJECTIONS TO DEFENDANTS' PROPOSED MEMORANDUM OPINION & ORDER REGARDING POLAR ELECTRO OY AND POLAR ELECTRO INC'S MOTION FOR JUDGMENT ON THE PLEADINGS** <br><br> JURY DEMANDED <br><br> Honorable District Judge Bruce S. Jenkins |

    Pursuant to Rule 46 of the Federal Rules of Civil Procedure and DUCivR 54-1(b), plaintiff

ICON Health & Fitness, Inc. ("ICON") objects to the Proposed Memorandum Opinion & Order

Regarding Polar Electro Oy and Polar Electro Inc.'s Motion for Judgment on the Pleadings

(appended as Ex. A, "Proposed Order") filed by defendants Polar Electro OY and Polar Electro

Inc. (collectively, "Polar").

## I.    ICON objects to Polar's proposed form of judgment.

As an initial matter, ICON objects to Polar's proposed form of judgment. This Court has provisionally granted Polar's Motion for Judgment on the Pleadings. (Dkt. 181; "Motion"). In its Motion, Polar contended that only certain claims of U.S. Pat. No. 6,701,271 (the "'271 Patent") were patent ineligible and thus, invalid under 35 U.S.C. § 101 ("Section 101"). Polar's Proposed Order should therefore be limited to those specific claims. Instead, the draft Judgment in a Civil Action appended to Polar's Proposed Order states that "judgment be entered in favor of the defendants, and plaintiff's claim against defendants for infringement of U.S. Patent No. 6,701,271 is dismissed with prejudice." (appended as Ex. B, "Judgment in a Civil Action"). ICON has asserted claims in this action that were not adjudicated by Polar's Motion for Judgment on the Pleadings, which were set forth in ICON's opposition to the Motion. (Dkt. No. 167, p. 2 "Hottinger Decl."). It would be improper to enter judgment on ICON's claim for infringement as to the '271 Patent when asserted claims from that patent are not the subject of the Court's order on the Motion.

## II.    Polar misrepresents the scope of the Asserted Claims.

In outlining the technological background of the '271 Patent, Polar mischaracterizes the disclosed method by improperly reducing its description to "three fundamental actions: (1) receiving information regarding physical characteristic(s) of subjects; (2) evaluating, or determining a course of action based on, the characteristic(s); and (3) providing a notification of the evaluation/course of action." (Ex. A, p. 2). This characterization wholly ignores the revised scope of the '271 Patent claims, having undergone both an *inter partes* and an *ex parte* reexamination.

Although claim 1 of the '271 Patent was canceled during these reexaminations, and is not at issue in this Action, Polar continues to improperly characterize the '271 Patent based on this canceled claim. (*See* Dkt. 166, p. 10-11).

**A.** **Polar improperly conflates the "evaluation" step and the "options" step of the Asserted Claims.**

ICON objects to Polar's misrepresentation of the scope of the issued claims. Even the broadest two claims, claims 15 and 80, include the steps of, respectively, "receiving a notification regarding a plurality of options; and selecting one of said plurality of options…"[1] or "determining…which of multiple options to provide…"[2] Polar oversimplifies the Asserted Claims to the "three fundamental actions" above, glossing over actual limitations of the inventions. (*See* Dkt. 166, p. 16-18).

Polar attempts to conceal this innovation within the step of determining an evaluation by describing it as "determining a course of action," a step entirely absent from the Asserted Claims. (*See* Ex. A, p. 2). Polar equates this nonexistent step to an example embodiment of the present invention, in which the method is used to enhance the delivery of a lecture. (Ex. A, p. 3).[3] However, the '271 Patent is not limited to a classroom/lecture setting; the specification discloses a "way for an observer of two or more subjects to take objective measurements of the subjects and use the information to direct the observer or a device under the observer's control along one

---

[1] '271 patent at 14:65–15:9, 17:43–50.

[2] '271 patent at 14:65–15:9; '271 patent *Ex Parte* Reexamination Certificate at 4:53–63.

[3] "Fourth, with respect to 'determining a course of action,' the '271 patent shows that the course of action can be either of an actor such as a teacher or entertainer, or of a subject such as a student or an audience member."

of several courses of action or to evaluate how best to alter or change what the observer or device is currently doing." ('271 Patent, 1:32-37). The disclosed methods are therefore applicable in a number of settings, both in and out of the classroom.

Furthermore, the "options" step does not entail the mere feedback of aggregated data. The "options" step reconciles a multitude of diverse data sets from different types of sensors in order to determine and analyze the parameters necessary to provide said options (e.g., custom content), and goes far beyond the mere "summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc." of data performed in the separate "evaluation" step. (*See* Ex. A, p. 3). Only by misrepresenting the '271 Patent claims' scope has Polar been able to argue that the Asserted Claims are directed to an abstract idea. *See id.* at 13.[4]

**B.   Polar mischaracterizes the hardware and software requirements of the Asserted Claims.**

In the Proposed Order, Polar mischaracterizes a quote from the '271 Patent, that "embodiments of the present invention are not limited to any specific combination of hardware and software," to argue that the Asserted Claims disclose nothing more than conventional technology. (Ex. A, p. 4). However, Polar cites this quote out of context: it was stated only with regard to the hardware and software of the server system. ('271 Patent, 12:16-46). ICON has previously explained that the novelty underlying the disclosed servers is not the servers

---

[4] "The Court agrees with Polar and finds that the Asserted Claims are directed to the abstract idea of providing and using feedback based upon data gathered from subjects...The abstract idea claimed by the Asserted Claims recites three ordinary activities...The Asserted Claims fall directly into the abstract idea of collecting and analyzing information or data."

themselves, but the ordered combination of associated databases supported within said servers. (Dkt. 180, p. 2-4).

### III. The Asserted Claims of the present Action have not yet been identified.

In its Proposed Order, Polar states that the Asserted Claims of the present Action are 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 ("Asserted Claims"). However, neither ICON nor Polar ever agreed upon the Asserted Claims at issue in the present Action. As stated in Polar's own Proposed Order, ICON filed an Opposition (Dkt. 166, "Opposition Memorandum") to Polar's Motion for Judgment on the Pleadings (Dkt. 147) with two declarations: (1) a Declaration of Tyson K. Hottinger (Dkt. No. 167), along with three letters related to alleged discovery disputes between the parties; and (2) a Declaration of Dr. David Brienza. (Dkt. No. 168, "Brienza Decl.").

The Hottinger Decl. explained that ICON did not limit its infringement contentions to ten claims, but only identified a limited preliminary set of ten claims as a professional courtesy so that Polar could provide its preliminary non-infringement contentions accordingly. ICON stated that it could not limit its infringement contentions to ten claims because Polar had failed to properly produce initial disclosures that included technical information allowing ICON to properly make an informed decision when limiting its claims. (Dkt. 167-2, p. 1-2). Polar failed to produce basic technical specifications of several of Polar's products, including Polar GoFit, Polar Personal Trainer, Challenges for Business, and Polar Club. (Dkt. 167-1, p. 2). ICON reserved its right to amend the chosen claims once Polar had produced the required information. (Dkt. 167-2, p. 2). Polar never produced the documents necessary for ICON to properly outline its infringement contentions. ICON is still asserting claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 in this Action.

## IV. Subject Matter Eligibility Analysis

### A. A presumption of validity would affect the subject matter eligibility analysis of the '271 Patent.

Polar contends that this Court would have reached its decision on patent eligibility of the '271 Patent regardless of a presumption of validity. In the very case that Polar cites, the Federal Circuit applied a presumption of validity in its subject matter eligibility analysis. *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338 (Fed. Cir. 2013) ("the *only* plausible reading of the patent must be that there is clear and convincing evidence of ineligibility. For those reasons, Rule 12(b)(6) dismissal for lack of eligible subject matter will be the exception, not the rule."). The Proposed Order mischaracterizes the *Ultramercial* case by citing a concurring opinion from one judge that disagreed with the application of this presumption.

ICON objects to Polar's conclusory and groundless contention that the Court would have reached the same conclusion with or without the presumption of validity. Such a heightened evidentiary standard would most assuredly affect the subject matter eligibility analysis of the '271 Patent, and should have been afforded to ICON.

### B. ICON differentiated the Asserted Claims from the claims at issue in *Content Extraction*.

Polar states that ICON failed to explain why the limitations of the Asserted Claims differentiated them from those found ineligible in *Content Extraction*. (Ex. A, p. 13). ICON dedicates an entire section of its Opposition Memorandum to explaining why the Asserted Claims go far beyond the mere collection and storage of data disclosed in the *Content Extraction* claims. (Dkt. 166, p. 16-18). Unlike *Content Extraction*, the Asserted Claims: utilize biometric sensors to collect data in order to create objective data concerning physical characteristics;

evaluate a combination of the collected data, as opposed to merely collecting and storing the data; provide a notification of that evaluation (not just of the collected data); identify and select options based on that evaluation; and select specific devices to receive/activate those options. *Id.* Polar's Proposed Order must address the above arguments in order to satisfactorily explain why the '271 Patent should be found ineligible in view of *Content Extraction*.

### C.   ICON does not argue that the addition of sensors alone render the Asserted Claims not abstract.

Polar states in its Proposed Order that the sensors of the '271 Patent are "disclosed as simply conventional sensors being used conventionally, which is insufficient to transform the abstract idea into patent-eligible subject matter." (Ex. A, p. 13-14). Notwithstanding the fact that ICON never argued that the sensors alone grant the '271 Patent subject matter eligibility, ICON further clarified the unique role the sensors play in the Asserted Claims in its Supplemental Brief. (Dkt. 180, p. 7, "Supplemental Brief")[5]. The '271 Patent's utilization of sensors are part of an unconventional arrangement of components, wherein data analysis is removed from the end user device/sensor to be performed by a network server supported by three distinct databases. *Id.* The data collected from each sensor is maintained at a granular level until it is aggregated at the server level, thereby facilitating the unique associative manner by which the evaluations are performed. *Id.* Polar's Proposed Order incorrectly states that the '271 Patent incorporates nothing more than conventional sensors used for conventional purposes, altogether ignoring ICON's detailed arguments to the contrary.

---

[5]  As set forth in ICON's Opposition Brief, Polar has suggested in its own patent filings that the presence of conventional sensors in its own claims qualifies as patent-eligible subject matter. (Dkt. 166, p. 20-22).

**D.   ICON does not argue that the recitation of an evaluation and a notification thereof, alone, render the Asserted Claims not abstract.**

Polar states in its Proposed Order that ICON argued that "the recitation of an evaluation and a notification render the Asserted Claims not abstract. (Ex. A, p. 14). ICON has never argued that the evaluation and notification, in and of themselves, render the Asserted Claims patent eligible. However, the actual arguments made by ICON regarding the role the evaluations play in rendering the '271 Patent subject matter eligible are not even mentioned in Polar's Proposed Order.

By dismissing the evaluation step as "common actions" such as "summarizing, tabulating, charting, or collecting information," Polar ignores ICON's actual contentions regarding the evaluation step: the Asserted Claims embody the concrete idea of receiving data from multiple subjects and multiple sensors of varying levels of granularity and particularity in real time for the performance of the evaluation. (Dkt. 180, p. 4-5). This evaluation is not only designed to reconcile a multitude of unrelated parameters from a diversity of sensors, but is used to identify options to be provided to specific end users and/or devices. *Id.* ICON objects to the absence of these arguments in the Proposed Order.

**E.   ICON argued that the Asserted Claims teach an improvement specific to the operation of servers.**

Polar states that ICON's reliance on *Enfish* is also ineffective because ICON "did not argue that the '271 patent teaches an improvement in how a computer functions, or any new sensor structure." (Ex. A, p. 14). ICON not only explained why the *Enfish* claims were analogous to the Asserted Claims in its Opposition Memorandum, but also in its Supplemental Brief. None of these arguments are addressed in Polar's Proposed Order.

Just as the Federal Circuit found the *Enfish* patent to be subject matter eligible because the claims were directed to a specific improvement to the way computers operate, ICON explained that the Asserted Claims of the '271 Patent represent an improvement in the way biometric sensors may be utilized within a network. (Dkt. 166, p. 23-24). Before the '271 Patent, fitness trackers "did not allow objective measurements taken by sensors of multiple persons around the world to be analyzed, compared, and then shared." *Id.* These features are enabled by specific improvements to the way the servers operate: through an innovative arrangement of databases at the network level. (Dkt. 180, p. 3-4). To take advantage of these database improvements, the sensors of the '271 Patent are designed specifically to maintain and transmit data at a granular level for evaluation at the server level. *Id.* at 7.

Polar's Proposed Order does not even consider the numerous arguments that ICON has made in relation to *Enfish*.

**F.   Polar fails to explain how the Asserted Claims resemble the claims at issue in *Electric Power Group*.**

Polar's Proposed Order states that the Asserted Claims are "quite similar" to those asserted in *Electric Power Group*. (Ex. A, p. 15-16). However, Polar provides nothing more than several conclusory quotes from the case finding a data analysis method for power-grid monitoring to be abstract, without explaining how or why such claims are similar to the Asserted Claims. *Id.*

Contrary to Polar's contentions, the distributed architecture of databases disclosed in the '271 Patent provide an inventive concept. (Dkt. 180, p. 3-4). The disclosed methods rely upon an ordered combination of specific databases working in conjunction with servers to reconcile and utilize diverse datasets from multiple sensors and multiple subjects in order to determine content therefrom. *Id.* Furthermore, ICON has previously differentiated the Asserted Claims from the

*Electric Power Group* claims: the latter taught only the collection and display of data, whereas the Asserted Claims teach the evaluation of data for the purposes of identifying and providing customized options to specific users. *Id.* at 9.

Polar's Proposed Order addresses none of the actual arguments that ICON has made against *Electric Power Group* throughout this Action.

### G.   Polar mischaracterizes the purpose of the Breinza Declaration.

Polar proposes that this Court find ICON's submission of the Brienza Decl. ineffective because novelty is not relevant to a subject matter eligibility analysis. (Ex. A, p. 17). ICON submitted the Brienza Decl. to offer Dr. Brienza's opinion, according to one of ordinary skill in the art, as to the inventive concepts taught by the '271 Patent. (Dkt. 168, p. 5). Particularly, Dr. Brienza identifies the ordered combination of elements that comprise the inventive concept necessary to grant the '271 Patent subject matter eligibility. *Id.*; *see also Mayo Collaborative Services v. Prometheus Laboratories*, 566 U.S. 66, 90 (2012) ("We recognize that, in evaluating the significance of additional steps, the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap.").

### H.   The "share and compare" feature solved a problem specific to biometric sensors.

Polar states that ICON neglected to argue or explain why the "share and compare" feature is similar to the Internet-centric claims found to be patent eligible in *DDR Holdings* and *Bascom*. ICON has previously explained that the "share and compare" feature, like the claims considered in both *DDR Holdings* and *Bascom*, is directed to solving an industry-specific problem. (Dkt. 166, p. 23). Prior to the '271 Patent, the fitness tracking industry's offerings "did not allow objective measurements taken by sensors of multiple persons around the world to be analyzed,

compared, and then shared." *Id.* Indeed, Polar fails to explain how the '271 Patent's "share and compare" feature is inapposite to the field-specific claims of *DDR Holdings* or *Bascom*.

**V.    Conclusion**

On the forgoing grounds, ICON objects to Polar's non-compliant and unapproved Proposed Order.

Dated: February 28, 2017.                   Respectfully submitted,

                                            MASCHOFF BRENNAN

                                   By:  /s/ *Tyson K. Hottinger*
                                        Tyson K. Hottinger
                                        David R. Wright
                                        Larry R. Laycock

                                        Attorneys for Plaintiff
                                        ICON HEALTH & FITNESS, INC.

# EXHIBIT A

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
(801) 359-9000
(801) 359-9011 (Facsimile)

John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
(202) 955-3000
(202) 955-5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

*Attorneys for Defendants Polar Electro Oy and Polar Electro Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| ICON HEALTH & FITNESS, INC., <br><br> Plaintiff, <br><br> v. <br><br> POLAR ELECTRO OY et al., <br><br> Defendants. | PROPOSED <br> MEMORANDUM OPINION & ORDER REGARDING POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS <br><br> Case No.: 1:11-cv-00167-BSJ <br><br> Honorable Bruce S. Jenkins |

In accordance with the Court's directive on February 8, 2017 (Dkt. No. 181), Polar Electro Oy and Polar Electro Inc. (collectively, "Polar") submit this Proposed Memorandum & Order Regarding Polar's Motion for Judgment on the Pleadings.

Pending before the Court is Defendants', Polar Electro Oy and Polar Electro Inc. (collectively, "Polar"), Motion for Judgment on the Pleadings filed pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 147) ("Motion"). Polar contends that certain claims of U.S. Patent No. 6,701,271 ("'271 patent") are directed to patent-ineligible subject matter and are, therefore, invalid under 35 U.S.C. § 101 ("Section 101"). For the reasons discussed below, the Court grants Polar's Motion.

## I.      Procedural Background

On November 18, 2011, ICON Health & Fitness, Inc. ("Icon") filed a Complaint against Polar Electro Oy ("Polar Oy") asserting infringement of U.S. Patent No. 7,789,800 ("'800 patent") and the '271 patent. (Dkt. No. 1). On June 8, 2012, Icon filed an amended complaint adding Polar Electro, Inc. ("Polar Inc.") and asserting infringement of an additional patent, U.S. Patent No. 6,921,351 ("'351 patent). (Dkt. No. 9). The case was stayed with respect to the '800 patent and the '271 patent pending finalization of reexamination proceedings for those patents. (Dkt. No. 51). The Court entered a scheduling order for the case concerning the '271 patent after finalization of the '271 patent reexamination. (Dkt. No. 141).

After entry of the scheduling order, Polar filed its Motion, requesting that the Court find that claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 of the '271 patent are directed to patent-ineligible subject matter and thus invalid under 35 U.S.C. § 101. (Dkt. No. 147). Icon filed an opposition ("Opposition") (Dkt. No. 166) together with two declarations: (1) a Declaration of Tyson K. Hottinger (Dkt. No. 167), along with three letters related to alleged discovery disputes between the parties; and (2) a Declaration of Dr. David Brienza. (Dkt. No. 168). With its Opposition, Icon also filed a Request that the Court take judicial notice of two groups of documents. The first group consists of the prosecution history of two patents that are unrelated to the asserted '271 patent: (1) the prosecution history file wrapper of U.S. Patent Application No. 11/545,018, which issued as U.S. Patent No. 8,512,238; and (2) the prosecution history file wrapper of U.S. Patent Application No. 13/418,781, which issued as U.S. Patent No. 9,149,213. The second group of documents includes portions of the two separate reexaminations of the '271

patent: (1) the *ex parte* reexamination of U.S. Patent No. 6,701,271 that was assigned Control No. 90/013,409; and (2) the *inter partes* reexamination of U.S. Patent No. 6,701,271 that was assigned Control No. 95/002,337. (Dkt. No. 169). Polar filed a reply brief in support of its Motion (Dkt. No. 171) and shortly thereafter a Notice of Errata. (Dkt. No. 174).

On January 19, 2017, the Court held a hearing during which Icon presented arguments based on new cases it had not previously cited. The Court allowed Polar to file a short response to Icon's arguments related to the new cases, which Polar filed shortly after the hearing. (Dkt. No. 178). In response, Icon filed a Supplemental Opposition Brief. (Dkt. No. 180). Neither party sought construction of any claim terms in its briefing on the Motion.

## II.    The '271 Patent

### A.    Technological Background

Based on a review of the '271 patent and the parties' briefing, the Court arrives at the following conclusions concerning the '271 patent. First, the '271 patent generally discloses a method and system:

> for providing feedback [that] includes receiving data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determining an evaluation of the data [or course of action]; and providing a notification regarding the evaluation [or course of action] to a device"

> (*See e.g.*, Dkt. No. 147, Ex. A, '271 patent col. 2:11-28).

The disclosed method reflects three fundamental actions: (1) receiving information regarding physical characteristic(s) of subjects; (2) evaluating, or determining a course of action based on, the characteristic(s); and (3) providing a notification of the evaluation/course of action. (*See* Dkt. No. 147, Ex. A, Figs. 1 and 2).

Second, the '271 patent broadly defines the terms used to describe and to claim the disclosed method via examples. With respect to "physical characteristic," the '271 patent gives examples, stating that it "might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a

change in any one or more of them." (*See e.g.* Dkt. No. 147, Ex. A, '271 patent Abstract; col. 1:57-64; col. 4:22-23, 53-58).

Third, the '271 patent gives examples of the "determining an evaluation" such that it "may be or include summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc. some or all of the raw physical characteristic data received." (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56-66).

Fourth, with respect to "determining a course of action," the '271 patent shows that the course of action can be either of an actor such as a teacher or entertainer, or of a subject such as a student or an audience member. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:27-30; col. 8:14-23, 26-29, 51-55, and col. 9:13-17). The '271 patent gives examples of a person reading stories or giving a lecture.  In those examples, the person is provided with feedback on the stories or on the parts of the lecture that the audience liked best, or on what story ending they might prefer. *Id*. Another example provided by the '271 patent is a course of action to get subjects to do something, or to improve the chances of the subjects actually doing something. *Id*. In the Background of the Invention, the '271 patent provides examples of situations where it might be "desirable to have information regarding how a subject or a group of subjects feels about information being delivered or presented to them or how the subjects react while information is being delivered or presented to them." (Dkt. No. 147, Ex. A, col. 1:17-21). For example, the "Background of the Invention, states:

> [A] teacher may wish to know if the students in her class understand the material the teacher is discussing. A lecturer may wish to know what portions of his lecture the audience members find most interesting. Alternatively, the lecturer may want to have a better idea of when to take a break. An entertainer may wish to know what ending to provide to a story or song medley being presented to an audience.

(Dkt. No. 147, Ex. A, col. 1:22-29).

The '271 patent gives another example in the context of a person giving a presentation:

> [A]ssume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the

> audience member's heart rates, posture, etc. may be obtained and used to help determine which of the themes the audience members are the most interested in. Once the information is communicated to the speaker, the speaker can direct the presentation appropriately.

(Dkt. No. 147, Ex. A, col. 4:2-11).

The speaker receives feedback information regarding the audience, such as posture (e.g., they are slumping in their seats) or facial response (e.g., they are yawning); the speaker can then make a decision based upon the information. For example, it might be time for the speaker to take a break, speak up, or move to a more rousing topic.

Fifth, the '271 patent gives examples of a "notification" such that it "may be or include an email message, instant message communication, electronic signal or other communication (e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible sound, a visual display, a voice message, etc." (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16). The notification can be any format. (*See e.g.*, Dkt. No. 147, Ex. A, col. 8:37-45).

Sixth, the '271 patent discloses that no unique or specific hardware or software is needed to implement the disclosed method, stating, for example, that "embodiments of the present invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt. No. 147, Ex. A, col. 12:25-27). Indeed, the '271 patent discloses that implementation of the disclosed method could be:

> implemented in many different ways using a wide range of programming techniques as well as general-purpose hardware or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus, implementation of the disclosed method can be via conventional technology used conventionally.

### B. The Asserted Claims

In accordance with LR 2.3, the asserted claims are: 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 ("Asserted Claims"). (Dkt. No. 167-2, p. 3). During reexamination of the '271 patent, independent claim 1 was cancelled. (Dkt. No. 147-1, Ex. 1, p. 22 of 26). All of the Asserted Claims depend directly or indirectly from claim 1, which reads:

A method for providing feedback, comprising:

receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and

providing a notification regarding said evaluation to a device.

Because all of the Asserted Claims depend directly or indirectly from claim 1, they each include the subject matter of claim 1. 35 U.S.C. § 112 (fourth paragraph).[1] The following table summarizes the subject matter added to claim 1 by the Asserted Claims.

| Dependent Claim | Added Subject Matter |
| --- | --- |
| Claim 15 (depends from claim 14, which depends from claim 13, which depends from claim 1) | This claim adds receiving a notification regarding a plurality of options, and selecting the device to which the notification is sent based on selecting one of the plurality of options. |
| Claims 42, 80, and 90 (each depends from claim 1) | These claims add that the first device of claim 1 is a sensor that senses a physical characteristic of a subject; a remote server receives the first data from the first sensor through the internet; and the remote server determines which of multiple options to provide to the first subject based on first data and second data. |
| Claims 49 (depends from claim 42), 81 (depends from claim 80), and 91 (depends from claim 90) | These claims add that the device is a software application operating on a portable computer/cell phone that has a touchscreen input device. |

---

[1] The '271 patent was filed May 17, 2001. (Dkt. No. No. 147, Ex. A, face page). This is prior to the September 16, 2012 effective date of the Leahy-Smith America Invents Act ("AIA"). Thus, reference herein is to the pre-AIA version of 35 U.S.C. § 112. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 n. 1 (Fed. Cir. 2015).

| Dependent Claim | Added Subject Matter |
|---|---|
| Claims 51 (depends from claim 42) and 82 (depends from claim 80) | These claims add that the first device of claim 1 is a portable wireless sensor configured to wirelessly connect to a cell phone through a wireless connection; they also add that the remote server receives the first data from the first sensor through the internet through the wireless connection between the first sensor and cell phone through a wireless cellular connection of the cell phone to the internet. |
| Claim 54 (depends from claim 51) | This claim adds that the first portable wireless sensor of claim 51 is a heart rate sensor. |

(Dkt. No. 147, pg. 5).

It is apparent from the above summary as well as from the full text of the Asserted Claims that each Asserted Claim articulates the claimed method slightly differently, but claim 1 exemplifies the general concept claimed by the Asserted Claims. It is further apparent that the general concept claimed by the Asserted Claims is providing and using feedback based upon data gathered from subjects, which amounts to (1) observing physical characteristic(s) of subjects; (2) evaluating the characteristic(s); and (3) providing a notification of the evaluation. (*See also* Dkt. No. 147, Ex. A, Fig. 1).

## III.    Legal Standards

### A.    Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter pleadings are closed – but early enough not to delay trial." To decide a motion for judgment on the pleadings, the Court accepts as true the non-movant's well-pleaded factual allegations and all reasonable inferences are indulged in favor of the non-movant. *Shaw v. Valdex*, 819 F.2d 965, 968 (10th Cir. 1987). Furthermore, the movant must clearly establish that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

Whether a claim recites patent-ineligible subject matter is a question of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010) ("[w]hether a claim is drawn to

patent-eligible subject matter under §101 is an issue of law[.]"). This determination is a threshold inquiry that is properly decided on the pleadings. *See Ultramercial*, 772 F.3d 709, 717 (Fed. Cir. 2014). The Federal Circuit and district courts have made clear that Section 101 patent eligibility may be, and regularly is, decided at the pleadings stage, without claim construction. *See, e.g.*, *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) (explaining the Federal Circuit "perceive[s] no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101"); *see also Epic Tech*, 2015 WL 8160884 at *5 (D. Utah 2015). Deciding the patent eligibility of the Asserted Claims is appropriate now.

### B. Patent-Eligible Subject Matter

Pursuant to 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." There are three exceptions to Section 101's broad patent-eligibility principles: laws of nature, physical phenomena, and abstract ideas. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

The Supreme Court most recently addressed determining whether a claim recites patent-eligible subject matter in *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2355 (2014). In *Alice*, the Supreme Court reaffirmed the two-step process to determine whether a claim recites patent-eligible subject matter set out in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)). The first step is to determine whether the claims at issue are directed to patent-ineligible concepts, such as laws of nature, natural phenomena, or abstract ideas. *Id.* If the claims recite, for example, an abstract idea, the Court proceeds with second step to determine if there are additional claim elements that introduce an inventive concept to the claim that is sufficient to transform the abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2355.

### C.   The presumption of Validity and the Standard of Proof

It is unsettled whether the presumption of validity provided by 35 U.S.C. § 282, along with the associated clear and convincing standard of proof, applies to a Section 101 challenge. For example, Judge Mayer's concurrence in *Ultramercial* concluded that the presumption of validity does not apply in Section 101 inquiries. 772 F.3d at 717 ("[N]o presumption of eligibility attends the section 101 inquiry."). In a nonprecedential opinion, a different panel of the Federal Circuit noted that "[w]e are not persuaded that the district court was correct that a presumption of validity does not apply." *Tranxition, Inc.* v. *Lenovo (United States) Inc.*, No. 2015-1907, 2016 WL 6775967, at *4 n.1 (Fed. Cir. Nov. 16, 2016). The U.S. Supreme Court has decided Section 101 cases, such as *Alice* and *Mayo*, but it has not discussed or applied a presumption of validity in its analysis. *See Ultramercial* 772 F.3d at 720-21 ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned— much less applied—any presumption of eligibility."). [2]

In the present case, the Court's decision does not depend upon a presumption of validity, and the Court would reach its conclusion concerning whether the '271 patent Asserted Claims are directed to patent-ineligible subject matter regardless of the applicability of the presumption. In addition, the content of the '271 patent is fixed and not disputable, regardless of whether a clear and convincing standard of proof, or a lesser standard is applied. Consequently, the Court need not choose between the varying Federal Circuit views on the applicability of the presumption of validity or its corresponding clear and convincing standard of proof to a Section 101 analysis.

---

[2] The Court notes that a presumption of validity as to a Section 101 inquiry would not apply to the reexamination of the '271 patent because such an inquiry may not be raised in a reexamination. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . ***may not be raised*** in reexamination proceedings.") (emphasis added). Thus, a presumption of validity, if any exists, would only apply as a result of the U.S. Patent and Trademark Office's original examination and issuance of the '271 patent, not as a result of a reexamination.

### 1.   *Alice* Step One: Are the claims directed to a patent-ineligible abstract idea?

The Supreme Court has confirmed that abstract ideas, such as ordinary human activities, are ineligible under Section 101 as being directed to unpatentable subject matter.[3] In *Alice*, the Supreme Court held that computerization of the ordinary human activity of maintaining escrow accounts is not patentable subject matter. 134 S. Ct. 2347. In *Bilski v. Kappos*, the Supreme Court held that the ordinary activity of hedging losses is not patentable. 130 S. Ct. 3218, 3229-30 (2010). And in *Mayo*, the Supreme Court held that the ordinary human activity of observing correlations is not patentable. 132 S. Ct. at 1293-94.

Following the Supreme Court's guidance, the Federal Circuit has confirmed that ordinary human activity, such as collecting and utilizing data by conventional means is not patentable subject matter. For example, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they merely recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*. The Federal Circuit recently reinforced point in *Electric Power Group, LLC v. Alstom S.A.*, stating that "we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." 830 F.3d 1350, 1353-54 (Fed. Cir. 2016) (collecting cases).

Abstract ideas are not limited to natural human activities or financial/business methods and systems. The Federal Circuit has also invalidated patent claims directed to the following abstract ideas: (1) a method and system for managing an electric power grid; (2) a method of managing a bingo game; (3) a method and system of tracking and documenting shipping

---

[3] As noted above, if the step one analysis results in a conclusion that the claims are directed to an abstract idea, then the claims are patent ineligible unless the step two analysis shows that the claims add an inventive concept to the abstract idea as further discussed in the next section.

containers; (4) a method of tracking financial transactions to determine whether they exceed a spending limit (i.e., budgeting); and (5) a method of price optimization.[4] These are just a handful of examples of patent-ineligible subject matter, but they have a commonality: abstract ideas such as natural human activity are not patent-eligible.

### 2. *Alice* Step Two: Do the claims recite additional elements sufficient to transform them into patent-eligible subject matter?

If a claim involves an abstract idea, the court next "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. The court looks at the elements both individually and as an ordered combination. *Id.* at 2355. In other words, if a claim recites an abstract idea, it "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.*

It is settled that reciting generic or conventional components used in their conventional intended way does not transform an ordinary human activity into patentable subject matter. *Alice*, 134 S. Ct. at 2359 (adding "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material). The Supreme Court in *Alice* held that elements, such as a computer, add nothing to a claim beyond their well-known functions, do not transform an abstract idea into patent-eligible subject matter. *Id.* at 2359-60 (using a computer to obtain data, adjust account balances based on the data, and issue automated instructions is well-known and does not transform an abstract idea into a patentable-eligible invention). The *Alice* Court explained that using a computer to complete the "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material. *Id.* at 2359; *see also Wireless Media Innovations LLC v. Maher*

---

[4] *See respectively,* (1) *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016); (2) *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014); (3) *Wireless Media Innovations LLC* 100 F.Supp.3d at 415-415; (4) *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015); and (5) *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir.), cert. denied, 136 S. Ct. 701, 193 L. Ed. 2d 522 (2015).

*Terminals, LLC*, 100 F.Supp.3d 405, 415-415, *aff'd* 2016 WL 463218 (Fed. Cir. 2016) (physical components such as vehicles, optical scanners, and computers do not transform an abstract idea into patentable subject matter).

## IV.    **Analysis and Discussion**

Polar argues that on their face, the Asserted Claims recite the abstract idea of providing and using feedback based on data gathered from subjects. Initially, the Court notes that humans have received and assessed information and thereafter provided feedback to one or more people from time immemorial. The aggregation of information and the use of information to provide advice to people is a practice that has long existed. Today, the process of aggregating information and providing advice is much quicker than in the past due to, for example, the use of computers in the process. Likewise electronic sensors enable various information to be gathered comprehensively and quickly. Sensors have existed in refrigerators, in heaters and furnaces, and temperature controls for a long time. Information gathering from particular sources through the use of sensors, absent uniqueness of a sensor, does not change the nature of the information gathering. As noted above, the '271 patent does not disclose any unique sensor or require any special hardware or programming.

### A.    *Alice* **Step One**

Polar points to claim 1 as the starting point of its argument because all Asserted Claims depend directly or indirectly from claim 1. Polar contends that the abstract idea recited by the Asserted Claims includes three common and ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data. (Dkt. No. 147, pgs. 14-15 of 21).

Polar compares the Asserted Claims to claims found invalid by the Federal Circuit. For instance, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they

recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*.

Polar also compares the Asserted Claims to the claims that the Federal Circuit recently held patent ineligible in *Electric Power Group*. There, the Federal Circuit analyzed the patent eligibility of three patents that claimed systems and methods for "performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" to determine power grid vulnerability. *Electric Power Group,* 830 F.3d at 1351-52. The Federal Circuit observed that it has "treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." *Electric Power Group*, 830 F.3d at 1353 (internal citations omitted). The Federal Circuit concluded that the idea of collecting and analyzing information or data, even when particularly limited, to be an abstract idea. *Electric Power Group,* 830 F.3d at 1353-54 (collecting cases) (Dkt. No. 171, pgs. 9-10 of 16).

Icon takes issue with Polar's description of the Asserted Claims, arguing that the Asserted Claims are like those at issue in *Enfish, LLC v. Microsoft Corp*., 822 F3d 1350 (Fed. Cir. 2016) and are therefore directed to patent-eligible subject matter. Icon presented arguments directed to only two of the Asserted Claims, claims 15 and 80. Those arguments were directed to distinguishing claims 15 and 80 from the asserted claims in *Content Extraction*. First, Icon argued that claim 15 does not merely recite "collecting data," but "separate devices (e.g., sensors) sense, measure, and create objective data concerning physical characteristics (e.g., brain waves) and then transmit the sensed characteristics in the form of data from each person," and that claim 15 "evaluates a combination of the collected data and provides a notification of that *evaluation* (not of the collected data), receives notification of options, selects an option and selects a device based on the option selection." (*See* Dkt. No. 166, pg. 21-22 of 31) (emphasis in original). Icon asserted that these claim limitations do not have "any counterpart in the *Content Extraction* claim." *Id*. Icon also argued that asserted claim 80 "introduces a key inventive

component in the last clause: determining which option(s) 'to provide to the first subject.'" *Id*. Icon argues that in *Content Extraction* the subjects are hard copy documents, and thus, *Content Extraction* is inapplicable to the present case. (*Id*. at pg. 23 of 31). While Icon's arguments pointed out that limitations of claims 15 and 80 were not identical to the *Content Extraction* claim, Icon did not argue or explain why such limitations rendered claims 15 and 80 patent eligible. Icon did not present separate arguments regarding any of the other Asserted Claims, and accordingly, the Court need not address those claims.

The Court agrees with Polar and finds that the Asserted Claims are directed to the abstract idea of providing and using feedback based upon data gathered from subjects. Controlling precedent establishes that the idea of collecting and analyzing information or data, even when particularly limited, is an abstract idea under Section 101. *See Electric Power Group,* 830 F.3d at 1353-54 (collecting cases). The abstract idea claimed by the Asserted Claims recites three ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data. (*See* '271 patent, col. 6:56-60; 7:31-35). The Asserted Claims fall directly into the abstract idea category of collecting and analyzing information or data.

While it is true, as Icon notes, that the Asserted Claims recite "providing a notification" and utilizing "a sensor," the Federal Circuit has ruled that claims reciting common hardware to perform functions a human could not, such as a scanner to collect data, do not thereby negate the abstract nature of the claim. As the Federal Circuit held in *Content Extraction*, added limitations must "involve more than performance of well-understood, routine [and] conventional activities previously known in the industry." 776 F.3d at 1347-48. Icon's argument that sensors make the Asserted Claims not abstract is unpersuasive. The '271 patent does not disclose and Icon does not argue that the sensors are of a unique and new structure. Instead, they are disclosed as simply conventional sensors being used conventionally, which is insufficient to transform the abstract

idea into patent-eligible subject matter.[5]

Icon's argues that the recitation of an evaluation and a notification render the Asserted Claims not abstract. The '271 patent, however, does not disclose such actions as being unique or novel. Instead, it discloses that these are common actions where an evaluation can be as simple as summarizing, tabulating, charting, or collecting information; (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56 – col. 7:3) and a notification according to the '271 patent can be as simple as an audible sound. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16).

Icon points to *Enfish* to argue that the Asserted Claims are patent eligible. Unlike the claims here, the *Enfish* claims were not abstract because they were "directed to a specific improvement to the way computers operate." *Enfish*, 822 F.3d at 1336. But, Icon did not argue that the '271 patent teaches an improvement in how a computer functions, or any new sensor structure. Instead, Icon discussed the claims as using conventional sensors to collect objective data and a conventional computer to evaluate data, send notifications, and make determinations. (*See e.g.*, Dkt. No. 166, p. 11 of 31:1-3 and ¶¶ 2 and 3). These are the ordinary functions of sensors and a computer. Because the '271 patent claims are not directed to an improvement in how sensors sense or operate, or an improvement in how computers compute, the Asserted Claims are unlike those in *Enfish*. *See Electric Power Group*, 830 F.3d at 1354.

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea.

### B.    *Alice* Step Two

At step two of the *Alice* analysis, Polar argues that the Asserted Claims do not recite any inventive concepts to transform the claimed abstract idea into patent-eligible subject matter. (*See,*

---

[5] The Court recognizes that *Alice's* first step looks at "the focus of the claims, their character as a whole." *Electric Power*, 830 F.3d at 1353. In the second step, the Court determines whether additional limitations represent a patent-eligible application of the abstract idea. *Id*. Icon, however, distinguishes *Content Extraction* in response to Polar's step one analysis on such a basis. Thus, the Court addresses certain of Icon's step two arguments in its discussion of *Alice's* step one.

*e.g.,* Dkt. No. 147, pgs. 16-17 of 21). To qualify as patent-eligible subject matter, a claim must recite "significantly more" than the abstract idea, for example by "improv[ing] an existing technological process," and not merely by "implement[ing] [the idea] on a computer." *Alice*, 134 S. Ct. at 2358. Polar argues that the Asserted Claims do not improve an existing technological process or product and merely recite using conventional devices for their conventional purpose – e.g., sensors for sensing and displays for displaying. (Dkt. No. 147, pgs. 16-17 of 21).

Icon argues that the Asserted Claims recite an inventive concept and provides several different bases for its argument. First, Icon argues that "[a]s an ordered combination, the additional elements do introduce inventive concepts." (Dkt. No. 166, pgs. 27-28 of 31). Icon contends that "by putting a sensor that collects 'data indicative of a physical characteristic' in communication with a remote, internet-accessible server that also receives similar data about one or more other subjects, the claims at issue enable the combined evaluation of more than one subject's objective physical-characteristics data, resulting in the provision of one or more options." (Dkt. No. 166, pgs. 27-28 of 31). Second, Icon relies upon *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2016) and *Bascom Global Internet Services, Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) in support of its argument that the Asserted Claims, even if directed to an abstract idea, contain inventive concepts to transform the claims into patentable subject matter. Third, at the January 19, 2017 hearing, Icon argued that the Asserted Claims teach a "unique distributed architecture" of databases and, for this reason, the Asserted Claims contain an inventive concept. (*See* Hearing Tr., 27:23-31:2, Jan 19, 2017). Fourth, Icon argued that certain arguments in Polar's own patent applications, which are unrelated to the Asserted Claims, estop Polar from making its step two arguments. (Dkt. No. 166, pgs. 25-27). Fifth, Icon argued that the reexamination of the '271 patent demonstrated that it was an improvement over existing technology. (Dkt. No. 166, pgs. 28-29 of 31).

The Court does not find Icon's arguments persuasive. It finds no inventive concept in the ordered combination of the claim limitations. The Asserted Claims are quite similar to those asserted in *Electric Power Group*, where the Federal Circuit reasoned that "limiting the claims

[directed to collecting data, analyzing the data, and displaying the results] to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." 830 F.3d at 1354. Furthermore, "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *Id.* at 1355. Here, the '271 patent does not disclose and the Asserted Claims do not "require[] anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" and, therefore, do not include an "inventive concept of the application." *Id.*

For the same reason, Icon's argument related to a unique architecture of databases is unavailing. As noted above, the '271 patent discloses that no unique or specific hardware or software is needed to implement the disclosed method, stating, for example, that "embodiments of the present invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt. No. 147, Ex. A, col. 12:25-27). More particularly, the '271 patent discloses that implementation of the disclosed method could be:

> implemented in many different ways using a wide range of programming
> techniques as well as general-purpose hardware or dedicated controllers.
> In addition, many, if not all, of the steps for the methods described above
> are optional or can be combined or performed in one or more alternative
> orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus the abstract idea underlying the '271 patent can be implemented via conventional technology used conventionally. Once again, there is no inventive concept in such an application of conventional technology.

Icon cited a Declaration of Dr. David Brienza in support of its argument that the Asserted Claims include an inventive concept. But, on a motion for judgment on the pleadings, the court considers only the Complaint, the Answer, and the documents attached as exhibits to either. *See Burkett v. Convergys Corp.*, 2:14-CV-376-EJF, 2015 WL 4487706 at *9 (D. Utah, July 23, 2015). The declaration meets none of these criteria. Additionally, whether the Asserted Claims

are directed to patent-eligible subject matter is a question of law, and Dr. Brienza's legal conclusions invade the province of the Court. *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013); s*ee also Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33-JRG-RSP, 2016 WL 98745 at *3 (E.D. Tex. Jan. 8, 2016) (striking an expert's opinion on subject matter eligibility because it did nothing more than analyze the law and offer legal conclusions).

Furthermore, even if the Court were to consider the declaration, it does not alter the analysis. The Supreme Court has held that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of <u>no relevance</u> in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 189 (1981) (emphasis added).

Icon's reliance upon *DDR Holdings* and *Bascom* is also unpersuasive. Icon argues that the '271 patent improved existing technology, specifically making "share and compare" possible. (Dkt. No. 166, pg. 28 of 31). But, sharing and comparing information has long been possible. Icon does not argue or explain why this Court should consider sharing and comparing information either new or inventive. The Federal Circuit in *DDR Holdings* found a computer-implemented method of manipulating computer interactions to be patent-eligible because the "claimed solution amounts to an inventive concept for resolving" the Internet-centric problem of making two web pages look the same. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d at 1258. The claims here do not provide any inventive functionality in employing generic components such as sensors and touchscreens. As in *Electric Power Group*, the Asserted Claims "specify what information . . . to gather, analyze, and display . . . by use of [nothing] but entirely conventional, generic technology." 830 F.3d at 1356 (analyzing the claims-at-issue against *DDR Holdings*). The Asserted Claims do not solve or claim to solve any internet or tech-centric problem.

*Bascom* is inapposite here for the same reason. In *Bascom*, the Federal Circuit found that the patent-at-issue claimed "a technology-based solution (not an abstract-idea-based solution

implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems . . . the claimed invention represents a software-based invention that improves the performance of the computer system itself." *Bascom Global Internet Services,* 827 F.3d at 1351. None of the Asserted Claims relate to or propose a technology-based solution to sensors, the Internet, or a computer.

Icon's argues that Polar should be estopped from arguing patent-ineligibility in this case because of arguments it made in patent applications that are entirely unrelated to the '271 patent. The Court sees no basis for estopping Polar.

Finally, Icon's argument based on the reexamination of the '271 patent is legally irrelevant. The question of patent-eligible subject matter cannot be raised in a reexamination. *See In re NTP, Inc.,* 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . may not be raised in reexamination proceedings."). Since this issue cannot be raised in a reexamination proceeding, the USPTO's decision has no bearing on subject matter eligibility. *Id.*; *see also SmartGene, Inc. v. Advanced Biological Labs., SA*, 852 F.Supp.2d 42, 50 (D.D.C. 2012), *aff'd*, 555 F.App'x 950 (Fed. Cir. 2014).

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea and do not include an inventive concept that would render them patent-eligible.

## V. Conclusion

Because the Asserted Claims are directed to patent-ineligible subject matter, Polar's Motion for Judgment on the Pleadings is granted.

DATED this XX day of February 2017.

/s/John P. Moran
John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
(202) 955-3000
(202) 955-5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, UT 84101
 (801) 359-9000
 (801) 359-9011 (Facsimile)

*Attorneys for Defendants Polar Electro Oy
and Polar Electro Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this, the XX day of February, 2017, the foregoing

document was filed electronically served by via the Court's ECF system on counsel of record.

/s/John P. Moran
_____

**Certificate of Service**

I certify that on February 21, 2017, I served the above Proposed Memorandum Opinion & Order Regarding Polar Electro Oy and Polar Electro Inc.'s Motion For Judgment on the Pleadings, on the following via email:

David R. Wright
    DWright@mabr.com

Larry R. Laycock
    LLaycock@mabr.com

Tyson K. Hottinger
    thottinger@mabr.com

By: */s/  John P. Moran*
        John P. Moran

# EXHIBIT B

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
_____ District of _____

| | | |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| _____ | ) | |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❐  the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

❐  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

❐  other:

.

This action was *(check one)*:

❐  tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

❐  tried by Judge _____ without a jury and the above decision
was reached.

❐  decided by Judge _____ on a motion for

.

Date: _____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, Utah 84101-3605
(801) 359-9000
(801) 359-9011 (Facsimile)

John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
(202) 955-3000
(202) 955-5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

*Attorneys for Defendants Polar Electro Oy and Polar Electro Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ICON HEALTH & FITNESS, INC., <br><br> Plaintiff, <br><br> v. <br><br> POLAR ELECTRO OY et al., <br><br> Defendants. | PROPOSED <br> MEMORANDUM OPINION & ORDER REGARDING POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS <br><br> Case No.: 1:11-cv-00167-BSJ <br><br> Honorable Bruce S. Jenkins |

In accordance with the Court's directive on February 8, 2017 (Dkt. No. 181), Polar Electro Oy and Polar Electro Inc. (collectively, "Polar") submit this Proposed Memorandum & Order Regarding Polar's Motion for Judgment on the Pleadings.

Pending before the Court is Defendants', Polar Electro Oy and Polar Electro Inc. (collectively, "Polar"), Motion for Judgment on the Pleadings filed pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 147) ("Motion"). Polar contends that certain claims of U.S. Patent No. 6,701,271 ("'271 patent") are directed to patent-ineligible subject matter and are, therefore, invalid under 35 U.S.C. § 101 ("Section 101"). For the reasons discussed below, the Court grants Polar's Motion.

## I.      Procedural Background

On November 18, 2011, ICON Health & Fitness, Inc. ("Icon") filed a Complaint against Polar Electro Oy ("Polar Oy") asserting infringement of U.S. Patent No. 7,789,800 ("'800 patent") and the '271 patent. (Dkt. No. 1). On June 8, 2012, Icon filed an amended complaint adding Polar Electro, Inc. ("Polar Inc.") and asserting infringement of an additional patent, U.S. Patent No. 6,921,351 ("'351 patent). (Dkt. No. 9). The case was stayed with respect to the '800 patent and the '271 patent pending finalization of reexamination proceedings for those patents. (Dkt. No. 51). The Court entered a scheduling order for the case concerning the '271 patent after finalization of the '271 patent reexamination. (Dkt. No. 141).

After entry of the scheduling order, Polar filed its Motion, requesting that the Court find that claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 of the '271 patent are directed to patent-ineligible subject matter and thus invalid under 35 U.S.C. § 101. (Dkt. No. 147). Icon filed an opposition ("Opposition") (Dkt. No. 166) together with two declarations: (1) a Declaration of Tyson K. Hottinger (Dkt. No. 167), along with three letters related to alleged discovery disputes between the parties; and (2) a Declaration of Dr. David Brienza. (Dkt. No. 168). With its Opposition, Icon also filed a Request that the Court take judicial notice of two groups of documents. The first group consists of the prosecution history of two patents that are unrelated to the asserted '271 patent: (1) the prosecution history file wrapper of U.S. Patent Application No. 11/545,018, which issued as U.S. Patent No. 8,512,238; and (2) the prosecution history file wrapper of U.S. Patent Application No. 13/418,781, which issued as U.S. Patent No. 9,149,213. The second group of documents includes portions of the two separate reexaminations of the '271

patent: (1) the *ex parte* reexamination of U.S. Patent No. 6,701,271 that was assigned Control No. 90/013,409; and (2) the *inter partes* reexamination of U.S. Patent No. 6,701,271 that was assigned Control No. 95/002,337. (Dkt. No. 169). Polar filed a reply brief in support of its Motion (Dkt. No. 171) and shortly thereafter a Notice of Errata. (Dkt. No. 174).

On January 19, 2017, the Court held a hearing during which Icon presented arguments based on new cases it had not previously cited. The Court allowed Polar to file a short response to Icon's arguments related to the new cases, which Polar filed shortly after the hearing. (Dkt. No. 178). In response, Icon filed a Supplemental Opposition Brief. (Dkt. No. 180). Neither party sought construction of any claim terms in its briefing on the Motion.

## II.    The '271 Patent

### A.    Technological Background

Based on a review of the '271 patent and the parties' briefing, the Court arrives at the following conclusions concerning the '271 patent. First, the '271 patent generally discloses a method and system:

> for providing feedback [that] includes receiving data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determining an evaluation of the data [or course of action]; and providing a notification regarding the evaluation [or course of action] to a device"

(*See e.g.*, Dkt. No. 147, Ex. A, '271 patent col. 2:11-28).

The disclosed method reflects three fundamental actions: (1) receiving information regarding physical characteristic(s) of subjects; (2) evaluating, or determining a course of action based on, the characteristic(s); and (3) providing a notification of the evaluation/course of action. (*See* Dkt. No. 147, Ex. A, Figs. 1 and 2).

Second, the '271 patent broadly defines the terms used to describe and to claim the disclosed method via examples. With respect to "physical characteristic," the '271 patent gives examples, stating that it "might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a

change in any one or more of them." (*See e.g.* Dkt. No. 147, Ex. A, '271 patent Abstract; col. 1:57-64; col. 4:22-23, 53-58).

Third, the '271 patent gives examples of the "determining an evaluation" such that it "may be or include summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc. some or all of the raw physical characteristic data received." (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56-66).

Fourth, with respect to "determining a course of action," the '271 patent shows that the course of action can be either of an actor such as a teacher or entertainer, or of a subject such as a student or an audience member. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:27-30; col. 8:14-23, 26-29, 51-55, and col. 9:13-17). The '271 patent gives examples of a person reading stories or giving a lecture.  In those examples, the person is provided with feedback on the stories or on the parts of the lecture that the audience liked best, or on what story ending they might prefer. *Id.* Another example provided by the '271 patent is a course of action to get subjects to do something, or to improve the chances of the subjects actually doing something. *Id.* In the Background of the Invention, the '271 patent provides examples of situations where it might be "desirable to have information regarding how a subject or a group of subjects feels about information being delivered or presented to them or how the subjects react while information is being delivered or presented to them." (Dkt. No. 147, Ex. A, col. 1:17-21). For example, the "Background of the Invention, states:

> [A] teacher may wish to know if the students in her class understand the material the teacher is discussing. A lecturer may wish to know what portions of his lecture the audience members find most interesting. Alternatively, the lecturer may want to have a better idea of when to take a break. An entertainer may wish to know what ending to provide to a story or song medley being presented to an audience.

(Dkt. No. 147, Ex. A, col. 1:22-29).

The '271 patent gives another example in the context of a person giving a presentation:

> [A]ssume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the

> audience member's heart rates, posture, etc. may be obtained and used to
> help determine which of the themes the audience members are the most
> interested in. Once the information is communicated to the speaker, the
> speaker can direct the presentation appropriately.

(Dkt. No. 147, Ex. A, col. 4:2-11).

The speaker receives feedback information regarding the audience, such as posture (e.g., they are slumping in their seats) or facial response (e.g., they are yawning); the speaker can then make a decision based upon the information. For example, it might be time for the speaker to take a break, speak up, or move to a more rousing topic.

Fifth, the '271 patent gives examples of a "notification" such that it "may be or include an email message, instant message communication, electronic signal or other communication (e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible sound, a visual display, a voice message, etc." (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16). The notification can be any format. (*See e.g.*, Dkt. No. 147, Ex. A, col. 8:37-45).

Sixth, the '271 patent discloses that no unique or specific hardware or software is needed to implement the disclosed method, stating, for example, that "embodiments of the present invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt. No. 147, Ex. A, col. 12:25-27). Indeed, the '271 patent discloses that implementation of the disclosed method could be:

> implemented in many different ways using a wide range of programming
> techniques as well as general-purpose hardware or dedicated controllers.
> In addition, many, if not all, of the steps for the methods described above
> are optional or can be combined or performed in one or more alternative
> orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus, implementation of the disclosed method can be via conventional technology used conventionally.

### B.    The Asserted Claims

In accordance with LR 2.3, the asserted claims are: 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 ("Asserted Claims"). (Dkt. No. 167-2, p. 3). During reexamination of the '271 patent, independent claim 1 was cancelled. (Dkt. No. 147-1, Ex. 1, p. 22 of 26). All of the Asserted Claims depend directly or indirectly from claim 1, which reads:

A method for providing feedback, comprising:

> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and

> providing a notification regarding said evaluation to a device.

Because all of the Asserted Claims depend directly or indirectly from claim 1, they each include the subject matter of claim 1. 35 U.S.C. § 112 (fourth paragraph).[1] The following table summarizes the subject matter added to claim 1 by the Asserted Claims.

| Dependent Claim | Added Subject Matter |
|---|---|
| Claim 15 (depends from claim 14, which depends from claim 13, which depends from claim 1) | This claim adds receiving a notification regarding a plurality of options, and selecting the device to which the notification is sent based on selecting one of the plurality of options. |
| Claims 42, 80, and 90 (each depends from claim 1) | These claims add that the first device of claim 1 is a sensor that senses a physical characteristic of a subject; a remote server receives the first data from the first sensor through the internet; and the remote server determines which of multiple options to provide to the first subject based on first data and second data. |
| Claims 49 (depends from claim 42), 81 (depends from claim 80), and 91 (depends from claim 90) | These claims add that the device is a software application operating on a portable computer/cell phone that has a touchscreen input device. |

---

[1] The '271 patent was filed May 17, 2001. (Dkt. No. No. 147, Ex. A, face page). This is prior to the September 16, 2012 effective date of the Leahy-Smith America Invents Act ("AIA"). Thus, reference herein is to the pre-AIA version of 35 U.S.C. § 112. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 n. 1 (Fed. Cir. 2015).

| Dependent Claim | Added Subject Matter |
|---|---|
| Claims 51 (depends from claim 42) and 82 (depends from claim 80) | These claims add that the first device of claim 1 is a portable wireless sensor configured to wirelessly connect to a cell phone through a wireless connection; they also add that the remote server receives the first data from the first sensor through the internet through the wireless connection between the first sensor and cell phone through a wireless cellular connection of the cell phone to the internet. |
| Claim 54 (depends from claim 51) | This claim adds that the first portable wireless sensor of claim 51 is a heart rate sensor. |

(Dkt. No. 147, pg. 5).

It is apparent from the above summary as well as from the full text of the Asserted Claims that each Asserted Claim articulates the claimed method slightly differently, but claim 1 exemplifies the general concept claimed by the Asserted Claims. It is further apparent that the general concept claimed by the Asserted Claims is providing and using feedback based upon data gathered from subjects, which amounts to (1) observing physical characteristic(s) of subjects; (2) evaluating the characteristic(s); and (3) providing a notification of the evaluation. (*See also* Dkt. No. 147, Ex. A, Fig. 1).

## III.    Legal Standards

### A.    Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter pleadings are closed – but early enough not to delay trial." To decide a motion for judgment on the pleadings, the Court accepts as true the non-movant's well-pleaded factual allegations and all reasonable inferences are indulged in favor of the non-movant. *Shaw v. Valdex*, 819 F.2d 965, 968 (10th Cir. 1987). Furthermore, the movant must clearly establish that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

Whether a claim recites patent-ineligible subject matter is a question of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010) ("[w]hether a claim is drawn to

patent-eligible subject matter under §101 is an issue of law[.]"). This determination is a threshold inquiry that is properly decided on the pleadings. *See Ultramercial*, 772 F.3d 709, 717 (Fed. Cir. 2014). The Federal Circuit and district courts have made clear that Section 101 patent eligibility may be, and regularly is, decided at the pleadings stage, without claim construction. *See, e.g.*, *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) (explaining the Federal Circuit "perceive[s] no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101"); *see also Epic Tech*, 2015 WL 8160884 at *5 (D. Utah 2015). Deciding the patent eligibility of the Asserted Claims is appropriate now.

### B.      Patent-Eligible Subject Matter

Pursuant to 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." There are three exceptions to Section 101's broad patent-eligibility principles: laws of nature, physical phenomena, and abstract ideas. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

The Supreme Court most recently addressed determining whether a claim recites patent-eligible subject matter in *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2355 (2014). In *Alice*, the Supreme Court reaffirmed the two-step process to determine whether a claim recites patent-eligible subject matter set out in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)). The first step is to determine whether the claims at issue are directed to patent-ineligible concepts, such as laws of nature, natural phenomena, or abstract ideas. *Id*. If the claims recite, for example, an abstract idea, the Court proceeds with second step to determine if there are additional claim elements that introduce an inventive concept to the claim that is sufficient to transform the abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2355.

**C.      The presumption of Validity and the Standard of Proof**

It is unsettled whether the presumption of validity provided by 35 U.S.C. § 282, along with the associated clear and convincing standard of proof, applies to a Section 101 challenge. For example, Judge Mayer's concurrence in *Ultramercial* concluded that the presumption of validity does not apply in Section 101 inquiries. 772 F.3d at 717 ("[N]o presumption of eligibility attends the section 101 inquiry."). In a nonprecedential opinion, a different panel of the Federal Circuit noted that "[w]e are not persuaded that the district court was correct that a presumption of validity does not apply." *Tranxition, Inc.* v. *Lenovo (United States) Inc.*, No. 2015-1907, 2016 WL 6775967, at *4 n.1 (Fed. Cir. Nov. 16, 2016). The U.S. Supreme Court has decided Section 101 cases, such as *Alice* and *Mayo*, but it has not discussed or applied a presumption of validity in its analysis. *See Ultramercial* 772 F.3d at 720-21 ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned— much less applied—any presumption of eligibility.").[2]

In the present case, the Court's decision does not depend upon a presumption of validity, and the Court would reach its conclusion concerning whether the '271 patent Asserted Claims are directed to patent-ineligible subject matter regardless of the applicability of the presumption. In addition, the content of the '271 patent is fixed and not disputable, regardless of whether a clear and convincing standard of proof, or a lesser standard is applied. Consequently, the Court need not choose between the varying Federal Circuit views on the applicability of the presumption of validity or its corresponding clear and convincing standard of proof to a Section 101 analysis.

---

[2] The Court notes that a presumption of validity as to a Section 101 inquiry would not apply to the reexamination of the '271 patent because such an inquiry may not be raised in a reexamination. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . ***may not be raised*** in reexamination proceedings.") (emphasis added). Thus, a presumption of validity, if any exists, would only apply as a result of the U.S. Patent and Trademark Office's original examination and issuance of the '271 patent, not as a result of a reexamination.

1.    *Alice* **Step One: Are the claims directed to a patent-ineligible abstract idea?**

The Supreme Court has confirmed that abstract ideas, such as ordinary human activities, are ineligible under Section 101 as being directed to unpatentable subject matter.[3] In *Alice*, the Supreme Court held that computerization of the ordinary human activity of maintaining escrow accounts is not patentable subject matter. 134 S. Ct. 2347. In *Bilski v. Kappos*, the Supreme Court held that the ordinary activity of hedging losses is not patentable. 130 S. Ct. 3218, 3229-30 (2010). And in *Mayo*, the Supreme Court held that the ordinary human activity of observing correlations is not patentable. 132 S. Ct. at 1293-94.

Following the Supreme Court's guidance, the Federal Circuit has confirmed that ordinary human activity, such as collecting and utilizing data by conventional means is not patentable subject matter. For example, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they merely recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*. The Federal Circuit recently reinforced point in *Electric Power Group, LLC v. Alstom S.A.*, stating that "we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." 830 F.3d 1350, 1353-54 (Fed. Cir. 2016) (collecting cases).

Abstract ideas are not limited to natural human activities or financial/business methods and systems. The Federal Circuit has also invalidated patent claims directed to the following abstract ideas: (1) a method and system for managing an electric power grid; (2) a method of managing a bingo game; (3) a method and system of tracking and documenting shipping

---

[3] As noted above, if the step one analysis results in a conclusion that the claims are directed to an abstract idea, then the claims are patent ineligible unless the step two analysis shows that the claims add an inventive concept to the abstract idea as further discussed in the next section.

containers; (4) a method of tracking financial transactions to determine whether they exceed a spending limit (i.e., budgeting); and (5) a method of price optimization.[4] These are just a handful of examples of patent-ineligible subject matter, but they have a commonality: abstract ideas such as natural human activity are not patent-eligible.

### 2. *Alice* Step Two: Do the claims recite additional elements sufficient to transform them into patent-eligible subject matter?

If a claim involves an abstract idea, the court next "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. The court looks at the elements both individually and as an ordered combination. *Id*. at 2355. In other words, if a claim recites an abstract idea, it "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id*.

It is settled that reciting generic or conventional components used in their conventional intended way does not transform an ordinary human activity into patentable subject matter. *Alice*, 134 S. Ct. at 2359 (adding "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material). The Supreme Court in *Alice* held that elements, such as a computer, add nothing to a claim beyond their well-known functions, do not transform an abstract idea into patent-eligible subject matter. *Id.* at 2359-60 (using a computer to obtain data, adjust account balances based on the data, and issue automated instructions is well-known and does not transform an abstract idea into a patentable-eligible invention). The *Alice* Court explained that using a computer to complete the "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material. *Id.* at 2359; *see also Wireless Media Innovations LLC v. Maher*

---

[4] *See respectively,* (1) *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016); (2) *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014); (3) *Wireless Media Innovations LLC* 100 F.Supp.3d at 415-415; (4) *Intellectual Ventures I LLC v. Capital One Bank (USA),* 792 F.3d 1363, 1367 (Fed. Cir. 2015); and (5) *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir.), cert. denied, 136 S. Ct. 701, 193 L. Ed. 2d 522 (2015).

*Terminals, LLC*, 100 F.Supp.3d 405, 415-415, *aff'd* 2016 WL 463218 (Fed. Cir. 2016) (physical components such as vehicles, optical scanners, and computers do not transform an abstract idea into patentable subject matter).

**IV.     Analysis and Discussion**

Polar argues that on their face, the Asserted Claims recite the abstract idea of providing and using feedback based on data gathered from subjects. Initially, the Court notes that humans have received and assessed information and thereafter provided feedback to one or more people from time immemorial. The aggregation of information and the use of information to provide advice to people is a practice that has long existed. Today, the process of aggregating information and providing advice is much quicker than in the past due to, for example, the use of computers in the process. Likewise electronic sensors enable various information to be gathered comprehensively and quickly. Sensors have existed in refrigerators, in heaters and furnaces, and temperature controls for a long time. Information gathering from particular sources through the use of sensors, absent uniqueness of a sensor, does not change the nature of the information gathering. As noted above, the '271 patent does not disclose any unique sensor or require any special hardware or programming.

**A.     *Alice* Step One**

Polar points to claim 1 as the starting point of its argument because all Asserted Claims depend directly or indirectly from claim 1. Polar contends that the abstract idea recited by the Asserted Claims includes three common and ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data. (Dkt. No. 147, pgs. 14-15 of 21).

Polar compares the Asserted Claims to claims found invalid by the Federal Circuit. For instance, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they

recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*.

Polar also compares the Asserted Claims to the claims that the Federal Circuit recently held patent ineligible in *Electric Power Group*. There, the Federal Circuit analyzed the patent eligibility of three patents that claimed systems and methods for "performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" to determine power grid vulnerability. *Electric Power Group,* 830 F.3d at 1351-52. The Federal Circuit observed that it has "treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." *Electric Power Group*, 830 F.3d at 1353 (internal citations omitted). The Federal Circuit concluded that the idea of collecting and analyzing information or data, even when particularly limited, to be an abstract idea. *Electric Power Group,* 830 F.3d at 1353-54 (collecting cases) (Dkt. No. 171, pgs. 9-10 of 16).

Icon takes issue with Polar's description of the Asserted Claims, arguing that the Asserted Claims are like those at issue in *Enfish, LLC v. Microsoft Corp*., 822 F3d 1350 (Fed. Cir. 2016) and are therefore directed to patent-eligible subject matter. Icon presented arguments directed to only two of the Asserted Claims, claims 15 and 80. Those arguments were directed to distinguishing claims 15 and 80 from the asserted claims in *Content Extraction*. First, Icon argued that claim 15 does not merely recite "collecting data," but "separate devices (e.g., sensors) sense, measure, and create objective data concerning physical characteristics (e.g., brain waves) and then transmit the sensed characteristics in the form of data from each person," and that claim 15 "evaluates a combination of the collected data and provides a notification of that *evaluation* (not of the collected data), receives notification of options, selects an option and selects a device based on the option selection." (*See* Dkt. No. 166, pg. 21-22 of 31) (emphasis in original). Icon asserted that these claim limitations do not have "any counterpart in the *Content Extraction* claim." *Id*. Icon also argued that asserted claim 80 "introduces a key inventive

component in the last clause: determining which option(s) 'to provide to the first subject.'" *Id*. Icon argues that in *Content Extraction* the subjects are hard copy documents, and thus, *Content Extraction* is inapplicable to the present case. (*Id*. at pg. 23 of 31). While Icon's arguments pointed out that limitations of claims 15 and 80 were not identical to the *Content Extraction* claim, Icon did not argue or explain why such limitations rendered claims 15 and 80 patent eligible. Icon did not present separate arguments regarding any of the other Asserted Claims, and accordingly, the Court need not address those claims.

The Court agrees with Polar and finds that the Asserted Claims are directed to the abstract idea of providing and using feedback based upon data gathered from subjects. Controlling precedent establishes that the idea of collecting and analyzing information or data, even when particularly limited, is an abstract idea under Section 101. *See Electric Power Group,* 830 F.3d at 1353-54 (collecting cases). The abstract idea claimed by the Asserted Claims recites three ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data. (*See* '271 patent, col. 6:56-60; 7:31-35). The Asserted Claims fall directly into the abstract idea category of collecting and analyzing information or data.

While it is true, as Icon notes, that the Asserted Claims recite "providing a notification" and utilizing "a sensor," the Federal Circuit has ruled that claims reciting common hardware to perform functions a human could not, such as a scanner to collect data, do not thereby negate the abstract nature of the claim. As the Federal Circuit held in *Content Extraction*, added limitations must "involve more than performance of well-understood, routine [and] conventional activities previously known in the industry." 776 F.3d at 1347-48. Icon's argument that sensors make the Asserted Claims not abstract is unpersuasive. The '271 patent does not disclose and Icon does not argue that the sensors are of a unique and new structure. Instead, they are disclosed as simply conventional sensors being used conventionally, which is insufficient to transform the abstract

idea into patent-eligible subject matter.[5]

Icon's argues that the recitation of an evaluation and a notification render the Asserted Claims not abstract. The '271 patent, however, does not disclose such actions as being unique or novel. Instead, it discloses that these are common actions where an evaluation can be as simple as summarizing, tabulating, charting, or collecting information; (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56 – col. 7:3) and a notification according to the '271 patent can be as simple as an audible sound. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16).

Icon points to *Enfish* to argue that the Asserted Claims are patent eligible. Unlike the claims here, the *Enfish* claims were not abstract because they were "directed to a specific improvement to the way computers operate." *Enfish*, 822 F.3d at 1336. But, Icon did not argue that the '271 patent teaches an improvement in how a computer functions, or any new sensor structure. Instead, Icon discussed the claims as using conventional sensors to collect objective data and a conventional computer to evaluate data, send notifications, and make determinations. (*See e.g.*, Dkt. No. 166, p. 11 of 31:1-3 and ¶¶ 2 and 3). These are the ordinary functions of sensors and a computer. Because the '271 patent claims are not directed to an improvement in how sensors sense or operate, or an improvement in how computers compute, the Asserted Claims are unlike those in *Enfish*. *See Electric Power Group*, 830 F.3d at 1354.

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea.

### B.     *Alice* Step Two

At step two of the *Alice* analysis, Polar argues that the Asserted Claims do not recite any inventive concepts to transform the claimed abstract idea into patent-eligible subject matter. (*See,*

---

[5] The Court recognizes that *Alice's* first step looks at "the focus of the claims, their character as a whole." *Electric Power*, 830 F.3d at 1353. In the second step, the Court determines whether additional limitations represent a patent-eligible application of the abstract idea. *Id*. Icon, however, distinguishes *Content Extraction* in response to Polar's step one analysis on such a basis. Thus, the Court addresses certain of Icon's step two arguments in its discussion of *Alice's* step one.

*e.g.,* Dkt. No. 147, pgs. 16-17 of 21). To qualify as patent-eligible subject matter, a claim must recite "significantly more" than the abstract idea, for example by "improv[ing] an existing technological process," and not merely by "implement[ing] [the idea] on a computer." *Alice*, 134 S. Ct. at 2358. Polar argues that the Asserted Claims do not improve an existing technological process or product and merely recite using conventional devices for their conventional purpose – e.g., sensors for sensing and displays for displaying. (Dkt. No. 147, pgs. 16-17 of 21).

Icon argues that the Asserted Claims recite an inventive concept and provides several different bases for its argument. First, Icon argues that "[a]s an ordered combination, the additional elements do introduce inventive concepts." (Dkt. No. 166, pgs. 27-28 of 31). Icon contends that "by putting a sensor that collects 'data indicative of a physical characteristic' in communication with a remote, internet-accessible server that also receives similar data about one or more other subjects, the claims at issue enable the combined evaluation of more than one subject's objective physical-characteristics data, resulting in the provision of one or more options." (Dkt. No. 166, pgs. 27-28 of 31). Second, Icon relies upon *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2016) and *Bascom Global Internet Services, Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) in support of its argument that the Asserted Claims, even if directed to an abstract idea, contain inventive concepts to transform the claims into patentable subject matter. Third, at the January 19, 2017 hearing, Icon argued that the Asserted Claims teach a "unique distributed architecture" of databases and, for this reason, the Asserted Claims contain an inventive concept. (*See* Hearing Tr., 27:23-31:2, Jan 19, 2017). Fourth, Icon argued that certain arguments in Polar's own patent applications, which are unrelated to the Asserted Claims, estop Polar from making its step two arguments. (Dkt. No. 166, pgs. 25-27). Fifth, Icon argued that the reexamination of the '271 patent demonstrated that it was an improvement over existing technology. (Dkt. No. 166, pgs. 28-29 of 31).

The Court does not find Icon's arguments persuasive. It finds no inventive concept in the ordered combination of the claim limitations. The Asserted Claims are quite similar to those asserted in *Electric Power Group*, where the Federal Circuit reasoned that "limiting the claims

[directed to collecting data, analyzing the data, and displaying the results] to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." 830 F.3d at 1354. Furthermore, "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *Id*. at 1355. Here, the '271 patent does not disclose and the Asserted Claims do not "require[] anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" and, therefore, do not include an "inventive concept of the application." *Id.*

For the same reason, Icon's argument related to a unique architecture of databases is unavailing. As noted above, the '271 patent discloses that no unique or specific hardware or software is needed to implement the disclosed method, stating, for example, that "embodiments of the present invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt. No. 147, Ex. A, col. 12:25-27). More particularly, the '271 patent discloses that implementation of the disclosed method could be:

> implemented in many different ways using a wide range of programming techniques as well as general-purpose hardware or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus the abstract idea underlying the '271 patent can be implemented via conventional technology used conventionally. Once again, there is no inventive concept in such an application of conventional technology.

Icon cited a Declaration of Dr. David Brienza in support of its argument that the Asserted Claims include an inventive concept. But, on a motion for judgment on the pleadings, the court considers only the Complaint, the Answer, and the documents attached as exhibits to either. *See Burkett v. Convergys Corp.*, 2:14-CV-376-EJF, 2015 WL 4487706 at *9 (D. Utah, July 23, 2015). The declaration meets none of these criteria. Additionally, whether the Asserted Claims

are directed to patent-eligible subject matter is a question of law, and Dr. Brienza's legal conclusions invade the province of the Court. *Accenture Global Servs. v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013); s*ee also Genband US LLC v. Metaswitch Networks Corp.*, No. 2:14-cv-33-JRG-RSP, 2016 WL 98745 at *3 (E.D. Tex. Jan. 8, 2016) (striking an expert's opinion on subject matter eligibility because it did nothing more than analyze the law and offer legal conclusions).

Furthermore, even if the Court were to consider the declaration, it does not alter the analysis. The Supreme Court has held that "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of <u>no relevance</u> in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*, 450 U.S. 175, 189 (1981) (emphasis added).

Icon's reliance upon *DDR Holdings* and *Bascom* is also unpersuasive. Icon argues that the '271 patent improved existing technology, specifically making "share and compare" possible. (Dkt. No. 166, pg. 28 of 31). But, sharing and comparing information has long been possible. Icon does not argue or explain why this Court should consider sharing and comparing information either new or inventive. The Federal Circuit in *DDR Holdings* found a computer-implemented method of manipulating computer interactions to be patent-eligible because the "claimed solution amounts to an inventive concept for resolving" the Internet-centric problem of making two web pages look the same. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d at 1258. The claims here do not provide any inventive functionality in employing generic components such as sensors and touchscreens. As in *Electric Power Group*, the Asserted Claims "specify what information . . . to gather, analyze, and display . . . by use of [nothing] but entirely conventional, generic technology." 830 F.3d at 1356 (analyzing the claims-at-issue against *DDR Holdings*). The Asserted Claims do not solve or claim to solve any internet or tech-centric problem.

*Bascom* is inapposite here for the same reason. In *Bascom*, the Federal Circuit found that the patent-at-issue claimed "a technology-based solution (not an abstract-idea-based solution

implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems . . . the claimed invention represents a software-based invention that improves the performance of the computer system itself." *Bascom Global Internet Services,* 827 F.3d at 1351. None of the Asserted Claims relate to or propose a technology-based solution to sensors, the Internet, or a computer.

Icon's argues that Polar should be estopped from arguing patent-ineligibility in this case because of arguments it made in patent applications that are entirely unrelated to the '271 patent. The Court sees no basis for estopping Polar.

Finally, Icon's argument based on the reexamination of the '271 patent is legally irrelevant. The question of patent-eligible subject matter cannot be raised in a reexamination. *See In re NTP, Inc.,* 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . may not be raised in reexamination proceedings."). Since this issue cannot be raised in a reexamination proceeding, the USPTO's decision has no bearing on subject matter eligibility. *Id.*; *see also SmartGene, Inc. v. Advanced Biological Labs., SA*, 852 F.Supp.2d 42, 50 (D.D.C. 2012), *aff'd*, 555 F.App'x 950 (Fed. Cir. 2014).

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea and do not include an inventive concept that would render them patent-eligible.

## V.     Conclusion

Because the Asserted Claims are directed to patent-ineligible subject matter, Polar's Motion for Judgment on the Pleadings is granted.

DATED this 1st day of March 2017.

/s/John P. Moran
John P. Moran (*pro hac vice*)
John.Moran@hklaw.com
HOLLAND & KNIGHT LLP
800 17th Street, N.W., Suite 1100
Washington, DC 20006
(202) 955-3000
(202) 955-5564 (Facsimile)

Anthony J. Fuga (*pro hac vice*)
anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 S. Dearborn, 30th Floor
Chicago, Illinois 60611
(312) 715-5771
(312) 578-6666 (Facsimile)

James E. Magleby (7247)
magleby@mgpclaw.com
Jennifer Fraser Parrish (11207)
parrish@mgpclaw.com
MAGLEBY & GREENWOOD, P.C.
170 South Main Street, Suite 850
Salt Lake City, UT 84101
 (801) 359-9000
 (801) 359-9011 (Facsimile)


*Attorneys for Defendants Polar Electro Oy
and Polar Electro Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that on this, the 1st day of March, 2017, the foregoing document was filed electronically served by via the Court's ECF system on counsel of record.

/s/John P. Moran

**Certificate of Service**

I certify that on February 21, 2017, I served the above Proposed Memorandum Opinion & Order Regarding Polar Electro Oy and Polar Electro Inc.'s Motion For Judgment on the Pleadings, on the following via email:

David R. Wright
   DWright@mabr.com

Larry R. Laycock
   LLaycock@mabr.com

Tyson K. Hottinger
   thottinger@mabr.com

By: */s/  John P. Moran*
       John P. Moran

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

|  |  |  |
|---|---|---|
| _____ | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| _____ | ) | |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

❒  the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

❒  the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ _____ .

❒  other: 

.

This action was *(check one)*:

❒  tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

❒  tried by Judge _____ without a jury and the above decision was reached.

❒  decided by Judge _____ on a motion for 

.

Date: _____

*CLERK OF COURT*

_____
*Signature of Clerk or Deputy Clerk*

Appx1125

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this, the 1st day of March, 2017, the foregoing document was filed electronically served by via the Court's ECF system on counsel of record.

/s/John P. Moran

## CERTIFICATE OF SERVICE

I, Tyson K. Hottinger, counsel for appellant Icon Health & Fitness, Inc., hereby certify that on this 10th day of June, 2017, the foregoing **CORRECTED JOINT APPENDIX** was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the following counsel of record, by means of electronic mail:

John P. Moran
      john.moran@hklaw.com
Anthony J. Fuga
      anthony.fuga@hklaw.com
HOLLAND & KNIGHT LLP
131 South Dearborn Street
Chicago, IL 60603
Telephone: (312) 263-3600


*Counsel for Appellants*
*Polar Electro Oy and Polar Electro Inc.*

    /s/ *Tyson K. Hottinger*
        Tyson K. Hottinger