**Appeal No. 17-1886**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**ICON HEALTH & FITNESS, INC., a Delaware corporation,**

*Plaintiff-Appellant,*

**v.**

**POLAR ELECTRO OY, a Finnish company, and
POLAR ELECTRO INC., a Delaware corporation.**

*Defendants-Appellees.*

APPEAL FROM THE UNITED STATES DISTRICT COUR FOR THE DISTRICT OF
UTAH IN 1:11-CV-00167-BSJ, JUDGE BRUCE S. JENKINS

**BRIEF OF APPELLANT ICON HEALTH & FITNESS, INC.**

Larry R. Laycock
David R. Wright
Tyson K. Hottinger
**Maschoff Brennan pllc**
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 297-1850

*Attorneys for Plaintiff-Appellant*

June 6, 2017

## <u>CERTIFICATE OF INTEREST</u>

Counsel for the appellant ICON Health & Fitness, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

   ICON Health & Fitness, Inc.

2. The name of the real party in interest represented by me is:

   ICON Health & Fitness, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   HF Holdings, Inc. is the parent company.

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

LARRY R. LAYCOCK
DAVID R. WRIGHT
TYSON K. HOTTINGER
**MASCHOFF BRENNAN PLLC**

 /s/ Tyson K. Hottinger
Tyson K. Hottinger
MASCHOFF BRENNAN PLLC

DATED: JUNE 6, 2017

# **TABLE OF CONTENTS**

**Page(s)**

CERTIFICATE OF INTEREST ................................................................ ii

TABLE OF CONTENTS .......................................................................... iii

TABLE OF AUTHORITIES .................................................................... v

STATEMENT OF RELATED CASES .................................................... 1

JURISDICTIONAL STATEMENT ......................................................... 3

STATEMENT OF THE ISSUE ................................................................ 3

STATEMENT OF THE CASE ................................................................. 3

STATEMENT OF THE FACTS ............................................................... 4

I.      The '271 patent ............................................................................ 4

II.     The Asserted Claims .................................................................... 7

SUMMARY OF THE ARGUMENT ....................................................... 16

STANDARD OF REVIEW ...................................................................... 18

ARGUMENT ............................................................................................ 19

III.    The District Court erred in applying the *Alice* framework. ....... 19

        A.      The District Court improperly applied step 1 of the Alice
                framework by over-generalizing the '271 patent and
                failing to recognize its technological advancements. ......... 19

                1.      The District Court failed to consider the
                        technological underpinning of the problem solved
                        by the Asserted Claims. ....................................... 21

                2.      The '271 patent is a patentable improvement in
                        fitness technology. ............................................... 23

B.    The District Court erred in applying step 2 of the Alice framework because it ignored an inventive claim limitation...........................................................................................26

    1.    The placement and the configuration of sensors within the Asserted Claims, as part of an ordered combination, contain an inventive concept. ......................27

    2.    The database architecture in the server of the Asserted Claims, as part of an ordered combination, contains an inventive concept. ..............................................31

    3.    The District Court erroneously held that *DDR Holdings* and *Bascom* were inapplicable to the Asserted Claims........................................................................34

    4.    The *inter partes* and *ex parte* reexaminations overcome by the '271 patent were relevant in considering the patent eligibility of the Asserted Claims. .....................................................................35

IV.    The Asserted Claims do not raise preemption concerns of any field. ...........................................................................................................37

CONCLUSION ..................................................................................................38

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
   134 S. Ct. 2347 (2014) ..................................................................19, 20, 23, 38

*Allergan, Inc. v. Athena Cosmetics, Inc.,*
   640 F.3d 1377 (Fed. Cir. 2011) ...........................................................18

*Amdocs (Israel) Limited v. Openet Telecom, Inc.,*
   841 F.3d 1288 (Fed. Cir. 2016) ..........................................................21, 29, 34

*Aspenwood Inv. Co. v. Martinez,*
   355 F.3d 1256 (10th Cir. 2004) ...........................................................18

*Bascom Global Internet Services v. AT&T Mobility,*
   827 F.3d 1341 (Fed. Cir. 2016) ...........................................................35, 36

*DDR Holdings, LLC v. Hotels.com,*
   773 F.3d 1245 (Fed. Cir. 2014) ...........................................................*passim*

*Deck v. Engineered Laminates,*
   349 F.3d 1253 (10th Cir.2003) ............................................................19

*Diamond v. Diehr,*
   450 U.S. 175 (1981)................................................................................21

*Electric Power Group, LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed Cir. 2016) ............................................................26, 27

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016) ..........................................................20, 21, 23

*Finjan. Finjan, Inc. v. Blue Coat Systems, LLC,*
   2016 WL 7212322 (N.D. Cal. Dec. 13, 2016) ............................................30, 32

*Icon Health & Fitness et al. v. MapMyFitness, Inc.,*
   Civil Docket No. 1:11-cv-00174-DB ....................................................2

*Icon Health & Fitness et al. v. Peloton Interactive, Inc.,*
   Civil Docket No. 1:16-cv-8303-RA ................................................................2

*Icon Health & Fitness et al. v. Polar Electro Oy,*
   Case No. 15-1891 ................................................................................1

*Icon Health & Fitness et al. v. Polar Electro Oy,*
   Civil Docket No. 1:11-cv-00167-BSJ................................................................1

*Icon Health & Fitness et al. v. Strava, Inc.,*
   Civil Docket No. 1:11-cv-00175-CW ................................................................2

*Keurig, Inc. v. Sturm Foods, Inc.,*
   732 F.3d 1370 (Fed. Cir. 2013) ................................................................3

*TNS Media Research LLC v. TIVO Research and Analytics, Inc.,*
   2016 WL 6993768 (S.D.N.Y. Nov. 29, 2016) ....................................25, 27, 28

*Trading Technologies International, Inc. v. CGQ, Inc. et. al.,*
   2017 WL 192716 (Fed. Cir. Jan. 18, 2017) ........................................37

**Statutes**

28 U.S.C. § 1295(a)(1) ........................................................................3

28 U.S.C. §§ 1331 and 1338................................................................3

35 U.S.C. § 101................................................................*passim*

**Rules**

Fed. R. Civ. P. Rule 54(b)................................................................2, 3

Rule 12(b)(6) ................................................................................18

Rule 12(c) ................................................................................19

## STATEMENT OF RELATED CASES

There are no pending appeals related to the present appeal involving the patent at issue, U.S. Patent No. 6,701,271 ("the '271 patent"). This action was previously before this Court:

- *Icon Health & Fitness et al. v. Polar Electro Oy,* Case No. 15-1891, commenced August 3, 2015.

  - Date of decision:  August 8, 2016

  - Composition of Panel: Newman, Moore, O'Malley, Circuit Judges.

  - Citation of Opinion in Federal Reporter: 656 F.App'x 1008 (Fed. Cir. 2016)

  - Companion case:  Case No. 16-1166

The following cases from the United States District Court for the Districts of Utah and the Southern District of New York involve the '271 patent and may therefore be affected by the outcome of the present appeal:

- *Icon Health & Fitness et al. v. Polar Electro Oy,* Civil Docket No. 1:11-cv-00167-BSJ, commenced November 11, 2011.

  - Judgment entered on May 8, 2017, regarding the '271 patent and certified pursuant to Rule 54(b), Fed. R. Civ. P.

- o Appeal to this Court of Rule 54(b) judgment regarding the '271 patent presently pending as Appeal No. 17-1886.

- *Icon Health & Fitness et al. v. MapMyFitness, Inc.*, Civil Docket No. 1:11-cv-00174-DB, commenced December 9, 2011.

  - o Claim for infringement of '271 patent stayed by court order dated February 6, 2015.

  - o Case administratively closed by court order dated February 6, 2015, with allowance that case may be reopened upon motion by either party.

- *Icon Health & Fitness et al. v. Strava, Inc.*, Civil Docket No. 1:11-cv-00175-CW, commenced December 9, 2011.

  - o Claim for infringement of '271 patent stayed by court order dated January 3, 2013.

- *Icon Health & Fitness et al. v. Peloton Interactive, Inc.*, Civil Docket No. 1:16-cv-8303-RA, commenced April 8, 2016.

  - o Claim for infringement of '271 to be dismissed due to a settlement reached by the parties.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. Judgment was entered on March 27, 2017 and certified final pursuant to Federal Rule of Civil Procedure 54(b). ICON Health & Fitness, Inc. ("ICON") timely appealed on March 31, 2017. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1). *See Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1372 (Fed. Cir. 2013) (noting appellate jurisdiction arises under 28 U.S.C. § 1295(a)(1) where District Court certified judgment pursuant to Fed. R. Civ. P. 54(b)).

## STATEMENT OF THE ISSUE

Whether the District Court erred in entering judgment that claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 of the '271 patent (the "Asserted Claims") are invalid because they are not directed to patent-eligible subject matter under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

On June 8, 2012, ICON filed an amended complaint in the United States District Court for the District of Utah ("District Court") against Polar Electro Oy and Polar Electro Inc. (collectively, "Polar") that included, among others, a claim for infringement of the '271 patent. The District

Court stayed the litigation related to the '271 patent pending finalization of *ex parte* and *inter partes* reexaminations.

Upon completion of the reexamination proceedings, the stay was lifted and Polar immediately filed a motion for judgment on the pleadings seeking a judgment that the Asserted Claims were patent ineligible under 35 U.S.C. § 101. The District Court held a hearing on Polar's motion on January 19, 2017.[1] On March 10, 2017, the District Court issued a Memorandum Decision and Order finding the Asserted Claims of the '271 patent abstract and patent ineligible.[2] The District Court entered its judgment on March 27, 2017.[3]

## STATEMENT OF THE FACTS

### I.    The '271 Patent

The '271 patent is entitled "Method and apparatus for using physical characteristic data collected from two or more subjects." In practice, the '271 patent enables fitness tracking systems to provide user-specific content based on that user's performance compared to others, and then provide

---

[1] Appx995.

[2] Appx2.

[3] Appx1.

"options" to that specific user based on the comparison.[4] The '271 patent accomplishes this by gathering data from biometric sensors at special associative databases that are centrally located.[5] By using the associative databases, the information gathered from the biometric sensors is associated with a particular user, a particular user device, and then analyzed so the system can generate user-specific instructions, messages, and other content, referred to as "options" throughout the patent.[6] When the data is compared, it allows a multitude of users to obtain specific instructions, recommendations, and options based on their workouts when compared to others' workouts.[7]

Prior to the inventions of the '271 patent, it was not possible for a system to produce these same sort of custom recommendations. While it

---

[4] While the specification of the '271 patent does not specifically discuss fitness systems, it was the subject of both an *ex parte* and *inter partes* reexamination wherein the majority of the prior art references were fitness tracking patents. Appx299 (*ex parte* reexamination, Corrected Request for *Ex Parte* Reexamination); Appx421 (*inter partes* reexamination, Request for *Inter Partes* Reexamination of U.S. Patent No. 6,701,271 under 35 U.S.C. § 311 and 37 C.F'.R. §§ 1.913, 1.915).

[5] Appx35-36 (col. 12:60-14:15).

[6] Appx32 (col. 5:47-64).

[7] Appx32 (col. 5:65-6:17).

was known to gather users' information at a database, the prior art simply aggregated and displayed the information.[8]

By practicing the methods taught in the '271 patent, ICON has been able to produce user-specific content beyond the mere "evaluations" of prior art systems.[9] This user-specific content, or "options," may include motivational content that encourages a specific user to keep pace with his/her peers, instructional content that compares a specific user's performance with other users, or even exercise program adjustments where the server senses that a class of users are overtraining, disengaged, or otherwise dissatisfied.[10]

In order to provide these "options," the overall system must be capable of several functions unique to the '271 patent's biometric sensor and associative database system. For example, the '271 patent system must reconcile data from a large diversity of sensors in a centralized location; the

---

[8] Appx30 (col. 1:30-43).

[9] Appx30 (col. 1:65-2:5).

[10] *See* Appx31 (col. 4:12-37 ["Applicants have also recognized that there is a need for systems and methods that enable a desired action associated with a group of subjects to be determined to be obtained by obtaining biometric information and other physical characteristic data to be obtained from or about the group and using such information and data to help determine a course of action that will lead to or produce the desired action."]).

system includes sensors for infrared heat, brain waves, blood sugar, blood pressure, heart rate, respiration, and body movement.[11] Rendering this even more difficult is the fact that the '271 patent envisions collecting these datasets from a large number of users in order to produce the multi-user evaluation necessary to identify the user-specific "options."[12]

To effectively generate the options for individual users, the '271 patent teaches a patentable improvement to the prior art systems that represents a concrete improvement to data handling in fitness tracking systems.

## II.    The Asserted Claims

Of the Asserted Claims, claims 15, 42, 80, and 90 are the broadest, and the rest of the Asserted Claims depend from one of them. Claims 42, 80, and 90 overlap substantially. Because claim 80 is broader than claims 42 and 90, the proper starting points for the patent eligibility analysis is claims 15 and 80.[13]

---

[11] Appx34 (col. 9:56-61); Appx36 (col. 13:1-4).

[12] Appx31 (col. 4:20-27); Appx34 (col. 9:42-46).

[13] Claims 42 and 90 entirely replicate the language of claim 80; they differ from claim 80 only by virtue of their final clauses, which add a phrase after the text shared with claim 80 ends. Specifically, claim 42 adds the phrase "for the first subject to select from" to the end of the final

(cont'd on next page)

Claim 15 provides:

> A method for providing feedback, comprising:
>
> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
>
> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
>
> providing a notification regarding said evaluation to a device;
>
> receiving a notification regarding a plurality of options;
>
> selecting one of said plurality of options based, at least in part, on said evaluation;
>
> selecting said device based, at least in part, on said selecting one of said plurality of options.

Claim 80 provides:

> A method for providing feedback, comprising:
>
> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical

---

clause and claim 90 adds the phrase "for the first subject to select from and to the second subject for the second subject to select from." Appx418 ('271 patent *ex parte* reexamination, Certificate, 2:7); Appx420 ('271 patent *ex parte* reexamination, Certificate, 6:1–2).

characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and

providing a notification regarding said evaluation to a device;

the first device is a first sensor;

the physical characteristic of the first subject is sensed by the first sensor;

the receiving of the first data includes a remote server receiving the first data from the first sensor through the Internet; and

the determining of the evaluation includes the remote server determining, based on the first data and based on the second data, which of multiple options to provide to the first subject.

In both claims 15 and 80 (as well as claims 42 and 90), the claimed methods recite steps typical of a fitness tracking system: receiving "physical characteristic" data from multiple subjects, evaluating the multiple sets of data, and providing a notification of the evaluation to a device. However, the next step(s) of claims 15 and 80 are directed to the focal point of the invention: the determination and selection of a plurality of multiple "options" based on the evaluation. In fact, the "options" step of

the Asserted Claims was the very innovation that enabled the '271 patent to successfully emerge with patentable claims from reexamination proceedings.[14]

The "options" identified and provided in the Asserted Claims depend on an organized tracking system that can perform a sophisticated evaluation of data gathered from multiple sensors. For example, the specification discloses options, derived from metrics that require a network of biometric sensors,[15] which suggest actual behavioral modifications to address problems or achieve goals identified during the evaluations step.[16]

---

[14] Appx406 (*ex parte* reexamination, Notice of Intent to Issue a Reexam Certificate) (finding that the art of record does not suggest that providing of multiple options for a subject to select from where the determining of which options to provide is based upon data about both the user (the first subject) and a second subject.); Appx924 (*inter partes* reexamination, Patent Board Decision) (finding that the prior art did not disclose selecting a particular device based on the selection of a particular option).

[15] Appx30 (col. 1:58-64 ["For example, a physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them."]).

[16] Appx32 (col. 5:28-43 ["For example, based on the information received during the step 102 for a subject, the determination performed during the step 104 may include determining a risk of violence associated with one or more of the subjects, determining one or more options to provide to one or more of the subjects, determining a trading propensity associated with one or more of the subjects, predicting at least one action or course of action that might be taken or contemplated by one or more of the subjects (e.g., is the subject likely to leave the room) or is desired to be taken by one or more of the subjects, determining a probability associated with an action or course of action that might be taken, or is desired to be taken, by one or more of the subjects (e.g., how likely is a subject to leave the room, how likely is a subject to stop paying attention to a speaker, how likely is a subject to fall asleep), etc."]).

Accordingly, the methods of the Asserted Claims cannot be performed on a prior art system of sensors and databases. An improvement in the technology was required, such as the improvement set forth in the '271 patent.

Because many of the "options" are determined from a variety of metrics collected from a multitude of people, data gathered from the biometric sensors is transmitted in its unprocessed form to the server, where the data can be more efficiently parsed, organized, and evaluated.[17] The server, as shown below in Fig. 5, features a distinctive arrangement of sensor, output, and evaluation databases to perform particularized tasks in a particular order.[18]

---

[17] Appx32 (col. 6:18-22); Appx35-36 (col. 12:60-14:8 ["…a server, user device, or other device may include or access a sensor database for storing or keeping information about sensors"… "a server, user device, or other device may include or access an output database for storing or keeping information about information sent and received from one or more servers."]).

[18] Appx35 (co. 12:1-15 ["The server 204 also may include or store information regarding sensors, evaluations, outputs, etc. For example, information regarding sensors may be stored in a sensor database 268 for use by the server 204, a user device, or another device or entity. Similarly, information regarding evaluation outputs and output devices might be stored in an output database 270 for use by the server 204, a user device or another device or entity. Information regarding evaluations may be stored in an evaluation database 272 for use by the server or another device or entity. In some embodiments, a server 204, a user device, or other device also may store, use, or access a subject database to keep information about one or more subjects, the data being collected from the subjects, subject activities, subject behavior patterns, evaluations, etc."].)



FIG. 5

When data reaches the server of the '271 patent, the sensor database (Fig. 6, below) is first used to identify the data type by associating it with the sensor that collected it.[19] The sensor database organizes data according to both sensor identifier and sensor description fields to, respectively, identify and describe the sensors from which the data originated.[20] The data is also classified according to a sensor output field in order to consider

---

[19] Appx35-36 (col. 12:61-13:18).

[20] Appx35-36 (col. 12:66-13:5 ["The sensor database 300 may include a sensor identifier field 302 that may includes codes or other identifying information for one or more sensors and a sensor description field 304 that may include information describing the sensors identified in the field 302, such as information regarding a sensor's name, description, model number, tolerances, specifications, manufacturer, etc."].)

the collection method employed by each sensor.[21] Other classification fields may also be implemented as necessary to properly organize the data according to sensor characteristics in preparation for the options to be provided.[22]

| SENSOR IDENTIFER 302 | SENSOR DESCRIPTION 304 | SENSOR OUTPUT 306 |
|---|---|---|
| S-123456 | HEART RATE SENSOR | HEART RATE DATA EVERY TEN SECONDS |
| S-387766 | TEMPERATURE SENSOR | TEMPERATURE READINGS ONCE A MINUTE |
| S-867454 | MOTION SENSOR | DATA SENT UPON MOTION |

FIG. 6

Next, the output database (Fig. 7, below) is used to identify the server or user device from which the data originated, in order to associate the data with a specific user.[23] The output database uses output identifier and output description

---

[21] Appx36 (col. 13:5-9 ["The sensor database 300 also may include a sensor output field 306 that may include information regarding the type, timing and format of the information or other data generated or otherwise provided by the sensors identified in the field 302."].)

[22] Appx36 (col. 13:9-13).

[23] Appx36 (col. 13:19-47).

fields to, respectively, identify and describe the end users.[24] A sensor identifier

field is also used to keep track of the various sensors associated with each user.[25]

Other classification fields may also be implemented as necessary to ensure that the

end users are properly identified for the evaluation of collected data and the

provision of user-specific options.[26]

| OUTPUT IDENTIFIER 402 | OUTPUT DESCRIPTION 404 | SENSOR IDENTIFIER 406 |
|---|---|---|
| O-493 | SERVER C-14 | S-123456 S-867454 |
| O-601 | USER DEVICE U-12 | S-387766 |

FIG. 7

Lastly, the data reaches an evaluation database (Fig. 8, below), used

to perform the multi-user evaluation of data necessary to determine user-

---

[24] Appx36 (col. 13:24-29 ["The output database 400 may include an output identifier field 402 that contains codes or other identifying information regarding recipients of sensor data. The output database 400 also may include an output description field 404 that includes a name, identifier or other descriptive information for the output identifiers identified in the field 402…"].)

[25] Appx36 (col. 13:29-32 ["…and a sensor identifier field 406 that identifies one or more sensors associated with the output identifiers provided in the field 402."].)

[26] Appx36 (col. 13:32-38 ["Other or different fields also may be used in the output database 400. In some embodiments a specific output identifier might be associated with a specific evaluation to be determined or a specific course of action to be determined. Thus, the output database 400 might include a field that associates the devices identified in the field 402 with a specific determination being made or to be made."].)

specific "options" to be provided back to the end users.[27] The evaluation database uses evaluation identifier and evaluation description fields to, respectively, identify and describe the evaluations and "options" derived therefrom.[28] A sensor identifier field is also used to keep track of the various sensors used to collect the specific data used for each evaluation and/or "option."[29] Other classification fields may also be implemented as necessary to ensure that the "options" are provided to the proper user, for example where an end user possesses more than one notification device.[30]

---

[27] Appx36 (col. 13:48-14:15).

[28] Appx36 (col. 13:54-50 ["The evaluation database 500 may include an evaluation identifier field 502 that may include codes or other identifying information for one or more evaluations or courses of action being determined. In addition, the evaluation database 500 also may include a description field 504 that may include information regarding the evaluations or courses of action identified in the field 502."].)

[29] Appx36 (col. 13:60-64 ["In some embodiments the evaluation database 500 also may include a sensor identifier field 506 that may contain identifiers or other information regarding the sensor data to be used in the evaluations identified in the field 502."]).

[30] Appx36 (col. 13:64-65, 14:9-15 ["In some embodiments a specific determination might be associated with a specific output device that will receive a notification of the determination. Thus, the evaluation database 500 might include a field that associates the evaluations identified in the field 502 with one or more devices that will receive information or other notifications regarding the evaluations."]).

| EVALUATION IDENTIFIER 502 | EVALUATION DESCRIPTION 504 | SENSOR IDENTIFIER 506 |
|---|---|---|
| E-0234 | INTEREST LEVEL DETERMINATION | S-123456 S-867454 |
| E-4629 | RESTLESSNESS DETERMINATION | S-387766 |

FIG. 8

The identification and provision of "options" as recited in the Asserted Claims would be impossible without these specific improvements to the system's data management process. These improvements represent the true concept underlying the '271 patent, which the District Court failed to appreciate or account for in its opinion and judgment.

## SUMMARY OF THE ARGUMENT

The District Court erred in ruling that the Asserted Claims of the '271 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101, and therefore invalid.

First, the Asserted Claims are not directed to the abstract idea of simply gathering and aggregating data from sensors, as the District Court incorrectly concluded. Rather, the Asserted Claims are directed to the type of improvement in technology that the Supreme Court has stated are not

abstract: the implementation of an inventive combination of biometric sensors and associative databases that permit the system to provide individualized and specific "options" to users based on their workouts compared to others.

Second, not only did the District Court incorrectly characterize the Asserted Claims at the highest level of abstraction, it did so in a way that was completed untethered with the claim language. Indeed, the District Court completed ignored the "options" claim limitation of the Asserted Claims that was key to the '271 patent's survival of the *ex parte* and *inter parte* reexaminations (i.e., the District Court discounted one of the key novel and inventive features of the claims). By discounting this claim element, the District Court missed the essence of the '271 patent and failed to recognize the unique and inventive sensor and database structures that allow the provision of "options."

When the Asserted Claims are viewed in light of the specification and all of the claim limitations are considered, it is clear that the '271 patent is directed to solving the technological challenges that had previously plagued fitness tracking systems that incorporate biometric sensors. This solution comes nothing close to being an abstract idea. Furthermore, the

specific elements of the Asserted Claims, alone and in combination, constitute inventive concepts.

## STANDARD OF REVIEW

This Court reviews a grant of a motion for judgment on the pleadings under the procedural law of the regional circuit. *Allergan, Inc. v. Athena Cosmetics, Inc.*, 640 F.3d 1377, 1380 (Fed. Cir. 2011).

The Tenth Circuit reviews such a decision "de novo, using the same standard of review applicable to a Rule 12(b)(6) motion." *Aspenwood Inv. Co. v. Martinez*, 355 F.3d 1256, 1259 (10th Cir. 2004). Thus, the Tenth Circuit upholds a dismissal "only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief." *Deck v. Engineered Laminates*, 349 F.3d 1253, 1256 (10th Cir.2003) (quotations omitted). Similarly, this Court reviews the District Court's determination of patent eligibility under 35 U.S.C. § 101 *de novo*. *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245, 1255 (Fed. Cir. 2014).

The District Court granted the motion for judgment on the pleadings pursuant to Rule 12(c) based on its determination that the claims were patent ineligible under 35 U.S.C. § 101. Therefore, the appropriate standard of review is *de novo*.

## ARGUMENT

In 2014, the Supreme Court established a two-part framework for determining whether a patent claim is invalid under Section 101 claiming an abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). First, a court must "determine whether the claims at issue are directed to [a] patent-ineligible concept[]." *Id*. If so, the court considers "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id*. This has been described as the search for an inventive concept: an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id*.

## III.    The District Court erred in applying the *Alice* framework.

### A.    The District Court improperly applied step 1 of the *Alice* framework by over-generalizing the '271 patent and failing to recognize its technological advancements.

In applying the first step of the *Alice* test, the District Court found that the Asserted Claims "are directed to the abstract idea of providing and using feedback based upon data gathered from subjects." In reaching this conclusion, the District Court improperly viewed the invention at a "high

level of abstraction and untethered from the language of the claims." *See, e.g., Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016); *Alice*, 134 S. Ct. at 2354.

The District Court also improperly relegated the '271 patent to three "ordinary" activities: "(1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data."[31]

The District Court's characterization of the '271 patent is the precise type of improper "overgeneralization" the Supreme Court warns will result in "all inventions [being] un-patentable because all inventions can be reduced to underlying principles of nature." *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981).

Instead of engaging in its improper overgeneralization, the District Court should have read the '271 patent "in light of its limitations and

---

[31] Appx14-15. The Court also noted that computers and electronic sensors have long been known to hasten and optimize the process of aggregating information, and that use of such hardware, absent uniqueness of such hardware, does not change the nature of the process. Appx12. This observation underscores the lack of consideration the District Court gave to the technological nature of the solution disclosed in the '271 patent.

against the parameters outlined in the specification." *See Amdocs (Israel) Limited v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016); *Enfish*, 822 F.3d at 1335. Read in this light, the '271 patent's non-abstract and patent eligible technological advancements are apparent.

> **1. The District Court failed to consider the technological underpinning of the problem solved by the '271 patent.**

Contrary to the District Court's statement that the '271 patent simply incorporated ordinary computers and electronic sensors as a means to optimize a well-known process, the patent is actually directed to addressing a deficiency inherent in fitness tracking systems that utilize biometric sensors: the lack of user interactivity beyond the mere aggregation of fitness data. Prior to the '271 patent, user feedback provided by fitness tracking systems was limited to the gathering of fitness data from multiple users and the organization of such data into content such as charts and graphs.[32] The '271 patent introduced a deeper level of feedback through the "options" disclosed in representative claims 15, 42, 80, and

---

[32] Appx30 (col. 1:30-43); Appx31 (col. 3:64-4:1); Appx31 (col. 4:12-18).

90.[33] As set forth above, these options include user-specific content derived from an analysis of diverse datasets gathered from multiple sensors associated with multiple users located in geographically diverse locations.

In its analysis, the District Court failed to recognize the specificity of the '271 patent, both with regard to the deficiency in prior art fitness tracking that the patent addressed, as well as the inventors' actual solution for it. As explained by the Supreme Court in *Alice*, claims are patent eligible where they offer an improvement in a "technology or technical field." 134 S. Ct. at 2359; *see also DDR Holdings*, 773 F.3d at 1257 (finding patent claims to be patent eligible because the "claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks.").

The Asserted Claims are patent-eligible because they address a particular problem in sensor-based fitness tracking, and because the claimed methods represent concrete solutions—not potential solutions to the problem.

---

[33] Appx36-37 (col. 14:65-15:9); Appx38 (col. 17:43-50); Appx419 ('271 patent *ex parte* reexamination, Certificate, 4:53-63).

## 2. The '271 patent is a patentable improvement in fitness technology and therefore not abstract.

The '271 patent is the type of "improvement in any other technology or technical field" that is rarely abstract under § 101. *See Alice*, 134 S. Ct. at 2359; *Enfish*, 822 F.3d at 1336 (finding "it relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea, even at the first step of the Alice analysis.").

All four of the '271 patent's representative claims emerged from *inter partes* (claim 15) or *ex parte* reexaminations (claims 42, 80, and 90) to include method steps reciting the determination, and selection or provision, of "options." These "options" do not entail the mere feedback of aggregated data. Instead, the "options" consist of user-specific content derived from analyzing fitness data collected from multiple users, such as user-specific suggestions, instructions, and encouragement, or the determination of modifications for an exercise program.[34]

User-specific content is then selectively provided to devices associated with users for which the content was intended.[35] Thus, in

---

[34] Appx32 (col. 5:47-64); Appx32 (col. 5:56-6:17); Appx33 (col. 8:7-33).

[35] Appx36 (col. 14:9-15).

addition to the three "ordinary" activities identified by the District Court, the Asserted Claims require a significant method step specifically directed to a deficiency of prior art fitness tracking systems: the lack of robust user feedback beyond the mere display of aggregated data. The District Court's disregard of this "options" step is a massive oversight that obscures and overgeneralizes the true scope of the Asserted Claims.

In improperly abstracting the Asserted Claims, the District Court misapplied case law cited by ICON to demonstrate the proper level of abstraction to apply. In *TNS Media*, claims for an advertising method, that could have been overgeneralized into the abstract idea of "collecting viewing and purchasing data to analyze the utility of an advertising campaign," were instead found to embody the concrete idea of reconciling numerous media platforms, to be mined for information of varying levels of granularity and particularity in real time, and then subsequently analyzed. *TNS Media Research LLC v. TIVO Research and Analytics, Inc.*, 2016 WL 6993768 at *10 (S.D.N.Y. Nov. 29, 2016). The Court held that this "type of multi-sourced, granular collection of data that allows for real-time calculations of utility" was plainly not an abstract idea. *Id.*

The Asserted Claims of the '271 patent embody a similar concrete idea: reconciling a diversity of biometric sensors, to receive data from multiple subjects of varying levels of granularity and particularity in real-time, for subsequent analysis and to provide "options" therefrom.[36] The method therefore teaches a multi-sourced, granular collection of fitness data that allow for real-time determinations of user-specific "options."[37] Generalizing the Asserted Claims to the mere collection and analysis of data would not do justice to the improvements to fitness tracking embodied in the '271 patent and would specifically ignore the "options" feature of the claims that was added as an inventive component of the invention during reexamination.

The District Court also relied upon *Electric Power Group* to reach its improper conclusion. *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed Cir. 2016). The '271 patent does more than simply collect data and display that data at a fixed location, as in the *Electric Power Group* claims.[38]

---

[36] Appx32 (col. 5:23-28).

[37] Appx32 (col. 5:28-43).

[38] Appx33 (col. 8:7-33).

Instead, the '271 patent actually performs an evaluation of the data and provides "options" to users. The '271 patent, also unlike the *Electric Power Group* claims, then utilizes the analysis to generate a customized recommendation and options in the Asserted Claims, that are sent to a specific device associated with a specific user (rather than a fixed terminal on a power grid as in *Electric Power Group*).[39]

The '271 patent is not akin to the *Electric Power Group* claims and more akin to cases such as *TNS Media Research LLC*, which should have resulted in a finding of patent eligibility by the District Court. Moreover, the '271 patent is not abstract because it represents a patentable improvement in fitness tracking technology that goes beyond the mere collection and aggregation of data.

### B.    The District Court erred in applying step 2 of the Alice framework because it ignored an inventive claim limitation.

The District Court also misinterpreted the claim elements of the Asserted Claims to find that they failed to disclose an inventive concept. Contrary to the District Court's opinion, the '271 patent does much more than implement conventional sensors and servers in conventional ways to

---

[39] Appx36 (col. 14:9-15).

accomplish the ordinary purpose of combining fitness tracking with a network.[40]

Instead, the Asserted Claims address the exact shortcomings that the fitness industry encountered whenever conventional sensors were integrated into a conventional network: an inability to evaluate the diverse and voluminous data collected from a multitude of sensors in real-time and the difficulties with determining and providing user-specific content derived from the evaluations of such data.[41] *See TNS Media Research LLC*, 2006 WL 6993768 at *11 (finding an inventive concept where the claimed method directly addressed specific issues that advertisers had previously encountered in the prior art, including an inability to assess utility in real time or with a sufficiently large sample size).

### 1. The placement and the configuration of sensors within the Asserted Claims, as part of an ordered combination, constitute an inventive concept.

First, the District Court found that the claim elements, when considered as an ordered combination, failed to introduce an inventive

---

[40] Appx17-19.

[41] Appx31 (col. 3:64-4:1).

concept by oversimplifying them as "off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting…information."[42]

This description is a gross overgeneralization and misrepresents the unique utilization of biometric sensors in the '271 patent. The '271 patent unconventionally situates and configures its sensors such that data analysis is removed from the end user device/sensor and performed by a network server, remote from the sensors themselves.[43] The data collected from each sensor is maintained at a granular level until it reaches the servers, thereby facilitating the multi-user evaluations from which the user-specific "options" are derived.[44] Thus, the placement and utilization of the sensors represent an ordered combination intended to dictate the specific type and timing of data analyses required for the efficient identification and provision of "options." *See Amdocs*, 841 F.3d at 1300-01; *DDR Holdings*, 773 F.3d at 1258.

---

[42] Appx17.

[43] Appx35-36 (col. 12:60-14:8).

[44] Appx32 (col. 6:18-22).

The novel utilization of sensors in the '271 patent parallels a method and system for computer virus protection found to disclose an inventive concept in *Finjan*. *Finjan, Inc. v. Blue Coat Systems, LLC*, 2016 WL 7212322 at *11 (N.D. Cal. Dec. 13, 2016). At the time of invention, virus protection was localized and reactive: virus protection programs were installed on individual, end-user computers and only monitored incoming files for viruses. *Id*.

The *Finjan* patent effected a paradigm shift by introducing both spatial and temporal alterations to conventional virus protection. *Id*. Spatially, Finjan moved malware profiling from its traditional location on end-user computers to an intermediate location on a network server. *Id*. Temporally, Finjan shifted the malware profiling process from profiling complete files to profiling file aspects or components. *Id*. The former (spatial) improvement utilized ordinary networking technology unconventionally by harnessing specific network architecture to improve malware protection across an entire computer network. The latter (temporal) improvement creatively rearranged an otherwise normal malware profiling process to bolster the preemptiveness of the process. The

combination of these two improvements, taken as an ordered combination, was found to recite an inventive concept.

As explained above, the '271 patent claims similarly achieve their objective through an unconventional arrangement of components. Spatially, ICON's invention moves data analysis from the end user device/sensor to a network server to enable the evaluation of multiple datasets and the provision of options therefrom.[45] Temporally, collected biometric data is maintained at a granular level until the data can be properly contrasted against the information and protocols stored in the databases of the network server.[46] The inventive combination of these two improvements represent an ordered combination that not only enables a user to access biometric data analyses representing large numbers of people, but enables the user to access customized content and options particular to one user's data in relation to other users' data.[47]

---

[45] Appx35-36 (col. 12:60-14:8).

[46] Appx32 (col. 6:18-22).

[47] Appx32 (col. 5:47-64).

Just like the *Finjan* claims, the '271 patent's combination of sensors and databases represents a paradigm shift entitled to patent protection.

> ### 2. The database architecture in the server of the Asserted Claims, as part of an ordered combination, constitutes an inventive concept.

Second, the District Court misunderstood ICON's argument as to the "unique architecture of databases" required by the Asserted Claims, relying on an excerpt from the '271 patent specification stating that "embodiments of the present invention are not limited to any specific combination of <u>hardware and software</u>."[48] This excerpt was taken out of context: it was stated specifically with regard to the hardware and software for the server system and not the database structure as the District Court mistakenly believed.[49] Indeed, the hardware and software of the server, including the aforementioned databases, may be otherwise conventional. The inventive concept of the databases is instead embodied in their ordered combination within the server system as a whole, not the hardware and software within the databases themselves.

---

[48] Appx35 (col. 12:25-27 [emphasis added]); Appx17-18 (p. 16-17).

[49] Appx35 (col. 12:16-46).

The architecture of databases within the server of the '271 patent refers to a unique, ordered combination of three databases to enable "an observer of two or more subjects to take objective measurements of the subjects and use the information to direct the observer or a device under the observer's control along one of several courses of action or to evaluate how best to alter or change what the observer or device is currently doing."[50] This ordered combination of databases includes a sensor database, an output database, and an evaluation database, each performing particularized tasks at the server that facilitate the orderly determination and provision of "options."[51] This specific database architecture represents ICON's particular solution to a technical limitation of biometric server systems: an inability to reconcile diverse datasets from multiple sensors associated with multiple subjects from multiple locales, in order to determine user-specific content therefrom and send options to that specific user/device.[52]

---

[50] Appx30 (col. 1:32-37).

[51] Appx35-36 (col. 12:66-13:9); Appx36 (col. 13:24-38); Appx36 (col. 13:54-65).

[52] Appx31 (col. 4:12-18).

The database architecture of the '271 patent closely resembles a "distributed architecture" of network devices found by this Court to embody an inventive concept in *Amdocs*. 841 F.3d at 1300-01. In *Amdocs*, various steps of the method claims depended on the invention's "distributed architecture"–"a specific structure of various components (network devices, gatherers, ISMs, a central event manager, a central database, a user interface server, and terminals or clients)"–purposefully arranged "to achieve a technological solution to a technological problem specific to computer networks." *Id*. at 1301. The *Amdocs* Court reached this conclusion despite finding the network components themselves to be generic, because the specific structure of the various components was "narrowly drawn to not preempt any and all generic enhancement of data in a similar system, and [did] not merely combine the components in a generic manner." *Id*.

The '271 patent, just like the claims in *Amdocs*, are entitled to patent protection because the specific structure of the various components of the '271 patent system are combined and utilized in such a way to achieve a technologic solution to prior art fitness tracking systems that did not allow

for the provision of customized options deliverable to a specific user/device.[53]

### 3. The District Court erroneously held that *DDR Holdings* and *Bascom* were inapplicable to the analysis of the '271 patent.

Next, the District Court rejected ICON's reliance upon *DDR Holdings*[54] and *Bascom*[55] as unpersuasive.[56] In *DDR Holdings*, this Court found a computer-implemented method to be patent-eligible because it resolved an Internet-centric problem by implementing a solution specific to that technological environment and different from the manner suggested by routine or conventional use within the field. 773 F.3d at 1259. In *Bascom*, this Court once again found a technology-based solution to be patent-eligible, focusing on the particular arrangement of generic and conventional components in the claims. 827 F.3d at 1351.

The District Court concluded that the Asserted Claims "do not solve or claim to solve any internet or tech-centric problem" because it

---

[53] Appx35-36 (col. 12:60-14:15).

[54] *DDR Holdings v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014).

[55] *Bascom Global Internet Services v. AT&T Mobility*, 827 F.3d 1341 (Fed. Cir. 2016).

[56] Appx18-19.

mischaracterized the underlying concept of the '271 patent as the mere gathering, analysis, and display of information.[57] On the contrary, the Asserted Claims, like those of *DDR Holdings* or *Bascom*, are directed to a technology-based solution for a known deficiency in prior art fitness tracking systems: an inability to analyze data from multiple users beyond aggregating the data into charts and graphs. Had this concept been properly identified, it would have been clear that the proposed solution, requiring a specific ordered combination of sensors, the server/databases, and communication therebetween (as set forth above), embodies an inventive concept.

> **4.    The *inter partes* and *ex parte* reexaminations overcome by the '271 patent were relevant in considering the patent eligibility of the Asserted Claims.**

Lastly, the District Court rejected ICON's argument relying on the *inter partes* and *ex parte* reexaminations traversed by the '271 patent as "legally irrelevant" because the issue of subject matter eligibility cannot be raised in a reexamination.[58] Although technically true, the issues of § 102

---

[57] Appx19.

[58] *Id.*

novelty and § 103 obviousness traversed during reexamination are still relevant in evaluating § 101 patent eligibility. In M*ayo Collaborative Services v. Prometheus Laboratories, Inc*., the Supreme Court recognized that, in making a § 101 patent-eligibility inquiry, "the § 102 novelty inquiry might sometimes overlap." 566 U.S. 66, 90 (2012). This Court has also acknowledged that the "threshold level of [patent] eligibility is often usefully explored by way of the substantive statutory criteria of patentability, for an invention that is new, useful and unobvious is more readily distinguished from the generalized knowledge that characterizes ineligible subject matter." *Trading Technologies International, Inc. v. CGQ, Inc. et. al*., 2017 WL 192716 at *4 (Fed. Cir. Jan. 18, 2017) (internal quotation marks omitted).

Not only did the District Court disregard the fact that the '271 patent overcame two rigorous reexaminations of its claims, it ignored the very limitations (the "options" steps) that refined the scope of the Asserted Claims to confer validity over the prior art. At a minimum, a proper application of the *Alice* test should have considered the "options" steps of the Asserted Claims in conjunction with the three "ordinary" activities identified by the District Court.

**IV.    The Asserted Claims do not raise preemption concerns of any field.**

As the Supreme Court noted in *Alice*, the "concern that drives" the abstract idea analysis is that of pre-emption: the "concern that patent law not inhibit further discovery by improperly tying up the future use of . . . building blocks of human ingenuity." *Alice*, 134 S. Ct. at 2354 (quoting *Mayo*, 132 S. Ct. at 1301) (quotations omitted). "Accordingly, in applying the § 101 exception, [courts] must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Id*.

Had the proper scope of the '271 patent Asserted Claims been considered, it would have been clear that the patent captures only a precise invention directed to a precise technological problem that was inherent in prior art fitness tracking systems. The actual solution disclosed in the Asserted Claims leaves plenty of room for others to accomplish the same result by different means, and it certainly does not preempt the entire field of gathering and comparing information. A person of skill in the art would not be prevented from achieving the same result through a conventional arrangement of biometric sensors, novel versions of biometric sensors, or a nonconventional arrangement of biometric sensors different from that

disclosed in the '271 patent. And, most importantly, the Asserted Claims would not preempt the abstract concept of collecting and aggregating data.

## CONCLUSION

In light of the foregoing, ICON respectfully submits that the Decision of the District Court should be reversed.

Respectfully submitted,

*/s/ Tyson K. Hottinger*

LARRY R. LAYCOCK
DAVID R. WRIGHT
TYSON K. HOTTINGER
**MASCHOFF BRENNAN PLLC**
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 297-1851

*Attorneys for Plaintiff-Appellant*

DATED: June 6, 2017

**ADDENDUM**

| Document | Page Nos. |
|---|---|
| Fed. R. Civ. P. 12(c) Judgment | Appx1 |
| Memorandum Decision and Order | Appx2 |
| U.S. Patent No. 6,701,271 | Appx21 |

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Utah

| | |
|---|---|
| ICON HEALTH AND FITNESS, INC. | ) |
| _Plaintiff_ | ) |
| v. | ) |
| POLAR ELECTRO OY et al. | ) |
| _Defendant_ | ) |

Civil Action No.   1:11-cv-00167-BSJ

## JUDGMENT IN A CIVIL ACTION

The court has ordered that _(check one)_:

❏ the plaintiff _(name)_ _____ recover from the defendant _(name)_ _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

❏ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant _(name)_ _____ recover costs from the plaintiff _(name)_ _____ _____ .

☑ other:   IT IS ORDERED AND ADJUDGED that judgment be entered in favor of the defendants, and plaintiff's claim against defendants for infringement of U.S. Patent No. 6,701,271 is dismissed with prejudice.

This action was _(check one)_:

❏ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

❏ tried by Judge _____ without a jury and the above decision was reached.

☑ decided by Judge   Bruce Sterling Jenkins _____ on a motion for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12 (c)

Date:   March 27, 2017 _____

CLERK OF COURT

_Signature of Clerk or Deputy Clerk_

**Appx1**

FILED
2017 MAR 10 PM 12:02
CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ICON HEALTH & FITNESS, INC., | |
| Plaintiff, | MEMORANDUM OPINION & ORDER REGARDING POLAR ELECTRO OY AND POLAR ELECTRO INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS |
| v. | |
| POLAR ELECTRO OY et al., | Case No.: 1:11-cv-00167-BSJ |
| Defendants. | Honorable Bruce S. Jenkins |

Pending before the Court is Defendants', Polar Electro Oy and Polar Electro Inc. (collectively, "Polar"), Motion for Judgment on the Pleadings filed pursuant to Federal Rule of Civil Procedure 12(c). (Dkt. No. 147) ("Motion"). Polar contends that certain claims of U.S. Patent No. 6,701,271 ("'271 patent") are directed to patent-incligible subject matter and are, therefore, invalid under 35 U.S.C. § 101 ("Section 101"). For the reasons discussed below, the Court grants Polar's Motion.

### I.   Procedural Background

On November 18, 2011, ICON Health & Fitness, Inc. ("Icon") filed a Complaint against Polar Electro Oy ("Polar Oy") asserting infringement of U.S. Patent No. 7,789,800 ("'800 patent") and the '271 patent. (Dkt. No. 1). On June 8, 2012, Icon filed an amended complaint adding Polar Electro, Inc. ("Polar Inc.") and asserting infringement of an additional patent, U.S. Patent No. 6,921,351 ("'351 patent"). (Dkt. No. 9). The case was stayed with respect to the '800 patent and the '271 patent pending finalization of reexamination proceedings for those patents. (Dkt. No. 51). The Court entered a scheduling order for the case concerning the '271 patent after finalization of the '271 patent reexamination. (Dkt. No. 141).

After entry of the scheduling order, Polar filed its Motion, requesting that the Court find that claims 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 of the '271 patent are directed to patent-

**Appx2**

ineligible subject matter and thus invalid under 35 U.S.C. § 101. (Dkt. No. 147). Icon filed an

opposition ("Opposition") (Dkt. No. 166) together with two declarations: (1) a Declaration of

Tyson K. Hottinger (Dkt. No. 167), along with three letters related to alleged discovery disputes

between the parties; and (2) a Declaration of Dr. David Brienza. (Dkt. No. 168). With its

Opposition, Icon also filed a Request that the Court take judicial notice of two groups of

documents. The first group consists of the prosecution history of two patents that are unrelated to

the asserted '271 patent: (1) the prosecution history file wrapper of U.S. Patent Application No.

11/545,018, which issued as U.S. Patent No. 8,512,238; and (2) the prosecution history file

wrapper of U.S. Patent Application No. 13/418,781, which issued as U.S. Patent No. 9,149,213.

The second group of documents includes portions of the two separate reexaminations of the '271

patent: (1) the *ex parte* reexamination of U.S. Patent No. 6,701,271 that was assigned Control

No. 90/013,409; and (2) the *inter partes* reexamination of U.S. Patent No. 6,701,271 that was

assigned Control No. 95/002,337. (Dkt. No. 169). Polar filed a reply brief in support of its

Motion (Dkt. No. 171) and shortly thereafter a Notice of Errata. (Dkt. No. 174).

On January 19, 2017, the Court held a hearing during which Icon presented arguments

based on new cases it had not previously cited. The Court allowed Polar to file a short response

to Icon's arguments related to the new cases, which Polar filed shortly after the hearing. (Dkt.

No. 178). In response, Icon filed a Supplemental Opposition Brief. (Dkt. No. 180). Neither party

sought construction of any claim terms in its briefing on the Motion.

## II.    The '271 Patent

### A.    Technological Background

Based on a review of the '271 patent and the parties' briefing, the Court arrives at the

following conclusions concerning the '271 patent. First, the '271 patent generally discloses a

method and system:

> for providing feedback [that] includes receiving data indicative of a
> physical characteristic of a first subject and a physical characteristic of a
> second subject; determining an evaluation of the data [or course of action];
> and providing a notification regarding the evaluation [or course of action]
> to a device"

2

(*See e.g.*, Dkt. No. 147, Ex. A, '271 patent col. 2:11-28).

The disclosed method reflects three fundamental actions: (1) receiving information regarding physical characteristic(s) of subjects; (2) evaluating, or determining a course of action based on, the characteristic(s); and (3) providing a notification of the evaluation/course of action. (*See* Dkt. No. 147, Ex. A, Figs. 1 and 2).

Second, the '271 patent broadly defines the terms used to describe and to claim the disclosed method via examples. With respect to "physical characteristic," the '271 patent gives examples, stating that it "might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them." (*See e.g.* Dkt. No. 147, Ex. A, '271 patent Abstract; col. 1:57-64; col. 4:22-23, 53-58).

Third, the '271 patent gives examples of the "determining an evaluation" such that it "may be or include summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc. some or all of the raw physical characteristic data received." (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56-66).

Fourth, with respect to "determining a course of action," the '271 patent shows that the course of action can be either of an actor such as a teacher or entertainer, or of a subject such as a student or an audience member. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:27-30; col. 8:14-23, 26-29, 51-55, and col. 9:13-17). The '271 patent gives examples of a person reading stories or giving a lecture. In those examples, the person is provided with feedback on the stories or on the parts of the lecture that the audience liked best, or on what story ending they might prefer. *Id*. Another example provided by the '271 patent is a course of action to get subjects to do something, or to improve the chances of the subjects actually doing something. *Id*. In the Background of the Invention, the '271 patent provides examples of situations where it might be "desirable to have information regarding how a subject or a group of subjects feels about information being delivered or presented to them or how the subjects react while information is being delivered or

3

presented to them." (Dkt. No. 147, Ex. A, col. 1:17-21). For example, the "Background of the

Invention, states:

> [A] teacher may wish to know if the students in her class understand the
> material the teacher is discussing. A lecturer may wish to know what
> portions of his lecture the audience members find most interesting.
> Alternatively, the lecturer may want to have a better idea of when to take a
> break. An entertainer may wish to know what ending to provide to a story
> or song medley being presented to an audience.

(Dkt. No. 147, Ex. A, col. 1:22-29).

The '271 patent gives another example in the context of a person giving a presentation:

> [A]ssume a speaker is giving a presentation to an audience of ten people
> and that the speaker may want to direct the presentation along one of
> several potential themes depending on the interest of the audience. In the
> method of the present invention, information regarding each of the
> audience member's heart rates, posture, etc. may be obtained and used to
> help determine which of the themes the audience members are the most
> interested in. Once the information is communicated to the speaker, the
> speaker can direct the presentation appropriately.

(Dkt. No. 147, Ex. A, col. 4:2-11).

The speaker receives feedback information regarding the audience, such as posture (e.g., they are

slumping in their seats) or facial response (e.g., they are yawning); the speaker can then make a

decision based upon the information. For example, it might be time for the speaker to take a

break, speak up, or move to a more rousing topic.

Fifth, the '271 patent gives examples of a "notification" such that it "may be or include

an email message, instant message communication, electronic signal or other communication

(e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible

sound, a visual display, a voice message, etc." (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16). The

notification can be any format. (*See e.g.*, Dkt. No. 147, Ex. A, col. 8:37-45).

Sixth, the '271 patent discloses that no unique or specific hardware or software is needed

to implement the disclosed method, stating, for example, that "embodiments of the present

invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt.

No. 147, Ex. A, col. 12:25-27). Indeed, the '271 patent discloses that implementation of the

disclosed method could be:

4

**Appx5**

> implemented in many different ways using a wide range of programming techniques as well as general-purpose hardware or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus, implementation of the disclosed method can be via conventional technology used conventionally.

### B.    The Asserted Claims

In accordance with LR 2.3, the asserted claims are: 15, 42, 49, 51, 54, 80, 81, 82, 90, and 91 ("Asserted Claims").[1] (Dkt. No. 167-2, p. 3). During reexamination of the '271 patent, independent claim 1 was cancelled. (Dkt. No. 147-1, Ex. 1, p. 22 of 26). All of the Asserted Claims depend directly or indirectly from claim 1, which reads:

> A method for providing feedback, comprising:
>
>> receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;
>>
>> determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and
>>
>> providing a notification regarding said evaluation to a device.

Because all of the Asserted Claims depend directly or indirectly from claim 1, they each include the subject matter of claim 1. 35 U.S.C. § 112 (fourth paragraph).[2] The following table summarizes the subject matter added to claim 1 by the Asserted Claims.

---

[1] ICON contends that it also alleges infringement of claims 46, 60, 61, 84, 85, 92, 94, and 95. *See* Dkt. No. 166, p. 1, n.3. The court finds that whether these additional claims are considered or not, the result of the court's analysis, as outlined herein, is the same.

[2] The '271 patent was filed May 17, 2001. (Dkt. No. No. 147, Ex. A, face page). This is prior to the September 16, 2012 effective date of the Leahy-Smith America Invents Act ("AIA"). Thus, reference herein is to the pre-AIA version of 35 U.S.C. § 112. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 n. 1 (Fed. Cir. 2015).

5

| Dependent Claim | Added Subject Matter |
|---|---|
| Claim 15 (depends from claim 14, which depends from claim 13, which depends from claim 1) | This claim adds receiving a notification regarding a plurality of options, and selecting the device to which the notification is sent based on selecting one of the plurality of options. |
| Claims 42, 80, and 90 (each depends from claim 1) | These claims add that the first device of claim 1 is a sensor that senses a physical characteristic of a subject; a remote server receives the first data from the first sensor through the internet; and the remote server determines which of multiple options to provide to the first subject based on first data and second data. |
| Claims 49 (depends from claim 42), 81 (depends from claim 80), and 91 (depends from claim 90) | These claims add that the device is a software application operating on a portable computer/cell phone that has a touchscreen input device. |
| Claims 51 (depends from claim 42) and 82 (depends from claim 80) | These claims add that the first device of claim 1 is a portable wireless sensor configured to wirelessly connect to a cell phone through a wireless connection; they also add that the remote server receives the first data from the first sensor through the internet through the wireless connection between the first sensor and cell phone through a wireless cellular connection of the cell phone to the internet. |
| Claim 54 (depends from claim 51) | This claim adds that the first portable wireless sensor of claim 51 is a heart rate sensor. |

(Dkt. No. 147, pg. 5).

It is apparent from the above summary as well as from the full text of the Asserted Claims that each Asserted Claim articulates the claimed method slightly differently, but claim 1 exemplifies the general concept claimed by the Asserted Claims. It is further apparent that the general concept claimed by the Asserted Claims is providing and using feedback based upon data gathered from subjects, which amounts to (1) observing physical characteristic(s) of subjects; (2) evaluating the characteristic(s); and (3) providing a notification of the evaluation. (*See also* Dkt. No. 147, Ex. A, Fig. 1).

6

**Appx7**

### III.    Legal Standards

####    A.    Motion for Judgment on the Pleadings

Pursuant to Federal Rule of Civil Procedure 12(c), a party may move for judgment on the pleadings "[a]fter pleadings are closed – but early enough not to delay trial." To decide a motion for judgment on the pleadings, the Court accepts as true the non-movant's well-pleaded factual allegations and all reasonable inferences are indulged in favor of the non-movant. *Shaw v. Valdex*, 819 F.2d 965, 968 (10th Cir. 1987). Furthermore, the movant must clearly establish that no material issue of fact remains to be resolved and that the movant is entitled to judgment as a matter of law. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012).

Whether a claim recites patent-ineligible subject matter is a question of law. *In re Bilski*, 545 F.3d 943, 951 (Fed. Cir. 2008), *aff'd* 561 U.S. 593 (2010) ("[w]hether a claim is drawn to patent-eligible subject matter under §101 is an issue of law[.]"). This determination is a threshold inquiry that is properly decided on the pleadings. *See Ultramercial*, 772 F.3d 709, 717 (Fed. Cir. 2014). The Federal Circuit and district courts have made clear that Section 101 patent eligibility may be, and regularly is, decided at the pleadings stage, without claim construction. *See, e.g., Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273-74 (Fed. Cir. 2012) (explaining the Federal Circuit "perceive[s] no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101"); *see also Epic Tech*, 2015 WL 8160884 at *5 (D. Utah 2015). Deciding the patent eligibility of the Asserted Claims is appropriate now.

####    B.    Patent-Eligible Subject Matter

Pursuant to 35 U.S.C. § 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor." There are three exceptions to Section 101's broad patent-eligibility principles: laws of nature, physical phenomena, and abstract ideas. *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980).

7

The Supreme Court most recently addressed determining whether a claim recites patent-eligible subject matter in *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2355 (2014). In *Alice*, the Supreme Court reaffirmed the two-step process to determine whether a claim recites patent-eligible subject matter set out in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296-97 (2012)). The first step is to determine whether the claims at issue are directed to patent-ineligible concepts, such as laws of nature, natural phenomena, or abstract ideas. *Id.* If the claims recite, for example, an abstract idea, the Court proceeds with second step to determine if there are additional claim elements that introduce an inventive concept to the claim that is sufficient to transform the abstract idea into patent-eligible subject matter. *Alice*, 134 S. Ct. at 2355.

### C.    The presumption of Validity and the Standard of Proof

It is unsettled whether the presumption of validity provided by 35 U.S.C. § 282, along with the associated clear and convincing standard of proof, applies to a Section 101 challenge. For example, Judge Mayer's concurrence in *Ultramercial* concluded that the presumption of validity does not apply in Section 101 inquiries. 772 F.3d at 717 ("[N]o presumption of eligibility attends the section 101 inquiry."). In a nonprecedential opinion, a different panel of the Federal Circuit noted that "[w]e are not persuaded that the district court was correct that a presumption of validity does not apply." *Tranxition, Inc. v. Lenovo (United States) Inc.*, No. 2015-1907, 2016 WL 6775967, at *4 n.1 (Fed. Cir. Nov. 16, 2016). The U.S. Supreme Court has decided Section 101 cases, such as *Alice* and *Mayo*, but it has not discussed or applied a presumption of validity in its analysis. *See Ultramercial* 772 F.3d at 720-21 ("Although the Supreme Court has taken up several section 101 cases in recent years, it has never mentioned—much less applied—any presumption of eligibility.").[3]

---

[3] The Court notes that a presumption of validity as to a Section 101 inquiry would not apply to the reexamination of the '271 patent because such an inquiry may not be raised in a reexamination. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . *may not be raised* in reexamination proceedings.") (emphasis added). Thus, a presumption of validity, if any exists,

8

In the present case, the Court's decision does not depend upon a presumption of validity, and the Court would reach its conclusion concerning whether the '271 patent Asserted Claims are directed to patent-ineligible subject matter regardless of the applicability of the presumption. In addition, the content of the '271 patent is fixed and not disputable, regardless of whether a clear and convincing standard of proof, or a lesser standard is applied. Consequently, the Court need not choose between the varying Federal Circuit views on the applicability of the presumption of validity or its corresponding clear and convincing standard of proof to a Section 101 analysis.

1.     *Alice* **Step One: Are the claims directed to a patent-ineligible abstract idea?**

The Supreme Court has confirmed that abstract ideas, such as ordinary human activities, are ineligible under Section 101 as being directed to unpatentable subject matter.[4] In *Alice*, the Supreme Court held that computerization of the ordinary human activity of maintaining escrow accounts is not patentable subject matter. 134 S. Ct. 2347. In *Bilski v. Kappos*, the Supreme Court held that the ordinary activity of hedging losses is not patentable. 130 S. Ct. 3218, 3229-30 (2010). And in *Mayo*, the Supreme Court held that the ordinary human activity of observing correlations is not patentable. 132 S. Ct. at 1293-94.

Following the Supreme Court's guidance, the Federal Circuit has confirmed that ordinary human activity, such as collecting and utilizing data by conventional means is not patentable subject matter. For example, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they merely recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection,

---

would only apply as a result of the U.S. Patent and Trademark Office's original examination and issuance of the '271 patent, not as a result of a reexamination.

[4] As noted above, if the step one analysis results in a conclusion that the claims are directed to an abstract idea, then the claims are patent ineligible unless the step two analysis shows that the claims add an inventive concept to the abstract idea as further discussed in the next section.

9

recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*. The Federal Circuit recently reinforced point in *Electric Power Group, LLC v. Alstom S.A.*, stating that "we have treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." 830 F.3d 1350, 1353-54 (Fed. Cir. 2016) (collecting cases).

Abstract ideas are not limited to natural human activities or financial/business methods and systems. The Federal Circuit has also invalidated patent claims directed to the following abstract ideas: (1) a method and system for managing an electric power grid; (2) a method of managing a bingo game; (3) a method and system of tracking and documenting shipping containers; (4) a method of tracking financial transactions to determine whether they exceed a spending limit (i.e., budgeting); and (5) a method of price optimization.[5] These are just a handful of examples of patent-ineligible subject matter, but they have a commonality: abstract ideas such as natural human activity are not patent-eligible.

### 2.    *Alice* **Step Two: Do the claims recite additional elements sufficient to transform them into patent-eligible subject matter?**

If a claim involves an abstract idea, the court next "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. The court looks at the elements both individually and as an ordered combination. *Id*. at 2355. In other words, if a claim recites an abstract idea, it "must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id*.

It is settled that reciting generic or conventional components used in their conventional intended way does not transform an ordinary human activity into patentable subject matter.

---

[5] *See respectively,* (1) *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016); (2) *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014); (3) *Wireless Media Innovations LLC* 100 F.Supp.3d at 415-415; (4) *Intellectual Ventures I LLC v. Capital One Bank (USA),* 792 F.3d 1363, 1367 (Fed. Cir. 2015); and (5) *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir.), cert. denied, 136 S. Ct. 701, 193 L. Ed. 2d 522 (2015).

10

*Alice*, 134 S. Ct. at 2359 (adding "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material). The Supreme Court in *Alice* held that elements, such as a computer, add nothing to a claim beyond their well-known functions, do not transform an abstract idea into patent-eligible subject matter. *Id.* at 2359-60 (using a computer to obtain data, adjust account balances based on the data, and issue automated instructions is well-known and does not transform an abstract idea into a patentable-eligible invention). The *Alice* Court explained that using a computer to complete the "well-understood, routine, conventional activit[ies]" previously known to the industry does not constitute § 101 patent-eligible material. *Id.* at 2359; *see also Wireless Media Innovations LLC v. Maher Terminals, LLC*, 100 F.Supp.3d 405, 415-415, *aff'd* 2016 WL 463218 (Fed. Cir. 2016) (physical components such as vehicles, optical scanners, and computers do not transform an abstract idea into patentable subject matter).

## IV.    Analysis and Discussion

Polar argues that on their face, the Asserted Claims recite the abstract idea of providing and using feedback based on data gathered from subjects. Initially, the Court notes that humans have received and assessed information and thereafter provided feedback to one or more people from time immemorial. The aggregation of information and the use of information to provide advice to people is a practice that has long existed. Today, the process of aggregating information and providing advice is much quicker than in the past due to, for example, the use of computers in the process. Likewise electronic sensors enable various information to be gathered comprehensively and quickly. Sensors have existed in refrigerators, in heaters and furnaces, and temperature controls for a long time. Information gathering from particular sources through the use of sensors, absent uniqueness of a sensor, does not change the nature of the information gathering. As noted above, the '271 patent does not disclose any unique sensor or require any special hardware or programming.

11

**Appx12**

### A.    *Alice* Step One

Polar points to claim 1 as the starting point of its argument because all Asserted Claims depend directly or indirectly from claim 1. Polar contends that the abstract idea recited by the Asserted Claims includes three common and ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data. (Dkt. No. 147, pgs. 14-15 of 21).

Polar compares the Asserted Claims to claims found invalid by the Federal Circuit. For instance, in *Content Extraction and Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit invalidated claims directed to "1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because they recited an abstract idea. 776 F.3d 1343, 1347 (Fed. Cir. 2014). In holding the claims invalid, the Federal Circuit recognized that the "concept of data collection, recognition, and storage is undisputedly well-known. Indeed, humans have always performed these functions." *Id*.

Polar also compares the Asserted Claims to the claims that the Federal Circuit recently held patent ineligible in *Electric Power Group*. There, the Federal Circuit analyzed the patent eligibility of three patents that claimed systems and methods for "performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results" to determine power grid vulnerability. *Electric Power Group,* 830 F.3d at 1351-52. The Federal Circuit observed that it has "treated collecting information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas." *Electric Power Group*, 830 F.3d at 1353 (internal citations omitted). The Federal Circuit concluded that the idea of collecting and analyzing information or data, even when particularly limited, to be an abstract idea. *Electric Power Group,* 830 F.3d at 1353-54 (collecting cases) (Dkt. No. 171, pgs. 9-10 of 16).

Icon takes issue with Polar's description of the Asserted Claims, arguing that the Asserted Claims are like those at issue in *Enfish, LLC v. Microsoft Corp*., 822 F3d 1350 (Fed.

Cir. 2016) and are therefore directed to patent-eligible subject matter. Icon presented arguments directed to only two of the Asserted Claims, claims 15 and 80. Those arguments were directed to distinguishing claims 15 and 80 from the asserted claims in *Content Extraction*. First, Icon argued that claim 15 does not merely recite "collecting data," but "separate devices (e.g., sensors) sense, measure, and create objective data concerning physical characteristics (e.g., brain waves) and then transmit the sensed characteristics in the form of data from each person," and that claim 15 "evaluates a combination of the collected data and provides a notification of that *evaluation* (not of the collected data), receives notification of options, selects an option and selects a device based on the option selection." (*See* Dkt. No. 166, pg. 21-22 of 31) (emphasis in original). Icon asserted that these claim limitations do not have "any counterpart in the *Content Extraction* claim." *Id.* Icon also argued that asserted claim 80 "introduces a key inventive component in the last clause: determining which option(s) 'to provide to the first subject.'" *Id.* Icon argues that in *Content Extraction* the subjects are hard copy documents, and thus, *Content Extraction* is inapplicable to the present case. (*Id.* at pg. 23 of 31). While Icon's arguments pointed out that limitations of claims 15 and 80 were not identical to the *Content Extraction* claim, Icon did not argue or explain why such limitations rendered claims 15 and 80 patent eligible. Icon did not present separate arguments regarding any of the other Asserted Claims, and accordingly, the Court need not address those claims.

The Court agrees with Polar and finds that the Asserted Claims are directed to the abstract idea of providing and using feedback based upon data gathered from subjects. Controlling precedent establishes that the idea of collecting and analyzing information or data, even when particularly limited, is an abstract idea under Section 101. *See Electric Power Group,* 830 F.3d at 1353-54 (collecting cases). The abstract idea claimed by the Asserted Claims recites three ordinary activities: (1) receiving data indicative of physical characteristics of two subjects; (2) evaluating the data, which can be as simple as collecting the received data; and (3) providing a notification regarding the evaluation, which can be as simple as displaying the received data.

13

**Appx14**

(*See* '271 patent, col. 6:56-60; 7:31-35). The Asserted Claims fall directly into the abstract idea category of collecting and analyzing information or data.

While it is true, as Icon notes, that the Asserted Claims recite "providing a notification" and utilizing "a sensor," the Federal Circuit has ruled that claims reciting common hardware to perform functions a human could not, such as a scanner to collect data, do not thereby negate the abstract nature of the claim. As the Federal Circuit held in *Content Extraction*, added limitations must "involve more than performance of well-understood, routine [and] conventional activities previously known in the industry." 776 F.3d at 1347-48. Icon's argument that sensors make the Asserted Claims not abstract is unpersuasive. The '271 patent does not disclose and Icon does not argue that the sensors are of a unique and new structure. Instead, they are disclosed as simply conventional sensors being used conventionally, which is insufficient to transform the abstract idea into patent-eligible subject matter.[6]

Icon's argues that the recitation of an evaluation and a notification render the Asserted Claims not abstract. The '271 patent, however, does not disclose such actions as being unique or novel. Instead, it discloses that these are common actions where an evaluation can be as simple as summarizing, tabulating, charting, or collecting information; (*See e.g.*, Dkt. No. 147, Ex. A, col. 6:56 – col. 7:3) and a notification according to the '271 patent can be as simple as an audible sound. (*See e.g.*, Dkt. No. 147, Ex. A, col. 7:11-16).

Icon points to *Enfish* to argue that the Asserted Claims are patent eligible. Unlike the claims here, the *Enfish* claims were not abstract because they were "directed to a specific improvement to the way computers operate." *Enfish*, 822 F.3d at 1336. But, Icon did not argue that the '271 patent teaches an improvement in how a computer functions, or any new sensor

---

[6] The Court recognizes that *Alice's* first step looks at "the focus of the claims, their character as a whole." *Electric Power*, 830 F.3d at 1353. In the second step, the Court determines whether additional limitations represent a patent-eligible application of the abstract idea. *Id.* Icon, however, distinguishes *Content Extraction* in response to Polar's step one analysis on such a basis. Thus, the Court addresses certain of Icon's step two arguments in its discussion of *Alice's* step one.

14

structure. Instead, Icon discussed the claims as using conventional sensors to collect objective data and a conventional computer to evaluate data, send notifications, and make determinations. (*See e.g.*, Dkt. No. 166, p. 11 of 31:1-3 and ¶¶ 2 and 3). These are the ordinary functions of sensors and a computer. Because the '271 patent claims are not directed to an improvement in how sensors sense or operate, or an improvement in how computers compute, the Asserted Claims are unlike those in *Enfish*. *See Electric Power Group*, 830 F.3d at 1354.

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea.

**B.    *Alice* Step Two**

At step two of the *Alice* analysis, Polar argues that the Asserted Claims do not recite any inventive concepts to transform the claimed abstract idea into patent-eligible subject matter. (*See, e.g.,* Dkt. No. 147, pgs. 16-17 of 21). To qualify as patent-eligible subject matter, a claim must recite "significantly more" than the abstract idea, for example by "improv[ing] an existing technological process," and not merely by "implement[ing] [the idea] on a computer." *Alice*, 134 S. Ct. at 2358. Polar argues that the Asserted Claims do not improve an existing technological process or product and merely recite using conventional devices for their conventional purpose – e.g., sensors for sensing and displays for displaying. (Dkt. No. 147, pgs. 16-17 of 21).

Icon argues that the Asserted Claims recite an inventive concept and provides several different bases for its argument. First, Icon argues that "[a]s an ordered combination, the additional elements do introduce inventive concepts." (Dkt. No. 166, pgs. 27-28 of 31). Icon contends that "by putting a sensor that collects 'data indicative of a physical characteristic' in communication with a remote, internet-accessible server that also receives similar data about one or more other subjects, the claims at issue enable the combined evaluation of more than one subject's objective physical-characteristics data, resulting in the provision of one or more options." (Dkt. No. 166, pgs. 27-28 of 31). Second, Icon relies upon *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2016) and *Bascom Global Internet Services, Inc. v. AT&T Mobility, LLC*, 827 F.3d 1341, 1351 (Fed. Cir. 2016) in support of its argument that

15

**Appx16**

the Asserted Claims, even if directed to an abstract idea, contain inventive concepts to transform the claims into patentable subject matter. Third, at the January 19, 2017 hearing, Icon argued that the Asserted Claims teach a "unique distributed architecture" of databases and, for this reason, the Asserted Claims contain an inventive concept. (*See* Hearing Tr., 27:23-31:2, Jan 19, 2017). Fourth, Icon argued that certain arguments in Polar's own patent applications, which are unrelated to the Asserted Claims, estop Polar from making its step two arguments. (Dkt. No. 166, pgs. 25-27). Fifth, Icon argued that the reexamination of the '271 patent demonstrated that it was an improvement over existing technology. (Dkt. No. 166, pgs. 28-29 of 31).

The Court does not find Icon's arguments persuasive. It finds no inventive concept in the ordered combination of the claim limitations. The Asserted Claims are quite similar to those asserted in *Electric Power Group*, where the Federal Circuit reasoned that "limiting the claims [directed to collecting data, analyzing the data, and displaying the results] to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." 830 F.3d at 1354. Furthermore, "merely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes, whose implicit exclusion from § 101 undergirds the information-based category of abstract ideas." *Id.* at 1355. Here, the '271 patent does not disclose and the Asserted Claims do not "require[] anything other than off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information" and, therefore, do not include an "inventive concept of the application." *Id.*

For the same reason, Icon's argument related to a unique architecture of databases is unavailing. As noted above, the '271 patent discloses that no unique or specific hardware or software is needed to implement the disclosed method, stating, for example, that "embodiments of the present invention are not limited to any specific combination of hardware and software." (*See e.g.*, Dkt. No. 147, Ex. A, col. 12:25-27). More particularly, the '271 patent discloses that implementation of the disclosed method could be:

16

**Appx17**

> implemented in many different ways using a wide range of programming
> techniques as well as general-purpose hardware or dedicated controllers.
> In addition, many, if not all, of the steps for the methods described above
> are optional or can be combined or performed in one or more alternative
> orders or sequences.

(Dkt. No. 147, Ex. A, col. 14:22-28). Thus the abstract idea underlying the '271 patent can be

implemented via conventional technology used conventionally. Once again, there is no inventive

concept in such an application of conventional technology.

Icon cited a Declaration of Dr. David Brienza in support of its argument that the Asserted

Claims include an inventive concept. But, on a motion for judgment on the pleadings, the court

considers only the Complaint, the Answer, and the documents attached as exhibits to either. *See*

*Burkett v. Convergys Corp.*, 2:14-CV-376-EJF, 2015 WL 4487706 at *9 (D. Utah, July 23,

2015). The declaration meets none of these criteria. Additionally, whether the Asserted Claims

are directed to patent-eligible subject matter is a question of law, and Dr. Brienza's legal

conclusions invade the province of the Court. *Accenture Global Servs. v. Guidewire Software,*

*Inc.*, 728 F.3d 1336, 1340-41 (Fed. Cir. 2013); *see also Genband US LLC v. Metaswitch*

*Networks Corp.*, No. 2:14-cv-33-JRG-RSP, 2016 WL 98745 at *3 (E.D. Tex. Jan. 8, 2016)

(striking an expert's opinion on subject matter eligibility because it did nothing more than

analyze the law and offer legal conclusions).

Furthermore, even if the Court were to consider the declaration, it does not alter the

analysis. The Supreme Court has held that "[t]he 'novelty' of any element or steps in a process,

or even of the process itself, is of <u>no relevance</u> in determining whether the subject matter of a

claim falls within the § 101 categories of possibly patentable subject matter." *Diamond v. Diehr*,

450 U.S. 175, 189 (1981) (emphasis added).

Icon's reliance upon *DDR Holdings* and *Bascom* is also unpersuasive. Icon argues that

the '271 patent improved existing technology, specifically making "share and compare" possible.

(Dkt. No. 166, pg. 28 of 31). But, sharing and comparing information has long been possible.

Icon does not argue or explain why this Court should consider sharing and comparing

information either new or inventive. The Federal Circuit in *DDR Holdings* found a computer-

17

implemented method of manipulating computer interactions to be patent-eligible because the "claimed solution amounts to an inventive concept for resolving" the Internet-centric problem of making two web pages look the same. *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d at 1258. The claims here do not provide any inventive functionality in employing generic components such as sensors and touchscreens. As in *Electric Power Group*, the Asserted Claims "specify what information . . . to gather, analyze, and display . . . by use of [nothing] but entirely conventional, generic technology." 830 F.3d at 1356 (analyzing the claims-at-issue against *DDR Holdings*). The Asserted Claims do not solve or claim to solve any internet or tech-centric problem.

*Bascom* is inapposite here for the same reason. In *Bascom*, the Federal Circuit found that the patent-at-issue claimed "a technology-based solution (not an abstract-idea-based solution implemented with generic technical components in a conventional way) to filter content on the Internet that overcomes existing problems with other Internet filtering systems . . . the claimed invention represents a software-based invention that improves the performance of the computer system itself." *Bascom Global Internet Services,* 827 F.3d at 1351. None of the Asserted Claims relate to or propose a technology-based solution to sensors, the Internet, or a computer.

Icon's argues that Polar should be estopped from arguing patent-ineligibility in this case because of arguments it made in patent applications that are entirely unrelated to the '271 patent. The Court sees no basis for estopping Polar.

Finally, Icon's argument based on the reexamination of the '271 patent is legally irrelevant. The question of patent-eligible subject matter cannot be raised in a reexamination. *See In re NTP, Inc.*, 654 F.3d 1268, 1275-76 (Fed. Cir. 2011) (citing 37 C.F.R. § 1.552) ("[Q]ualification as patentable subject matter under § 101 . . . may not be raised in reexamination proceedings."). Since this issue cannot be raised in a reexamination proceeding, the USPTO's decision has no bearing on subject matter eligibility. *Id.*; *see also SmartGene, Inc. v. Advanced Biological Labs., SA*, 852 F.Supp.2d 42, 50 (D.D.C. 2012), *aff'd*, 555 F.App'x 950 (Fed. Cir. 2014).

**Appx19**

For the foregoing reasons, the Court concludes that the Asserted Claims are directed to an abstract idea and do not include an inventive concept that would render them patent-eligible.

**V.     Conclusion**

Because the Asserted Claims are directed to patent-ineligible subject matter, Polar's Motion for Judgment on the Pleadings is granted.

Let judgment be entered accordingly.

DATED this _10th_ day of March, 2017.

Bruce S. Jenkins
United States Senior District Judge

19

**Appx20**



US006701271B2

(12) **United States Patent**     (10) **Patent No.:**    **US 6,701,271 B2**

Willner et al.     (45) **Date of Patent:**    **Mar. 2, 2004**

(54) **METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS**

(75) Inventors: **Barry E. Willner**, Briarcliff Manor, NY (US); **Edith H. Stern**, Yorktown Heights, NY (US); **David P. Greene**, Ossining, NY (US); **Philip Shi-lung Yu**, Chappaqua, NY (US)

(73) Assignee: **International Business Machines Corporation**, Armonk, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 22 days.

(21) Appl. No.: **09/859,827**

(22) Filed: **May 17, 2001**

(65)     **Prior Publication Data**

US 2002/0173928 A1 Nov. 21, 2002

(51) **Int. Cl.**[7] ............................ **G06F 15/00**; G01D 1/00
(52) **U.S. Cl.** ........................................ **702/127**; 702/182
(58) **Field of Search** ........................ 702/81, 127, 128, 702/130, 136, 182, 186; 600/300, 301, 310, 481; 128/903, 870; 434/257–259; 723/9–10, 14, 16; 705/1, 80

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,907,973 A * 3/1990 Hon ........................... 434/262
5,233,520 A * 8/1993 Kretsch et al. .............. 600/300
5,542,420 A * 8/1996 Goldman et al. ........... 600/301
5,762,503 A * 6/1998 Hoo et al. ................... 434/237

OTHER PUBLICATIONS

Cristiane G. Lau, "Shear Madness has right mix of character, audience", http:/the–tech.mit.edc/V113/N45/madness.45a.txt.html, vol. 113, No. 45, 2 pages.*

* cited by examiner

*Primary Examiner*—Bryan Bui
(74) *Attorney, Agent, or Firm*—Buckley, Maschoff & Talwalker LLC; Stephen C. Kaufman

(57)       **ABSTRACT**

A system, method, apparatus, and computer program code for using physical characteristic information obtained from two or more subjects to help evaluate subjects or to determine a course of action to take with the subjects includes receiving data indicative of one or more physical characteristics from two or more subjects, determining an evaluation of the data, and providing a notification to a device of the evaluation. A physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

**41 Claims, 8 Drawing Sheets**



100

RECEIVE DATA INDICATIVE OF A PHYSICAL CHARACTERISTIC OF AT LEAST TWO SUBJECTS

102

DETERMINE AN EVALUATION OF THE PHYSICAL CHARACTERISTIC DATA

104

PROVIDE A NOTIFICATION OF THE EVALUATION TO A DEVICE

106

100

```
┌─────────────────────────────────┐
│  RECEIVE DATA INDICATIVE OF A    │
│  PHYSICAL CHARACTERISTIC OF AT   │
│       LEAST TWO SUBJECTS         │
│                            102   │
└─────────────────────────────────┘
                 │
                 ▼
┌─────────────────────────────────┐
│   DETERMINE AN EVALUATION OF     │
│   THE PHYSICAL CHARACTERISTIC    │
│              DATA                │
│                            104   │
└─────────────────────────────────┘
                 │
                 ▼
┌─────────────────────────────────┐
│   PROVIDE A NOTIFICATION OF THE  │
│    EVALUATION TO A DEVICE        │
│                            106   │
└─────────────────────────────────┘
```

FIG. 1



120

RECEIVE DATA INDICATIVE OF A PHYSICAL
CHARACTERISTIC OF AT LEAST TWO
SUBJECTS

102

DETERMINE A COURSE OF ACTION BASED
ON THE PHYSICAL CHARACTERISTIC DATA

122

PROVIDE A NOTIFICATION BASED ON THE
COURSE OF ACTION

124

FIG. 2



140

DETERMINE A DESIRED ACTION
ASSOCIATED WITH A GROUP OF
SUBJECTS

<u>142</u>

RECEIVE DATA INDICATIVE OF A PHYSICAL
CHARACTERISTIC OF AT LEAST ONE OF
THE SUBJECTS

<u>144</u>

DETERMINE A COURSE OF ACTION BASED
ON THE PHYSICAL CHARACTERISTIC

<u>146</u>

PROVIDE A NOTIFICATION BASED ON THE
COURSE OF ACTION

<u>148</u>

FIG. 3



FIG. 4



FIG. 5

—300

| SENSOR IDENTIFER 302 | SENSOR DESCRIPTION 304 | SENSOR OUTPUT 306 |
|---|---|---|
| S-123456 | HEART RATE SENSOR | HEART RATE DATA EVERY TEN SECONDS |
| S-387766 | TEMPERATURE SENSOR | TEMPERATURE READINGS ONCE A MINUTE |
| S-867454 | MOTION SENSOR | DATA SENT UPON MOTION |

FIG. 6

—400

| OUTPUT IDENTIFIER 402 | OUTPUT DESCRIPTION 404 | SENSOR IDENTIFIER 406 |
|---|---|---|
| O-493 | SERVER C-14 | S-123456 S-867454 |
| O-601 | USER DEVICE U-12 | S-387766 |

## FIG. 7

—500

| EVALUATION IDENTIFIER 502 | EVALUATION DESCRIPTION 504 | SENSOR IDENTIFIER 506 |
|---|---|---|
| E-0234 | INTEREST LEVEL DETERMINATION | S-123456 S-867454 |
| E-4629 | RESTLESSNESS DETERMINATION | S-387766 |

FIG. 8

US 6,701,271 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## METHOD AND APPARATUS FOR USING PHYSICAL CHARACTERISTIC DATA COLLECTED FROM TWO OR MORE SUBJECTS

### FIELD OF THE INVENTION

The present invention relates to a method and apparatus for using information obtained from two or more subjects and, more particularly, embodiments of the present invention relate to methods, apparatus, and computer program code for determining a course of action based on information regarding one or more physical characteristics of two or more subjects.

### BACKGROUND OF THE INVENTION

There are many situations in which it might be desirable to have information regarding how a subject or a group of subjects feels about information being delivered or presented to them or how the subjects react while information is being delivered or presented to them. For example, a teacher may wish to know if the students in her class understand the material the teacher is discussing. A lecturer may wish to know what portions of his lecture the audience members find most interesting. Alternatively, the lecturer may want to have a better idea of when to take a break. An entertainer may wish to know what ending to provide to a story or song medley being presented to an audience.

While devices exist that allow take information from a single subject and provide information regarding the single subject, unfortunately, there is no way for an observer of two or more subjects to take objective measurements of the subjects and use the information to direct the observer or a device under the observer's control along one of several courses of action or to evaluate how best to alter or change what the observer or device is currently doing. It would be advantageous to provide a method and apparatus that overcame the drawbacks of the prior art. In particular, it would be desirable to use physical characteristic information obtained from or about two or more subjects and to determine a course of action based on such information or an evaluation of the information.

### SUMMARY OF THE INVENTION

Embodiments of the present invention provide a system, method, apparatus, and computer program code for using physical characteristic information obtained from or about two or more subjects and, more particularly, embodiments of the present invention relate to methods, apparatus, and computer program code for determining a course of action based on the information or an evaluation of the information. Information or other data regarding physical characteristics of two or more subjects may be received from one or more sensors carried, worn, or handled by the subjects or otherwise associated with the subjects. The data may be indicative of a variety of physical characteristics. For example, a physical characteristic of a subject might be or include the subject's heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern or rhythm, odor, motion, etc., or a change in any one or more of them.

Based on the data received regarding one or more physical characteristics, an evaluation of the data may be determined or a course of action based on the data may be determined. The results of the determination may be sent to one or more devices to provide feedback based on the physical characteristics of the subjects or to enable the device(s) to make an evaluation or determine a course of action based on the physical characteristics.

Additional objects, advantages, and novel features of the invention shall be set forth in part in the description that follows, and in part will become apparent to those skilled in the art upon examination of the following or may be learned by the practice of the invention.

According to embodiments of the present invention, a method for providing feedback includes receiving data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determining an evaluation of the data; and providing a notification regarding the evaluation to a device. In other embodiments of the present invention, a method for providing feedback includes receiving data indicative of a physical characteristic of a plurality of subjects; determining a course of action based, at least in part, on the data; and providing a notification based, at least in part, on the course of action. In still further embodiments, a method for providing feedback includes determining a desired action associated with a group of subjects; receiving data indicative of a physical characteristic of at least one of the subjects; determining a course of action based, at least in part, on the characteristic and the desired action; and providing a notification based on the course of action.

According to another embodiment of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a first subject and a physical characteristic of a second subject; determine an evaluation of the data; and provide a notification regarding the evaluation to device. In other embodiments of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to receive data indicative of a physical characteristic of a plurality of subjects; determine a course of action based, at least in part, on the data; and provide a notification based, at least in part, on the course of action. In other embodiments of the present invention, a system for facilitating feedback includes a memory; a communication port; and a processor connected to the memory and the communication port, the processor being operative to determine a desired action associated with a group of subjects; receive data indicative of a physical characteristic of at least one of the subjects; determine a course of action based, at least in part, on the characteristic and the desired action; and provide a notification based on the course of action.

According to yet another further embodiment of the present invention, an apparatus for using feedback includes means for obtaining data representative of a physical characteristic of a first subject and a physical characteristic of a second subject; means for evaluating the data; and means for sending data indicative of the evaluation to a device. In other embodiments of the present invention, an apparatus for using feedback includes means for obtaining data indicative of a physical characteristic of a plurality of subjects; means for identifying a course of action based, at least in part, on the data; and means for sending a notification based, at least in part, on the course of action. In other embodiments of the present invention, an apparatus for using feedback includes means for identifying a desired action associated with a

US 6,701,271 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

group of subjects; means for obtaining data indicative of a physical characteristic of at least one of the subjects; means for identifying a course of action based, at least in part, on the characteristic and the desired action; and means for sending a notification based on the course of action.

According to a further embodiment of the present invention, a computer program product in a computer readable medium for using feedback includes first instructions for obtaining receiving data representative of a physical characteristic of a first subject and a physical characteristic of a second subject; second instructions for evaluating the data; and third instructions for sending data indicative of the evaluation to a device. In other embodiments of the present invention, a computer program product in a computer readable medium for using feedback includes first instructions for obtaining data indicative of a physical characteristic of a plurality of subjects; second instructions for identifying a course of action based, at least in part, on the data; and third instructions for sending a notification based, at least in part, on the course of action. In other embodiments of the present invention, a computer program product in a computer readable medium for using feedback first instructions for identifying a desired action associated with a group of subjects; second instructions for obtaining data indicative of a physical characteristic of at least one of the subjects; third instructions for identifying a course of action based, at least in part, on the characteristic and the desired action; and fourth instructions for sending a notification based on the course of action.

With these and other advantages and features of the invention that will become hereinafter apparent, the nature of the invention may be more clearly understood by reference to the following detailed description of the invention, the appended claims and to the several drawings attached herein.

BRIEF DESCRIPTION OF THE DRAWINGS

The accompanying drawings, which are incorporated in and form a part of the specification, illustrate the preferred embodiments of the present invention, and together with the descriptions serve to explain the principles of the invention.

FIG. 1 is a flowchart of a first embodiment of a method in accordance with the present invention;

FIG. 2 is a flowchart of a second embodiment of a method in accordance with the present invention;

FIG. 3 is a flowchart of a third embodiment of a method in accordance with the present invention;

FIG. 4 is a block diagram of system components for an embodiment of an apparatus usable with the methods of FIGS. 1–3;

FIG. 5 is a block diagram of a representative server of FIG. 4;

FIG. 6 is an illustration of one possible implementation of the sensor database of FIG. 5;

FIG. 7 is an illustration of one possible implementation of the output database of FIG. 5; and

FIG. 8 is an illustration of one possible implementation of the evaluation database of FIG. 5.

DETAILED DESCRIPTION

Applicants have recognized that there is a need for systems and methods that allow for biometric information and other physical characteristic data to be obtained regarding two or more subjects and evaluate or determine a course

of action or evaluation based on the information and data. For example, assume a speaker is giving a presentation to an audience of ten people and that the speaker may want to direct the presentation along one of several potential themes depending on the interest of the audience. In the method of the present invention, information regarding each of the audience member's heart rates, posture, etc. may be obtained and used to help determine which of the themes the audience members are the most interested in. Once the information is communicated to the speaker, the speaker can direct the presentation appropriately.

Applicants have also recognized that there is a need for systems and methods that enable a desired action associated with a group of subjects to be determined to be obtained by obtaining biometric information and other physical characteristic data to be obtained from or about the group and using such information and data to help determine a course of action that will lead to or produce the desired action. For example, a math instructor may desire that students in a classroom memorize multiplication tables. Sensors may obtain information from two or more of the students regarding brain wave patterns, amount of movement (e.g., an indication of restlessness), heart and respiration rates, etc. Based on this information, a determination may be made as to a course of action the instructor should take to increase the chances of getting students to memorize the multiplication tables. For example, students who are determined to be bored or sleepy (e.g., have relatively slow heart rates, have not shifted position recently) may need to engage in a physical activity to wake them up or make them more alert prior to studying the multiplication tables. Students who are very active (e.g., have relatively high heart rates, are very fidgety) may need to be calmed down before beginning to memorize the multiplication tables. Once the determination of a course of action is made, it can be provided to the instructor so that the instructor can proceed accordingly with an improved chance of reaching the desired activity.

These and other features will be discussed in further detail below, by describing a system, individual devices, and processes according to embodiments of the invention.

Process Description

Reference is now made to FIG. 1, where a flow chart 100 is shown which represents the operation of an embodiment of the present invention. The particular arrangement of elements in the flow chart 100 is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method 100 can be implemented by a server or other device.

Processing begins at a step 102 during which data indicative of one or more physical characteristics of two or more subjects (e.g., human beings, animals) is obtained or otherwise received. A physical characteristic of a subject might be or include the subjects' heart rate, blood pressure, blood sugar level, posture, temperature, respiration rate, facial response or position, weight, height, galvanic skin response, pheromone emission, brain wave pattern, odor, motion, etc., or a change in any one or more of them.

The physical characteristic of one subject for which data is received during the step 102 may be the same as or different from the physical characteristic for which data is received for another subject during the step 102. For example, during the step 102, data might be received regarding the heart rate of one subject and the respiration and/or heart rate of a second subject. Data from more than one subject might be received simultaneously from multiple subjects during the step 102 or from different subjects at

US 6,701,271 B2

**5**

different periods of time during the step **102**. The data for different subjects can come from different sources or sensors, be in different formats and contain information regarding the same or different physical characteristics. In some embodiments, information regarding one or more sensors may be stored in, and accessed from, a sensor information database.

Data and other information regarding physical characteristics of a subject can be obtained directly or indirectly by having the subject wear, carry or hold a sensor or other data gathering device (e.g., heart rate sensor, blood pressure monitor, motion sensor), by having the subject sit in a chair having sensors or data gathering devices mounted in it or attached to it, etc. Thus, a sensor might be associated with a specific subject and provide data regarding only that subject. In some embodiments, a sensor or other data gathering device might detect or obtain data indicative of a physical characteristic for more than one subject. Data regarding or indicative of one or more physical characteristics of one or more subjects also may be received during the step **102** from observers watching the subject(s) and making, entering or recording observations.

During a step **104**, an evaluation is determined of the physical characteristic(s) for which data was received during the step **102** regarding one or more of the subjects for which data was received during the step **102**. The determination or evaluation may occur in a variety of ways and the evaluation may be directed toward a variety of behaviors. For example, based on the information received during the step **102** for a subject, the determination performed during the step **104** may include determining a risk of violence associated with one or more of the subjects, determining one or more options to provide to one or more of the subjects, determining a trading propensity associated with one or more of the subjects, predicting at least one action or course of action that might be taken or contemplated by one or more of the subjects (e.g., is the subject likely to leave the room) or is desired to be taken by one or more of the subjects, determining a probability associated with an action or course of action that might be taken, or is desired to be taken, by one or more of the subjects (e.g., how likely is a subject to leave the room, how likely is a subject to stop paying attention to a speaker, how likely is a subject to fall asleep), etc. In some embodiments, information regarding one or more evaluations may be stored in, or accessed from, an evaluation database.

In some embodiments, the step **104** may include determining one or more options to provide to a subject or a group of subjects. For example, the method **100** may include a step of receiving a notification of several possible endings to a play being presented to an audience. The step **104** may include determining which of the options to provide to the audience or determining which of the options the audience will be allowed to choose from. Suppose five possible endings are available for the play, two of which are happy endings and three of which are sad endings. If the audience appears or is determined to want a happy ending, the audience may be provided with the two options having happy endings for the play. If instead the audiences appears or is determined to want a sad ending, the audience may be provided with the three options having a sad ending for the play. A notification of the possible options may be provided to one or more of the audience members to allow them to make the selection on the desired ending.

In some embodiments, the determination made during the step **104** may include determining what type of response to provide to a subject or group of subjects. For example, two

**6**

or more subjects may be part of a group listening to a live lecture or training seminar. The data received during the step **102** may indicate that one or more of the subjects is sleepy, bored, restless, confused, etc. Thus, an evaluation of the data may indicate that the person conducting the lecture or seminar should change the responses given to questions asked by the subject(s) in order to hold the subjects' interest better and provide more effective instruction to the subject(s). In addition, the evaluation may indicate that the conductor should provide different information to the subjects (e.g., raise or lower the sophistication of the presentation to better match the subjects' interests, background, education, topic familiarity, etc.). As another example, the evaluation determined during the step **104** may indicate that a break or interruption is needed so that the subjects can stretch their legs, use the restroom, overcome boredom or fatigue, etc.

The determination made during the step **104** might include comparing the data received during the step **102** with stored records or examples of previously gathered data and associated behaviors or evaluations. The records or examples may be stored in a database. For example, the data collected during the step **102** may be from two or more subjects watching a new television show. The producers of the show may be trying to evaluate which ending to use for the show based on the subjects' reaction to earlier parts of the show. Thus, the step **104** may include determining a course of entertainment or response to provide to a subject. The data received during the step **102** may include heart rate information, respiration rate information, etc. By comparing the data received during the step **102** to data received for the subjects when they watched previous shows, the producers may be able to determine the subject's level of interest during various parts of the current show. Alternatively, by comparing the data received during the step **102** to data from other subjects who watched the same show, the producers may be able to predict what parts of the current show most interest the current subjects.

In some embodiments, determining an evaluation during the step **104** may include determining an environmental condition to alter or select. For example, the data received during the step **102** may indicate that some or all of a group of subjects are cold based on temperature and facial response information collected from the subjects. Thus, the determination made during the step **104** may be to increase the room temperature so as to improve the mood and enjoyment of the subjects.

In some embodiments, the evaluation determined during the step **104** may be or include an aggregating or averaging of data taken or received from multiple subjects or some other manipulation or transformation of the data. For example, the evaluation determined during the step **104** may be or include finding the average heart rate for a group of subjects, the average maximum and/or minimum heart rate for a group of subjects, the average respiration rate for the group of subjects, etc. Thus, determining an evaluation during the step **104** may be or include summarizing, tabulating, charting, collecting, aggregating, averaging, comparing, correlating, etc. some or all of the raw physical characteristic data received during the step **102**. The evaluation may use other information in addition to the data received during the step **102**. As another example, determining an evaluation during the step **104** may be or include determining the total number of people in a room who have moved, yawned, slept, undergone a decrease/increase in heart rate or respiration rate, etc. during a given time period. Thus, determining an evaluation during the step **104** may be

US 6,701,271 B2

7

or include collecting and preparing for later use the raw data received during the step 102 and/or a processed or altered version of the raw data received during the step 102.

In some embodiments, determining an evaluation during the step 104 may be or include determining a pattern in data received during the step 102 from two or more subjects regarding one or more physical characteristics.

During a step 106, a notification of the evaluation determined during the step 104 is provided to at least one device. The notification provided during the step 106 can be sent to more than one device and more than one type of device. The notification may be or include an email message, instant message communication, electronic signal or other communication (e.g., radio or wireless transmission, FTP, HTTP or HTML transmission, XML feed), an audible sound, a visual display, a voice message, etc. The notification may be sent to a variety of devices such as, for example, ear phones, a speaker, a software program operating on a device, an electronic storage device (e.g., hard disk drive, CD-ROM drive), a server, and a user device (e.g., personal digital assistant, computer). The notification may be or include a summary, table, chart, correlation, comparison, graph, etc of some or all of the data received during the step 102. In some embodiments, information regarding the notification or devices the notification is sent to may be stored in, or accessed from, an output or notification database.

As one example of the step 106, assume a speaker is giving a lecture to a group of subjects. Data received from the subjects during the step 102 and evaluated during the step 104 may provide guidance as to what parts of the lecture the group is most interested in. Once the evaluation is determined during the step 104, a notification of the evaluation may be sent to a computer being used by the speaker and displayed on the computer's screen as raw data, as a histogram, chart, graph, etc. Alternatively, the speaker may be wearing an ear phone that can pick up a wireless signal containing the notification. The audible notification may be created by a text-to-speech converter that converts the evaluation determined during the step 104 to a signal that is sent to the speaker's ear phone.

In some embodiments of the method 100, the notification sent during the step 106 may include a suggested course of action based on the evaluation determined during the step 104 or the characteristic data received during the step 102. Thus, the method 100 may include a step during which a suggested course of action is determined. For example, the data received during the step 102 may be indicative of heart rates, blood pressures, fidgetiness or restlessness, etc. for a group of subjects listening to a training lecture. The determination made during the step 104 of the data received during the step 102 may indicate that the group of subjects may be bored or in need of a break. Based on this evaluation and/or characteristic data of the subjects, a determination may be made that a ten-minute break should be given. The notification sent during the step 106 may include the suggestion or another notification may be sent after the step 106 that includes the suggestion.

In some embodiments, the method 100 may include a step of determining a desired action to be taken by a subject or group of subjects. Such a step may be completed before or after the step 102. Thus, the evaluation determined during the step 104 may be directed to getting the subject or group of subjects to initiate, perform or complete the desired action based on the physical characteristic data received during the step 102.

Reference is now made to FIG. 2, where a flow chart 120 is shown which represents the operation of an embodiment

8

of the present invention. The particular arrangement of elements in the flow chart 120 is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method 120 can be implemented by a server or other device.

The method 120 includes the step 102 as previously discussed above. In addition, after the step 102 the method includes a step 122 during which a course of action is determined based on the characteristic data received during the step 102. For example, a storyteller may be telling a series of stories. The data received during the step 102 may be indicative of heart rate, respiration rate, etc. for one or more people in the audience. The data can be used to determine which type of story the audience likes the best, the preferred length of stories, etc. Thus, a course of action may be determined that suggests what type of stories the audience is most interested in and how the long the stories should be for the storyteller. A database may exist of different stories that the storyteller can provide and, as a result, the course of action determined during the step 122 may include a list of stories, and perhaps a desired sequence of stories, that the storyteller can recite to the audience.

As another example, a film may be presented to an audience of people. The film may have a variety of possible endings. Data regarding physical characteristics of the audience members received during the step 102 may be used during the step 122 to determine which specific ending to provide to this particular audience.

The determination made during the step 122 may be performed by comparing the data received during the step 102 to stored records of behaviors and associated physical characteristics.

During a step 124, a notification is provided regarding the course of action determined during the step 122. The step 124 is similar to the step 106 previously discussed above. The notification may be sent to a variety of devices in a variety of formats. The notification provided during the step 124 may be sent in any format or form, including, but not limited to, HTTP, HTML or FTP transmission, XML feed, email message, instant message communication, facsimile transmission, telephone call, electronic signal or communication, etc., and may be sent to any type of device, such as a server or user device (e.g., computer, cellular telephone). In some embodiments, the notification may be sent to different devices depending on the course of action determined during the step 122.

In some embodiments, the method 120 may include a step of determining a desired action to be taken by one or more of a group of subjects, as previously discussed above with regard to the method 100. Thus, the course of action determined during the step 122 may be directed to getting a subject or group of subjects to perform or complete the desired action based on the physical characteristic data received during the step 102 for two or more of the subjects.

Reference is now made to FIG. 3, where a flow chart 140 is shown which represents the operation of an embodiment of the present invention. The particular arrangement of elements in the flow chart 140 is not meant to imply a fixed order to the steps; embodiments of the present invention can be practiced in any order that is practicable. In some embodiments, some or all of the steps of the method 140 can be implemented by a server or other device.

The method 140 includes a step 142 during which a desired action associated with a group of subjects is determined. For example, a motivational speaker may want to get a group of audience members to stand up and applaud and

US 6,701,271 B2

9                                    10

a specific time during a presentation. As another example, a researcher conducting a psychological examination via computer of a group of people may want to have the people communicate with each other at a specific time.

During a step 144, data indicative of one or more physical characteristics of at least one of the subjects is received. The step 144 is similar to the step 102 previously discussed above.

During a step 146, a course of action is determined based on the physical characteristic(s) for which data was received during the step 144. In addition, the course of action may be based on the desired action determined during the step 142. The course of action determined during the step 146 may be selected so as to improve the chances of a subject or group of subjects completing the action determined during the step 142 based on the physical characteristic data received during the step 144 for one or more of the subjects.

During a step 148, a notification regarding the course of action is provided. The step 148 is similar to the step 124 previously discussed above. The notification may be provided in any form or format.

System

Now referring to FIG. 4, an apparatus or system 200 usable with the methods 100, 120 and 140 is illustrated. The apparatus 200 includes one or more sensors 202 that may communicate directly or indirectly with one or more servers, controllers or other devices 204, and one or more user devices 206 that may communicate with a server 204, via a computer, data, or communications network 208. For purposes of further explanation and elaboration of the methods 100, 120 and 140, the method 100, 120 and 140 will be assumed to be operating on, or under the control of, one the servers 204.

In some embodiments, a server 204 may implement or host a Web site. A server 204 can comprise a single device or computer, a networked set or group of devices or computers, a workstation, etc. In some embodiments, a server 204 also may function as a database server, sensor controller, and/or as a user device. The use, configuration and operation of servers will be discussed in more detail below.

The sensors 202 preferably allow data to be obtained from one or more subjects regarding one or more physical characteristics of the subject(s). The sensors 202 may send data regarding physical characteristics to one or more of the servers 204 and or one or more of the user devices 206. In some embodiments, a sensor 202 may be worn, carried or handled by a subject or otherwise in contact with the subject. In other embodiments, a sensor 202 may form part of chair or other piece of furniture a subject is sitting in, resting or standing on, etc. In some embodiments, a sensor 202 may be not be in contact with a subject. For example, a heat sensor (e.g., an infrared signal detector) may be used to detect an amount of heat or energy being created by a subject, even though the sensor is not in contact with the subject.

There are many kinds of sensors that might be used with the apparatus 200. Potential sensors include heart rate monitors, blood pressure monitors, respiration rate monitors, water or perspiration detectors, temperature or heat detectors, pressure sensors, load sensors, motion detectors, acceleration sensors, brain wave monitors, etc.

The user devices 206 allow users to interact with the server 204 and the remainder of the apparatus 200. The user devices 206 also may enable a user or entity to access Web sites, software, databases, sensor data, etc. hosted or operated by, or stored on, the servers 204 and to receive communications or other notifications sent by the servers

204. If desired, the user devices 206 also may be connected to or otherwise in communication with other devices. Possible user devices include a personal computer, portable computer, mobile or fixed user station, workstation, network terminal or server, cellular telephone, kiosk, dumb terminal, personal digital assistant, radio, two-way pager, etc. In some embodiments, a user device 206 also may function as a server 204.

Many different types of implementations or hardware configurations can be used in the system 200 and with the methods 100, 120, 140 and the methods disclosed herein are not limited to any specific hardware configuration for the system 200 or any of its components.

The communications network 208 might be or include the Internet, the World Wide Web, or some other public or private computer, cable, telephone or communications network or intranet, as will be described in further detail below. The communications network 208 illustrated in FIG. 4 is only meant to be generally representative of cable, computer, telephone or other communication networks for purposes of elaboration and explanation of the present invention and other devices, networks, etc. may be connected to the communications network 208 without departing from the scope of the present invention. The communications network 208 can also include other public and/or private wide area networks, local area networks, wireless networks, data communication networks or connections, intranets, routers, satellite links, microwave links, cellular or telephone networks, radio links, fiber optic transmission lines, ISDN lines, T1 lines, DSL, etc. In some embodiments, a user device 206 or sensor 202 may be connected directly to a server 204 or a user device 206 without departing from the scope of the present invention. Moreover, as used herein, communications include those enabled by wired or wireless technology.

In some embodiments, a suitable wireless communication network 208 may include the use of Bluetooth technology, allowing a wide range of computing and telecommunication devices to be interconnected via wireless connections. Specifications and other information regarding Bluetooth technology are available at the Bluetooth Internet site www-.bluetooth.com. In embodiments utilizing Bluetooth technology, some or all of the devices of FIG. 4 may be equipped with a microchip transceiver that transmits and receives in a previously unused frequency band of 2.45 GHz that is available globally (with some variation of bandwidth in different countries). In addition to data, up to three voice channels are available. Connections can be point-to-point or multipoint over a current maximum range of ten (10) meters. Embodiments using Bluetooth technology may require the additional use of one or more receiving stations to receive and forward data from individual sensors 202, user devices 206 or servers 204.

Although three sensors 202, three user devices 206, and two servers 204 are shown in FIG. 4, any number of such devices may be included in the system 200. The devices shown in FIG. 4 need not be in constant communication. For example, a user device or sensor may communicate with a server only when such communication is appropriate or necessary.

Server

Now referring to FIG. 5, a representative block diagram of a server or controller 204 is illustrated. The server 204 may include a processor, microchip, central processing unit, or computer 250 that is in communication with or otherwise uses or includes one or more communication ports 252 for communicating with user devices and/or other devices.

US 6,701,271 B2

**11**

Communication ports may include such things as local area network adapters, wireless communication devices, Bluetooth technology, etc. The server **204** also may include an internal clock element **254** to maintain an accurate time and date for the server **204**, create time stamps for data, notifications and other communications received or sent by the server **204**, etc.

If desired, the server **204** may include one or more output devices **256** such as a printer, infrared or other transmitter, antenna, audio speaker, display screen or monitor, text to speech converter, etc., as well as one or more input devices **258** such as a bar code reader or other optical scanner, infrared or other receiver, antenna, magnetic stripe reader, image scanner, roller ball, touch pad, joystick, touch screen, microphone, computer keyboard, computer mouse, etc.

In addition to the above, the server **204** may include a memory or data storage device **260** to store information, software, databases, notifications and communications, device drivers, sensor data, potential responses or courses of action, etc. The memory or data storage device **260** preferably comprises an appropriate combination of magnetic, optical and/or semiconductor memory, and may include, for example, Random Read-Only Memory (ROM), Random Access Memory (RAM), a tape drive, flash memory, a floppy disk drive, a Zip™ disk drive, a compact disc drive, DVD drive, and/or a hard disk drive. The server **204** might also include ROM **262** and RAM **264** for additional storage and memory.

The processor **250** and the data storage device **260** in the server **204** each may be, for example: (i) located entirely within a single computer or other computing device; or (ii) connected to each other by a remote communication medium, such as a serial port cable, telephone line or radio frequency transceiver. In one embodiment, the server **204** may comprise one or more computers that are connected to a remote server computer for maintaining databases.

A conventional personal computer or workstation with sufficient memory and processing capability may be used as the server **204**. In one embodiment, the server **204** operates as or includes a Web server for an Internet environment. The server **204** preferably is capable of high volume transaction processing, performing a significant number of mathematical calculations in processing communications and database searches. A Pentium™ microprocessor such as the Pentium III™ microprocessor, manufactured by Intel Corporation may be used for the processor **250**. Equivalent processors are available from Motorola, Inc., AMD, or Sun Microsystems, Inc. The processor **250** also may comprise one or more microprocessors, computers, computer systems, etc.

Software may be resident and operating or operational on the server **204**. The software may be stored on the data storage device **260** and may include a control program **266** for operating the server, databases, etc. The control program **266** may control the processor **250**. The processor **250** preferably performs instructions of the control program **266**, and thereby operates in accordance with the present invention, and particularly in accordance with the methods described in detail herein. The control program **266** may be stored in a compressed, uncompiled and/or encrypted format. The control program **266** furthermore includes program elements that may be necessary, such as an operating system, a database management system and device drivers for allowing the processor **250** to interface with peripheral devices, databases, etc. Appropriate program elements are known to those skilled in the art, and need not be described in detail herein.

**12**

The server **204** also may include or store information regarding sensors, evaluations, outputs, etc. For example, information regarding sensors may be stored in a sensor database **268** for use by the server **204**, a user device, or another device or entity. Similarly, information regarding evaluation outputs and output devices might be stored in an output database **270** for use by the server **204**, a user device or another device or entity. Information regarding evaluations may be stored in an evaluation database **272** for use by the server or another device or entity. In some embodiments, a server **204**, a user device, or other device also may store, use, or access a subject database to keep information about one or more subjects, the data being collected from the subjects, subject activities, subject behavior patterns, evaluations, etc.

According to an embodiment of the present invention, the instructions of the control program may be read into a main memory from another computer-readable medium, such as from the ROM **262** to RAM **264**. Execution of sequences of the instructions in the control program causes the processor **250** to perform the process steps described herein. In alternative embodiments, hard-wired circuitry may be used in place of, or in combination with, software instructions for implementation of some or all of the methods of the present invention. Thus, embodiments of the present invention are not limited to any specific combination of hardware and software.

The processor **250**, communication port **252**, clock **254**, output device **256**, input device **258**, data storage device **260**, ROM **262**, and RAM **264** may communicate or be connected directly or indirectly in a variety of ways. For example, the processor **250**, communication port **252**, clock **254**, output device **256**, input device **258**, data storage device **260**, ROM **262**, and RAM **264** may be connected via a bus **272**.

While specific implementations and hardware configurations for servers **204** devices have been illustrated, it should be noted that other implementations and hardware configurations are possible and that no specific implementation or hardware configuration is needed. Thus, not all of the components illustrated in FIG. **5** may be needed for a server implementing the method **100**, method **120**, or the method **140**. Therefore, many different types of implementations or hardware configurations can be used in the system **200** and the methods disclosed herein are not limited to any specific hardware configuration.

User Device

As mentioned above, user device **206** may be any of a number of different types of devices, including, but not limited to a personal computer, portable computer, mobile or fixed user station, workstation, network terminal or server, telephone, beeper, kiosk, dumb terminal, personal digital assistant, facsimile machine, radio, two-way pager, cable set-top box, etc. In some embodiments, a user device might be or include speakers, earphones, a signal detector or receiver, etc. If desired, the user device **206** also may function as a server **204**. In some embodiments, a user device **206** may have the same structure, components or configuration as the server **204** illustrated in FIG. **5**.

Databases

As previously discussed above, in some embodiments a server, user device, or other device may include or access a sensor database for storing or keeping information about sensors. One representative sensor database **300** is illustrated in FIG. **6**.

The sensor database **300** may include a sensor identifier field **302** that may includes codes or other identifying

US 6,701,271 B2

13

information for one or more sensors and a sensor description field **304** that may include information describing the sensors identified in the field **302**, such as information regarding a sensor's name, description, model number, tolerances, specifications, manufacturer, etc. The sensor database **300** also may include a sensor output field **306** that may include information regarding the type, timing and format of the information or other data generated or otherwise provided by the sensors identified in the field **302**. Other or different fields also may be used in the sensor database **300**. For example, a sensor database might include a field that stores information regarding one or more subjects associated with the sensor.

As illustrated in the sensor database **300** of FIG. **6**, the sensor identified as "S-123456" in the field **302** is a heart rate sensor or monitor and provides heart rate data every ten seconds. The sensor identified as "S-867454" in the field **302** is a motion detector or sensor and provides data upon the detection of motion.

As previously discussed above, in some embodiments a server, user device, or other device may include or access an output database for storing or keeping information about information sent and received from one or more servers. One representative output database **400** is illustrated in FIG. **7**.

The output database **400** may include an output identifier field **402** that contains codes or other identifying information regarding recipients of sensor data. The output database **400** also may include an output description field **404** that includes a name, identifier or other descriptive information for the output identifiers identified in the field **402** and a sensor identifier field **406** that identifies one or more sensors associated with the output identifiers provided in the field **402**. Other or different fields also may be used in the output database **400**. In some embodiments a specific output identifier might be associated with a specific evaluation to be determined or a specific course of action to be determined. Thus, the output database **400** might include a field that associates the devices identified in the field **402** with a specific determination being made or to be made.

As illustrated in the output database **400** of FIG. **7**, the output identified as "O-493" in the field **402** is "SERVER C-14" and is associated with the data provided by the sensors "S-123456" and "S-867454". Thus, the data provided by the sensors identified as "S-123456" and "S-867454", or a notification of an evaluation of the data provided by the sensors "S-123456" and "S-867454", is provided to or received by the "SERVER C14", which is identified as "O-493" in the field **402**.

As previously discussed above, in some embodiments a server, user device, or other device may include or access an evaluation database for storing or keeping information about evaluations or courses of action to be determined. One representative evaluation database **500** is illustrated in FIG. **8**.

The evaluation database **500** may include an evaluation identifier field **502** that may include codes or other identifying information for one or more evaluations or courses of action being determined. In addition, the evaluation database **500** also may include a description field **504** that may include information regarding the evaluations or courses of action identified in the field **502**. In some embodiments the evaluation database **500** also may include a sensor identifier field **506** that may contain identifiers or other information regarding the sensor data to be used in the evaluations identified in the field **502**. Other or different fields also may be used in the evaluation database **500**.

As illustrated in the evaluation database **500** of FIG. **8**, the evaluation identified as "E-0234" in the field **502** is an

14

"INTEREST LEVEL DETERMINATION" based on data obtained or received from the sensors "S-123456" and "S-867454". Thus, during the determination during an implementation of the step **104**, an evaluation is made using the data received during the step **102** from the sensors identified as "S-123456" and "S-867454" to determine if a subject or subject exhibits interest at one or more moments or during one or more periods of time.

In some embodiments a specific determination might be associated with a specific output device that will receive a notification of the determination. Thus, the evaluation database **500** might include a field that associates the evaluations identified in the field **502** with one or more devices that will receive information or other notifications regarding the evaluations.

The methods of the present invention may be embodied as a computer program developed using an object oriented language that allows the modeling of complex systems with modular objects to create abstractions that are representative of real world, physical objects and their interrelationships. However, it would be understood by one of ordinary skill in the art that the invention as described herein could be implemented in many different ways using a wide range of programming techniques as well as general-purpose hardware systems or dedicated controllers. In addition, many, if not all, of the steps for the methods described above are optional or can be combined or performed in one or more alternative orders or sequences without departing from the scope of the present invention and the claims should not be construed as being limited to any particular order or sequence, unless specifically indicated.

Each of the methods described above can be performed on a single computer, computer system, microprocessor, etc. In addition, two or more of the steps in each of the methods described above could be performed on two or more different computers, computer systems, microprocessors, etc., some or all of which may be locally or remotely configured. The methods **100**, **120** and **140** can be implemented in any sort or implementation of computer software, program, sets of instructions, code, ASIC, or specially designed chips, logic gates, or other hardware structured to directly effect or implement such software, programs, sets of instructions or code. The computer software, program, sets of instructions or code can be storable, writeable, or savable on any computer usable or readable media or other program storage device or media such as a floppy or other magnetic or optical disk, magnetic or optical tape, CD-ROM, DVD, punch cards, paper tape, hard disk drive, Zip™ disk, flash or optical memory card, microprocessor, solid state memory device, RAM, EPROM, or ROM.

Although the present invention has been described with respect to a preferred embodiment thereof, those skilled in the art will note that various substitutions may be made to those embodiments described herein without departing from the spirit and scope of the present invention.

The words "comprise," "comprises," "comprising," "include," "including," and "includes" when used in this specification and in the following claims are intended to specify the presence of stated features, elements, integers, components, or steps, but they do not preclude the presence or addition of one or more other features, elements, integers, components, steps, or groups thereof.

The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

    1. A method for providing feedback, comprising:

        receiving first data indicative of a physical characteristic of a first subject from a first device associated with said

US 6,701,271 B2

15

first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said evaluation is representative of a state of both said first subject and said second subject; and

providing a notification regarding said evaluation to a device.

2. The method of claim 1, wherein said physical characteristic of said first subject includes at least one of the following:

said first subject's heart rate;

said first subject's blood pressure;

said first subject's blood sugar level;

said first subject's posture;

said first subject's weight;

said first subject's height;

said first subject's temperature;

said first subject's respiration rate;

a facial response of said first subject;

a galvanic skin response of said first subject;

a pheromone associated with said first subject;

a brain wave pattern of said first subject;

an odor generated by said first subject;

motion of said first subject;

a change in motion of said first subject;

a change in said first subject's heart rate;

a change in said first subject's blood pressure;

a change in said first subject's blood sugar level;

a change in said first subject's posture;

a change in said first subject's temperature;

a change in said first subject's respiration rate;

a change in a facial response of said first subject;

a change in a galvanic skin response of said first subject;

a change in a pheromone associated with said first subject;

a change in a brain wave pattern of said first subject; and

a change in an odor generated by said first subject.

3. The method of claim 1, wherein said receiving first data indicative of a physical characteristic of a first subject includes at least one of the following:

receiving data from at least one observer of said first subject regarding at least one physical characteristic of said first subject;

receiving data indicative of at least one physical characteristic from at least one sensor worn by said first subject; and

receiving data indicative of at least one physical characteristic from at least one sensor associated with said first subject.

4. The method of claim 1, further comprising:

receiving data indicative of one or more physical characteristics for each of a plurality of subjects, wherein said plurality of subjects includes said first subject and said second subject.

5. The method of claim 4, further comprising:

determining a pattern in said data indicative of one or more physical characteristics for each of a plurality of subjects.

6. The method of claim 5, further comprising:

providing a notification regarding said pattern to said device.

16

7. The method of claim 1, wherein said determining an evaluation of said first data and said second data includes at least one of the following:

determining an aggregation of data indicative of a physical characteristic for each of a plurality of subjects, said plurality of subjects including said first subject and said second subject and at least one other subject;

determining an averaging of data indicative of a physical characteristic for each of a plurality of subjects, said plurality of subjects including said first subject and said second subject and at least one other subject;

computing a result based on a function of said first data and said second data;

comparing said physical characteristic of said first subject with a stored record of behavior;

comparing said physical characteristic of said second subject with a stored record of behavior;

determining a prediction regarding at least one action that might be taken by at least one of said first subject and said second subject;

determining a risk of violence associated with at least one of said first subject and said second subject;

determining a trading propensity associated with at least one of said first subject and said second subject;

determining an action that may be taken by at least one of said first subject and said second subject;

determining an action that is desired to be taken by at least one of said first subject and said second subject;

determining a course of entertainment to provide to at least one of said first subject and said second subject;

determining probability associated with an action that might be taken by said first subject;

determining at least one response to provide at least one of said first subject and said second subject;

determining at least one option to offer at least one of said first subject and said second subject;

selecting entertainment to provide at least one of said first subject and said second subject;

selecting information to provide at least one of said first subject and said second subject;

selecting at least one environmental condition for at least one of said first subject and said second subject; and

altering at least one environmental condition for at least one of said first subject and said second subject.

8. The method of claim 1, further comprising:

determining which of a plurality of devices to provide said notification.

9. The method of claim 8, further comprising:

identifying said plurality of devices.

10. The method of claim 1, wherein said device includes at least one of the following:

ear phones;

a speaker;

a software program;

a visual display device;

an electronic storage device;

a server; and

a user device.

11. The method of claim 1, wherein said notification includes at least one of the following:

an evaluation of said first data and said second data;

an email message;

US 6,701,271 B2

17

a visual display;

an electronic signal;

an audible sound; and

a voice message.

12. The method of claim 1, wherein said evaluation includes at least one of the following:

an aggregation of data indicative of a physical characteristic for each of a plurality of subjects;

an averaging of data indicative of a physical characteristic for each of a plurality of subjects;

a selection of a behavior associated with said physical characteristic of said first subject;

a selection of a behavior associated with said physical characteristic of said second subject;

a comparison of said physical characteristic of said first subject with a stored record of behavior;

a prediction regarding at least one action that might be taken by at least one of said first subject and said second subject;

a determination of a risk of violence associated with at least one of said first subject and said second subject;

a determination of a trading propensity associated with at least one of said first subject and said second subject;

a determination of a course of action;

a determination of a course of entertainment;

a determination of a probability associated with a course of action that might be taken by at least one of said first subject and said second subject;

a determination of at least one response to provide at least one of said first subject and said second subject;

a determination of a least one response to subject said first subject to;

a determination of a least one response to subject said first subject to;

a determination of at least one option to offer at least one of said first subject and said second subject;

a selection of entertainment;

a selection of information; and

a selection of at least one environmental condition.

13. The method of claim 1, further comprising:

receiving a notification regarding a plurality of options.

14. The method of claim 13, further comprising:

selecting one of said plurality of options based, at least in part, on said evaluation.

15. The method of claim 14, further comprising:

selecting said device based, at least in part, on said selecting one of said plurality of options.

16. The method of claim 13, wherein said device is associated with at least one of said plurality of options.

17. The method of claim 1, further comprising:

determining a course of action based on said first data and said second data.

18. The method of claim 17, further comprising:

providing a notification based on said course of action.

19. The method of claim 1, further comprising:

determining a course of action based on said evaluation.

20. The method of claim 19, further comprising:

providing a notification based on said course of action.

21. The method of claim 1, wherein said determining an evaluation of said first data and said second data includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject.

18

22. The method of claim 21, wherein said determining an evaluation includes determining a course of action based on said record of behavior.

23. The method of claim 1, further comprising:

determining a desired course of action and wherein said determining an evaluation of said first data and said second data includes determining an action based, at least in part on said data and said desired course of action.

24. The method of claim 1, wherein said physical characteristic of said first subject is the same as said physical characteristic of said second subject.

25. The method of claim 1, wherein said physical characteristic of said first subject is different from said physical characteristic of said second subject.

26. The method of claim 1, wherein said physical characteristic of said first subject is indicative of a response of said first subject to a first presentation.

27. The method of claim 26, wherein said physical characteristic of said second subject is indicative of a response of said second subject to a second presentation.

28. The method of claim 26, wherein said physical characteristic of said second subject is indicative of a response of said second subject to said first persentation.

29. The method of claim 1, wherein said first and second devices are the same.

30. The method of claim 1, wherein said first device is associated with more than one subject.

31. A method for providing feedback, comprising:

receiving data indicative of a physical characteristic of each of a plurality of subjects, wherein said physical characteristics of said subjects are indicative of responses of said subjects to a presentation;

determining a desired course of action associated with said plurality of subjects based, at least in part, on said data indicative of a physical characteristic of each of said plurality of subjects; and

providing a notification based, at least in part, on said course of action.

32. The method of claim 31, wherein said determining a course of action based on said data indicative of a physical characteristic of each of a plurality of subjects includes one of the following:

determining a course of action based, at least in part, on said data indicative of a physical characteristic of each of a plurality of subjects and a desired action that can be taken by at least one of said plurality of subjects;

determining a course of action based, at least in part, on said data indicative of a physical characteristic of each of a plurality of subjects and a desired action that can be taken by said plurality of subjects; and

determining at least one behavior associated with said physical characteristic.

33. The method of claim 31, further comprising:

determining a desired action to be taken by said plurality of subjects.

34. The method of claim 31, wherein said plurality of subjects includes a first subject and a second subject and wherein said data indicative of a physical characteristic of each of a plurality of subjects includes data indicative of a characteristic of said first subject and data indicative of a characteristic of said second subject.

35. The method of claim 31, wherein said characteristic of said first subject is different from said characteristic of said second subject.

US 6,701,271 B2

**19**

**36**. A method for providing feedback, comprising:

determining a desired action associated with a group of subjects;

receiving data indicative of a physical characteristic of at least one of said group of subjects, wherein said physical characteristic of said at least one of said group of subjects is indicative of a response of said at least one of said group of subjects to a presentation;

determining a course of action expected to lead to said desired action based, at least in part, on said physical characteristic and said desired action; and

providing a notification based on said course of action.

**37**. A system for facilitating feedback, comprising:

a memory;

a communication port; and

a processor connected to said memory and said communication port, said processor being operative to:

    receive first data indicative of a physical characteristic of a first subject and second data indicative of a physical characteristic of a second subject;

    determine an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

    provide a notification regarding said evaluation to device.

**38**. A computer program product in a computer readable medium for using feedback, comprising:

    first instructions for obtaining receiving first data representative of a physical characteristic of a first subject and second data representative of a physical characteristic of a second subject;

**20**

    second instructions for preparing an evaluation of said first data and said second data, wherein said evaluation is representative of a state associated with both said first subject and said second subject; and

    third instructions for sending third data indicative of said evaluation of said first data and said second data to a device.

**39**. A method for providing feedback, comprising:

receiving first data indicative of a physical characteristic of a first subject from a first device associated with said first subject and second data indicative of a physical characteristic of a second subject from a second device associated with said second subject;

determining an evaluation of said first data and said second data, wherein said determining said evaluation includes comparing said physical characteristic of said first subject to at least one record of behavior associated with said physical characteristic of said first subject; and

providing a notification regarding said evaluation to a device.

**40**. The method of claim **39**, wherein said determining an evaluation includes determining a course of action based on said at least one record of behavior.

**41**. The method of claim **39**, wherein said determining said evaluation includes comparing said physical characteristic of said second subject to at least one record of behavior associated with said physical characteristic of said second subject.

\* \* \* \* \*

## CERTIFICATE OF SERVICE

I, Tyson K. Hottinger, counsel for appellant Icon Health & Fitness, Inc., hereby certify that on this 6th day of June, 2017, the foregoing **BRIEF OF APPELLANT ICON HEALTH & FITNESS, INC.** was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the following counsel of record, by means of electronic mail:

John P. Moran
   Email: John.Moran@hklaw.com
Anthony J. Fuga
   Email: Anthony.Fuga@hklaw.com
Holland & Knight, LLP
131 S. Dearborn, 30th Floor
Chicago, IL 60611
Firm: 312-715-5771
Fax: 312-578-6666

*Counsel for Defendants-Appellees*
*Polar Electro Oy and Polar Electro Inc.*

/s/ Tyson K. Hottinger
TYSON K. HOTTINGER

# CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 7,379 words.

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

DATED: June 6, 2017                  /s/ *Tyson K. Hottinger*

LARRY R. LAYCOCK
DAVID R. WRIGHT
TYSON K. HOTTINGER
**MASCHOFF BRENNAN PLLC**
201 South Main Street, Suite 600
Salt Lake City, Utah 84111
Telephone: (801) 297-1850

*Attorneys for Plaintiff-Appellant*